1   SARAH PREIS (D.C. Bar No. 997387)
2   (*Pro Hac Vice application pending*)
    sarah.preis@cfpb.gov
3   Tel.: (202) 435-9318
    JESSE STEWART (N.Y. Bar No. 5145495)
4   (*Pro Hac Vice application pending*)
5   jesse.stewart@cfpb.gov
    Tel.: (202) 435-9641
6   1700 G Street, NW
7   Washington, DC 20552
    Fax: (202) 435-5471
8

9   LEANNE E. HARTMANN (CA Bar No. 264787) – Local Counsel
    leanne.hartmann@cfpb.gov
10  301 Howard Street, Suite 1200
11  San Francisco, CA 94105
    Tel: (415) 844-9787
12  Fax: (415) 844-9788
13

14  *Attorneys for Plaintiff*
    *Bureau of Consumer Financial Protection*
15

16                   **UNITED STATES DISTRICT COURT**

17            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

18                        **SOUTHERN DIVISION**

19

| 20 | Bureau of Consumer Financial Protection, et al. | ) | CASE NO. |
|---|---|---|---|
| 21 | | ) | **MEMORANDUM OF POINTS AND** |
| 22 | Plaintiffs, | ) | **AUTHORITIES IN SUPPORT OF** |
| | | ) | **PLAINTIFF'S EX PARTE** |
| 23 | | ) | **APPLICATION FOR TEMPORARY** |
| 24 | vs. | ) | **RESTRAINING ORDER WITH** |
| | | ) | **ASSET FREEZE AND OTHER** |
| 25 | | ) | **EQUITABLE RELIEF AND ORDER** |
| 26 | Consumer Advocacy Center Inc., d/b/a | ) | **TO SHOW CAUSE WHY** |
| | Premier Student Loan Center, et al. | ) | **PREMINARY INJUNCTION** |
| 27 | | ) | **SHOULD NOT ISSUE (FILED** |
| 28 | | ) | **UNDER TEMPORARY SEAL)** |

ORIGINAL

i

# TABLE OF AUTHORITIES

## Cases

*Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837 (9th Cir. 2009).............................. 29

*CFPB v. D & D Mktg.*, 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016)............................ 23

*CFPB v. Gordon*, 819 F.3d 1179 (9th Cir. 2016)........................................... 16, 20

*CFPB v. Seila Law LLC*, 923 F.3d 680 (9th Cir. 2019)....................................... 12

*CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-0859-RWS, 2019 WL
    1295004 (N.D. Ga. Mar. 21, 2019)....................................................... 23

*FTC v. Alliance Document Prep.*, 296 F. Supp. 3d 1197 (C.D. Cal 2017)....................... 17

*FTC v. Alliance Document Prep., LLC*, No. 2:17-cv-07048-SJO-KS, Slip. Op. (C.D. Cal.
    Sept. 28, 2017) ................................................................... 27, 29

*FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067 (N.D. Cal. 2018)..................... 19, 20

*FTC v. Am. Tax Relief LLC*, 751 F. Supp. 2d 972 (N.D. Ill. 2010) ................................. 18

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989)................................. 28

*FTC v. Consumer Defense LLC*, 926 F.3d 1208 (9th Cir. June 2019)............................ 13

*FTC v. Consumer Health Ben. Assoc.*, 2011 WL 13254502 (E.D.N.Y. Oct. 12, 2011)... 23

*FTC v. Cyberspace.com LLC,* 453 F.3d 1196 (9th Cir. 2006)................................. 16

*FTC v. Data Med. Capital, Inc.*, 2009 WL 2059442 (C.D. Cal. July 13, 2009)............... 18

*FTC v. Digital Altitude LLC*, No. 2:18-cv-00729, Slip Op. (C.D. Cal. Feb. 1, 2018)...... 29

*FTC v. EMA Nationwide, Inc.* 767 F.3d 611 (6th Cir. 2014)................................. 16, 18

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ................................. 21

*FTC v. Johnson*, 156 F. Supp. 3d 1202 (D. Nev. 2015)....................................... 21

*FTC v. Johnson,* 96 F. Supp. 3d 1110 (D. Nev. 2015)....................................... 18

*FTC v. Lake*, 181 F. Supp. 3d 692 (C.D. Cal. 2016)......................................... 22

*FTC v. Lucas*, 483 F. App'x 378 (9th Cir. 2012)........................................... 16

*FTC v. MacGregor*, 360 Fed. Appx. 891 (9th Cir. 2009)..................................... 20

*FTC v. Publ'g Clearing House*, 104 F.3d 1168 (9th Cir. 1997) .............................. 20

*FTC v. Universal Premium Servs., Inc.*, 2006 WL 8442134 (C.D. Cal. Mar. 14, 2006) . 27

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

1  *FTC v. Warner Communications, Inc.*, 742 F.2d 1156 (9th Cir. 1984) ............................. 24

2  *FTC v. Wealth Educators, Inc.*, 2015 WL 11439063 (C.D. Cal. Apr. 6, 2015) ......... 28, 29

3  *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ................................ 13, 24

4  *In re Consumer Advocacy Center Inc.*, 19-10655 (Bankr. S.D. Fla.) ............................. 27

5  *In re Zermeno-Gomez*, 868 F.3d 1048 (9th Cir. 2017) ................................................ 12

6  *Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) .................................................. 27

7  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) .................................................. 23

8  *SEC v. Apuzzo*, 698 F.3d 204 (2d Cir. 2012) ............................................................ 23

9  *SEC v. Cavanaugh*, 155 F.3d 129 (2d Cir. 1998) ....................................................... 27

10  *SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998) .......................................................... 26

11  *SEC v. Hickey*, 322 F.3d 1123 (9th Cir. 2003) ..................................................... 27, 28

12  *SEC v. I-Cubed Domains, LLC*, 664 Fed. App'x. 53 (2d Cir. 2016) ......................... 27, 28

13  *SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272 (9th Cir. 1990) .................................... 28

14  *SEC v. JSG Capital Inv., LLC*, 2017 WL 3579570 (N.D. Cal. June 30, 2017) ............... 26

15  *SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980) ....................................................... 26

16  *Seila Law LLC v. CFPB*, No. 19-7, 2019 WL 4528136 (U.S. Sept. 17, 2019) ............... 12

17  *Solis v. Matheson*, 563 F.3d 425 (9th Cir. 2009) ....................................................... 29

18  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832 n.7 (9th Cir.

19      2001) .................................................................................................................. 13

**Statutes**

12 U.S.C. § 5481 ..................................................................................................... 14, 15

12 U.S.C. § 5491 ....................................................................................................... 2, 12

12 U.S.C. § 5536 ..................................................................................................... 14, 22

12 U.S.C. § 5564 ....................................................................................................... 2, 12

12 U.S.C. § 5565 ............................................................................................................ 13

15 U.S.C. §§ 6101-6108 .............................................................................................. 14

15 U.S.C. § 6105 ......................................................................................................... 2, 14

20 U.S.C. § 1097 ............................................................................................................ 20

iii

**Other Authorities**

U.S. Department of Education, Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last accessed Oct. 18, 2019) .............................. 7

**Regulations**

16 C.F.R. § 310 ................................................................................ 14, 15, 16, 22

34 C.F.R. § 685.209 ................................................................................................ 7

34 C.F.R. § 685.219 ................................................................................................ 7

34 C.F.R. § 685.221 ................................................................................................ 7

Amended Telemarketing Sales Rule Statement of Basis and Purpose, 75 Fed. Reg. 48458 (Aug. 10, 2010) ...................................................................................... 16, 25

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................... 6

   A.  Federal Student Loan Programs ................................................................ 6

   B.  Defendants' Business Practices ................................................................ 7

   C.  Evasion of Law Enforcement and Ongoing Consumer Harm .................... 10

ARGUMENT ..................................................................................................... 12

   A.   The Bureau is likely to succeed on the merits. ........................................ 14

     1.   Defendants violate the TSR by collecting advance fees. ...................... 15

     2.   Defendants' misrepresentations are deceptive under the CFPA and material misrepresentations under the TSR. ....................................................... 16

     3.  The Individual Defendants are liable. ................................................... 20

   B.  The balance of equities weigh in the Bureau's favor. .............................. 23

   C.  Defendants' practices warrant ancillary relief. ....................................... 26

     1.   An asset freeze and order for an accounting are necessary to prevent dissipation of assets and to preserve the status quo. ........................................ 27

     2.   The Court should appoint a temporary receiver to secure Defendants' and Relief Defendants' property. ..................................................................... 29

     3.  The Court should order immediate access to Defendants' premises and limited expedited discovery. ....................................................................................... 29

CONCLUSION ................................................................................................ 300

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

# INTRODUCTION

Defendants have engaged in an illegal federal-student-loan debt-relief operation that has resulted in tens of millions of dollars in harm to tens of thousands of consumers nationwide. The corporate Defendants are an interconnected web of student-loan debt-relief companies (SLDR companies) who lure borrowers into paying significant illegal upfront fees by deceptively claiming that consumers qualify for loan forgiveness or lower monthly payments that the companies can obtain on consumers' behalf. Once consumers are lured in, unbeknownst to them, the SLDR companies submit forbearance requests on their behalf (that rarely benefit consumers). While the loans are in forbearance, consumers make payments to the SLDR companies, which many consumers thought were going to pay down their loans. The SLDR companies then routinely submit false information to federal-student-loan servicers about consumers' income, family size, or marital status in an effort to obtain modified monthly payments that are artificially low. These practices are made possible by the actions of the individual Defendants, Albert Kim, Kaine Wen, and Tuong Nguyen, each of whom facilitated the companies' illegal acts. The Bureau of Consumer Financial Protection (Bureau) requests that this Court halt these illegal practices.

