1  **THE STATE OF MINNESOTA**
   EVAN ROMANOFF (MN Bar No. 0398223)
2  Assistant Attorney General
   Office of the Minnesota Attorney General
3  445 Minnesota Street, Suite 1200
   St. Paul, MN 55101-2130
4  Tel: (651) 757-1454 / Fax: (651) 296-7438
   Email: evan.romanoff@ag.state.mn.us
5
   **THE STATE OF NORTH CAROLINA**
6  M. LYNNE WEAVER (N.C. Bar No. 19397)
   Special Deputy Attorney General
7  MICHAEL T. HENRY (N.C. Bar No. 35338)
   Assistant Attorney General
8  North Carolina Department of Justice
   114 W. Edenton Street
9  Raleigh, NC 27602
   Tel: (919) 716-6000 / Fax: (919) 716-6050
10 Emails: lweaver@ncdoj.gov/mhenry@ncdoj.gov

11 **THE PEOPLE OF THE STATE OF CALIFORNIA**
   MICHAEL N. FEUER (CA Bar No. 111529)
12 Los Angeles City Attorney
   CHRISTINA V. TUSAN (CA Bar No. 192203)
13 Supervising Deputy City Attorney
   Office of the City Attorney
14 Criminal Branch, Special Litigation Section
   200 N. Main Street, 500 City Hall East
15 Los Angeles, California 90012-4131
   Tel: (213) 473-6908 / Fax: (213) 978-8112
16 Emails: christina.tusan@lacity.org

17
                    **UNITED STATES DISTRICT COURT**
18
              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
19
                          **SOUTHERN DIVISION**
20
21 Bureau of Consumer Financial        ) Case No.: **8:19-cv-01998 JVS (JDEx)**
   Protection, et al.                   )
22                                       )
              Plaintiffs,                ) **MEMORANDUM OF POINTS AND**
23      vs.                              ) **AUTHORITIES IN SUPPORT OF**
                                         ) **PLAINTIFF STATES' *EX PARTE***
24 Consumer Advocacy Center Inc., et al., ) **APPLICATION TO JOIN IN**
                                         ) **BUREAU'S *EX PARTE***
25      Defendants                       ) **APPLICATION FOR TEMPORARY**
                                         ) **RESTRAINING ORDER**
26                                       )
                                         ) **[FILED UNDER TEMPORARY SEAL]**
27                                       )
28                                       )

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STATES' EX PARTE
APPLICATION, ETC. [FILED UNDER TEMPORARY SEAL]

**THE STATE OF MINNESOTA**
EVAN ROMANOFF (MN Bar No. 0398223)
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 757-1454 / Fax: (651) 296-7438
Email: evan.romanoff@ag.state.mn.us

**THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (N.C. Bar No. 19397)
Special Deputy Attorney General
MICHAEL T. HENRY (N.C. Bar No. 35338)
Assistant Attorney General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
Tel: (919) 716-6000 / Fax: (919) 716-6050
Emails: lweaver@ncdoj.gov/mhenry@ncdoj.gov

**THE PEOPLE OF THE STATE OF CALIFORNIA**
MICHAEL N. FEUER (CA Bar No. 111529)
Los Angeles City Attorney
CHRISTINA V. TUSAN (CA Bar No. 192203)
Supervising Deputy City Attorney
Office of the City Attorney
Criminal Branch, Special Litigation Section
200 N. Main Street, 500 City Hall East
Los Angeles, California 90012-4131
Tel: (213) 473-6908 / Fax: (213) 978-8112
Emails: christina.tusan@lacity.org

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al. | Case No: |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF STATES' *EX PARTE* APPLICATION TO JOIN IN BUREAU'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| vs. | |
| Consumer Advocacy Center Inc., et al., | |
| Defendants | |
| | **[FILED UNDER TEMPORARY SEAL]** |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.     RELIEF REQUESTED IN THE BUREAU TRO ............................................ 1

II.    *EX PARTE* NOTICE SHOULD BE WAIVED IN THE INTEREST
OF JUSTICE ...................................................................................................... 2

III.   THE COURT SHOULD GRANT THIS *EX PARTE*
JOINDER APPLICATION ................................................................................ 4

THE STATES JOIN IN THE BUREAU TRO APPICATION ................................ 5

STATE OF MINNESOTA ......................................................................................... 6

MINNESOTA CONSUMER COMPLAINTS ......................................................... 7

     Consumer Sentinel Network Complaint Reference No. 89730285 .............. 8

     Consumer Sentinel Network Complaint Reference No. 85320952 .............. 8

STATE OF NORTH CAROLINA ............................................................................ 8

NORTH CAROLINA CONSUMER COMPLAINTS ............................................ 9

     A. Declaration of Alyssa Pugh .................................................................. 10

     B. Complaint to NCDOJ – File No. 1814061 ................................................ 11

     C. Complaint to NCDOJ – File No. 1807655 ................................................ 11

PEOPLE OF THE STATE OF CALIFORNIA ...................................................... 12

CALIFORNIA CONSUMER COMPLAINTS ...................................................... 14

     A. Consumer Sentinel Network Complaint Reference No. 111460393 ..... 14

     B. Consumer Sentinel Network Complaint Reference No. 107399615 ...... 15

     C. Consumer Sentinel Network Complaint Reference No. 104795362 ..... 14

CONCLUSION ......................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>

*Boubelik v. Liberty State Bank* (Minn. 1996)
    553 N.W.2d 490 ........................................................................................ 7

