## Processing

| | | | | |
|---|---|---|---|---|
| Estimated Monthly Volume: $ 100,000 | | | | |

Average Ticket Amount (average price of the product or service): $ 125

Highest Ticket Amount (highest price of the product or service): $ 899

Have you accepted credit card on this website before: ☐ YES  ☑ NO

If yes, name of current/former processor:   Account/Merchant ID #:   Years with this processor:

Have you EVER been blacklisted or had an account closed by MasterCard/Visa or ACH processor? ☐ YES  ☑ NO

Required processing currencies: 1 USD   2   3   4

Required settlement currencies: 1 USD   2   3   4

Do you require MOTO (Virtual Terminal, ie phone orders) : ☐ YES  ☑ NO  If yes, % of sales via MOTO :   % via online Credit Card:   %

Required Card Brands: ☑ Visa  ☑ MasterCard  ☐ Maestro  ☐ Diners Club  ☑ Discover  ☐ Cartes Bancaires
☐ JCB  ☐ ChinaUnionPay

## Integration

Will you need assistance with the API Integration from our IT Department? ☐ YES  ☑ NO

Do you have a web programmer or other IT personnel that will be assisting you with the integration? ☑ YES  ☐ NO

Are you offering memberships on your website? ☐ YES  ☑ NO

Do you have a shopping cart? ☐ YES  ☑ NO   If Yes, which one?

How did you hear about Allied Wallet ?

## AUTHORIZATION & ACKNOWLEDGEMENT

As part of my application, the company may obtain commercial credit bureau reports on applicant companies. In some instances, additional information about principals of the applicant company may be required, and the company will then obtain a consumer credit report on the Principal(s) identified in this application. The Principals' signatures are therefore required below.

I understand and give authorization to Allied Wallet to hold and distribute a copy of my identification for any additionally required third-party documentation. I also give authorization and understand the third-party of Allied Wallet's choosing may hold a copy of my identification.

☑ Yes, Authorize

*I certify that the above information is true and correct, to the best of my knowledge.*

*Moreover, Allied Wallet will handle personal data with applicable local data protection and privacy laws and regulations, including, but not limited to, the European Union General Data Protection Regulation (2016/679) (the "GDPR"). GDPR was adopted in April 2016 and became enforceable in May 2018. All our client data is held securely within our IT environment held in the UK all our data storage providers, including our back-up storage providers, based in the UK.*

| | | | |
|---|---|---|---|
| Tuong Nguyen | 06/04/2017 | | |
| *Print Principal Name* | *Date* | *Print Principal Name* | *Date* |

3

CONFIDENTIAL

Allied CID response

Pl. Ex. 25
p. 332
ALLIED_0000004

## Document Requirements for New Applications

**Required Documents:**

1. Completed and signed application
2. One form of Photo Identification. Color copy of current Passport, driver's license, Government Issued Identification, of owner(s) / signatory(ies)
3. Corporate documents: Copy of Articles of Incorporation (or equivalent). If DBA, please furnish DBA filing. If not available, a copy of your business license may be considered an acceptable substitute.
4. Proof of URL ownership.

**If Applicable:**

1. Business License IF required by law or for specific industries (i.e. Forex, Gaming, etc.)
2. Supplier agreement, if applicable.

**For Websites:**

1. Clear description of goods and services listed on site
2. Clear pricing and currencies of each and every product and service
3. Terms and conditions clearly stated online.
4. Privacy policy on site
5. Contact details and location of business easily found on site
6. Customer service email and phone number listed on website
7. Times listed that customer service is available
8. Refund policy clearly stated
9. Shipping policy clearly stated on order page
10. Display Visa and MasterCard logo's at checkout
11. SSL on all pages where customer information is collected

4

Allied CID response

CONFIDENTIAL



**Merchant Services Application**

Important: Every field MUST be filled in.

## Company

| | |
|---|---|
| Company DBA (doing business as) / trading name:  PREMIER STUDENT LOAN CENTER | |
| Legal business name:  TRUE COUNT STAFFING INC | Email address:  TRUECOUNTSTUDENT@OUTLOOK.COM |
| Tax ID number (optional): | Skype / IM address (optional): |
| Business telephone number:  (888) 548-0476 | Customer service phone number:   (888) 548-0476 |
| Country of Incorporation or Organization:  U.S. | Date business established (MM/YY):   03/17 |
| Business street address: 777 E SIERRA MADRE AVE | |

| City: AZUSA, CA | Country:  U.S. | Postcode: 91702 |
|---|---|---|
| Business mailing address: | | |
| City: | Country: | Postcode: |

Type of business:  ☐ Individual   ☐ Partnership   ☑ Corporation   ☐ Nonprofit
Operating from:   ☐ Office suite   ☐ Retail storefront   ☐ Warehouse   ☐ Private Sector

## Website(s) (Important: We NEED to be able to login to your website(s) to approve your application)

| | |
|---|---|
| Website's URL: PREMIERSTUDENTLOANCENTER.COM | Website's URL: |
| Industry: STUDENT LOAN DOCUMENT PREPARATION | Industry: |
| Description of Products/Services: PROCESSING | Description of Products/Services: |
| AND CUSTOMER SERVICE | |
| User ID: | User ID: |
| Password: | Password: |

| | |
|---|---|
| Website's URL: | Website's URL: |
| Industry: | Industry: |
| Description of Products/Services: | Description of Products/Services: |
| | |
| User ID: | User ID: |
| Password: | Password: |

1

Allied CID response

Pl. Ex. 25
p. 334

CONFIDENTIAL

ALLIED_0000006

**Ownership** Please list ALL owners. Total MUST equal 100% ownership (attach additional sheet if necessary).

| | | | |
|---|---|---|---|
| Owner 1 name: KAINE WEN | % ownership: 100 | Owner since: 03/17 | (MM/YY) |
| Current address: ▮ | | | |
| City: | Country: | Postcode: | |
| Previous address: | | | |
| City: | Country: | Postcode: | |
| TaxID #: ▮3143 | Mobile phone #: ▮ | Date of Birth: ▮1977 | |
| Personal email address: | | Driver License #: ▮ | |
| Passport #: | | Passport country of issue: | |

| | | | |
|---|---|---|---|
| Owner 2 name: | % ownership: | Owner since: | (MM/YY) |
| Current address: | | | |
| City: | Country: | Postcode: | |
| Previous address: | | | |
| City: | Country: | Postcode: | |
| TaxID #: | Mobile phone #: | Date of Birth: | |
| Personal email address: | | Driver License #: | |
| Passport #: | | Passport country of issue: | |

## Terms

**Payout Schedule**

Allied Wallet wires every Wednesday to all Merchants due more than 1000 units of the processed and settled currency. Funds will post to the wired account within 1 to 4 business days (bank holidays and country specific holidays may delay funds). Price display: the customer must be able to identify the final price of a product unmistakably.

All Merchants must put the Allied Wallet logo and Allied Wallet details for customers to clearly see who they will be billed by on payment pages – Allied Wallet technical team will send you details. This must be done prior to your first payout.

****All fees will be charged in the equivalence of USD, with the exception of EUR and GBP
****Should a chargeback be issued on the basis of fraud, an additional $20.00 per dispute will be charged.

**Discount Rate and Details**

Currency: $

Merchant Discount Rate: Visa _____ MC _____ Discover / Diners Club _____ AMEX_____ Other _____ Alt Pay Methods – See page5

One Time Setup Fee: _____     Monthly Maintenance Fee: $95.00     Transaction Fee: _____

Refund Fee: _____     Chargeback 1 Fee: $5.00     Chargeback Fee: _____     Wire Fee: $45.00

Holdback Reserve (Rolling 6 Months): 10%

*Holdback funds are released on the 15th of each month, unless this date falls on a weekend, and are only released if 1000 Units or more are due and are subject to a wire fee*

Payout Period: *12 days in arrears based on amount to be determined*

Processing Period: *Saturday to Friday*

New clients have no limit on voids of pre-authorizations. Refunds are limited to five percent (5%) of total captured transactions.

2

Allied CID response

CONFIDENTIAL

ALLIED_0000007

## Processing

| Estimated Monthly Volume: $ 150,000 |
| Average Ticket Amount (average price of the product or service): $ 175 |
| Highest Ticket Amount (highest price of the product or service): $1,000 |

Have you accepted credit card on this website before: ☐ YES  ☑ NO

| If yes, name of current/former processor: | Account/Merchant ID #: | Years with this processor: |

Have you EVER been blacklisted or had an account closed by MasterCard/Visa or ACH processor? ☐ YES  ☑ NO

Required processing currencies: 1 $   2   3   4

Required settlement currencies: 1 $   2   3   4

Do you require MOTO (Virtual Terminal, ie phone orders) : ☐ YES  ☑ NO  If yes, % of sales via MOTO :   % via online Credit Card:   %

Required Card Brands: ☑ Visa  ☑ MasterCard  ☐ Maestro  ☐ Diners Club  ☑ Discover  ☐ Cartes Bancaires
☐ JCB  ☐ ChinaUnionPay

## Integration

Will you need assistance with the API Integration from our IT Department? ☑ YES  ☐ NO

Do you have a web programmer or other IT personnel that will be assisting you with the integration? ☐ YES  ☑ NO

Are you offering memberships on your website? ☐ YES  ☑ NO

Do you have a shopping cart? ☐ YES  ☑ NO   If Yes, which one?

How did you hear about Allied Wallet ?

## AUTHORIZATION & ACKNOWLEDGEMENT

As part of my application, the company may obtain commercial credit bureau reports on applicant companies. In some instances, additional information about principals of the applicant company may be required, and the company will then obtain a consumer credit report on the Principal(s) identified in this application, The Principals' signatures are therefore required below.

I understand and give authorization to Allied Wallet to hold and distribute a copy of my identification for any additionally required third-party documentation. I also give authorization and understand the third-party of Allied Wallet's choosing may hold a copy of my identification.

☑ Yes, Authorize

*I certify that the above information is true and correct, to the best of my knowledge.*

*Moreover, Allied Wallet will handle personal data with applicable local data protection and privacy laws and regulations, including, but not limited to, the European Union General Data Protection Regulation (2016/679) (the "GDPR"). GDPR was adopted in April 2016 and became enforceable in May 2018. All our client data is held securely within our IT environment held in the UK all our data storage providers, including our back-up storage providers, based in the UK.*

| KAINE WEN | 06/12/2017 | | |
| Print Principal Name | Date | Print Principal Name | Date |

3

CONFIDENTIAL

Pl. Ex. 25
p. 336
ALLIED_0000008

## Document Requirements for New Applications

**Required Documents:**

1. Completed and signed application
2. One form of Photo Identification. Color copy of current Passport, driver's license, Government Issued Identification, of owner(s) / signatory(ies)
3. Corporate documents: Copy of Articles of Incorporation (or equivalent). If DBA, please furnish DBA filing. If not available, a copy of your business license *may* be considered an acceptable substitute.
4. Proof of URL ownership.

**If Applicable:**

1. Business License IF required by law or for specific industries (i.e. Forex, Gaming, etc.)
2. Supplier agreement, if applicable.

**For Websites:**

1. Clear description of goods and services listed on site
2. Clear pricing and currencies of each and every product and service
3. Terms and conditions clearly stated online.
4. Privacy policy on site
5. Contact details and location of business easily found on site
6. Customer service email and phone number listed on website
7. Times listed that customer service is available
8. Refund policy clearly stated
9. Shipping policy clearly stated on order page
10. Display Visa and MasterCard logo's at checkout
11. SSL on all pages where customer information is collected

4

Allied CID response

CONFIDENTIAL



## Bank Account Information Form

*Funds will be deposited via international wire transfer.*

## Account Details

Merchant Account Name: True Count Staffing Inc.

Merchant Account ID (MID): 31864

Beneficiary Name: Consumer Advocacy Center Inc.

**Please note Beneficiary name can be no longer than 30 characters and have no special characters, such as "&" or "-". If submitted Beneficiary Name includes these items wire is at risk of return or decline**

Beneficiary Address on account: 173 Technology Dr, Ste 202

Beneficiary City and State on account: Irvine, CA

Beneficiary Post/Zip Code on account: 92618-2489

Beneficiary Country on account: USA

## Bank Details

### Please complete one form for each receiving bank account

*ALL INFORMATION MUST BE FILLED OUT*

Receiving Bank Name: JPMorgan Chase Bank, N.A.

Receiving Bank Address: 1111 Polaris Parkway, Columbus, OH 43240

Account Number: ▮1522

IBAN: _____   Swift Code: CHASUS33

ABA/Routing Number: ▮0021   IFSC code (only if applicable): _____

AW Processing Currency: USD   Currency Requested For Payout: USD

*If multiple currencies are requested for pay out, you must complete one form for each requested currency*

Signature ( hand-signatures only )   Date: 06/28/2017

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Please be advised that in order for Allied Wallet to use the provided bank details above, you must provide either:

☒ pre-printed voided check

☐ bank account verification form from your bank

**If we do not have a form of verification on file, we cannot approve your details.**

Allied CID response

CONFIDENTIAL

ALLIED_0000010



## Bank Account Information Form

*Funds will be deposited via international wire transfer.*

## Account Details

Merchant Account Name: Natural Nine Staffing Inc.

Merchant Account ID (MID): 31815

Beneficiary Name: Consumer Advocacy Center Inc.

**Please note Beneficiary name can be no longer than 30 characters and have no special characters, such as "&" or "-". If submitted Beneficiary Name includes these items wire is at risk of return or decline**

Beneficiary Address on account: 173 Technology Dr, Ste 202

Beneficiary City and State on account: Irvine, CA

Beneficiary Post/Zip Code on account: 92618-2489

Beneficiary Country on account: USA

## Bank Details

**Please complete one form for each receiving bank account**

*ALL INFORMATION MUST BE FILLED OUT*

Receiving Bank Name: JPMorgan Chase Bank, N.A.

Receiving Bank Address: 1111 Polaris Parkway, Columbus, OH 43240

Account Number: ███1522

IBAN: _____   Swift Code: CHASUS33

ABA/Routing Number: ███0021   IFSC code (only if applicable): _____

AW Processing Currency: USD   Currency Requested For Payout: USD

*If multiple currencies are requested for pay out, you must complete one form for each requested currency*

Signature ( hand-signatures only )   Date: 06/23/2017

*********************************************************************

Please be advised that in order for Allied Wallet to use the provided bank details above, you must provide either:

☐ pre-printed voided check

☐ bank account verification form from your bank

**If we do not have a form of verification on file, we cannot approve your details.**

CONFIDENTIAL



**Allied Wallet Card Payment Processing Agreement**

Between

    **Allied Wallet, Ltd. ("Allied Wallet")**

And

    **Natural Nine Staffing Inc.**
    http://premierstudentloancenter.com **(the "Merchant")**

MERCHANT'S INITIALS: _T_ _N_

CONFIDENTIAL

Pl. Ex. 25
p. 340
ALLIED_0000146



THIS AGREEMENT ("*Agreement*") is made on **June 7, 2017** "*Effective Date*" between:

1. Allied Wallet Ltd., a company incorporated in England and Wales under registration number 05832811, the registered office of which is 1 Northumberland Avenue, Trafalgar Square, London, WC2N 5BW United Kingdom ("**Allied Wallet**"); and

2. **Natural Nine Staffing Inc** known as the *Merchant*, a company incorporated in UK under registration number 10667765, the registered office which is located at Lytchett House ,13 Freeland Park, Wareham Road Lytchett Matravers, Poole, Dorset, England, BH16 6FA

**WHEREAS**

(A) Allied Wallet provides payment processing service which allows Allied Wallet to clear payments for the Merchant's products and services over the Internet via payment cards, credit cards and/or debit cards;

(B) Allied Wallet, as part of the service, shall also provide Merchant with access to the administration interface which allows Merchant to track sales and make certain administrative changes to its account(s) on-line;

(C) Merchant wishes to have such payment processing service provided to it; and

(D) Allied Wallet agrees to provide such services on the terms of and subject to the conditions contained in this Agreement;

In consideration of the mutual covenants herein contained and intending to be legally bound by the provisions of this Agreement, the **parties** to this Agreement agree as follows:

1 **Definitions and interpretation**

1.1 *Definitions*

The following terms are defined for use in this Agreement.

