11.8.1   the director will be obliged to conduct himself in accordance with any terms, limits and/or conditions imposed by the directors in relation to the Conflict;

11.8.2   the director will not infringe any duty he owes to the company by virtue of sections 171 to 177 of the Companies Act 2006 provided he acts in accordance with such terms, limits and/or conditions (if any) as the directors impose in respect of its authorisation.

11.9   A director is not required, by reason of being a director (or because of the fiduciary relationship established by reason of being a director), to account to the company for any remuneration, profit or other benefit which he receives as director or other officer or employee of the Company's subsidiaries or of any other body corporate in which the Company is interested or which he derives from or in connection with a relationship involving a Conflict which has been authorised by the directors or by the company in general meeting (subject in each case to any terms, limits or conditions attaching to that authorisation) and no contract shall be liable to be avoided on such grounds nor shall the receipt of any such remuneration or other benefit constitute a breach of his duty under section 176 of the Companies Act 2006.

11.10   Subject to the applicable provisions for the time being of the Companies Acts and to any terms, limits and/or conditions imposed by the directors in accordance with Article 11.5.2, and provided that he has disclosed to the directors the nature and extent of any interest of his in accordance with the Companies Acts, a director notwithstanding his office:

11.10.1   may be a party to, or otherwise interested in, any contract, transaction or arrangement with the company or in which the company is otherwise interested;

11.10.2   shall be counted as participating for voting and quorum purposes in any decision in connection with any proposed or existing transaction or arrangement with the company, in which he is in any way directly or indirectly interested;

11.10.3   may act by himself or his firm in a professional capacity for the company (otherwise than as auditor) and he or his firm shall be entitled to remuneration for professional services as if he were not a director;

11.10.4   may be a director or other officer of, or employed by, or a party to any contract, transaction or arrangement with, or otherwise interested in, any body corporate promoted by the company or in which the company is otherwise interested; and

11.10.5   shall not, by reason of his office, be accountable to the company for any benefit which he (or anyone connected with him (as defined in section 252 of the Companies Act 2006) derives from any such office or employment or from any such contract, transaction or arrangement or from any interest in any such body corporate and no such contract, transaction or arrangement shall be liable to be avoided on the ground of any such interest or benefit, nor shall the receipt of any such remuneration or benefit constitute a breach of his duty under section 176 of the Companies Act 2006.

## 12   Records of decisions to be kept

Where decisions of the directors are taken by electronic means, such decisions shall be recorded by the directors in permanent form, so that they may be read with the naked eye.

## 13   Number of directors

Unless otherwise determined by ordinary resolution, the number of directors (other than alternate directors) shall not be subject to any maximum but shall not be less than one.

## 14   Methods of appointing directors

14.1   In any case where, as a result of death or bankruptcy, the company has no shareholders and no directors, the transmittee(s) of the last shareholder to have died or to have a bankruptcy order made against him (as the case may be) shall have the right, by notice in writing, to appoint a person (including a transmittee who is a natural person), who is willing to act and is permitted to do so, to be a director.

14.2   For the purposes of Article 14.1, where two or more shareholders die in circumstances rendering it uncertain who was the last to die, a younger shareholder is deemed to have survived an older shareholder.

## 15   Directors' expenses

Article 20 of the Model Articles shall be amended by the insertion of the words "(including alternate directors) and the secretary (if any)" before the words "properly incur".

## 16   Appointment and removal of alternate directors

16.1   Any director (**appointor**) may appoint as an alternate any other director, or any other person approved by resolution of the directors, to:

16.1.1   exercise that director's powers; and

16.1.2   carry out that director's responsibilities,

16.1.3   in relation to the taking of decisions by the directors in the absence of the alternate's appointor

16.2   Any appointment or removal of an alternate must be effected by notice in writing to the company signed by the appointor, or in any other manner approved by the directors.

16.3   The notice must:

16.3.1   identify the proposed alternate; and

Allied CID response

Pl. Ex. 25
p. 391

CONFIDENTIAL

AW_0000373

16.3.2 in the case of a notice of appointment, contain a statement signed by the proposed alternate that the proposed alternate is willing to act as the alternate of the director giving the notice.

## 17 Rights and responsibilities of alternate directors

17.1 An alternate director may act as alternate director to more than one director and has the same rights in relation to any decision of the directors as the alternate's appointor.

17.2 Except as the articles specify otherwise, alternate directors:

17.2.1 are deemed for all purposes to be directors;

17.2.2 are liable for their own acts and omissions;

17.2.3 are subject to the same restrictions as their appointors (including those set out in sections 172 to 177 CA 2006 inclusive and Article 11); and

17.2.4 are not deemed to be agents of or for their appointors,

and , in particular (without limitation), each alternate director shall be entitled to receive notice of all meetings of directors and of all meetings of committees of directors of which his appointor is a shareholder.

17.3 A person who is an alternate director but not a director:

17.3.1 may be counted as participating for the purposes of determining whether a quorum is present  (but only if that person's appointor is not participating and provided that no alternate may be counted as more than one director for these purposes);

17.3.2 may participate in a unanimous decision of the directors (but only if his appointor does not participate); and

17.3.3 may sign a written resolution (but only if it is not signed or to be signed by that person's appointor).

17.4 A director who is also an alternate director is entitled, in the absence of any of his appointors, to a separate vote on behalf of that appointor, in addition to his own vote on any decision of the directors but he shall count as only one for the purpose of determining whether a quorum is present.

17.5 An alternate director is not entitled to receive any remuneration from the company for serving as an alternate director except such part of the alternate's appointor's remuneration as the appointor may direct by notice in writing made to the company.

## 18 Termination of alternate directorship

An alternate director's appointment as an alternate for any appointor terminates:

18.1 when that appointor revokes the appointment by notice to the company in writing specifying when it is to terminate;

18.2 when notification is received by the Company from the alternate that the alternate is resigning as alternate for that appointor and such resignation has taken effect in accordance with its terms;

18.3 on the occurrence, in relation to the alternate, of any event which, if it occurred in relation to that appointor, would result in the termination of that appointor's appointment as a director;

18.4 on the death of that appointor; or

18.5 when the alternate's appointor's appointment as a director terminates.

## 19 Appointment and removal of secretary

The directors may appoint any person who is willing to act as the secretary for such term, at such remuneration, and upon such conditions as they may think fit and from time to time remove such person and, if the directors so decide, appoint a replacement, in each case by a decision of the directors.

## 20 Further issues of shares: authority

20.1 The following paragraphs of this Article 20 shall not apply to a private company with only one class of shares.

20.2 Subject to Article 20.1 and save to the extent authorised by these articles, or authorised from time to time by an ordinary resolution of the shareholders, the directors shall not exercise any power to allot shares or to grant rights to subscribe for, or to convert any security into, any shares in the company.

20.3 Subject to the remaining provisions of this Article 20 and to Article 21 (Further issues of shares: pre-emption rights) and to any directions which may be given by the company in general meeting, the directors are generally and unconditionally authorised, for the purpose of section 551 of the Companies Act 2006 to exercise any power of the company to:

20.3.1 offer or allot;

20.3.2 grant rights to subscribe for or to convert any security into;

20.3.3 otherwise create, deal in, or dispose of,

any shares in the company to any person, at any time and subject to any terms and conditions as the directors think proper.

20.4 The authority referred to in Article 20.3:

20.4.1 shall be limited to a maximum nominal amount of £1,000[1];

20.4.2 shall only apply insofar as the company has not renewed, waived or revoked it by ordinary resolution; and

20.4.3 may only be exercised for a period of five years commencing on the date on which the company is incorporated or these articles are adopted whichever is the later, save that the directors may make an offer or agreement which would, or might, require shares to be allotted after the expiry of such authority (and the directors may allot shares in pursuance of an offer or agreement as if such authority had not expired).

---

[1] If you have more than one class of shares and particularly where they have different nominal values, you may wish to break the maximum amount down and allocate a particular amount to each class of shares.

Allied CID response

Pl. Ex. 25
p. 392

CONFIDENTIAL

AW_0000374

## 21 Further issues of shares: pre-emption rights

21.1    In accordance with section 567(1) of the Companies Act 2006, sections 561 and 562 of the Companies Act 2006 shall not apply to an allotment of equity securities (as defined in section 560(1) of the Companies Act 2006) made by the company.

21.2    Unless otherwise agreed by special resolution, if the company proposes to allot any equity securities, those equity securities shall not be allotted to any person unless the company has first offered them to all shareholders on the date of the offer on the same terms, and at the same price, as those equity securities are being offered to such other person on a pari passu basis and pro rata to the nominal value of shares held by those shareholders (as nearly as possible without involving fractions).

21.3    The offer:

21.3.1    shall be in writing, shall be open for acceptance for a period of fifteen working days from the date of the offer and shall give details of the number and subscription price of the relevant equity securities; and

21.3.2    may stipulate that any shareholder who wishes to subscribe for a number of equity securities in excess of the proportion to which he is entitled shall, in his acceptance, state the number of excess equity securities (**Excess Securities**) for which he wishes to subscribe.

21.4    Any equity securities not accepted by shareholders pursuant to the offer made to them in accordance with Articles 21.1 and 21.2 shall be used for satisfying any requests for Excess Securities made pursuant to Article 21.3.2. If there are insufficient Excess Securities to satisfy such requests, the Excess Securities shall be allotted to the applicants as nearly as practicable in the proportion that the number of Excess Securities each shareholder indicated he would accept bears to the total number of Excess Securities applied for (as nearly as possible without involving fractions or increasing the number of Excess Securities allotted to any shareholder beyond that applied for by him). After that allotment, any Excess Securities remaining shall be offered to any other person as the directors may determine, at the same price and on the same terms as the offer to the shareholders.

## 22 Variation of class rights

22.1    Whenever the capital of the company is divided into different classes of shares, the special rights attached to any class may only be varied or abrogated, either whilst the company is a going concern or during or in contemplation of a winding up, with the consent of the holders of the issued shares of that class given in accordance with Article 22.2.

22.2    The consent of the holders of a class of shares may be given by:

22.2.1    a special resolution passed at a separate general meeting of the holders of the issued shares of that class; or

22.2.2    a written resolution in any form signed by or on behalf of the holders of three-quarters in nominal value of the issued shares of that class,

but not otherwise. To every such meeting, all the provisions of these articles and the Companies Act 2006 relating to general meetings of the company shall apply (with such amendments as may be necessary to give such provisions efficacy) but so that the necessary quorum shall be two holders of shares of the relevant class present in person or by proxy and holding or representing not less than one third in nominal value of the issued shares of the relevant class; that every holder of shares of the class shall be entitled on a poll to one vote for every such share held by him; and that any holder of shares of the class, present in person or by proxy or (being a corporation) by a duly authorised representative, may demand a poll. If at any adjourned meeting of such holders such a quorum as aforesaid is not present, not less than one holder who is present in person or by proxy or (being a corporation) by a duly authorised representative shall be a quorum.

## 23 Company's lien over shares

The company has a lien (**company's lien**) over every share, whether or not fully paid, which is registered in the name of any person indebted or under any liability to the company, whether he is the sole registered holder of the share or one of several joint holders, for all monies payable by him (either alone or jointly with any other person) to the company, whether payable immediately or at some time in the future and whether or not a call notice has been sent in respect of it.

23.1    The company's lien over a share:

23.1.1    takes priority over any third party's interest in that share, and

23.1.2    extends to any dividend or other money payable by the company in respect of that share and (if the lien is enforced and the share is sold by the company) the proceeds of sale of that share.

23.2    The directors may at any time decide that a share which is or would otherwise be subject to the company's lien shall not be subject to it, either wholly or in part.

## 24 Enforcement of the company's lien

24.1    Subject to the provisions of this Article 24, if:

24.1.1    a lien enforcement notice has been given in respect of a share, and

24.1.2    the person to whom the notice was given has failed to comply with it,

the company may sell that share in accordance with Article 32.5.

24.2    A lien enforcement notice:

24.2.1    may only be given in respect of a share which is subject to the company's lien, in respect of which a sum is payable and the due date for payment of that sum has passed;

24.2.2    must specify the share concerned;

24.2.3    must be in writing and require payment of the sum payable within fourteen days of the notice;

Allied CID response

Pl. Ex. 25
p. 393

CONFIDENTIAL

AW_0000375

24.2.4   must be addressed either to the holder of the share or to a transmittee of that holder; and

24.2.5   must state the company's intention to sell the share if the notice is not complied with.

24.3   Where shares are sold under this Article 24:

24.3.1   the directors may authorise any person to execute an instrument of transfer of the shares to the purchaser or a person nominated by the purchaser, and

24.3.2   the transferee is not bound to see to the application of the consideration, and the transferee's title is not affected by any irregularity in or invalidity of the process leading to the sale.

24.4   The net proceeds of any such sale (after payment of the costs of sale and any other costs of enforcing the lien) must be applied:

24.4.1   first, in payment of so much of the sum for which the lien exists as was payable at the date of the lien enforcement notice,

24.4.2   second, to the person entitled to the shares at the date of the sale, but only after the certificate for the shares sold has been surrendered to the company for cancellation or an indemnity in a form reasonably satisfactory to the directors has been given for any lost certificates, and subject to a lien equivalent to the company's lien for any money payable (whether payable immediately or at some time in the future) as existed over the shares before the sale in respect of all shares registered in the name of such person (whether as the sole registered holder or as one of several joint holders) after the date of the lien enforcement notice.

24.5   A statutory declaration by a director or the company secretary (if any) that the declarant is a director or the company secretary (as the case may be) and that a share has been sold to satisfy the company's lien on a specified date:

24.5.1   is conclusive evidence of the facts stated in it as against all persons claiming to be entitled to the share, and

24.5.2   subject to compliance with any other formalities of transfer required by the articles or by law, constitutes a good title to the share.

## 25   Call notices

25.1   Subject to the articles and the terms on which shares are allotted, the directors may send a notice (**call notice**) to a shareholder requiring the shareholder to pay the company a specified sum of money (**call**) which is payable by that member to the Company at the date when the directors decide to send the call notice.

25.2   A call notice:

25.2.1   must be in writing;

25.2.2   may not require a shareholder to pay a call which exceeds the total amount of his indebtedness or liability to the company;

25.2.3   must state when and how any call to which it relates it is to be paid; and

25.2.4   may permit or require the call to be paid by instalments.

25.3   A shareholder must comply with the requirements of a call notice, but no shareholder is obliged to pay any call before fourteen days have passed since the notice was sent.

25.4   Before the company has received any call due under a call notice the directors may:

25.4.1   revoke it wholly or in part, or

25.4.2   specify a later time for payment than is specified in the notice,

by a further notice in writing to the shareholder in respect of whose shares the call is made.

