# MERCHANT ACCOUNT APPLICATION AND AGREEMENT    V1.2

## FEE SCHEDULE

| Pass Through Interchange Plus | Transaction Fee | Monthly Fee | Batch Fee |
|---|---|---|---|
| 2.00 % | $0.15 | $20.00 | $0.30 |
| Qualified Rate | Authorization Fee | Maverick Portal Monthly Access Fee | Chargeback Fee |
| % | $ | $10.00 | $35.00 |
| Mid-Qual Surcharge (Qual+) | AVS (Address Verification Service) Transaction Fee | Monthly PCI Fee | Retrieval Fee |
| % | $0.10 | $8.00 | $15.00 |
| Non-Qual Surcharge (Qual+) | Voice Authorization/IVR Fee | Monthly Minimum Fee | Other |
| % | $0.95 | $35.00 | $ |
| PIN Debit Rate | PIN Debit Authorization Fee | Application Fee | Other |
| % | $0.15 | $0.00 | $ |
| EBT Rate | EBT Authorization Fee | Annual Fee | Other |
| % | $ | $99.00 | $ |
| Special Pricing or Exception Notes: | | | |

The Qualified Rate & Pass Thru Interchange Plus programs include all Visa, MasterCard, Discover, and American Express Optblue cards, unless otherwise noted. A 0.20% fee will apply to all American Express transactions for merchants In the American Express Optblue Program. To pass through MasterCard's annual Acquirer License Fee, assessments for MasterCard transactions will be charged the current Acquirer License Fee. All other Card Brand & network fees are passed through at the rates established by the Card Brands. Chargeback reversal fee is $10 per occurrence. ACH Reject Fee is $35 per occurrence. Annual IRS Reporting Fee is $1.95 annually and charged the first month. PCI non-compliance is $25 per month. Arbitration Fee is $25 per occurrence.

## MERCHANT ACCEPTANCE AND AGREEMENT

By executing this Merchant Application on behalf of the merchant described above (the "Merchant"), the undersigned individual(s): (i) represent(s) and warrant(s) that all information contained in this Merchant Application is true, correct and complete as of the date of this Merchant Application, and that such individual(s) have the requisite corporate power and authority to complete and submit this Merchant Application and make and provide the acknowledgements, authorizations and agreements set forth below, both on behalf of the Merchant and individually; (ii) acknowledge(s) that the information contained in this Merchant Application is provided for the purpose of obtaining, or maintaining a merchant account with Bank and ISO on behalf of the Merchant; (iii) authorize Bank and ISO to investigate the credit of the Merchant and each person listed on this Merchant Application; (iv) agree, on behalf of the Merchant and in the event this Merchant Application is accepted and executed by Bank and ISO, to the Fee Schedule set forth above and to the Terms and Conditions included with and incorporated into this Merchant Agreement. Merchant understands that this Agreement shall not take effect until Merchant has been approved by Bank and ISO, and a merchant number is issued.

Merchant: (Legal Name of Business)

Consumer Advocacy Center Inc.

Principal 1: (Signature of Principal/Owner)     Title: President

Principal 2: (Signature of Principal/Owner)     Title: General Counsel

Esquire Bank: (Signature)     Name and Title:

Maverick BankCard, Inc.: (Signature)     Name and Title:

## PERSONAL GUARANTEE

In consideration of Bank's and ISO's acceptance of this Agreement, the undersigned Principal ("Guarantor") (jointly and severally if more than one) unconditionally guarantees the performance of all obligations of Merchant to Bank and ISO under the Agreement, and payment of all sums due there under, and in the event of default, hereby waives notice of default and agrees to indemnify Bank and ISO for all funds due from Merchant pursuant to the terms of the Agreement. Guarantor waives any and all rights of subrogation, reimbursement or indemnity derived from Merchant, and further waives any and all rights or defenses arising by reason of any modification or change in the terms of the Agreement whatsoever, including, without limitation, the renewal, extension, acceleration, or other change in the time any payment or other performance there under is due, and / or any change in any interest or discount rate or fee there under. Guarantor confirms that Guarantor, collectively or individually, is a party to the Agreement, and unconditionally and specifically authorizes Bank and ISO or their authorized agents, to debit any overdue fees, costs, chargebacks, fines, fees, penalties, expenses or obligations under the Agreement and / or any contractual relationship with Bank and ISO from any personal checking account or other account owned or controlled by Guarantor, and further to report any default hereunder on Guarantor's personal Credit Bureau Report. Guarantor agrees to pay all costs and expenses of whatever nature, including attorneys' fees and other legal expenses, incurred by or on behalf of Bank in connection with the enforcement of this Guaranty.

Guarantor 1:     Date: 10/16/2017

Guarantor 2:     Date: 10/16/2017

Maverick CID response

Pl. Ex. 27
p. 421
R-011726-00000540

## MERCHANT ACCOUNT APPLICATION AND AGREEMENT

### BANK DISCLOSURE: Member Bank Information

Esquire Bank  |  320 Old Country Road  |  Garden City, NY 11503

**Important Bank Responsibilities**

1. Esquire Bank is the only entity approved to extend acceptance of VISA products directly to a Merchant.
2. Esquire Bank must be a principal (signor) to the Merchant Agreement.
3. Esquire Bank is responsible for educating Merchants on pertinent VISA Operating Regulations with which Merchants must comply.
4. Esquire Bank is responsible for and must provide settlement funds to the Merchant.
5. Esquire Bank is responsible for all funds held in reserve that are derived from settlement.

**Important Merchant Responsibilities**

1. Ensure compliance with cardholder data security and storage requirements.
2. Maintain fraud and chargebacks below thresholds.
3. Review and understand the terms of the Merchant Agreement.
4. Comply with VISA Operating Regulations.

The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands some important obligations of each party and that the VISA Member – Esquire Bank - is the ultimate authority should the Merchant have any problems.

| Principal 1 Signature | Date | Principal 1 Printed Name & Title | | |
|---|---|---|---|---|
| | 10/16/2017 | Albert | Kim | President |
| Principal 2 Signature | Date | Principal 2 Printed Name & Title | | |
| | 10/16/2017 | Kaine | Wen | General Counsel |

## MERCHANT AGREEMENT                                                V1.2

In consideration of the mutual promises and covenants contained in this Merchant Agreement ("Agreement"), and the agreement of Merchant to participate in the card processing services program established by Bank, the parties agree as follows:

**1. Parties.**
The parties to this Agreement are ESQUIRE BANK, a federally chartered bankwhose address is 320 Old Country Road, Garden City, New York 11503 ("Bank"), Maverick BankCard, Inc., a California corporation, whose address is 28720 Roadside Drive Suite 101, Agoura Hills CA 91301 ("ISO"), and the Merchant set forth on the Merchant Application form to which this Agreement is attached ("Merchant").

**2. Definitions.**
For the purposes of this Agreement and the Schedules referred to herein, the following definitions apply unless the context otherwise requires:

"Address Verification" means a service that allows Merchant to verify the home address of Cardholders with the relevant Issuer.

"Applicable Law" means: (i) all applicable federal, state and local laws, rules and regulations; and (ii) the Rules.

"Association(s)" means VISA U.S.A., Inc. ("Visa"), MasterCard International Incorporated ("MasterCard") and Discover Financial Services LLC ("Discover").

"Authorization" means an affirmative response, by or on behalf of an Issuer to a request to effect a Transaction, that a Transaction is within the relevant Cardholder's available credit limit and that the Cardholder has not reported the Card lost or stolen. All Transactions requiring Authorization by the Associations must be authorized.

"Authorization Center" means the facility or facilities designated from time to time by Bank or ISO to which Merchant shall submit all requests for Authorization.

"Business Day" means any day other than: (i) a Saturday or Sunday; or (ii) a day on which banking institutions in New York are authorized by law or executive order to be closed (and on which Bank is in fact closed).

"Card(s)" means either a Visa, MasterCard or Discover credit card, debit card (or other similar card that requires a PIN for identification purposes), or pre-paid, stored-value or gift card.

"Cardholder" means a person authorized to use a Card.

"Chargeback" means a Transaction that Bank returns to Merchant pursuant to this Agreement.

"Forced Sale" means a sales Transaction processed without an approved electronic Authorization number being obtained for the full amount of the sales Transaction at the time the Transaction is processed.

"Full Recourse Transactions" means mail orders, telephone orders, e-commerce (Internet) orders, Pre-Authorized Recurring Order Transactions, and other "card not present" sales.

"Issuer" means a member of an Association that enters into a contractual relationship with a Cardholder for the issuance of one or more Cards.

"Merchant Statement" means an itemized monthly statement of all charges and credits to the Operating Account (as that term is defined in Section 5 of this Agreement).

"Monthly Chargeback Violation," for any given calendar month, means that more than five Chargebacks have been processed in that month and that the Transaction Chargeback Ratio for that month is equal to or greater than 1%.

"Mid-Qualified Transactions" means any Transaction categorized as such by the processor designated by Bank to settle Transactions with the Associations

"Non-Qualified Transactions" means: (i) any Transaction submitted for processing more than 48 hours past the time the Authorization occurred; (ii) any Transaction missing required data; and (iii) any Transaction categorized as such by the processor designated by Bank to settle Transactions with the Associations.

"Normal Transaction" means a Transaction in which the Card is swiped through a terminal, register or other device, capturing the Card information encoded on the Card's magnetic strip.

"Pre-Authorized Recurring Order Transaction" means a Transaction that has been pre-authorized by the Cardholder and for which the goods or services are to be delivered or performed in the future by Merchant without having to obtain approval from the Cardholder each time.

"Qualified Transactions" means any Transaction categorized as such by the processor designated by Bank to settle Transactions with the Associations.

"Rules" means all rules, regulations, by-laws, standards and procedures adopted and/or amended from time to time by the Associations (including, without limitation, the Payment Card Industry Data Security Standard), Bank and each relevant Issuer. "Rules" shall be deemed to include the MOG, as defined in Section 46(o).

"Services" means the transaction processing services described on the attached Schedule A, as the same may be amended from time to time by Bank, in its sole discretion.

"Transaction" means the acceptance of a Card or information embossed on the Card for payment for goods sold and/or leased or services provided to Cardholders by Merchant and receipt of payment from Bank, whether the Transaction is approved, declined, or processed as a Forced Sale. The term "Transaction" also includes credits, errors, returns and adjustments.

**3. Services Provided to Merchant.**
During the term of this Agreement, subject to the terms and conditions of this Agreement: (i) ISO shall provide technical documentation as needed, and technical support and customer support (including, without limitation, Authorization, settlement and Chargeback processing and reporting), twenty-four hours each day, seven days each week, in order to allow Merchant to accept and process Transactions; and (ii) Bank shall provide the Services to Merchant.

**4. Term.**
This Agreement shall become effective when all parties sign the MerchantApplication form to which this Agreement is attached (or in connection with which this Agreement is provided) and, unless sooner terminated, shall remain in effect for a term of three (3) years. This Agreement shall renew automatically for successive terms of three (3) years each, unless any party provides written notice of termination to the other parties at least 90 days prior to the end of the then-current term. All existing obligations, warranties, indemnities and agreements with respect to Transactions entered into before such termination shall remain in full force and effect, and, regardless of any such termination, Merchant shall remain liable for all obligations to Cardholders and Bank that are incurred while this Agreement is in effect. In the event this agreement is terminated early, Merchant hereby authorizes Bank or ISO to charge an Early Termination Fee and deduct the greater of (a) $295 and (b) average overall monthly fees multiplied by remaining months in agreement (provided in no event shall either such amount exceed the maximum amount permitted by applicable state law).

**5. Merchant Operating Account.**
Prior to accepting any Cards, Merchant shall establish a demand deposit account at Bank, or at a financial institution approved by Bank (the "Operating Account"), through which fees, charges and credits due to Merchant in accordance with this Agreement may be processed. Merchant authorizes Bank to debit all amounts Merchant owes Bank hereunder or any other agreement entered into between Merchant and Bank from the Operating Account, whether maintained at Bank or another financial institution, at times deemed appropriate by Bank, through the ACH Banking Network or by a manual debit of the Operating Account. Merchant waives any and all claims for loss or damage arising out of any such charges or debits to the Operating Account.

**6. Reserve Account.**
Upon, or at any time after, execution of this Agreement, Bank mayestablish a reserve account at Bank (the "Reserve Account") in such amount as Bank from time to time may determine in its sole discretion. Bank may fund the Reserve Account by deducting amounts from payments due to Merchant, by effecting a charge against Merchant's Operating Account or against any of Merchant's accounts at Bank, or by demanding payment from Merchant (which payment Merchant shall make within ten (10) days after receipt of any such demand). The Reserve Account will be maintained for a minimum of nine months after the date on which this Agreement terminates or until such time as Bank determines that the release of the funds to Merchant is prudent, in the best interest of Bank, and commercially reasonable, and that Merchant's account with Bank under this Agreement and any other agreement entered into between Merchant and Bank is fully resolved. Merchant and ISO acknowledge and agree that only Bank, and not ISO, may authorize or effect any release of funds from the Reserve Account. Bank may withdraw funds from the Reserve Account at any time to offset any indebtedness of Merchant to Bank that may arise out of or relate to the obligations of Merchant under this agreement (including, but not limited to, Chargebacks and fees) or to offset any other indebtedness of Merchant to Bank under any other agreement entered into between Merchant and Bank.Upon expiration of this nine-month period, any balance remaining in the Reserve Account will be paid to Merchant. Bank will inform Merchant in writing of any charges debited to the Reserve Account during this nine-month period. Notwithstanding the foregoing, Bank, in its sole discretion, may release funds from the Reserve Account prior to the expiration of such nine-month period based on its assessment of the risks associated with effecting such release. Bank may deposit into the Reserve Account funds it would otherwise be obligated to pay Merchant, if it determines such action is reasonably necessary to protect its interest.

