Case 8:19-cv-01998-MWF-KS Document 33-1 Filed 10/21/19 Page 1 of 4 Page ID #:1156
The Consumer Advocacy Center Inc. d/b/a
Premier Student Loan Center ("PSL")
CONFIDENTIAL
REDACTED
PER 12 USC 3413

DocuSign Envelope ID: DEC01BE6-0424-4D9A-AB20-DB5C0AF9717A

MERCHANT AGREEMENT 0413 AR

*[Body text of merchant agreement is too low-resolution to reliably transcribe. Sections visible include:]*

Merchant shall follow instructions from the Authorization Center, including recovery of Cards by reasonable and peaceful means. Merchant shall retain or retrieve Cards, as required by the Rules, which are expired or for which reasonable grounds exist to believe that such Cards are counterfeit, fraudulent or stolen...

7. **Settlement.** Merchant agrees to balance and settle its POS device transactions daily and to electronically submit sales no later than the day following the date of Authorization. Transactions submitted for settlement more than one day after the date of Authorization may be refused, become subject to Chargeback or assessed additional fees by Bank and EMS. Transactions charged to a Card issued by a foreign (non-U.S.A.) issuer or a commercial card issued for business purposes may be assessed additional fees. Merchant acknowledges that all transactions between Merchant, Bank and EMS under this Agreement shall be treated as a single transaction and that all settlements are provisional subject to the cardholder's rights under the Rules for disputing charges against the cardholder's account. In submitting transactions to Bank and EMS, Merchant endorses and assigns to Bank and EMS all right, title and interest to such items with rights of endorsement. Bank and EMS have the right to receive payment on all Transactions acquired and Merchant will not attempt to collect any such Transactions. If any payment is received, Merchant will hold it in trust and promptly deliver it to Bank or EMS.

8. **Payment.** Merchant may not assign to any third party any payments due to it under this Agreement, provided, however, that Merchant may sell and assign future Transaction receivables to EMS, its affiliated entities and/or any other cash advance funding source that partners with EMS or its affiliated entities. Unless the context indicates otherwise, when used in this Section 8, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). Merchant shall at all times maintain a commercial checking account with Bank or with another financial institution of Merchant's choice acceptable to Bank and EMS that belongs to the Automated Clearing House ("ACH") network, that can accept ACH transactions, and that Bank and EMS will use to debit and/or credit funds on a daily or monthly basis ("Merchant's Bank"). Bank will debit Merchant's Designated Deposit Account ("DDA") daily for the Discount Fees...

9. **Discount Fees, Transaction Fees, and Access Fees.** (a) The Bank must approve, in advance, any fee to or obligation of the Merchant arising from or related to performance of this Agreement. (b) Merchant agrees to pay to Bank and EMS the Discount Fees, Transaction Fees, Access Fees, and other fees stated in the Schedule of Fees...

10. **Sales Drafts.** Merchant agrees to use a POS device, computer, telephone and related equipment approved by Bank and EMS for transmission of all Transaction data and to record each Transaction by "swiping" the Card through the POS device whenever a Card is present, or if a Card cannot be electronically read, to enter the Card number and expiration date into the POS device manually. Merchant shall prepare a sales draft in legible form for each Transaction...

11. **Retention of Records.** Bank and/or EMS may examine and verify at reasonable times all records of Merchant pertaining to all Transactions processed hereunder. Merchant will be responsible for the retrieval of all sales drafts and receipts and credit receipts requested by Bank or EMS within the time limits established by the Rules...

12. **Chargebacks.** For purposes of this Agreement, "Chargeback" shall mean the procedure by which a sales draft or other indicia of a Transaction (or disputed portion thereof) is denied or returned to Bank or the issuing bank after it was entered into the appropriate settlement network for payment, in accordance with the Rules, for failing to comply with the Rules or due to a cardholder dispute, the liability of which is the Merchant's responsibility...

13. **Returns and Credits.** Merchant shall maintain a fair policy permitting refunds, exchanges, returns and adjustments in accordance with applicable law. If, with respect to any Transaction, any goods are accepted for return...

