CONFIDENTIAL

DocuSign Envelope ID: A6882224-067C-4687-B504-35F4772D6832

[Page of dense contractual text — Merchant Agreement, sections 7–12, largely illegible due to scan quality. Key section headings discernible include:]

**7. Settlement.** Merchant agrees to balance and settle its POS device transactions daily and to electronically submit sales no later than the day following the date of Authorization. Transactions submitted for settlement more than one day after the date of Authorization may be refused, become subject to Chargeback or assessed additional fees by Bank or EMS. ...

**8. Payment.** Merchant may not assign to any third party any payments due to it under this Agreement, provided, however, that Merchant may sell and assign future Transaction receivables to EMS, its affiliated entities and/or any other cash advance funding source that partners with EMS or its affiliated entities. ...

**9. Discount Fees, Transaction Fees, and Access Fees.** (a) The Bank must approve, in advance, any fee to be or obligation of the Merchant arising from or related to performance of this Agreement. (b) Merchant agrees to pay to Bank and EMS the Discount Fees, Transaction Fees, Access Fees, and other fees stated in the Schedule of Fees. ...

**10. Sales Drafts.** Merchant agrees to use a POS device, computer, telephone and related equipment approved by Bank and EMS for transmission of all Transaction data and to record each Transaction by "swiping" the Card through the POS device whenever a Card is present, or if a Card cannot be electronically read, to enter the Card number and expiration date into the POS device manually. ...

**11. Retention of Records.** Bank and/or EMS may examine and verify at reasonable times all records of Merchant pertaining to all Transactions processed hereunder. ...

**12. Chargebacks.** For purposes of this Agreement, "Chargeback" shall mean the procedure by which a sales draft or other indicia of a Transaction (or disputed portion thereof) is denied or returned to Bank or the issuing bank after it was entered into the appropriate settlement network for payment, in accordance with the Rules, for failing to comply with the Rules or due to a cardholder dispute, the liability of which is the Merchant's responsibility. ...

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand
dated 5/10/2019, received 6/10/2019
EMS CID response

SL1 - 4
Pl. Ex. 30
p. 511
R-013763-00000184

In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL")
UNREDACTED PER 12 USC 3413
CONFIDENTIAL

SL Account Mgmt
DocuSign Envelope ID: A6882224-067C-4687-B504-35F4772D6832

MERCHANT AGREEMENT 1215D

13. Returns and Credits. Merchant shall maintain a fair policy permitting refunds, exchanges, returns and adjustments in accordance with applicable law. If, with respect to any Transaction, any goods are accepted for return or any services are refunded, terminated or canceled, or any price adjustment is allowed by Merchant and except where otherwise required by law or governmental regulations, Merchant shall not under any circumstances, except as permitted by certain debit card networks, during the term of this Agreement, issue cash for return of goods or cancellations of service where goods or services were originally purchased in a Transaction. Instead, Merchant shall utilize a credit record evidencing such refund or adjustment. Merchant must process the credit record Transaction within three (3) business days of the original Transaction. Merchant shall date each credit record with the credit date and include thereon a brief description of the goods returned, services canceled or adjustment made and the amount of the credit, in sufficient detail to identify the Transaction. A completed copy of the credit record shall be delivered to the cardholder at the time of each return or cancellation of a transaction. The credit shall not exceed the amount of the original Transaction. The per item Transaction Fee will be applicable and Merchant may not receive a refund of Discount Fees paid for the original Transaction. With proper disclosure at the time of the Transaction, Merchant may: (a) refuse to accept goods in return or exchange and refuse to issue a refund to a cardholder; (b) accept returned goods in exchange for the Merchant's promise to deliver goods or services of equal value available from Merchant at no additional cost to cardholder; or (c) stipulate special circumstances agreed to by the cardholder. Proper disclosure shall be deemed to have been given only if, at the time of the Transaction, the following notice appears on all copies of the sales draft in legible letters at least one-quarter (1/4) inch high and in close proximity to the space provided for the cardholder's signature stating "NO REFUND" or "EXCHANGE ONLY" or "IN STORE CREDIT ONLY" or any special terms as applicable, or equivalent language, provided and to the extent such sales practices are permitted under applicable law.

