In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL1")
CONFIDENTIAL
UNREDACTED PER 12 USC 3413

spreidis@emscorporate.com
www.emscorporate.com

<image001.png><image002.png><image003.png><image004.png>

---

**From:** Kaine Wen [mailto:kaine@premierstudentloancenter.com]
**Sent:** Tuesday, February 20, 2018 3:06 AM
**To:** Preidis, Stephanie
**Cc:** Tom Nelson
**Subject:** Re: New Corp Info

Hi Stephanie,

I honestly don't know how else I can explain this, but let me try again:

Currently:

PSLC is the front-end Sales company.
PSLC is the back-end Processing company.
PSLC collects the payments from the clients.

Effective March 5:

PSLC will be the front-end Sales company.
SLAM will be the back-end Processing company.
PSLC will refer enrolled clients to SLAM for processing.
SLAM will collect the payments from the clients.
SLAM will pay PSLC a percentage of the collected payments, for PSLC's client referrals.

Since PSLC can't be used as the descriptor on SLAM accounts, let's just keep things simple:

**1. Keep our PSLC merchant account as-is (same ownership, same EIN, same descriptor).**
**2. SLAM would like to apply for a merchant account with EMS, under the same terms as PSLC.**
**3. PSLC can provide SLAM with a cross-corporate guarantee, if necessary.**

Can we try to expedite the SLAM application and approval? I think you can use the second DocuSign form. Please let me know if you have any further questions.

Thank you.

Best,

**Kaine Wen, Esq.**
**Premier Student Loan Center**
Managing Partner
173 Technology Dr, Ste 202
Irvine, CA 92618
E-mail: kaine@premierstudentloancenter.com

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended*

3

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
SL1 - 38
EMS CID response
Pl. Ex. 30
p. 541
R-013763-00000218

In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL1")
UNREDACTED PER 12 USC 3413
CONFIDENTIAL

*exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

On Feb 19, 2018, at 11:25 AM, Preidis, Stephanie <spreidis@emscorporate.com> wrote:

Kaine,

I need definite answers to these questions or you are not going to get approved for your new account.

1. PSLC can't be used as the descriptor on SLAM accounts
2. . The red is a confusing concept. Why are you dividing the businesses?
3. The owner of EMS wants clarification as to all the payments and companies you will be collecting on.

Please call me for further clarification.

Stephanie Preidis
Electronic Merchant Systems
888-558-4367 Ext 5101
866-225-6197 Fax
spreidis@emscorporate.com
www.emscorporate.com

<image001.png><image002.png><image003.png><image004.png>

---

**From:** Kaine Wen [mailto:kaine@premierstudentloancenter.com]
**Sent:** Friday, February 16, 2018 3:02 PM
**To:** Preidis, Stephanie
**Cc:** Tom Nelson
**Subject:** Re: New Corp Info

Hi Stephanie,

I have CC'ed Tom, our Accounting Manager, on this e-mail.

1. The descriptor has to reflect the new name of the business, MC/VISA rules and regulations....can have nothing to do with PSLC

Effective March 5, PSLC will no longer board new clients. However, all of PSLC's existing clients already processing through EMS are accustomed to seeing the PSLC descriptor. If we switch to the SLAM descriptor, this will cause confusion and lead to chargebacks.

That's why SLAM would like to have two MIDs with EMS:

1. Switch current PSLC merchant account ownership to SLAM, but keep the PSLC descriptor - this will be for all existing clients already assigned to EMS.

4

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019, received 6/10/2019
EMS CID response
SL1 - 39
Pl. Ex. 30
p. 542
R-013763-00000219

In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL1") UNREDACTED PER 12 USC 3413
CONFIDENTIAL

2. Create new SLAM merchant account, with the SLAM descriptor - this will be for all new clients effective March 5.

2. We need more information as to why you are dividing the businesses.

PSLC currently has four separate Departments under one company: Sales, Processing, Customer Service, and Billing. Effective March 5, PSLC is ceasing its Processing, Customer Service, and Billing Departments and only retaining its Sales Department. Thereafter, PSLC will handle the "front end" (sales). SLAM will handle the "back end" (processing, customer service, and billing).

3. The owner of EMS wants clarification as to all the payments you will be collecting.

Effective March 5, SLAM will be collecting ALL client payments (both existing clients and new clients). PSLC will focus strictly on sales (signing up new clients), and SLAM will service (processing, customer service, and billing) ALL the clients. PSLC will no longer process any payments, since it will only be a sales company, receiving commissions from SLAM for referrals.

Please feel free to reach out with any additional questions.

Best,

Kaine

On Feb 16, 2018, at 2:05 PM, Preidis, Stephanie <spreidis@emscorporate.com> wrote:

Hello,

Hope you are enjoying your trip overseas. we have some issues with your accounts:

1. The descriptor has to reflect the new name of the business, MC/VISA rules and regulations....can have nothing to do with PSLC
2. We need more information as to why you are dividing the businesses.
3. The owner of EMS wants clarification as to all the payments you will be collecting.

Please advise.

Stephanie Preidis
Electronic Merchant Systems
888-558-4367 Ext 5101
866-225-6197 Fax
spreidis@emscorporate.com
www.emscorporate.com

5

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
EMS CID response
SL1 - 40
Pl. Ex. 30
p. 543
R-013763-00000220

In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL1")
UNREDACTED PER 12 USC 3413
CONFIDENTIAL

<image001.png><image002.png><image003.png><image004.png>

---

**From:** Kaine Wen [mailto:kaine@premierstudentloancenter.com]
**Sent:** Wednesday, February 14, 2018 1:30 PM
**To:** Preidis, Stephanie
**Cc:** Pattee, David
**Subject:** Re: New Corp Info

Hi Stephanie (and David),

1. What exactly are you accepting payments for? I need to know everything that PSLC assists their clients with and what and how SLAM will be collecting payments for…………………

SLAM is the back-end Processing Department and will collect payment for PSLC's student loan document preparation services.

2. Per your email on 2/7/18 at 12:48 pm: **please do not change the descriptor, as we want to avoid customer confusion.** The descriptor is Premier Student Loan Center and we can't keep PSLC if we are changing the Corporate and dba.

I am pasting the below from my e-mail dated Feb 7:

*1. For Premier Student Loan Center's ("PSLC") existing merchant account, number [REDACTED]8157, with $425k monthly volume limit:*
*- Please change ownership from PSLC to our new company True Count Staffing Inc. d/b/a SL Account Mgmt ("SLAM"). SLAM will handle all of our payment processing. I have the corporate documents and DBA documents ready.*
*- Please do not change the descriptor, as we want to avoid customer confusion.*
*- We will provide new SLAM bank account information for deposits.*

*2. Add a second MID, also under SLAM, with additional monthly volume.*
*- We will use this MID to process new customer payments.*
*- Please have the descriptor reflect "SL Account Mgmt".*
*- We will provide new SLAM bank account information for deposits.*

*The reason for the changes is because PSLC will no longer be processing any customer payments. SLAM will be processing all customer payments. SLAM needs the original descriptor for PSLC's current customers. SLAM needs the new descriptor for its customers moving forward.*

To further clarify:

PSLC's existing customers have been seeing the PSLC descriptor on their payment transactions. We want to continue to keep the PSLC descriptor for these clients. If we change the descriptor to SLAM, there will surely be customer confusion which will likely lead to chargebacks.

6

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
EMS CID response
SL1 - 41
Pl. Ex. 30
p. 544
R-013763-00000221

In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SLT")
CONFIDENTIAL
UNREDACTED PER 12 USC 3413

For all "new" customers, beginning approximately March 5, SLAM will explain that it is the back-end Processing Department for PSLC and alert the clients that the payment transaction will reflect the SLAM descriptor.

Best,

Kaine

On Feb 14, 2018, at 1:20 PM, Preidis, Stephanie <spreidis@emscorporate.com> wrote:

There are a couple of issues that we need clarification on:

1. What exactly are you accepting payments for? I need to know everything that PSLC assists their clients with and what and how SLAM will be collecting payments for...................
2. Per your email on 2/7/18 at 12:48 pm: **please do not change the descriptor, as we want to avoid customer confusion.** The descriptor is Premier Student Loan Center and we can't keep PSLC if we are changing the Corporate and dba.

Please advise.

Stephanie Preidis
Electronic Merchant Systems
888-558-4367 Ext 5101
866-225-6197 Fax
spreidis@emscorporate.com
www.emscorporate.com

<image001.png><image002.png><image003.png><image004.png>

---

**From:** Kaine Wen [mailto:kaine@premierstudentloancenter.com]
**Sent:** Wednesday, February 14, 2018 1:00 PM
**To:** Preidis, Stephanie
**Subject:** Re: New Corp Info

The slaccountmgmt.com website will soft-launch by the start of next week.

On Feb 14, 2018, at 12:45 PM, Preidis, Stephanie <spreidis@emscorporate.com> wrote:

Hello,

7

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
EMS CID response
SL1 - 42
Pl. Ex. 30
p. 545
R-013763-00000222

In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL1")
UNREDACTED PER 12 USC 3413
CONFIDENTIAL

When will your website be up and running?

Stephanie Preidis
Electronic Merchant Systems
888-558-4367 Ext 5101
866-225-6197 Fax
spreidis@emscorporate.com
www.emscorporate.com

<image001.png><image002.png><image003.png><image004.png>

---

**From:** Kaine Wen [mailto:kaine@premierstudentloancenter.com]
**Sent:** Monday, February 12, 2018 12:13 PM
**To:** Preidis, Stephanie
**Subject:** Re: New Corp Info

Hi Stephanie,

Did you send them to the updated e-mail address, kaine@slaccountmgmt.com?

I am out of the country this week so we will have to communicate by e-mail, my apologies in advance.

Best,

Kaine

On Feb 12, 2018, at 11:54 AM, Preidis, Stephanie <spreidis@emscorporate.com> wrote:

The DocuSigns were resent earlier this morning. Please call me if you do not receive them.

Sorry for the inconvenience.

Stephanie Preidis
Electronic Merchant Systems
888-558-4367 Ext 5101
866-225-6197 Fax
spreidis@emscorporate.com
www.emscorporate.com

-----Original Message-----
From: Preidis, Stephanie

8

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019, received 6/10/2019
EMS CID response
SL1 - 43
Pl. Ex. 30
p. 546
R-013763-00000223

Case 8:19-cv-01998-MWF-KS Document 33-7 Filed 10/21/19 Page 7 of 16 Page ID #:1212

In re True Count Staffing Inc. d/b/a
SL Account Mgmt ("SLP")

CONFIDENTIAL

REDACTED
PER 12 USC 3413

Sent: Saturday, February 10, 2018 12:04 PM
To: Kaine Wen
Subject: Re: New Corp Info

For some reason, I can't open and resend your DocuSigns. Will have to resend on Monday.

Sent from my iPad

On Feb 9, 2018, at 6:16 PM, Kaine Wen <kaine@premierstudentloancenter.com> wrote:

Nothing in my Junk Mail. If they are Docusign links, the size of the file shouldn't matter.

On Feb 9, 2018, at 3:13 PM, Preidis, Stephanie <spreidis@emscorporate.com> wrote:

Look in you junk mail:.......large file.

Sent from my iPad

On Feb 9, 2018, at 5:33 PM, Kaine Wen <kaine@premierstudentloancenter.com> wrote:

Here is the voided check for True Count:

On Feb 9, 2018, at 1:44 PM, Kaine Wen <kaine@premierstudentloancenter.com<mailto:kaine@premierstudentloancenter.com>> wrote:

Hi Stephanie,

I did not receive the two Docusign emails, can you resend?

9

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand
dated 5/10/2019 - received 6/10/2019
EMS CID response

Pl. Ex. 30
p. 547
R-013763-00000224
SL1 - 44

Case 8:19-cv-01998-MWF-KS Document 33-7 Filed 10/21/19 Page 8 of 16 Page ID #:1213

In re True Count Staffing Inc. d/b/a
SL Account Mgmt ("SL1")

CONFIDENTIAL

REDACTED
PER 12 USC 3413

Best,

Kaine

On Feb 9, 2018, at 1:23 PM, Preidis, Stephanie <spreidis@emscorporate.com<mailto:spreidis@emscorporate.com>> wrote:

Hello,

I did two complete sets of paperwork. I'm not sure what will be required but more is always better and then we can throw what we don't need away (Iron Mountain). I thought you were staying in the same location? Also, I need a voided check with the business name imprinted on the check or a bank letter.

Have a wonderful weekend.

