1    in -- I think national average is one in three but for the

2    company though, it's maybe one in five.  One more thing,

3    so reasons not to file a forbearance if a person was

4    already on a zero dollar payment plan on an income driven

5    payment plan there would be no point in doing it.

6         Q.   How frequently did that happen?

7         A.   Not very often.

8         Q.   Okay.  Who at the company submitted the

9    forbearance request?

10        A.   It would be the processor.

11        Q.   How did consumers know that the company was

12   requesting a forbearance?

13        A.   I do not recall if it was in the welcome call

14   script or not.  It might have been.  It's been a while.

15        Q.   When would consumers review the forbearance

16   request, if at all?

17        A.   They wouldn't.

18        Q.   How would a consumer be able to access the

19   request after it had been submitted, if at all?

20        A.   They could call their servicer to find out if

21   there was a forbearance request submitted or they get an

22   e-mail from their servicer saying we received your

23   forbearance request.  Generally those clients didn't know

24   unless it was in the script and I don't know if it was or

25   not.

1     Q.   Could you please mark this as Exhibit 7.

2          (Exhibit 7 was marked for

3          identification.)

4   BY MS. PREIS:

5     Q.   Mr. Camp, you're looking at a document that's

6   been marked for identification as Exhibit 7.  Do you

7   recognize this document?

8     A.   Yes.

9     Q.   What is this document?

10    A.   This is a general forbearance request.

11    Q.   Is this the form the processor used to submit

12  forbearance requests on behalf of consumers?

13    A.   Just pages one and two.

14    Q.   And how would processors submit this form?

15    A.   We would send it in via fax generally.

16    Q.   So I'd like to direct your attention to the top

17  of the page where it says Section 1, borrower information.

18  Underneath that do you see where it says SSN, name,

19  address, city, telephone, telephone, e-mail, et cetera?

20    A.   Yeah.

21    Q.   Can you please explain what information

22  processors would put in these fields?

23    A.   We didn't have to technically put it in directly.

24  The way these would be generated was in the CRM.  We would

25  just select in a drop down window general forbearance

Page 95

1    difficulties.

2        Q.   Do you see where it says Number 2, if approved

3    forbearance I would like to and there are some options,

4    which option would be selected?

5        A.   Again, the processors didn't select it.  It was

6    an automatically generated in the system and it would be

7    temporary stop making payments.

8        Q.   Would processors fill in the next two fields

9    Number 3, would processors fill out that field, I would

10   like my forbearance to begin with the monthly payments as

11   due in the month and year below?

12       A.   No, it would be a drop down window in the CRM

13   with two little calendars and you pick the dates and it

14   you generates the document that is on here too.

15       Q.   I see and how would the processor pick the dates?

16       A.   Depending on when we talk to the client.  So if I

17   talk to them March 1st, I would send this out for March

18   1st to whenever their last enrollment payment would

19   finish.

20       Q.   I see.  So just to clarify, was that the -- you

21   would want the payments -- the forbearance -- when would

22   you want the forbearance to begin?

23       A.   It would begin right away.

24       Q.   When would you select for the forbearance to end?

25       A.   Generally three to four months out depending on

Page 96

1    their -- how they broke up their enrollment payments.

2        Q.   I see.  So would the forbearance be calibrated to

3    end after the enrollment payments?

4        A.   Generally it would.  The standard was about three

5    months.

6        Q.   If you turn the page, please, under Section 3 the

7    very end says borrowers/endorser's signature, who would

8    sign this document?

9        A.   The processor would.

10       Q.   And whose name would they sign it as?

11       A.   The clients.

12       Q.   Would the processor date it as well?

13       A.   Yes.

14       Q.   So for the student loan servicer, would it look

15   as though it was the consumer who had submitted this

16   document?

17       A.   Correct.

18       Q.   So it's five to noon.  Let's go off the record

19   and take a lunch break.

20           (Recess.)

21   BY MS. PREIS:

22       Q.   So when we -- before we took a break we were

23   talking about processors signing forbearance requests and

24   you wanted to clarify something that you said about that?

25       A.   Yeah, for signing documents our manager obviously

1     Q.   I see.  So for the on line consolidation

2     application, what information would you input into that

3     application?

