1    I don't remember.  I think that's more honest, I don't

2    remember.  I did see both Albert and Kaine at the new

3    building for SL Account Management, that I can say and I

4    did see Albert at the Premier Student Loan Center as well.

5        Q.   When you started working for Premier Student Loan

6    Center, where did you go to work?  What was the address?

7        A.   I don't know the exact address but it was on

8    Technology Drive in Irvine.  I want to say it was 173

9    Technology Drive but I don't remember specifically.

10       Q.   Did you go to that address to work for Premier

11   Student Loan Center the entire time until March 2018?

12       A.   Yes, correct.

13       Q.   In March 2018 when you started working for SL

14   Account Management, where did you go to work?

15       A.   It was still in Irvine.  It was a different

16   building.  The address I believe was 8 Hughes.  The

17   building was 8 Hughes, yeah.

18       Q.   And did you go to that same location to work for

19   SL Account Management until you stopped working for the

20   company?

21       A.   Yes.

22       Q.   When did you stop working for the company?

23       A.   I don't know the exact date but it was definitely

24   the last week of May of this year, 2019.  So I don't even

25   think I worked there in June.  It had to be the last week

Page 27

1    of May.   It was a Friday.

2        Q.   Why did you stop working for the company?

3        A.   It was time to just move on to something else.   I

4    didn't want to work there anymore.

5        Q.   Any specific reasons why you decided to stop

6    working there?

7        A.   Well, the thing is how these programs work, they

8    require a recertification every year.   You have to follow

9    up with the clients to see if any information has changed

10   with them either their income or their family size, right?

11   And I started noticing when I was doing these

12   recertification applications that things weren't matching

13   up with what the clients were saying.   So that kind of put

14   me in a, you know, it put me in a weird position and I was

15   like wait.

16          So last year this wasn't the case.   I can't go

17   into specifics obviously because of different clients but

18   basically that was a red flag.   I was like, okay, there

19   was something that wasn't really clear between last year's

20   work and then this year's work and that was a red flag for

21   me.

22       Q.   What do you mean by things weren't matching up?

23       A.   So, for example, income and family size, there

24   was discrepancies between the information we had last year

25   and the information for this year and that was on a lot of

Page 28

1    clients and that was always a little -- definitely caught

2    my eye and I was like something is up.

3         MS. PREIS:  Can you give us some examples,

4    please?

5         THE WITNESS:  Sure.  For example, a file was

6    submitted with a family size of six.  Then this year

7    around when we contact the client they so Oh, no, my

8    family size has always been one.  So what that does is

9    when a family size issue is -- whenever there is a

10   difference with family size, it affects the client's

11   payment.  So if the family size goes down, the payment is

12   going to go up, which is going to be an issue.  So I saw a

13   lot of those issues happening and then if they're telling

14   me that their family size was always this, it wasn't that,

15   then, okay, what -- that's definitely something to be

16   alerted about and there was a lot of issues like that.  So

17   it just made my working more complicated, you know?

18   BY MR. STEWART:

19        Q.   You mentioned recertifications, what is a

20   recertification?

21        A.   From what I was trained it is an annual renewal

22   of the client's income driven application.  So I guess

23   once they're in a program, they have to renew it every

24   year by providing updated income information and family

25   size, if that changed as well, but mainly income.  They

Page 30

1    because of that they just had all of the other processors

2    just do that duty as well instead of having a department

3    for it, they just had everyone do it.

4            MS. PREIS:  Do you recall when recertification

5    became a separate department?

6            THE WITNESS:  To be honest, I don't.

7            MS. PREIS:  Okay.  Do you remember at what point

8    the recertification department was -- is it fair to say it

9    was dissolved?  Let me put it a different way.  At what

10   point were the recertifications distributed across all of

11   the processors instead of as part of a separate

12   department?

13           THE WITNESS:  Like I said, I don't recall the

14   exact time.  It was recent, had to be a few months ago but

15   I don't -- I don't want to give an exact date because I

16   don't know.

