ORIGINAL

1  SARAH PREIS (D.C. Bar No. 997387)
2  (*Pro Hac Vice Application pending*)
   sarah.preis@cfpb.gov
3  JESSE STEWART (N.Y. Bar No. 5145495)
4  (*Pro Hac Vice Application pending*)
   jesse.stewart@cfpb.gov
5  1700 G Street, NW
6  Washington, DC 20552
   Tel.: (202) 435-9318
7  Fax: (202) 435-5471

8
   LEANNE E. HARTMANN (CA Bar No. 264787) — Local Counsel
9  leanne.hartmann@cfpb.gov
10 301 Howard Street, Suite 1200
   San Francisco, CA 94105
11 Tel.: (415) 844-9787
12 Fax: (415) 844-9788

13 *Attorneys for Plaintiff*
14 *Bureau of Consumer Financial Protection*

15            **UNITED STATES DISTRICT COURT**
16            **CENTRAL DISTRICT OF CALIFORNIA**
                   **SOUTHERN DIVISION**
17

18                                   CASE NO. **8:19-cv-01998 JVS (JDEx)**

19 Bureau of Consumer Financial
   Protection, et al.                 **PLAINTIFF'S EXHIBITS IN
20                                     SUPPORT OF PLAINTIFF'S
        Plaintiffs,                    *EX PARTE* APPLICATION
                                       FOR TEMPORARY
21                                     RESTRAINING ORDER WITH
        v.                             ASSET FREEZE AND OTHER
22                                     EQUITABLE RELIEF AND
   Consumer Advocacy Center Inc., d/b/a ORDER TO SHOW CAUSE
23 Premier Student Loan Center,        WHY PRELIMINARY
                                       INJUNCTION SHOULD NOT
24      Defendants.                    ISSUE**

25
                                       **VOL. IV OF VII (EXS. 37-50-1)**
26

27                                     **[FILED UNDER TEMPORARY
                                       SEAL]**
28

# Exhibit

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:                                                    Case No.: 19-10655-BKC-JKO

  CONSUMER ADVOCACY CENTER INC.,          Chapter 11

          Debtor.
_____/

**UNITED STATES TRUSTEE'S MOTION FOR THE APPOINTMENT**
**OF A CHAPTER 11 TRUSTEE, OR ALTERNATIVELY, FOR THE**
**APPOINTMENT OF A CHAPTER 11 EXAMINER**

Nancy J. Gargula, United States Trustee for Region 21 (the "United States Trustee" or the "US Trustee"), pursuant to 11 U.S.C. § 1104 moves this Court for entry of an Order directing the appointment of a chapter 11 trustee in this case or alternatively, directing the appointment of a chapter 11 examiner, and in support thereof states as follows:

**PRELIMINARY STATEMENT**

Based on review of the pleadings, testimony and documents filed and produced thus far, it appears that the primary reason that Consumer Advocacy Center, Inc. ("CAC") and Premier Student Loans Inc. ("Premier") sought bankruptcy relief in this Court was an attempt to avoid investigation by multiple state agencies and/or regulatory bodies and litigation brought against them by customers in multiple states.[1]   CAC and Premier listed multiple state agencies on their Schedule F, including a claim for the State Attorney

_____

[1]      Contemporaneous with CAC's commencement of the above-captioned bankruptcy case, Premier Student Loans, Inc. ("Premier") filed its own bankruptcy case in this Court captioned as *In re Premier Student Loans, Inc.*, Case No.: 19-10658-JKO (the "Premier Case"), and as more fully described herein, CAC and Premier represented in their bankruptcy pleadings that they are "related" debtors.   Accordingly, the relief requested herein is being sought in both cases.

1

General of Minnesota scheduled in the amount of $573,828.22. Furthermore, public records reveal that CAC and/or Premier have been the subject of investigation and/or enforcement action conducted by state agencies in North Dakota and Oregon [2]. Moreover, shortly before the commencement of the instant bankruptcy case, the California state bar issued a Notice of Stayed Suspension of Attorney Kaine Wen wherein *inter alia* it was reported that Kaine Wen had (1) outsourced his law firm's client services to CAC <u>and</u> (2) impermissibly split legal fees with the CAC. Additionally, on their Statement of Financial Affairs, CAC and Premier disclosed three (3) lawsuits pending against them prepetition, including two (2) class actions, all of which include allegations that CAC and/or Premier violated the *Telephone Consumer Protection Act*, 47 U.S.C. § 227 et seq. ("TCPA").

