Exhibit

## Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:     CASE NO. 19-10655-JKO

CONSUMER ADVOCACY CENTER, INC.,

    Debtor.
_____/

341 MEETING OF CREDITORS
March 5, 2019

The above-entitled cause came on for a Section 341 Meeting of Creditors before ZANA M. SCARLETT, Trial Attorney, Office of the U.S. Trustee, Department of Justice, in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd., Fort Lauderdale, Broward County, Florida on March 5, 2019, commencing at or about 10:05 a.m., and the following proceedings were had.

Transcribed from a digital recording by:
Cheryl L. Jenkins, RPR, RMR

## Page 2

APPEARANCES:

ZANA M. SCARLETT, Trial Attorney
    Office of the U.S. Trustee
    Department of Justice

BEHAR GUTT & GLAZER, by
    BRIAN BEHAR, Esquire
    On behalf of the Debtor

ALSO PRESENT
GREENSPOON MARDER, by
    CHRIS MEYER, Esquire

-------

WITNESS
ALBERT KIM     Page
    Examination by Ms. Scarlett     4

## Page 3

MS. SCARLETT: Okay. Good morning. It is Tuesday, March 5th, 2019 at 10:05 a.m., and this is the 341 Meeting for Consumer Advocacy Center, Inc., Case Number 19-10655-JKO.

My name is Zana Scarlett, and I'm the trial attorney with the U.S. Trustee that's handling this case. This is the meeting of the debtor, the creditors and the U.S. Trustee pursuant to Section 341 of the Bankruptcy Code. It allows us to examine the debtor, go through the schedules and get some general background information. The meeting is being recorded. Anyone wishing to get a copy of the recording should contact the U.S. Trustee's office.

Sir, I'm going to swear you in and then ask questions. When I'm done asking questions, any creditors present have a right to ask questions.

Can you raise your right hand?

Do you swear or affirm to tell the truth, the whole truth and nothing but the truth?

MR. KIM: I do.

Thereupon,
    ALBERT KIM,
having been first duly sworn, was examined and testified as follows:
    EXAMINATION

## Page 4

BY MS. SCARLETT:

    Q.    Okay, and for the record, sir, can you give me your name?

    A.    Albert Kim.

    Q.    Okay, and can you spell both names, Albert and then Kim, please --

    A.    Sure.

    Q.    -- for the record?

    A.    A-l-b-e-r-t, last name is K-i-m.

    MS. SCARLETT: Okay, and Mr. Behar, you represent the debtor, correct?

    MR. BEHAR: Yes, Brian Behar on behalf of the debtor-in-possession, and I'll waive the opening statement.

    MS. SCARLETT: Okay.

BY MS. SCARLETT:

    Q.    And, Mr. Kim, you're authorized to testify on behalf of Consumer Advocacy today?

    A.    Yes.

    Q.    Are you the president of Consumer Advocacy?

    A.    Yes.

    Q.    Are you the hundred percent owner of Consumer Advocacy?

    A.    Yes.

    Q.    And does Consumer Advocacy own any other

Page 5

1 companies, or is it in any joint ventures or anything with
2 any other companies? Does it have any relationship with
3 any other company?
4     A. No.
5     Q. Okay, and does Consumer Advocacy, Inc.
6 require any special license, permit in order to operate
7 its business?
8     A. No, not that I'm aware of.
9     Q. Do you have a Florida Department -- a
10 Florida operating license, a business operating license in
11 Florida?
12     A. No, I do not.
13     Q. Is it your plan to operate the business in
14 Florida?
15     A. Yes.
16     Q. All right. We'll get more into that.
17 Did it have a license to operate anywhere
18 else?
19     A. Yes.
20     Q. Okay, and where?
21     A. California.
22     Q. Okay, and so does it still have that
23 license, the debtor?
24     A. That I'm aware of, but I don't really know
25 for sure.

Page 6

1     Q. Okay. So you don't know, okay.
2 Who would know?
3     A. That's a good question. I would have to do
4 some more research on that.
5     Q. Can you tell me what Consumer Advocacy -- or
6 I guess first let's start with this, is Consumer Advocacy
7 Center, Inc. currently operating?
8     A. We -- no.
9     Q. No, okay, so not currently.
10 As of when did it stop operating?
11     A. I can't recall the exact date.
12     Q. Roughly, a month, two months ago, six
13 months, was it more than a year ago?
14     A. Probably somewhere around six months ago.
15     Q. Six months ago, approximately. I'm not
16 going to hold you to it. I just want an idea.
17     A. Okay.
18     Q. It stopped operating, okay, and does
19 Consumer Advocacy have any employees today?
20     A. No.
21     Q. No employees.
22 Did it have any employees six months ago?
23     A. Yes.
24     Q. How many?
25     A. I don't recall the exact number.

Page 7

1     Q. Ballpark, more than 100, less than 50?
2     A. Probably more than 100.
3     Q. More than 100 employees.
4 Okay. So, in -- about six months ago the
5 company terminated its operations and lay off -- it laid
6 off employees, is that what happened?
7     A. I assume so. I would have to do -- I don't
8 recall correctly.
9     Q. Okay. Were you president of the company at
10 the time that it terminated its operations?
11     A. Yes, I was.
12     Q. And did you have somebody else that you
13 worked with that would have been in charge of, for
14 example, laying off employees, is there somebody else --
15     A. Yes.
16     Q. -- that would have that information? Who
17 was that?
18     A. I don't recall at this moment.
19     Q. Who it was?
20     A. Yes.
21     Q. Okay. All right. Can you tell me about the
22 circumstances of the termination. Tell me what was
23 happening and how it came about that the business was
24 terminated?
25     A. I don't understand the question.

