Page 49

1 that the company paid.
2 Q. Did you have a credit card for the company
3 that you used?
4 A. Yes, I did.
5 Q. Okay. Was it an American Express?
6 A. No, it was not.
7 Q. What was ---
8 A. There was no -- I think it was -- yeah, for
9 a short period of time there was a credit card, but we
10 ended up not using that. We used, like, a debit card.
11 Q. You used a debit card?
12 A. Uh-huh.
13 Q. So it would come straight from the business
14 account?
15 A. Correct.
16 Q. And who was authorized to use that debit
17 card?
18 A. I was authorized to use it.
19 Q. Are you the only one?
20 A. No, I was not.
21 Q. Did you ever make personal purchases using
22 the debit card?
23 A. Not that I can recall.
24 Q. Were you ever reimbursed for any spending
25 that you did for the company? Did you ever spend your own

Page 50

1 money and then get the company to reimburse in any
2 instance?
3 A. Not that I can recall.
4 Q. Other than your salary and the benefits, the
5 car payment, did you ever get distributions from the
6 company, take distributions separate from your salary?
7 A. I don't understand the question.
8 Q. Did you receive money from the company
9 otherwise, any money at all?
10 A. To me, personally?
11 Q. To you, personally --
12 A. No.
13 Q. -- other than your salary?
14 No, okay.
15 Did anyone else receive any distributions
16 from the company, other than salary payments?
17 A. Other than salary payments, no, not that I
18 recall.
19 MS. SCARLETT: Okay. So you have to amend
20 the car payments, there is no listing of that, the
21 payments to insiders.
22 MR. BEHAR: Well, but you didn't ask if that
23 was ---
24 MS. SCARLETT: He said that the company may
25 have made payments on the car. So, to the extent that it

Page 51

1 did, I think you have to list those.
2 MR. BEHAR: But I think there is a time
3 period, isn't it a year?
4 MS. SCARLETT: It's within a year.
5 MR. BEHAR: A year. I don't know if he
6 testified that there were car payments within a year.
7 BY MS. SCARLETT:
8 Q. Okay. When was the last time the debtor
9 made a car payment for you?
10 A. I don't know for sure, but I think it was in
11 2017.
12 Q. Okay. So you don't believe that you got
13 your payments, any car payments made -- were made -- you
14 don't think any were made in 2018?
15 A. Correct.
16 Q. Okay.
17 A. But I'm not certain, but correct.
18 MS. SCARLETT: Can you go and check, and
19 then --
20 MR. BEHAR: Yes.
21 MS. SCARLETT: -- you'll amend.
22 MR. BEHAR: Uh-huh.
23 BY MS. SCARLETT:
24 Q. Did the -- prior to the petition date --
25 it's your testimony, though, that you don't believe any

Page 52

1 bills for the debtor have been paid since the filing,
2 correct? Because you're the one that would authorize it,
3 and you don't know that you've made any bill payments?
4 A. Correct.
5 Q. Including the rent, correct?
6 A. Correct.
7 Q. Prior to the filing, did you make rent
8 payments, do you recall?
9 MR. BEHAR: For what period?
10 MS. SCARLETT: Prior to filing the
11 bankruptcy.
12 MR. BEHAR: Any time?
13 BY MS. SCARLETT:
14 Q. Immediately filing -- immediately prior to
15 filing the bankruptcy --
16 A. Uh-huh.
17 Q. -- were you making any bill payments?
18 A. The company or me, personally?
19 Q. Yes, the company, the company.
20 A. Yes, yes.
21 Q. I'm just saying you because you're the one,
22 you're the only one left --
23 A. Got you.
24 Q. -- correct?
25 A. Okay.

Page 53

1  Q. So, any payments would have had to be
2  authorized by you, or made by you, correct?
3  A. Correct.
4  Q. So let's say from the period when the
5  operations stopped, approximately September, to when the
6  case filed in January --
7  A. Correct.
8  Q. -- do you recall making any payments --
9  A. No.
10  Q. -- of rent, for example?
11  A. No.
12  Q. So you don't remember making those payments?
13  A. I do not.
14  Q. So, you believe that -- are you current on
15  the rent in Irvine?
16  A. I don't think so.
17  Q. Do you think you're current on the rent in
18  Fort Lauderdale?
19  A. Yeah, I think so.
20  Q. You remember making payments up until the
21  filing? Because I think your testimony is that you
22  haven't made any payments for anything since the filing,
23  correct?
24  A. Right, yeah. Yeah, I think, yeah, I think
25  that office is being paid for. Yeah, it's a virtual

Page 54

1  office.
2  Q. Okay. How do you pay for it, you pay for it
3  online?
4  A. I haven't made -- personally made the
5  payments. I could find out for you, though.
6  Q. Who would do it, is it your friend Tuong
7  that would be dealing with that?
8  A. Tuong, yeah.
9  Q. So in the three months prior to filing,
10  prior to January when you filed, did you pay down or pay
11  off any creditors, including any credit cards?
12  A. I'm sorry, can you repeat the question?
13  Q. In the three months before you filed, in
14  January of 2019, when you filed this case, in the three
15  months prior, did you pay down or pay off any creditors?
16    MR. BEHAR: That would be from, like,
17  October 2018 through January 2019.
18    THE WITNESS: I think we just paid our bills
19  the same way.
20  BY MS. SCARLETT:
21  Q. Okay. So nobody got any payoffs?
22  A. Yeah.
23  Q. And it's your testimony that the debtor
24  didn't have credit cards at that time?
25  A. Well, we possibly may have had one.

