MR. BEHAR: We have to retain the accountant if he's representing Consumer.
THE WITNESS: Okay. Well, we're going to have to do that, but as of right now ---
BY MS. SCARLETT:
Q. Nobody?
A. Yeah.
Q. The MOR that you filed, the monthly operating report that you filed for February shows a $345 fee paid to the McCormick firm. What is that?
A. That was from a previous TCPA.
Q. What's TCPA?
A. Telephone Consumer Protection Act.
Q. Uh-huh.
A. A lawsuit that an individual was filing against the company. He's not a client.
Basically we had to retain an attorney in his state, and that's what that's for. Brian -- Mr. Behar told me that that's not allowed. So we're in the process of getting a refund for those two payments.
Q. Okay.
A. And there was one in January and one in February.
Q. Is he representing the company now, still, Mr. McCormick?

A. That was for previous work I think he did. I'll get the details for you.
Q. Okay. So who authorized those payments?
A. Tuong, Tuong Ngyen.
Q. Okay, and you had testified before that Tuong was involved in opening the bank account, the debtor-in-possession bank account, is that correct?
A. Well, he helped me, but I had to open it.
Q. You opened it?
A. Yeah.
Q. And does Tuong have signatory authority on the bank account?
A. Not that one.
Q. Does Kaine Wen have signatory authority on Consumer Advocacy's bank account?
A. The Consumer Advocacy bank -- the BankUnited debtor-in-possession bank account?
Q. Yes.
A. No, he does not.
Q. Who has signatory authority on the bank account?
A. It's only me.
Q. And the account before, the one you closed --
A. Uh-huh.

Q. -- right, who had signatory authority on that one?
A. Tuong, Tuong did.
Q. Tuong did. Who else?
A. I think it was just Tuong, me -- I don't know. I would have to find out.
Q. Do you know if Kaine Wen had signatory authority for Consumer Advocacy?
A. I don't know, I don't think so.
Q. Do you think at any point, did he ever have signatory authority?
A. I don't know, I would have to find out.
Q. And now the other information that I know I had asked about, you amended the statement of financial affairs, and if you could ---
MS. SCARLETT: Do you have the amendment, Brian?
MR. BEHAR: Yeah. I hope I brought it. I do not.
BY MS. SCARLETT:
Q. All right. Mr. Kim, do you recall that you amended the schedules in this bankruptcy case?
A. Yes, I did.
Q. Did you assist your attorney in preparing the amended schedules?

A. Yes, I did.
Q. Did you review the amended schedules before they were filed?
A. I did. I wish I had a copy of it.
Q. Here, that's mine.
MR. BEHAR: I wish I brought it.
BY MS. SCARLETT:
Q. That's mine, but I want to ask about it.
Do you recall signing the amended schedules?
A. I do.
Q. And the amended schedules are true and correct to the best of your knowledge?
A. Yes.
Q. Do you remember what you amended and why?
A. Not all of it. Yeah, no, the ---
Q. Okay. Just tell me what you remember.
A. The computers, the computer equipment.
Q. Okay. So, you amended it to add the computer equipment?
A. I did, yes.
Q. Because there were no -- there was no computer equipment on the original schedules, correct?
A. Correct.
Q. Okay, and you put a value on there for the computer equipment?

A. I did.
Q. And what was the value based on?
A. Scrap metal.
Q. Okay, and that's based on scrap metal because? I mean, why did you determine that that was the appropriate value?
A. Because the computers are very old.
Q. How old are they?
A. Three years or so.
Q. Okay, and other than computers, what else did you own, or what other property in the offices of Consumer Advocacy did you own other than computers?
A. Nothing.
Q. The office furniture was not yours?
A. No.
Q. That came with the rent?
A. Correct.
MR. BEHAR: And to be clear, it's computers and monitors.
MS. SCARLETT: Okay.
BY MS. SCARLETT:
Q. So other than computers and monitors, anything else of any value owned by the debtor? Artwork?
A. No. Most of the equipment was there prior to the lease.

Q. Okay, and do recall amending anything else on the schedules?
A. Not off the top of my head.
Q. Do you recall that you amended to add the transfer of the lease interest? Do you recall that that was one of the amendments, to add that the lease was transferred to True Staffing?
A. Oh, yes, yes, yes.
Q. Do you recall?
A. Yes.
Q. Okay, and do you recall that you added any -- did you add any information regarding any cash or any benefits that you received from the company, do you recall adding anything like that?
A. I don't recall.
Q. Okay. Do you recall representing a hundred percent, or putting a hundred percent on that form for anything of value received by insiders within a year before the bankruptcy?
A. Oh, the car payments.
Q. Well, I don't think you added the car payments.
A. Yeah, because it was in 2017.
Q. Okay.
A. Yeah.

