## Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:         CASE NO. 19-10655-JKO
CONSUMER ADVOCACY CENTER, INC.,
    Debtor.
_____/

341 MEETING OF CREDITORS
May 13, 2019

The above-entitled cause came on for a Section 341 Meeting of Creditors before ZANA M. SCARLETT, Trial Attorney, Office of the U.S. Trustee, Department of Justice, in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd., Fort Lauderdale, Broward County, Florida on May 13, 2019, commencing at or about 2:02 p m., and the following proceedings were had.

Transcribed from a digital recording by:
Cheryl L. Jenkins, RPR, RMR

## Page 2

APPEARANCES:

ZANA M. SCARLETT, Trial Attorney
Office of the U.S. Trustee
Department of Justice

BEHAR GUTT & GLAZER, by
BRIAN BEHAR, Esquire
On behalf of the Debtor

- - - - - - -

WITNESS                                PAGE
ALBERT KIM
    Examination by Ms. Scarlett         3

## Page 3

MS. SCARLETT: Okay. Good afternoon. This is the -- well, first let me state, it is Monday, May 13th, 2019, at 2:02 p.m., and this is the continued 341 Meeting for Consumer Advocacy Center, Case Number 19-10655-JKO.

You need to raise your right hand, and swear or affirm -- do you swear or affirm to tell the truth, the whole truth and nothing but the truth?

MR. KIM: Yes.

Thereupon,
    ALBERT KIM,
having been first duly sworn, was examined and testified as follows:
            EXAMINATION
BY MS. SCARLETT:
    Q.  Okay, and for the record can you state your name again?
    A.  Albert Kim.
    Q.  Okay, and Mr. Kim, has anything changed with regard to your position at Consumer Advocacy Center, Inc., are you still the president?
    A.  Yes.
    Q.  Okay, and are you the hundred percent shareholder?
    A.  Yes.

## Page 4

    Q.  Okay, and has the company restarted operations?
    A.  Yes.
    Q.  Okay. Tell me about that, when did the company restart operations?
    A.  March of 2018 -- 2019.
    Q.  March of -- okay. So, is the company currently profitable?
    A.  Yes.
    Q.  It is.
        Okay, and does the company have any employees at this time?
    A.  No.
    Q.  No. Okay. Other than yourself, is there anybody else employed by the debtor at this time?
    A.  No.
    Q.  Okay. So are you the sole employee at this time?
    A.  Yes.
    Q.  And your testimony is that the company has been profitable. So the company has earned income?
    A.  Yes.
    Q.  Okay. When did it start earning income, was it the same time that it started operations, or did it start, and then the money came in later?

1 (Pages 1 to 4)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 862

Page 5

1  A. I'm sorry, can you please rephrase?
2  Q. Okay. Let me -- it might be easier if you
3  just tell me. You said the business started operating in
4  March 2019?
5  A. Yes.
6  Q. So tell me what happened, just tell me about
7  that, how the company has restarted, what it's doing, how
8  it's making money, and then if you sort of tell me that,
9  then I can get the answer to what I'm asking. I'm just
10 trying to figure out, you're saying it's profitable, so I
11 just want to know what are you doing, how are you making
12 income? So, just tell me about it. It restarted
13 operations on March 2019 -- in March 2019.
14  A. Right. We are selling marketing calls to
15 other companies.
16  Q. Okay, and when you say "we" --
17  A. I.
18  Q. -- you are?
19  A. Consumer.
20  Q. Just you?
21  A. Yes.
22  Q. So, there is nobody else working on this
23 right now?
24  A. Correct.
25  Q. Okay, and so you are selling marketing

Page 6

1  leads?
2  A. Correct.
3  Q. Okay. To who?
4  A. To Acceptance Financial.
5  Q. Okay. So before you name them, because what
6  you're going to tell me is there is multiple companies, is
7  that right, that you're selling the leads to, or is it
8  just one?
9  A. Multiple.
10  Q. Multiple, okay. So you sell marketing leads
11 to multiple -- what kind of companies are these?
12  A. They are call centers.
13  Q. Call centers, okay, and are they call
14 centers dealing with a particular kind of industry, or is
15 it call centers on a bunch of different things? Like,
16 what are these call centers doing? What industries are
17 they involved in?
18  A. One is in student loan document preparation.
19  Q. Okay, and which one is that?
20  A. Prime Consulting.
21  Q. Okay, and what's the -- what are the others?
22  A. And the other is debt settlement.
23  Q. Okay. So that's the other industry?
24  A. Correct.
25  Q. And you're selling to more than one player

Page 7

1  in this industry, or only one?
2  A. Only one.
3  Q. Only one. Who is it?
4  A. Acceptance Financial.
5  Q. Okay, and in the student loan you're only
6  selling to Prime Consulting?
7  A. Correct.
8  Q. And so these are the only two that you
9  currently are selling leads to?
10  A. Correct.
11  Q. Do you have contracts for that, for each of
12 these relationships, or is it just, they call you, and pay
13 you, and you sell them the leads? Or is there, like, an
14 agreement between Consumer Advocacy and Prime Consulting?
15  A. Invoices.
16  Q. Okay. So, it's invoiced?
17  A. Correct.
18  Q. So invoiced at the time that you provide the
19 leads? Or, well, they send you an invoice? Or, well,
20 actually you tell me how it works. I'm not going to try
21 to guess because I don't know how your industry works.
22 So ---
23  A. I send them an invoice, they pay, and then I
24 generate the calls for them.
25  Q. Oh, okay.

