Page 45

1  is a lot of deposits in. What do you think was the chunk
2  of money that went out of the company, what expense?
3      MR. BEHAR: You mean this month?
4      MS. SCARLETT: Yeah, or any month. I mean,
5  I'm going to guess it's probably the same every month,
6  right? Which expenses are larger than others?
7      A. I'm sorry, can you rephrase that?
8      Q. Okay. So, I'm just going to look at the
9  plain numbers. When I look at this bank statement in
10 August, it shows $2.8 million, roughly --
11     A. Uh-huh.
12     Q. -- being deposited in August, okay? And
13 then when I look at the total that came out, it's showing
14 2.7 million. So, I'm just asking you roughly, as a person
15 who owned this company, right, because you were the
16 hundred percent shareholder, correct?
17     A. Yes.
18     Q. What do you think the biggest chunk of money
19 that went out, what kinds of expenses made up that
20 $2.7 million, the large part of that?
21     A. Payroll and marketing.
22     Q. Payroll and marketing, okay. I see the
23 payroll payments, so I agree with you those are
24 significant.
25     So, for example, on August 27th, this is

Page 46

1  Page 13 of 16. Are you there? It's like the first two
2  transactions on August 27th, the first two withdrawals.
3      A. Uh-huh.
4      Q. And I see Huntington Legal Solutions, do you
5  know what that is?
6      A. Yeah, that's an attorney.
7      Q. Okay. So that was an attorney?
8      A. Uh-huh.
9      Q. Do you have any idea what that attorney was
10 doing for Consumer Advocacy? Did it provide services to
11 Consumer Advocacy? If you know -- if you don't, you know,
12 I'm assuming QuickBooks will give me an explanation.
13     A. Right. I don't know.
14     Q. Okay. Well, let's go back. I recall very
15 early in this case, and if you look at the service list,
16 or the list of creditors, Consumer Advocacy listed a bunch
17 of Attorneys General, right, on the ---
18     A. Uh-huh.
19     Q. What was the reason for listing all of those
20 Attorneys General, was it because some of them had been
21 conducting investigations? Like, why did you list all of
22 them as creditors, do you know?
23     A. Why did we list all of them as creditors?
24     Q. Yes.
25     A. Because -- to prevent an investigation.

Page 47

1      Q. To prevent an investigation?
2      A. Uh-huh.
3      Q. But how would that prevent an investigation?
4      A. I don't know how to rephrase what my
5  attorneys told me, so ---
6      Q. Okay.
7      A. But, yeah.
8      Q. Okay. That's fine, that's fine. So, in
9  other words, they weren't listed there because they were
10 actual creditors? Did you owe money to any of these
11 Attorneys General? Were there any Attorneys General that
12 you owed money to, that the company owed money to? Did
13 any of these Attorneys General fine the debtor?
14     A. Find?
15     Q. Fine.
16     MR. BEHAR: Fine.
17     MS. SCARLETT: Fine.
18     MR. BEHAR: F-i-n-e.
19 BY MS. SCARLETT:
20     Q. Was the debtor subject to any fines by these
21 Attorneys Generals?
22     A. Can you rephrase that?
23     MR. BEHAR: Like a penalty or something.
24 BY MS. SCARLETT:
25     Q. Were there any fees owed, or any -- did you

Page 48

1  owe any money to any Attorneys General prior to filing
2  this bankruptcy case?
3      A. (No verbal response.)
4      Q. Okay. We'll back up. We're going to
5  start ---
6      A. I don't remember --
7      Q. Okay.
8      A. -- right now.
9      Q. Did any Attorneys General -- were any
10 Attorneys General actually investigating the debtor prior
11 to the filing that you were aware of?
12     A. Yes.
13     Q. Yes, okay.
14     A. Uh-huh.
15     Q. Do you know which ones? Is it a long list?
16 It's not all the ones that were listed on your schedule,
17 correct?
18     A. The State of Minnesota.
19     Q. The State of Minnesota for sure. Okay. Do
20 you know of any other state?
21     A. That were in ---
22     Q. Okay. I won't even say investigation. Had
23 Consumer Advocacy been contacted by any State Attorney
24 General?
25     A. Yes.

12 (Pages 45 to 48)

Page 49

1  Q. A lot of them? A few of them? Do you
2  remember the ones?
3  A. There are a few.
4  Q. There are a few, and the contact with these
5  -- what was the contact, you received a letter, or a phone
6  call, or both? You tell me.
7  A. Both.
8  Q. Both?
9  A. Uh-huh.
10 Q. And as a result of them contacting you, did
11 any of those agencies fine the company, or charge you a
12 penalty for something? So that the company had to pay any
13 of these State Attorneys Generals any money, are you aware
14 of that at all?
15 A. I don't want to comment because I'm not
16 exactly sure of the terminology you're asking me. So I
17 don't really understand the question.
18 Q. All right. Well, just tell me, because this
19 is -- did you pay any money to any State Attorneys
20 General? Did Consumer Advocacy ever have to write a check
21 or make some other payment to an Attorney General?
22 A. No.
23 Q. Okay. Did Consumer Advocacy get asked to
24 pay any money to any Attorney General, get a piece -- you
25 got a piece of paper that said you need to pay this, or

Page 50

1  you went to court, or you went to a hearing and they said
2  you have to pay this? I don't know the form that it may
3  have come, but was there ever any point that Consumer
4  Advocacy was asked to pay money?
5  A. Asked?
6  Q. Yeah, or ordered to. I don't know how the
7  AGs do it, maybe they enter an order that says you have to
8  pay, or maybe you get -- okay. Have you had any consent
9  decrees with any State Attorney General, like you have an
10 agreement with an Attorney General to pay something?
11 A. Have an agreement?
12 Q. Yes, Consumer Advocacy, did Consumer
13 Advocacy enter into any kind of written settlement? They
14 call it different things in different states, some say
15 it's called a consent decree, some call it -- I can't
16 remember, it's an ABC, something in writing, have you
17 entered into any agreement with an Attorney General of any
18 state?
19 A. I don't understand the question.
20 Q. Okay. Have you ever been subpoenaed by any
21 Attorney General --
22 A. No.
23 Q. -- of any state?
24    Received any kind of paperwork requiring
25 that you show up for a hearing, for example?

