# DECLARATION OF DAVID C. EVERS

Pursuant to 28 U.S.C. § 1746

I, David C. Evers, hereby declare and state as follows:

1. I am over the age of eighteen and reside in Raleigh, North Carolina. I am employed as a Consumer Protection Specialist with the Consumer Protection Division of the North Carolina Department of Justice ("NCDOJ") in Raleigh, North Carolina and have been employed in that capacity for nineteen years. The following facts are known to me personally and if called as a witness, I would competently testify thereto.

2. As part of my job responsibilities, I regularly conduct and assist in investigations of business activities of individuals and entities that the NCDOJ has reason to believe may be acting in violation of North Carolina's consumer protection laws. I have been assigned to work on the NCDOJ's investigation into the activities of Consumer Advocacy Center, Inc. d/b/a Premier Student Loan Center and its related entities, including but not limited to True Count Staffing, Inc. and Prime Consulting LLC, and the enterprise's controlling individuals (collectively "CAC").

3. In the course of the NCDOJ's investigation, including through the issuance of civil investigative demands (or investigative subpoenas), the NCDOJ obtained copies of numerous lease agreements for the lease of real estate premises by CAC. My review of various lease agreements entered into by CAC is summarized in the following paragraphs.

4. On November 4, 2016, "Consumer Advocacy Center dba Premier Student Loan Center" (designated as "Sublessee") entered into a thirty-nine month lease agreement with Guaranteed Rate, Inc. (designated as "Sublessor") to lease the premises located at 173

Technology Drive, Suite 202, Irvine, California—which is described in the lease as consisting of approximately 15,000 square feet of office space and 60 unreserved vehicle parking spaces—at a base rent of $18,000.00 per month (hereafter "Technology Drive Lease"). The terms of the Technology Drive Lease provide that the lease commenced on December 1, 2016 and that the lease will expire on February 28, 2020. Paragraph 1.8 of the Technology Drive Lease, which specifies the "Agreed Use" of the premises, states: "The Premises shall be used and occupied only for Student loan center." The Technology Drive Lease shows it was signed and initialed by Kaine Wen as "GC" on behalf of "Consumer Advocacy Center, dba Premiere Student Loan Center," as Sublessee.

5. A true and correct copy of the aforementioned Technology Drive Lease is attached hereto as **Attachment A**.

6. On January 19, 2018, True Count Staffing, Inc. (designated as "Lessee") entered into a fifty-one month lease agreement with Stivers Investment Company ("designated as "Lessor") to lease the premises located at 8 Hughes Parkway, #210, Irvine, California 92618 ("Hughes Parkway Lease")—which is described in the lease as consisting of approximately 10,054 rentable square feet and 35 unreserved vehicle parking spaces—at a base rent of $10,557.00 per month. The terms of the Hughes Parkway Lease provide that the lease commenced on March 1, 2018 and that the lease will expire on May 31, 2022. The Hughes Parkway Lease shows it was signed and initialed by Kaine Wen on behalf of "True Count Staffing, Inc.," as Lessee, and that Mr. Wen lists his email address as kaine@premierstudentloancenter.com.

7. The Hughes Parkway Lease contains a "Guaranty of Lease" in which "Kaine Wen & Consumer Advocacy Center, Inc." are identified as having "a financial interest" in Lessee True Count Staffing, Inc., and agree to be "Guarantors" of the performance of all obligations of True Count Staffing, Inc. under the Hughes Parkway Lease (hereafter "Hughes Parkway Lease Guaranty"). The Hughes Parkway Lease Guaranty shows it was signed and initialed on January 22, 2018 by Kaine Wen on behalf of "Guarantors Kaine Wen & Consumer Advocacy Center."

8. A true and correct copy of the Hughes Parkway Lease and related documents, including the Hughes Parkway Lease Guaranty, are attached hereto as **Attachment B.**

9. On February 23, 2018, Kaine Wen on behalf of SL Account Management (designated as "licensee") entered into a six-month service license agreement with Irvine Office and Storage, LLC for the use of a work station and mail service located at 8 Whatney, Suite 100, Irvine, CA 92618 ("8 Whatney Agreement"). The agreement shows a service license start date of March 1, 2018 and a termination date of August 31, 2018 at a base monthly payment of $255.00. The 8 Whatney Agreement was renewed on July 17, 2018 and shows a service license start date of September 1, 2018 and a termination date of February 28, 2019 at a base monthly payment of $280.00. The 8 Whatney Agreement provides for the shared use of common areas, including conference rooms, lobby and kitchen areas, mail services, beverage/lounge services, telephone installation and programming. The 8 Whatney Agreement shows it was signed and initialed by Kaine Wen on behalf of "SL Account Mgmt" as Licensee, and that Mr. Wen listed his email address

as kaine@slaccountmgmt.com.

