~~any option or right substantially similar thereto, either to extend the term of this Sublease, to renew this Sublease, to purchase the Premises, or to lease or purchase adjacent property which Sublessor may own or in which Sublessor has an interest, then Sublessor shall pay to Broker a fee in accordance with the schedule of Broker in effect at the time of the execution of this Sublease.~~ Notwithstanding the foregoing, Sublessor's obligation under this Paragraph is limited to a transaction in which Sublessor is acting as a Sublessor, lessor or seller.

~~9.2   If a separate brokerage fee agreement is attached then Master Lessor agrees that if Sublessee shall exercise any option or right of first refusal granted to Sublessee by Master Lessor in connection with this Sublease, or any option or right substantially similar thereto, either to extend or renew the Master Lease, to purchase the Premises or any part thereof, or to lease or purchase adjacent property which Master Lessor may own or in which Master Lessor has an interest, or if Broker is the procuring cause of any other lease or sale entered into between Sublessee and Master Lessor pertaining to the Premises, any part thereof, or any adjacent property which Master Lessor owns or in which it has an interest, then as to any of said transactions, Master Lessor shall pay to Broker a fee, in cash, in accordance with the schedule attached to such brokerage fee agreement.~~

9.3   ~~Any fee due from Sublessor or Master Lessor hereunder shall be due and payable upon the exercise of any option to extend or renew, upon the execution of any new lease, or, in the event of a purchase, at the close of escrow.~~

~~9.4   Any transferee of Sublessor's interest in this Sublease, or of Master Lessor's interest in the Master Lease, by accepting an assignment thereof, shall be deemed to have assumed the respective obligations of Sublessor or Master Lessor under this Paragraph 9. Broker shall be deemed to be a third party beneficiary of this paragraph 9.~~

10.   **Representations and Indemnities of Broker Relationships.** The Parties each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Sublease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Sublessee and Sublessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

11.   **Attorney's fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Sublessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

12.   **No Prior or Other Agreements; Broker Disclaimer.** This Sublease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Sublessor and Sublessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Sublease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to negotiation, execution, delivery or performance by either Sublessor or Sublessee under this Sublease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Sublease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

13.   **Accessibility; Americans with Disabilities Act.**
  (a)   The Premises: ☒ have not undergone an inspection by a Certified Access Specialist (CASp). ☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. ☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.
  (b)   Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

**ATTENTION:** NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY REAL ESTATE BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS SUBLEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS SUBLEASE.

2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR SUBLESSEE'S INTENDED USE.
**WARNING:** IF THE SUBJECT PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE SUBLEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

| | |
|---|---|
| Executed at: _____ | Executed at: _____ |
| On: _____ | On: _____ |
| By SUBLESSOR: | By SUBLESSEE: |
| Guaranteed Rate Inc., a Delaware corporation | Consumer Advocacy Center, |
| | dba Premiere Student Loan Center |
| By: /s/ | By: /s/ |
| Name Printed: John Enus | Name Printed: KAINE WAN |
| Title: Chief Revenue and Strategy Officer | Title: GC |
| By: _____ | By: _____ |

PAGE 5 OF 6

INITIALS _____   INITIALS KW

Name Printed: _____     Name Printed: _____
Title: _____             Title: _____
Address: 3940 N Ravenswood Ave, Chicago, IL   Address: _____
60613, Attn: Scott Ubersox & Legal Dept.
Telephone: (713) 516-6360               Telephone: (___) _____
Facsimile: (___) _____   Facsimile: (___) _____
Email: realestate@rate.com              Email: _____
Email: _____             Email: _____
Federal ID No. ███████████              Federal ID No. _____
BROKER:                                 BROKER:
Cushman & Wakefield of California Inc.  Kidder Mathews

Attn: Blake Garrett & Christopher Bosley    Attn: Ted Sawyer
Title: _____             Title: _____

Address: _____           Address: _____

Telephone: (___) _____   Telephone: (___) _____
Facsimile: (___) _____   Facsimile: (___) _____
Email: _____             Email: _____
Federal ID No. _____     Federal ID No. _____
Broker/Agent BRE License #: _____ Broker/Agent BRE License #: _____

