FILED

1   VENABLE LLP
    Witt W. Chang (SBN 281721)
2     wwchang@venable.com
    2049 Century Park East, Suite 2300
3   Los Angeles, CA 90067
    Telephone: (310) 229-9900
4   Facsimile: (310) 229-9901

5   Allyson B. Baker (*Pro Hac Vice Application forthcoming*)
      abbaker@venable.com
6   Gerald S. Sachs (*Pro Hac Vice Application forthcoming*)
      gssachs@venable.com
7   600 Massachusetts Ave., NW
    Washington, D.C. 20001
8   Telephone: (202) 344-4000
    Facsimile: (202) 344-8300

9

10  Attorneys for Defendants

2019 OCT 28  AM 11: 53

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____EV_____

11              **UNITED STATES DISTRICT COURT**

12      **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

13  Bureau of Consumer Financial          CASE NO. 8:19-cv-01998-JVS(JDEx)
    Protection; State of Minnesota, by its
14  Attorney General, Keith Ellison;       Hon. James V. Selna
    State of North Carolina, *ex rel.*     Courtroom 10C
15  Joshua H. Stein, Attorney General;
    and The People of The State of         **DEFENDANTS' RESPONSE TO**
16  California, Michael N. Feuer, Los      **ORDER TO SHOW CAUSE WHY**
    Angeles City Attorney,                 **PRELIMINARY INJUNCTION**
17                                         **SHOULD NOT ISSUE**
                   Plaintiffs,
18                                         Date:      November 4, 2019
             v.                            Time:      3:00 p.m.
19                                         Crtrm:     10C
    Consumer Advocacy Center Inc., d/b/a
20  Premier Student Loan Center; True      Action Filed: October 21, 2019
    Count Staffing Inc., d/b/a SL Account  Trial Date:   None set
21  Management; Prime Consulting LLC,
    d/b/a Financial Preparation Services;
22  Albert Kim, a/k/a Albert King; Kaine
    Wen, a/k/a Wenting Kaine Dai, Wen
23  Ting Dai, and Kaine Wen Dai; and
    Tuong Nguyen, a/k/a Tom Nelson,
24
                   Defendants, and
25
    Infinite Management Corp., f/k/a
26  Infinite Management Solutions Inc.;
    Hold The Door, Corp.; and TN
27  Accounting Inc.,
28                 Relief Defendants.

47872002

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

BY FAX

ORIGINAL

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ........................................................................................1

II.  STATEMENT OF FACTS .........................................................................2

    A.  TCS and PC Have Endeavored To Operate Lawfully .......................2

        1.  Prime Consulting, LLC .............................................................3

        2.  True Count Staffing, Inc. ..........................................................3

    B.  Third Party Trusted Account Services Holds Client Funds in Escrow ...............................................................................................3

    C.  PC and TCS Have Established Rigorous Auditing Policies and Practices ............................................................................................4

    D.  The Bureau Issues A Civil Investigative Demand to CAC ...............6

III.  LEGAL STANDARD .................................................................................7

IV.  ARGUMENT ..............................................................................................8

    A.  The Bureau Has Not Met Its Burden to Show That it is Likely to Succeed on the Merits ....................................................................8

        1.  The Business' Customer Re-Certification Results Demonstrate That the Bureau is Unlikely to Succeed on the Merits of Its Claims .......................................................8

        2.  The Bureau has not demonstrated recent violations ...............10

    B.  The Balance of Equities Strongly Favors Defendants ......................10

        1.  The Preliminary Injunction Sought Would Unfairly Destroy Defendants' Business And Harm Their Employees ..............................................................................11

        2.  The Bureau's Proposed Ancillary Relief of an Asset Freeze is Inequitable and Overbroad .......................................14

            a.  The Bureau's Half-Billion-Dollar Fund Ensures Consumer Redress, if Required, After Trial ...............14

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

47872002

i

b.    Actual Alleged Consumer Harm Does Not Justify an Asset Freeze............................................................. 15

c.    The Non-Existent Chance That Consumers Will Not Have Funds for Redress Following Trial is Heavily Outweighed by the Extreme Prejudice That Would Result in a Pre-Judgment Asset Freeze... 17

d.    The Asset Freeze, if Warranted at All, Is Vastly Overbroad and Should Be Subject to Reasonable Carve-Outs................................................................. 17

3.    The Bureau's Proposed Ancillary Relief of a Receivership is Inequitable and Overbroad............................20

V.    CONCLUSION ........................................................................22

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

47872002

ii

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*In re Am. W. Airlines,*
 40 F.3d 1058 (9th Cir. 1994) ........................................................................ 18

5

6

*Canada Life Assur. Co. v. LaPeter,*
 563 F.3d 837 (9th Cir. 2009) ........................................................................ 19

7

8

*Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.,*
 67 F.3d 766 (9th Cir. 1995) .......................................................................... 18

9

10

*Compass Bank v. Baraka Holdings, LLC,*
 No. CV 17-06563-AB, 2017 WL 10378348 (C.D. Cal. Oct. 26,
 2017) .............................................................................................................. 19

11

12

*Fed. Sav. & Loan Ins. Corp. v. Dixon,*
 835 F.2d 554 (5th Cir. 1987) ........................................................................ 18

13

14

*FTC v. 8 Figure Dream Lifestyle LLC,*
 No. SACV 19-01165, 2019 WL 4570040 (C.D. Cal. July 8, 2019) ................ 19

15

16

*FTC v. A To Z Mktg.,*
 No. SACV 13-00919-DOC, 2013 WL 12134132 (C.D. Cal. Oct.
 30, 2013) ........................................................................................................ 18

17

18

19

*FTC v. Consumer Def., LLC,*
 926 F.3d 1208 (9th Cir. 2019) ........................................................................ 7

20

*FTC v. Lakhany,*
 No. SACV 12-00337-CJC, 2012 WL 12860115 (C.D. Cal. May 2,
 2012) ................................................................................................................ 7

21

22

23

*FTC v. BF Labs, Inc.,*
 No. 4:14-cv-00815-BCW, 2014 WL 7238080 (W.D. Mo. Dec. 12,
 2014) .......................................................................................................... 9, 11

24

25

*FTC v. Check Investors, Inc.,*
 No. 03-2115 (JWB), 2003 U.S. Dist. LEXIS 26941 (D.N.J. Jul. 30,
 2003) .............................................................................................................. 13

