SARAH PREIS (D.C. Bar No. 997387)
(Admitted *pro hac vice*)
sarah.preis@cfpb.gov
Tel.: (202) 435-9318
JESSE STEWART (N.Y. Bar No. 5145495)
(Admitted *pro hac vice*)
jesse.stewart@cfpb.gov
Tel.: (202) 435-9641
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-5471

LEANNE E. HARTMANN (CA Bar No. 264787) – Local Counsel
leanne.hartmann@cfpb.gov
301 Howard Street, Suite 1200
San Francisco, CA 94105
Tel: (415) 844-9787
Fax: (415) 844-9788

*Attorneys for Plaintiff*
*Bureau of Consumer Financial Protection*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al.,<br><br>      Plaintiffs,<br><br>   v.<br><br>Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al.,<br><br>      Defendants. | CASE NO. 8:19-cv-01998 JVS (JDEx)<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: November 4, 2019<br>Time: 3:00 p.m.<br>Courtroom: 10C<br><br>Action Filed: October 21, 2019<br>Trial Date: None set |

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Cases**

*Caplin & Drysdale v. United States*, 491 U.S. 617 (1989)..........................................7

CFTC v. Co Petro Mktg. Grp, Inc., 700 F.2d 1279 (9th Cir.1983).............................8

*CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995) ............................7, 8

*CFTC v. Wilson*, No. 11CV1651 WQH BLM, 2011 WL 6398933 (S.D. Cal. Dec. 20, 2011)........................................................................................................9

*City of Burlington v. Dague,* 505 U.S. 557 (1992) ......................................................9

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*, 561 U.S. 477 (2010)........11

*FTC v. 8 Figure Dream Lifestyle LLC*, No. SACV1901165AGKESX, 2019 WL 4570040 (C.D. Cal. July 8, 2019) ........................................................................8

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .........................................5

*FTC v. Alliance Document Prep.,* 296 F. Supp. 3d 1197 (C.D. Cal. Nov. 2, 2017)5, 6

*FTC v. BF Labs Inc.*, No. 4:14-cv-00815-BCW, 2014 WL 7238080 (W.D. Mo. Dec. 12, 2014).................................................................................................................6

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) ....................................................4

*FTC v. H.N. Singer*, 668 F.2d 1107 (9th Cir. 1982)....................................................5

*FTC v. Lucaslawcenter "Incorporated*", No. SACV090770DOCANX, 2009 WL 10669363 (C.D. Cal. Sept. 30, 2009)...................................................................8

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) .......................................................4

*FTC v. Warner Communications, Inc.*, 742 F.2d 1156 (9th Cir. 1984) ....................... 5

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ........................ 5, 7, 8

Kerr v. Screen Extras Guild, 526 F.2d 67 (9th Cir. 1975) ............................................ 9

*Microsoft Corp. v. A-Tech Corp.*, 855 F. Supp. 308 (C.D. Cal. 1994) ........................ 8

*SEC v. Private Equity Mgmt. Grp., Inc.*, No. CV 09-2901 PSG (EX), 2009 WL
2058247 (C.D. Cal. July 9, 2009) ............................................................. 9, 10

SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993) ............................................................... 8

*Seila Law LLC v. CFPB*, No. 19-7 (U.S. Sept. 17, 2019), 2019 WL 4528136 (U.S.)
.................................................................................................................... 11

*United States v. Monsanto*, 491 U.S. 600 (1989) ....................................................... 7

*Victim Services, Inc. v. CFPB*, 3:19-mc-80040-VC (N.D. Cal. June 21, 2018) ......... 2

**Statutes**

12 U.S.C. § 5491 ........................................................................................................ 11

12 U.S.C. § 5302 ........................................................................................................ 11

12 U.S.C. § 5497 .......................................................................................................... 1

12 U.S.C. § 5531 .......................................................................................................... 1

12 U.S.C. § 5536 .......................................................................................................... 1

**Regulations**

12 C.F.R. § 1075.104 ................................................................................................... 1

16 C.F.R. § 310 ....................................................................................................... 3

75 Fed. Reg. 48458-01 (Aug. 10, 2010) ................................................................... 3

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................. ii

**INTRODUCTION** ............................................................................................... 1

    A preliminary injunction is warranted. ........................................................ 2

        A.    The Bureau is likely to prevail on its advance fee and deception claims. ................................................................................ 2

