Sanjay Bhandari (SBN 181920)
sbhandari@mcnamarallp.com
Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Attorneys for Temporary Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection; State of Minnesota, by its Attorney General, Keith Ellison; State of North Carolina, *ex rel.* Joshua H. Stein, Attorney General; and The People of The State of California, Michael N. Feuer, Los Angeles City Attorney, | Case No. 8:19-cv-01998-JVS (JDEx) |
| | **PRELIMINARY REPORT OF TEMPORARY RECEIVER** |
| Plaintiffs, | JUDGE:    Hon. James V. Selna |
| v. | CTRM:     10C |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; True Count Staffing Inc., d/b/a SL Account Management; Prime Consulting LLC, d/b/a Financial Preparation Services; Albert Kim, a/k/a Albert King; Kaine Wen, a/k/a Wenting Kaine Dai, Wen Ting Dai, and Kaine Wen Dai; and Tuong Nguyen, a/k/a Tom Nelson, | |
| Defendants, and | |
| Infinite Management Corp., f/k/a Infinite Management Solutions Inc.; Hold The Door, Corp.; and TN Accounting Inc., | |
| Relief Defendants. | |

# TABLE OF CONTENTS

## Contents

I. INTRODUCTION ...................................................................................................1
II. RECEIVERSHIP ACTIVITIES ..........................................................................2
    A.    Immediate Access .........................................................................................2
        1.    15261 Laguna Canyon Rd, Suite 200, Irvine, CA ......................2
        2.    173 Technology Drive, Suite 202, Irvine, CA ...........................4
        3.    8 Hughes Parkway, Suite 210, Irvine, CA ................................4
    B.    Bank Accounts ..............................................................................................5
    C.    Documents/Information/Electronic Data .....................................................6
    D.    Accounting ....................................................................................................7
    E.    Notice to Consumers ....................................................................................7
III. DEFENDANTS' PIVOT TOWARD COMPLIANCE IN AUGUST 2019 ........7
IV. DEFENDANTS COLLECT UNLAWFUL ADVANCE FEES .......................11
    A.    The Law – Telemarketing Sales Rule (16 C.F.R. § 310.4(a)(5)) .......11
    B.    Defendants Collect Advance Fees .............................................................12
    C.    No Valid Escrow or Trust Procedure .........................................................12
V. TRUSTED ACCOUNT SERVICES .................................................................14
    A.    Defendants Establish Trusted Account Services .......................................15
        1.    Incorporation..............................................................................15
        2.    Website ......................................................................................16
    B.    Defendants' First Attempt to Secure Payment Processing for Trusted Account Services .............................................................................17
    C.    Defendants Deceive DebtPayPro to Get Trusted Account Services on the Platform .............................................................................18
    D.    Defendants Purloined Legitimate Third Party Companies' Methods and Documents to Establish Trusted Account Services ......19
    E.    Defendants Own and Control the Trusted Account Services Bank Accounts ............................................................................................20
    F.    Defendants Arrange Trusted Account Services Payment Processing through Jimmy Lai and National Merchant Center..........21
    G.    Defendants' Assertion that Trusted Account Services Is a Third Party Dedicated Account Provider Is False .................................23
VI. STUDENT LOAN DEBT RELIEF – THE SALES PITCH AND PROCESS.........................................................................................................25
    A.    Leads ...........................................................................................................26
    B.    Sales Tactics................................................................................................26
    C.    Enrollment Fees ..........................................................................................28
    D.    Customer Service and Processing ..............................................................29
    E.    Compliance .................................................................................................32
    F.    Complaints ..................................................................................................32
VII. FINANCIAL INFORMATION .......................................................................35
VIII. CAN THE BUSINESSES BE OPERATED  LAWFULLY AND PROFITABLY?...................................................................................................36

# I.

# INTRODUCTION

I was appointed Temporary Receiver for the business activities of Receivership Defendants True Count Staffing Inc., d/b/a SL Account Management ("True Count") and Prime Consulting LLC, d/b/a Financial Preparation Services ("Prime Consulting") by the Temporary Restraining Order ("TRO") entered October 21, 2019.[1] Defendant Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center ("CAC"), which is in bankruptcy, is not a Receivership Defendant. Albert Kim, Kaine Wen, and Tuong Nguyen are named Individual Defendants.

By this Preliminary Report, I convey to the Court my team's preliminary observations and initial actions.

Our onsite review of operations has identified the basic realities of the student loan debt relief business of Receivership Defendants:

- The overall enterprise secured more than 170,000 customers and more than $71 million in gross revenue. But, 70% of these customers cancelled their enrollments. *See* Exhibit 1.

- Historically, the sales process to secure consumers with student loan debt relief has included hard sell tactics and misrepresentations prohibited by the TRO which have misled and confused consumers.

- Beginning in late August 2019, Defendants pivoted to a more compliant process, but based on recent documents and consumer

---

[1] Receivership Defendants are defined in the TRO to mean True Count and Prime Consulting "and their successors, assigns, affiliates, or subsidiaries, and each of them, by whatever names each may be known, provided that the Receiver has reason to believe they are owned or controlled in whole or in part by any of the Receivership Defendants." *See* TRO, Definitions, pages 6-7.

On October 25, 2019, pursuant to Section XIII(T) of the TRO we gave notice to the parties that First Priority LLC, Horizon Consultants LLC, and TAS 2019 LLC d/b/a Trusted Account Services qualify as Receivership Defendants. No party has challenged that determination.

complaints, this pivot was not comprehensive and, of course, it did not remedy prior unlawful practices.

- Defendants collect consumer fees in advance without complying with the Telemarketing Sales Rule, which renders the entire business unlawful. The August 2019 pivot included representations that fees would be deposited to a "dedicated customer account" at third party Trusted Account Services and only paid out when work was completed. But, this appears to be a new deception designed to create the appearance of a procedure consistent with the Telemarketing Sales Rule "escrow exception" to the advance fee prohibition. Not only is Trusted Account Services not an independent third party, I have determined that it is a Receivership Defendant.

## II.

## RECEIVERSHIP ACTIVITIES

### A.    Immediate Access

As authorized by the TRO (Section XIV, page 24), we took control and exclusive custody of Defendants'[2] three business premises in Irvine, California on October 23, 2019, commencing at approximately 10:30 a.m. At each location, we received support from law enforcement officers. After securing each site, we provided access to counsel and other representatives of Plaintiffs and retained locksmiths who changed all exterior locks.

### 1.    15261 Laguna Canyon Rd, Suite 200, Irvine, CA

This 22,000 square foot space, bearing a nondescript "Prime Consulting" sign, comprises the entire second floor of a two-story building in an upscale office

///

---

[2] "Defendants" means collectively the Corporate Defendants, Individual Defendants and Relief Defendants, individually, collectively, or in any combination. TRO, Definitions at p. 6.

park.  Prime Consulting is the lessee at a monthly rent of approximately $65,000.  Exhibit 2 is a schematic of the space and an inventory of the property on site.

At our arrival, we encountered an active operation with approximately 130 personnel on site, many of whom appeared to be either brand new hires commencing training or prospects on site for job interviews.  None of the Individual Defendants were present.

Given the large number of people, many with minimal history with the business, it was a challenge to assemble them as a group and secure their cooperation.  While several supervisors were on site, they were not cooperative; they did not assist during our effort to explain the receivership situation and secure TRO-required questionnaires from employees.[3]  We ultimately imposed order, secured questionnaires from those employees who were cooperative, and met with a small number of sales personnel.

The premises are built out to support a large telephone sales operation.  The open floor space includes nearly 150 individual workstations equipped with telephones, computers, and monitors and organized in a pod-type system with each pod housing 12-15 sales workstations and one team leader.  At our arrival, 97 workstations appeared to be currently active.  The walls are adorned with multiple big screen TVs and the usual accoutrements of sales boiler rooms, including white boards tracking the daily "closings" of each sales agent, motivational sales posters, and instructions to "close" the sale.  *See* Section VI below for a summary of the sales operation.