As shown below, a temporary restraining order (TRO), asset freeze, and other injunctive relief are appropriate here. The Bureau is likely to succeed on the merits given the significant volume of evidence showing that Defendants violated the Telemarketing Sales Rule (TSR) and the Consumer Financial Protection Act of 2010 (CFPA). And the equities favor granting the Bureau's requested relief. Facing scrutiny from law enforcement and state regulators, Defendants shifted the debt-relief operation to additional corporate entities and drained assets out of the original debt-relief company, Consumer Advocacy Center (CAC). CAC then filed for bankruptcy, claiming it had ceased operations. In fact, CAC had transferred millions of dollars to other companies owned or controlled by the individual Defendants. The debt-relief operation has continued, collecting over $71 million from consumers since 2016, more than $52 million

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

of which were collected after CAC began shifting its operations to other entities controlled by the individual Defendants. In light of these and other efforts to evade law enforcement and continue harming consumers, the equities favor the requested relief.

The Bureau seeks an *ex parte* TRO to (1) enjoin Defendants' illegal practices; (2) freeze the assets of Defendants and the Relief Defendants; (3) appoint an independent temporary receiver over the corporate Defendants (with an appropriate exclusion of any assets within the purview of CAC's bankruptcy estate); (4) grant the temporary receiver immediate access to Defendants' business premises; and (5) allow the Bureau to seek limited expedited discovery. The Bureau further respectfully requests that the Court issue an order to show cause why a preliminary injunction should not issue.

## PARTIES

### A.    Plaintiff

The Bureau is an independent agency charged with enforcing the CFPA and other federal consumer-financial laws. 12 U.S.C. § 5491(a). It has the authority to bring civil actions against persons violating federal consumer-financial laws and to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a). These consumer-financial-protection laws include the CFPA's prohibition of unfair, deceptive, and abusive practices and the TSR. 15 U.S.C. § 6105(d).

### B.    Defendants

**Consumer Advocacy Center Inc.** (CAC) is a California corporation formed on August 6, 2014, that has held itself out as doing business at 173 Technology Drive, Suite 202, Irvine, CA 92618, among other locations.[1] CAC has done business as Premier Student Loan Center in offering, selling, and performing student-loan debt-relief services.[2]

---

[1] Schneider Decl., Pl. Ex. 66, pp. 1837 ¶7, 1853 tbl. 1; Pl. Ex. 1, p. 2.
[2] Schneider Decl., Pl. Ex. 66, pp. 1836 ¶5(a), 1838 ¶9, 1839 ¶19, 1850-52 ¶¶53-56; Pl. Ex. 9, pp. 41-45; Pl. Ex. 21.

1    **True Count Staffing Inc.** (True Count) registered as a California corporation on

2    February 13, 2017, and has held itself out as doing business at 173 Technology Dr., Suite

3    202, Irvine, CA 92618 and 8 Hughes Parkway, Irvine, CA 92618, among other

4    locations.[3] True Count has done business as SL Account Management (SLAM) in

5    offering, selling, and performing student-loan debt-relief services.[4]

6    **Prime Consulting LLC** (Prime) is a Wyoming limited-liability company that

7    registered with the California Secretary of State on April 25, 2018, and has held itself out

8    as doing business at 15261 Laguna Canyon Road, Suite 200, Irvine, CA 92618 and 2522

9    Chambers Rd, Ste. 100, Tustin, CA 92780, among other locations.[5] Prime has done

10   business as, among others, Financial Preparation Services (FPS).[6]

11   **Albert Kim (a/k/a Albert King)** is CAC's primary owner and manager.[7]

12   Defendant Kim is an account signatory on bank accounts held by CAC, True Count, and

13   Relief Defendant Infinite Management.[8] Defendant Kim has also personally responded to

14   consumer complaints on CAC's behalf.[9]

15   **Kaine Wen (a/k/a Wenting Kaine Dai, Wen Ting Dai)** is True Count's primary

16   owner and founder and has also been an owner, general counsel, and manager of CAC.[10]

17   Defendant Wen incorporated True Count and has served as its CEO, director, partner, and

---

[3] Schneider Decl., Pl. 66, pp. 1837 ¶7, 1853 tbl. 1; Pl. Ex. 2, pp. 5-8.

[4] *See, e.g.,* Schneider Decl., Pl. Ex. 66, pp. 1836 ¶5(c), 1838 ¶9; Pl. Ex. 10, pp. 46-57.

[5] Schneider Decl., Pl. Ex. 66, pp.1837 ¶8, 1853 tbl. 1; Evers Decl, Pl. Ex. 63, pp. 1709 ¶13, att. D, 1711 ¶19, att. F; Pl. Ex. 5, pp. 18-22.

[6] Schneider Decl., Pl. Ex. 66, pp. 1836 ¶5(c), 1838 ¶9; Pl. Ex. 11, pp. 58-59.

[7] *See, e.g.,* Pl. Ex. 1, pp. at 2-3.

[8] Heidari Decl., Pl. Ex. 65, pp. 1822-23 ¶3; Schneider Decl., Pl. Ex. 66, p. 1845 ¶32; Pl. Ex. 24, pp. 258, 265, 269, 280, 286, 328.

[9] Marin Decl., Pl. Ex. 50, pp. 895 ¶6, 906, 912, 938, 945.

[10] Schneider Decl., Pl. Ex. 66, pp. 1845 ¶33, 1847 ¶35, 1847 ¶38, 1847 ¶39; Pl. Ex. 2, pp. 5-7; Pl. Ex. 25, pp. 403-11, 380; Pl. Ex. 27, pp. 419-21; Pl. Ex. 30, pp. 488-89, 507, 536-54; Pl. Ex. 31, pp. 605-606.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

president.[11] He has been an account signatory on bank accounts held by CAC, True Count, and Relief Defendant Hold the Door.[12]

**Defendant Tuong Nguyen (a/k/a Tom Nelson)** served as CAC's controller and as True Count's secretary.[13] He has been an account signatory on accounts held by CAC, True Count, and Relief Defendant TN Accounting.[14] He has been responsible for paying CAC's bills, reviewing company expenditures, and handling merchant accounts for CAC and True Count.[15] Nguyen at times handled consumer complaints for CAC and True Count.[16]

**Relief Defendant Infinite Management Corporation** (aka Infinite Management Solutions Inc.) (Infinite Management) registered as a California corporation on September 8, 2016, and has held itself out as doing business at 9228 City Lights Drive, Aliso Viejo, CA, 92656.[17] Defendant Kim is identified as Infinite Management's registered agent and sole corporate officer, and he is the sole signatory on a bank account belonging to it.[18] Infinite Management has received over $1.8 million from CAC and True Count, hundreds of thousands of which were used to pay Kim's personal expenses.[19]

**Relief Defendant Hold the Door Corp.** (Hold the Door) registered as a California corporation on December 30, 2016, and listed its address as 777 E. Sierra Madre Ave,

---

[11] Pl. Ex. 2, pp. 5-7.

[12] Heidari Decl., Pl. Ex. 65, pp. 1822-23 ¶3; Pl. Ex. 23, pp. 251-54; Pl. Ex. 24, pp. 259, 265, 269, 271, 288, 329.

[13] Pl. Ex. 24, p. 258; Pl. Ex. 31, pp. 610-12.

[14] Heidari Decl., Pl. Ex. 65, pp. 1822-23 ¶3; Pl. Ex. 24, pp. 260, 263, 280, 286, 327.

[15] Kim 341 3/27 Tr., Pl. Ex. 47-2, pp. 846 at 9:15-23, 860 at 65:3-13; Camp Tr., Pl. Ex. 33, pp. 663d at 29:10-19, 698a at 150:2-6; Heidari Decl., Pl. Ex. 65, pp. 1823-24 ¶4; Pl. Ex. 25, pp. 339-351; Pl. Ex. 30, p. 576.

[16] *See* Simmons Decl., Pl. Ex. 64, pp. 1800 ¶11, 1804-07; Marin Decl., Pl. Ex. 50, pp. 895 ¶6, 914-15, 916-17, 919-20, 921-22, 936-37; Liming Decl., Pl. Ex. 58, p. 1647 ¶20.

[17] Pl. Ex. 6, pp. 23-30.

[18] Pl. Ex. 6, pp. 26-27; Heidari Decl., Pl. Ex. 65, pp. 1822-23 ¶3: Pl. Ex. 24, p. 328.

[19] Heidari Decl., Pl. Ex. 65, pp. 1828-29 ¶¶13(d), 14(c), 16(a), p. 1833, tbl. 1.

4

1  Azusa, CA 91702.[20] Wen incorporated Hold the Door and is its sole corporate officer.[21]

2  He is the sole signatory on a bank account belonging to it.[22] Hold the Door has received

3  over $1.5 million from CAC and True Count, hundreds of thousands of which were used

4  to pay Defendant Wen's personal expenses.[23]

5        **Relief Defendant TN Accounting Inc.** (TN Accounting) is a California

6  corporation that filed its Articles of Incorporation on February 8, 2017, and listed its

7  principal place of business address as 1704 S. Granada Ave, Alhambra, CA 91801.[24]

8  Nguyen is TN Accounting's president and sole corporate officer, and he is the sole

9  signatory on a bank account belonging to it.[25] TN Accounting has received over $300,000

10  from CAC and True Count, tens of thousands of which were used to pay Defendant

11  Nguyen's personal expenses.[26]

12      **C.    Common Enterprise**

13        Together, CAC, True Count, and Prime have acted as a common enterprise

14  controlled by the individual Defendants.[27] Initially, CAC offered, sold, and performed the

15  debt-relief services.[28] In March 2018, CAC transferred its processing department, which

16  handled preparing consumers' loan-adjustment applications and the collection of

17

18

19

---

20  [20] Pl. Ex. 3, p. 9.

21  [21] Pl. Ex. 3, pp. 9-11.

[22] Heidari Decl., Pl. Ex. 65, pp. 1822-23 ¶3; Pl. Ex. 24, p. 329.

22  [23] Heidari Decl., Pl. Ex. 65, pp. 1828-29 ¶¶13(c), 14(b), 16(b), p. 1833 tbl. 1.

23  [24] Pl. Ex. 7, pp. 33, 35.

[25] Pl. Ex. 7, pp. 33-35; Heidari Decl., Pl. Ex. 65, pp. 1822-23 ¶3; Pl. Ex. 24, p. 327.

24  Public records indicate that Defendant Nguyen is not a licensed accountant in California.
*See* Schneider Decl., Pl. Ex. 66, pp. 1840 ¶21.