*First Tech. Safety Sys., Inc. v. Depinet* (6th Cir. 1193)
    11 F.3d 641   ........................................................................................ 5

*IT Corp. v. Cty. Of Imperial* (1983)
    35 Cal.3d 63   ........................................................................................ 12

*Ly v. Nystrom* (Minn. 2000)
    615 N.W.2d 302 ........................................................................................ 7

*Mayton v. Hiatt's Used Cars* (1980)
    45 N.C. App. 206 ........................................................................................ 9

*People ex rel. Mosk v. Nat'l Research Co.* (1962)
    201 Cal.App.2d 765 ........................................................................................ 12

*People v. Pac. Land Research Co.* (1977)
    20 Cal.3d 10   ........................................................................................ 12

*Reno Air Racing Ass'n, Inc. v. McCord* (9th Cir. 2006)
    452 F.3d 1126 ........................................................................................ 5

*State v. Alpine Air Prods., Inc.* (Minn. 1993)
    500 N.W.2d 788 ........................................................................................ 7

*State v. Cross Country Brank, Inc.* (Minn. App. 2005)
    703 N.W.2d 562 ........................................................................................ 6

*State ex rel. Edmisten v. Challenge, Inc.* (1981)
    54 N.C. App. 513 ........................................................................................ 9

*State v. Minn. Sch. of Bus., Inc.* (Minn. 2017)
    899 N.W.2d 467 ........................................................................................ 6

# TABLE OF AUTHORITIES (CONT'D)

**Page**

## CASES

*State ex rel. Morgan v. Dare to Be Great, Inc.* (1972)
15 N.C. App. 275 .............................................................................................. 9

*State v. Philip Morris, Inc.* (Minn. 1996)
551 N.W.2d 490 .............................................................................................. 7

*Wadena Implement Co. v. Deere & Co., Inc.* (Minn. App. 1992)
480 N.W.2d 383 .............................................................................................. 6

## STATUTES

**Business and Professions Code**

section 17200 .............................................................................................. 13

section 17203 ..........................................................................................12-13

**Federal Rules of Civil Procedure**

Rule 65(b) ......................................................................................................

**Minnesota Consumer Protection Statutes**

§§ 325D.43-.48 .............................................................................................. 6

§§ 325F.68-.694 .............................................................................................. 6

§ 8.31 subd.3 .............................................................................................. 6

**North Carolina Consumer Protection Statutes**

§ 14-291.2 .............................................................................................. 9

§ 14-423, et seq. ..........................................................................................8-9

§ 14-425 .............................................................................................. 9

§ 66-260, et seq. .............................................................................................. 8

§ 66-266, et seq. .............................................................................................. 9

§ 75-1.1 ..........................................................................................8-9

§ 75-14 ........................................................................................8-10

1

**STATUTES (Cont'd.)**

2

**U.S. Code: Title 15**

3

§ 6103 ........................................................................................... 5

4

**U.S. Code: Title 28**

5

§ 1367 ........................................................................................... 7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STATES' EX PARTE
APPLICATION, ETC. [FILED UNDER TEMPORARY SEAL]

1

# MEMORANDUM OF POINTS AND AUTHORITIES

2      The State of Minnesota, the State of North Carolina, and the People of the State of

3 California (collectively "the States"), having jointly filed a Complaint with the Bureau of

4 Consumer Financial Protection ("Bureau") seeking a permanent injunction and other

5 relief to protect consumers from Defendants' unlawful practices, apply to this court—on

6 an *ex parte* basis and, in the interest of justice, without notice to Defendants—to join in

7 the Bureau's *Ex Parte* Application for a Temporary Restraining Order with an asset

8 freeze, appointment of a receiver, other equitable relief, and an order to show cause why

9 a preliminary injunction should not issue ("Bureau TRO") against Defendants who have

10 engaged in an intricate, unlawful, and fraudulent scheme that has deceived consumers

11 and taken tens of millions of dollars from those consumers.

12 **I.   RELIEF REQUESTED IN THE BUREAU TRO**

13      The Bureau has filed an *ex parte* application seeking an order for a TRO and other

14 equitable relief that requests, among other things:

15           a. A restriction on Defendants' collection of unlawful advance fees;

16           b. A prohibition against Defendants' making certain false

17              representations;

18           c. An order that Defendants preserve certain records and tangible things;

19           d. The preservation of Defendants' websites from destruction or erasure;

20           e. An asset freeze;

21           f. Retention of assets and records by financial institutions and other third

22              parties;

23           g. Preparation of financial statements and accounting;

24           h. Collection of Defendants' credit reports;

25           i. Repatriation of foreign assets;

26           j. Noninterference with repatriation;

27           k. Appointment of a temporary receiver;

28           l. Immediate Access to business premises and records;

1

1          m. Cooperation with the temporary receiver;

2          n. Delivery of receivership property;

3          o. Prohibition on release of consumer information;

4          p. Stay of actions;

5          q. Limited expedited discovery;

6          r. Ongoing monitoring; and

7          s. Order to show cause regarding preliminary injunction.