"*Allied Wallet Credit Card Service*" means the Allied Wallet service which allows Allied Wallet to accept payments for Merchant's services via credit card

"*Agreement*" means this Payment Processing Agreement

"*Cardholder*" or "*End User*" means the natural person or legal entity or entities who or which has or have ordered goods and/or services from Merchant via Allied Wallet and who or which is/are formally and officially registered with a financial institution as the holder of a particular debit or credit card.

"*Cardholder Charge*" means the amount to be charged to the Cardholder's account for the purchase of access to the Merchant's products and services via Allied Wallet and/or the Merchant

"*CBKI*" means a Chargeback as defined below

"*Chargeback*" means a Cardholder Charge via the Allied Wallet Credit Card Service which the Cardholder's credit card issuer identifies as being invalid or non-collectible after initial acceptance on account of fraud, lost, canceled, non-issued, invalid account identification, an unresolved cardholder complaint, or other cause which results in the deduction of the Cardholder Charge from moneys otherwise payable to Allied Wallet.

"*Country of Origin*" means the country where the Merchant is established.

"*Effective Date*" means the date as of which this Agreement is effective between the Parties

"*G2*" means a third party compliance service.

"*G2 Super Persistent Monitoring*' means an additional third party compliance service

"*Merchant*" means the individual or business entity that agrees to these terms and conditions and intends to use Allied Wallet's payment processing service.

"*Net Revenue*' means the Total Revenue minus Refunds and Chargebacks

"*Penalties*' means the penalties and other charges the Card Associations and/or Allied Wallet may charge

"*Refund*' means a Cardholder Charge via the Service which Allied Wallet, Merchant, or the Cardholder and Allied Wallet, or the Cardholder and Merchant identify as being invalid or non-collectible after initial acceptance on account of fraud, lost canceled, non-issued, invalid account identification, an unresolved cardholder complaint, or other cause which results in the deduction of the Cardholder Charge from moneys otherwise payable to Allied Wallet

"*Retrieval*" means a dispute initiated by a customer of the Merchant with the issuing bank that is considered, for purposes of this Agreement, to be a Chargeback.

"*Reserve*' means funds withheld from Merchant by Allied Wallet sales in order to cover Chargebacks and Refunds or Merchant indemnification obligations hereunder.

"*Service*" means the Allied Wallet payment processing service and any related products and services provided pursuant to this Agreement.

"*Service Fees*" means the charges, fees and prices for the Services as further set out in Appendix 1 to this Agreement.

"*Software*' means software and related documentation provided by Allied Wallet to Merchant in connection with the Service

"*Total Revenue*' means Merchant's revenues for the applicable service, before the deduction of applicable Reverse, Service Fees, and any other charges or obligations

"*Trademarks*' means all trademarks and logos of Allied Wallet that exist now or in the future, both registered and non-registered, all as may be specified by Allied Wallet from time to time

"*USD*' means the currency, dollar of United States of America.

1.2 *Interpretation*

MERCHANT'S INITIALS. T N

CONFIDENTIAL



1.2.1 Headings in this Agreement are only for convenience and shall not affect its construction and shall not be used in interpreting, construing, performing or enforcing this Agreement.

1.2.2 Any obligations given or entered into by more than one person are given to or entered into jointly and severally unless otherwise specified.

1.2.3 Any reference in this Agreement to a paragraph or a schedule is a reference to a paragraph or schedule of this Agreement.

1.2.4 Any reference to a statute or statutory provision shall be construed as a reference to the same as from time to time amended, consolidated, modified, amended, re-enacted or replaced.

2. **Subject of the Agreement**

2.1 In consideration of the Service Fees payable by Merchant and subject to Merchant complying in full with its obligations in this Agreement Allied Wallet agrees with effect from the Effective Date to provide the Services upon the terms of and subject to the conditions contained in this Agreement.

2.2 Merchant agrees that Allied Wallet in providing the Services does not act as principal but acts as facilitator on behalf of Merchant to enable Merchant to enter into transactions with its customers. Merchant further agrees to allow Allied Wallet to act as facilitator on behalf of Merchant for the purpose of processing payments.

3. **Investigate Consumer Report**

Merchant agrees that an investigative or consumer report may be made in connection with this Agreement. Merchant authorizes any party to the Agreement or any of their agents to investigate the reference provided or any other statements or data obtained from Merchant and from any of its personal guarantor(s), as from any person or entity with any financial obligations under this Agreement. You have a right, upon written request, to a complete and accurate disclosure of the nature of and scope of the investigation requested.

4. **Fees and Reserve**

4.1 *Fees for Credit Card Service*
The Service Fees for Allied Wallet Credit Card Services are equal to a percentage of the Net Revenue during the relevant billing period.

4.2 *Penalties and Other Charges Imposed By Card Association*
Merchant shall be responsible for any fees imposed upon Allied Wallet by the bank, or card brand that is related to processing Merchant's credit card transactions. Moreover, Allied Wallet will not share any fine documentation received from the bank or the card brands it deems to be confidential.

4.3 *Fees for Credit Card Services Chargebacks and/or CBKI*
Merchant shall be charged per Chargeback and/or CBKI processed against the Merchant's account. Fees assessed against Merchant hereunder, if any, shall be applied immediately. Chargebacks and/or CBKIs are strictly limited to 100 Chargebacks / CBKIs / Retrievals OR one percent (1%) of the total aggregate transactions that have been processed by Allied Wallet for the account of Merchant during a period of one (1) month, whichever comes first. Anything over that amount is excessive and will incur penalties and constitutes cause for Allied Wallet to terminate this Agreement and close Merchant's account with funds held for one hundred and eighty (180) days to five hundred and forty days (540) from the last card event depending on the service provided. After which time, the balance in the account less Chargebacks, CBK1s, penalties, fines, Service Fees and any other fees will be returned. If Merchant's account incurs 100 Chargebacks / CBK1s or more OR incurs Chargebacks / CBK1s exceeding one percent (1%) of transactions processed in a one month period, Merchant's account will be fined by Allied Wallet, in addition to and / or separate from any fine imposed by the bank or card brand, at a rate of $100 USD per Chargeback / CBK1. Moreover, Merchant agrees that it is absolutely prohibited to suggest, imply, propose, advertise, indicate, express, promote, advise or state to any of its customers to a Chargeback, Refund or initiate a Retrieval/CBK1 for the products or services offered by Merchant. If a Merchant causes Allied Wallet or its subsidiaries to lose a merchant account, or Visa or MasterCard relationship within a Merchant account, there will be a $1 000 000 USD fine assessed against the Merchant in addition to the fines and penalties assessed by the credit card associations and the bank. Causes for this typically include high chargeback rates, fraud, non-compliance with the laws of local, state and national jurisdictions as well as not adhering to the acceptable use policies of the card associations.

4.4 *Reserve for Allied Wallet Credit Card Processing*
Allied Wallet will withhold a percentage of Merchant's Total Revenues for Allied Wallet Credit Card processing for a period of as set forth in Appendix 1 (which may be updated from time to time) as Reserve to be applied towards Chargebacks / CBK1s, Retrievals and Refunds for Allied Wallet Credit Card services. Allied Wallet shall have the right anytime, in its sole discretion, to hold funds and / or adjust the amount held and holdback period as is deemed necessary as security against future Chargebacks, CBK1s, Refunds, Disputes or indemnification obligations of Merchant hereunder. Reserves will be returned to Merchant subject to expiration and resolution of all claims and issues in relation thereto. In addition, if Allied Wallet for any reason suspects or has concern that it may sustain losses as a result of Merchant's account. Merchant agrees and gives Allied Wallet the right to automatically ACH debit Merchant's bank account in advance for the amount of potential losses Allied Wallet may sustain as security. Allied Wallet may hold the funds as reserve until it is determined that Merchant's account is secure and Allied Wallet will not sustain losses as a result. Allied Wallet also reserves the right to refund all fraud reported transactions and all associated transactions that are reported by the banks, or on the TC40 and SIC safe fraud lists.

MERCHANT'S INITIALS: T  N

CONFIDENTIAL



4.5   *Aggregation Damages.* Merchant CANNOT aggregate or send transactions to Allied Wallet from any URL that is not approved by Allied Wallet, and under no circumstances is Merchant allowed to take payments for other companies, be it through a URL, call center or any other means. If Merchant violates this provision and aggregates or sends any single transaction to Allied Wallet from any URL that is not approved by Allied Wallet, Merchant must pay an agreed upon liquidated damages in the amount of $200,000 USD per URL that Merchant has not submitted to and received approval from Allied Wallet in writing. This liquidated damages amount will be in addition to and separate from any bank or card brand fine also imposed for said aggregation. If Merchant take payment for other companies, be it through a URL, call center or any other means, one such transaction is cause for immediate termination and a fine equivalent to the total amount of funds (processing and holdback) at the time of termination and up to $500,000 USD in liquidated damages.

4.6   *Technical Assistance from Allied Wallet*
If Merchant is in need of technical assistance from Allied Wallet technicians, Merchant will be billed on an hourly basis. This includes phone and email. The technician will first hear and learn about the problem and then decide in Allied Wallet's discretion if billing is appropriate. Billing will be at a rate as set by Allied Wallet and may be amended from time to time.

4.7   *Monthly Maintenance Fee*
Each month a service maintenance fee is deducted from the Merchant's account and is payable regardless of processing volume.

## 5   *Payment to Merchant*
5.1   *Account Activation*
Before Merchant may utilize the Service, Allied Wallet's compliance department must ensure that Merchant has complied with Allied Wallet's set up requirements and has properly set up its account and Allied Wallet must activate the Merchant's account. This set-up includes among other things, the various issues in any API (Application Program Interface) Merchant may be instructed by Allied Wallet to use.

5.2   *Credit Card Services.*
Merchant payouts are calculated based on "Settlement period" as set forth in Appendix 1. Payment shall be delivered to Merchant as promptly as is practicable after processing, subject to Allied Wallet's rights to offset and holdback as set forth in this Agreement. The payment due to Merchant is equal to the sum of Merchant's Total Revenues during the specified time period along with any Reserve due to be released LESS:

- the sum of all Chargebacks / CHKs is processed during the period,
- the sum of all Refunds processed and requested during the Settlement Period.
- the applicable Reserve,
- the applicable Service Fee, and
- all taxes, Penalties and other items reimbursable hereunder or otherwise occurring during the period including but not limited to any indemnification obligations, offsets and holdbacks as determined by Allied Wallet

5.3   *Payments by Bank Wire Transfer*
There will be a charge off against Merchant's account for each wire transfer made. A wire transfer will not be made if the amount due is less than specified in Appendix 1. Any outstanding balances not credited to Merchant shall roll over to Merchant's next billing cycle if appropriate. Merchant authorizes Allied Wallet to deposit amounts owed Merchant by initiating credit entries to Merchant's financial institution indicated on the form submitted to Allied Wallet. Merchant further authorizes Merchant's financial institution to accept and credit any entries indicated by Allied Wallet to Merchant's account. In the event that Allied Wallet deposits funds erroneously into Merchant's account, including payment of transactions which are later Chargebacks, CHKs or otherwise contested, Merchant authorizes Allied Wallet to debit Merchant's account for an amount not to exceed the original amount of the erroneous credit, and Merchant shall be personally liable for any amounts that are not available for debit. This authorization is to remain in full force and effect until Allied Wallet and Merchant's financial institution have received written notice from Merchant of its termination in such time and manner as to afford Allied Wallet and Merchant's financial institution reasonable opportunity to act on such notice and until all accounts between Merchant and Allied Wallet are settled, in Allied Wallet's discretion.

5.4   *General Conditions*
5.4.1   *Payment by Merchant to owner or parent company only.*
Allied Wallet will only direct payments to Merchant, the owner or parent company of the Merchant, or the Merchant's registered fictitious name (also known as "Doing Business As" ("DBA") name) and accounts held in the name of any such party.
5.4.2   *Revision of Service Fee.*
Allied Wallet is entitled to revise the Service Fee at any time taking into account a notice period of two (2) months. If the Service Fee is revised, Merchant is entitled to terminate the Agreement per the effective date of the amendment by sending Allied Wallet a written notice within thirty (30) days from receipt of Allied Wallet's notification of the Service Fee change
5.4.3   *Set-off*
Allied Wallet is entitled to set-off any indebtedness of Merchant towards Allied Wallet pursuant to this Agreement. Merchant has no right to set-off, or to withhold payments to Allied Wallet, in connection with any amounts due to Merchant by Allied Wallet

MERCHANT'S INITIALS ___ T N

CONFIDENTIAL

Allied CID response

Pl. Ex. 25
p. 343
ALLIED_0000149



5.4.4. *Taxpayer or Employer ID required for Merchants who are US Persons.*
A valid social security number or Employer's ID number will be required in the sign-up process as a condition of making payment to any individual citizen or resident of the United States or a domestic corporation, partnership, or limited liability company. Foreign individuals and entities need to supply a Tax Identification number.

5.4.5 *Compliance with Laws Regarding Money Transfer and Money Laundering.*
Allied Wallet reserves the right to require Merchant to furnish Allied Wallet with such additional information concerning Merchant's business or its ownership as may be necessary to assure Allied Wallet's compliance with the laws of any state or the United States or any other applicable jurisdiction concerning money transfer, money laundering, or similar subject. Allied Wallet may refuse to provide services, or withhold payments to Merchant without liability if Merchant does not promptly furnish Allied Wallet with information requested hereunder or if such conduct may be in violation of relevant law.

5.4.6 *Inactive Accounts*
Funds can be held on all accounts that do not process continuously, or stop processing at any time if Allied Wallet deems the account to be risky for release.

5.4.7. *Closed or Terminated Accounts*
All closed or terminated Merchant accounts will incur $500 USD monthly fee in addition to any monthly fees set forth in the Term Sheet if the account receives any disputes. Allied Wallet will not dispute on the closed or terminated Merchant's accounts after the date of closure or termination. The monthly fee will be increased to $1000 USD on accounts that receive more than 20 disputes per month after closure or termination, and a fine of $100 will be issued per dispute that Allied Wallet receives after closure or termination date. Upon the expiration or termination of this Agreement, or from the date of the Merchant's last successful transaction, whichever occurs first, Merchant has eighteen (18) months to request in writing a release of the balance of funds remaining in its account(s) and provide a designated bank account for the transfer, otherwise the funds shall be forfeited to Allied Wallet.

6. **Undertakings of Merchant**
Merchant guarantees to Allied Wallet that, while using the Services

6.1 It provides and will provide such information to customers on its website and on other commercial communications to customers as is required pursuant to the laws of the Country of Origin and of those countries in which it offers its goods and/or services;

6.2. It respects and will respect the intellectual property rights of third parties and does not and will not infringe such rights in any way and upon becoming aware of any infringement of such rights will immediately terminate such infringement;

6.3. It does not and will not sell any goods or services the sale of which is prohibited under the laws of the Country of Origin and of those countries at which it offers its goods and/or services;

6.4. It will perform its obligations towards Cardholder, including but not limited to accepting responsibility for the acceptance of a Cardholder order, its fulfillment in an agreed upon manner, and all material warranties and guarantees or order commitments; and

6.5 It is and will remain for the term of this Agreement PCI Compliant

7. **Sales of Illegal Products or Services**
Allied Wallet reserves the right to close and freeze any access to accounts or funds, and terminate the Agreement, if Allied Wallet discovers any illegal products or services are being run through the Merchant's account or if Merchant aggregates or sends transactions to Allied Wallet from any URL that is not approved by Allied Wallet.

8. **Spam**
"Spam" generally involves the sending of unsolicited commercial e-mail. The use of Spam to promote a site receiving service hereunder is prohibited. While Allied Wallet cannot monitor the manner in which Merchants advertise, upon receipt of a verifiable complaint that Spam has been generated on behalf of a site receiving Service hereunder, Allied Wallet shall notice Merchant. Upon the second complaint of Spam sent to the same recipient, Allied Wallet reserves the right to suspend the Merchant's account, until such time as Allied Wallet receives adequate assurances that Merchant shall refrain from engaging in Spam. Failure to provide such assurances or continued use of Spam by Merchant entitles Allied Wallet to terminate this Agreement in its discretion.

9. **End User Information**
Merchant understands that any information accepted by Allied Wallet from end-users is the property of Allied Wallet, and shall remain the property of Allied Wallet upon cancellation of this Agreement.