## 26   Liability to pay calls

26.1   Liability to pay a call is not extinguished or transferred by transferring the shares in respect of which it is required to be paid.

26.2   Joint holders of a share are jointly and severally liable to pay all calls in respect of that share.

26.3   Subject to the terms on which shares are allotted, the directors may, when issuing shares, provide that call notices sent to the holders of those shares may require them:

26.3.1   to pay calls which are not the same, or

26.3.2   to pay calls at different times.

## 27   When call notice need not be issued

27.1   A call notice need not be issued in respect of sums which are specified, in the terms on which a share is issued, as being payable to the company in respect of that share:

27.1.1   on allotment;

27.1.2   on the occurrence of a particular event; or

27.1.3   on a date fixed by or in accordance with the terms of issue.

27.2   But if the due date for payment of such a sum has passed and it has not been paid, the holder of the share concerned is treated in all respects as having failed to comply with a call notice in respect of that sum, and is liable to the same consequences as regards the payment of interest and forfeiture.

## 28   Failure to comply with call notice: automatic consequences

28.1   If a person is liable to pay a call and fails to do so by the call payment date:

28.1.1   the directors may issue a notice of intended forfeiture to that person, and

28.1.2   until the call is paid, that person must pay the company interest on the call from the call payment date at the relevant rate.

Page 8   Pl. Ex. 25
p. 394

CONFIDENTIAL

AW_0000376

28.2   For the purposes of this Article 28:

    28.2.1   the **call payment date** is the time when the call notice states that a call is payable, unless the directors give a notice in writing specifying a later date, in which case the **call payment date** is that later date;

    28.2.2   the relevant rate is:

        28.2.2.1   the rate fixed by the terms on which the share in respect of which the call is due was allotted;

        28.2.2.2   such other rate as was fixed in the call notice which required payment of the call, or has otherwise been determined by the directors; or

        28.2.2.3   if no rate is fixed in either of these ways, five per cent. (5%) per annum.

28.3   The relevant rate must not exceed by more than five percentage points the base lending rate most recently set by the Monetary Policy Committee of the Bank of England in connection with its responsibilities under Part 2 of the Bank of England Act 1998.

28.4   The directors may waive any obligation to pay interest on a call wholly or in part.

## 29   Notice of intended forfeiture

29.1   A notice of intended forfeiture:

    29.1.1   must be in writing;

    29.1.2   may be sent in respect of any share in respect of which a call has not been paid as required by a call notice;

    29.1.3   must be sent to the holder of that share (or, in the case of joint holders of a share in accordance with Article 56.3) or to a transmittee of that holder in accordance with Article 56.4;

    29.1.4   must require payment of the call and any accrued interest and all expenses that may have been incurred by the company by reason of such non-payment by a date which is not less than fourteen days after the date of the notice;

    29.1.5   must state how the payment is to be made; and

    29.1.6   must state that if the notice is not complied with, the shares in respect of which the call is payable will be liable to be forfeited.

## 30   Directors' power to forfeit shares

If a notice of intended forfeiture is not complied with before the date by which payment of the call is required in the notice of intended forfeiture, the directors may decide that any share in respect of which it was given is forfeited, and the forfeiture is to include all dividends or other moneys payable in respect of the forfeited shares and not paid before the forfeiture.

## 31   Effect of forfeiture

31.1   Subject to the articles, the forfeiture of a share extinguishes:

    31.1.1   all interests in that share, and all claims and demands against the company in respect of it, and

    31.1.2   all other rights and liabilities incidental to the share as between the person whose share it was prior to the forfeiture and the company.

31.2   Any share which is forfeited in accordance with the articles:

    31.2.1   is deemed to have been forfeited when the directors decide that it is forfeited;

    31.2.2   is deemed to be the property of the company; and

    31.2.3   may be sold, re-allotted or otherwise disposed of as the directors think fit in accordance with Article 32.5.

31.3   If a person's shares have been forfeited:

    31.3.1   the company must send that person  written notice that forfeiture has occurred and record it in the register of members;

    31.3.2   that person ceases to be a shareholder in respect of those shares;

    31.3.3   that person must surrender the certificate for the shares forfeited to the company for cancellation;

    31.3.4   that person remains liable to the company for all sums payable by that person under the articles at the date of forfeiture in respect of those shares, including any interest (whether accrued before or after the date of forfeiture); and

    31.3.5   the directors may waive payment of such sums wholly or in part or enforce payment without any allowance for the value of the shares at the time of forfeiture or for any consideration received on their disposal.

31.4   At any time before the company disposes of a forfeited share, the directors may decide to cancel the forfeiture on payment of all calls and interest due in respect of it and on such other terms as they think fit.

## 32   Procedure following forfeiture

32.1   If a forfeited share is to be disposed of by being transferred, the company may receive the consideration for the transfer and the directors may authorise any person to execute the instrument of transfer.

32.2   A statutory declaration by a director or the company secretary (if any) that the declarant is a director or the company secretary (as the case may be) and that a share has been forfeited on a specified date:

    32.2.1   is conclusive evidence of the facts stated in it as against all persons claiming to be entitled to the share, and

    32.2.2   subject to compliance with any other formalities of transfer required by the articles or by law, constitutes a good title to the share.

32.3   A person to whom a forfeited share is transferred is not bound to see to the application of the consideration (if any) nor is that person's title to the share affected by any irregularity in or invalidity of the process leading to the forfeiture or transfer of the share.

Allied CID response
Pl. Ex. 25
p. 395

CONFIDENTIAL

AW_0000377

32.4 If the company sells a forfeited share, the person who held it prior to its forfeiture is entitled to receive from the company the proceeds of such sale, net of any commission, and excluding any amount which:

32.4.1   was, or would have become, payable, and

32.4.2   had not, when that share was forfeited, been paid by that person in respect of that share,

but no interest is payable to such a person in respect of such proceeds and the company is not required to account for any money earned on them.

32.5 All shares to be sold in the enforcement of the company's lien or rights of forfeiture shall be offered in accordance with Article 37 (Voluntary Transfers) as if they were Sale Shares in respect of which a Transfer Notice had been given and treating as the Seller the holder of those shares save that the Sale Price shall be the Market Value of those shares and the Transfer Notice shall be deemed not to contain a Total Transfer Condition.

## 33   Surrender of shares

33.1 A shareholder may surrender any share:

33.1.1   in respect of which the directors may issue a notice of intended forfeiture;

33.1.2   which the directors may forfeit; or

33.1.3   which has been forfeited.

33.2 The directors may accept the surrender of any such share.

33.3 The effect of surrender on a share is the same as the effect of forfeiture on that share.

33.4 A share which has been surrendered may be dealt with in the same way as a share which has been forfeited.

## 34   Payment of commission on subscription for shares

34.1 The company may pay any person a commission in consideration for that person:

34.1.1   subscribing, or agreeing to subscribe, for shares; or

34.1.2   procuring, or agreeing to procure, subscriptions for shares.

34.2 Any such commission may be paid:

34.2.1   in cash, or in fully paid or partly paid shares or other securities or partly in one way and partly in the other; and

34.2.2   in respect of a conditional or an absolute subscription.

## 35   Share certificates

35.1 Article 24(2)(c) of the Model Articles shall be amended by:

35.1.1   the deletion of the word "fully" and the insertion of the words "extent to which" before the word "shares"; and

35.1.2   the word "up" at the end of this Article 24(2)(c).

## 36   Transfer of shares- general

36.1 In these articles, a reference to the **transfer** of or **transferring** shares shall include any transfer, assignment, disposition or proposed or purported transfer, assignment or disposition:

36.1.1   of any share or shares of the company; or

36.1.2   of any interest of any kind in any share or shares of the company; or

36.1.3   of any right to receive or subscribe for any share or shares of the company.

36.2 The directors shall not register the transfer of any share or any interest in any share unless the transfer is made in accordance with Article 37 (Voluntary Transfers), and, in any such case, is not prohibited under Article 38 (Prohibited Transfers).

36.3 If the directors refuse to register a transfer of a share they shall, as soon as practicable and in any event within two months after the date on which the transfer was lodged with the company, send to the transferee notice of, and the reasons for, the refusal.

36.4 An obligation to transfer a share under these articles shall be deemed to be an obligation to transfer the entire legal and beneficial interest in such share free from any lien, charge or other encumbrance.

36.5 Article 26(1) of the Model Articles shall be amended by the insertion of the words "and (if any of the shares is partly paid) the transferee" at the end of that article.

## 37   Voluntary Transfers

37.1 Any shareholder who wishes to transfer any share (**Seller**) shall before transferring or agreeing to transfer such share or any interest in it, serve notice in writing (**Transfer Notice**) on the company of his wish to make that transfer.

37.2 In the Transfer Notice the Seller shall specify:

37.2.1   the number and class of shares (**Sale Shares** and each one a **Sale Share**) which he wishes to transfer;

37.2.2   the identity of the person (if any) to whom the Seller wishes to transfer the Sale Shares;

37.2.3   the price per share at which the Seller wishes to transfer the Sale Shares (**Proposed Sale Price**);

37.2.4   any other terms relating to the transfer of the Sale Shares; and

37.2.5   whether the Transfer Notice is conditional upon all (and not part only) of the Sale Shares being sold pursuant to the following provisions of this Article 37 (**Total Transfer Condition**).

37.3 Each Transfer Notice shall:

37.3.1   relate to one class of shares only;

Allied CID response

Pl. Ex. 25
p. 396

CONFIDENTIAL

AW_0000378

37.3.2    constitute the company as the agent of the Seller for the sale of the Sale Shares on the terms of this Article 37; and

37.3.3    save as provided in Article 37.8, be irrevocable.

37.4    The Sale Shares shall be offered for purchase in accordance with this Article 37 at a price per Sale Share (**Sale Price**) agreed between the Seller and the directors or, in default of such agreement by the end of the 15th working day after the date of service of the Transfer Notice:

37.4.1    if the directors so elect within that fifteen working day period after the date of service of the Transfer Notice, the Sale Price shall be the price per Sale Share reported on by the Valuers as their written opinion of the open market value of each Sale Share (**Market Value**) as at the date of service of the Transfer Notice (in which case for the purposes of these Articles the Sale Price shall be deemed to have been determined on the date of the receipt by the company of the Valuer's report); and

37.4.2    otherwise the Sale Price shall be the Proposed Sale Price, in which case for the purpose of these Articles the Sale Price shall be deemed to have been agreed at the end of that 15th working day.

37.5    If instructed to report on their opinion of Market Value under Article 37.4 the Valuers shall:

37.5.1    act as expert and not as arbitrator and their written determination shall be final and binding on the shareholders; and

37.5.2    proceed on the basis that:

37.5.2.1    the open market value of each Sale Share shall be the sum which a willing buyer would agree with a willing seller to be the purchase price for all the class of shares of which the Sale Shares form part, divided by the number of issued shares then comprised in that class;

37.5.2.2    there shall be no addition of any premium or subtraction of any discount by reference to the size of the holding the subject of the Transfer Notice or in relation to any restrictions on the transferability of the Sale Shares; and

37.5.2.3    any difficulty in applying either of the foregoing bases shall be resolved by the Valuers as they think fit in their absolute discretion.

37.6    The company will use its reasonable endeavours to procure that the Valuers deliver their written opinion of the Market Value to the directors and to the Seller within twenty-eight days of being requested to do so.

37.7    The Valuers' fees for reporting on their opinion of the Market Value shall be borne as the Valuers shall specify in their valuation having regard to the conduct of the parties and the merit of their agreements in respect of the matters in dispute or otherwise (in the absence of any such specification by the Valuers) as to one half by the Seller and as to the other half by the company unless the Seller revokes the Transfer Notice pursuant to Article 37.8, in which case the Seller shall pay all the Valuers' fees.

37.8    If the Market Value is reported on by the Valuers under Article 37.4 to be less than the Proposed Sale Price, the Seller may revoke any Transfer Notice which was not stated to be, or is not deemed by these Articles to be, irrevocable by written notice given to the directors within the period of five working days after the date the directors serve on the Seller the Valuers' written opinion of the Market Value.

37.9    The directors shall at least ten working days after and no more than twenty working days after the Sale Price has been agreed or determined give an Offer Notice to all shareholders to whom the Sale Shares are to be offered in accordance with these Articles.

37.10    An Offer Notice shall:

37.10.1    specify the Sale Price;

37.10.2    contain the other details included in the Transfer Notice; and

37.10.3    invite each of the shareholders (other than the Seller) to respond in writing, before expiry of the Offer Notice, to purchase the numbers of Sale Shares specified by them in their application,

and shall expire twenty working days after its service.

37.11    After the expiry date of the Offer Notice, the directors shall allocate the Sale Shares in accordance with the applications received save that:

37.11.1    if there are applications from shareholders for more than the number of Sale Shares available, they shall be allocated to those applicants in proportion (as nearly as possible but without allocating to any shareholder more Sale Shares than the maximum number applied for by him) to the number of shares then held by them respectively; however, in his application for Sale Shares a shareholder may, if he so desires, indicate that he would be willing to purchase a particular proportionate entitlement (**Excess Shares**), in which case, applications for Excess Shares shall be allocated in accordance with such application, or in the event of competition among those shareholders applying for Excess Shares in such proportions as equal (as nearly as may be) the proportions of all the shares held by such shareholders;

37.11.2    if it is not possible to allocate any of the Sale Shares without involving fractions, they shall be allocated amongst them in such manner as the Board shall think fit; and

37.11.3    if the Transfer Notice contained a valid Total Transfer Condition, no allocation of Sale Shares shall be made unless all the Sale Shares are allocated.

37.12    The directors shall, within five working days of the expiry date of the Offer Notice, give notice in writing (**Allocation Notice**) to the Seller and to each person to whom Sale Shares have been allocated (each a **Buyer**) specifying the name and address of each Buyer, the number and class of Sale Shares agreed to be purchased by him and the aggregate price payable for them.

37.13    Completion of a sale and purchase of Sale Shares pursuant to an Allocation Notice shall take place at the registered office of the company at the time specified in the Allocation Notice when the Seller shall, upon payment to him by a

Allied CID response
Pl. Ex. 25
p. 397

CONFIDENTIAL
AW_0000379

Buyer of the Sale Price in respect of the Sale Shares allocated to that Buyer, transfer those Sale Shares and deliver the relative share certificate(s) to that Buyer.