**7. Fees.**
Merchant shall pay to Bank or ISO all fees specified on Schedule A, as amended by Bank or ISO from time to time. For each Transaction, Bank or ISO will charge Merchant as follows:

(a) An amount ("Merchant Discount Fees") equal to a specified percentage of the total cash price of each sales and cash withdrawal Transaction ("Merchant Discount Rate");

(b) A specified amount per Transaction ("Transaction Fee"); and

(c) A specified amount per Authorization ("Authorization Fee").

The Merchant Discount Rate, Authorization Fees and Transaction Fees are set forth on Schedule A. Different Merchant Discount Rates apply to Qualified, Mid-Qualified and Non-Qualified Transactions, as shown on Schedule A. Merchant agrees that Bank will, and authorizes Bank to, deduct Merchant Discount Fees from the Operating Account or Reserve Account on a daily basis unless a monthly basis is specified on Schedule A. Merchant also agrees to pay to Bank or ISO the amount of any fees, charges or penalties assessed against Bank or ISO by any Association or Issuer for Merchant's violation of any Applicable Law. Merchant shall pay Bank or ISO for any other services provided to Merchant by Bank or ISO and for all other fees shown on Schedule A, including, but not limited to, monthly minimum fees, Chargeback fees and customer service fees.

### 8. Billing.

All amounts Merchant owes to Bank, for any reason, may be charged to the Operating Account or Reserve Account, recouped by adjustment to any credits due to Merchant, or set off against any account or property Bank holds for or on behalf of Merchant.

### 9. Security Interest.

As security for the performance by Merchant of all of its obligations under this Agreement, Merchant hereby grants to Bank a security interest in: (i) the funds held in the Operating Account and in the Reserve Account; and (ii) any inventory with respect to which a Transaction has occurred but has not yet been fulfilled. Merchant will execute and deliver to Bank such documents, in form satisfactory to Bank, as Bank may reasonably request in order to perfect Bank's security interest in the Operating Account, Reserve Account and such inventory, and will pay all costs and expenses associated with filing the same or this Agreement in all public filing offices, where filing is deemed by Bank to be necessary or desirable. Bank is authorized to file financing statements relating to the Operating Account, the Reserve Account and such inventory without ISO where authorized by law. Merchant appoints Bank as its attorney-in-fact to execute such documents as are necessary or desirable to accomplish perfection of any security interests. This appointment is coupled with an interest and shall be irrevocable as long as Merchant owes any amount to Bank.

### 10. Processing Transactions.

(a) Merchant shall obtain Authorizations and process Transactions using such equipment and software as may be approved from time to time by Bank and ISO, in its sole discretion (the "Equipment"). Merchant shall validate Cards and Cardholders in face-to-face transactions as required by Applicable Law.

(b) Merchant shall obtain Authorizations for Transactions in a manner required by Applicable Law and in the manner, and following the processes and procedures, determined from time to time by Bank, in its sole discretion, and communicated to Merchant by either Bank or ISO.

(c) Merchant shall not submit a Transaction to Bank (electronically or otherwise) until Merchant has performed its obligations to the Cardholder in connection with the Transaction or obtained Cardholder's consent for a Pre-Authorized Recurring Order Transaction.

(d) Merchant shall not transmit any Transaction to Bank that Merchant knows or should have known to be illegal, fraudulent or not authorized by the Cardholder.

(e) Merchant shall not process a Transaction that does not result from an act between a Cardholder and Merchant.

(f) Merchant shall not request or use any Card number for any purpose other than as payment for its goods or services.

(g) Merchant may transmit a Transaction that effects a prepayment of services or full prepayment of custom-ordered merchandise, manufactured to a Cardholder's specifications, if Merchant advises Cardholder of the immediate billing at the time of the Transaction and within time limits established by the Associations.

### 11. Prohibited Transactions. Merchant shall not do any of the following:

(a) Establish a minimum on debit cards or greater than $10.00 on credit cards or a maximum dollar Transaction amount;

(b) Obtain multiple Authorizations for amounts less than the total sale amount;

(c) Obtain Authorization for the purpose of setting aside the Cardholder's credit line for use in future sales;

(d) Extend credit for or defer the time of payment of the total cash price in any Transaction;

(e) Honor a Card except in a Transaction where a total cash price is due and payable;

(f) Make any special charge to or extract any special agreement or security from any Cardholder in connection with any Transaction;

(g) Transmit or accept payment for any Transaction that was not originated directly between Merchant and a Cardholder for the sale or lease of goods or the performance of services of the type indicated in the Merchant Application form to which this Agreement is attached;

(h) Honor or accept a Card as payment for any legal services or expenses arising out of or related to: (i) any domestic relations matter where such services or expenses are furnished to a person whose name is not embossed on a Card; or (ii) any bankruptcy, insolvency, compromise, composition or other process affecting Cardholder's creditors;

(i) Use Merchant's own Card, or one to which Merchant has access, to process a Transaction for the purpose of obtaining credit for Merchant's own benefit;

(j) Re-process any Transaction that was previously charged back to Bank and subsequently returned to Merchant, irrespective of Cardholder approval;

(k) Initiate a Transaction credit without a preceding debit at least equal to the credit;

(l) Initiate a Transaction without a balance in the Operating Account at least equal to the credit;

(m) Use the Equipment or any data received thereon for any other purpose than for determining whether or not Merchant should accept checks or Cards in connection with a current sale or lease of goods or services;

(n) Use the Equipment or any data received thereon for credit inquiry purposes or any other purpose not authorized by this Agreement;

(o) Draw or convey any inference concerning a person's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living when any Card or check is processed as non-accepted;

(p) Disclose any information obtained through the Equipment to any person except for necessary disclosures to affected Cardholders, Bank and/or the Issuer;

(q) Disburse funds in the form of travelers cheques, if the sole purpose is to allow the Cardholder to make a cash purchase of goods or services from Merchant;

(r) Disburse funds in the form of cash;

(s) Accept a Card to collect or refinance an existing debt (whether originally owed to Merchant or otherwise) that is considered uncollectible (for example, payments to a collection agency or attempts to recover funds for a dishonored check) except to the extent specifically permitted by Applicable Law;

(t) Issue a Transaction credit in respect of goods or services acquired in a cash transaction which are returned;

(u) Make any cash refund to a Cardholder who has made a purchase with a credit Card (all Transaction credits shall be issued to the same credit Card account number used in the sale);

(v) Require a Cardholder to complete a postcard or similar device that includes the Cardholder's account number, Card expiration date, signature or any other Card account data in plain view when mailed;;

(w) Accept a Card for the purchase of Scrip (as defined by applicable VISA regulations), except to the extent specifically permitted by Applicable Law;

(x) Accept any payment directly from a Cardholder for previous Card charges incurred and processed by Merchant;

(y) Require, through an increase in price or otherwise, any Cardholder to pay any surcharge in connection with any Transaction or to pay any part of any charge imposed on Merchant by Bank except, in either case, as expressly permitted by, and under terms and conditions that comply in full with, Applicable Law;

(z) Provide cash to a Visa cardholder unless Merchant is either (i) participating in Visa Cash-Back Services or (ii) a hotel or cruise line;

    (aa) Cause any Cardholder to waive its right to dispute a Transaction;

    (bb) Request the Card Verification Value 2 data (as defined by Visa) on any paper order form;

    (cc) Request a Cardholder account number for any purpose that is not related to payment for goods or services;

    (dd) Add any tax to Transactions, unless applicable law expressly requires that a merchant be permitted to impose a tax, and only if such tax is included in the Transaction amount and not collected separately; or

    (ee) Process payments for a product or service that has not been disclosed and approved by Bank and ISO. This includes web processing and processing on a website that has not been approved by Bank and ISO. Merchant shall disclose to Bank and ISO all URLs through which Merchant processes transactions or otherwise accepts at the time of executing this Agreement, upon request, and before processing through any URL not previously disclosed.

### 12. Prohibition of Furnishing Account Information.

Use of Third Parties. Merchant shall not, without the Cardholder's consent, sell, purchase, provide or exchange any Card information in the form of Transaction documents, carbon copies of imprinted Transaction documents, mailing lists, tapes, journal rolls or other media obtained through the use of a Card to any third party. Merchant may use third parties that do not have a direct agreement with Bank as Merchant's agent for the direct delivery of Transactions for clearing and settlement if:

(a) Merchant advises Bank that it will use a third-party processor in this capacity, identifying the third party so selected by Merchant;

(b) Merchant agrees that Bank will reimburse Merchant only for the Visa Transactions delivered by that third-party processor to VisaNet; and

(c) Merchant assumes responsibility for any failure by its third-party processor to comply with Applicable Law.

Merchant shall notify Bank of the identity of any third party performing services to Merchant in connection with which such third party has access to any Card information.

### 13. Daily Reconciliation of Transactions.

(a) Electronically Transmitted Transactions. Bank shall control and disburse all Transaction-related settlement funds to Merchant. Transactions with respect to which Bank receives payment from or through the Associations will be settled on a daily basis, and, except as otherwise expressly provided or permitted pursuant to the terms of this Agreement, Bank shall deliver payment to Merchant in connection with such Transactions by effecting a credit to the Operating Account equal to the reconciled and paid summary Transaction total of all of Merchant's total paid summary Transactions since the previous credit. Notwithstanding the foregoing, Bank may, in its sole discretion, effect a credit to the Operating Account in connection with any Transaction prior to the point in time Bank receives payment in connection therewith from or through the Associations. In either case, Bank may, if necessary or appropriate, reduce any credit made to the Operating Account by, and/or Bank may require that Merchant pay to Bank an amount equal to: (i) the sum of all Cardholder charges denied, refused or charged back; (ii) all refunds processed on account of Cardholders during said time period; (iii) the amounts, fees and charges, including (but not limited to) Chargebacks, Merchant owes Bank hereunder or under any other agreement entered into between Bank and Merchant; (iv)

all taxes, penalties, charges, fees and other items incurred by Bank that are reimbursable pursuant to this Agreement; (v) all applicable rates, fees and charges described on Schedule A; (vi) any amount Bank previously credited to the Operating Account that Bank determines, in good faith, was incorrectly so credited; and (vii) any amount Bank determines, in its sole discretion, represents unacceptable risk to the relevant Cardholder or Bank. Any application of funds associated with the settlement of Transactions that differs from the foregoing must be agreed to, in writing, by Bank and Merchant and may not, in any respect, violate Applicable Law.

(b) Reconciliation of Transactions. Merchant shall reconcile each settled Transaction within fifteen (15) days after the date on which such Transaction is submitted to Bank for payment, and shall notify Bank and ISO immediately of any discrepancies or errors Merchant notes as a result of such reconciliation. Neither Bank nor ISO shall have any responsibility or liability for Transaction-related errors or omissions that are brought to their attention more than thirty (30) days after the date on which the Transaction to which such error or omission relates is first presented to Bank for settlement.

(c) Provisional Credit. Any credits to the Operating Account are provisional only and subject to revocation by Bank until such time that the Transaction is final and no longer subject to Chargeback by the Issuer, Cardholder or Associations. Bank may withhold payment for a Transaction to Merchant, for any reason, until such time as the Transaction has been verified as legitimate by the relevant Issuer, or Bank receives adequate supporting documentation from Merchant to authenticate the Transaction and mitigate Chargeback risk.

**14. Adjustments and Returns.**
Merchant will maintain a fair exchange and return policy and make adjustments with respect to goods and services sold and/or leased to its customers whenever appropriate. If Merchant limits its acceptance of returned merchandise, or if Merchant is an Electronic Commerce Merchant, Merchant will ensure that its return policy is clearly set forth on the Transaction receipt or on Merchant's website, as required by Applicable Law. If goods are returned, or services are terminated or canceled, or any price is adjusted, Merchant will prepare and transmit a credit or return Transaction, either electronically or by paper, for the amount of the adjustment as a deduction from the total amount of Transactions transmitted that day. If the amount of credit or return Transactions exceeds the amount of sales Transactions, Merchant shall pay the excess to Bank. Merchant shall make no cash refunds on credit Transactions and shall handle all credit adjustments as provided in this Section 14. If no refund or return will be given, Merchant must advise Cardholder in writing, at the time of the Transaction, that the sale is a "final sale" and "no returns" are permitted. Merchant must advise Cardholder in writing of any policy of Merchant that provides for no-cash refunds and in-store credit only. Merchant shall follow Association reservation/no-show policies, and shall notify Cardholders in writing of this policy on all advance reservations. Merchant also shall notify Cardholders at the time of the reservation of the exact number of days required for reservation deposit refunds.