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019, received 6/10/2019
EMS CID response
PSL - 4
Pl. Ex. 30
p. 491
R-013763-00000014

Case 8:19-cv-01998-MWF-KS Document 33-1 Filed 10/21/19 Page 2 of 4 Page ID #:1157
In re Consumer Advocacy Center Inc. d/b/a
Premier Student Loan Center ("PSL")
CONFIDENTIAL
REDACTED PER 12 USC 3413

Premier Student Loan Center
DocuSign Envelope ID: DEC01BE6-0424-4D9A-AB20-DB5C0AF9717A
MERCHANT AGREEMENT 04/15 A9

or any services are refunded, terminated or canceled, or any price adjustment is allowed by Merchant and except where otherwise required by law or governmental regulations, Merchant shall not under any circumstances, except as permitted by certain debit card networks, during the term of this Agreement, issue cash for return of goods or cancellations of service where goods or services were originally purchased in a Transaction. Instead, Merchant shall utilize a credit record evidencing such refund or adjustment. Merchant must process the credit record Transaction within three (3) business days of the original Transaction. Merchant shall date each credit record with the credit date and include thereon a brief description of the goods returned, services canceled or adjustment made and the amount of the credit, in sufficient detail to identify the Transaction. A completed copy of the credit record shall be delivered to the cardholder at the time of such return or cancellation of a transaction. The credit shall not exceed the amount of the original Transaction. The par item Transaction Fee will be applicable and Merchant may not receive a refund of Discount Fees paid for the original Transaction. With proper disclosure at the time of the Transaction, Merchant may: (a) refuse to accept goods in return or exchange and refuse to issue a refund to a cardholder; (b) accept returned goods in exchange for the Merchant's promise to deliver goods or services of equal value available from Merchant at no additional cost to cardholder; or (c) stipulate special circumstances agreed to by the cardholder. Proper disclosure shall be deemed to have been given only if, at the time of the Transaction, the following notice appears on all copies of the sales draft in legible letters at least one-quarter (1/4) inch high and in close proximity to the space provided for the cardholder's signature stating "NO REFUND" or "EXCHANGE ONLY" or "IN STORE CREDIT ONLY" or any special terms as applicable, or equivalent language, provided and to the extent such sales practices are permitted under applicable law.

14. Security Interest. Unless the context indicates otherwise, when used in this Section 14, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). IN ORDER TO SECURE ALL OBLIGATIONS OF MERCHANT TO BANK AND EMS ARISING FROM THIS AGREEMENT, MERCHANT HEREBY GRANTS BANK AND EMS A CONTINUING SECURITY INTEREST IN AND TO ALL DEPOSITS, REGARDLESS OF SOURCE, TO MERCHANT'S DDA AND OTHER ACCOUNTS IN THE DIRECT OR INDIRECT CONTROL OF THE BANK (INCLUDING THE RESERVE ACCOUNT), ESTABLISHED IN MERCHANT'S NAME OR BY ANY PARTY SIGNING THE PERSONAL GUARANTY AS PART OF THIS AGREEMENT, AND TO ALL PROCEEDS OF SAID DEPOSITS. Said security interest may be set-off or otherwise exercised by BANK without notice or demand of any kind by making an immediate withdrawal from or holding said account, upon Bank's or EMS's reasonable determination that a breach of any obligation of Merchant under this Agreement has occurred. The exercise of this security interest shall be in addition to any other rights of Bank and EMS under this Agreement or applicable laws. The parties specifically acknowledge and affirm that pursuant to the Uniform Commercial Code, Bank has a general lien and right of offset upon all funds on deposit with Bank, which shall stand as one continuing collateral security for the timely performance by Merchant of all of its obligations to Bank and EMS. Bank and EMS shall also have the right to require Merchant to furnish such other and different security as Bank or EMS shall deem appropriate in their sole discretion in order to secure Merchant's obligations under this Agreement. Merchant agrees to execute any documents or take any actions required in order to comply with and perfect any security interest under this Section, at Merchant's cost. To the extent permitted by law and the Rules, Merchant irrevocably authorizes Bank and EMS to record any financing statement or other documents relating to this security interest. Merchant represents and warrants that no other person or entity has a security interest in the property described herein and that this security interest is a first lien security interest and secures Merchant's obligations to Bank under this Agreement. Merchant must obtain the prior written consent of Bank before granting any subsequent security interest in the property described herein.