14. Security Interest. Unless the context indicates otherwise, when used in this Section 14, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). IN ORDER TO SECURE ALL OBLIGATIONS OF MERCHANT TO BANK AND EMS ARISING FROM THIS AGREEMENT, MERCHANT HEREBY GRANTS BANK AND EMS A CONTINUING SECURITY INTEREST IN AND TO ALL DEPOSITS, REGARDLESS OF SOURCE, TO MERCHANT'S DDA AND OTHER ACCOUNTS IN THE DIRECT OR INDIRECT CONTROL OF THE BANK (INCLUDING THE RESERVE ACCOUNT), ESTABLISHED IN MERCHANT'S NAME OR BY ANY PARTY SIGNING THE PERSONAL GUARANTY AS PART OF THIS AGREEMENT, AND TO ALL PROCEEDS OF SAID DEPOSITS. Said security interest may be set-off or otherwise exercised by BANK without notice or demand of any kind by making an immediate withdrawal from or holding said account, upon Bank's or EMS's reasonable determination that a breach of any obligation of Merchant under this Agreement has occurred. The exercise of this security interest shall be in addition to any other rights of Bank and EMS under this Agreement or applicable laws. The parties specifically acknowledge and affirm that pursuant to the Uniform Commercial Code, Bank has a general lien and right of offset upon all funds on deposit with Bank, which shall stand as one continuing collateral security for the timely performance by Merchant of all of its obligations to Bank and EMS. Bank and EMS shall also have the right to require Merchant to furnish such other and different security as Bank or EMS shall deem appropriate in their sole discretion in order to secure Merchant's obligations under this Agreement. Merchant agrees to execute any documents or take any actions required in order to comply with and perfect any security interest under this Section, at Merchant's cost. To the extent permitted by law and the Rules, Merchant irrevocably authorizes Bank and EMS to record any financing statement or other documents relating to this security interest. Merchant represents and warrants that no other person or entity has a security interest in the property described herein and that this security interest is a first lien security interest and secures Merchant's obligations to Bank under this Agreement. Merchant must obtain the prior written consent of Bank before granting any subsequent security interest in the property described herein.

15. Reserve Account. Unless the context indicates otherwise, when used in this Section 15, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). In addition to the security interest and Chargeback rights granted to Bank and EMS by Merchant, Merchant hereby authorizes Bank or EMS to establish a non-interest bearing "Reserve Account", with or without notice to the Merchant, at any time prior to, at, or after the termination of this Agreement, when the Bank or EMS have determined that any of the following has occurred: (a) reasonable doubt exists concerning Merchant's ability to comply with this Agreement; (b) Merchant's breach of this Agreement or other applicable Rules and regulations; (c) excessive Chargebacks, customer disputes, ACH rejects, retrieval requests or the reasonable possibility of any of the foregoing occurring; (d) inability of the Merchant to fund any potential Chargebacks, post termination fees, charges or other expenses and fees payable to the Bank or EMS; (e) suspicious Transaction activity or Transaction activity which requires further research to verify or substantiate. The Reserve Account is not a bank account, but is an account payable to Merchant by Bank or EMS, as the case may be. Bank may elect to deposit all or a portion of the balance of the Reserve Account in a depository account or trust account at Bank or at another financial institution, however, neither Merchant nor its creditors shall have any rights of withdrawal, pledge or assignment with respect to any such bank account. The Reserve Account may be funded, supplemented or replenished by the Bank or EMS in any or all of the following methods to the extent permitted by the Rules: (a) one or more debits to Merchant's DDA; (b) one or more deductions from payments due Merchant (including but not limited to regular deductions calculated as a percentage of net batch amounts); or (c) if Bank, EMS and Merchant agree, delivery of letter of credit or certificate of deposit issued by a financial institution acceptable to Bank and EMS. Merchant hereby agrees that Bank or EMS shall have a full right of offset with respect to the Reserve Account, and that Bank may deduct from this Reserve Account any amount owed to such party in accordance with this Agreement or any other agreement with Merchant. Any balance in the Reserve Account may be held until the expiration of any applicable Chargeback rights under applicable Rules of the Card Issuer, whose holding period may extend beyond the termination of this Agreement. Bank may fund, supplement or replenish the Reserve Account in such an amount as Bank or EMS may reasonably estimate is necessary to secure Merchant's payment obligations under this Agreement. Without limiting the generality of the foregoing, Merchant shall, upon termination of this Agreement, maintain sufficient balance in the Reserve Account in such amount as may be reasonably required by Bank or EMS until all of the Chargeback rights of the Transactions processed preceding termination have expired. If, after all such Chargeback rights have expired, Bank and EMS are unable to return the funds in the Reserve Account to Merchant after using reasonable efforts to contact Merchant, a fee of $95 per month shall be deducted from the Reserve Account in order to offset the administrative, clerical, legal, and risk management costs incurred by Bank and EMS to monitor the funds remaining in the Reserve Account. Merchant hereby agrees that any financial institution at which Merchant maintains a deposit account may rely upon an executed copy of this Agreement provided by Bank as Merchant's express, written instruction and authorization to permit such offset by Bank, and Merchant's agreement that said financial institution shall be released from any liability for any good faith compliance with the express written instruction and authorization as set forth herein to permit such offset by Bank.