Stephanie Preidis
Electronic Merchant Systems
888-558-4367 Ext 5101
866-225-6197 Fax
spreidis@emscorporate.com<mailto:spreidis@emscorporate.com>
www.emscorporate.com<http://www.emscorporate.com/>

<image001.png><http://www.twitter.com/EMScorporate><image002.png><http://www.youtube.com/emscorporate><image003.png><http://www.facebook.com/emscorporate><image004.png><http://www.linkedin.com/company/electronic-merchant-systems>

From: Kaine Wen [mailto:kaine@premierstudentloancenter.com]
Sent: Friday, February 9, 2018 4:15 AM
To: Preidis, Stephanie
Subject: New Corp Info

Hi Stephanie,

I apologize for not providing the new corporate information to you earlier, but here they are:

True Count Staffing Inc.
d/b/a SL Account Mgmt
EIN: 82-0854249
Years in Business: 1

8 Hughes, #210
Irvine, CA 92618
(424) 333-8290

Kaine Wen
kaine@slaccountmgmt.com<mailto:kaine@slaccountmgmt.com>
███ 7851
███ 3143

10

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand
dated 5/10/2019 - received 6/10/2019
EMS CID response

Pl. Ex. 30
p. 548
R-013763-00000225
SL1 - 45

Case 8:19-cv-01998-MWF-KS Document 33-7 Filed 10/21/19 Page 9 of 16 Page ID #:1214

In re True Count Staffing Inc. d/b/a
SL Account Mgmt (SLP)

CONFIDENTIAL

REDACTED
PER 12 USC 3413

Owner, 100%

Azusa, CA
Years at Residence: 3.5

JP Morgan Chase Bank
Business Checking Account
Routing Number: ▇▇▇1627
Account Number: ▇▇▇1126

Also, the Credit Repair and Debt Relief Addendums do NOT apply to us.

Please revise and resend, thank you!

Best,

Kaine Wen, Esq.
Premier Student Loan Center
Managing Partner
173 Technology Dr, Ste 202
Irvine, CA 92618
E-mail: kaine@premierstudentloancenter.com<mailto:kaine@premierstudentloancenter.com>

Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.

<True Count Voided Check.pdf>

11

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand
dated 5/10/2019 - received 6/10/2019
EMS CID response

Pl. Ex. 30
p. 549
R-013763-00000226

SL1 - 46




DocuSign Envelope ID: 0C8DD934-9AF2-4F25-A4B2-A2E0F2737824

12158MO D

**electronic merchant systems**
5005 Rockside Road, Penthouse 100,
Independence, Ohio 44131
Phone: 800-726-2117
Fax: 216-674-3110
www.emscorporate.com

# MERCHANT AGREEMENT

Merchant acknowledges that its obligations to EMS and Bank under this agreement relate to EMS' processing of transactions on behalf of Merchant and that, as such, this agreement is solely for commercial and business purposes, and not for personal, family or household purposes.

**BMO Harris Bank**
Sponsored by:
BMO Harris Bank, NA, Schaumburg, Illinois
150 North Martingale Road, Suite 900,
Schaumburg, Illinois 60173A

| Field | Value |
|---|---|
| MCC | |
| MN | [REDACTED]5266 |
| Office Number | 160 |
| Account Mgr | Bill Felberg |
| Account Rep | Stephanie Preidis |

## BUSINESS NAME (S)

| Field | Value |
|---|---|
| Corporate or Legal Name | True Count Staffing Inc |
| No. Locations | |
| Doing Business As | SL Account Mgmt |
| Corporate Address | 8 Hughes, #210 |
| City | Irvine |
| State | California |
| Zip | 92618 |
| Telephone Number | 888-283-9631 |
| Federal Tax ID | 82-0854249 |
| Contact Person | Kaine Wen |
| Email Address | kwen@slaccountmgmt.com |

## MERCHANT PROFILE

- Type of Ownership: Corporation
- Type of Goods Sold: doc prep
- Length of Ownership: 1 YRS MOS
- Length at Location: YRS 1 MOS
- Year Business Established: 2-2017
- Web Address: slaccountmgmt.com

## PROCESSING HISTORY

- Has the business or any associated owner ever been terminated as a VISA/MasterCard/Discover/American Express merchant? NO
- Do you currently accept VISA/MasterCard/Discover/American Express? YES
- Are there third parties/payment applications involved with your payment process? NO
- Is your business PCI compliant? YES
- Has your business had any ongoing or prior data compromise investigations? NO

## CREDIT CARD TRANSACTION PROFILE

- [X] Service
- Mail Order 50%
- Telephone Order 50%
- Sales Keyed Into POS terminal 100%

## OWNERS AND OFFICERS

| Name | Title | Residential Address | SSN | Equity | DOB |
|---|---|---|---|---|---|
| Kaine Wen | Owner | Azusa, CA | [REDACTED]3143 | 100% | 1977 |

BANK REFERENCE: JP Morgan Chase Bank — Account # [REDACTED]1126

## MERCHANT SITE INSPECTION REPORT

Signature of Inspector: [signature]
Date: 3/5/2018

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019, received 6/10/2019
EMS CID response
Pl. Ex. 30
p. 550
R-013763-00000255
SL2 - 1

DocuSign Envelope ID: 0C8DD934-9AF2-4F25-A4B2-A2E0F2737824

## MERCHANT AGREEMENT

OK 

12158MO D

### DEBIT / CREDIT AUTHORIZATION

MERCHANT hereby authorizes BANK and EMS in accordance with this MERCHANT Agreement to initiate debit/credit entries to MERCHANTS' checking account as indicated below. This authority is to remain in full force and effect during the term of the Agreement. This authorization extends to such entries in said account concerning lease, rental or purchase agreement applying to POS terminal, accompanying equipment, check guarantee fees and/or gift/loyalty card fees.

STAPLE CHECK HERE

**DO NOT USE A DEPOSIT TICKET, MAKE SURE CHECK IS VOIDED PROPERLY**
**CHECK MUST BE MICR ENCODED WITH ABA ROUTING NUMBER AND ACCOUNT NUMBER**
**MAKE SURE CHECK IS PRE-PRINTED WITH MERCHANT BUSINESS NAME**

### AMERICAN EXPRESS CARD ACCEPTANCE

☐ By checking this box, Merchant elects to accept payments via American Express (Ineligible Merchants will not be enrolled). Merchant may opt out of accepting American Express Cards at any time without directly or indirectly affecting its rights to accept other Cards.

☐ By checking this box, Merchant opts out of receiving future commercial marketing communications from American Express. Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express.

### SCHEDULE OF FEES

☐ VISA®/MasterCard®/Discover® Discount ____% + ____ c Transaction
☐ American Express® Discount 3.50 % + 20 c Transaction
☐ Pin Debit Network Discount ____% + ____ c Transaction
☐ Quote Rates —same rates & fees— ____% + ____ c Transaction
☐ Quote Rates ____% + ____ c Transaction
☐ Quote Rates ____8157 ____% + ____ c Transaction
☐ Quote Rates — Authorize.Net Monthly $19.00 + Trans $____
☒ eCommerce

$~~125~~.00 Application/Set Up Fee
$15.00 Monthly Access
$22.50 Monthly Access with Debit or Online Statements
$30.00 Monthly Access with Debit and Online Statements
$25.00 Monthly Cellular Transaction Fee + $0.10/Transaction
$0.60 Voice ARU / $0.30 Batch Headers
$15.00 Monthly 100K Data and Breach Protection
$25.00 Monthly Minimum (Visa®/MasterCard®/Discover®/American Express® Discount)

☐ Platinum Service Club $10.00
☐ Web Hosting Professional $59.00 Monthly
☐ Web Hosting Premier $89.00 Monthly
☐ E-Commerce Cart Plus $49.00 Monthly
☐ WebPak Professional $99.00 Monthly
☐ WebPak Premier $139.00 Monthly
☐ Flok $59.00 Monthly
☐ Flok $79.00 Monthly
$75.00 Semi-Annual Technology Upgrade and Update
Third Party Authorization Fee 25c Transaction
☐ iMenu
☐ iMenu VPOS $29.00 Monthly

Additional charge of $.10 and 2.35% of sales amount for international, commercial, or Transactions that do not meet the best qualified interchange rate qualification criteria for credit card and unregulated signature debit transactions. Fees of $25.00 per retrieval request, $45.00 per chargeback and $25.00 per returned ACH item. For restaurants, supermarkets, hotel, passenger transport and gas station merchants, standard, reward, enhanced, and world Visa/MasterCard credit cards and unregulated signature debit cards will be surcharged .95%. Card association's network transaction fees, assessments and $.10 will be charged to the merchant on every transaction. PIN debit network fees include base switch, acquirer, interchange and authorization expenses. All signature debit card sales will be surcharged $.10 per transaction. Regulated signature debit card transactions will process at the lowest qualified credit card rate unless otherwise specified. Unregulated signature debit card transactions will process at the corresponding credit card rate unless otherwise specified. Merchant will pay all applicable Card Brand registration fees. Section 9 of this Agreement provides more detail as to how Merchant fees contained in this Schedule of Fees are calculated. This Schedule of Fees does not provide all information pertinent to this Merchant Agreement. Merchant is advised to thoroughly review this Agreement, including the attached terms and conditions, and to contact EMS or Bank with any questions. THE ABOVE SCHEDULE OF FEES IS PREDICATED ON THE BUSINESS:

AVERAGE MONTHLY SALES VOLUME: $ **150,000.00**   AVERAGE TICKET SIZE: $ **450.00**   HIGHEST TICKET SIZE: $ **4500.00**

OFFICERS AND OWNERS OF MERCHANT WARRANT THAT THE AVERAGE MONTHLY SALES VOLUME AND AVERAGE TICKET SIZE ARE ACCURATE AND ACKNOWLEDGE THAT ANY VARIANCE MAY RESULT IN THE DELAY OR THE WITHHOLDING OF FUNDS SETTLEMENT OR TERMINATION OF THE MERCHANT AGREEMENT. All information contained in the attached Merchant Application was completed by owners and/or authorized officers of Merchant, who hereby represent and warrant that all such information and documentation submitted in connection with this Merchant Application is true, complete and correct No spaces were left incomplete. N/A or None is to be filled in any space where applicable.
Merchant acknowledges having received and read a copy of this agreement, including the attached Terms and Conditions which are incorporated herein by reference, that it agrees to be bound by the agreement and all of its terms, and that the agreement shall not be effective until approved by Bank and EMS. THIS IS AN AUTOMATICALLY RENEWABLE 24 MONTH MERCHANT CONTRACT. CANCELLATION DURING THE TERM WILL RESULT IN A $595 EARLY TERMINATION FEE. MERCHANT AGREES TO COMPLY WITH PCI COUNCIL DATA SECURITY STANDARDS (HEREINAFTER DEFINED) WITHIN 90 DAYS AFTER SIGNING THIS AGREEMENT. FAILURE TO DO SO WILL RESULT IN AN ADDITIONAL $50.00 MONTHLY FEE UNTIL MERCHANT BECOMES COMPLIANT. AN INVESTIGATIVE CONSUMER REPORT MAY BE MADE IN CONNECTION WITH THE ATTACHED APPLICATION. MERCHANT AUTHORIZES BANK, EMS AND THEIR AGENTS AND AFFILIATES, OR ANY CREDIT REPORTING AGENCY EMPLOYED BY THEM TO INVESTIGATE THE REFERENCES GIVEN OR ANY OTHER STATEMENTS OR DATA OBTAINED FROM MERCHANT, OR ANY OF THE UNDERSIGNED PRINCIPALS, FOR THE PURPOSE OF THIS APPLICATION OR ANY APPLICATION FOR ACCOMPANYING POS EQUIPMENT FINANCING.

### AGREED AND ACCEPTED

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

SL Account Mgmt

Print Merchant (Redacted) signed by:

(1) Sign X _Kaine Wen_ Owner 3/5/2018
        DS68F8401828432
        Title    Date

(2) Sign X _____
              Title    Date

### CORPORATE RESOLUTION

The officers identified in #1 and #2 have the authority to execute the Merchant Agreement with BANK and EMS on behalf of the corporation.

Sign X _Kaine Wen_ Owner 3/5/2018
       DS68F8401828432
       Title    Date

By my signature, I verify that I already own a manual imprinter and will provide imprinted sales drafts whenever necessary.

Sign X _____
              Title    Date

### PERSONAL GUARANTY FROM OWNER/OFFICER

In consideration of BANK and EMS entering into this Merchant Agreement ("Agreement") with the above named Merchant, the undersigned (jointly and severally if more than one) hereby absolutely and unconditionally guarantee(s) the full and prompt payment by MERCHANT of any and all amounts it owes to BANK and EMS, and the performance of all MERCHANT's obligations, under this Agreement as may be subsequently amended from time to time, whether before or after termination or expiration of the Agreement. This Guaranty is a guaranty of payment, and not of collection, and a debt of the undersigned guarantor(s) for his or her own account. The undersigned guarantor(s) agree(s) to pay or perform upon demand and waive(s) any notice, presentment, demand, collection from others or any delay in enforcement. This Guaranty includes (i) any amount returned by the BANK and EMS after receipt due to any bankruptcy or similar law and (ii) BANK's and EMS's expenses including attorney fees and costs. Any sums owing by the MERCHANT to the undersigned guarantor(s) shall be subordinated to sums owed to BANK and EMS. This Guaranty is continuing, binding upon heirs and successors and may not be changed except in writing and signed by BANK and EMS. The undersigned hereby authorize(s) BANK and EMS to obtain from any credit reporting agency financial or credit information pertaining to the undersigned and give(s) BANK and EMS continuing authority to obtain such information in connection with the maintenance, renewal or extension of the Agreement. Guarantor(s) acknowledge(s) and agree(s) that this guaranty is made as part of a transaction that is solely for business and commercial purposes and is not primarily for personal, family, or household purposes.