4     A.   We would input the client's name, already had the

5     clients personal info, social, date of birth and

6     everything, the main thing we were putting in was

7     clarifying income information such as the file -- how they

8     file their taxes, how many children or adult dependents

9     they have and addresses as well.  We would put in

10    addresses as well.

11    Q.   So let's stop there.  What information would

12    processors put for the consumer's address?

13    A.   For address for new consolidations generally the

14    address would be one of three or four different addresses

15    that our manager assigned to us.

16    Q.   And why would your manager assign different

17    addresses to you?

18    A.   I'm not entirely sure.

19    Q.   Do you -- what were those addresses?

20    A.   One was Technology when I was there.

21    Q.   173 Technology?

22    A.   Yeah.  The other one for me was when I was

23    working under SLAM at the other address at Hughes.  The

24    address I was assigned to use was 8 Whatney.

25    Q.   Do you recall the city and state and zip for that

Page 101

1    one?

2        A.    It's a weird one.   8 Whatney Suite 101, I think

3    or 100, one of those two in Irvine, California 92618,

4    pretty sure.

5        Q.    And what is that address?

6        A.    I've never seen it.   I Googled it once.   I assume

7    it's just a satellite office.

8        Q.    And what other addresses would you use for the

9    consumer's address?

10       A.    I mainly used 8 Whatney when I was at SLAM.   When

11   it was still Premier it was the 173 Technology.

12       Q.    Any others?

13       A.    Other processors used other addresses.   One of

14   them was Esplanade and I don't remember the rest of it but

15   that was my manager's house.

16       Q.    Which manager was that?

17       A.    Monique.

18       Q.    And why would processors -- why wouldn't

19   processors use the consumer's actual address?

20       A.    Well, in the consolidation process there is a

21   letter that would be sent out to the processor called a

22   loan summary statement and it's basically an update

23   saying, Hey, your consolidation is going forward as

24   planned.   We would get those letters at our office and

25   just to know everything is going the way it's supposed to

Page 102

1    and then we would inform the client, Hey, we got your loan

2    summary statement, everything is going the way it's

3    supposed to.

4        Q.   Why not just have the letter go directly to the

5    consumer?

6        A.   I'm not entirely sure.  It probably made it

7    easier to keep track knowing things were moving forward

8    properly.  That's all I can assume.

9        Q.   And would the consolidation application require

10   additional forms of contact information for the consumer

11   aside from an address?

12       A.   E-mail and phone number.

13       Q.   What e-mail address would processors provide?

14       A.   We were instructed to generate a new e-mail.  I

15   can't remember what the at part was.  At one point it was

16   mailprem, m-a-i-l-p-r-e-m, that was when we were in

17   Premier.  Later when we moved to SLAM it was livemailserv,

18   s-e-r-v, that was the e-mail that was used.  We would

19   generate it by C Panel?

20       Q.   What is C Panel?

21       A.   I'm not sure.  It's just some -- I'm going to

22   say -- I don't want to say CRM but some other program

23   website portal that the company wanted us to use.

24       Q.   This was not part of Debt Pay Pro?

25       A.   No, it was not part of Debt Pay Pro.

Page 103

1    Q.   And why didn't the company provide the consumer's

2    actual e-mail address?

3    A.   From when I asked my manager about it, Monique,

4    she said it was because the servicers send out lots of

5    e-mails, which can basically bombard a client and get them

6    confused and think things aren't going the way they're

7    supposed to and cause more phone calls and issues.  So she

8    thought it would be easier to do it like this.

9    Q.   Who monitored these e-mail accounts that were

10   generated by the company?

11   A.   I don't know who monitored them.  I know when we

12   generated the e-mail we would also send a forwarding so

13   anything that went to that e-mail would go to a big master

14   e-mail and I don't know who monitored it.

15   Q.   What information do processors provide for

16   consumer's phone number?

17   A.   It was always just the regular phone number, the

18   one the client already had on file.

19   Q.   Was there other information requested about the

20   consumer in the consolidation application?

21   A.   Income information, family size, contact info,

22   there were references, like two people for references for

23   each consolidation.

24   Q.   And what would the processors put down for the

25   two references?