17           MS. PREIS:  Some time in 2019?

18           THE WITNESS:  Oh, yes, yes.

19   BY MR. STEWART:

20      Q.   Going back to what you said about certain things

21   not matching up, is it fair to say that when you said

22   certain things were not matching up, you were seeing

23   discrepancies in income and family size between an

24   original IDR application and the recertification

25   application?

Page 31

1      A.   Correct.

2      Q.   Where would the information come from relating to

3   income and family size that was on the original IDR

4   application?

5      A.   So there's a system that we use a Debt Pay Pro

6   CRM when the sales team whatever they do, they input that

7   information on there.  So you can see it's on the actual

8   system.  So you can see last years and everything is

9   noted, if that makes sense and you can see what they were

10   apparently sold on and then when we follow up with the

11   client, we obviously asked them questions about that and

12   that's when, you know, that doesn't match because

13   everything is noted on the system because you can see last

14   year's information.

15          MS. PREIS:  When you say we follow up with the

16   client, are you referring to the processors who are doing

17   the recertifications?

18          THE WITNESS:  Yes.

19   BY MR. STEWART:

20      Q.   Debt Pay Pro is a software system?

21      A.   Yes.

22      Q.   What were the -- let me rephrase.  What was not

23   matching up in terms of income?  Can you give an example

24   like the kinds of things that weren't matching up in terms

25   of income?

Page 75

1    paid -- they hadn't paid the company, we couldn't do

2    anything.  We wouldn't do anything at all to the file.

3    The file would just get canceled out.

4        Q.   Let me ask that again.  If you don't mind waiting

5    until I finish.

6        A.   Yeah.  Sorry.

7        Q.   So the no IDR -- you were instructed to not

8    submit an IDR application or consolidation request until

9    the consumer had made at least one payment to the company?

10       A.   Correct.

11            MS. PREIS:  Was that practice the entire time you

12   were at the company?

13            THE WITNESS:  Yeah, it was always -- they had --

14   the welcome call we can do, that's fine, but in terms of

15   actually submitting applications, we couldn't do anything

16   unless they made at least one payment.

17   BY MR. STEWART:

18       Q.   Going back to the situation you described where

19   after a certain amount of time the consumer had not

20   submitted proof of income during the period when you were

21   instructed to just move the file forward and submit the

22   IDR application without proof of income and marked the

23   consumer as unemployed whether or not they were

24   unemployed, how frequently did that happen that you ended

25   up doing that?

Page 79

1    that system.  It's all there.

2       Q.   What did you do with the proof of income once it

3    was received?

4       A.   Well, we would -- that would be sent along with

5    the consolidation application and the IDR.

6       Q.   Would you use the proof of income to calculate

7    the consumer's income?

8       A.   Correct, yeah.  If everything matched up with

9    what was on the file around what they made then, yeah, it

10   would be submitted.  Like I said, if there was a

11   discrepancy, it would be sent back to the sales team.

12   That's just how they wanted things.

13      Q.   Are you familiar with forbearance requests?

14      A.   Yes, yes, forbearance.

15      Q.   What would processors do with forbearance?

16      A.   So that was after the welcome call.  So once the

17   welcome call was done, they would have us submit

18   forbearances for the client.

19           MS. PREIS:  What is a forbearance request?

20           THE WITNESS:  What they tell me -- I don't know

21   too much about it, it just pauses their account with their

22   current servicer.

23           (Exhibit 4 was marked for

24           identification.)

25   BY MR. STEWART:

Page 83

1      Q.   What are those four boxes -- which of those four

2   boxes would Debt Pay Pro check?

3      A.   From what I remember it had to be in the

4   financial difficulties.  That's the one it checked.

5      Q.   So as a processor for the companies whenever you

6   submitted a forbearance request you would submit it

7   marking the basis for request as financial difficulties?

8      A.   Yeah, Debt Pay Pro, that's what it would

9   automatically check off, yeah.

10     Q.   You said the only thing you would fill in were

11   the dates for the forbearance?

12     A.   Yeah, and then the system would generate the

13   rest.