CAC represented that its prepetition operations were terminated in approximately September 2018. However CAC informed the United States Trustee that it restarted operations post-petition in approximately March 2019. The United States Trustee is continuing to review all pertinent pleadings, documents and testimony, but has insufficient information at this time to confirm that CAC's post-petition operations do not and/or will not raise the same issues that precipitated the prepetition investigation, enforcement action and/or litigation that CAC and Premier faced prepetition.[3]

---

[2]     The United States Trustee notes in particular that the *Final Order To Cease And Desist, Entered By Default* issued by the State Of Oregon Department Of Consumer And Business Services Division Of Financial Regulation against "CONSUMER ADVOCACY CENTER INC. dba PREMIER STUDENT LOAN CENTER", a true and correct copy of which is attached hereto as Exhibit "A" (the "Oregon Cease & Desist") was entered *post-petition* on **March 14, 2019**.

[3]     The United States Trustee acknowledges that CAC has recently provided additional documents in response to the request for documentation substantiating transfers into and out of CAC's bank account during the one (1) year period prior to the Petition Date. However, it does not appear that the documents produced provide all the information necessary to validate the amounts of transfers to related parties.

2

Moreover, although CAC's Statement of Financial Affairs reported that CAC's gross revenue for 2018 exceeded $19 million, CAC's schedules reflects that as of January 16, 2019 (the "Petition Date"), there was less than $30,000 in its bank account. Review CAC's bank statements reflect that CAC made substantial transfers totaling over $700,000 to a related entity within the one (1) year period before the Petition Date that were not contained in the Statement of Financial Affairs. Accordingly, to the extent that any of CAC's assets were inappropriately transferred to that related entity prepetition, it is highly unlikely that current management will seek to recover such transfers. And where CAC's Schedule F lists unsecured claims totaling close to $800,000, it is clear there are unsecured creditors who could benefit from recovery of any avoidable transfers.

Finally, it is unclear that CAC is properly managing its affairs as inconsistencies have arisen with regard to important information CAC has represented during the pendency of this case. For example, it was revealed recently that CAC's purported prepetition transfer of its interest in leased property located at 173 Technology Drive, Suite 202, Irvine, CA 92618 (the "CA Property"), appears not to have been effective where the landlord has never consented to the transfer of the lease. Accordingly, although CAC has represented, and its monthly operating reports ("MORs") reflect, that CAC has not made any rent payments post-petition, it appears that CAC remains liable for the monthly rent of more than $25,000 for the CA Property. Additionally, although CAC initially produced to the United States Trustee a 2016 Federal Income Tax Return that issued K-1s to Albert Kim and Kaine Wen as 50% shareholders, CAC recently provided the United States Trustee with an amended 2016 Federal Income Tax Return issuing a K-1 to Albert Kim was a 100% shareholder.

3

As more fully outlined herein, the United States Trustee believes there is sufficient cause for the appointment of a chapter 11 trustee based on the significant uncertainty surrounding the feasibility (legally and financially) of the post-petition operations of CAC and/or Premier, and substantial concerns regarding the ability of existing management to manage CAC's business affairs and carry out their fiduciary duties. But even if this Court does not find sufficient cause to appoint a chapter 11 trustee, the United States Trustee submits that a chapter 11 examiner should be appointed to answer crucial questions concerning the continued viability of these bankruptcy cases.

## BACKGROUND FACTS

1. On January 16, 2019, CAC filed a petition for relief under Chapter 11 of the Bankruptcy Code [D.E. #1] (the "CAC Petition") that was signed by "Albert Kim" as "President".

2. Also on January 16, 2019, Premier filed a petition for relief under Chapter 11 of the Bankruptcy Code [Premier Case, D.E.#1] (the "Premier Petition") that was signed by "Kaine Wen" as "Managing Member".

## CAC and Premier are "Related Debtors"

3. As shown in the excerpt below from the Premier Petition, Premier represented that it is "related" to CAC:

| 10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor? | ☐ No ■ Yes. | | | | | | |
|---|---|---|---|---|---|---|---|
| List all cases. If more than 1, attach a separate list | Debtor | Consumer Advocacy Center Inc. | | | | Relationship | |
| | District | Southern District Florida | When | 1/16/19 | | Case number, if known | 19-10655-JKO |

*See Premier Petition* at p. 2.

4

4. On February 11, 2019 CAC filed its Case Management Summary [D.E. #11] (the "CAC Case Management Summary").

5. Also on February 11, 2019, Premier filed its Case Management Summary [Premier Case, D.E. #14] (the "Premier Case Management Summary" and together with the "CAC Case Management Summary", the "Case Management Summaries").