Page 8

1     Q. Okay. Can you tell me why -- why did
2 Consumer Advocacy terminate its operations approximately
3 six months ago?
4     A. We weren't making money, and the possibility
5 of getting into a big lawsuit with, you know, federal
6 regulators made it basically not worth it to continue at
7 that point.
8     Q. Okay, and you said "the possibility", so had
9 anyone filed suit before you terminated, had any entity,
10 any state, any federal --
11     A. No.
12     Q. -- agency?
13 Nobody had filed ---
14     A. Wait, wait, wait, filed a law, no.
15     Q. Nobody had?
16     A. That I can recall, no.
17     Q. Okay. Were there investigations ongoing?
18     A. Yes.
19     Q. By what entities, if you recall?
20     A. I don't recall for sure, but I think the
21 State of Minnesota.
22     Q. Okay.
23     A. I don't know if that's actually -- yeah,
24 that was -- yeah, investigated, yeah, we were talking to
25 them.

Page 9

1   Q.  Uh-huh.
2   A.  And then we've had inquiries from other AGs,
3   too.
4   Q.  Okay.
5   A.  And I can't ---
6   Q.  And you had inquiries before you terminated
7   the business, or have you had -- or are you talking about
8   inquiries that happened since?
9   A.  Before.
10  Q.  Before, okay.
11      Now that the company is terminated, have you
12  had inquiries since you've terminated the company?
13  A.  I can't recall.
14  Q.  Have you had any communication with any
15  state agencies since the business was terminated, whether
16  through your attorneys or otherwise?
17  A.  Yes, I think so.
18  Q.  Okay.  So, in other words what I'm asking
19  you is, are the investigations still ongoing?
20  A.  Yes, I think so.
21  Q.  Okay, and you think the State of Minnesota
22  would be one of those that's still conducting --
23  A.  Yes.
24  Q.  -- an investigation?
25  A.  Yes, I think so, yeah.

Page 10

1   Q.  Any other states that you can think of?
2   There are several states listed on the petition.
3       MS. SCARLETT:  Mr. Behar, can you show it to
4   Mr. Kim?
5       MR. BEHAR:  You mean the schedules?
6       MS. SCARLETT:  Yes, the schedules list a lot
7   of creditors, and I think they list a bunch of states on
8   there with unknown claims, several states.
9   BY MS. SCARLETT:
10  Q.  So I guess my question is, do you know why
11  they're all listed on the schedules?
12      MR. BEHAR:  If I may just introduce
13  Chris Meyer.  He's the lawyer that was handling the
14  investigations.
15      MS. SCARLETT:  I understand.
16      And Mr. Meyer, to the extent that you need
17  to confer with your client, that's fine.  The problem is I
18  need the client to testify.
19      MR. MEYER:  Understood.
20      MS. SCARLETT:  So, obviously if there is
21  something that you need to say and do it on the record,
22  just announce your name so that if somebody orders the
23  transcript it's clear who is speaking, okay?
24      MR. MEYER:  Okay.
25      MS. SCARLETT:  So let me back up before we

Page 11

1   get there.  Let me go ahead and just do my perfunctory
2   questions regarding the Chapter 11 guidelines.
3   BY MS. SCARLETT:
4   Q.  Sir, have you reviewed the United States
5   Trustee guidelines?
6   A.  Yes.
7   Q.  Do you understand the guidelines?
8   A.  Yes.
9   Q.  Do you have any questions for me about the
10  guidelines?
11  A.  Not at this moment.
12  Q.  Do you understand that pursuant to the
13  guidelines you have to file monthly debtor-in-possession
14  operating reports?
15  A.  Yes.
16  Q.  Who will be preparing those reports for the
17  debtor?
18  A.  Me.
19  Q.  Okay, and do you understand that pursuant to
20  the guidelines you have to pay quarterly U.S. Trustee
21  fees?
22  A.  Yes.
23  Q.  Do you understand that non-compliance with
24  either of those requirements to pay the fees, or to file
25  the reports, can subject this case to dismissal,

Page 12

1   conversion or the appointment of a Chapter 11 trustee?
2   A.  Yes.
3   Q.  And now it was your testimony that the
4   debtor has stopped operating.  Before filing bankruptcy,
5   did the debtor have any bank accounts?
6   A.  Yes.
7   Q.  How many bank accounts did the debtor have?
8   A.  I can't recall.
9   Q.  Are we talking more than 10, more than 20,
10  less than five?
11  A.  Probably less than five.
12  Q.  Okay.
13  A.  Yeah.
14  Q.  What bank, were they all in the same bank?
15  A.  I can't recall.
16  Q.  Okay.  Who handled, who handled ---
17  A.  Oh, just one, yeah, we had one.
18  Q.  You only had one bank account?
19  A.  Yeah.
20  Q.  Who dealt with the bank account issues when
21  the company was operating, was it you?
22  A.  Was it me?  Partly ---
23  Q.  For example, who is a signatory on the
24  account?  Who would have been able to write checks on the
25  bank account?