Page 55

1  Q. Okay.
2  A. But it was -- yeah.
3  Q. But there was no balance on it?
4  A. I don't recall. No, I don't think so.
5  Q. Do you still have a credit card for the
6  company?
7  A. No, we do not.
8  Q. When did you close that credit card account?
9  A. I don't remember.
10  Q. Who would have done it?
11  A. Somebody that would be -- probably the
12  controller of the company at that time.
13  Q. Okay.
14  A. Yeah.
15  Q. But you haven't had a controller since you
16  closed in September?
17  A. Correct.
18  Q. Were you the one that terminated the
19  controller? Would you have been the one that told him
20  that his services were no longer required?
21  A. No.
22  Q. Who would have done that?
23  A. I'm assuming HR.
24  Q. Okay. Who was in charge of HR?
25  A. I can't recall at this moment.

Page 56

1  Q. Okay. Who was, who was the controller?
2  A. There was a lot of people in charge of that.
3  Q. Okay.
4  A. Yeah, and I don't really understand the
5  definition of controller, too. So the person that paid
6  the bills?
7  Q. Yes, who was that? Who was that? Do you
8  remember who did that?
9  A. Many people.
10  Q. Many people did it, okay.
11  A. I don't know for sure.
12  Q. All right. You have listed on the schedules
13  three pieces of litigation, Abramson versus Consumer
14  Advocacy Center. Are you aware of that litigation? It's
15  in Pittsburgh, Pennsylvania.
16  A. Yes, I am aware of it.
17  Q. Can you tell me, what's that about?
18  A. TCPA.
19  Q. And what is that?
20  A. I don't really --
21  Q. -- know what it stands for?
22  A. Correct.
23  Q. But you're saying that's what the litigation
24  is about? Well, what's your understanding of what the
25  litigation is about? Who is Mr. Abramson, or

14 (Pages 53 to 56)

Page 57

1  Mrs. Abramson?
2  A. He -- I think he -- I don't recall for sure,
3  but I just think he's just an individual, and I think he's
4  claiming that we called him illegally.
5  Q. Okay.
6  A. Yeah.
7  Q. So this is one of your consumer people --
8  A. Correct.
9  Q. -- one of your clients?
10 A. Correct.
11 Q. Jeremy Jackson versus Consumer, is that a
12 similar kind of litigation?
13 A. Correct.
14 Q. And Joseph Bond, the same thing?
15 A. Correct.
16 Q. And as far as you know, those litigations
17 are not continuing right now because of the filing?
18 A. That I'm aware of, correct.
19 Q. Okay. Has the debtor sold or given away any
20 assets in the one year prior to filing?
21 A. No, not that I'm aware of.
22 Q. Has anything been repossessed, surrendered
23 to the bank?
24 A. Not that I'm aware of.
25 Q. And do you remember the law firm Greenspoon

Page 58

1  Marder?
2  A. I do.
3  Q. What did Greenspoon Marder do for you, for
4  the debtor?
5  A. They handled a lot of the litigation when it
6  came to these matters, and compliance matters.
7  Q. Okay. So, they're ---
8  A. Especially like with the AG and stuff.
9  Q. So they were working with the debtor prior
10 to the operations being terminated?
11 A. Correct.
12 Q. And did they work with the debtor after
13 that?
14 A. Correct.
15 Q. Are they still working with the debtor?
16 A. No, not really.
17 Q. You say not really, are you still
18 communicating with attorneys there?
19 A. No.
20 Q. When was the last time you spoke to a
21 Greenspoon Marder attorney?
22    (Laughter.)
23 Q. So Greenspoon Marder is still involved?
24 A. Okay.
25    MR. BEHAR: We will probably be retaining

Page 59

1  Mr. Meyer as special counsel.
2  BY MS. SCARLETT:
3  Q. Mr. Meyer is representing who, the debtor or
4  representing you?
5  A. I'm sorry, I don't understand the question.
6  Q. Is Mr. Meyer representing Consumer Advocacy,
7  is that the client?
8  A. Yes.
9  Q. Did Consumer Advocacy pay Mr. Meyer to
10 represent it?
11    MR. BEHAR: Since the bankruptcy?
12    THE WITNESS: Yeah, I'm kind of confused. I
13 don't ---
14 BY MS. SCARLETT:
15 Q. Okay. Okay. Do you remember when
16 Greenspoon Marder was retained, approximately?
17 A. I don't.
18 Q. Okay. Who retained Greenspoon Marder, did
19 Consumer Advocacy retain --
20 A. Yes, we have.
21 Q. -- their services?
22    Okay. So as far as you know, has that
23 changed, is the client still Consumer Advocacy?
24 A. I think we're going to hire him as a special
25 counsel for this bankruptcy. So ---

Page 60

1  Q. But they've always represented the debtor,
2  correct?
3  A. I don't understand, I don't know.
4  Q. Do you have an attorney separate and apart
5  from -- you, personally --
6  A. No, I do not.
7  Q. -- Mr. Kim?
8     You do not?
9  A. No.
10 Q. Does Greenspoon Marder provided advice for
11 you, or do they provided advice for Consumer Advocacy?
12 A. I don't understand the question.
13 Q. Okay. It's your testimony that Greenspoon
14 Marder dealt with the AG stuff, the Attorney General
15 investigations?
16 A. Correct.
17 Q. So the Attorney General investigation, are
18 they investigating the company, or are they investigating
19 you?
20 A. They're investigating the company.
21 Q. Okay. Has anybody investigated you,
22 personally, that you're aware of?
23 A. No, I don't know.
24 Q. Okay. So was Greenspoon Marder retained to
25 deal with the investigations of the company?