Q. Okay. So ---
A. It was just ---
Q. So let's talk about what you received from the debtor. In 2018, did you receive anything from the debtor?
A. Did I receive anything ---
Q. Anything of value, car payment, salary, anything?
A. Yes, I received a salary.
Q. Okay, but that's not on the amended SOFA.
A. Okay.
Q. Other than, other than the salary, did you receive anything, any value in the year before filing the bankruptcy?
A. No.
Q. No car payment, no phone payment?
A. No.
Q. No housing payment?
A. No.
Q. No housing allowance.
Did you withdraw any funds from the bank account of Consumer Advocacy in the year before the filing?
A. Withdraw cash?
Q. Yes.

A. No.
Q. No distributions, no shareholder distributions?
A. I can't recall. Possibly.
Q. Okay. You've got to look at that.
A. I don't think so.
Q. But you've got to look at it, and you've got to verify, so that if it needs to be amended, it needs to be amended.
A. Okay.
Q. Other than you in 2018, were there any other officers in the corporation, in Consumer Advocacy, Inc.?
A. Officers, no.
Q. In 2018, while it was still operating, before everybody -- before the operations terminated.
A. You mean that received a salary --
Q. Yes.
A. -- from the company?
Yeah, there were people that received salary from the company.
Q. Okay, but you don't have any of those people listed.
MR. BEHAR: Well, hold on, hold on. I think you're confusing him.
She's asking if officers of the company

received a salary, not just ---
THE WITNESS: I'm the only officer of the company.
BY MS. SCARLETT:
Q. Okay. You were the only officer in 2018?
A. Correct.
Q. Okay. Did Kaine Wen receive a salary in 2018? I think you testified that he did.
A. Yes, he did.
Q. Okay. That's not on there. You said he was involved in macro decisions, correct?
A. I did.
Q. Now I can't tell you if he's an officer or not. You testified that he didn't have a title.
A. He did not have a title.
Q. But you've got to talk to your attorney.
MR. BEHAR: Huh?
MS. SCARLETT: About whether or not that's somebody whose benefits need to be disclosed.
MR. BEHAR: I'm not so sure it is, but we'll look at it.
BY MS. SCARLETT:
Q. Do you have ---
MR. BEHAR: We haven't disclosed any ---
BY MS. SCARLETT:

Q. Yeah, do you have -- does Consumer Advocacy maintain copies of its bank statements? Like, would I be able to get for the year prior to the bankruptcy filing copies of the bank statements?
A. Yes.
Q. Okay. Where would that be?
A. We'd probably have to call the bank to request those.
MS. SCARLETT: Okay. I need you to request those.
MR. BEHAR: For one year before bankruptcy?
MS. SCARLETT: Yep.
THE WITNESS: So request bank statements for 2018.
MS. SCARLETT: I'm going to print out the amendment because I need to -- I thought I had it, but I don't, because I do need to ask him one last question in light of the ---
MR. BEHAR: Can you just read it to us?
MS. SCARLETT: No, because I need -- he needs to see it because he needs to testify because it was ---
MR. BEHAR: And I can't believe I didn't bring it.
MS. SCARLETT: I don't have it.

Yeah, we need to go off the record for a minute and let me print out that schedule.
MR. BEHAR: And while we're off ---
(Thereupon, a recess was had, after which the following proceedings were had.)
MS. SCARLETT: We're back on the record. I'm continuing in the 341 for Consumer Advocacy Center, Inc., Case Number 19-10655-JKO.
Sir, could you raise your right hand again?
Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.
MS. SCARLETT: Okay. I went off the record so I could provide copies of the amended schedules that were filed in this case, and I handed a copy to Mr. Kim.
BY MS. SCARLETT:
Q. Mr. Kim, have you had a chance to look at the document?
A. Yes.
Q. Do you recognize the document?
A. I do.
Q. Did you assist your attorney in preparing this document?
A. I did.
Q. Did you review the document before it was

filed?
A. Briefly, yes.
Q. You provided information to your attorney in order to complete this document, correct?
A. Correct.
Q. Is this document -- are these amended schedules and statement of financial affairs true and correct to the best of your knowledge?
A. Yes, to the best of my knowledge.
MR. BEHAR: Other than the amendment that we're going to make.
MS. SCARLETT: Okay. All right.
MR. BEHAR: To the salary.
MS. SCARLETT: To the salary, okay.
BY MS. SCARLETT:
Q. And we had some discussion before we went off the record, earlier you testified that you did receive a salary in 2018, correct?
A. I did, yes.
Q. Okay, and so what your attorney is saying now is that you're going to amend the schedules to include those amounts, because they're not included in what's on this amended schedule, correct?
A. Correct.
MR. BEHAR: And to be clear, it's the

statement of financial affairs that's being amended, not the schedule.