Page 8

1  A. Or I find somebody who can generate the
2  calls for them.
3  Q. Okay. So -- but how did -- I mean, I guess
4  I want to know, how did you get together with Prime
5  Consulting? How did you connect? How did they know that
6  you would be able to provide them leads? Are these people
7  you were working with before? I mean ---
8  A. Correct.
9  Q. Okay. So, Consumer Advocacy, prior to
10 filing, was working with Prime Consulting?
11  A. No.
12  Q. No. Who was working with Prime Consulting?
13 Nobody?
14  A. Nobody.
15  Q. You had no history of working with them
16 before?
17  A. Correct.
18  Q. So this just started in March?
19  A. Correct.
20  Q. And how did you generate that business?
21  A. I -- just through relationships.
22  Q. Okay. So a relationship?
23  A. Uh-huh.
24  Q. And so you said you invoiced them. I mean,
25 what happens first, do they call you and say they need

2 (Pages 5 to 8)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 863

Page 9

1  leads, or do you just sort of offer leads to them and then
2  they pay -- they ask you to -- I mean, how does it work?
3      A.   I would call them --
4      Q.   Uh-huh.
5      A.   -- and I would call the people I know in the
6  industry --
7      Q.   Uh-huh.
8      A.   -- and see if they're in the market for
9  leads.
10     Q.   Okay, and if they are, then they tell you
11 what they want and you send them an invoice?
12     A.   Correct.
13     Q.   And so they pay before or after you give
14 them the leads?
15     A.   Before.
16     Q.   Okay.  So you give them the invoice, they
17 pay, and then you provide the leads?
18     A.   I'm sorry, can you repeat that?
19     Q.   You gave them an in -- well, you find out if
20 they want some leads.
21     A.   Uh-huh.
22     Q.   They say, okay.  You send them an invoice
23 that says how much it's going to cost them for this many
24 leads.  I mean, is it by number, by the number of leads?
25 Like, how do you price ---

Page 10

1      A.   Correct, it's cost per call.
2      Q.   Cost per call.  Okay, and so once you
3  invoice them, they pay you?
4      A.   Yes.
5      Q.   And they pay the lump sum of the invoice,
6  they have to pay the entire thing before you provide the
7  leads?
8      A.   Correct.
9      Q.   Okay and then how do you go about -- or how
10 do you go about finding the leads for them?
11     A.   Through contacts that I know in the
12 industry.
13     Q.   Okay.  I mean, I literally, I have no idea
14 how this works.  So you have to tell me, what is a lead?
15 Like, what is a lead?  Is that somebody's name and a phone
16 number, or somebody's name and an address?  What is a
17 lead?
18     A.   The type of leads that I sell are direct
19 inbound calls, phone calls.
20     Q.   Okay.  So you sell -- and I apologize
21 because I don't know how this works.  I'm literally going
22 to get -- you're going to teach me about how that whole
23 marketing lead thing works.
24          You get a call, a direct phone call, or you
25 make a call, you make a direct inbound call, or somebody

Page 11

1  calls?  Like, how does a direct inbound call become a
2  lead?
3      A.   So, what I'll do is I will work with a media
4  company --
5      Q.   Uh-huh.
6      A.   -- who will generate advertisement through
7  social media.
8      Q.   Okay.
9      A.   They'll put an ad out.
10     Q.   Uh-huh.
11     A.   The consumer sees the ad.  If they're
12 interested, they'll click on the ad.
13     Q.   Okay.
14     A.   There will be a phone number there.
15     Q.   Yes.
16     A.   And then they'll click the phone number to
17 call.  Once that -- once that person clicking the phone
18 number calls, it will get routed to one of the call
19 centers.
20     Q.   Okay.  Okay.  So the whole thing where you
21 get with a marketing company and they do the marketing,
22 that's after you got paid to get the leads?
23     A.   Correct.
24     Q.   Oh, okay, so once you get the payment, then
25 you go out and you work with a marketing company to set up

Page 12

1  some kind of advertising on social media that's
2  advertising for the particular industry, for example, in
3  Prime Consulting?
4      A.   Correct.
5      Q.   Okay.  So that would advertise services for
6  student loan documentation?
7      A.   Correct.
8      Q.   Okay.  All right.  So you're basically going
9  out and getting clients for these people, is that roughly
10 what you're doing?  Like, they have some services they
11 want to provide, I'm guessing Prime Consulting does
12 student loan documentation, is that right?
13     A.   Correct.
14     Q.   And so they want to be able to give that
15 service to people?
16     A.   Correct.
17     Q.   And so you go out and find the people?
18     A.   I find the media buyer, or the marketing
19 company who is generating those type of calls, and then
20 what I'll do is I will tell them to send calls to Prime
21 Consulting.
22     Q.   Oh, okay, so the media company -- now, so
23 tell me about the media company in this model.  So the
24 media company doesn't provide services.  They just
25 generate the interest, like -- okay.