Page 51

1  A. No.
2  Q. Okay.
3  A. Wait, to require to show up, or just
4  paperwork in general?
5  Q. No, I think your testimony is that you got
6  both, you got phone calls, and you got letters or some
7  kind of paper.
8  A. Correct.
9  Q. Right. So, my question is, but did you ever
10 get something that said you have to be here at this time?
11 A. No.
12 Q. All right. Did you ever get something that
13 said you have to pay this amount?
14 A. I don't remember.
15 Q. Okay. What happened with the State Attorney
16 General of Minnesota? Because there is an amount listed
17 on your schedule, and I think my recollection is it was
18 over $600,000.
19 A. Correct.
20 Q. Okay. So tell me about that, what is that?
21 Because I don't know what it is. All I see is the State
22 Attorney General of Minnesota and an amount. What is
23 that?
24 A. The State of Minnesota wants us to -- wants
25 me, CAC, to pay 6 -- well, I don't remember the number.

Page 52

1  Q. Okay but whatever that number is that you
2  listed on your schedule, they want you to pay that. Why
3  do they want you to pay that? Why do they say they want
4  you to pay that? I'm not saying you agree with it,
5  because maybe you disagree, I don't believe -- are you in
6  litigation with them currently?
7  A. No.
8  Q. So did they send you a letter asking for
9  that, or was that a meeting where you had a conversation
10 and they told you that? How do you know how much money --
11 how did you know how much money to put on the schedule?
12 Where did that amount come from?
13 A. From my attorney.
14 Q. Okay. Okay, and so why does, why does the
15 State Attorney General want you to pay $645,000? Not why
16 do you think you should or shouldn't. What does the State
17 say? Is there a complaint? Is there a piece of paper
18 that says that Consumer Advocacy was doing something? Did
19 they provide paper to you that said, you know, you
20 shouldn't be doing this, and because of that we're going
21 to fine you this amount of money? Was there something in
22 writing?
23 A. Yes, there was.
24 Q. Do you have it?
25 A. Not with me.

13 (Pages 49 to 52)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 874

Page 53

```
 1    Q.  Okay. Can you get a copy of it?
 2    A.  Yes.
 3    Q.  Because you can't explain it to me at all,
 4  you don't remember what it says. So if I can get a copy
 5  it will be just better. So, can I get a copy of whatever
 6  the document is that's the basis for that, you list -- you
 7  scheduled a claim from the State of Minnesota?
 8    A.  Sure.
 9    Q.  Do you recall when that was?
10    A.  I don't.
11    Q.  Was it shortly before filing? Was it years
12  before filing? Was it last year?
13    A.  Last year.
14    Q.  It was last year, okay, and I think it's
15  your testimony that other than the State of Minnesota, you
16  don't have any recollection of any other state having some
17  money that you have to pay to any other state, or that
18  you're being asked to pay to any other state, do you? As
19  of the filing, I'm not talking about after, I'm talking
20  about prior to filing.
21    A.  Just the State of Minnesota.
22    Q.  Okay. Now, since the filing, have you been
23  receiving calls, or letters, or anything?
24        MR. BEHAR: From State Attorneys?
25        MS. SCARLETT: Yeah.
```

Page 54

```
 1        THE WITNESS: From State Attorneys?
 2        MS. SCARLETT: Yes.
 3        THE WITNESS: Yes.
 4  BY MS. SCARLETT:
 5    Q.  Okay. Which states?
 6    A.  Oregon.
 7    Q.  Okay. Who else?
 8    A.  I don't know. I can find out.
 9    Q.  Okay. Who gets the calls, or gets the
10  letters, is it addressed to your attorneys, or is it
11  addressed to you?
12    A.  It's addressed to me.
13    Q.  Okay, and it's addressed to you where, like,
14  your home address?
15    A.  No, the 173.
16    Q.  Okay. So at that location?
17    A.  Uh-huh.
18    Q.  Is there anybody there now that goes into
19  that office on a daily basis?
20    A.  No.
21    Q.  But True Count is paying the rent, correct?
22    A.  True Count stopped paying the rent.
23    Q.  When did True Count stop paying the rent?
24    A.  Last month.
25    Q.  When is the last month?
```

Page 55

```
 1    A.  April.
 2    Q.  April. Okay, and what did they do? They
 3  did a notice of termination or something?
 4    A.  I don't know.
 5    Q.  How do you know, how do you know they
 6  stopped paying the rent?
 7    A.  I was told.
 8    Q.  Who told you?
 9    A.  Kaine.
10    Q.  Do you know why?
11    A.  Guaranteed Rate didn't execute the
12  reassignment.
13    Q.  The reassignment, okay. So, let's -- let me
14  back up then, because you gave me the lease and the
15  sublease. So let's start from the top of that so you can
16  explain to me what you -- okay. This is what your
17  attorney provided to me. I had asked for the lease, and
18  then that was an assignment, and this is the sublease. I
19  guess this is the actual lease that Consumer Advocacy
20  signed to Guaranteed Rate, right?
21    A.  (No verbal response.)
22    Q.  Okay, and it was in 2016, do you remember
23  that?
24    A.  Yes.
25    Q.  Okay, and that was a sublease, correct, and
```