10. The 8 Whatney Agreement includes a tenant information sheet which shows Kaine Wen as owner of "SL Account Mgmt" and describes the company's business as "document preparation processing & customer service." The agreement also includes a copy of an Application for Delivery of Main Through Agent ("PS Form 1583"), signed by Kaine Wen on behalf of SL Account Mgmt, authorizing the delivery of mail to and in care of Irvine Office and Storage as its authorized agent for mail addressed to 8 Whatney, Suite 100, Irvine, CA 92618. A copy of Mr. Wen's California driver license is included with PS Form 1583 and shows Mr. Wen's address as ███████████████, Azusa, CA ███.

11. Among other lease documents and information I reviewed, I also examined payment transactions to Irvine Office and Storage from Kaine Wen for workstation and mail service from February 2018 to October 2018. The payment transactions show monthly payment amounts from $255.00 to $275.00 debited from a bank account ending in 1126.

12. A true and correct copy of the aforementioned 8 Whatney Agreement is attached hereto as **Attachment C.**

13. On May 16, 2018, Prime Consulting, LLC (designated as "client") entered into a month-to-month virtual office agreement with Irvine Ranch Executive Suites/Universal Virtual Office located at 2522 Chambers Road, Suite 100, Tustin, CA 92780 ("Chambers Road Agreement"). The agreement shows a monthly payment of

$59.00 for a basic mailbox package to include mail handling, free coffee, parking, Wi-Fi, and discounted meeting room/office services. The Chambers Road Agreement shows it was signed by Le Ho on behalf of Prime Consulting, LLC as client, and that Mr. Ho listed his email address as calvin.ho@slaccountmgmt.com.

14. The Chambers Road Agreement includes a credit card authorization for Irvine Ranch Executive Suites to charge the credit card of Le Trong Hieu Ho at a billing address of ███████████████████, El Monte, CA ████. The credit card authorization shows it was signed by Le Ho.

15. A true and correct copy of the aforementioned Chambers Road Agreement is attached hereto as **Attachment D.**

16. On August 8, 2018, True Count Staffing, Inc. (designated as "Sublessee") entered into a lease agreement with Guaranteed Rate, Inc. (designated as "Sublessor") for a sixteen-month term for the premises located at 173 Technology Drive, Suite 201, Irvine, California 92618—which is described in the lease as consisting of approximately 16,640 square feet and 68 unreserved vehicle parking spaces—at a base rent of $19,968.00 per month (hereafter "Technology Drive Lease Two"). The terms of Technology Drive Lease Two provide that the lease commenced on November 1, 2018 and that the lease will expire on February 29, 2020. The Technology Drive Lease Two shows it was signed and initialed by Kaine Wen on behalf of True Count Staffing, Inc., as Sublessee.

17. Attached to the Technology Drive Lease Two is a "Guaranty of Sublease" in which the Sublessee of the Technology Drive Lease Two is identified as "True Count

Staffing, Inc., dba First Priority Inc., and dba Premiere Student Loan Center." The Guaranty of Sublease provides that "Consumer Advocacy Center, Inc. hereinafter `Guarantors' have a financial interest in Sublessee," and Consumer Advocacy Center, Inc. guarantees the payment of rents by True Count Staffing, Inc. Based on my review, the Guaranty of Sublease for Technology Drive Lease Two appears to have been signed by Albert Kim.