~~Consent to the above Sublease is hereby given.~~

~~Executed at:~~ _____    ~~Executed at:~~ _____
~~On:~~ _____              ~~On:~~ _____

By MASTER LESSOR:                       By GUARANTOR(S):
Spectrum Office Properties II, LLC as    By: _____
successor in interest to The Irvine Company    Name Printed: _____
~~By:~~ _____                   Address: _____
~~Name Printed:~~ _____
~~Title:~~ _____

~~By:~~ _____
~~Name Printed:~~ _____    By: _____
~~Title:~~ _____           Name Printed: _____
~~Address:~~ _____          Address: _____

~~Telephone: (___)~~ _____
~~Facsimile: (___)~~ _____
~~Email:~~ _____
~~Federal ID No.~~ _____

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 500 N Brand Blvd, Suite 900, Glendale, CA 91203. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

©Copyright 2001 By AIR Commercial Real Estate Association.
All rights reserved. No part of these works may be reproduced in any form without permission in writing.

INITIALS          PAGE 5 OF 6          KW
                                       INITIALS
©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM SBMT-5-09/15E



# ADDENDUM

Date: November 4, 2016

By and Between Guaranteed Rate Inc.
(SubLessor)

(SubLessee) Consumer Advocacy Center, dba, Premiere Student Loan Center

Address of Premises: 173 Technology Drive, Suite 202
Irvine, CA 92618

Paragraph _____

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

Paragraph 14

Base Rent Schedule

| Period | Monthly Base Rent |
|---|---|
| 12/1/2016 - 11/30/2017 | $18,000.00 |
| 12/1/2017 - 11/30/2018 | $18,540.00 |
| 12/1/2018 - 11/30/2019 | $19,096.20 |
| 12/1/2019 - 2/28/2020 | $19,669.09 |

Paragraph 15

Security Deposit
Sublessee shall deposit with Sublessor upon execution hereof the Security Deposit as security for Sublessee's faithful performance of its obligations under this Sublease. If Sublessee fails to pay Rent, or otherwise Defaults under this Sublease, Sublessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Sublessor, for Rents which will be due in the future, and/ or to reimburse or compensate Sublessor for any liability, expense, loss or damage which Sublessor may suffer or incur by reason thereof. If Sublessor uses or applies all or any portion of the Security Deposit, Sublessee shall within 10 days after written request therefor deposit monies with Sublessor sufficient to restore said Security Deposit to the full amount required by this Sublease. Should the Agreed Use be amended to accommodate a material change in the business of Sublessee or to accommodate a sublessee or assignee, Sublessor shall have the right to increase the Security Deposit to the extent necessary, in Sublessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Sublessee occurs during this Sublease and following such change the financial condition of Sublessee is, in Sublessor's reasonable judgment, significantly reduced, Sublessee shall deposit such additional monies with Sublessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Sublessor shall not be required to keep the Security Deposit separate from its general accounts. Within 30 days after the expiration or termination of this Sublease, Sublessor shall return that portion of the Security Deposit not used or applied by Sublessor. Sublessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Sublessee under this Lease. THE SECURITY DEPOSIT SHALL NOT BE USED BY SUBLESSEE IN LIEU OF PAYMENT OF ANY MONTH'S RENT.

If Sublessee is not in Default or late in Rent at any time prior, the Security Deposit shall be reduced to

INITIALS  PAGE 1 OF 4  INITIALS

$42,408.58 at start of month 13 of the Term. Such reduction shall be applied to month Rent inclusive of Common Area Operating Expenses or, in Sublessor's sole discretion, to Sublessee's unpaid charges. If Sublessee is not in Default or late in Rent at any time prior, the Security Deposit shall be reduced to $19,650.00 at the start of month 25 of the Term. Such reduction shall be applied to month 25 Rent Inclusive of Common Area Operating Expenses or, in Sublessor's sole discretion, to Sublessee's unpaid charges. In no event shall Sublessee be entitled to a refund under this section.

Sublessor's obligations and Sublessee's right with respect to the Security Deposit shall be governed by the terms of this Sublease, and Sublessee hereby waives all rights it may otherwise have under California Civil Code Section 1950.7 or any similar or successor laws.