26

27

28

*FTC v. Lifewatch Inc.,*
 176 F. Supp. 3d 757 (N.D. Ill. Mar. 31, 2016) ............................................. 13

**V E N A B L E  L L P**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

47872002

iii

*FTC v. Verity Int'l,*
    124 F. Supp. 2d 193 (S.D.N.Y. 2000) ...................................................... 19, 20, 21

*FTC v. World Wide Factors, Ltd.,*
    882 F.2d 344 (9th Cir. 1989) ......................................................................... 19

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ...................................................................................... 14

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009) ....................................................................... 17

*Lamb-Weston, Inc. v. McCain Foods, Ltd.,*
    941 F.2d 970 (9th Cir. 1991) ........................................................................... 7

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ......................................................................................... 8

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) ......................................................................... 7

*S.E.C. v. Interlink Data Network of Los Angeles, Inc.,*
    77 F.3d 1201 (9th Cir. 1996) ......................................................................... 18

*S.E.C. v. Private Equity Mgmt. Grp., Inc.,*
    No. CV 09-2901 PSG (Ex), 2009 WL 2058247 (C.D. Cal. July 9,
    2009) ............................................................................................................. 19

*S.E.C. v. WorldCom, Inc.,*
    No. 02 CIV.4963(JSR), 2002 U.S. Dist. LEXIS 14201 (S.D.N.Y.
    Aug. 2, 2002) ................................................................................................ 20

*S.E.C. v. Schooler,*
    No. 3:12-CV-2164-GPC-JMA, 2015 WL 11233061 (S.D. Cal.
    Mar. 27, 2015) .............................................................................................. 18

*S.E.C. v. Int'l Heritage, Inc.,*
    4 F. Supp. 2d 1368 (N.D. Ga. 1998) ............................................................. 20

*S.E.C. v. Liu,*
    No. SACV 16-00974-CJC(AGRx), 2016 U.S. Dist. LEXIS 91078
    (C.D. Cal. July 11, 2016) .......................................................................... 20, 21

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) ......................................................................... 8

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

47872002

iv

*Trump v. Int'l Refugee Assistance Project,*
    137 S. Ct. 2080 (2017) ........................................................................ 8

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................... 7

**Statutes**

12 C.F.R. § 1075, *et seq.* ......................................................................... 14

**Rules**

Fed. R. Civ. P. 65(b)(1)(A) ...................................................................... 7

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

## I.  **INTRODUCTION**

Plaintiffs Consumer Financial Protection Bureau (the "Bureau"), the State of Minnesota, the State of North Carolina, and the People of the State of California, moved the Court for a TRO that fails to reflect the manner in which Defendants'[1] businesses currently operate.  Indeed, the Bureau has relied on stale evidence, as well as vague testimony of a statistically insignificant number of cherry-picked consumers and rogue employees.  The Bureau either willingly ignored or failed to investigate the current state of affairs of Defendants' business, which would show a different set of circumstances than the ones described in the complaint, which formed the basis for the Bureau's TRO request.

As set forth herein, the TRO should not be converted to a preliminary injunction.  The Bureau has not met its burden to demonstrate a likelihood of success on the merits for factual and legal reasons, nor has it demonstrated that the balance of equities favors the draconian pre-judgment asset freeze it seeks to impose on Defendants.  Instead, the balance of the equities favors, at most, an injunction to which Defendants would stipulate that would require Defendants to continue to operate the business within the parameters of the law pursuant to supervision of a court-appointed monitorship (rather than an onerous receivership). This is all that is required to ensure compliance with the law and that assets are not being dissipated.  Should the Court grant the request for a preliminary injunction, Defendants respectfully request that they be allowed reasonable allowances for living expenses and attorneys' fees.

---

[1] Defendants, as used herein, refers to True Count Staffing, Inc., Prime Consulting, LLC, Kaine Wen, and Albert Kim.  Undersigned counsel also represent the Relief Defendants Infinite Management Corp., f/k/a Infinite Management Solutions Inc., and Hold The Door, Corp., which oppose the Bureau's TRO request for the reasons stated herein.

1    At base, the Bureau and the other Plaintiffs have obtained a TRO based on

2    an outdated and inaccurate portrayal of Defendants' business. The Bureau's

3    contention that wrongful conduct occurred in the past is something that should and

4    shall be fully and fairly litigated in due course and subject to due process. Past

5    alleged wrongful conduct does not automatically entitle a moving party to the

6    expedited and extremely harsh pre-trial remedies proposed by the Bureau,

7    particularly when, like here, Defendants have worked diligently to operate lawfully

8    and cooperate with the Bureau.

9    **II.    STATEMENT OF FACTS**

10       **A.    TCS and PC Have Endeavored To Operate Lawfully**

11    True Count Staffing, Inc. ("TCS") and Prime Consulting, LLC ("PC") assist

12    their clients by helping them navigate the byzantine federal student loan

13    consolidation and modification process. Declaration of Adon Janse ("Janse

14    Decl.") ¶ 2; Declaration of Nicole Balestreri ("Balestreri Decl.") ¶ 2. This process,

15    as the Bureau acknowledges, engenders significant confusion and frustration

16    among borrowers, with a corresponding volume of complaints to the Bureau and

17    media attention. *See* Consumer Fin. Prot. Bureau, *Staying on Track While Giving*

18    *Back*, at 11-14 (June 2017) (detailing consumer complaints across a spectrum of

19    issues relating to federal student loans)[2]; Tara Siegel Bernard, *The Should-Be*

20    *Solution to the Student-Debt Problem*, N.Y. Times (Oct. 13, 2019).[3] TCS and PC

21    assist some clients with preparing the paperwork required for the clients' loan

22    consolidation and income-driven repayment ("IDR") program applications. Janse

23    Decl. ¶ 2; Balestreri Decl. ¶ 2. For other clients, whose loans have already been

24

25    [2] Available at https://files.consumerfinance.gov/f/documents/201706_cfpb_PSLF-
26    midyear-report.pdf.

27    [3] Available at https://www.nytimes.com/2019/10/13/your-money/student-loans-
      income-repayment.html.