        B.    The balance of the equities supports the requested relief. ................ 5

        C.    None of the Defendants have shown that they are entitled to relief from the asset freeze or a receivership. ........................................... 7

        D.    The constitutionality of the CFPA's "for cause" removal provision has no impact on these proceedings. ..................................... 11

## I. INTRODUCTION

The evidence presented in the TRO application and the supporting documents shows that that Defendants have operated a common enterprise that has harmed consumers by charging illegal advance fees and engaging in deceptive practices. Defendants' efforts to obfuscate the ongoing and interrelated nature of their operations, the degree of consumer harm, the risk of asset dissipation, and the need to preserve evidence warrant a preliminary injunction.

Defendants oppose the imposition of a preliminary injunction, arguing that the Bureau is unlikely to prevail on the merits because for the past month they have ceased charging illegal advance fees, instituted auditing procedures aimed at ceasing misrepresentations, and because some consumers have reported being happy with their services. Defs' Resp. at 3:5-6:5, 8:25-9:11. These arguments lack merit. Even if Defendants did begin operating legally within the last month, which the Bureau does not concede, it would not counteract the overwhelming volume of evidence showing that Defendants violated the Consumer Financial Protection Act of 2010 (CFPA) (12 U.S.C. §§ 5531, 5536(a)) and the Telemarketing Sales Rule (TSR) 16 C.F.R. 310.4(a)(5) for years. Indeed, Defendants do not even attempt to defend their conduct before September 2019.

Defendants also claim that they are entitled to relief from the asset freeze because the Bureau's civil penalty fund is currently available to compensate injured consumers. Defs' Resp. at 14:25-18; 17:27-19:2, 20:5-28. But the existence of the Bureau's civil penalty fund has no bearing on the asset freeze and does not justify allowing Defendants to continue to spend their ill-gotten gains.[1] Further, Defendants'

---

[1] Congress has authorized the Bureau to collect civil penalties, hold them in that Fund, and use that Fund to compensate victims of certain violations who have not otherwise been compensated for their harm. 12 U.S.C. § 5497(d)(1), (2); 12 C.F.R. § 1075.104(a). Whether consumers could receive future payments from the Fund is not relevant. The fact that the Civil Penalty Fund could potentially be used to

arguments aimed at lifting the asset freeze and dismissing the receiver fail because they did not provide any factual basis for granting this relief.

## II. A preliminary injunction is warranted.

### A. The Bureau is likely to prevail on its advance fee and deception claims.

Because the undisputed evidence shows the Student Loan Debt Relief companies (SLDR companies) have collected advance fees in violation of the TSR for years, the Bureau is likely to prevail on its advance fee claim. Under the TSR, debt relief providers can only accept fees once they have both (1) renegotiated or settled a debt on behalf of a consumer, and (2) the consumer has made at least one payment under the settled or renegotiated arrangement. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

The SLDR companies collect fees from consumers well before the companies even apply for loan adjustments on the consumers' behalf. TRO Memo at 15:14-16:2; *see also* Defs Opp. at 3:16-18 (stating that since Sept. 16, 2019, TCS used TAS to hold consumers' funds). And the companies do not track whether consumers' have made an initial payment toward an adjusted loan. TRO Memo at 15:19-16:2. Payment-processor records indicate that the SLDR companies continued collecting these illegal advance fees through merchant accounts for Premier and other dbas,

---

compensate Defendants' victims (if the Fund had sufficient assets and other requirements were met) does not suggest that Defendants should get to dissipate their assets. That would only leave the Bureau's Civil Penalty Fund to compensate consumers for the harm that Defendants should compensate themselves—and it would deplete the Fund's resources that would otherwise go to compensate other victims. In any event, the potential availability of compensation from the Civil Penalty Fund does not relieve Defendants of their obligation to pay redress for the harm they caused. In *Victim Services, Inc. v. CFPB*, 3:19-mc-80040-VC (N.D. Cal. June 21, 2018), the district court held "no law" supported the proposition that a defendant "should be allowed to keep money simply because" the Bureau compensated the defendant's victims from the Civil Penalty Fund. *Id*. at 1.

even after representing to the bankruptcy court that CAC/Premier had stopped operating.[2] Thus, the Bureau is likely to prevail on its advance-fee claims.