The space also includes a large conference room, eleven interior offices,[4]

---

[3]  Two of the supervisors who refused to cooperate and complete questionnaires – Compliance Manager Nicole Balestreri and HR Director Shirena Hulzar – did, however, file declarations in connection with Defendants' opposition to a Preliminary Injunction.

[4]  The interior offices are allocated to Human Resources (2), Training (4), the Floor Manager and his staff (2), a Compliance Manager, Information Technology, and Marketing.  The marketing office is occupied by Pub Club Leads, allegedly a third

and four exterior offices.[5]

## 2.  173 Technology Drive, Suite 202, Irvine, CA

This suite of approximately 15,000 square feet is subleased by Defendant CAC from a neighboring company at a monthly rent of approximately $18,000.

The site has capacity for nearly 120 staff with 4 individual exterior offices. At our arrival, approximately 60 employees were on site:  2 managers (the Customer Support Manager and the head of "Junior Processing"); 10-15 members of the Customer Service team; 10-15 members of the Junior Processing Team; and 30 temporary employees, just recently hired for the reverification campaign described below.  Two other managers (Adon Janse and Isabel Banda) with offices at this site were both at the Hughes location, conducting hiring and training of temporary employees for the reverification campaign.

Nearly all employees at this site were cooperative, completed questionnaires, and responded to our questions.

Exhibit 3 is a schematic of the office and an inventory of the property on site.

## 3.  8 Hughes Parkway, Suite 210, Irvine, CA

This site is an approximately 10,000 square foot suite in a two-story building in an office park leased by True Count at a monthly rate of approximately $10,000. A small sign for "SL Account Management" is posted on the front door.

About a dozen people were present – most were temporary staff from AppleOne, a staffing agency regularly used by Receivership Defendants, on their first day of training for the reverification campaign.

The suite consists of seven rooms built out along the windows (only one in

---

party firm to which Defendants have subcontracted advertising and lead generation.

[5]  The exterior offices are allocated to operations/accounting (with 9 workstations), employee Le Ho (aka Calvin Ho) and one office each to Individual Defendants Tuong Nguyen (aka Tom Nelson) and Albert Kim.

active use) and a large open area with approximately 120 cubicles (almost all of which were out of use).[6, 7]

Exhibit 4 is a schematic of the space and an inventory of the property on site.[8]

### B.     Bank Accounts

Immediately after receiving the TRO, Plaintiffs and the Receiver served the asset freeze on banks and other financial institutions where Defendants were known to maintain accounts.  In the brief time since the TRO was entered, we have received the following information as to frozen accounts:

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| First Priority LLC | JPMorgan Chase Bank | 8566 | $159,457.33 |
| First Priority LLC | Sunwest Bank | 0992 | $4,534.25 |
| Hold The Door Corp. (Relief Defendant) | Wells Fargo | 7284 | $53,634.41 |
| Horizon Consultants LLC | Sunwest Bank | 1069 | $707,127.02 |
| Infinite Management Corp. | JPMorgan Chase Bank | 3880 | $40,628.40 |
| Prime Consulting LLC | JPMorgan Chase Bank | 0325 | $517,412.78 |
| Prime Consulting LLC | Sunwest Bank | 1026 | $10,000.00 |
| TAS 2019 LLC | HSBC Bank USA | 3327 | $2,870,097.75 |
| TAS 2019 LLC | HSBC Bank USA | 0413 | $3,096.99 |

---

[6] One of the rooms was set up as a training room and was in use when we arrived. Another office was occupied by Ms. Banda (HR), and another appeared to be in occasional use by IT personnel.  The rest seemed to be unoccupied.  Nearly all the cubicles were equipped with computer monitors, but many lack an actual computer, and appear to have been out of use for some time.

[7] Both IT personnel (Keneth Hu and Mr. Vu) listed 8 Hughes as their principal office, and Mr. Hu told us that IT had offices in each location, and determined where they would spend each day based on the support requests it needed to address. Next to the IT office in the corner of 8 Hughes, we found a room containing a large rack of computer equipment apparently running bitcoin mining computations as a personal hobby of Mr. Hu.  With Mr. Hu's consent, we turned that equipment off.

[8] At all three locations, we observed thousands of unopened letters from various student loan servicers and the Department of Education addressed to customers but sent to Defendants' various mail drops.

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| TN Accounting Inc. (Relief Defendant) | JPMorgan Chase Bank | 7163 | $18,461.53 |
| True Count Staffing Inc. | BNY Mellon | 2000 | $2,824.83 |
| True Count Staffing Inc. | JPMorgan Chase Bank | 1126 | $8,887.95 |
| True Count Staffing Inc. | Sunwest Bank | 2499 | $364,355.56 |
| True Count Staffing Inc. | Wells Fargo | 7276 | $1,500.00 |
| **TOTAL** | | | **$4,762,018.80** |

## C.    Documents/Information/Electronic Data

Upon taking possession of each of the three offices, we confirmed the hard copy documents onsite were secure.  We retained a computer forensic firm to supervise Plaintiffs' computer forensics experts in making images of selected desktop computers.

Receivership Defendants utilize multiple cloud computing services – Microsoft Office 365 for email; Intuit QuickBooks Online for accounting; and DebtPayPro for their customer relationship management database (CRM).  Despite some initial difficulty, we ultimately secured access, via the administrative credentials, to most of the email accounts attached to the active domains[9] and to QuickBooks Online for most of the Receivership Defendants.[10]  DebtPayPro immediately suspended the CRM accounts.[11]

---

[9]  slaccountmgmt.com, financialpreparationservices.com, processingsupport.com, and studentservicesplus.com.

[10]  We do not yet have QuickBooks access for Receivership Defendants First Priority, Horizon Consultants, or Trusted Account Services.

[11]  DebtPayPro also suspended the CRM database for EDU Doc Support – a related entity identified by Plaintiffs.  When EDU Doc Support complained that their account should not be locked, we asked them to provide additional information to determine whether they are a related entity (i.e., owner's name, type of business, location, etc.).  To date, EDU Doc Support has not provided any information.  Based on a review of their website (www.edudocsupport.com), they also provide student loan debt relief services.  Until EDU Doc Support demonstrates that they are not related to the common enterprise, we are not comfortable taking its DebtPayPro account off suspension.

Receivership Defendants employed CallerReady for telephone services. CallerReady's counsel has confirmed they have preserved call recordings and are cooperating with the Receiver.

### D.   Accounting

Our forensic accountant, Lisa Jones, is in the process of reviewing available financial records, which include QuickBooks records, bank statements, and merchant account statements for True Count and Prime Consulting. Based on the information available to date, she has prepared a Receivership Initial Account Records Review report attached as Exhibit 5. She has confirmed Defendants took in more than $71 million in gross deposits from consumer payments from January 2016 to August 2019. We have also identified accountants who have provided bookkeeping and tax preparation services for Receivership Defendants in the past. We will follow up with them to secure relevant records and tax returns.

### E.   Notice to Consumers

We added an outgoing telephone greeting to the Receivership Defendants' telephone numbers noting the suspension of operations and strongly encouraging customers to contact their student loan servicers. We have also placed a notice on the Receiver's website and will use that as a vehicle to communicate with consumers.

### III.

### DEFENDANTS' PIVOT

### TOWARD COMPLIANCE IN AUGUST 2019

As important context for this receivership, we must note Defendants' operation has attracted significant state and federal regulatory attention over the last several years. Defendants failed to comply with fundamental regulations for telemarketing sales, including the prohibition of advance fees. Only beginning in August 2019 did Defendants initiate any material changes to their operations and then only after the regulators were knocking at the door.

As alleged in Plaintiffs' submissions to the Court and reflected in CAC's bankruptcy filings, Defendants' regulatory exposure was highlighted by a $31 million bankruptcy claim by the State of Minnesota and by the CFPB's issuance on September 10, 2018 of a civil investigative demand ("CID") to Defendant CAC.