25  [26] Heidari Decl., Pl. Ex. 65, pp. 1828-29 ¶¶13(e), 14(d), 16(c), p. 1833 tbl. 1.

26  [27] *See* Schneider Dec., Pl. Ex. 66, pp. 1835-39, 1853-57; Camp Tr., Pl. Ex. 33, pp. 660-61
at 14:23-15:25, 663b-63c at 25:15-26:7, 664-68 at 33:6-39, 671-72 at 44:15-45:13;

27  Ortuno Tr., Pl. Ex. 34, pp. 709f-710 at 24:16-26:4; Heidari Decl., Pl. Ex. 65, pp. 1822-24
¶¶3-4.

28  [28] Schneider Decl., Pl. Ex. 66, pp. 1838 ¶13; Pl. Ex. 12; Pl. Ex. 21; Pl. Ex. 30, p. 498.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

consumers' payments, to True Count.[29] By September 2018, CAC had fully transferred its sales department to Prime, which is owned by Le Ho (aka Calvin Ho), True Count's operations manager.[30] Not long after that, CAC guaranteed a lease agreement for Prime's new office space.[31]

Since that time, True Count has continued to collect payments from legacy CAC consumers and from new consumers who Prime enrolled.[32] The companies share a customer-relationship-management system (CRM) to store consumers' information,[33] have employed the same personnel, including high-level managers,[34] and have used nearly identical client agreements.[35] Kim and Wen control the companies, and Kim, Wen, and Nguyen have managed their finances.[36]

## STATEMENT OF FACTS

### A.    Federal Student Loan Programs

The Department of Education (DOE) offers federal-student-loan repayment and forgiveness programs to borrowers. One program that may result in lower monthly payments and eventual loan forgiveness is the income-driven repayment (IDR)

---

[29] Camp Tr., Pl. Ex. 33, pp. 668-69 at 39:22-40:1; Kim 341 05/13 Tr., Pl. Ex. 47-3, p. 871 at 38:15-40:19; Pl. Ex. 43, pp. 806-807; Pl. Ex. 44, p. 809 ¶5; Pl. Ex. 30, pp. 536-49.
[30] *See* Pl. Ex. 44, p. 809 ¶5; Camp Tr., Pl. Ex. 33, pp. 662a at 17:6-12, 667-668 at 38:3-39:10; Pl. Ex. 5, pp. 18-22.
[31] Evers Decl., Pl. Ex. 63, pp. 1712 ¶20, 1793-96.
[32] *See* Heidari Decl., Pl. Ex. 65, pp. 1826-27 ¶¶9-10, 12, p. 1831 ¶22; Pl. Ex. 30, pp. 536-549.
[33] Camp Tr., Pl. Ex. 33, pp. 699-700 at 165:2-166:17; Pl. Ex. 44, pp. 808-809 at ¶¶3-5; Pl. Ex. 32, pp. 650-51; *see also* Camp Tr., Pl. Ex. 33, pp. 671-72 at 44:15-45:2.
[34] Camp Tr., Pl. Ex. 33, pp. 660-61 at 14:20-15:25, 671-72 at 44:15-45:2; Heidari Decl., Pl. Ex. 65, p. 1831 ¶21.
[35] Schneider Decl., Pl. Ex. 66, p. 1835 ¶4(e); Camp Tr., Pl. Ex. 33, pp. 660-61 at 14:20-15:25.
[36] *See, e.g.*, Heidari Decl., Pl. Ex. 65, pp. 1822-24 ¶¶3-4. It also appears that Wen is an account signatory for Prime. *See* Devers Decl., Pl. Ex. 63, p. 1712 ¶¶21-22, p. 1798. At a minimum, Kim, Wen, and Nguyen were signatories on CAC bank accounts that were closed prior to January 2019 and are signatories on True Count accounts. *See* Heidari Decl., Pl. Ex. 65, pp. 1822-23 ¶3.

6

program.[37] Student-loan servicers (not third-party debt-relief providers) determine consumer's monthly loan-payment amount based on factors including the consumer's income, family size, marital status, and tax-filing status.[38] A consumer in an IDR program might qualify for lower monthly loan payments depending on these factors.[39] Because these factors may vary over the duration of the loan-repayment period, consumers are required to recertify their eligibility for IDR programs on an annual basis and may see their monthly loan payments adjusted accordingly.[40]

Consumers who make qualifying payments under an IDR program may also be eligible for loan forgiveness after 10-25 years. For example, the Public Service Loan Forgiveness (PSLF) program can result in forgiveness of consumers' outstanding student-loan balances after 10 years of full-time employment for a qualifying public-service employer during which consumers make qualifying monthly payments, provided they satisfy other eligibility criteria.[41]

**B.    Defendants' Business Practices**

Defendants purport to provide borrowers with student-loan debt-relief services in connection with the DOE federal-student-loan repayment and forgiveness programs.[42] As early as November 2015, CAC began offering and selling student-loan debt-relief services that would purportedly result in lower monthly payments or loan forgiveness on consumers' federal student loans.[43] The SLDR companies, using multiple dbas, make outbound marketing telephone calls to consumers, field incoming consumer telephone

---

[37] U.S. Department of Education, Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last accessed Oct. 18, 2019); *see also, e.g.*, 34 C.F.R. §§ 685.209, 685.221.
[38] *See generally, e.g.*, 34 C.F.R. §§ 685.209, 685.221.
[39] *See generally, e.g.*, 34 C.F.R. §§ 685.209, 685.221.
[40] *See generally, e.g.*, 34 C.F.R. §§ 685.209, 685.221.
[41] 34 C.F.R. § 685.219(c).
[42] *See* Pl. Ex. 12, pp. 64, 75; Pl. Ex. 30, pp. 498, 519; Kim 341 3/5 Tr., Pl. Ex. 47-1, p. 830 at 19:17-20:19; Pl. Exs. 13-20.
[43] Pl. Ex. 12, p. 75; Pl. Ex. 21.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

calls, and enroll consumers in their services.[44] They collect the fees charged for the services and prepare consumers' forbearance, consolidation, and IDR plan applications (loan-adjustment applications).[45] They then submit applications to consumers' student-loan servicers.[46]

The SLDR companies charge enrollment fees, typically totaling about $900-$1,300, shortly after consumers have purchased debt-relief services and signed contracts with the companies.[47] Consumers typically pay the fee in several installment payments.[48] In addition to the enrollment fee, consumers are charged a monthly fee, typically $10-42 over a 10-20 year period.[49]

In the course of offering, selling, and providing their purported debt-relief services to consumers, Defendants have made a number of misrepresentations, including the following:

- the companies can get consumers' student loans forgiven in whole or in part shortly after enrolling[50];

---

[44] Camp Tr., Pl. Ex. 33, pp. 666 at 35:19-23, 668 at 39:14-21; Pl. Ex. 12, p. 75; Schneider Decl., Pl. Ex. 66, pp. 1850-52 ¶¶53-56.
[45] Camp Tr., Pl. Ex. 33, pp. 668-69 at 39:22-40:1, 681-82 at 89:7-90:8; Ortuno Tr., Pl. Ex. 34, pp. 709b-709e at 16:20-19:10, 714c at 79:13-22; Pl. Ex. 44, p. 809 ¶5.
[46] Ortuno Tr., Pl. Ex. 34, pp. 709c-709e at 17:22-19:10.
[47] See, e.g. Camp Tr., Pl. Ex. 33, pp. 676a-676b at 57:2-59:13; Pl. Ex. 35, p. 733 ¶6; Kim 341 3/5 Tr., Pl. Ex. 47-1, pp. 832 at 27:6-28:9, 833 at 31:10-15; Berthiuame Decl., Pl. Ex. 51, p. 1441 ¶18; Donaldson Decl., Pl. Ex. 54, p. 1552 ¶7; Rosca Decl., Pl. Ex. 60, pp. 1667-69 ¶¶6-7, 17; Pl Ex. 50, p. 1417.
[48] See Kim 341 3/5 Tr., Pl. Ex. 47-1, pp. 832 at 27:6-28:9, 833 at 31:10-15; Pl. Ex. 35, p. 733 ¶6; Pl. Ex. 51, p. 1441 ¶18; Pl. Ex. 54, p. 1552 ¶7; Pl. Ex. 60, pp. 1667-69 ¶¶6-7, 17.
[49] See, e.g., Breemes Decl., Pl. Ex. 52, pp. 1471-73; Crawford Decl., Pl. Ex. 53, pp. 1491-94; Donaldson Decl., Pl. Ex. 54, pp. 1564-67; Honold Decl., Pl. Ex. 57, pp. 1632-34; Pl. Ex. 50, pp. 1370, 1420.
[50] See Breemes Decl., Pl. Ex. 52, pp. 1458-59 ¶¶3, 6, p. 1461 ¶21; Rosco Decl., Pl. Ex. 60, pp. 1667-70 ¶¶6, 12, 15, 22; Varno Decl., Pl. Ex. 61, pp. 1671-72 ¶¶3-4, 7, 10, 15; Lause Decl., Pl. Ex. 62, p. 1694 ¶14; Camp Tr., Pl. Ex. 33, pp. 675-76 at 56:19-57:17; Ortuno Tr., Pl. Ex. 34, p. 728 at 152:4-8; Schneider Decl., Pl. Ex. 66, pp. 1851-52 ¶¶54, 56.