8    **II.    *EX PARTE* NOTICE SHOULD BE WAIVED IN THE INTEREST OF JUSTICE**

9          The States request that the Court waive the notice requirement applicable to this *ex*

10   *parte* application to join the Bureau TRO. Pursuant to Local Civil Rule 7-19.2, the Court

11   has discretion to waive the notice requirement in the interest of justice. As explained in

12   detail below, the States meet the standard outlined in Rule 7-19.2, and, given that the

13   States' Joinder Application is closely related to the Bureau's TRO, the States also set

14   forth facts sufficient to establish under Federal Rule of Civil Procedure 65(b) that

15   "immediate and irreparable injury, loss, or damage will result" if Defendants receive

16   notice of this application; the Declaration of Christina V. Tusan supporting this

17   application "certifies in writing . . . the reasons why [notice] should not be required."

18         A non-noticed *ex parte* TRO like the one the States are applying to join here is

19   warranted where the facts show that irreparable injury, loss, or damage will result before

20   the defendant can be heard in opposition. *See* Fed. R. Civ. P. 65(b). In other cases in this

21   district and circuit, courts have granted law enforcement agencies an *ex parte* TRO with

22   an asset freeze and appointment of a receiver based on defendants' deceptive acts and

23   practices.[1] As in those cases, irreparable injury, loss, or damage likely will result if

24   Defendants receive notice of the Bureau TRO or of this application to join it.

25

26         [1] *See, e.g., FTC v. Apex Capital Group, et al.,* CV-18-9573-JFR (November 16,
2018) (*ex parte* TRO with asset freeze, appointment of a receiver, immediate access to
27   business premises ); *FTC v. Good EBusiness, LLC,* CV-16-1048-ODW (JPRx) (Feb. 23
16, 2016) (same); *FTC v. Sale Slash, LLC,* CV-15-03107-PA (AJWx) 25 (Apr. 27, 2015)
28   (same); *FTC v. Applied Mktg. Servs., LLC,* CV-13-6794-CAS (CWx) (Sept. 16, 2013)

2

1    In the States' experience, defendants who have engaged in fraudulent schemes like
2  those at issue here will withdraw funds from bank accounts and move or destroy
3  inculpatory documents when given notice of the enforcement action filed against them.
4  *See* Declaration of Christina V. Tusan In Support Of the States' Joinder in the Bureau's
5  TRO ("Tusan Decl.") at ¶¶ 6-12.

6    As explained in detail in the Bureau TRO and its supporting exhibits, Defendants
7  have engaged in an illegal federal student loan debt-relief operation that has resulted in
8  tens of millions of dollars in harm to tens of thousands of consumers nationwide. The
9  corporate Defendants are an interconnected web of student loan debt-relief companies
10 ("SLDR companies") that lure borrowers into paying significant illegal upfront fees by
11 deceptively claiming that consumers qualify for loan forgiveness or lower monthly
12 payments that the companies can obtain on consumers' behalf. Once consumers are lured
13 in, unbeknownst to them, the SLDR companies submit forbearance requests on their
14 behalf (that rarely benefit consumers). While the loans are in forbearance, consumers
15 make payments to the SLDR companies, which many consumers thought were going to
16 pay down their loans. The SLDR companies also routinely submit false information to
17 federal-student-loan servicers about consumers' income, family size, or marital status in
18 an effort to obtain modified monthly payments that are artificially low. These practices
19 are made possible by the actions of the individual Defendants, Albert Kim, Kaine Wen,
20 and Tuong Nguyen, each of whom facilitated the companies' illegal acts. *See* Complaint;
21 Bureau TRO.

22   In short, Defendants have shown their disregard for the rule of law by lying to both
23 consumers and loan servicers working with the Department of Education in order to

24 (same); *FTC v. Asset & Capital Mgmt. Group, Inc.*, CV-13-5267-DSF (JCx) (July 24,
25 2013) (same); *Federal Trade Commission V. Kutzner, et al.* CV 16-00999-BRO (June 1,
26 2016) (same); *FTC v. Am. Mortgage Consulting Group, LLC*, SACV-12-01561-DOC
   (JPRx) (Sept. 18, 2012) (same); *FTC v. Rincon Mgmt. Servs. LLC*, CV-11-01623-VAP
27 (SPx) (Oct. 11, 2011) (same); *FTC v. Forensic Case Mgmt. Servs., Inc.*, CV-11-07484-
28 RGK (SSx) (Sept. 13, 2011) (same); *FTC v. US. Homeowners Relief Inc.*, CV-10-01452-
   JST (PJWx) (Sept. 25, 2010) (same).

3

1  conceal from consumers their collection of illegal advanced fees. These practices
2  establish that these Defendants, like other defendants operating similar schemes, would
3  almost certainly disregard a direct court order, dissipate their assets, and destroy records
4  evidencing their misconduct within the time it would take to hold a hearing. *See, e.g.,*
5  *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (citing *First*
6  *Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993).

7  　　　Defendants have gone to great lengths to escape responsibility for their
8  misconduct. Facing scrutiny from law enforcement and state regulators, Defendants have
9  shifted the debt-relief operation to additional corporate entities and drained assets out of
10  the original debt-relief company, Consumer Advocacy Center (CAC). CAC then filed for
11  bankruptcy, claiming it had ceased operations. In fact, CAC had transferred millions of
12  dollars to other companies owned or controlled by the individual Defendants. The debt-
13  operation run by the defendants has continued, collecting over $71 million from
14  consumers since 2016, more than $52 million of which were collected after CAC began
15  shifting its operations to other entities controlled by the individual Defendants. *See*
16  Complaint; Bureau TRO. The repeated steps Defendants have taken to conceal assets,
17  hide the responsible corporate entities and individuals, and to escape responsibility for
18  this misconduct confirms that a non-noticed *ex parte* application is necessary here.