10. **Merchant Transaction Limits**
Allied Wallet is entitled to set an overall transaction limit for all transactions along with a specific limit for each channel. Should Merchant request to increase this limit for any reason Allied Wallet agrees to review such request in good faith along with Merchant to determine whether such request can be accommodated in light of Merchant's existing and projected. Chargeback and refund levels. There is also a standard "time limit" function that prevents Merchant to be accidentally double charged – this feature is found in WLH mode and in API mode.

11. **Cardholder Transaction Limits**
In order to prevent the occurrence of fraudulent transactions Allied Wallet may impose reasonable limits on the amount or number of purchases which may be charged to an individual Cardholder account during any time period, or refuse to accept orders from Cardholders with a prior history of questionable charges.

MERCHANT'S INITIALS: T N

CONFIDENTIAL

Pl. Ex. 25
p. 344
ALLIED_0000150



12. **Refund Policy**

Allied Wallet will use commercially reasonable efforts to direct inquiring and complaining Cardholders to utilize the cardholder support services offered by Merchant in order to resolve all disputes and complaints, however, Allied Wallet reserves the right to issue a Refund without the knowledge or consent of Merchant in any case that it deems appropriate. Such determination will be binding on Merchant and the Refund debited from this account. Any transaction deemed fraudulent by Allied Wallet, will be addressed by Allied Wallet cardholder department, and if not verified as valid to Allied Wallet's satisfaction the transaction will be cancelled and refunded, and with also add an additional fraud transaction fee of $20 on each reported fraud transaction. Moreover, Allied Wallet will Refund any transaction reported by the card brands or the banks to avoid Chargebacks.

13. **Merchant Cardholder Support**

Merchant shall be responsible for all cardholder support issues. Merchant shall have the ability to reasonably respond to inquiries from its Cardholders promptly and shall endeavor to resolve disputes with Cardholders amicably. The occurrence of complaints from Cardholders and/or inquiries or Chargeback's regarding Merchant's services may be cause for termination of this Agreement if such events occur with unacceptable frequency as determined in the sole discretion of Allied Wallet. In addition, Allied Wallet reserves the right to charge Merchant reasonable fees and recover its expenses on account of excessive cardholder inquiries, Refunds, or Chargebacks. Prior to imposing such fees and recovering its costs, Allied Wallet shall notify Merchant of the details and nature of the problems and attempt to find mutually acceptable solutions. If Allied Wallet and Merchant are unable to achieve mutually acceptable solutions, Merchant shall have the option of continuing this Agreement subject to the additional fees and costs imposed by Allied Wallet, or of terminating this Agreement and paying fees and costs through the date of termination.

14. **Shipping Documents**

Request for shipping documents on tangible goods and/or for proof of services provided, must be provided by Merchant to Allied Wallet within one (1) working day of the request. Documents not supplied to Allied Wallet within that time will be charged a $150 fine per day the documents are not received up to a maximum of $1,000. It is imperative that Allied Wallet obtains these documents upon request to dispute Chargebacks and keep Merchant accounts in good standing. Failure to provide such documentation is cause for termination of this Agreement by Allied Wallet.

15. **Password security**

The security of Merchant's Allied Wallet account is dependent in part upon Merchant maintaining the confidentiality of the Allied Wallet passwords. Merchant is wholly responsible for maintaining the confidentiality of Merchant's password and account and for any and all activities that occur under Merchant's account and shall indemnify Allied Wallet with respect thereto. Allied Wallet shall not be responsible for any unauthorized changes made to the Merchant's account.

16. **Merchant E-Mail, Account Changes**

Merchant must provide a valid, working administrative e-mail address on enrollment. Any changes to Merchant's account via e-mail must be made via the administrative e-mail address provided on enrollment. The security of Merchant's Allied Wallet account is dependent in part upon Merchant maintaining the security of the administrative e-mail address as provided to Allied Wallet by Merchant. Any changes to Merchant's account via e-mail must be made via the administrative e-mail address provided on enrollment. Allied Wallet shall not be responsible for any unauthorized changes made to Merchant's account via this e-mail address.

17. **Regulation Authorization, Merchant Representations**

Merchant represents and warrants that it is legally authorized and has obtained all necessary regulatory approvals and certificates to provide any services it intends to offer. Merchant further represents and warrants that it will comply at all times with all applicable federal, state-provincial, or local laws, rules and regulations including any applicable card association or Automated Clearing House rules and that the goods/services it offers are in compliance with the same. If at any time, Merchant is being investigated in a civil or criminal matter regarding its business, products or services that Merchant is engaged in, by local, state or federal authorities, or has violated any local, state or federal rules or regulations, it must inform Allied Wallet immediately or within 5 days of said investigation or violation, otherwise it will be in breach and there will be a significant penalty assessed and the account will be subject to termination by Allied Wallet. If even with remaining funds to be released after one hundred and eighty (180) days to five hundred and forty days (540) from the last card event subject to offsets set forth in this Agreement.

18. **Merchant Information**

Merchant is responsible for providing information which is timely, complete, truthful, and not misleading. If Merchant provides any misleading information, infringes on any copyrights or trademarks, or misrepresents its business, products or services that Merchant is engaged in to Allied Wallet to its customers or potential customers, there will be a significant fine assessed up to the amount of funds held by Allied Wallet. Moreover, the account will be subject to termination by Allied Wallet and frozen with remaining funds to be released after one hundred and eighty (180) days to five hundred and forty days (540) from the last card event, subject to offsets and fines set forth herein. If Allied Wallet approves a Merchant based on a conditional approval or limitation of products and services sold, any deviation from said approval of products and services will result in possible suspension or termination of services, with funds frozen for one hundred and eighty (180) days to five hundred and forty days (540) from the last card event, and subject to offsets set forth herein. Merchant agrees to notify Allied Wallet of any changes of ownership, regulatory actions, financial conditions and business products or services it provides that could materially affect Allied Wallet's rights under this Agreement. All Merchants must have a website to use Allied Wallet services, all websites and content on the websites (video, text, music, merchandise, etc.) must be reviewed by Allied Wallet for compliance with the card

MERCHANT'S INITIALS: T N

CONFIDENTIAL

Pl. Ex. 25
p. 345
ALLIED_0000151



brands rules and regulations as well as the Automated Clearing House rules and regulations. Upon approval of content, the website is considered approved for processing. Allied Wallet reserves the right to change terms of approval of website content, albeit that website has been previously approved, if it is discovered that the content could be a possible Business Risk Assessment Mitigation (pHRAM) violation or definite HRAM violation of the card brand rules and regulations. If the Merchant changes or adds new content, products or services to a website, Allied Wallet must be notified immediately so the website can be reviewed for compliance. If content is added or changed without Allied Wallet being notified, or even if the website is offline and inactive, Allied Wallet reserves the right to interrupt service pending a review of said content, product or services for compliance or the reason for the inactivity. Any content, products or services found to be a pHRAM or HRAM violation can result in fines and possible termination of services and agreements with Allied Wallet. Should Allied Wallet terminate a Merchant for any reason, all funds will be held for one hundred and eighty (180) days from the last card event to five hundred and forty days (540), depending on products or services offered by Merchant to its customers. Funds will be eligible for release once a review of transaction liability and possible loss to Allied Wallet has been successfully reviewed and mitigated. Merchant will be responsible for all chargebacks, refunds and losses to Allied Wallet, which Allied Wallet will offset against the Merchant's frozen funds without prejudice to Allied Wallet's right to claim any further damages against Merchant.

### 19. Data Protection

Merchant complies and will comply at all times with the personal data protection laws of any country in which it offers its goods and/or services and that it shall implement appropriate technical and organizational measures to protect personal data.

### 20. Confidential Information

Allied Wallet's services and all information and documentation relating thereto shall be held in confidence by Merchant and may not be used by Merchant (other than for the furtherance of the purposes of the Agreement) nor disclosed to third parties without Allied Wallet's prior written consent. This includes the discovery of any errors or omissions in the Services. The terms and conditions of this Agreement may not be disclosed or made available by either party hereto to third parties without the prior written consent of the other party. In addition, Allied Wallet will not under any circumstance reveal its banking partners. Notwithstanding anything in this Agreement to the contrary, either party may disclose to third parties the fact that Merchant is using Allied Wallet's services. Merchant recognizes that the services and documentation are and contain the valuable, confidential and trade secret information of Allied Wallet. In furtherance of the foregoing Merchant and Allied Wallet shall enter into a confidentiality agreement substantially in the form of Appendix 3.

### 21. Intellectual Property

21.1 Allied Wallet hereby grants Merchant a royalty-free, non-transferable and non-exclusive right for the term of this Agreement to use the Trademarks on its website(s) and in any off-line promotional materials solely in order to indicate that it makes use of the Services. Merchant shall use such Trademarks in accordance with Allied Wallet's directions for the use of such Trademarks. Merchant does not have a right of sub-license. Allied Wallet may apply limitations to the right granted to Merchant under this paragraph at any time and at its sole discretion. Merchant hereby grants Allied Wallet and its affiliated companies an irrevocable, royalty free and non-exclusive right for the term of this Agreement to use its trademark and logos on their websites and in off-line publications for promotional purposes.

21.2 When using the Trademarks, Merchant will ensure that no composite marks are created with its own trademarks and/or logos. Merchant acknowledges that its use of the Trademarks does not create for itself any rights in the Trademarks other than those explicitly granted in this Agreement.

21.3 All proprietary rights in the equipment, software (such as interfaces) and other materials used or made available by Allied Wallet in the performance of this Agreement, whether or not supplied to Merchant, shall remain with Allied Wallet or its licensors. Merchant shall only acquire such right of use as is explicitly granted hereunder or otherwise.

21.4 Upon termination of this Agreement, Merchant will immediately withdraw any reference to Allied Wallet from its website(s) and will cease the use of the Trademarks.

### 22. Software

22.1 As Is Basis. The Software Services or related products are provided to Merchant under this Agreement on an "as-is" basis. Merchant understands that processing outages are normal and can occur time to time due to service interruption from banks, failed servers or the storage facility. Merchant agrees not to hold Allied Wallet liable for any loss of business or other damages caused by such outages.

22.2 In consideration for payment of any applicable fees, Merchant is granted a personal, non-exclusive, non-transferable license to use the Software, in object code form only, solely in connection with the Service (the "License"). Merchant shall not: (i) attempt to reverse engineer, decompile, disassemble or otherwise translate or modify the Software in any manner; or (ii) sell, assign, license, sublicense or otherwise transfer, transmit or convey Software, or any copies or modifications thereof, or any interest therein, to any third party. All rights in the Software, including without limitation any patents, copyrights and any other intellectual property rights therein, shall remain the exclusive property of Allied Wallet and/or its licensors. Merchant agrees that the Software is the proprietary and confidential information of Allied Wallet and/or its licensors subject to the provisions of Section 20 ("Confidential Information") above. The License shall immediately terminate upon the earlier of: (i) termination or expiration of this Agreement, (ii) termination of the Service(s) with which the Software is intended for use, or (iii) failure of Merchant to comply with any provisions of this Section.

### 23. Taxes

Merchant is fully responsible for and agrees to pay all taxes and other charges imposed by any government authority on the services provided under this Agreement and on any transactions processed pursuant to this Agreement.

MERCHANT'S INITIALS:   T   N

CONFIDENTIAL

Allied CID response

Pl. Ex. 25
p. 346
ALLIED_0000152



24. **Limitations of Liability**

ALLIED WALLET ASSUMES NO LIABILITY FOR DISRUPTIONS OR IMPROPER OPERATION OF THE SERVICE FOR ANY REASON, INCLUDING, BUT NOT LIMITED TO, VANDALISM, THEFT, ACTIONS OF THIRD PARTY SERVICE PROVIDERS, PHONE SERVICE OUTAGES, INTERNET DISRUPTIONS, EXTREME OR SEVERE WEATHER CONDITIONS OR ANY OTHER CAUSES IN THE NATURE OF "ACTS OF GOD" OR FORCE MAJEURE. ALLIED WALLET SHALL NOT BE RESPONSIBLE FOR ANY SPECIAL, INCIDENTAL INDIRECT OR CONSEQUENTIAL DAMAGES INCLUDING ANY LOSS OF PROFIT, REVENUE, SOFTWARE OR DATA, EVEN IF ALLIED WALLET IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO CASE SHALL MERCHANT BE ENTITLED TO RECOVER DAMAGES FROM ALLIED WALLET WHICH EXCEED THE SUM OF THE AMOUNTS OF FEES RETAINED BY ALLIED WALLET UNDER THIS AGREEMENT DURING THE ONE MONTH PRIOR TO THE EVENT GIVING RISE TO THE CLAIM FOR DAMAGES.

25. **Disclaimer of Warranties**

EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, ALLIED WALLET MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY ALLIED WALLET SERVICES, RELATED PRODUCTS, SOFTWARE OR DOCUMENTATION. ALLIED WALLET SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

26. **Indemnification**

Merchant agrees to indemnify and hold harmless Allied Wallet, its employees, officers, agents, directors and subsidiaries from any and all fines, penalties, losses, claims, expenses (including attorney fees), lawsuits by its customers or other liabilities resulting from or in connection with this Agreement. Allied Wallet assumes no liability of Merchant for failure to comply with this Agreement and any results caused by the acts, omissions or negligence of Merchant, sub-contractor or an agent of Merchant or an employee of any one to them, including, but not limited to, claims of third parties arising out of or resulting from or in connection with Merchant's products or services, messages, Segregation, caller contracts, promotions, advertising, infringement or any claim for libel or slander or for violation of copyright, trademark or other intellectual property rights. Allied Wallet may deduct the above described fines, penalties, losses, claims, expenses (including attorney fees and the allocable costs of in-house counsel), or other liabilities from the Reserve, or if the Reserves are inadequate, directly from the proceeds of Merchant's sales.

27. **Cross Corporate Guarantee**

Merchant shall procure an independent guarantee by its parent and/or its group companies in favor of Allied Wallet substantially in the form of Appendix 2.

28. **Term**

The term of this Agreement shall be for twelve (12) months beginning upon execution of this document by Merchant and subsequent acceptance by Allied Wallet, and shall automatically renew at the end of each consecutive twelve (12) month period unless Allied Wallet receives written notice of non-renewal from Merchant no less than thirty (30) days prior to the expiration of such twelve (12) month period. Allied Wallet reserves the right to terminate this Agreement at any time with or without cause or prior notification to Merchant. Allied Wallet may further terminate this Agreement immediately without notice at any time Merchant breaches any part of this Agreement. Upon termination of processing, notice of non-removal or cancellation of this Agreement, payment shall be made in accordance with the Section entitled "Payment to Merchant", above. Upon expiration or termination of this Agreement or if the Merchant stops processing, Allied Wallet may hold Merchant funds until such time as all of the Merchant's Cardholder transactions are complete and Allied Wallet reasonably believes no further Chargebacks, CBLs, refunds or dispute claims of fraud or other offsets will be incurred and all outstanding claims and issues with the Merchant have been resolved.

29. **Default**

In the event Merchant defaults in any provision or fails to perform pursuant to this Agreement, Allied Wallet shall be entitled to damages, costs and attorney's fees from Merchant.

30. **Survival of Claims**

Any claim arising out of or related to this Agreement must be brought no later than one year after it has accrued.

31. **Invalid or Non-enforceable Provisions**

The invalidity or non-enforceability of any provision of this Agreement, as so determined by a court of competent jurisdiction, shall not affect the other provisions hereof, and in any such occasion this Agreement shall be construed in all respects as if such invalid or non-enforceable provision were omitted or, as the case may be, such provision shall be modified to the minimum extent necessary to make it legal, valid and enforceable.

32. **Account Claims, Disputes, and Attorneys' Fees Clause**

If another person or entity makes a claim against funds in Merchant's account, or if Allied Wallet has reason to believe there is or may be a dispute over matters such as ownership of the account or the authority to receive payment, or make changes to the account, Allied Wallet may: in its sole discretion (1) continue to rely upon current Allied Wallet documents; (2) honor the competing claim upon receipt of evidence; Allied Wallet deem satisfactory to justify such claim; (3) freeze all or part of the funds until the dispute is resolved to Allied Wallet's satisfaction, or (4) pay the funds to an appropriate court of law for resolution.