37.14 The Seller may, during the period of thirty working days immediately following the expiry date of the Offer Notice, sell all or any of these Sale Shares, for which an Allocation Notice has not been given, by way of bona fide sale to the proposed transferee (if any) named in the Transfer Notice or, if none was so named, to any transferee, in either case at any price per Sale Share which is not less than the Sale Price, without any deduction, rebate or allowance to the proposed transferee, provided that:

37.14.1 the Seller may not transfer such share and the directors shall not register any transfer to a transferee who is not at that date a shareholder unless such transferee is first approved in writing by the directors; and

37.14.2 if the Transfer Notice contained a Total Transfer Condition, the Seller shall not be entitled, save with the written consent of the directors, to sell only some of the Sale Shares under this Article 37.14.

37.15 If a Seller fails for any reason (including death) to transfer any Sale Shares when required pursuant to this Article 37, the directors may authorise any director of the company (who shall be deemed to be irrevocably appointed as the attorney of the Seller for the purpose) to execute each necessary transfer of such Sale Shares and deliver it on the Seller's behalf. The company may receive the purchase money for such Sale Shares from the Buyer and shall upon receipt (subject, if necessary, to the transfer being duly stamped) register the Buyer as the holder of such Sale Shares. The company shall hold such purchase money in a separate bank account on trust for the Seller but shall not be bound to earn or pay interest on any money so held. The company's receipt for such purchase money shall be a good discharge to the Buyer who shall not be bound to see to the application of it, and after the name of the Buyer has been entered in the register of members in purported exercise of the power conferred by this Article 37.15 the validity of the proceedings shall not be questioned by any person.

## 38   Prohibited Transfers

Notwithstanding any other provision of these articles, no transfer of any Share shall be registered if it is to any minor, undischarged bankrupt, trustee in bankruptcy or person of unsound mind.

## 39   Transmission of shares

39.1 Nothing in these articles releases the estate of a deceased shareholder from any liability in respect of a share solely or jointly held by that shareholder.

39.2 Article 27(3) of the Model Articles shall be amended by the insertion of the words "subject to the provisions of Article 14.1", after the initial word "But".

## 40   Transmittees bound by prior notices

Article 29 of the Model Articles shall be amended by the insertion of the words "or the name of any person nominated under article 27(2)" after the words "transmittee's name".

## 41   Procedure for disposing of fractions of shares

41.1 This Article applies where:

41.1.1 there has been a consolidation or division of shares; and

41.1.2 as a result, shareholders are entitled to fractions of shares.

41.2 The directors may:

41.2.1 sell the shares representing the fractions to any person including the company for the best price reasonably obtainable;

41.2.2 authorise any person to execute an instrument of transfer of the shares to the purchaser or a person nominated by the purchaser; and

41.2.3 distribute the net proceeds of sale in due proportion among the holders of the shares.

41.3 The person to whom the shares are transferred is not obliged to ensure that any purchase money is received by the person entitled to the relevant fractions.

41.4 The transferee's title to the shares is not affected by any irregularity in or invalidity of the process leading to their sale.

## 42   Calculation of dividends

42.1 Except as otherwise provided by the articles or the rights attached to shares, all dividends must be:

42.1.1 declared and paid according to the amounts paid up on the shares on which the dividend is paid; and

42.1.2 apportioned and paid proportionately to the amounts paid up on the shares during any portion or portions of the period in respect of which the dividend is paid.

42.2 If any share is issued on terms providing that it ranks for dividend as from a particular date, that share ranks for dividend accordingly.

## 43   Deductions from distributions in respect of sums owed to the company

43.1 If:

43.1.1 a share is subject to the company's lien; and

43.1.2 the directors are entitled to issue a lien enforcement notice in respect of it,

Pl. Ex. 25
Allied CID response
p. 398

CONFIDENTIAL

AW_0000380

they may, instead of issuing a lien enforcement notice, deduct from any dividend or other sum payable in respect of the share any sum of money which is payable to the company in respect of that share to the extent that they are entitled to require payment under a lien enforcement notice.

43.2    Money so deducted must be used to pay any of the sums payable in respect of that share.

43.3    The company must notify the distribution recipient in writing of:

    43.3.1    the fact and amount of any such deduction;

    43.3.2    any non-payment of a dividend or other sum payable in respect of a share resulting from any such deduction; and

    43.3.3    how the money deducted has been applied.

44    **Authority to capitalise and appropriation of capitalised sums**

Article 36(4) of the Model Articles shall be amended by inserting the phrase "in or towards paying up any amounts unpaid on existing shares held by the persons entitled, or" after the words "may be applied".

45    **Convening general meetings**

The directors may call general meetings and, on the requisition of shareholders pursuant to the provisions of the Companies Act 2006, shall forthwith proceed to convene a general meeting in accordance with the Companies Act 2006. If there are not within the United Kingdom sufficient directors to call a general meeting, any director or the shareholders requisitioning the meeting (or any of them representing more than one half of the total voting rights of them all) may call a general meeting. If the company has only a single shareholder, such shareholder shall be entitled at any time to call a general meeting.

46    **Notice of general meetings**

46.1    General meetings (other than an adjourned meeting) shall be called by at least fourteen Clear Days' notice but a general meeting may be called by shorter notice if it is so agreed by a majority in number of the shareholders having a right to attend and vote, being a majority together holding not less than ninety per cent (90%) in nominal value of the shares at the meeting, giving that right.

46.2    The notice shall specify the time, date and place of the meeting, the general nature of the business to be transacted and the terms of any resolution to be proposed at it.

46.3    Subject to the provisions of these articles and to any restrictions imposed on any shares, the notice shall be given to all shareholders, to all persons entitled to a share in consequence of the death or bankruptcy of a shareholder (if the company has been notified of their entitlement) and to the directors, alternate directors and the auditors for the time being of the company.

46.4    The accidental omission to give notice of a meeting to, or the non-receipt of notice of a meeting by, any person entitled to receive notice shall not invalidate the proceedings at that meeting.

47    **Resolutions requiring special notice**

47.1    If the Companies Act 2006 requires special notice to be given of a resolution, then the resolution will not be effective unless notice of the intention to propose it has been given to the company at least twenty-eight Clear Days before the general meeting at which it is to be proposed.

47.2    Where practicable, the company must give the shareholders notice of the resolution in the same manner and at the same time as it gives notice of the general meeting at which it is to be proposed.  Where that is not practicable, the company must give the shareholders at least fourteen Clear Days' before the relevant general meeting by advertisement in a newspaper with an appropriate circulation.

47.3    If, after notice to propose such a resolution has been given to the company, a meeting is called for a date twenty-eight days or less after the notice has been given, the notice shall be deemed to have been properly given, even though it was not given within the time required by Article 47.1.

48    **Quorum for general meetings**

No business shall be transacted at any meeting unless a quorum is present. Subject to section 318(2) of the Companies Act 2006, two qualifying persons (as defined in section 318(3) of the Companies Act 2006) entitled to vote upon the business to be transacted shall be a quorum, provided that if the company has only a single shareholder, the quorum shall be one such qualifying person.

49    **Adjournment**

Article 41(1) of the Model Articles shall be amended by inserting the following sentence at the end of the first sentence of that article: "If, at the adjourned meeting, a quorum is not present within half an hour from the time appointed for the meeting, the meeting shall be dissolved".

50    **Voting: general**

50.1    Subject to any rights or restrictions attached to any shares, on a show of hands, every shareholder who (being an individual) is present in person or (being a corporation) is present by a duly authorised representative (unless the representative is himself a shareholder, in which case he shall have more than one vote) shall have one vote.  A proxy shall not be entitled to vote on a show of hands.

Pl. Ex. 25
p. 399

Allied CID response

CONFIDENTIAL

AW_0000381

50.2 No shareholder shall vote at any general meeting or at any separate meeting of the holder of any class of shares, either in person or by proxy, in respect of any share held by him unless all monies presently payable by him in respect of that share have been paid.

50.3 In the case of joint holders the vote of the senior who tenders a vote shall be accepted to the exclusion of the votes of the other joint holders; and seniority shall be determined by the order in which the names of the holders stand in the register of members.

50.4 Unless a poll is duly demanded, a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost, or not carried by a particular majority and an entry to that effect in the minutes of the meeting shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against the resolution.

51 **Poll votes**

51.1 On a poll every shareholder who (being an individual is present in person or by proxy or (being a corporation) is present by a duly authorised representative or by proxy shall have one vote for every share of which he is the holder.  On a poll, a shareholder entitled to more than one vote need not use all his votes or cast all the votes he uses in the same way.

51.2 Article 44(2) of the Model Articles shall be amended by the insertion of the following sub-paragraph as article 44(2)(e):

"a person or persons holding shares conferring a right to vote on the resolution on which not less than one tenth of the total sum paid up on all the shares conferring that right.".

51.3 Article 44(3) of the Model Articles shall be amended by inserting the following sentence at the end of the Article:

"A demand so withdrawn shall not invalidate the result of a show of hands declared before the demand was made".

51.4 The result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

51.5 A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken either forthwith or at such time and place as the chairman directs not being more than thirty days after the poll is demanded.  The demand for a poll shall not prevent the continuance of a meeting for the transaction of any business other than the question on which the poll was demanded.  If a poll is demanded before the declaration of the result of a show of hands and the demand is duly withdrawn, the meeting shall continue as if the demand had not been made.

51.6 No notice need be given of a poll not taken forthwith if the time and place at which it is to be taken are announced at the meeting at which it is demanded. In any other case at least seven Clear Days' notice shall be given specifying the time and place at which the poll is to be taken.

52 **Content of proxy notices**

52.1 Subject to the provisions of these articles, a shareholder is entitled to appoint another person as his proxy to exercise all or any of his rights to attend and to speak and vote at a general meeting.  A shareholder may appoint more than one proxy in relation to a meeting, provided that each proxy is appointed to exercise the rights attached to a different share or shares held by that shareholder.

52.2 Proxies may only validly be appointed by a notice in writing (**proxy notice**) which:

52.2.1 states the name and address of the shareholder appointing the proxy;

52.2.2 identifies the person appointed to be that shareholder's proxy and the general meeting in relation to which that person is appointed;

52.2.3 is signed by or on behalf of the shareholder appointing the proxy, or is authenticated in such manner as the directors may determine; and

52.2.4 is delivered to the company in accordance with the articles and in accordance with any instructions contained in the notice of the general meeting (or adjourned meeting) to which they relate and received by the company:

52.2.4.1 subject to articles 52.2.4.2 and 52.2.4.3, in the case of a general meeting or adjourned meeting, not less than forty-eight hours before the time for holding the meeting or adjourned meeting at which the right to vote is to be exercised;

52.2.4.2 in the case of a poll taken more than forty-eight hours after it is demanded, after the poll has been demanded and not less than twenty-four hours before the time appointed for the taking of the poll; or

52.2.4.3 where the poll is not taken forthwith but is taken not more than forty-eight hours after it was demanded, at the time at which the poll was demanded or twenty-four hours before the time appointed for the taking of the poll, whichever is the later,

and a proxy notice which is not delivered and received in such manner shall be invalid.

52.3 Article 45(3) of the Model Articles shall be amended by the addition of the following at the end of the article:

" and the proxy is obliged to vote or abstain from voting in accordance with the specified instructions. However, the Company is not obliged to check whether a proxy votes or abstains from voting as he has been instructed and shall incur no liability for failing to do so. Failure by a proxy to vote or abstain from voting as instructed at a meeting shall not invalidate proceedings at that meeting."

Allied CID response

CONFIDENTIAL

53   **Delivery of proxy notices**

53.1   Any notice of a general meeting must specify the address or addresses (**proxy notification address**) at which the company or its agents will receive proxy notices relating to that meeting, or any adjournment of it, delivered in hard copy or electronic form.

53.2   Article 46(1) of the Model Articles shall be amended by inserting the words: "to a proxy notification address" at the end of that Article.

53.3   A notice revoking a proxy appointment only takes effect if it is received by the company:

53.3.1   Subject to articles 53.3.2 and 53.3.3, in the case of a general or adjourned meeting, not less than forty-eight hours before the time for holding the meeting or adjourned meeting at which the right to vote is to be exercised;

53.3.2   in the case of a poll taken more than forty-eight hours after it was demanded, not less than twenty-four hours before the time appointed for the taking of the poll; or

53.3.3   in the case of a poll not taken forthwith but not more than forty-eight hours after it was demanded, at the time at which it was demanded or twenty-four hours before the time appointed for the taking of the poll, whichever is later,

and a notice which is not delivered and received in such manner shall be invalid.

53.4   In calculating the periods referred to in Article 52 (Content of proxy notices) and this Article 53, no account shall be taken of any part of a day that is not a working day.

54   **Representation of corporations at meetings**

Subject to the Companies Act 2006, a company which is a shareholder may, by resolution of its directors or other governing body, authorise one or more persons to act as its representative or representatives at a meeting of the company or at a separate meeting of the holders of a class of shares of the company (**corporate representative**).  A director, secretary or other person authorised for the purpose by the directors may require a corporate representative to produce a certified copy of the resolution of authorisation before permitting him to exercise his powers.

55   **A resolution of the shareholders (or a class of shareholders) may be passed as a written resolution in accordance with chapter 2 of part 13 of the Companies Act 2006.**

56   **Means of communication to be used**

56.1   Any notice, document or other information shall be deemed served on or delivered to the intended recipient:

56.1.1   If properly addressed and sent by prepaid United Kingdom first class post to an address in the United Kingdom, forty-eight hours after it was posted;

56.1.2   If properly addressed and delivered by hand, when it was given or left at the appropriate address;

56.1.3   If properly addressed and send or supplied by electronic means forty-eight hours after the document or information was sent or supplied; and

56.1.4   If sent or supplied by means of a website, when the material is first made available on the website or (if later) when the recipient receives (or is deemed to have received) notice of the fact that the material is available on the website.

For the purposes of this Article 56.1, no account shall be taken of any part of a day that is not a working day.

56.2   In proving that any notice, document or other information was properly addressed, it shall be sufficient to show that the notice, document or other information was delivered to an address permitted for the purpose by of the Companies Act 2006.

56.3   In the case of joint holders of a share, all notices or documents shall be given to the joint holder whose name stands first in the register in respect of the joint holding. Notice so given shall be sufficient notice to all of the joint holders. Where there are joint holders of a share, anything which needs to be agreed or specified in relation to any notice, document or other information to be sent or supplied to them can be agreed or specified by any one of the joint holders. The agreement or specification of the joint holder whose name stands first in the register will be accepted to the exclusion of the agreement or specification of any other joint holder (s) whose name(s) stand later in the register.

56.4   The Company may give notice to the transmittee of a member, by sending or delivering it in any manner authorised by these Articles for the giving of notice to a member, addressed to that person by name, or by the title, of representative of the deceased or trustee of the bankrupt or representative by operation of law or by any like description, at the address (if any) within the United Kingdom supplied for the purpose by the person claiming to be so entitled. Until such an address has been so supplied, a notice may be given in any manner in which it might have been given if the death or bankruptcy or operation of law had not occurred.