**15. Chargebacks.**
The acceptance by Bank of any Transaction processed in accordance with the terms of this Agreement shall be without recourse to Merchant, except for:

(i) Full Recourse Transactions; (ii) as otherwise indicated in this Agreement; and (iii) under any of the following circumstances:

(a) No specific prior Authorization for the Transaction was obtained from the Authorization Center, or approval number does not appear in the electronic transmittal that is maintained by Bank, or the Transaction was submitted to the Bank or ISO thirty (30) days or more after the date on which the goods and/or services to which the Transaction relates were purchased or leased by the relevant Cardholder;

(b) The Transaction was based on a pre-authorization form, the Card on which the Authorization was based was canceled and Merchant was so notified prior to the Transaction;

(c) The Card giving rise to the Transaction was canceled and prior to, or at the time of, the Transaction, and Merchant received notice of the cancellation through the electronic terminal, in writing or otherwise;

(d) The Card expired prior to the date of the Transaction or the date of the Transaction was prior to the validation date, if any, indicated on the Card;

(e) The Transaction information required by this Agreement was not submitted to Bank, or the procedures required by this Agreement to be followed in connection with processing a Transaction were not followed;

(f) Bank or Issuer receives a complaint from or on behalf of a Cardholder stating that there is an unresolved dispute or defense to a charge (whether or not valid) between Merchant and Cardholder;

(g) The Cardholder makes a written complaint to Bank or Issuer that the Cardholder did not make or authorize the Transaction;

(h) A setoff or counterclaim of any kind exists in favor of any Cardholder against Merchant that may be asserted in defense of an action to enforce payment against the Cardholder in the Transaction;

(i) The Transaction was made at or by a merchant other than Merchant;

(j) The Transaction otherwise violates the terms of this Agreement or any Applicable Law;

(k) A Transaction is charged back by an Issuer; or

(l) Any representation or warranty made by Merchant in connection with the Transaction is false or inaccurate in any respect.

In any such case, Bank shall not be obligated to accept a Transaction for credit to the Operating Account. If Bank has credited the Operating Account or Reserve Account for such a Transaction, Bank may return the Transaction to the Merchant, and Merchant shall pay Bank the amount of the Transaction. Merchant agrees that it is solely responsible for all Chargebacks, and that Bank, without prior notice to Merchant, may: (i) charge the amount of the Transaction to the Operating Account or Reserve Account; (ii) recoup the amount of the Transaction by adjustment of the credits due to Merchant; and/or (iii) set off the amount of the Transaction against any account or property Bank holds for or on behalf of Merchant. If Merchant disagrees with Bank's decision to charge back a Transaction, Merchant must so notify Bank in writing within 10 days of the Chargeback, and provide documentation that the dispute has been resolved to Cardholder's satisfaction or proof that a credit has been issued. Without limiting the generality of any other provision of this Agreement, if Bank or ISO, if ISO has indemnified Bank, takes legal action against Merchant for any Chargebacks or any amounts due Bank or ISO hereunder, Merchant shall pay the costs and attorneys' fees incurred by Bank and/or ISO, whether suit is commenced or not.

In addition to any other remedy available to Bank, upon the occurrence of a Monthly Chargeback Violation, Merchant must pay to Bank a fee that is calculated as follows (where X in the table below is the Transaction Chargeback Ratio for the relevant calendar month and Y is the number of Chargebacks processed during the relevant calendar month):

| Y | 1.0% ≤X≤ 1.5% | 1.5% <X≤ 2% | 2% <X≤ 2.25% | 2.25% <X≤ 2.5% | 2.5% <X≤ 3% | 3- <X≤ 3.5% | 3.5% <X≤ 5% | 5% <X≤ 7.5% | 7.5% <X |
|---|---|---|---|---|---|---|---|---|---|
| 5 - 25 | $0 | $10 | $10 | $15 | $15 | $20 | $25 | $40 | $50 |
| 26 - 50 | $10 | $10 | $15 | $15 | $20 | $20 | $25 | $40 | $50 |
| 51 - 75 | $15 | $20 | $20 | $20 | $25 | $25 | $30 | $50 | $50 |
| 76 - 100 | $15 | $20 | $20 | $25 | $25 | $30 | $35 | $50 | $50 |
| 101 - 125 | $20 | $20 | $25 | $25 | $30 | $35 | $35 | $60 | $60 |
| 126 - 150 | $20 | $25 | $25 | $30 | $35 | $35 | $40 | $75 | $75 |
| 151 - 175 | $25 | $30 | $30 | $35 | $35 | $40 | $40 | $75 | $100 |
| 175 + | $25 | $30 | $35 | $35 | $40 | $40 | $50 | $100 | $100 |

**16. Merchant Statement.**
At least once each month, Bank or ISO shall provide a statement (the "Merchant Statement") to Merchant. All information appearing on the Merchant Statement shall be deemed accurate and affirmed by Merchant unless Merchant objects by written notice specifying the particular item in dispute within 30 days of the date of the Merchant Statement.

**17. Retention of Information.**
Merchant shall retain the information required to be submitted in connection with a Transaction or to be maintained in connection with a complaint for seven years from the date of the Transaction or the complaint. At the request of Bank, Merchant shall provide such information to Bank or ISO, as directed by Bank, within five (5) days of receipt of a request from Bank. Failure to meet such time frame or non-delivery of any item or delivery of an illegible copy of an item requested by an Issuer shall, among other things, constitute a waiver by Merchant of any claims and may result in an irrevocable Chargeback for the full amount of the Transaction.

**18. Recovery of Cards.**
Merchant will use its best efforts to reasonably and peaceably recover and retain any Card with respect to which Merchant receives notification of cancellation, restrictions, theft or counterfeiting. This notice may be given: (i) electronically through the Equipment; (ii) by the Authorization Center through any means; or (iii) by listing on any canceled Card or restricted Card list. Merchant shall also take reasonable steps to recover a Card that it has reasonable grounds to believe is counterfeit, fraudulent or stolen.

**19. Customer Complaints.**
Merchant shall respond promptly to inquiries from Cardholders and shall attempt to resolve any disputes amicably. If unresolved disputes occur with a frequency unacceptable to Bank, Bank may terminate this Agreement. Bank reserves the right to charge Merchant reasonable fees and reimbursement on account of excessive Cardholder inquiries, refunds or Chargebacks. Merchant agrees to maintain the following information in writing with respect to each claim or defense asserted by a Cardholder for which Merchant has received notice:

(a) The Cardholder's name;

(b) The Card account number;

(c) The date and time the Cardholder asserted the claim or defense;

(d) The nature of the claim or defense; and

(e) The action that Merchant took in an attempt to resolve the dispute.

Upon request, Merchant shall furnish Bank with this information in writing within 10 days.

**20. Confidentiality.**
Merchant shall treat all information received in connection with this Agreement as confidential. Merchant shall prevent the disclosure of this information except for necessary disclosures to affected Cardholders, to Bank, to ISO and to Issuers.

**21. Compliance with Applicable Law.**
a. General. Merchant represents and warrants that it has obtained all necessary regulatory approvals, certificates and licenses, and that it is in compliance with all Applicable Law, in connection with the operation of its business. Merchant represents and warrants that it



Bureau of Consumer Financial Protection Civil Investigation Demand – Premier Student Loan Company 000529

Maverick CID response

Pl. Ex. 27
p. 425
R-011726-00000544

understands the importance of complying with Applicable Law in connection with any and all actions it takes in connection with Transactions (including, without limitation, complying with requirements relating to Transaction Information, storage and disclosure), and covenants at all times to comply in full with all Applicable Law. Merchant further acknowledges and agrees that it is responsible for the actions of all its employees while in Merchant's employ.

b. Data Security Rules. Without limiting the generality of the foregoing or any other provision of this Agreement, Merchant understands that it and all of its employees, agents, representatives and service providers must comply with the Rules, including without limitation, those relating to Cardholder information security issues, non-disclosure of Cardholder Information and Transaction documents, retention and storage of Cardholder

and Transaction Information and other security procedures adopted by the Associations. Merchant hereby confirms its agreement to abide by and fully comply with such Rules, including, without limitation, the Rules and procedures described below:

i. Visa Cardholder Information Security Program and MasterCard Site Data Protection Program. Visa and MasterCard have implemented programs to protect Cardholder data. The Visa Cardholder Information Security Program ("CISP") and MasterCard Site Data Protection Program ("SDP") apply to Merchant if Merchant processes or stores Cardholder data as a result of Internet or mail/telephone acceptance of Visa or MasterCard Card account information. A copy of the complete Visa Cardholder Information Security Standards manual and a Self-Assessment Worksheet can be obtained online at www.visa.com/cisp or from Bank, and a copy of the SDP provisions can be obtained from Bank. Visa and MasterCard may impose restrictions, fines, or prohibit Merchant from participating in Visa or MasterCard programs if it is determined that Merchant is non-compliant. Merchant may be required to comply with an audit to verify compliance with security procedures. The following list describes some of the current CISP and SDP program requirements, with all of which Merchant may be required to comply, if applicable to Merchant. (A) Install and maintain a working network firewall to protect data accessible via the Internet; (B) keep security patches up-to-date; (C) encrypt stored data; (D) encrypt data sent across networks; (E) use and regularly update anti-virus software; (F) restrict access to data by business "need to know"; (G) assign a unique ID to each person with computer access to data; (H) don't use vendor-supplied defaults for system passwords and other security parameters; (I) track access to data by unique ID; (J) maintain a policy that addresses information security for employees and contractors; and (K) restrict physical access to Cardholder information. Merchant must also comply with the requirements of Section 10.3 of the Visa Rules in connection with suspected or confirmed losses, thefts, compromises of information, and fraud or laundering associated with information. Please also note that this is not intended to be a complete list, and Merchant remains solely responsible for understanding and complying in full with all of the applicable CISP and SDP requirements.·

ii. Transaction Information. Merchant acknowledges that the sale or disclosure of databases containing Cardholder account numbers, personal information, or other Transaction Information to third parties is strictly prohibited by the Rules. Unless Merchant obtains consents from Bank, and each applicable Association, issuing bank and Cardholder, Merchant must not use, disclose, sell or disseminate any Cardholder Information obtained in connection with a Transaction (including without limitation, the names, addresses and Card account numbers of Cardholders, copies of imprinted sales drafts and/or credit records, mailing lists, tapes or other media obtained in connection with a sales draft and/or credit record) except for purposes of authorizing, completing and settling Transactions and resolving any Chargebacks, retrieval requests or similar issues involving Transactions, other than pursuant to a court or governmental agency request, subpoena or order. Merchant shall use proper controls for, limit access to, and render unreadable prior to discarding all records containing Cardholder account numbers and Card imprints.

Merchant may not retain or store magnetic stripe data after a Transaction has been authorized. If Merchant stores any electronically captured signature of a Cardholder, Merchant may not reproduce such signature except upon the specific request of Bank. Merchant shall store all media containing Cardholder names, Cardholder account information, and other personal information, as well as Card imprints (such as sales drafts and credit records, auto rental agreements, and carbons) in an area limited to selected personnel and, prior to discarding any such information, destroy it in a manner that renders the data unreadable. Merchant further warrants and agrees that in the event of its failure, including bankruptcy, insolvency, or other suspension of business operations, it will not sell, transfer or disclose any materials that contain Cardholder account numbers, personal information, or Transaction Information to third parties, and shall return the information to Bank and provide acceptable proof of destruction to Bank.

**22. Taxes.**
Each party hereto shall report its income and pay its own taxes to any applicable jurisdiction. If either Bank or ISO is required to pay any taxes, interests, fines or penalties owed by Merchant, said amount shall become immediately due and payable by Merchant to Bank or ISO. If excise, sale or use taxes are imposed on Transactions, Merchant shall be responsible for the collection and payment thereof. Merchant shall not add any tax to any Transaction unless Applicable Law expressly provides that Merchant is permitted to impose a tax, and any such tax amount, if so allowed, shall be included in the Transaction amount and not collected separately. Bank or ISO shall be entitled to recover from Merchant any of said taxes paid by it on behalf of Merchant immediately after payment.·

**23. Limitation of Liability.**
In addition to all other limitations on the liability of Bank and ISO contained in this Agreement, neither Bank nor ISO shall be liable to Merchant or Merchant's customers or any other person for any of the following:

(a) Any loss or liability resulting from the denial of credit to any person or Merchant's retention of any Card or any attempt to do so;

(b) Any loss caused by a Transaction downgrade resulting from defective or faulty Equipment, even if such Equipment is owned by Bank or ISO;

(c) The unavailability of Services caused by the termination of contracts with computer hardware vendors, processors or installers, whether terminated by Bank, ISO or any other person for any reason; or

(d) Interruption or termination of any Services caused by any reason except for failure of ISO to repair or replace Equipment at Merchant's expense (in which case, any resulting liability shall be for the sole account of ISO). At no time will ISO's liability exceed the amount of fees collected or reasonably expected to be collected from Merchant for this delay period.

NEITHER BANK NOR ISO SHALL BE LIABLE FOR ANY LOST PROFITS, PUNITIVE, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES TO MERCHANT OR TO ANY THIRD PARTY IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE SERVICES TO BE PERFORMED BY BANK OR ISO PURSUANT TO THIS AGREEMENT. MERCHANT ACKNOWLEDGES THAT BANK HAS PROVIDED NO WARRANTIES, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO ANY EQUIPMENT AND THAT BANK HAS NO LIABILITY WITH RESPECT TO ANY EQUIPMENT. BANK MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE SERVICES IT PROVIDES HEREUNDER. IF THERE ARE ERRORS, OMISSIONS, INTERRUPTIONS OR DELAYS RESULTING FROM BANK'S OR ISO'S PERFORMANCE OR ANY FAILURE TO PERFORM, BANK'S AND ISO'S LIABILITY SHALL BE LIMITED TO CORRECTING SUCH ERRORS, IF COMMERCIALLY REASONABLE.