15. Reserve Account. Unless the context indicates otherwise, when used in this Section 15, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). In addition to the security interest and Chargeback rights granted to Bank and EMS by Merchant, Merchant hereby authorizes Bank and EMS to establish a non-interest bearing "Reserve Account", with or without notice to the Merchant, at any time prior to, at, or after the termination of this Agreement, when the Bank or EMS have determined that any of the following has occurred: (a) reasonable doubt exists concerning Merchant's ability to comply with this Agreement, (b) Merchant's breach of this Agreement or other applicable Rules and regulations; (c) excessive Chargebacks, customer disputes, ACH rejects, retrieval requests or the reasonable possibility of any of the foregoing occurring; (d) inability of the Merchant to fund any potential Chargebacks, post termination fees, charges or other expenses and fees payable to the Bank or EMS; (e) suspicious Transaction activity or Transaction activity which requires further research to verify or substantiate. The Reserve Account is not a bank account, but is an account payable to Merchant by Bank or EMS, as the case may be. Bank may elect to deposit all or a portion of the balance of the Reserve Account in a depository account or trust account at Bank or at another financial institution, however, neither Merchant nor its creditors shall have any rights of withdrawal, pledge or assignment with respect to any such bank account. The Reserve Account may be funded, supplemented or replenished by the Bank or EMS in any or all of the following methods to the extent permitted by the Rules: (a) one or more debits to Merchant's DDA; (b) one or more deductions from payments due Merchant (including but not limited to regular deductions calculated as a percentage of net batch amounts); or (c) if Bank, EMS and Merchant agree, delivery of letter of credit or certificate of deposit issued by a financial institution acceptable to Bank and EMS. Merchant hereby agrees that Bank or EMS shall have a full right of offset with respect to the Reserve Account, and that Bank may deduct from this Reserve Account any amount owed to such party in accordance with this Agreement or any other agreement with Merchant. Any balance in the Reserve Account may be held until the expiration of any applicable Chargeback rights under applicable Rules of the Card Issuer, whose holding period may extend beyond the termination of this Agreement. Bank may fund, supplement or replenish the Reserve Account in such an amount as Bank or EMS may reasonably estimate is necessary to secure Merchant's payment obligations under this Agreement. Without limiting the generality of the foregoing, Merchant shall, upon termination of this Agreement, maintain sufficient balance in the Reserve Account in such amount as may be reasonably required by Bank or EMS until all of the Chargeback rights of the Transactions processed preceding termination have expired. If, after all such Chargeback rights have expired, Bank and EMS are unable to return the funds in the Reserve Account to Merchant after using reasonable efforts to contact Merchant, a fee of $95 per month shall be deducted from the Reserve Account in order to offset the administrative, clerical, legal, and risk management costs incurred by Bank and EMS to monitor the funds remaining in the Reserve Account. Merchant hereby agrees that any financial institution at which Merchant maintains a deposit account may rely upon an executed copy of this Agreement provided by Bank as Merchant's express, written instruction and authorization to permit such offset by Bank, and Merchant's agreement that said financial institution shall be released from any liability for any good faith compliance with the express written instruction and authorization as set forth herein to permit such offset by Bank.