16. Warranties by Merchant. Merchant represents and warrants to Bank and EMS that Merchant has taken all necessary action and has the authority to enter into this Agreement with Bank and EMS and that the person(s) signing for or on behalf of Merchant is (are) specifically authorized and directed to do so by Merchant. This Agreement constitutes the legal, valid and binding obligation of Merchant, enforceable against Merchant in accordance with its terms. Without limiting any other representations, warranties, covenants and agreements hereunder, Merchant agrees, represents and warrants to Bank and EMS that at all times during the term of this Agreement: (a) Merchant is engaged and will engage in the lawful business shown on the front of the Application and is duly licensed under the laws of the State, County and City in which Merchant is located to conduct such business; (b) Merchant currently accepts or desires to accept Cards for the purchase of goods and services through Transactions with cardholders; (c) Merchant has not been terminated from the settlement of card transactions by any financial institution or determined to be in violation of the rules and regulations of Bank, EMS, MasterCard, Visa, American Express or any other Card Brand or network; (d) Merchant will fully comply with all federal, state, and local laws, rules and regulations, as amended from time to time, including all laws with respect to consumer protection and credit, and the Rules; (e) Merchant is aware that Visa, MasterCard, American Express and other Card Brands maintain and publish various guides and best practices policies with respect to risk management, cardholder data security, chargeback management, fraud prevention, and dispute resolution and will familiarize itself with those materials and any amendments to them, and will accept Cards in accordance with the terms of this Agreement and the operating and other rules and regulations of the Card Brands including without limitation the American Express Merchant Operating Guide as such terms may be amended from time to time; (f) except to the extent inconsistent with specific provisions of this Agreement, Merchant also will comply with any and all best practices guidelines provided by EMS; (g) Merchant will provide Bank and EMS sixty (60) days prior written notice of its intent to (i) transfer or sell 10% or more of its total stock, assets and/or liquidate, (ii) change the nature of its business, or (iii) convert all or part of its retail sales to mail, e-commerce, or telephone orders or any other sales method in which the Card is not present and swiped through the POS terminal; (h) as to each Transaction presented to Bank and EMS for payment: (i) the sales draft is and will be valid in form and has been completed in accordance with the Rules, all applicable laws and requirements, (ii) Merchant has delivered goods to the Cardholder or completed the service described on the sales draft in accordance with Merchant's agreement with the Cardholder, (iii) each sales draft represents a bona fide Transaction directly between the Merchant and the cardholder in the Merchant's ordinary course of business and the sales draft shows the cardholder's indebtedness for the total amount shown, (iv) the cardholder has no claim, defense, right of offset, or dispute against Merchant in connection with the purchase of the goods or service and Merchant will provide adequate services to cardholders and will honor all warranties applicable thereto, (v) Merchant has not charged cardholder any separate or additional fee(s) in connection with the Transaction other than as may be required by law or permitted by the Rules (the foregoing shall not prohibit Merchant from extending discounts to customers paying by cash, check, or any other means, other than by Card), and (vi) each Transaction was and will be placed by a person who is the cardholder or authorized user of the Card; (i) all of Merchant's business locations engage and will engage in the same or substantially similar business activity as that listed on the face of this Agreement; (j) the percentage of mail and/or telephone order sales listed by Merchant is and will be consistent at all of Merchant's locations; (k) Merchant does not and will not offer enticements or incentives to cardholders in connection with Transactions for the sale of Merchant products; (l) Merchant uses and will use both the name and address shown on the front of the Agreement on all sales drafts and does not and will not use any other name; (m) Merchant shall include all items of goods and services purchased in a single Transaction in the total amount on a single sales draft or transaction record (i.e., Merchant shall not "split tickets") and shall not submit duplicates of any transaction; (n) Merchant will process no Transaction between a cardholder and an entity other than Merchant; (o) Merchant shall be responsible for its employees' and agents' actions whether or not authorized by Merchant; (p) Merchant will not knowingly submit, and hereby acknowledges that Bank and EMS will not knowingly accept, for submission any Transaction that is illegal or that the Merchant should have known was illegal; (q) in the event Merchant was undergoing a forensic investigation at the time this Agreement was signed, Merchant fully cooperate with the investigation until it was completed; and (r) Merchant certifies that it has provided Bank and EMS its correct federal tax identification number; is not subject to backup withholding; and is a U.S. citizen or other U.S. person. Merchant further warrants and agrees that it shall not, without the cardholder's consent and as permitted by law and the Rules, sell, purchase, provide, or exchange card account information in the form of sales drafts, mailing lists, tapes, or any other media obtained by reason of a Transaction or otherwise, to any third party other than to Merchant's agents approved by Bank and EMS for the purpose of assisting Merchant in its business, to Bank, EMS, or the respective card issuer or Card Brand or pursuant to lawful government demand. All media containing card account numbers must be stored in an area limited to selected personnel until discarding and must be destroyed in a manner that will render the data unreadable. Merchant will not disclose and will keep confidential the terms and conditions of this Agreement. If Merchant processes and stores Card data and/or has access to that information via the Internet, Merchant agrees to comply with all Rules in respect of protecting Card data and maintaining security measures, including the PCI Council DSS. Failure to comply with the Rules or foregoing requirements, the occurrence of any significant circumstance that may create harm or loss of goodwill to any Card Brand, and/or any security breach compromising Card data shall make the Merchant liable for any network fines, fees and/or unauthorized charges to compromised Card accounts. Merchant understands and agrees that violation of any of the foregoing warranties, representations, covenants and agreements or otherwise provided in this Agreement shall constitute an event of default and breach by Merchant of this Agreement, and may cause this Agreement to be immediately terminated, or be subject to termination, and may result in all funds being placed in a Reserve Account pursuant to Section 15 hereof.