(1) Sign X _Kaine Wen_ 3/5/2018      Kaine Wen
        DS68F8401828432   NO TITLE PERMITTED    Date     PLEASE PRINT NAME

(2) Sign X _____
              NO TITLE PERMITTED    Date     PLEASE PRINT NAME

### EMS AND BANK USE ONLY

EMS Approval _____   Declined By _____
             Signature  Title  Date                Signature  Title  Date

Bank Approval _____   TERMINAL ID NUMBER _____
              Signature  Title  Date

Merchant Setup _____ (Initial)   MERCHANT NUMBER _____

©2015 Electronic Merchant Systems         Electronic Merchant Systems is a registered ISO/MSP of BMO Harris Bank N.A.

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019, received 6/10/2019
EMS CID response

SL2 - 2
Pl. Ex. 30
p. 551
R-013763-00000256

CONFIDENTIAL

In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL2")

UNREDACTED PER 12 USC 3413

DocuSign Envelope ID: 0C8DB934-9AF2-4F25-A4B2-A2E0F2737824

SL Account Mgmt

MERCHANT AGREEMENT 1215BMO D

THIS MERCHANT AGREEMENT (the "Agreement"), which includes the attached Merchant Application (the "Application"), is made and entered into by and among BMO Harris Bank N.A., a national banking association ("Bank"), Francis David Corporation, an Ohio corporation doing business as Electronic Merchant Systems ("EMS"), and the undersigned Merchant ("Merchant") and its guarantor(s).

WHEREAS, Bank is engaged in the business of providing settlement services to Merchants that accept a valid credit card or valid off-line debit card (hereinafter, each a "Card") of Visa®, U.S.A., Inc. ("Visa"), MasterCard® International, Inc. ("MasterCard"), Discover® Financial Services ("Discover"), American Express® Travel Related Services Company, Inc. ("American Express") or other credit card brands (hereinafter, each a "Card Brand" and, collectively, the "Card Brands") for payment for goods and/or services sold, rented or rendered by Merchant; and

WHEREAS, EMS is registered with Visa as an Independent Sales Organization, with MasterCard as a Member Service Provider, and with American Express as an OptBlue® Participant Sales Entity and has agreed with the Bank to provide credit card processing, authorization and related services for Merchants that use Bank's settlement services for Card transactions (individually, a "Transaction" and, collectively, "Transactions"); and

WHEREAS, Merchant desires to use the services of Bank and EMS to authorize, process and settle Transactions undertaken by any authorized user of a Card (collectively, the "Services") in accordance with the rules, regulations, procedures and requirements imposed or adopted by Visa, MasterCard, American Express or other Card Brands as amended from time to time (the "Rules") and on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and of the representations, covenants and agreements set forth in this Agreement, the parties hereby agree as follows:

**1. Honoring/Acceptance of Cards.** Merchant shall honor and accept, without discrimination, all valid Cards when properly presented as payment by a cardholder or authorized user and upon obtaining authorization for each Transaction in advance from the authorization center in accordance with the terms and conditions of this Agreement. Merchant shall not accept a Card for any unlawful transaction. Merchant will submit all authorized Transactions for its business exclusively to Bank and EMS. Merchant will pay all Card Brand fines, fees, penalties and all other assessments or indebtedness levied by Card Brands and/or regulatory agencies to Bank or EMS which are attributable, at the Bank's or EMS' discretion, to Merchant's transaction processing or business. Merchant shall not indicate that Visa, MasterCard, American Express or any other Card Brand endorses its goods or services. Merchant has no right to use the proprietary name and/or symbol of Bank, Visa, MasterCard or American Express except during the term of this Agreement, or until Merchant is notified by Bank, Visa, MasterCard or American Express to cease such usage, and only to the extent the materials containing such are provided to Merchant by EMS or Bank and/or are approved in advance by EMS or Bank. Merchant and its guarantor(s) are jointly and severally liable for the obligations of Merchant's establishments under this Agreement.

**2. Point of Sale Devices.** (a) Merchant shall utilize and maintain, at Merchant's expense, Point of Sale ("POS") devices and terminal(s), proprietary software and related equipment approved by Bank and EMS for all Transactions, in a format and medium of transmission acceptable to Bank and EMS. Merchant will implement the Integrated Circuit Card Specifications for Payment Systems (global payment industry specifications that describe the requirements for interoperability between chip based consumer payment applications and acceptance terminals to enable payment, also referred to as "EMV") when required by EMS, Bank or a Card Brand, and such implementation may require upgrade or replacement of terminal or point of sale hardware and software. Bank and EMS shall have no liability or responsibility for any negligent design or manufacture of any POS terminal or printer, or for any proprietary software or related equipment; EMS' entire liability, if any, and Merchant's exclusive remedy in all situations, shall be to perform repair services on any inoperative POS terminal or printer sold or leased by EMS. (b) Merchant shall record each transaction by "swiping" the card through the POS terminal whenever possible. Merchant acknowledges that each outlet, retail location, or business entity will have its own POS terminal and Merchant identification number. Merchant understands and agrees that sales completed at one location cannot be processed through a terminal at another location. (c) In the event of breakdown of the POS terminal or other system failure, Merchant shall immediately contact the designated Merchant Help Desk. In such case, Merchant shall imprint each sales draft with the embossed data from each card and Merchant's imprinter plate and obtain the cardholder's or authorized user's signature which must match the signature on the card. If Merchant uses an electronic printer connected to a POS terminal, Merchant must still obtain the cardholder's or authorized user's signature on the printed sales draft. As soon as a POS Terminal is operable, Merchant will enter all transactions engaged in during such period. Failure to comply with these requirements may result in a Chargeback. (d) Merchant is responsible for all telephone and communication fees and charges with respect to POS terminals.

**3. Card Brand and Payment Card Industry Rules.** (a) Merchant shall fully comply with and abide by the Rules including without limitation the following which Merchant acknowledges are strictly enforced by Visa, MasterCard and American Express: (i) any use of a mark by a Merchant in acceptance advertising, acceptance decals, or signs, must be in accordance with the Rules as may be in effect from time to time; (ii) the Merchant's use or display of any mark will terminate effective with the termination of the Merchant Agreement or upon notification by the Card Brand to discontinue such use or display; (iii) Merchant will adequately display the Visa, MasterCard or American Express service marks, and, if applicable, on promotional materials to inform the public which Cards are to be honored at Merchant's place of business; (iv) Merchant will refrain from establishing or implementing procedures that discourage, favor, or discriminate against the use of any particular Card; (v) Merchant will refrain from establishing minimum or maximum transaction amounts as a condition for accepting Cards; (vi) Merchant will refrain from imposing any surcharge or fee or any other special conditions for accepting a Card (except as permitted by the Rules); (vii) unless permitted under the Rules, Merchant will refrain from requiring a cardholder to provide any personal information, such as a home or business address or telephone number, or a driver's license or other proof of identification as a condition of honoring a Card, unless instructed by the authorization center (with exceptions for a mail/telephone order or delivery required transaction and zip code for a card-present key-entered transaction in order to obtain address verification); (viii) Merchant shall not require a cardholder to complete a postcard or similar device that includes the cardholder's account number, card expiration data, signature, or any other card account data in plain view when mailed; (ix) Merchant shall not resubmit any Transaction that was previously charged back to the merchant, irrespective of cardholder approval; (x) Merchant shall not accept a Card to collect or refinance existing debt that has been deemed uncollectible or that represents collection of a dishonored check; (xi) Merchant shall not request or use a customer's card number of any purpose other than for payment for its goods or services; (xii) Merchant shall not disburse funds in the form of travelers cheques, if the sole purpose is to allow the cardholder to make a cash purchase of goods or services from the Merchant; (xiii) Merchant shall not disburse funds in the form of cash, unless permitted by the Rules; (xiv) Merchant will include any taxes and any handling or other fees that Merchant collects in the total transaction amount as opposed to collecting them separately in cash or processing them as additional transactions (it being understood that Merchant is responsible for the payment of all taxes applicable to Transactions); (xv) Merchant will refrain from accepting a Card for any unlawful Internet gambling transaction; (xvi) Merchant may not accept cardholder payments for previous Card charges incurred at the merchant location; (xvii) Merchant may not accept a card for the purchase of Scrip; (xviii) Merchant will comply with the Rules relating to cardholder information security issues, non-disclosure of cardholder information and Transaction documents, retention and storage of cardholder and Transaction information, and other security procedures adopted by the Card Brands or the Payment Card Industry Security Standards Council (the "PCI Council"), and (xix) all indebtedness arising from Transactions will be for bona fide sales of goods and services (or both) at Merchant's establishments and free of liens, claims, and encumbrances other than ordinary sales taxes. (b) The PCI Council has implemented programs and standards to protect cardholder data. The PCI Council Data Security Standards ("DSS") as they change from time to time apply to Merchant. A copy of the complete PCI Council DSS can be obtained online at www.pcisecuritystandards.org. (c) Visa, MasterCard and American Express have implemented programs to protect cardholder data. The Visa Cardholder Information Security Program ("CISP") and MasterCard Site Data Protection Program ("SDP") apply to Merchant if Merchant processes or stores cardholder data as a result of internet or mail/telephone acceptance of Visa or MasterCard Card account information. A copy of the complete Visa CISP manual and a Self-Assessment Worksheet can be obtained online at www.visa.com/cisp. Along with the MasterCard SDP, these materials can also be obtained from EMS's customer service department. A copy of the American Express Data Security Requirements ("DSR") can be obtained online at www.americanexpress.com/dsr. (d) Merchant shall abide by and fully comply with the Rules, DSS, CISP, SDP, DSR, and any other applicable Card Brand programs and standards. To the extent they require Merchant to do so, but without limiting any other requirements imposed by the foregoing, Merchant agrees to: (i) install and maintain a working network firewall to protect data accessible via the internet; (ii) keep security patches up-to-date; (iii) encrypt stored data; (iv) encrypt data sent across networks; (v) use and regularly update anti-virus software; (vi) restrict access to data by business "need to know"; (vii) assign a unique ID to each person with computer access to data; (viii) refrain from using vendor-supplied defaults for system passwords and other security parameters; (ix) track and monitor access to data by unique user ID; (x) maintain a policy that addresses information security for employees and contractors; (xi) restrict physical access to cardholder information; and (xii) regularly test security systems and processes. If Merchant does not comply with such programs, then, among other things, Visa, MasterCard, American Express and other Card Brands may impose restrictions and/or fines on Merchant, and/or prohibit Merchant from participating in Visa, MasterCard, American Express or other Card programs. Merchant may be required to submit to an audit to verify compliance with security procedures. (e) Merchant acknowledges that the sale or disclosure of cardholder account numbers, personal information, or other Transaction information to third parties is strictly prohibited by the Rules. Unless Merchant obtains consents from Bank and EMS, and each applicable Card Brand, issuing bank and cardholder, Merchant must not use, disclose, sell or disseminate any cardholder information obtained in connection with a Transaction (including without limitation, the names, addresses and Card account numbers of cardholders, copies of imprinted sales drafts and/or credit records, mailing lists, tapes or other media obtained in connection with a sales draft and/or credit record) except for purposes of authorizing, completing, and settling Transactions, and resolving any Chargebacks, retrieval requests, or similar issues involving Transactions, other than pursuant to a court or governmental agency request, subpoena or order. (f) Merchant shall use proper controls for discarding all records containing cardholder account numbers and Card imprints, and shall limit access to, and render unreadable, such records prior to their being discarded. Merchant may not retain or store magnetic stripe data after a Transaction has been authorized. If Merchant stores any electronically captured signature of a cardholder, Merchant may not reproduce such signature except upon the specific request of Bank or EMS. Merchant shall store all media containing cardholder names, cardholder account information, and other personal information, as well as Card imprints (such as sales drafts and credit records, auto rental agreements, and carbons) in an area limited to selected personnel. Merchant further warrants and agrees that in the event of its failure, including bankruptcy, insolvency, or other suspension of business operations, it will not sell, transfer or disclose any materials that contain cardholder account numbers, personal information, or Transaction information to third parties, and shall return the information to Bank or EMS and provide acceptable proof of destruction to Bank and EMS. Merchant agrees to keep all information it receives from its customers confidential and only use it in connection with the transactions processed under this Agreement. Merchant further agrees to refrain from disclosing or distributing, in any way, any such information to any third party for any purpose except with the prior express consent of the customer.