Page 107

1    net income usually because we had to verify it any way.

2    So it wouldn't matter necessarily what the sales rep put

3    for income, we're going to get pay stubs any way.  So --

4         Q.   So at what point in the process were consumers

5    asked about their income and their family size?  I just

6    want to make sure I understand.

7         A.   Sales would ask them up front like during the

8    sales call, that's how they would pre-qualify them and

9    give them some kind of initial quote and then later on in

10   processing when we got their pay stub or tax returns back,

11   if the information matched up to what they were quoted, we

12   would just submit the file.  If the income was actually

13   really high and the payment was higher than quoted, we

14   would tag the salesperson, sales manager, our manager and

15   say this is what their actual income is and this is what

16   the payment looks like, please resell and it would go back

17   to them to fix it.

18        Q.   How frequently did resells happen?

19        A.   Decent amount.  I'd say one in five.  It just

20   comes down to if a person gave correct income information

21   really because the sales people would want that accurately

22   up front probably.

23        Q.   And what about family size, how frequently was

24   there a discrepancy between family size discovered?

25        A.   Many.  Discovered, I'm not entirely sure.

Page 108

1    Q.   I just want to clarify, would processors verify

2    family size with the consumer?

3    A.   Sometimes we did.  Like I said, before it was.

4    That practice was inconsistent.  Originally we weren't

5    then we were, then we weren't again and then when I was on

6    the recertification side I didn't have to.

7    Q.   During the period when processors were verifying

8    them how frequently were there inconsistencies between

9    what the consumer told you the family size was and what

10   was listed on the family size in the system?

11   A.   When we were verifying with clients?

12   Q.   Yes.

13   A.   There were actually a decent amount of times

14   where it was inflated, like the sales rep put in higher

15   family sizes than what the client said and we had to kick

16   it back.  There was a period where we weren't kicking the

17   files back and we were supposed to submit it with whatever

18   was on file.

19   Q.   So why would a sales rep put a higher family size

20   than what a consumer actually had?

21   A.   It would give them a lower payment.  So you made

22   50,000, single person, you'll pay less if you're making

23   50,000 and you have three kids.

24   Q.   How were sales reps paid?

25   A.   Commission.

Page 109

1    Q.   So they would get more -- earn more for each

2  consumer that purchased the services?

3    A.   I guess, yeah.

4    Q.   Would the companies collect information about

5  consumers marital status?

6    A.   Yes, they would ask if they were married or

7  filing jointly or filing separately for taxes.

8    Q.   At what point in the process are they asked about

9  their marriage status?

10    A.   It would be on the welcome call for processing.

11    Q.   Would processors ever submit consolidation

12  requests that indicated a consumer was something other

13  than married if the consumer had said they were married?

14    A.   Yes.

15    Q.   Can you please describe that?

16    A.   Our manager told us to primarily submit files as

17  single even if they weren't.

18    Q.   Why were you directed to do that?

19    A.   She told us because it is that person's loans.

20  So it's just their income.

21    Q.   What is a grace period?

22    A.   That's when a person graduates college they get

23  six months from when they graduate college to when their

24  payments are supposed to start.  So it's that period where

25  there's no payments.

Page 116

1      A.   In the electronic application it already

2   automatically has the social there, date of birth and

3   whatever name the client had when they got their loans,

4   like a maiden name or things like that were there.

5      Q.   What address would be provided under address?

6      A.   We would put the address that our managers

7   assigned for us to use for submissions.

8      Q.   Would those addresses be the same as the ones

9   used for the consolidation applications?

10      A.   Yes.

11      Q.   So for you those addresses would be --

12      A.   173 Technology and 8 Whatney.

13      Q.   And what information would be provided for the

14   consumer's telephone number?

15      A.   Just their phone number.

16      Q.   And how about for the consumer's e-mail, what

17   information would be provided for that?

18      A.   The generated e-mail that -- the company

19   generated e-mail.

20      Q.   And for IDR plans, do you know why it was the

21   practice not to use the consumer's actual contact

22   information here?

23      A.   I assume the same reason as for the consolidation

24   application.  These were done simultaneously.