14     Q.   How did you determine the dates?

15     A.   We were instructed to put a forbearance for three

16   months for the client, that was always the case.

17     Q.   So you always completed the forbearance request

18   for three months?

19     A.   That's what management wanted and that's how they

20   instructed us always, three months, because -- just

21   because they didn't want their current servicer's payments

22   to affect the payments going to Premier.  I don't know if

23   that makes sense.

24     Q.   Describe that a little more?

25     A.   So obviously -- every client situation is

Page 84

1    different but for the most part, clients are being billed

2    by their current servicer.  So they don't -- so the point

3    of the forbearance was to pause the account the servicers

4    end.  So whoever that servicer is so they would stop

5    billing the client for three months and that way it would

6    be easy or easier for the client to just pay Premier.

7        Q.   When you refer to the servicer billing the

8    consumer, what is the servicer charging the consumer for,

9    for loan payments?

10       A.   Yeah.  So from what I understand every client has

11   a servicer that holds their loans and they're being

12   billed, you know, for the loans and they would tell us to

13   send the forbearance request so we can pause -- so they

14   can pause the payments on the servicers end while we work

15   on the file and they just pay the company and then once

16   everything is done, the consolidation will get them away

17   from that servicer.

18       Q.   During this forbearance period you mentioned the

19   consumer is paying the company.  What is the consumer

20   paying company for?

21       A.   So they were paying Premier and SL Account

22   Management to do the document preparation for

23   consolidation programs and forgiveness programs.  That was

24   always the pitch.  That was what it was for what they

25   would tell us.

Page 90

1   requested.  That's it.  There was never any talk of any

2   specifics.

3           MS. PREIS:  How did consumers know that a

4   forbearance request had been submitted for them?

5           THE WITNESS:  We had to let them know.  We would

6   let them now as kind of letting them know, you know, a

7   forbearance will be submitted or they would ask like, Oh,

8   what's going to happen with my payment to my servicer and

9   we'd say we'll submit a forbearance request for you.  That

10  was it.

11          MS. PREIS:  When you say that you would let

12  consumers -- I guess -- so how would processors let -- who

13  at the company would let consumers know that there would

14  will a forbearance request submitted for them?

15          THE WITNESS:  So during the welcome call once it

16  was over -- we weren't really -- I'm trying to think

17  because I don't think we were instructed to actually tell

18  them.  That wasn't -- I don't remember that ever being in

19  the script but naturally a client is going to ask what

20  about the payment for the servicer and at that point,

21  yeah, we tell them -- we definitely were instructed or we

22  would tell them, yeah, we're submitting a forbearance

23  request on your behalf so that payment with the servicer

24  is not going to affect you.

25          MS. PREIS:  So, in other words, is it fair to say

Page 91

1    that processors would let the consumer know that the

2    company was going to submit a forbearance request on their

3    behalf if the consumer asked what would happen to their

4    payment to the servicer?

5         THE WITNESS:  Yeah, I would say so because

6    honestly I don't remember in the script it saying, Oh, we

7    need to tell them we are going to submit a forbearance

8    request.

9    BY MR. STEWART:

10   Q.   So after the forbearance request was submitted,

11   what was the next step?  What was the next contact with

12   the consumer?

13   A.   Like I mentioned before, once that's done, the

14   welcome call and the forbearance, we have to wait for the

15   income.  We would follow up with them if we could to see

16   where they're at, if they're going to send that in or not,

17   and then go from there.  That was basically it.

18        If you're asking about phone communication with

19   the client, I don't know what you mean by that.

20   Q.   Once you received the proof of income, what

21   happened next?

22   A.   Like I mentioned before, we submit the

23   consolidation.  We were instructed to submit the

24   consolidation and the income-driven plan, along with the

25   proof of income, and send that out to the servicer.

Page 94

1          The training manual goes into detail as to what

2     we choose.  I just can't remember off the top of my head.

3          Q.   And you said that you would be able to log on to

4     studentloans.gov to log on to the consumer's account there

5     by using the FSA login, correct?