6. In the Case Management Summaries, both Premier and CAC represent that they are "related debtors". *See CAC Case Management Summary and Premier Case Management Summary* at ¶2.

7. The Case Management Summaries also reflect the same "location of operations" for Premier <u>and</u> CAC, namely: (1) 500 East Broward Blvd., Suite 1710, Ft. Lauderdale, FL 33394 (the "FL Property"); and (2) the CA Property. *See CAC Case Management Summary* at ¶4.

8. Pursuant to the Case Management Summaries, the FL Property and the CA Property are leased. *See CAC Case Management Summary* at ¶4.

9. As shown in the excerpt below from the CAC Case Management Summary, in response to Question #6 which asks for "a list of officers and directors" and "their salaries and benefits at the time of filing and during the 1 year prior to the filing", CAC listed "Albert Kim" and "Kaine Wen", and also reported that Albert Kim received a salary of $36,000 in 2017 and $128,000 in 2018; and Kaine Wen received a salary of $36,000 in 2017.

> 6. List of officers and directors, if applicable, and their salaries and benefits at the time of filing and during the 1 year prior to filing:
> Albert Kim- $36,000.00 in year 2017, $128,000 in year 2018
> Kaine Wen- $36,000.00 in year 2017

*See CAC Case Management Summary* at ¶6.

5

10.     Additionally, CAC produced a copy of its 2016 Federal Income Tax Return (the "CAC 2016 Tax Return") to the United States Trustee which reflected that in 2016 K-1s were issued to Kaine Wen as a 50% shareholder of CAC.

**The United States Trustee's Motions to Dismiss**

11.     On February 14, 2019, the United States Trustee filed Motions to Dismiss[4] in both cases where, *inter alia*, CAC and Premier had failed to provide proof of insurance.

12.     The Motions to Dismiss were set for hearing on February 27, 2019.

13.     On February 22, 2019, CAC filed its bankruptcy schedules and statement of financial affairs [DE# 17] (collectively, the "CAC Schedules").

14.     Also on February 22, 2019, Premier filed its bankruptcy schedules and statement of financial affairs [Premier Case; DE# 21] (collectively, the "Premier Schedules").

15.     In the interim, CAC and Premier cured the deficiencies identified in the Motions to Dismiss.

16.     However, based on review of the CAC Schedules and the Premier Schedules, and in light of representations by both CAC and Premier that neither CAC nor Premier were currently operating, at the February 27, 2019 hearing on the Motions to Dismiss, the United States Trustee nevertheless argued that there was cause to Court dismiss or convert both cases.

17.     The Court declined to rule on the Motions to Dismiss and instead continued the Motions to Dismiss to March 19, 2019 [D.E#20] in order to permit the United States

---

4       As used herein the "Motions to Dismiss" collectively refers to the *United States Trustee's Emergency Motion to Dismiss or Convert Case and Request for Expedited Hearing* filed in the CAC case [D.E. #14], and the *United States Trustee's Emergency Motion to Dismiss or Convert Case and Request for Expedited Hearing* filed in the Premier case [Premier, D.E.#16].

Trustee to conduct the 11 U.S.C. § 341 meeting of creditors in both cases that were previously scheduled for March 5, 2019.

**The Initial 341 Meetings on March 5, 2019**

18.     The 11 U.S.C. § 341 Meeting of Creditors for Premier (the "Premier 341 Meeting") was held and concluded on March 5, 2019.

19.     Kaine Wen appeared at the Premier 341 Meeting and testified that he was the sole shareholder of Premier.

20.     For ease of reference, a true and correct copy of the "mini" version of the *Official Transcript of the 341 Meeting of Creditors for Premier Student Loans, Inc.* held on March 5, 2019 is attached hereto as Exhibit "B".

21.     The 11 U.S.C. § 341 Meeting of Creditors for CAC (the "CAC 341 Meeting") was initially held on March 5, 2019; continued to March 27, 2019 and further continued to and concluded on May 13, 2019.

22.     For ease of reference, true and correct copies of the "mini" versions of the *Official Transcripts of the 341 Meeting of Creditors for Consumer Advocacy Center, Inc.* held on (a) March 5, 2019 (the "3/5/19 CAC 341 Transcript"); (b) March 27, 2019 (the "3/27/19 CAC 341 Transcript"); and (c) May 13, 2019 (the "5/13/19 CAC 341 Transcript") are attached hereto as Exhibits "C", "D" and "E", respectively.[5]

23.     On March 5, 2019, Albert Kim appeared at the initial CAC 341 Meeting and testified that he was the sole shareholder of CAC.