Page 13

1   A. Me.
2   Q. Anybody else?
3   A. Yes, but I can't recall.
4   Q. You don't know who?
5   A. No.
6   Q. Was there a CFO?
7   A. No.
8   Q. Did you have a controller or ---
9   A. Yes, I did.
10  Q. Okay. You think maybe that person would
11  know --
12  A. Yes.
13  Q. -- about the banking?
14      Who is that person, the former controller,
15  is that person no longer working for the debtor?
16  A. Correct.
17  Q. Okay. Who is that?
18  A. I can't recall.
19  Q. You can't remember the name of the person?
20  Okay. Can you find out for me?
21  A. Sure.
22  Q. I mean, are there records, like company
23  records where you'll be able to refresh yourself --
24  refresh your recollection of who worked for the company,
25  and how many people? I mean, do you have those kinds of

Page 14

1   records?
2   A. I'm pretty sure I do.
3   Q. Where would those records be?
4   A. I don't know at the moment.
5   Q. Are they in electronic format, or do you
6   have paper records, or do you have both?
7   A. I would have to ask.
8   Q. Who would you ask?
9   A. Probably a previous employee. Yeah, I'm
10  sure I do.
11  Q. Okay.
12  A. Yeah.
13  Q. Where would they be if you had paper
14  documents? Where was the company operating before it
15  terminated operations?
16  A. In Irvine.
17  Q. In Irvine, okay.
18  A. California, correct.
19  Q. And so there was an office?
20  A. Yes, there was.
21  Q. Does the debtor still maintain that office?
22  A. Yes.
23  Q. Okay. It's leased, correct?
24  A. Yes.
25  Q. So is there any reason that the documents or

Page 15

1   records, you wouldn't expect them to be in the office?
2   A. They're there.
3   Q. Okay.
4   A. They're probably there, yeah.
5   Q. What's in the office now that the debtor is
6   operating, is there office furniture?
7   A. Correct.
8   Q. Office equipment, computers?
9   A. Yes.
10  Q. How large is the office?
11  A. I can't recall exactly, but somewhere in the
12  neighborhood of 15,000 square feet.
13  Q. Okay, because that's where all the employees
14  worked?
15  A. Yes, correct.
16  Q. Okay. How much is the rent every month for
17  that property?
18  A. I don't recall the exact amount, but
19  roughly --
20  Q. Ballpark.
21  A. -- 20,000, 25,000.
22  Q. And is the debtor -- are you still current
23  on that rent?
24  A. Yes, I think so.
25  Q. Okay. Who pays the rent every month?

Page 16

1   A. The company.
2   Q. The company pays the rent?
3   A. Uh-huh.
4   Q. Okay. Does the company have any other
5   employees currently other than you?
6   A. No.
7   Q. So if the rent is supposed to be paid, who
8   does it? Who makes the payment?
9   A. The company.
10  Q. How does the company make the payment?
11  A. I don't recall correctly. I don't recall
12  right now.
13  Q. When was the last rent payment made?
14  A. I don't recall.
15  Q. When is the rent due, the first of the
16  month, the middle of the month, the end of the month?
17  A. I don't recall.
18  Q. Who would know?
19  A. The controller probably.
20  Q. But the controller hasn't worked there, am I
21  correct, that controller hasn't worked there for six
22  months, roughly?
23  A. I don't recall.
24  Q. Does the controller work there now?
25  A. No, I don't think so.

4 (Pages 13 to 16)

Page 17

1  Q. Have you been paying any other bills for the
2  debtor since the filing? Has the debtor been paying any
3  other bills besides the rent?
4     MR. BEHAR: Since the filing?
5  BY MS. SCARLETT:
6  Q. Since the filing of the bankruptcy.
7  A. I don't recall. I don't think so.
8  Q. Has the debtor paid rent since the filing of
9  the bankruptcy?
10 A. I don't recall. I'd have to get -- I'd have
11 to find out.
12 Q. Who would you find out from?
13 A. The controller.
14 Q. Since the filing of the bankruptcy the
15 debtor has had a controller?
16 A. I don't remember who pays the bills. The
17 office was pretty big.
18 Q. Understood, but since the filing of the
19 bankruptcy who is working in the office now?
20 A. Since the filing, nobody.
21 Q. Right. So who has been paying any bills
22 since the filing of the bankruptcy, including the rent?
23 A. I don't think anybody has.
24 Q. So you don't think the rent has been paid?
25 A. I don't know for sure.

Page 18

1  Q. How would you check? How would you find
2  out?
3  A. Yeah, I would have to -- I don't know.
4  Q. Okay. What is the debtor's plan for getting
5  out of Chapter 11 bankruptcy?
6  A. Well, the plan is to possibly continue a
7  business of some sort, probably marketing -- as a
8  marketing broker.
9  Q. Okay. Why did the debtor file bankruptcy?
10 In other words, why do you think bankruptcy is going to
11 help the debtor to do what you just told me you're
12 expecting to do?
13    MR. BEHAR: To the extent that that calls
14 for are attorney/client privilege, you can't answer the
15 question. It also calls for a legal conclusion.
16    MS. SCARLETT: This is a 341. I'm asking
17 you about the financial affairs of the debtor.
18 BY MS. SCARLETT:
19 Q. Why did you file bankruptcy, in your own
20 words?
21 A. Because there were potential litigations
22 that could possibly financially hurt, and it wouldn't make
23 sense to continue to operate.
24 Q. And so you filed bankruptcy, and the plan to
25 get out of bankruptcy is what? What is the plan?