Page 61

1  A. Correct.
2  Q. Okay. So is Greenspoon Marder giving you,
3  personally, any legal advice?
4  A. No.
5  Q. Okay, and is it the debtor's plan to
6  continue to lease the property in Broward going forward?
7  A. Yes.
8  Q. And is it the debtor's intent to continue
9  leasing the property in California going forward?
10  A. Yes.
11  Q. Now, if you know, what is the relationship
12  between Consumer Advocacy and Premier Student -- let me
13  make sure I say the name correct, Premier Student Loans,
14  Inc., what's the relationship between those two companies,
15  if you know?
16  A. Premier, we were going to use that as
17  another option for CAC. You know, Kaine and I have been
18  friends for a long time.
19  Q. Okay. So Premier Student Loans is a -- was
20  another company, it's a separate company from Consumer
21  Advocacy?
22  A. Correct.
23  Q. No relationship in terms of any joint
24  ownership?
25  A. Correct.

Page 62

1  Q. Okay, and they separately provided Pre --
2  they had their own business or, I mean, to your knowledge
3  was Premier Student Loans operating?
4  A. No, it was not.
5  Q. It was never operating?
6  A. No.
7  Q. Okay. What's your understanding of Premier
8  Student Loans' operations?
9  A. We created the corporation to possibly use
10  it in the future, but we never got around to it.
11  Q. Okay.
12  A. So we just focused on Consumer Advocacy
13  Center.
14  Q. Okay. So you say "we", who is "we"?
15  A. Well, me, and then my friend Kaine. I mean,
16  we've been good friends. So we would work together.
17  Q. So you both created Premier Student Loans,
18  Inc. Do you know when you created that entity,
19  approximately?
20  A. I don't recall.
21  Q. Who owns Premier Student Loans, Inc.?
22  A. He does, Kaine does.
23  Q. He's the hundred percent owner?
24  A. Uh-huh.
25  Q. Okay, and I may have asked you this before,

Page 63

1  but I don't remember. When was the last time you recall
2  making a rent payment in California?
3  A. I don't recall.
4  Q. Was it more than a year ago?
5  A. I don't recall.
6  Q. Is there a way for you to find out?
7  A. Possibly, yes.
8  Q. Do you get bank statements for the debtor?
9  Did you receive bank statements for the account that the
10  debtor --
11  A. Yes, yes.
12  Q. -- had before?
13  A. Yes, yes.
14  Q. Okay.
15  A. So I can check there, yes.
16  Q. I mean, presumably the rent was paid from
17  that bank account, correct?
18  A. Correct.
19  Q. Did you ever have to write a check yourself?
20  A. No, I did not.
21  Q. Did you ever have to make a personal payment
22  to them?
23  A. No, I didn't.
24  Q. Okay. So the bank records should ---
25  A. Right.

Page 64

1  Q. You would expect it to show that, correct?
2  A. Correct.
3  Q. Did the debtor -- did Consumer Advocacy ever
4  own any vehicles? And I'm not referring to the payments
5  they made for your car.
6  A. No.
7  Q. Did it own any other vehicles?
8  A. No.
9  Q. Did you ever own any real estate?
10  A. No.
11  Q. And among the employees prior to the
12  termination of the operations, were there any family
13  members that were employed by the company?
14  A. No.
15  MS. SCARLETT: Okay. I am going to adjourn,
16  but not conclude the meeting for Consumer Advocacy,
17  because I need to see what you amend, because I may need
18  Mr. Kim to come back.
19  MR. BEHAR: Can we use him by telephone --
20  MS. SCARLETT: No.
21  MR. BEHAR: -- if we have to?
22  MS. SCARLETT: No. No, he has to be here.
23  MR. BEHAR: All right. We'll amend ---
24  BY MS. SCARLETT:
25  Q. Mr. Kim, do you live here?

16 (Pages 61 to 64)

Page 65

1   A.  No, I do not.
2   Q.  You flew in for this --
3   A.  Yes.
4   Q.  -- 341?
5       MS. SCARLETT: I'm going to -- I was going
6   to schedule it for the 12th, unless you think you need
7   more time.
8       MR. BEHAR: March 12th?
9       MS. SCARLETT: A week from now, since you're
10  going to be here already for another case. But if that's
11  too soon ---
12      MR. BEHAR: It may be too soon, but I'm also
13  thinking when am I going to -- I'm leaving on the 15th.
14      MS. SCARLETT: Right.
15      MR. BEHAR: Yeah, that's going to be a
16  little too soon, I think.
17      MS. SCARLETT: To get everything together.
18      MR. BEHAR: Yeah, and I won't be back until
19  the 18th -- the 19th, I'm ---
20      MS. SCARLETT: Right, you said you can't
21  make ---
22      MR. BEHAR: (Inaudible.)
23      MS. SCARLETT: Right, so we're talking about
24  the following week then?
25      MR. BEHAR: Right.

Page 66

1       MS. SCARLETT: Okay. The 26th?
2       MR. BEHAR: That should be enough time.
3       MS. SCARLETT: That's ---
4       MR. BEHAR: That's a Tuesday.
5       MS. SCARLETT: Right, that's how many ---
6       MR. BEHAR: And it's possible you won't need
7   us if we amend and you don't have further questions?
8       MS. SCARLETT: It's possible, anything is
9   possible.
10      Because you said you're gone until when?
11      MR. BEHAR: I'm gone until the 19th, and I'm
12  flying on the 19th, so I really won't be back ---
13      MS. SCARLETT: Okay. So you're here on the
14  20th then. So we could do it on the 20th?
15      MR. BEHAR: I'm getting back the 19th.
16      MS. SCARLETT: I know.
17      MR. BEHAR: That's my birthday, come on, the
18  next week, the 26th.
19      MS. SCARLETT: No, I mean, I don't want this
20  case to just languish. It's been filed since January.
21  It's, like, three months.
22      MR. BEHAR: This is the first time we've sat
23  together ---
24      MS. SCARLETT: Understood, but all of this
25  information should have already been in the schedules.