MS. SCARLETT: Okay.

MR. BEHAR: It's Question 4.

MS. SCARLETT: Right, Question 4 on the statement of financial affairs.

MR. BEHAR: Right, and only because I'm a little pressed for time, I went over it off the record with him, and I can tell you what we changed and you can ask him about it.

On the schedules, Question 50 on the personal property is where the computers were added. We also amended Schedule G to disclose the Fort Lauderdale lease. That's the only changes, as I recall, on the schedules, and on the statement of financial affairs we will amend Number 4, to the extent that we have to, and we amended Question 13.1 to reflect the transfer of the California lease interest.

BY MS. SCARLETT:

Q. Okay. For the record, that was, Mr. Kim, the debtor's attorney, Brian Behar speaking. Mr. Behar -- or actually, Mr. Kim, do you agree with what your attorney just said --

A. Yes.

Q. -- with regard to what was amended?

A. Yes.

Q. Okay.

MR. BEHAR: And can I -- and you can ask him this question, you asked before we took a break that you wanted the original lease in the California space. The interest that the debtor had, I believe, based on what Mr. Kim just told me off the record, was a sub-sublease.

THE WITNESS: Correct.

MR. BEHAR: We never had a copy of the original lease with the Irvine Company, is that correct?

THE WITNESS: Correct.

MR. BEHAR: So we don't have that lease.

BY MS. SCARLETT:

Q. Okay. All right. So, Mr. Kim, what your attorney has explained to me, so I just need to understand. The lease for the Irvine property, it's not a master lease. It's a sublease, is that what your attorney is trying to tell me?

A. Correct, it's a sub-sublease.

Q. Okay. Do you know who the original parties to the lease were?

A. They're probably no longer in business. It was -- yeah, I don't know, I don't know who it is, yeah.

Q. All right. Do you have any relationship with any of the original parties to the lease?

A. No, I do not.

Q. So these were unrelated companies?

A. Correct.

Q. And you said it's a sub-sublease. So, in the sublease, are you aware of who the parties of that is, who the parties of the sublease are?

A. Yes.

Q. Who are those parties?

A. Guaranteed Rate.

Q. Guaranteed Rate?

A. Uh-huh.

Q. That's the name of the company?

A. Correct.

Q. Do you have a relationship with that company?

A. I don't understand. Can you rephrase that?

Q. Guaranteed Rate, do you have any ownership interest in that company?

A. No, I do not.

Q. Did you ever work for that company?

A. No, I haven't.

Q. Do you know who owns that company?

A. No, I don't.

Q. And you said the party to that lease is -- so Guaranteed Rate is the company. Do you know what

Guaranteed Rate does?

A. They are a mortgage company.

Q. Okay.

A. Yeah.

Q. Do you know who owns that company?

A. I don't.

Q. And so how ---

A. I think --

Q. Go ahead.

A. -- it's a publicly traded company.

Q. Oh, okay.

A. Yeah.

Q. And how did, how did Consumer Advocacy come to become a sublease -- sublessee on that sublease, do you know?

A. We looked for office space available on one of those, I can't remember the website, and then we had our broker contact them.

Q. Okay. So the broker would know how that lease came about?

A. Correct.

Q. And you've never seen the master lease?

A. I have not. No, I have not.

Q. Did you sign the sub-sublease, the one that Consumer Advocacy is a party to?

A. Yes, uh-huh.
Q. Can I have a copy of the sub-sublease?
A. Yes.
Q. Where would that be if I wanted to get a copy of it?
A. Irvine Company would have it. Guaranteed Rate would have it. The broker we used to negotiate that lease, we no longer work with. So, I may have a copy of it, too.
Q. Okay. Can you look for it?
A. Yes.
Q. And what's the broker that you used to use?
A. I don't remember.
Q. You don't remember the name, okay.
A. No.
Q. Okay.
A. So you need a copy of the Guaranteed Rate to Consumer Advocacy lease?
Q. That's right, basically the one that the debtor is a party to now, and then I had already asked for the reassignment, or whatever the document is that transfers the lease interest to True Staffing, okay?
And so I'm trying to understand a little bit more about -- the termination of operations, I think your testimony was that it was in September or October of last