3 (Pages 9 to 12)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 864

Page 13

1  A. They provide services, too.
2  Q. Okay.
3  A. But the companies that I work for, they are
4  having a hard time finding these companies, and I already
5  have relationships with these companies.
6  Q. Okay, right, because you were in the
7  industry before.
8  A. Correct.
9  Q. Now, tell me -- so, tell me, now that you're
10 just -- I guess you're saying what Consumer Advocacy is
11 doing now is just generating those leads?
12 A. Correct.
13 Q. But what did Consumer Advocacy do before
14 that's different from what you're doing now?
15 A. We were an enrollment company.
16 Q. Okay.
17 A. What we would do is we would field those
18 incoming marketing leads, and explain the services that we
19 offered to the client, and see if they would like to
20 participate or enroll.
21 Q. Okay. So, that's a service. So, you were
22 providing the service?
23 A. Correct.
24 Q. Or signing them up for the service?
25 A. Signing them up for the service.

Page 14

1  Q. Because I think your testimony before was
2  that somebody else would be on the back-end --
3  A. Correct.
4  Q. -- that would provide the service?
5  A. Correct.
6  Q. So you're saying Consumer Advocacy would --
7  so, for example, in this Prime Consulting example where
8  they -- where you direct calls to Prime Consulting,
9  somebody would direct calls to Consumer Advocacy, or was
10 Consumer Advocacy directing it's -- you know, like, did
11 you have your own leads that you ---
12 A. The first one, what you just mentioned, the
13 first one.
14 Q. Oh, the one -- so what you have now?
15 A. Consumer Advocacy Center wouldn't generate
16 their own.
17 Q. Oh, okay.
18 A. We would ---
19 Q. You would be the recipient of these calls?
20 A. Correct.
21 Q. So who would generate those calls, do you
22 know? Like, how would you get the calls?
23 A. Through networking and contacts.
24 Q. Okay, but did you have to pay for leads, I
25 guess is my question?

Page 15

1  A. Yes, I did.
2  Q. Right. So, you paid for the leads. Did you
3  have, like, a few companies that you worked with, or were
4  there a lot, or how does it work, or how did it work?
5  A. There were a lot.
6  Q. And how do you find them?
7  A. Through --
8  Q. Contacts?
9  A. -- contacts, yeah, and networking.
10 Q. Okay.
11 A. Being in the industry, yeah.
12 Q. And so you paid them, and so now what you're
13 doing is basically what you used to pay somebody else to
14 do when you were in Consumer Advocacy?
15 A. Correct.
16 Q. Okay. Okay. Okay, and how much have you
17 been able to generate in terms of income since March, I
18 mean, ballpark?
19 A. 22,000.
20 Q. Okay, and that's -- and you said it's per
21 call?
22 A. Correct.
23 Q. So roughly how many calls is that?
24 A. I don't know.
25 Q. Okay. I was just wondering. I'm just

Page 16

1  trying to see if I can understand how this all works.
2      So, but if you're doing this -- and how many
3  hours are you spending doing this? Is this, like, a
4  40-hour week, an 80-hour week?
5  A. I don't know.
6  Q. You don't know?
7  A. Yeah.
8  Q. Like, how much -- on a day-to-day, are you
9  working every day? Where are you operating from? Are you
10 in an office?
11 A. I just --
12 Q. So, like, from home?
13 A. Yeah, I can -- wherever.
14 Q. Wherever, you just need a telephone and an
15 internet --
16 A. Correct.
17 Q. -- connection?
18 A. Uh-huh.
19 Q. And are you doing it, like, all day, every
20 day, or ---
21 A. Every day.
22 Q. Every day?
23 A. Uh-huh.
24 Q. So I guess my question is how long does it
25 take you to generate $22,000 in income? How long did that

Page 17

1  take? I know you said you started in March.
2  A.  Uh-huh.
3  Q.  And we're now May 13th. So, what was that,
4  like, two months?
5  A.  I don't understand the question.
6  Q.  I'm trying to figure out how long it took
7  Consumer Advocacy to make $22,000.
8  A.  I don't know.
9  Q.  Okay. The $22,000, is that made up of both
10 Prime Consulting stuff and Acceptance?
11 A.  Yes.
12 Q.  Okay. Do you know what the split was?
13 A.  I don't. It's here, but I don't have a
14 calculator, so I'm not going to ---
15 Q.  That's fine because, again, you say they
16 invoice you. So, I'm just trying to figure out, was it,
17 like -- did you have, like, one invoice for Prime
18 Consulting and one invoice for Acceptance, or were there
19 multiple invoices?
20 A.  Multiple invoices.
21 Q.  Oh, okay, so how often were you getting
22 invoices, or giving out invoices, between March and now?
23 Is it, like, a daily thing?
24 A.  No.
25 Q.  Okay. So roughly, once a week, once a

Page 18

1  month?
2  A.  Weekly.
3  Q.  Weekly, okay. So weekly invoicing, all
4  right, and so weekly invoicing between March, and you
5  don't know approximately when you started in March, the
6  middle, the beginning, the end?
7  A.  I don't know.
8  Q.  Okay. I'm just trying to get -- I'm trying
9  to understand the model and how much it's going to
10 generate.
11      All right. Let me do this, what's your
12 estimate for going forward? Is this, like, a slow startup
13 to get to 22,000? Is that going to be a steady number? I
14 mean, what's your read on the future? I'm trying to
15 understand the debtor's prospects.
16 A.  It's hard to say.
17 Q.  Okay. I mean, you know more than I. So,
18 I'm just literally asking, and I may be asking a very
19 stupid question, but that's because I don't understand the
20 industry. So, I'm trying to understand. You're in
21 Chapter 11 --
22 A.  Right.
23 Q.  -- and the idea is to reorganize to be
24 profitable --
25 A.  Right.