Page 56

```
 1  that was your testimony, and then you said in December
 2  of 2018, which is what you put on the schedules, you
 3  transferred that lease to True Count?
 4    A.  Correct.
 5    Q.  And that was through that assignment, is
 6  that correct?
 7    A.  Yes.
 8    Q.  Okay. So, based on that assignment, you
 9  transferred Consumer Advocacy's interest in that lease to
10  True Count?
11    A.  Correct.
12    Q.  But you're saying now that Guarantee would
13  not sign? In other words, Guarantee would not accept them
14  as a subtenant, is that what's happening?
15    A.  There was a verbal agreement. We've been
16  trying to get in contact with Guaranteed Rate. We think
17  -- and there is no answer.
18    Q.  Okay. So Consumer Advocacy is still then
19  liable on this lease?
20    A.  Correct.
21    Q.  And so how many months is it in arrears?
22    A.  Just April.
23    Q.  Just April?
24    A.  Uh-huh.
25    Q.  And under the terms of the lease do you know
```

14 (Pages 53 to 56)

Page 57

1  when they might be able to terminate the lease based on
2  non-payment? Do you know how much time you have? I mean,
3  have you received a notice from them that the rent hasn't
4  been paid?
5      A.   No, I have not.
6      Q.   You have not, okay, and nobody has called
7  you?
8      A.   No.
9      Q.   Okay. Did you guarantee the rent
10 personally? Usually in these commercial leases, a lot of
11 times they ask for personal guarantees. Did anybody
12 guarantee this rent?
13     A.   There is no personal guarantees.
14     Q.   On any of the rent?
15     A.   Yeah.
16     Q.   Okay. Why did Kaine Wen agree that True
17 Count would take over paying the rent? Why did they do
18 that? What was the benefit to them?
19         MR. BEHAR: If you know.
20         THE WITNESS: I don't know.
21 BY MS. SCARLETT:
22     Q.   You don't know, okay.
23          You mentioned that you got -- you were
24 contacted by Oregon. You didn't tell me how. Was it in
25 writing or by telephone, since the case has been filed?

Page 58

1      A.   Mail.
2      Q.   Mail, and what they -- what did you receive,
3  a letter?
4      A.   Yeah.
5      Q.   And what did the letter say?
6      A.   Cease and desist.
7      Q.   A cease and desist?
8      A.   Uh-huh.
9      Q.   An order or a letter?
10     A.   Just a letter.
11     Q.   And what does it say?
12     A.   I can't -- I don't remember.
13     Q.   But to cease and desist what?
14     A.   I don't know.
15     Q.   You don't know. Is that -- did you give it
16 to your attorney?
17     A.   No.
18     Q.   You haven't given it to your attorney?
19     A.   No.
20     Q.   So, so nobody knows about it?
21     A.   No.
22     Q.   So what does it mean to you? What does a
23 cease and desist letter mean to you?
24     A.   To stop doing business in that state.
25     Q.   That's what it means, it didn't tell you

Page 59

1  specifically what business, or what you were engaged in?
2  They just said you don't do business here, whatever the
3  business is?
4      A.   Correct.
5      Q.   Okay. Do you know why they would send that
6  to you?
7      A.   I don't know.
8      Q.   So what does that mean for you going
9  forward, and the operation of the business going forward,
10 what does that mean to the debtor?
11     A.   (No verbal response.)
12     Q.   Does that have any impact on what you're
13 doing?
14     A.   Yes, it does.
15     Q.   What does it -- how does it impact what
16 you're doing?
17     A.   That I cannot broker calls that are entering
18 the State of Oregon.
19     Q.   Okay, but you don't know why? Why Oregon is
20 telling you not to do that, you don't know why?
21     A.   I don't understand the question.
22     Q.   Okay. My question is if they're telling you
23 to cease and desist, okay, I have to assume that they
24 think that whatever you're doing is objectionable to them,
25 okay? I don't know, because I haven't seen the letter, so

Page 60

1  my question for you is what does that mean for you
2  operating in the other states? Do you think the debtor is
3  subject to getting a cease and desist in another state?
4  That's what I'm asking.
5          MR. BEHAR: I'm going to object to the
6  extent it calls for a legal conclusion.
7          THE WITNESS: Yes, that's attorney/client
8  privilege.
9  BY MS. SCARLETT:
10     Q.   Okay, and so the cease and desist, you think
11 it means you stop operating there. You don't know why?
12 And you don't think -- I mean, I don't -- you know, I'm
13 asking for your business decision going forward. In other
14 words, you don't think it means you need to stop doing
15 what you're doing at all? I'm just asking what you think,
16 because I think it was your testimony that with the State
17 of Minnesota, for example, you're not doing business there
18 either, correct?
19     A.   Correct.
20     Q.   Okay. So, you can't do business in
21 Minnesota. You can't do business in Oregon. Do you know
22 if it's the same reason that they both objected to what
23 you were doing? Do you know what aspect of your business
24 they have problems with? Is it a particular thing?
25     A.   It's based on complaints.

15 (Pages 57 to 60)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 876

**Page 61**

1  Q. Complaints, okay, and complaints about what?
2  A. Services.
3  Q. The services --
4  A. Uh-huh.
5  Q. -- that you provide? Because your testimony
6  is that you didn't really provide the services, right?
7  A. Correct.
8  Q. It was True Count. So, what are the
9  complaints about? Are they all the same? Are they
10 different? Did they give you a copy of the complaints?
11 A. No, they did not.
12 Q. And you don't know how many complaints there
13 were?
14 A. No, I don't.
15 Q. And you don't know what the basis of the
16 complaints were? Did it have to do with the calls that
17 you made? Did it have to do with emails or texts that you
18 sent?
19 A. (No verbal response.)
20 Q. You don't know?
21 A. Yeah, I don't know.
22 Q. Okay. So other than Oregon, any other
23 states postpetition have you been contacted since the
24 filing of the case, that you received any communication,
25 phone call, email, letter?