18. A true and correct copy of the aforementioned Technology Drive Lease Two and Guaranty of Sublease for Technology Drive Lease Two are attached hereto as **Attachment E.**

19. On October 10, 2018, Prime Consulting, LLC (designated as "Tenant") entered into a twenty-four month lease agreement with Discovery Business Center, LLC (designated as "Landlord") to lease the premises located at 15261 Laguna Canyon Road, Irvine, California 92618—which is described in the lease as consisting of approximately 22,296 rentable square feet and up to 79 parking spaces—at a basic rent of $50,166.00 per month for the first 12 months and $52,396 per month for the second 12 months (hereafter "Laguna Canyon Lease"). The terms of the Laguna Canyon Lease provide that the lease commenced on October 15, 2018 and that the lease will expire on October 31, 2020. The Laguna Canyon Lease shows it was signed electronically by "Calvin Ho" as "Operations Director," on behalf of Prime Consulting LLC, as Tenant. Attached to the Laguna Canyon Lease is an "Acceptance of Premises Commencement Memorandum" in which Prime Consulting LLC acknowledges that it inspected the premises on October 11, 2018, and that

6
Evers Decl.
Pl. Ex. 63
p. 1711

the premises are satisfactory. The "Acceptance of Premises Commencement Memorandum" shows it is signed by Calvin Ho on behalf of Prime Consulting LLC.

20. The Laguna Canyon Lease includes a "Guarantee of Lease," in which "Consumer Advocacy Center Inc." agrees to be a "Guarantor" and guarantees the performance of Prime Consulting LLC, including payment of rents (hereafter Laguna Canyon Lease Guarantee"). The Laguna Canyon Lease Guarantee shows it is signed electronically by "Albert Kim" as "Owner" of "Consumer Advocacy Center, Inc." on behalf of Consumer Advocacy Center, Inc. as Guarantor.

21. Among other lease documents and information I reviewed, I also examined a check dated October 3, 2018 from Prime Consulting, LLC to Discovery Business Center, LLC for $221,500.00 as "lease deposit." The check appears to have been signed by Kaine Wen.

22. A true and correct copy of the aforementioned Laguna Canyon Lease and related documents, including the Laguna Canyon Lease Guarantee and lease deposit check, are attached hereto as **Attachment F**.

23. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on October __11__, 2019.

David C. Evers



EXHIBIT A



## STANDARD SUBLEASE
## MULTI-TENANT
### AIR COMMERCIAL REAL ESTATE ASSOCIATION

1. **Basic Provisions ("Basic Provisions").**
   1.1 **Parties:** This Sublease ("Sublease"), dated for reference purposes only November 4, 2016, is made by and between Guaranteed Rate Inc. ("Sublessor") and Consumer Advocacy Center dba Premiere Student Loan Center ("Sublessee"), (collectively the "Parties", or individually a "Party").
   1.2(a) **Premises:** That certain portion of the Project (as defined below), known as 173 Technology Drive, Suite 202, Irvine, CA consisting of approximately 15,000 square feet ("Premises"). The Premises are located at: 173 Technology Drive, Suite ? in the City of Irvine, County of Orange, State of CA, with zip code 92618. In addition to Sublessee's rights to use and occupy the Premises as hereinafter specified, Sublessee shall have nonexclusive rights to the Common Areas (as defined below) as hereinafter specified, but shall not have any rights to the roof, the exterior walls, or the utility raceways of the building containing the Premises ("Building") or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project."
   1.2(b) **Parking:** 60 unreserved and 0 reserved vehicle parking spaces.
   1.3 **Term:** 3 years and 3 months commencing December 1, 2016 ("Commencement Date") and ending February 28, 2020 ("Expiration Date").
   1.4 **Early Possession:** If the Premises are available Sublessee may have non-exclusive possession of the Premises commencing November 15, 2016 ("Early Possession Date").
   1.5 **Base Rent:** $18,000.00 per month ("Base Rent"), payable on the first (1st) day of each month commencing December 1, 2016.
   ☑ If this box is checked, there are provisions in this Sublease for the Base Rent to be adjusted.
   1.6 **Sublessee's Share of Operating Expenses:** Fifty percent (50 %) ("Sublessee's Share"). In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.
   1.7 **Base Rent and Other Monies Paid Upon Execution:**
       (a) **Base Rent:** $18,000.00 for the period December 1, 2016 – December 31, 2016.
       (b) **Security Deposit:** $68,000.00 ("Security Deposit").
       (c) **Other:** $7,051.42 for December NNN Charges
       (d) **Total Due Upon Execution of this Lease:** $93,051.42
   1.8 **Agreed Use:** The Premises shall be used and occupied only for Student loan center and for no other purposes.
   1.9 **Real Estate Brokers:**
       (a) **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):
       ☑ Cushman & Wakefield of California, Inc. represents Sublessor exclusively ("Sublessor's Broker");
       ☑ Kidder Mathews represents Sublessee exclusively ("Sublessee's Broker"); or
       ☐ _____ represents both Sublessor and Sublessee ("Dual Agency").
       (b) **Payment to Brokers:** Upon execution and delivery of this Sublease by both Parties, Sublessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (~~or if there is no such agreement, the sum of _____ or _____% of the total Base Rent~~) for the brokerage services rendered by the Brokers.
   1.10 **Guarantor.** The obligations of the Sublessee under this Sublease shall be guaranteed by _____ ("Guarantor").
   1.11 **Attachments.** Attached hereto are the following, all of which constitute a part of this Sublease:
   ☑ an Addendum consisting of Paragraphs 14 through 20;
   ☐ a plot plan depicting the Premises and/or Project;