Paragraph 16

Tenant Improvements

A) Sublessor at Sublessor's sole cost and expense shall construct a wall to separate the suite as depicted on Exhibit A. Sublessor to perform work per Landlord's approval.

B) Sublessee shall be responsible for removing all corporate signage and patch walls where it relates to signage removal.

Paragraph 17

Consent of Master Tenant

17.1 In the event that the Master Sublease requires that Sublessor obtain the consent of Master Tenant to any subletting by Sublessor then, this Sublease shall not be effective unless, within 10 days of the date hereof, Master Tenant signs this Sublease or otherwise consents to this Sublease in writing, thereby giving its consent to this Subletting.

17.2 In the event that the obligations of the Sublessor under the Master Sublease have been guaranteed by third parties then neither this Sublease, nor the Master Tenant's consent, shall be effective unless, within 10 days of the date hereof, said guarantors sign this Sublease or otherwise consents to this Sublease in writing thereby giving their consent to this Sublease.

17.3 In the event that Master Tenant does give such consent then:

(a) Such consent shall not release Sublessor of its obligations or alter the primary liability of Sublessor to pay the Rent and perform and comply with all of the obligations of Sublessor to be performed under the Master Sublease.

(b) The acceptance of Rent by Master Tenant from Sublessee or any one else liable under the Master Sublease shall not be deemed a waiver by Master Tenant of any provisions of the Master Sublease.

c) The consent to this Sublease shall not constitute a consent to any subsequent subletting or assignment.

(d) In the event of any Default of Sublessor under the Master Sublease, Master Tenant may proceed directly against Sublessor, any guarantors or any one else liable under the Master Sublease or this Sublease without first exhausting Master Tenant's remedies against any other person or entity liable thereon to Master Tenant.

(e) Master Tenant may consent to subsequent sublettings and assignments of the Master Sublease or this Sublease or any amendments or modifications thereto without notifying Sublessor or any one else liable under the Master Sublease and without obtaining their consent and such action shall not relieve such persons from liability.

(f) In the event that Sublessor shall Default in its obligations under the Master Sublease, then Master


INITIALS

PAGE 2 OF 4

kw
INITIALS

Tenant, at its option and without being obligated to do so, may require Sublessee to attorn to Master Tenant in which event Master Tenant shall undertake the obligations of Sublessor under this Sublease from the time of the exercise of said option to termination of this Sublease but Master Tenant shall not be liable for any prepaid Rent nor any Security Deposit paid by Sublessee, nor shall Master Tenant be liable for any other Defaults of the Sublessor under the Sublease.

17.4 The signatures of the Master Tenant and any Guarantors of Sublessor at the end of this document shall constitute their consent to the terms of this Sublease.

17.5 Master Tenant acknowledges that, to the best of Master Tenant's knowledge, no Default presently exists under the Master Sublease of obligations to be performed by Sublessor and that the Master Sublease is in full force and effect.

17.6 In the event that Sublessor Defaults under its obligations to be performed under the Master Sublease by Sublessor, Master Tenant agrees to deliver to Sublessee a copy of any such notice of default. Sublessee shall have the right to cure any Default of Sublessor described in any notice of default if Sublessee does so within the same number of days set forth in the notice of default given to Sublessor. If such Default is cured by Sublessee then Sublessee shall have the right of reimbursement and offset from and against Sublessor.