28

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

1   consolidated, the companies assist with preparing the paperwork required to apply
2   for IDR programs. *Id.*

###### 1.  Prime Consulting, LLC

4   PC is a sales company that is in charge of the "front-end" of the business.
5   Balestreri Decl. ¶ 3.  PC acquires clients through online advertising campaigns run
6   and controlled by third parties. *Id.*  PC clearly, completely, and accurately
7   describes the services offered to clients in its sales script on which its employees
8   are thoroughly trained. *See id.* & Ex. A thereto.  PC takes pains to walk clients
9   through contracts, authorizations, and disclosures that it needs to ensure that clients
10  understand the services to be rendered. *Id.* ¶ 4.  On the initial sales call, a welcome
11  email containing, among other things, disclosures, is sent to each client. *Id.* ¶ 4 &
12  Ex. B thereto.  All of PC's compliance policies, including, for example, its
13  Telemarketing Sales Rule Policy, are distributed and explained to each new
14  employee. *Id.* ¶ 5 & Ex. C thereto.

###### 2.  True Count Staffing, Inc.

16  TCS is the "back-end" of the business.  Janse Decl. ¶ 3; Balestreri Decl. ¶ 7.
17  On behalf of and working with clients, TCS prepares and submits the documents
18  required to apply for loan consolidation and IDR programs, interfaces with clients'
19  loan servicers, handles customer services inquiries, and gathers necessary
20  information to prepare and submit the re-certifications required for its clients to
21  stay in the IDR programs for which it helped them qualify. *Id.*

22  Each new employee must score more than 85% on a compliance quiz before
23  they are allowed to begin.  Balestreri Decl. ¶ 6, Ex. D.  The company's policies are
24  also distributed and explained to each new employee. *Id.* ¶ 5.

### B.  **Third Party Trusted Account Services Holds Client Funds in Escrow**

27  As part of a client's on-boarding process, the client enters into a contract
28  with third party Trusted Account Services ("TAS"), which is a dedicated account

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

3

provider that provides escrow services.  Declaration of Jimmy Lai ("Lai Decl.") ¶ 3, ¶ 5 & Ex. B thereto.  TAS holds the client's payments for TCS's services in escrow for the client's benefit.  *Id.* ¶ 4.  No Defendant or Relief Defendant owns or controls (or has ever owned or controlled) TAS.[4]  *Id.* ¶ 6.  TAS has an arms-length contract with TCS pursuant to which TAS is in charge of processing payments made by TCS clients and holds these funds in escrow for the benefit of TCS's clients.  *Id.* ¶ 4 & Ex. A thereto.

No Defendant or Relief Defendant has access to or control over funds held in escrow by TAS until proof is submitted to TAS that that the client services relating to which the funds were escrowed have been performed.  *Id.* ¶ 8.  For instance, for TCS clients that apply for loan consolidation, TAS requires TCS to submit each client's final repayment letter and proof that the first payment under the client's new repayment plan has been made.  *Id.*  TAS also requires that the client affirm on a call that they are satisfied with services rendered prior to funds being able to be released to TCS.  *Id.*

Since September 16, 2019, TAS has been holding TCS client funds in escrow for the benefit of TCS's clients.  *Id.* ¶ 9.  It currently holds approximately $2.8 million in escrow for the benefit of TCS clients.  *Id.*

### C.    PC and TCS Have Established Rigorous Auditing Policies and Practices

As part of its ongoing efforts to ensure compliance with relevant laws, including the Telemarketing Sales Rule ("TSR") and the Dodd-Frank Act

---

[4] The only connection that TAS had to any Defendant or Relief Defendant is TAS worked with TCS to establish the software portal through which TAS's systems could integrate with TCS's systems to ensure visibility into funds held in escrow, provide a mechanism for TCS to submit the documentation required to release client funds to TCS, and permit customer service calls to be properly routed.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

1  prohibitions against unfair, deceptive and Abusive acts or practices ("UDAAP"),
2  PC instituted auditing procedures, including automatic call recording, and the
3  routine review of sales calls by management.  Balestreri Decl. ¶ 8.  For its part,
4  TCS developed a sophisticated software program—a bot known as "Ultron"—that
5  checks for technical anomalies within TCS's systems that may be indicative of
6  employees cutting corners or engaging in potentially non-compliant activities.
7  Janse Decl. ¶ 4; Balestreri Decl. ¶ 8.

8       When auditing functions catch potentially non-compliant activities, affected
9  client files are paused pending investigation, and swift action is taken to investigate
10  the issue, rectify any problems discovered, and undertake any appropriate
11  employee discipline, up to and including termination.  Janse Decl. ¶ 4; Balestreri
12  Decl. ¶ 9; Declaration of Shirena Huizar ¶ 2 & Exs. A-B thereto.  And, compliance
13  memos are issued to remind employees of potentially wrongful conduct.  *Id.*  These
14  memos are reviewed by managers and signed by employees, and each memo is
15  added to the onboarding package for new employees as well as compliance
16  training.  Janse Decl. ¶ 4; Balestreri Decl. ¶ 9 & Ex. E thereto.

17       Layered on top of these auditing functions is the business' backwards-
18  looking auditing and compliance re-verification program.[5]  Janse Decl. ¶ 5;
19  Balestreri Decl. ¶ 10.  As part of every incoming customer service call, TCS
20  personnel walk the client through a series of documents and questions to re-verify
21  that their information was accurate, and that those clients understood the services
22  they signed up for and were satisfied with those services.  Janse Decl. ¶ 5 & Ex. A
23  thereto; Balestreri Decl. ¶ 10.  TCS personnel have also included the compliance
24  package as part of annual calls to clients made to prepare the paperwork to

25
26  [5] The auditing and compliance re-certification program (or re-verification program)
27  is to be distinguished from the re-certification program consumers complete in
order to continuing qualifying for repayment programs.
28

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310.229.9900

1  recertify their information with the Department of Education.  Janse Decl. ¶ 6;

2  Balestreri Decl. ¶ 11.  Indeed, TCS was in the process of onboarding and training

3  additional personnel to reinforce its compliance re-verification program at the

4  exact time that the Bureau and Receiver raided its offices and detained its

5  employees under the authority of the TRO.  Janse Decl. ¶ 6; Balestreri Decl. ¶ 11.