Defendants do not dispute that they violated the TSR before September 16, 2019. Instead, they argue that they have operated lawfully for the past three weeks because, since that time, they have used a purported third-party escrow account to hold client funds in escrow. *See* Defs' Resp. at 3:16-18

Even if Defendants have established third-party escrow accounts, these third-party escrow accounts do not pass muster under the TSR. While the TSR allows for a carveout to the advance-fee ban for certain escrow accounts, that carveout is limited to accounts used for a debt-relief provider's fees *"and* for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt." 16 C.F.R. § 310.4(a)(5)(ii) (emphasis added). In addition to the plain language of the Rule, the preamble discussion in the final rule states that "[if] a provider is going to require a dedicated bank account, it may not require the use of a dedicated bank account solely to set aside funds for the provider's fees." 75 Fed. Reg. 48458-01, 48490 n. 444 (Aug. 10, 2010). Since the SLDR companies use these escrow accounts exclusively to hold their own fees, not for payments to creditors, even assuming Defendants' assertions of changed practices is true, Defendants continue to violate the TSR's advance-fee ban.

The Bureau is also likely to prevail on its deception claims. The overwhelming weight of the evidence shows that Defendants misrepresent the nature and efficacy

---

[2] *Compare* TRO Memo Pl. Ex. 41, ¶ at 792 (stating Premier stopped operating September 21, 2018) and Chaya Decl. on Behalf of Ram Payment LLC, Ex. 1 at ¶ 3 (stating "Defendant Premier Student Loan Center used a variety of names[,]" but "it was always the same group of people" and explaining that RAM processed payments from December 2018 through February 2019 for them under the name Priority Account Management).

of their services, the purpose of consumers' payments to the companies, and the actions that the companies take on behalf of consumers. Further, emails obtained during the immediate access discuss how "in most cases" Defendants "incorrectly" submit student-loan-adjustment applications to servicers, including always listing consumers as single (whether married or not) and inaccurately recording family size. *See* Schneider Decl.; Ex. 13. All of the Individual Defendants are included on these emails. As recently as August 19, 2019, Defendants' customer-service manager stated in an email that "[t]he way almost every advisor is pitching family is pretty similar to this client. This client has no dependents, but his file has a family size of 7 on it." *See* Ex. 12; *see also* TRO Memo at 16:3-20:4. Although Defendants claim that they have "operated lawfully since September 30," Def. Resp. at 12:27-28, even if true, that would not change the fact that the Bureau is likely to prevail on the merits of its deception claims or negate the need for a preliminary injunction. Moreover, undercover calls from a Bureau investigator and recent consumer complaints suggest that any recently implemented compliance procedures fell short. Schneider Decl. at ¶¶16-17, 19-23.

Defendants' barebones assertions about purported customer satisfaction do not change this conclusion. First, the existence of some satisfied customers is not a defense to the instant claims. *See FTC v. Stefanchik*, 559 F.3d 924, 929 n.12 (9th Cir. 2009) (citations omitted); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1049 n. 21 (C.D. Cal. 1999), aff'd 265 F.3d 944 (9th Cir. 2001) (finding even when there are thousands of satisfied customers, such customers are still injured when that satisfaction arises out of illegal practices of defendants). Second, Defendants provide scant details about this survey process, leaving many questions about the integrity of this alleged data. Tellingly, there is no indication that the consumers Defendants polled were informed of the true nature of Defendants' practices or that Defendants have collected illegal

4
PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

advance fees. Defendants questionable claims about "satisfied" consumers thus have no bearing on whether the Bureau is likely to succeed on its deception claims.

Defendants argue that a preliminary injunction is not necessary because they reformed their illegal advance fee practices three weeks ago and have since adopted "rigorous" compliance procedures to curb deceptive conduct. Defs Resp. at 10:3-18. As set forth above, Defendants did not bring their practices into compliance before the receiver's appointment. Regardless, it is well settled that a request for an injunction does not become moot if the complained of conduct has been terminated. *FTC v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999). To show that their (claimed) voluntary cessation of illegal conduct moots the need for a preliminary injunction, Defendants must show that "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur." *Id.* Defendants efforts to evade law enforcement, their misrepresentations about the status of the debt-relief operation and the relationship between the corporate defendants in the bankruptcy proceeding, and their continued violations of the CFPA and the TSR indicate precisely the opposite. *See* TRO Memo at 10:1-11:9; *see also* Schneider Decl. at ¶¶16-17, 19-23. A preliminary injunction is therefore necessary to halt Defendants' illegal activity. *See FTC v. H.N. Singer*, 668 F.2d 1107, 1111 (9th Cir. 1982); *FTC v. Alliance Document Prep.,* 296 F. Supp. 3d 1197, 1212 (C.D. Cal. Nov. 2, 2017).