Around the time of the CID, CAC shifted operations and assets to other Receivership Defendants – the sales operations were transferred to Prime Consulting and the customer base and revenue stream were shifted to True Count. CAC then filed bankruptcy in Florida in January 2019 with the goal, according to the testimony of Individual Defendant Albert Kim, to avoid the regulatory enforcement agencies which were circling.  Because of concerns about false statements in its filings, the bankruptcy court later appointed a trustee over CAC's bankruptcy estate.

The CFPB's and the states' investigation of Defendants proceeded despite the bankruptcy.  In July 2019, the CFPB took the investigative testimony of at least two former employees.[12]  Individual Defendants Kaine Wen and Albert Kim were aware of this testimony and they contacted one of the witnesses just before his scheduled appearance.

Defendants appear to have reached a tipping point after the *Wall Street Journal* published an article highly critical of their practices on August 26, 2019, which was immediately emailed to Individual Defendants Albert Kim and Kaine Wen.  *See* Exhibit 6.

A day after the *Wall Street Journal* article ran, management[13] convened an emergency meeting which resulted in a decision to immediately suspend all sales

---

[12]  Excerpts of the testimony of these former employees – Maxwell Camp and Jovani Ortoro – are attached as Exhibits 33 and 34 to Plaintiffs' TRO Application.

[13]  This meeting of management included Kaine Wen, Albert Kim, Isabel Banda, Sal Avila, Kenny Nguyen, and Eric Ortiz.

efforts.  Defendants announced to employees that "effective immediately all sales and marketing will be paused until further notice."  The stated purpose of this pause, projected to last approximately three weeks, was that "[d]uring this period the company and each department will work on re-training, compliance, and policies.  In addition, each department will work together to address any and all mistakes on all client files."  *See* Exhibit 7.

The sales pause was broadcast on the Financial Preparation Services website on August 28, 2019.[14]  Human Resources emailed customer service personnel on August 28, 2018 to alert them that there was a new script to follow and instructed them to tell customers as follows:

> "[W]e are upgrading our technology and other systems to ensure that clients have received and continue to receive high-quality services from us.  While our acceptance of new clients has been temporarily put on pause, we are absolutely continuing to work with current clients who have paid at least one installment for our services."

*See* Exhibit 8.[15]

At the outset of the sales pause, management identified prohibited practices that would be subject to a new "zero tolerance" policy.[16]  We located a flyer reciting these new policies posted just outside the "Junior Processing" department

---

[14]  The "ATTENTION ALL CUSTOMERS" notice recited that as of that date Financial Preparation Services "will be integrating new operational changes" and had "decided to temporarily pause our acceptance of new clients while undertak[ing] this integration."  *See* Exhibit 8.

[15]  The email also instructed that customers needing more information be told (1) "We are working on a variety of upgrades, including the way we process payments and other operational processes"; and (2) "Improved quality control to ensure that 100% of our customers received the services that they paid for and are in the right loan modification, repayment, or forgiveness plan."  If a customer wanted to cancel, customer service should "process the cancellation without hesitation."

[16]  These prohibited practices included: Accessing NSLDS (National Student Loan Data System); accessing FSA (Federal Student Aid); changing FS (family size); signing documents on behalf of clients; misrepresentation of the company (Example: we work with the DOE/servicer); submitting clients as unemployed on annual recertifications; and final pay without ROA [release of authorization]/confirmation documents uploaded.  *See* Exhibits 7 and 9.

with a character wagging his fingers, "Ah, Ah, Ah, You Didn't Say the Magic Words." *See* Exhibit 9.

During this sales pause (August 29, 2019 to September 30, 2019), Defendants took some steps toward compliance, including new sales scripts and training, a reverification campaign, and new claims about not accepting advanced fees. *See* Section VI.E "Compliance" below.  A new dba "Student Services Plus" was also launched as Defendants' public face for new customers, replacing Financial Preparation Services which had been featured prominently in the *Wall Street Journal* article.  The launch of a new dba was consistent with Defendants' practice of deploying multiple generic-sounding business names.[17]

The business changes implemented after the *Wall Street Journal* article could fairly be interpreted as a mad scramble to correct illegal practices to stave off potential regulatory, civil, and possibly criminal liability.  Or, the changes might be a sincere effort to embrace compliance.  But as Receiver, I need not reach a definitive conclusion on such internal motivations, which do not impact my determination, as detailed below, that the Receivership Defendants operated unlawfully even after the August pivot and the businesses cannot operate profitably and lawfully using the assets of the Receivership Estate going forward.

With this history as context, we present below a summary of the operations as we found them.

---

[17]  At the time of immediate access, we found lists identifying employee teams, each with a different, and very generic, company name including: Premier Student Loan Center; Financial Preparation Services; South Coast Financial Center; Direct Account Services; Financial Loan Advisors; Account Preparation Services; Administrative Financial; Tangible Savings Solutions; Coastal Shores Financial Group; First Choice Financial Centre; Administrative Account Services; Primary Account Solutions; Prime Document Services; Financial Accounting Center; Doc Management Solutions; Sequoia Account Management; Pacific Palm Financial Group; Pacific Shores Advisory; First Document Services; Keystone Document Center; Administrative Accounting Center; Global Direct Accounting Services; Signature Loan Solutions; Best Choice Financial Center; Yellowstone Account Services; Regional Accounting Center; and Financial Direct Services. *See* Exhibit 10.

# IV.

## DEFENDANTS COLLECT UNLAWFUL ADVANCE FEES

The Telemarketing Sales Rule prohibition of such fees is a significant structural obstacle to this business succeeding as a lawful enterprise.  The well-documented policy goal of the advance fee rule is to deter telemarketing opportunists from entering the debt relief business by removing a critical lure of such businesses – instant cash flow from susceptible consumers.  Without that cash flow, the financial rationale for the business expires.  Even with a TSR-compliant escrow, the impact on cash flow of deferring actual collection until the TSR pre-conditions are met is significant.

Defendants' current position, which is that their collection of advance fees is now lawful because the fees go to dedicated client accounts provided by third-party Trusted Account Services, is an ill-conceived effort to invoke the escrow exception to the TSR's advance fee prohibition.

### A.    The Law – Telemarketing Sales Rule (16 C.F.R. § 310.4(a)(5))

The Telemarketing Sales Rule (16 C.F.R. § 310, "TSR") expressly prohibits the collection of advance fees for any debt relief service.  *See* 16 C.F.R. § 310.4(a)(5).  The full text is complex, but at its core, it prohibits requesting or receiving payment of any fee unless and until (A) the telemarketer has settled at least one debt pursuant to an agreement executed by the customer, and (B) the customer has made at least one payment pursuant to that agreement.

The TSR includes a very narrow exception (the "Escrow Exception") which permits the collection of advance fees if the funds are placed in a dedicated escrow-type account that meets five specific requirements, namely:

- The account is at an insured financial institution;
- The customer owns those funds and is paid accrued interest;
- The account holder is not owned or controlled by the debt relief servicer;

- The account holder does not give or accept any referral fees; and
- The customer may withdraw from the debt relief service at any time without penalty and, upon withdrawal, must receive all funds in the account, except for compliant advance fees, within seven days of the withdrawal request.

### B.  Defendants Collect Advance Fees

Consumer payments for Defendants' services have been and continue to be collected long before any work has been completed or the customer has made a first payment on a new renegotiated plan.  During the initial sales call, Defendants acquire the customer's payment information and schedule the first payment, which is generally processed almost immediately after the customer executes the Services Agreement.

The recurring monthly "recertification fee" is by definition collected in advance for 12 months before the annual recertification process even commences.