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

1  •  the companies can secure lower monthly payments or that consumers qualify for or
2     are approved for lower monthly payments[51]; and

3  •  payments consumers make to the companies will go toward paying down the
4     consumers' student-loan debt.[52]

5  Further, the SLDR companies omit critical information from consumers about how they

6  perform debt-relief services, including failing to inform consumers that the companies

7  will obtain forbearances on the consumers' behalf.[53] The SLDR companies also fail to

8  inform consumers that the companies often submit false information in order to qualify

9  the consumer for a lower payment.[54]

10

11

12

13

14

15

16

17

18  [51] *See* Berthiamue Decl., Pl. Ex. 51, p. 1439 ¶¶4-5; Breemes Decl., Pl. Ex. 52, p. 1458 ¶3;
    Crawford Decl., Pl. Ex. 53, p. 1482 ¶¶4-5; Donaldson Decl., Pl. Ex. 54, p. 1552 ¶7; Etzel-
19  Elaqad Decl., Pl. Ex. 55, p. 1577 ¶6; Pugh Decl., Pl. Ex. 59, pp. 1663-64 ¶9; Rosco Decl.,
20  Pl. Ex. 60, pp. 1667-68 ¶¶6-7, 9; Lause Decl., Pl. Ex. 62, pp. 1693-94 ¶12; Ortuno Tr., Pl.
    Ex. 34, p. 730 at 154:6-20;
21  [52] *See* Hershenson Decl., Pl. Ex. 56, pp. 1608-09 ¶¶4, 10-11, 14; Liming Decl., Pl. Ex. 58,
22  p. 1646-47 ¶¶12, 17-18, 21; Pugh Decl., Pl. Ex. 59, pp. 1663-64 ¶9; Varno Decl., Pl. Ex.
    61, pp. 1671-72 ¶¶4, 14; Lause Decl., Pl. Ex. 62, p. 1695 ¶16; Ortuno Tr., Pl. Ex. 34, pp.
23  728-29 at 152:8-153:19; Camp Tr., Pl. Ex. 33, pp. 674-75 at 55:17-56:1; Kim 341 5/13
24  Tr., Pl. Ex. 47-3, p. 868 at 27:16-28:2.
    [53] *See* Ortuno Tr., Pl. Ex. 34, pp. 715-16 at 90:25-91:9; Lause Decl., Pl. Ex. 62, p. 1698
25  ¶¶25-26; Camp Tr., Pl. Ex. 33, pp. 684-85 at 92:11-93:25.
26  [54] *See* Lause Decl., Pl. Ex. 62, pp. 1693 ¶¶11(h), 1699-1701 ¶¶27-31; Camp Tr., Pl. Ex.
    33, pp. 662b-663a at 18:15-19:3, 692-93 at 107:23-108:25, 694 at 109:4-19; Ortuno Tr.,
27  Pl. Ex. 34, pp. 711-12 at 27:7-28:17, 713-714a at 30:20-31:17, 722-24 at 125:16-127:25,
28  725-26 at 129:23-130:11; Berthiuame Decl., Pl. Ex. 51, p. 1442 ¶¶27, 29; Etzel-Elaqad
    Decl., Pl. Ex. 55, pp. 1577, 1579 ¶¶7, 19-22, p. 1607; Pugh Decl., Pl. Ex. 59, p. 1665 ¶18.

9

## C.   Evasion of Law Enforcement and Ongoing Consumer Harm

Defendants have gone to great lengths to continue their debt-relief enterprise. The Bureau issued a civil investigative demand (CID) to CAC on Sep. 10, 2018.[55] CAC evaded service, but was eventually served on September 13, 2018.[56] CAC failed to provide any of the information or documents requested in the CID despite several follow up requests.[57] Aware of the Bureau's CID and facing an inquiry from at least one other law-enforcement agency, by September 21, 2018, CAC had shifted its entire sales operation to Prime.[58] Prime has since received at least $25 million in transfers from True Count.[59]

In January 2019, CAC filed for bankruptcy. In that proceeding, CAC asserted that it had been barely profitable, had ceased operations, and later, that it had no accounts receivable.[60] In fact, CAC had transferred its customer base and corresponding revenue stream to True Count, which continued to collect payments from consumers who had enrolled in CAC's services and from new consumers who Prime enrolled.[61] CAC went on to issue press releases acknowledging that it was continuing to service (and bill) existing

---

[55] *See* Schneider Decl., Pl. Ex. 66, pp. 1848-49 ¶43.

[56] *See* Schneider Decl., Pl. Ex. 66, p. 1849 ¶44.

[57] *See* Schneider Decl., Pl. Ex. 66, p. 1849 ¶45-48. To date, CAC has not produced any documents or information to the Bureau in response to the CID. After CAC filed for bankruptcy, counsel for Kim, Wen, True Count, and Prime reached out to the Bureau regarding the CID issued to CAC. Although counsel initially indicated a willingness to produce responsive documents, they have not, several months later, provided a complete response to that CID, nor given any indication they actually intend to do so.

[58] *See* Pl. Ex. 44, pp. 808-809 ¶¶3, 5; Heidari Decl., Pl. Ex. 65, pp. 1827-28 ¶¶13(a)-(b), 14, p. 1833 tbl. 1; Kim 341 3/5 Tr., Pl. Ex. 47-1, pp. 827 at 8:1-21.

[59] Heidari Decl., Pl. Ex. 65, pp. 1827-28 ¶¶13(b), 14(a), p. 1833, tbl. 1.

[60] *See* Kim 341 3/5 Tr., Pl. Ex. 47-1, pp. 837 at 46:15-17, 831-32 at 26:10-27:1; Pl. Ex. 44, pp. 808-809 ¶3.

[61] Pl. Ex. 43, pp. 806-807; Pl. Ex. 44, p. 809 ¶5; Heidari Decl., Pl. Ex. 65, pp. 1822-28 ¶¶3-4, 7-13, p. 1833 tbl. 1; Pl. Ex. 30, pp. 536-49; Camp Tr., Pl. Ex. 33, pp. 666c-668 at 37:14-39:9.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

customers.[62] CAC's website is still active, and calls to the number listed there indicate that the company is still active.[63]

In the bankruptcy proceeding, CAC's conduct—including potentially concealing insider transfers and its failure to be forthcoming about government inquiries—led the court to appoint a trustee to oversee CAC's estate.[64] Although the trustee has taken control of CAC's finances, True Count and Prime continue to collect payments from consumers, including at least $16 million since March of this year, and to distribute money to the Relief Defendants (and by extension, the individual Defendants).[65]

Defendants' practices continue to harm consumers, costing them at least $71 million in illegal advance fees since 2016.[66] Defendants' false and misleading representations regarding their services result in consumers paying significant fees for services they would not purchase otherwise.[67] Consumers frequently are led to believe that these payments are going toward their student-loan balance, which has led to consumers missing payments on their loans.[68] Defendants' practices have also led to increased loan costs for consumers through the accrual of additional interest and to the loss of qualifying payments for loan forgiveness.[69]

---

[62] See Pl. Ex. 22-4, p. 238; Pl. Ex. 22-3, p. 235; see also Pl. Ex. 22-1, pp. 229-31; Pl. Ex. 22-2, p. 232.

[63] See Schneider Decl., P. Ex. 66, pp. 1850-52 ¶¶53-56; Pl. Ex. 20.

[64] See Pl. Ex. 37, pp. 757-59 ¶¶27-33, 770 ¶69, 772 ¶75; Pl. Ex. 48.

[65] Heidari Decl., Pl. Ex. 65, pp. 1826-29 ¶¶9-10, 12-16, p. 1833 tbl. 1.

[66] Heidari Decl., Pl. Ex. 65, pp. 1826-27 ¶¶11-12, 1833 tbl. 1; see also, e.g., Pl. Ex. 50, pp. 1207, 1438, 1420; Schneider Decl., Pl. Ex. 66, pp. 1841-42 ¶¶24-25, 1843 ¶27, 1850-52 ¶¶53-56; Pl. Ex. 20.

[67] See, e.g., Berthiaume Decl., Pl. Ex. 51, p. 1442 ¶¶28-29; Breemes Decl., Pl. Ex. 52, p. 1461 ¶¶21-22; Crawford Decl., Pl. Ex. 53, p. 1483 ¶13; Etzel-Elaqad Decl., Pl. Ex. 55, p. 1579 ¶22-23; Liming Decl., Pl. Ex. 58, p. 1647 ¶21.

[68] See, e.g., Berthiaume Decl., Pl. Ex. 51, pp. 1441-42 ¶¶20, 28; see also Pl. Ex. 50, pp. 1402, 1408.

[69] See, e.g., Berthiaume Decl., Pl. Ex. 51, p. 1442 ¶31; Rosca Decl., Pl. Ex. 60, p. 1670 ¶¶20-22; Honold Decl., Pl. Ex. 57, p. 1623 ¶13; Crawford Decl., Pl. Ex. 53, p. 1483 ¶12; Lause Decl., Pl. Ex. 62, p. 1697 ¶24, 1698 ¶25, 1700-1701 ¶¶30-31.

11

As recently as October 11, 2019, CAC's Premier Student Loan Center website was live and representatives answer calls to the number listed on its website.[70] As set forth the attached declaration from a Bureau investigator, during calls to that number and related follow up calls, company representatives state that they work for Premier, Student Loan Account Management, and Student Services Plus.[71] When asked about Premier Student Loan Center, one representative explained that Premier recently merged with eight other companies, all doing the same work.[72] Representatives further state that the companies specialize in student-loan forgiveness and payment options, and claimed that one person who owed about $540,000 in student loans was able to reduce the balance to about $40,000 with the representative's help.[73] A different representative stated that the companies are usually able to reduce student loans by about half.[74]

## ARGUMENT

When a person violates federal consumer-financial law, the Bureau may seek appropriate Relief, including a permanent or temporary injunction. 12 U.S.C. § 5564(a).[75] Here, the Bureau seeks a permanent injunction and other equitable relief to protect consumers from future harm and to redress the injuries caused by Defendants' CFPA and

---

[70] Schneider Decl., Pl. Ex. 66, p. 1851 ¶55; *see also* Pl. Ex. 20.

[71] *See* Schneider Decl., P. Ex. 66, pp. 1850-52 ¶¶53-56.

[72] Schneider Decl., Pl. Ex. 66, pp. 1851-52 ¶56.

[73] Schneider Decl., Pl. Ex. 66, p. 1851 ¶54.

[74] Schneider Decl., Pl. Ex. 66, p. 1852 ¶56.