19  　　　In light of these and other efforts to evade law enforcement, dissipate assets, and
20  continue harming consumers, the States submit that without an order granting the
21  Bureau's and States' request to waive notice pursuant to Local Civil Rule 7-19.2, funds
22  may not be available to satisfy a final order granting restitution to defrauded customers,
23  and substantial volumes of inculpatory evidence may be destroyed. *See* Tusan Decl. ¶¶
24  6-12.

25  **III.   THE COURT SHOULD GRANT THIS *EX PARTE* JOINDER APPLICATION**

26  　　　In order to avoid duplicative briefing, and for the reasons specific to each of the
27  States that are set forth in more detail below, the States' respectfully request that the
28  Court grant their *ex parte* application to join the Bureau TRO, waive notice of this *ex*

1  *parte* application to Defendants, and enter the separate Proposed Order lodged

2  concurrently with this application, which Order enters the relief requested in the Bureau's

3  TRO under the authority provided by the States' respective consumer protection statutes.

## THE STATES JOIN IN THE BUREAU TRO APPLICATION

5  The State of Minnesota, by its Attorney General, Keith Ellison ("Minnesota"), the

6  State of North Carolina, by its Attorney General, Joshua H. Stein ("North Carolina"), and

7  the People of the State of California, by and through Michael N. Feuer, Los Angeles City

8  Attorney ("California," and collectively with Minnesota and North Carolina, "the

9  States"), respectfully join the Bureau of Consumer Financial Protection's ("Bureau")

10  concurrently filed *Ex Parte* Application for Temporary Restraining Order ("Bureau

11  TRO"), and concurrently filed Memorandum of Points and Authorities In Support of

12  Plaintiff's *Ex Parte* Application for Temporary Restraining Order (the "TRO Memo").

13  The States join in the concurrently filed *ex parte* application, and adopt and

14  incorporate all arguments and evidence raised in the Bureau TRO and supporting

15  memorandum, declarations, and other documentary evidence filed in support of the

16  Bureau TRO.

17  This joinder will present brief additional State-specific authorities and evidence in

18  support of the Bureau TRO.

19  Further, in addition to their authority to enforce their respective state laws,

20  pursuant to the Telemarketing Act, the State Attorneys General have specific authority to

21  enforce the Telemarketing Act and the TSR, including the TSR's prohibitions on debt

22  relief services, 16 C.F.R. 310.4(a)(5), and to seek to enjoin activity in violation of the

23  Act. See 15 U.S.C. § 6103 (providing that a State "may bring a civil action on behalf of

24  its residents … to enjoin such telemarketing, to enforce compliance with such rule of the

25  Commission, to obtain damages, restitution, or other compensation on behalf of residents

26  of such State, or to obtain such further and other relief as the court may deem

27  appropriate.")

28  //

5

3a234d4516309672

1

## STATE OF MINNESOTA

2    As alleged in the parties' Complaint and as set forth in the Bureau's TRO Memo,

3  Defendants' misrepresentations and deceptive acts and practices in connection with the

4  offer and sale of student loan debt relief services violate Minnesota consumer protection

5  laws, including the Minnesota Prevention of Consumer Fraud Act ("MNCFA"), Minn.

6  Stat. §§ 325F.68-.694, and the Minnesota Uniform Deceptive Trade Practices Act

7  ("MNDTPA"), Minn. Stat. §§ 325D.43-.48 (collectively, the "Minnesota Consumer

8  Protection Statutes"). Where, as here, a defendant violates Minnesota's Consumer

9  Protection Statutes, Minnesota is entitled, by statute, to injunctive (and other equitable)

10  relief. *See, e.g.*, Minn. Stat. §§ 8.31 subds. 3, 3a (authorizing the Attorney General to

11  obtain injunctive relief and other equitable relief upon bringing an action to enforce and

12  remediate violations of the Consumer Protection Statutes); 325F.70, subd. 1 (providing

13  for injunctive relief); 325D.45, subd. 1 (same); *accord State v. Minn. Sch. of Bus., Inc.*,

14  899 N.W.2d 467, 471-72 (Minn. 2017) (holding that the Attorney General's burden to

15  obtain an injunction pursuant to section 8.31 is "limited to the statutory condition:

16  proving that a listed law 'has been or is being violated or is about to be violated'").

17    Similar to the Bureau, preliminary injunctions involving Minnesota Attorney

18  General enforcement of the Minnesota Consumer Protection Statutes do not require a

19  showing of irreparable harm or that legal remedies are inadequate. *State v. Cross Country*

20  *Bank, Inc.*, 703 N.W.2d 562, 572 (Minn. App. 2005). Rather, courts may issue a

21  temporary restraining order or preliminary injunction upon a showing by the Minnesota

22  Attorney General that defendants "violated or were about to violate the statutes involved"

23  and that "injunctive relief would fulfill the legislative purpose of the statutes." *Id.*

24  (quoting *Wadena Implement Co. v. Deere & Co.*, Inc., 480 N.W.2d 383, 389 (Minn. App.