MERCHANT'S INITIALS: ___T___ ___N___

CONFIDENTIAL

Pl. Ex. 25
p. 347
ALLIED_0000153



In the event of a dispute between Allied Wallet and the Merchant relating to the subject matter of this Agreement, it is agreed that the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs in enforcing its rights hereunder

33  **Choice of Law/Venue**

For purposes of convenience, this Agreement shall be construed and enforced in accordance with the laws of the State of California, in the United States, and the exclusive venue for any action, dispute or proceeding with respect to this Agreement shall be in Los Angeles, California

34  **Amendments and Modifications**

No Amendment or modification of this Agreement shall be valid unless same is in writing and signed by all parties hereto. Allied Wallet may amend this Agreement to take into account changes in law or regulations or industry mandates and to accommodate changes imposed on Allied Wallet, and to make other changes deemed necessary by Allied Wallet, by sending Merchant a specimen of the changed Agreement, or making a specimen of the changed Agreement available upon a web page located on the Internet. Unless Merchant rejects the changed Agreement and terminates this Agreement by notice to Allied Wallet in writing within fifteen (15) days after Allied Wallet sends the changed Agreement, or makes said changed agreement available on the Internet, the changed Agreement shall replace this Agreement and be in full force and effect.

35  **Notices**

Any and all notices to Allied Wallet, or other communications under or with respect to this Agreement to Allied Wallet, shall be in writing, and shall be delivered by hand, e-mail, mailed postage pre-paid, either by registered or certified mail, return receipt requested; or by overnight courier to the following address

> Allied Wallet, Ltd
> 1 Northumberland Avenue
> Trafalgar Square, London, WC2N 5BW
> United Kingdom
> And via email: support@alliedwallet.com

> Notices to Merchant shall be made to the administrative e-mail provided by Merchant on enrollment with Allied Wallet and be deemed delivered when sent.

36  **Survival of Obligations**

The rights and obligations of the parties hereunder which by their nature would continue beyond the termination or cancellation of this Agreement (including, without limitation, those relating to confidentiality, payment of charges and limitations of liability) shall survive any termination or cancellation of this Agreement.

37  **Transfer and Assignment**

Merchant may not sell, assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Allied Wallet.

38  **Authorization; Entire Agreement**

The persons signing or otherwise accepting this Agreement on behalf of Merchant represent and warrant that they have the authority to enter into this Agreement on behalf of Merchant. This Agreement contains the entire agreement of the parties and supersedes any other agreements (written or oral) instruments or writings as to its subject matter.

39  **Acceptance**

By signing this page you state that you understand and agree to these terms and conditions. Merchant agrees that Merchant has read, understands, and agrees to abide by this Agreement and any documents incorporated by reference, and Merchant agrees that Merchant intends to form a legally binding contract; and that this Agreement constitutes "a writing signed by Merchant" under any applicable law or regulation. **Any rights not expressly granted herein are reserved by Allied Wallet.**

By signing and entering into this Agreement with Allied Wallet, I certify that I have carefully read and understood the terms of this Agreement, hereby agree to it, and acknowledge receipt of a fully completed and signed copy of it. Moreover, I certify that I am an authorized person of Merchant that is the subject of this Agreement

**AGREED AND ACCEPTED:**

| Natural Nine Staffing Inc | ALLIED WALLET |
|---|---|
| SIGNATURE: _(signature)_ | SIGNATURE: _____ |
| BY [print]: TUONG NGUYEN | BY [print]: _____ |
| TITLE / DATE: OWNER   06/07/17 | TITLE / DATE: _____ |

WITNESS FOR MERCHANT: ALBERT KMM

MERCHANT'S INITIALS:  T   N

CONFIDENTIAL



**APPENDIX 1**

**PAYOUT SCHEDULE**

Allied Wallet wires every Wednesday to all Merchants due more than 1000 units of the processed and settled currency. Funds will post to the wired account within 1 to 4 business days (bank holidays and country specific holidays may delay funds). Price display: the customer must be able to identify the final price of a product unmistakably.

All Merchants must put the Allied Wallet logo and Allied Wallet details for customers to clearly see who they will be billed by on payment pages – Allied Wallet technical team will send you details. This must be done prior to your first payout.

****All fees will be charged in the equivalence of USD, with the exception of EUR and GBP.
****Should a chargeback be issued on the basis of fraud, an additional €15.00 per dispute will be charged.

<u>Discount Rate and Details</u>

Currency: USD

*Merchant Discount Rate: 3.35%*

*One Time setup fee: Waived*

*Monthly Maintenance Fee: Waived*

*Transaction Fee: 0.20 units*

*Refund Fee: 1.25 units*

*Chargeback1 Fee: 8.00 units*

*Chargeback fee: 20.00 units*

*Wire Fee: 45.00 units*

*Holdback Reserve (rolling 6 mo.): 5%*

*Holdback funds are released on the 15th of each month, unless this date falls on a weekend, and are only released if 1000 Units or more are due and are subject to a wire fee.*

*Payout Period: 12 days in arrears based on amount to be determined*

*Processing Period: Saturday to Friday*

New clients have no limit on voids of pre-authorizations.

AlliedWallet. Ltd.                          **Natural Nine Staffing Inc**

By: _____  _____            By: _~~Tuong an~~_ _____

Name _____  _____          Name _TUONG NGUYEN_

Title _____  _____           Title _OWNER_ _____

                                     Date _06/07/17_ _____

MERCHANTS INITIALS _T N_

Pl. Ex. 25
p. 349
ALLIED_0000155

CONFIDENTIAL



## APPENDIX 2

### CROSS CORPORATE GUARANTEE

Date: __06/07/17__

From: **Natural Nine Staffing Inc** ("Guarantor[s]") in favor of Allied Wallet Ltd ("Allied Wallet").

**Allied Wallet Card Payment Processing Agreement dated __06/07/17__** between **Natural Nine Staffing Inc** ("Merchant") and Allied Wallet (the "Agreement")

As a primary inducement to Allied Wallet to enter into the Agreement, the undersigned in (his/her/his/their) capacity of Guarantor[s] by signing this Agreement, hereby guarantee[s], without reservation, jointly and severally, unconditionally and irrevocably, by way of independent guarantee (as the continuing, full and faithful performance by Merchant of each of its duties and obligations to and (b) payment of any monies due by Merchant to Allied Wallet under the Agreement or any other agreement currently in effect or in the future entered into between Merchant or its principals and Allied Wallet as such agreements now exist or are amended from time to time, with or without notice

Guarantor[s] understand[s] further that Allied Wallet may proceed directly against Guarantor[s] without first exhausting their remedies against any other person or entity responsible to it or any security held by Allied Wallet or Merchant. To the extent permitted by applicable law, Guarantor[s] waive[s] all defenses and deferral rights and legal prerogatives which the law has vested in or may vest in guarantors and joint and several debtors.

Guarantor[s] agree[s] to immediately remit payment regarding any monies owed to Allied Wallet. In addition, Guarantor[s] will promptly provide any information requested concerning (its/her/his/their) financial profile and business relationships

This guarantee will not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit or any other variations of the terms and agreement of the Agreement

Guarantor[s] waive[s] trial by jury with respect to litigation arising out of or relating to this guarantee. This guarantee will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of Allied Wallet or its subsidiaries

Guarantor[s] understand[s] that the inducement to Allied Wallet to enter into this Agreement is consideration for the guarantee, and that this guarantee remains in full force and effect even if Guarantor[s] receive[s] no additional benefit from the guarantee

Guarantor[s] certify[s/ies] that Guarantor[s] [is/are] an [RELATIONSHIP] of Merchant.

This guarantee shall be construed and enforced in accordance with the laws of California and the venue for any action, dispute or proceeding with respect to this guarantee shall be Los Angeles, California.

Sincerely,

**Natural Nine Staffing Inc**

SIGNATURE: _Zhuong Ow_

BY [print]: _TUONG NGUYEN_

TITLE: _OWNER_

WITNESS: _ALBERT KIM_

**AGREED AND ACCEPTED**
ALLIED WALLET

SIGNATURE: _____

BY [print]: _____

TITLE: _____

**Attachment:** Corporate Resolution of Guarantor[s]

MERCHANT'S INITIALS: _T N_

Pl. Ex. 25
p. 350
ALLIED_0000156

CONFIDENTIAL



## APPENDIX 3

### NON-DISCLOSURE / CONFIDENTIALITY AGREEMENT

With this Agreement dated __06/07/17__ Allied Wallet is providing Merchant confidential trade secret information, including, but not limited to, terms and conditions, fee schedules, rates (such information whether written or oral called the "**Confidential Information**"). In consideration of furnishing the Confidential Information to Merchant, Merchant agrees to the following

Merchant may disclose such Confidential Information only to those of its employees who need to know such information given the nature of the business relationship being considered by Merchant and Allied Wallet, and who agree to be bound by the terms and conditions of this Agreement. Neither Merchant nor any of its employees shall use, disseminate or in any way circulate within its own organization or otherwise any Confidential Information that is supplied to or obtained by Merchant in writing, orally or by observation, except (i) to the extent necessary to evaluate a possible business relationship with Allied Wallet and (ii) in the course of negotiations, discussions and consultations with personnel or authorized representatives of the Allied Wallet in connection with such evaluation or defining the terms of such relationship

Merchant shall treat all Confidential Information with a degree of care that is not less than the degree of care used by it in safeguarding its own similar information or material, and in no event less than the degree of care generally accorded in the industry to confidential information of the same or similar nature.

Merchant shall NOT publish or copy any Confidential Information, or disclose any Confidential Information to ANY third party, before, during or after the conclusion of its business relationship with Allied Wallet. The non-disclosure provisions of this Agreement shall survive the termination of this Agreement and Merchant's duty to hold the Confidential Information in confidence shall remain in effect until Allied Wallet sends Merchant written notice releasing Merchant from the non-disclosure provisions of this Agreement. In any event, the merchant shall not publish any information in any public forum regarding it's relationship with Allied Wallet

Merchant makes this Agreement in good faith without mental reservation or purpose of evasion. Merchant understands that Allied Wallet may seek any remedy available to it to enforce this Agreement, including, but not limited to, application for a court order prohibiting disclosure of information or breach of this Agreement.

If a court finds any provisions of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of the parties.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party. Merchant has signed this Agreement through its authorized representative

Any failure by either party to enforce at any time any term or condition of this Agreement shall not be considered a waiver of that party's right thereafter to enforce each and every term and condition of this Agreement.

This Agreement shall be construed and enforced in accordance with the laws of California and the venue for any action, dispute or proceeding with respect to this Agreement shall be Los Angeles, California

IN WITNESS WHEREOF, Merchant has executed this Agreement as of the date first written above.

Allied Wallet, Ltd.

Natural Nine Staffing Inc

By _____

By _____

Name _____

Name   THONG NGUYEN

Title _____

Title   OWNER

MHEG-ANTS INITIALS: _T_ _N_

Pl. Ex. 25
p. 351
ALLIED_0000157

CONFIDENTIAL



### Allied Wallet Card Payment Processing Agreement

Between

**Allied Wallet, Ltd. ("Allied Wallet")**

And

**True Count Staffing Inc**
**http://premierstudentloancenter.com (the "Merchant")**

MERCHANT'S INITIALS: K W



THIS AGREEMENT ("*Agreement*") is made on _____7/3/17_____ "*Effective Date*" between:

1.  Allied Wallet, Inc., a company incorporated in Nevada, with a principal place of business at 9000 Sunset Boulevard, Suite 820, West Hollywood, CA 90069, United States of America) ("**Allied Wallet**"); and

2.  **True Count Staffing** known as the *Merchant*, a company incorporated in _____CA_____ under registration number _____, the registered office which is located at _173 TECHNOLOGY DR, STE 202 IRVINE, CA 92618_

**WHEREAS**

(A)  Allied Wallet provides payment processing service which allows Allied Wallet to clear payments for the Merchant's products and services over the Internet via payment cards, credit cards and/or debit cards;

(B)  Allied Wallet, as part of the service, shall also provide Merchant with access to the administration interface which allows Merchant to track sales and make certain administrative changes to its account(s) on-line;

(C)  Merchant wishes to have such payment processing service provided to it; and

(D)  Allied Wallet agrees to provide such services on the terms of and subject to the conditions contained in this Agreement.

In consideration of the mutual covenants herein contained and intending to be legally bound by the provisions of this Agreement, the **parties** to this Agreement agree as follows:

1.  ***Definitions and interpretation***
    1.1.  *Definitions*
        The following terms are defined for use in this Agreement:
        "*Allied Wallet Credit Card Service*" means the Allied Wallet service which allows Allied Wallet to accept payments for Merchant's services via credit card.
        "*Agreement*" means this Payment Processing Agreement
        "*Cardholder*" or "*End User*" means the natural person or legal entity or entities who or which has or have ordered goods and/or services from Merchant via Allied Wallet and who or which is/are formally and officially registered with a financial institution as the holder of a particular debit or credit card.
        "*Cardholder Charge*" means the amount to be charged to the Cardholder's account for the purchase of access to the Merchant's products and services via Allied Wallet and/or the Merchant.
        "*CBK1*" means a Chargeback as defined below.
        "*Chargeback*" means a Cardholder Charge via the Allied Wallet Credit Card Service which the Cardholder's credit card issuer identifies as being invalid or non-collectible after initial acceptance on account of fraud, lost, canceled, non-issued, invalid account identification, an unresolved cardholder complaint, or other cause which results in the deduction of the Cardholder Charge from moneys otherwise payable to Allied Wallet.
        "*Country of Origin*" means the country where the Merchant is established.
        "*Effective Date*" means the date as of which this Agreement is effective between the Parties.
        "*G2*" means a third party compliance service.
        "*G2 Super Persistent Monitoring*" means an additional third party compliance service.
        "*Merchant*" means the individual or business entity that agrees to these terms and conditions and intends to use Allied Wallet's payment processing service.
        "*Net Revenue*" means the Total Revenue minus Refunds and Chargebacks.
        "*Penalties*" means the penalties and other charges the Card Associations and/or Allied Wallet may charge.
        "*Refund*" means a Cardholder Charge via the Service which Allied Wallet, Merchant, or the Cardholder and Allied Wallet, or the Cardholder and Merchant identify as being invalid or non-collectible after initial acceptance on account of fraud, lost, canceled, non-issued, invalid account identification, an unresolved cardholder complaint, or other cause which results in the deduction of the Cardholder Charge from moneys otherwise payable to Allied Wallet.
        "*Retrieval*" means a dispute initiated by a customer of the Merchant with the issuing bank that is considered, for purposes of this Agreement, to be a Chargeback.
        "*Reserve*" means funds withheld from Merchant by Allied Wallet sales in order to cover Chargebacks and Refunds or Merchant indemnification obligations hereunder.
        "*Service*" means the Allied Wallet payment processing service and any related products and services provided pursuant to this Agreement.
        "*Service Fees*" means the charges, fees and prices for the Services as further set out in Appendix 1 to this Agreement.
        "*Software*" means software and related documentation provided by Allied Wallet to Merchant in connection with the Service.
        "*Total Revenue*" means Merchant's revenues for the applicable service, before the deduction of applicable Reserve, Service Fees, and any other charges or obligations.
        "*Trademarks*" means all trademarks and logos of Allied Wallet that exist now or in the future, both registered and non-registered, all as may be specified by Allied Wallet from time to time.
        "*USD*" means the currency, dollar of United States of America.

MERCHANT'S INITIALS. ___K W___

Pl. Ex. 25
p. 353
CONFIDENTIAL
ALLIED_0000172



1.2.  *Interpretation*

    1.2.1.  Headings in this Agreement are only for convenience and shall not affect its construction and shall not be used in interpreting, construing, performing or enforcing this Agreement.

    1.2.2.  Any obligations given or entered into by more than one person are given to or entered into jointly and severally unless otherwise specified.

    1.2.3.  Any reference in this Agreement to a paragraph or a schedule is a reference to a paragraph or schedule of this Agreement.

    1.2.4.  Any reference to a statute or statutory provision shall be construed as a reference to the same as from time to time amended, consolidated, modified, attended, re-enacted or replaced.

## 2.  **Subject of the Agreement**

    2.1.  In consideration of the Service Fees payable by Merchant and subject to Merchant complying in full with its obligations in this Agreement Allied Wallet agrees with effect from the Effective Date to provide the Services upon the terms of and subject to the conditions contained in this Agreement.

    2.2.  Merchant agrees that Allied Wallet in providing the Services does not act as principal but acts as facilitator on behalf of Merchant to enable Merchant to enter into transactions with its customers. Merchant further agrees to allow Allied Wallet to act as facilitator on behalf of Merchant for the purpose of processing payments.