57   **Company seals**

Article 49(3) of the Model Articles shall be amended by the insertion of the words "by either at least two authorised persons or" after the word "signed".

58   **Indemnity**

58.1   Subject to Article 58.2, but without prejudice to any indemnity to which a relevant officer is otherwise entitled:

58.1.1   each relevant officer shall be indemnified out of the company's assets against all costs, charges, losses, expenses and liabilities incurred by him as a relevant officer:

Allied CID response
Pl. Ex. 25
p. 401

CONFIDENTIAL
AW_0000383

58.1.1.1   in the actual or purported execution and/or discharge of his duties, or in relation to them; and

58.1.1.2   in relation to the company's (or any associated company's) activities as trustee of an occupational pension scheme (as defined in section 235(6) of the Companies Act 2006),

including (in each case) any liability incurred by him in defending any civil or criminal proceedings in which judgment is given in his favour or in which he is acquitted or the proceedings are otherwise disposed of without any finding or admission of any material breach of duty on his part or in connection with any application in which the court grants him, in his capacity as a relevant officer, relief from liability for negligence, default, breach of duty or breach of trust in relation to the company's (or any associated company's ) affairs; and

58.1.2   the company may provide any relevant officer with funds to meet expenditure incurred or to be incurred by him in connection with any proceedings or application referred to in Article 58.1.1 and otherwise may take any action to enable any such relevant officer to avoid incurring such expenditure.

58.2   This Article does not authorise any indemnity which would be prohibited or rendered void by any provision of the Companies Acts or by any other provision of law.

58.3   In this Article 58:

58.3.1   companies are associated if one is a subsidiary of the other or both are subsidiaries of the same body corporate, and

58.3.2   a **relevant officer** means any director or alternate director or other officer or former director or other officer  of the company or an associated company (including any company which is a trustee of an occupational pension scheme (as defined by section 235(6) of the Companies Act 2006) and may, if the shareholders so decide, include any person engaged by the company (or any associated company) as auditor (whether or not he is also a director or other officer), to the extent he acts in his capacity as auditor).

## 59   Insurance

59.1   The directors may decide to purchase and maintain insurance, at the expense of the company, for the benefit of any relevant officer in respect of any relevant loss.

59.2   In this Article:

59.2.1   a **relevant officer** means any director or alternate director or other officer or former director or other officer of the company or an associated company (including any company which is a trustee of an occupational pension scheme (as defined by section 235(6) of the Companies Act 2006;

59.2.2   a **relevant loss** means any loss or liability which has been or may be incurred by a relevant officer in connection with that officer's duties or powers in relation to the company, any associated company or any pension fund or employees' share scheme of the company or associated  company; and

59.2.3   companies are associated if one is a subsidiary of the other or both are subsidiaries of the same body corporate.

## 60   Objects of the company

60.1   The objects for which the company is established are to provide online advertising and marketing services. The company shall offer all services relating to advertising and marketing specifically to the online market place.

Pl. Ex. 25
p. 402
Allied CID response

CONFIDENTIAL
AW_0000384

**AllíedWallet**

**Allied Wallet Card Payment Processing Agreement**

Between

      **Allied Wallet Ltd. ("Allied Wallet")**

And

      **Consumer Advocacy Center Inc**
      **http://premierstudentloancenter.com (the "Merchant")**

MERCHANT'S INITIALS: K W

Pl. Ex. 25
p. 403

CONFIDENTIAL

AW_0000385

**Allied**Wallet

THIS AGREEMENT ("*Agreement*") is made on 04/18/2016 _____ "*Effective Date*" between:

1.  Allied Wallet Ltd., a company incorporated in England and Wales under registration number 05832811, the registered office of which is 1 Northumberland Avenue, Trafalgar Square, London, WC2N 5BW, United Kingdom ("**Allied Wallet**"); and

2.  [Consumer Advocacy Center Inc] known as the *Merchant*, a company incorporated in United Kingdom _____ under registration number 10117596 _____, the registered office which is located at _____
    Office 3 Unit R, Penfold Works Trading Estate, Imperial Way, Watford Herts, WD24 4YY _____.

**WHEREAS**

(A)  Allied Wallet provides payment processing service which allows Allied Wallet to clear payments for the Merchant's products and services over the Internet via payment cards, credit cards and/or debit cards;

(B)  Allied Wallet, as part of the service, shall also provide Merchant with access to the administration interface which allows Merchant to track sales and make certain administrative changes to its account(s) on-line;

(C)  Merchant wishes to have such payment processing service provided to it; and

(D)  Allied Wallet agrees to provide such services on the terms of and subject to the conditions contained in this Agreement.

In consideration of the mutual covenants herein contained and intending to be legally bound by the provisions of this Agreement, the **parties** to this Agreement agree as follows:

1.  *Definitions and interpretation*
    1.1.  *Definitions*
        The following terms are defined for use in this Agreement:
    "*Allied Wallet Credit Card Service*" means the Allied Wallet service which allows Allied Wallet to accept payments for Merchant's services via credit card.
    "*Agreement*" means this Payment Processing Agreement.
    "*Cardholder*" or "*End User*" means the natural person or legal entity or entities who or which has or have ordered goods and/or services from Merchant via Allied Wallet and who or which is/are formally and officially registered with a financial institution as the holder of a particular debit or credit card.
    "*Cardholder Charge*" means the amount to be charged to the Cardholder's account for the purchase of access to the Merchant's products and services via Allied Wallet and/or the Merchant.
    "*CBK1*" means a Chargeback as defined below.
    "*Chargeback*" means a Cardholder Charge via the Allied Wallet Credit Card Service which the Cardholder's credit card issuer identifies as being invalid or non-collectible after initial acceptance on account of fraud, lost, canceled, non-issued, invalid account identification, an unresolved cardholder complaint, or other cause which results in the deduction of the Cardholder Charge from moneys otherwise payable to Allied Wallet.
    "*Country of Origin*" means the country where the Merchant is established.
    "*Effective Date*" means the date as of which this Agreement is effective between the Parties.
    "*G2*" means a third party compliance service.
    "*G2 Super Persistent Monitoring*" means an additional third party compliance service.
    "*Merchant*" means the individual or business entity that agrees to these terms and conditions and intends to use Allied Wallet's payment processing service.
    "*Net Revenue*" means the Total Revenue minus Refunds and Chargebacks.
    "*Penalties*" means the penalties and other charges the Card Associations and/or Allied Wallet may charge.
    "*Refund*" means a Cardholder Charge via the Service which Allied Wallet, Merchant, or the Cardholder and Allied Wallet, or the Cardholder and Merchant identify as being invalid or non-collectible after initial acceptance on account of fraud, lost, canceled, non-issued, invalid account identification, an unresolved cardholder complaint, or other cause which results in the deduction of the Cardholder Charge from moneys otherwise payable to Allied Wallet.
    "*Retrieval*" means a dispute initiated by a customer of the Merchant with the issuing bank that is considered, for purposes of this Agreement, to be a Chargeback.
    "*Reserve*" means funds withheld from Merchant by Allied Wallet sales in order to cover Chargebacks and Refunds or Merchant indemnification obligations hereunder.
    "*Service*" means the Allied Wallet payment processing service and any related products and services provided pursuant to this Agreement.
    "*Service Fees*" means the charges, fees and prices for the Services as further set out in Appendix 1 to this Agreement.
    "*Software*" means software and related documentation provided by Allied Wallet to Merchant in connection with the Service.
    "*Total Revenue*" means Merchant's revenues for the applicable service, before the deduction of applicable Reserve, Service Fees, and any other charges or obligations.
    "*Trademarks*" means all trademarks and logos of Allied Wallet that exist now or in the future, both registered and non-registered, all as may be specified by Allied Wallet from time to time.
    "*USD*" means the currency, dollar of United States of America.

MERCHANT'S INITIALS: K W

**AlliedWallet**

1.2.    *Interpretation*
   1.2.1.   Headings in this Agreement are only for convenience and shall not affect its construction and shall not be used in interpreting, construing, performing or enforcing this Agreement.
   1.2.2.   Any obligations given or entered into by more than one person are given to or entered into jointly and severally unless otherwise specified.
   1.2.3.   Any reference in this Agreement to a paragraph or a schedule is a reference to a paragraph or schedule of this Agreement.
   1.2.4.   Any reference to a statute or statutory provision shall be construed as a reference to the same as from time to time amended, consolidated, modified, attended, re-enacted or replaced.

2.   *Subject of the Agreement*
   2.1.   In consideration of the Service Fees payable by Merchant and subject to Merchant complying in full with its obligations in this Agreement Allied Wallet agrees with effect from the Effective Date to provide the Services upon the terms of and subject to the conditions contained in this Agreement.
   2.2.   Merchant agrees that Allied Wallet in providing the Services does not act as principal but acts as facilitator on behalf of Merchant to enable Merchant to enter into transactions with its customers. Merchant further agrees to allow Allied Wallet to act as facilitator on behalf of Merchant for the purpose of processing payments.

3.   *Investigate Consumer Report*
   Merchant agrees that an investigative or consumer report may be made in connection with this Agreement. Merchant authorizes any party to the Agreement or any of their agents to investigate the reference provided or any other statements or data obtained from Merchant and from any of its personal guarantor(s), or from any person or entity with any financial obligations under this Agreement. You have a right, upon written request, to a complete and accurate disclosure of the nature of and scope of the investigation requested.

4.   *Fees and Reserve*
   4.1.   *Fees for Credit Card Service.*
         The Service Fees for Allied Wallet Credit Card Services are equal to a percentage of the Net Revenue during the relevant billing period.

   4.2.   *Penalties and Other Charges Imposed By Card Association.*
         Merchant shall be responsible for any fees imposed upon Allied Wallet by the bank or card brand that is related to processing Merchant's credit card transactions. Moreover, Allied Wallet will not share any fine documentation received from the bank or the card brands it deems to be confidential.

   4.3.   *Fees for Credit Card Services Chargebacks and/or CBK1.*
         Merchant shall be charged per Chargeback and/or CBK1 processed against the Merchant's account. Fees assessed against Merchant hereunder, if any, shall be applied immediately. Chargebacks and/or CBK1s are strictly limited to 100 Chargebacks / CBK1s / Retrievals OR one percent (1%) of the total aggregate transactions that have been processed by Allied Wallet for the account of Merchant during a period of one (1) month, whichever comes first. Anything over that amount is excessive and will incur penalties and constitutes cause for Allied Wallet to terminate this Agreement and close Merchant's account with funds held for one hundred and eighty (180) days to five hundred and forty days (540) from the last card event depending on the service provided. After which time, the balance in the account less Chargebacks, CBK1s, penalties, fines, Service Fees and any other fees will be returned. If Merchant's account incurs 100 Chargebacks / CBK1s or more OR incurs Chargebacks / CBK1s exceeding one percent (1%) of transactions processed in a one month period, Merchant's account will be fined by Allied Wallet, in addition to and / or separate from any fine imposed by the bank or card brand, at a rate of $100 USD per Chargeback / CBK1. Moreover, Merchant agrees that it is absolutely prohibited to suggest, imply, propose, advertise, indicate, express, promote, advise or state to any of its customers to Chargeback, Refund or initiate a Retrieval/CBK1 for the products or services offered by Merchant. If a Merchant causes Allied Wallet or its subsidiaries to lose a merchant account, or Visa or MasterCard relationship within a Merchant account, there will be a $1,000,000 USD fine assessed against the Merchant in addition to the fines and penalties assessed by the credit card associations and the bank. Causes for this typically include high chargeback rates, fraud, non-compliance with the laws of local, state and national jurisdictions as well as not adhering to the acceptable use policies of the card associations.

   4.4.   *Reserve for Allied Wallet Credit Card Processing.*
         Allied Wallet will withhold a percentage of Merchant's Total Revenues for Allied Wallet Credit Card processing for a period of as set forth in Appendix 1 (which may be updated from time to time) as Reserve to be applied towards Chargebacks, CBK1s, Retrievals and Refunds for Allied Wallet Credit Card services. Allied Wallet shall have the right anytime, in its sole discretion, to hold funds and / or adjust the amount held and holdback period as is deemed necessary as security against future Chargebacks, CBK1s, Refunds, Disputes or indemnification obligations of Merchant hereunder. Reserves will be returned to Merchant subject to expiration and resolution of all claims and issues in relation thereto. In addition, if Allied Wallet for any reason suspects or has concern that it may sustain losses as a result of Merchant's account, Merchant agrees and gives Allied Wallet the right to automatically ACH debit Merchant's bank account in advance for the amount of potential losses Allied Wallet may sustain as security. Allied Wallet may hold the funds as reserve until it is determined that Merchant's account is secure and Allied Wallet will not sustain losses as a result.

   4.5.   *Aggregation Damages.* Merchant CANNOT aggregate or send transactions to Allied Wallet from any URL that is not approved by Allied Wallet. If Merchant violates this provision and aggregates or sends transactions to Allied Wallet from

MERCHANT'S INITIALS: K W

Pl. Ex. 25
p. 405

CONFIDENTIAL

AW_0000387



any URL that is not approved by Allied Wallet, Merchant must pay an agreed upon liquidated damages in the amount of $200,000 USD per URL that Merchant has not submitted to and received approval from Allied Wallet in writing. This liquidated damages amount will be in addition to and separate from any bank or card brand fine also imposed for said aggregation.

4.6.   *Technical Assistance from Allied Wallet.*
If Merchant is in need of technical assistance from Allied Wallet technicians, Merchant will be billed on an hourly basis. This includes phone and email. The technician will first hear and learn about the problem and then decide in Allied Wallet's discretion if billing is appropriate. Billing will be at a rate as set by Allied Wallet and may be amended from time to time.

4.7.   *Monthly Maintenance Fee.*
Each month a service maintenance fee is deducted from the Merchant's account and is payable regardless of processing volume.

5.   **Payment to Merchant**
5.1.   *Account Activation.*
Before Merchant may utilize the Service, Allied Wallet's compliance department must ensure that Merchant has complied with Allied Wallet's set up requirements and has properly set up its account and Allied Wallet must activate the Merchant's account. This set-up includes among other things, the various issues in any API (Application Program Interface) Merchant may be instructed by Allied Wallet to use.

5.2.   *Credit Card Services.*
Merchant payouts are calculated based on "Settlement period" as set forth in <u>Appendix 1</u>. Payment shall be delivered to Merchant as promptly as is practicable after processing, subject to Allied Wallet's rights to offset and holdback as set forth in this Agreement. The payment due to Merchant is equal to the sum of Merchant's Total Revenues during the specified time period along with any Reserve due to be released LESS;

- the sum of all Chargebacks / CBK1s processed during the period,
- the sum of all Refunds processed and requested during the Settlement Period,
- the applicable Reserve,
- the applicable Service Fee, and
- all taxes, Penalties and other items reimbursable hereunder or otherwise occurring during the period including but not limited to any indemnification obligations, offsets and holdbacks as determined by Allied Wallet.