**24. Limitation on Damages.**
In no case shall Merchant be entitled to recover damages from ISO or Bank that exceed the fees retained by Bank and ISO pursuant to this Agreement during the six month period immediately prior to the event giving rise to the claim for damages.

**25. Indemnification.**
Merchant agrees to indemnify and hold Bank and ISO harmless from any and all losses, claims, damages, liabilities and expenses, including attorneys' fees and costs (whether or not an attorney is an employee of Bank or Bank's affiliates, ISO or affiliates of ISO) arising out of any of the following:

(a) Merchant's failure to comply with this Agreement;

(b) Any act or omission of Merchant;

(c) Merchant's failure to comply with any Equipment's user's guide;

(d) Merchant's failure to comply with any Applicable Law;

(e) Any dispute concerning the quality, condition or delivery of any merchandise or the quality of performance of any service;

(f) The fraud or dishonesty of Merchant or Merchant's employees, licensees, successors, agents and/or assigns;

(g) Merchant's selection of an Internet service provider or other telecommunication services provider;

(h) The theft of or damage or destruction to any Equipment; or

(i) Full Recourse Transactions, unauthorized Transactions and prohibited Transactions.

**26. Credit Investigation and Bank Auditing.**
Bank may audit, from time to time, Merchant's compliance with the terms of this Agreement. Merchant shall provide all information requested by Bank to complete Bank's audit. Merchant authorizes parties contacted by Bank to release the credit information requested by Bank, and Merchant agrees to provide a separate authorization for release of credit information, if requested by Bank. Merchant shall deliver to Bank such information as Bank may reasonably request from time to time, including without limitation, financial statements and information pertaining to Merchant's financial condition. Such information shall be true, complete and accurate. Without limiting the generality of the foregoing, Merchant shall provide to Bank and ISO its balance sheet and income statements not less frequently than every three calendar months during the term of this Agreement.

**27. Termination of Agreement by Bank and ISO.**
Bank or ISO may terminate this Agreement upon at least 30 days' prior written notice to the other parties. In addition, Bank may terminate this Agreement immediately upon written notice to Merchant upon the occurrence of any of the following (each, an "Event of Default"):

(a) Any information concerning Merchant obtained by Bank is unsatisfactory to Bank, in Bank's sole discretion.

(b) Any act of fraud or dishonesty is committed by Merchant, its employees or agents, or Bank or ISO believes in good faith that Merchant, its employees or agents have committed, are committing or are planning to commit any acts of fraud or misrepresentation.

(c) Chargebacks are excessive, in the opinion of Bank or ISO.

(d) There is a breach of any representation or warranty made by Merchant to Bank or ISO, or Merchant defaults in the performance of any of its obligations under this Agreement.

(e) Merchant files a petition under any bankruptcy or insolvency law.

(f) Bank or ISO determines that the continuation of this Agreement may create harm or the loss of goodwill to Bank or any Association.

(g) Merchant fails to maintain sufficient funds in the Operating Account to cover the amounts due to Bank or ISO hereunder.

(h) Merchant's percentage of error Transactions or retrieval requests is excessive in the opinion of Bank or ISO.

(i) Any insurance policy obtained by Bank, ISO or Merchant relating to Transactions and/or Chargebacks is cancelled or terminated for any reason.

(j) Merchant fails to provide financial statements suitable to Bank on request.

(k) ISO does not or cannot perform its duties under this Agreement and Bank determines that it is not feasible to provide the Services contemplated by this Agreement to Merchant. Bank is not obligated to provide replacement Services if ISO does not or cannot perform.

(l) Any Association requests or demands that this Agreement be terminated.

Bank or ISO may selectively terminate one or more of Merchant's approved locations without terminating this entire Agreement.

In the event of termination, all obligations of Merchant incurred or existing under this Agreement prior to termination shall survive the termination. Merchant's obligations with respect to any Transaction shall be deemed incurred and existing on the date of such Transaction.

In the event Bank terminates this Agreement following any Event of Default, Merchant: (i) agrees that Bank may place Merchant on each Association's "Terminated Merchant File" (or any other list or file serving a similar purpose); and (ii) agrees to indemnify and hold Bank and ISO harmless from and against any and all costs, expenses and liabilities incurred by Bank and/or ISO in connection with or arising out of such Event of Default.

### 28. Termination of Agreement by Merchant.
Merchant may terminate this Agreement upon at least 30 days' prior written notice to the other parties if Bank amends Schedule A pursuant to Section 31 to increase the rates, fees or charges Merchant pays hereunder, except for fees or rates that result from a pass through from an Association.

### 29. Setoff.
In addition to any other legal or equitable remedy available to it in accordance with this Agreement or by law, Bank and ISO may set off any amounts due to it against any property of Merchant in its possession or under its control.

### 30. Web Processing.
Merchant shall disclose to Bank and ISO all URLs for which merchant processes transactions or otherwise accepts payments at the time of executing this agreement, upon agreement, upon request, and before processing through any URL not previously disclosed. If Merchant processes through an unapproved URL or URLs, it may result in termination and/or funds being held with or without notice to merchant.

### 31. Amendments to this Agreement.
From time to time Bank may amend this Agreement as follows:

(a) Bank may amend or delete Cards or Services listed in Schedule A by notifying Merchant in writing of any such amendment. All provisions of this Agreement shall apply to Cards or Services added to this Agreement. Bank shall notify Merchant of the fees to be charged for processing the additional Cards and Services. Acceptance by Merchant of a new approved Card as payment for a Transaction or use of a new Service after Bank has sent Merchant notice of an amendment shall constitute Merchant's agreement to the amendment and the fees or charges related to these additions..

(b) From time to time, Bank may change all rates, fees and charges set forth on Schedule A. Bank will provide written notice to Merchant of all such amendments. Bank may change the rates, fees and charges without prior written notice if Merchant's sales volume or average Transaction amount does not meet Merchant's projections contained in the Merchant Application form to which this Agreement is attached or if the risk factors associated with processing Transactions increase. If notice is required, Bank will give written notice on the Merchant Statement. All new rates, fees and charges will become effective for the month immediately following the month in which the notice appeared on the Merchant Statement unless Merchant terminates this Agreement in accordance with Section 28.

(c) Bank may amend this Agreement in any manner other than as described in Section 31(a) or 31(b) above simply by providing written notice of such amendment to Merchant, and such amendment shall become effective on the latter of: (i) the date on which such written notice is received by Merchant; or (ii) a date specified by Bank in such written notice.

### 32. Assignment.
This Agreement may not be assigned by Merchant without the prior written consent of Bank. Bank may assign this Agreement without limitation. Assignment of this Agreement by Bank shall relieve Bank of any further obligations under this Agreement.

### 33. Financial Accommodations.
Bank, ISO and Merchant intend this Agreement to be construed as a contract to extend financial accommodations for the benefit of Merchant.

### 34. Waiver.
To the extent that Merchant becomes a debtor under any chapter of title 11 of the United States Code and such event does not result in the termination of this Agreement, Merchant hereby unconditionally and absolutely waives any right or ability that Merchant may otherwise have had to oppose, defend against or otherwise challenge any motion filed by Bank for relief from the automatic stay of 11 U.S.C. § 362(a) to enforce any of Bank's rights or claims under this Agreement.

### 35. Cooperation.
In their dealings with one another, each party agrees to act reasonably and in good faith and to fully cooperate with each other in order to facilitate and accomplish the transactions contemplated hereby.

### 36. Entire Agreement.
This Agreement, together with the Schedules attached hereto, supersedes any other agreement, whether written or oral, that may have been made or entered into by any party (or by any officer or officers of any party) relating to the matters covered herein and constitutes the entire agreement of the parties hereto.

### 37. Severability.
If any provisions of this Agreement shall be held, or deemed to be, or shall in fact be, inoperative or unenforceable as applied in any particular situation, such circumstance shall not have the effect of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatsoever. The invalidity of any one or more phrases, sentences, clauses or sections herein contained shall not affect the remaining portions of this Agreement or any part hereof.

### 38. Notices.
Except for notices provided by Bank to Merchant on the Merchant Statement, all notices, requests, demands or other instruments which may or are required to be given by any party hereunder shall be in writing and each shall be deemed to have been properly given when: (i) served personally on an officer of the party to whom such notice is to be given, (ii) upon expiration of a period of three (3) business days from and after the date of mailing thereof when mailed postage prepaid by registered or certified mail, requesting return receipt, or (iii) upon delivery by a nationally recognized overnight delivery service, addressed as follows:

If to BANK: Esquire Bank

320 Old Country Road, Garden City, New York 11503

If to ISO: Attn: President

Maverick BankCard, Inc.

28720 Roadside Drive Suite 101, Agoura Hills, CA 91301

If to MERCHANT:

Address listed on the application to which this Agreement is attached.

Any party may change the address to which subsequent notices are to be sent by notice to the others given as aforesaid.

### 39. Governing Law.
This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to internal principles of conflict of laws, and federal law.

### 40. Captions.
Captions in this Agreement are for convenience of reference only and are not to be considered as defining or limiting in any way the scope or intent of the provisions of this Agreement.

### 41. No Waiver.
Any delay, waiver or omission by Bank to exercise any right or power arising from any breach or default of the other party in any of the terms, provisions or covenants of this Agreement shall not be construed to be a waiver of any subsequent breach or default of the same or any other terms, provisions or covenants on the part of the other party. All remedies afforded by this Agreement for a breach hereof shall be cumulative.

### 42. Force Majeure.
The parties shall be excused from performing any of their respective obligations under this Agreement which are prevented or delayed by any occurrence not within their respective control including but not limited to strikes or other labor matters, destruction of or damage to any building, natural disasters, accidents, riots or any regulation, rule, law, ordinance or order of any federal, state or local government authority.

### 43. Cooperation.
Merchant covenants and agrees that, if it is undergoing forensic investigation at the time this Agreement is signed, Merchant will fully cooperate with the investigation until it is completed.

### 44. Limited Acceptance.
Visa Rules allow Merchant to become a Limited Acceptance Merchant as part of its use of Bank's Services. A "Limited Acceptance Merchant," as defined by Visa, is a merchant that accepts either, but not both, of the following:

☒ Visa Credit and Business Category Cards

☒ Visa Debit Category Cards

Merchant has elected to become a Limited Acceptance Merchant by choosing to accept ONLY (please mark the applicable card category below):

☒ Visa Credit and Business Category Cards

☒ Visa Debit Category Cards

Merchant's failure to select one of the Limited Acceptance Categories above means that Merchant has elected to accept BOTH Visa Credit and Business Category Cards and Visa Debit Category Cards.

If Merchant elects to be a Limited Acceptance Merchant, Merchant must properly display the Visa-approved signage that represents the Limited Acceptance Category that Merchant has selected above.


Bureau of Consumer Financial Protection Civil Investigative Demand – Premier Student Loan Company 000531
Maverick CID response

Pl. Ex. 27
p. 427
R-011726-00000346

**45. Special Merchant Categories.**

(a) If Merchant is a Health Care Merchant (as defined by the Visa Core Rules and Visa Product and Service Rules (the "Visa Core Rules")), Merchant acknowledges that it must comply with the provisions of Section 5.9.12 of the Visa Core Rules.

(b) If Merchant is a T&E Merchant (as defined by the Visa Core Rules), Merchant acknowledges that it must comply with all of the provisions of the Visa Core Rules relating to T&E Merchants, including Sections 5.9.6, 5.10.4.1, 7.3.12, and 11.1.3.2. Merchant further agrees that, if it is an International Airline Program Merchant (as defined by the Visa Core Rules), the terms of the attached International Airline Program Merchant Addendum apply.

(c) If Merchant receives BIN Information, Merchant agrees that the terms of the attached Merchant Receiving BIN Information Addendum apply.

(d) If Merchant is an Electronic Commerce Merchant (as defined by the Visa Core Rules and Visa Product and Service Rules (2014)—the "VCR"), the following terms apply (references following each requirement indicate whether the requirement is located in the VCR or the Visa Acquirer Risk Program Standards Guide (2010) (VPSG); capitalized terms that are not otherwise defined in this Agreement are used as defined in the VCR):

i. Merchant must display its consumer data privacy policy on its website. (VPSG)

ii. Merchant must display the security method it uses for the transmission of payment data on its website. (VPSG)

iii. Merchant must offer Cardholders a secure transaction method and a data protection method, such as Secure Sockets Layer (SSL), 3-D Secure and/or Verified by Visa. (VPSG; VCR Section 1.5.6.2)

iv. For Non-Secure Transactions and Non-Authenticated Security Transactions, Merchant must attempt to obtain a Visa Card expiration date and submit it as part of the Authorization Request. (VCR Section 5.8.4.1)

v. Merchant's website must contain all of the following:

(A) Customer service contact, including email address or telephone number.

(B) The address, including the country, of Merchant's permanent establishment, either:

(1) On the same screen view as the checkout screen used to present the final Transaction amount; or

(2) Within the sequence of web pages the Cardholder accesses during the checkout process.

(C) Policy for delivery of multiple shipments.

(D) Security capabilities and policy for transmission of payment card details.