16. Warranties by Merchant. Merchant represents and warrants to Bank and EMS that Merchant has taken all necessary action and has the authority to enter into this Agreement with Bank and EMS and that the person(s) signing for or on behalf of Merchant is (are) specifically authorized and directed to do so by Merchant. This Agreement constitutes the legal, valid and binding obligation of Merchant, enforceable against Merchant in accordance with its terms. Without limiting any other representations, warranties, covenants and agreements hereunder, Merchant agrees, represents and warrants to Bank and EMS that at all times during the term of this Agreement: (a) Merchant is engaged and will engage in the lawful business shown on the front of the Application and is duly licensed under the laws of the State, County and City in which Merchant is located to conduct such business; (b) Merchant currently accepts or desires to accept Cards for the purchase of goods and services through Transactions with cardholders; (c) Merchant has not been terminated from the settlement of card transactions by any financial institution or determined to be in violation of the rules and regulations of Bank, EMS, MasterCard, Visa, American Express or any other Card Brand or network; (d) Merchant will fully comply with all federal, state, and local laws, rules and regulations, as amended from time to time, including all laws with respect to consumer protection and credit, and the Rules; (e) Merchant is aware that Visa, MasterCard, American Express and other Card Brands maintain and publish various guides and best practices policies with respect to risk management, cardholder data security, chargeback management, fraud prevention, and dispute resolution and will familiarize itself with those materials and any amendments to them, and will accept Cards in accordance with the terms of this Agreement and the operating and other rules and regulations of the Card Brands including without limitation the American Express Merchant Operating Guide as such terms may be amended from time to time, (f) except to the extent inconsistent with specific provisions of this Agreement, Merchant also will comply with any and all best practices guidelines provided by EMS; (g) Merchant will provide Bank and EMS sixty (60) days prior written notice of its intent to (i) transfer or sell 10% or more of its total stock, assets and/or liquidate, (ii) change the nature of its business, or (iii) convert all or part of its retail sales to mail, e-commerce, or telephone orders or any other sales method in which the Card is not present and swiped through the POS terminal, (h) as to each Transaction presented to Bank and EMS for payment: (i) the sales draft is and will be valid in form and has been completed in accordance with the Rules, all applicable laws and requirements, (ii) Merchant has delivered goods to the Cardholder or completed the service described on the sales draft in accordance with Merchant's agreement with the Cardholder, (iii) each sales draft represents a bona fide Transaction directly between the Merchant and the cardholder in the Merchant's ordinary course of business and the sales draft shows the cardholder's indebtedness for the total amount shown, (iv) the Cardholder has no claim, defense, right of offset, or dispute against Merchant in connection with the purchase of the goods or service and Merchant will provide adequate services to cardholders and will honor all warranties applicable thereto, (v) Merchant has not charged cardholder any separate or additional fee(s) in connection with the Transaction other than as may be required by law or permitted by the Rules (the foregoing shall not prohibit Merchant from extending discounts to customers paying by cash, check, or any other means, other than by Card), and (vi) each Transaction was and will be placed by a person who is the cardholder or authorized user of the Card, (i) all of Merchant's business locations engage and will engage in the same or substantially similar business activity as that listed on the face of this Agreement; (j) the percentage of mail and/or telephone order sales is/will by Merchant is and will be consistent at all of Merchant's locations; (k) Merchant does not and will not offer enticements or incentives to cardholders in connection with Transactions for the sale of Merchant products; (l) Merchant uses and will use both the name and address shown on the front of the Agreement on all sales drafts and does not and will not use any other name; (m) Merchant shall include all items of goods and services purchased in a single Transaction in the total amount on a single sales draft or transaction record (i.e., Merchant shall not "split tickets") and shall not submit duplicates of any transaction; (n) Merchant will process no Transaction between a cardholder and an entity other than Merchant; (o) Merchant shall be responsible for its employees' and agents' actions whether or not authorized by Merchant; (p) Merchant will not knowingly submit, and hereby acknowledges that Bank and EMS will not knowingly accept, for submission any Transaction that is illegal or that the Merchant should have known was illegal, (q) in the event Merchant was undergoing a forensic investigation at the time this Agreement was signed, Merchant fully cooperates with the investigation until it was completed; and (r) Merchant certifies that it has provided Bank and EMS its correct federal tax identification number; is not subject to backup withholding; and is a U.S. citizen or other U.S. person. Merchant further warrants and agrees that it shall not, without the cardholder's consent and as permitted by law and the Rules, sell, purchase, provide, or exchange card account information in the form of sales drafts, mailing lists, tapes, or any other media obtained by reason of a Transaction or otherwise, to any third party other than to Merchant's agents approved by Bank and EMS for the purpose of assisting Merchant in its business, to Bank, EMS, or the respective card issuer or Card Brand or pursuant to lawful government demand. All media containing card account numbers must be stored in an area limited to selected personnel until discarding and must be destroyed in a manner that will render the data unreadable. Merchant will not disclose and will keep confidential the terms and conditions of this Agreement. If Merchant processes and stores Card data and/or has access to that information via the Internet, Merchant agrees to comply with all Rules in respect of protecting Card data and maintaining security measures, including the PCI Council DSS. Failure to comply with the Rules or foregoing requirements, the occurrence of any significant circumstance that may create harm or loss of goodwill to any Card Brand, and/or any security breach compromising Card data shall make the Merchant liable for any network fines, fees and/or unauthorized charges to compromised Card accounts. Merchant understands and agrees that violation of any of the foregoing warranties, representations, covenants and agreements or otherwise provided in this Agreement shall constitute an event of default and breach by Merchant of this Agreement, and may cause this Agreement to be immediately terminated, or be subject to termination, and may result in all funds being placed in a Reserve Account pursuant to Section 15 hereof.