17. Term. The term of this Agreement shall be twenty four (24) months commencing on the acceptance of the Application and this Agreement by Bank and EMS and the issuance of a merchant account identification number to Merchant identifying Merchant for accounting, billing, customer service and related purposes in connection with the Services. Thereafter, the Term shall automatically renew for additional consecutive twenty four (24) month terms, unless written notice of termination (to be effective upon the expiration of the then current term) is provided by Merchant to Bank and EMS or by Bank and EMS to Merchant at least ninety (90) days prior to the then existing term, unless earlier terminated in accordance with the provisions of this Agreement.

18. Termination and Events of Default. Bank and/or EMS, in addition to any rights of immediate termination without notice as may be contained elsewhere in this Agreement, may terminate this Agreement, and at Bank's and/or EMS's discretion, any merchant processing agreement(s) of any other business that is commonly owned with or controlled by Merchant for any reason or cause (or for no reason) whatsoever upon ten (10) business days prior written notice to Merchant; provided, that Bank and/or EMS may immediately suspend operation of this Agreement and/or take other steps Bank and/or EMS consider necessary. Such termination shall become effective on the later of ten (10) business days from the date such notice is given in the manner prescribed for notices herein or the date specified in such notice; provided, however, that in the event of termination by Bank or EMS due to breach by Merchant of any of the terms and conditions of this Agreement, such termination shall become effective immediately, and Merchant shall pay to EMS a termination fee in the amount of $595. This Agreement may also be terminated effective immediately upon the giving of notice at the discretion of Bank and/or EMS for reasons including but not limited to: (a) Bank and/or EMS determines that Merchant's type of business as indicated on the Application differs from the actual type of business Merchant operates; (b) Merchant moves or relocates to a new location without giving Bank and EMS at least thirty (30) days prior written notice; (c) the business as conducted by Merchant could endanger the safety and/or soundness of Bank or EMS; (d) the Merchant's owner, officer or corporate entity has a separate relationship with Bank and/or EMS and such relationship has been terminated by Bank and/or EMS; (e) Merchant and/or any of its guarantors files for bankruptcy or is otherwise shown to be insolvent; (f) Merchant has Chargebacks and or returns and credit transactions which exceed one-half of one percent (0.50%) of the total number of Transactions or the total dollar value of Transactions completed by Merchant in any thirty (30) calendar day period; (g) Merchant owes money to Bank and/or EMS or any of their respective affiliates, and fails to make a timely payment thereof; (h) Merchant has breached or is in default under an End-User Agreement or similar agreement regarding the provision of web hosting, e-mail, electronic commerce, domain name and/or other internet application or system services; (i) Merchant fails to notify Bank and EMS if it knows or suspects that cardholder personal information has been compromised; (j) EMS and / or Bank is otherwise not secure (as determined by EMS and / or Bank, in its sole and absolute discretion) with respect to Merchant's financial position; (k) the continued provision of services to Merchant would pose a level of risk and/or exposure to EMS or Bank (including, without limitation, credit, operational, reputational, financial, technological, security and/or fraud risk or exposure) that Bank or EMS considers, in its sole discretion, to be unacceptable; or (l) the Rules require that EMS and/or Bank terminate and/or suspend this Agreement. In addition, Merchant hereby acknowledges that the Card Brands have the right to terminate or limit this Agreement. Upon the occurrence of an event of default or the termination of this Agreement by Bank or EMS in accordance with the terms hereof, Bank and EMS shall be entitled to pursue all rights and remedies available to it or them under this Agreement, at law or in equity, including but not limited to placing the Merchant in the "Terminated Merchant File." All obligations of confidentiality and of any party to this Agreement to pay funds to another shall survive any termination hereof. Nothing herein shall be construed as relieving Merchant of the obligation for the Minimum Discount Fee as provided in Schedule of Fees for the term of this Agreement.