**4. Mail, Telephone, E-Commerce (Internet), Recurring and Pre-Authorized Transactions.** (a) Merchant understands that mail, telephone and e-commerce (internet) Transactions have a substantially higher risk of Chargeback and cardholder dispute than Card "present" Transactions, as Merchant will not have an imprinted or magnetically "swiped" Transaction with the cardholder's signature on the sales draft. Bank and EMS discourage accepting mail or telephone orders and other Transactions in which the Card is not presented by the cardholder in person. Merchant may engage in mail, telephone and e-commerce Transactions only if it requested to do so in the Application and only for the approved percentage of Merchant's total monthly sales volume limit reflected for such Transactions on the Application, or as may otherwise have been approved in writing by Bank and EMS. If Merchant exceeds the approved percentages, payment for said Transactions may be withheld by Bank or EMS pending further review. Bank and EMS may make payment of these Transactions at their sole discretion. Bank and EMS reserve the right to establish a Reserve Account pursuant to Section 15 below to fund Chargebacks that may arise from said Transactions. Merchant acknowledges that its failure to disclose true and accurate percentages as part of the Application may result in the establishment by Bank and EMS of a Reserve Account, increased discount rate or fees and transaction fees, or the termination of this Agreement. Merchant hereby covenants that all of its Transactions will comply fully with all applicable provisions of Federal consumer protection and other laws including, without limitation, the Electronic Fund Transfer Act, 15 U.S.C. §1601, et seq., the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101, et seq., the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a, et seq., the Federal Trade Commission Act, 15 U.S.C. §45(a), and any regulations adopted under or in accordance with any such laws. (b) In connection with all mail order Transactions, telephone order Transactions, periodic charges for recurring goods or services to be provided by Merchant ("Recurring Transactions"), preauthorized order Transactions, and e-commerce (internet) Transactions, Merchant will take reasonable precautions to protect against Chargebacks, including, but not limited to the following: (i) delivering merchandise only to the cardholder's billing address where the issuing bank sends the cardholder's billing statement; (ii) using a delivery service that maintains shipping logs and requires signatures by a person receiving merchandise; (iii) using AVS and not processing sales unless all information matches the AVS; (iv) obtaining CVV2/CVC2 verification from the issuing bank; (v) obtaining the expiration date of the Card; and (vi) on the sales draft, clearly print the cardholder's account number, effective and expiration dates, date of Transaction, description of the goods and services, amount of the Transaction (including shipping, handling, insurance, etc.), cardholder's name, billing address and shipping address, Authorization code, and Merchant's name and address. (c) If Merchant processes Recurring Transactions and charges a cardholder's account periodically for recurring products or services (e.g., monthly insurance premiums, yearly subscriptions, annual membership fees, etc.), then in addition to other applicable procedures and the Rules, Merchant must do the following: (i) have the cardholder complete and deliver to Merchant a written request and consent for such products or services to be charged to cardholder's account (such request to specify, at a minimum, the transaction amounts, the frequency of recurring charges, and the duration of time for which the cardholder's consent or permission is granted, and must be provided promptly in response to a cardholder's request for a copy); (ii) if the Recurring Transaction is renewed, the cardholder must complete and deliver to Merchant a subsequent written request for the continuation of such products or services to be charged to the cardholder's account; (iii) Merchant may not complete a Recurring Transaction after receiving a cancellation notice from the cardholder or issuing bank or after a request for Authorization has been denied; (iv) Merchant must obtain an Authorization for each Transaction and type or print legibly on the signature line of the sales draft for Recurring Transactions the words "Recurring Transaction" (and "PO" for MasterCard Transaction) in lieu of the cardholder's signature, and must provide both an invoice number and the appropriate "Recurring Transaction" indicator with each Authorization request; (v) Merchant must perform an AVS inquiry for at least the first Transaction and then annually thereafter, if applicable (Merchant understands that penalties can be assessed by the Card Brands for failure to use the Recurring Payment Indicator); (vi) a Recurring Transaction or Pre-authorized order may not include partial payments for products or services purchased in a single Transaction; and (vii) no finance charge may be imposed in connection with a Recurring Transaction or Pre-authorized order. Pre-authorized Transactions may be submitted if Merchant advises the cardholder that it will be immediately billing his or her Card at the time of the transaction for prepayment of services or for full prepayment of custom-ordered merchandise to be manufactured to the cardholder's specifications. Merchant acknowledges that Transactions with an Authorization date more than thirty (30) days prior to shipping date or date of service are subject to an increased risk of Chargeback. (d) If Merchant is an e-commerce merchant and accepts orders via the internet, in addition to other applicable procedures and the Rules, Merchant must do the following: (i) post its privacy and security policies on its websites, where such policies shall be clearly marked for consumers to see and review; (ii) prominently display the name of the Merchant (as both the identity of the Merchant and as the name that will appear on the Cardholder Statement) on its website along with all the following information: (A) complete description of the products or services offered, (B) returned merchandise and refund policy, (C) method for the cardholder to acknowledge his acceptance of the terms and conditions for returned merchandise or for the refund policy (this acknowledgment to comply with Card Brand guidelines for proper disclosure), (D) customer service contact, including e-mail address and/or telephone number, (E) Transaction currency (U.S. dollars, unless permission is otherwise received from Bank and EMS), (F) any applicable export or legal restrictions, (G) delivery policy, (H) consumer data privacy policy, and (I) a description of the Transaction security used on Merchant's website. Merchant acknowledges that the Electronic Commerce Indicator must be used to identify e-commerce Transactions in the Authorization request and clearing record. Penalties may be assessed for failure to use the correct Electronic Commerce Indicator.

**5. Fraudulent Sales, Factoring or Laundering.** Merchant shall never accept or deposit or enter into its POS terminal a Transaction not authorized by the Cardholder, or a Transaction made by any entity other than the Merchant. Should Merchant do so, Bank or EMS may immediately terminate this Agreement, have all funds placed into a Reserve Account pursuant to Section 15 above and be placed on the "Combined Terminated Merchant File" as required by the Rules. Said action may result in Merchant's being restricted from setting Transactions with any bank in the future. Merchant hereby releases Bank and EMS and agrees to hold Bank and EMS harmless from any claims, liabilities, losses or damages arising out of or resulting from Merchant's being placed on any such restrictive list.

**6. Authorization.** Approval by, or on behalf of, a cardholder's bank or the bank that issued the Card (hereinafter, "Authorization") is required on all Transactions. Merchant understands and acknowledges that an Authorization only confirms the availability of the cardholder's credit at the time of the Authorization; it does not warrant that the person presenting the Card is the rightful cardholder, nor is it an unconditional promise, guarantee or representation by Bank or EMS that a Transaction is or will be deemed valid and not subject to dispute, debit or Chargeback (as hereinafter defined). Merchant acknowledges and understands that its floor limit shall be Zero and that all Transactions must be authorized in advance through the authorization center. Merchant shall request Authorization for the exact amount of the Transaction on the date the Transaction takes place by swiping the Card through the terminal or keying the account number, expiration date, amount and address verification ("AVS") information into the terminal. If the electronic Card terminal is not functioning, Merchant may obtain Authorization by telephone, calling the voice authorization phone number provided by Bank or EMS. Merchant must provide the voice authorization center the Card account number, expiration date and the amount of the sale. In order to process any approved voice authorization, when the electronic credit card terminal is functioning, the transaction must be key entered utilizing the "force," "offline," or "post authorization" function. Merchant agrees that in connection with the acceptance of Cards (in addition to, and not in lieu of, other applicable procedures and Rules) it will comply with the following procedures and Rules: (a) it will not accept any Card that is not yet valid or has expired; (b) it will verify that the Card is not stolen, fraudulent or counterfeit; (c) it will use due diligence to verify that a Cardholder is authorized to use the Card presented; (d) at the point of sale, it will (i) carefully examine the signature on every Card presented and carefully compare the signature on the Card to the sales record, and (ii) check the date on which the Card becomes valid and the date on which the Card expires; (e) for Card present Transactions when the signature panel for a Visa Card is not signed Merchant shall in addition to requesting an Authorization (i) review positive identification bearing the Cardholder's signature to validate the cardholder's identity, (ii) indicate the positive identification, including any serial number and expiration date, on the Transaction receipt, and (iii) require the cardholder to sign the signature panel of the Card prior to completing the Transaction; (f) when the signature panel for a MasterCard Card is not signed and the Cardholder refuses to sign the Card, Merchant shall not accept it for a Transaction, but if the cardholder is willing to sign the Card in the presence of Merchant, Merchant shall request two pieces of valid and current identification; and (g) for Visa and MasterCard, a signature panel bearing the words "See I.D." or equivalent language shall be deemed to be blank, and in either case, if such identification is uncertain, or if Merchant otherwise questions or has suspicions regarding the validity of the Card, Merchant shall contact Bank's designated authorization center for instructions. If Authorization is denied, the Transaction shall not be completed and Merchant shall follow instructions from the authorization center, including recovery of Cards by reasonable and peaceful means.

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019

EMS CID response

SL2 - 3

Pl. Ex. 30

p. 552

R-013763-00000257

Merchant shall retain or retrieve Cards, as required by the Rules, which are expired or for which reasonable grounds exist to believe that such Cards are counterfeit, fraudulent or stolen.

**7. Settlement.** Merchant agrees to balance and settle its POS device transactions daily and to electronically submit sales no later than the day following the date of Authorization. Transactions submitted for settlement more than one day after the date of Authorization may be refused, become subject to Chargeback or assessed additional fees by Bank and EMS. Transactions charged to a Card issued by a foreign (non-U.S.A.) issuer or a commercial card issued for business purposes may be assessed additional fees. Merchant acknowledges that all transactions between Merchant, Bank and EMS under this Agreement shall be treated as a single transaction and that all settlements are provisional subject to the cardholder's rights under the Rules for disputing charges against the cardholder's account. In submitting transactions to Bank and EMS, Merchant endorses and assigns to Bank and EMS all right, title and interest to such items with rights of endorsement. Bank and EMS have the right to receive payment on all Transactions acquired and Merchant will not attempt to collect any such Transactions. If any payment is received, Merchant will hold it in trust and promptly deliver it to Bank or EMS.

**8. Payment.** Merchant may not assign to any third party any payments due to it under this Agreement, provided, however, that Merchant may sell and assign future Transaction receivables to EMS, its affiliated entities and/or any other cash advance funding source that partners with EMS or its affiliated entities. Unless the context indicates otherwise, when used in this Section 8, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). Merchant shall at all times maintain a commercial checking account with Bank or with another financial institution of Merchant's choice acceptable to Bank and EMS that belongs to the Automated Clearing House ("ACH") network, that can accept ACH transactions, and that Bank will use to debit and/or credit funds on a daily or monthly basis ("Merchant's Bank"). Bank will debit Merchant's Designated Deposit Account ("DDA") daily for the Discount Fees. Merchant agrees to cooperate with Bank to help resolve any problems in crediting/debiting Merchant's DDA. Merchant agrees to be bound by the terms of the operating rules of the National Automated Clearing House Association as in effect and modified from time to time. Merchant hereby authorizes Bank to access information from the DDA and to initiate credit and/or debit entries and adjustments to Merchant's DDA by bank wire or ACH transfer process and/or through direct instructions to Merchant's Bank for amounts due under this Agreement and under any agreements with Bank or its affiliates for any related services, as well as for any credit entries in error. Merchant hereby authorizes the Merchant's Bank to effect all such debits and credits to the Merchant DDA. This authorization is without respect to the source of any funds in the DDA, is irrevocable and is coupled with an interest, and shall remain in full force and effect until Bank gives written notice to Merchant's Bank that all monies due under this Agreement and under any other agreements with Bank or its affiliates for any related services have been paid in full. All settlements for Visa, MasterCard and American Express Card Transactions will be net of credits/ refunds, adjustments, applicable Discount Fees when due, Transaction Fees, Chargebacks, reserves, lease payments, rental fees, Minimum Discount Fees, or other adjustments, charges and any other amounts then due from Merchant. All credits to Merchant's DDA or other payments to Merchant are provisional and are subject to, among other things, final audit by Bank, Chargebacks (including Bank and/or EMS related losses) fees, assessments, and fines imposed by the Card Brands. Merchant agrees that Bank may debit or credit Merchant's DDA for any deficiencies, overages, fees, fines, charges, and pending Chargebacks, or may deduct such amounts from settlement funds due to Merchant. Merchant hereby also agrees and authorizes Bank in its sole discretion, to debit any other banking account maintained by Merchant for any and all such amounts. Alternatively, Bank and/or EMS may elect to invoice Merchant for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified. Bank and/or EMS cannot guarantee the timeliness with which any ACH payment may be credited by Merchant's Bank. Merchant understands that, due to the nature of the ACH and the electronic networks utilized for the movement of funds and the fact that not all banks belong to the ACH Network, payment to Merchant can be delayed. Bank and EMS will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties, by Bank and/or EMS, including but not limited to any Card Brand or Merchant's financial institution. Merchant acknowledges that the funds due for Visa, MasterCard and American Express Transactions will generally be processed and transferred to the Merchant's DDA within two (2) business days from the time a batch is closed. Bank reserves the right to divert and hold all funds when Bank and/or EMS is investigating suspicious Transactions, the breach of any warranty, covenant, representation, or agreement by Merchant or has reasonable cause to believe that Merchant may have violated a provision of this Agreement, the Rules and/or is engaged in illegal, fraudulent or suspicious activity. In the event that a payment is rejected by Merchant's Bank or fails to arrive within five (5) business days after Bank's attempted ACH payment, Bank may periodically wire transfer any funds due Merchant until the ACH problem is resolved, and all such wire transfers and resolution of all issues shall be solely at the Merchant's expense. If Merchant receives settlement funds by wire transfer, Bank and/or EMS may charge a wire transfer fee per wire, which fee will not be subject to refund. Not all fees will be debited on a daily basis, but may be subject to a month end debit to the DDA or other available funds.