25      Q.   I'd like to direct your attention in Section 2 to

Page 124

1   about why your paycheck was from House Lanester?

2       A.   I just thought it was kind of funny and they told

3   me that we were technically employed by a staffing company

4   for like -- and then working like for Premier and what

5   not.  It never really made much sense to me but

6   technically we were employed by a staffing company, which

7   was Kaine and Albert's staffing company.

8       Q.   When you were hired, what kind of paperwork did

9   you receive from the company?

10      A.   W-2 and then general, you know, new job

11  paperwork.

12      Q.   What were the names of the companies listed in

13  your new paperwork?

14      A.   When I was first being hired on with Premier I

15  don't remember what all the paperwork said.  I just

16  remember getting my paycheck and it saying House Lanester.

17      Q.   How long were you receiving paychecks from House

18  Lanester?

19      A.   I think it was most of the time I was actually

20  under as Premier and then it switched when I went to SL

21  Account Management.

22      Q.   When you -- when you started working for SLAM,

23  did you have to reapply or did you have to apply for that

24  job?

25      A.   No, I was automatically given the job.  Basically

Page 125

1    we were all told we were going to be laid off and then

2    given a -- what's the word for it?  Offer letter.  So

3    Thursday or Friday night here's your paycheck from last

4    week and you're technically last paycheck from Premier,

5    there you go.  Here is your offer letter for the new

6    position at SLAM, sign it, and then go to work Monday at

7    the new office and then all of my pipeline and clients I

8    was working with were transferred and I just still worked

9    on those on Monday, like nothing happened.

10        Q.   You mentioned a conversation with Mr. Albert

11   about the DBAs.  What other conversations did you have

12   with Mr. Kim about things related to the companies sale of

13   student loan debt relief services?

14        A.   I asked him to clarify the DBA information.  I

15   remember talking to him saying that my finance company and

16   to speak to HR and getting that taken care of.  I went to

17   him about how Monique was very hard to work with, mainly,

18   and then --

19        Q.   What did he say?

20        A.   He said that, Hey, it's best that you go through

21   HR for that kind of thing so we can keep records and

22   reports and that kind of stuff.  I never really wanted to

23   go to HR though because Monique was a nasty person.  I saw

24   how she would try and retaliate against other people at

25   times.  So I'd rather just stay under the radar and not

Page 150

1          after your program is approved.

2          What's your understanding of what -- of where

3    consumer funds went when consumers made payments?

4      A.   It went into merchant accounts.

5      Q.   And who controlled those merchant accounts?

6      A.   Tom.

7      Q.   Would processors communicate to Tom when they had

8    submitted correspondence or applications to student loan

9    servicers?

10     A.   No.

11     Q.   Would processors have any way of knowing if

12   consumers made payments on their adjusted loans?

13     A.   On the loans or on the enrollment payments?

14     Q.   On the loans themselves.  Would the company have

15   any way of knowing if a consumer actually made a payment

16   to their student loan servicer?

17     A.   If we still had log information for their

18   servicer account we could see it in the payment history

19   but that wasn't part of our procedure to look for it.

20     Q.   What discussions do you recall about dedicated

21   client accounts at the company?

22     A.   I remember going and talking to Christian about

23   it, Stark, and asking about the dedicated client accounts

24   because I'm familiar with the reason why you're supposed

25   to have those and I asked him if we actually had those or

Page 154

1    him that I just told you all that.  Obviously, that was a

2    joke about that as well.  Probably can't read sarcasm in

3    the transcript.

4        Q.   So I'm going to go back.  I think you testified

5    earlier that before submitting a student loan adjustment

6    application it was the companies' practice to wait until

7    the consumers first payment had cleared; is that correct?

8        A.   Correct.

9        Q.   And how would you know that the payment had

10   cleared?

11       A.   In the bottom left corner, I think it was the

12   left corner of the CRM, you could see a little bit of a

13   payment history.  So you could see when the next one was

14   scheduled or if one had recently cleared.  You could also

15   click in the enrollment tab and see everything, like the

16   history.

17       Q.   Okay.  Did consumers ever complain about the

18   services offered by the company?