6          A.   Correct, that the salespeople would obtain from

7     the client.

8          Q.   Okay.  Do you know how the sales team got that

9     information from the consumer?

10         A.   I do not.

11         Q.   And once you logged onto studentloan.gov using

12     the FSA login, what could you see?

13         A.   I mean, on studentloans.gov it shows like a lot

14     of options.  It gives you an option to consolidate.  I

15     can't -- I mean, I can't really visualize everything, but

16     it has, you know, a lot of options for you.

17         Q.   And so you would input information into

18     studentloans.gov to consolidate the loan?

19         A.   Yeah.  So based off the information that was in

20     Debt Pay Pro, yeah, we would fill everything out.  We

21     would do that.  And then there's a point where the address

22     comes up, right?  The client's address comes up.  We were

23     trained, instructed, everything.  Because this was clearly

24     stated by them that we had to change the client's address,

25     their own address had to be changed in the consolidation

Page 95

1   application.

2      Q.   What were you instructed to change the consumer's

3   address to?

4      A.   The address is in the training manual.  I don't

5   remember specifically.  But it's an address that the

6   company provided.  And we would have to do that for every

7   consolidation application.  The reason for that was the --

8   I don't know how they did it.  I don't know how -- the

9   logistics of it.  But the reason they did that was because

10  once everything was submitted, the servicers would

11  obviously provide updates on the applications.  They would

12  send out mail.  And that mail would go to the company.

13     Q.   So the address that you would submit with the

14  consolidation application was a company address?

15     A.   Correct.  They provided it.  I don't know where

16  it was at or went to, but yeah.

17     Q.   And the effect was that the consumer wouldn't

18  receive communications from the servicer?

19     A.   Correct, yeah.  They would not -- that was what

20  it was for, yeah.  The company would get the mail for the

21  client so they could get the updates on the application.

22     Q.   Why -- do you know why the company used this

23  procedure?

24     A.   I don't know, honestly.  I would -- I mean, like

25  I said, I think the reason why they did that was so they

Page 97

1      Q.   So the training -- the company instructed you to

2  log on to the servicer's website as the consumer, create

3  the login information to do that?

4      A.   Correct.

5      Q.   And then provide that information to the consumer

6  after the consolidation and IDR request had been

7  processed?

8      A.   Correct.  So once everything was done, the

9  company instructed us to provide them their login

10 information to their new servicer account.  And from then

11 on it was their account.  We had no access to it.  But

12 before then, like I said, yeah, the company instructed us

13 to make the accounts for them.

14     Q.   So at that time after the consolidation had

15 occurred, presumably the consolidation had occurred and

16 the IDR application had been addressed, that's when

17 processors were instructed to change the consumer's

18 address back to the consumer's actual address?

19     A.   Yeah.  To go into detail, they would change that

20 protocol around.  I know because there's -- I think

21 there's two parts.  First the consolidation needs to be

22 approved and then the income-driven plan is approved.  So

23 I remember that once the consolidation was approved, they

24 had us change the address back, but not the e-mail.  We

25 haven't gone over that yet, but obviously we would also

Page 98

1  change the e-mail for the client.  The company had their

2  own e-mail system that they set up.  And we were

3  instructed to also change the e-mail.  The e-mail was the

4  last thing that we changed that was only changed once the

5  plan was approved, everything was done.

6      Q.   So you said you were instructed to change the

7  e-mail?

8      A.   Uh-huh.  Yes.

9      Q.   What e-mail were you instructed to put on the

10 consolidation application?

11     A.   Like I mentioned, they have -- it's in the

12 training manual.  They had a system that they set up.  I

13 don't know how, but they had their own e-mail system.  It

14 was called -- at first it was Mail Prem, @mailprem.com.

15 And then it was @livemailserve.com.  That was the e-mail.

16 All they instructed us to do was to make an e-mail for the

17 client with that address @livemailserve.com or whatever

18 the e-mail was.

19     Q.   So the e-mail you put on the consolidation

20 application and the IDR plan request was an e-mail that

21 was company generated?