---

[5]     The Official Transcript of the 341 Meeting of Creditors for Premier Student Loans, Inc. held on March 5, 2019 and The Official Transcripts of the 341 Meeting of Creditors for Consumer Advocacy Center, Inc. held on (a) March 5, 2019; (b) March 27, 2019 and (c) May 13, 2019 will be filed with the Court prior to the hearing on the instant motion.

7

24. But the United States Trustee was forced to continue the initial CAC 341 Meeting where:

a. The *CAC Case Management Summary* listed payments to Albert Kim within one (1) year of the Petition Date and Albert Kim testified that he received a salary from CAC in 2018, but there were no payments to insiders listed on the CAC Schedules.

b. The *CAC Schedules* listed no personal property but Albert Kim testified that CAC owned computers and related equipment that were located at the CA Property.

25. By Order dated March 21, 2019, the hearing on the Motions to Dismiss was further continued to April 3, 2019 [D.E. #25] to permit CAC to file any required amendment to the CAC Schedules and to allow the United States Trustee to conduct the continued CAC 341 meeting scheduled for March 27, 2019

26. On March 22, 2019, an amendment was filed to the CAC Schedules [D.E.#28] (the "Amended CAC Schedules"), disclosing CAC's ownership of 100 computers, but still failing disclose <u>any</u> payments to insiders.

**Purported Prepetition Transfer of CAC's Leasehold Interest to Kaine Wen's Company - True Count Staffing and Conflicting Information Regarding CAC Ownership**

27. More than two (2) months after the Petition Date, at the continued CAC 341 Meeting on March 27, 2019, Albert Kim testified for the first time that CAC had transferred its interest in the lease for the CA Property (the "CA Property Lease") to an entity called "True Count Staffing" ("True Count Staffing") prepetition in October 2018. *See 3/27/19 CAC 341 Transcript* at p. 5. lines 22-25.

28. Albert Kim further testified, *inter alia*, that:

a. The CA Property Lease contained rent abatements;

8

b. Kaine Wen is the owner of True Count Staffing, Inc.

c. Kaine Wen was involved in CAC's management decision-making that led to the transfer the CA Property Lease to True Count Staffing.

d. CAC had an ongoing business relationship with True Count Staffing, Inc. prepetition described as follows:

(i) CAC would enroll customers at the front-end for programs that would assist them in preparing documentation to apply for student loans;

(ii) Then CAC would then pass these customers on to True Count Staffing, Inc. who would provide customer service at the back-end to process the documentation for student loans.

*See 3/27/19 CAC 341 Transcript* at pp. 6-15.

29. And contrary to what was reflected in the CAC 2016 Tax Return, Albert Kim also testified that he has always been the 100% owner of the Debtor. *See 3/27/19 CAC 341 Transcript* at p. 4, lines 6-10.

30. Based on the discrepancies regarding ownership of CAC and CAC's continued failure to provide complete and accurate disclosure, including its initial failure to disclose the computers and the transfer of the CA Property Lease:

a. The United States Trustee requested that CAC produce *inter alia*: (1) copies of the CA Property Lease; (2) copies of the sublease and/or assignment documents related to the transfer of the CA Property Lease to True Count Staffing; and (3) CAC's bank statements for the one (1) year period prior to the Petition Date (collectively, the "Requested Documents");

9

b. The United States Trustee further continued the CAC 341 Meeting to May 6, 2019, pending (a) receipt of the requested documents and/or information; and (b) the filing of any required amendments to the Second Amended CAC Schedules; and

c. On April 2, 2019, the United States Trustee filed the *Supplement to the Emergency Motion to Dismiss or Convert and Request for Expedited Hearing* [DE #],apprising the Court of the undisclosed transfer to True Count Staffing and the discrepancy in reported ownership of CAC.

31. On April 3, 2019, CAC filed an amendment to the Amended CAC Schedules [D.E. #] (the "Second Amended CAC Schedules") which finally reflected that Albert Kim had received $128,000 from the Debtor in 2018.

32. And as reflected in the excerpt below from the Second Amended CAC Schedules, CAC also disclosed the transfer of the CA Property Lease to True Count Staffing on December 31, 2018.