Page 19

1  A. The plan is -- well, we've -- we're -- we've
2  been -- you know, I had experience in this industry. I
3  met a lot of people, and made a lot of connections with
4  people in the industry. So the plan is to possibly open,
5  you know, a marketing company or agency to, you know,
6  supply marketing to other companies very similar to
7  whatever ---
8  Q. So when you say open a company, you're
9  talking about Consumer Advocacy, so you're --
10 A. Continue to --
11 Q. -- saying Consumer Advocacy would continue
12 to operate --
13 A. Correct.
14 Q. -- but it would be doing something
15 different?
16 A. Yes.
17 Q. What did Consumer Advocacy do up until the
18 time that the operations were terminated?
19 A. We were a document preparation company.
20 Q. Okay. So who were your customers? Tell me
21 about the business, like, how did it work?
22 A. We helped people that needed assistance with
23 their -- with student loans, to possibly get them into a
24 program that could benefit them.
25 Q. Okay. How did you do that, you said you're

Page 20

1  a document preparation firm. So --
2  A. Correct.
3  Q. -- just, I need to understand what you did
4  for these people.
5  A. Sure. So basically we helped people with
6  federal student loans --
7  Q. Okay.
8  A. -- anybody that was having a hard time
9  making their payments.
10 Q. Right.
11 A. What they would do is they would call us.
12 Q. Okay.
13 A. We would navigate them though the many
14 programs available to see if there was any benefit in
15 helping them reduce their student loan payments.
16 Q. Okay, and the programs available, you're
17 talking about established programs, not programs that
18 you --
19 A. Correct.
20 Q. -- started?
21 Okay. So how would they know about your
22 company?
23 A. Through marketing.
24 Q. Okay, and what kind of marketing?
25 A. Social media.

Page 21

1  Q. Okay. So you were on Facebook, Instagram?
2  A. Correct.
3  Q. And you had advertisements, you had ads that
4  ran in those platforms?
5  A. We -- correct.
6  Q. Okay, and you would target particular
7  people? Like, how would you know, or was this a blanket
8  marketing to, like, whoever is on Facebook?
9  A. Facebook has algorithms --
10  Q. Okay.
11  A. -- that they generate based on what you put
12  in your bio.
13  Q. Okay.
14  A. So, that's how ---
15  Q. So Facebook would provide that information
16  to you?
17  A. Correct.
18  Q. And then you would know who to target?
19  A. Correct.
20  Q. So other than the social media, did you have
21  any kind of mailing campaigns that you used?
22  A. No, we did not.
23  Q. So it was all social media?
24  A. Correct.
25  Q. Did you do blast emails?

Page 22

1  A. Personally, no.
2  Q. Not you. I mean the company, did the
3  company do that?
4  A. No, we outsourced our marketing --
5  Q. Okay.
6  A. -- through a third party marketing company,
7  correct.
8  Q. So, you paid somebody to do that?
9  A. Correct.
10  Q. And they also did the social media?
11  A. Correct.
12  Q. Okay. So in-house you didn't have somebody
13  that was doing that?
14  A. Correct.
15  Q. What was the name of the company that you
16  used to do that, or did you have multiple companies?
17  A. Multiple companies.
18  Q. Okay. So were they geographically based,
19  like, they would handle certain areas, or how did -- why
20  did you have more than one company doing that?
21  A. It's good to have multiple marketing
22  companies working for you just in case --
23  Q. Okay.
24  A. -- one isn't performing.
25  Q. Okay. So they all sort of operated

Page 23

1  everywhere?
2  A. Correct.
3  Q. Where did the company operate, did it
4  operate in all 50 states?
5  A. For the most part I think, yes. I don't
6  know for sure.
7  Q. Who would know?
8  A. Our marketing company, the marketing
9  companies, yeah.
10  Q. And who are they, how many are there?
11  A. Over 10 for sure. Over 20 for sure.
12  Q. Okay.
13  A. Throughout the -- yeah.
14  Q. And did you have agreements with them, like
15  contracts?
16  A. I did, yes.
17  Q. Okay. So what happened when the business
18  terminated, what happened to those contracts?
19  A. I -- what do you mean by "contracts"? I'm
20  sorry, I don't understand the question.
21  Q. Well, did you have agreements with the
22  marketing companies to provide services to Consumer
23  Advocacy? Were there agreements?
24  A. Yes.
25  Q. And the agreements provided for what they

Page 24

1  would do, and then what the debtor would do, i.e., pay
2  them or whatever it is, right?
3  A. That's correct.
4  Q. Okay. Those agreements, are those still in
5  place, or did they end when the operations ended?
6  A. They ended when the operations ended.
7  Q. How do you know they ended?
8  A. I don't know for sure.
9  Q. Who would know?
10  A. We haven't -- I haven't had anybody look
11  into that, so ---
12  Q. Have you had any calls for marketing
13  companies seeking payment?
14  A. No.
15  Q. Did you notify the marketing companies when
16  the operations were terminated?
17  A. Correct.
18  Q. How did you do that?
19  A. Phone calls.
20  Q. Okay. So, you called them?
21  A. Uh-huh.
22  Q. Was it you or was it somebody else?
23  A. That was -- some of those were me, yeah.
24  Q. Okay, and how did the marketing companies
25  react, they just said, okay, we'll terminate our

Page 25

1 relationship, or what happened?
2     A.  Yes, they're -- yeah, yeah.
3     Q.  So as far as you know all these contracts
4 are terminated?
5     A.  Yeah. When you're referring to contracts,
6 are you referring to ---
7     Q.  Agreements, whatever your arrangement was
8 with them. Do you have written agreements with the
9 marketing companies?
10    A.  Yes, they're for some, and some -- some,
11 they didn't request it.
12    Q.  Okay.
13    A.  Yeah.
14    Q.  So how did you know how much to pay them?
15    A.  It was -- we would pay them, we would prepay
16 them.
17    Q.  Oh, okay.
18    A.  Yeah.
19    Q.  So they would tell you a price to do X, and
20 you could just pay them --
21    A.  Right.
22    Q.  -- ahead of time?
23    A.  Right, right, right.
24    Q.  Okay. So at the time that you terminated,
25 were there people that you owed money to, were there any