Page 67

1       MR. BEHAR: It's not the first time that the
2   schedules get amended after a creditor meeting. Give us
3   until the 26th to amend.
4       MS. SCARLETT: No, I'll give you to the 20th
5   to amend, but you've got to be here on the 26th to answer
6   questions.
7       MR. BEHAR: I'm just looking at my calendar.
8   I'm gone from the 15th though and including the 19th.
9       MS. SCARLETT: Okay. So can you have them
10  amended by the 22nd.
11      MR. BEHAR: Give us to the 27th -- the 22nd,
12  March 22nd.
13      MS. SCARLETT: Okay, and we will schedule --
14  let me just see the time to make sure I don't -- we have
15  the room.
16      MR. BEHAR: And you don't have an issue of
17  continuing the 19th hearing, because I'll be sunning
18  myself in Bimini at that time, right?
19      MS. SCARLETT: I guess I don't have a
20  choice.
21      MR. BEHAR: No, you can ---
22      MS. SCARLETT: It's really the judge.
23      MR. BEHAR: Well, I ---
24      MS. SCARLETT: I mean, no, if you're not
25  going to be here, no, I don't have a problem with you

Page 68

1   going ---
2       MR. BEHAR: I'm just ---
3       MS. SCARLETT: I don't want to know what
4   you're doing in Bimini, but I don't have a problem with
5   you going there.
6       MR. BEHAR: I'm going to be sitting on the
7   beach smoking.
8       MS. SCARLETT: What happens in Bimini stays
9   in Bimini.
10      MR. BEHAR: Legal and illegal stuff. No,
11  just kidding. Many cigars.
12      MS. SCARLETT: Let me just make sure the
13  room is available. I think he has a calendar on the 27th,
14  so maybe they can move it to the 27th, the hearing.
15      MR. BEHAR: That's fine, the 27th I'm fine.
16  I'll call Christina and see if we can get it moved to the
17  27th. Can I tell her you have no objection?
18      MS. SCARLETT: Yeah, I have no objection to
19  that because I'll be there on the 27th, so that's a good
20  day for me.
21      MR. BEHAR: Good.
22      MS. SCARLETT: I mean, I can file the -- I
23  mean, I guess it's my motion, right? That's the only
24  thing that's on that date? So I'll take care of it, and
25  I'll have her move it to the 27th.

Page 69

1  MR. BEHAR: Okay.
2  MS. SCARLETT: I'll see if she can just
3  notice it, re-notice it.
4  MR. BEHAR: Thank you.
5  MS. SCARLETT: If not, then she'll probably
6  have me file something.
7  MR. BEHAR: Uh-huh.
8  Oh, the other thing on that day is my
9  retention. I have no objection, if you can just ---
10  MS. SCARLETT: Yeah, no, I'll just have her
11  -- I'll ask her if she can just --
12  MR. BEHAR: Right.
13  MS. SCARLETT: -- re-notice everything, but
14  I don't know -- if not, I'll let you know if you have to
15  file something.
16  MR. BEHAR: Okay.
17  MS. SCARLETT: Okay. It looks like the room
18  is available, so let's say the 26th at 10:30.
19  MR. BEHAR: This is March 26th for the
20  continued 341?
21  MS. SCARLETT: Wait a minute, hold on. It
22  looks like I have a hearing at 10:30. Let me just see,
23  make sure. Hearing at 10:30.
24  11:00.
25  MR. BEHAR: 11:00, I just screwed up then.

Page 70

1  MS. SCARLETT: 11 o'clock on March 26th.
2  So, I'm going to adjourn.
3  MR. BEHAR: That's fine with me. You're
4  okay if we have to come back on March 26th?
5  MR. KIM: I don't have my calendar but,
6  yeah, I'll make it, yeah.
7  MR. BEHAR: What time?
8  MS. SCARLETT: Okay. At 11:00 a.m.
9  MR. BEHAR: Okay.
10  MS. SCARLETT: Okay. So, I'm going to
11  adjourn the meeting until then, ask you to make the
12  amendments, and --
13  MR. BEHAR: Yep.
14  MS. SCARLETT: -- provide the lease, I need
15  a copy of the lease, both leases, and we will adjourn
16  until March 26th, 2019 at 11:00 a.m.
17  And for the record, there are no creditors
18  present.
19  
20  (Thereupon, the 341 Meeting of Creditors was
21  adjourned.)
22  
23  
24  
25  

Page 71

1
2  CERTIFICATION
3
4  STATE OF FLORIDA    :
5  COUNTY OF MIAMI-DADE :
6
7  I, Cheryl L. Jenkins, RPR, RMR, Shorthand
8  Reporter and Notary Public in and for the State of Florida
9  at Large, do hereby certify that the foregoing Section 341
10  Meeting of Creditors was transcribed by me from a digital
11  recording made on the date and at the place as stated in
12  the caption hereto on page 1; that the foregoing
13  computer-aided transcription is a true record to the best
14  of my ability of said proceedings.
15  WITNESS my hand this 30th day of April,
16  2019.
17
18  _____
19
20  CHERYL L. JENKINS, RPR, RMR
21  Court Reporter and Notary Public
   in and for the State of Florida at Large
22  Commission #GG 138863
   December 27, 2021
23
24
25

# Exhibit

## Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:           CASE NO. 19-10655-JKO

CONSUMER ADVOCACY CENTER, INC.,

Debtor.
_____/

341 MEETING OF CREDITORS
March 27, 2019

The above-entitled cause came on for a Section 341 Meeting of Creditors before ZANA M. SCARLETT, Trial Attorney, Office of the U.S. Trustee, Department of Justice, in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd., Fort Lauderdale, Broward County, Florida on March 27, 2019, commencing at or about 12:39 p.m., and the following proceedings were had.