year, 2018, correct?
A. Yes.
Q. But at that time you did not determine that Consumer Advocacy was going to file bankruptcy, is that correct?
A. Correct.
Q. You didn't think about bankruptcy then?
A. I don't know.
Q. You don't know?
A. Yeah.
Q. Okay. Did you consult with any counsel to discuss bankruptcy options at that time, around September or October?
A. Possibly, yeah. We did discuss it, but I don't know the timeframe.
Q. Okay. Who did you discuss that with?
A. Our attorneys that were handling the State Attorney General cases.
Q. Okay. So the attorneys from Greenspoon Marder?
A. Correct.
Q. Okay. When did you first meet with Mr. Behar?
A. I don't remember.
Q. Before filing this case do you recall

meeting with Mr. Behar?
A. Before filing this case?
Q. Before this case was filed --
A. Yes.
Q. -- do you recall?
A. Yes.
Q. Do you recall how many times you met with Mr. Behar?
A. No.
Q. Did you meet in person or over the phone?
A. Over the phone.
Q. Prior to the petition being filed, prior to the document that commenced this case being filed --
A. Yes.
Q. -- did you ever meet with Mr. Behar in person?
A. No, I did not.
Q. But you signed the petition, correct?
A. I did.
Q. All right. That was your testimony at the last -- at the original 341, that you signed the petition.
So where did you sign the petition?
A. In California.
Q. In California?
A. Uh-huh.

Q. And how did Mr. Behar get the petition, the signed petition from you to file it?
A. I don't remember.
Q. This case was filed in January of 2019.
A. Uh-huh.
Q. So, it was filed after the company had terminated operations, correct?
A. Yes.
Q. And your testimony is after you terminated operations you didn't have any employees?
A. Correct.
Q. Okay. So, if there was anyone that would have transmitted the petition, the signed petition to Mr. Behar, was there anybody other than you that would have done that?
A. Yes, Tuong.
Q. Tuong?
A. Uh-huh.
Q. Okay. So Tuong was involved?
A. Correct.
Q. And in terms of deciding whether or not to file for bankruptcy --
A. Uh-huh.
Q. -- okay, Consumer Advocacy -- who at Consumer Advocacy came up with the decision? Who made the

decision to file?
A. It was my decision.
Q. It was your decision?
A. Yes.
Q. Did you discuss it with anybody, either Tuong Ngyen or Kaine Wen?
A. Yeah, I talked to them because they're -- you know, they're my friends, and I trust them.
Q. Okay.
A. And I also talked to attorneys, too, that recommended it as well.
Q. Okay. When you say you talked to attorneys, other than Mr. Behar?
A. Yes.
Q. Okay. These are the attorneys at Greenspoon Marder?
A. Correct.
Q. Okay, and do you know how much you paid Mr. Behar, how much Consumer Advocacy paid Mr. Behar to represent them in this case?
A. I think we sent a $20,000 retainer, or $10,000 retainer.
Q. Okay. Okay. So you believe it was 10 or $20,000?
A. Yes.

Q. Okay. Have you made any other payments to Mr. Behar?
A. No.
Q. Okay. All right. So, if you look at the amended schedule that I showed you, and you go to Page 9 of 16, that's Number 11, and it actually starts on Page 8, payments related to bankruptcy.
MR. BEHAR: Page 8?
THE WITNESS: Page 9 or Page 8?
BY MS. SCARLETT:
Q. It's Page 9 of 16, but I'm just telling you the question starts -- the question that you're responding to on Page 9, it starts on the prior page at the bottom. It's Part 6, certain payments or transfers, payment related to bankruptcy, and it asks for a list of transfers within one year of the filing that you consulted with about consolidation, or restructuring, or bankruptcy, okay?
A. Right.
Q. And have you a listing there, okay, so you have Mr. Behar, December 6th, 2018.
A. Yep.
Q. And it shows there that it was $31,000 that was paid.
A. Yes.