Page 19

1  Q.  -- ultimately.
2  A.  Right.
3  Q.  So, I'm just trying to understand where you
4  see this going based on your very limited time now doing
5  this marketing. So I understand it's limited and you
6  can't -- you probably can't make a huge prediction, but
7  where do you feel like it's going?
8  A.  Right, I feel confident that we can be
9  successful.
10 Q.  Okay, and so 22,000 in two months, you think
11 you're going to do more than that, significantly more than
12 that, or is that what you think you're going to do?
13      MR. BEHAR: That wasn't two months.
14      MS. SCARLETT: Well, that's what I'm trying
15 to get -- Brian, I don't want you to testify, but I'm
16 trying to understand how long -- he said he started in
17 March. We're now in May.
18      MR. BEHAR: But it was reported on the April
19 DIP report.
20 BY MS. SCARLETT:
21 Q.  Okay. So that was two months, the 22,000?
22 Or it was one month, from March to April?
23 A.  We didn't start -- we started mid to late --
24 late March.
25 Q.  Okay. All right. So that's what I'm trying

Page 20

1  to understand. I'm trying to understand.
2      So -- and so mid to late March. So, in a
3  few weeks you made 22,000? Because your counsel has just
4  stated that your March report ---
5      MR. BEHAR: April.
6  BY MS. SCARLETT:
7  Q.  Or April report is what reports the $22,000
8  of income.
9  A.  Correct.
10 Q.  So would the May -- will the May report
11 report income as well? Have you been --
12 A.  Yes.
13 Q.  -- getting income?
14      Okay, and in terms of your costs, the
15 22,000, is that net, after you pay for expenses?
16 A.  No, it's not net.
17 Q.  It's not net. So what's net?
18 A.  About half that.
19 Q.  Half of that, okay, and what are the
20 expenses?
21 A.  Paying for the marketing leads.
22 Q.  Okay, because -- and now you're not paying
23 any staff, right?
24 A.  Yes.
25 Q.  And you're not paying any rent, other than

Page 21

1 the -- are you still paying for that virtual office in
2 Fort Lauderdale?
3     A.  Yes, I am.
4     Q.  Okay.  So other than that rent, I think it's
5 $500 a month, is that right, or something ---
6     A.  It's $222.33.
7     Q.  So other than that, and paying for the
8 leads, what other expenses does the debtor have?
9     A.  Miscellaneous, I had to buy checks.
10    Q.  Okay.  Right, but no other big expense?
11    A.  Nope.
12    Q.  Okay.  So if I go back to what Consumer
13 Advocacy was doing in the past, and I think it's your
14 testimony that you would have had to pay for leads --
15    A.  Yes.
16    Q.  -- correct, because Consumer Advocacy was
17 not in the business of generating those leads?
18    A.  Yes.
19    Q.  Okay.  So, when I looked at your statements,
20 what I want to do is to just try to understand where the
21 money -- you know, where the expense -- what the expenses
22 are, and it sounds -- again, it sounds like what we're
23 going to find out is that there are leads, but I just want
24 to go ahead and have you look at them, and then see if you
25 can tell me.  So I have the February statement,

Page 22

1 February 2018, and if you go though that statement, can
2 you pretty much -- are you able to look at that statement
3 and tell me where the lead expenses are?
4     A.  Can you rephrase the question?
5     Q.  I'm trying to understand on your bank
6 statement, right, the bank statement shows money coming
7 in, and it shows money going out.  Among the money that
8 goes out, can you identify, are you able to look at your
9 statement and tell me, based on the name of the person
10 that's being paid, which ones of those are leads?
11        I mean, take some time, just look at it,
12 maybe you have to refamiliarize yourself with the names, I
13 don't know.
14    A.  So, are you asking me if I'm able to
15 identify every marketing lead?
16    Q.  Well, listen, I don't know if you can
17 identify every, but can you identify any?
18    A.  Yes.
19    Q.  Okay.  So can you just start, like, telling
20 me the dates, and the amounts, so I can check them off on
21 my list, so I know what we're talking about?  You know, as
22 soon as you see one, let me know.
23    A.  Under electronic withdrawals?
24    Q.  Yes, or whichever.  How did Consumer
25 Advocacy typically pay for the leads?  Was it a transfer?

Page 23

1 Did somebody use a credit card?  Was it both?  I mean, how
2 did you typically pay for leads?
3        And I guess before I go there, who would be
4 responsible at Consumer Advocacy for paying for the leads?
5     A.  Me and Tuong Ngyen.
6     Q.  Okay, and how did you guys pay for them?
7     A.  Checks, ATM, ACH, and wire.
8     Q.  Okay, and when you say ATM, did you actually
9 go to an ATM and take cash out and pay somebody cash for
10 leads?
11    A.  No.
12    Q.  Okay.  So when you say ATM, what do you
13 mean?
14    A.  With the card.
15    Q.  A debit card?
16    A.  Uh-huh.
17    Q.  Okay.  All right.  So, based on that, just,
18 can you identify any of those payments on there, whether
19 it's electronic -- I mean, just start going though the
20 withdrawals, and just, when you see one, let me know.
21        I mean, I could go through and ask, but it
22 would seem to me that it would be quicker, rather than me
23 asking you every single line that may not be a lead, it
24 might be quicker for you to just tell me which ones are
25 leads.