**Page 62**

1  A. No.
2  Q. Only Oregon.
3     So in terms of your operations going
4  forward, are those the only two states you're not
5  operating in at this time?
6  A. Depends.
7  Q. Okay. Tell me.
8  A. Because I'm brokering the calls.
9  Q. Uh-huh, okay.
10 A. So if a specific company wants to exclude
11 certain states, then it would be up to them.
12 Q. It would be up to the company?
13 A. Correct.
14 Q. But if you -- but can you broker a call in
15 Oregon?
16 A. I would exclude it.
17 Q. But so do you have to tell them that when
18 you're negotiating with them, or to pay -- where they're
19 saying that they're asking you for leads?
20 A. No, I don't have to, I don't have to tell
21 them.
22 Q. Okay. Does that have to do with the fact
23 that you're only doing leads now?
24 A. I don't understand the question.
25 Q. I mean, I'm trying to understand how you're

**Page 63**

1  not operating in Oregon and Minnesota based on what you
2  do, how do you do that?
3  A. You cannot target consumers in those
4  states --
5  Q. Okay.
6  A. -- through social media. You can exclude
7  those states if you like.
8  Q. Okay.
9  A. Right.
10 Q. But do you have to tell the people that are
11 buying the leads that you will not be operating in those
12 states? Do you have to tell them that, or they don't
13 care?
14 A. They don't care. I don't have to tell them.
15 Q. Okay, because they just want targets, they
16 don't care where they are?
17 A. Correct, they have to be interested in the
18 program, and they pay me on a cost per call basis.
19 Q. And it doesn't matter to them where it comes
20 from?
21 A. Correct.
22 Q. Okay. So ---
23 A. Unless they state otherwise.
24 Q. Oh, unless they actually say we want to
25 target -- so, for example, somebody is calling you and

**Page 64**

1  they actually want to target people in Oregon, then you
2  actually have say you can't do it?
3  A. Right.
4  Q. Okay. That's what I'm trying to understand.
5     Okay. So, going back to the statement, the
6  August 27th, so we talked about the Huntington Legal, and
7  then after that there is a $200,000 transfer to Annon
8  Enterprises (phonetic) who is Annon Enterprises?
9  A. A marketing company.
10 Q. Okay. So that's a company that you got
11 leads from?
12 A. No.
13 Q. Okay. What did that company do?
14 A. They would create a catalog and print.
15 Q. A catalog and print?
16 A. Right.
17 Q. Okay. So you used print advertising, too?
18 I thought you were only doing social media and ---
19 A. No, we tried it.
20 Q. Okay. So they prepared a catalog, and what
21 did the catalog have in it?
22 A. Company information, information about the
23 programs, a pretty big catalog, and then it was mailed to
24 people that we spoke to, or people that were enrolled.
25 Q. Okay. Who owns that company, do you know?

16 (Pages 61 to 64)

Page 65

1  A. I do not.
2  Q. How did you get into business with Annon
3  Enterprise? Were you the one that had the relationship?
4  Did anyone ---
5  A. Yes.
6  Q. Yes, okay, but you never -- did you meet
7  anybody that -- did you meet anyone from Annon Enterprise?
8  A. Yes.
9  Q. Who did you meet?
10 A. Kyle.
11 Q. What's the name of the person?
12 A. Kyle.
13 Q. Kyle what?
14 A. Kyle Kim.
15 Q. And who is he?
16 A. He works there.
17 Q. Okay, and so you met with him, and he would
18 design -- he designed the catalog, or you designed the
19 catalog?
20 A. He designed it.
21 Q. And he did the mailing?
22 A. Yes.
23 Q. Okay, and so how much was it per catalog, do
24 you know?
25 A. $2.

Page 66

1  Q. $2 a catalog. So, 200,000, it's 100,000
2  catalogs?
3  A. Correct.
4  Q. And he would mail them out?
5  A. Correct.
6  Q. And how often would you do the catalog?
7  A. For a couple of months out of the year.
8  Q. A couple months out of the year. Okay. So,
9  I'm looking at the statement, and so it looks like you
10 paid them 200,000 on August 13th, you paid them 200,000
11 August 20th, so that's a week later, and then you paid
12 them 200,000 the following week, August 27th. So that's
13 600,000 just in August. That was for catalogs?
14 A. Yes.
15 Q. You actually paid them another 200,000 the
16 week before, but it was weekly. So, is that -- do you
17 remember if that's how it was, it was weekly, they were
18 billed weekly?
19 A. Yes, for a couple of months.
20 Q. So, you only used them for a couple of
21 months ever, or just a couple of months every year?
22 A. I don't remember, I don't know.
23 Q. Was there an agreement, a written agreement?
24 How would you know how much to pay them?
25 A. An invoice.