INITIALS _____   PAGE 1 OF 6   INITIALS KW

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION   FORM SBMT-5-09/15E

- ☐ a current set of the Rules and Regulations;
- ☐ a Work Letter;
- ☐ a copy of the Master Lease;
- ☑ other (specify): Exhibit A depicting the Premises

2. **Premises.**

  2.1 **Letting.** Sublessor hereby subleases to Sublessee, and Sublessee hereby subleases from Sublessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Sublease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. Note: Sublessee is advised to verify the actual size prior to executing this Sublease.

  2.2 **Condition.** Sublessor shall deliver the Premises to Sublessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), and any items which the Sublessor is obligated to construct pursuant to the Work Letter attached hereto, if any, other than those constructed by Sublessee, shall be in good operating condition on said date. If a noncompliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Sublessor shall, as Sublessor's sole obligation with respect to such matter, except as otherwise provided in this Sublease, promptly after receipt of written notice from Sublessee setting forth with specificity the nature and extent of such noncompliance, malfunction or failure, rectify same at Sublessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements. If Sublessee does not give Sublessor the required notice within the appropriate warranty period, correction of any such noncompliance, malfunction or failure shall be the obligation of Sublessee at Sublessee's sole cost and expense.

  2.3 **Compliance.** Sublessor warrants that any improvements, alterations or utility installations made or installed by or on behalf of Sublessor to or on the Premises comply with all applicable covenants or restrictions of record and applicable building codes, regulations and ordinances ("Applicable Requirements") in effect on the date that they were made or installed. Sublessor makes no warranty as to the use to which Sublessee will put the Premises or to modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Sublessee's use. NOTE: Sublessee is responsible for determining whether or not the zoning and other Applicable Requirements are appropriate for Sublessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Sublessor shall, except as otherwise provided, promptly after receipt of written notice from Sublessee setting forth with specificity the nature and extent of such noncompliance, rectify the same.

  2.4 **Acknowledgements.** Sublessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Sublessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Sublessee's intended use, (c) Sublessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Sublessor, (e) the square footage of the Premises was not material to Sublessee's decision to sublease the Premises and pay the Rent stated herein, and (f) neither Sublessor, Sublessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Sublease. In addition, Sublessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Sublessee's ability to honor the Sublease or suitability to occupy the Premises, and (ii) it is Sublessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

  2.5 **Americans with Disabilities Act.** In the event that as a result of Sublessee's use, or intended use, of the Premises the Americans with Disabilities Act or any similar law requires modifications or the construction or installation of improvements in or to the Premises, Building, Project and/or Common Areas, the Parties agree that such modifications, construction or improvements shall be made at: ☐ Sublessor's expense ☑ Sublessee's expense.

  2.6 **Vehicle Parking.** Sublessee shall be entitled to use the number of Unreserved Parking Spaces and Reserved Parking Spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time for parking. Sublessee shall not use more parking spaces than said number. Said parking spaces shall be used for parking by vehicles no larger than fullsize passenger automobiles or pickup trucks, herein called "Permitted Size Vehicles." Sublessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9. No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Sublessor.

  (a) Sublessee shall not permit or allow any vehicles that belong to or are controlled by Sublessee or Sublessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Sublessor for such activities.

  (b) Sublessee shall not service or store any vehicles in the Common Areas.