Paragraph 18

Furniture, Fixtures & Equipment

Sublessee shall have the right to use the furniture, fixtures, equipment and cabling depicted on Exhibit A (collectively, "FF&E") during the Term for no additional cost; provided, however, that (i) Sublessee acknowledges that Tenant has made no representation or warranty concerning the safety, condition, functionality, or fitness for a particular use of the FF&E and Sublessee assumes the risk for the use of the same by its employees, agents and guests and any personal property or physical injury that may result therefrom, (ii) Sublessee shall maintain such FF&E in the same condition as such FF&E is on the Commencement Date, reasonable wear and tear excepted, and shall be responsible for any damage to such FF&E, (iii) Sublessor shall retain ownership and title to such FF&E throughout the Term, but last day of the Term, ownership and title to the FF&E (other than any cabling included therein) shall automatically be vested in Sublessee without any consideration therefor so long as an Event of Default is not existing as of the first anniversary of the Term, and (iv) if the ownership and title to the FF&E (other than any cabling, included therein) so vests in Sublessee, Sublessee shall remove the FF&E (other than any cabling included therein) from the Premises upon the expiration of the Term. Sublessee acknowledges that the FF&E shall be conveyed "AS IS," "WHERE IS," AND "WITH ALL FAULTS" as of the last day of the Term, without any express or implied representation or warranty of any kind whatsoever, including but not limited to, condition, fitness for use, fitness for any particular purpose, merchantability, or as to compliance with specification, suitability, performance, design, absence of defects, operation or non-infringement or patent, copyright, trademark or other intellectual property rights of the FF&E (or any part thereof), or any other warranty, express or implied, and that Sublessee shall rely solely on its own independent investigations and inspections of the FF&E and not in reliance on any information provided by Sublessor or Sublessor's agents.

Paragraph 19

Rent Abatement

Provided no event of Default exists on the part of Sublessee, Sublessor agrees to abate Sublessee's Base Rent for months 38 and 39 of the Term. Sublessee shall remain responsible for applicable Common Area Operating Expenses and Utilities and all other rights and obligations shall remain in full force and effect.

Paragraph 20

Notices

All notices, consents, requests, demands and other communications required or permitted hereunder (a) shall be in writing; (b) shall be sent (unless otherwise provided) by messenger, certified U.S. mail, or a reliable

INITIALS

PAGE 3 OF 4

KW
INITIALS

overnight courier service such as Federal Express, charges prepaid as applicable, to the appropriate address(es) or number(s) set forth below; and (c) shall be deemed to have been given on the date of receipt (or refusal) by the addressee (or, if the date of receipt is not a business day, on the first business day after the date of receipt), as evidenced by a receipt executed by the addressee (or a responsible person in his or her office), the records of the person or entity delivering such communication or a notice to the effect that such addressee refused to claim or accept such communication, if sent by messenger, U.S. mail or overnight courier service. The parties acknowledge that notices may be sent by electronic means, but must be sent concurrently by messenger, certified U.S. mail, or a reliable overnight courier service as provided in this section. All such communications shall be sent to the respective parties at their address below, or to such other addresses or numbers as any party may inform the other by giving five (5) business days' prior written notice.

Sublessor:

Guaranteed Rate, Inc.
Attn: Scott Ubersox
3940 N Ravenswood Ave
Chicago, IL 60613

And

Guaranteed Rate, Inc.
Attn: General Counsel
3940 N Ravenswood Ave
Chicago, IL 60613

Sublessee:

Consumer Advocacy Center dba
Premiere Student Loan Center

_[signature]_

PAGE 4 OF 4

INITIALS _[initials]_         INITIALS _Kw_

**EXHIBIT B**



## STANDARD MULTI-TENANT OFFICE LEASE - NET

1. **Basic Provisions ("Basic Provisions").**

    1.1 **Parties.** This Lease ("Lease"), dated for reference purposes only **January 19, 2018**, is made by and between **Stivers Investment Company** ("Lessor") and **True Count Staffing, Inc.** ("Lessee"), (collectively the "Parties", or individually a "Party").

    1.2(a) **Premises:** That certain portion of the Project (as defined below), commonly known as (street address, suite, city, state): **8 Hughes Parkway #210, Irvine, CA 92618** ("Premises"). The Premises are located in the County of **Orange**, and consist of approximately **10,054** rentable square feet and approximately **9199** useable square feet. In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the Common Areas (as defined in Paragraph 2.7 below) as hereinafter specified, but shall not have any rights to the roof, the exterior walls, the area above the dropped ceilings, or the utility raceways of the building containing the Premises ("Building") or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." The Project consists of approximately **43,560** rentable square feet. (See also Paragraph 2)

    1.2(b) **Parking:** **35** unreserved and **0** reserved vehicle parking spaces at a monthly cost of **FREE** per unreserved space and **N/A** per reserved space. (See Paragraph 2.6)

    1.3 **Term:** **four (4)** years and **three (3)** months ("Original Term") commencing **March 1, 2018** ("Commencement Date") and ending **May 31, 2022** ("Expiration Date"). (See also Paragraph 3)

    1.4 **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing **February 23, 2018** ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

    1.5 **Base Rent:** **$10,557.00** per month ("Base Rent"), payable on the **1st** day of each month commencing **March 1, 2018**. (See also Paragraph 4)

    ☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph **50**.