**D.     The Bureau Issues A Civil Investigative Demand to CAC**

7          The Bureau issued a Civil Investigative Demand to Consumer Advocacy

8  Center, Inc. ("CAC"), dated September 10, 2018.  CAC was PC's predecessor on

9  the "front-end" side of the business and CAC ceased operations in or around

10 September 2018.  The Bureau has never issued any CID to any Defendant or Relief

11 Defendant other than CAC.

12         In January 2019, CAC declared bankruptcy.  After briefly attempting to

13 operate as a debtor-in-possession providing sales and advertising services, a

14 Trustee was appointed to wind it down and distribute its assets to its creditors.

15         Contrary to the Bureau's implication that Defendants were non-responsive to

16 its attempts to investigate, the record evidence demonstrates that Defendants,

17 through counsel, attempted to work with the Bureau.

18         In July 2019, PC retained counsel, and CAC also retained new bankruptcy

19 counsel.  Though CAC had no ability to respond to the CID other than through the

20 Court-appointed bankruptcy Trustee, PC's counsel reached out to the Bureau and

21 offered to voluntarily provide the Bureau with documents and other information.

22 Indeed, on August 30, 2019, counsel provided thousands of pages of documents to

23 the Bureau, including (i) data exports obtained from the third party company that

24 hosted CAC's customer relationship management platform and that exclusively

25 stored that data; (ii) employee information from the third party company that ran

26 CAC's payroll function; (iii) and other documents relating to CAC, including

27 QuickBooks log-in information, lists of employees, merchant accounts, and

28 marketing companies, bank statements, tax returns, financial statements, lease

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

1   agreements, insurance policies, and call logs.  Declaration of Gerald S. Sachs
2   ("Sachs Decl.") ¶ 2, Ex. A.

3        On September 30, 2019, counsel reiterated the standing offer to voluntarily
4   produce additional information that would be of interest to the Bureau, offered to
5   set up an in-person meeting, and noted that additional work was ongoing to
6   respond to the subpoenas issued by the Bureau in CAC's bankruptcy proceeding.
7   Declaration of Gerald S. Sachs ("Sachs Decl.") ¶ 3, Ex. B.  Unfortunately, those
8   efforts did not result in any meaningful discussions between the parties (*id.* ¶ 3);
9   rather, it seems that the Bureau's effort here was well underway, notwithstanding
10  counsel's good faith efforts to cooperate and voluntarily work with the Bureau.

11  **III.   LEGAL STANDARD**

12       Federal Rule of Civil Procedure 65 provides that a federal district court may
13  issue a temporary restraining order only if "specific facts in an affidavit or a
14  verified complaint clearly show that immediate and irreparable injury, loss, or
15  damages will result to the movant before the adverse party can be heard in
16  opposition…"  Fed. R. Civ. P. 65(b)(1)(A).  To convert a temporary restraining
17  order to a preliminary injunction *pendente lite,* the movant bears the burden of
18  demonstrating that it is likely to succeed on the merits, that consumers are likely to
19  suffer irreparable harm in the absence of a preliminary injunction, that the balance
20  of equities tips in the movant's favor, and that an injunction is in the public
21  interest. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008).  In cases
22  where the government is acting under a statute authorizing injunctive relief, while
23  irreparable harm may be presumed, the government is still required to demonstrate
24  a likelihood of success on the merits and that the balance of the equities favors the
25  injunctive relief sought.  *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1212 (9th
26  Cir. 2019).

27       It is axiomatic that enjoining conduct prior to a full and fair trial on the
28  merits is an "extraordinary and drastic remedy." *FTC v. Lakhany*, No. SACV 12-

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

1   00337-CJC (JPRx), 2012 WL 12860115, at *1-2 (C.D. Cal. May 2, 2012) (denying

2   the FTC's *ex parte* application for a TRO and order to show cause). As such,

3   injunctive relief must be narrowly tailored to remedy the specific and redressable

4   harms shown by a plaintiff. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d

5   970, 974 (9th Cir. 1991). In the Ninth Circuit, "[a]n overbroad injunction is an

6   abuse of discretion." *Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013)

7   (citing *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009)). The

8   United States Supreme Court has cautioned that injunctive relief should be no

9   more burdensome to the defendant than necessary to provide complete relief to the

10  plaintiffs before the court. *See Trump v. Int'l Refugee Assistance Project*, 137 S.

11  Ct. 2080, 2090 (2017); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765

12  (1994).

13  **IV.   ARGUMENT**

14      **A.   The Bureau Has Not Met Its Burden to Show That it is Likely to**

15          **Succeed on the Merits**

16      No preliminary injunction should issue because the Bureau is unlikely to

17  succeed on the merits of its claims. The Bureau's evidence, the majority of which

18  details events that occurred last year, is rebutted by the results of the re-verification

19  efforts TCS has implemented in its ongoing initiative to improve consumer

20  satisfaction and compliance. The Bureau also has not provided recent evidence of

21  the alleged violations and is unlikely to be able to do so.

22          1.   The Business' Customer Re-Certification Results Demonstrate

23              That the Bureau is Unlikely to Succeed on the Merits of Its

24              Claims

25      As a preliminary matter, TCS's re-verification campaign has resulted to date

26  in approximately 3,252 re-verification interactions with clients, ~96% of which

27  certified they were satisfied and re-executed their agreements with TCS, after

28  reviewing content in these compliance packages. Balestreri Decl. ¶ 12 & Ex. F

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310.229-9900

thereto. The vast majority of the ~4% that did not re-execute compliance packages could not do so only because their personal information (*e.g.* family size, marital status, or income) had changed since the time they initially provided such information. *Id.* ¶ 13. Defendants' sampling taken from those who called into customer service is more statistically significant and a more accurate picture than the pool of consumer complaints cited by the Bureau because (1) unlike the Bureau's sampling, Defendants' sampling is random; and (2) customers rarely, if ever, call in to customer service when they are satisfied with the service they have received.[6] Thus, even the pool of customers from which compliance re-verifications were obtained successfully is likely biased against—not for—Defendants.