**B.     The balance of the equities supports the requested relief.**

When balancing equities where the public interest is involved, courts accord greater weight to the public interest than private interests. *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (internal citation omitted). "[T]he public has a compelling interest in ensuring the robust enforcement of federal consumer protection laws," *Alliance,* 296 F. Supp. 3d 1197 at 1212 (C.D. Cal. Nov.

2, 2017). That interest would be harmed if Defendants were permitted to continue operating.

Defendants have endeavored to continue their illegal activity and to conceal that activity and the true relationship between the companies from law enforcement. CAC ignored the Bureau's CID, petitioned for bankruptcy after depleting its assets, and misrepresented the status of its operations in the bankruptcy court. *See* TRO Memo at 10:2-11:8.[3] As demonstrated by documents obtained during the immediate access, Defendants' misrepresentations were pervasive through at least August 2019 and occurred with the individual Defendants' knowledge. Despite purporting to be three separate companies, evidence obtained during the immediate access further confirms that CAC, True Count, and Prime are part of a common enterprise controlled by Defendants Kim, Wen, and Nguyen. Schneider Decl. at ¶11-14; *see also* TRO Memo at 5:13-6:10. In this proceeding, Defendants are not complying with numerous provisions of the Court's order, including by failing to identify websites (IV), provide financial statements (VIII), identify foreign assets (X), or to identify other business locations (XIV). *See* Order Granting TRO; Decl. of Sarah Preis. And Defendants do not have any private interest in continuing their illegal activity. Thus, the balance of the equities supports entry of a preliminary injunction.

Defendants reliance on *FTC v. BF Labs Inc.*, No. 4:14-cv-00815-BCW, 2014 WL 7238080, at *2, 6 (W.D. Mo. Dec. 12, 2014), is misplaced. In *BF Labs*, the FTC alleged that the defendant, which marketed bitcoin-mining products, had misrepresented the shipping date of its products to consumers and the profitability of its products. *Id.* at *2. The court denied the FTC's request for a preliminary injunction

---

[3] Counsel's characterization of the Defendants efforts to cooperate with the Bureau are not accurate. Attached is a Declaration authenticating the most recent email exchange regarding Defendants' purported attempts to cooperate is attached hereto, and the complete record of communication is available if that is helpful to the Court.

based on the facts of that case, including questions about whether the representations at issue were false at the time they were made. The court further found that the defendants were unlikely to return to the potentially unlawful conduct. *Id.* at *2-3, 6. In contrast, the core of Defendants' business model involves deceiving struggling student-loan borrowers and charging them illegal advance fees. *See, e.g.,* TRO Memo at 15:3-20:4.

Defendants' bare assertion that there is no threat of consumer harm and that consumers somehow benefitted from Defendants' services is belied by the evidence. Consumers have been harmed by paying significant fees for services that Defendants cannot deliver as promised. Some consumers lost qualifying payments toward loan forgiveness or had their overall loan balance increase as a result of Defendants' practices. *See* TRO Memo at 11:9-16. Given Defendants' efforts to continue operations to date, these practices are likely to continue absent a preliminary injunction.

**C. None of the Defendants have shown that they are entitled to relief from the asset freeze or a receivership.**

The asset freeze should remain in place because Defendants have demonstrated that they would continue to dissipate the assets they have unlawfully taken from consumers. *See* TRO Memo at 27:22-28:23. Defendants' efforts to have the asset freeze lifted fail because 1) they have not demonstrated that the assets are untainted by their illegal acts; 2) they have not shown they are unable to cover living expenses and attorney fees from assets outside the freeze; and 3) they have not shown the reasonableness of the requests for attorneys' fees and living expenses.