### C.  No Valid Escrow or Trust Procedure

In four years of operation, Defendants have not had escrow or trust procedures which could lawfully invoke the TSR's Escrow Exception.[18] Consumer payments have been collected and deposited directly to Defendants' bank accounts.  Nearly $71 million have flowed directly to Defendants in this manner.

Despite these immediate deposit procedures, Defendants have for years **falsely** trumpeted the absence of advance fees.  A standard "No Advance Fees" provision of the form contract recites: A "third-party dedicated account provider ("DAP") [will be used] to collect and deposit payments that Client has agreed to

---

[18]  There are two very minor exceptions.  Defendants contracted with third party dedicated account holders Reliant Account Management and Account Management Plus for a very short time.  As best we can discern this was done so Defendants could steal these companies' trade practices, methods, and documents. (Discussion below).

make with company . . . and to deposit and hold Client's funds in a trust account established and serviced by the DAP.  The DAP will not disburse any Client fees until Client has received a consolidation, adjustment, or otherwise satisfactory result, and Client completes one payment towards such."[19]

Now, Defendants have introduced Trusted Account Services into this "No Advance Fees" misrepresentation.  The October 21, 2019 Sales Script in use at the time of the TRO proclaims:

- "Our fees will be placed into your own Dedicated Client Account and these funds belong to you at all times. Your dedicated account provider is Trusted Account Services, and they will only release our fees after the Department of Education approves your Income Driven Repayment Program every year."  *See* Exhibit 11.

- "As noted earlier on the call, all payments to us will be placed into your Dedicated Client Account.  Any time before completion of the work, you can cancel and get your funds back.  Your funds will only be released to us after we prove to you and Trusted Account Services that we have completed the work . . . ."  *See* Exhibit 11.

The "Compliance Call Script" within the Sales Script further recites:

"Do you understand that our company does not take any upfront fees, and that your payments to us will be placed into your own Dedicated Client Account for your benefit until we successfully complete our work for you?"  If the consumer responds No, then the script continues:  "It is very important to us your money is protected.  You are making payments for our fees to your own Dedicated Client Account held by a non-related company (like a trust company).  Your payments will be released to our company only after the Department of Education accepts your program/plan.  That money belongs to you at all times and you can ask for it back prior to completion of our work."

---

[19]  The consumer declarations filed by plaintiffs in connection with the TRO Motion include these underlying contracts.  *See, e.g.*, Pl. Exhibit 52, attachment A, p. 1466, para. 4.  *See also* Pl. Exhibit 53, attachment A, para. 4.

*See* Exhibit 11 (emphasis in original).  Even if Defendants followed procedures as described in the scripts, they do not comply with the specific requirements of the TSR.[20]

Defendants' fundamental misrepresentation is that a Dedicated Client Account has been set up with a third party:  Trusted Account Services.  Our investigation has revealed that Trusted Account Services is not a third party, but an appendage of Defendants' operation which is maintained in-house by a very narrow group of insiders.  Hence, Trusted Account Services does not provide Defendants cover that they are in compliance with the TSR.

Given the complex history of Defendants' deep deception as to Trusted Account Services, we present below as Section V a summary of Trusted Account Services' formation and implementation based on the materials available to us from the immediate access.

# V.

## TRUSTED ACCOUNT SERVICES

Trusted Account Services (sometimes referred to as TAS) is not an independent third-party provider of dedicated client accounts.  Rather, it was created and is beneficially owned and controlled by the Defendants who have closely guarded their ownership secret.  The truth was shared with only a handful of Defendants' high-level and trusted employees, who, in turn, relied on internal IT personnel and IT contractors located in Vietnam to build the Trusted Account Services facade.[21]

---

[20]  TSR prohibits the release of fees from the consumer's trust account until (A) the telemarketer has settled at least one debt pursuant to an agreement executed by the customer, and (B) the customer has made at least one payment pursuant to that agreement.  Defendants' script ignores the one payment requirement, stating that funds will be released "only after Department of Education accepts your program/plan," *not* after the plan has been accepted and one payment has been made as the TSR requires.

[21]  Outside the C-suite executives and IT functionaries, employees within Defendants' companies were fed the party line about Trusted Account Services.  Despite that, however, some employees we interviewed – who were mid-level

Because Trusted Account Services is owned and controlled by the Individual Defendants and affiliated with the Receivership Defendants – and indeed is part of the Defendants' student loan debt relief common enterprise – I have determined it is a Receivership Defendant.

Once Trusted Account Services was operational, it was touted as the independent provider of dedicated client accounts for Receivership Defendants, all in an effort to create the appearance of an escrow procedure compliant with the TSR advance fee rule.

### A.   Defendants Establish Trusted Account Services

#### 1.   Incorporation

The Trusted Account Services entity, TAS 2019 LLC ("TAS 2019"), was incorporated on March 20, 2019 as a Wyoming entity through an anonymous process using a local registered agent.  The Wyoming Secretary of State does not provide information beyond the name of the registered agent – this allowed Defendants to conceal their involvement.

The address listed for Trusted Account Services on its website is 109 E. 17th Street Suite 5656, Cheyenne, WY which is simply a virtual office that accepted mail and provided the false appearance of an actual operating company.  The Wyoming virtual office was rented in the name of Trusted Account Services and Kenny Huang and was instructed to forward Trusted Account Services mail to an address in Huntington Beach, CA – 17011 Beach Blvd, Suite 900.  *See* Exhibit 12. The Beach Blvd location is yet another virtual office/mail drop arranged and paid for by Defendants' employees, including operations manager Calvin Ho, in the name of Trusted Account Services and Kenny Huang.  *See* Exhibit 13.

The TAS 2019 incorporation documents we recently secured identify Kenny Huang as the managing member of the LLC.  We believe Kenny Huang is or was

---

managers and line employees – noted they were suspicious about the independence of Trusted Account Services.

an employee of the Defendants or perhaps was simply acting as a "front" for the Defendants in their effort to secure merchant payment processing.[22]  During a phone call with Kenny Huang at 6:12 p.m. on October 30, 2019, I directly asked him if he was the owner of TSA 2019, and he responded "yes" twice, but then would not answer further questions and has not responded to our several calls since then.

2.   Website

On March 20, 2019, Defendants also registered a website – trustedaccountservices.com.  Although the domain is registered anonymously with internet domain registrar GoDaddy, our investigation indicates that Defendants control the Trusted Account Services server and website.  We discovered correspondence between Defendants' employees Calvin Ho and Thein Nguyen discussing, evaluating and revising the initial content for this website.  We also located the GoDaddy and TAS domain credentials (username and password) in Individual Defendant Albert Kim's Dropbox.

Defendants also controlled the Trusted Account Services email system.  In a Customer Service Manager's workstation, we located the Outlook password for email account studentloanmanagement@trustedaccountservices.com.  *See* Exhibit 14.  That email mailbox was only recently created (October 13th), but had already received several hundred emails from customers.  Although they were addressed to a Trusted Account Services account, these emails were regularly reviewed and responded to by Defendants' employees.

---

[22]  We found an IRS W-4 form completed in the name of Kenny Huang at Defendants' Laguna Canyon office.  Trusted Account Services merchant account application documents purportedly completed by Kenny Huang reflect he is employed by the U.S. Department of Labor.  Regardless of where Mr. Huang is employed, we believe he was acting as a "front" or nominee used to establish TAS 2019, open bank accounts, and most importantly obtain merchant account payment processing.  Defendants have used other employees, for example, Keneth Hu (discussed below), to act as "front" for Defendants' merchant account applications.  In Mr. Hu's case, he opened a Horizon Consultants LLC d/b/a Premier Student Loan Center merchant account.