[75] The Bureau notes that the Supreme Court has granted certiorari to consider whether the provision in the CFPA restricting the President's ability to remove the Director is constitutional, and, if not, whether it may be severed from the rest of the statute. *See Seila Law LLC v. CFPB*, No. 19-7 (2019). The Bureau's Director had previously determined that this provision, 12 U.S.C. § 5491(c)(3), is unconstitutional, but severable. Brief for Respondent, *Seila Law LLC v. CFPB*, No. 19-7, 2019 WL 4528136 (U.S. Sept. 17, 2019). These developments do not affect this motion for a TRO. That is because the Ninth Circuit has held that the removal provision is constitutional. *CFPB v. Seila Law LLC*, 923 F.3d 680, 682-84 (9th Cir. 2019). Although the Supreme Court has granted certiorari to review that decision, the Ninth Circuit's decision in *Seila Law* remains the law of this circuit "unless and until overruled by a body competent to do so." *In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017) (quotation marks omitted).

TSR violations. To preserve the possibility of effective final Relief and to prevent Defendants from committing further violations during the pendency of this action, the Court should grant the Bureau's application for an *ex parte* TRO, including an asset freeze, appointment of a temporary receiver, and immediate access to Defendants' business premises.

A court should grant a TRO in a statutory enforcement action where the government agency demonstrates a likelihood of success on the merits and that the balance of equities tips in its favor. *See, e.g.*, *FTC v. Consumer Defense LLC*, 926 F.3d 1208, 1212-14 (9th Cir. June 2019) (citing *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir. 1989)). Irreparable harm is presumed when a government agency sues under a statute authorizing injunctive relief, as is the case here. *Consumer Defense*, 926 F.3d 1212-13; *see* 12 U.S.C. § 5565(a)(2). The standard for evaluating an application for a TRO and a motion for a preliminary injunction is the same. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). The Bureau meets that standard here.

**A.     The Bureau is likely to succeed on the merits.**

As set forth in more detail below, Defendants: (1) violated the TSR by charging illegal advance fees; and (2) violated the CFPA and TSR by making deceptive representations about their services.

The Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, apply to "sellers" and "telemarketers" engaged in "telemarketing," 16 C.F.R. §§ 310.2; 310.3. The Bureau may enforce the TSR against sellers and telemarketers "with respect to the offering or provision of a consumer financial product or service subject to the [CFPA]," 15 U.S.C. § 6105(d), which includes a "financial advisory service" that encompasses "debt management or debt settlement" and involves "modifying the terms of any extension of credit." 12 U.S.C. § 5481(15)(A)(viii)(II). Each Defendant is a seller or telemarketer under the TSR.[76]

The Bureau may enforce the CFPA's prohibition of unfair, deceptive, or abusive acts or practices against "covered persons," defined as "any person offering or providing a consumer financial product or service." 12 U.S.C. §§ 5481(6); 5536(a)(1)(B). The SLDR companies' services, which purport to modify the terms of consumers' federal student loans, constitute financial-advisory services under the CFPA. Thus, the SLDR companies are "covered persons."[77]

The individual Defendants are also "related persons" under the CFPA. That term includes "any officer, director, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered person" or any person "who materially participates in the conduct of the affairs of such covered person." 12 U.S.C. § 5481(25)(C)(i), (ii). As set forth in the Bureau's Complaint, each of the individual Defendants is a "related person."[78] As "related persons," the individual Defendants are

---

[76] Compl. ¶¶163-66.
[77] Comp. ¶168.
[78] Compl. ¶¶170-72.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

"covered person[s] for all purposes of any provision of Federal consumer financial law."
12 U.S.C. § 5481(25)(B).

**1.    Defendants violate the TSR by collecting advance fees.**

The TSR prohibits sellers and telemarketers from

[r]equesting or receiving payment of any fee or consideration for any
debt relief service until and unless: (A) The seller or telemarketer has
renegotiated, settled, reduced, or otherwise altered the terms of at least one
debt pursuant to a settlement agreement, debt management plan, or other
such valid contractual agreement executed by the customer; [and] (B) The
customer has made at least one payment pursuant to that settlement
agreement, debt management plan, or other valid contractual agreement
between the customer and the creditor or debt collector.

16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

The SLDR companies frequently collect consumers' enrollment fees before the
companies even apply for loan adjustments on the consumers' behalf.[79] Even when
consumers pay the enrollment fee in installments, consumers still pay one or more
installments before the loan adjustment is even approved.[80] The monthly fees of $10 -
$42 likewise violate the TSR's advance-fee prohibition for the same reasons, among
others.[81] Notably, the companies do not track or otherwise know when or whether a

---

[79] Camp Tr., Pl. Ex. 33, pp. 676b at 59:8-15, 698b at 154:4-16; Ortuno Tr., Pl. Ex. 34, p.
714b at 75:7-16; *see also, e.g.*, Elaqad Decl., Pl. Ex. 55, pp. 1586, 1588; Hershenson
Decl., Pl. Ex. 56, pp. 1612, 1614; Donaldson Decl., Pl. Ex. 54, pp. 1561, 1564.
[80] *See, e.g.*, Ortuno Tr., Pl. Ex. 34, pp. 721b-721c at 120:2-121:11; Elaqad Decl., Pl. Ex.
55, pp. 1586, 1588; Hershenson Decl., Pl. Ex. 56, pp. 1612, 1614; Donaldson Decl., Pl.
Ex. 54, pp. 1561, 1564.
[81] *See* Camp Tr., Pl. Ex. 33, pp. 676c at 61:17-25; *see also* 16 C.F.R. § 310.4(a)(5)(i)(A)-
(B),(ii).

15

1  consumer has made an initial payment following a loan adjustment, and therefore cannot

2  know when it is permissible to begin collecting a fee for debt-relief services.[82]

3        **2.**    **Defendants' misrepresentations are deceptive under the CFPA**

4                  **and material misrepresentations under the TSR.**

5        Under the CFPA, an act or practice is deceptive if "(1) there is a representation,

6  omission, or practice that, (2) is likely to mislead consumers acting reasonably under the

7  circumstances, and (3) the representation, omission, or practice is material." *CFPB v.*

8  *Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (internal citation and quotations

9  omitted). A representation is material if it "involves information that is important to

10  consumers and, hence, likely to affect their choice of, or conduct regarding, a product."

11  *FTC v. Lucas*, 483 F. App'x 378, 379 (9th Cir. 2012).[83] Although proof of actual

12  deception is not necessary to establish a CFPA violation, "such proof is highly probative

13  to show that a practice is likely to mislead consumers acting reasonably under the

14  circumstances." *FTC v. Cyberspace.com LLC,* 453 F.3d 1196, 1201 (9th Cir. 2006).

15        Similarly, the TSR prohibits sellers and telemarketers from misrepresenting "any

16  material aspect of the performance, efficacy, nature, or central characteristics of goods or

17  services that are the subject of a sales offer," or any material aspect of any debt-relief

18  service. 16 C.F.R. § 310.3(a)(2)(iii), (x). "A representation is material if it is likely to affect

19  a consumer's choice to buy a product or service." *FTC v. EMA Nationwide*, 767 F.3d 611,

20  631, 633-34 (6th Cir. 2014) (citation omitted); *Cyberspace.com,* 453 F.3d at 1201; *see also*

21  Amended Telemarketing Sales Rule Statement of Basis and Purpose, 75 Fed. Reg. 48458,

22  48484 (Aug. 10, 2010) (hereinafter TSR Amended Rule 2010).

23        Here, Defendants misrepresented the purpose of consumers' payments to the

24  companies, the nature and efficacy of their services, and the actions that the companies

25

26  _____

27  [82] *See* Camp Tr., Pl. Ex. 33, p. 698a at 150:11-19; *see also* 16 C.F.R. § 310.4(a)(5)(i)(A)-
(B),(ii).

28  [83] Courts rely on FTC cases interpreting the FTC Act to interpret similar language in the
CFPA. *See Gordon*, 819 F.3d at 1193 n.7.

purport to take on behalf of consumers. Each of these practices are material and likely to mislead consumers acting reasonably under the circumstances, and numerous consumers have, in fact, been misled by these practices.[84]

### a. The SLDR companies misrepresent the nature and efficacy of their services.

The SLDR Companies misrepresent the nature and efficacy of their services in two key areas: loan forgiveness and lower monthly payments. The companies told many consumers that their loans would be forgiven—either in whole or in part—shortly after enrollment.[85] Defendants' representations were false because only the Department of Education can forgive federal student loans, and it can only do so after consumers have made at least 10 years of qualifying payments, in addition to meeting other criteria.[86] Representations about a consumer's eligibility or approval for loan forgiveness are material. *See FTC v. Alliance Document Prep.*, 296 F. Supp. 3d 1197, 1205-06 (C.D. Cal 2017).

Defendants also represent that their services could lower consumers' monthly loan payments.[87] At times, during sales calls, they even quote a specific monthly payment to consumers.[88] But only student-loan servicers, not third-party debt-relief providers like the SLDR companies, can set monthly payments based on variables such as consumers'

---

[84] *See, e.g.,* Berthiaume Decl., Pl. Ex. 51, p. 1442 ¶¶28-29; Breemes Decl., Pl. Ex. 52, p. 1461 ¶¶21-22; Crawford Decl., Pl. Ex. 53, p. 1483 ¶13; Etzel-Elaqad Decl., Pl. Ex. 55, p. 1579 ¶22-23; Liming Decl., Pl. Ex. 58, p. 1647 ¶21.

[85] *See* Breemes Decl., Pl. Ex. 52, pp. 1458-59, 1461 ¶¶3, 6, 21; Rosco Decl., Pl. Ex. 60, pp. 1667-70 ¶¶6, 12, 15, 22; Varno Decl., Pl. Ex. 61, p. 1671-72 ¶¶3-4, 7, 10, 15; Lause Decl., Pl. Ex. 62, p. 1694 ¶14; Camp Tr., Pl. Ex. 33, pp. 675-76 at 56:19-57:17; Ortuno Tr., Pl. Ex. 34, p. 728 at 152:4-8.

[86] Lause Decl., Pl. Ex. 62, p. 1694 ¶13.