25  1992)); *accord Minn. Sch. of Bus., Inc.*, 899 N.W.2d at 471-72 (recognizing that "[t]he

26  conditions that must be met to grant a statutory injunction are determined by the text of

27  the statute authorizing the injunction"). Accordingly, Minnesota is entitled to a temporary

28  restraining order and preliminary injunction on its supplemental state law claims, 28

6

1  U.S.C. § 1367, based upon a showing that: (1) Defendants violated, are violating, or are
2  about to violate, the MNCFA and MNDTPA, and (2) the injunctive relief sought would
3  fulfill the legislative purpose of the MNCFA and MNDTPA.

4       There is more than sufficient evidence that Defendants have violated the
5  Minnesota Consumer Protection Statutes, based on the evidence provided by the Bureau
6  in support of the Bureau TRO and the State-specific evidence outlined below. Moreover,
7  the injunctive relief sought here—including the requirement that Defendants stop
8  misrepresenting their student loan debt relief services and cease collecting advance
9  fees—undoubtedly would fulfill the purposes of the Minnesota Consumer Protection
10  Statutes because it would protect consumers from any further harm while the parties
11  prosecute the Defendants' misconduct.

12       "In passing consumer fraud statutes, the legislature clearly intended to make it easier
13  to sue for consumer fraud than it had been to sue for fraud at common law." *State v.*
14  *Alpine Air Prods., Inc.*, 500 N.W.2d 788, 790 (Minn. 1993). *See also State v. Philip*
15  *Morris, Inc.*, 551 N.W.2d 490, 496 (Minn. 1996) ("These statutes are generally very
16  broadly construed to enhance consumer protection."); *Boubelik v. Liberty State Bank*, 553
17  N.W.2d 393, 402 (Minn. 1996) ("Consumer protection statutes are remedial in nature and
18  are to be liberally construed in favor of protecting consumers."); *State v. Alpine Air*
19  *Prods., Inc.*, 490 N.W.2d 888, 892 (Minn. App. 1992) (noting the "remedial" nature of
20  the Minnesota Consumer Protection Statutes that "were intended to broaden the cause of
21  action to counteract the disproportionate bargaining power present in consumer
22  transactions"). As the Supreme Court reiterated in *Philip Morris*, these statutes "reflect a
23  clear legislative policy encouraging aggressive prosecution of statutory violations." 551
24  N.W.2d at 495. Accordingly, the Attorney General has "broad enforcement authority" to
25  remediate violations of these laws. *Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000).

26  **MINNESOTA CONSUMER COMPLAINTS**

27       As of July 2018, the State of Minnesota has identified over 1,200 Minnesota
28  consumers who contracted with Premier Student Loan Center ("Premier"), just one of the

1  Defendants named in the parties' Complaint. (See Declaration of Evan Romanoff

2  ("Romanoff Decl.") at ¶ 4.) Premier has collected over $570,000 from this subset of

3  consumers alone. (*Id.*) Summarized below are two Minnesota consumer complaints taken

4  from the Federal Trade Commission's ("FTC") Consumer Sentinel database.

5  **Consumer Sentinel Network Complaint Reference No. 89730285**

6  This Maple Grove consumer signed up with Premier, which persuaded her to pay

7  $300 for three months based on promises of student loan forgiveness. Romanoff Decl.,

8  Ex. A. Premier told the consumer that the payments would go toward paying down her

9  student loan balance. *Id.* Only after she signed up and paid the fees did she realize that

10  none of the payments she made went toward her student loans. *Id.*

11  **Consumer Sentinel Network Complaint Reference No. 85320952**

12  This Brooklyn Park consumer received a call from Premier, which claimed to be

13  affiliated with the Department of Education. Romanoff Decl., Ex. B. Premier informed

14  this consumer that it could consolidate her student loans for a monthly fee of $189 for

15  five months. *Id.*

16  ## STATE OF NORTH CAROLINA

17  Defendants also have violated North Carolina law, including the North Carolina

18  Debt Adjusting Act, N.C. Gen. Stat. § 14-423, et seq., (NCDAA); North Carolina Unfair

19  and Deceptive Practices Act, N.C. Gen. Stat. § 75-1.1 (NCUDPA); and North Carolina

20  Telephonic Seller Registration Act, N.C. Gen. Stat. § 66-260, et seq. (NCTSRA)

21  (collectively, "North Carolina Consumer Protection Statutes"). As alleged in the

22  Complaint and as further described in the Burearu's TRO Memo, Defendants'

23  misrepresentations and deceptive acts and practices in connection with the offer and sale

24  of student loan debt relief services violate North Carolina's Consumer Protection

25  Statutes.

26  Where, as here, Defendants have violated North Carolina's Consumer Protection

27  Statutes, North Carolina is entitled, by statute, to injunctive (and other equitable) relief.

28  See, e.g., N.C. Gen. Stat. § 75-14 (authorizing the Attorney General to obtain temporary,

8

1  preliminary, and permanent injunctive relief to carry out the provisions of Chapter 75,

2  which include the Consumer Protection Statutes); N.C. Gen. Stat. § 75-1.1 (declaring

3  unfair or deceptive practices in or affecting commerce as unlawful); N.C. Gen. Stat. § 14-

4  423 (authorizing the Attorney General to seek injunctive relief to enjoin violations of the

5  Debt Adjusting Act, including the collection of advance fees for debt settlement services,

6  as an unfair and deceptive practice, and authorizing the Attorney General to seek the

7  appointment of a receiver to assist in the recovery of monies unlawfully collected from

8  consumers); N.C. Gen. Stat. § 66-266 (providing that any violation of the Telephonic