## 3.  **Investigate Consumer Report**

Merchant agrees that an investigative or consumer report may be made in connection with this Agreement.  Merchant authorizes any party to the Agreement or any of their agents to investigate the reference provided or any other statements or data obtained from Merchant and from any of its personal guarantor(s), or from any person or entity with any financial obligations under this Agreement. You have a right, upon written request, to a complete and accurate disclosure of the nature of and scope of the investigation requested.

## 4.  **Fees and Reserve**

    4.1.  *Fees for Credit Card Service.*
    The Service Fees for Allied Wallet Credit Card Services are equal to a percentage of the Net Revenue during the relevant billing period.

    4.2.  *Penalties and Other Charges Imposed By Card Association.*
    Merchant shall be responsible for any fees imposed upon Allied Wallet by the bank or card brand that is related to processing Merchant's credit card transactions. Moreover, Allied Wallet will not share any fine documentation received from the bank or the card brands it deems to be confidential.

    4.3.  *Fees for Credit Card Services Chargebacks and/or CBK1.*
    Merchant shall be charged per Chargeback and/or CBK1 processed against the Merchant's account.  Fees assessed against Merchant hereunder, if any, shall be applied immediately.  Chargebacks and/or CBK1s are strictly limited to 100 Chargebacks / CBK1s / Retrievals OR one percent (1%) of the total aggregate transactions that have been processed by Allied Wallet for the account of Merchant during a period of one (1) month, whichever comes first.  Anything over that amount is excessive and will incur penalties and constitutes cause for Allied Wallet to terminate this Agreement and close Merchant's account with funds held for one hundred and eighty (180) days to five hundred and forty days (540) from the last card event depending on the service provided. After which time, the balance in the account less Chargebacks, CBK1s, penalties, fines, Service Fees and any other fees will be returned.  If Merchant's account incurs 100 Chargebacks / CBK1s or more OR incurs Chargebacks / CBK1s exceeding one percent (1%) of transactions processed in a one month period, Merchant's account will be fined by Allied Wallet, in addition to and / or separate from any fine imposed by the bank or card brand, at a rate of $100 USD per Chargeback / CBK1. Moreover, Merchant agrees that it is absolutely prohibited to suggest, imply, propose, advertise, indicate, express, promote, advise or state to any of its customers to Chargeback, Refund or initiate a Retrieval/CBK1 for the products or services offered by Merchant. If a Merchant causes Allied Wallet or its subsidiaries to lose a merchant account, or Visa or MasterCard relationship within a Merchant account, there will be a $1,000,000 USD fine assessed against the Merchant in addition to the fines and penalties assessed by the credit card associations and the bank. Causes for this typically include high chargeback rates, fraud, non-compliance with the laws of local, state and national jurisdictions as well as not adhering to the acceptable use policies of the card associations.

    4.4.  *Reserve for Allied Wallet Credit Card Processing.*
    Allied Wallet will withhold a percentage of Merchant's Total Revenues for Allied Wallet Credit Card processing for a period of as set forth in Appendix 1 (which may be updated from time to time) as Reserve to be applied towards Chargebacks, CBK1s, Retrievals and Refunds for Allied Wallet Credit Card services. Allied Wallet shall have the right anytime, in its sole discretion, to hold funds and / or adjust the amount held and holdback period as is deemed necessary as security against future Chargebacks, CBK1s, Refunds, Disputes or indemnification obligations of Merchant hereunder. Reserves will be returned to Merchant subject to expiration and resolution of all claims and issues in relation thereto.  In addition, if Allied Wallet for any reason suspects or has concern that it may sustain losses as a result of Merchant's account, Merchant agrees and gives Allied Wallet the right to automatically ACH debit Merchant's bank account in advance for the amount of potential losses Allied Wallet may sustain as security.  Allied Wallet may hold the funds as reserve until it is determined that Merchant's account is secure and Allied Wallet will not sustain losses as a result. Allied Wallet also reserves the right to refund all fraud reported transactions and all associated transactions that are reported by the banks, or on the TC40 and MC safe fraud lists.

MERCHANT'S INITIALS: ~~K~~  ~~W~~

CONFIDENTIAL



4.5. *Aggregation Damages*. Merchant CANNOT aggregate or send transactions to Allied Wallet from any URL that is not approved by Allied Wallet, and under no circumstances is Merchant allowed to take payments for other companies, be it through a URL, call center or any other means. If Merchant violates this provision and aggregates or sends any single transaction to Allied Wallet from any URL that is not approved by Allied Wallet, Merchant must pay an agreed upon liquidated damages in the amount of $200,000 USD per URL that Merchant has not submitted to and received approval from Allied Wallet in writing. This liquidated damages amount will be in addition to and separate from any bank or card brand fine also imposed for said aggregation. If Merchant take payment for other companies, be it through a URL, call center or any other means, one such transaction is cause for immediate termination and a fine equivalent to the total amount of funds (processing and holdback) at the time of termination and up to $500,000 USD in liquidated damages.

4.6. *Technical Assistance from Allied Wallet*.
If Merchant is in need of technical assistance from Allied Wallet technicians, Merchant will be billed on an hourly basis. This includes phone and email. The technician will first hear and learn about the problem and then decide in Allied Wallet's discretion if billing is appropriate. Billing will be at a rate as set by Allied Wallet and may be amended from time to time.

4.7. *Monthly Maintenance Fee*.
Each month a service maintenance fee is deducted from the Merchant's account and is payable regardless of processing volume.

5. **Payment to Merchant**
5.1. *Account Activation*.
Before Merchant may utilize the Service, Allied Wallet's compliance department must ensure that Merchant has complied with Allied Wallet's set up requirements and has properly set up its account and Allied Wallet must activate the Merchant's account. This set-up includes among other things, the various issues in any API (Application Program Interface) Merchant may be instructed by Allied Wallet to use.

5.2. *Credit Card Services*.
Merchant payouts are calculated based on "Settlement period" as set forth in Appendix 1. Payment shall be delivered to Merchant as promptly as is practicable after processing, subject to Allied Wallet's rights to offset and holdback as set forth in this Agreement. The payment due to Merchant is equal to the sum of Merchant's Total Revenues during the specified time period along with any Reserve due to be released LESS;

- the sum of all Chargebacks / CBK1s processed during the period,
- the sum of all Refunds processed and requested during the Settlement Period,
- the applicable Reserve,
- the applicable Service Fee, and
- all taxes, Penalties and other items reimbursable hereunder or otherwise occurring during the period including but not limited to any indemnification obligations, offsets and holdbacks as determined by Allied Wallet.

5.3. *Payment by Bank Wire Transfer*
There will be a charge of against Merchant's account for each wire transfer made. A wire transfer will not be made if the amount due is less than specified in Appendix 1. Any outstanding balances not credited to Merchant shall roll over to Merchant's next billing cycle, if appropriate. Merchant authorizes Allied Wallet to deposit amounts owed Merchant by initiating credit entries to Merchant's financial institution indicated on the form submitted to Allied Wallet. Merchant further authorizes Merchant's financial institution to accept and credit any entries indicated by Allied Wallet to Merchant's account. In the event that Allied Wallet deposits funds erroneously into Merchant's account, including payment of transactions which are later Chargebacks, CBK1s or otherwise contested, Merchant authorizes Allied Wallet to debit Merchant's account for an amount not to exceed the original amount of the erroneous credit, and Merchant shall be personally liable for any amounts that are not available for debit. This authorization is to remain in full force and effect until Allied Wallet and Merchant's financial institution have received written notice from Merchant of its termination in such time and manner as to afford Allied Wallet and Merchant's financial institution reasonable opportunity to act on such notice and until all accounts between Merchant and Allied Wallet are settled, in Allied Wallet's discretion.

5.4. *General Conditions*
5.4.1. *Payment to Merchant or owner or parent company only*.
Allied Wallet will only direct payments to Merchant, the owner or parent company of the Merchant, or the Merchant's registered fictitious name (also known as "Doing Business As" ("DBA") name) and accounts held in the name of any such party.
5.4.2. *Revision of Service Fee*.
Allied Wallet is entitled to revise the Service Fee at any time taking into account a notice period of two (2) months. If the Service Fee is revised, Merchant is entitled to terminate the Agreement per the effective date of the amendment by sending Allied Wallet a written notice within thirty (30) days from receipt of Allied Wallet's notification of the Service Fee change.
5.4.3. *Set-off*.
Allied Wallet is entitled to set-off any indebtedness of Merchant towards Allied Wallet pursuant to this Agreement.

MERCHANT'S INITIALS: K W

Pl. Ex. 25
p. 355

CONFIDENTIAL

ALLIED_0000174



Merchant has no right to set-off, or to withhold payments to Allied Wallet, in connection with any amounts due to Merchant by Allied Wallet.

5.4.4. *Taxpayer or Employer ID required for Merchants who are US Persons*
A valid social security number or Employer's ID number will be required in the sign-up process as a condition of making payment to any individual citizen or resident of the United States or a domestic corporation, partnership, or limited liability company. Foreign individuals and entities need to supply a Tax Identification number.

5.4.5. *Compliance with Laws Regarding Money Transfer and Money Laundering.*
Allied Wallet reserves the right to require Merchant to furnish Allied Wallet with such additional information concerning Merchant's business or its ownership as may be necessary to assure Allied Wallet's compliance with the laws of any state or the United States or any other applicable jurisdiction concerning money transfer, money laundering, or similar subject. Allied Wallet may refuse to provide services, or withhold payments to Merchant without liability if Merchant does not promptly furnish Allied Wallet with information requested hereunder or if such conduct may be in violation of relevant law.

5.4.6. *Inactive Accounts.*
Funds can be held on all accounts that do not process continuously, or stop processing at any time if Allied Wallet deems the account to be risky for release.

5.4.7. *Closed or Terminated Accounts.*
All closed or terminated Merchant accounts will incur $500 USD monthly fee in addition to any monthly fees set forth in the Term Sheet if the account receives any disputes. Allied Wallet will not dispute on the closed or terminated Merchant's accounts after the date of closure or termination. The monthly fee will be increased to $1000 USD on accounts that receive more than 20 disputes per month after closure or termination, and a fine of $100 will be issued per dispute that Allied Wallet receives after closure or termination date. Upon the expiration or termination of this Agreement, or from the date of the Merchant's last successful transaction, whichever occurs first, Merchant has eighteen (18) months to request in writing a release of the balance of funds remaining in its account(s) and provide a designated bank account for the transfer, otherwise the funds shall be forfeited to Allied Wallet.

6. **Undertakings of Merchant**
Merchant guarantees to Allied Wallet that, while using the Services:

6.1. it provides and will provide such information to customers on its website and in other commercial communications to customers as is required pursuant to the laws of the Country of Origin and of those countries in which it offers its goods and/or services;

6.2. it respects and will respect the intellectual property rights of third parties and does not and will not infringe such rights in any way and upon becoming aware of any infringement of such rights will immediately terminate such infringement;

6.3. it does not and will not sell any goods or services the sale of which is prohibited under the laws of the Country of Origin and of those countries in which it offers its goods and/or services,

6.4. it will perform its obligations towards Cardholder, including but not limited to accepting responsibility for the acceptance of a Cardholder order, its fulfillment in an agreed upon manner, and all material warranties and guarantees or order commitments; and

6.5. it is and will remain for the term of this Agreement PCI Compliant.

7. **Sales of Illegal Products or Services**
Allied Wallet reserves the right to close and freeze any access to accounts or funds, and terminate the Agreement, if Allied Wallet discovers any illegal products or services are being run through the Merchant's account or if Merchant aggregates or sends transactions to Allied Wallet from any URL that is not approved by Allied Wallet.

8. **Spam**
"Spam" generally involves the sending of unsolicited commercial e-mail. The use of Spam to promote a site receiving service hereunder is prohibited. While Allied Wallet cannot monitor the manner in which Merchants advertise, upon receipt of a verifiable complaint that Spam has been generated on behalf of a site receiving Service hereunder, Allied Wallet shall notice Merchant. Upon the second complaint of Spam sent to the same recipient, Allied Wallet reserves the right to suspend the Merchant's account, until such time as Allied Wallet receives adequate assurances that Merchant shall refrain from engaging in Spam. Failure to provide such assurances or continued use of Spam by Merchant entitles Allied Wallet to terminate this Agreement in its discretion.

9. **End User Information**
Merchant understands that any information accepted by Allied Wallet from end users is the property of Allied Wallet, and shall remain the property of Allied Wallet upon cancellation of this Agreement.

10. **Merchant Transaction Limits**
Allied Wallet is entitled to set an overall transaction limit for all transactions along with a specific limit for each channel. Should Merchant request to increase this limit for any reason Allied Wallet agrees to review such request in good faith along with Merchant to determine whether such request can be accommodated in light of Merchant's existing and projected, Chargeback and refund levels. There is also a standard "time limit" function that prevents Merchant to be accidentally double charged – this feature is found in WEB mode and in API mode.

11. **Cardholder Transaction Limits**
In order to prevent the occurrence of fraudulent transactions Allied Wallet may impose reasonable limits on the amount or

MERCHANT'S INITIALS: K W



number of purchases which may be charged to an individual Cardholder account during any time period, or refuse to accept orders from Cardholders with a prior history of questionable charges.

12. **Refund Policy**

Allied Wallet will use commercially reasonable efforts to direct inquiring and complaining Cardholders to utilize the cardholder support services offered by Merchant in order to resolve all disputes and complaints, however, Allied Wallet reserves the right to issue a Refund without the knowledge or consent of Merchant in any case that it deems appropriate. Such determination will be binding on Merchant and the Refund debited from this account. Any transaction deemed fraudulent by Allied Wallet, will be addressed by Allied Wallet cardholder department, and if not verified as valid to Allied Wallet's satisfaction the transaction will be cancelled and refunded, and will also add an additional fraud transaction fee of $20 on each reported fraud transaction. Moreover, Allied Wallet will Refund any transaction reported by the card brands or the banks to avoid Chargebacks.

13. **Merchant Cardholder Support**

Merchant shall be responsible for all cardholder support issues. Merchant shall have the ability to reasonably respond to inquiries from its Cardholders promptly and shall endeavor to resolve disputes with Cardholders amicably. The occurrence of complaints from Cardholders and/or inquiries or Chargeback's regarding Merchant's services may be cause for termination of this Agreement if such events occur with unacceptable frequency as determined in the sole discretion of Allied Wallet. In addition, Allied Wallet reserves the right to charge Merchant reasonable fees and recover its expenses on account of excessive cardholder inquiries, Refunds, or Chargebacks. Prior to imposing such fees and recovering its costs, Allied Wallet shall notify Merchant of the details and nature of the problems and attempt to find mutually acceptable solutions. If Allied Wallet and Merchant are unable to achieve mutually acceptable solutions, Merchant shall have the option of continuing this Agreement subject to the additional fees and costs imposed by Allied Wallet, or of terminating this Agreement and paying fees and costs through the date of termination.

14. **Shipping Documents**

Request for shipping documents on tangible goods and or for proof of services provided, must be provided by Merchant to Allied Wallet within one (1) working day of the request. Documents not supplied to Allied Wallet within that time will be charged a $150 fine per day the documents are not received up to a maximum of $1,000. It is imperative that Allied Wallet obtains these documents upon request to dispute Chargebacks and keep Merchant accounts in good standing. Failure to provide such documentation is cause for termination of this Agreement by Allied Wallet.

15. **Password security**

The security of Merchant's Allied Wallet account is dependent in part upon Merchant maintaining the confidentiality of the Allied Wallet passwords. Merchant is wholly responsible for maintaining the confidentiality of Merchant's password and account and for any and all activities that occur under Merchant's account and shall indemnify Allied Wallet with respect thereto. Allied Wallet shall not be responsible for any unauthorized changes made to the Merchant's account.

16. **Merchant E-Mail, Account Changes**

Merchant must provide a valid, working administrative e-mail address on enrollment. Any changes to Merchant's account via e-mail must be made via the administrative e-mail address provided on enrollment. The security of Merchant's Allied Wallet account is dependent in part upon Merchant maintaining the security of the administrative e-mail address as provided to Allied Wallet by Merchant. Any changes to Merchant's account via e-mail must be made via the administrative e-mail address provided on enrollment. Allied Wallet shall not be responsible for any unauthorized changes made to Merchant's account via this e-mail address.