5.3.   *Payment by Bank Wire Transfer.*
There will be a charge of against Merchant's account for each wire transfer made. A wire transfer will not be made if the amount due is less than specified in Appendix 1. Any outstanding balances not credited to Merchant shall roll over to Merchant's next billing cycle, if appropriate. Merchant authorizes Allied Wallet to deposit amounts owed Merchant by initiating credit entries to Merchant's financial institution indicated on the form submitted to Allied Wallet. Merchant further authorizes Merchant's financial institution to accept and credit any entries indicated by Allied Wallet to Merchant's account. In the event that Allied Wallet deposits funds erroneously into Merchant's account, including payment of transactions which are later Chargebacks, CBK1s or otherwise contested, Merchant authorizes Allied Wallet to debit Merchant's account for an amount not to exceed the original amount of the erroneous credit, and Merchant shall be personally liable for any amounts that are not available for debit. This authorization is to remain in full force and effect until Allied Wallet and Merchant's financial institution have received written notice from Merchant of its termination in such time and manner as to afford Allied Wallet and Merchant's financial institution reasonable opportunity to act on such notice and until all accounts between Merchant and Allied Wallet are settled, in Allied Wallet's discretion.

5.4.   *General Conditions*
5.4.1.   *Payment to Merchant or owner or parent company only.*
Allied Wallet will only direct payments to Merchant, the owner or parent company of the Merchant, or the Merchant's registered fictitious name (also known as "Doing Business As" ("DBA") name) and accounts held in the name of any such party.
5.4.2.   *Revision of Service Fee.*
Allied Wallet is entitled to revise the Service Fee at any time taking into account a notice period of two (2) months. If the Service Fee is revised, Merchant is entitled to terminate the Agreement per the effective date of the amendment by sending Allied Wallet a written notice within thirty (30) days from receipt of Allied Wallet's notification of the Service Fee change.
5.4.3.   *Set-off.*
Allied Wallet is entitled to set-off any indebtedness of Merchant towards Allied Wallet pursuant to this Agreement. Merchant has no right to set-off, or to withhold payments to Allied Wallet, in connection with any amounts due to Merchant by Allied Wallet.
5.4.4.   *Taxpayer or Employer ID required for Merchants who are US Persons.*
A valid social security number or Employer's ID number will be required in the sign-up process as a condition of making payment to any individual citizen or resident of the United States or a domestic corporation, partnership, or limited liability company. Foreign individuals and entities need to supply a Tax Identification number.

MERCHANT'S INITIALS: K W

CONFIDENTIAL

AW_0000388

**AlliedWallet**

5.4.5. *Compliance with Laws Regarding Money Transfer and Money Laundering.*
Allied Wallet reserves the right to require Merchant to furnish Allied Wallet with such additional information concerning Merchant's business or its ownership as may be necessary to assure Allied Wallet's compliance with the laws of any state or the United States or any other applicable jurisdiction concerning money transfer, money laundering, or similar subject. Allied Wallet may refuse to provide services, or withhold payments to Merchant without liability if Merchant does not promptly furnish Allied Wallet with information requested hereunder or if such conduct may be in violation of relevant law.

5.4.6. *Closed or Terminated Accounts.*
All closed or terminated Merchant accounts will incur $500 USD monthly fee in addition to any monthly fees set forth in the Term Sheet if the account receives any disputes. Allied Wallet will not dispute on the closed or terminated Merchant's accounts after the date of closure or termination. The monthly fee will be increased to $1000 USD on accounts that receive more than 20 disputes per month after closure or termination, and a fine of $100 will be issued per dispute that Allied Wallet receives after closure or termination date. Upon the expiration or termination of this Agreement, or from the date of the Merchant's last successful transaction, whichever occurs first, Merchant has eighteen (18) months to request in writing a release of the balance of funds remaining in its account(s) and provide a designated bank account for the transfer, otherwise the funds shall be forfeited to Allied Wallet.

6.   *Undertakings of Merchant*
Merchant guarantees to Allied Wallet that, while using the Services:
6.1.   it provides and will provide such information to customers on its website and in other commercial communications to customers as is required pursuant to the laws of the Country of Origin and of those countries in which it offers its goods and/or services;
6.2.   it respects and will respect the intellectual property rights of third parties and does not and will not infringe such rights in any way and upon becoming aware of any infringement of such rights will immediately terminate such infringement;
6.3.   it does not and will not sell any goods or services the sale of which is prohibited under the laws of the Country of Origin and of those countries in which it offers its goods and/or services;
6.4.   it will perform its obligations towards Cardholder, including but not limited to accepting responsibility for the acceptance of a Cardholder order, its fulfillment in an agreed upon manner, and all material warranties and guarantees or order commitments; and
6.5.   it is and will remain for the term of this Agreement PCI Compliant.

7.   *Sales of Illegal Products or Services*
Allied Wallet reserves the right to close and freeze any access to accounts or funds, and terminate the Agreement, if Allied Wallet discovers any illegal products or services are being run through the Merchant's account or if Merchant aggregates or sends transactions to Allied Wallet from any URL that is not approved by Allied Wallet.

8.   *Spam*
"Spam" generally involves the sending of unsolicited commercial e-mail. The use of Spam to promote a site receiving service hereunder is prohibited. While Allied Wallet cannot monitor the manner in which Merchants advertise, upon receipt of a verifiable complaint that Spam has been generated on behalf of a site receiving Service hereunder, Allied Wallet shall notice Merchant. Upon the second complaint of Spam sent to the same recipient, Allied Wallet reserves the right to suspend the Merchant's account, until such time as Allied Wallet receives adequate assurances that Merchant shall refrain from engaging in Spam. . Failure to provide such assurances or continued use of Spam by Merchant entitles Allied Wallet to terminate this Agreement in its discretion.

9.   *End User Information*
Merchant understands that any information accepted by Allied Wallet from end users is the property of Allied Wallet, and shall remain the property of Allied Wallet upon cancellation of this Agreement.

10.   *Merchant Transaction Limits*
Allied Wallet is entitled to set an overall transaction limit for all transactions along with a specific limit for each channel.. Should Merchant request to increase this limit for any reason Allied Wallet agrees to review such request in good faith along with Merchant to determine whether such request can be accommodated in light of Merchant's existing and projected, Chargeback and refund levels. There is also a standard "time limit" function that prevents Merchant to be accidentally double charged – this feature is found in WEB mode and in API mode.

11.   *Cardholder Transaction Limits*
In order to prevent the occurrence of fraudulent transactions Allied Wallet may impose reasonable limits on the amount or number of purchases which may be charged to an individual Cardholder account during any time period, or refuse to accept orders from Cardholders with a prior history of questionable charges.

12.   *Refund Policy*
Allied Wallet will use commercially reasonable efforts to direct inquiring and complaining Cardholders to utilize the cardholder support services offered by Merchant in order to resolve all disputes and complaints, however, Allied Wallet reserves the right to issue a Refund without the knowledge or consent of Merchant in any case that it deems appropriate. Such determination will be binding on Merchant and the Refund debited from this account. Any transaction deemed fraudulent by Allied Wallet, will be addressed by Allied Wallet cardholder dep. - and if not verified as valid to Allied Wallet's satisfaction the transaction will be

MERCHANT'S INITIALS: K W

Allied CID response

CONFIDENTIAL

AW_0000389



cancelled and refunded.  Moreover, Allied Wallet will Refund any transaction reported by the card brands or the banks to avoid
Chargebacks.

13.  **Merchant Cardholder Support**
     Merchant shall be responsible for all cardholder support issues. Merchant shall have the ability to reasonably respond to
     inquiries from its Cardholders promptly and shall endeavor to resolve disputes with Cardholders amicably. The occurrence of
     complaints from Cardholders and/or inquiries or Chargeback's regarding Merchant's services may be cause for termination of
     this Agreement if such events occur with unacceptable frequency as determined in the sole discretion of Allied Wallet. In
     addition, Allied Wallet reserves the right to charge Merchant reasonable fees and recover its expenses on account of excessive
     cardholder inquiries, Refunds, or Chargebacks. Prior to imposing such fees and recovering its costs, Allied Wallet shall notify
     Merchant of the details and nature of the problems and attempt to find mutually acceptable solutions. If Allied Wallet and
     Merchant are unable to achieve mutually acceptable solutions, Merchant shall have the option of continuing this Agreement
     subject to the additional fees and costs imposed by Allied Wallet, or of terminating this Agreement and paying fees and costs
     through the date of termination.

14.  **Shipping Documents**
     Request for shipping documents on tangible goods and/or for proof of services provided, must be provided by Merchant to
     Allied Wallet within one (1) working day of the request.  Documents not supplied to Allied Wallet within that time will be
     charged a $150 fine per day the documents are not received up to a maximum of $1,000.  It is imperative that Allied Wallet
     obtains these documents upon request to dispute Chargebacks and keep Merchant accounts in good standing. Failure to provide
     such documentation is cause for termination of this Agreement by Allied Wallet.

15.  **Password security**
     The security of Merchant's Allied Wallet account is dependent in part upon Merchant maintaining the confidentiality of the
     Allied Wallet passwords. Merchant is wholly responsible for maintaining the confidentiality of Merchant's password and
     account and for any and all activities that occur under Merchant's account and shall indemnify Allied Wallet with respect
     thereto.  Allied Wallet shall not be responsible for any unauthorized changes made to the Merchant's account.

16.  **Merchant E-Mail, Account Changes**
     Merchant must provide a valid, working administrative e-mail address on enrollment. Any changes to Merchant's account via e-
     mail must be made via the administrative e-mail address provided on enrollment. The security of Merchant's Allied Wallet
     account is dependent in part upon Merchant maintaining the security of the administrative e-mail address as provided to Allied
     Wallet by Merchant. Any changes to Merchant's account via e-mail must be made via the administrative e-mail address
     provided on enrollment. Allied Wallet shall not be responsible for any unauthorized changes made to Merchant's account via
     this e-mail address.

17.  **Regulation Authorization, Merchant Representations**
     Merchant represents and warrants that it is legally authorized and has obtained all necessary regulatory approvals and
     certificates to provide any services it intends to offer. Merchant further represents and warrants that it will comply at all times
     with all applicable federal, state/provincial, or local laws, rules and regulations including any applicable card association or
     Automated Clearing House rules and that the good/services it offers are in compliance with the same.  If at any time, Merchant
     is being investigated in a civil or criminal matter regarding its business, products or services that Merchant is engaged in, by
     local, state or federal authorities, or has violated any local, state or federal rules or regulations, it must inform Allied Wallet
     immediately or within 3 days of said investigation or violation, otherwise it will be in breach and there will be a significant
     penalty assessed and the account will be subject to termination by Allied Wallet, frozen with remaining funds to be released
     after one hundred and eighty (180) days to five hundred and forty days (540) from the last card event subject to offsets set forth
     in this Agreement.

18.  **Merchant Information**
     Merchant is responsible for providing information which is timely, complete, truthful, and not misleading.  If Merchant provides
     any misleading information or misrepresents its business, products or services that Merchant is engaged in, there will be a
     significant penalty assessed and the account will be subject to termination by Allied Wallet, frozen with remaining funds to be
     released after one hundred and eighty (180) days to five hundred and forty days (540) from the last card event, subject to offsets
     set forth herein.  If Allied Wallet approves a Merchant based on a conditional approval or limitation of products and services
     sold, any deviation from said approval, products and services will result in possible suspension or termination of services, with
     funds frozen for one hundred and eighty (180) days to five hundred and forty days (540) from the last card event, and subject to
     offsets set forth herein.  Merchant agrees to notify Allied Wallet of any changes of ownership, regulatory actions, financial
     conditions and business products or services it provides that could materially affect Allied Wallet's rights under this Agreement.
     All Merchants must have a website to use Allied Wallet services, all websites and content on the websites (video, text, music,
     merchandise, etc.) must be reviewed by Allied Wallet for compliance with the card brands rules and regulations as well as the
     Automated Clearing House rules and regulations.  Upon approval of content, the website is considered approved for processing.
     Allied Wallet reserves the right to change terms of approval of website content, albeit that website has been previously
     approved, if it is discovered that the content could be a possible Business Risk Assessment Mitigation (pBRAM) violation or
     definite BRAM violation of the card brand rules and regulations. If the Merchant changes or adds new content, products or
     services to a website, Allied Wallet must be notified immediately so the website can be reviewed for compliance.  If content is
     added or changed without Allied Wallet being notified, or even if the website is offline and inactive, Allied Wallet reserves the
     right to interrupt service pending a review of said content, product or services for compliance or the reason for the inactivity.
     Any content, products or services found to be a pBRAM or BRAM violation can result in fines and possible termination of

MERCHANT'S INITIALS: K W



services and agreements with Allied Wallet. Should Allied Wallet terminate a Merchant for any reason, all funds will be held for one hundred and eighty (180) days from the last card event to five hundred and forty days (540), depending on products or services offered by Merchant to its customers. Funds will be eligible for release once a review of transaction liability and possible loss to Allied Wallet has been successfully reviewed and mitigated. Merchant will be responsible for all chargebacks, refunds and losses to Allied Wallet, which Allied Wallet will offset against the Merchant's frozen funds without prejudice to Allied Wallet's right to claim any further damages against Merchant.

19. **Data Protection**
   Merchant complies and will comply at all times with the personal data protection laws of any country in which it offers its goods and/or services and that it shall implement appropriate technical and organizational measures to protect personal data.

20. **Confidential Information**
   Allied Wallet's services and all information and documentation relating thereto shall be held in confidence by Merchant and may not be used by Merchant (other than for the furtherance of the purposes of the Agreement) nor disclosed to third parties without Allied Wallet's prior written consent. This includes the discovery of any errors or omissions in the Services. The terms and conditions of this Agreement may not be disclosed or made available by either party hereto to third parties without the prior written consent of the other party. In addition, Allied Wallet will not under any circumstance reveal its banking partners. Notwithstanding anything in this Agreement to the contrary, either party may disclose to third parties the fact that Merchant is using Allied Wallet's services. Merchant recognizes that the services and documentation are and contain the valuable, confidential and trade secret information of Allied Wallet. In furtherance of the foregoing Merchant and Allied Wallet shall enter into a confidentiality agreement substantially in the form of Appendix 3.