(E) In addition, on an Online Gambling Merchant's homepage or payment page, all of the following:

(1) The statement "Internet gambling may be illegal in the jurisdiction in which you are located; if so, you are not authorized to use your payment card to complete this transaction";

(2) A statement of the Cardholder's responsibility to know the laws concerning online gambling in the Cardholder's country;

(3) A statement prohibiting the participation of minors;

(4) A complete description of the rules of play, cancellation policies, and pay-out policies;

(5) A statement recommending that the Cardholder retain a copy of Transaction records and Merchant policies and rules; and

(6) An Acquirer numeric identifier specified by Visa.

(VCR Section 5.9.3.1)

vi. Merchant must not display the full Account Number to the Cardholder online. (VCR Section 5.9.3.2)

vii. If Merchant is a Verified by Visa Merchant, Merchant acknowledges that its Electronic Commerce Transactions are not eligible for Chargeback protection from Chargeback reason codes 75 (Transaction Not Recognized) and 83 (Fraud-Card-Absent Environment) if either:

(A) The Merchant is classified with one of the following MCCs:

(1) MCC 4829 (Wire Transfer Money Orders);

(2) MCC 5967 (Direct Marketing – Inbound Teleservices Merchant);

(3) MCC 6051 (Non-Financial Institutions – Foreign Currency, Money Orders (not Wire Transfer), Travelers' Cheques); or

(4) MCC 7995 (Betting, including Lottery Tickets, Casino Gaming Chips, Off-Track Betting, and Wagers at Race Tracks); or

(B) Merchant has been identified in the Merchant Chargeback Monitoring Program or Risk Identification Service Online. Merchant remains ineligible while it is in either program, and for an additional 4 months after exiting the program. This condition also applies if Merchant enabled Verified by Visa while identified in either program. (VCR Section 5.9.3.5)

viii. Merchant must include the following in its transaction receipts:

(A) Customer service contact;

(B) Merchant country; and

(C) Conditions of sale, including return and cancellation policy.

(VCR Section 5.10.3.3)

ix. In an Authorization Request, Merchant must not transmit Authentication Data specific to one Transaction with another Transaction, except when either:

(A) 2 Transactions are related due to delayed delivery; or

(B) All items of an order cannot be shipped at the same time.

(VCR Section 10.15.3.2)

(e) If Merchant limits its acceptance of returned merchandise or is an Electronic Commerce Merchant, Merchant must ensure that its return policies are clearly indicated to a Cardholder on the Transaction Receipt or on Merchant's website, as follows (VCR Section 5.4.2.4):

| Location | Required Disclosure | To be used for the following Merchant Policies |
|---|---|---|
| Transaction Receipt (all copies, near the Cardholder signature area or in an area easily seen by the Cardholder) | "No Refund" "No Exchanges" "All Sales Final" | Merchant does not:<br>• Accept merchandise as a return or exchange<br>• Issue a refund to a Cardholder |
| | "Exchange Only" | Merchant accepts merchandise in exchange for merchandise of equal value to the original Transaction amount |
| | "In-Store Credit Only" | Merchant accepts merchandise in exchange for an in-store credit document that both:<br>• Equals the value of the returned merchandise<br>• Must be used at the Merchant location |
| Website (on checkout screen or in sequence of web pages before final checkout) | "Click to accept" or other acknowledgement button or checkbox | All return/refund policies and other purchase terms and conditions |

**46. Participation in the American Express OptBlue® Program**

By checking the "Accept" checkbox next to AMERICAN EXPRESS OptBlue® on (the application), Merchant has elected to participate in the American Express OptBlue program ("American Express Card Acceptance"). The following terms and conditions apply to Merchant's participation in American Express Card Acceptance.

(a) The definition of "Association(s)" is changed to read as follows:

"Association(s)" means VISA U.S.A., Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), Discover Financial Services LLC ("Discover") and American Express Travel Related Services Company, Inc. ("American Express").

(b) The definition of "Card(s)" is changed to read as follows:

"Card(s)" means either a Visa, MasterCard, Discover or American Express credit card, debit card (or other similar card that requires a PIN for identification purposes), or pre-paid, stored-value or gift card.

(c) The definition of "Issuer" is changed to read as follows:

"Issuer" means American Express or a member of an Association that enters into a contractual relationship with a Cardholder for the issuance of one or more Cards

(d) Merchant authorizes Bank and/or its affiliates to submit American Express Transactions to, and receive settlement on such Transactions from, American Express on behalf of Merchant.

(e) Merchant agrees that Bank may disclose to American Express information regarding Merchant and Transactions to American Express, and that American Express may use such information: (i) to perform its responsibilities in connection with American Express Card Acceptance; (ii) to promote American Express; (iii) to perform analytics and create reports; and (iv) for any other lawful business purposes, including commercial marketing communications purposes within the parameters of American Express Card Acceptance, and important transactional or relationship communications from American Express. American Express may use the information about Merchant obtained in this Agreement at the time of setup to screen and/or monitor Merchant in connection with American Express marketing and administrative purposes. Merchant agrees it may receive messages from American Express, including important information about American Express products, services, and resources available to its business. These messages may be sent to the mailing address, phone numbers, email addresses or fax numbers of Merchant. Merchant may be contacted at its wireless telephone number and the communications sent may include autodialed short message service (SMS or "text") messages or automated or prerecorded calls. Merchant agrees that it may be sent fax communications.

(f) Merchant may opt-out of receiving future commercial marketing communications from American Express by contacting ISO; however, Merchant may continue to receive marketing communications while American Express updates its records to reflect this choice. Opting out of commercial marketing communications will not preclude Merchant from receiving important transactional or relationship messages from American Express.

(g) Merchant acknowledges that it may be converted from American Express Card Acceptance

to a direct relationship with American Express if and when its American Express-related Transaction volumes exceed the eligibility thresholds for American Express Card Acceptance. If this occurs, upon such conversion: (i) Merchant will be bound by American Express's then-current Card Acceptance Agreement; and (ii) American Express will set pricing and other fees payable by Merchant.

(h) Merchant will not assign to any third party any payments due to it under American Express Card Acceptance, and all indebtedness arising from Transactions will be for bona fide sales of goods and services (or both) at its business locations and free of liens, claims, and encumbrances other than ordinary sales taxes; provided, however, that Merchant may sell and assign future American Express-related Transaction receivables to Bank, its affiliated entities and/or any other cash advance funding source that partners with Bank or its affiliated entities, without consent of American Express. Notwithstanding the foregoing, Bank prohibits Merchant from selling or assigning future American Express-related Transaction receivables to any third party.

(i) Notwithstanding anything in this Agreement to the contrary, American Express shall have third-party beneficiary rights, but not obligations, to the terms of this Agreement applicable to American Express Card Acceptance to enforce such terms against Merchant.

(j) By contacting Bank or ISO Merchant may opt out of accepting American Express at any time without directly or indirectly affecting its rights to accept other Cards.

(k) Bank and ISO have the right to terminate Merchant's participation in American Express Card Acceptance immediately upon written notice to Merchant: (i) if Merchant breaches any of the provisions of this Section 46 or any other terms of this Agreement applicable to American Express Card Acceptance; or (ii) for cause or fraudulent or other activity, or upon American Express's request. In the event Merchant's participation in American Express Card Acceptance is terminated for any reason, Merchant must immediately remove all American Express branding and marks from Merchant's website and wherever else they are displayed.

(l) Merchant's refund policies for American Express-related Transactions must be at least as favorable as its refund policy for purchase with any other Card, and the refund policy must be disclosed to Cardholders at the time of purchase and in compliance with Applicable Law. Merchant may not bill or attempt to collect from any cardholder for any American Express-related Transaction unless a Chargeback has been exercised, Merchant has fully paid for such Chargeback, and it otherwise has the right to do so.

(m) Merchant must accept American Express as payment for goods and services (other than those goods and services prohibited by this Agreement, the MOG, or Applicable Law) sold, or (if applicable) for charitable contributions made at all of its business locations and websites, except as expressly permitted by state statute. Merchant is jointly and severally liable for the obligations of Merchant's business locations and websites under this Agreement.

(n) Merchant or American Express may elect to resolve any claim against each other, or against Bank or ISO with respect to American Express-related Transactions, by individual, binding arbitration, decided by a neutral arbitrator, in accordance with the MOG.

(o) Merchant will comply in full with American Express's Merchant Operating Guide ("MOG") (as the same may be amended from time to time). The current MOG can be found at www.americanexpress.com/merchantopguide. The term "Rules" shall be deemed to include the MOG.

(p) American Express has the right to modify the terms of this Section 46 and any other provisions of this Agreement that relate to American Express Card Acceptance, and to

terminate Merchant's acceptance of American Express-related Transactions and to require an investigation of Merchant's activities with respect to American Express-related transactions.

(q) A copy of the American Express Data Security Requirements ("DSR") can be obtained online at www.americanexpress.com/dsr. Merchant shall abide by and fully comply with applicable American Express requirements.

**47. Participation in PayPal In-Store Checkout**
Unless Merchant otherwise specifically indicates to Bank that Merchant does not wish to accept any PayPal Payment Method as a method of payment for goods services at Merchant's point(s) of sale, the following terms and provisions will apply. If Merchant elects American Express Card Acceptance and does opt out of the application of this Section 47, the application of Section 46 and this Section 47 will be deemed to be cumulative and not in the alternative.

(a) Merchant acknowledges and agrees that all of its actions associated with the acceptance by Merchant of a PayPal Method as the method of payment for goods or services at a point of sale, and in connection with processing any sale, credit, chargeback, representment, reversal or correction or settlement activity associated with any such transaction is subject to the terms and conditions of the Program Documents, as that term is defined in the PayPal Operating Regulations for In-Store Checkout (as the same may be amended or replaced from time to time, the "PayPal Operating Regulations"). Merchant will comply in full, at all times, will all relevant provisions of the Program Documents, a copy of which Merchant acknowledges and agrees it has received and reviewed. Capitalized and italicized terms used in this Section 47 that are not otherwise defined are used as defined in the PayPal Operating Regulations.

(b) The definition of "Card(s)", as used throughout this Agreement, is changed to read as follows:

"Card(s)" means any of the following: (i) a Visa, MasterCard or Discover credit card, debit card (or other similar card that requires a PIN for identification purposes), or pre-paid, stored-value or gift card; and (ii) any PayPal Payment Method.

(c) The definition of "Issuer", as used throughout this Agreement, is changed to read as follows:

"Issuer" means a member of an Association that enters into a contractual relationship with a Cardholder for the issuance of one or more Cards and PayPal, Inc. ("PayPal"), in connection with any PayPal Payment Method.

(d) Merchant will comply in full with the Program Documents in connection with all of its activities associated with PayPal Acceptance and associated Transaction processing and Settlement of Transactions.

(e) Merchant acknowledges and agrees that Acquirer may disclose Transaction Data and Merchant Information to PayPal, regulatory authorities and other entities to which PayPal is required to provide such information for the purposes deemed necessary and related to performing Transactions or to comply with Applicable Law, including, by way of example and without limitation:

(i) Detailed information about the Transactions conducted by Merchant, including Transaction Data required by the Program Documents, to be delivered to PayPal in connection with Authorization Requests, Transaction Data, and Dispute responses;

(ii) Merchant Information and detail about the transactions accepted by Merchant, including the Merchant Category Code assigned by Bank to Merchant;

(iii) Collective and detailed information about Merchant's Transactions, Disputes and other information reasonably required by PayPal during any investigation of Merchant;

(iv) Information regarding the aggregate number, type, and kind of Transactions accepted by Merchant, in the Authorized Jurisdiction; and

(v) Business and registration information provided by Merchant and/or its principals in connection with any application submitted by Merchant to Bank.

(f) Merchant acknowledges and agrees that each of the following is strictly and expressly prohibited:

(i) Any use, storage, or disclosure by Merchant of PayPal's confidential information, any PayPal Account Holder Data or Transaction Data, other than as necessary to complete a Transaction.

(ii) The retention or storage of PayPal Account Numbers, Track Data or Transaction Data.

(iii) Any use of any PayPal Account Holder's personal information for marketing and/or other purposes without explicit consent from the PayPal Account Holder.

(g) Bank may terminate Merchant's PayPal Acceptance and/or this Agreement for any of the reasons set forth in the PayPal Operating Regulations or for any violation by Merchant of the terms that Bank is required to enforce against Merchant in the PayPal Operating Regulations. PayPal may directly contact Merchant if Merchant is terminated by Bank for any reason, including investigating compliance by Merchant with the Security Requirements set forth in Section 13 of the PayPal Operating Regulations.

(h) "PayPal Marks" mean the brands, emblems, trademarks, and/or logos that identify PayPal Acceptance. The PayPal Marks are described in Appendix A of the PayPal Operating Regulations. Merchant may use the PayPal Marks only to promote PayPal products, offers, services, processing and/or acceptance. Merchant use of the PayPal Marks is restricted to the display of decals, signage, advertising, and marketing materials provided or approved by PayPal in writing pursuant to the process set forth in the PayPal Operating Regulations. Merchant shall not use the PayPal Marks in such a way that PayPal Account Holders could believe that the products or services offered by Merchant are sponsored or guaranteed by the owners of the PayPal Marks. Merchant recognizes that it has no ownership rights in the PayPal Marks. Merchant shall not assign to any third party any of the rights to use the PayPal Marks. Merchant is prohibited from using the PayPal Marks, not permitted above, unless expressly authorized in writing by PayPal.

## Premier Plus Enrollment Agreement ("Agreement")

This Agreement is entered into on the date shown below between PREMIER STUDENT LOAN CENTER,(hereinafter the "Company") and the Client identified on the signature lines below (the "Client").