17. Term. The term of this Agreement shall be twenty four (24) months commencing on the acceptance of the Application and this Agreement by Bank and EMS and the issuance of a merchant account identification number to Merchant identifying Merchant for accounting, billing, customer service and related purposes in connection with the Services. Thereafter, the Term shall automatically renew for additional consecutive twenty four (24) month terms, unless written notice of termination (to be effective upon the expiration of the then current term) is provided by Merchant to Bank and EMS or by Bank and EMS to Merchant at least ninety (90) days prior to the then existing term, unless earlier terminated in accordance with the provisions of this Agreement.

18. Termination and Events of Default. Bank and/or EMS, in addition to any rights of immediate termination without notice as may be contained elsewhere in this Agreement, may terminate this Agreement, and at Bank's and/or EMS's discretion, any merchant processing agreement(s) of any other business that is commonly owned with or controlled by Merchant for any reason or cause (or for no reason) whatsoever upon ten (10) business days prior written notice to Merchant; provided, that Bank and/or EMS may immediately suspend operation of this Agreement and/or take other steps Bank and/or EMS consider necessary. Such termination shall become effective on the later of ten (10) business days from the date such notice is given in the manner prescribed for notices herein or the date specified in such notice; provided, however, that in the event of termination by Bank or EMS due to breach by Merchant of any of the terms and conditions of this Agreement, such termination shall become effective immediately, and Merchant shall pay to EMS a termination fee in the amount of $585. This Agreement may also be terminated effective immediately upon the giving of notice at the discretion of Bank and/or EMS for reasons including but not limited to: (a) Bank and/or EMS determines that Merchant's type of business as indicated on the Application differs from the actual type of business Merchant operates; (b) Merchant moves or relocates to a new location without giving Bank and EMS at least thirty (30) days prior written notice; (c) the business as conducted by Merchant could endanger the safety and/or soundness of Bank or EMS; (d) the Merchant's owner, officer or corporate entity has a separate relationship with Bank and/or EMS and such relationship has been terminated by Bank and/or EMS; (e) Merchant and/or any of its guarantors files for bankruptcy or is otherwise shown to be insolvent; (f) Merchant has Chargebacks and or returns and credit transactions which exceed one-half of one percent (0.50%) of the total number of Transactions or the total dollar value of Transactions completed by Merchant in any thirty (30) calendar day period; (g) Merchant owes money to Bank and/or EMS or any of their respective affiliates, and fails to make a timely payment thereof; (h) Merchant has breached or is in default under an End-User Agreement or similar agreement regarding the provision of web hosting, e-mail, electronic commerce, domain name and/or other internet application or system services; (i) Merchant fails to notify Bank and EMS if it knows or suspects that cardholder personal information has been compromised, (j) EMS and / or Bank is otherwise not secure (as determined by EMS and / or Bank, in its sole and absolute discretion) with respect to Merchant's financial position; (k) the continued provision of services to Merchant would pose a level of risk and/or exposure to EMS or Bank (including, without limitation, credit, operational, reputational, financial, technological, security and/or fraud risk or exposure) that Bank or EMS considers, in its sole discretion, to be unacceptable; or (l) the Rules require that EMS and/or Bank terminate and/or suspend this Agreement. In addition, Merchant hereby acknowledges that the Card Brands have the right to terminate or limit this Agreement. Upon the occurrence of an event of default or the termination of this Agreement by Bank or EMS in accordance with the terms hereof, Bank and EMS shall be entitled to pursue all rights and remedies available to it or them under this Agreement, at law or in equity, including but not limited to placing the Merchant in the "Terminated Merchant File." All obligations of confidentiality and of any party to this Agreement to pay funds to another shall survive any termination hereof. Nothing herein shall be construed as relieving Merchant of the obligation to pay the Minimum Discount Fee as provided in Schedule of Fees for the term of this Agreement.