19. Indemnification; Bank and EMS Liability. Merchant agrees to indemnify and hold Bank and EMS harmless from and against any Card Brand fines, assessments, or fees, and all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) resulting from any breach of any warranty, covenant or agreement (including, without limitation, a violation of the Rules), or any misrepresentation by Merchant under this Agreement, or arising out of Merchant's or Merchant's employees' or agents' negligence or willful misconduct, in connection with Transactions or otherwise arising from Merchant's provision of products and services to cardholders. Except as expressly provided in this Agreement, Bank and EMS make no warranties whether express, implied or statutory, in connection with this Agreement. Without limiting the foregoing, BANK AND EMS DISCLAIM ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Bank or EMS may utilize systems of others, including those of any Card Brands, in connection with its performances of the services described hereunder. Bank and EMS shall not be responsible or liable for any information provided by others or for the use of any system or equipment of Bank and EMS or others or for any circumstances beyond its control. The sole and exclusive liability of Bank and EMS and remedy of Merchant hereunder (including negligence) shall be general money damages not to exceed the amount of the item subject to claim or dispute, regardless of the characterization of such action. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL BANK AND EMS, OR THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY, FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. Neither Bank nor EMS shall be responsible or liable for any action taken by Bank or EMS (or the results thereof) that is authorized by this Agreement, the Rules, or applicable regulations or law. Neither Bank nor EMS shall have liability for any taxes arising under this Agreement (which liability will be that of Merchant), other than taxes based on Bank's or EMS's income. Merchant acknowledges that Bank is directly involved in the administration of Merchant's Visa and Master Card Transactions (as a result of Bank's membership in those Card Brand associations), but Bank has no similar relationship with respect to its Discover Transactions or American Express Transactions. Merchant's relationship with those Card Brands is established (directly or indirectly) through EMS.

20. Force Majeure. The parties to this Agreement shall be released from liability hereunder for failure to perform any of the obligations herein where such failure to perform occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, communications failure, sabotage, war, military operation, national emergency, mechanical or electronic breakdown, civil commotion or the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or either party's compliance therewith, or governmental proclamation, regulation, or priority, or any other cause beyond either party's reasonable control, whether similar or dissimilar to such causes.

21. Notices. Any notice, request, instruction or other document directed to Merchant required or permitted under this Agreement shall be deemed to have been given: (a) upon receipt if by (i) personal delivery or (ii) overnight courier service by way of a national courier; (b) upon transmission if by (i) e-mail to the address provided by Merchant on the Agreement, or (ii) fax to the fax number provided by Merchant on this Agreement; or (c) on the third day after the same shall be sent by first class mail, postage prepaid, to the address provided by Merchant on this Agreement or at such other address as Merchant may give to the Bank or EMS from time to time by written notice. Any notice, request, instruction or other document directed to Bank or EMS required or permitted under this Agreement shall be deemed to have been given on the third day after the same shall be sent by first class mail, postage prepaid, to EMS at 5005 Rockside Road, Suite PH100, Cleveland, Ohio 44131 and to Chesapeake Bank at 97 North Main Street, Kilmarnock, Virginia 22482, or to Merrick Bank at 10705 South Jordan Gateway, Suite 200, South Jordan, Utah 84095. or at such

BANK COPY

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
EMS CID response
SL1 - 5
Pl. Ex. 30
p. 512
R-013763-00000185

In re True Count Staffing Inc. d/b/a SL Account Mgmt (SL1) UNREDACTED FEB 12 USC 3413
CONFIDENTIAL

DocuSign Envelope ID: A6882224-067C-4687-B504-35F4772D6832

other addresses as EMS or Bank may give to the Merchant from time to time by written notice.

22. Severability. If any part of this Agreement is held unenforceable or invalid or prohibited by law, said part shall be deemed stricken therefrom and this Agreement shall be read and interpreted as though said part did not exist, and shall not affect the validity or enforcement of any other provision.

23. Waiver. Neither the failure nor any delay on the part of Bank or EMS to exercise any right, remedy, power or privilege hereunder shall operate as a waiver nor be construed as an agreement to modify the terms of this Agreement, nor shall any single or partial exercise of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver by a party hereunder shall be effective unless it is in writing and signed by the party making such waiver, and then such waiver shall apply only to the extent specifically stated in such writing.

24. Entire Agreement. This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and understanding between the Merchant, Bank and EMS with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written. Neither this Agreement nor any portion or provision hereof may be changed, waived or amended orally or in any manner other than be a writing specifically identified as such and signed by the duly authorized representatives of Bank and EMS. This Agreement is not effective and may not be modified in any respect without the express written consent of Bank. Merchant and Guarantor(s) acknowledge and agree (i) that this Agreement is made as part of a transaction solely for business and commercial purposes and is not primarily for personal, family, or household purposes, and (ii) that Bank, EMS and Merchant are "business association(s)" as defined in Ohio Revised Code Section 169.01(B)(2).

25. Assignment and Delegation. This Agreement may be assigned by Bank. , EMS may subcontract, sublicense, assign, license, franchise, or in any manner extend or transfer to any third party any right or obligation of EMS set forth herein but only as may be approved by Bank and permitted under the Rules. This Agreement may not be assigned by Merchant without Bank's and EMS's prior written consents and any purported assignment without such consents shall be void. This Agreement shall be binding on the parties and their permitted heirs, successors, and assigns. Bank (and EMS, if and to the extent permitted under the Rules) reserves the right, in its sole discretion, to delegate or assign to third parties the performance of certain of Bank's (or EMS's, if applicable) servicing or settlement obligations to Merchant. The relationship of Bank, EMS and Merchant is solely that of independent parties contracting for services.