**9. Discount Fees, Transaction Fees, and Access Fees.** (a) The Bank must approve, in advance, any fee to or obligation of the Merchant arising from or related to performance of this Agreement. (b) Merchant agrees to pay to Bank and EMS the Discount Fees, Transaction Fees, Access Fees, and other fees stated in the Schedule of Fees. (c) For the purposes of calculating fees and other amounts to be paid by Merchant under this Section 9 and the Schedule of Fees (as such is amended from time to time), the following terms have the following meanings: (i) "Discount Fee" means a fee charged on the total value of a Transaction at the applicable Discount Rate disclosed in the Schedule of Fees on the face of this Agreement and incorporated herein; (ii) "Transaction Fee" means a fee charged on each sales draft and each credit record regardless of the total stated and shall also mean a fee charged for any other Transaction which utilizes a POS device for transmission or reception of Card data or information, including but not limited to, debit card transactions, batch closing, Authorizations and any other communications using the POS device.; (iii) the terms "Pass-through," "Interchange Plus" (or "I/C Plus") mean that in addition to the Discount Rate, per Transaction charge and Assessments, Merchant shall pay the interchange fees applicable to the type of card presented for payment, and. in the case of American Express, the OptBlue® program fees applicable to the Transaction. Interchange and program fees are set and changed by the Card Brands from time to time and vary based on the Card Brand, regions or jurisdictions, the type of credit or debit card, the type of the accepting merchant, the value of the Transaction, and the type of the Transaction (e.g. transaction size, industry type, online, in-store, phone order, whether the card is present for the transaction, etc.). In certain circumstances, the Schedule of Fees may also provide for interchange surcharges on certain categories of cards presented for payment as defined herein or as commonly used in the payments industry; (iv) the term "Bundled Pricing" means that the Discount Rate and per Transaction charges are the same for all cards, while the term "Tiered Rate Pricing" means that the Discount Rate and per Transaction charges will vary for certain Tiers (certain categories of cards presented for payment as defined herein or as commonly used in the payments industry) as described in the Schedule of Fees. (v) "Qualified cards" or "Best Qualified cards" have the lowest interchange fees. Of the remaining card types (also known as "Non Best Qualified cards"), Non-Qualified cards are those with the highest interchange fees, while the "Mid Qualified cards" have interchange fees that are lower than Non-Qualified cards and higher than Qualified cards. (vi) Other types of cards sometimes bundled in Tiered pricing include "PIN Debit" (debit cards used with a PIN), "Check Cards" (debit cards which are used without a PIN, also called "signature debit"), "Regulated cards" (Check Cards which are issued by certain larger banks and have interchange fees regulated by the Federal Reserve Bank), "Unregulated cards" (Check Cards which are issued by certain smaller banks and do not have regulated interchange fees), International (cards issued by non-U.S. banks), "Rewards," "Rewards I," and "Rewards II" cards (cards which have specified card holder rewards), "EIRF" type cards, "Business cards" or "Corporate cards" (certain cards issued to businesses), and "EBT" (electronic benefit transaction) cards. (vii) Transactions involving these cards are described as "Keyed" or "Hand Entered" transactions (Transactions where the card is not physically swiped in to a point of sale device), or "Swiped Transactions" (transactions which are not Keyed). (viii) Merchant agrees that the classification of the thousands of individual interchange and card types in to these types of broad categories is complex and is made at the discretion of EMS. (ix) As disclosed in the Schedule of Fees, Transaction fees are sometimes charged per "Authorization" (the process by which a card presented for payment and the payment amount are sent to the Card Brand and approved or denied by the card issuing bank), or by cleared and settled transactions. An Authorization Transaction Fee shall still be payable under this Agreement even if Merchant contracts separately with American Express for settlement of American Express Transactions. (x) "Voice Authorizations" (or Voice ARU) are those obtained by telephone. (xi) The term "Assessments" includes dues, assessments, acquirer fees, network fees, or other Card Brand fees and expenses assessed to Merchant, EMS or Bank (EMS and Bank sometimes referred to as the "Acquirer"). Examples of these types of charges include NABU, NAPF, APF, FANF, switch charges, international transaction surcharge fees or cross border fees, network fees, integrity fee, Card Brand Authorization fees, and Card Brand Assessments. With respect to American Express, Assessments shall also include, but not be limited to the OptBlue® Network Fee, Inbound Fee, Non-Swiped Transaction Fee, Non Compliance Fee, Data Quality Fee, and Excessive Dispute Fees, among others. (xii) A "Batch Header" or "Data Capture" fee is one charged for each batch submitted by or on behalf of the Merchant. (xiii) "Monthly Minimum" fees will be charged to the extent the Transaction fees for Bank Card (Visa, MasterCard or Discover credit cards or signature debit cards, plus American Express if settled to Merchant under this Agreement) Transactions are less than the specified minimum. (xiv) Other one-time or recurring monthly fees are as described in the Schedule of Fees. (xv) The term "e-Commerce" means those Transactions accepted through the use of a web site. (xvi) An "Access fee" is a monthly fee charged for Merchant's access to the applicable Card Brand networks. (d) Merchant acknowledges that the monthly fees apply to each Merchant identification number assigned to Merchant. Merchant agrees that the amounts of such fees set forth on said Schedule may be amended from time to time by EMS and Bank. (e) Merchant acknowledges that in determining whether to accept the Application and in setting the Discount Rate and Fees and Transaction Fees to be charged Merchant, Bank and EMS have relied upon the information contained in the Application including but not limited to the type of business in which Merchant is engaged, the product or service sold, the average transaction or ticket size and monthly volume, the amount of telephone and mail order sales, and the ratio of keyed/swiped transactions. If any of the foregoing information on which Bank and EMS relied is materially misstated, or if Merchant changes the nature of its business from that indicated on the Application or otherwise changes its business or goods sold or services rendered in a way that may increase EMS's costs or lead to excessive Chargebacks, or if Merchant's percentage of on and off premises, mail, telephone, and internet transaction sales varies from that disclosed in the Application, the Discount Rate, as amended from time to time, shall be the sum of (i) the otherwise applicable Discount Rate, plus (ii) Five Percent (5.00%) (or such lower amount that is acceptable to Bank and EMS). In the event of a change in the parameters stated above or should special circumstances arise which shall change either temporarily or permanently the existing conditions, Merchant must notify Bank or EMS prior to those changes, so that necessary adjustments can be made. (f) Fees become due at the time a Transaction is submitted to Bank and EMS. Merchant agrees to close batches at least once every business day, and acknowledges the Discount Fees quoted in the accompanying Application, as amended from time to time, are contingent upon the foregoing, and further understands that in the event that batches are not closed at least daily, (i) Bank and EMS may initiate batch closing on Merchant's behalf, and (ii) the interchange qualification of Transactions may change, resulting in additional charges as described in the Schedule of Fees. (g) Merchant acknowledges that higher Assessment and / or interchange fees apply to sales or credit drafts emanating from foreign (non-U.S.A.) credit cards or commercial cards issued for business purposes. (h) For every Transaction, an Authorization matching the sales amount exactly (or within 15% for hotels and car rentals, 20% for restaurants, bars and night clubs) must be obtained, or higher Assessment and / or interchange charges apply. (i) Merchant benefits of Data and Breach protection (i) are provided solely through a third party vendor and neither EMS nor Bank shall have any obligation therefor, and (ii) are only available in any particular month to the extent Merchant timely documents full compliance in that month with PCI Council Data Security Standards. PLEASE REFER TO THE SCHEDULE OF FEES INCORPORATED INTO THIS AGREEMENT, AS AMENDED FROM TIME TO TIME, FOR THE AMOUNT OF THESE FEES.

**10. Sales Drafts.** Merchant agrees to use a POS device, computer, telephone and related equipment approved by Bank and EMS for transmission of all Transaction data and to record each Transaction by "swiping" the Card through the POS device whenever a Card is present, or if a Card cannot be electronically read, to enter the Card number and expiration date into the POS device manually. Merchant shall prepare a sales draft in legible form for each Transaction. All items, goods and services purchased in a single transaction shall be included in the total amount on a single sales draft. Merchant shall legibly type, print or imprint the following information on each sales draft: (a) the cardholder's name or name of authorized user; (b) the cardholder's account number and expiration date; (c) Merchant's correct name and address of business; (d) the date of the Transaction; (e) the total cash price of the sale (including all applicable state, federal or local surcharges and taxes); (f) the amount to be charged if a partial payment is made in cash or by check, or the amount to be charged if a partial payment is made as a deposit or as the balance owing after a deposit has been accepted; (g) a brief description of the goods or services; (h) the words "deposit" or "balance" if full payment is to be made in this manner at different times on different sales drafts; (i) the authorization approval code from the authorization center; and (j) for telephone orders transactions, the designation "TO", for mail order transactions, the designation "MO", for preauthorized transactions, the designation "PO", and for recurring transactions, the phrase "Recurring Transaction" in each instance shall be typed or printed on the signature line. Merchant will take reasonable steps to verify card information in accordance with the Rules for each Transaction. Merchant warrants the cardholder's identity whether or not Authorization is received and whether or not Card is present. Merchant shall deliver to the cardholder a true and completed copy of the sales draft. Failure to comply with the above requirements will, in addition to other remedies, subject Merchant to immediate termination, the establishment of a Reserve Account under Section 15 hereof, and the Merchant's indemnification obligations to Bank and EMS under Section 19 hereof.

**11. Retention of Records.** Bank and/or EMS may examine and verify at reasonable times all records of Merchant pertaining to all Transactions processed hereunder. Merchant will be responsible for the retrieval of all sales drafts and receipts and credit receipts requested by Bank or EMS within the time limits established by the Rules. Merchant will retain originals or copies of sales drafts and receipts and credit receipts for at least three (3) years from the processing date of the Transaction. Merchant agrees to deliver the paper copy or facsimile of any such sales drafts and credit receipts in its files to Bank or EMS, or to such person as Bank or EMS may designate, within such period after request therefor as is required by law or by the Rules. Such requested copies must be legible. Merchant will be responsible for all liabilities arising from any failure to provide an acceptable copy of any sales drafts as required by law or the Rules. Prior to discarding any sales drafts or other records of Transactions, Merchant will destroy, in a manner rendering data unreadable, all material containing cardholder account numbers, Card imprints, and carbons. Merchant shall not under any circumstances retain cardholder information including cardholder name, account number, expiration dates, billing addresses, etc. in a database that can be accessed via a web-based application. Merchant shall indemnify and hold Bank and EMS harmless from all judgments, losses, costs and expenses, including reasonable attorneys' fees, incurred by Bank or EMS and arising out of any claim by cardholders whose security has been breached due to violation of Merchant of this Section. Merchant acknowledges that EMS may pass on research fees of up to $75 per hour resulting from research of archived records that are the responsibility of the Merchant. Merchant further acknowledges that it is responsible for examining its monthly Merchant Statement for billing accuracy. EMS reserves the right to limit billing error corrections and refunds to those occurring within the last ninety (90) days. Merchant further agrees that Bank or EMS or their representatives may, during normal business hours, inspect, audit, and make copies of Merchant's books, accounts, records and files pertaining to any transactions, refunds or adjustments thereon.