19       A.   Yeah, I'd say so.

20       Q.   How do you know consumers complained?

21       A.   A Google search.

22       Q.   What kind of complaints did the company receive

23   from consumers?

24       A.   From what Christian told me a lot of the ones he

25   received, because that's -- he handled that, people a lot

Page 165

1      A.   Yes.

2      Q.   What is stored in Debt Pay Pro?

3      A.   It's going to have all of the client's card

4  information, payment information, personal information,

5  it's going to have the personal info.  It's going to have

6  the FSA or servicer log in info, the notes for every file

7  and the history of the file.

8      Q.   When you say notes, whose notes?

9      A.   Sales, managers, processors, just everyone who is

10  talking about that file is on that file in the notes.

11      Q.   What else?

12      A.   Copies of the client services agreement, up

13  loaded documents such as the loan summary statement, the

14  final approval, the actual income driven or consolidation

15  applications, it's all in there.

16      Q.   How about payment information, is that in there?

17      A.   Yeah, cards.  That's in there too.

18      Q.   What about records of payment?

19      A.   Yeah, I guess under the enrollment tab is the

20  records of how many payments they paid the company.

21      Q.   And you've testified that the companies have

22  operated under various names.  Have there been any changes

23  to DPP over time, in other words do all of the companies

24  share the CRM?

25      A.   Yeah, you're going to see -- there's a little, as

1   of now, to my knowledge, there's a little tab where it

2   says what sales DBA that person signed up with and

3   everything.

4       Q.   Okay.  So a consumer -- I guess I want to get a

5   sense of how information is organized in the CRM.  Would

6   each consumer have their own file in the CRM?

7       A.   Yeah, they'd have a file number.

8       Q.   And would that file number be the same for the

9   consumer regardless of changes to the companies' DBA over

10  time?

11      A.   Correct.  The numbers that are shorter are from

12  early on and gets bigger and bigger as people sign up.

13  You can look up three year old files in DPP through today.

14      Q.   So when you were at SLAM could you access

15  information for people who signed up through Premier?

16      A.   Yes, when I was doing recertifications I had

17  recertification files that were two or three years old.

18      Q.   What is Caller Ready?

19      A.   Caller Ready is the I think VoIP is the term,

20  VoIP phone system, you know, just computer phone.

21      Q.   And how does the company use Caller Ready?

22      A.   Caller Ready is, you know, your direct line is on

23  there.  Right near the end of when I was leaving, they

24  stopped having direct lines or calls go directly to

25  processors.  They would all funnel exclusively to customer

Page 175

1    any former employees?

2        A.   Yes, they -- sued former employees?  I know they

3    were sued by a former employee.

4        Q.   Who was that?

5        A.   Morgan Peacock.  She sued the company for

6    wrongful termination long time ago.

7        Q.   Were you at the company at the same time as

8    Morgan Peacock?

9        A.   Yeah, I knew Morgan.

10       Q.   And are you aware of any other employees suing

11   the company?

12       A.   I think Frank is only suing Kaine directly or

13   back and forth.  I don't know how that actually is set up.

14   I just know there is a thing going on with Frank.  Anybody

15   else, not to my knowledge.  I don't know anyone else.

16       Q.   Are you aware of the companies suing anyone

17   besides Frank or, I guess, are you aware of the company

18   suing any employees?

19       A.   Not to my knowledge.

20            MS. PREIS:  Let's take a ten minute break.

21            (Recess.)

22   BY MS. PREIS:

23       Q.   You testified earlier -- we talked about

24   dedicated accounts.  What is a trust account?

25       A.   Same thing.  Some kind of escrow, just a

Page 176

1    different name for it.  It's just what I call it.

2        Q.   Have you ever heard of a trust me account?

3        A.   Trust me account?  I know at one point when I

4    actually did ask Christian about trust accounts there

5    actually was -- he made a joke at one time in passing when

6    I asked him about the trust accounts and whether we had

7    trust accounts and he said Oh, yeah, trust me, Christian.

8    So he made a joke about that.  Never heard of anything

9    else other than that.

10       Q.   Who is Judy Dai?

11       A.   Judy Dai, I don't know that name.

12       Q.   Who is Diana Dai?

13       A.   Maybe a salesperson.  I know there was a person

14   named Diana at some point.  I don't know the specifics.