22     A.   Correct.

23     Q.   And it was either Mail Prem?

24     A.   Yeah, at Mail Prem or at Live Mail Serve.  I

25 think they changed it again, but I don't remember the

Page 99

1    other one.  It was very recent.

2        Q.   And before the ampersand, how did you know what

3    to enter for the e-mail address?

4        A.   Like what e-mail we put in there?  I think they

5    always wanted us to keep it the same.  So whatever their

6    actual e-mail is, just put it in there as that.

7        Q.   So before the ampersand, you would just use the

8    consumer's e-mail and then after the ampersand would be

9    Mail Prem or Live Mail Serve?

10       A.   So if I'm understanding you correctly, just to

11   clarify, we -- the company, all they instructed was to

12   change the e-mail on the applications.  So whatever e-mail

13   we -- whatever e-mail was on file, all we did was change

14   the e-mail on the application to either at Mail Prem or at

15   Life Mail Serve.

16       MS. PREIS:  So I just want to be sure I

17   understand.  So, in other words, would you take the first

18   part of the consumer's e-mail address and then just change

19   what came after the at symbol?

20       THE WITNESS:  Gotcha.  Yes, yes, yes.  Just to

21   keep it simple, that's how they wanted it.

22   BY MR. STEWART:

23       Q.   Is there any other information in terms of the

24   borrower contact information that you changed on the

25   consolidation and IDR requests?

Page 120

1    BY MR. STEWART:

2        Q.   How long would it take once -- once the processor

3    submits the IDR request, how long does it take for the

4    consumer to actually receive notification that they --

5    about the new payment amount that they'll be making to the

6    servicer?

7        A.   From experience, if it's only the income-driven

8    plan was done, it was like a month, 30 days or so.  If it

9    was a consolidation, those take longer, like 60 days.

10       Q.   So by the time the consumer was under a new

11   payment plan that was based on the application the company

12   would submit on the consumer's behalf, was the three-month

13   forbearance period typically over or almost over?

14       A.   Yeah, the forbearance -- that was an issue

15   definitely.  So basically what would happen is if a

16   consolidation was submitted and they were on that

17   forbearance with their current servicer, what happens is,

18   you have to keep this in mind, when the consolidation goes

19   through, everything goes through, that servicer where we

20   sent the forbearance doesn't matter no more.  That

21   servicer is done.  They're with a new servicer now.  So

22   that's why I think what you guys are asking, it doesn't

23   really matter.  Because that old servicer where we sent

24   the forbearance to, they're done.  The consolidation went

25   through and they got paid off through the consolidation.

Page 121

1   And now they're dealing with a different servicer and they

2   don't receive the forbearance.

3          MS. PREIS:  By the time the servicer is dealing

4   with the new servicer, how much of their -- how of much of

5   the fees would they have paid to the company?

6          THE WITNESS:  That -- it would -- typically if

7   everything went through like correctly, the clients were

8   sending everything in correctly on time, maybe within a

9   payment or two.  Like they were already approved.

10  Everything was done already.  So, yeah, that's what would

11  normally happen.

12  BY MR. STEWART:

13      Q.   If it was a consolidation request together with

14  an IDR plan, I think you testified it would be at least 60

15  days, typically, before the consolidation and the IDR plan

16  were fully processed and the servicer was involved; is

17  that correct?

18      A.   Correct.  Sometimes even longer, because the

19  servicers do take a while.  There's an issue on their end

20  as well.  They take a while to process applications at

21  times.  They would even go up to 90 days, honestly, for

22  consolidation.  But regularly, just from experience, 60 to

23  90.  That was what I saw.

24      Q.   I think you testified before that typically the

25  consolidation was processed first and then after the

Page 125

1   consumer?

2       A.   From what I remember, recertifications, they did

3   not change the address.  Everything stayed the same.

4   Nothing was changed.

5       Q.   So when you say it stayed the same, you would

6   input the consumer's address?

7       A.   Yeah.  Whatever Debt Pay Pro had at the time,

8   yes.  Their contact info is the same.