List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☐ None.

| | Who received transfer?<br>Address | Description of property transferred or<br>payments received or debts paid in exchange | Date transfer<br>was made | Total amount or<br>value |
|---|---|---|---|---|
| 13.1<br>. | True Count Staffing, Inc.<br>173 Technology Dr., Ste 202<br>Irvine, CA 92618 | Lease Interest | 12/31/18<br>Effective<br>10/1/18 | Unknown |
| | Relationship to debtor | | | |

*See Second Amended CAC Schedule* at 5.

33. As shown in the excerpt from the Second Amended CAC Schedules, CAC did not disclose any relationship between True Count Staffing and the Debtor.

34. And at the April 3, 2019 hearing on the Motions to Dismiss, CAC and Premier's counsel argued to the Court that CAC had in fact received a benefit from the

10

transfer of the CA Property Lease because it was relieved from liability for any existing obligations under the lease.

35.     By Order dated April 5, 2019, this Court granted the United States Trustee's request for a further continuance of the hearing on the Motions to Dismiss to May 14, 2019 [D.E. #38] based on the pending production of the Requested Documents by CAC and the continued CAC 341 Meeting scheduled for April 23, 2019 [D.E.#37].

**CAC's Production of Some of the Requested Documents**

36.     On the morning of April 23, 2019, the day of the scheduled continued CAC 341 Meeting, CAC produced some of the Requested Documents to the United States Trustee, namely:

a.  A copy of the CA Property Lease;

b.  A copy of an unexecuted Assignment and Assumption of Lease and Consent of Lessor purporting to assign the CA Property Lease from CAC to True Count Staffing, a true copy of which is attached hereto as Exhibit "F";

c.  Copies of CAC's monthly bank statements for the one (1) year period prior to the Petition Date as follows:

(i)  Copies of monthly bank statements for CAC's checking account at Chase (the "Chase Account") for the period from February 1, 2018 through September 28, 2018 (the "Chase Statements); and

(ii)  Copies of monthly bank statements for CAC's checking account at Sunwest Bank (the "Sunwest Accounts") for the period from September 19, 2018 through December 31, 2018 (the "Sunwest Statements," and together with the "Chase Statements", the "Prepetition Bank Statements").

11

37.     Because there was insufficient time to review the documents produced by CAC, the United States Trustee further continued the CAC 341 Meeting to May 7, 2019 [D.E.#43].

38.     Due to a scheduling conflict, the CAC 341 was further continued to May 13, 2019 [D.E. #44].

## Chase Statements Reflect Substantial Intercompany Transfers Between CAC and True Count Staffing Within One Year of the Petition Date

39.     The Chase Statements[6] reflect that during the 1 (one) year period before the Petition Date, there were substantial intercompany transfers between True Count Staffing and CAC as follows:

a. It appears that between February 2018 and September 2018, CAC transferred more than $700,000 to True Count Staffing; and

b. It appears that during that same period, True Count Staffing transferred more than $12 million to CAC.

40.     The Chase Statements also reveal that during the 1 (one) year period before the Petition Date, CAC made substantial transfers to various other entities.

41.     For example, between July 1, 2018 and September 28, 2019, CAC transferred at least $1.8 million to an entity named "Anan Enterprises".

## Albert Kim's Testimony Regarding CAC's Prepetition Business Operations

42.     Based on Albert Kim's testimony at the continued 341 Meeting on May 13, 2019, CAC's prepetition business operations were described generally as follows:

---

[6]     Review of the Sunwest Statements provided limited information where they did not identify the transferees and recipients of funds into and out of the Sunwest Account.   As a result, the United States Trustee was unable to identify the recipients of substantial transfers out of the Sunwest Account which transfers occurred within the four (4) months prior to the Petition Date (September 18, 2018 to December 31, 2018).

a. CAC would purchase marketing "leads" from third party marketing companies.

b. The marketing "leads" were actually phone calls that would be directed to CAC.

c. CAC would take the calls, describe the services that were offered, and then enroll customers.

d. The enrolled customers would then be directed to True Count Staffing.

e. Customers were charged $899 or $1099 for services provided and they would make monthly payments over 3 – 5 months.

f. True Count Staffing would collect the payment for those services and True Count Staffing would provide the services to the customers.

g. True Count and CAC split the proceeds from these customers (55% to CAC and 45% to True Count).

h. The True Count deposits into the Chase Account reflect True Count's payment of CAC's share of the proceeds.

*See 5/13/19 Transcript of CAC 341 Meeting* at p. 46, lines 35-41.