Page 26

1 marketing companies that were owed fees?
2     A.  That I can recall, no.
3     Q.  Okay.
4     A.  Yeah.
5     Q.  And it's your testimony that you haven't
6 gotten any contact, any letters or any calls from any
7 marketing companies seeking fees that they are owed?
8     A.  Correct.
9     Q.  Okay. Does anybody owe the company money?
10    A.  Does anybody owe the -- owe Consumer
11 Advocacy money?
12    Q.  Yes. Did they have accounts receivable?
13    A.  No, not that I'm aware of.
14    Q.  Okay. So the business model that you had,
15 when people contacted you, how did they pay, they paid
16 upfront?
17    A.  Right, yeah, yeah. So, consumers would owe
18 us money, yeah.
19    Q.  Okay. So do you know how much they owe you?
20    A.  No, I do not.
21    Q.  Ballpark?
22    A.  I don't.
23    Q.  How did they pay for the services you
24 provided? It wasn't, when you delivered it they paid?
25 Was it over time? How did it work?

Page 27

1     A.  It was over time, correct.
2     Q.  And how much did they pay?
3     A.  How much were our -- I don't understand the
4 question.
5     Q.  You how much did you charge the consumers?
6     A.  Anywhere from $899 to $1,199.
7     Q.  Okay, and those were the two price points?
8     A.  Uh-huh, yes.
9     Q.  And so for 8,999, what was the consumer ---
10        MR. MEYER:  It's 899.
11        MR. BEHAR:  No.
12        MS. SCARLETT:  I'm sorry.
13 BY MS. SCARLETT:
14    Q.  For 899, what did the consumer receive?
15    A.  Their document preparation, their documents
16 prepared --
17    Q.  Okay.
18    A.  -- to get their loans consolidated --
19    Q.  Okay.
20    A.  -- with a new servicer.
21    Q.  Okay.
22    A.  Constant monitoring to make sure that it was
23 done in time.
24    Q.  Okay.
25    A.  Yeah.

Page 28

1     Q.  Okay, and then the 899, how did they pay
2 that, they paid you a deposit, or -- I mean, how did -- I
3 mean, how was the payment structure?
4     A.  It was paid over time, monthly payments.
5     Q.  Okay.
6     A.  Yeah, so -- yeah, they weren't paying that
7 899 or 1,199 in one lump sum.
8     Q.  And how many months did it go?
9     A.  Typically from five to six months.
10    Q.  Okay. So you believe that there probably
11 were consumers that were in the process of paying for
12 services?
13    A.  Correct.
14    Q.  And were there consumers that would have
15 paid something and were -- their service hadn't been
16 completed at the time that you terminated?
17    A.  Probably, I don't know for sure.
18    Q.  Do you know how many customers you had, how
19 many consumers?
20    A.  I don't know for sure.
21    Q.  And have all the consumers been notified
22 that the company terminated operations?
23    A.  No, they have not.
24    Q.  Are you -- does the company in Irvine, the
25 office in Irvine, are there phones there? Are there

7 (Pages 25 to 28)

Page 29

1 phones there, like, can you take calls?
2     A.  No.
3     Q.  No, no, there are no phones?
4     A.  Yeah.
5     Q.  How did you communicate with the consumers,
6 only by email, or did you have a phone number?
7     A.  Phone numbers and emails.
8     Q.  Okay. Is there somebody monitoring those
9 emails? Has there been anybody since the closing of the
10 company that has been monitoring those emails from
11 consumers?
12     A.  No, not that I'm aware of.
13     Q.  When you assisted the consumers in preparing
14 the documents, did you have to at any point collect stuff
15 like Social Security numbers, or addresses, or phone
16 numbers?
17     A.  Yes, we did.
18     Q.  What kind of information -- so you did have
19 to collect Social Security numbers?
20     A.  Correct.
21     Q.  Where would those be, the ones that you
22 collected?
23     A.  They would probably be in the CRM.
24     Q.  What is that?
25     A.  It's, like, a software that you use.

Page 30

1     Q.  Oh, okay.
2     A.  Uh-huh.
3     Q.  So the software that your company used, it
4 would store that information?
5     A.  Correct.
6     Q.  So that's like, does it reside on a server
7 in the building, or is it like in the cloud?
8     A.  It's probably in the cloud.
9     Q.  Okay.
10    A.  Yeah.
11    Q.  And so Consumer Advocacy has, like, a cloud
12 account or, I mean, it has something that it pays for? It
13 pays for space to keep data, correct?
14    A.  It did, yes, correct.
15    Q.  It did?
16    A.  Yeah.
17    Q.  You're saying it did?
18    A.  Yeah.
19    Q.  So ---
20    A.  Well, the software is, you set up an account
21 where there is specific software for your industry.
22    Q.  Okay, and that software is linked to some
23 database in the cloud that keeps the information?
24    A.  Correct.
25    Q.  And so the software, is there some kind of