Transcribed from a digital recording by:
Cheryl L. Jenkins, RPR, RMR

## Page 2

APPEARANCES:

ZANA M. SCARLETT, Trial Attorney
Office of the U.S. Trustee
Department of Justice

BEHAR GUTT & GLAZER, by
BRIAN BEHAR, Esquire
On behalf of the Debtor

ALSO PRESENT
GREENSPOON MARDER, by
CHRIS MEYER, Esquire

-------

WITNESS                              Page
ALBERT KIM
  Examination by Ms. Scarlett          3

## Page 3

(Thereupon, there was static throughout the recording.)

MS. SCARLETT: Good afternoon. It is Wednesday, March 27th, at 12:39 p.m., and this is the continued meeting for Consumer Advocacy Center, Inc., Case Number 19-10655-JKO.

The meeting is being recorded. Anyone wishing to get a copy of the recording should contact the U.S. Trustee.

Can you raise your right hand, sir?

Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth?

MR. KIM: I do.

Thereupon,

ALBERT KIM,

having been first duly sworn, was examined and testified as follows:

MS. SCARLETT: And at this time I'm going to hand you back your driver's license that you provided to me to prove that you are who you say you are.

EXAMINATION
BY MS. SCARLETT:

Q. And for the record can you state your name, sir?

A. Albert Kim.

## Page 4

Q. And, Mr. Kim, who owns the debtor, Consumer Advocacy, Inc.?

A. I do.

Q. And what is your percentage ownership interest?

A. 100 percent.

Q. And have you always been a hundred percent shareholder?

A. Yes, I have.

Q. When was Consumer Advocacy, Inc. formed, if you recall, approximately?

A. I don't recall.

Q. Was it more than five years ago?

A. No, I don't think so. I think it was November of two thousand -- actually October of 2014.

Q. And you had testified the last time when we were here, it was your testimony that the debtor still had a lease for the property in California, is that correct?

A. Correct.

Q. Okay, and what's the address of that property?

A. 173 Technology, but we do not have the lease. We reassigned the sublease to another company.

Q. Okay. When did you do that?

A. October of 2018.

1 (Pages 1 to 4)

### Page 5

1  Q. October of 2018.
2      Is there -- and I think at the last meeting
3  I asked for copy of the lease.
4      MR. BEHAR: I think you did, too, and I'm
5  waiting to get it.
6      THE WITNESS: Right.
7      MS. SCARLETT: And can you announce your
8  name for the record?
9      MR. BEHAR: Oh, I'm sorry. Brian Behar for
10 the debtor.
11 BY MS. SCARLETT:
12     Q. Do you know where the lease is? Where could
13 I get a copy of the lease?
14     A. I don't know.
15     Q. Who would know?
16     A. The leasing broker.
17     Q. The leasing broker. Who was the leasing
18 broker?
19     A. Tucker Hughes.
20     Q. Tucker Hughes, that's the name of a firm, or
21 the name of a person?
22     A. The name of a person.
23     Q. Okay. Okay, and if I need to get contact
24 information for Mr. Hughes, would you be able to provide
25 that?

### Page 6

1      A. Yes, I would.
2      Q. Okay. Can you provide that to your
3  attorney?
4      A. Yes.
5      Q. Now, you said you reassigned the lease, so
6  there was, like, another agreement that was signed?
7      A. Correct.
8      Q. An assignment that was signed?
9      A. Correct.
10     Q. And who signed that? Who were the parties
11 to that?
12     A. True Count --
13     Q. True Count --
14     A. -- Staffing.
15     Q. -- Staffing. That's the new subtenant, is
16 that correct?
17     A. Correct.
18     Q. Who signed for that company?
19     A. Christian Stark.
20     Q. Can you spell the name for me?
21     A. Christian, C-h-r-i-s-t-i-a-n.
22     Q. Last name?
23     A. S-t-a-r-k.
24     Q. Okay, and do you know what his position is
25 with True Count Staffing?

### Page 7

1      A. I do not.
2      Q. Do you have a copy of that document that was
3  signed by Mr. Stark?
4      A. I do not.
5      Q. Who signed on behalf of Consumer Advocacy?
6      A. I did.
7      Q. Okay. You don't have a copy of the lease?
8      A. I do not.
9      Q. Who would have a copy of the lease?
10     A. Tucker, Tucker Hughes.
11     Q. So Tucker Hughes also handled the
12 subleasing?
13     A. Correct.
14     Q. And you said it happened around
15 October 2018?
16     A. Correct.
17     Q. And what did Consumer Advocacy receive for
18 transferring their interest in that lease?
19     A. Release of liability of a lease.
20     Q. A release of liability?
21     A. Actually I don't know.
22     Q. You don't know?
23     A. Yeah, I think that -- I'm assuming that,
24 yeah.
25     Q. You're assuming that?