Q. Okay. How would I verify this information? How did you complete this schedule? Or how did you provide information to Mr. Behar for this? How were you able to do that?
MR. BEHAR: Object to form. I don't understand what you're asking.
BY MS. SCARLETT:
Q. Okay. It was your testimony that it was 10 or $20,000 that you paid Mr. Behar, correct?
A. Right, I didn't remember, yes.
Q. You didn't remember?
A. Uh-huh.
Q. Because it was paid by wire, correct?
A. I honestly don't remember, yeah.
Q. Okay. You don't remember.
A. Uh-huh.
Q. But who would have authorized the payment? Was there anybody who could have authorized Consumer Advocacy to pay Mr. Behar other than you?
A. Yes.
Q. Who could have?
A. Tuong.
Q. Tuong?
A. Uh-huh.
Q. And there was a payment to Greenspoon Marder

of 20,000 in October 2018.
A. Correct.
Q. Okay. So do you recall making that payment or authorizing that payment?
A. It was a long time ago, I don't recall.
Q. Okay, and December 17th, 2018, $20,000 again to Greenspoon Marder. Do you recall authorizing that payment?
A. It looks familiar, but I don't remember exact dates.
Q. And it would be -- your testimony would be the same, that it would be that Tuong could have been involved in this payment as well?
A. Yes.
Q. And there is another payment to Mr. Behar, $4,250.
A. Uh-huh.
Q. Okay. Do you remember that payment?
A. It looks familiar, but I don't remember the exact ---
Q. Would Tuong know more about this?
A. Yes.
Q. And Tuong had signatory authority --
A. Yes, he did.
Q. -- on the account?

Okay. So Tuong could have authorized it?
A. Yes.
Q. Okay. Now, other than these that we've gone through, do you recall talking to any other attorney about bankruptcy, or restructuring, or anything to do with financial restructuring, do you recall speaking with any other attorneys?
MR. BEHAR: For what period of time?
BY MS. SCARLETT:
Q. For the year prior to the filing.
A. Yes, I do.
Q. Okay. Can you tell me about that?
A. I mean, it wasn't a very long conversation.
Q. Okay.
A. Akerman law firm.
Q. The Akerman law firm, okay.
A. Yeah.
Q. And do you recall approximately when you spoke to them?
A. No, I do not.
Q. But you know it was within a year?
A. Correct.
Q. Okay. So that needs to be amended.
A. Okay.
Q. Does that need to be amended? Did you pay

them? Did they receive payment?
A. Within that year?
Q. Yes.
MR. BEHAR: For bankruptcy or financial ---
THE WITNESS: For bankruptcy? I wouldn't say it was a conversation, like they were on the call and he agreed, you know, and ---
BY MS. SCARLETT:
Q. They were "on the call", what call?
MR. BEHAR: Well, be careful, you can't disclose ---
MS. SCARLETT: No, I'm not asking him for attorney/client privilege.
MR. BEHAR: I didn't say you were. I'm ---
BY MS. SCARLETT:
Q. I just said what call, because now you're saying "they were on the call". What call? You're remembering a call, what call?
A. Like a -- am I supposed to ---
MR. BEHAR: If you can't answer ---
THE WITNESS: Yeah, I don't remember, honestly.
MR. BEHAR: Can I ask him a question that may ---
MS. SCARLETT: No, no, I've got to ask my

questions. Let me see if I can get at this another way.
BY MS. SCARLETT:
Q. I am trying to understand if they should be listed here.
A. Okay.
Q. So should they be listed here? Did they give you any advice relating to bankruptcy? Don't tell me what the advice is, any advice relating to restructuring, bankruptcy, or anything like that?
A. Can you rephrase again?
Q. Okay. I'm going to assume that you didn't ultimately hire them, is that correct?
A. Yes.
Q. But you were talking to them, and you might have -- you were thinking about hiring them, or you were trying to get information from them in order to make a decision as to whether or not to hire them, is that correct?
A. Yeah.
Q. So that's why you were talking about Akerman?
A. Yes.
Q. Okay. I'm not asking for the content of the conversations.
A. Okay.

Q. Why did you -- why were you talking to them about hiring them? What precipitated that call? Why did you think you needed to possibly hire Akerman?
A. To ---
Q. What was going on at the time?
A. To prevent -- you know, we just ---
Q. Prevent?
A. Yeah, to prevent, like, a lawsuit.
Q. A lawsuit. So this had to do with the State Attorney General inquiries?
A. Right, uh-huh.
Q. Okay. So it was not -- it didn't have anything to do with bankruptcy?
A. Yeah. So, wait, I'm sorry, rephrase the question.
Q. Did it have anything to do with bankruptcy or talking about restructuring your debt, or otherwise dealing with financial distress?
A. No, it was to prevent a lawsuit.
Q. Okay. All I'm trying to figure out is if they should be listed here.
A. Okay.
Q. That's really the question.
A. Got it.
Q. So if they shouldn't, no problem.