Page 24

1     A.  Okay.
2     Q.  But we could do it the other way, you know,
3 it's up to you.
4     A.  So, under electronic withdrawals --
5     Q.  Uh-huh.
6     A.  -- (inaudible) 21.
7     Q.  Okay.
8     A.  The amount is $36,360.
9         MR. BEHAR:  Page 9.
10        THE WITNESS:  Page 9 of 60.
11 BY MS. SCARLETT:
12    Q.  Yeah, because I gave you my copies
13 unfortunately.
14        Okay.  36,000.  All right.  So, Mirabella
15 Group, LLC, doing business as Five Newport Beach.  So
16 that's a lead -- a marketing company?
17    A.  Yes.
18    Q.  Okay.  Do you know who owns that company?
19 Do you have any relationship with that company other than
20 they're just a marketing company?  Are these people that
21 you're acquainted with?  Because I remember you said you
22 had contacts.
23    A.  Yes.
24    Q.  So, you, like, know the people that own this
25 marketing company, so you work with them regularly, or you

6 (Pages 21 to 24)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 867

Page 25

1 worked with them regularly?
2    A.  Yes.
3    Q.  Okay, and so, for example, this $36,000, you
4 would have paid that before they gave you the leads?
5    A.  I'm sorry, what do you mean by
6 "acquaintances"?
7    Q.  You testified that -- because I was trying
8 to figure out how you get in contact with these people,
9 whether it's the people that are buying the leads, or the
10 people that are selling them, and you're saying a lot of
11 it is networking.
12    A.  Correct.
13    Q.  So, I'm just wondering if Mirabella Group,
14 LLC, for example -- like, how did you become acquainted
15 with Mirabella Group? Do you know them personally? Do
16 you know the people -- you do?
17    A.  No, I do not --
18    Q.  You don't. Okay. So, how ---
19    A.  -- have a personal, it's a business
20 relationship.
21    Q.  It's a business relationship?
22    A.  Uh-huh.
23    Q.  But did you ever meet them in person, or was
24 this all online?
25    A.  Yes, I've met them in person.

Page 26

1    Q.  Okay. Okay. I'm just trying to understand,
2 you know, the relationships. If there is no relationship,
3 there is no relationship, but I was wondering if this is
4 somebody that you're acquainted with personally?
5    A.  They're not my friend.
6    Q.  No, they're business -- they're people you
7 do business with?
8    A.  Right.
9    Q.  I got it.
10    A.  Okay.
11    Q.  Are there any marketing companies that are
12 not just people you do business with? Are there people
13 that maybe you would consider business partners?
14    A.  No.
15    Q.  No, okay. So, they're all pretty much third
16 party transactions? That's what I'm trying --
17    A.  Yes.
18    Q.  -- to understand.
19       Okay, and if I look at this -- well, since
20 we're on that first page, the second payment, this 105,000
21 ADP wage pay, is that salaries for employees? It's the
22 bottom -- it's that same page, it's right under the
23 36,000.
24    A.  Yes, that's employee payroll.
25    Q.  Okay, and ADP tax, is that when they

Page 27

1 withhold tax?
2    A.  That's the Social Security and FICA.
3    Q.  Okay, perfect, and EMS fees, what are those?
4    A.  Those are fees collected by a merchant
5 company.
6    Q.  Oh, okay. So, if we go back to what
7 Consumer Advocacy did, when it would sign, enroll people,
8 they would make a payment with a credit card, is that
9 right?
10    A.  Yes.
11    Q.  And so that's why you would need a merchant
12 company? I mean, that's what EMS --
13    A.  Yes.
14    Q.  -- where you process credit card payments?
15    A.  Yes.
16    Q.  And you worked with a bunch of different
17 ones, I'm guessing?
18    A.  Yes.
19    Q.  Okay, and so they -- that would just
20 automatically deposit whatever fees were paid into the
21 bank account, correct, into the company's bank account?
22    A.  Rephrase, please.
23    Q.  The merchant services that collect -- they
24 process the fees from the people that you enrolled, and
25 they would just automatically deposit the fees into the

Page 28

1 debtor's bank account, correct?
2    A.  Yes.
3    Q.  For example, this $2,778, that's coming from
4 people who were enrolled?
5    A.  That's a withdrawal out of our account.
6    Q.  Oh, well, there you go. So, what does that
7 mean?
8    A.  Those are for fees.
9    Q.  Okay. So just fees for using that service?
10    A.  These are fees the merchant company charges
11 Consumer Advocacy Center.
12    Q.  Okay, and they would charge you fees based
13 on the number transactions, or how did they come up with
14 the fees?
15    A.  I don't know.
16    Q.  You don't know.
17       Okay, and the bank card stuff on the next
18 page, so who had bank cards for this debtor at this time?
19    A.  I don't think that's a bank card. I think
20 that's a merchant company.
21    Q.  Oh, okay.
22    A.  I don't know. I can find out for you.
23    Q.  Right, and it may be their fees. Okay.
24 That's fine. That's fine.
25       And then there is something that says ADP --