Page 67

1  Q. So it was invoices. So, QuickBooks would
2  have those invoices?
3  A. Yes.
4  Q. Okay. All right. So, I guess I really do
5  need the QuickBooks. So that looks like in August you
6  paid them $800,000. Again, I'm just trying to figure out
7  what the biggest portion of the expenses were, and you did
8  say marketing. So, that's one of the big expenses, but
9  did you do cataloging all the time? You said two months
10 out of the year. What would determine when you would do
11 the cataloging?
12 A. When we needed marketing.
13 Q. And this, and Kyle Kim, what does he do?
14 He's a printer? This company is a printing company?
15 A. They do marketing.
16 Q. That's what they do, marketing, but print
17 marketing?
18 A. Correct.
19 Q. Are you doing any work with them now, by any
20 chance?
21 A. No.
22 Q. The work that you're doing now, you don't
23 need to do that kind of marketing, or you just haven't?
24 A. Don't need to.
25 Q. Okay. So none of those large expenses going

Page 68

1  forward.
2     Okay, and I think we had had some testimony
3  before about Akerman, LLP. Do you recall that law firm,
4  working with that law firm, Akerman?
5  A. Yes.
6  Q. What did Akerman, what kind of services did
7  they provide to you, with regard to what cases, do you
8  remember?
9  A. TCPA.
10 Q. Okay, and are they still doing work for
11 you --
12 A. No.
13 Q. -- Consumer Advocacy?
14    Okay. So sitting here today do you know
15 what's going to happen with the rent, the rent for that --
16 for Irvine, the Irvine location? What are you going to do
17 about that?
18 A. We amended our schedules.
19 Q. I understand that, but you're saying, your
20 testimony is that the company never approved the sublease,
21 the landlord didn't.
22 A. They verb ---
23 Q. Oh, you're saying they verbally did?
24 A. Uh-huh.
25 Q. So what are you going to do about that?

17 (Pages 65 to 68)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 878

Page 69

1  A. Continue to call them.
2  Q. Okay. So that's what you're doing, you've
3  been calling them?
4  A. Uh-huh.
5  Q. To ask them what?
6  A. When are you going to sign the assignment?
7  Q. Okay, and when you say "verbally", when did
8  they verbally approve it, who did? You had a meeting with
9  them?
10  A. Oliver Line (phonetic).
11  Q. Okay, and you had a meeting with them?
12  A. Uh-huh.
13  Q. And at that meeting they said they were
14  going to --
15  A. Yes.
16  Q. -- execute it, and you've been sending it to
17  them, or calling them and nobody -- you haven't heard
18  back, but in the meantime the rent isn't being paid?
19  A. Right.
20  MR. BEHAR: I could argue that the lease has
21  been rejected.
22  MS. SCARLETT: Yeah, but you have damages,
23  so you still have to figure out what you're going to do
24  with it.
25  MR. BEHAR: They've got to file a claim.

Page 70

1  BY MS. SCARLETT:
2  Q. But I think -- well, actually you said
3  you've been calling them?
4  A. Yeah.
5  Q. And they don't -- and I think you testified
6  earlier that they hadn't -- that you had not notified them
7  that you had filed bankruptcy, correct? That was your
8  testimony months ago.
9  MR. BEHAR: We amended the schedules.
10  They're listed now.
11  BY MS. SCARLETT:
12  Q. I understand, but I'm saying you hadn't
13  notified them. You've never actually spoken to them and
14  told them you filed bankruptcy?
15  A. I'm sorry?
16  Q. You've never told them you filed bankruptcy?
17  You've never spoken to Oliver and told him you filed
18  bankruptcy, have you?
19  A. No, we have not.
20  Q. So I understand you amended the schedules,
21  but ---
22  MR. BEHAR: And sent them notice.
23  MS. SCARLETT: Okay. You did, okay.
24  MR. BEHAR: Of course. We filed a
25  certificate of service.

Page 71

1  BY MS. SCARLETT:
2  Q. So if I wanted copies of the invoices for
3  all of these marketing companies that you paid, I know you
4  said the QuickBooks would have probably the documents.
5  Would it have the invoices in there? Are they scanned?
6  How did you keep records of invoices?
7  A. Tuong should have most of them. I don't
8  know, we'd have to ask. There were so many.
9  MS. SCARLETT: Okay. Okay. I mean, because
10  that's what I would need to see for those transfers, those
11  significant transfers, is the invoices. I need to see the
12  backup.
13  MR. BEHAR: Send me something in writing so
14  I know what you're looking for.
15  MS. SCARLETT: Yeah, but I'm telling you
16  right now, I want the backup for those marketing payments.
17  MR. BEHAR: I'm just asking you to put it in
18  writing so we all are on the same page.
19  MS. SCARLETT: Right.
20  MR. BEHAR: Then we won't have to order
21  transcripts. I've asked you to put it in writing before.
22  MS. SCARLETT: No, I wanted to ask him
23  first.
24  MR. BEHAR: Well, except you don't have all
25  the information, you're asking him blind, which I

Page 72

1  understand, but we were trying to prevent that from
2  happening.
3  MS. SCARLETT: Yep. I just have a couple
4  more.
5  THE WITNESS: Can I get my jacket? It's
6  really cold in here.
7  MS. SCARLETT: Sure.
8  THE WITNESS: It's in my car.
9  MS. SCARLETT: Yeah, go get it, no problem,
10  but it's raining, it's pouring.
11  MR. BEHAR: Use this.
12  MS. SCARLETT: I don't have an umbrella.
13  MR. BEHAR: That' all right. I'm not cold.
14  THE WITNESS: Are you sure?
15  MR. BEHAR: I'm positive.
16  MS. SCARLETT: No, apparently he's hot all
17  the time.
18  MR. BEHAR: I am.
19  MS. SCARLETT: So I think you're fine.
20  MR. BEHAR: I didn't move down here because
21  of the weather.
22  Let me see how you look. Pretty good.
23  THE WITNESS: Yeah? My size, too.
24  MR. BEHAR: It's a little big on you.
25  BY MS. SCARLETT:

18 (Pages 69 to 72)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 879

Page 73

1 Q. Okay. So on these statements, after
2 September you have these other statements. What are
3 these? And you can look at them.
4     MR. BEHAR: He switched banks.
5     MS. SCARLETT: Okay. So, yeah, let's talk
6 about those statements, because they don't give me any
7 information.
8     MR. BEHAR: There is one Chase in there.
9     MS. SCARLETT: Yeah.
10 BY MS. SCARLETT:
11 Q. You changed banks from Chase at some point?
12 A. Yes.
13 Q. What happened, why did you change banks?
14 A. Chase closed down our account.
15 Q. Okay. They closed your account. Do you
16 know why?
17 A. No.
18 Q. They never told you. They never sent a
19 letter?
20 A. I'm sorry?
21 Q. They never sent a letter?
22 A. They do, and they don't give a reason.
23 Q. Was there money in the bank? Was there
24 money in the account?
25 A. I don't know.