  (c) If Sublessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Sublessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Sublessee, which cost shall be immediately payable upon demand by Sublessor.

  2.7 **Common Areas - Definition.** The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Premises that are provided and designated by the Sublessor from time to time for the general nonexclusive use of Sublessor, Sublessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

  2.8 **Common Areas - Sublessee's Rights.** Sublessor grants to Sublessee, for the benefit of Sublessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Sublease, the nonexclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Sublessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of Sublessor or Sublessor's designated agent, which consent may be revoked at any time. In the event that any unauthorized storage shall occur then Sublessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Sublessee, which cost shall be immediately payable upon demand by Sublessor.

  2.9 **Common Areas - Rules and Regulations.** Sublessor or such other person(s) as Sublessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("Rules and Regulations") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees. Sublessee agrees to abide by and conform to all such Rules and Regulations, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Sublessor shall not be responsible to Sublessee for the noncompliance with said Rules and Regulations by other tenants of the Project.

2.10 **Common Areas - Changes.** Sublessor shall have the right, in Sublessor's sole discretion, from time to time:
(a) To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;
(b) To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;
(c) To add additional buildings and improvements to the Common Areas;
(d) To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and
(e) To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Sublessor may, in the exercise of sound business judgment, deem to be appropriate.

3. **Possession.**
3.1 **Early Possession.** Any provision herein granting Sublessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Sublessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Sublease (including but not limited to the obligations to pay Sublessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall, however, be in effect during such period. Any such Early Possession shall not affect the Expiration Date.
3.2 **Delay In Commencement.** Sublessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises by the Commencement Date. If, despite said efforts, Sublessor is unable to deliver possession as agreed, the rights and obligations of Sublessor and Sublessee shall be as set forth in Paragraph 3.3 of the Master Lease (as modified by Paragraph 6.3 of this Sublease).
3.3 **Sublessee Compliance.** Sublessor shall not be required to tender possession of the Premises to Sublessee until Sublessee complies with its obligation to provide evidence of insurance. Pending delivery of such evidence, Sublessee shall be required to perform all of its obligations under this Sublease from and after the Start Date, including the payment of Rent, notwithstanding Sublessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Sublessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Sublessor may elect to withhold possession until such conditions are satisfied.

4. **Rent and Other Charges.**
4.1 **Rent Defined.** All monetary obligations of Sublessee to Sublessor under the terms of this Sublease (except for the Security Deposit) are deemed to be rent ("Rent"). Rent shall be payable in lawful money of the United States to Sublessor at the address stated herein or to such other persons or at such other places as Sublessor may designate in writing.
4.2 **Common Area Operating Expenses.** Sublessee shall pay to Sublessor during the term hereof, in addition to the Base Rent, Sublessee's Share of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Sublease, in accordance with the following provisions:
(a) "Common Area Operating Expenses" are defined, for purposes of this Sublease, as those costs incurred by Sublessor relating to the operation of the Project, which are included in the following list:
(i) Costs related to the operation, repair and maintenance, in neat, clean, good order and condition, but not the replacement of the following:
(aa) The Common Areas and Common Area Improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, and roof drainage systems.
(bb) Exterior signs and any tenant directories.
(cc) Any fire sprinkler systems.
(ii) The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.
(iii) The cost of trash disposal, pest control services, property management, security services, and the costs of any environmental inspections.
(iv) Reserves set aside for maintenance and repair of Common Areas.
(v) Real Property Taxes.
(vi) Insurance premiums.
(vii) Any deductible portion of an insured loss concerning the Building or the Common Areas.
(b) The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Sublessor to either have said improvements or facilities or to provide those services unless Sublessor already provides the services, or Sublessor has agreed elsewhere in this Sublease to provide the same or some of them.
(c) Sublessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Sublessor's estimate of the Common Area Operating Expenses. Within 60 days after written request (but not more than once each year) Sublessor shall deliver to Sublessee a reasonably detailed statement showing Sublessee's Share of the actual Common Area Operating Expenses incurred during the preceding year. If Sublessee's payments under this Paragraph 4.2(c) during the preceding year exceed Sublessee's Share as indicated on such statement, Sublessor shall credit the amount of such overpayment against Sublessee's Share of Common Area Operating Expenses next becoming due. If Sublessee's payments under this Paragraph 4.2(c) during the preceding year were less than Sublessee's Share as indicated on such statement, Sublessee shall pay to Sublessor the amount of the deficiency within 10 days after delivery by Sublessor to Sublessee of the statement.
4.3 **Utilities.** Sublessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. Notwithstanding the provisions of Paragraph 4.2, if at any time in Sublessor's sole judgment, Sublessor determines that Sublessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Sublessee is generating such a large volume of trash as to require an increase in the size of the dumpster and/or an increase in the number of times per month that the dumpster is emptied, then Sublessor may increase Sublessee's Base Rent by an amount equal to such increased costs.