    1.6 **Lessee's Share of Operating Expenses:** **twenty-four point seven** percent (**24.7** %) ("Lessee's Share"). In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

    1.7 **Base Rent and Other Monies Paid Upon Execution:**
    (a) Base Rent: **$10,557.00** for the period **March 1, 2018**.
    (b) Operating Expenses: **$7,842.00** for the period **March 1, 2018**.
    (c) Security Deposit: **$12,689.60** ("Security Deposit"). (See also Paragraph 5)
    (d) Parking: _____ for the period _____.
    (e) Other: _____ for _____.
    (f) Total Due Upon Execution of this Lease: **$31,088.60**.

    1.8 **Agreed Use:** **General office and administrative purposes**. (See also Paragraph 6)

    1.9 **Insuring Party.** Lessor is the "Insuring Party". (See also Paragraph 8)

    1.10 **Real Estate Brokers.** (See also Paragraph 15 and 25)
    (a) **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):
    ☑ **NAI Capital, Inc.** represents Lessor exclusively ("Lessor's Broker");
    ☑ **A-Med Realty Group** represents Lessee exclusively ("Lessee's Broker"); or
    ☐ _____ represents both Lessor and Lessee ("Dual Agency").
    (b) **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent) for the brokerage services rendered by the Brokers.

    1.11 **Guarantor.** The obligations of the Lessee under this Lease shall be guaranteed by **Kaine Wen** ("Guarantor"). (See also Paragraph 37)

    1.12 **Business Hours for the Building:** **7** a.m. to **6** p.m., Mondays through Fridays (except Building Holidays) and **9** a.m. to **12** p.m. on Saturdays (except Building Holidays). "Building Holidays" shall mean the dates of observation of New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and **Martin Luther King Day**.

    1.13 **Lessor Supplied Services.** Notwithstanding the provisions of Paragraph 11.1, Lessor is NOT obligated to provide the following within the Premises:
    ☐ Janitorial services
    ☐ Electricity
    ☑ Other (specify): **Telephone & Internet**

    1.14 **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
    ☑ an Addendum consisting of Paragraphs **50** through **58**; a plot plan
    ☑ depicting the Premises;
    ☑ a current set of the Rules and Regulations;
    ☐ a Work Letter;
    ☐ a janitorial schedule;
    ☐ other (specify): _____.

2. **Premises.**

    2.1 **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. NOTE: Lessee is advised to verify the actual size prior to executing this Lease.

    2.2 **Condition.** Lessor shall deliver the Premises to Lessee in a clean condition on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), and all other items which the Lessor is obligated to construct pursuant to the Work Letter attached hereto, if any, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premises; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

    2.3 **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises and the Common Areas comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the zoning and other Applicable Requirements are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an

INITIALS

Page 1 of 13
Last Edited: 1/19/2018 4:20 PM

INITIALS

© 2017 AIR CRE. All Rights Reserved.   MTON-20.01, Revised 11-01-2017

alteration of the Premises, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Premises ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

2.4 Acknowledgements. Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) Lessee has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5 Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date, Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

2.6 Vehicle Parking. So long as Lessee is not in default, and subject to the Rules and Regulations attached hereto, and as established by Lessor from time to time, Lessee shall be entitled to rent and use the number of parking spaces specified in Paragraph 1.2(b) at the rental rate applicable from time to time for monthly parking as set by Lessor and/or its licensee.

(a) If Lessee commits, permits or allows any of the prohibited activities described in the Lease or the rules then in effect, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

(b) The monthly rent per parking space specified in Paragraph 1.2(b) is subject to change upon 30 days prior written notice to Lessee. The rent for the parking is payable one month in advance prior to the first day of each calendar month.