The results of the re-verification campaign suggest that the incidents cited by the Bureau were caused by rogue sales employees. When TCS discovered employees who engaged in violative behavior, it swiftly and appropriately disciplined or terminated any such employee. *See FTC v. BF Labs, Inc.,* No. 4:14-cv-00815-BCW, 2014 WL 7238080 (W.D. Mo. Dec. 12, 2014) (refusing to grant the FTC's request for a preliminary injunction after an *ex parte* TRO because there was no evidence that the defendants' false statements at issue therein "were widely disseminated or made systematically to all or even most consumers"). Considered in context, rather than in isolation, the Bureau's evidence is unreliable, inconsistent with current practices and thus, simply does not warrant the draconian procedures

---

[6] This is not to say that Defendants discount consumer complaints. To the contrary, Defendants have routinely offered complete refunds to consumers who complain, regardless of circumstance.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

1  and requirements the agency has employed to date and seeks judicial approval to

2  continue.[7]

3          2.      The Bureau has not demonstrated recent violations

4        Notably, the evidence the Bureau presented in its motion presents only a

5  narrow slice of TCS's work and completely omits recent events—a crucial factor

6  in determining whether an injunction is necessary.

7        For example, the Bureau has attached declarations from 11 of TCS's tens of

8  thousands of customers.  None of those customers went through the re-verification

9  process TCS has implemented.  Similarly, the Declaration of Scott Lause does not

10  reflect any of the compliance measures TCS has implemented, nor do the transcript

11  excerpts[8] of interviews with the former employees, both of whom left prior to the

12  September compliance trainings and re-verification campaign, and one of whom

13  was let go for failing to follow proper procedures.  Pl. Ex. 33, at 662-63; Pl. Ex.

14  34, at 710.  There is simply no acknowledgement of the current state of the

15  Defendants' operations.  Combined with the vague and disputed evidence of

16  previous conduct and the statistically significant data demonstrating overwhelming

17  customer satisfaction, the conspicuous lack of recent evidence undermines the

18  Bureau's likelihood of success on the merits.

19  **B.**    **The Balance of Equities Strongly Favors Defendants**

20        The Bureau's proposed injunction is vastly overbroad, unnecessary, and

21  ultimately inequitable, including with respect to the proposed asset freeze and

22  

23  [7] Notably, the Bureau is requesting this ongoing and severe relief at a time when

24  the agency has admitted that its current configuration is unconstitutional. *Letter from Dir. Kathleen L. Kraninger to the Hon. Mitch McConnell* (Sept. 17, 2019).

25  The uncertainty militates towards restrained and narrowly tailored relief, not less,

26  and possibly a stay given the likely permanent consequences for the Defendants.

27  [8] Defendants have requested complete copies of the transcripts but the Bureau has not provided them as of the time of this filing.

28  

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

1   receivership that will result in the *de facto* termination of all business operations;

2   prevent Defendants from mounting a defense; and prevent the Individual

3   Defendants from supporting themselves and their dependents—all before the

4   Constitutional due process afforded by a trial on the merits can take place.[9]

5              1.     The Preliminary Injunction Sought Would Unfairly Destroy

6                     Defendants' Business And Harm Their Employees

7          The balance of the equities favors Defendants because the business is

8   operating lawfully, including with respect to the advance fee and specific

9   misrepresentation issues identified by the Bureau in its supporting papers. *See,*

10  *e.g.*, *FTC v. BF Labs, Inc.*, No. 4:14-cv-00815-BCW, 2014 WL 7238080 (W.D.

11  Mo. Dec. 12, 2014) (finding FTC not entitled to preliminary injunction where

12  defendants implemented compliant business model).

13         In *BF Labs*, the Court held that the FTC was not entitled to convert the

14  temporary restraining order, asset freeze, and temporary receiver it obtained on an

15  *ex parte* basis into a preliminary injunction. *Id.* at *2, 6. The Court found that the

16  balance of the equities weighed in favor of the defendants, and concluded that the

17  defendants' abandonment of the business model resulting in the alleged material

18  misrepresentations to consumers upon which the FTC built its case, and their

19  representation to the court that they would not return to that model outweighed the

20  FTC's stated concerns. *Id.* at *6.

21         Here, as in *BF Labs*, the balance of the equities weighs in favor of

22  Defendants because they made a clean break from the time period during which the

---

[9] The proposed injunction is inequitable – indeed extreme and unfair – in numerous other respects. For instance, among others, no Defendant may use credit or debit cards; authorizes extremely expedited discovery; and authorizes the Receiver to gain access to the Individual Defendants' personal mobile devices, and potentially waive attorney-client privilege. *See* TRO, Sections VI, XXIII, XIV.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

47872002

11

1  practices alleged to be unlawful occurred.  In fact, after retaining counsel, PC's
2  sales business shut itself down from August 28, 2019 to September 30, 2019 and
3  implemented a rigorous campaign to raise the bar with respect to its operational
4  compliance policies, procedures, and practices, under which it has consistently
5  operated and from which it does not intend to deviate.  Janse Decl. ¶ 7; Balestreri
6  Decl. ¶ 14.  To this end, Defendants retained several outside consultants to assist
7  with these substantial revamped compliance efforts.  *Id.*

8       For example, PC implemented new sales scripts and trained salespeople on
9  how to use them.  Balestreri Decl. ¶ 15.  PC revamped its customer agreements,
10  procedures, and disclosures to ensure clients understood the services being offered
11  and to reduce the risk that information submitted on their behalf was inaccurate or
12  incomplete.  *Id.*  Compliance training modules for Sales, Marketing, Processing,
13  and Customer Service functions were built and deployed.  *Id.* ¶ 15 & Ex. G thereto.
14  TCS created and implemented an automated software system to detect anomalies
15  suggestive of rogue employee conduct was developed in-house and deployed.
16  Janse Decl. ¶ 4; Balestreri Decl. ¶ 8.  Upon detection of any anomaly, PC takes the
17  appropriate disciplinary action, up to termination.  Janse Decl. ¶ 4; Balestreri Decl.
18  ¶ 9.  As an additional safeguard, manager-level personnel listen to phone
19  recordings for compliance.  Balestreri Decl. ¶ 16.  The sales call for every single
20  client on-boarded since sales restarted on or about September 30, 2019 has been
21  audited by an independent company for compliance.  *Id.*

22       While the Bureau has presented evidence of past complaints—which
23  Defendants intend to rebut in due course—the Bureau has not, and cannot, show
24  that the business has operated in anything but a compliant-fashion since the new
25  compliance measures were instituted on September 30, or that the business will
26  deviate from such practices going forward.

27       Further, not only has the business been operating lawfully since September
28  30, a statistically-significant number of existing clients have confirmed in re-

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

47872002                                    12

1   verification compliance checks that they got what they signed up to receive:

2   document preparation services to assist them with their federal student loan

3   consolidations, modifications, and re-certifications. Balestreri Decl. ¶ 12, Ex. F.