First, Defendants have not established that the funds they seek to unfreeze are not the proceeds of their illegal conduct properly subject to the freeze. Wrongdoers have no right to defend their wrongdoing with other people's money. *United States v. Monsanto*, 491 U.S. 600, 607 (1989); *Caplin & Drysdale v. United States*, 491

U.S. 617, 626 (1989); *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). Defendants lured consumers into paying illegal advance fees through making deceptive representations. Defendants are not entitled to any portion of the fees they collected through this unlawful conduct. *See CFTC v. Co Petro Mktg. Grp, Inc.,* 700 F.2d 1279 (9th Cir.1983) ; *FTC v. Lucaslawcenter "Incorporated"*, No. SACV090770DOCANX, 2009 WL 10669363, at *13 (C.D. Cal. Sept. 30, 2009) ("Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime.") (quoting *SEC v. Quinn*, 997 F.2d 287, 287 (7th Cir. 1993)).

Second, the freeze is proper because the monetary loss to consumers likely far exceeds the funds subject to the freeze. In such circumstances, the need for a freeze is heightened. *See Noble Metals Int'l*, 67 F.3d at 775; *FTC v. 8 Figure Dream Lifestyle LLC*, No. SACV1901165AGKESX, 2019 WL 4570040, at *1 (C.D. Cal. July 8, 2019). To date, the Bureau has identified over $5 million in assets subject to the freezing order, only a fraction of the over $71 million in consumer fees that Defendants unlawfully obtained. Defendants' reliance at ECF 48 at 16 on *Microsoft Corp. v. A-Tech Corp.*, 855 F. Supp. 308, 311 (C.D. Cal. 1994), is thus misplaced, as that case dealt with a request for an *ex parte* asset freeze "substantially in excess" of the amount the moving party could recover. That is not the case here.

Third, Defendants' request for attorney fees is excessive and not adequately supported. "Courts regularly have frozen assets and denied attorney fees or limited the amount for attorney fees." *FTC v. World Wide Factors, Ltd., 882 F.2d 344, 347 (9th Cir. 1989)*; *Noble Metals Int'l*, 67 F.3d at 775.[4] A party seeking the release of

---

[4] Defendants cite this case in their Response to the Order to Show Cause and include a parenthetical to a Fifth Circuit decision providing that "some kind of

8
PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

frozen funds to pay living expenses or attorney fees is required to demonstrate, in sufficient detail, that the request is reasonable. *See SEC v. Private Equity Mgmt. Grp., Inc.*, No. CV 09-2901 PSG (EX), 2009 WL 2058247, at *2-4 (C.D. Cal. July 9, 2009).

      Here, Defendants make vague reference to the "complexity and magnitude of this case" and "prior billings" to assert they should be entitled to $100,000 per month "at least initially" for attorney fees. ECF 48 at 19. Nowhere in Defendants' response do they provide factual support for the request, such as anticipated billing rates or an estimated number of hours. *See Private Equity Mgmt. Grp.*, No. CV 09-2901 PSG (EX), 2009 WL 2058247, at *3 (citing *Kerr v. Screen Extras Guild*, 526 F.2d 67, 70 (9th Cir. 1975) (listing several factors courts look to determine whether a fee request is reasonable), abrogated on other grounds by *City of Burlington v. Dague,* 505 U.S. 557 (1992)). Accordingly, Defendants should not be permitted to use assets subject to the freeze for attorney fees.[5]

      Defendant Kim's and Wen's requests for living expenses are also insufficient to justify relief from the freeze. Courts may look to a defendant's overall assets and income in assessing requests for a partial release from an asset freeze for living

---

allowance must be made to permit each defendant to pay reasonable attorneys' fees." ECF 48 at 18-19. This citation fails to acknowledge that the portion of the opinion that Defendants' reference in their brief and the language from the Fifth Circuit decision are found in the dissent. *See Noble Metals Int'l, Inc.,* 67 F.3d 766, 778 (9th Cir. 1995) (Reinhardt, J., dissenting in part). The majority opinion provided, "[a] district court may, within its discretion, forbid or limit payment of attorney fees out of frozen assets." *Id.* at 775.