### B.   Defendants' First Attempt to Secure Payment Processing for Trusted Account Services

In February 2019, even before the Trusted Account Services name had been selected, Defendants sought a payment processing vendor for the new venture. They began discussions with Donald Cook, a broker who seems to cater to high-risk clients. On February 26, Cook told the Individual Defendants Wen and Nguyen and senior employee Calvin Ho that he could secure processing services, but warned they needed a third party intermediary for client funds. *See* Exhibit 15.[23]

Not long after the entity was incorporated, Kaine Wen (copying the other Individual Defendants and Calvin Ho) notified Donald Cook that TAS 2019 LLC would be the processing applicant with Kenny Huang as the owner. *See* Exhibit 18. Cook responded by email to Kenny Huang (who Mr. Cook understood was an employee of the Defendants) with more requests for information. In response, Kaine Wen, who had been copied on the email, forwarded Cook's requests to his operations manager Calvin Ho to complete (which he did).[24] While he was able to secure some payment processing for Defendants, Cook terminated the relationship after a falling out with Defendants. As a result, Trusted Account Services was left without payment processing capability, but the void was later filled by Jimmy Lai – a long-time associate of the Defendants, discussed below.

///

///

---

[23]  A few days later, on March 3, Calvin Ho emailed the Individual Defendants a flow chart for a new "DAP" [dedicated account provider] intermediary, Exhibit 16, and on March 11, he emailed his technical team a list of desired functions for the DAP intermediary, **which for the first time he identifies as Trusted Account Services**. Exhibit 17.

[24]  Kenny Huang was purported to be using the email TAS2019@gmail.com, but in fact Kaine Wen actually controlled that email account and used it frequently (posing as Kenny Huang) in communications with vendors.

## C.   Defendants Deceive DebtPayPro to Get Trusted Account Services on the Platform

For Trusted Account Services to function, it had to be integrated with Defendants' customer relation management (CRM) software, provided by DebtPayPro.  Kaine Wen along with Calvin Ho orchestrated a ruse to get Trusted Account Services accepted and integrated in the DebtPayPro CRM database.  They went to great lengths to posture Trusted Account Services as a real and independent company, including creating fictional characters to interact with DPP via email and over the telephone.

On May 1, 2019, Kaine Wen emailed DebtPayPro's support team, writing:

> "Please provide detailed answers and explanations to the following questions from Trusted Account Services.  *We are testing out their dedicated account provider services (same services as Reliant Account Management or Account Management Plus).*  Thank you in advance.
> *1.    How can we integrate with DPP?*
> *2.    Do you have any document that details what information we need to receive from DPP's end or pass to DPP from our end?*
> *3.    Do you have any API to use for integration?*
> *4.    How can we manage the transactions and clients between our systems and DPP?"*

*See* Exhibit 19 (emphasis added)

The questions posed by Kaine Wen did not, however, originate from Trusted Account Services, but were crafted by Defendants' IT employee[25] who had been tasked to integrate Trusted Account Services into the DebtPayPro platform.  *See* Exhibit 20.

Kaine Wen created these questions and the lead-in to them to paint the mirage of Trusted Account Services as a separate company.  When DebtPayPro support staff followed up with a request for the company's website and the name of a direct contact there, Calvin Ho responded with a link to the website

---

[25]  We believe the Vietnam company, Processing Service Co., Ltd., is owned by Calvin Ho's mother.  It received nearly $600,000 from Horizon Consultants.

(https://trustedaccountservices.com) and an email address (technicalsupport@tasportal.com).  *See* Exhibit 19.  DebtPayPro support then asked, "[i]s there a person there you've been working with that I can ask reach [*sic*] out to specifically?"  *Id.*  Calvin Ho responded with a name: Michael Tabin (michaelt@trustedaccountservices.com) whose signature listed him as Trusted Account Services' Chief Technology Officer.  *Id.* We believe, however, that "Michael Tabin" is a fictional name invented by Kaine Wen and Calvin Ho to deal with DebtPayPro.

On May 23, Ho emailed the group – addressing both DebtPayPro and "Michael" – to ask how the integration was proceeding and when Defendants could begin using Trusted Account Services.  *Id.*  DebtPayPro responded that they were still reviewing the API documentation and drafting a scope of work proposal and quote.  *Id.*  Throughout the email chain with DebtPayPro, Wen and Ho maintained the deception that they were Trusted Account Services.  Trusted Account Services was ultimately accepted by DebtPayPro – which gave Defendants the ability to process consumer payments through Trusted Account Services on the DebtPayPro platform.

**D.**    **Defendants Purloined Legitimate Third Party Companies'**
          **Methods and Documents to Establish Trusted Account Services**

Our review also revealed that in establishing Trusted Account Services, Defendants just copied the methods, operations and documents of other such providers like Reliant Account Management ("RAM") and Account Management Plus ("AMP").  Defendants had their IT contractor in Vietnam copy wholesale the practices and documents (generally word-for-word) of RAM and AMP which were then only slightly modified and rebranded as Trusted Account Services materials. We located in Defendants' team management software, Monday.com (which is used to monitor IT and operations projects), a project associated with the creation of Trusted Account Services.  The Defendants' Monday.com platform includes

tasks such as "Figure AMP's services charges to find a processing comp for TAS" and "Create a new agreement based on RAM Authorization Form," as well as "Build database for TAS" and "Revise TAS Contents."  *See* Exhibit 21.[26]  This "creative" history demonstrates that Trusted Account Services was hatched by Defendants, complete with intellectual property thievery.

### E.    Defendants Own and Control the Trusted Account Services Bank Accounts

Defendants opened Trusted Account Services bank accounts at HSBC Bank shortly after TAS 2019 was incorporated.  While we have not yet received a fullsome response from HSBC, we found the following documents at the Laguna Canyon offices which show Defendants own and control these HSBC accounts:

- An HSBC account statement for Trusted Account Services for September/October 2019 was found in a back corner office (where Defendants' operations/accounting were located).

- Two large packages of Trusted Account Services HSBC business checks were found in a safe in the same office.  Although Kenny Huang is the signatory on the account, the checks were mailed to the home address of Defendants' accounting employee, Thu Quach.  Ms. Quach labeled the two accounts as an operating account and a client funds account.

- One sheet of checks were pre-signed via a signature stamp in the name of Kenny Huang.  *See* Exhibit 22.  We later found the stamp in the safe in Ms. Quach's office.

---

[26]  Notably, Defendants contracted with both RAM and AMP for a short period of time.  For example, Defendants entered into a contract in November 2018 with RAM, but the relationship terminated in roughly March of 2019 – Defendants having used RAM for only a couple of dozen customers (out of the Defendants' roughly 50,000 active customers).  But in doing so, Defendants learned the methods of these third party dedicated account provider companies and accessed their agreements and contracts which the Defendants promptly plagiarized.

- We also found Costco receipts, dated September 10, 2019, for two orders of Trusted Account Services HSBC checks.  The checks had been mailed to Ms. Quach's home.
- The address on the checks is the Beach Blvd. virtual office for Trusted Account Services, which was opened under Kenny Huang's name but which Defendants arranged.

**F.     Defendants Arrange Trusted Account Services Payment Processing through Jimmy Lai and National Merchant Center**

Once Defendants integrated Trusted Account Services into the DebtPayPro platform, they still needed a payment processing vendor.  Defendants had been on alert for payment processing options for several months.  *See* Exhibit 23.  When the arrangement with Donald Cook fell apart, the Defendants went back to Jimmy Lai, who, like Cook, acts as a middle man between high-risk merchants and payment processors.[27]  He has worked with Defendants on numerous occasions to secure payment processing for their various entities.

Defendants did not have to present an elaborate charade of Trusted Account Services' independence with Jimmy Lai.  Lai was in on the lie.  He understood that Defendants owned and controlled TAS 2019 and that Kenny Huang was a front.  He had worked with Defendants for years and, in fact, had previously executed nearly this exact "front" scam with Defendants.

In late 2018, Lai worked with Individual Defendants Wen and Nguyen to use a front – this time Keneth Hu, an IT employee of Defendants – to apply for a merchant processing account in the name of Horizon Consultants LLC d/b/a Premier Student Loan Center.  Hu claimed to be the 100% owner of Horizon Consultants for purposes of the application – but all involved understood that

---

[27]  In this instance it is unclear whether Lai was acting as a broker or as an employee of National Merchant Center, as we see that he uses a National Merchant email address in connection with Trusted Account Services.