[87] *See* Berthiamue Decl., Pl. Ex. 51, p. 1439 ¶¶4-5; Breemes Decl., Pl. Ex. 52, pp. 1458 ¶3; Crawford Decl., Pl. Ex. 53, p. 1482 ¶¶4-5; Donaldson Decl., Pl. Ex. 54, p. 1552 ¶7; Etzel-Elaqad Decl., Pl. Ex. 55, p. 1577 ¶6; Pugh Decl., Pl. Ex. 59, pp. 1663-64 ¶9; Rosco Decl., Pl. Ex. 60, pp. 1667-68 ¶¶6-7, 9; Lause Decl., Pl. Ex. 62, pp. 1693-94 ¶12; Ortuno Tr., Pl. Ex. 34, p. 730 at 154:6-20.

[88] *See, e.g.,* Berthiaume Decl., Pl. Ex. 51, p. 1439 ¶6; Rosca Decl., Pl. Ex. 60, p. 1667 ¶6.

17

income and family size.[89] The SLDR companies therefore cannot approve consumers for a set payment or otherwise guarantee that consumers would pay a specific monthly payment for the life of their loans.[90] Representations that a consumer's periodic payments or liabilities may be reduced if Defendants' services are procured are material. *See FTC v. Am. Tax Relief LLC*, 751 F. Supp. 2d 972, 978-79 (N.D. Ill. 2010); *FTC v. Data Med. Capital, Inc.*, 2009 WL 2059442, at *10 (C.D. Cal. July 13, 2009).

Here, numerous consumers have been misled by Defendants' misrepresentations regarding loan forgiveness and lowering monthly payments.[91] These consumers have paid significant fees for services that they would not have purchased otherwise.[92]

### b.     The SLDR companies misrepresent the purpose of their fees.

At times, Defendants represent that the monthly fees paid by consumers were payments on consumers' loan balances and that any outstanding balance beyond the sum of the monthly fees had been forgiven.[93] In fact, Defendants did not remit any of the fees paid by consumers to their student-loan servicers to be applied toward their loan balances.[94] Representations about what services are actually being provided are material to consumers because they influence purchasing decisions. *See FTC v. Johnson,* 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015) (citations omitted); *see also FTC v. EMA Nationwide, Inc.* 767 F.3d 611, 631 (6th Cir. 2014). Indeed, numerous consumers would

---

[89] *See* U.S. Department of Education, Federal Student Aid, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven#consistent-payments (last accessed Oct. 17, 2019).
[90] *See* Lause Decl., Pl. Ex. 62, pp. 1693-94 ¶12.
[91] *See supra,* notes 50-54.
[92] *See, e.g.*, Breemes Decl., Pl. Ex. 52, p. 1461 ¶21; Crawford Decl., Pl. Ex. 53, p. 1483 ¶13; Donaldson Decl., Pl. Ex. 54, p. 1554 ¶21; Honold Decl., Pl. Ex. 57, p. 1624 ¶17.
[93] *See* Camp Tr., Pl. Ex. 33, p. 673-74 at 54:21-55:16; Varno Decl., Pl. Ex. 61, p. 1671 ¶¶3-7.
[94] *See, e.g.*, Camp Tr., Pl. Ex. 33, p. 674 at 55:4-23; Lause Decl., Pl. Ex. 62, p. 1695 ¶16.

18

1  not have engaged the SLDR companies if they had known their payments exclusively

2  went to the Defendants, not toward paying down their loan balances.[95]

### c.    The SLDR companies omit material information.

4      The SLDR companies' failure to inform consumers about their practice of

5  submitting forbearance requests, as well as the consequences and risks for consumers of

6  this practice, is a material omission. Loans that are placed in forbearance continue to

7  accrue interest even though the consumer is excused from making their periodic

8  payments during the forbearance period.[96] Often, that interest is added to the balance

9  owed by the consumer (which has not decreased during the forbearance period) and the

10  higher loan balance may be re-amortized, resulting in a higher periodic payment for the

11  consumer in the event that their loan-adjustment application is not approved.[97] And for

12  some student loans, there may be limits on the total amount of time the loans can be in

13  certain forbearance statuses.[98] Thus, the SLDR companies' forbearance practices may

14  limit consumers' ability to later request forbearance when needed. During the forbearance

15  period, Defendants continue to charge fees to consumers, but Defendants retain those

16  fees.[99] Because consumers are often unaware that their loans were in forbearance,

17  Defendants' practice of charging fees during the forbearance period further contributes to

18  consumers' belief "that payments to the Companies were being applied to their loan

19  balances." *FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1083 (N.D. Cal. 2018).

20  Thus, the SLDR companies' omissions regarding forbearance requests were material.

21      The SLDR companies' failure to inform consumers of their practice of providing

22  false information regarding consumers' family size, income, and marital status in order to

23

24  [95] *See, e.g.*, Hershenson Decl., Pl. Ex. 56, p. 1609 ¶14; Liming Decl., Pl. Ex. 58, p. 1647
25  ¶21; Pugh Decl., Pl. Ex. 59, p. 1666 ¶21; Varno Decl., Pl. Ex. 61, p. 1672 ¶14.
   [96] Lause Decl., Pl. Ex. 62, p. 1698 ¶25.
26  [97] *See* Lause Decl., Pl. Ex. 62, p. 1698-99 ¶¶25-26.
27  [98] *See* Lause Decl., Pl. Ex. 62, p. 1698 ¶25.
   [99] *See, e.g.*, Camp Tr., Pl. Ex. 33, pp. 674 at 55:4-23, 683 at 90:15-91:10; Ortuno Tr., Pl.
28  Ex. 34, pp. 714d-714e at 83:15-84:25; Lause Decl., Pl. Ex. 62, p. 1695 ¶16.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

1  lower the consumers' monthly payment was a material omission. Knowingly making a

2  false statement on an IDR request violates federal law[100] and has led to increased costs

3  for borrowers.[101] Consumers would not have purchased Defendants' services had they

4  known of this practice.[102] Such omissions were therefore material.

### 3.   The Individual Defendants are liable.

6        The individual Defendants are liable both for their own actions and because they

7  substantially assisted others' violations. To obtain injunctive relief against an individual

8  for corporate violations of the TSR or the CFPA, the Bureau must show that he

9  "participated directly in the acts or practices or had authority to control them." *FTC v.*

10 *MacGregor*, 360 Fed. Appx. 891, at *2-3 (9th Cir. 2009); *FTC v. Am. Fin. Benefits Ctr.*,

11 324 F. Supp. 2d 1067, 1080 (N.D. Cal. 2018) (citing *FTC v. Publ'g Clearing House*, 104

12 F.3d 1168, 1170 (9th Cir. 1997)). To obtain monetary relief from an individual for

13 corporate violations of the TSR and the CFPA, the Bureau must show that he "had

14 knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of

15 the misrepresentation, or was aware of a high probability of fraud along with an

16 intentional avoidance of the truth." *Gordon*, 819 F.3d at 1193.

17       A person's role and authority within a company can demonstrate the requisite

18 control. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). As

19 officers and managers with the ability to sign contracts and transact business on behalf of

20 the companies, Kim, Wen, and Nguyen each had the authority to control the corporate

21 Defendants and their deceptive acts.[103] Wen represented to a payment processor that CAC

22

---

23 [100] *See* 20 U.S.C. 1097(a).

24 [101] *See, e.g.,* Berthiaume Decl., Pl. Ex. 51, p. 1442 ¶31; Rosca Decl., Pl. Ex. 60, p. 1670
   ¶¶20-22; Honold Decl., Pl. Ex. 57, p. 1623 ¶13; Crawford Decl., Pl. Ex. 53, p. 1483 ¶12;

25 Lause Decl., Pl. Ex. 62, pp. 1697 ¶24, 1698 ¶25, 1700-1701 ¶¶30-31.

26 [102] *See, e.g.,* Berthiaume Decl., Pl. Ex. 51, p. 1442 ¶¶28-29; Etzel-Elaqad Decl., Pl. Ex.
   55, p. 1579 ¶22-23.

27 [103] *See* Heidari Decl., Pl. Ex. 65, pp. 1822-24 ¶¶3-4; Pl. Ex. 1, pp. 2-3; Pl. Ex. 30, pp.

28 548-549; Pl. Ex. 31, pp. 610-12; Evers Decl, Pl. Ex. 63, pp. 1706-12 ¶¶4, 6-7, 9-10, 16-
   17, 20.

and True Count would comply with the TSR and CFPA[104] As a high-level manager of CAC, Nguyen was also involved in setting up and managing merchant accounts, which in turn involved handling issues related to chargebacks and consumer complaints, and he also oversaw the company's finances, including reviewing disbursements.[105] Wen, Kim, and Nguyen authorized payment-processor transactions to and from bank accounts where they were the sole signatories and therefore knew or were recklessly indifferent to high chargeback rates and hundreds of thousands of dollars in consumer refunds on some merchant accounts.[106]

In addition to knowledge of the unlawful practices themselves, knowledge or reckless indifference can be found based on a person's awareness of underlying information, such as consumer complaints and high chargeback rates. *See, e.g.*, *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014); *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1209 (D. Nev. 2015). Kim testified during CAC's bankruptcy proceeding that the company charged upfront fees that were collected within the first three to five months after a consumer purchased CAC's services.[107] Moreover, he was also aware that the companies were under regulatory scrutiny for their debt-relief practices.[108] Kim, Wen, and Nguyen's positions at the corporate Defendants would have made it difficult for them to avoid knowing that the companies' business model depended on the collection of fees from consumers before any services were provided.

---

[104] Pl. Ex. 30, pp. 498, 519.
[105] *See* Kim 341 3/27 Tr., Pl. Ex. 47-2, pp. 846 at 9:15-23, 860 at 65:3-13; Camp Tr., Pl. Ex. 33, pp. 663d at 29:10-19, 698a at 150:2-6; Pl. Ex. 25, pp. 339-351; Simmons Decl., Pl. Ex. 64, pp. 1800 ¶11, 1804-07; Marin Decl., Pl. Ex. 50, pp. 895 ¶6, 914-15, 916-17, 919-20, 921-22, 936-37; Liming Decl., Pl. Ex. 58, p. 1647 ¶20; Pl. Ex. 31, pp. 610-12.
[106] Heidari Decl., Pl. Ex. 65, pp. 1822-24 ¶¶3-4, 1831-32 ¶23; Pl. Ex. 31, pp. 610-12, 632-34.
[107] Kim 341 3/5 Tr., Pl. Ex. 47-1, p. 832 at 26:14-18; Kim 341 5/13 Tr., Pl. Ex. 47-3, p. 850 at 27:16-28:2.
[108] *See* Kim 341 3/5 Tr., Pl. Ex. 47-1, pp. 827 at 8:1-21.