9  Seller Registration Act is an unfair and deceptive practice, and authorizing the Attorney

10  General to bring an action to enforce the Act).

11       Under established North Carolina law, the standard governing a motion by the State

12  for preliminary relief in consumer protection cases is different from the traditional

13  standard applicable to private litigants. In order to obtain a preliminary injunction, the

14  State is only required to show a reasonable likelihood of success on its claim that the

15  defendants' activity is in violation of law. See generally, *State ex rel. Edmisten v.*

16  *Challenge, Inc.*, 54 N.C. App. 513 (1981); *State ex rel. Morgan v. Dare to Be Great, Inc.*,

17  15 N.C. App. 275 (1972). It is not necessary for the Attorney General to demonstrate

18  irreparable harm or even actual injury; a showing that "that the act or practice complained

19  of adversely affects the public interest" is sufficient. *Challenge, Inc.,* 54 N.C. App. at 522

20  (citing *Mayton v. Hiatt's Used Cars*, 45 N.C. App. 206, 211, disc. review denied, 300

21  N.C. 198, (1980)). In *Challenge*, the North Carolina Court of Appeals noted that the

22  Attorney General has specific statutory authority to obtain injunctive relief against

23  pyramid schemes (the activity at issue in that case), N.C. Gen. Stat. § 14-291.2, and to

24  obtain mandatory orders to enforce the provisions of Chapter 75, N.C. Gen. Stat. § 75-14.

25  *Id.*  Similarly, in this case, the Attorney General has specific authority to obtain

26  injunctions against debt adjusting schemes, including the collection of illegal advance

27  fees for debt settlement services, N.C. Gen. Stat. § 14-425, as well as to seek injunctions

28

9

1  against the Defendants' unfair and deceptive trade practices pursuant to N.C. Gen. Stat. §
2  75-14.

3  **NORTH CAROLINA CONSUMER COMPLAINTS**

4      The Consumer Protection Division of the North Carolina Attorney General's
5  Office (NCAGO) has received four consumer complaints against the Defendants, and the
6  NCAGO has identified over twenty  complaints against the Defendants that have been
7  filed by North Carolina consumers with the Federal Trade Commission against
8  Defendants, using the names Premier Student Loan Center, SL Account Management,
9  Financial Preparation Services, and other names identified in the Complaint. See
10  Declaration of Lynne Weaver ("Weaver Decl.") at ¶ 4. These complaints are fully
11  consistent with the allegations of the Complaint, as they illustrate Defendants' practices
12  and the harm Defendants have inflicted on consumers.  Summarized here are the
13  declaration of one North Carolina consumer and the complaints of two consumer
14  complainants.

15      **A.  Declaration of Alyssa Pugh**

16      Alyssa Pugh, who lives in Franklinville, North Carolina, attests that in 2017, she
17  was looking for assistance in lowering her student loan payments and contacted Premier
18  Student Loan Center ("Premier"). See Plaintiff's Exhibit 56, Declaration of Alyssa Pugh
19  ("Pugh Decl.") at ¶ 4. When Ms. Pugh contacted Premier, Premier told her it worked with
20  the U.S. Department of Education (DOE) and assured her it could lower her monthly loan
21  payments. Ms. Pugh told Premier that she was a speech therapist working in the public
22  school system but was considering leaving for the private sector. Pugh Decl. at ¶¶ 5-6. In
23  providing Premier with her relevant information, Ms. Pugh told Premier she was married
24  and had one child. Premier told Ms. Pugh that its fee would be $248.75 for four months,
25  and that her student loan payments would then be reduced to $41 a month for ten years.
26  Pugh Decl. at ¶¶ 8-9. Over fifteen months, Ms. Pugh paid Premier $1,487. Pugh Decl. at
27  ¶14. Ms. Pugh subsequently received a letter from her loan servicer FedLoan, stating that
28  she was no longer eligible for reduced student loan payments under the income-driven

1   repayment (IDR) plan because she had taken a job with increased income. Upon
2   contacting FedLoan, Ms. Pugh learned for the first time that FedLoan was not working
3   with Premier, and that Premier had changed her federal student aid (FSA) ID number and
4   had created a new email for her. Pugh Decl. at ¶¶ 16-17. Ms. Pugh also learned that
5   Premier had submitted false information to FedLoan, stating that she was a single mother
6   with three children, which had improperly qualified her for reduced payments. Pugh
7   Decl. at ¶ 18. As a result, Ms. Pugh's loan balance subsequently increased because of
8   Premier's submission of false documents and information to DOE, as she did not actually
9   qualify for the artificially lowered payments which did not reduce her loan balance. Pugh
10  Decl. at ¶ 20.

11          **B.    Complaint to NCDOJ – File No. 1814061**

12          This consumer, who is from Columbia, North Carolina, complained to NCDOJ in
13  December 2018 about Financial Preparation Services ("FPS"). See Declaration of Lynne
14  Weaver ("Weaver Decl."), Ex. B. The consumer stated she was contacted by FPS and
15  told she qualified for student loan forgiveness. FPS asked her to verify her email address
16  on studentaid.gov. The consumer states she was told by FPS that her loans totaled
17  $77,583, and that she was approved for a consolidated loan of $66,258, but that she
18  would only need to pay back $11,325. She understood her payments would be $207 for
19  six (6) months, and then $42 for 240 months. FPS asked the consumer for her credit card
20  information to draft her account. Later the consumer received an email from her servicer
21  stating that her FSA password had been changed, which she had not authorized FSA to
22  do. When she contacted her loan servicer, she was told that FPS "was a scam." She
23  immediately contacted FPS to cancel.