17. **Regulation Authorization, Merchant Representations**

Merchant represents and warrants that it is legally authorized and has obtained all necessary regulatory approvals and certificates to provide any services it intends to offer. Merchant further represents and warrants that it will comply at all times with all applicable federal, state/provincial, or local laws, rules and regulations including any applicable card association or Automated Clearing House rules and that the good/services it offers are in compliance with the same. If at any time, Merchant is being investigated in a civil or criminal matter regarding its business, products or services that Merchant is engaged in, by local, state or federal authorities, or has violated any local, state or federal rules or regulations, is must inform Allied Wallet immediately or within 3 days of said investigation or violation, otherwise it will be in breach and there will be a significant penalty assessed and the account will be subject to termination by Allied Wallet, frozen with remaining funds to be released after one hundred and eighty (180) days to five hundred and forty days (540) from the last card event subject to offsets set forth in this Agreement.

18. **Merchant Information**

Merchant is responsible for providing information which is timely, complete, truthful, and not misleading. If Merchant provides any misleading information, infringes on any copyrights or trademarks, or misrepresents its business, products or services that Merchant is engaged in to Allied Wallet or to its customers or potential customers, there will be a significant fine assessed up to the amount of funds held by Allied Wallet. Moreover, the account will be subject to termination by Allied Wallet and frozen with remaining funds to be released after one hundred and eighty (180) days to five hundred and forty days (540) from the last card event, subject to offsets and fines set forth herein. If Allied Wallet approves a Merchant based on a conditional approval or limitation of products and services sold, any deviation from said approval of products and services will result in possible suspension or termination of services, with funds frozen for one hundred and eighty (180) days to five hundred and forty days (540) from the last card event, and subject to offsets set forth herein. Merchant agrees to notify Allied Wallet of any changes of ownership, regulatory actions, financial conditions and business products or services it provides that could materially affect

MERCHANT'S INITIALS: ___

CONFIDENTIAL
ALLIED_0000176



Allied Wallet's rights under this Agreement. All Merchants must have a website to use Allied Wallet services, all websites and content on the websites (video, text, music, merchandise, etc.) must be reviewed by Allied Wallet for compliance with the card brands rules and regulations as well as the Automated Clearing House rules and regulations. Upon approval of content, the website is considered approved for processing. Allied Wallet reserves the right to change terms of approval of website content, albeit that website has been previously approved, if it is discovered that the content could be a possible Business Risk Assessment Mitigation (pBRAM) violation or definite BRAM violation of the card brand rules and regulations. If the Merchant changes or adds new content, products or services to a website, Allied Wallet must be notified immediately so the website can be reviewed for compliance. If content is added or changed without Allied Wallet being notified, or even if the website is offline and inactive, Allied Wallet reserves the right to interrupt service pending a review of said content, product or services for compliance or the reason for the inactivity. Any content, products or services found to be a pBRAM or BRAM violation can result in fines and possible termination of services and agreements with Allied Wallet. Should Allied Wallet terminate a Merchant for any reason, all funds will be held for one hundred and eighty (180) days from the last card event to five hundred and forty days (540), depending on products or services offered by Merchant to its customers. Funds will be eligible for release once a review of transaction liability and possible loss to Allied Wallet has been successfully reviewed and mitigated. Merchant will be responsible for all chargebacks, refunds and losses to Allied Wallet, which Allied Wallet will offset against the Merchant's frozen funds without prejudice to Allied Wallet's right to claim any further damages against Merchant.

19  **Data Protection**

Merchant complies and will comply at all times with the personal data protection laws of any country in which it offers its goods and/or services and that it shall implement appropriate technical and organizational measures to protect personal data.

20.  **Confidential Information**

Allied Wallet's services and all information and documentation relating thereto shall be held in confidence by Merchant and may not be used by Merchant (other than for the furtherance of the purposes of the Agreement) nor disclosed to third parties without Allied Wallet's prior written consent. This includes the discovery of any errors or omissions in the Services. The terms and conditions of this Agreement may not be disclosed or made available by either party hereto to third parties without the prior written consent of the other party. In addition, Allied Wallet will not under any circumstance reveal its banking partners. Notwithstanding anything in this Agreement to the contrary, either party may disclose to third parties the fact that Merchant is using Allied Wallet's services. Merchant recognizes that the services and documentation are and contain the valuable, confidential and trade secret information of Allied Wallet. In furtherance of the foregoing Merchant and Allied Wallet shall enter into a confidentiality agreement substantially in the form of Appendix 3.

21.  **Intellectual Property**

21.1.  Allied Wallet hereby grants Merchant a royalty-free, non-transferable and non-exclusive right for the term of this Agreement to use the Trademarks on its website(s) and in any off-line promotional materials solely in order to indicate that it makes use of the Services. Merchant shall use such Trademarks in accordance with Allied Wallet 's directions for the use of such Trademarks. Merchant does not have a right of sub-license. Allied Wallet may apply limitations to the right granted to Merchant under this paragraph at any time and at its sole discretion. Merchant hereby grants Allied Wallet and its affiliated companies an irrevocable, royalty free and non-exclusive right for the term of this Agreement to use its trademark and logos on their websites and in off-line publications for promotional purposes.

21.2  When using the Trademarks, Merchant will ensure that no composite marks are created with its own trademarks and/or logos. Merchant acknowledges that its use of the Trademarks does not create for itself any rights in the Trademarks other than those explicitly granted in this Agreement.

21.3.  All proprietary rights in the equipment, software (such as interfaces) and other materials used or made available by Allied Wallet in the performance of this Agreement, whether or not supplied to Merchant, shall remain with Allied Wallet or its licensors. Merchant shall only acquire such right of use as is explicitly granted hereunder or otherwise.

21.4.  Upon termination of this Agreement, Merchant will immediately withdraw any reference to Allied Wallet from its website(s) and will cease the use of the Trademarks.

22.  **Software**

22.1.  *As-Is Basis.* The Software, Services or related products are provided to Merchant under this Agreement on an "as-is" basis. Merchant understands that processing outages are normal and can occur time to time due to service interruption from banks, failed servers or the storage facility. Merchant agrees not to hold Allied Wallet liable for any loss of business or other damages caused by such outages.

22.2.  In consideration for payment of any applicable fees, Merchant is granted a personal, non-exclusive, non-transferable license to use the Software, in object code form only, solely in connection with the Service (the "**License**"). Merchant shall not: (i) attempt to reverse engineer, decompile, disassemble or otherwise translate or modify the Software in any manner; or (ii) sell, assign, license, sublicense or otherwise transfer, transmit or convey Software, or any copies or modifications thereof, or any interest therein, to any third party. All rights in the Software, including without limitation any patents, copyrights and any other intellectual property rights therein, shall remain the exclusive property of Allied Wallet and/or its licensors. Merchant agrees that the Software is the proprietary and confidential information of Allied Wallet and/or its licensors subject to the provisions of Section 20 ("**Confidential Information**") above. The License shall immediately terminate upon the earlier of: (i) termination or expiration of this Agreement; (ii) termination of the Service(s) with which the Software is intended for use; or (iii) failure of Merchant to comply with any provisions of this Section.

23.  **Taxes**

Merchant is fully responsible for and agrees to pay all taxes and other charges imposed by any government authority on the services provided under this Agreement and on any transactions processed pursuant to this Agreement.

MERCHANT'S INITIALS: ____

CONFIDENTIAL

Pl. Ex. 25
p. 358
ALLIED_0000177



24. **Limitations of Liability**

ALLIED WALLET ASSUMES NO LIABILITY FOR DISRUPTIONS OR IMPROPER OPERATION OF THE SERVICE FOR ANY REASON, INCLUDING, BUT NOT LIMITED TO, VANDALISM, THEFT, ACTIONS OF THIRD PARTY SERVICE PROVIDERS, PHONE SERVICE OUTAGES, INTERNET DISRUPTIONS, EXTREME OR SEVERE WEATHER CONDITIONS OR ANY OTHER CAUSES IN THE NATURE OF "ACTS OF GOD" OR FORCE MAJEURE. ALLIED WALLET SHALL NOT BE RESPONSIBLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES INCLUDING ANY LOSS OF PROFIT, REVENUE, SOFTWARE OR DATA, EVEN IF ALLIED WALLET IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO CASE SHALL MERCHANT BE ENTITLED TO RECOVER DAMAGES FROM ALLIED WALLET WHICH EXCEED THE SUM OF THE AMOUNTS OF FEES RETAINED BY ALLIED WALLET UNDER THIS AGREEMENT DURING THE ONE MONTH PRIOR TO THE EVENT GIVING RISE TO THE CLAIM FOR DAMAGES.

25. **Disclaimer of Warranties**

EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, ALLIED WALLET MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY ALLIED WALLET SERVICES, RELATED PRODUCTS, SOFTWARE OR DOCUMENTATION. ALLIED WALLET SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES; INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

26. **Indemnification**

Merchant agrees to indemnify and hold harmless Allied Wallet, its employees, officers, agents, directors and subsidiaries from any and all fines, penalties, losses, claims, expenses (including attorney fees), lawsuits by its customers or other liabilities resulting from or in connection with this Agreement. Allied Wallet assumes no liability of Merchant for failure to comply with this Agreement and any results caused by the acts, omissions or negligence of Merchant, sub-contractor or an agent of Merchant or an employee of any one to them, including, but not limited to, claims of third parties arising out of or resulting from or in connection with Merchant's products or services, messages, Seprograms, caller contracts, promotions, advertising, infringement or any claim for libel or slander or for violation of copyright, trademark or other intellectual property rights. Allied Wallet may deduct the above described fines, penalties, losses, claims, expenses (including attorney fees and the allocable costs of in-house counsel), or other liabilities from the Reserve, or if the Reserves are inadequate, directly from the proceeds of Merchant's sales.

27. **Cross Corporate Guarantee**

Merchant shall procure an independent guarantee by its parent and/or its group companies in favor of Allied Wallet substantially in the form of Appendix 2.

28. **Term**

The term of this Agreement shall be for twelve (12) months beginning upon execution of this document by Merchant and subsequent acceptance by Allied Wallet, and shall automatically renew at the end of each consecutive twelve (12) month period unless Allied Wallet receives written notice of non-renewal from Merchant no less than thirty (30) days prior to the expiration of such twelve (12) month period. Allied Wallet reserves the right to terminate this Agreement at any time with or without cause or prior notification to Merchant. Allied Wallet may further terminate this Agreement immediately without notice at any time Merchant breaches any part of this Agreement. Upon termination of processing, notice of non-renewal or cancellation of this Agreement, payment shall be made in accordance with the Section entitled "Payment to Merchant", above. Upon expiration or termination of this Agreement or if the Merchant stops processing, Allied Wallet may hold Merchant funds until such time as all of the Merchant's Cardholder transactions are complete and Allied Wallet reasonably believes no further Chargebacks, CBK1s, refunds or dispute claims of fraud or other offsets will be incurred and all outstanding claims and issues with the Merchant have been resolved.

29. **Default**

In the event Merchant defaults in any provision or fails to perform pursuant to this Agreement. Allied Wallet shall be entitled to damages, costs and attorney's fees from Merchant.

30. **Survival of Claims**

Any claim arising out of or related to this Agreement must be brought no later than one year after it has accrued.

31. **Invalid or Non-enforceable Provisions**

The invalidity or non-enforceability of any provision of this Agreement, as so determined by a court of competent jurisdiction, shall not affect the other provisions hereof, and in any such occasion this Agreement shall be construed in all respects as if such invalid or non-enforceable provision were omitted or, as the case may be, such provision shall be modified to the minimum extent necessary to make it legal, valid and enforceable.

32. **Account Claims, Disputes, and Attorneys' Fees Clause**

If another person or entity makes a claim against funds in Merchant's account, or if Allied Wallet has reason to believe there is or may be a dispute over matters such as ownership of the account or the authority to receive payment, or make changes to the account, Allied Wallet may, in its sole discretion, (1) continue to rely upon current Allied Wallet documents; (2) honor the competing claim upon receipt of evidence Allied Wallet deem satisfactory to justify such claim; (3) freeze all or part of the funds until the dispute is resolved to Allied Wallet's satisfaction; or (4) pay the funds to an appropriate court of law for resolution.

MERCHANT'S INITIALS: K W

CONFIDENTIAL



In the event of a dispute between Allied Wallet and the Merchant relating to the subject matter of this Agreement, it is agreed that the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs in enforcing its rights hereunder.

33. **Choice of Law/Venue**
For purposes of convenience, this Agreement shall be construed and enforced in accordance with the laws of the State of California, in the United States, and the exclusive venue for any action, dispute or proceeding with respect to this Agreement shall be in Los Angeles, California.

34. **Amendments and Modifications**
No Amendment or modification of this Agreement shall be valid unless same is in writing and signed by all parties hereto. Allied Wallet may amend this Agreement to take into account changes in law or regulations or industry mandates and to accommodate changes imposed on Allied Wallet, and to make other changes deemed necessary by Allied Wallet, by sending Merchant a specimen of the changed Agreement, or making a specimen of the changed Agreement available upon a web page located on the Internet. Unless Merchant rejects the changed Agreement and terminates this Agreement by notice to Allied Wallet in writing within fifteen (15) days after Allied Wallet sends the changed Agreement, or makes said changed agreement available on the Internet, the changed Agreement shall replace this Agreement and be in full force and effect.

35. **Notices**
Any and all notices to Allied Wallet, or other communications under or with respect to this Agreement to Allied Wallet, shall be in writing, and shall be delivered by hand; e-mail; mailed postage pre-paid, either by registered or certified mail, return receipt requested; or by overnight courier to the following address:

    Allied Wallet, Inc.
    9000 Sunset Boulevard., Suite 820.
    West Hollywood, CA 90069

    And via email: support@AlliedWallet.com

    Notices to Merchant shall be made to the administrative e-mail provided by Merchant on enrollment with Allied Wallet and be deemed delivered when sent.

36. **Survival of Obligations**
The rights and obligations of the parties hereunder which by their nature would continue beyond the termination or cancellation of this Agreement (including, without limitation, those relating to confidentiality, payment of charges and limitations of liability) shall survive any termination or cancellation of this Agreement.

37. **Transfer and Assignment**
Merchant may not sell, assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Allied Wallet.

38. **Authorization; Entire Agreement**
The persons signing or otherwise accepting this Agreement on behalf of Merchant represent and warrant that they have the authority to enter into this Agreement on behalf of Merchant. This Agreement contains the entire agreement of the parties and supersedes any other agreements (written or oral), instruments or writings as to its subject matter.

39. **Acceptance**
By signing this page you state that you understand and agree to these terms and conditions, Merchant agrees that Merchant has read, understands, and agrees to abide by this Agreement, and any documents incorporated by reference, and Merchant agrees that Merchant intends to form a legally binding contract; and that this Agreement constitutes "a writing signed by Merchant" under any applicable law or regulation. **Any rights not expressly granted herein are reserved by Allied Wallet.**

By signing and entering into this Agreement with Allied Wallet, I certify that I have carefully read and understood the terms of this Agreement, hereby agree to it, and acknowledge receipt of a fully completed and signed copy of it. Moreover, I certify that I am an authorized person of Merchant that is the subject of this Agreement.

**AGREED AND ACCEPTED:**

| [True Count Staffing | ALLIED WALLET, INC. |
|---|---|
| SIGNATURE: _Kain Wen_ | SIGNATURE: _____ |
| BY [print]: KAINE WEN | BY [print]: _____ |
| TITLE: GENERAL COUNSEL | TITLE: _____ |
| DATED: 7/31/17 | DATED: _____ |

MERCHANT'S INITIALS: K W



WITNESS FOR MERCHANT:_____

### APPENDIX 1

### PAYOUT SCHEDULE

Allied Wallet wires every Wednesday to all Merchants due more than 1000 units of the processed and settled currency. Funds will post to the wired account within 1 to 4 business days (bank holidays and country specific holidays may delay funds). Price display: the customer must be able to identify the final price of a product unmistakably.

All Merchants must put the Allied Wallet logo and Allied Wallet details for customers to clearly see who they will be billed by on payment pages – Allied Wallet technical team will send you details. This must be done prior to your first payout.