21. **Intellectual Property**
   21.1. Allied Wallet hereby grants Merchant a royalty-free, non-transferable and non-exclusive right for the term of this Agreement to use the Trademarks on its website(s) and in any off-line promotional materials solely in order to indicate that it makes use of the Services. Merchant shall use such Trademarks in accordance with Allied Wallet 's directions for the use of such Trademarks. Merchant does not have a right of sub-license. Allied Wallet may apply limitations to the right granted to Merchant under this paragraph at any time and at its sole discretion. Merchant hereby grants Allied Wallet and its affiliated companies an irrevocable, royalty free and non-exclusive right for the term of this Agreement to use its trademark and logos on their websites and in off-line publications for promotional purposes.
   21.2. When using the Trademarks, Merchant will ensure that no composite marks are created with its own trademarks and/or logos. Merchant acknowledges that its use of the Trademarks does not create for itself any rights in the Trademarks other than those explicitly granted in this Agreement.
   21.3. All proprietary rights in the equipment, software (such as interfaces) and other materials used or made available by Allied Wallet in the performance of this Agreement, whether or not supplied to Merchant, shall remain with Allied Wallet or its licensors. Merchant shall only acquire such right of use as is explicitly granted hereunder or otherwise.
   21.4. Upon termination of this Agreement, Merchant will immediately withdraw any reference to Allied Wallet from its website(s) and will cease the use of the Trademarks.

22. **Software**
   22.1.   *As-Is Basis.*  The Software, Services or related products are provided to Merchant under this Agreement on an "as-is" basis. Merchant understands that processing outages are normal and can occur time to time due to service interruption from banks, failed servers or the storage facility. Merchant agrees not to hold Allied Wallet liable for any loss of business or other damages caused by such outages.
   22.2.   In consideration for payment of any applicable fees, Merchant is granted a personal, non-exclusive, non-transferable license to use the Software, in object code form only, solely in connection with the Service (the **"License"**). Merchant shall not: (i) attempt to reverse engineer, decompile, disassemble or otherwise translate or modify the Software in any manner; or (ii) sell, assign, license, sublicense or otherwise transfer, transmit or convey Software, or any copies or modifications thereof, or any interest therein, to any third party. All rights in the Software, including without limitation any patents, copyrights and any other intellectual property rights therein, shall remain the exclusive property of Allied Wallet and/or its licensors. Merchant agrees that the Software is the proprietary and confidential information of Allied Wallet and/or its licensors subject to the provisions of Section 20 (**"Confidential Information"**) above. The License shall immediately terminate upon the earlier of: (i) termination or expiration of this Agreement; (ii) termination of the Service(s) with which the Software is intended for use; or (iii) failure of Merchant to comply with any provisions of this Section.

23. **Taxes**
   Merchant is fully responsible for and agrees to pay all taxes and other charges imposed by any government authority on the services provided under this Agreement and on any transactions processed pursuant to this Agreement.

24. **Limitations of Liability**
   ALLIED WALLET ASSUMES NO LIABILITY FOR DISRUPTIONS OR IMPROPER OPERATION OF THE SERVICE FOR ANY REASON, INCLUDING, BUT NOT LIMITED TO, VANDALISM, THEFT, ACTIONS OF THIRD PARTY SERVICE PROVIDERS, PHONE SERVICE OUTAGES, INTERNET DISRUPTIONS, EXTREME OR SEVERE WEATHER CONDITIONS OR ANY OTHER CAUSES IN THE NATURE OF "ACTS OF GOD" OR FORCE MAJEURE. ALLIED WALLET SHALL NOT BE RESPONSIBLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES INCLUDING ANY LOSS OF PROFIT, REVENUE, SOFTWARE OR DATA. EVEN IF ALLIED WALLET IS ADVISED OF THE POSSIBLITY OF SUCH DAMAGES. IN NO CASE SHALL MERCHANT BE ENTITLED TO RECOVER DAMAGES FROM ALLIED WALLET WHICH EXCEED THE SUM OF THE AMOUNTS OF FEES

MERCHANT'S INITIALS: K W

Pl. Ex. 25
p. 409

CONFIDENTIAL

AW_0000391



RETAINED BY ALLIED WALLET UNDER THIS AGREEMENT DURING THE ONE MONTH PRIOR TO THE EVENT GIVING RISE TO THE CLAIM FOR DAMAGES.

25. *Disclaimer of Warranties*
EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, ALLIED WALLET MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY ALLIED WALLET SERVICES, RELATED PRODUCTS, SOFTWARE OR DOCUMENTATION. ALLIED WALLET SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES; INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

26. *Indemnification*
Merchant agrees to indemnify and hold harmless Allied Wallet, its employees, officers, agents, directors and subsidiaries from any and all fines, penalties, losses, claims, expenses (including attorney fees), lawsuits by its customers or other liabilities resulting from or in connection with this Agreement. Allied Wallet assumes no liability of Merchant for failure to comply with this Agreement and any results caused by the acts, omissions or negligence of Merchant, sub-contractor or an agent of Merchant or an employee of any one to them, including, but not limited to, claims of third parties arising out of or resulting from or in connection with Merchant's products or services, messages, Seprograms, caller contracts, promotions, advertising, infringement or any claim for libel or slander or for violation of copyright, trademark or other intellectual property rights. Allied Wallet may deduct the above described fines, penalties, losses, claims, expenses (including attorney fees and the allocable costs of in-house counsel), or other liabilities from the Reserve, or if the Reserves are inadequate, directly from the proceeds of Merchant's sales.

27. *Cross Corporate Guarantee*
Merchant shall procure an independent guarantee by its parent and/or its group companies in favor of Allied Wallet substantially in the form of Appendix 2.

28. *Term*
The term of this Agreement shall be for twelve (12) months beginning upon execution of this document by Merchant and subsequent acceptance by Allied Wallet, and shall automatically renew at the end of each consecutive twelve (12) month period unless Allied Wallet receives written notice of non-renewal from Merchant no less than thirty (30) days prior to the expiration of such twelve (12) month period. Allied Wallet reserves the right to terminate this Agreement at any time with or without cause or prior notification to Merchant. Allied Wallet may further terminate this Agreement immediately without notice at any time Merchant breaches any part of this Agreement. Upon termination of processing, notice of non-renewal or cancellation of this Agreement, payment shall be made in accordance with the Section entitled "Payment to Merchant", above. Upon expiration or termination of this Agreement or if the Merchant stops processing, Allied Wallet may hold Merchant funds until such time as all of the Merchant's Cardholder transactions are complete and Allied Wallet reasonably believes no further Chargebacks, CBK1s, refunds or dispute claims of fraud or other offsets will be incurred and all outstanding claims and issues with the Merchant have been resolved.

29. *Default*
In the event Merchant defaults in any provision or fails to perform pursuant to this Agreement, Allied Wallet shall be entitled to damages, costs and attorney's fees from Merchant.

30. *Survival of Claims*
Any claim arising out of or related to this Agreement must be brought no later than one year after it has accrued.

31. *Invalid or Non-enforceable Provisions*
The invalidity or non-enforceability of any provision of this Agreement, as so determined by a court of competent jurisdiction, shall not affect the other provisions hereof, and in any such occasion this Agreement shall be construed in all respects as if such invalid or non-enforceable provision were omitted or, as the case may be, such provision shall be modified to the minimum extent necessary to make it legal, valid and enforceable.

32. *Account Claims, Disputes, and Attorneys' Fees Clause*
If another person or entity makes a claim against funds in Merchant's account, or if Allied Wallet has reason to believe there is or may be a dispute over matters such as ownership of the account or the authority to receive payment, or make changes to the account, Allied Wallet may, in its sole discretion, (1) continue to rely upon current Allied Wallet documents; (2) honor the competing claim upon receipt of evidence Allied Wallet deem satisfactory to justify such claim; (3) freeze all or part of the funds until the dispute is resolved to Allied Wallet's satisfaction; or (4) pay the funds to an appropriate court of law for resolution.

In the event of a dispute between Allied Wallet and the Merchant relating to the subject matter of this Agreement, it is agreed that the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs in enforcing its rights hereunder.

33. *Choice of Law/Venue*
For purposes of convenience, this Agreement shall be construed and enforced in accordance with the laws of the State of California, in the United States, and the exclusive venue for any action, dispute or proceeding with respect to this Agreement shall be in Los Angeles, California.

MERCHANT'S INITIALS: K W

Pl. Ex. 25
p. 410

CONFIDENTIAL

AW_0000392

# AlliedWallet

**34.** *Amendments and Modifications*
No Amendment or modification of this Agreement shall be valid unless same is in writing and signed by all parties hereto.
Allied Wallet may amend this Agreement to take into account changes in law or regulations or industry mandates and to
accommodate changes imposed on Allied Wallet, and to make other changes deemed necessary by Allied Wallet, by sending
Merchant a specimen of the changed Agreement, or making a specimen of the changed Agreement available upon a web page
located on the Internet. Unless Merchant rejects the changed Agreement and terminates this Agreement by notice to Allied
Wallet in writing within fifteen (15) days after Allied Wallet sends the changed Agreement, or makes said changed agreement
available on the Internet, the changed Agreement shall replace this Agreement and be in full force and effect.

**35.** *Notices*
Any and all notices to Allied Wallet, or other communications under or with respect to this Agreement to Allied Wallet, shall be
in writing, and shall be delivered by hand; e-mail; mailed postage pre-paid, either by registered or certified mail, return receipt
requested; or by overnight courier to the following address:

> Allied Wallet, Ltd.
> 1 Northumberland Avenue
> Trafalgar Square, London, WC2N 5BW
> United Kingdom
> And via email: support@AlliedWallet.com

> Notices to Merchant shall be made to the administrative e-mail provided by Merchant on enrollment with Allied
> Wallet and be deemed delivered when sent.

**36.** *Survival of Obligations*
The rights and obligations of the parties hereunder which by their nature would continue beyond the termination or cancellation
of this Agreement (including, without limitation, those relating to confidentiality, payment of charges and limitations of
liability) shall survive any termination or cancellation of this Agreement.

**37.** *Transfer and Assignment*
Merchant may not sell, assign or transfer any of its rights or obligations under this Agreement without the prior written consent
of Allied Wallet.

**38.** *Authorization; Entire Agreement*
The persons signing or otherwise accepting this Agreement on behalf of Merchant represent and warrant that they have the
authority to enter into this Agreement on behalf of Merchant. This Agreement contains the entire agreement of the parties and
supersedes any other agreements (written or oral), instruments or writings as to its subject matter.

**39.** *Acceptance*
By signing this page you state that you understand and agree to these terms and conditions. Merchant agrees that Merchant has
read, understands, and agrees to abide by this Agreement, and any documents incorporated by reference, and Merchant agrees
that Merchant intends to form a legally binding contract; and that this Agreement constitutes "a writing signed by Merchant"
under any applicable law or regulation. **Any rights not expressly granted herein are reserved by Allied Wallet.**

By signing and entering into this Agreement with Allied Wallet, I certify that I have carefully read and understood the terms of this
Agreement, hereby agree to it, and acknowledge receipt of a fully completed and signed copy of it. Moreover, I certify that I am an
authorized person of Merchant that is the subject of this Agreement.

**AGREED AND ACCEPTED:**

[Consumer Advocacy Center Inc]                    **ALLIED WALLET**

SIGNATURE: _____          SIGNATURE: _____

BY [print]: Kaine Wen                          BY [print]: _____

TITLE: CFO                                     TITLE: _____

DATED: 04/18/2016                              DATED: _____

WITNESS FOR MERCHANT: _____

MERCHANT'S INITIALS: K W

---

CONFIDENTIAL

Pl. Ex. 25
p. 411

AW_0000393



**APPENDIX 1**

**PAYOUT SCHEDULE**

Allied Wallet wires every Wednesday to all Merchants due more than 1000 units of the processed and settled currency. Funds will post to the wired account within 1 to 4 business days (bank holidays and country specific holidays may delay funds).
Price display: the customer must be able to identify the final price of a product unmistakably.

All Merchants must put the Allied Wallet logo and Allied Wallet details for customers to clearly see who they will be billed on by on payment pages – Allied Wallet technical team will send you details. This must be done prior to your first payout.

****All fees will be charged in the equivalence of USD, with the exception of EUR and GBP.
****Should a chargeback be issued on the basis of fraud, an additional €15.00 per dispute will be charged.

**Discount Rate and Details**

**Currency: USD**

*Merchant Discount Rate:  2.60%*

*One Time setup fee: WAIVED*

*Monthly Maintenance Fee: WAIVED*

*Transaction Fee: 0.20 Units*

*Refund Fee: 1.25 Units*

*Chargeback1 Fee: 8.00  Units*

*Chargeback fee: 20.00  Units*

*Wire Fee: 45.00 Units*

*Holdback Reserve (rolling 6 mo.): 5%*

*Holdback funds are released on the 15th of each month, unless this date falls on a weekend, and are only released if 1000 Units or more are due and are subject to a wire fee.*

*Payout Period: 12 days in arrears based on amount to be determined*

*Processing Period: Saturday to Friday*

New clients have no limit on voids of pre-authorizations.

AlliedWallet, Ltd.                                   _____

                                                     [Consumer Advocacy Center Inc]

By: _____                          By: _____

Name: _____                        Name: Kaine Wen

Title: _____                       Title: CFO

                                                     Date: 04/18/2016

MERCHANT'S INITIALS: K W

CONFIDENTIAL

AW_0000394



## APPENDIX 2

### CROSS CORPORATE GUARANTEE

Date: 04/18/2016

From: [Premier Student Loan Center Limited] ("**Guarantor**[s]") in favor of Allied Wallet Ltd. ("**Allied Wallet**")

**Allied Wallet Card Payment Processing Agreement dated _____ between _____ ("Merchant") and Allied Wallet (the "Agreement")**

As a primary inducement to Allied Wallet to enter into the Agreement, the undersigned in [its/her/his/their] capacity of Guarantor[s], by signing this Agreement, hereby guarantee[s], without reservation, jointly and severally, unconditionally and irrevocably, by way of independent guarantee (a) the continuing full and faithful performance by Merchant of each of its duties and obligations to and (b) payment of any monies due by Merchant to Allied Wallet under the Agreement or any other agreement currently in effect or in the future entered into between Merchant or its principals and Allied Wallet as such agreements now exist or are amended from time to time, with or without notice.

Guarantor[s] understand[s] further that Allied Wallet may proceed directly against Guarantor[s] without first exhausting their remedies against any other person or entity responsible to it or any security held by Allied Wallet or Merchant. To the extent permitted by applicable law, Guarantor[s] waive[s] all defenses and deferral rights and legal prerogatives which the law has vested in or may vest in guarantors and joint and several debtors.