The Company is a provider of valued non-insurance lifestyle and student benefits. The Company is a private for-profit company and is not affiliated with any government agency. For a fee the Company will make discount benefits available to the Client. The Company is not a debt consolidation company, or a law firm and does not provide legal advice.

The Company and the Client do hereby understand, covenant and agree to the following:

1. **Performance of Services**. Upon receipt of this signed Agreement from the Client, including the completed Payment Authorization (Exhibit A) section below, the Company will initiate the Client's enrollment into Premier Plus on the date agreed upon in Exhibit A. Thereafter, the Client will be contacted by a Company representative who will provide assistance in accessing program benefits.

2. **Fees that Client Pays**. The payment for the Company's services will be $929.00 per month, commencing on the date agreed upon in Exhibit A. The Client can cancel Premier Plus at any time. Payments will be collected automatically by the Company on a periodic payment plan as indicated in the Payment Authorization (Exhibit A) section below. All fees shall be debited from Client's bank account or charged on Client's credit card pursuant to the Payment Authorization. Client shall be responsible for any third party support or service fees, such as bank processing or third party account fees.

3. **Timing**. Once the Client provides the Company with a signed Agreement and Payment Authorization, the Client will have completed all steps necessary to initiate enrollment in the services. The Client is eligible to receive benefits after the date agreed upon in Exhibit A.

4. **Conditions and Limitations of Service.**

(a) Premier Plus includes Student Loan Solutions, which is a service that oversees your student loan account for the duration of your account. Student Loan Solutions provides administrative services, including support with postponing payments, changing debit dates, document preparation services for modifying payment plans, reapplying for student aid and providing related administrative support.

5. **Cancellation Policy**. If the Client cancels Student Assist Plus within the first thirty days of Client's first payment, the Client will receive a refund. The Client can cancel its subscription to Student Assist Plus at any time by written cancellation setting forth the Client's name and account number to:

6. **Limitations on Damages**. Liability under this Agreement and/or relating directly or indirectly to the Client's participation in any student benefit or discount program, under any theory of liability regarding any claim by the Client is limited to the amount of fees paid by the Client and received by the Company. The Parties agree to be contractually bound to such limitation on any damages, and agree not to demand or attempt to recover any amount in excess of such. This section shall survive any termination of this Agreement.

7. **Entire Agreement**. By virtue of Client's signature below, Client acknowledges that he/she has read, understands and agrees to every term, covenant and condition of this Agreement without change or modification and that he/she has received a true and complete copy hereof, effective on the date below. This agreement is the only agreement between the parties and there is no other collateral agreement (oral or written) between the parties in any manner relating to the subject matter of this agreement. If any portion of this agreement is held to be invalid or unenforceable, the remaining provisions will remain in effect. The parties mutually understand and agree that a facsimile copy signature or an electronic signature on this agreement shall be deemed an original for all lawfully enforceable purposes.

8. **Electronic and Voice Communication Consent**. Client consents to do business electronically with Company. Client understands that electronic transactions, not limited to emails, are inherently unsecure and that both Client and Company will take all reasonable steps to maintain the Privacy of the information shared between the parties. Client consents to receive information and documents relating to this Agreement and Company services via electronic mail, text message, facsimile, voicemail, and any other common electronic means. Client understands that all costs associated with the receipt, review and use of such electronic communications shall be those of Client, such as maintaining access to the Internet or paying for text messages. Client consents to receive updates and documents relating to this Agreement and the services and programs offered by Company via prerecorded voice messages, text/SMS messages, and/or through the use of an automated dialing system. Client may contact Company at any time to opt-out of receiving updates, new programs or offers through prerecorded or autodialed messages.

**IMPORTANT - Mandatory Binding Arbitration To Resolve All Disputes And Class Action Waiver. Please Read This Section Carefully and Do Not Sign This Agreement Unless You Understand and Agree With This Section: This Agreement is governed by a Binding Mandatory Arbitration Requirement. You are encouraged to consult with independent legal counsel so**

Bureau of Consumer Financial Protection Civil Investigation Demand – Premier Student Loan Company 000534

Maverick CID response

Pl. Ex. 27
p. 430
R-011726-00000549

that you understand your rights relating to this requirement. This Section limits your l7e.gal rights and ability to go to court. Please consult with legal counsel to be sure you understand this Section prior to signing. In the event of any controversy, claim or dispute between the parties (the Company, the Client, and any support entities or persons contemplated herein) arising out of or relating to this agreement or the breach, termination, enforcement, interpretation, unconsionability or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined and resolved exclusively by arbitration in the county which the consumer resides, or the closest metropolitan county, in accordance with the Laws of the State of California for agreements to be made in and to be performed in California. The parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures and an arbitrator shall be selected by the AAA. The arbitrator shall be neutral and independent and shall comply with the AAA code of ethics. The award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the parties. If either party fails to comply with the arbitrator's award, the injured party may petition the circuit court for enforcement. The parties agree that either party may bring claims against the other only in his/her or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings of more than one person's claims, and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost (not attorney's fees) of arbitration equally. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award. Binding Arbitration means that both parties give up the right to a trial by a jury. It also means that both parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. This section and the arbitration requirement shall survive any termination.

BY SIGNING BELOW, I ACKNOWLEDGE THAT PREMIER PLUS MAKES NO GUARANTEES CONCERNING THE AVAILABILITY, QUALITY OR VALUE OF ANY SERVICE PROVIDED BY ITS PROVIDERS. THE CLIENT WILL HAVE ACCESS TO SERVICES AT A DISCOUNT THROUGH STUDENT ASSIST PLUS, BUT THE COMPANY HAS NO CONTROL OR INFLUENCE OVER THE NATURE, AMOUNT, QUALITY, TYPE OR AVAILABILITY OF ANY SERVICE OBTAINED THROUGH THE PROGRAM. THE CLIENT HAS READ THIS ENTIRE AGREEMENT, HAS HAD A REASONABLE OPPORTUNITY TO ASK QUESTIONS AND OBTAIN THE ADVICE DEEMED NECESSARY, AND ENTERS INTO THIS AGREEMENT FREELY AND VOLUNTARILY, FULLY INFORMED OF THE TERMS AND CONDITIONS OF PREMIER PLUS.

**THE CLIENT**

Dated: Jun 21, 2017 _____

Signature: _____
Print Name:   Sample Sample _____

# Payment Authorization
# Exhibit A

## Payment Plan Authorization

Name:     Sample Sample

Billing Address
City/ State / Zip:     , ,
Telephone:

## Payment Plan Schedule

| # | Date | Enrollment Fee | Monthly Fee | Total Payment |
|---|------|---------------|-------------|---------------|
| 1 | Jun 16, 2017 | $232.25 | $0.00 | $232.25 |
| 2 | Jul 16, 2017 | $232.25 | $0.00 | $232.25 |
| 3 | Aug 16, 2017 | $232.25 | $0.00 | $232.25 |
| 4 | Sep 16, 2017 | $232.25 | $0.00 | $232.25 |
| 5 | Oct 16, 2017-Sep 16, 2027 | $0.00 | $30.00 | $30.00 |

### Customer ACH Information

Bank:
Routing Number:
Account Number:

### Customer Credit Card Information

Name on Card:
CC#:     *****
CC Expiration:     /     CVV:

# Payment Authorization

I authorize my bank to debit my account as identified above to the terms stated here. This authorization shall remain in effect until the Service Provider and bank receive written notification from me of intent to terminate at such time and in such manner as to afford the Service Provider and bank reasonable opportunity to act (Minimum 15 days).

I understand that if the total amount owed to the Service Provider is increased, I authorize this plan to continue as long as the payment amount remains unchanged until owed the Service Provider is paid off, or unless the plan is terminated earlier by me as above. I understand any added amounts can be applied for with a new ACH Debit Authorization Form.

All other changes such as payment amount, frequency, bank account number change, will require a Payment Authorization Form (Exhibit A) to be filled out and submitted to Merchant 15 days prior to any change being implemented. I understand that this payment plan may be cancelled by the service Provider or Merchant due to NSF (Non-sufficient Funds).

I represent and warrant that I am authorized to execute this payment authorization for the purpose of implementing this payment plan. I indemnify and hold the Service Provider, the bank, and the Merchant harmless from damage, loss or claim resulting from all authorized

Bureau of Consumer Financial Protection Civil Investigation Demand – Premier Student Loan Company 000536

Maverick CID response

Pl. Ex. 27
p. 432
R-011726-00000551

 Merchant Welcome Packet

Revision Date: **14 July 2015**

# Important Contact Information

**Your Account Information**

Legal Name: Consumer Advocacy Center Inc.
DBA: Premier Student Loan Center
Merchant Number: ██████████3640
V#: V8916836
Cards Accepted: Mastercard/Visa/Discover/Amex/JCB
Discover #: ██████████1797
AMEX #: ██████████9964
Approved Monthly Volume: $ 600,000.00
Average Ticket: $ 180.00
High Ticket: $ 1,500.00

**Contact Information**

Please contact us at any time (24 hours) for any reason (support, billing questions, terminal issues, voice authorizations, ordering supplies, etc.) using the following information:

**Phone**: 800.464.9777
**Email**: CS@MaverickBankCard.com
**Fax**: 888.772.9706
8:30 AM – 4:30 PM PST Monday-Friday

**Backup Contact Information**

If you experience any issues contacting us using the above information, you can use the following numbers as backups:

**Backup Customer Support**: 800.552.8227
**Backup Voice Authorization**: 800.291.4840
**Chargeback Center**: 866.637.5467

© 2016 Maverick BankCard



**MAVERICK BANKCARD**

800.464.9777 (p)
888.772.9706 (f)
v.1.3

## Bank Account Change Request

Date: 9/19/2018

Business Owner's Name(s): Albert Kim and Kaine Wen

Business Name: Consumer Advocacy Center Inc

Merchant Number: 8640

**New Bank Account Information**

Bank Name: Sunwest Bank

Account Number: 1689

Routing Number: 122 228 003

<u>A void pre-printed check or bank letter for the new account must be included with this completed and signed form. Please also provide a copy of the business owner's driver's license as this is required.</u>

*If you have changed ownership, your corporate name or your tax ID, you must submit a new application.*

*If you process American Express and/or use a third party program (i.e. payment gateway) that bills you direct, you will need to contact them separately to change your bank account for their deposits.*

In witness and by their execution hereof, the undersigned individual(s) certifies (certify) that they are duly authorized representatives of Merchant and hereby acknowledge(s) and authorize(s) the bank account change listed above and Merchant certifies the same.

Business Owner Signature:

Business Owner Signature (if business has two owners):

Please fax to 888.772.9106 or email to CS@MaverickBankCard.com

--------------------------------------------------------------

Internal Use:

Completion By:_____ Date:

Maverick BankCard, Inc.

26565 Agoura Road, Suite 305

Calabasas, CA 91302

www.MaverickBankCard.com

# Exhibit

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**QUANTUM ELECTRONIC** PAYMENTS

MERCHANT PROCESSING APPLICATION & AGREEMENT

PAGE 1

## 1. GENERAL INFORMATION | BUSINESS LOCATION INFORMATION | BUSINESS STRUCTURE

Sales Agent ID: 3020

SL ACCOUNT MGMT
Client Business Name (Doing Business As)

8 Hughes, #210
Location Address (physical location)

| Irvine | CA | 92618 | (888) 314-0801 | |
|---|---|---|---|---|
| City | State | Zip | Location Phone | Location Fax |

888-283-9631
Customer Service Phone

www.slaccountmgt.com
Business Website Address

info@slaccountmgmt.com
Business Email

True Count Staffing Inc.
Client Corporate Name/Legal Name

8 Whatney, Suite 100, #8
Corporate Address (if different than location)

| Irvine | Ca | 92618 | Kaine Wen | (424) 333-8290 |
|---|---|---|---|---|
| City | State | Zip | Contact Name | Contact Phone |

82-0854249
Fed Tax ID

Tax Filing Name (if different)

Prior Security Breach?  Yes ☐  No ☑

Date Business Started

Send Retrieval/Chargeback Requests to:  Corporate Address ☑   Location Address ☐

Multiple Locations?  ☐ Yes  ☑ No   If Yes, enter # of locations _____   Additional Location to existing MID _____

Indicate Company Structure:
☐ Sole Prop   ☐ Partnership   ☐ C Corp   ☐ S Corp   ☐ 501 C/Tax Ex   ☑ LLC/LLP   ☐ Govt. (Local/State/Federal)

State Filing  CA    ☐ I certify that I am a foreign entity/nonresident alien (If checked, please attach IRS Form W-8)

**NOTE:** Failure to provide accurate information may result in a withholding of merchant funding per: IRS regulations (See Part IV, Section A.3 of your Program Guide for further information)

## 2. BANKING ACCOUNT INFORMATION AND MEMBER BANK DISCLOSURE

Bank Name  **Sunwest Bank**

Bank Phone

Routing #  ████8003

Account #  ████1069

ACH Method:  ☑ Combined   ☐ Individual

(Must be a checking account. Savings accounts are not permitted.)