19. Indemnification; Bank and EMS Liability. Merchant agrees to indemnify and hold Bank and EMS harmless from and against any Card Brand fines, assessments, or fees, and all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) resulting from any breach of any warranty, covenant or agreement (including, without limitation, a violation of the Rules), or any misrepresentation by Merchant under this Agreement, or arising out of Merchant's or Merchant's employees' or agents' negligence or willful misconduct, in connection with Transactions or otherwise arising from Merchant's provision of products and services to cardholders. Except as expressly provided in this Agreement, Bank and EMS make no warranties whether express, implied or statutory, in connection with this Agreement. Without limiting the foregoing, BANK AND EMS DISCLAIM ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Bank or EMS may utilize systems of others, including those of any Card Brands, in connection with its performance of the services described hereunder. Bank and EMS shall not be responsible or liable for any information provided by others or for the use of any system or equipment of Bank and EMS or others or for any circumstances beyond its control. The sole and exclusive liability of Bank and EMS and remedy of Merchant hereunder (including negligence) shall be general money damages not to exceed the amount of the item subject to claim or dispute, regardless of the characterization of such action. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL BANK AND EMS, OR THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY, FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. Neither Bank nor EMS shall be responsible or liable for any action taken by Bank or EMS (or the results thereof) that is authorized by this Agreement, the Rules, or applicable regulations or law. Neither Bank nor EMS shall have liability for any taxes arising under this Agreement (which liability will be that of Merchant), other than taxes based on Bank's or EMS's income. Merchant acknowledges that Bank is directly involved in the administration of Merchant's Visa and Master Card Transactions (as a result of Bank's membership in those Card Brand associations), but Bank has no similar relationship with respect to its Discover Transactions or American Express Transactions. Merchant's relationship with those Card Brands is established (directly or indirectly) through EMS.

20. Force Majeure. The parties to this Agreement shall be released from liability hereunder for failure to perform any of the obligations herein where such failure to perform occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, communications failure, sabotage, war, military operation, national emergency, mechanical or electronic breakdown, civil commotion or the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or either party's compliance therewith, or governmental proclamation, regulation, or priority, or any other cause beyond either party's reasonable control, whether similar or dissimilar to such causes.

21. Notices. Any notice, request, instruction or other document directed to Merchant required or permitted under this Agreement shall be deemed to have been given (a) upon receipt if by (i) personal delivery or (ii) overnight courier service by way of a national courier; (b) upon transmission if by (i) e-mail to the address provided by Merchant on this Agreement, or (ii) fax to the fax number provided by Merchant on this Agreement; or (c) on the third day after the same shall be sent by first class mail, postage prepaid, to the address provided by Merchant on this Agreement or at such other address as Merchant may give to the Bank or EMS from time to time by written notice. Any notice, request, instruction or other document directed to Bank or EMS required or permitted under this Agreement shall be deemed to have been given on the third day after the same shall be sent by first class mail, postage prepaid, to EMS at 5005 Rockside Road, Suite PH100, Cleveland, Ohio 44131 and to Chesapeake Bank at 97 North Main Street, Kilmarnock, Virginia 22482, or to Merrick Bank at 10705 South Jordan Gateway, Suite 200, South Jordan, Utah 84095, or at such other addresses as EMS or Bank may give to the Merchant from time to time by written notice.