26. Disputes, Governing Law, Jurisdiction, and Venue. Bank and EMS shall have the absolute right to initiate or defend any and all disputes arising from this Agreement with Merchant. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. In the event of a claim by Bank and/or EMS for the failure of a Merchant to pay any Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant and guarantor(s) of Merchant's obligations and duties hereunder agree that personal jurisdiction and exclusive venue of any such claim shall lie in the federal or state courts of Cuyahoga County, Ohio, and Merchant and any guarantors do each hereby waive all objections to said jurisdiction and agree to submit thereto. Each party is responsible for its own costs and expenses, except that Merchant and/or guarantors shall be liable jointly and severally for all costs and expenses of Bank and EMS (including attorneys fees in connection with the enforcement of this Agreement), as a result of any breach or the collection of any sums due to Bank or EMS hereunder. In connection with any claim by Bank and/or EMS for the failure of a Merchant and/or guarantor(s) to pay any Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant and guarantor(s) hereby waive any right to assert any counterclaim or affirmative defense for set off or other relief against Bank and/or EMS, it being the parties' intention that any such counterclaims are subject to arbitration in accordance with the procedures set forth in Section 27 and that no such arbitration proceeding shall be commenced until after a final unappealed judgment is entered in the court proceedings. The parties hereby waive any right to trial by jury in connection with any dispute between them. Any claims concerning errors in the Fees charged hereunder must be made in writing within six months of the occurrence of the error on which the claim is based, and must specify the grounds for the claim. No such claim for Fees charged hereunder may be filed for Arbitration or in Court until thirty days after a written claim for such was first timely made. Merchant acknowledges and agrees that, in addition to clearing and settling Transactions, Bank collects fees, costs, and other charges due from Merchant under this Agreement at EMS' instruction. Merchant agrees that Bank has no duty to verify, audit, review or otherwise oversee the fees, costs, or other charges that Bank collects from Merchant.

27. Arbitration. Except as expressly provided in Section 26 any claim or dispute arising out of or related to this Agreement shall be finally resolved by final and binding arbitration. Whenever a party shall decide to institute arbitration proceedings, it shall give written notice to that effect to the other parties. The party giving such notice shall refrain from instituting the arbitration proceedings for a period of thirty (30) days following such notice to allow the parties to attempt to resolve the dispute between or among themselves. If the parties are still unable to resolve the dispute, the party giving notice may institute the arbitration proceeding under the rules of the American Arbitration Association ("AAA Rules"). There shall be no right or authority for any claims or disputes to be arbitrated on a class action basis. Arbitration shall exclusively and solely be held in Cleveland, Ohio. The arbitration shall be conducted before a single arbitrator mutually chosen by the parties, but if the parties have not agreed upon a single arbitrator within fifteen (15) days after notice of the institution of the arbitration proceeding, then the arbitration shall be conducted by a panel of three (3) arbitrators. In such case, Merchant, on the one hand, and Bank and/or EMS on the other, shall within thirty (30) days after notice of the institution of the arbitration proceedings appoint one arbitrator. The presiding arbitrator shall then be appointed in accordance with AAA Rules. Decisions of the arbitrator(s) shall be final and binding on the parties. The arbitrator shall have the authority to award any remedy or relief a court of the State of Ohio could order or grant, including, without limitation, specific performance of any obligation created under this Agreement, the awarding of the issuance of an injunction or the imposition of sanctions for abuse or frustration of the arbitration process. Judgment upon the award of the arbitrator may be entered in any court of competent jurisdiction and enforced with full judicial effect thereafter. All fees and expenses of the arbitration shall be borne by the parties equally and each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentations, provided, however, that the arbitrator(s) is/are authorized to award the prevailing party such sums as shall be deemed proper for the time, expense and inconvenience of arbitration, including arbitration fees and expenses and attorney fees and expenses. Except to the extent that entry of judgment and any subsequent enforcement may require disclosure, all matters relating to the arbitration, including the award, shall be held in confidence by the parties.