**12. Chargebacks.** For purposes of this Agreement, "Chargeback" shall mean the procedure by which a sales draft or other indicia of a Transaction (or disputed portion thereof) is denied or returned to Bank or the issuing bank after it was entered into the appropriate settlement network for payment, in accordance with the Rules, for failing to comply with the Rules or due to a cardholder dispute, the liability of which is the Merchant's responsibility. As used in this Section 12, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules), unless the context indicates otherwise. Merchant understands and acknowledges that an authorized sale does not constitute a guarantee of payment, only available credit, and may be subject to dispute or chargeback. Notwithstanding any nonrecourse provisions contained herein, Merchant is responsible for any and all Chargebacks, as well as Card Brand fines, assessments and fees related to or arising out of such Chargebacks, and will pay Bank, upon demand and without notice, the face amount of any Chargeback, and Bank shall have the right to debit the Merchant's DDA, incoming transactions, or any other funds of the Merchant in Bank's direct or indirect control by reason of Bank's security interest granted by Merchant under Section 14 below, for the face amount of any Chargeback including without limitation and by way of example, in any of the following circumstances: (a) a mail order, e-commerce order, or telephone order Transaction is disputed by the cardholder; (b) merchandise has been returned or service canceled by cardholder and cardholder requested a credit from Merchant and such credit was not processed by Merchant; (c) the purchase had not been authorized as required or the denial of an Authorization was disregarded; (d) a Transaction is for a type of merchandise or services other than as described in the Application and the draft was charged back by the cardholder; (e) the cardholder contends or disputes to Bank, EMS or the appropriate issuing bank that: (i) the goods or services were not received by the cardholder or their authorized user or (ii) the goods or services received by cardholder or their authorized user do not conform to what was on the sales draft or (iii) goods or services of value were defective or (iv) the dispute reflects a claim or defense authorized against card issuers or creditors by a relevant statute or regulation; (f) Merchant fails to honor a retrieval request from Bank or EMS for an original sales draft in accordance with the requirements hereof; (g) a sales draft is illegible, incomplete or does not contain a Transaction date on the face or such dollar amount has been altered or incorrectly entered and sales draft has been charged back by the Card issuer; (h) the sales draft contains the imprinted or otherwise transcribed description of a Card other than the Card specified; (i) the transaction was generated through the use of an invalid, altered, counterfeit or expired Card; (j) no signature appears on the sales draft or sales draft does not contain the embossed legend from a Card or Merchant has failed to obtain the specific authorization from a designated Authorization Center to complete the Transaction and/or the cardholder has certified in writing, to Bank, EMS or the issuing bank that he did not make or authorize the Transaction; (k) security procedures have not been followed or where the signature on the sales draft is different from the signature appearing on the signature panel of the Card and the sales slip is charged back; (l) a Card Issuer, Bank or EMS has information that Merchant fraud occurred at the time of the Transaction, whether or not such Transaction was authorized by the issuer and the cardholder neither participated in nor authorized the Transaction; (m) if with respect to any one Merchant outlet, the ratio of questionable Merchant activity to Card sales exceeds industry standards, in the sole determination of Bank or EMS. If, with respect to any one of Merchant's outlets, the amount of any Card counterfeit or fraud incidences becomes excessive, in the sole and absolute discretion of Bank or EMS, Merchant may be charged back for all Transactions, terminated immediately for cause, and Merchant's funds, including but not limited to those incoming Transactions and in Merchant's DDA and Reserve Account shall be held pursuant to the provisions of this Agreement. Merchant agrees to accept and understands that it is responsible for all Chargebacks and understands that some Chargebacks cannot be rebutted or remedied. Merchant agrees to satisfy directly with the cardholder any claim or dispute arising from a Transaction. Bank and EMS will provide Merchant with any information possessed by them that will enable Merchant to recover from others the amount of any Chargeback. Bank and EMS shall retain any discount and/or other fee related to a Chargeback. Merchant understands that Bank and EMS will assess up to $45 per Chargeback, or other charges that may be established by Bank and EMS from time to time. Furthermore, Bank and EMS may assess Merchant for any fines imposed by MasterCard, Visa and American Express plus a processing fee for such fine as may be required by Bank and EMS at their sole discretion. Disputes relating to Chargebacks shall be governed by the Rules, including Merchant's obligation to provide required documentation. If the actual Card is "not present," Merchant also understands and acknowledges that Merchant bears one hundred percent (100%) of the risk of Chargeback under the Rules, for all Transactions and any fees resulting from any losses, claims, and costs arising from or associated with such all Transactions, including any Authorizations.

**13. Returns and Credits.** Merchant shall maintain a fair policy permitting refunds, exchanges, returns and

CONFIDENTIAL In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL2") UNREDACTED PER 12 USC 3413

SL Account Mgmt
DocuSign Envelope ID: 0C8DD934-9AF2-4F25-A4B2-A2E0F2737824
MERCHANT AGREEMENT 121580 D

adjustments in accordance with applicable law. If, with respect to any Transaction, any goods are accepted for return or any services are refunded, terminated or canceled, or any price adjustment is allowed by Merchant and except where otherwise required by law or governmental regulations, Merchant shall not under any circumstances, except as permitted by certain debit card networks, during the term of this Agreement, issue cash for return of goods or cancellations of service where goods or services were originally purchased in a Transaction. Instead, Merchant shall utilize a credit record evidencing such refund or adjustment. Merchant must process the credit record Transaction within three (3) business days of the original Transaction. Merchant shall date each credit record with the credit date and include thereon a brief description of the goods returned, services canceled or adjustment made and the amount of the credit, in sufficient detail to identify the Transaction. A completed copy of the credit record shall be delivered to the cardholder at the time of each return or cancellation of a transaction. The credit shall not exceed the amount of the original Transaction. The per item Transaction Fee will be applicable and Merchant may not receive a refund of Discount Fees paid for the original Transaction. With proper disclosure at the time of the Transaction, Merchant may: (a) refuse to accept goods in return or exchange and refuse to issue a refund to a cardholder; (b) accept returned goods in exchange for the Merchant's promise to deliver goods or services of equal value available from Merchant at no additional cost to cardholder; or (c) stipulate special circumstances agreed to by the cardholder. Proper disclosure shall be deemed to have been given only if, at the time of the Transaction, the following notice appears on all copies of the sales draft in legible letters at least one-quarter (1/4) inch high and in close proximity to the space provided for the cardholder's signature stating "NO REFUND" or "EXCHANGE ONLY" or "IN STORE CREDIT ONLY" or any special terms as applicable, or equivalent language, provided and to the extent such sales practices are permitted under applicable law.

14. Security Interest. Unless the context indicates otherwise, when used in this Section 14, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). IN ORDER TO SECURE ALL OBLIGATIONS OF MERCHANT TO BANK AND EMS ARISING FROM THIS AGREEMENT, MERCHANT HEREBY GRANTS BANK AND EMS A CONTINUING SECURITY INTEREST IN AND TO ALL DEPOSITS, REGARDLESS OF SOURCE, TO MERCHANT'S DDA AND OTHER ACCOUNTS IN THE DIRECT OR INDIRECT CONTROL OF THE BANK (INCLUDING THE RESERVE ACCOUNT), ESTABLISHED IN MERCHANT'S NAME OR BY ANY PARTY SIGNING THE PERSONAL GUARANTY AS PART OF THIS AGREEMENT, AND TO ALL PROCEEDS OF SAID DEPOSITS. Said security interest may be set-off or otherwise exercised by BANK without notice or demand of any kind by making an immediate withdrawal from or holding said account, upon Bank's or EMS's reasonable determination that a breach of any obligation of Merchant under this Agreement has occurred. The exercise of this security interest shall be in addition to any other rights of Bank and EMS under this Agreement or applicable laws. The parties specifically acknowledge and affirm that pursuant to the Uniform Commercial Code, Bank has a general lien and right of offset upon all funds on deposit with Bank, which shall stand as one continuing collateral security for the timely performance by Merchant of all of its obligations to Bank and EMS. Bank and EMS shall also have the right to require Merchant to furnish such other and different security as Bank or EMS shall deem appropriate in their sole discretion in order to secure Merchant's obligations under this Agreement. Merchant agrees to execute any documents or take any actions required in order to comply with and perfect any security interest under this Section, at Merchant's cost. To the extent permitted by law and the Rules, Merchant irrevocably authorizes Bank and EMS to record any financing statement or other documents relating to this security interest. Merchant represents and warrants that no other person or entity has a security interest in the property described herein and that this security interest is a first lien security interest and secures Merchant's obligations to Bank under this Agreement. Merchant must obtain the prior written consent of Bank before granting any subsequent security interest in the property described herein.

15. Reserve Account. Unless the context indicates otherwise, when used in this Section 15, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). In addition to the security interest and Chargeback rights granted to Bank and EMS by Merchant, Merchant hereby authorizes Bank or EMS to establish a non-interest bearing "Reserve Account," with or without notice to the Merchant, at any time prior to, at, or after the termination of this Agreement, when the Bank or EMS have determined that any of the following has occurred: (a) reasonable doubt exists concerning Merchant's ability to comply with this Agreement; (b) Merchant's breach of this Agreement or other applicable Rules and regulations; (c) excessive Chargebacks, customer disputes, ACH rejects, retrieval requests or the reasonable possibility of any of the foregoing occurring; (d) inability of the Merchant to fund any potential Chargebacks, post termination fees, charges or other expenses and fees payable to the Bank or EMS; (e) suspicious Transaction activity or Transaction activity which requires further research to verify or substantiate. The Reserve Account is not a bank account, but is an account payable to Merchant by Bank or EMS, as the case may be. Bank may elect to deposit all or a portion of the balance of the Reserve Account in a depository account or trust account at Bank or at another financial institution, however, neither Merchant nor its creditors shall have any rights of withdrawal, pledge or assignment with respect to any such bank account. The Reserve Account may be funded, supplemented or replenished by the Bank or EMS in any or all of the following methods to the extent permitted by the Rules: (a) one or more debits to Merchant's DDA; (b) one or more deductions from payments due Merchant (including but not limited to regular deductions calculated as a percentage of net batch amounts); or (c) if Bank, EMS and Merchant agree, delivery of letter of credit or certificate of deposit issued by a financial institution acceptable to Bank and EMS. Merchant hereby agrees that Bank or EMS shall have a full right of offset with respect to the Reserve Account, and that Bank may deduct from this Reserve Account any amount owed to such party in accordance with this Agreement or any other agreement with Merchant. Any balance in the Reserve Account may be held until the expiration of any applicable Chargeback rights under applicable Rules of the Card issuer, whose holding period may extend beyond the termination of this Agreement. Bank may fund, supplement or replenish the Reserve Account in such an amount as Bank or EMS may reasonably estimate is necessary to secure Merchant's payment obligations under this Agreement. Without limiting the generality of the foregoing, Merchant shall, upon termination of this Agreement, maintain sufficient balance in the Reserve Account in such amount as may be reasonably required by Bank or EMS until all of the Chargeback rights of the Transactions processed preceding termination have expired. If, after all such Chargeback rights have expired, Bank and EMS are unable to return the funds in the Reserve Account to Merchant after using reasonable efforts to contact Merchant, a fee of $95 per month shall be deducted from the Reserve Account in order to offset the administrative, clerical, legal, and risk management costs incurred by Bank and EMS to monitor the funds remaining in the Reserve Account. Merchant hereby agrees that any financial institution at which Merchant maintains a deposit account may rely upon an executed copy of this Agreement provided by Bank as Merchant's express, written instruction and authorization to permit such offset by Bank, and Merchant's agreement that said financial institution shall be released from any liability for any good faith compliance with the express written instruction and authorization as set forth herein to permit such offset by Bank.

16. Warranties by Merchant. Merchant represents and warrants to Bank and EMS that Merchant has taken all necessary action and has the authority to enter into this Agreement with Bank and EMS and that the person(s) signing for or on behalf of Merchant is (are) specifically authorized and directed to do so by Merchant. This Agreement constitutes the legal, valid and binding obligation of Merchant, enforceable against Merchant in accordance with its terms. Without limiting any other representations, warranties, covenants and agreements hereunder, Merchant agrees, represents and warrants to Bank and EMS that at all times during the term of this Agreement: (a) Merchant is engaged and will engage in the lawful business shown on the front of the Application and is duly licensed under the laws of the State, County and City in which Merchant is located to conduct such business; (b) Merchant currently accepts or desires to accept Cards for the purchase of goods and services through Transactions with cardholders; (c) Merchant has not been terminated from the settlement of card transactions by any financial institution or determined to be in violation of the rules and regulations of Bank, EMS, MasterCard, Visa, American Express or any other Card Brand or network; (d) Merchant will fully comply with all federal, state, and local laws, rules and regulations, as amended from time to time, including all laws with respect to consumer protection and credit, and the Rules; (e) Merchant is aware that Visa, MasterCard, American Express and other Card Brands maintain and publish various guides and best practices policies with respect to risk management, cardholder data security, chargeback management, fraud prevention, and dispute resolution and will familiarize itself with those materials and any amendments to them, and will accept Cards in accordance with the terms of this Agreement and the operating and other rules and regulations of the Card Brands including without limitation the American Express Merchant Operating Guide as such terms may be amended from time to time; (f) except to the extent inconsistent with specific provisions of this Agreement, Merchant also will comply with any and all best practices guidelines provided by EMS; (g) Merchant will provide Bank and EMS sixty (60) days prior written notice of its intent to (i) transfer or sell 10% or more of its total stock, assets and/or liquidate, (ii) change the nature of its business, or (iii) convert all or part of its retail sales to mail, e-commerce, or telephone orders or any other sales method in which the Card is not present and swiped through the POS terminal; (h) as to each Transaction presented to Bank and EMS for payment: (i) the sales draft is and will be valid in form and has been completed in accordance with the Rules, all applicable laws and requirements, (ii) Merchant has delivered goods to the Cardholder or completed the service described on the sales draft in accordance with Merchant's agreement with the Cardholder, (iii) each sales draft represents a bona fide Transaction directly between the Merchant and the cardholder in the Merchant's ordinary course of business and the sales draft shows the cardholder's indebtedness for the total amount shown, (iv) the cardholder has no claim, defense, right of offset, or dispute against Merchant in connection with the purchase of the goods or service and Merchant will provide adequate services to cardholders and will honor all warranties applicable thereto, (v) Merchant has not charged cardholder any separate or additional fee(s) in connection with the Transaction other than as may be required by law or permitted by the Rules (the foregoing shall not prohibit Merchant from extending discounts to customers paying by cash, check, or any other means, other than by Card), and (vi) each Transaction was and will be placed by a person who is the cardholder or authorized user of the Card; (i) all of Merchant's business locations engage and will engage in the same or substantially similar business activity as that listed on the face of this Agreement; (j) the percentage of mail and/or telephone order sales listed by Merchant is and will be consistent at all of Merchant's locations; (k) Merchant does not and will not offer enticements or incentives to cardholders in connection with Transactions for the sale of Merchant products; (l) Merchant uses and will use both the name and address shown on the front of the Agreement on all sales drafts and does not and will not use any other name; (m) Merchant shall include all items of goods and services purchased in a single Transaction in the total amount on a single sales draft or transaction record (i.e., Merchant shall not "split tickets") and shall not submit duplicates of any transaction; (n) Merchant will process no Transaction between a cardholder and an entity other than Merchant; (o) Merchant shall be responsible for its employees' and agents' actions whether or not authorized by Merchant; (p) Merchant will not knowingly submit, and hereby acknowledges that Bank and EMS will not knowingly accept, for submission any Transaction that is illegal or that the Merchant should have known was illegal; (q) in the event Merchant was undergoing a forensic investigation at the time this Agreement was signed, Merchant fully cooperate with the investigation until it was completed; and (r) Merchant certifies that it has provided Bank and EMS its correct federal tax identification number; is not subject to backup withholding; and is a U.S. citizen or other U.S. person. Merchant further warrants and agrees that it shall not, without the cardholder's consent and as permitted by law and the Rules, sell, purchase, provide, or exchange card account information in the form of sales drafts, mailing lists, tapes, or any other media obtained by reason of a Transaction or otherwise, to any third party other than to Merchant's agents approved by Bank and EMS for the purpose of assisting Merchant in its business, to Bank, EMS, or the respective card issuer or Card Brand or pursuant to lawful government demand. All media containing card account numbers must be stored in an area limited to selected personnel until discarding and must be destroyed in a manner that will render the data unreadable. Merchant will not disclose and will keep confidential the terms and conditions of this Agreement. If Merchant processes and stores Card data and/or has access to that information via the Internet, Merchant agrees to comply with all Rules in respect of protecting Card data and maintaining security measures, including the PCI Council DSS. Failure to comply with the Rules or foregoing requirements, the occurrence of any significant circumstance that may create harm or loss of goodwill to any Card Brand, and/or any security breach compromising Card data shall make the Merchant liable for any network fines, fees and/or unauthorized charges to compromised Card accounts. Merchant understands and agrees that violation of any of the foregoing warranties, representations, covenants and agreements or otherwise provided in this Agreement shall constitute an event of default and breach by Merchant of this Agreement, and may cause this Agreement to be immediately terminated, or be subject to termination, and may result in all funds being placed in a Reserve Account pursuant to Section 15 hereof.