15       Q.   Aside from Albert and Kaine has anyone else

16   contacted you about your testimony today?

17       A.   From the company, no.  No one is calling from the

18   company about it.

19       Q.   Has anyone else who doesn't work at the company

20   contacted you about your testimony today?

21       A.   My family is aware of all this.  I talked to my

22   family about it just getting advice and everything.

23       Q.   So I want to talk a little more about your

24   conversation with Kim and Kaine and so the last time you

25   spoke with them was last night?

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken before

4     me at the time and place herein set forth; that any

5     witnesses in the foregoing proceedings, prior to

6     testifying, were duly sworn; that a record of the

7     proceedings was made by me using machine shorthand which

8     was thereafter transcribed under my direction; further,

9     that the foregoing transcript is a true record of the

10    testimony given.

11         Further, that if the foregoing pertains to the

12    original transcript of a deposition in a Federal Case,

13    before completion of the proceedings, review of the

14    transcript [  ] was [  ] was not requested.

15         I further certify I am neither financially

16    interested in the action nor a relative or employee of any

17    attorney of any of this action.

18         IN WITNESS WHEREOF, I have this date subscribed

19    my name.

20

21    Dated: July 12, 2019

22

23

24                              ANGELA METZ
25                              CSR No. 12454

**Exhibit**

CONSUMER FINANCIAL PROTECTION BUREAU

In the Matter of:        )
                         )  No. 2018-1938-02
PREMIER STUDENT LOAN     )
CENTER                   )

---

CONFIDENTIAL
INVESTIGATIVE HEARING UNDER OATH OF

JOVANI ORTUNO

Santa Ana, California

Friday, July 12, 2019
Volume I

Reported by:
ANGELA METZ
CSR No. 12454

JOB No. 46814

PAGES 1 - 179

Page 2

1              CONSUMER FINANCIAL PROTECTION BUREAU

2

3

4

5

6
     In the Matter of:        )
7                             )  No. 2018-1938-02
     PREMIER STUDENT LOAN     )
8    CENTER                   )

9

10

11  _____

12                                  U.S. Attorneys Office
                                    Ninth Floor; Room 9032
13                                  411 West 4th Street
                                    Santa Ana, California
14
                                    Friday,
15                                  July 12, 2019

16

17          Whereupon, the investigational hearing

18   testimony of JOVANI ORTUNO commenced, pursuant to notice

19   at 8:59 a.m.

20

21

22

23

24

25

```
 1    APPEARANCES:

 2    For Consumer Financial Protection Bureau:

 3       Consumer Financial Protection Bureau
         BY:  JESSE D. STEWART
 4       BY:  SARAH M. PREIS
         ATTORNEYS AT LAW
 5       1700 G Street, NW
         Washington, DC 20552
 6       (202) 435-9318
         jesse.stewart@cfpb.gov
 7       sarah.preis@cfpb.gov

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                         INDEX

 2  WITNESS                                 EXAMINATION

 3  JOVANI ORTUNO
    VOLUME I
 4

 5            BY MR. STEWART                    5

 6

 7                       EXHIBITS
            (ALL EXHIBITS MAINTAINED BY COUNSEL)
 8

 9      Exhibit 1   Civil Investigative Demand   9

10      Exhibit 2   Letter Dated July 2nd, 2019  11

11      Exhibit 3   Training Manual              59

12      Exhibit 4   General Forbearance Request  79

13      Exhibit 5   Consolidation Application    92

14      Exhibit 6   Income-driven Plan           92

15      Exhibit 7   Compliance Call Script      132

16      Exhibit 8   Sample Question Sheet       133

17      Exhibit 9   Training Manual             133

18      Exhibit    Processing Assessment        135
        10
19

20              INFORMATION REQUESTED

21                  (None.)

22
                INSTRUCTION NOT TO ANSWER
23
                    (None.)
24

25
```