9       Q.   The e-mail that you would select on a

10  recertification application, would it be the consumer's

11  e-mail or the company-generated e-mail?

12      A.   The consumer's e-mail.  The only time we were

13  instructed to change the address or the e-mail was in the

14  consolidation process in the beginning.  Everything else,

15  no, it stayed the same.

16      Q.   How about for family size, what were you

17  instructed to do to determine family size on

18  recertification?

19      A.   As I said, I didn't do recertifications for too

20  much.  We just kept it the same.  So whatever was used the

21  previous year, that's what we used.  That was the

22  instruction.

23      Q.   I think you testified earlier that sometimes the

24  information you submitted with the recertification about

25  family size didn't match.  How did you learn about that?

Page 126

1      A.   We had to do a welcome call for the

2   recertification.  And I don't think we mentioned that,

3   yeah.  We had to do that.  Now, I don't remember how

4   specific the welcome calls were.  I don't think they

5   were -- I don't believe there was a compliance question in

6   those.  I think it was very vague, vague information.

7      Q.   During the welcome call you would ask family size

8   sometimes?

9      A.   Yes.

10      Q.   And so based on those calls you learned that

11   sometimes family sizes were different?

12      A.   Yeah, yeah.  That was a common one, yes.

13      Q.   How common was it in your experience doing

14   recertification welcome calls for family size to be

15   different than what was entered in Debt Pay Pro?

16      A.   I would say common.

17      Q.   And how was family size different?

18      A.   Just it wasn't what the client said wasn't the

19   same as what was on the file last time, if that makes

20   sense.

21      Q.   Would what the client say their family size was,

22   would that be bigger or smaller than what was in Debt Pay

23   Pro?

24      A.   Smaller.

25      Q.   When you were doing recertifications, I think you

Page 127

1    testified earlier that you were handling recertifications

2    for files that other processors had worked before and

3    submitted the original IDR request on; is that correct?

4        A.   Yes.  Just to clarify, you're asking about if I

5    was assigned recertifications that were not assigned to me

6    last year, right?

7        Q.   That's correct.

8        A.   Yes, yes.

9        Q.   To clarify --

10       A.   Please.

11       Q.   -- did you handle recertifications for consumers

12   who had IDR plans where you had not submitted the original

13   IDR plan?

14       A.   Definitely, yeah, yeah, yeah.  Everybody had

15   them.  I believe -- see, I wouldn't even know, because

16   like I said, I wasn't even in the recertification

17   department.  I don't know how they handle things.  But I

18   know that when that got dismantled, it was just random,

19   randomly assigned to every processor.

20       Q.   So when you were handling recertifications for

21   consumers who were in IDR plans that had been originally

22   processed by a different processor, am I correct that you

23   commonly saw that family size in Debt Pay Pro was higher

24   than the family size the consumer told you they actually

25   had?

Page 129

1    that's it.  Just keep -- whatever they said, keep it in

2    there.  I hope that answered your question.

3    BY MR. STEWART:

4       Q.   When you were doing recertifications, did you

5    ever notice any other information that didn't match the

6    information in Debt Pay Pro?

7       A.   Well, not really, because it's kind of hard to

8    say to clients -- income can go up.  You know, it's not

9    going to -- it's not always going to be the same.  So it's

10   kind of hard to answer that.  But, no, just the main issue

11   that I saw was the amount itself.  That's it.

12           MS. PREIS:  I believe you testified earlier that

13   the discrepancy in the family size was a red flag for you?

14           THE WITNESS:  Yeah.

15           MS. PREIS:  Why is that?

16           THE WITNESS:  Because I didn't know -- well, when

17   I saw that I was seeing that, like I said, it wasn't the

18   real family size, I don't know what was on that file.  I

19   was thinking that's what their family size is on the file.

20   So why am I seeing many files that are not matching up

21   like that?  Because, you know, things happen.  Obviously,

22   family size can change by one or -- you know, things.  But

23   when you see it constantly, it's like, okay, something

24   wasn't done right from the beginning.  And you have to

25   assume it was sales, because they're the ones that explain

Page 130

1    things and make the agreement.