**Albert Kim's Testimony Regarding the Purported Lease Assignment to True Count Staffing**

43. Albert Kim testified that although the landlord had verbally consented to CAC's transfer of the CA Property Lease to True Count Staffing, the landlord never signed the Assignment. *See 5/13/19 Transcript of CAC 341 Meeting* at pp. 54-57.

44. Indeed as reflected on the Assignment, the signature block for the Assignor, Guaranteed Rate, Inc. to indicate its consent to the assignment, is blank.

13

45.     And curiously, although CAC represented in the Second Amended
Schedules that the Assignment was executed on December 31, 2018, as reflected in the
highlighted excerpt from the Assignment below, the footer text of the Assignment reflects
that the document was last edited on March 15, 2019.

| | | |
|---|---|---|
| INITIALS | Page 1 of 2 | INITIALS |
| © 2017 AIR CRE.  All Rights Reserved. | Last Edited: 3/15/2019 2:09 PM | AACL-1.00, Revised 01-03-2017 |

*See Assignment* at p. 1.

**Albert Kim's Testimony Regarding the Transfers Out of the CAC Bank Accounts**

46.     Albert Kim testified that aside from payroll expenses, CAC made substantial
transfers to entities that provided CAC with leads and other marketing-related services.

47.     For example, Albert Kim testified that Anan Enterprises was paid to produce
catalogs that were mailed to the customers that CAC enrolled.   *See 5/13/19Transcript of
CAC 341 Meeting* at pp. 64-69

48.     Albert Kim further testified that CAC made loans to True Count Staffing and
that True Count Staffing had repaid all the loans from CAC.

**CAC and/or Premier Were the Subject of Investigation and/or Enforcement Action
by Multiple State Agencies Prepetition**

49.     As reflected in the excerpt below from the CAC Case Management
Summary, CAC represented that prepetition, it was engaged in the business of assisting
student loan borrowers by helping them to select repayment programs and preparing the
requisite documentation for such programs.

14

3.  Description of debtor's business: the Debtor assisted Federal student loan borrowers by helping them choose the best Dept. Of Education repayment programs to suit their needs. The Debtor also assisted such borrowers by preparing the requisite documentation they needed to submit to the Dept. Of Education.

50.  And as reflected in the excerpt below from the Case Management Summaries, CAC and Premier stated that "investigations" and "threatened investigations" by "different State Attorney Generals" was one of the reasons that they sought bankruptcy relief.

5.  Reasons for filing chapter 11: Litigation in different locations in the country by former clients, and various investigations and threatened investigations from different State Attorney Generals, was the significant factors

*See CAC Case Management Summary* at 5.

51.  Indeed, as shown in below in the excerpt from the Transcript of the continued CAC 341 Meeting on May 13, 2019, Albert Kim testified that CAC listed the State Attorneys General on the CAC Schedules to "prevent an investigation."

```
19          Q.    What was the reason for listing all of those
20    Attorneys General, was it because some of them had been
21    conducting investigations?  Like, why did you list all of
22    them as creditors, do you know?
23          A.    Why did we list all of them as creditors?
24          Q.    Yes.
25          A.    Because -- to prevent an investigation.
```

*See 5/13/19 Transcript of CAC 341 Meeting* at p. 46, lines 23-25.

52.  And it appears from a review of public information, that CAC has indeed been the subject of investigation and/or enforcement action conducted by multiple state agencies, including a Cease & Desist Order that was entered post-petition.

15

**The Oregon Cease & Desist Order Entered Post-petition**

53.    First, as reflected in the Oregon Cease & Desist Order, the State of Oregon found that CAC and/or Premier had violated Oregon law by, *inter alia*:

a.  performing a debt management service without being registered with the Division as a debt management service provider; and

b.  by charging [the complainant] an initial fee of $224.75 where Oregon statute prohibited a debt management service provider from charging more than a $50 initial fee. *See Oregon Cease & Desist* at ¶11-13.

54.    Among other things, the Oregon Cease & Desist found that the complainant had entered into a written contract with CAC and/or Premier and that contract included a fee payment schedule that charged the complainant "an enrollment fee totaling $899 to be paid in four installments of $224.75, *and a monthly recurring fee of $10 to be paid from May 10, 2017 to December 10, 2036*." *See Oregon Cease & Desist* at ¶6 (emphasis added).

55.    As stated before, and as shown in the excerpt from the 341 meeting transcript below, at the CAC 341 Meeting, Albert Kim testified that CAC charged its customers an enrollment fee that was paid in monthly installments over 3 – 5 months.