Page 31

1 licensing fee that you had to pay over time, or do you buy
2 it once and that was it?
3     A.  Yeah, there was a monthly fee.
4     Q.  Has the debtor been paying those monthly
5 fees?
6     A.  No, they have not.
7     Q.  So do you know what's going on with the
8 database and where the data is?
9     A.  No, I do not.
10    Q.  Ballpark, how many consumers do you think
11 your company dealt with?
12    A.  Honestly, I don't know for sure.
13    Q.  Are you talking thousands, hundreds, no
14 idea?
15    A.  Yeah, thousands.
16    Q.  And it's like nationwide, right?
17    A.  Certain states, like -- no.
18    Q.  Okay. So which states -- is it easier to
19 tell me which states you don't operate in?
20    A.  Correct.
21    Q.  Okay. Tell me the states you don't operate
22 in.
23    A.  From what I recall --
24    Q.  Yes.
25    A.  -- this may not be correct --

Page 32

1     Q.  Uh-huh.
2     A.  -- North Dakota, Minnesota, Oregon.
3     Q.  Okay.
4     A.  Those are the only ones that I can think of
5 at the moment.
6     Q.  And why do you know that you don't operate
7 there, or you didn't operate there?
8     A.  Because of inquiries from the state.
9     Q.  Okay. So you had been operating there, but
10 once the inquiries started, you terminated your operations
11 in those states?
12    A.  Yes, correct.
13    Q.  Okay. So you testified that the debtor has
14 a lease in California, you don't know if it's been paid
15 since the petition date. Do you have any reason to think
16 it has been paid, since you'd be the one who paid it?
17    A.  Yeah, I'm assuming it has not been.
18    Q.  Have you heard from the landlord? Have you
19 gotten any letter, any call, or anything for payment?
20    A.  No, I have not.
21    Q.  No emails?
22    A.  Yeah, I wouldn't, yeah.
23    Q.  Does the landlord know that you filed
24 bankruptcy?
25    A.  No, he doesn't.

8 (Pages 29 to 32)

Page 33

1  Q. You didn't call the landlord when you filed?
2  A. No, I have not.
3     MS. SCARLETT: And can you show Mr. Kim a
4  copy of the petition and the schedules? He has them here.
5  BY MS. SCARLETT:
6  Q. I want you to, if you could just look at
7  that and verify for me that you signed the petition.
8  That's the document that commenced the filing of the case.
9     MR. BEHAR: I'm showing the witness the
10 petition.
11    THE WITNESS: Yes.
12 BY MS. SCARLETT:
13 Q. Okay, and the address is listed there,
14 500 East Broward Boulevard, and 173 Technology Drive. Are
15 those correct?
16 A. Yes.
17 Q. Okay, and what is at suite 1710 in
18 Fort Lauderdale? What is there? What is that, is that
19 just an office, a suite?
20 A. Yes, correct.
21 Q. An office suite.
22    Do you have any employees there?
23 A. No, we do not.
24 Q. When did you start that lease,
25 approximately?

Page 34

1  A. October.
2  Q. October. Can I have a copy of that lease?
3  Can you provide it to your attorney?
4  A. Yes.
5  Q. Do you know how much the rent is pursuant to
6  that lease?
7  A. I don't remember.
8  Q. Okay. Do you know if that lease has been
9  paid since the filing, that rent?
10 A. Yeah, I think it has been.
11 Q. I mean, would you have paid it? Would you
12 have been the one that made the payment?
13 A. Yes.
14 Q. Okay, and is there any equipment in there,
15 any computers, any office furniture?
16 A. I'm assuming, yes.
17 Q. Have you been there before?
18 A. No, I have not.
19 Q. Did you sign the schedules? So in addition
20 to the petition, the schedules listed the debtor's assets
21 and liabilities.
22 A. Yes, I did.
23 Q. Okay. Did you assist your attorney in
24 preparing the schedules? Did you assist him to prepare
25 these?

Page 35

1  A. Yes.
2  Q. Was there anybody else who assisted your
3  attorney in preparing these schedules?
4  A. No.
5  Q. Are the schedules and the statement of
6  financial affairs true and correct to the best of your
7  knowledge?
8  A. To the best of my knowledge, yes.
9  Q. Are there any assets that you are aware that
10 were not included on the schedules?
11 A. At this moment nothing that I'm aware of.
12    MS. SCARLETT: And the schedules haven't
13 been amended, Mr. Behar, for any reason --
14    MR. BEHAR: No.
15    MS. SCARLETT: -- at this point?
16 BY MS. SCARLETT:
17 Q. Are you aware of any errors on the
18 schedules?
19 A. Not that I'm aware of.
20 Q. Okay. Did you review ---
21 A. Not at this moment.
22 Q. Did you review them before Mr. Behar filed
23 them?
24 A. Briefly, yes.
25 Q. And in the California location there is

Page 36

1  office furniture, and computers, et cetera, correct?
2  A. Yes, that I'm aware of, yes.
3  Q. Is the furniture leased? Is it part of the
4  property? Does it come with the property, or did you have
5  your own furniture?
6  A. It was part of the property.
7  Q. And what about the computers, did you own
8  those?
9  A. Yes, I did.
10 Q. Okay. Any other equipment that you owned?
11 A. Not that I'm aware of right now, I can't
12 recall correctly, no.
13 Q. And are all the computers still there in
14 California?
15 A. I'm assuming they are.
16 Q. You're assuming. Who would know?
17 A. I don't know.
18 Q. Who has access to that building, to that
19 office?
20 A. I do.
21 Q. How do you get in, is it a key, is it a card
22 key?
23 A. It's a card.
24 Q. It's a card?
25 A. Uh-huh.