### Page 8

1      A. Well yes. Yeah, I don't know for sure, but
2  that's what I think.
3      Q. That's what you think?
4      A. Uh-huh.
5      Q. Okay. I think you testified that when the
6  company terminated operations -- or just so that I have
7  some frame of reference, it's your testimony that this
8  transfer of the lease was signed in October of 2018,
9  correct?
10     A. Around there, correct.
11     Q. Was this before or after the debtor
12 terminated operations?
13     A. After.
14     Q. After?
15     A. Uh-huh.
16     Q. And at that time how many employees did
17 Consumer Advocacy have?
18     A. I don't know.
19     Q. At that time did Consumer Advocacy have any
20 employees?
21     A. Of the reassigning of the lease?
22     Q. At the time that you signed that
23 reassignment?
24     A. We had no employee.
25     Q. No employees?

2 (Pages 5 to 8)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 03.27.19

Pl. Ex. 47-2
p. 845

Page 9

1  A. Yeah.
2  Q. Okay. So in terms of determining, making
3  the determination that you were going to reassign the
4  lease, who was responsible for that decision?
5  A. Me.
6  Q. Okay.
7  A. I was, Tuong.
8  Q. Tuong?
9  A. And Kaine Wen.
10 Q. Okay. So, Tuong is -- can you tell me who
11 Tuong is, and spell his name, please?
12 A. T-o -- no, T-u-o-n-g.
13 Q. Okay, and that's his first ---
14 A. N-g-y-e-n.
15 Q. Okay. So Tuong Ngyen?
16 A. Correct.
17 Q. Okay.
18 A. And he was in charge of paying all the
19 bills.
20 Q. And when you say he was in charge of paying
21 all the bills, was he an employee of Consumer Advocacy?
22 A. He was not an employee but he was
23 contracted.
24 Q. Okay, he was contracted?
25 A. Right.

Page 10

1  Q. So he was paid?
2  A. Correct.
3  Q. How much was he paid?
4  A. He, himself, was not paid. His accounting
5  company was paid.
6  Q. Okay. So is he a CPA?
7  A. No, he is not.
8  Q. Okay, but he owns an accounting company?
9  A. The name of his company is TN Accounting.
10 Q. TN Accounting.
11    Okay. So Consumer Advocacy had a contract
12 with TN Accounting?
13 A. Correct.
14 Q. Do you know how much TN Accounting was paid?
15 A. I do not.
16 Q. Was TN Accounting providing services to
17 Consumer Advocacy before it stopped operating?
18 A. Yes, yes, yes.
19 Q. TN Accounting was providing services to
20 Consumer Advocacy for more than a year before they filed?
21 A. Yes.
22 Q. Okay, and then you said the decision was
23 made between you, Tuong and Kaine Wen, correct?
24 A. Correct.
25 Q. And Kaine Wen was involved in that decision

Page 11

1  why?
2  A. Because he was a part of the company.
3  Q. He was a part of Consumer Advocacy?
4  A. Correct.
5  Q. But your testimony is that there were no
6  employees, correct?
7  A. Correct, he's not an employee.
8  Q. He's not an employee, but you said he was
9  part of the company?
10 A. Yeah, but he was not getting paid.
11 Q. He was not getting paid?
12 A. Yeah.
13 Q. But in terms of determining this lease
14 arrangement, he was part of the leadership team that made
15 that determination, or he ---
16 A. Correct.
17 Q. Okay. So of either you, Kaine or
18 Tuong Ngyen, do any of you have a relationship with True
19 Count Staffing?
20 A. Yes.
21 Q. Okay. What's the relationship, and who has
22 the relationship?
23 A. Kaine is the owner of True Count Staffing.
24 Q. And can you tell me what True Count Staffing
25 does, if you know?

Page 12

1  A. Customer service and processing, that's it's
2  business.
3  Q. Customer service and processing?
4  A. Uh-huh.
5  Q. Processing what?
6  A. Documentation for student loan programs.
7  Q. So is it similar to what Consumer Advocacy
8  was doing?
9  A. Yes.
10 Q. Okay. You were hesitating. Is there a
11 difference between what True Count Staffing does and what
12 Consumer Advocacy does, if you know?
13 A. Yes.
14 Q. Okay, and what is the difference?
15 A. Consumer Advocacy Center, it was the
16 front-end enrollment center. Our job and responsibility
17 was to educate people that called in about the programs
18 available to them, and to see if it was possible to
19 provide some type of benefit or help for the client.
20 Q. Okay, and then you would pass that on to
21 another company?
22 A. Correct.
23 Q. And that company was True Count Staffing?
24 A. Correct.
25 Q. So Consumer Advocacy had to have been

3 (Pages 9 to 12)

Page 13

1 working with True Count Staffing prior to the time that
2 you transferred this lease?
3    A. Correct.
4    Q. How long had they been working together?
5    A. I don't know for sure.
6    Q. More than a year before the filing?
7    A. Less.
8    Q. Less than a year?
9    A. Yes.
10    Q. And so your testimony was that you believe,
11 you're assuming that there was a release of liability, but
12 other than the release of liability which you're not sure
13 if Consumer Advocacy received that. Did Consumer Advocacy
14 receive any monetary payment for transferring the lease
15 interest?
16    A. No.
17    Q. How much was -- how much time was left on
18 that lease at the time that you entered into that
19 reassignment?
20    A. February 2020 was --
21    Q. Okay. So it went ---
22    A. -- the end of the lease.
23    Q. Okay, and for that period the rent was
24 supposed to stay the same? Was it the same rent through
25 that term, or was the rent escalading under the terms of