A. Okay.
Q. And with regard to transferring the lease, did the debtor receive legal advice with regard to that?
A. No.
Q. Okay. There was no lawyer involved in that transaction?
A. No.
Q. And if you go to that amendment, the specific question, it's Page 10 of 16.
A. Okay.
Q. Okay, and so it says there that the date the transfer was made, what it says there is December 31st, '18, effective October 1st, '18. Do you know what that means?
A. I do not.
Q. Do you know why it has 12-31-18 effective two months prior or --
A. I do not.
Q. -- almost three or four months prior, you don't have any -- you don't know why?
A. No.
Q. Do you recall if it was -- the lease was signed -- it said the transfer was made on December 31st. So would you think that means that the lease was signed on that day, that the reassignment of the lease was signed

that day?
A. Possibly, I don't know.
Q. But you were the one that signed it, right?
A. Correct.
Q. And now you list in the schedules that you have a security deposit, is that -- that's connected to the property in California, the security deposit of 19,000.
A. What page are you on?
Q. I am on -- I'm still looking at the amended, it's the amended statement of financial affairs, but I guess there is also -- yes, there is an amended Schedule A/B, and an amended statement of financial affairs. We're on Page 4 of 16, and it's listing all the assets of the debtor, Consumer Advocacy?
A. Correct.
Q. And it has a deposit and prepayments of $19,650. Do you know what that is?
A. (No verbal response.)
Q. You don't know what that is?
A. Yeah, a security deposit for the sub-sublease. I'm guessing. I can find out for you.
Q. Okay. Where would that -- where is that money held, do you know?
A. No, I do not.

Q. Who would know, Tuong again?
A. Irvine Company.
Q. The Irvine Company, okay.
A. Uh-huh.
Q. Okay. On Page 13 of 16, Number 30, and I know we talked about this, and you're going to amend Number 30 to add your salary.
A. Correct.
Q. Okay. It lists here on 30.1, it says amount of money or description and value of property. I'm trying to understand what 30.1 is trying to tell me. It lists your name.
MR. BEHAR: 30.1.
BY MS. SCARLETT:
Q. It says within one year before filing the case did the debtor provide an insider with value in any form, and you say, yes, and then you list the recipient as Albert Kim, that's you, correct?
MR. BEHAR: We meant to list the salary there.
MS. SCARLETT: It says amount of money, description or value of property, a hundred percent.
MR. BEHAR: Because he's the hundred percent owner, so we meant to ---
THE WITNESS: The salary.

MR. BEHAR: The salary, because it's listing ---
MS. SCARLETT: No, but that's the section that asks for amount of money or value of the property.
MR. BEHAR: Including salary.
MS. SCARLETT: I understand, but you have a hundred percent. What does a hundred percent mean?
MR. BEHAR: It's just, he's the hundred percent owner. That's what it means.
MS. SCARLETT: Okay. I was just wondering if that's a hundred percent of something.
MR. BEHAR: No, no, no.
MS. SCARLETT: Okay. I'm going to go to the bank statement, because I believe I have that number, I think that income statement issue I had, it's on here.
THE WITNESS: The 46,000?
MS. SCARLETT: Yes, I believe it might be on this.
MR. BEHAR: Yes, it's in the (inaudible) ---
MS. SCARLETT: All right. Here -- oh, you have it?
THE WITNESS: Yes.
MR. BEHAR: Yes.
BY MS. SCARLETT:
Q. Okay. Great. So, you're looking at the

Page 57

Premier -- okay. First of all, I notice that it says Premier Student Loan Center on the top of your financial sheets, the bank statement -- I mean, the balance sheet, the income statement, they all say Premier Student Loan Center. Why does it say Premier Student Loan Center and not Consumer Advocacy Center, Inc.?

A. That was a d/b/a we filed for Consumer Advocacy Center.

Q. Okay. Is that d/b/a registered anywhere?

A. The State of California.

Q. Okay, and the d/b/a is Premier Student Loan Center, no Inc., Company, LLC, none of those things, it's just Premier Student Loan Center?

A. Correct.

Q. And just so that I'm clear, that Premier Student Loan Center, it was your testimony, is not Premier Student Loan Center, the other debtor that filed in this case?

A. Yeah, it's different. Yeah, it's not the same company.

Q. Okay, but these cases are related, correct, Consumer Advocacy Center, Inc. and Premier Student Loan Center?

MR. BEHAR: Object to form.

BY MS. SCARLETT:

Page 58

Q. On the petition you indicated that this was a related company, that these companies were related, do you recall that?

A. Vaguely, yeah. I mean ---

Q. Do you consider them to be -- yeah, do you consider them to be related?

A. Yeah.

Q. Tell me how they're related?

A. We were planning on using Premier Student Loans, owned by Kaine Wen, as a corporation that we may use later down the line, and that's why the corporations were -- that's why he named it very similar to the d/b/a we had. We were thinking about maybe using it as a staffing company, opening up a separate marketing entity for it. We just never got around to it.