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 868

Page 29

1  no, I'm sorry, not that.
2        Because there is a lot of bank cards. So,
3  like on February 2nd there is a bank card transaction for
4  42,000.
5     A.  I'm sorry, which date?
6     Q.  There is a lot of stuff on February 2nd, but
7  it's the largest amount on February 2nd.
8     A.  Yeah, that's a merchant company.
9     Q.  Okay, and so that would be fees that they
10 charged you, okay.
11    A.  I don't know.
12    Q.  You don't know?
13    A.  Yeah.
14    Q.  Okay.
15    A.  But that's a merchant company.
16    Q.  All right. For everything that's here --
17 and we had testimony before that the company has
18 QuickBooks, right?
19    A.  Yes.
20    Q.  And those records are in the cloud, right?
21    A.  Yes.
22    Q.  And you continue to pay to maintain those
23 records, right?
24    A.  Yes.
25    Q.  So in QuickBooks would I be able to see what

Page 30

1  the purpose of this payment was, the 42,000 in your
2  general ledger, in the books of the company?
3     A.  Yes.
4     Q.  So I'd be able to get the backup for that?
5     A.  Yes.
6     Q.  Okay.
7        MR. BEHAR: Are you asking for it or ---
8        MS. SCARLETT: Not yet, because you can tell
9  there is a whole bunch. So, I'm trying -- I don't want to
10 have him literally pull, you know, 50 million entries.
11 So, I'm just going to, at the end, tell you what I'm
12 interested in seeing.
13       Maverick, it says merchant, so I'm going to
14 guess that's probably a merchant account again. There is
15 a bunch of Maverick withdrawals as well.
16       What about Caller Ready on February 6th?
17    A.  That's software.
18    Q.  Okay. So that's software that you use in
19 the company?
20    A.  Yes.
21    Q.  And why would you have multiple payments on
22 the same day? If you look at February 6th there are two
23 payments, there is one at 17,000, and there is one at
24 16,000.
25    A.  I don't know.

Page 31

1     Q.  You don't know.
2        But if I had your QuickBooks, I'd be able to
3  tell.
4     A.  I don't know. I don't know if it would
5  describe in detail which each transaction was for.
6     Q.  It wouldn't, $17,000?
7     A.  I don't know. I can find out for you.
8     Q.  Yeah, I mean, I think, because that's what
9  I'm -- I mean, what I think -- because this is going to be
10 very painful if I was to sit here and try to ask you, and
11 you're probably not going to remember a lot of this stuff
12 because maybe -- you know, this is February, it's more
13 than a year ago.
14    A.  Right.
15       MS. SCARLETT: That it's probably better if
16 I just get the QuickBooks. Can I get the QuickBooks?
17 Like, you're ---
18       MR. BEHAR: The entire program?
19       MS. SCARLETT: Yeah, because otherwise -- I
20 mean, because there is a lot of large transactions which I
21 would want to ask, and then you'll have to sit down and go
22 through it, and pull them out, and there is a lot of them.
23 I mean, I went through these statements. There is a lot
24 of very large transactions.
25       MR. BEHAR: That's kind of why I was asking

Page 32

1  you to postpone this and give us a list of what you
2  wanted.
3        MS. SCARLETT: Yeah, but what I'd be, in
4  effect, asking you for is your QuickBooks.
5        MR. BEHAR: You could have asked us for
6  that.
7        MS. SCARLETT: No, no.
8        MR. BEHAR: Now that he's here, and ---
9        MS. SCARLETT: That's fine, all I can do is
10 ask him. If he doesn't know, then he'll provide it to me,
11 right? I mean, you said you can find out about it.
12       MR. BEHAR: Then we have to keep coming
13 back.
14       MS. SCARLETT: No, no, no. No, if I ask him
15 to provide the books, then that will be it, because the
16 books presumably will explain stuff.
17       THE WITNESS: Correct.
18 BY MS. SCARLETT:
19    Q.  If I go to February 7th, Pub Club Leads, is
20 that a lead company?
21    A.  Yes.
22    Q.  Okay, and now as -- what you're doing now as
23 Consumer Advocacy, like, somebody else's bank statement is
24 going to now say Consumer Advocacy when they buy leads?
25 Are you like a Pub Leads now, is that what you're doing,

Page 33

1  basically the same thing they do?
2      A.  I don't generate any leads. Pub Club Leads,
3  they actually generate the ads, create them.
4      Q.  Oh, so you're like a middle man?
5      A.  Correct.
6      Q.  Oh, you're like a broker?
7      A.  Yes.
8      Q.  I got it. See, eureka. I was trying to
9  figure this out.
10         MR. BEHAR: Can we go home now?
11         MS. SCARLETT: No. This is not -- you know,
12 this is complicated stuff you do.
13 BY MS. SCARLETT:
14     Q.  Okay. So, if I go to page -- well, I'll ask
15 you generally. I think you testified that you had a bank
16 card for this account, yeah? That you were an authorized
17 signer on the account, you could withdraw money from the
18 account?
19     A.  Yes.
20     Q.  Right, and I think you testified that Mr. --
21 I'm going to mess his name up. Ngyen?
22     A.  Ngyen.
23     Q.  Ngyen?
24     A.  Uh-huh.
25     Q.  Not Kaine Wen?