Page 74

1 Q. Okay. So you opened a new account. Where
2 did you open it? What bank is that? I can't tell.
3 A. Sunwest.
4 Q. Sunwest, okay, but if you look, if you look
5 at the bank account, it's, like, two pages long, and it
6 doesn't give the name of the people, like you know how the
7 other account I could ask you, you know, for the payments
8 to Annon Enterprises. When you look at that it doesn't
9 tell me the names. So, for example, on the September 28th
10 one --
11     MR. BEHAR: It's this one.
12 BY MS. SCARLETT:
13 Q. -- and I look at the first wire transfer in,
14 and it's showing me, you know, a wire trans -- online
15 transfer from Analyzed. What's Analyzed, do you know?
16 A. I don't know.
17 Q. Do you know who could have deposited
18 $185,000 into that account in September of 2018? Because
19 that's a big deposit.
20 A. I can find out, but I don't know.
21 Q. You think it might have been True Count?
22 A. I don't want to guess.
23 Q. Okay, but do you understand why this bank
24 account, this bank statement is just not helpful?
25 Because, you know, you can't even tell who it is.

Page 75

1 A. Right.
2 Q. So you said you can find out.
3 A. Right, yeah.
4 Q. And is the account with this Sunwest, that's
5 closed now?
6 A. Yes.
7 Q. It is closed. I had asked you this before,
8 I don't think you were able to explain it to me, or at
9 least now that I understand the business model a little
10 better, maybe I can ask it in a better way. I wanted to
11 find out about all the people that Consumer Advocacy
12 enrolled, right? So, you enrolled people, do you know how
13 many, you know, ballpark?
14 A. I don't know.
15 Q. Would it be more than 50,000 people? Less?
16 You don't know?
17 A. Less.
18 Q. Less. All right. So they enrolled these
19 people, and they signed up to pay, and I think it was your
20 testimony they would make payments in installments,
21 correct? They didn't make lump sum payments?
22 A. Correct.
23 Q. So at the time that you shut down, when you
24 shut down the company, or stopped operating, is it
25 possible that people would have been, like, midstream, for

Page 76

1 example, they were paying -- what was the payment period
2 usually, the term of payment? I think you had testified
3 that there was, like, an 899, and then there was a 1,099,
4 is that right, fee?
5 A. Correct.
6 Q. So how would that break down, like, on a
7 monthly?
8 A. Correct.
9 Q. Was it two years of payments? Was it one
10 year of payments?
11 A. No, usually three to five months.
12 Q. Oh, so they paid over three to five months.
13 Okay. So at the time that the business shut
14 down, you know that there were payments that would have
15 been -- that people would have been done with payments or,
16 I mean, what if somebody had, like, a third month or a
17 fifth month payment that came in after you shut down,
18 where would that money go? I mean, did that happen, did
19 you have money that came in after you closed?
20 A. Yes.
21 Q. Okay. So you think then by December --
22 like, by the time you filed, you think that people with
23 payments would have been done --
24 A. Yep.
25 Q. -- because you wouldn't have signed anybody

19 (Pages 73 to 76)

Page 77

1 else up?
2    A. Correct.
3    Q. Okay, and then in terms of the services, you
4 weren't providing the services. So True Count was
5 providing the services. So the fact that you closed
6 wouldn't effect their service, am I right? Or were there
7 people that you were providing services for?
8    A. No, there were no people we were providing
9 services for.
10    Q. I know you had said in the beginning you
11 tried to do that, but then it was disorganized, but there
12 weren't people from that beginning period that you were
13 still providing services for?
14    A. No.
15    Q. You had pretty much shipped all of that, you
16 had outsourced all the servicing?
17    A. Correct.
18    Q. Okay, and did Consumer Advocacy have any
19 other companies like True Count that it would outsource
20 servicing to?
21    A. Yes, just the one that I mentioned.
22    Q. Just the one that you mentioned, no more,
23 okay.
24        MR. BEHAR: GST Factoring.
25        MS. SCARLETT: I'm almost done.

Page 78

1 BY MS. SCARLETT:
2    Q. Do you know what Debt Watch Dogs is? Does
3 that name sound familiar?
4    A. Yes.
5    Q. What is that?
6    A. A marketing company.
7    Q. Okay. Now, we always had -- when I look at
8 the statements, most of the time what I see is True Count
9 depositing money into the account, and that was as a
10 product of that 55 percent split that you had with them,
11 correct?
12    A. Yes.
13    Q. And did you ever transfer money to True
14 Count? Did Consumer Advocacy ever transfer money to True
15 Count?
16    A. Yes.
17    Q. Okay, and in what circumstance would they
18 transfer money?
19    A. Loan.
20    Q. Okay. Tell me about that, loan to who from
21 who?
22    A. Loan from CAC to True Count.
23    Q. So, Consumer Advocacy would loan money to
24 True Count?
25    A. Yes.