5. ~~Security Deposit. The rights and obligations of Sublessor and Sublessee as to said Security Deposit shall be as set forth in Paragraph 5 of the Master Lease (as modified by Paragraph 7.3 of this Sublease).~~

6. **Master Lease and Master Sublease.**
6.1 Sublessor is the sublessee of the Premises by virtue of the Master Lease, date May 20, 2009, as assigned on March 27, 2012 and Amended on August 24, 2010 and September 1, 2014, wherein Spectrum Office Properties II, LLC as succesor in interest to The Irvine Company, LLC

is the lessor, hereinafter the "Master Lessor"

INITIALS            PAGE 3 OF 6            INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION            FORM SBMT-5-09/15E

Evers Decl. - Attachment A            Pl. Ex. 63
                                        p. 1715

hereinafter the "Master Tenant".

6.2 This Sublease is and shall be at all times subject and subordinate to the Master Lease and Master Sublease.

6.3 The terms, conditions and respective obligations of Sublessor and Sublessee to each other under this Sublease shall be the terms and conditions of the Master Lease and Master Sublease except for those provisions of the Master Lease and Master Sublease which are directly contradicted by this Sublease in which event the terms of this Sublease document shall control over the Master Lease and Master Sublease. Therefore, for the purposes of this Sublease, wherever in the Master Lease the word "Lessor" or wherever in the Master Sublease the word "Sublessor" is used it shall be deemed to mean the Sublessor herein and wherever in the Master Lease the word "Lessee" or wherever in the Master Sublease the word "Sublessee" is used it shall be deemed to mean the Sublessee herein.

6.4 During the term of this Sublease and for all periods subsequent for obligations which have arisen prior to the termination of this Sublease, Sublessee does hereby expressly assume and agree to perform and comply with, for the benefit of Sublessor, Master Tenant and Master Lessor, each and every obligation of Sublessor under the Master Lease and Master Sublease except for the following paragraphs which are excluded therefrom:

_____

6.5 The obligations that Sublessee has assumed under paragraph 6.4 hereof are hereinafter referred to as the "Sublessee's Assumed Obligations". The obligations that sublessee has not assumed under paragraph 6.4 hereof are hereinafter referred to as the "Sublessor's Remaining Obligations".

6.6 Sublessee shall hold Sublessor free and harmless from all liability, judgments, costs, damages, claims or demands, including reasonable attorneys fees, arising out of Sublessee's failure to comply with or perform Sublessee's Assumed Obligations.

6.7 Sublessor agrees to maintain the Master Lease, as applicable, and the Master Sublease during the entire term of this Sublease, subject, however, to any earlier termination of the Master Lease or Master Sublease without the fault of the Sublessor, and to comply with or perform Sublessor's Remaining Obligations and to hold Sublessee free and harmless from all liability, judgments, costs, damages, claims or demands arising out of Sublessor's failure to comply with or perform Sublessor's Remaining Obligations.

6.8 Sublessor represents to Sublessee that the Master Lease and Master Sublease is in full force and effect and that no default exists on the part of any Party to the Master Lease or Master Sublease.

6.9 All references hereinafter to the Master Lease shall also refer to the Master Sublease. All references hereinafter to the Master Lessor shall also refer to the Master Tenant.

7. **Assignment of Sublease and Default.**

7.1 Sublessor hereby assigns and transfers to Master Lessor the Sublessor's interest in this Sublease, subject however to the provisions of Paragraph 8.2 hereof.