2.7 Common Areas - Definition. The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Premises that are provided and designated by the Lessor from time to time for the general nonexclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including, but not limited to, common entrances, lobbies, corridors, stairwells, public restrooms, elevators, parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8 Common Areas - Lessee's Rights. Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time. In the event that any unauthorized storage shall occur, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9 Common Areas - Rules and Regulations. Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to adopt, modify, amend and enforce reasonable rules and regulations ("Rules and Regulations") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees. The Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the noncompliance with said Rules and Regulations by other tenants of the Project.

2.10 Common Areas - Changes. Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a) To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b) To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;
(c) To designate other land outside the boundaries of the Project to be a part of the Common Areas;
(d) To add additional buildings and improvements to the Common Areas;
(e) To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and
(f) To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

3. Term.

3.1 Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2 Early Possession. Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of the Operating Expenses) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3 Delay In Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4 Lessee Compliance. Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the

INITIALS                                     Page 2 of 13                                           INITIALS
                                      Last Edited: 1/19/2018 4:20 PM
© 2017 AIR CRE. All Rights Reserved.                                              MTO-20.01, Revised 11-01-2017

Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4. Rent.**

**4.1 Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

**4.2 Operating Expenses.** Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share of all Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

(a) "Operating Expenses" include all costs relating to the ownership and operation of the Project, calculated as if the Project was at least 95% occupied, including, but not limited to, the following:

  (i) The operation, repair, and maintenance in neat, clean, safe, good order and condition, of the following:

    (aa) The Common Areas, including their surfaces, coverings, decorative items, carpets, drapes and window coverings, and including parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, stairways, parkways, driveways, landscaped areas, striping, bumpers, irrigation systems, Common Area lighting facilities, building exteriors and roofs, fences and gates;

    (bb) All heating, air conditioning, plumbing, electrical systems, life safety equipment, communication systems and other equipment used in common by, or for the benefit of, lessees or occupants of the Project, including elevators and escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair.

    (cc) The Premises and/or any other space occupied by a tenant.

  (ii) The cost of trash disposal, janitorial and security services, pest control services, and the costs of any environmental inspections;

  (iii) The cost of any other service to be provided by Lessor that is elsewhere in this Lease stated to be an "Operating Expense";

  (iv) The cost of the premiums for the insurance policies maintained by Lessor pursuant to paragraph 8 and any deductible portion of an insured loss concerning the Building or the Common Areas;

  (v) The amount of the Real Property Taxes payable by Lessor pursuant to paragraph 10;

  (vi) The cost of water, sewer, gas, electricity, and other publicly mandated services not separately metered;

  (vii) Labor, salaries, and applicable fringe benefits and costs, materials, supplies and tools, used in maintaining and/or cleaning the Project and accounting and management fees attributable to the operation of the Project;

  (viii) The cost to replace equipment or capital components such as the roof, foundations, or exterior walls, the cost to replace a Common Area capital improvement, such as the parking lot paving, elevators or fences, and/or the cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3. Provided however, that if such equipment or capital component has a useful life for accounting purposes of 5 years or more that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month;

  (ix) The cost to replace equipment or improvements that have a useful life for accounting purposes of 5 years or less.

  (x) Reserves set aside for maintenance, repair and/or replacement of Common Area Improvements and equipment.

(b) Any item of Operating Expense that is specifically attributable to the Premises, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Premises, Building, or other building. However, any such item that is not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(c) The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(d) Lessee's Share of Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the Operating Expenses. Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Operating Expenses for the preceding year. If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over-payment against Lessee's future payments. If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

(e) Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or by insurance proceeds.

**4.3 Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Operating Expenses, and any remaining amount to any other outstanding charges or costs.

**5. Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

**6. Use.**

**6.1 Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements of the Building, will not adversely affect the mechanical, electrical, HVAC, and other systems of the Building, and/or will not affect the exterior appearance of the Building. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

**6.2 Hazardous Substances.**

(a) Reportable Uses Require Consent. The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, byproducts or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation

Evers Decl. - Attachment B

Pl. Ex. 63
p. 1725