4   Thus, the consumer harm *alleged* by the Bureau is cabined to pre-September 30

5   conduct, and at that, such conduct is nowhere near as likely to have caused the

6   consumer harm proffered by the Bureau in order to obtain its TRO.

7        Finally, the Bureau could easily have discovered the now-compliant

8   operation prior to filing its TRO. Had the Bureau done so, it would have heard

9   sales agents make lawful sales pitches and disclosures, and explain that client

10  payments would be held in escrow by a third party until completion of work, as

11  explained above.

12       Instead of doing that, it only made cursory calls to ascertain that the

13  companies were still operating in October. Notably, at the same time it made these

14  calls, the Bureau chose not to go through the sales process to ascertain the

15  Defendants' current procedures and methods, which would have reflected the re-

16  verification campaign and extensive training. If the full facts had been disclosed in

17  the Bureau's brief, there would be no basis for a temporary restraining order, let

18  alone a preliminary injunction.

19       Moreover, there is no cognizable threat of ongoing consumer harm that

20  needs to be enjoined. The record evidence demonstrates that consumers benefited

21  and continue to benefit from Defendants' services. Balestreri Decl. ¶ 12, Ex. F.

22  The proposed injunction would leave Defendants' clients in the hands of a

23  Receiver without the requisite experience to serve them, and close off valuable

24  debt consolidation and modification services to potential clients in need of them.

25  Of course, Defendants are more than willing to voluntarily submit to the portions

26  of the proposed injunction that require them to operate compliantly (*see, e.g.*, TRO,

27  Sections I and II); indeed, they are already doing so and will continue to do so.

28       No injunction should issue other than one that requires that Defendants

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310.229.9900

1 continue to operate their business lawfully. *See FTC v. Lifewatch Inc.*, 176 F.

2 Supp. 3d 757, 784 (N.D. Ill. Mar. 31, 2016) (explaining that the balance of equities

3 tilted in favor of injunctive relief because the injunction "would only require that

4 Defendants . . . comply with federal law"); *FTC v. Check Investors, Inc.*, 2003 U.S.

5 Dist. LEXIS 26941, at *42-*43 (D.N.J. Jul. 30, 2003) ("Even with a preliminary

6 injunction, Defendants can continue to operate their business. They need only

7 conform to the regulations of the FDCPA and FTCA. . . . Accordingly, the Court

8 finds that the balance of the equities weighs in favor of the public interest and a

9 preliminary injunction."). At a minimum, the business should be permitted to

10 continue to operate the critical functions required to service current clients, such as

11 processing and customer service, as clients need to prepare their annual re-

12 certifications with the Department of Education and have their customer support

13 inquiries handled. Regardless of any conduct alleged to have occurred in the past,

14 requiring a lawfully-operating enterprise to cede its client servicing functions to a

15 Receiver who is highly unlikely to be able to run the business successfully would

16 actually cause the very consumer harm the Bureau is charged with preventing.

17         2.    The Bureau's Proposed Ancillary Relief of an Asset Freeze is

18              Inequitable and Overbroad

19      The Bureau has not met its burden to show that the balance of the equities

20 entitle it to impose an asset freeze, which the United States Supreme Court has

21 characterized as a "nuclear weapon of the law." *Grupo Mexicano de Desarrollo*

22 *S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 328-33 (1999).

23         **a.**     **The Bureau's Half-Billion-Dollar Fund Ensures**

24              **Consumer Redress, if Required, After Trial**

25      An asset freeze is unnecessary because any consumer redress that might be

26 obtained in a judgment is virtually guaranteed by the Consumer Financial Civil

27 Penalty Fund (the "Fund"), established through 12 C.F.R. §§ 1075, *et seq. See*

28 *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982) (primary purpose of

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

47872002

14

1     asset freeze in consumer context to ensure availability of funds for consumer

2     redress).

3         Any consumer harmed from a violation resulting in a civil money penalty of

4     any amount, including *as little as one dollar*, is entitled to be redressed through the

5     Fund. *See* 12 C.F.R. § 1075.103 (establishing consumer access to the Fund where

6     "a final order in a Bureau enforcement action imposed a civil penalty for the

7     violation or violations"); *see* Compl. ¶ 262 (seeking civil money penalty). Indeed,

8     the Bureau routinely imposes one-dollar civil penalties to make the Fund available

9     for consumer redress. *See* Consumer Fin. Prot. Bureau, CFO Update for the Third

10    Quarter of Fiscal Year 2019 (Sep. 17, 2019), pp. 4-6; Consumer Fin. Prot. Bureau,

11    CFO Update for the Fourth Quarter of Fiscal Year 2018 (Dec. 7, 2018), pp. 4-5.

12    According to the Bureau's most recent annual report, the Fund has collected

13    upwards of *one billion dollars* from 2012 through September 2018, and had

14    upwards of *$534 million* remaining unallocated. *See* Consumer Fin. Prot. Bureau,

15    Financial Report of the Bureau of Consumer Financial Protection Fiscal Year

16    2018, (Nov. 15, 2018), p. 23.

17        Accordingly, any consumers adjudicated to be harmed after trial will be

18    entitled to access the half-billion-dollar Fund to obtain redress.[10]

19            **b.**     **Actual Alleged Consumer Harm Does Not Justify an**

20                 **Asset Freeze**

21        As detailed above, the business' backward-looking compliance re-

22    verification is ongoing, and current results demonstrate that the overwhelming

23    majority of customers verified that they obtained the valuable document

24    preparation services for which they bargained and with which they are satisfied.

25

26 _____

27 [10] Tellingly, the Bureau cites to no Bureau cases to support its supposed authority
    to obtain an asset freeze in this context.

28

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

DEFENDANTS' RESPONSE TO OSC WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310.229.9900

1  Balestreri Decl. ¶ 12, Ex. F.  Thus, even assuming there was wrongdoing (which

2  Defendants dispute), actual consumer harm does not—as a matter of law—justify

3  the imposition of an asset freeze.  *Microsoft Corp. v. A-Tech Corp.*, 855 F. Supp.