[5] That the corporate Defendants may not be permitted to appear in court absent an attorney does not require a contrary conclusion. *See CFTC v. Wilson*, No. 11CV1651 WQH BLM, 2011 WL 6398933, at *3 (S.D. Cal. Dec. 20, 2011) ("Corporations cannot proceed pro se in court; however, they do not have a Sixth Amendment right to counsel in a civil case.").

expenses. *See Private Equity Mgmt. Grp.*, No. CV 09-2901 PSG (EX), 2009 WL 2058247, at *3. Where a defendant has other sources of income or requests funds for luxuries, courts have denied access to funds subject to a freeze. *See id.*

Here, Kim and Wen request over $10,000 and nearly $15,000, respectively, for living expenses and include declarations in support. ECF 48 at 19. But Kim and Wen did not timely file the financial disclosures required by Sections VII(A) and X(A) of the Court's October 21, 2019 Order. And neither declaration addresses whether Kim and Wen have assets available to them outside the freeze to cover living expenses. Nor do the declarations attach any documentation supporting the expenses asserted or the nature of those expenses. For example, Kim seeks $9,200 each month for rent without providing any information about the property or properties he rents. Similarly, Wen seeks over $1,400 per month for a vehicle lease without providing any information about the vehicle lease. Without a full accounting of the Defendants' assets as required by Sections VII and X(A) of the TRO, and any additional documentation necessary to support unfreezing some assets for living expenses, any request for living expenses is premature. *See Private Equity Mgmt. Grp.*, No. CV 09-2901 PSG (EX), 2009 WL 2058247, at *4.

Similarly, the receivership should be extended to safeguard the property of the Receivership Defendants, consumers' personal information, and to manage the affairs of the businesses. Defendants have shown that they cannot be trusted to lawfully operate their interconnected maze of businesses or to protect and preserve their assets and property. As set forth in the TRO Memo, Defendants have a history of evading law enforcement and concealing evidence. *See* TRO Memo at 24:5-25:2. Defendants sustained, concerted effort to continue their unlawful operations and to conceal evidence warrants continued oversight by a receiver.

Finally, Defendants argue that their continued oversight of the enterprise is needed "to assist [consumers] with time-sensitive requirements like annual

Department of Education re-certification of status." Def. Resp. at 21:24-28. Defendants have not asserted that the Receiver cannot provide consumers with any necessary assistance. Further, the immediate access revealed thousands of letters addressed to consumers from student-loan servicers, including some that had not been opened, in the shred bin. Schneider Decl. at ¶8. Defendants attempt to invoke consumer well-being as a defense to continued oversight by a receiver is both insufficient and disingenuous.

**D. The constitutionality of the CFPA's "for cause" removal provision has no impact on these proceedings.**

While Defendants suggest in a footnote that the determination by the Bureau's Director that the removal restriction in the Bureau's statute, 12 U.S.C. § 5491(c)(3), counsels against granting preliminary injunctive relief, Resp. at 10 n.7, they cannot and do not dispute that the removal provision is constitutional under binding circuit precedent. *See* TRO Memo at n. 75, 12:21-28. In any event, under the applicable severability clause, 12 U.S.C. § 5302, and consistent with basic principles of severability, *see*, e.g., *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*, 561 U.S. 477, 509-10 (2010), a future judicial decision that the removal provision is unconstitutional would not affect the validity of the remainder of the CFPA. *See Seila Law LLC v. CFPB*, No. 19-7 (U.S. Sept. 17, 2019), 2019 WL 4528136, at *16-17 (U.S.). And even if there were some problem with the Bureau's exercise of enforcement authority, that problem would not affect the

authority of the other government plaintiffs to obtain injunctive relief under both state and federal law.

For the reasons set forth above, the Plaintiffs respectfully request that the Court enter a preliminary injunction, and continue the asset freeze and appointment of the temporary receiver.

Dated: November 1, 2019                     Respectfully submitted,

　　　　　　　　　　　　　　　　　　　 /s/ Sarah Preis
Sarah Preis (D.C. Bar No. 997387) (admitted *pro hac vice*)
Email: sarah.preis@cfpb.gov
Jesse Stewart (N.Y. Bar No. 5145495) (admitted *pro hac vice*)
Email: jesse.stewart@cfpb.gov
Enforcement Attorneys

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

KEITH ELLISON
Attorney General of Minnesota

　　　 /s/ Evan Romanoff
EVAN S. ROMANOFF (*pro hac vice*)

*Attorneys for the State of Minnesota,*

*By Its Attorney General, Keith Ellison*

JOSHUA H. STEIN
Attorney General of North Carolina

　　　 /s/ M. Lynne Weaver

12
PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

M. LYNNE WEAVER (*pro hac vice*)

*Attorneys for the State of North Carolina*

MICHAEL N. FEUER
Los Angeles City Attorney


\_\_\_\_\_/s/\_\_Christina V. Tusan_____
Christina V. Tusan