Defendants own and control the company.  When the application was finalized – in Keneth Hu's name and containing all of his personal information – Lai sent it to Individual Defendants Wen and Nguyen, not Hu, with a note: "Please review for accuracy, sign and return."  Kaine Wen then forwarded the application on to Hu with instructions, "Please sign on page 6 (twice) and page 7."  *See* Exhibit 24. Horizon Consultants' merchant application was approved and it proceeded to run consumer charges through the account.  *See* Exhibit 25.

Eight months later, Defendants approached Lai about filing another application package using a "front" – this time for Trusted Account Services.  Lai was happy to oblige.  On June 19, Lai submitted an application for TAS 2019 with National Merchant Center with Kenny Huang as the "front" – listed as the 100% owner.  *See* Exhibit 26.  Six days later, the associate director of underwriting wrote to Lai and identified a number of holes in the application.  Lai simply forwarded the email with a one sentence introduction: "Kaine/Kenny, There are a lot of things missing that we need to obtain before we can send to First Data for review and approval."  *Id.*  The application was revised and submitted on July 1.  *See* Exhibit 27.  Again, Kenny Huang was the "front," listed as the owner of TAS 2019.  On July 9, Lai forwarded the final application for signature, listing Kenny Huang as the 100% owner.  But Lai did not send the application to Kenny Huang; he sent it **only** to Kaine Wen with the instruction to "[p]lease execute with Wet Signature."  *See* Exhibit 28.

National Merchant Center accepted the application – an application that Kaine Wen, Kenny Huang and Jimmy Lai knew was false.  Processing for Trusted Account Services began on September 12 and by the end of the month more than $800,000 in consumer funds had been processed.  Another $2,000,000 in consumer charges were processed before the TRO was issued.[28]

---

[28]  Based upon information contained in the Trusted Account Services portal that Defendants' employees control, more than 56,000 separate transactions were processed in the roughly six weeks of operation.  Indeed, it appears that all of

### G.     Defendants' Assertion that Trusted Account Services Is a Third Party Dedicated Account Provider Is False

In Defendants' Response to the Order to Show Cause, they assert that Trusted Account Services is a "third party" which is "a dedicated account provider that provides escrow services" and that "[n]o Defendant or Relief Defendant owns or controls (or has ever owned or controlled) [Trusted Account Services]." Response at pp. 9-10.  Each of these assertions is based entirely on the declaration of Jimmy Lai attached to the Response.  Mr. Lai's declaration is riddled with extraordinary falsehoods.

As discussed above, Mr. Lai was a long-time payment processing broker for the Defendants and was instrumental on at least two occasions in obtaining merchant accounts for Defendants using "fronts" or nominees, including Trusted Account Services.  Nevertheless, Mr. Lai now claims that Trusted Account Services is not, and was never, owned or controlled by any Defendant or Relief Defendant (¶ 6).  This claim is belied by substantial evidence as described above.  Mr. Lai also claims he is the majority owner of TAS 2019 and has been since September 1, 2019 (¶ 1), and that since his involvement with Trusted Account Services, its connection to Defendants has been limited to software integration (¶ 6).  These claims are inconsistent with the facts described above and any number of objective post-September 1, 2019 facts:

- On September 9, 2019, two Merchant Account Change Request Forms for Trusted Account Services were filed with National Merchant Center (a company at which Mr. Lai is or was employed).  The owner of Trusted Account Services is listed as Kenny Huang and a signature in that name appears on the forms.  *See* Exhibit 29.  The

---

Defendants customers' payment processing was transferred to Trusted Account Services without notice to customers.

email listed for Mr. Huang, tas2019llc@gmail.com, is controlled by Kaine Wen.

- A Trusted Account Services voided check was attached to the September 9th Merchant Account Change Request Forms.  The address listed on the check is Kenny Huang's home address.  *Id.*

- Also included with the Merchant Account Change Request Forms was a letter from HSBC, dated September 9, 2019, reflecting that TAS 2019 and Kenny Huang established a business account with the bank.  *Id.*

- On September 10, 2019, Defendants' employees ordered new HSBC Trusted Account Services checks and had them mailed to an employee's home.

- On September 19, 2019, National Merchant Center ran another check on the Wyoming Secretary of State site to confirm that TAS 2019 remained active at the mail drop in Wyoming.  *See* Exhibit 30.

- On September 20, 2019, a Trusted Account Services mail drop invoice in the amount of $125 for October 2019 was forwarded to an employee of Defendants for payment.

- National Merchant Center sent a "card processing statement" for the period of September 1 to September 30, 2019 to Kenny Huang at the mail drop in Wyoming.  *See* Exhibit 31.

- In early October, National Merchant Center mailed the Trusted Account Services September processing statement to Kenny Huang at the mail drop in Wyoming (the address listed on the Wyoming Secretary of State site).  *See* Exhibit 32.

- We located the check stub for the last customer refund check written on the Trusted Account Services HSBC business account at the

Laguna Canyon office; the check was written on October 4 using a signature stamp in the name of Kenny Huang.

- On October 7, 2019, National Merchant Center forwarded the TAS 2019 September statements to Jimmy Lai at his swiftpaymentsinc.com and his nationalmerchant.com addresses. (Again, it is unclear if Mr. Lai continues to work at National Merchant Center.)  Within eight minutes of getting the statements, Lai forwarded them to Defendant Nguyen.  *See* Exhibit 33.

- Two days ago, Wednesday, October 30 at 6:12 p.m., in a short telephone call with me, Kenny Huang claimed (twice) that **he owns** TAS 2019.  Mr. Huang asked to see the TRO before having any further conversation.  The TRO was provided.  Mr. Huang has not responded to our emails or telephone calls since.

We noticed and served a deposition notice on Mr. Lai on Tuesday, October 29, for a Friday, November 1 deposition.  (That deposition is now set for Tuesday, November 5.)

# VI.

## STUDENT LOAN DEBT RELIEF –
## THE SALES PITCH AND PROCESS

Defendants' acceptance of advance fees in violation of the TSR dooms the business from the start.[29]  But, the analysis of whether this business can continue lawfully and profitably does not hang entirely on advance fees.  We identified fundamental flaws in the tactics deployed to secure customers which have left consumers feeling confused and misled.  *See* Section VI.F "Complaints" below.

Defendants' student loan debt relief business is built on a challenging premise:  identify and target consumers with student loan debt to sell them a

---

[29] Even advance fees collected through TSR-compliant escrow would pose serious challenges to financial sustainability – see discussion below.

utilitarian service they can do themselves (by filling out Department of Education forms or with the assistance of resources available from the DOE, DOE-approved loan servicers, and other consumer-friendly resources. And do this in an environment that is heavily regulated to protect consumers and prohibits advance fees until the work is completed and accepted by consumers. By any definition, this is not a promising business model for a lawful operator, and this reality is borne out by Defendants' 70% cancellation rate. *See* Exhibit 1.

### A.    Leads

New customers are secured by the telemarketing sales team by calls to and from consumer "leads." Lead generation has been managed by Pub Club Leads ("Pub Club"), the marketing business which operated from an interior office at the Laguna Canyon site. Pub Club was tasked to generate "Billable Leads" based on parameters set forth in time-specific orders from Prime Consulting. Pub Club did this by retaining and managing multiple sub-vendors who deployed various data mining techniques. Pub Club was compensated by a percentage of the total "advertising buy" for each of the Orders. Our review indicates that for the period October 2018 to October 2019, Pub Club received approximately $9 million from Prime Consulting. Pub Club also received approximately $5 million from Horizon Consultants between March 2019 and September 2019.