21

1    The individual Defendants likewise were aware of numerous consumer disputes
2    against the companies that would have put them on notice of the companies' TSR and
3    CFPA violations. Both Wen and Nguyen signed correspondence on behalf of True Count
4    and CAC with payment processors that acknowledged the companies' "excessive"
5    chargeback rate and identified fraud as one of the primary reasons consumers sought
6    chargebacks.[109] Kim and Nguyen were also aware of consumer complaints alleging fraud,
7    another indicia of knowledge.[110]

8        The individual Defendants are also liable based on the substantial assistance that
9    they provided to the companies in their violations.

10       Under the TSR, a person may be liable for substantially assisting any seller or
11   telemarketer when that person knows or consciously avoids knowing that the seller or
12   telemarketer is engaged in any act or practice that violates the TSR. 16 C.F.R. § 310.3(b).
13   To establish substantial assistance under the TSR, courts require: (1) an underlying TSR
14   violation; (2) substantial assistance or support to the seller or telemarketer violating the
15   TSR; and (3) that the person knew or consciously avoided knowing that the seller or
16   telemarketer violated the TSR. *See FTC v. Lake*, 181 F. Supp. 3d 692, 700-01 (C.D. Cal.
17   2016).

18       The CFPA similarly provides that it is unlawful for "any person to knowingly or
19   recklessly provide substantial assistance to a covered person" engaging in unfair,
20   deceptive, or abusive acts or practices. *See* 12 U.S.C. § 5536(a)(3). A substantial
21   assistance violation under the CFPA requires: (1) an underlying violation; (2) the person
22   to have provided substantial assistance to the party committing the underlying violation;
23   and (3) the person to have acted knowingly or recklessly. *See CFPB v. Universal Debt &*
24   *Payment Sols., LLC*, No. 1:15-CV-0859-RWS, 2019 WL 1295004, at *6-7 (N.D. Ga.

---

[109] Pl. Ex. 31, pp. 610-12; *see also* Varno Decl., Pl. Ex. 61, pp. 1672 ¶13, 1679-89.

[110] *See, e.g.,* Simmons Decl., Pl. Ex. 64, pp. 1800 ¶11, 1804-07; Marin Decl., Pl. Ex. 50, pp. 895 ¶6, 906, 912, 914-915, 916-917, 919-920, 921-922, 936-937, 938, 945; Liming Decl., Pl. Ex. 58, p. 1647 ¶20.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

1   Mar. 21, 2019); *CFPB v. D & D Mktg.*, 2016 WL 8849698, at *13 (C.D. Cal. Nov. 17,

2   2016). Substantial assistance is found when a person "in some sort associated himself

3   with the venture, that the defendant participated in it as something that he wished to bring

4   about, and that he sought by his action to make it succeed." *D & D Mktg.*, 2016 WL

5   8849698, at *12 (quoting *SEC v. Apuzzo*, 698 F.3d 204, 206 (2d Cir. 2012)).

6   Recklessness is demonstrated by conduct that "led to 'an unjustifiably high risk of harm

7   that is either known or so obvious that it should be known.'" *D & D Mktg.*, 2016 WL

8   8849698, at *12 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-69 (2007)).

9   Recklessness may be found when individuals oversee activities such as reviewing

10   consumer complaints, cancellation and refund practices, and training. *See FTC v.*

11   *Consumer Health Ben. Assoc.*, 2011 WL 13254502, at *4 (E.D.N.Y. Oct. 12, 2011).

12        Kim, Wen, and Nguyen substantially assisted the companies' TSR and CFPA

13   violations. The degree of control the individual Defendants exercised over the corporate

14   Defendants, the management of the corporate Defendants' payment processor and other

15   third-party relationships, and their admitted knowledge of the companies' illegal

16   practices and high chargeback rates, all establish that the individual Defendants

17   substantially assisted in the corporate Defendants' violations.[111]

18        Even if the individual Defendants lacked knowledge of the underlying TSR and

19   CFPA violations, they would have had to consciously avoid knowing critical elements of

20   the companies' business model. These elements include the corporate Defendants'

21   advance-fee structure and the companies' false and misleading representations to induce

22   consumers to purchase the companies' services.

23       **B.**    **The balance of equities weigh in the Bureau's favor.**

24        Not only is the Bureau likely to succeed on the merits, but the balance of equities

25   also weigh in its favor. When balancing equities where the public interest is involved,

26   courts accord greater weight to the public interest than private interests. *FTC v. World*

27

28   ---

[111] *See, e.g.*, Heidari Decl., Pl. Ex. 65, pp. 1822-24 ¶¶3-4; Pl. Ex. 31, pp. 610-12, 632-34.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

1 *Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (citing *FTC v. Warner*

2 *Communications, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984)). "Public equities include, but

3 are not limited to, economic effects and pro-competitive advantages for consumers and

4 effective relief" for the agency bringing a statutory enforcement action. *Id.*

5       The public equities at issue here are significant and include deliberate efforts to

6 evade law enforcement and continue a debt-relief operation that harms consumers,

7 including by charging millions in illegal upfront fees each month. After attempting to

8 evade service, CAC ignored the Bureau's September 2018 CID and related

9 correspondence for several months.[112] Leading up to its bankruptcy filing, Defendants

10 drained assets out of CAC, thereby creating the false impression that the debt-relief

11 operation had ceased and that there are no assets to distribute to consumers even if a

12 judgment is entered against it.[113] Indeed, at one point Kim testified in the bankruptcy

13 proceeding that consumers only paid fees for a 5-6 month period and therefore there were

14 no incoming fees when CAC petitioned for bankruptcy.[114] In fact, the companies'

15 contracts require payments over the course of 10-20 *years,* and TCS has continued to

16 collect fees from consumers who enrolled in CAC's services.[115] In addition to trying to

17 misrepresent this revenue stream, CAC and Kim concealed significant assets from the

18 bankruptcy court and misrepresented (along with Wen) the nature of Wen's involvement

19 with CAC.[116] CAC and Kim's conduct ultimately led the bankruptcy court to take the

20

21

22

---

23 [112] *See* Schneider Decl., Pl. Ex. 66, pp. 1848-49 ¶¶43-48.

24 [113] *See* Heidari Decl., Pl. Ex. 65, p. 1824 ¶8; Pl. Ex. 37, p. 752; Kim 341 3/5 Tr., p. 827 at 6:5-8; *see also* Kim 341 5/13 Tr., Pl. Ex. 47-3, p. 873 at 46:19-47:2.

25 [114] *See* Kim 341 3/5 Tr., Pl. Ex. 47-1, pp. 832-33 at 26:10-29:12.

26 [115] *See, e.g.,* Breemes Decl., Pl. Ex. 52, pp. 1471-73; Crawford Decl., Pl. Ex. 53, pp. 1491-94; Donaldson Decl., Pl. Ex. 54, pp. 1564-67; Honold Decl., Pl. Ex. 57, pp. 1632-

27 34; Heidari Decl., Pl. Ex. 65, p. 1831 ¶22.

[116] *See* Kim 341 3/5 Tr., Pl. Ex. 47-1, pp. 832-833 at 26:10-29:12; Pl. Ex. 37, p. 752; Pl.

28 Ex. 46, p. 822-23.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

1  extraordinary step of appointing a trustee to take over the financial affairs from CAC,

2  which had been operating as a debtor-in-possession.[117]

3       Moreover, the relief the Bureau seeks here would protect consumers' interests.

4  Struggling student-loan borrowers have and will continue to pay thousands of dollars

5  each in fees as a result of Defendants' deceptive conduct.[118] As the FTC observed when it

6  amended the TSR to better police debt-relief servicers:

7       [T]he widespread deception in this industry [and] the advance fee model

8       used by many debt settlement providers causes substantial consumer injury.

9       Consumers often are not aware that their initial payments are taken by the

10      provider as its fees and are not saved for settlement of their debt; in many

11      instances, providers deceptively underestimate the time necessary to

12      complete the program. As a result, many consumers fall further behind in

13      their debts, incur additional charges, harm their creditworthiness … and, in

14      some cases, suffer legal action against them to collect the debt.

15 TSR Amended Rule 2010, 75 Fed. Reg. 48458, 48463 (Aug. 10, 2010). In addition to

16 paying exorbitant fees, consumers have and will continue to face other forms of harm as a

17 result of retaining Defendants, including but not limited to losing qualifying payments

18 toward loan forgiveness and increased loan balances.[119]

19      Defendants' illegal conduct continues under multiple dbas.[120] True Count

20 continues to collect payments from consumers (including those who signed up for

21 services with CAC), pay fees to Prime for its sales services, and to process and submit

22

23

24   [117] *See* Pl. Ex. 48.

  [118] *See, e.g.,* Breemes Decl., Pl. Ex. 52, pp. 1471-73; Crawford Decl., Pl. Ex. 53, pp.

25 1491-94; Donaldson Decl., Pl. Ex. 54, pp. 1564-67; Honold Decl., Pl. Ex. 57, pp. 1632-

26 34.

  [119] *See, e.g.,* Berthiaume Decl., Pl. Ex. 51, p. 1442 ¶31; Rosca Decl., Pl. Ex. 60, p. 1670

27 ¶¶20-22; Honold Decl., Pl. Ex. 57, p. 1623 ¶13; Crawford Decl., Pl. Ex. 53, p. 1483 ¶12;

Lause Decl., Pl. Ex. 62, pp. 1697 ¶24, 1698 ¶25, 1700-1701 ¶¶30-31.