24          **C.    Complaint to NCDOJ – File No. 1807655**

25          This consumer, who is from Durham, North Carolina, complained to NCDOJ in
26  July 2018 about Premier. See Weaver Decl., Ex. A. The consumer stated she was called
27  by an agent of Premier who told her that Premier could lower her student loan payment,
28  and that, of her student loan balance of $39,231, she would only need to repay $14,305.

11

1  She understood that she would make five monthly payments of $239 and then payments
2  of $114 for 115 months; and then her loan would be paid in full. The consumer learned
3  from her servicer FedLoan that Premier had submitted an IDR application for her with
4  "wrong information" in order to lower her monthly payment. The consumer reported she
5  felt like "a ghost in this process," as she was told by Premier not to call FedLoan
6  anymore; and, upset by Premier's false representations, she cancelled. When she tried to
7  contact Premier to express her concerns, her calls were not returned. Only after she
8  complained to NCDOJ, did Premier respond and refund the $717 she had paid to Premier
9  before cancelling.

## PEOPLE OF THE STATE OF CALIFORNIA

11  Under California law, "An action filed by the People seeking injunctive relief . . .
12  is fundamentally a law enforcement action designed to protect the public . . ." *People v.*
13  *Pac. Land Research Co.*, 20 Cal.3d 10, 17 (1977). Here, similar to Minnesota and North
14  Carolina and their authority under their respective states' laws as well as the Bureau, the
15  People of the State of California are seeking to protect the public from the unlawful
16  predatory student loan servicing that Defendants, as detailed in the Complaint and the
17  Bureau TRO and TRO Memo, have used to harm consumers nationwide, including in
18  California. See Complaint; TRO Memo. California Business and Professions Code
19  section 17203 authorizes California law enforcement, including the Los Angeles City
20  Attorney, to seek injunctive relief, including temporary restraining orders and preliminary
21  injunctions, to protect the public from violations of consumer protection laws.  Cal. Bus.
22  & Prof. Code § 17203. Section 17203 specifically empowers the Court to issue orders "as
23  may be necessary to prevent the use or employment by any person of any practice which
24  constitutes unfair competition." *Id*. Once the trial court invokes its equitable jurisdiction,
25  it is within the court's broad discretion to determine the scope or type of relief that should
26  be granted. *People ex rel. Mosk v. Nat'l Research Co*. 201 Cal.App.2d 765, 775 (1962).
27  In a civil law enforcement action brought pursuant to a law in which the People
28  may obtain injunctive relief, harm to the public is presumed. *IT Corp. v. Cty. of Imperial*,

12

1   35 Cal.3d 63 (1983); see also TRO Memo. In such a case, if the governmental entity
2   establishes a reasonable probability that it will prevail on the merits at trial, there arises a
3   rebuttable presumption that the potential harm to the public outweighs the potential harm
4   to the defendant. *IT Corp.*, 35 Cal.3d at 71.

5        By authorizing injunctive relief via California Business and Professions Code
6   section 17203, including emergency and preliminary injunctive relief, to remedy
7   violations of California's consumer protection laws, via California Business and
8   Professions Code section 17203, the California Legislature has determined that such
9   violations harm the public interest and that an injunction is the proper way to protect
10  against that harm. Thus, if the People demonstrate a reasonable probability of prevailing
11  on the merits at trial, harm to the public is presumed. The burden is on Defendants to
12  demonstrate that they will be harmed by issuance of the injunction sought. Here, the
13  Bureau's and States' requested injunction is fundamentally a request that Defendants stop
14  violating clear laws, i.e., that they stop making misrepresentations and performing
15  deceptive acts and practices in connection with the offer and sale of student loan debt
16  services and relief. Defendants cannot credibly claim harm will issue from an injunction
17  that simply requires them to stop breaking the law.

18       Based on the compelling, voluminous evidence provided by the Bureau in support
19  of the Bureau TRO, and the State-specific information provided in this *Ex Parte*
20  Application to Join, more than a reasonable probability exists that California will
21  establish violations of the TSR and Business and Professions Code sections 17200 et seq.
22  (the "Unfair Competition Law" or "UCL"). Based on this evidence, Defendants cannot
23  demonstrate that any interest of theirs in continuing to operate their illegal enterprise
24  outweighs the interest of the general public in being protected from Defendants' unlawful
25  practices.

26       And because several of the predicate violations California has identified involve a
27  failure to register as a lawful student loan servicer and as a business that can negotiate
28  loans on another's behalf, and Defendants have not in fact so registered, (see Declaration

1  of Steven Shin, at ¶¶ 15-19 ("Shin Decl.")), Defendants have violated the UCL as a
2  matter of law; as a result, it is overwhelmingly likely that California will establish these
3  predicate violations.

4      If Defendants are permitted to continue their unlawful scheme, the continuing
5  harm to the public will be devastating and irreparable. Consumers targeted by Defendants
6  face not only the loss of substantial amounts of money but, in most cases, a range of
7  collateral consequences that negatively impact their lives and livelihoods. For example,
8  consumers defrauded by Defendants can be denied access to additional educational loans
9  (thereby losing opportunities to build and evolve their careers), suffer harm to their
10  credit, and incur substantial increases in the amounts owed on their loans. If Defendants
11  are not enjoined from their conduct, consumers will be irreparably harmed.