****All fees will be charged in the equivalence of USD, with the exception of EUR and GBP.
****Should a chargeback be issued on the basis of fraud, an additional €15.00 per dispute will be charged.

**Discount Rate and Details**

Currency: USD

*Merchant Discount Rate:* 3.35%

*One Time setup fee:* 0.00

*Monthly Maintenance Fee:* 0.00

*Transaction Fee:* .20 UNITS

*Refund Fee:* 1.25 UNITS

*Chargeback1 Fee:* 8.00 UNITS

*Chargeback fee:* 45.00 UNITS

*Wire Fee:* 45.00 UNITS

*Holdback Reserve (rolling 6 mo.):* 5%

*Holdback funds are released on the 15th of each month, unless this date falls on a weekend, and are only released if 1000 Units or more are due and are subject to a wire fee.*

*Payout Period: 12 days in arrears based on amount to be determined*

*Processing Period: Saturday to Friday*

New clients have no limit on voids of pre-authorizations.

AlliedWallet, Inc.

|                          | [True Count Staffing      |
|--------------------------|---------------------------|
| By: _____    | By: _____     |
| Name: _____  | Name: KAYNE WEN           |

MERCHANT'S INITIALS: K  W

CONFIDENTIAL                                                    ALLIED_0000180

**Allied**Wallet

Title: _____

Title: _GENERAL COUNSEL_

Date: _7/31/17_

MERCHANT'S INITIALS: _E W_

Allied CID response

CONFIDENTIAL

ALLIED_0000181



## APPENDIX 2

### CROSS CORPORATE GUARANTEE

Date: 7/3/17

From: [Merchant Parent or Group Company] ("**Guarantor[s]**") in favor of Allied Wallet Inc. ("**Allied Wallet**").
TRME COUNT
**Allied Wallet Card Payment Processing Agreement dated _____ between STAPPING ("Merchant") and Allied Wallet (the "Agreement")**

As a primary inducement to Allied Wallet to enter into the Agreement, the undersigned in [its/her/his/their] capacity of Guarantor[s], by signing this Agreement, hereby guarantee[s], without reservation, jointly and severally, unconditionally and irrevocably, by way of independent guarantee (a) the continuing full and faithful performance by Merchant of each of its duties and obligations to and (b) payment of any monies due by Merchant to Allied Wallet under the Agreement or any other agreement currently in effect or in the future entered into between Merchant or its principals and Allied Wallet as such agreements now exist or are amended from time to time, with or without notice.

Guarantor[s] understand[s] further that Allied Wallet may proceed directly against Guarantor[s] without first exhausting their remedies against any other person or entity responsible to it or any security held by Allied Wallet or Merchant. To the extent permitted by applicable law, Guarantor[s] waive[s] all defenses and deferral rights and legal prerogatives which the law has vested in or may vest in guarantors and joint and several debtors.

Guarantor[s] agree[s] to immediately remit payment regarding any monies owed to Allied Wallet. In addition, Guarantor[s] will promptly provide any information requested concerning [its/her/his/their] financial profile and business relationships.

This guarantee will not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit or any other variations of the terms and agreement of the Agreement.

Guarantor[s] waive[s] trial by jury with respect to litigation arising out of or relating to this guarantee. This guarantee will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of Allied Wallet or its subsidiaries.

Guarantor[s] understand[s] that the inducement to Allied Wallet to enter into this Agreement is consideration for the guarantee, and that this guarantee remains in full force and effect even if Guarantor[s] receive[s] no additional benefit from the guarantee.

Guarantor(s) certif[y/ies] that Guarantor[s] [is/are] an [RELATIONSHIP] of Merchant.

This guarantee shall be construed and enforced in accordance with the laws of California and the venue for any action, dispute or proceeding with respect to this guarantee shall be Los Angeles, California.

Sincerely,

[GUARANTOR NAME]

SIGNATURE: _____

BY [print]: KATHE WEN

TITLE: GENERAL COUNSEL


WITNESS: _____


**AGREED AND ACCEPTED**
ALLIED WALLET, INC.

SIGNATURE: _____

BY [print]: _____

TITLE: _____

**Attachment:** Corporate Resolution of Guarantor[s]

MERCHANT'S INITIALS: K W

Pl. Ex. 25
p. 363
CONFIDENTIAL · · · · · · · · · · · · · · · · · · · · · · · · ALLIED_0000182



## APPENDIX 3

### NON-DISCLOSURE / CONFIDENTIALITY AGREEMENT

With this Agreement dated 7/3/17 , Allied Wallet is providing Merchant confidential trade secret information, including, but not limited to, terms and conditions, fee schedules, rates (such information whether written or oral called the "**Confidential Information**"). In consideration of furnishing the Confidential Information to Merchant, Merchant agrees to the following:

Merchant may disclose such Confidential Information only to those of its employees who need to know such information given the nature of the business relationship being considered by Merchant and Allied Wallet, and who agree to be bound by the terms and conditions of this Agreement. Neither Merchant nor any of its employees shall use, disseminate or in any way circulate within its own organization or otherwise any Confidential Information that is supplied to or obtained by Merchant in writing, orally or by observation, except (i) to the extent necessary to evaluate a possible business relationship with Allied Wallet and (ii) in the course of negotiations, discussions and consultations with personnel or authorized representatives of the Allied Wallet in connection with such evaluation or defining the terms of such relationship.

Merchant shall treat all Confidential Information with a degree of care that is not less than the degree of care used by it in safeguarding its own similar information or material, and in no event less than the degree of care generally accorded in the industry to confidential information of the same or similar nature.

Merchant shall NOT publish or copy any Confidential Information, or disclose any Confidential Information to ANY third party, before, during or after the conclusion of its business relationship with Allied Wallet. The non-disclosure provisions of this Agreement shall survive the termination of this Agreement and Merchant's duty to hold the Confidential Information in confidence shall remain in effect until Allied Wallet sends Merchant written notice releasing Merchant from the non-disclosure provisions of this Agreement. In any event, the merchant shall not publish any information in any public forum regarding it's relationship with Allied Wallet.

Merchant makes this Agreement in good faith, without mental reservation or purpose of evasion. Merchant understands that Allied Wallet may seek any remedy availabe to it to enforce this Agreement, including, but not limnited to, application for a court order prohibiting disclosure of information in breach of this Agreement.

If a court finds any provisions of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of the parties.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party. Merchant has signed this Agreement through its authorized representative.

Any failure by either party to enforce at any time any term or condition of this Agreement shall not be considered a waiver of that party's right thereafter to enforce each and every term and condition of this Agreement.

This Agreement shall be construed and enforced in accordance with the laws of California and the venue for any action, dispute or proceeding with respect to this Agreement shall be Los Angeles, California.

IN WITNESS WHEREOF, Merchant has executed this Agreement as of the date first written above.

Allied Wallet, Inc.

[True Count Staffing]

By: _____    By: _____

Name: _____    Name: KATIE WEN

Title: _____    Title: GENERAL COUNSEL

MERCHANT'S INITIALS: K W

CONFIDENTIAL



### APPENDIX 1

### PAYOUT SCHEDULE

Allied Wallet wires every Wednesday to all Merchants due more than 1000 units of the processed and settled currency. Funds will post to the wired account within 1 to 4 business days (bank holidays and country specific holidays may delay funds). Price display: the customer must be able to identify the final price of a product unmistakably.

All Merchants must put the Allied Wallet logo and Allied Wallet details for customers to clearly see who they will be billed by on payment pages -- Allied Wallet technical team will send you details. This must be done prior to your first payout.

****All fees will be charged in the equivalence of USD, with the exception of EUR and GBP.
****Should a chargeback be issued on the basis of fraud, an additional €15.00 per dispute will be charged.

**Discount Rate and Details AMEX / DISCOVER**

*Currency: USD*

*Merchant Discount Rate*

*One Time setup fee: WAIVED*

*Monthly Maintenance Fee: 95.00 USD*

*Transaction Fee: .20 units*

*Refund Fee: 1.25 units*

*Chargeback1 Fee: 5.00 units*

*Chargeback fee: 20.00 units*

*Wire Fee: 45.00 units*

*Holdback Reserve (rolling 6 mo.): 10%*

*Holdback funds are released on the 15th of each month, unless this date fails on a weekend, and are only released if 1000 Units or more are due and are subject to a wire fee.*

*Payout Period: 12 days in arrears based on amount to be determined*

*Processing Period: Saturday to Friday*

New clients have no limit on voids of pre-authorizations.

AlliedWallet, Ltd.

[True Count Staffing ]

By: _____    By: _____

Name: _____    Name: KAINE WEN

Title: _____    Title: GENERAL COUNSEL

Date: 7/31/17

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**CONSUMER ADVOCACY CENTER, INC.**
**Federal Tax ID# 47-1590303**

NAMES, ADDRESSES, & CAPITAL CONTRIBUTIONS OF MEMBERS

Member's Name:                          Kaine Wen
Address:                                ▮▮▮▮▮▮▮▮▮▮
                                        Azusa, CA ▮▮▮▮▮

Capital Contribution:                   $30,000
Share Ownership Interest:               750 out of 1,500 shares
Percentage Ownership Interest:          50%
Share in Profits & Losses:              50%

_____         __10/01/2015_____

Kaine Wen                               Date
Title: Chief Financial Officer


Member's Name:                          Albert Kim
Address:                                ▮▮▮▮▮▮▮▮▮▮
                                        Aliso Viejo, CA ▮▮▮▮▮

Capital Contribution:                   $10,000
Share Ownership Interest:               750 out of 1,500 shares
Percentage Ownership Interest:          50%
Share in Profits & Losses:              50%

_____         __10/01/2015_____

Albert Kim                              Date
Title: President


Allied CID response

CONFIDENTIAL

Pl. Ex. 25
p. 380
AW_0000254

**Allied wallet**

**Merchant Services Application**

| | |
|---|---|
| Company DBA (doing business as) / trading name: Premier Student Loan Center | |

| | |
|---|---|
| Legal business name: Consumer Advocacy Center Inc. | Email address: Kaine@premierstudentloancenter.com |
| Tax ID number: 49-1590303 | Skype / IM address: |
| Business telephone number: 949-207-1018 | Customer service phone number: 888-548-0476 |
| State of Incorporation or Organization: CA | Date business established (MM/YY): 08/14 |
| Business street address: 29901 Santa Margarita Pkwy, Ste 200F | City: Rancho Santa Margarita State: CA    Postcode: 92688 |
| Business mailing address: 29901 Santa Margarita Pkwy, Ste 200F | City: Rancho Santa Margarita State: CA    Postcode: 92688 |

| List of all URL's | Industry | Description of Product/Services |
|---|---|---|
| premierstudentloancenter.com | Student Loans | Document Preparation Services |
| | | |
| | | |
| | | |

Website Login Details:    UN: _____    PW: _____

Type of business:  ☐ Individual    ☐ Partnership    ☑ Corporation    ☐ Nonprofit

Operating from:  ☑ Office suite    ☐ Retail storefront    ☐ Warehouse    ☐ Private Sector

Describe your use of our processing/transaction services:

Accounting Manager will process clients' credit card payments on a daily basis.

**OWNERSHIP: Please list the two owners with the largest share of ownership:**

Owner 1 name: Kaine Wen    % ownership: 50    Owner since: 08/2014    (MM/YY)

| | Residence Address | City | Country | Postcode |
|---|---|---|---|---|
| Current Address: | | Azusa, CA | | |
| Previous Address: | | | | |
| Social Security #: | -3143 | Date of Birth: | 1977 | |
| Mobile phone #: | | Personal email address: | kaine@premierstudentloancenter.com | |
| Drivers License #: | | Passport Number / Country of Issue: | | |

Owner 2 name: Albert Kim    % ownership: 50    Owner since: 08/2014    (MM/YY)

| | Residence Address | City | Country | Postcode |
|---|---|---|---|---|
| Current Address: | | Aliso Viejo, CA | | |
| Previous Address: | | | | |
| Social Security #: | 5610 | Date of Birth: | 1980 | |
| Mobile phone #: | | Personal email address: | albert@premierstudentloancenter.com | |
| Drivers License #: | | Passport Number / Country of Issue: | | |

**Bank Reference**

| | | | |
|---|---|---|---|
| Business Bank Name: JP Morgan Chase Bank | Contact name: Bank Manager | Phone: (949) 635-6872 | |
| Bank Street Address: | City: | State:    Postcode: | |
| Checking account # for merchant card /funds deposits: 1522 | | SWIFT or Routing number: 322271627 | |
| Name on your account: Consumer Advocacy Center Inc. | | Date account established: 08/2014 | |

Allied CID response

CONFIDENTIAL

Pl. Ex. 25
p. 381

AW_0000319

- Estimated Monthly Volume: $ 100,000
- Average Ticket Amount: $ 350
- Highest Ticket Amount: $ 1,200
- Have you accepted credit cards/ACH before?

  ☑ YES   ☐ NO

- If yes, name of current/former processor:

  Electronic Merchant Systems

  Account/Merchant ID #: ████████ 3157

  Years with this processor: Since 11/2015
  (include last 3 months processing statements)

- Monthly chargebacks: # 0   $ 0

- Have you EVER been blacklisted or had an account closed by MasterCard/ Visa or ACH processor?   ☐ YES   ☑ NO

- Requested transaction currencies: USD

  _____   _____   _____

- Number of Employees: 12

| | | Yes | No |
|---|---|---|---|
| 1. | Has any person on this application ever been convicted of a crime? | ☑ | ☐ |
| 2. | Has any person listed above filed bankruptcy in the last 10 years? | ☐ | ☑ |
| 3. | Has any person listed above, served as an Officer, Director, or Manager of a company that was the subject of any regulatory request for investigation, action or lawsuit of any kind? | ☐ | ☑ |
| 4. | Has any person listed above ever been refused a bond, or had a bond cancelled or revoked? | ☐ | ☑ |
| 5. | Has any person listed above ever had any occupational license suspended or revoked? | ☐ | ☑ |
| 6. | Are your shipping, refund & contact details clearly listed on your website? | ☑ | ☐ |
| 7. | Do you use telemarketing to contact potential customers? | ☐ | ☑ |
| 8. | Do you use mass emails in any way to market your product/services? | ☐ | ☑ |

FOR PHYSICAL / TANGIBLE GOODS:

| | | | |
|---|---|---|---|
| 9. | When are credit card transactions processed?   At date of order ☐   at date of shipment ☐ | | |
| 10. | If at date of order, how many days is it between order date and shipment date? _____ days. | | |
| 11. | How do you ship the majority of your orders?   Overnight ☐   2-3 day air ☐   Ground ☐ | | |
| 12. | What shipping service do you typically use?   UPS ☐   FedEx ☐   Postal Service ☐   DHL ☐ | | |
| 13. | What is the average number of days from shipment to delivery? _____ days. | | |
| 14. | Do you require a signature on delivery?   Yes ☐   No ☐ | | |
| 15. | Do you use a fulfillment house to take your orders or ship your products?   Yes ☐   No ☐ | | |
| 16. | Is business 100% over the Internet?   Yes ☐   No ☐ | | |
| 17. | Do you offer recurring billing?   Yes ☐   No ☐ | | |
| 18. | Do you require a virtual terminal?   Yes ☐   No ☐ | | |
| 19. | What type of customer support do you offer? ☐ Email   ☐ Phone   ☐ Both | | |
| 20. | What are your customer support hours (check all that apply) ☐ 24/7   ☐ 9 to 5   ☐ M-F   ☐ Weekends | | |
| 21. | Do you email a receipt upon order with contact and billing details?   Yes ☐   No ☐ | | |
| 22. | Do you allow PO Boxes in the address field?   Yes ☐   No ☐ | | |

## Credit References:

| Company name: LaRue Business Group, Inc. | Contact name: Jay LaRue | Phone: (714) 619-5730 | |
|---|---|---|---|
| Street address: 15661 Red Hill Ave, Ste 201 | City: Tustin | State: CA | Postcode: 92780 |
| Date account established: 10/2015 | Account #: 29901 Rancho Santa Margarita Pkwy, Ste 200F | | |

| Company name: | Contact name: | Phone: | |
|---|---|---|---|
| Street address: | City: | State: | Postcode: |
| Date account established: | Account #: | | |

## AUTHORIZATION & ACKNOWLEDGEMENT

As part of my application, the company may obtain commercial credit bureau reports on applicant companies. In some instances, additional information about principals of the applicant company may be required, and the company will then obtain a consumer credit report on the Principal(s) identified in this application. The Principals' signatures are therefore required below.