Guarantor[s] agree[s] to immediately remit payment regarding any monies owed to Allied Wallet. In addition, Guarantor[s] will promptly provide any information requested concerning [its/her/his/their] financial profile and business relationships.

This guarantee will not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit or any other variations of the terms and agreement of the Agreement.

Guarantor[s] waive[s] trial by jury with respect to litigation arising out of or relating to this guarantee. This guarantee will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of Allied Wallet or its subsidiaries.

Guarantor[s] understand[s] that the inducement to Allied Wallet to enter into this Agreement is consideration for the guarantee, and that this guarantee remains in full force and effect even if Guarantor[s] receive[s] no additional benefit from the guarantee.

Guarantor(s) certif[y/ies] that Guarantor[s] [is/are] an [RELATIONSHIP] of Merchant.

This guarantee shall be construed and enforced in accordance with the laws of California and the venue for any action, dispute or proceeding with respect to this guarantee shall be Los Angeles, California.

Sincerely,

[Premier Student Loan Center Limite]

SIGNATURE: _____

BY [print]: Kaine Wen

TITLE: CFO

WITNESS: _____

**AGREED AND ACCEPTED**
ALLIED WALLET

SIGNATURE: _____

BY [print]: _____

TITLE: _____

**Attachment:** Corporate Resolution of Guarantor[s]

MERCHANT'S INITIALS: K  W



**APPENDIX 3**

**NON-DISCLOSURE / CONFIDENTIALITY AGREEMENT**

With this Agreement dated 0418/2016____, Allied Wallet is providing Merchant confidential trade secret information, including, but not limited to, terms and conditions, fee schedules, rates (such information whether written or oral called the **"Confidential Information"**). In consideration of furnishing the Confidential Information to Merchant, Merchant agrees to the following:

Merchant may disclose such Confidential Information only to those of its employees who need to know such information given the nature of the business relationship being considered by Merchant and Allied Wallet, and who agree to be bound by the terms and conditions of this Agreement. Neither Merchant nor any of its employees shall use, disseminate or in any way circulate within its own organization or otherwise any Confidential Information that is supplied to or obtained by Merchant in writing, orally or by observation, except (i) to the extent necessary to evaluate a possible business relationship with Allied Wallet and (ii) in the course of negotiations, discussions and consultations with personnel or authorized representatives of the Allied Wallet in connection with such evaluation or defining the terms of such relationship.

Merchant shall treat all Confidential Information with a degree of care that is not less than the degree of care used by it in safeguarding its own similar information or material, and in no event less than the degree of care generally accorded in the industry to confidential information of the same or similar nature.

Merchant shall NOT publish or copy any Confidential Information, or disclose any Confidential Information to ANY third party, before, during or after the conclusion of its business relationship with Allied Wallet. The non-disclosure provisions of this Agreement shall survive the termination of this Agreement and Merchant's duty to hold the Confidential Information in confidence shall remain in effect until Allied Wallet sends Merchant written notice releasing Merchant from the non-disclosure provisions of this Agreement. In any event, the merchant shall not publish any information in any public forum regarding it's relationship with Allied Wallet.

Merchant makes this Agreement in good faith, without mental reservation or purpose of evasion. Merchant understands that Allied Wallet may seek any remedy availabe to it to enforce this Agreement, including, but not limnited to, application for a court order prohibiting disclosure of information in breach of this Agreement.

If a court finds any provisions of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of the parties.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party. Merchant has signed this Agreement through its authorized representative.

Any failure by either party to enforce at any time any term or condition of this Agreement shall not be considered a waiver of that party's right thereafter to enforce each and every term and condition of this Agreement.

This Agreement shall be construed and enforced in accordance with the laws of California and the venue for any action, dispute or proceeding with respect to this Agreement shall be Los Angeles, California.

IN WITNESS WHEREOF, Merchant has executed this Agreement as of the date first written above.

**Allied Wallet, Ltd.**

[Consumer Advocacy Center Inc]

By: _____        By: _____

Name: _____     Name: Kaine Wen

Title: _____      Title: CFO

MERCHANT'S INITIALS: K W

Exhibit



# EPS Online Reporting Module

*EIA Web Portal gives you the power you need to manage your merchant processing online. You will receive:*

- *Detailed transaction information*

- *Batch Information*

- *Search by Card Number*

- *Secure Username and Password Protection*

- *Secure Site Location*

- *Detailed History*

*By signing below you authorize EPS Online to provide you and your company with Online access to your merchant account transaction and statement data. You accept the responsibility for the security of the username and password. You authorize EPS to collect $9.95 per month electronically and this service is an extension of your merchant account and requires no additional data. Upon receipt of this agreement (facsimile is acceptable) you will be contacted via E-mail with confirmation of your user name and password. You will be able to access your account within 24 hours.*

*By signing below I agree to the terms on conditions outlined above:*

**Company Name:** Consumer Advocacy Center Inc     *MID#*_____3257_____

    d/b/a Premier Student Loan Center   .

**Email Address:** kaine@premierstudentloancenter.com

**Owner Signature X** _____ **Date** 09/08/2017_____

Premier StudentLoan

3257

**Attn:** Daniel Guy     **Ext:** _____     *Fax #* 303-222-1957



# EPS Online Reporting Module

*EIA Web Portal gives you the power you need to manage your merchant processing online. You will receive:*

- *Detailed transaction information*

- *Batch Information*

- *Search by Card Number*

- *Secure Username and Password Protection*

- *Secure Site Location*

- *Detailed History*



*By signing below you authorize EPS Online to provide you and your company with Online access to your merchant account transaction and statement data. You accept the responsibility for the security of the username and password. You authorize EPS to collect $9.95 per month electronically and this service is an extension of your merchant account and requires no additional data. Upon receipt of this agreement (facsimile is acceptable) you will be contacted via E-mail with confirmation of your user name and password. You will be able to access your account within 24 hours.*

*By signing below I agree to the terms on conditions outlined above:*

*Company Name:* Consumer Advocacy Center Inc.     *MID#*_█████3257_____

*Email Address:* kaine@premierstudentloancenter.com

*Owner Signature X* _____ *Date* 05/06/2016 _____

*Attn:* _____ *Ext:* _____ *Fax #* 303-222-1957

Premier Student
█████ 3257



**EPS** ELECTRONIC PAYMENT SYSTEMS
6472 South Quebec Street Englewood, CO 80111 800-863-5995

**ESQUIRE BANK**
138 Old Country Road, Garden City, NY 11530
800-996-0233

MERCHANT APPLICATION AND PROCESSING AGREEMENT

## MERCHANT BUSINESS INFORMATION

| | | |
|---|---|---|
| DBA NAME: Premier Student Loan Center | LEGAL NAME: Consumer Advocacy Center Inc. | FEDERAL TAX ID# 471590303 |
| PHYSICAL ADDRESS: 29901 Santa Margarita Pkwy, Suite 200F | MAILING ADDRESS: Same | |
| CITY, STATE, ZIP: Rancho Santa Margarita   92688 COUNTY: Orange | CITY, STATE, ZIP: | |
| BUSINESS PHONE: 949-207-1018   CELL PHONE: | BUSINESS WEBSITE: PremierStudentloancenter.com | |
| FAX NUMBER: | MANAGER CONTACT: Kaine Wen | EMAIL ADDRESS: KaineC premierstudentloancenter.com |

## OWNER / OFFICER INFORMATION (must be an officer, owner, or partner)

| PRIMARY: Albert Kim | TITLE: President | PRIMARY: | TITLE: |
|---|---|---|---|
| SOCIAL SECURITY #: 5610 | D.O.B. 1960 | SOCIAL SECURITY #: | D.O.B. |
| RESIDENTIAL ADDRESS: | PHONE: | RESIDENTIAL ADDRESS: | PHONE: |
| CITY, STATE, ZIP: Aliso Viejo, CA | OWNERSHIP%: 51 | CITY, STATE, ZIP: | OWNERSHIP%: |

## BUSINESS BANK ACCOUNT INFORMATION (may attach voided check for each DDA)

| BANK NAME: JP Morgan Chase Bank | BANK CONTACT: Bank Manager | BANK ACCOUNT NUMBER: 1522 | BANK ROUTING NUMBER (9 digit): 322271827 |
|---|---|---|---|

## CARD PROCESSING INFORMATION

| DO You Currently Accept Credit Cards? Yes | Gateway or POS Type: NMI |
|---|---|
| Current Processor Name: Electronic Merchant System  Attach Product Processing Statements (3 MO.) | POS or SOFTWARE VERSION NUMBER: |
| BUSINESS PLAN / PROCESSING DATA: | VAR SHEET: YES ☑ NO ◯   EMAIL TO BE SENT TO |

| Low Ticket | $ 180 | Card Swipe: | % | Additional Terminal: |
|---|---|---|---|---|
| Average Ticket | $ 356 | Manually Keyed: 100 % | | TERMINAL DESCRIPTOR HEADER TO READ: |
| High Ticket | $ 2,400 | Website: | % | |
| Average Monthly: | $70,000 | Call Center: | % | TECHNICAL CONTACT NAME/NUMBER: |

## MERCHANT BANK RELATIONSHIP.

Important Bank Responsibilities:
1. Esquire Bank is the only entity approved to extend acceptance of VISA products directly to a Merchant
2. Esquire Bank is responsible for educating Merchants on pertinent VISA Operating Regulations with which Merchants must comply
3. Esquire Bank is responsible for all funds held in reserve that are derived from settlement

Important Merchant Responsibilities:
1. Ensure compliance with cardholder data security and storage requirements
3. Review and understand the terms of the Merchant Agreement

2. Esquire Bank must be a principal signer to the Merchant Agreement.
4. Esquire Bank is responsible for and must provide settlement funds to the merchant.

2. Maintain Fraud and Chargebacks below thresholds.
4. Comply with Visa Operating Regulations.

The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands some important obligations of each party and that the VISA Member-Esquire Bank is the ultimate authority should the merchant have any problems.

Owner Signature: X [signature]      Printed Name: Albert Kim      Date: 03-25-2018

## PRODUCT / MERCHANT DBA SURVEY

| Years in Business: 2 | Length of Current Ownership: 2 years | Type of Business/Service Sold: Document Preparation | How is the Product/Service Delivered: Mail and Internet | |
|---|---|---|---|---|
| Location of Business: ◯ Retail Store Front ◯ Residence ● Office Building ◯ Other: | Area Zoned: ◯ Commercial ◯ Residential ◯ Industrial | | | |

| TYPE OF OWNERSHIP: | Major Cross Streets: | Square Footage: ◯ 250-500 ● 501-2,000 ◯ Over 2,000 | Photos Provided: Y / N |
|---|---|---|---|
| ◯ Proprietorship | Does the Inventory & merchandise appear to match the type of business? Y / N | Business Premises is ◯ Owned by merchant ● Leased from LaRue Proof (949) 219-5 | |
| ◯ Partnership | | | |
| ● Corporation | Describe the merchants refund /return policy: Full money back if requested prior to document submission. | | |
| ◯ LLC | | | |
| ◯ Other | Additional comments by Inspector (must be completed): | | |

## AGENT / INSPECTOR NOTES

I hereby verify that this application has been fully completed by the merchant and that I have physically inspected the business premises of the merchant at this address and that the information stated above is true and correct to the best of my knowledge and belief.

Agent Name:                Contact Number:              DBA# :

Agent Signature: X [signature]                            Date: 3-29-16

Application Check List:

Please provide the following documents for application approval:
VOIDED CHECK (matching BANK LETTER)
COPY OF STATE ISSUED ID (PASSPORT)
COPY OF BUSINESS LICENSE
MOTO ADDENDUM (if applicable: 30% of sample are keyentered)
Other Items Requested:

**Electronic Debit/Credit Authorization**                     Early Termination Fee $295.00

Merchant hereby authorizes Bank in accordance with this Agreement to initiate debit/credit entries to merchant's deposit account, as indicated below. This authority is to remain in full force and effect until (a) Bank has received written notification from Merchant of its termination, in such a manner as to afford Bank reasonable opportunity to act on it and (b) all obligations of Merchant to Bank that have arisen under this agreement have been paid in full. This authorization extends, but is not limited, to such entries to this account which concern discount fees, transaction fees, chargebacks, penalties, service fees, return item fees, lease, rental and purchase charges, check services, warranty services, internet services or other services offered by EPS, involving Point of Sale ("POS") and processing equipment.

### PRICING SCHEDULE A - Credit Card Processing                                          Pin Based Debit

| | | | | | |
|---|---|---|---|---|---|
| Card Discount Rate: ___% Offline Debit ___% | | | American Express SE #: | | Discount Rate ___% |
| Cost Plus Pricing: 2.99 % Per Item Fee: $ 0.30 (+VS/MC/DS Cost of Interchange) | | | Annual Fee | $99.50 | Per Item Fee $0___ |
| | | | Annual PCI-DSS Compliance | $99.50 | Admin Fee $10.00 |
| AUTH FEE | RETAIL | MOTO | Monthly Administration Fee $10.00 | Monthly PCI Non-Compliance* | $19.95 |
| VS/MC/DS | $0.25 | $0.35 | Minimum Discount Fee | $25.00 | Encryption Fee $20.00 |
| Other | $0.25 | $0.35 | Internet/Gateway Fee* | $15.00 | An encrypted pin pad is needed to |
| Wireless* | $0.15 | $0.15 | Mobile Monthly Fee* | $12.95 | accept pin based debit. |
| AVS | $0.04 | $0.04 | Wireless Access Fee* | $25.00 | |
| Voice Auth Set Up | $4.95 | $4.95 | Chargeback Fee | $25.00 | SIC/MCC Code: |
| Per Voice Auth | $0.95 | $0.95 | Retrieval Fee | $12.50 | Warranty includes Free Repair & Replacement 7399 |

| Warranty Program | |
|---|---|
| ○ 1 Terminal | $9.95 |
| ○ 2 Terminals | $14.95 |

*Some fees above may or may not apply due to the type of account and terminal or gateway you will use to process transactions. If you add additional terminals or programs there fees may come into affect. When accepting cards a surcharge of up to 1.75% applied to all transactions which fail to qualify for Visa MasterCard electronic data capture interchange requirements. If applying for a Cost Plus account, these quotes are in addition to VS/MC/DS cost of interchange. Please review your merchant processing agreement for additional information on the fees listed under pricing schedule A. If using mobile, each additional phone added has an additional $3.95 monthly fee assessed.