Visa and MasterCard Member Bank Information as indicated below by agent: **Commercial Bank of California**

**COMMERCIAL BANK**
OF CALIFORNIA

**Mailing Address:** 19752 MacArthur Blvd., Suite 100, Irvine, CA 92612

Prior Bankruptcies?  ☐ Yes  ☑ No   If Yes: ☐ Business   ☐ Personal

Date Discharged

## 3. TRADE REFERENCE

| Trade Reference Business Name | Contact |
|---|---|
| Business Address | Telephone |
| City ___ State ___ Zip ___ | Account No. |

Quantum Electronic Payments LLC is a registered ISO of Commercial Bank of California

Pl. Ex. 28
p. 444
T-013088-00000083

## 4. OWNERS | PARTNERS | OFFICERS

### OWNER | PARTNER | OFFICER 1

| | | | |
|---|---|---|---|
| Name **Kaine Wen** | Title **Managing Partner** | % Ownership* **100** | Guarantor** Yes ☑ No ☐ |
| Home Address ▇▇▇▇▇▇ | City **Azusa** | State **Ca** | Zip ▇▇▇ |
| Cell Phone ▇▇▇▇ | Social Security ▇▇**3143** | Date of Birth ▇▇**1977** | Email Address **kaine@slaccountma** |

### OWNER | PARTNER | OFFICER 2

| | | | |
|---|---|---|---|
| Name _____ | Title _____ | % Ownership* _____ | Guarantor** Yes ☑ No ☐ |
| Home Address _____ | City _____ | State _____ | Zip _____ |
| Cell Phone _____ | Social Security _____ | Date of Birth _____ | Email Address _____ |

### OWNER | PARTNER | OFFICER 3

| | | | |
|---|---|---|---|
| Name _____ | Title _____ | % Ownership* _____ | Guarantor** Yes ☑ No ☐ |
| Home Address _____ | City _____ | State _____ | Zip _____ |
| Cell Phone _____ | Social Security _____ | Date of Birth _____ | Email Address _____ |

### OWNER | PARTNER | OFFICER 4

| | | | |
|---|---|---|---|
| Name _____ | Title _____ | % Ownership* _____ | Guarantor** Yes ☑ No ☐ |
| Home Address _____ | City _____ | State _____ | Zip _____ |
| Cell Phone _____ | Social Security _____ | Date of Birth _____ | Email Address _____ |

* Each individual who owns, directly or indirectly through any contract, arrangement, understanding relationship or otherwise, 25% or more of the equity interests of the Client, or who is the Client's sole proprietor, must be added.

** A control prong owner means a "beneficial owner" who is a single individual (e.g. Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer) with significant responsibility to control, manage, or direct Client's legal entity. The control prong owner must also serve as the Guarantor in connection with the Merchant Processing Agreement.

## 5. NATURE OF BUSINESS | TRANSACTION INFORMATION

Business Type:
☐ Retail  ☐ Restaurant  ☐ Healthcare  ☐ Lodging  ☐ Supermarket  ☐ Government
☐ Internet  ☐ QSR  ☐ Education  ☐ Utilities  ☐ Petroleum  ☐ Charity/Non Profit
☐ B2B  ☑ Mail / Telephone Order  ☐ Other _____

| | | | |
|---|---|---|---|
| Requested Monthly V/MC/DS Card Volume **1,500,000** | American Exp Monthly Volume _____ | Card Present Swiped _____ % | Sales to Consumers **100** % |
| Requested Average V/MC/DS Card Ticket **180.00** | American Exp Average Ticket _____ | Card Present Keyed _____ % | Sales to Business _____ % |
| Requested Highest Payment Card Ticket **1500.00** | | MOTO **100** % | Sales to Govt. _____ % |
| | | Internet (Ecommerce) _____ % | |

| | | |
|---|---|---|
| Seasonal Merchant: Yes ☐ No ☑ Months Closed _____ | Previous Processor **National Merc** | Reason For Leaving **Currently Processing** |

Has the Merchant or Owner been terminated from accepting payment cards from any payment network for this business or any other business? Yes ☐ No ☑
If yes, please explain the reason for termination: _____

Description of Products or Services Sold: **Student loan document prep services**

Describe your Return Policy: **Full refund (no questions asked)**   Days to delivery **31-90 days**

# 6. SERVICE ACCEPTANCE | FEE SCHEDULES AND OTHER CARD TYPES

**Request to Accept Card Types:**

- ☑ Visa Credit
- ☑ Visa Debit
- ☑ MasterCard Credit
- ☑ MasterCard Debit
- ☐ Discover Network
- ☑ AMEX Network
- ☐ PIN Debit

**Select VI/MC/Discover Network Discount Plan:**

- ☐ Tiered Basic
- ☐ I/C Flat Rate
- ☑ Pass Through
- ☐ CDP Flat Rate

**Assessments & Brand Fees:** Included ☐  Billed Separately ☑    **Requested Discount Payment Method:** Daily ☑  Monthly ☐

| DISCOUNT FEES: Visa, MasterCard, Discover, Pin Debit | | | | | | American Express OPT Blue or AMEX Direct | | |
|---|---|---|---|---|---|---|---|---|
| **Tiered** | % | Per Item | **Pass Through** | % | Per Item | **Opt Blue Discount Plan:** | **AMEX Direct:** | |
| Qualified Discount = | | | Pass Through IC+ = | 2.00 | | ☐ Tiered Basic | ☐ Order New No. | |
| Mid Qual = (Qual+) | | | Debit PassThrough IC+ = | 2.00 | | ☑ Pass Through Program Pricing | Existing SE No. ___ | |
| Non Qual = (Qual+) | | | Pin Debit Pass Through+ = | 2.00 | | ☐ Flat Rate | ☐ Use Existing Cap No. ___ | |
| Debit Qual Discount = | | | **Flat Rate** | % | | | (Flat fee of $7.95 or Discount Rate may apply) | |
| Debit Mid Qual = (Qual+) | | | Flat Rate = | | | | % | Per Item |
| Debit Non Qual = (Qual+) | | | Debit Flat Rate = | | | Credit Qual = | | |
| | | | | | | Credit Mid-Qual = | | |
| | | | | | | Credit Non-Qual = | | |
| | | | | | | Pass Through IC = | 2.00 | |

## Authorization, Monthly AND Miscellaneous Fees

**Authorization & Per Item Fees**

| | |
|---|---|
| Visa/MC/Discover Networks | $ 0.15 |
| AMEX/Fleet/Other | $ 0.15 |
| Pin Debit | $ ___ |
| EBT | $ ___ |
| FCS# ___ | |
| Electronic AVS | $ 0.10 |
| Voice Auth | $ 1.00 |
| Voice AVS | $ 1.25 |
| Sales Transaction Fee | $ ___ |
| Return Transactions | $ 0.50 |
| Batch Fee (Per Item) | $ 0.25 |
| Micros Fee (Per Transaction) | $ ___ |

**Monthly Fees**

| | |
|---|---|
| Monthly Service | $ 20.00 |
| Monthly Minimum | $ 250.00 |
| Wireless Fee | $ ___ |
| Pin Debit Monthly | $ ___ |
| EBT Monthly | $ ___ |
| PCI Non-Compliance | $ 35.00 |
| Govt Compliance | $ 3.95 |
| TIN Mis-Match (until validated) | $ 49.00 |
| Licensing Fee | $ ___ |
| PCI Monthly Fee | $ 20.00 |
| Security Software | $ 14.95 |

**Miscellaneous Fees**

| | |
|---|---|
| Chargeback Fee (Per Occurrence) | $ 35.00 |
| Retrieval Fee (Per Occurrence) | $ 20.00 |
| ACH Reject Fee (Per Occurrence) | $ 30.00 |
| Annual Fee | $ 199.00 |
| Month to Bill | December |
| PCI Annual Fee | $ 250.00 |
| Risk Monitoring | $ 50.00 |
| POS Software | $ ___ |
| SPM Setup Fee | $ 200.00 |
| SPM Monthly Fee | $ 200.00 |

**Gateway Fees**

| | |
|---|---|
| Gateway Setup Fee | $ 150.00 |
| Gateway Monthly Fee | $ 25.00 |
| Gateway Transaction Fee | $ 0.25 |
| Gateway Batch Fee | $ 0.10 |

Association fees will be passed through to the merchant. Fees include, but are not limited to, Visa's FANF and APF, Acqr ISA and MasterCard's NABU, Acqr Support, Cross Border Fee and Discover IPF, ISF, Data Usage, AMEX Network, AMEX Non-Swipe, AMEX downgrade, Assessments (MC,Visa Credit,Visa Debit, Discover,MC > $1,000), MC AVS Acqr Access (CNP), MC AVS Acqr Access, MC License, MC KiloByte, Visa AFD Partial Auth, Non Participant, Visa File Transmission, MC CVC2, DISC Network Auth, Visa Acqr Processing (CR), Visa International Acqr, Visa Acqr International Service Assessment, Visa Misuse Auth, Visa Zero Floor, MC Digital Enablement, MC Reversal, Visa Return Data Processing (CR & DB), Visa Acqr Data Processing (Debit), Visa Tran Integrity, Visa Network Part CT, Visa Network CNP. Association fees are set by Associations and are subject to change from time to time.

0.30% non-swiped transaction fee will be charged by American Express for transactions whenever a CNP or Card Not Present Charge occurs. CNP means a charge which the card is not presented at the point of purchase (e.g., Charges by mail, telephone, fax or the Internet). Note: The CNP Fee is applicable to all transactions made on all American Express Cards, including Prepaid Cards.

An inbound fee of 0.40% will be applied on any Charge made using a Card, and including Prepaid Cards that was issued outside the United States (As used herein the United States does not include Puerto Rico, Virgin Islands and other US Territories and possessions).

☑ By checking this box, Guarantor opts out of receiving future commercial marketing communications from American Express. Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional relationship messages from American Express.

☐ **Next Day Funding\*** $ <u>5.00</u> Per Month: \*NDF is subject to approval and all POS Device batch(es) must be closed by 4:30pm PST/7:30pm EST Monday-Saturday and by 3pm PST/6pm EST on Sunday. All payments are provisional and are subject to, including but not limited to: additional fees, chargebacks, withholding, set off, security and reserve rights. Processor or Bank will not be liable for any delay in receipt of funds, fees for any delays, or errors in debit and credit entries caused by third parties, including by not limited to, any Association or your financial institution.

In the event that this Agreement is terminated early, Merchant will be responsible for the payment of a $ <u>495</u> Early Termination Fee in accordance with Part III Section A.3. of the Merchant Program Guide. In the event QEP is unable to price match a competitor offer for similar services in the future, QEP will waive Merchant's ETF.  QEP reserves the right to verify proposal and activation.

☐ **Merchant Club**: The representative has explained the Merchant Club program to me and I elect to opt out of the program. I understand I can opt into the program at any time and benefit from the program, which includes equipment support and replacement per terminal/ peripheral (where applicable), as well as great discounts for items such as car rentals, hotels, office supplies, health and legal services and more for my company and employees for an additional fee of $14.95 per month. Initials: _____

## 7. EQUIPMENT | PROCESSING METHOD

**Application Type:**  Retail ☐   Retail w/Tip ☐   MOTO ☐   Quick Serve Restaurant (no tip) ☑   Restaurant w/Tip ☐   Hotel ☐   Auto Rental ☐

### Terminal Features: Choose Desired Functions

| | | | |
|---|---|---|---|
| Fraud Check (last 4-digits) ☐ | Purchasing Card ☐ | Time Zone _____ | IP Connection ☐ |
| AVS + CVV2 ☑ | Server / Clerk # ☐ | Auto Close ☐<br>If yes, what time? _____ | Dial ☐ |
| EBT Food Stamps ☐ | Order Gift Card ☐ | Wireless MAN/Serial _____ | Wireless ☐ |
| EBT Cash Benefit ☐ | Invoice / PO # ☐ | SIM Card # _____ | Special Request _____ |
| ACH / Check Services ☐ | CDP Discount ☐ | | _____ |

| TYPE OF EQUIPMENT | PRODUCT NAME | QUANTITY | DEPLOYMENT |
|---|---|---|---|
| ☐ Terminal ☐ Pin Pad ☐ Printer ☑ VAR\* | Quantum Gateway | 1 | ☐ Existing ☑ Agent ☐ New Order (Attach Form) |
| ☐ Terminal ☐ Pin Pad ☐ Printer ☐ VAR\* | | | ☐ Existing ☐ Agent ☐ New Order (Attach Form) |
| ☐ Terminal ☐ Pin Pad ☐ Printer ☐ VAR\* | | | ☐ Existing ☐ Agent ☐ New Order (Attach Form) |

\* Manufacturer/product/version of PC/Internet Software: <u>NMI</u>

Do you use any third party to store, process or transmit cardholder data?   ☐ Yes   ☑ No
If yes, please provide name/address: _____

For software or VAR users, by checking yes below MERCHANT certifies that it has used a certified Qualified Integrator or Reseller (QIR) to install or re-program MERCHANT's software systems. Notwithstanding MERCHANT's use of a QIR as described herein above, MERCHANT acknowledges that is, and shall remain, fully responsible for compliance with PCI-DSS standards at all times in accordance with the Program Terms and Conditions (Program Guide).   ☑ Yes   ☐ No

## 8. SITE INSPECTION (COMPLETED BY SALES AGENT)

I have personally conducted a Site Inspection for this merchant, visually inspected the merchant's inventory (if applicable), verified the merchant's payment application is PA-DSS (Payment Application Data Security Standards) validated (if applicable) and represent that the information in this merchant application is accurate, as to the best of my knowledge. I am subject to criminal penalties and/or financial losses for false or misleading information.