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand
dated 5/10/2019 received 6/10/2019
EMS CID response
PSL - 5
Pl. Ex. 30
p. 492
R-013763-00000015

Case 8:19-cv-01998-MWF-KS Document 33-1 Filed 10/21/19 Page 3 of 4 Page ID #:1158
In re Consumer Advocacy Center Inc. d/b/a
Premier Student Loan Center ("PSL")
CONFIDENTIAL
REDACTED PER 12 USC 3413

DocuSign Envelope ID: DEC01BE6-0424-4D9A-AB20-DB5C0AF9717A

22. Severability. [text illegible in scan]

23. Waiver. [text illegible in scan]

24. Entire Agreement. This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and understanding between the Merchant, Bank and EMS with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written. Neither this Agreement nor any portion or provision hereof may be changed, waived or amended orally or in any manner other than by a writing specifically identified as such and signed by the duly authorized representatives of Bank and EMS. This Agreement is not effective and may not be modified in any respect without the express written consent of Bank. Merchant and Guarantor(s) acknowledge and agree (i) that this Agreement is made as part of a transaction solely for business and commercial purposes and is not primarily for personal, family, or household purposes, and (ii) that Bank, EMS and Merchant are "business association" as defined in Ohio Revised Code Section 109.01(B)(2).

25. Assignment and Delegation. [text]

26. Disputes, Governing Law, Jurisdiction, and Venue. [text]

27. Arbitration. [text]

28. Compliance and Disclosure of Information; Patriot Act. [text]

29. Amendments. [text]

30. Privacy. Merchant acknowledges that it has read, understood, and hereby accepts EMS' Privacy Policy which is posted online at www.emscorporate.com/privacypolicy.

31. Survival. All representations, warranties and covenants shall survive the termination of this Agreement.

32. Construction. The captions contained in this Agreement are for the convenience of the parties and shall not be construed or interpreted to limit or otherwise define the scope of this Agreement.

33. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, such counterparts to constitute but one and the same instrument.

34. Exclusive Agent. [text]

35. Default Interest Rate. [text]

36. Financial Accommodation. [text]

37. Covenants applicable to American Express acceptance. [text]

Premier Student Loan Center
Merchant Name (Print)
Kaine Wen

By: _[signature]_ 11/2/2015
Authorized Signature        Date
Kaine Wen

Authorized Signer's Name (Print)

Its: ___

Guarantor ___ Date ___

Guarantor ___ Date ___

ELECTRONIC MERCHANT SYSTEMS

By: ___
          Date ___

Its: ___

BANK

By: ___
          Date ___

Its: ___
        BANK

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019; received 6/10/2019
EMS CID response
PSL - 6
Pl. Ex. 30
p. 493
R-013763-00000016

CONFIDENTIAL
In re Consumer Advocacy Center Inc. d/b/a Premier Student Loan Center ("PSL")
UNREDACTED PER 12 USC 3413

DocuSign SECURED

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Number: DEC01BE604244D9AAB20DB5C0AF9717A | | Status: Completed |
| Subject: Documents for your DocuSign Signature | | |
| Source Envelope: | | |
| Document Pages: 17 | Signatures: 11 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 2 | Stephanie Preidis |
| AutoNav: Enabled | | 5005 Rockside Rd |
| EnvelopeId Stamping: Enabled | | Independence, OH 44121 |
| | | spreidis@emscorporate.com |
| | | IP Address: 206.183.14.57 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>10/30/2015 2:36:49 PM PT | Holder: Stephanie Preidis<br>spreidis@emscorporate.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Kaine Wen<br>kaine@premierstudentloancenter.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Kaine Wen<br>87483AE8A34E4C8...<br><br>Using IP Address: 24.250.84.78 | Sent: 10/30/2015 2:39:41 PM PT<br>Viewed: 11/2/2015 1:32:04 PM PT<br>Signed: 11/2/2015 4:01:28 PM PT |

Electronic Record and Signature Disclosure:
Accepted: 11/2/2015 4:00:26 PM PT
ID: 7e2b3d26-4692-4116-bc63-2f12ab9f17fc

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/30/2015 2:39:41 PM PT |
| Certified Delivered | Security Checked | 11/2/2015 1:32:04 PM PT |
| Signing Complete | Security Checked | 11/2/2015 4:01:29 PM PT |
| Completed | Security Checked | 11/2/2015 4:01:29 PM PT |

## Electronic Record and Signature Disclosure

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019, received 6/10/2019
EMS CID response
PSL - 7
Pl. Ex. 30
p. 494
R-013763-00000017