28. Compliance and Disclosure of Information; Patriot Act. Merchant shall provide such information and certifications as Bank and EMS may reasonably require from time to time in reviewing Merchant's compliance with the terms and conditions of this Agreement and the Rules. Merchant further agrees to produce and make available for inspection by Bank, EMS or its officers, agents or representatives, such books and records of Merchant as Bank or EMS may deem reasonably necessary to be adequately informed of the business practices and financial condition of Merchant, or the ability of Merchant to observe or perform its obligations to Bank and EMS pursuant to this Agreement. Merchant further agrees to provide to Bank or EMS within seven (7) days of notice such information as Bank or EMS may request including but not limited to, credit reports, personal and/or business financial statements, income tax returns, or other such information as Bank or EMS may request. Merchant grants to Bank and EMS continuing authority to conduct credit checks and background investigation and inquiries concerning Merchant and its owner(s) including, but not limited to, character and business references and the financial condition of Merchant and Merchant's owner(s). Merchant expressly authorizes Bank, EMS or its agents and representatives to provide and receive such information from any and all third parties directly, without further consent or authorization on the part of Merchant. Bank and EMS may share with others its credit, sales and other information. Merchant will not transfer, sell, or merge or liquidate its business or assets or otherwise transfer control of its business, change its ownership in any amount or respect, engage in any joint venture partnership or similar business arrangement, change its basic nature or method of business, types of products sold or engage in sales by phone, internet, or mail order without providing notice to Bank or EMS and providing Bank or EMS with the opportunity to terminate this Agreement. Merchant acknowledges that Bank has implemented a customer identification program as required under the USA Patriot Act and other similar state laws and regulations. Merchant agrees to make available to Bank and/or EMS such information as may be required by Bank in connection with its customer identification program and/or as required under the USA Patriot Act and related state laws and regulations. Merchant hereby expressly consents to disclosure by EMS of Transaction data, Merchant data, and other information about the Merchant to American Express, and, further, expressly consents to American Express' use such information to perform its responsibilities in connection with its Card program, promote the American Express Network, perform analytics and create reports, and for any other lawful business purposes, including commercial marketing communications purposes and important transactional or relationship communications from American Express. American Express may use the information obtained in this application at the time of setup to screen and/or monitor Merchant in connection with Card marketing and administrative purposes.

29. Amendments. This Agreement is not effective until, and not before, it is signed by the Bank, and may not be modified in any respect without the express written agreement of the Bank. This Agreement may be amended by Bank and EMS from time to time upon written notice. Any amendment to the fees and rates set forth in the Schedule of Fees, including any additional fees, shall be effective on 30 days written notice. Any other amendment to this Agreement shall be effective on the effective date specified in the notice unless otherwise provided for herein. In the event of any amendment of the terms and conditions of this Agreement or of the fees payable to Bank or EMS hereunder, Merchant shall have the right to terminate this Agreement without the payment of the termination fee provided in Section 10 above by providing Bank and EMS written notice of such termination within 30 days after Merchant received notice of the amendment, except as otherwise required by the Rules. No such termination shall effect any obligation of Merchant to

MERCHANT AGREEMENT 12153

pay any fees, charges, or other obligations incurred by Merchant under this Agreement prior to the date of termination. To the extent not inconsistent with the foregoing, Merchant's submission of transactions to Bank and EMS on or after any amendment effective date constitutes acceptance of such amendment. Any unrelated alteration or modification to the preprinted form of this Agreement has no effect and, at the Bank and EMS's discretion, may render this Agreement void.

30. Privacy. Merchant acknowledges that it has read, understood, and hereby accepts EMS' Privacy Policy which is posted online at www.emscorporate.com/privacypolicy.

31. Survival. All representations, warranties and covenants shall survive the termination of this Agreement.

32. Construction. The captions contained in this Agreement are for the convenience of the parties and shall not be construed or interpreted to limit or otherwise define the scope of this Agreement.

33. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, such counterparts to constitute but one and the same instrument.

34. Exclusive Agent. For purposes of this Agreement and performance of the Services by EMS, (a) EMS is the exclusive agent of Bank, (b) Bank is at all times and entirely responsible for and in control of EMS's performance hereunder, and (c) Bank must approve, in advance, any fee to or obligation of Merchant arising from or related to performance of this Agreement.

35. Default Interest Rate. Merchant agrees that all amounts due and payable by Merchant to Bank or EMS under this Agreement shall accrue interest at the rate of one and one-half percent (1.50%) per month, or the maximum interest rate permissible under law, whichever is lesser, beginning as of date due and continuing following any judgment obtained by Bank or EMS against Merchant until paid in full.

36. Financial Accommodation. The acquisition, processing and settlement of Transactions is a financial accommodation and, as such, in the event Merchant becomes a debtor in bankruptcy, this Agreement cannot be assigned or enforced and Bank and EMS shall be excused from performance hereunder.

37. Covenants applicable to American Express acceptance. The provisions of the American Express Operating Guide are incorporated herein by reference and made a part hereof (see http://www.americanexpress.com/merchantopguide). Merchant hereby expressly authorizes EMS to submit Transactions to, and receive settlement from, American Express on behalf of the Merchant. American Express is hereby conferred third-party beneficiary rights, but not obligations, to this Agreement that will fully provide American Express with the ability to enforce the terms of this Agreement against the Merchant. Merchant may, at any time, opt out of accepting American Express Cards without directly or indirectly affecting its rights to accept other Cards.

Merchant acknowledges that it may be converted from the OptBlue® Program to a direct Card acceptance relationship with American Express if and when it becomes a High CV Merchant in accordance with the Rules and expressly agrees that upon conversion, (i) the Merchant will be bound by American Express' then-current Card Acceptance Agreement; (ii) American Express will set pricing and other fees payable by the Merchant for American Express Card acceptance; and (iii) Authorization or other Transaction Fees may still be payable to EMS pursuant to the Schedule of Fees in this Agreement. Neither Bank nor EMS is a party to the American Express Card acceptance agreement.