17. Term. The term of this Agreement shall be twenty four (24) months commencing on the acceptance of the Application and this Agreement by Bank and EMS and the issuance of a merchant account identification number to Merchant identifying Merchant for accounting, billing, customer service and related purposes in connection with the Services. Thereafter, the Term shall automatically renew for additional consecutive twenty four (24) month terms, unless written notice of termination (to be effective upon the expiration of the then current term) is provided by Merchant to Bank and EMS or by Bank and EMS to Merchant at least ninety (90) days prior to the then existing term, unless earlier terminated in accordance with the provisions of this Agreement.

18. Termination and Events of Default. Bank and/or EMS, in addition to any rights of immediate termination without notice as may be contained elsewhere in this Agreement, may terminate this Agreement, and at Bank's and/or EMS's discretion, any merchant processing agreement(s) of any other business that is commonly owned with or controlled by Merchant for any reason or cause (or for no reason) whatsoever upon ten (10) business days prior written notice to Merchant; provided, that Bank and/or EMS may immediately suspend operation of this Agreement and/or take other steps Bank and/or EMS consider necessary. Such termination shall become effective on the later of ten (10) business days from the date such notice is given in the manner prescribed for notices herein or the date specified in such notice; provided, however, that in the event of termination by Bank or EMS due to breach by Merchant of any of the terms and conditions of this Agreement, such termination shall become effective immediately, and Merchant shall pay to EMS a termination fee in the amount of $595. This Agreement may also be terminated effective immediately upon the giving of notice at the discretion of Bank and/or EMS for reasons including but not limited to: (a) Bank and/or EMS determines that Merchant's type of business as indicated on the Application differs from the actual type of business Merchant operates; (b) Merchant moves or relocates to a new location without giving Bank and EMS at least thirty (30) days prior written notice; (c) the business as conducted by Merchant could endanger the safety and/or soundness of Bank or EMS; (d) the Merchant's owner, officer or corporate entity has a separate relationship with Bank and/or EMS and such relationship has been terminated by Bank and/or EMS; (e) Merchant and/or any of its guarantors files for bankruptcy or is otherwise shown to be insolvent; (f) Merchant has Chargebacks and or returns and credit transactions which exceed one-half of one percent (0.50%) of the total number of Transactions or the total dollar value of Transactions completed by Merchant in any thirty (30) calendar day period; (g) Merchant owes money to Bank and/or EMS or any of their respective affiliates, and fails to make a timely payment thereof; (h) Merchant has breached or is in default under an End-User Agreement or similar agreement regarding the provision of web hosting, e-mail, electronic commerce, domain name and/or other Internet application or system services; (i) Merchant fails to notify Bank and EMS if it knows or suspects that cardholder personal information has been compromised; (j) EMS and / or Bank is otherwise not secure (as determined by EMS and / or Bank, in its sole and absolute discretion) with respect to Merchant's financial position; (k) the continued provision of services to Merchant would pose a level of risk and/or exposure to EMS or Bank (including, without limitation, credit, operational, reputational, financial, technological, security and/or fraud risk or exposure) that Bank or EMS considers, in its sole discretion, to be unacceptable; or (l) the Rules require that EMS and/or Bank terminate and/or suspend this Agreement. In addition, Merchant hereby acknowledges that the Card Brands have the right to terminate or limit this Agreement. Upon the occurrence of an event of default or the termination of this Agreement by Bank or EMS in accordance with the terms hereof, Bank and EMS shall be entitled to pursue all rights and remedies available to it or them under this Agreement, at law or in equity, including but not limited to placing the Merchant in the "Terminated Merchant File." All obligations of confidentiality and of any party to this Agreement to pay funds to another shall survive any termination hereof. Nothing herein shall be construed as relieving Merchant of the obligation for the Minimum Discount Fee as provided in Schedule of Fees for the term of this Agreement.

19. Indemnification; Bank and EMS Liability. Merchant agrees to indemnify and hold Bank and EMS harmless from and against any Card Brand fines, assessments, or fees, and all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) resulting from any breach of any warranty, covenant or agreement (including, without limitation, a violation of the Rules), or any misrepresentation by Merchant under this Agreement, or arising out of Merchant's or Merchant's employees' or agents' negligence or willful misconduct, in connection with Transactions or otherwise arising from Merchant's provision of products and services to cardholders. Except as expressly provided in this Agreement, Bank and EMS make no warranties whether express, implied or statutory, in connection with this Agreement. Without limiting the foregoing, BANK AND EMS DISCLAIM ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Bank or EMS may utilize systems of others, including those of any Card Brands, in connection with its performances of the services described hereunder. Bank and EMS shall not be responsible or liable for any information provided by others or for the use of any system or equipment of Bank and EMS or others or for any circumstances beyond its control. The sole and exclusive liability of Bank and EMS and remedy of Merchant hereunder (including negligence) shall be general money damages not to exceed the amount of the item subject to claim or dispute, regardless of the characterization of such action. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL BANK AND EMS, OR THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY, FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. Neither Bank nor EMS shall be responsible or liable for any action taken by Bank or EMS (or the results thereof) that is authorized by this Agreement, the Rules, or applicable regulations or law. Neither Bank nor EMS shall have liability for any taxes arising under this Agreement (which liability will be that of Merchant), other than taxes based on Bank's or EMS's income. Merchant acknowledges that Bank is directly involved in the administration of Merchant's Visa and Master Card Transactions (as a result of Bank's membership in those Card Brand associations), but Bank has no similar relationship with respect to its Discover Transactions or American Express Transactions. Merchant's relationship with those Card Brands is established (directly or indirectly) through EMS.

20. Force Majeure. The parties to this Agreement shall be released from liability hereunder for failure to perform any of the obligations herein where such failure to perform occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, communications failure, sabotage, war, military operation, national emergency, mechanical or electronic breakdown, civil commotion or the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or either party's compliance therewith, or governmental proclamation, regulation, or priority, or any other cause beyond either party's reasonable control, whether similar or dissimilar to such causes.

21. Notices. Any notice, request, instruction or other document directed to Merchant required or permitted under this Agreement shall be deemed to have been given: (a) upon receipt if by (i) personal delivery or (ii) overnight courier service by way of a national courier; (b) upon transmission if by (i) e-mail to the address provided by Merchant on this Agreement, or (ii) fax to the fax number provided by Merchant on this Agreement; or (c) on the third day after the same shall be sent by first class mail, postage prepaid, to the address provided by Merchant on this Agreement or at such other address as Merchant may give to the Bank or EMS from time to time by written notice. Any notice, request, instruction or other document directed to Bank or EMS required or permitted under this Agreement shall be deemed to have been given on the third day after the same shall be sent by first class mail, postage prepaid, to EMS at 5005 Rockside Road, Suite PH100, Cleveland, Ohio 44131 and to BMO Harris Bank N.A., at 150 North Martingale Road, Suite 900, Schaumburg, Illinois 60173 or at such other addresses as EMS or Bank may give to the Merchant from time to time by written notice.

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
EMS CID response
SL2 - 5
Pl. Ex. 30
p. 554
R-013763-00000259

CONFIDENTIAL In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL2") UNREDACTED PER 12 USC 3413

DocuSign Envelope ID: 0C8DD934-9AF2-4F25-A4B2-A2E0F2737824

MERCHANT AGREEMENT 121&MO D

22. **Severability.** If any part of this Agreement is held unenforceable or invalid or prohibited by law, said part shall be deemed stricken therefrom and this Agreement shall be read and interpreted as though said part did not exist, and shall not affect the validity or enforcement of any other provision.

23. **Waiver.** Neither the failure nor any delay on the part of Bank or EMS to exercise any right, remedy, power or privilege hereunder shall operate as a waiver nor be construed as an agreement to modify the terms of this Agreement, nor shall any single or partial exercise of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver by a party hereunder shall be effective unless it is in writing and signed by the party making such waiver, and then such waiver shall apply only to the extent specifically stated in such writing.

24. **Entire Agreement.** This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and understanding between the Merchant, Bank and EMS with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written. Neither this Agreement nor any portion or provision hereof may be changed, waived or amended orally or in any manner other than be a writing specifically identified as such and signed by the duly authorized representatives of Bank and EMS. This Agreement is not effective and may not be modified in any respect without the express written consent of Bank. Merchant and Guarantor(s) acknowledge and agree (i) that this Agreement is made as part of a transaction solely for business and commercial purposes and is not primarily for personal, family, or household purposes, and (ii) that Bank, EMS and Merchant are "business association(s)" as defined in Ohio Revised Code Section 169.01(B)(2).

25. **Assignment and Delegation.** This Agreement may be assigned by Bank. . EMS may subcontract, sublicense, assign, license, franchise, or in any manner extend or transfer to any third party any right or obligation of EMS set forth herein but only as may be approved by Bank and permitted under the Rules. This Agreement may not be assigned by Merchant without Bank's and EMS's prior written consents and any purported assignment without such consents shall be void. This Agreement shall be binding on the parties and their permitted heirs, successors, and assigns. Bank (and EMS, if and to the extent permitted under the Rules) reserves the right, in its sole discretion, to delegate or assign to third parties the performance of certain of Bank's (or EMS's, if applicable) servicing or settlement obligations to Merchant. The relationship of Bank, EMS and Merchant is solely that of independent parties contracting for services.

26. **Disputes, Governing Law, Jurisdiction, and Venue.** Bank and EMS shall have the absolute right to initiate or defend any and all disputes arising from this Agreement with Merchant. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. In the event of a claim by Bank and/or EMS for the failure of a Merchant to pay any Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant and guarantor(s) of Merchant's obligations and duties hereunder agree that personal jurisdiction and exclusive venue of any such claim shall be in the federal or state courts of Cuyahoga County, Ohio, and Merchant and any guarantors do each hereby waive all objections to said jurisdiction and agree to submit thereto. Each party is responsible for its own costs and expenses, except that Merchant and/or guarantors shall be liable jointly and severally for all costs and expenses of Bank and EMS (including attorneys fees in connection with the enforcement of this Agreement), as a result of any breach or the collection of any sums due to Bank or EMS hereunder. In connection with any claim by Bank and/or EMS for the failure of a Merchant and/or guarantor(s) to pay any Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant and guarantor(s) hereby waive any right to assert any counterclaim or affirmative defense for set off or other relief against Bank and/or EMS, it being the parties' intention that any such counterclaims are subject to arbitration in accordance with the procedures set forth in Section 27 and that no such arbitration proceeding shall be commenced until after a final unappealed judgment is entered in the court proceedings. The parties hereby waive any right to trial by jury in connection with any dispute between them. Any claims concerning errors in the Fees charged hereunder must be made in writing within six months of the occurrence of the error on which the claim is based, and must specify the grounds for the claim. No such claim for Fees charged hereunder may be filed for Arbitration or in Court until thirty days after a written claim for such was first timely made. Merchant acknowledges and agrees that, in addition to clearing and settling Transactions, Bank collects fees, costs, and other charges due from Merchant under this Agreement at EMS' instruction. Merchant agrees that Bank has no duty to verify, audit, review or otherwise oversee the fees, costs, or other charges that Bank collects from Merchant.