Page 5

```
 1            Santa Ana, California, Friday, July 12th, 2019
 2                          8:59 a.m.
 3
 4
 5
 6            MR. STEWART:  Good morning.  My name is Jesse
 7    Stewart.  I'm here with Sarah Preis.  We are attorneys
 8    with the Office of Enforcement at the Bureau of Consumer
 9    Financial Protection.  Before we get started I'd like to
10    go over a few preliminary matters with you.  First, today
11    is July 12th, 2019.  It's approximately 8:59 a.m.  We're
12    here at the United States Attorneys Office located in
13    Santa Ana, California.
14            This is an investigational hearing conducted by
15    the Bureau of Consumer Financial Protection pursuant to
16    12CFR part 1080.  Any objections that may be properly
17    raised during this hearing or set forth in that section,
18    in that regulations.  This is not a deposition and it is
19    not governed by the Federal Rules of Civil Procedure.  We
20    are here to conduct the investigational hearing of Jovani
21    Ortuno pursuant to an civil investigative demand served on
22    June 27th, 2019 in Matter Number 2018-1938-02.  At this
23    time please swear in the witness.
24
25    ///
```

Page 6

1                    JOVANI ORTUNO,

2   having been first duly sworn, was examined and testified

3   as follows:

4

5                     EXAMINATION

6   BY MR. STEWART:

7       Q.   Please state your full name and spell your last

8   name for the record.

9       A.   Full name Jovani Ortuno, last name is spelled

10  O-r-t-u-n-o.

11      Q.   Thank you.  What is your address?

12      A.   ███████████████████, Santa Ana, California

13  ████.

14      Q.   So before we start asking any questions I'd like

15  to go through some preliminary matters including the rules

16  governing today's hearing and some logistics related to

17  questioning.  Did you understand the oath you just took?

18      A.   Yes.

19      Q.   Is that a "yes"?

20      A.   Yes.

21      Q.   Thank you.  Are you on any medications or

22  substances that could impair your ability to give true and

23  accurate testimony today?

24      A.   No.

25      Q.   Is there any other reason that you may not be

Page 16

1    then it was through there.

2        Q.    Did you interview?

3        A.    Yes, I did.

4        Q.    Who did you interview with?

5        A.    The manager at the time.  Her name was Monique.

6        Q.    Do you remember her last name?

7        A.    I think I do but I'm not exactly sure because I

8    know she used an alias working there.  So I don't want to

9    give you guys the wrong last name.

10       Q.    Do you remember her aliases?

11       A.    Yes, Washington.

12             MS. PREIS:  Do you know why she used an aliases?

13             THE WITNESS:  I do not, no.

14   BY MR. STEWART:

15       Q.    And you said you started in October 2017?

16       A.    Yes, I do remember, towards the end.

17       Q.    What position did you have with Premier Student

18   Loan Center when you started?

19       A.    The job title was processor.

20       Q.    What were your responsibilities as a processor?

21       A.    Basically there was a sales team.  I don't know

22   how they work.  They gather the clients and then somebody,

23   at the time, would delegate the files to us, of the

24   clients.  We would contact them, basically set everything

25   up for them, get, you know, try to gather their proof of

Page 17

1    income to submit the applications for them and making

2    sure, you know, everything went through correctly.  So

3    basically pushing the files through and making sure that

4    they were enrolled in a program.

5        Q.   You mentioned clients, what kind of clients did

6    you have?

7        A.   Can you clarify that?

8        Q.   What kind of services were the clients seeking

9    from the company?

10       A.   They were seeking student loan consolidations and

11   enrollment in an income driven forgiveness program.

12       Q.   So you said -- I believe you said you worked with

13   the files.  What precisely did you do with the file?

14       A.   So, that's why I brought the training manual.  It

15   gives you step by step on how the file was worked.  There

16   are steps to it.  First we had to call the clients just to

17   see if they're still on board with everything.  We had a

18   script we had to read and then from there, if everything

19   was okay, we would have to just wait for them to send in a

20   form of income document that proves or shows how much they

21   make, either a tax return or a pay stub.

22           MS. PREIS:  You mentioned applications, what were

23   you referring to?

24           THE WITNESS:  So there's the -- we worked on

25   consolidation applications and then the income driven

Page 18

1   application, that was the main two applications that we

2   had to work on.