2         MS. PREIS:  So were the -- what was -- how would

3    you describe the discrepancy of the number of family

4    members?

5         THE WITNESS:  Like I mentioned, it was -- it went

6    from high, they were high, and then the real family size

7    was lower.

8         MS. PREIS:  Could you -- how frequently was it by

9    multiple family members different?

10        THE WITNESS:  I know the highest family size I

11   would always see that Debt Pay Pro would have is six.

12   That was always the highest family size.  And obviously

13   it's case by case with every client, but it wasn't six,

14   you know.  That would be something I could say.  I would

15   see that.

16   BY MR. STEWART:

17   Q.   When you were doing recertifications, was it

18   common to see family size of six?

19   A.   No, I wouldn't say that it was.

20   Q.   Let me clarify.  Was it common to see that the

21   family size in Debt Pay Pro had been entered in six?

22   A.   No, but it was common to see it higher than what

23   it really was.  I think that's what you're looking for.

24   Q.   So when you noticed that family size that had

25   been entered in Debt Pay Pro was higher than family size

Page 151

1    Q.   Would consumers ask for refunds?

2    A.   Definitely.

3    Q.   Who at the company was in charge of handling

4    refund requests?

5    A.   I don't know, but what I can tell you is that we

6    were instructed to tell the client that they can receive a

7    refund as long as nothing is finalized, if that makes

8    sense.  That's what we were told to tell the client if

9    they did request that.

10   Q.   What did that mean, nothing is finalized?

11   A.   Like if the consolidation isn't approved, fully

12   approved or fully done.  That was one thing they did tell

13   us.  But I don't know who handled that.

14   Q.   If you would turn to Exhibit 8, Question 15

15   states, "I already paid.  Why aren't my loans forgiven?

16   Why did my enrollment agent say that I had been forgiven

17   after the enrollment payments?"

18        Did you get questions like this from consumers?

19   A.   Yes.  But I was never given this form.  But,

20   yeah, I do remember that.

21   Q.   Why do you think you got questions like that?

22   A.   Had to be sales.  I don't know how they pitched

23   to them or what they told them, but everything has to be

24   through sales, yeah, whatever they told them.

25        MS. PREIS:  How frequently would you get

Page 152

1   questions like this?

2           THE WITNESS:  Frequent.

3   BY MR. STEWART:

4       Q.   So it was common for consumers that you spoke

5   with to think that after they finished making the

6   enrollment payments to the company, their loans would be

7   forgiven?

8       A.   Yes.  Or -- that's a common, but the most common

9   one I would always hear is -- because there's a certain

10  amount of this is -- there's a certain amount of money

11  they agreed to pay the company over the period of time,

12  however much it is.  And sometimes they would ask me if

13  that was their loan balance.  I don't know if that makes

14  sense.  I don't want to confuse it.  But I would get that

15  a lot, a lot.  So let's say they're going to pay the

16  company $12,000 or whatever.  They would think that 12,000

17  is their actual loan balance now from whatever it was.

18          MS. PREIS:  And consumers frequently had that

19  perception?

20          THE WITNESS:  Yeah.  That was one thing that I

21  did -- that was one of the most common, common issue I

22  saw.  And it was very frustrating to deal with, because I

23  had to explain to the client, no, that's not how it works.

24  It was just a headache.  But that was definitely one I saw

25  a lot.  Because they would confuse how much they were

Page 153

1    paying the company, Premier, with their loan balance.

2    They thought that would be their loan balance, that it

3    would get reduced to that.

4         MS. PREIS:  So, in other words, the consumer

5    thought that the fees they were paying to the company were

6    actually paying towards the balance of their loans?

7         THE WITNESS:  I believe.  I don't know exactly

8    how they would word it, but I remember like seeing the

9    number that they would give me, and then I would see the

10   number that they're paying the company, and I was like,

11   oh, that matches up.  And I was like there's some

12   confusion there.