16

Page 76

```
 1    example, they were paying -- what was the payment period
 2    usually, the term of payment?  I think you had testified
 3    that there was, like, an 899, and then there was a 1,099,
 4    is that right, fee?
 5             A.    Correct.
 6             Q.    So how would that break down, like, on a
 7    monthly?
 8             A.    Correct.
 9             Q.    Was it two years of payments?  Was it one
10    year of payments?
11             A.    No, usually three to five months.
```

*See 5/13/19 Transcript of CAC 341 Meeting* at p. 76, lines 1-11.

56.     To the extent that the contract described in the Oregon Cease & Desist was emblematic of CAC's contracts with some or all of its customers, the United States Trustee is concerned that there may in fact be customers who are currently obligated to pay CAC a monthly recurring fee for several more years.

57.     The United States Trustee further refers the Court to Albert Kim's testimony regarding the Oregon Cease & Desist where in response to the United States Trustee questioning, Albert Kim provided <u>no</u> information about the genesis of the Oregon Cease & Desist.

```
22             Q.    You don't know, okay.
23                   You mentioned that you got -- you were
24    contacted by Oregon.  You didn't tell me how.  Was it in
25    writing or by telephone, since the case has been filed?
```

17

Page 58

```
 1          A.    Mail.
 2          Q.    Mail, and what they -- what did you receive,
 3   a letter?
 4          A.    Yeah.
 5          Q.    And what did the letter say?
 6          A.    Cease and desist.
 7          Q.    A cease and desist?
 8          A.    Uh-huh.
 9          Q.    An order or a letter?
10          A.    Just a letter.
11          Q.    And what does it say?
12          A.    I can't -- I don't remember.
13          Q.    But to cease and desist what?
14          A.    I don't know.
```

See 5/13/19 Transcript of CAC 341 Meeting at pp. 57-58.

**CAC Filed an Assurance of Voluntary Compliance In a Proceeding Brought Against CAC and/or Premier by the State Attorney General of North Dakota**

58.     Attached hereto as Exhibit "G" is a true and correct copy of the docket for the North Dakota Action pulled from the North Dakota state court website which reflects that on April 18, 2018, CAC and/or Premier filed an "Assurance of Voluntary Compliance" in a proceeding brought by the State Attorney General of North Dakota captioned as *State of North Dakota ex rel. Wayne Stenehjem, Attorney General vs. Consumer Advocacy Center Inc., et al.*, Case No.: 08-2018-CV-01021 (the "North Dakota Action").

59.     The United States Trustee notes that other than testifying that CAC had obtained a debt settlement license from North Dakota pursuant to the state's request, Albert Kim made no reference to the North Dakota Action.  *See 5/13/19 Transcript of CAC 341 Meeting* at pp. 81-82.

18

**The Unexplained Scheduled Claim of the State Attorney General of Minnesota for $573,828.22**

60.     Although CAC scheduled a claim for the State Attorney General of Minnesota in the amount of $573,828.22, when questioned at the CAC 341 Meeting, Albert Kim provided no information regarding the basis for that claim.

61.     However Albert Kim did testify that he believed that the State of Minnesota's investigation was still ongoing.   *See 3/5/19 Transcript of CAC 341 Meeting* at p. 9.

62.     Accordingly, while United States Trustee has no further information concerning the basis of the Minnesota AG claim, one can only surmise that such a substantial claim is likely related to an investigation and/or enforcement action being conducted by the State of Minnesota.

**The State Bar of California Notice of Stayed Suspension of Attorney Kaine Wen Includes a Finding that Kaine Wen Had Outsourced Client Services to CAC and Had Impermissibly Share Legal Fees with CAC**

63.     Attached hereto as Exhibit "H" is a true and correct copy of a *Notice of Stayed Suspension* entered by the State Bar of California against Attorney Kaine Wen (the "Suspension Notice").

64.     The Suspension Notice includes the following findings:

        a. Attorney Kaine Wen's law firm (the Stone Law Group) had "outsourced primary tasks of marketing, customer acquisition and service, data collection, verification, and document preparation to the owner of Consumer Advocacy Center".

        b. Kaine Wen had provided two retainer agreements to the complainant through [Consumer Advocacy Center] where:

19

(i) The first retainer agreement covered evaluation of the complainant's options and the preparation and delivery of a Qualified Written Request to the complainant's home mortgage lender; and

(ii) The second retainer agreement covered the processing and drafting of documents for a loan modification and preparing a loan modification package to be submitted to the complainant's mortgage lender.

c. Kaine Wen had impermissibly split legal fees for services provided to the complainant with Consumer Advocacy Center – a nonlawyer.