9 (Pages 33 to 36)

Page 37

1  Q. Does anybody else have a card like yours
2  that gives them access to that office?
3  A. Yes.
4  Q. Who?
5  A. A lot of people. Yeah, I don't think we
6  collected the keys from ex-employees.
7  Q. Okay. So employees may still have card keys
8  that work?
9  A. Possibly, I don't know for sure.
10  Q. Is the building in California, is it
11  self-contained by itself, or are there other businesses in
12  that building?
13  A. There is other businesses in the building.
14  Q. Okay. So there is, like, a security
15  department that you would deal with, that would give
16  people access to the building, who would make the cards
17  work?
18  A. You mean offsite?
19  Q. Yes, who would make the cards work?
20  A. We had the ability to make the cards work.
21  Q. Okay, and you're saying you didn't turn off
22  the access?
23  A. I'm assuming we did. I don't know for sure.
24  Q. Who would know?
25  A. Ex-employees. I'm assuming that none of the

Page 38

1  card keys work still, including mine.
2  Q. When was the last time you visited that
3  office?
4  A. A while ago.
5  Q. But that's the address that you're listing
6  on the petition. Are you getting mail there?
7  A. Yes.
8  Q. How do you retrieve the mail?
9  A. I don't think we've retrieved the mail in
10  quite some time.
11  Q. How long are we talking about?
12  A. I don't know.
13  Q. Since September?
14  A. Probably.
15  Q. And I think it was your testimony that the
16  phones don't work there?
17  A. Correct.
18  Q. And to your knowledge there has been nobody
19  working in the office since you closed the operation?
20  A. Correct.
21  Q. Okay. On the schedules it lists that as of
22  the petition date there was $26,000 approximately in the
23  bank account?
24  A. Correct.
25  Q. Do you know how much money is in the bank

Page 39

1  account now, sitting here right now, is it still this
2  amount, 26,496?
3  A. I don't, I don't know for sure.
4  Q. Have you spent any money, has the debtor
5  spent any money since filing bankruptcy?
6  A. That I can recall, not that I'm aware of.
7  Q. You opened up a -- did you open up a
8  debtor-in-possession bank account post-filing?
9  A. Yes, we did.
10  Q. Okay. Did you put money -- okay. Did you
11  close the prepetition bank account?
12  A. Yes, we did.
13  Q. And what did you do with the money that you
14  withdrew from the prepetition bank account when you closed
15  it?
16  A. I think it got transferred, it's in the
17  process of getting transferred over to the new bank
18  account.
19  Q. Okay. Who is the one that would be doing
20  that, not you?
21  A. No.
22  Q. Who would be doing that?
23  A. A friend of mine.
24  Q. Who is that?
25  A. My friend Tuong.

Page 40

1  Q. Tuong?
2  A. Uh-huh.
3  Q. What's his last name?
4  A. Ngyen.
5  Q. W-e-n?
6  A. (No verbal response.)
7  Q. And Mr. Wen, was Mr. Wen ever an employee of
8  the debtor?
9  A. No, N-g-u-y-n.
10  Q. N-g-u -- oh, okay, and how do you pronounce
11  that, Ngyen?
12  A. Ngyen, Ngyen.
13  Q. Okay, and Mr. Ngyen, was he an employee of
14  the debtor at any point?
15  A. No, he was not.
16  Q. He was never an employee, but he had
17  signatory authority on the bank account?
18  A. I don't know for sure.
19  Q. How was he able to -- who went to the bank
20  and closed the account?
21  A. I did.
22  Q. You did.
23  Okay, and when you closed the account, were
24  you given a check for the amount that was on deposit?
25  A. Actually I don't know if that account is

10 (Pages 37 to 40)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Pl. Ex. 47-1
p. 835

Page 41

1 open or closed.
2 Q. You don't know if it's open or closed?
3 A. I know we're in the process of getting a new
4 account for the bankruptcy.
5 Q. But you don't know if this one was closed?
6 A. I don't know the exact details, I'm sorry.
7 Q. But you think Tuong would know?
8 A. I don't know for sure.
9 Q. Why did you say you thought Tuong was
10 dealing with the bank account, has he been dealing with
11 your attorney and dealing with the closing of the bank
12 account?
13 A. He's helped me but, yeah, yeah.
14 Q. Okay. Do you have any idea how much the
15 equipment in California is worth, the computers?
16 A. No, I do not.
17 Q. How many computers are we talking about, do
18 you have any clue?
19 A. I don't.
20 Q. Are there more than a hundred work stations?
21 A. Possibly, I don't know for sure.
22 Q. And there would be printers as well?
23 A. Correct, possibly, yeah.
24 Q. But sitting here you don't know what the
25 value of those are?

Page 42

1 A. No, I do not.
2 Q. But it's your understanding that the debtor
3 owned that equipment, correct?
4 A. Correct.
5 Q. It wasn't leased?
6 A. No, it was not.
7 MS. SCARLETT: Okay. So you need to amend
8 the schedules because it's saying that you don't own any
9 -- it's saying the debtor doesn't own any office
10 furniture, equipment, machinery. I mean, it's saying
11 nothing, it doesn't own anything.
12 MR. BEHAR: Right.
13 BY MS. SCARLETT:
14 Q. Did the debtor have any patents or licenses
15 for the technology or the process that you were engaged
16 in? Do you have in any patents, licenses, copyrights?
17 A. No, I do not.
18 Q. Okay, and it says the debtor doesn't have
19 accounts receivable. I think you need to check that
20 because it's your testimony that there are consumers that
21 might owe money for services you provided.
22 A. Possibly.
23 Q. How did they make the payments, did they
24 make them online, or did they mail checks in?
25 A. Over the phone.