Page 14

1 the lease?
2    A. It was not escalading.
3    Q. So it would have been the same rent through
4 February 2020?
5    A. I would have to find out, that or less.
6    Q. Okay.
7    A. Yeah.
8    Q. Or less? You think -- was there something
9 in there that you thought might have reduced the rent?
10    A. Rent abatement.
11    Q. Okay, and what is that, can you explain that
12 to me? What do you understand that ---
13    A. It's free rent.
14    Q. Free rent?
15    A. Uh-huh.
16    Q. Okay, and what would that -- what is that?
17 How do you get free rent under a lease?
18    A. You negotiate that prior to signing the
19 lease.
20    Q. Okay, and so when you negotiated -- what
21 you're negotiating is that there is some period of the
22 lease that there is no rent paid?
23    A. Correct, like certain months.
24    Q. Okay.
25    A. For instance, if it was a 36-month lease,

Page 15

1 month five would be free.
2    Q. Okay.
3    A. And then tier two would probably be month
4 13, month 15.
5    Q. Okay. So various months ---
6    A. Correct.
7    Q. And so the lease would spell it out.
8    A. Correct.
9    Q. And when did the reassignment -- True Count
10 Staffing basically stands in the shoes of Consumer
11 Advocacy, so they would have rent abatement, too, if
12 that's what was provided for --
13    A. Correct.
14    Q. -- in the lease?
15    A. Correct.
16    Q. So to your knowledge is True Count Staffing
17 paying the lease?
18    A. To my knowledge, yes.
19    Q. And who is the landlord for that property?
20    A. Irvine Company.
21    Q. And to your knowledge True Count Staffing
22 has employees?
23    A. Yes.
24    Q. And do you know if there are currently True
25 Count Staffing employees in the space in California?

Page 16

1    A. I'm sorry, can you rephrase the question?
2    Q. Do you know if there are any -- does True
3 Count Staffing currently occupying the Irvine location,
4 the 173 Technology?
5    A. No, they do not.
6    Q. They don't.
7 Is anybody currently occupying the space?
8    A. Not that I'm aware of.
9    Q. And it's your testimony that Kaine Wen never
10 got paid with respect to work or -- okay, and you
11 testified that Kaine Wen was doing work for Consumer
12 Advocacy, correct, at some point?
13    A. Correct.
14    Q. How long was he doing work for Consumer
15 Advocacy?
16    A. Before the termination of CAC.
17    Q. Yes.
18    A. Not much.
19    Q. Okay. So he wasn't involved with Consumer
20 Advocacy?
21    A. No. Yeah, no, he was, but I mean you asked
22 me how -- can you rephrase the question?
23    Q. Okay. All right. You testified that with
24 regard to the decision to transfer the lease, or to
25 reassign the lease, you said Kaine Wen was involved,

4 (Pages 13 to 16)

Page 17

1 because he was part of Consumer Advocacy, correct?
2   A.  Correct, he helped me, correct.
3   Q.  He helped you. Okay. Other than that time
4 when he helped you with the reassignment, did he do any
5 other work, or help you in any other respect with regard
6 to Consumer Advocacy, either before or after it
7 terminated?
8   A.  Yes.
9   Q.  Okay. So, can you tell me about that?
10   A.  He helped with the macro decisions of the
11 company. He also helped with negotiating the lease.
12   Q.  So the original lease?
13   A.  Right.
14   Q.  Do you recall when that lease was signed,
15 approximately?
16   A.  I don't know.
17   Q.  Do you think it was two years ago?
18   A.  I'm thinking it was November of 2016.
19   Q.  Okay. Your estimate, okay.
20   A.  Yeah.
21   Q.  And so you're saying Kaine Wen was involved
22 with that negotiation?
23   A.  Yes.
24   Q.  And with regard to all of this help that
25 Kaine provided to you --

Page 18

1   A.  Uh-huh.
2   Q.  -- did he ever receive any monetary
3 compensation?
4   A.  Yes, he did.
5   Q.  Okay. Can you tell me about that?
6       MR. BEHAR:  From the debtor, you're asking?
7 BY MS. SCARLETT:
8   Q.  From Consumer Advocacy, I apologize.
9   A.  Yes, he was paid.
10   Q.  Okay. When was he paid? Did he receive a
11 salary?
12   A.  Yes, he did.
13   Q.  Okay. What period did he receive a salary?
14   A.  2017.
15   Q.  Okay. So, in ---
16   A.  2018.
17   Q.  2018. Okay.
18   A.  Yeah.
19   Q.  And when did he stop receiving a salary?
20   A.  After the termination of CAC.
21   Q.  After the termination, okay. So he received
22 a salary from the debtor.
23       In 2017 and 2018, do you recall how much he
24 was paid?
25   A.  I do not.

Page 19

1   Q.  And did he have a title? Did he have a
2 role, an official role at the company?
3   A.  No, he did not have an official role.
4   Q.  And did he ever have an ownership interest
5 in the company?
6   A.  No, he did not.
7   Q.  And you don't recall how much he was paid?
8   A.  I do not.
9   Q.  How would I find that out, if I wanted to
10 know how much he was paid in 2017 or 2018?
11   A.  Our payroll books.
12   Q.  Okay. Where are your payroll books?
13   A.  Some are on ADP.
14   Q.  Okay, and then some are on QuickBooks.
15   A.  Okay, yeah.
16   Q.  So it's electronically available?
17   A.  Correct.
18   Q.  So you're able to provide that to me?
19   A.  Yes.
20   Q.  Can you provide it to your attorney?
21   A.  Yes.
22       THE WITNESS:  Can I borrow a ---
23       MR. BEHAR:  Sure.
24       THE WITNESS:  (Inaudible) more prepared.
25       MR. BEHAR:  This pen may run out of ink.