Q. But at a macro level they were related? I mean, you believe that they were related?

A. Yes. What's the definition of "related"? What are you -- rephrase that, please.

Q. I don't know what the definition is of "related", but the fact is that the case was filed, and they were filed as related cases. I'm not making that up. That's what --

A. Right, right.

Q. -- was indicated on the petition. So, I am

Page 59

asking you why you thought they were related, and I think you've explained to me why you thought they were.

A. Gotcha.

Q. Okay. So, on the -- do you have the MORs, the monthly operating reports?

A. Yes.

Q. The February MOR, Page 2, under disbursements, W --

A. Yes.

Q. -- list other operating expenses, see MOR, MOR 3, which is referring to an attachment that should be attached, but I don't think it is, or if it is, I don't -- I'm trying to understand what the other operating expenses are. There is other operating expenses of $29,000, approximately, in February, and so I was flipping through and I was trying to figure out what is included in that $29,000.

A. I think it's on the last page, the explanation.

Q. Okay.

A. So during February we still had this CAC pre-BK account open.

Q. Okay.

A. And we're in the process of opening the debtor-in-possession bank account.

Page 60

Q. Okay.

A. So, in order for it to match the bank statements correctly, he had to put that this was the money that we disbursed out of the pre-BK bank account.

Q. Okay.

A. And so that's why he had to put that there.

Q. Okay.

A. And then come early March, he deposited that into the DIP account.

Q. Okay. So this was just showing the transfer of the money --

A. Correct.

Q. -- from the pre -- and then the recites at the top --

A. Uh-huh.

Q. -- $5,774. Is that money that's coming from an account?

A. Yeah, that was part of a ---

Q. Another account that the debtor closed?

A. I think it's -- yeah, yes, correct, I think, and that one we got earlier, so we ---

Q. Yes, I think on Page 3 it says Chase bank account, closure refund check, is that correct?

A. Correct, and the others were with the two -- 28,956.86 was for the (inaudible) CAC bank account.

Q. Okay, and then on Page 3 if -- you we can go to Page 3 ---
MR. BEHAR: And just so you know, Page 16 is the explanation for the closing of the bank account.
MS. SCARLETT: Okay.
BY MS. SCARLETT:
Q. On Page 3 there is reversal of charge-backs. What are those?
A. Reversal of charge-backs, so this is when a client requests a charge-back, calls their bank to charge back the funds that they paid us. Yeah, but I think maybe the merchant company that was doing that made a mistake, and they sent the funds back to us.
So if you look at other charge-back fees down below for other disbursements, you'll see $4,669.67.
Q. Okay. So you're saying this is what merchant, what merchants are charging because your company isn't operating, correct?
A. Right, but our -- when we were operating --
Q. Right.
A. -- we had a merchant account that we would use to run the payments.
Q. Okay.
A. So basically even though we're not operating anymore, there are still clients that basically can issue

a charge-back for work we did, you know, six months down the line, or six months previous --
Q. Right.
A. -- saying, you know, you know, I didn't authorize this charge, or whatever the case may be. So they can contact their bank, and then the bank will contact the merchant, and the merchant will take the money out of our account and pay back the client.
Q. Okay, because you testified the last time, and I remember asking if there were any -- and you didn't recall whether there were any customers or clients that still owed money to Consumer Advocacy.
A. Correct.
Q. Do you remember now if there are people who still owe money?
A. No, there is nobody that owes money to Consumer Advocacy Center.
Q. So there are no clients that had payments that were due? Because you said they paid in installments, correct?
A. Right, but there is no way to do the work for them.
Q. So how does the money come out of their account, is it some kind of automatic withdraw?
A. Yes, it is.