Page 34

1      A.  Tuong Nguyen.
2      Q.  Tuong Nguyen?
3      A.  Yes.
4      Q.  Ngyen, so how do you pronounce them
5  different? Because one is W-e-n, or is that a short --
6  did he just shorten that name, is that what he did?
7      A.  No, that's his last name, too.
8      Q.  But he pronounces it the same way?
9      A.  Yes.
10     Q.  Wow. Okay. So that's why I've got to say
11 which one. So, Tuong Nguyen, and did Kaine Wen also have
12 signatory on this account?
13     A.  I don't know.
14     Q.  If you go down to page -- there is a page
15 where you list all the people -- you know, the list of
16 transactions per person that has a card, so if you go to
17 page -- it's 9 of 16, and there is an ATM debit card
18 summary.
19     A.  Yes, he did.
20     Q.  Yes, and this is consistent with your
21 testimony. I mean, because I think you testified before
22 that he did -- well, I think you testified that you did
23 work with him at Consumer Advocacy, that he did work with
24 you guys. I mean, that was your testimony, right? And
25 you couldn't tell me what his title was? You said he

Page 35

1  didn't have a title?
2      A.  He does not.
3      Q.  Right, but he did do work at Consumer
4  Advocacy. I mean, does that make sense that he would have
5  a card?
6      A.  Yes.
7      Q.  And it makes sense that he would have
8  purchases, because it says here he had $28,000 of
9  purchases. What kind of purchases would he be making?
10     A.  Company purchases.
11     Q.  Like leads?
12     A.  I don't know.
13     Q.  You don't know?
14     A.  Huh-uh.
15     Q.  But, again, if we had the QuickBooks I could
16 see what they were --
17     A.  Yes.
18     Q.  -- because it would show me who is making
19 the actual purchase, right? It would show the person
20 that's actually using the card?
21     A.  It would be in QuickBooks.
22     Q.  It would be in QuickBooks, okay.
23         And Farrington Media, LLC, does that sound
24 familiar, that name?
25     A.  Yes.

Page 36

1      Q.  Is that also a leads company?
2      A.  Yes.
3      Q.  A marketing company, and the reason I'm
4  asking is because, again, rather than going through each
5  of them, the big numbers I saw were five -- were
6  Mirabella, and I saw Farrington Media, and I saw Pub Club,
7  those were the three big ones, but you're saying that
8  there could have been smaller ones --
9      A.  Yes.
10     Q.  -- as well?
11         Okay. Can you think of any other big ones,
12 other than those three, or were those, like, the biggest
13 ones?
14     A.  I can't remember.
15     Q.  Okay, and when -- Consumer Advocacy would
16 enroll these customers, because I wanted to really
17 understand what happens. So they call, and somebody at
18 Consumer Advocacy, because you had that lease, and you had
19 over a hundred employees, that was your testimony, and
20 some of those people would be answering the phone?
21     A.  Yes.
22     Q.  Or did the phones get answered somewhere
23 else?
24     A.  No, they were answered ---
25     Q.  They were right there? So the person

9 (Pages 33 to 36)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 870

Page 37

1  answers, and -- I mean, the person at Consumer Advocacy
2  answers, and then offers, or explains to them what kinds
3  of services they can sign up for?
4     A.  Can you rephrase?
5     Q.  When somebody at Consumer Advocacy answers
6  the phone, because these calls are now being directed,
7  because you paid for somebody to direct the calls, am I
8  right?
9     A.  Yes.
10    Q.  Okay.  So the calls are now being directed,
11 you're answering the phone.  What does the person at
12 Consumer Advocacy do?  What are they telling these people
13 on the phone?  What are they offering?
14    A.  Services to help with their student loan.
15    Q.  Okay, and would they collect information?
16    A.  Yes.
17    Q.  Okay, but your testimony is that Consumer
18 Advocacy did not actually do the servicing, correct?  They
19 just signed them up?
20    A.  They ---
21    Q.  That's why it's better if you just tell me
22 what happened, when somebody calls, tell me what happened,
23 just give me an example --
24    A.  So ---
25    Q.  -- because otherwise I'm going to keep

Page 38

1  getting it wrong.
2     A.  Right.  We would file the paperwork when we
3  first started, but then it was disorganized.  So, then we
4  outsourced --
5     Q.  Okay.
6     A.  -- and had somebody else do it.
7     Q.  Okay.  Do you know approximately when that
8  happened that you stopped actually doing the paperwork
9  yourself?  Because you're saying in-house you would
10 actually do the services at some point, you did that?
11    A.  Correct.
12    Q.  But at some point you stopped.  Do you
13 remember approximately when that happened?
14    A.  No.
15    Q.  Okay.  So once you decided to outsource, who
16 did you outsource to?
17    A.  True Count.
18    Q.  Okay.
19    A.  True Count Staffing.
20    Q.  And did True Count and Consumer Advocacy
21 have an agreement?  Was there, like, a written agreement?
22 Was it a joint venture?  Was there any agreement for you
23 when you would send people to them, or -- well, tell me
24 how it worked.  Once you started not servicing yourself,
25 what would happen, somebody calls, and then what happens?