Page 79

1    Q. When did that happen? Did it happen more
2 than once?
3    A. Yes.
4    Q. And what did they loan money -- why did they
5 loan money to True Count?
6    A. They needed money.
7    Q. Do you remember when they loaned money to
8 them?
9    A. The exact dates?
10    Q. Yes. Or not exact, ballpark, was it last
11 year? Do you recall loaning money to them last year?
12    A. Yes.
13    Q. And did True Count pay the money back?
14    A. Yes.
15    Q. How do you know they paid it back?
16    A. It's in the bank statements.
17    Q. It's in the bank statements, and that would
18 be separate and apart from the 55 percent deposits?
19    A. Yes.
20    Q. And so True Count, any money that you loaned
21 to True Count, you believe has been paid back?
22    A. Yes.
23    Q. And I'd be able to see that from QuickBooks?
24    A. Yes.
25    Q. Okay, and the loans, were they -- was there

Page 80

1 any written agreement on those loans?
2    A. No.
3    Q. Who authorized the loans? You would
4 authorize the loan?
5    A. I would, yes.
6    Q. And it would be a wire?
7    A. Yes, and ACH possibly.
8    Q. And ACH, okay.
9    A. Yeah.
10    Q. Ballpark last year, you think you can tell
11 me how much? Was it more than 500,000, less than 500,000?
12    A. More than 500,000.
13    Q. In one year?
14    A. Yes.
15    Q. More than a million?
16    A. No.
17    Q. Now one thing I notice about the True Count
18 payments, when they deposit, it's like whole numbers, it's
19 300,000, 200,000, is that typical for a 55 percent split?
20 Are the calls, like, on a -- is it, like, a dollar per
21 call, like, how much is -- you know, why would it be whole
22 numbers whenever they would give you your percentage?
23    A. I don't know. I can find out.
24    Q. Okay, because if I saw one that wasn't, do
25 you think that might have been a loan payment -- a loan

20 (Pages 77 to 80)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875
19-10655-BKC-JKO 341 Tr. 05.135.19

Pl. Ex. 47-3
p. 881

Page 81

```
 1  repayment?
 2      A.  I don't know.
 3      Q.  You don't know.
 4          When you were servicing these clients -- or
 5  not servicing, but when you would enroll them, and they
 6  paid over the three months, did you have clients that
 7  didn't pay?  Did you have customers that didn't pay?
 8      A.  Yes.
 9      Q.  And what would happen to those accounts?
10      A.  They would ---
11      Q.  Did you try to collect them?
12      A.  Yes.
13      Q.  And how would you do that?
14      A.  We would call.
15      Q.  Okay.  So you would personally call them and
16  try to collect, and then what if they didn't pay, what
17  would happen?
18      A.  They would be cancelled.
19      Q.  Okay.  Now do you know if what you're doing
20  now, you said you're marketing leads, do you know if what
21  you're doing now is any -- well, prior to the time that
22  the debtor filed, did the debtor require any special
23  license or permit to do the work that it did, enrolling
24  people for these programs?  Did it have any special
25  license?
```

Page 82

```
 1      A.  Yes, it did.
 2      Q.  What did it have?
 3      A.  Debt settlement license in the State of
 4  North Dakota.
 5      Q.  Okay, but only in North Dakota?
 6      A.  Yes.
 7      Q.  Now, is that because North Dakota is the
 8  only one that required a license?  Do you know why you
 9  only had it in North Dakota?
10      A.  They requested it.
11      Q.  They requested that you get a license, and
12  you did?
13      A.  Uh-huh.
14      Q.  And so you operated, you continued to
15  operate in North Dakota after you got the license?
16      A.  Yes.
17      Q.  Okay, and up until -- well, I guess once you
18  stopped operating, then you didn't need the license any
19  more?
20      A.  Yes.
21      Q.  And for what you do now do you need a
22  license, the marketing?
23      A.  No.
24      Q.  Okay, even if you're operating in North
25  Dakota --
```

Page 83

```
 1      A.  Yes.
 2      Q.  -- you don't need a license?
 3      A.  No.
 4      Q.  And you've checked with them, it's not the
 5  same thing?
 6      A.  It's not the same thing.
 7      Q.  Okay.  Generating the leads is not the same
 8  as enrolling people, is that the difference?
 9      A.  Correct.
10      Q.  Okay, and when people would pay over a three
11  to five month range, did you charge interest on the
12  payments, or it was just a straight division, you know, if
13  it's three months, it was the payment divided by three?
14      A.  Correct.
15      Q.  Okay.  So no interest, it wasn't like a
16  factoring or ---
17      A.  No interest.
18      Q.  Okay, and does -- did Consumer Advocacy have
19  a license, like an operating license in any of the states
20  to do business?
21      A.  (No verbal response.)
22      Q.  No operating license?
23      A.  No.
24      Q.  Did it need to register in any of the
25  states?
```

Page 84

```
 1      A.  No.
 2      Q.  Okay, and what you're doing now, are you
 3  registered to do business here in Florida?
 4      A.  No, we're not.
 5      Q.  Are you registered to do business anywhere?
 6      A.  California.
 7      Q.  In California, because it's a California
 8  company?
 9      A.  Correct.
10      Q.  Or was a California company, or is it still
11  a California company, which is it?
12      A.  It's a California company, with an office in
13  Florida.
14      Q.  Okay, but no office in California?
15      A.  No.
16          MS. SCARLETT:  Okay, with that I'm going to
17  conclude the 341.
18
19
20
21
22          (Thereupon, the 341 Meeting of Creditors was
23  concluded.)
24
25
```

21 (Pages 81 to 84)

Page 85

**CERTIFICATION**

STATE OF FLORIDA :
COUNTY OF MIAMI-DADE :

    I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing Section 341 Meeting of Creditors was transcribed by me from a digital recording made on the date and at the place as stated in the caption hereto on page 1; that the foregoing computer-aided transcription is a true record to the best of my ability of said proceedings.

    WITNESS my hand this 28th day of May, 2019.

_____
CHERYL L. JENKINS, RPR, RMR
Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #GG 138863
December 27, 2021

# Exhibit



ORDERED in the Southern District of Florida on July 31, 2019.