7.2 Master Lessor, by executing this document, agrees that until a Default shall occur in the performance of Sublessor's Obligations under the Master Lease, that Sublessor may receive, collect and enjoy the Rent accruing under this Sublease. However, if Sublessor shall Default in the performance of its obligations to Master Lessor then Master Lessor may, at its option, receive and collect, directly from Sublessee, all Rent owing and to be owed under this Sublease. Master Lessor shall not, by reason of this assignment of the Sublease nor by reason of the collection of the Rent from the Sublessee, be deemed liable to Sublessee for any failure of the Sublessor to perform and comply with Sublessor's Remaining Obligations.

7.3 Sublessor hereby irrevocably authorizes and directs Sublessee upon receipt of any written notice from the Master Lessor stating that a Default exists in the performance of Sublessor's obligations under the Master Lease, to pay to Master Lessor the Rent due and to become due under the Sublease. Sublessor agrees that Sublessee shall have the right to rely upon any such statement and request from Master Lessor, and that Sublessee shall pay such Rent to Master Lessor without any obligation or right to inquire as to whether such Default exists and notwithstanding any notice from or claim from Sublessor to the contrary and Sublessor shall have no right or claim against Sublessee for any such Rent so paid by Sublessee.

7.4 No changes or modifications shall be made to this Sublease without the consent of Master Lessor.

8. **Consent of Master Lessor.**

8.1 In the event that the Master Lease requires that Sublessor obtain the consent of Master Lessor to any subletting by Sublessor then, this Sublease shall not be effective unless, within 10 days of the date hereof, Master Lessor signs this Sublease or otherwise consents to this Sublease in writing, thereby giving its consent to this Subletting.

8.2 In the event that the obligations of the Sublessor under the Master Lease have been guaranteed by third parties then neither this Sublease, nor the Master Lessor's consent, shall be effective unless, within 10 days of the date hereof, said guarantors sign this Sublease or otherwise consents to this Sublease in writing thereby giving their consent to this Sublease.

8.3 In the event that Master Lessor does give such consent then:

(a) Such consent shall not release Sublessor of its obligations or alter the primary liability of Sublessor to pay the Rent and perform and comply with all of the obligations of Sublessor to be performed under the Master Lease.

(b) The acceptance of Rent by Master Lessor from Sublessee or any one else liable under the Master Lease shall not be deemed a waiver by Master Lessor of any provisions of the Master Lease.

(c) The consent to this Sublease shall not constitute a consent to any subsequent subletting or assignment.

(d) In the event of any Default of Sublessor under the Master Lease, Master Lessor may proceed directly against Sublessor, any guarantors or any one else liable under the Master Lease or this Sublease without first exhausting Master Lessor's remedies against any other person or entity liable thereon to Master Lessor.

(e) Master Lessor may consent to subsequent sublettings and assignments of the Master Lease or this Sublease or any amendments or modifications thereto without notifying Sublessor or any one else liable under the Master Lease and without obtaining their consent and such action shall not relieve such persons from liability.

(f) In the event that Sublessor shall Default in its obligations under the Master Lease, then Master Lessor, at its option and without being obligated to do so, may require Sublessee to attorn to Master Lessor in which event Master Lessor shall undertake the obligations of Sublessor under this Sublease from the time of the exercise of said option to termination of this Sublease but Master Lessor shall not be liable for any prepaid Rent nor any Security Deposit paid by Sublessee, nor shall Master Lessor be liable for any other Defaults of the Sublessor under the Sublease.

8.4 The signatures of the Master Lessor and any Guarantors of Sublessor at the end of this document shall constitute their consent to the terms of this Sublease.

8.5 Master Lessor acknowledges that, to the best of Master Lessor's knowledge, no Default presently exists under the Master Lease of obligations to be performed by Sublessor and that the Master Lease is in full force and effect.

8.6 In the event that Sublessor Defaults under its obligations to be performed under the Master Lease by Sublessor, Master Lessor agrees to deliver to Sublessee a copy of any such notice of default. Sublessee shall have the right to cure any Default of Sublessor described in any notice of default if Sublessee does so within the same number of days set forth in the notice of default given to Sublessor. If such Default is cured by Sublessee then Sublessee shall have the right of reimbursement and offset from and against Sublessor.

9. ~~Additional Brokers Commissions.~~

~~9.1 Sublessor agrees that if Sublessee exercises any option or right of first refusal as granted by Sublessor herein, or~~

INITIALS _____   PAGE 4 OF 6   INITIALS KW

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION   FORM SBMT-5-09/15E