4  308, 312 (C.D. Cal. Jun. 14, 1994) (holding that an "illegitimate use of the asset

5  freeze process to tie up more assets than is reasonably necessary to secure

6  [plaintiff's] claims" may constitute an abuse of process); *see also FTC v. Venma*

7  *Nutrition Co.*, 2015 U.S. Dist. LEXIS 179855, at *29-*30 (D. Ariz. Sep. 18, 2015).

8  Defendants' statistically sound evidence far outweighs the probative value of the

9  consumer complaints, which appear to be the by-product of rogue employees

10  (some of whom may have even been interviewed by the Bureau in this matter).  In

11  addition, Defendants' policy and practice have always required issuance of a full

12  refund to an unsatisfied customer.  In short, to the extent consumer harm may need

13  to be addressed, even through restitution, it is likely to be minimal.

14      The Bureau's argument that an asset freeze is warranted because money was

15  allegedly transferred between various entities misses the point and does not support

16  imposition of an asset freeze.  In any case, the monetary transfers that the Bureau

17  references are part and parcel of running an ordinary business.  Wen and Kim were

18  paid for their services through executive salaries and management fees paid to their

19  consulting companies.  This structure is not uncommon for the executives of small,

20  rapidly-growing businesses.  What Wen and Kim purchased with the money they

21  earned from building a business from scratch is irrelevant.

22      Next, the Bureau's implication that Defendants flaunted bankruptcy court

23  orders is simply wrong.  While it is true that CAC sought and obtained an

24  extension of time to produce materials to the Trustee, no Defendant has violated

25  any bankruptcy court orders nor been held in contempt.  Indeed, CAC produced

26  extensive documentation concerning its prior client base.  *See* Sachs Decl. ¶ 2, Ex.

27  A.

28

1   The Bureau's request for a pre-judgment asset freeze is unfair, and not
2   justified by the actual facts in this matter.

3         **c.**    **The Non-Existent Chance That Consumers Will Not**
4                     **Have Funds for Redress Following Trial is Heavily**
5                     **Outweighed by the Extreme Prejudice That Would**
6                     **Result in a Pre-Judgment Asset Freeze**

7   In contrast to the virtually non-existent possibility that the Bureau will not
8   be able to obtain redress for consumers following a trial on the merits, the
9   prejudice that would inure to Defendants as a result of an asset freeze between now
10  and trial is extreme and unwarranted.  It is especially inequitable considering the
11  barebones due process associated with expedited briefing, and Defendants'
12  extremely limited access to information to defend themselves following the *ex*
13  *parte* imposition of a TRO, asset freeze, and temporary receivership seizing control
14  of the business, its assets, and its documents.

15  Most fundamentally, the asset freeze ensures the destruction of a currently
16  operating and compliant business, completely deprives Defendants of any ability to
17  keep counsel retained, and prevents the Individual Defendants from obtaining basic
18  life necessities including food, water, and shelter.

19  Under the circumstances, imposing the proposed asset freeze through trial
20  would be anathema to the fundamental tenant that every defendant should have a
21  full and fair ability to mount a defense and its day in court.  *Consumer Fin. Prot.*
22  *Bureau v. Howard*, No. 8:17-cv-00161-JLS-JEM, 2017 U.S. Dist. LEXIS 222742,
23  at *2 (C.D. Cal. Feb. 13, 2017).

24        **d.**    **The Asset Freeze, if Warranted at All, Is Vastly**
25                    **Overbroad and Should Be Subject to Reasonable**
26                    **Carve-Outs**

27  If an asset freeze is to be imposed, the balance of the equities dictates that (i)
28  it should only apply to funds relating to clients acquired prior to September 30,

**VENABLE LLP**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

47872002

17

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

1  2019; (ii) exclude amounts required for Defendants to cover legal services already

2  rendered, and include reasonable releases of funds to cover legal expenses on a

3  going-forward basis; and (iii) and include reasonable amounts so that the

4  Individual Defendants can afford everyday living expenses for themselves and

5  their families pending trial. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th

6  Cir. 2009).

7  First, funds relating to clients acquired on or after September 30, 2019 are

8  not within the bounds of the allegations of the Complaint because, as explained

9  above, the Bureau has not and cannot show that such funds were ill-gotten.

10  Preliminary relief cannot encapsulate that which cannot be awarded as part of final

11  relief after trial. *FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1315 (S.D.

12  Fla. Sep. 18, 2013) ("the amount of assets that could properly be frozen—a remedy

13  designed to ensure that assets subject to disgorgement would still be available at

14  the end of a case—is equal to the defendant's ill-gotten gains") (citing *FTC v.

15  Bishop*, 425 Fed. Appx. 796, 798 (11th Cir. 2011).

16  Second, Defendants are entitled to reasonable amounts to pay for legal

17  services already rendered (totaling approximately $314,000), especially those

18  rendered pre-asset freeze. *See S.E.C. v. Interlink Data Network of Los Angeles,

19  Inc.*, 77 F.3d 1201, 1205, 1205 n.3 (9th Cir. 1996) (explaining that funds held by a

20  law firm in a retainer belonged to the law firm once earned); *S.E.C. v. Schooler*,

21  2015 WL 11233061, at *3 (S.D. Cal. Mar. 27, 2015) (payment of reasonable

22  attorneys' fees in defending against a TRO is not grounds to freeze the assets used

23  to pay those fees).

24  Similarly, Defendants should be permitted to pay for legal services to be

25  rendered. In the Ninth Circuit, "[d]iscretion must be exercised by the district court

26  in light of the fact that wrongdoing is not yet proved when the application for

27  attorney fees is made." *Commodity Futures Trading Comm'n v. Noble Metals

28  Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) (citing *Fed. Sav. & Loan Ins. Corp. v.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

1   *Dixon*, 835 F.2d 554, 565 (5th Cir. 1987) ("Thus we conclude that some kind of an

2   allowance must be made to permit each defendant to pay reasonable attorneys' fees

3   if he is able to show that he cannot pay them from new or exempt assets[.]"))

4   Moreover, here, a number of Defendants, as companies, require counsel, as they

5   cannot appear *pro se*. *See In re Am. W. Airlines*, 40 F.3d 1058, 1059 (9th Cir.

6   1994) ("Corporations and other unincorporated associations must appear in court

7   through an attorney.").

8          Given the complexity and magnitude of this case, and prior billings, a

9   reasonable allocation for attorneys' fees would be approximately $100,000 a

10  month (at least initially) to ensure a fair and efficient proceeding, and to permit the

11  corporate defendants to be represented.  *See FTC v. A To Z Mktg.*, 2013 WL

12  12134132, at *2 (C.D. Cal. Oct. 30, 2013).