### B.    Sales Tactics

Defendants' new "zero tolerance compliance" protocols, announced in August 2019, are themselves confirmation of bad practices that historically permeated the sales process. *See* Exhibit 7. One such practice related to family size where sales agents, with or without the customer's assistance, inflated family size to secure lower payments. In one recorded telephone call from July 25, 2019, that we reviewed, the sales advisor added the customer's two dogs to increase family size. In June 2019, a customer service manager identified an issue internally that customers felt "scammed" because they were paying $1,300 when

Defendants do "very little." *See* Exhibit 34.  In April, 2019, Individual Defendant Nguyen internally reported that he had done a small audit on family size and found that 6 out of 10 failed with "All fake FS."  *See* Exhibit 35.

Our review of the Laguna Canyon site confirmed the obvious reality that Defendants were in the sales business with sales personnel incentivized to <u>sell</u>:

- The Sales Department was physically structured to maximize results with sales agents organized in pods headed by a Team Leader, each with a separate white board to track results and weekly goals.

- Sales advisors (who were retitled Student Loan Specialists on September 30, 2019) were paid weekly with an hourly minimum ($12-$15 per hour) and a commission based on a percentage (18%-22%) of the dollar value of closed deals after the enrollment payment cleared.  The applicable percentage was determined by the advisor's rank, which was based on total revenue from sales over the previous four weeks.  *See* Exhibit 36.

- Sales advisors were also paid bonuses through various "performance sprints", including special bonuses for same day closings/payments and 5 deals in a day. The big producers even got to participate in raffles for laptops, gaming consoles, headphones and movie tickets.  *See* Exhibit 37.

- The overriding mission was to "Close."  A big screen TV in the main room ranked the highest closers.  Inspirational signs promoted "Always Be Closing" and "Assume the Close."

- Sales advisors were exhorted to complete the "Hard Close," sometimes called "Same Days," by manufacturing a need to close now.  Rebuttals to customers wanting to "call back" included "the government is very strict" and the "system does not allow me to keep your application open."  *See* Exhibit 38.

Absent aggressive real time supervision, these incentives created an atmosphere where sales agents are tempted to do whatever necessary to "close" and get their commissions and bonuses.

We reviewed scripts, training materials, and sales directives found at each workstation in the Sales Department.  After August 2019, the Sales Scripts were revised several times, but even the most recent Sales Script – October 21, 2019 (Exhibit 11) – may confuse consumers about the services and the related fees, and creates the impression that fees paid to Defendants would be credited to their loan. This confusion is reflected in consumer complaints.  *See* Section VI.F "Complaints" below.

### C.    Enrollment Fees

"Enrollment Fees" (now called "Initial Fees") were a key component of the sales process and engendered significant confusion among customers.  The most recent schedule includes three tiers based on the customers student loan balance. The "Initial Fee" was set at $1,545 (loan balance above $40,000), $1,395 (loan balance $25,000-$40,000), and $1,245 (loan balance $9,000 – $25,000).[30]  The standard payment plan was five monthly payments (six with manager approval). Consumers who agreed to immediately pay in full were rewarded with a $100 discount and sales advisors received bonuses.  The fee structure with the corresponding monthly payment amounts and related commissions were published in materials and on white boards around the office.  *See* Exhibit 36.

All customers were also charged a recurring monthly "recertification fee" ($22, $32, or $42) as required by most repayment plans.  This recertification fee created residual monthly cash flow for Defendants with no immediate benefit to the customer and was paid out well before the annual recertification application was actually prepared or even due.

---

[30]  Fee amounts have varied over time with $1,750 being the highest level we identified.

Fee payment schedules were entered into DebtPayPro and monthly auto payments were pulled from customer accounts. The recertification fee was scheduled to be charged in the month after receipt of the final payment on the Initial Fee.[31]

### D.     Customer Service and Processing

At the time of the TRO, customer service operated from the 173 Technology Drive site. In early October 2019, Defendants actually laid off the entire processing department as a prelude to outsourcing processing functions to an offshore vendor.[32]

The Customer Service Team was primarily tasked to handle complaints from consumers, the BBB, and regulators. Internal protocols emphasized, however, that representatives were to answer the phone generically as "customer service/customer support" and to give the appearance of being a "third party."[33]

Scripts and instructions found on site confirmed complaints were a big part of the business. Written instructions found in Customer Service cubicles identified two primary goals (1) retain the customer by resolving the issue and (2) mitigate the fallout from customers likely to complain to outsiders. "Retention Policies"

---

[31] For example, the DPP file for customer L. Burdick (loan balance $40,303) shows enrollment on October 4, 2019 with the Initial Fee of $1,245 scheduled out at 5 monthly payments of $249 commencing October 4, 2019, completing February 4, 2020, and the $42 monthly recertification fee scheduled to commence March 4, 2020 and running through September 4, 2029.

[32] Historically, the primary processing functions were to pick up the customer "file" from the sales agent once the agreement was signed. From there, processing finalized data collection on income and other matters, secured customer signatures on the necessary documents and commenced the processing of enrollment fees.

[33] The customer service representatives were provided scripted language: "We are a third party customer service department that takes care of customer support for many different companies. It looks like you have been working with (insert appropriate name here: SL Account Management, Premier Student Loan Center, Financial Preparation Services, Financial Loan Advisors, and Tangible Saving Solutions.)." They were also instructed not to acknowledge any of Defendants' name changes or that customer service was part of any of those companies. *See* Exhibit 39.

directed that full refunds be given to consumers likely to complain to the BBB, regulators, or enforcement authorities.  *See* Exhibit 40.

Customer Service also maintained a list of 20 "Disposition Codes" which highlight the level of customer confusion.  These codes included "Fees not Explained to Me," "Program not Explained Correctly," and "Payments did not go toward my Student Loan Payment."  *See* Exhibit 41.

During September and October 2019, a primary activity at the Technology Drive site was a reverification campaign supposedly designed to confirm the data on more than 40,000 files and have customers sign new documentation.  This campaign was implemented by personnel from Junior Processing, Customer Service, and approximately 30 temporary workers who made outbound calls to customers based on a script.  After verifying identity, the customer was directed to a website to verify and initial a series of compliance questions and provide fresh signatures on documents signed at their original enrollment.  This campaign also introduced customers for the first time to Trusted Account Services and directed them to sign a contract with Trusted Account Services.[34, 35]

---

[34]  In this regard, the reverification script included Compliance Questions, Paragraph 10 of which provides:

- "Do you understand that your monthly recertification assistance fee to us will be placed into your own Dedicated Client Account held for your benefit until we successfully complete our work for you?"

- "You are making payments for our fees to your own Dedicated Client Account **held by a non-related company (like a trust account) until your program is finalized and complete**."

- "To fully emphasis we do not take upfront fees.  That means that until your program is approved any payments you are making are going into a separate trust account for you until you are placed in the program initially outlined with the payment details initially discussed."

*See* Exhibit 42 (Emphasis added).

[35]  Notably, Defendants unilaterally transferred all customer payment processing to Trusted Account Services in September 2019 without customer consent.

In their recent filings, Defendants cite a supposed 96% success rate in the reverification campaign as evidence that their customers were fully satisfied and re-executed agreements willingly. *See, e.g.*, Defendants' Response re: OSC at 8-9 (citing Balestreri Decl. ¶ 12 & Ex. F). They claim this high success rate for the 3,252 reverifications is "more statistically significant and a more accurate picture" than the customer complaints relied on by the CFPB because Defendants' "sampling of customers is random." *Id.* at 8. This success figure is astounding and suspect, particularly in a business with a 70% customer cancellation rate.

My investigation indicates, however, that the reverification campaign was not an objective scientific process confirming universally happy customers. Rather, it was a hastily organized exercise using temporary employees with little training to retroactively confirm data in old files, guided by a script that required more than 90 minutes of talk time to complete. In addition, Defendants' "sampling" does not appear random at all, but instead it appears Defendants cherry-picked the initial files to be reverified in order to achieve a higher success rate. Notes we found in the office of Mr. Ortiz, the head of Junior Processing, from a September 20, 2019 meeting with customer service managers Christian Sangalang and Adon Janse indicate that Mr. Ortiz's team was assigned 2,800 files designated "High priority." All of these had small "FS (family size)," between 1 and 5 members, thus reducing the likelihood of prior family size inflation. The notes indicate that Mr. Janse stated that approximately 2% of these files "have issues" and that "Most clients will sign." *See* Exhibit 43.

Defendants also suggest that the reverification campaign reflected a "random" sampling of calls coming ***into*** customer service. This is, however, belied by the reverification scripts which state: "I am calling you today on a recorded line to ensure the accuracy of all details on your account. We are contacting all our existing clients to complete a routine follow up as part of our ///

newly required compliance policies and procedures."[36]  *See* Exhibit 42.

### E.   Compliance

Compliant practices did not come naturally to Defendants.  Compliance concerns and procedures before the August pivot were sporadic.  Beginning August, 2019, however, compliance efforts were upgraded, including:

- The zero tolerance policies first announced in the August 27, 2019 Memo, were re-stated in various other formats.  *See* Exhibit 44.
- New Hires were run through a week of day-long training and education sessions.  *See* Exhibit 45.
- The basic Sales Script was updated and revised multiple times resulting in the current version of October 21, 2019.  *See* Exhibit 11.
- The 4 training rooms at the Laguna Canyon site, each outfitted with 4 workstations, were updated with new directives and information posted above each workstation, including Rebuttals, Doc. Assistance, File Accuracy, and Verbal Consent.  *See* Exhibit 46.

These are representative, but not exhaustive examples of compliance efforts after the August pivot.  These moves were in the right direction, although some elements could be described as window dressing.  Regardless of motivation or sincerity, however, compliance was on Defendants' radar, beginning in August 2019.

### F.   Complaints

The ultimate gauge of whether consumers are confused or feel misled is to review the flow of complaints generated by those consumers.  Defendants suggest that the August pivot has resulted in a compliant operation and claim a

---

[36]  Customer service representatives were instructed that they could conduct the reverification during regular customer service calls, but when customers called with concerns about withdrawals made by a new entity (Trusted Account Services) they were told they would be receiving separate calls to reverify their information and sign contracts with Trusted Account Services.

96% satisfaction rate by customers contacted in the reverification campaign. While we did not have the time or resources to statistically sample all the data, we do have the ability to get a sense of the situation by reviewing Defendants' customer contacts post-pivot.

We identified a Trusted Account Services email box studentloanmgmt@trustedaccountservices.com established around October 13, 2019.  Defendants controlled and monitored this email box.  Defendants' employees reviewed and responded (as necessary) to customer inquiries.[37]  This has given us a discrete stream of inquiries to review – some 400 emails delivered since October 13 – which again, is obviously after the Defendants' August pivot.

We identified approximately 250 informational inquiries (*e.g.*, requests for a return call or email, requests to update payment information, inquiries about the status of consumers' application or the recertification process, etc.).  One customer stated he was satisfied with Defendants' service, but then asked for clarification why FedLoan was asking him for a large payment, thinking that the monthly $40 payment handled his obligation.

We identified approximately 150 troubling customer contacts – complaints of one kind or another.  Some examples follow:

- "The payments that are being taken each month are not the payments I agreed to and not an amount I can manage.  I need to hear back from someone asap and get this resolved."  *See* Exhibit 47.
- "If I'm paying $40/month, WHY has my student loan increased from $52k to $54k? . . . Instead of paying $52k to Nelnet, at the end of 240 payments, I will pay a total of $10,555 to Premier Student Loans?  Will the balance be expunged from my financial obligation?"  *See id.*

---

[37]  We have not yet been able to canvas all Defendants' email accounts and therefore have not identified all mailboxes which might be receiving customer inquiries and complaints.

- "I have spoken to Navinet - who hlds my student loan perNavinet they have nothing from you concerning my student loan and they are now delinquent.  I need answer's and I am stoping Payment."  *See id.*

- "This is a scam and I want all of my money returned or I am prepared to legal action.  My student loans are still showing up as unpaid on my credit report."  *See id.*

- "If I am going through this organization for my student loans, and if you are charging me $42.00 per month, I have two questions that are confusing me?

  1. My loan amount has increased by $5,000 since I turned my information over to you.

  2. Fed Loan just sent me an email saying they are going to deduct $131 from my account each month starting November.

  Can someone please explain all of this to me, and why did my amount increase?"  *See id.*

- "This is a scam.  You've been reported.  Stop contacting me."  *See id.*

- "STOP TAKING THE AUTOMATIC PAYMENT IMMEDIATELY.  I WANT A REFUND.  The Department of Education called me – you are a fraud!"  *See id.*

- "I am just trying to figure out why I am still receiving bills from fedloan.  They are saying I am behind and that i am not paying.  I was told that I wouldn't have to worry about them once I sign on with you guys.  Can you please explain."  *See id.*

- "This service was set up to help me with the payments at FEDLOAN SERVICING.  I keep getting emails and phone calls saying my account is past due.  Are the payments you're pulling from my account not being sent to the FEDLOAN SERVICING?"  *See id.*

- "Who is this payment going to?  I just logged into my FEdloan Servicing Account, and none of my $40 monthly payments are showed as posting to my actual student loans.  I am wondering who I am paying?"  *See id.*
- "Why am I paying y'all money and fed loan servicing is reporting missed payments to the credit bureaus.  It's messing up my credit score and I really do not need that."  *See id.*
- "Is Navient aware that I am paying my student loans through this company now?"  *See id.*

The volume of complaints (roughly 150) compared to the number of customer contacts (roughly 400) is very high – 40% of the people who contacted Defendants through the email box had a complaint.  This paints a far different picture of customer satisfaction than that presented by the purported 96% satisfaction rate in the reverification campaign.  And these are customer initiated contacts, rather than outreach instituted by a reverification campaign.

Beyond the volume of complaints, the content of the complaints is troubling.  The complaint themes are consistent with the consumer declarations and the allegations made by the Plaintiffs.  Pre-pivot or post-pivot, Defendants' sales materials and tactics have left consumers confused and feeling misled, particularly about Defendants' services, their fees, and whether the fees reduced their loan balances.

## VII.

## FINANCIAL INFORMATION

The Receiver's forensic accountant, Lisa Jones, has prepared a Receivership Initial Account Records Review report based on available Receivership Defendant records which is attached as Exhibit 5.

///

///

# VIII.

## CAN THE BUSINESSES BE OPERATED
## LAWFULLY AND PROFITABLY?

Section XIII(O) (at page 23) of the TRO directs and authorizes the Temporary Receiver to continue and conduct the business of Receivership Defendants "conditioned on the Receiver's good faith determination that the business can be lawfully operated at a profit using the Assets of the Receivership Defendants' estate."  I conclude that the business cannot.

These defendants chose to operate a highly-regulated and revenue-challenged business.  The product is not unique or proprietary.  The marketing costs to secure and retain customers are high, compounded by very high cancellation rates.  Operating expenses, including commission for sales personnel, are high.  And the TSR prohibits the collection of fees until the work is completed and the consumer makes the first payment.

Even if Defendants were to activate a legitimate third party provider of dedicated accounts and fully comply with the TSR escrow exception, the impact on cash flow and sustainability would be enormous, all with the added administrative costs of the escrow procedure itself.  And the business would still face the compliance challenges, and related new expenses, to re-invent a sales process free of tactics and procedures that leave consumers feeling confused and misled.

Dated:  November 1, 2019

By: _/s/ Thomas W. McNamara_
     Thomas W. McNamara
     *Temporary Receiver*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of November 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.


 /s/ Edward Chang
Edward Chang
*Attorney for Temporary Receiver,*
*Thomas W. McNamara*