28   [120] *See* Schneider Decl., Pl. Ex. 66, pp. 1836 ¶5, 1850-52 ¶¶53-56, 1856-57.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

loan-adjustment applications on behalf of consumers to student-loan servicers.[121] In August 2019 alone, True Count collected at least $3.8 million in consumer fees.[122] Consumers continue to be harmed by Defendants' practices.[123] The individual Defendants continue to be involved with the companies and the Relief Defendants continue to receive transfers from True Count.[124] Defendants' operation—and unlawful conduct—is ongoing and likely to continue unless this Court grants an injunction.

## C.    Defendants' practices warrant ancillary relief.

The Court's inherent equitable powers allow it to order ancillary relief in connection with the issuance of a TRO and preliminary injunction. *See SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980). Ancillary relief may also be ordered for relief defendants against whom no claim is asserted, but who may nonetheless retain ill-gotten gains from defendants' conduct that are recoverable. *See SEC v. JSG Capital Inv., LLC*, 2017 WL 3579570, at *8 (N.D. Cal. June 30, 2017) (citing *SEC v. Colello*, 139 F.3d 674, 676-77 (9th Cir. 1998)). Here, the Bureau seeks to freeze assets that represent the proceeds from Defendants' operation, whether controlled by Defendants or the Relief Defendants.[125] The Bureau also seeks an accounting of assets, appointment of a receiver, immediate access, and limited expedited discovery. In light of the appointment of a chapter 7 trustee over CAC's estate in its bankruptcy proceeding, the Bureau seeks to carve out the chapter 7 trustee from the asset freeze and other provisions of the proposed TRO and does not seek appointment of a temporary receiver over CAC.

---

[121] *See* Heidari Decl., Pl. Ex. 65, pp. 1827-28 ¶¶12, 14, p. 1831 ¶22; Pl. Ex. 44, p. 809 ¶5; Pl. Ex. 30, pp. 536-549; Pl. Ex. 20.

[122] Heidari Decl., Pl. Ex. 65, p. 1827 ¶12.

[123] *See, e.g.*, Pl. Ex. 50, pp. 1207, 1208, 1420, 1438; Heidari Decl., Pl. Ex. 65, p. 1827 ¶12; *see also* Schneider Decl., Pl. Ex. 66, pp. 1850-52 ¶¶53-56.

[124] *See* Heidari Decl., Pl. Ex. 65, p. 1828 ¶14; Camp Tr., Pl. Ex. 33, pp. 663b-663c at 25:15-26:7.

[125] *See generally*, Heidari Decl., Pl. Ex. 65.

1  |  **1.**    **An asset freeze and order for an accounting are necessary to**
2  |  **prevent dissipation of assets and to preserve the status quo.**

3  A court may freeze a defendant's assets upon the government's showing of "a

4  likelihood of dissipation of the claimed assets, or other inability to recover monetary

5  damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir.

6  2009); *see, e.g.*, *FTC v. Alliance Document Prep., LLC*, No. 2:17-cv-07048-SJO-KS,

7  Slip. Op. at *7-10, 14-15, 16-17, 27-28 (C.D. Cal. Sept. 28, 2017). To obtain an asset

8  freeze against a relief defendant, the government must show that the person has received

9  ill-gotten funds and does not have a legitimate claim to those funds. *SEC v. Cavanaugh*,

10  155 F.3d 129, 136 (2d Cir. 1998). Alternatively, a court may freeze a relief defendant's

11  assets where the government can demonstrate that the defendant exercises complete

12  control over that third party. *See SEC v. Hickey*, 322 F.3d 1123, 1131-32 (9th Cir. 2003).

13  Courts likewise order complete asset freezes where the relief defendant's assets are

14  commingled with the defendant's fraudulent assets, because requiring the government to

15  identify specific assets tainted by fraud would incentivize defendants to "spend[] down

16  illicit gains while protecting legitimately obtained assets … or by commingling and

17  transferring" such gains. *SEC v. I-Cubed Domains, LLC*, 664 Fed. App'x. 53, 56 (2d Cir.

18  2016). Finally, a court may order a third party, such as a financial institution, to "preserve

19  [a defendant's] assets that are easily dissipated and may be difficult or impossible to

20  trace." *FTC v. Universal Premium Servs., Inc.*, 2006 WL 8442134, at *10 (C.D. Cal.

21  Mar. 14, 2006) (citation omitted).

22  Here, the corporate Defendants have dissipated their assets and are likely to

23  continue doing so unless this Court freezes them.[126] Since January 2017, CAC and True

24

25  [126] The Bureau's proposed order accompanying this application excludes those assets

26  now under the control of the trustee appointed in *In re Consumer Advocacy Center Inc.*,
   19-10655 (Bankr. S.D. Fla.), because the risk of dissipation has lessened significantly

27  with respect to those assets. Should the trustee assume control of additional assets
   (including those outside of CAC's estate) that are within the scope of the Bureau's

28  proposed order, the Bureau will move this Court for an amendment of the order.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

1  Count have transferred more than $3.5 million to Relief Defendants Hold the Door,

2  Infinite Management, and TN Accounting.[127] True Count has transferred at least $25

3  million to Prime since September 2018, when CAC claims that it ceased operating.[128]

4        The Relief Defendants, in turn, are directed and controlled by Kim, Wen, and

5  Nguyen, each of whom is the signatory on his respective company's bank accounts.[129]

6  The Relief Defendants' income from 2017 to early 2019 was furnished almost entirely by

7  CAC, True Count, or both.[130] Kim, Wen, and Nguyen then transferred monies out of the

8  Relief Defendants' accounts either to their personal bank accounts or to pay their

9  personal expenses, including credit-card bills, luxury car purchases and payments,

10  wedding expenses, dental payments, and art purchases.[131] The complete control by Kim,

11  Wen, and Nguyen over the Relief Defendants' assets, the transfer of money from the

12  corporate Defendants to the Relief Defendants' bank accounts, and the use of the Relief

13  Defendants' assets to Kim, Wen, and Nguyen's personal benefit warrant a freeze of the

14  entirety of their assets by this Court. *See Hickey*, 322 F.3d at 1131-32; *I-Cubed Domains*,

15  664 Fed. App'x. at 56.

16        The Court should also freeze Kim, Wen, and Nguyen's assets because "the

17  individual defendants controlled the deceptive activity [of the corporate defendants] and

18  had actual or constructive knowledge of the deceptive nature of the practices in which

19  they were engaged." *See FTC v. Wealth Educators, Inc.*, 2015 WL 11439063, at *8 (C.D.

20  Cal. Apr. 6, 2015) (citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir.

21  1989)). The Court should also use its inherent equitable power to order an asset freeze

22  and "an accounting the purpose of which is to identify assets subject to disgorgement."

23  *SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990).

24

25

---

26  [127] Heidari Decl., Pl. Ex. 65, pp. 1827-28 ¶¶13-14.
   [128] Heidari Decl., Pl. Ex. 65, pp. 1827-28 ¶¶13(b), 14(a); Pl. Ex. 44, p. 809 ¶5.

27  [129] *See* Heidari Decl., Pl. Ex. 65, pp. 1822-23 ¶3.

28  [130] *See* Heidari Decl., Pl. Ex. 65, pp. 1827-28 ¶¶13-14.
   [131] *See* Heidari Decl., Pl. Ex. 65, p. 1829 ¶16.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

### 2. The Court should appoint a temporary receiver to secure Defendants' and Relief Defendants' property.

The court considers "a host of relevant factors, and … no one factor is dispositive" in exercising its broad discretion to appoint a receiver. *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009). These factors include "whether the defendant engaged in fraudulent conduct, whether an imminent danger of loss of property exists, the inadequacy of available legal remedies, and harm to the plaintiff if the request for receivership is denied." *Solis v. Matheson*, 563 F.3d 425, 438 (9th Cir. 2009).

Here, the Court should appoint a receiver because Defendants have made numerous fraudulent misrepresentations to consumers about the nature of their services and the fees they collect in violation of federal law. Defendants' conduct to date raises the concern that they are trying to conceal property and evidence supporting the Bureau's claims against them. Moreover, Defendants' operation of their business under myriad names and from various addresses and telephone numbers underscores the facility with which Defendants can move their property to frustrate the Bureau's efforts to gather evidence that would support its claims and substantiate the significant consumer harm in this case.[132]

### 3. The Court should order immediate access to Defendants' premises and limited expedited discovery.

Among other forms of ancillary relief, the Court should grant the Bureau immediate access to Defendants' business premises and limited expedited discovery because Defendants have demonstrated a willingness to move or conceal records and other evidence to evade law-enforcement scrutiny. *See Wealth Educators*, 2015 WL 11439063, at *8; *FTC v. Digital Altitude LLC*, No. 2:18-cv-00729, Slip Op. at *22-23, 25-26 (C.D. Cal. Feb. 1, 2018); *Alliance Document Prep.*, No. CV 17-7048 SJO (KS), Slip Op. at *27-28, 29-39 (C.D. Cal. Sept. 28, 2017).

---

[132] *See* Schneider Decl., Pl. Ex. 66, pp. 1835-39.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF AND ORDER TO

# CONCLUSION

For the foregoing reasons, the Court should grant the Bureau's *ex parte* application for a TRO, freeze Defendants'[133] and Relief Defendants' assets, order an accounting of Defendants' and Relief Defendants' assets, appoint a temporary receiver, grant the Bureau immediate access to Defendants' business premises, and permit limited expedited discovery, as set forth in the Proposed Order filed with this motion.

Dated: Oct. 21, 2019                    Respectfully submitted,

Cara Petersen
Acting Enforcement Director
Deborah Morris
Deputy Enforcement Director
Alusheyi J. Wheeler
Assistant Deputy Enforcement Director


/s/ Leanne E Hartmann
Leanne E. Hartmann (CA Bar No. 264787)
Email: leanne.hartmann@cfpb.gov
Sarah Preis (D.C. Bar No. 997387) (*pro hac vice application pending*)
Email: sarah.preis@cfpb.gov
Jesse Stewart (N.Y. Bar No. 5145495) (*pro hac vice application pending*)
Email: jesse.stewart@cfpb.gov
*Enforcement Attorneys*

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

---

[133] The Proposed Order does not include CAC's assets under the purview of the asset freeze, as they are currently under the control of the Ch. 7 trustee.