12  **CALIFORNIA CONSUMER COMPLAINTS**

13      The People of the State of California have identified dozens of unique complaints
14  against the Defendants named in the parties' Complaint that have been filed by California
15  consumers with the Federal Trade Commission alone. See Shin Decl. at ¶ 14. Every one
16  of the main Defendants named in the Complaint is implicated by these FTC complaints.
17  These complaints illustrate the harm caused to California consumers by Defendants'
18  pattern and practice of unlawful practices, and describe conduct consistent with the
19  allegations as to the harm inflicted by Defendants on consumers in general as set forth in
20  the parties' Complaint and the Bureau's TRO Memo. Summarized here are three
21  California consumer complaints taken from the FTC's Consumer Sentinel database.

22  **A. Consumer Sentinel Network Complaint Reference No. 111460393**

23      This Los Angeles consumer received a call from Defendant Prime Consulting,
24  LLC d/b/a Financial Preparation Services ("Prime"), in which the company allegedly
25  offered the consumer access, for "a small fee," to a "government-backed student loan
26  forgiveness program" that would lower the consumer's monthly payments, stop interest
27  from accruing on this loans, and forgive any debt not paid after 240 months. Shin Decl.,
28  Ex. E. The consumer only realized it was a scam after making $1,245 in payments to

14

1 Prime. *Id.* When the consumer called his loan servicer, he was told by the servicer that
2 Prime had put his loans in forbearance, and misrepresented the number of dependents he
3 supported in order to artificially lower his monthly loan payments. *Id.* When the
4 consumer confronted Prime, the company refused to explain what it had done, and urged
5 the consumer to hand over yet more money to get his loans out of forbearance and into an
6 income-driven repayment program. *Id.*

7 **B. Consumer Sentinel Network Complaint Reference No. 107399615**

8 This consumer made a $1,000 lump sum payment plus monthly fees to Premier, in
9 reliance on the company's false promise that it would reduce the consumer's total loan
10 repayment amount and limit his repayment to a ten-year period. *Id.* The consumer's
11 monthly payments were $67 before he contracted with Premier; afterwards his monthly
12 payment amount jumped up to $339 a month. Despite paying Premier a total of $5,500
13 over a six-year period, when the consumer checked his actual federal student loan
14 balance he discovered the total amount owed had decreased by only $100 in that time.
15 The consumer is seeking a full refund of the $5,500 he paid to Premier.

16 **C. Consumer Sentinel Network Complaint Reference No. 104795362**

17 Premiere cold-called this consumer on his cellphone and told him that it could
18 settle his $46,000 in student loan debt for less than 20% of what he owed as long as he
19 paid $1,000 down, and then paid $30 a month for thirty years. *Id.* The consumer
20 understood that these $30 monthly payments, which were withdrawn directly from his
21 checking account by Premier, would be used to directly pay down his loans. Based on
22 this representation from Premier, the consumer sent monthly payments to the company
23 for over a year, only to then discover that none of the money he paid to Premier had been
24 sent to his actual federal loan servicer, and that his loans were almost in default status. *Id.*

25 **CONCLUSION**

26 The States respectfully request that the Court grant this *Ex Parte* Application to
27 Join in the Bureau's *Ex Parte* Application for a Temporary Restraining Order; that the
28 Court grant the Bureau TRO; and that the Court grant the relief set forth in the States'

15

1 | Proposed Order filed concurrently herewith, as well as the relief set forth in the Proposed

2 | Order filed by the Bureau concurrent with the Bureau TRO.

3 |

4 | October 19, 2019                          Respectfully submitted,

5 |                                           **KEITH ELLISON**

6 |                                           **Attorney General of Minnesota**

7 |

8 |                                           EVAN S. ROMANOFF (*pro hac vice* pending)
                                              Attorney Reg. No. 0398223

9 |                                           Assistant Attorney General

10|                                           445 Minnesota Street, Suite 1200
                                              St. Paul, MN 55101-2130

11|                                           Telephone: (651) 757-1454
                                              Fax: (651) 296-7438

12|                                           evan.romanoff@ag.state.mn.us

13|

14|                                           *Attorneys for the State of Minnesota,*
                                              *By Its Attorney General, Keith Ellison*

15|

16|

17|                                           **JOSHUA H. STEIN**
                                              **Attorney General of North Carolina**

18|

19|

20|                                           M. LYNNE WEAVER (*pro hac vice* pending)
                                              N.C. State Bar No. 19397

21|                                           Special Deputy Attorney General
                                              114 W. Edenton Street

22|                                           Raleigh, NC 27602

23|                                           Telephone: (919) 716-6039
                                              Fax: (919) 716-6050

24|                                           Lweaver@ncdoj.gov

25|

26|

27| //

28| //

16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STATES' EX PARTE
APPLICATION, ETC. [FILED UNDER TEMPORARY SEAL]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MICHAEL N. FEUER**
**Los Angeles City Attorney**

Christina V. Tusan
CA Bar No. 192203
Supervising Deputy City Attorney
Office of the Los Angeles City Attorney
Criminal and Special Litigation Branch
200 North Main St., 500 City Hall East
Los Angeles, California 90012-4131
Telephone (213) 978-8707
Fax (213) 978-8111
christina.tusan@lacity.org

*Attorneys for the People of the State of California*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STATES' EX PARTE
APPLICATION. ETC. [FILED UNDER TEMPORARY SEAL]