*I certify that the above information is true and correct, to the best of my knowledge.*

*I hereby authorize, without reservation, the company or an agent acting on its behalf to procure information from various federal, state and other agencies which maintain public and non-public records concerning my past activities relating to my driving, credit, civil, education, employment and other experiences. This report may be compiled with information from but not limited to credit bureaus, court record repositories, military records, department of motor vehicles, past or present employers and educational institutions, governmental occupational licensing or registration entities, business or personal references, any public domain, insurance company, and any other source required to verify information that I have voluntarily supplied for the purpose of verifying my financial standing and credit worthiness.*

| _Kaine Wen (signature)_   03/29/2016 | _____ |
|---|---|
| Principal Signature          Date | Principal Signature          Date |
| Kaine Wen | |
| Print Principal Name | Print Principal Name |

CONFIDENTIAL

Allied CID response

Pl. Ex. 25
p. 382

AW_0000320

## Document Requirements for New Applications

**For all Applications:**

1. Completed and signed application.
2. Color copy of current Passport or driver's license of principal(s) – easiest to take a photo and send a color picture of the document.
3. Past 3 months processing statements.
4. Corporate documents: Copy of Articles of Incorporation (or equivalent). If DBA; please furnish DBA filing. If not available, a copy of your business license *may* be considered an acceptable substitute.
5. At least one of the following:
   a. Past 3 months bank statements
   b. Most recent utility bill
   c. Additional government issued photo ID

**For Websites:**

1. Clear description of goods and services listed on site
2. Clear pricing and currencies of each and every product and service.
3. Terms and conditions clearly stated online.
4. Privacy policy on site.
5. Contact details and location of business easily found on site.
6. Customer service email and phone number listed on website.
7. Times listed that customer service is available.
8. Refund policy clearly stated.
9. Shipping policy clearly stated on order page.
10. Display Visa and MasterCard logo's at checkout
11. SSL on all pages where customer information is collected.

Allied CID response

CONFIDENTIAL

Pl. Ex. 25
p. 383
AW_0000321



## Bank Account Information Form

Funds will be deposited via international wire transfer. Please complete one form for each receiving bank account (applicable for processing in multi-currency settlement accounts).

## Account Details

Beneficiary Name: Consumer Advocacy Center Inc.

**Please note Beneficiary name can be no longer than 30 characters and have no special characters, such as "&" or "-". If submitted Beneficiary Name includes these items wire is at risk of return or decline**

Beneficiary Address on account: 29901 Santa Margarita Pkwy, Ste 200F

Beneficiary City and State on account: Rancho Santa Margarita, CA

Beneficiary Post/Zip Code on account: 92688

Beneficiary Country on account: U.S.A.

Merchant Account ID 9ccc5dfb-0c10-477d-aa27-bfe5cf9b989b

Merchant Website(s) http://premierstudentloancenter.com

## Bank Details

Receiving Bank Name: JPMorgan Chase Bank NA

Receiving Bank Address: 270 Park Ave, New York, NY 10017

Account Number: ████ 522

ABA/Routing Number: ████ 1627

Swift Code: CHASUS33    IBAN:

Print Name: Kaine Wen

Signature                                04/13/2016

Signature                                Date

CONFIDENTIAL

Pl. Ex. 25
p. 384
AW_0000322



# CERTIFICATE OF INCORPORATION
## OF A
## PRIVATE LIMITED COMPANY

Company Number **10117596**

The Registrar of Companies for England and Wales, hereby certifies that

PREMIER STUDENT LOAN CENTER LIMITED

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales.

Given at Companies House, Cardiff, on **11th April 2016**.

The above information was communicated by electronic means and authenticated by the Registrar of Companies under section 1115 of the Companies Act 2006



**THE OFFICIAL SEAL OF THE REGISTRAR OF COMPANIES**



Companies House

Allied CID response

Pl. Ex. 25
p. 385

## Premier Student Loan Center Limited
## Company No: 10117596

Status Report of the company on 11/04/16

The Registered Office of the Company is situated at

Office 3
Unit R
Penfold Works Trading Estate
Imperial Way
Watford
Herts
WD24 4YY

Kaine Wen are appointed first Directors pursuant to Companies Act 2006.

This Company was formed without a secretary

Kaine Wen - 50 Ordinary Share(s) are listed as Original Subscribers
Albert Kim - 50 Ordinary Share(s) are listed as Original Subscribers

IT WAS NOTED that the Company was registered as having 100 Ordinary Shares of 1
British Pounds each with amount paid/due of 1 British Pounds and amount unpaid of 0
British Pounds and voting rights of 1 share = 1 vote, each having rights to dividends

CONFIDENTIAL

AW_0000368

**THE COMPANIES ACT 2006**

**PRIVATE COMPANY HAVING A SHARE CAPITAL**

**MEMORANDUM OF ASSOCIATION**

of

**Premier Student Loan Center Limited**

Each subscriber to this memorandum of association wishes to form a company under the Companies Act 2006 and agrees to become a member of the company and to take at least one share.

Name(s):

Kaine Wen

Albert Kim

Dated this 11th day of April 2016

Allied CID response

CONFIDENTIAL

AW_0000369

THE COMPANIES ACT 2006

PRIVATE COMPANY HAVING A SHARE CAPITAL

ARTICLES OF ASSOCIATION

of

## Premier Student Loan Center Limited

1   **Defined terms**

1.1     In these articles, unless the context requires otherwise:

**Allocation Notice** has the meaning given to that term in Article 37.12;

**appointor** has the meaning given to that term in Article 16.1;

**articles** means the company's articles of association for the time being in force;

**Articles** means the articles of association set out in this document which, together with the Model Articles (as modified or excluded by this document) forming part of the articles, and **Article** shall be construed accordingly;

**Buyer** has the meaning given to that term in Article 37.12;

**call** has the meaning given to that term in Article 25.1;

**call notice** has the meaning given to that term in Article 25.1;

**call payment date** has the meaning given to that term in Article 28.2.1;

**company's lien** has the meaning given to that term in Article 23;

**Clear Days** means (in relation to the period of a notice) that period excluding the day when the notice is given or deemed to be given and the day for which it is given or on which it is to take effect;

**Conflict** has the meaning given to that term in Article 11.2;

**conflicted director** means a director who has, or could have, a Conflict in a situation involving the company and consequently whose vote is not to be counted in any vote to authorise such Conflict and who is not to be counted as participating in the quorum for the meeting (or part of the meeting) at which such matter is to be voted upon;

**corporate representative** has the meaning given to that term in Article 54;

**Excess Securities** has the meaning given to that term in Article 21.3.2;

**Excess Shares** has the meaning given to that term in Article 37.11.1;

**holder** in relation to shares means the person whose name is entered in the register of members as the holder of the shares or, in the case of a share in respect of which a share warrant has been issued (and not cancelled), the person in possession of that warrant;

**lien enforcement notice** has the meaning given to that term in Article 24;

**Market Value** has the meaning given to that term in Article 37.4.1;

**Model Articles** means the model articles for private companies limited by shares contained in Schedule 1 of the Companies (Model Articles) Regulations 2008 (SI 2009/3229) as amended prior to the date of adoption of these articles;

**non-conflicted director** means any director who is not a conflicted director;

**Offer Notice** has the meaning given to that term in Article 37.10;

**partly-paid** in relation to a share means that part of that share's nominal value or any premium at which it was issued has not been paid to the company;

**Proposed Sale Price** has the meaning given to that term in Article 37.2.3;

**proxy notification address** has the meaning given to that term in Article 53.1;

**relevant officer** has the meaning given to that term in Articles 58.3.2 or 59.2.1, as the case may be;

**relevant loss** has the meaning given to that term in Article 59.2.2;

**relevant rate** has the meaning given to that term in Article 28.2.2;

**Sale Price** has the meaning given to that term in Article 37.4;

**Sale Shares** has the meaning given to that term in Article 37.2.1 and **Sale Share** shall be construed accordingly;

**Seller** has the meaning given to that term in Article 37.1;

**Total Transfer Condition** has the meaning given to that term in Article 37.2.5;

**transfer** or **transferring** has the meaning given to those terms respectively in Article 36.1;

**Transfer Notice** has the meaning given to that term in Article 37.1;

**United Kingdom** means Great Britain and Northern Ireland;

1.1     Save as otherwise specifically provided in these Articles, words and expressions which have particular meanings in the Model Articles shall have the same meanings in these Articles, subject to which and unless the context

otherwise requires, words and expressions which have particular meanings in the Companies Act 2006 as in force on the date when these Articles become binding on the company shall have the same meanings in these Articles.

1.2 Headings in these Articles are used for convenience only and shall not affect the construction or interpretation of these Articles.

1.3 Unless expressly provided otherwise, a reference to a statute, statutory provision or subordinate legislation is a reference to it as it is in force from time to time and shall include any orders, regulations or subordinate legislation from time to time made under it and any amendment or re-enactment of it or any such orders, regulations or subordinate legislation for the time being in force.

1.4 Any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.

1.5 The Model Articles shall apply to the company, except in so far as they are modified or excluded by these Articles.

1.6 Articles 7, 8, 11(2) and (3), 13, 14(1) to (4) inclusive, 17(2), 19(5), 21, 26(5), 44(4), 45(1), 46(3), 52 and 53 of the Model Articles shall not apply to the company.

## 2   Directors' general authority

Article 3 of the Model Articles shall be amended by the insertion of the words "and to the applicable provisions for the time being of the Companies Acts", after the phrase "subject to the articles".

## 3   Change of Company name

Without prejudice to the generality of Article 2, the directors may resolve in accordance with Article 5 to change the Company's name.

## 4   Committees

Where a provision of the articles refers to the exercise of a power, authority or discretion by the directors and that power, authority or discretion has been delegated by the directors to a committee, the provision shall be construed as permitting the exercise of power, authority or discretion by the committee.

## 5   Directors to take decisions collectively

5.1 The general rule about decision-making by directors is that any decision of the directors must be taken as a majority decision at a meeting or as a directors' written resolution in accordance with Article 8 (Directors' written resolutions) or otherwise as a unanimous decision taken in accordance with Article 7 (Unanimous decisions).

5.2 If:

5.2.1 the company only has one director for the time being, and

5.2.1 no provision of the articles requires it to have more than one director,

the general rule does not apply, and the director may (for so long as he remains the sole director) take decisions without regard to any of the provisions of the articles relating to directors' decision-making.

5.3 Subject to the articles, each director participating in a directors' meeting has one vote.

## 6   Directors' written resolutions

6.1 Any director may propose a directors' written resolution by giving notice in writing of the proposed resolution to each of the other directors (including alternate directors).

6.2 If the company has appointed a company secretary, the company secretary must propose a directors' written resolution if a director so requests by giving notice in writing to each of the other directors (including alternate directors).

6.3 Notice of a proposed directors' written resolution must indicate:

6.3.1 the proposed resolution; and

6.3.2 the time by which it is proposed that the directors should adopt it.

6.4 A proposed directors' written resolution is adopted when a majority of the non-conflicted directors (or their alternates) have signed one or more copies of it, provided that those directors  (or their alternates) would have formed a quorum at a directors' meeting were the resolution to have been proposed at such meeting.

6.5 Once a directors' written resolution has been adopted, it must be treated as if it had been a decision taken at a directors' meeting in accordance with the articles.

## 7   Unanimous decisions

7.1 A decision of the directors is taken in accordance with this Article 7 when all non-conflicted directors indicate to each other by any means that they share a common view on a matter.

7.2 A decision may not be taken in accordance with this Article 6 if the non-conflicted directors would not have formed a quorum at a directors' meeting had the matter been proposed as a resolution at such a meeting.

7.3 Once a directors' unanimous decision is taken in accordance with this Article 7 it must be treated as if it had been a decision taken at a directors' meeting in accordance with the Articles.

## 8   Calling a directors' meeting

8.1 Article 9 of the Model Articles shall be amended by:

8.1.1 inserting the words "each of" before the words "the directors";

Allied CID response

Pl. Ex. 25
p. 389

CONFIDENTIAL

AW_0000371

8.1.2   by inserting the phrase "(including alternate directors) ,whether or not he is absent from the UK," after the words "the directors";

8.1.3   by inserting the words "subject to article 9.4" at the beginning of article 9(3) of the Model Articles; and

8.1.4   by inserting the words "prior to or up to and including" before the words "not more than seven days" in article 9(4) of the Model Articles.

9   **Chairman's casting vote at directors' meetings**

9.1   Article 13(1) of the Model Articles shall be amended by the insertion of the words "at a meeting of directors" after the word "proposal".

9.2   Article 13(1) of the Model Articles (as amended by Article 8.1) does not apply in respect of a particular meeting (or part of a meeting) if, in accordance with the articles, the chairman or other director chairing the meeting is a conflicted director for the purposes of that meeting (or that part of that meeting at which the proposal is voted upon).

10   **Quorum for directors' meetings**

10.1   Subject to Article 10.2, the quorum for the transaction of business at a meeting of directors may be fixed from time to time by a decision of the directors but it must never be less than two directors, and unless otherwise fixed it is two. A person who holds office only as an alternate director shall, if his appointor is not present, be counted in the quorum. If and so long as there is a sole director, he may exercise all the powers and authorities vested in the directors by these articles and accordingly the quorum for the transaction of business in these circumstances shall be one.

10.2   For the purposes of any meeting (or part of a meeting) held pursuant to Article 11 (Directors' conflicts of interests) to authorise a director's Conflict, if there is only one non-conflicted director in office in addition to the conflicted director(s), the quorum for such meeting (or part of a meeting) shall be one non-conflicted director.

11   **Directors' conflicts of interests**

11.1   For the purposes of this Article 11, a **conflict of interest** includes a conflict of interest and duty and a conflict of duties, and interest includes both direct and indirect interests.

11.2   The directors may, in accordance with the requirements set out in this Article 11, authorise any matter proposed to them by any director which would, if not authorised, involve a director breaching his duty under section 175 of the Companies Act 2006 to avoid conflicts of interest ( such matter being hereinafter referred to as a **Conflict**).

11.3   A director seeking authorisation in respect of a Conflict shall declare to the other directors the nature and extent of his interest in a Conflict as soon as is reasonably practicable. The director shall provide the other directors with such details of the relevant matter as are necessary for the other directors to decide how to address the Conflict, together with such other information as may be requested by the other directors.

11.4   Any authorisation under this Article 11 will be effective only if:

11.4.1   the matter in question shall have been proposed by any director for consideration at a meeting of directors in the same way that any other matter may be proposed to the directors under the provisions of these articles or in such other manner as the directors may determine;

11.4.2   any requirement as to the quorum at the meeting of the directors at which the matter is considered is met without counting the director in question and any other conflicted director(s); and

11.4.3   the matter was agreed to without the director and any other conflicted director(s) voting or would have been agreed to if their votes had not been counted.

11.5   Any authorisation of a Conflict under this Article 11 may (whether at the time of giving the authorisation or subsequently):

11.5.1   extend to any actual or potential conflict of interest which may reasonably be expected to arise out of the Conflict so authorised;

11.5.2   be subject to such terms and for such duration, or impose such limits or conditions as the directors may determine; or

11.5.3   be terminated or varied by the directors at any time.

This will not affect anything done by the director prior to such termination or variation in accordance with the terms of the authorisation.

11.6   In authorising a Conflict the directors may decide (whether at the time of giving the authorisation or subsequently) that if a director has obtained any information through his involvement in the Conflict otherwise than as a director of the company and in respect of which he owes a duty of confidentiality to another person the director is under no obligation to:

11.6.1   disclose such information to the directors or to any director or other officer or employee of the company; or

11.6.2   use or apply any such information in performing his duties as a director,

where to do so would amount to a breach of that confidence.

11.7   Where the directors authorise a Conflict they may provide, without limitation (whether at the time of giving the authorisation or subsequently) that the director:

11.7.1   is excluded from discussions (whether at meetings of directors or otherwise) related to the Conflict;

11.7.2   is not given any documents or other information relating to the Conflict;

11.7.3   may or may not vote (or may or may not be counted in the quorum) at any future meeting of directors in relation to any resolution relating to the Conflict.

11.8   Where the directors authorise a Conflict:

Allied CID response

Pl. Ex. 25
p. 390

CONFIDENTIAL

AW_0000372