### EZ Pay, Internet And Single Check Conversion                                   A.I.M. MARKETING

☐ Single Check Conversion No Guarantee: submit the check through the ElectCheck system and have the funds automatically debited from the customers account and deposited in to the business account on file.          Discount Rate: ___% Per Item $0.38

☐ Single Check Conversion with Guarantee: submit the check through the ElectCheck system, with funds verification and guarantee, and have the funds automatically debited from the customer's account and deposited in to the business account on file this option will need to meet ACH verification approval.          Discount Rate: ___% Per Item $0.25

☐ EZ Payment Plan Conversion and Guarantee: allow your customer a NO Credit Check option of up to $5,000.00 of credit to spend at your business. Have your customer complete a quick application, submit the check series and application through the EZ Payment system, and receive an instant approval of this program.          Discount Rate: ___% Per Item $1.00

Monthly Administration Fee: $10.00          Monthly Discount Fee: $25.00          ACH Reject Fee (per item): $25.00

An account set up fee of $50.00 will be debited from the first check in the series when multiple checks are used in a single transaction. If no payment not otherwise covered in this Agreement shall be debited from merchants account on or about the 1st of each month for activity in the prior calendar month. An annual fee of $99.50 is billed each year regardless of fees of enrollment and cannot be waived or refunded. When applicable, in consideration for the granting of the license and use of the software, licensee agrees to pay developer a recurring monthly gateway fee of $19.95 of the term of this agreement and any subsequent renewals. All checks must be Pay to the order of (the merchant/business name) EPS)

Access-Now develops and builds custom websites that drives "Industry Specific Customers" direct to your website with their proprietary TRAFFIC BOOST product, generating thousands of verified hits in days. Just check the box below to receive information on these products today. Are you interested in

○ Boost Traffic to my CURRENT website
○ Build a customized 3 Page website
○ Build a customized 5 page website
○ Create a customized affordable Marketing Package
○ Add a shopping cart to my site for processing

---

Does Merchant use any independent servicer that stores, maintains, or transmits cardholder information:     YES X NO  If Yes, Please provide the following for each servicer:

Name: _____     Phone Number/Contact: _____

Does the merchant use: ____ Software Type: _____     Terminal Type: _____

X _____  Albert Kim  03-25-2016     X _____ _____ _____
Merchants Signature   Printed Name   Date              Guarantor Signature   Printed Name   Title

### PERSONAL GUARANTEE AND ACCEPTANCE

The undersigned personally, and in his or her capacity and for any named entity he/she represent, unconditionally guarantees the Bank and Electronic Payment Systems, LLC (EPS) the performance of this Agreement including by not limited to: payment of all sums due and owing; adherence to all terms and conditions of this agreement and any attachments hereto; and agrees to pay any attorney's fees and costs associated with enforcement of the terms, conditions, and agreements contained herein. Bank and/or EPS shall not be required to first proceed against Merchant for enforce or sue any other remedy before proceeding against the undersigned. This is a continuing guaranty and shall not be discharged or affected by the death or the undersigned, shall bind the heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of Bank or EPS. The terms of this guaranty shall be for the duration of the Merchant Processing Agreement and all attachments thereto and shall guarantee all obligations which may arise or accrue during the terms thereof. Enforcement may be sought subsequent to any termination.

X _____  Albert Kim  03-25-2016     X _____ _____ _____
Merchants Signature   Printed Name   Date              Guarantor Signature   Printed Name   Title

The undersigned personally, and in his or her capacity and for any named entity herein represents and warrants that all information provided by Merchant in the Merchant Application and Processing Agreement, and if elected as a service, the EPS 90 Application and Purchase Agreement, and any other documents thereto, is true and correct. Also, the undersigned authorizes the Bank and/or EPS or its representative to investigate the credit of each person and/or entity listed on the Merchant Application and represents that he/she has the authority to provide such information. MERCHANT HEREBY AGREES AND ACCEPTS ALL TERMS AND CONDITIONS CONTAINED HEREIN AND OUTLINED IN THE ARTICLES 1.01 THRU 3.14(L) and articles 1-7 of the MERCHANT APPLICATION.RESPECTIVELY FOR THE MERCHANT PROCESSING AGREEMENT, AND IF ELECTED AS A SERVICE, ARTICLES 1 THRU 9(b) RESPECTIVELY OF THE ARTICLES, TERMS AND CONDITIONS OF THE EZ PAYMENT PLAN APPLICATION AND PURCHASE AGREEMENT. FURTHERMORE, MERCHANT ACKNOWLEDGES RECEIPT OF A PHYSICAL COPY OF THIS AGREEMENT WHICH CONTAINS THE AFOREMENTIONED ARTICLES AND OTHER TERMS AND CONDITIONS THAT GOVERN THIS AGREEMENT, INCLUDING THE TWO (2) YEAR PROCESSING TERM FOUND IN SECTION 3.05 OF THE TERMS AND CONDITIONS.
IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT: To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

X _____  President  03-25-2016     X _____ _____ _____
Merchants Signature   Title   Date              Guarantor Signature   Title   Date

### For store use only

Accepted by Esquire Bank* Garden City, NY 11530* 800-996-0213          Accepted by Electronic Payment Systems, LLC* Englewood, CO* 800-863-5995

X _____                                   X _____

# Exhibit

# MAVERICK BANKCARD

P: (800) 464-9777 | F: (888) 772-9106

### ⚖ ESQUIRE BANK

320 Old Country Road, Garden City NY 11530 | (800) 996-0213

## MERCHANT ACCOUNT APPLICATION AND AGREEMENT    V1.2

### INTERNAL USE ONLY

| Merchant # | Agent/Sales Partner |
|---|---|
| | 002100 |

### GENERAL INFORMATION

**CORPORATE / LEGAL NAME**
Consumer Advocacy Center Inc.

| LOCATION ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 173 Technolgy Drive. STE 202 | Irvine | Ca | 92618 |

**MERCHANT NAME (DBA OR TRADE NAME)**   ☑ Information same as above corporate / legal
Premier Student Loan Center

| LOCATION ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |

### CONTACT INFORMATION

| CUSTOMER SERVICE NUMBER | CONTACT TELEPHONE | FAX NUMBER |
|---|---|---|
| 8557820742 | | |

**CUSTOMER SERVICE EMAIL**

**CONTACT EMAIL ADDRESS**
kaine@premierstudentloancenter.com

| YEARS IN BUSINESS | WEBSITE ADDRESS | # OF LOCATIONS |
|---|---|---|
| 3 | http://premierstudentloancenter.com/ | 1 |

**DOES THIS BUSINESS CURRENTLY PROCESS CARDS?** ☐ NO ☑ YES   **CURRENT PROCESSOR** EMS, Wells fargo   **FEDERAL TAX ID NUMBER** 471590303

| AVERAGE TRANSACTION AMOUNT | MAXIMUM TRANSACTION AMOUNT | MONTHLY VOLUME | PLEASE CHOOSE MAILING ADDRESS: |
|---|---|---|---|
| $ 180.00 | $ 1500.00 | $ 1,000,000.00 | ☐ DBA ADDRESS  ☑ LEGAL ADDRESS |

**DESCRIBE YOUR PRODUCT/SERVICE:** Document Preparation Services   **MCC/SIC CODE:** 7299

PAYMENT CARD INDUSTRY DATA SECURITY STANDARD: MUST PROVIDE COPY OF SELF ASSESSMENT QUESTIONNAIRE. IF APPLICABLE, MUST PROVIDE CERTIFICATE OF COMPLIANCE. MERCHANTS HAVE 90 DAYS AFTER BOARDING TO BECOME PCI COMPLIANT BY PROVIDING SAQ AND/OR SCAN, OR WILL BE CHARGED NON-COMPLIANCE FEE.

### OWNERSHIP TYPE

☐ INDIVIDUAL / SOLE PROPRIETOR   ☐ PARTNERSHIP   ☑ CORPORATION   ☐ GOVERNMENT   ☐ LLC
☐ NON-PROFIT (MUST PROVIDE 501C3 LETTER)   ☐ PUBLICLY TRADED PA/PC

### LOCATION

| BUILDING TYPE: | ☐ SHOPPING CENTER | ☑ OFFICE BUILDING | ☐ INDUSTRIAL BUILDING | ☐ RESIDENCE |
|---|---|---|---|---|
| MERCHANT: | ☐ OWNS | ☑ RENTS | | |
| AREA ZONED: | ☑ COMMERCIAL | ☐ INDUSTRIAL | ☐ RESIDENTIAL | |
| SQUARE FOOTAGE: | ☐ 0-500 | ☐ 501-2500 | ☐ 2501-5000 | ☐ 5000-10,000 ☑ 10,000+ |

### PRINCIPALS (MUST HAVE AT LEAST 51% COMBINED OWNERSHIP)

**1. PRINCIPAL NAME:**

| FIRST | MIDDLE | LAST | SSN: | % OWNERSHIP: | TITLE: |
|---|---|---|---|---|---|
| Albert | | Kim | 5610 | 50 | President |

| HOME ADDRESS: | CITY: | STATE: | ZIP: |
|---|---|---|---|
| | Irvine | CA | |

| HOME PHONE: | EMAIL: | DRIVERS LICENSE NUMBER AND EXP DATE: | DATE OF BIRTH: |
|---|---|---|---|
| | | 12/11/2020 | 80 |

**2. PRINCIPAL NAME:**

| FIRST | MIDDLE | LAST | SSN: | % OWNERSHIP: | TITLE: |
|---|---|---|---|---|---|
| Kaine | | Wen | 3143 | 50 | GC |

| HOME ADDRESS: | CITY: | STATE: | ZIP: |
|---|---|---|---|
| | Azusa | CA | |

| HOME PHONE: | EMAIL: | DRIVERS LICENSE NUMBER AND EXP DATE: | DATE OF BIRTH: |
|---|---|---|---|
| | | 11/15/17 | 77 |

## MERCHANT ACCOUNT APPLICATION AND AGREEMENT V1.2

HAVE MERCHANT OR OWNERS / PRINCIPALS EVER FILED:
☐ BUSINESS BANKRUPTCY ☐ PERSONAL BANKRUPTCY ☒ NEVER FILED (If yes, please explain):

HAVE MERCHANT OR OWNERS / PRINCIPALS EVER BEEN TERMINATED FROM ACCEPTING BANKCARDS FOR THIS BUSINESS OR ANY OTHER BUSINESSES?
☐ NO ☒ YES (If yes, please explain):

Banks no longer wanted to process for doc prep companies

WHICH PAYMENTS WOULD YOU LIKE TO ACCEPT? (CHECK ALL THAT APPLY.)
☒ VISA, MASTERCARD, DISCOVER, AMERICAN EXPRESS OPTBLUE® ☒ PIN DEBIT ☐ EBT - EBT FNS NUMBER:

NOTES:

### SALES METHOD (MUST EQUAL 100%)

| RETAIL SWIPED ____% | MAIL/PHONE 100 % | INTERNET ____% |
|---|---|---|

### BANK ACCOUNT INFORMATION (ATTACH VOIDED CHECK FOR BANK ACCOUNT WHERE FUNDS ARE TO BE DEPOSITED)

ROUTING NUMBER: 322271627

ACCOUNT NUMBER: [redacted]1522

### MERCHANT QUESTIONNAIRE (PLEASE PROVIDE ALL APPLICABLE INFORMATION)

**A. FOR ALL MERCHANTS**

i. PLEASE DESCRIBE YOUR REFUND/RETURN POLICY

Full refund (no questions asked) if the client does not get approved for the program, or if we make a material mistake in the application.

ii. PLEASE LIST EQUIPMENT AND/OR SOFTWARE USED TO PROCESS CARDS (POINT-OF-SALE, TERMINAL, PAYMENT GATEWAY, ETC.)

DebtPayPro (CRM software), NMI gateway, Authorize.net gateway

**B. FOR CARD-NOT PRESENT MERCHANTS (E-COMMERCE & MOTO)**

i. INVENTORY MAINTAINED:
☒ ON-SITE ☐ OFF-SITE (I.E. WAREHOUSE). IF SO, PROVIDE ADDRESS
☐ 3RD PARTY FULFILLMENT CENTER. IF SO, PROVIDE FULLY EXECUTED FULFILLMENT AGREEMENT

ii. ARE THERE ANY OTHER COMPANIES INVOLVED IN SHIPPING OR FULFILLING PRODUCT/SERVICE (I.E. FULFILLMENT CENTER)?
☒ NO ☐ YES. IF SO, PROVIDE FULLY EXECUTED FULFILLMENT AGREEMENT

iii. DO YOU OFFER RECURRING AND TIME-EXTENDED SERVICES (SUBSCRIPTIONS, MEMBERSHIPS, RECURRING PLANS, ETC.)? IF YES, PLEASE DESCRIBE AND INCLUDE DURATION.

OPTIONAL montly re-certification fee (to re-apply for the program annually). Included with the fee are credit monitoring and Identity theft protection.

iv. CUSTOMER PROFILE (ESTIMATE THE PERCENTAGE OF SALES IN EACH CATEGORY – MUST ADD UP TO 100%)

| INDIVIDUAL CONSUMERS: 100 % | BUSINESSES: % | GOVERNMENT: % |
|---|---|---|

v. CUSTOMER LOCATION PROFILE (ESTIMATE THE PERCENTAGE OF EACH CARDHOLDER'S LOCATION – MUST ADD UP TO 100%)

| LOCAL: % | NATIONAL: 100 % | INTERNATIONAL: % |
|---|---|---|

vi. HOW LONG AFTER CHARGING THE CUSTOMER IS THE PRODUCT FULFILLED OR DOES THE SERVICE BEGIN?
WITHIN: ☒ 24 HOURS ☐ 2 DAYS ☐ 3-10 DAYS ☐ 11-30 DAYS ☐ 31-90 DAYS ☐ 90 + DAYS

vii. HOW LONG AFTER THE TIME OF ORDER DOES THE CARDHOLDER RECEIVE THE PRODUCT OR SERVICE?
WITHIN: ☐ 24 HOURS ☐ 2-5 DAYS ☐ 6-10 DAYS ☒ 11+ DAYS

viii. IS THE CARDHOLDER CHARGED AT TIME OF ORDER OR UPON SHIPMENT?
☒ YES ☐ NO

At client's discretion.

xi. DO YOU HAVE A RETAIL LOCATION (FOR MOTO/INTERNET MERCHANTS)? IF YES, PLEASE CONFIRM PHYSICAL ADDRESS:

No.

x. HOW DO YOU ADVERTISE (INTERNET, MAGAZINES, TV, ETC.)? LIST ALL THAT APPLY:

Internet

xi. IS YOUR BUSINESS SEASONAL?
☐ YES ☒ NO IF YES, WHICH MONTHS?

☐ JANUARY ☐ FEBRUARY ☐ MARCH ☐ APRIL ☐ MAY ☐ JUNE
☐ JULY ☐ AUGUST ☐ SEPTEMBER ☐ OCTOBER ☐ NOVEMBER ☐ DECEMBER