**Sales Agent Name (printed)** Jimmy Lai   **Signature** *Jimmy Lai*

**9. CARD NOT PRESENT INFORMATION**

If you process more than 20% of your bankcard transactions or volume, without swiping, and/or examining the credit card, please complete this section:

1. Please submit your product catalog; brochures; promotional materials; a current price list; and a copy of your service agreement with card holder, if applicable. If on the internet, please include screen-prints of your website address if your site is not active yet.

2. If internet, please check your type of business: Selling Hard Goods ☐    Digital Products ☐    Services ■

☐ Other: _____

3. How will the product be advertised or promoted? Internet

4. How often will you bill your customer?    Monthly 100 %    Yearly 100 %    One Time _____ %

5. List the name(s) and address(es) of the vendors(s) from which supplies are purchased:
   In House

6. Who performs product/service fulfillment? If direct from vendor, please provide vendor name, address and phone number in full:
   In House

7. Please describe how a sale takes place from beginning of order until completion of fulfillment:
   A potential client will contact a Sales Advisor, who then performs a personalized federal stud

**10. SIGNATURES**

Client certifies that all information set forth in this completed Merchant Processing Application is true and correct and that Client has received a copy of the version of the Program Guide stated on this Merchant Processing Application which includes the Processor & Bank Confirmation Page ("Confirmation Page"), which Confirmation Page is hereby incorporated by reference into this Merchant Processing Application and Agreement. Client acknowledges and agrees that we, our Affiliates and our third-party subcontractors and/or agents may use automatic telephone dialing systems to contact Client at the telephone number(s) Client has provided in this Merchant Processing Application and/or may leave a detailed voice message in the event that Client is unable to be reached, even if the number provided is a cellular or wireless number or if Clients has previously registered on a Do Not Call list or requested not to be contacted for solicitation purposes. Client hereby consents to receiving commercial electronic mail messages from us, our Affiliates and our third-party subcontractors and/or agents from time to time. Client further agrees that Client will not accept more than 20% of its card transactions via mail, telephone or internet order. However, if your Application is approved based upon contrary information stated in Section 7 you are authorized to accept transactions in accordance with the percentages indicated in that section. Client, and each individual signing below on behalf of the Client or as Guarantor, authorizes Quantum Electronic Payments ("Processor) and Commercial Bank of California ("Bank") and their respective agents to investigate the references, statements and other data contained herein and to obtain additional information from credit bureaus and other lawful sources, including persons and companies named in this Merchant Processing Application. Client, and each individual signing below on behalf of the Client or as Guarantor, authorizes Processor and Bank and their respective agents (a) to procure information from any credit reporting agency bearing on Client's credit standing, credit capacity, general reputation, or characteristics, and to obtain consumer reports from consumer reporting agencies on each individual signing below on behalf of Client or as a Guarantor (if such individual asks Processor or Bank whether such a report was requested, Processor or Bank will tell such individual and if Processor or Bank requests a report, Processor or Bank will give such individual the name and address of the agency that furnished it), and (b) to contact all previous references. Client also authorizes us and our Affiliates to provide amongst each other the information contained in the Merchant Processing Application and Agreement and any information received from all references, including banks and credit reporting agencies.

Client authorizes Processor and Bank and their affiliates to debit Client's designated bank account via Automated Clearing House (ACH) for costs associated with the equipment hardware, software and shipping.

Client certifies and agrees that Client does not and will not provide, offer or facilitate gambling services, including offering or facilitating internet gambling services, or establishing quasi-cash, credit or monetary value of any type that may be used to conduct gambling.

**CIP - Card Identification Program -** IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We will also ask for a copy of your driver's license or other identifying documents.

Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct. Client agrees to all terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by Processor and Bank.

**Certification of Beneficial Owner(s)**

Persons opening an Account on behalf of a legal entity must provide the following information:

**a.** Name and title of natural person opening Account,

**b.** Name, address and entity type of legal entity for which the account is being opened as provided in section 2,

**c.** The following information (Name, Date of Birth, Address, and a Social Security Number for a US person or, for a non-US person, a Social Security Number or unexpired alien ID card number, or the number and country of issuance of an unexpired passport or other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard) for each individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the legal entity (provided in Section 4 above), and

**d.** The following information (Name, Date of Birth, Address, and a Social Security Number for a US person or, for a non-US person, a Social Security Number or unexpired alien ID card number, or the number and country of issuance of an unexpired passport or other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard) for one individual (referred to herein as the "control prong" for purposes of the FinCen Rule) with significant responsibility for managing the legal entity listed on the Merchant Processing Application and Agreement such as: An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer), or any other individual who regularly performs similar functions. The under-signed individual opening the Account on behalf of the Client legal entity, has identified the Guarantor as the "control prong" for the Client legal entity, and the Guarantor, by his or her signature below acknowledges that he or she is so regarded.

I, the signer and person opening this Account, hereby certify that I am authorized to open accounts for the Client at financial institutions, and, to the best of my knowledge, that the information provided on this Merchant Processing Application and Agreement is complete and correct. Client agrees to all the terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by Processor and Bank. Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct.

**Client's Business Principal/Officer**

Signature _____*Kaine Wen*_____     Title _____     Signature _____     Title _____

Print Name **Kaine Wen**     Date _____     Print Name _____     Date _____

**Personal Guarantee**

In exchange for Quantum Electronic Payments, LLC ("Processor") AND Commercial Bank of California ("Bank") (the Guaranteed Parties) acceptance of the Merchant Processing Application and Agreement with the Client named therein (which Merchant Processing Application and Agreement is hereby incorporated by reference into this Personal Guaranty), the undersigned unconditionally and irrevocably guarantees the full payment and performance of Client's obligations under the foregoing agreements, as applicable, as they now exist or as modified from time to time, whether before or after termination or expiration of such agreements and whether or not the undersigned has received notice of any amendment of such agreements. The undersigned waives notice of default by Client and agrees to indemnify the Guaranteed Parties for any and all amounts due from Client under the foregoing agreements. The Guaranteed Parties shall not be required to first proceed against Client to enforce any remedy before proceeding against the undersigned. This is a continuing personal guaranty and shall not be discharged or affected for any reason. The undersigned understands that this is a Personal Guaranty of payment and not of collection and that the Guaranteed Parties are relying upon this Personal Guaranty in entering in to the foregoing agreements, as applicable. The undersigned authorizes Processor and Bank, and their respective agents, (a) to investigate the references, statements, and other data contained in the Merchant Processing Application and to obtain additional information (including, but not limited to, consumer credit reports) from credit bureaus, consumer reporting agencies and other lawful sources bearing on his or her personal credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living (if the undersigned asks Processor or Bank whether a consumer report was requested, Processor or Bank will tell such person, and if a report was requested will provide the name and address of the agency which furnished the report), and (b) to contact all previous employers, personal references, and educational institutions as well as to provide amongst each other, the information contained in the Merchant Processing Application as well as any information received from references including banks and consumer reporting agencies. If the Application is approved, the undersigned authorizes Processor and Bank to obtain subsequent consumer reports in connection with the maintenance, updating, renewal or extension of the Agreement.

Signature _____*Kaine Wen*_____     Print Name **Kaine Wen**     Title _____

**Accepted By Processor**
625 The City Drive S. #420, Orange, CA 92868

Signature _____

Title _____     Date _____

**Accepted By Commercial Bank of California**
19752 MacArthur Blvd., Suite 100, Irvine, CA 92612

Signature _____

Title _____     Date _____

**PART IV: CONFIRMATION PAGE**

**ISO INFORMATION:**                    Name: **Quantum Electronic Payments LLC**
                                        Address: **625 The City Drive S. #420, Orange, CA 92868**

Please read the Program Guide in its entirety. It describes the terms under which we will provide merchant processing Services to you.

**Program Guide: https://www.quantumelectronicpayments.com/2018-program-guide/**

From time to time you may have questions regarding the contents of your Agreement with Bank and/or Processor. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.

**1. Your Discount Rates are assessed** on transactions that qualify for certain reduced interchange rates imposed by Visa, MasterCard, American Express and/or Discover. Any transactions that fail to qualify for these reduced rates will be charged an additional fee.

**2. We may debit your bank account** from time to time for amounts owed to us under the Agreement.

**3. There are many reasons why a Charge-back may occur.** When they occur we will debit your settlement funds or settlement account. For a more detailed discussion, see the Chargebacks Section of the Program Guide.

**4. If you dispute any charge or funding,** you must notify us within 60 days of the date of the statement where the charge or funding appears for Card Processing.

**5. The Agreement limits our liability to you.** For a detailed description, see the Limitation of Liability section of the Program Guide.

**6. We have assumed certain risks** by agreeing to provide you with Card processing or check services. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you, under certain circumstances as described in the Term, Events of Default, Reserve Account, and Security Interest sections of the Program Guide.

**7. By executing this Agreement** with us you are authorizing us and our Affiliates to obtain financial and credit information regarding your business and the signers and guarantors of the Agreement until all your obligations to us and our Affiliates are satisfied.

**8. The Agreement contains a provision** that in the event you terminate the Agreement prior to the expiration of your term, you will be responsible for the payment of an early termination fee as set forth in the "Additional Fee Information" section of the Program Guide.

**9. You may elect to lease equipment from Processor** or third parties under a separate lease agreement not included in the Program Guide. Notwithstanding anything to the contrary herein, Commercial Bank of California neither sells nor leases any equipment to Client and has no responsibility or liability for equipment you obtain through Processor or from others

**10. For questions regarding your Merchant Processing** Application and Agreement, please contact Customer Service at 1-888-858-1678, and /or refer to Important Phone Numbers on the Additional Important Information Page.

**11. Card Organization Disclosure**
Visa and MasterCard Member Bank Information: Commercial Bank of California
The Bank's mailing address is 19752 MacArthur Blvd., Suite 100, Irvine, CA 92612, and its phone number is (310) 882-4800.

**Important Member Bank Responsibilities:**
a) The Bank is the only entity approved to extend acceptance of Visa and MasterCard products directly to a Merchant.
b) The Bank must be a principal party to the Merchant Agreement.
c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard rules with which Merchants must comply; but this information may be provided to you by Processor.
d) The Bank is responsible for and must provide settlement funds to the Merchant.
e) The Bank is responsible for all funds held in reserves that are derived from settlement.

**Important Merchant Responsibilities:**
a) Ensure compliance with Cardholder data security and storage requirements.
b) Maintain fraud and Chargebacks below Card Organization thresholds.
c) Review and understand the terms of the Merchant Agreement.
d) Comply with Card Organization rules and applicable law and regulations.
e) Retain assigned copy of this Disclosure Page.
f) You may download "Visa Regulations from Visa's website at: **http://usa.visa.com/merchants/operations/op_regulations.html**
g) You may download "MasterCard Regulations" from MasterCard's website at: **http://www.mastercard.com/us/merchant/support/rules/html**

**Print Client's Business Name:** <u>True Count Staffing</u>

**By its signature below, Client acknowledges that it has received (either in person, by facsimile, or by electronic transmission) the complete Program Guide including this confirmation.**

Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement. Upon receipt of a signed facsimile or original of this Confirmation Page by us, Client's Application will be processed. Client understands that a copy of the Program Guide is also available for downloading from the Internet using the Program Guide link above.

**NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED.**

Client's Business Principal: Signature _____   Title **Managing Partner**

Print Name of Signer **Kaine Wen** _____   Date _____

**Accepted By Commercial Bank of California** 19752 MacArthur Blvd., Suite 100, Irvine, CA 92612

Signature _____   Title _____   Date _____

# Document Preparation and Service Agreement ("Agreement")

This Agreement is entered into on the date shown below between SL ACCOUNT MGMT (Hereinafter referred to as "Company") and the Client shown below (Hereinafter referred to as "Client").

**Company provides document preparation services to assist consumers who are applying for federal student loan programs using Department of Education ("DOE") forms. Company is a private company, not affiliated with any government agency, and for a fee Company will assist in preparation and completion of student loan consolidation or other application documents for student loan debt assistance programs offered by the DOE, for delivery to Client for Client's review and submission to the DOE. Company is not a lender, a debt consolidation company, or a law firm and does not provide legal advice. Company shall deliver completed applications to Client, for Client's use and submission to the DOE.**

Company and Client do hereby understand, covenant, and agree to the following:

1.      **Provide Complete and Truthful Information**. Company will provide Client with an overview session limited to Client's federal student loan debts and Company's services. Client expressly represents and warrants that Client will provide Company with information that is complete, accurate, and truthful.

2.      **Performance of Services**. Upon receipt of all information from Client, Company shall promptly review the information provided by the Client and complete the application forms required for the DOE program(s) that have been selected by the Client. Company shall prepare for filing an application to initiate a federal student loan consolidation through the DOE on behalf of Client, or alternatively and at the Client's option, identify and apply for other DOE-sponsored programs suitable for Client. All completed applications shall be delivered by Company to Client for Client's approval, signature, and direct submission to DOE.

**By initialing here, Client requests Company to complete & submit executed application to DOE.**

Initials _____

3.      **Fees that Client Pays**. The payment for Company's services relating to the student loan assistance applications, their preparation, delivery to Client, and ongoing support are described in the attached Fee and Service Schedule (Exhibit A). Client should review the attached Fee and Service Schedule carefully as it sets forth one or more fees that the Client will be charged depending on the services that are selected. All fees are earned, due, and payable pursuant to the attached Fee and Service Schedule. Payments may be collected on a periodic payment option as indicated in the attached Draft Schedule (Exhibit B). The fees shall be debited from Client's bank