Merchant may not bill or collect from any Card Member for any purchase or payment on the American Express Card unless Chargeback has been exercised, the Merchant has fully paid for such Charge, and it otherwise has the right to do so.

Merchant's refund policies for purchases on the American Express Card must be at least as favorable as its refund policy for purchase on any other Card and the refund policy be disclosed to Card Members at the time of purchase and in compliance with Applicable Law.

Any and all American Express Card Member Information is confidential and the sole property of the Issuer, American Express or its Affiliates. Except as otherwise specified, Merchant must not disclose American Express Card Member Information, nor use nor store it, other than to facilitate Transactions at Merchant's establishments in accordance with this Agreement. Merchant must ensure that it and any third parties it enlists to facilitate Transaction processing complies with the American Express Technical Specifications (valid and accurate data must be provided for all data elements in accordance with the American Express Technical Specifications). Failure to comply with the American Express Technical Specifications may impact Merchant's ability to successfully process Transactions. Merchants may be assessed non-compliance fees if Merchant fails to comply with the Technical Specifications. To ensure compliance with the Technical Specifications, Merchants should work with EMS.

If a Merchant closes any of its Establishments, Merchant must follow these guidelines: (i) notify EMS immediately; (ii) policies must be conveyed to the Card Member prior to completion of the Charge and printed on the copy of a receipt or Charge Record the Card Member signs; (iii) if not providing refunds or exchanges, post notices indicating that all sales are final (e.g., at the front doors, by the cash registers, on the Charge Record and on websites and catalogs); (iv) return and cancellation policies must be clearly disclosed at the time of sale; and (v) for Advance Payment Charges or Delayed Delivery Charges, Merchant must either deliver the goods or services for which Merchant has already charged the Card Member or issue Credit for any portion of the Charge for which Merchant has not delivered the goods or services.

This Agreement shall be effective only upon acceptance and/or signature by EMS and Bank. Merchant's submission of transactions under this Agreement shall constitute Merchant's acknowledgment of acceptance of this Agreement by Bank and EMS notwithstanding the absence of any Bank or EMS signature. Any application fee paid to Bank or EMS is nonrefundable whether or not Merchant and this Agreement are accepted by Bank and EMS.

SL Account Mgmt

Merchant Name (Print)

By: [signature: Kaine Wen] 2/12/2018

Authorized Signature Date

Kaine Wen

Authorized Signer's Name (Print) [initials: KW]

Its: DocuSigned by: [signature: Kaine Wen] 30FF77394362418 2/12/2018

Guarantor Date

Guarantor Date

ELECTRONIC MERCHANT SYSTEMS

By:

Date

Its:

BANK

By:

Date

Its:

BANK

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
EMS CID response
SL1 - 6
Pl. Ex. 30
p. 513
R-013763-00000186

In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL1") UNREDACTED FER 12 USC 3413
CONFIDENTIAL

## Certificate Of Completion

Envelope Id: A6882224067C4687B50435F4772D6832
Subject: Documents for your DocuSign Signature
Source Envelope:
Document Pages: 17
Certificate Pages: 4
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 13
Initials: 2

Status: Completed

Envelope Originator:
Stephanie Preidis
5005 Rockside Road
Independence, OH 44121
spreidis@emscorporate.com
IP Address: 13.108.238.8

## Record Tracking

| Status: Original | Holder: Stephanie Preidis | Location: DocuSign |
|---|---|---|
| 2/8/2018 6:50:29 AM | spreidis@emscorporate.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Kaine Wen<br>kaine@slaccountmgmt.com<br>Security Level: Email, Account Authentication (None), Authentication | DocuSigned by:<br>Kaine Wen<br>30FF7738436241B...<br>Using IP Address: 186.96.77.18 | Sent: 2/9/2018 8:23:52 AM<br>Resent: 2/12/2018 5:58:16 AM<br>Viewed: 2/12/2018 10:23:58 PM<br>Signed: 2/12/2018 10:28:26 PM |

**Authentication Details**
Passed ID Check for Kaine Wen as a result of successful prior ID Check within the last 3 days. Last Successful ID Check: 2/12/2018 10:01:35 PM PST on EnvelopeId: 70e2a674-86ac-4d00-81b1-339585e6206c

**Electronic Record and Signature Disclosure:**
Accepted: 2/12/2018 10:23:58 PM
ID: fee20fca-09da-451a-84e4-116f9c5b35d6

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/12/2018 5:58:16 AM |
| Certified Delivered | Security Checked | 2/12/2018 10:23:58 PM |
| Signing Complete | Security Checked | 2/12/2018 10:28:26 PM |
| Completed | Security Checked | 2/12/2018 10:28:26 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
EMS CID response
SL1 - 7
Pl. Ex. 30
p. 514
R-013763-00000187