27. **Arbitration.** Except as expressly provided in Section 26 any claim or dispute arising out of or related to this Agreement shall be finally resolved by final and binding arbitration. Whenever a party shall decide to institute arbitration proceedings, it shall give written notice to that effect to the other parties. The party giving such notice shall refrain from instituting the arbitration proceedings for a period of thirty (30) days following such notice to allow the parties to attempt to resolve the dispute between or among themselves. If the parties are still unable to resolve the dispute, the party giving notice may institute the arbitration proceeding under the rules of the American Arbitration Association ("AAA Rules"). There shall be no right or authority for any claims or disputes to be arbitrated on a class action basis. Arbitration shall exclusively and solely be held in Cleveland, Ohio. The arbitration shall be conducted before a single arbitrator mutually chosen by the parties, but if the parties have not agreed upon a single arbitrator within fifteen (15) days after notice of the institution of the arbitration proceeding, then the arbitration shall be conducted by a panel of three (3) arbitrators. In such case, Merchant, on the one hand, and Bank and/or EMS on the other, shall within thirty (30) days after notice of the institution of the arbitration proceedings appoint one arbitrator. The presiding arbitrator shall then be appointed in accordance with AAA Rules. Decisions of the arbitrator(s) shall be final and binding on the parties. The arbitrator shall have the authority to award any remedy or relief a court of the State of Ohio could order or grant, including, without limitation, specific performance of any obligation created under this Agreement, the awarding of the issuance of an injunction or the imposition of sanctions for abuse or frustration of the arbitration process. Judgment upon the award of the arbitrator may be entered in any court of competent jurisdiction and enforced with full judicial effect thereafter. All fees and expenses of the arbitration shall be borne by the parties equally and each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentations, provided, however, that the arbitrator(s) is/are authorized to award the prevailing party such sums as shall be deemed proper for the time, expense and inconvenience of arbitration, including arbitration fees and expenses and attorney fees and expenses. Except to the extent that entry of judgment and any subsequent enforcement may require disclosure, all matters relating to the arbitration, including the award, shall be held in confidence by the parties.

28. **Compliance and Disclosure of Information; Patriot Act.** Merchant shall provide such information and certifications as Bank and EMS may reasonably require from time to time in reviewing Merchant's compliance with the terms and conditions of this Agreement and the Rules. Merchant further agrees to produce and make available for inspection by Bank, EMS or its officers, agents or representatives, such books and records of Merchant as Bank or EMS may deem reasonably necessary to be adequately informed of the business practices and financial condition of Merchant, or the ability of Merchant to observe or perform its obligations to Bank and EMS pursuant to this Agreement. Merchant further agrees to provide to Bank or EMS within seven (7) days of notice such information as Bank or EMS may request including but not limited to, credit reports, personal and/or business financial statements, income tax returns, or other such information as Bank or EMS may request. Merchant grants to Bank and EMS continuing authority to conduct credit checks and background investigation and inquiries concerning Merchant and its owner(s) including, but not limited to, character and business references and the financial condition of Merchant and Merchant's owner(s). Merchant expressly authorizes Bank, EMS or its agents and representatives to provide and receive such information from any and all third parties directly, without further consent or authorization on the part of Merchant. Bank and EMS may share with others its credit, sales and other information. Merchant will not transfer, sell, or merge or liquidate its business or assets or otherwise transfer control of its business, change its ownership in any amount or respect, engage in any joint venture partnership or similar business arrangement, change its basic nature or method of business, types of products sold or engage in sales by phone, internet, or mail order without providing notice to Bank or EMS and providing Bank or EMS with the opportunity to terminate this Agreement. Merchant acknowledges that Bank has implemented a customer identification program as required under the USA Patriot Act and other similar state laws and regulations. Merchant agrees to make available to Bank and/or EMS such information as may be required by Bank in connection with its customer identification program and/or as required under the USA Patriot Act and related state laws and regulations. Merchant hereby expressly consents to disclosure by EMS of Transaction data, Merchant data, and other information about the Merchant to American Express, and, further, expressly consents to American Express' use of such information to perform its responsibilities in connection with its Card program, promote the American Express network, perform analytics and create reports, and for any other lawful business purposes, including commercial marketing communications purposes and important transactional or relationship communications from American Express. American Express may use the information obtained in this application at the time of setup to screen and/or monitor Merchant in connection with Card marketing and administrative purposes.

29. **Amendments.** This Agreement is not effective until, and not before, it is signed by the Bank, and may not be modified in any respect without the express written agreement of the Bank. This Agreement may be amended by Bank and EMS from time to time upon written notice. Any amendment to the fees and rates set forth in the Schedule of Fees, including any additional fees, shall be effective on 30 days written notice. Any other amendment to this Agreement shall be effective on the effective date specified in the notice unless otherwise provided for herein. In the event of any amendment of the terms and conditions of this Agreement or of the fees payable to Bank or EMS hereunder, Merchant shall have the right to terminate this Agreement without the payment of the termination fee provided in Section 18 above by providing Bank and EMS written notice of such termination within 30 days after Merchant received notice of the amendment, except as otherwise required by the Rules. No such termination shall affect any obligation of Merchant to pay any fees, charges, or other obligations incurred by Merchant under this Agreement prior to the date of termination. To the extent not inconsistent with the foregoing, Merchant's submission of transactions to Bank and EMS on or after any amendment effective date constitutes acceptance of such amendment. Any unrelated alteration or modification to the preprinted form of this Agreement has no effect and, at the Bank and EMS's discretion, may render this Agreement void.

30. **Privacy.** Merchant acknowledges that it has read, understood, and hereby accepts EMS' Privacy Policy which is posted online at www.emscorporate.com/privacypolicy.

31. **Survival.** All representations, warranties and covenants shall survive the termination of this Agreement.

32. **Construction.** The captions contained in this Agreement are for the convenience of the parties and shall not be construed or interpreted to limit or otherwise define the scope of this Agreement.

33. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, such counterparts to constitute but one and the same instrument.

34. **Exclusive Agent.** For purposes of this Agreement and performance of the Services by EMS, (a) EMS is the exclusive agent of Bank, (b) Bank is at all times and entirely responsible for and in control of EMS's performance hereunder, and (c) Bank must approve, in advance, any fee to or obligation of Merchant arising from or related to performance of this Agreement.

35. **Default Interest Rate.** Merchant agrees that all amounts due and payable by Merchant to Bank or EMS under this Agreement shall accrue interest at the rate of one and one-half percent (1.50%) per month, or the maximum interest rate permissible under law, whichever is lesser, beginning as of date due and continuing following any judgment obtained by Bank or EMS against Merchant until paid in full.

36. **Financial Accommodation.** The acquisition, processing and settlement of Transactions is a financial accommodation and, as such, in the event Merchant becomes a debtor in bankruptcy, this Agreement cannot be assigned or enforced and Bank and EMS shall be excused from performance hereunder.

37. **Covenants applicable to American Express acceptance.** The provisions of the American Express Operating Guide are incorporated herein by reference and made a part hereof (see http://www.americanexpress.com/merchantopguide). Merchant hereby expressly authorizes EMS to submit Transactions to, and receive settlement from, American Express on behalf of the Merchant. American Express is hereby conferred third-party beneficiary rights, but not obligations, to this Agreement that will fully provide American Express with the ability to enforce the terms of this Agreement against the Merchant. Merchant may, at any time, opt out of accepting American Express Cards without directly or indirectly affecting its rights to accept other Cards.

Merchant acknowledges that it may be converted from the OptBlue® Program to a direct Card acceptance relationship with American Express if and when it becomes a High CV Merchant in accordance with the Rules and expressly agrees that upon conversion, (i) the Merchant will be bound by American Express' then-current Card Acceptance Agreement; (ii) American Express will set pricing and other fees payable by the Merchant for American Express Card acceptance; and (iii) Authorization or other Transaction Fees may still be payable to EMS pursuant to the Schedule of Fees in this Agreement. Neither Bank nor EMS is a party to the American Express Card acceptance agreement.

Merchant may not bill or collect from any Card Member for any purchase or payment on the American Express Card unless Chargeback has been exercised, the Merchant has fully paid for such Charge, and it otherwise has the right to do so.

Merchant's refund policies for purchases on the American Express Card must be at least as favorable as its refund policy for purchase on any other Card and the refund policy be disclosed to Card Members at the time of purchase and in compliance with Applicable Law.

Any and all American Express Card Member Information is confidential and the sole property of the Issuer, American Express or its Affiliates. Except as otherwise specified, Merchant must not disclose American Express Card Member Information, nor use nor store it, other than to facilitate Transactions at Merchant's establishments in accordance with this Agreement. Merchant must ensure that it and any third parties it enlists to facilitate Transaction processing complies with the American Express Technical Specifications (valid and accurate data must be provided for all data elements in accordance with the American Express Technical Specifications). Failure to comply with the American Express Technical Specifications may impact Merchant's ability to successfully process Transactions. Merchants may be assessed non-compliance fees if Merchant fails to comply with the Technical Specifications. To ensure compliance with the Technical Specifications, Merchants should work with EMS.

If a Merchant closes any of its Establishments, Merchant must follow these guidelines: (i) notify EMS immediately; (ii) policies must be conveyed to the Card Member prior to completion of the Charge and printed on the copy of a receipt or Charge Record the Card Member signs; (iii) if not providing refunds or exchanges, post notices indicating that all sales are final (e.g., at the front doors, by the cash registers, on the Charge Record and on websites and catalogs); (iv) return and cancellation policies must be clearly disclosed at the time of sale; and (v) for Advance Payment Charges or Delayed Delivery Charges, Merchant must either deliver the goods or services for which Merchant has already charged the Card Member or issue Credit for any portion of the Charge for which Merchant has not delivered the goods or services.

This Agreement shall be effective only upon acceptance and/or signature by EMS and Bank. Merchant's submission of transactions under this Agreement shall constitute Merchant's acknowledgment of acceptance of this Agreement by Bank and EMS notwithstanding the absence of any Bank or EMS signature. Any application fee paid to Bank or EMS is nonrefundable whether or not Merchant and this Agreement are accepted by Bank and EMS.

Merchant Name (Print)

By: Kaine Wen 3/5/2018

Authorized Signature Date

Kaine Wen

Authorized Signer's Name (Print)

Its: ____________________

____________________

Guarantor Date

____________________

Guarantor Date

ELECTRONIC MERCHANT SYSTEMS

By: ____________________

Date

Its: ____________________

BANK

By: ____________________

Date

Its: ____________________

BANK

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019 SL2 - 6
EMS CID response
Pl. Ex. 30
p. 555
R-013763-00000260

CONFIDENTIAL
In re True Count Staffing Inc. d/b/a SL Account Mgmt ("SL2")
UNREDACTED PER 12 USC 3413

DocuSign SECURED

## Certificate Of Completion

Envelope Id: 0C8DD9349AF24F25A4B2A2E0F2737824
Subject: Documents for your DocuSign Signature
Source Envelope:
Document Pages: 7
Certificate Pages: 4
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 5
Initials: 0

Status: Completed

Envelope Originator:
Stephanie Preidis
5005 Rockside Road
Independence, OH 44121
spreidis@emscorporate.com
IP Address: 13.108.238.8

## Record Tracking

| Status: Original | Holder: Stephanie Preidis | Location: DocuSign |
|---|---|---|
| 3/5/2018 1:36:01 PM | spreidis@emscorporate.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Kaine Wen<br>kwen@slaccountmgmt.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by: Kaine Wen D568F8401828432...<br>Using IP Address: 66.210.48.146 | Sent: 3/5/2018 1:54:26 PM<br>Viewed: 3/5/2018 2:16:21 PM<br>Signed: 3/5/2018 3:27:29 PM |

Electronic Record and Signature Disclosure:
Accepted: 3/5/2018 2:16:21 PM
ID: 231f68b3-70af-4fa6-8434-434009e65218

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/5/2018 1:54:26 PM |
| Certified Delivered | Security Checked | 3/5/2018 2:38:21 PM |
| Signing Complete | Security Checked | 3/5/2018 3:27:29 PM |
| Completed | Security Checked | 3/5/2018 3:27:29 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

Response of Electronic Merchant Systems to CFPB Civil Investigative Demand dated 5/10/2019 - received 6/10/2019
EMS CID response
SL2 - 7
Pl. Ex. 30
p. 556
R-013763-00000261