3   BY MR. STEWART:

4       Q.   What did you do with those applications?

5       A.   So based off what they trained us to do, you

6   know, every client has a different situation, right, but

7   what we had to do is based off the information that the

8   client gave the sales team, we would just process it for

9   them.  So, for example, they're supposed to be aware of

10  what plan they're going to go in.  You know, I can't

11  really get into specifics on the payments and all that but

12  they're supposed to be aware of basically what they

13  qualify for based off whatever they spoke with with the

14  salesperson.  So we just proceed from there.  So if --

15  let's say the client is on board and everything is good to

16  go, they're aware that they make this amount of money,

17  this is their family size, this is the payment.  We wait

18  for them to send in the income and if everything matches

19  up, we submit everything for them.

20      Q.   You submitted everything to whom?

21      A.   Okay.  So the applications, they go obviously to

22  different servicers that work with the Department of

23  Education.  We just, depending on the client situation,

24  they would go to different servicers.  I can't get into

25  specifics.  Every client is different so we would submit

Page 19

1    these applications to a servicer and they would process

2    the rest.

3        Q.   And again when you refer to applications, you're

4    referring to --

5        A.   The consolidation application and the income

6    driven application.

7        Q.   Processors completed those applications for the

8    client?

9        A.   Correct, that's how they wanted us to do it,

10   uh-huh.

11       Q.   You mentioned certain plans?

12       A.   Uh-huh.

13       Q.   What do you mean by plans?

14       A.   So like I said, when they trained us, they told

15   us about four different plans that a client could qualify

16   for based off their income; the revised pay as you earn

17   plan, the income based repayment plan, the pay as you earn

18   plan and the income contingent plan.  So those four plans

19   were what we had to work with.

20       Q.   You also mentioned payments.  What did you mean

21   by payments?  Who are those payments to?

22       A.   So there was -- now, this is -- like I said, I

23   wasn't on the sales team but clients were to make two

24   separate payments.  One plan was the payments that were to

25   the company and then the second payment is their actual

Page 24

1      Q.   Yes.

2      A.   I do remember on the document that the document

3  for SL Account Management, I do remember seeing the

4  owner's name was Kaine, that I do remember seeing,

5  literally written on the document.  That's all I can say.

6  So I would say Kaine was part of the -- well, he was the

7  owner.  So I'm assuming it was his decision but, yeah, his

8  name was on the document that he was the owner of SL

9  Account Management.

10     Q.   Do you know Kaine's full name?

11     A.   I actually don't.  If it comes to me, I'll let

12  you know but as of now I don't.  I had no real

13  relationship with neither of them.

14          MS. PREIS:  When you say neither of them, what do

15  you mean?

16          THE WITNESS:  From what I understand there were

17  two owners, Albert and Kaine.

18          MS. PREIS:  When you say two owners, which

19  company are you referring to?

20          THE WITNESS:  So from what I understand, they

21  were both the owners of Premier Student Loan Center.

22  BY MR. STEWART:

23     Q.   Do you know Albert's last name?

24     A.   I think I do.  I think it's Kim.  I believe so

25  but I'm not exactly sure.

Page 25

1          MS. PREIS:  What led you to think that Albert and

2     Kaine were the owners of Premier Student Loan Center?

3          THE WITNESS:  That's a good question.  I mean,

4     for sure just probably conversations, that's the owner,

5     they were walking around and someone would say, that's

6     them or but, oh, okay.  I know how.  Albert's name was on

7     the BBB page for Premier Student Loan Center and it said

8     that I remember that.  That's how I knew Albert was an

9     owner of Premier Student Loan Center.  And then just by

10    word of mouth like that's him.

11         MS. PREIS:  And how about for Kaine?

12         THE WITNESS:  Kaine, like I said, I knew he was

13    for sure the owner of SL Account Management because I saw

14    it on the document that we were given for SL Account

15    Management.

16    BY MR. STEWART:

17    Q.   What led to you believe that Kaine was also an

18    owner of Premier Student Loan Center?

19    A.   Just because of word of mouth, you know, they're

20    the owners, them two, but other than that, I don't know.

21    No documents or none of that, just conversations with

22    coworkers.

23    Q.   Did you ever see Kaine in the Premier Student

24    Loan Center?

25    A.   That's a good question.  I mean I don't think so.