13   BY MR. STEWART:

14   Q.   So consumers would think -- so, in your

15   experience, consumers thought that the only payments they

16   would need to make were the fees they made -- were paying

17   to the company, and somehow after making those fees, they

18   would have paid off their loans entirely?

19   A.   Yeah.  I think that's one common thing.  They

20   would also ask a lot, oh, can I pay this ahead of time?

21   So let's say it's 10,000, right?  I believe they would

22   think that 10,000 is their actual loan balance, and they

23   were like, "Can I just pay that right now?"  And then we

24   would obviously explain, "No, that's not how it works."

25   And blah, blah, blah.  But there was definitely an issue I

Page 154

 1   saw with that.  And that had to come through sales.  I

 2   don't know if they weren't explaining it properly or they

 3   just didn't understand it.  I couldn't tell you that.  But

 4   that's a common thing any processor would tell you we deal

 5   with, just a common question.

 6        Q.   If you look at Question 38, it says, "I was told

 7   by my enrollment agent that I was approved for the program

 8   before I get a processor.  Why?"

 9        A.   Yeah, I would hear that.

10        Q.   Was that common about questions about that, that

11   consumers, it seems that consumers would effectively think

12   they were already approved and into a program before they

13   ever had their file handed to a processor?

14        A.   I would say not as common, but, yes, I would

15   definitely see that or get that question.

16             Like they would be confused when we would ask for

17   proof of income.  They'd be like, "Why?  I was already

18   approved."  That was one.  That was a common one I would

19   get.  And we were like, "No, we still need this proof of

20   income to get this submitted."

21        Q.   If you look at Question 44 in that same document,

22   it says, "Why do my enrollment agent say I have to sign up

23   today and there was a deadline if there isn't?"

24             Did you get questions about that, where, based on

25   this question, it seems that the consumer might be

1            I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3            That the foregoing proceedings were taken before

4    me at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand which

8    was thereafter transcribed under my direction; further,

9    that the foregoing transcript is a true record of the

10   testimony given.

11

12

13

14

15            I further certify I am neither financially

16   interested in the action nor a relative or employee of any

17   attorney of any of this action.

18            IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20

21   Dated: July 17, 2019

22

23

24   ANGELA METZ
     CSR No. 12454

25

**Exhibit**

STATE OF OREGON
DEPARTMENT OF CONSUMER AND BUSINESS SERVICES
DIVISION OF FINANCIAL REGULATION

In the Matter of:

CONSUMER ADVOCACY CENTER INC.
dba PREMIER STUDENT LOAN CENTER,

Respondent.

Case No. DM-19-0014

FINAL ORDER TO CEASE AND
DESIST, ENTERED BY DEFAULT

On February 14, 2019, the Director of the Department of Consumer and Business Services for the State of Oregon ("the Director"), through the Division of Financial Regulation ("the Division"), properly served Respondent, Consumer Advocacy Center Inc. ("CAC") dba Premier Student Loan Center ("PSLC"), and Respondent's attorneys an Order to Cease and Desist and Notice of Right to an Administrative Hearing ("Notice Order") via regular and certified United States mail at the following addresses:

A. 173 Technology Dr. Ste 202, Irvine, CA 92618;

B. 777 E. Sierra Madre Ave., Azusa, CA 91702; and

C. 1855 Griffin Road, Suite A-350, Ft. Lauderdale, FL 33004.

On February 21, 2019, the Director, through the Division, also personally served the Notice Order on Respondent through the Oregon Secretary of State at 255 Capitol Street NE, Suite 151, Salem, OR 97310.

The Notice Order offered Respondent an opportunity for a hearing, if requested in writing within 20 days. The Notice Order further informed Respondent that if a hearing was not conducted because Respondent did not timely request a hearing or other otherwise defaulted, then the designated portion of the Division's file, which includes all materials Respondent submitted, would automatically become part of the contested case record to prove a *prima facie* case. Respondent has not made a written request for a contested



Division of Financial Regulation
Labor and Industries Building
350 Winter Street NE, Suite 410
Salem, OR 97301-3881
Telephone: (503) 378-4387