## **ARGUMENT**

65.     By this Motion, the United States Trustee seeks entry of an Order directing the appointment of a chapter 11 trustee, or alternatively directing the appointment of a chapter 11 examiner.

66.     The United States Trustee believes that there is sufficient cause for the appointment of a chapter 11 trustee, but submits that even if this Court does not find sufficient cause for the appointment of a chapter 11 trustee, there are adequate grounds for the appointment of a chapter 11 examiner.

**Cause Exists for the Appointment of a Chapter 11 Trustee Pursuant to Section 1104(a) of the Bankruptcy Code**

67.     Section 1104(a) provides in pertinent part that:

> ...on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
> …
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the

20

commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

*See* 11 U.S.C. § 1104(a).

68.     The United States Trustee believes that CAC's repeated failure to disclose accurate material information to parties in interest constitutes, at a minimum, gross mismanagement of the affairs of CAC sufficient to warrant the appointment of a chapter 11 trustee pursuant to Section 1104(a)(1).

69.     Moreover, management's evident reluctance to disclose information regarding the nature and substance of any prior or existing investigations and/or enforcement actions conducted by multiple state agencies comprises an additional aggravating factor that further militates in favor of the appointment of a chapter 11 trustee pursuant to Section 1104(a)(1).

70.     "One of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization." *See In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009) *citing In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (finding that a chapter 11 trustee was "required" pursuant to section 1104(a)(1) "[w]here… the Debtor fail[ed] to disclose material and relevant information to the Court and creditors…").

71.     Here, CAC has repeatedly fail to perform this most basic duty of a chapter 11 debtor and therefore a chapter 11 trustee must be appointed.

21

72.     Moreover, the United States Trustee submits that there is cause sufficient

for the appointment of a chapter 11 trustee pursuant to Section 1104(a)(2) where some

factors that Courts have considered when determining whether to appoint a trustee

pursuant to 1104(a)(2) are:

> 1) Materiality of the misconduct;
> 2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;
> 3) The existence of pre-petition voidable preferences or fraudulent transfers;
> 4) Unwillingness or inability of management to pursue estate causes of action;
> 5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;
> 6) Self-dealing by management or waste or squandering of corporate assets.

*See In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D.Fla. 2003) *citing In re*

*Matter of Intercat, Inc.*, 247 B.R. at 911, 927 (Bankr. S.D. Ga. 2000).

73.     Specifically with respect to the fifth factor, bankruptcy courts have found

sufficient cause to appoint a chapter 11 trustee where debtor's management is unable to

carry out its fiduciary obligations due to conflicts of interest.   *See In re SunCruz Casinos,*

*LLC*, 298 B.R. 821, 827-28 (Bankr. S.D.Fla. 2003) (finding that the "numerous adverse,

potentially adverse, and conflicting relationships to the [d]ebtors' estates" held by related

entity and its affiliates "interfere[d] with its ability to carry out the fiduciary obligations of a

debtor in possession" and constituted cause to appoint a chapter 11 trustee.); *see also In*

*re Eurospark Industries, Inc.*, 424 B.R. 621, 629 (Bankr. E.D.N.Y. 2010) ("It is well

established that courts may appoint a chapter 11 trustee where a debtor-in-possession's

management has a conflict of interest that interferes with its ability to fulfill its fiduciary

duties to the estate.")

22

74.     Here, CAC's management appears to have significant conflicts of interest that could interfere with its ability to fulfil its fiduciary obligations where there were substantial intercompany transfers between CAC and True Count Staffing during one (1) year period before the Petition Date.

75.     Based on the connections and relationship between Kaine Wen and CAC outlined herein, it is highly unlikely that CAC's current management (Albert Kim) will investigate and/or pursue any potential avoidable transfers made by CAC to Kaine Wen's company --True Count Staffing, or any potential accounts receivable owed by True Count Staffing to CAC.

76.     Where the facts here clearly demonstrate the existence of conflicts of interest that could prevent CAC's management from effectively carrying out its fiduciary responsibility, appointment of a chapter 11 trustee would certainly be in the best interest of the parties and the estate.

**Cause Exists for the Appointment of a Chapter 11 Examiner Pursuant to Section 1104(c) of the Bankruptcy Code**

77.     Section 1104(c) provides in pertinent part that:

> …
> (c)  If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> > (1)    such appointment is in the interests of creditors, any equity security holders, and other interests of the estate;

23