Page 43

1 Q. Okay. So they called in --
2 A. Correct.
3 Q. -- to make the -- but the phones don't work.
4 So if they tried to call now they wouldn't be able to make
5 a payment.
6 A. Correct.
7 Q. Right. So you probably have outstanding
8 accounts receivable, you would guess?
9 A. Correct.
10 Q. Okay. You have it checked no, so that needs
11 to be amended.
12 And, Mr. Kim, did you take a salary when you
13 were employed with the -- well, have you ever taken a
14 salary from the debtor?
15 A. Yes.
16 Q. How much were you paid prior to the filing
17 of the bankruptcy?
18 A. I don't recall the exact amount.
19 Q. On a yearly basis, how much were you paid?
20 A. As a salary?
21 Q. Yes.
22 A. Probably -- per year?
23 Q. Right.
24 A. Less than a hundred thousand.
25 Q. Less than a hundred thousand?

Page 44

1 A. Uh-huh.
2 Q. Was it was more than 50,000?
3 A. Possibly.
4 Q. Okay. When was the last time you received a
5 salary -- a payment, a salary payment from the debtor?
6 Have you received any payments from the debtor since
7 operations were terminated?
8 A. No, I have not.
9 Q. In the year prior to the filing of the case,
10 how much money did you receive in salary?
11 A. Is that 2017? Probably less than a hundred
12 thousand.
13 Q. Okay.
14 MR. BEHAR: It's not 2017. She said the
15 year ---
16 THE WITNESS: Oh, the year before?
17 MS. SCARLETT: The year before. So, year to
18 year.
19 MR. BEHAR: We filed January 16th of this
20 year, so go back to January 16th of 2018.
21 THE WITNESS: 2018, the salary, more than a
22 hundred thousand dollars, less than $200,000, I'm
23 assuming, I don't know for sure.
24 BY MS. SCARLETT:
25 Q. So January through the time you closed, you

11 (Pages 41 to 44)

Page 45

1  think you got paid more than a hundred thousand?
2      A.  Correct.
3      Q.  When do you think was the last time you
4  received a payment?
5      A.  I don't remember.
6      Q.  Was it before the termination of the
7  operations?
8      A.  Correct.
9      Q.  And you don't remember the exact date that
10 the operations were terminated?
11     A.  The exact date, no, I do not.
12     Q.  Do you remember the month?
13     A.  September.
14     Q.  September, okay, and you believe you -- you
15 don't know if you got paid that month?
16     A.  I don't remember.
17     Q.  Okay, and did you tell the employees that
18 the operations were terminated?  Were you the one that
19 made the announcement?
20     A.  No, I was not.
21     Q.  Who was that person?
22     A.  HR.
23     Q.  HR did that?
24     A.  Yes.
25     Q.  And that would have been in September?

Page 46

1      A.  Yes.
2      Q.  But you don't know how they did it?
3      A.  Right.
4      Q.  You don't know if they did an email?
5      A.  I'm assuming they did an email, and I'm
6  assuming it was done in person as well.
7      Q.  Okay, and do you know if people received
8  severance payments?
9      A.  I don't know for sure, but I don't think
10 they did.
11     Q.  Right, because you would have had to
12 authorize that, right, as the president?
13     A.  Right.
14     Q.  Was the debtor profitable prior to the
15 termination, or was it operating at a loss?
16     A.  It was profitable, I think, a very, very
17 small profit.
18     Q.  On the schedules it lists -- in the
19 statement of financial affairs it lists that in the year
20 2018 there was gross revenue of over 19 million.  Does
21 that sound correct to you?
22     A.  Yes, it does.
23     Q.  Okay.  How much profit do you think you made
24 on that 19 million?
25     A.  I think it was somewhere around a hundred

Page 47

1  thousand or so, maybe less than that.
2      Q.  Okay.  Other than your salary, did you
3  receive anything else of any benefit from the debtor?  Did
4  the debtor pay for a car for you?
5      A.  They paid some of the bills, correct.  Yes,
6  it did.
7      Q.  Okay.  Can you tell me what it paid?
8      A.  I can't recall correct -- I can't recall if
9  it was a car payment.
10     Q.  A car payment, okay.
11     A.  Yeah.
12     Q.  Phone, cell phone?
13     A.  No, I don't think so.
14     Q.  You're living, like, arrangement, apartment
15 or a home?
16     A.  I don't recall, I don't think so.
17     Q.  Okay.  Was the car in your name, or was it
18 in the name of the debtor?
19     A.  It was most likely in my name.
20     Q.  Do you still have the car?
21     A.  Yes, I do.
22     Q.  What kind of car was it?
23     A.  BMW.
24     Q.  Okay.  What model?
25     A.  535.

Page 48

1      Q.  What year?
2      A.  2012.
3      Q.  And other than you, were there any other
4  employees prior to the termination that were receiving,
5  for example, a car payment paid, or that was just you, you
6  were the only one that received that benefit?
7      A.  I think that was just me, yeah, correct.
8      Q.  Okay.
9      A.  I don't recall --
10     Q.  You don't recall?
11     A.  -- for sure.
12     Q.  But there are records, right, that would
13 show that?  There are business records, records that the
14 debtor has, that would be able to show me who -- what
15 people received in addition to salary, if anything?
16     A.  Yes.
17     Q.  Okay, and so your testimony is that some
18 bills were paid, you believe the car was paid.  Can you
19 think of any other bills, your personal bills that the
20 company covered?
21     A.  (No verbal response.)
22     Q.  Do you have life insurance?  Did you have
23 health insurance?
24     A.  No, I do not.
25     Q.  Okay.  So you don't know of any other bills