Page 20

1       THE WITNESS:  That's fine.
2       MS. SCARLETT:  Right. So let me just
3 recount. I had asked for the lease the last time, but I
4 also want the reassignment, whatever paperwork there is
5 that memorializes the reassignment of the lease.
6       THE WITNESS:  Okay, reassigned lease. Okay.
7 BY MS. SCARLETT:
8   Q.  Okay, and so the other, the last thing I
9 just asked you for was for records, Kaine records.
10   A.  For Kaine Wen.
11   Q.  For Kaine Wen.
12   A.  Uh-huh, and the reassignment of lease, CAC
13 to True Count, and then what was the other one.
14   Q.  The original lease, which I had asked for
15 before.
16       And now you reported in the schedules that
17 Consumer Advocacy made, in gross revenue, 18 million --
18 more than $18 million in 2018, is that correct?
19   A.  Correct.
20   Q.  And did Consumer Advocacy, to your
21 recollection, have a profit in 2018?
22   A.  A very small one.
23   Q.  Approximately how much?
24   A.  I don't, I don't know.
25   Q.  Okay. If I wanted to find out, if I want to

5 (Pages 17 to 20)

Page 21

1  see the books and records that support that 2018 number,
2  so it would have the 18 million, and then the revenues,
3  and like the QuickBooks information, is that something you
4  can provide?
5      A.   Yes.
6      Q.   Okay.
7           MR. BEHAR: We provided the tax return,
8  didn't we?
9           MS. SCARLETT: Yeah, but the tax return
10 doesn't give me everything. I need an itemized -- I mean,
11 I need to see -- for example, I believe I saw in the tax
12 return that there were $46,000 roughly of other expenses,
13 and I don't know what those are. The tax return doesn't
14 tell me, for example. I'm just giving you an example of
15 information that a tax return does not tell me.
16          THE WITNESS: I'm sorry, could you
17 repeat ---
18          MS. SCARLETT: Yes. I believe it was 2017
19 or 2018 that I looked at the tax return and it showed a
20 profit, and then it showed other expenses --
21          THE WITNESS: Okay.
22          MS. SCARLETT: -- and you don't know what
23 those are. So that's why I need the backup for that.
24          THE WITNESS: Okay.
25          MR. BEHAR: All right. So, specifically

Page 22

1  what are you asking for?
2           MS. SCARLETT: I'm just saying, that's why
3  I'm saying I need to see the actual books of the company,
4  because the tax return, for example, didn't tell me what
5  those expenses were.
6           MR. BEHAR: Books of the company. Is this
7  something digital?
8           MS. SCARLETT: He says it's on QuickBooks.
9           THE WITNESS: Yeah.
10          MS. SCARLETT: So ---
11          MR. BEHAR: For what period of time?
12          MS. SCARLETT: For example in 2018.
13          MR. BEHAR: 2018?
14          MS. SCARLETT: Let's start with that, how
15 about I do that? If you go back to the tax return, I
16 believe there is a line item that talks about -- maybe it
17 was the income statement or balance sheet that's attached,
18 and it says there was a profit, and then it said there
19 were other expenses.
20          THE WITNESS: Other expenses.
21          MR. BEHAR: I actually think -- to be clear,
22 I think you're referring to the 2017. You haven't
23 filed --
24          MS. SCARLETT: Well, maybe it's the 2017.
25          MR. BEHAR: -- 2018.

Page 23

1           MS. SCARLETT: Sorry.
2           THE WITNESS: Yes.
3           MS. SCARLETT: Sorry, you're right, you're
4  absolutely right, the 2017.
5           MR. BEHAR: So you want the --
6           MS. SCARLETT: The latest tax return.
7           MR. BEHAR: -- 2017 records?
8           MS. SCARLETT: Yep.
9           THE WITNESS: The other expenses.
10          MS. SCARLETT: Yep.
11          THE WITNESS: There is 47, estimated 47.
12          MS. SCARLETT: Yes, 46,000 -- whatever it
13 was, there was a category called "other expenses", and I
14 can't tell from the tax return what those are.
15          THE WITNESS: Okay.
16          MS. SCARLETT: So let's just start with
17 that, if I can get the backup for that 46,000 number.
18          THE WITNESS: Okay.
19 BY MS. SCARLETT:
20     Q.   Have you filed a 2018 tax return for --
21     A.   No.
22     Q.   -- Consumer Advocacy?
23          Is somebody preparing it now, working on it?
24     A.   Yeah, I believe we filed an extension for
25 that.

Page 24

1      Q.   Okay. So it will be due in October?
2      A.   Yes.
3      Q.   And who is working on that?
4      A.   Tuong Ngyen.
5      Q.   So TN Accounting?
6      A.   And then Kramer & Associates Accounting.
7      Q.   Okay. So you have two accounting firms
8  working on stuff?
9      A.   Well, they -- Kramer & Associates is the one
10 who files the corporate tax returns.
11     Q.   Okay, but TN Accounting does what?
12     A.   Prepares it for him --
13     Q.   Okay.
14     A.   -- I guess.
15     Q.   Okay, but so they are both -- in some
16 capacity both work on the tax returns?
17     A.   Yes.
18     Q.   Okay. So other than Mr. Behar, do you have
19 any other professionals that you have retained in this
20 case?
21     A.   After ---
22     Q.   Other than Mr. Behar?
23     A.   No.
24     Q.   Okay. So, no accountants?
25     A.   Oh ---

6 (Pages 21 to 24)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 03.27.19

Pl. Ex. 47-2
p. 849