Q. Why is it still -- why are there still automatic withdrawals from clients?
A. No, these are from when we were open.
Q. Oh, okay.
A. Yeah, before we -- so, like, you can -- this person could have signed up a year ago --
Q. Okay.
A. -- and basically looked at the bank statement, and say, I didn't authorize this charge, and then they can --
Q. Okay.
A. -- request that money back from us.
Q. But nobody is currently being charged?
A. Correct.
Q. Okay, and there are charges here for ADP. What are those charges for?
A. Those are to keep a record of our payroll.
Q. Okay. So that's storage fees for the records?
A. Correct.
Q. Do you have to pay for the QuickBooks records? ADP is just payroll, correct? What about your other financial records?
A. That's a good question. I'm sure that we do. Maybe there was another discounted annual payment, I

don't know.
Q. Okay. So it may be that it was paid up?
A. Yeah.
Q. You just don't know?
A. Yes.
Q. Okay.
A. But we do have access to it.
Q. You do have access?
A. Correct.
Q. Okay, and who is providing its QuickBooks -- it's the company's QuickBooks?
A. Correct.
Q. And do you have -- did you have a bank card for Consumer Advocacy Center?
A. I did.
Q. Okay, and what did you use the bank card for?
A. Taking clients out to lunch.
Q. Okay.
A. Maybe not clients, vendors. Vendors, like marketing vendors and stuff like that.
Q. Okay. So, you used it for (inaudible) expenses?
A. Correct.
Q. But that bank card, the money came directly

from the debtor's account, correct?
A. Correct.
Q. Okay. So how did you account for that? How did you know -- how did you know in accounting that these were all business related expenses? Did you submit receipts? Did you -- how do we know that the charges are all related to the company?
A. Tuong would look at the bank statements on a monthly basis, and if he had any questions, he would let me know about a charge, and then I would explain it to him, if he needed explaining. For instance, if he looked at the descriptor of the charge and couldn't tell it was a restaurant ---
Q. Okay.
A. Yeah.
Q. So were there ever any charges that you had to pay the company back for? Were there any charges that were not business related?
A. No.
Q. Did you ever pay for anything for the business and have the business reimburse you, so you used your own card or -- so you never got any kind of reimbursements --
A. Correct.
Q. -- from Consumer Advocacy?



And who else had access to use the bank card?
A. Tuong.
Q. Tuong did?
A. Yes.
Q. And what about ---
A. Kaine (inaudible) ---
Q. Okay, and they never paid for anything and were reimbursed by the company?
A. Not that I can recall.
Q. But the books would have it if they were, right? So can you go and check, please --
A. Sure.
Q. -- and make sure? Because, again, I need to make sure that those schedules are ---
MR. BEHAR: What period of time do you want?
MS. SCARLETT: Well, the schedules ask for within a year --
MR. BEHAR: Right.
MS. SCARLETT: -- right? So ---
THE WITNESS: So any reimbursements to a personal account, right?
MS. SCARLETT: Yes.
THE WITNESS: Okay.
MR. BEHAR: I think the one year, though, is



for insiders.
MS. SCARLETT: Okay.
MR. BEHAR: I mean, we'll probably just produce any, but I don't think they're insiders.
MS. SCARLETT: Okay. All right. So when do you think you can have amendments?
MR. BEHAR: If we have to.
MS. SCARLETT: No, you do have to amend, you have to add his salary.
MR. BEHAR: You're right, salary.
How long (inaudible) ---
THE WITNESS: A day or two.
MS. SCARLETT: Oh, okay, so not long.
THE WITNESS: I'm going to be on a plane, so ---
MR. BEHAR: Yeah, a little longer than that (inaudible) ---
MS. SCARLETT: Okay. All right, because I need to look at those, and I need to look at the statements that you're going to provide to him, the bank statements, all the information I asked for.
MR. BEHAR: (Inaudible.)
THE WITNESS: Yeah, oh yeah, so for everything.
MS. SCARLETT: Yes, so we're talking April



maybe then before -- for sure, because next week is April. So like the 16th?
MR. BEHAR: Are you going to go forward with your motion on April 3rd?
MS. SCARLETT: What are you going to give me before? Do you have any information on his salary? Before that -- can I get that before April 3rd, so that I at least have something, have some more information? Otherwise, I mean, I can go forward.
MR. BEHAR: I don't want you to. I want you to withdraw your motion.
MS. SCARLETT: I'm going to go forward with the motion, because I ---
MR. BEHAR: (Inaudible.)
MS. SCARLETT: All right. So, at this time I'm going to adjourn to a date to be determined for a continued 341.
Thank you.
THE WITNESS: Thank you.

(Thereupon, the 341 Meeting of Creditors was adjourned.)


CERTIFICATION

STATE OF FLORIDA :
COUNTY OF MIAMI-DADE :

I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing Section 341 Meeting of Creditors was transcribed by me from a digital recording made on the date and at the place as stated in the caption hereto on page 1; that the foregoing computer-aided transcription is a true record to the best of my ability of said proceedings.

WITNESS my hand this 30th day of April, 2019.

______________________________

CHERYL L. JENKINS, RPR, RMR
Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #GG 138863
December 27, 2021

# Exhibit