Page 39

1     A.  We would explain the options available --
2     Q.  Okay.
3     A.  -- to them.
4     Q.  Sure.
5     A.  If they agreed, we would collect the
6  information.
7     Q.  And the payment?
8     A.  No.
9     Q.  No, you wouldn't collect payment.  Okay.  So
10 information?
11    A.  Uh-huh.
12    Q.  But some of it would be maybe the billing
13 information from them so you could bill them?
14    A.  We would collect all the billing
15 information --
16    Q.  Okay.
17    A.  -- so True Count could bill them.
18    Q.  Okay.  So True Count would bill them, okay.
19    A.  We would have -- and we would have -- we
20 would execute the documents.
21    Q.  Okay.  When you say "execute the documents",
22 what's do you mean?
23    A.  We would have them sign the agreement to use
24 the services.
25    Q.  Okay, and all of that would happen before

Page 40

1  True Count would get the outsource account?
2     A.  Correct.
3     Q.  Okay.  So once they executed the agreement,
4  that would get fed to -- I'm guessing this is all
5  electronic, to True Count?
6     A.  Yes.
7     Q.  And True Count would do the actual, whatever
8  service it was that they were providing, and you're saying
9  its documentation for student loans?
10    A.  Correct.
11    Q.  And they would actually fill out the
12 documentation, submit it, et cetera, whatever -- okay?
13    A.  Uh-huh.
14    Q.  That's what would happen, okay.
15       And True Count would bill them?
16    A.  Yes.
17    Q.  So how would Consumer Advocacy get paid?
18    A.  We would get paid 55 percent of all --
19 whatever payment is collected by them.
20    Q.  Okay.  All right.  So, if I go to -- and I
21 mean, I looked in the February statement, and I didn't see
22 anything from True Count.  So, I guess was that a time
23 when you were still doing it yourself, you think?
24    A.  Yes.
25    Q.  Okay.  So was True Count the first company

10 (Pages 37 to 40)

Page 41

1 that you outsourced the stuff to, or was there somebody
2 before True Count?
3     A. One second.
4     Q. Sure.
5     A. Can you rephrase the question?
6     Q. Your testimony is that True Count -- you
7 outsourced the actual servicing to True Count, correct, at
8 some point?
9     A. Yes.
10     Q. So my question was, were they always the
11 only company you outsourced to?
12     A. No.
13     Q. Okay. So tell me about that, was there
14 somebody before True Count, after True Count, during?
15     A. I don't know if it was before, or after, or
16 during.
17     Q. Okay, but what was the other company's name
18 then? Maybe that will help us to figure it out, because
19 we can look at the statements. Do you know what the other
20 company's name was?
21     A. Yeah, and on the (inaudible) it's GST
22 Factoring.
23     Q. GST Factoring, okay, and that was a
24 factoring company?
25     A. Nope, they -- we outsourced lines to them as

Page 42

1 well.
2     Q. Okay.
3     A. And they would provide a similar service to
4 True Count.
5     Q. Okay, and you would get the 55 percent, or
6 was it a different break?
7     A. It was a different break.
8     Q. Do you know how much it was?
9     A. I do not off the top of my head.
10     Q. And was it the case that you would outsource
11 stuff to them and True Count at the same time, or did you
12 use them first, and then you stopped and started using
13 True Count?
14     A. I can't remember if we started before or
15 after, but I think during that time we were receiving
16 payments from both True Count and GST Factoring.
17     Q. Okay. So there was a time when you had them
18 both, and then at one point you stopped GST, or no, where
19 you ---
20     A. Yes.
21     Q. Okay. Why did you stop, do you know? Do
22 you remember, was there a reason?
23     A. It was just more -- it was better to use
24 True Count.
25     Q. Okay. So, did it help with True Count that

Page 43

1 you were acquainted with Kaine Wen, I mean, that you guys
2 were friends, and had been working together for a while,
3 does that help?
4     A. Yes.
5     Q. And I'm guessing with GST there wasn't that
6 relationship --
7     A. No.
8     Q. -- the historic relationship?
9 Okay. So if we go to the August statement,
10 and I'm not going to ask you about every one. I'm not
11 trying to keep you here all day, and if we go to ---
12     A. This is the one I was missing.
13     Q. Oh, okay.
14     A. Yeah.
15     Q. Okay.
16     MR. BEHAR: No, we got it.
17     THE WITNESS: Yeah, we got it now.
18     MS. SCARLETT: Okay. Well, I got it
19 from ---
20     MR. BEHAR: Me.
21     MS. SCARLETT: I mean, I got it from you
22 guys.
23     THE WITNESS: Yeah, yeah, I forgot.
24 BY MS. SCARLETT:
25     Q. Okay. So, August, if I look at deposits and

Page 44

1 additions, there are, like, a lot of transactions here,
2 lots of deposits -- or not lots, but some large deposits
3 from True Count. So what are those, these deposits?
4     A. Those are payments to CAC.
5     Q. Okay, and is that the 55 percent -- so after
6 they collected the billing, and then they would do a
7 55 percent to you, or did they just -- all the money came
8 to you and then you split it after?
9     A. The agreement was 55 percent --
10     Q. Okay.
11     A. -- of all fees collected would go to CAC.
12     Q. Okay. So this number would reflect
13 55 percent already? They would only be depositing
14 55 percent of what they got, is that right?
15     A. Yes, that was the agreement.
16     Q. Okay. So I'm just saying, so that's --
17 presumably that's what this is?
18     A. Yes.
19     Q. Okay, and then I see GST Factoring on
20 August 24th. It's a small number, but tell me if that's
21 what we were talking about before? On August 24th there
22 is a fed wire of $2,000, and it says GST Factoring, Inc.,
23 it's about the middle of the page.
24     A. Yes.
25     Q. So we're making, you know, 55 percent, there

11 (Pages 41 to 44)