John K. Olson, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:  Case No.: 19-10655-BKC-JKO

CONSUMER ADVOCACY CENTER INC.,  Chapter 11

Debtor.
_____/

**ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE
AND SETTING A STATUS CONFERENCE**

THIS MATTER came before the Court on July 31, 2019 at 10:30 a.m. upon the *United States Trustee's Motion For The Appointment Of A Chapter 11 Trustee, Or Alternatively, For The Appointment Of A Chapter 11 Examiner* [D.E. #54] (the "Motion"). The Court having reviewed the Motion and the record, heard the argument of counsel, and for the reasons stated on the record, it is

**ORDERED** as follows:

1. The Motion is **GRANTED** and the United States Trustee is directed to appoint a Chapter 11 Trustee immediately.

2. The Chapter 11 Trustee is directed to appear for a status conference hearing that

the Court will hold in this case on **August 19, 2019 at 10:30 a.m.** at the U.S. Courthouse, Courtroom 301, 299 E. Broward Blvd., Ft. Lauderdale, Florida 33301.

###

Submitted by: Zana M. Scarlett, Esq.
U.S. Trustee's Office
51 SW 1st Ave., Rm. 1204
Miami, FL 33130

**ALL CREDITORS AND PARTIES IN INTEREST (BY CLERK'S OFFICE)**

# Exhibit

| | |
|---|---|
| STATE OF NORTH DAKOTA | IN DISTRICT COURT |
| COUNTY OF BURLEIGH | SOUTH CENTRAL JUDICIAL DISTRICT |
| STATE OF NORTH DAKOTA EX REL. WAYNE STENEHJEM, ATTORNEY GENERAL, | Civil No. 08-2018-CV-01021 |
| Petitioner, | ASSURANCE OF VOLUNTARY COMPLIANCE |
| -vs- | |
| CONSUMER ADVOCACY CENTER INC. DBA PREMIER STUDENT LOAN CENTER | |
| Respondent | CPAT 180001.002 |

To: CONSUMER ADVOCACY CENTER INC.
DBA PREMIER STUDENT LOAN CENTER
173 TECHNOLOGY DRIVE #202
IRVINE, CA 92618-2489

1. WHEREAS Wayne Stenehjem, Attorney General of the State of North Dakota (hereinafter "the Attorney General") acts in the public interest pursuant to North Dakota Century Code (N.D.C.C.) chs. 51-15 (commonly known as the "Consumer Fraud Law") and 13-11 (commonly referred to as the "Debt-Settlement Providers Law");

2. WHEREAS Consumer Advocacy Center, Inc. is a California Business Corporation with its principal place of business located at 173 Technology Drive #202 Irvine, CA 92618. Respondent is not registered in the State of North Dakota;

3. WHEREAS Consumer Advocacy Center, Inc. dba Premier Student Loan Center (hereinafter "Respondent") is engaged in the business of advertising, soliciting or

selling merchandise, as that term is defined in N.D.C.C. § 51-15-01, including student loan relief services, to residents in North Dakota;

4. WHEREAS the Attorney General has determined that, in the public interest, an investigation should be conducted into the activities of Respondent to ascertain whether violations of N.D.C.C. chs. 51-15 and 13-11 have occurred;

5. WHEREAS it is unlawful for any person to act as a debt-settlement provider in North Dakota as defined in N.D.C.C. § 13-11-01 except as authorized by N.D.C.C. ch. 13-11 and without first having obtained a license under N.D.C.C. ch. 13-11;

6. WHEREAS the Attorney General alleges that Respondent has violated N.D.C.C. ch. 13-11 by acting as a debt-settlement provider in North Dakota without the required license;

7. WHEREAS a violation of N.D.C.C. ch. 13-11 is a violation of N.D.C.C. ch. 51-15;

8. WHEREAS the parties desire to settle this matter without further investigation, litigation or adjudication; **NOW, THEREFORE**, it is hereby agreed as follows:

9. This Assurance of Voluntary Compliance shall constitute the statutory Assurance of Voluntary Compliance as provided in N.D.C.C. § 51-15-06.1. Respondents acknowledge *in personam* jurisdiction in North Dakota and agree the forum of any action in connection with this agreement shall be in the State courts of North Dakota. Nothing in this Assurance of Voluntary Compliance is, or may be represented as, an approval or endorsement of Respondent or its business practices,

nor a grant of any affirmative right to Respondent. Nothing in this Assurance of Voluntary Compliance is intended to waive any rights or private remedies available to consumers.

10. Respondent, its directors, officers, principals, employees, agents, and servants, and all other persons in active concert or participation with them, voluntarily agrees to be, and hereby is, permanently enjoined from engaging in any violations of N.D.C.C. chs. 51-15.

11. Respondent, its directors, officers, principals, employees, agents, and servants, and all other persons in active concert or participation with it, voluntarily agrees to be, and hereby is, permanently enjoined from engaging in any violations of N.D.C.C. ch. 13-11, and agree to comply with N.D.C.C. ch. 13-11, including its licensing requirements, before acting as a debt-settlement provider in North Dakota.

12. Respondent agrees to obtain the debt-settlement provider license pursuant to N.D.C.C ch. 13-11, within sixty (60) days of this agreement. If Respondent does not obtain the license within sixty (60) days, Respondent shall cancel and refund all existing agreements with North Dakota consumers and shall, in writing, notify all the consumers, through a letter, subject to approval by the Office of the Attorney General, giving the consumer notice that the consumer's contract with Respondent has been cancelled and refunded.

13. Respondents agree to cancel and fully refund any contracts with any existing North Dakota customers who makes a cancellation and refund request to Respondents or the Attorney General within sixty (60) days of the Court's approval of