13         <u>Third</u>, the Individual Defendants should be allowed reasonable living

14  monthly expenses, estimated to be $10,097.00 for Mr. Wen, and $14,810.00 for

15  Mr. Kim.[11]  "Courts regularly hold that they have discretion to modify the asset

16  freeze to release funds to pay living expenses.  In exercising this discretion, courts

17  tend to look for evidence of the defendant's overall assets or income."  *S.E.C. v.*

18  *Private Equity Mgmt. Grp., Inc.*, 2009 WL 2058247, at *3 (C.D. Cal. July 9, 2009)

19  (citations omitted) (citing cases); *see e.g.*, *FTC v. World Wide Factors, Ltd.*, 882

20  F.2d 344, 346 (9th Cir. 1989).  If the defendants can "provide the Court with

21  enough information . . . for example, propose[] a concrete amount of funds that

22  should be unfrozen, or submit[] documents detailing what these expenses might

23  be," the balance of equity necessitates a modification of the asset freeze to allow

24  for payment of basic living expenses.  *FTC v. 8 Figure Dream Lifestyle LLC*, 2019

25

26  [11] Defendants are in the process of completing the corporate and individual
    financial statements as mandated by the TRO, which will further evidence the need
27  for reasonable monthly living expenses.

28

1   WL 4570040, at *1 (C.D. Cal. July 8, 2019).

2       The balance of equities requires these carve-outs, at a minimum.

3       3.    The Bureau's Proposed Ancillary Relief of a Receivership is

4       Inequitable and Overbroad

5       The receivership is unnecessary and wasteful in light of the lawfully

6   operating business. *See Compass Bank v. Baraka Holdings, LLC*, No. CV 17-

7   06563-AB (RAOx), 2017 WL 10378348, at *3 (C.D. Cal. Oct. 26, 2017)

8   ("Appointing a receiver is an extraordinary equitable remedy, which should be

9   applied with caution.") (citing *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837,

10   842 (9th Cir. 2009)).  As the Southern District of New York cautioned in *FTC v.*

11   *Verity Int'l*, "Courts of equity must bear in mind that preliminary injunction rulings

12   are based on incomplete records and therefore arguably have a higher probability

13   of error than rulings after trial or on summary judgment." 124 F. Supp. 2d 193, 204

14   (S.D.N.Y. 2000).  When "the relief sought . . . would have a drastic adverse impact

15   on the defendants' business," a court should be "reluctant to impose what might be

16   a commercial death sentence at an interlocutory stage if there is some reasonable

17   alternative." *Id.*

18       That is the case here.  The imposition of a receivership through the time of

19   trial would guarantee the destruction of a compliant business helping consumers,

20   and, if the Bureau is presumed to be correct, the destruction of the company would

21   result in the loss of significant funds to redress alleged consumer harm and harm to

22   those employees who have not been paid, despite their ongoing compliance.

23   Respectfully, a receiver cannot reasonably be expected to ensure the smooth

24   continuation of this lawfully operating business. Moreover, the Receiver's

25   interaction with the Defendants' employees thus—which included confiscating and

26   imaging personal cell phones and making employees feel unable to leave—has

27   been disproportionate to the issues in this case and the rationale for the *ex parte*

28   TRO.  The balance of equities requires a more measured approach.

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

1    If the Court determines that oversight is warranted, the equitable solution is

2  to appoint a neutral monitor.  "A court-appointed monitor differs from an ordinary

3  receiver in that, unlike a receiver who steps into the shoes of a defendant, a

4  monitor is an objective third party, who exercises oversight responsibility over a

5  defendant." *S.E.C. v. Liu*, No. SACV 16-00974-CJC(AGRx), 2016 U.S. Dist.

6  LEXIS 91078, at *35 (C.D. Cal. July 11, 2016) (citations omitted).  "A monitor's

7  responsibilities can range from 'periodically review[ing] the activities of a

8  defendant to ensure compliance with a court's order,'" to greater oversight, as

9  required to meet the needs of the case.  *Id.* at *35-36 (quoting *S.E.C. v. Int'l

10  Heritage, Inc.*, 4 F. Supp. 2d 1368, 1376 (N.D. Ga. 1998) and citing *S.E.C. v.

11  WorldCom, Inc.*, No. 02 CIV.4963(JSR), 2002 U.S. Dist. LEXIS 14201, at *1

12  (S.D.N.Y. Aug. 2, 2002)).  Monitors often have broad access to the defendant's

13  books and employees to ensure protection and preservation of the defendant's

14  assets.  *Id.* at *36.  But monitors are significantly less disruptive to the operation of

15  the business than a receivership.

16    Defendants are willing to submit to a monitorship, which is a more

17  appropriate solution given the highly technical nature of the Defendants' industry

18  and the ongoing compliance efforts.  *See Verity*, 124 F. Supp. 2d at 204-05

19  (rejecting FTC's broader request but accepting Defendants' proposed compromise

20  to accept enjoinment of some parts of the business activities but not others).  Under

21  a monitorship, a Court-appointed monitor would have full access to the company's

22  books and records and physical premises to ensure that the business is operating

23  compliantly and the funds are not being dissipated.  Defendants are willing to

24  submit monthly detailed reports regarding operations.  This would provide the

25  oversight the Bureau seeks without causing harm to current clients, who rely on the

26  Defendants to assist them with time-sensitive requirements like annual Department

27  of Education required re-certifications of status.  Ignoring these customers

28  guarantees consumer harm.  Simply terminating the relationship with these

47872002

21

customers and refunding them is not only extremely wasteful, but also unfairly prejudices the overwhelming majority of customers who are satisfied with the services they received and continue to receive.

**V.      CONCLUSION**

For the foregoing reasons, the Court should not issue a preliminary injunction.  If the Court is inclined to issue a preliminary injunction, Defendants respectfully request that it be within the bounds of equity, as set forth as alternative relief in the concurrently-filed [Proposed] Order.

Dated:  October 28, 2019                         VENABLE LLP

By:  /s/ Witt W. Chang
Witt W. Chang
Allyson B. Baker
Gerald S. Sachs
Attorneys for Defendants

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

DEFENDANTS' RESPONSE TO OSC WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE