UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re                                              Case No. 19-10655-JKO

CONSUMER ADVOCACY CENTER, INC.,                    Chapter 7

     Debtor.

_____/

SONYA SALKIN SLOTT,                                Adv. No
Chapter 7 Trustee

     Plaintiff,

v.

ANAN ENTERPRISE, INC.,

     Defendant.

_____/

**<u>COMPLAINT TO AVOID AND RECOVER</u>**
**<u>FRAUDULENT AND PREFERENTIAL TRANSFERS</u>**

     Plaintiff, SONYA SALKIN SLOTT (the "**Plaintiff**" or the "**Trustee**"), as Chapter 7

Trustee for Consumer Advocacy Center, Inc. (the "**Debtor**"), files this Complaint to Avoid and

Recover Fraudulent and Preferential Transfers against the Defendant, ANAN ENTERPRISE,

INC. (the "**Defendant**"), and alleges as follows:

**<u>THE PARTIES, JURISDICTION AND VENUE</u>**

     1.     On January 16, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition

for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of Florida (the "**Bankruptcy Court**").

     2.     Prior to the Petition Date, Albert Kim was the president of the Debtor.  Upon

information and belief, as of the Petition Date, Albert Kim was either the Debtor's sole or

principal shareholder.

3.      On July 31, 2019, the Bankruptcy Court entered an Order directing the appointment of a Chapter 11 Trustee for the Debtor.

4.      Plaintiff, Sonya S. Slott, was thereafter appointed as the Debtor's Chapter 11 Trustee.

5.      On August 20, 2019, the Debtor's case was converted to a Chapter 7 proceeding.

6.      Plaintiff, Sonya S. Slott, was thereafter appointed as the Debtor's Chapter 7 Trustee.

7.      Defendant, ANAN ENTERPRISE, INC., is a California corporation with the following business, mailing and/or registered agent addresses:

ANAN ENTERPRISE, INC.
Kyle Dongwook Kim
1015 Crocker Street # R35
Los Angeles, CA 90021

8.      Upon information and belief, the person who owns and/or controls the Defendant is an individual named Kyle Dongwook Kim ("**Kyle Kim**").

9.      According to the sworn testimony of Albert Kim, Kyle Kim is married to Albert Kim's sister.  As such, Kyle Kim is Albert Kim's brother in law.

10.     Defendant is an "insider" of the Debtor pursuant to 11 U.S.C. § 101(31)(B).

11.     The Bankruptcy Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

12.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders and judgment by the Bankruptcy Court.

13.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     At all times material hereto, the Debtor was inadequately capitalized, was insolvent, and/or was otherwise unable to pay its debts as such debts matured or became due, or

was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

15.　　All conditions precedent to the filing of this action have been performed, occurred, waived or have otherwise been excused.

## FACTS COMMON TO ALL COUNTS

16.　　Prior to the Petition Date, the Debtor was purportedly in the business of providing student loan debt relief services.  The Debtor claims to have "assisted Federal student loan borrowers by helping them choose the best Dept. of Education repayment programs to suit their needs."  The Debtor also claims to have "assisted such borrowers by preparing the requisite documentation they needed to submit to the Dept. of Education." *See* ECF No. 11 in Case No. 19-10655-JKO.

17.　　On October 21, 2019, the Federal Bureau of Consumer Financial Protection and certain state governmental entities (collectively, the "**Government**"), filed a Complaint in the United States District Court for the Central District of California (the "**District Court**") against the Debtor and certain related entities and individuals, including the Debtor's president Albert Kim, captioned *Bureau of Consumer Financial Protection, et al., v. Consumer Advocacy Center, Inc., True Count Staffing, Inc., Prime Consulting, LLC, Albert Kim, Kaine Wen, and Tuong Nguyen, Defendants, and Infinite Management Corp., Hold the Door Corp. and TN Accounting, Inc., Relief Defendants* Case No. 19-cv-01998-JVS (the "**Receivership Proceeding**").  A copy of the Complaint filed in the Receivership Proceeding is attached as **Exhibit "A"**.

18.　　As alleged by the Government in the Receivership Proceeding, the Debtor, through Albert Kim, and other defendants named in the Receivership Proceeding, operated a debt-relief enterprise since at least 2015 which deceived thousands of federal student loan

borrowers and collected millions in unlawful advance fees in violation of various federal and
state consumer protection laws, including the Consumer Financial Protection Act of 2010 and the
Telemarketing and Consumer Fraud and Abuse Prevention Act.

19.     Among other things, the Debtor, Albert Kim and other defendants are alleged to
have engaged in an unlawful student-loan debt-relief business that, among other things, harmed
consumers nationwide by charging unlawful advance fees, deceiving consumers, and
misrepresenting the terms and conditions of services.

20.     On October 21, the District Court entered an *Ex-Parte Temporary Restraining
Order with Asset Freeze, Appointment of Receiver, and Other Equitable Relief, and Order to
Show Cause why a Preliminary Injunction should not Issue* [ECF No. 24 in the Receivership
Court Proceeding] (the "**TRO**").

21.     On November 15, 2019, the District Court entered a *Stipulated Preliminary
Injunction With Asset Freeze, Appointment of Receiver, and Other Equitable Relief* [ECF No.
103 in the Receivership Proceeding] (the "**Preliminary Injunction**").  A copy of the Preliminary
Injunction is attached as **Exhibit "B"**.

22.     The District Court found, in the Preliminary Injunction, that good cause existed to
conclude that the Debtor and Albert Kim, among other things, violated federal and state
consumer protection laws, and further concluded that the Government is likely to prevail on the
merits of the complaint in the Receivership Proceeding.

23.     Prior to the Receivership Proceeding and facing investigation and scrutiny from
law enforcement and federal and state regulators, the Debtor and Albert Kim transferred
the Debtor's purported debt relief operation to related corporate entities in late 2018 and

otherwise drained and transferred assets out of Debtor.  Several months later, Albert Kim caused

the Debtor to file for Chapter 11.

## THE AVOIDABLE TRANSFERS
## AT ISSUE IN THIS CASE

24.     Between April 2017 and September 2018, the Debtor transferred the aggregate

sum of $3,643,000.00 to the Defendant (the "**Transfers**").  A schedule of the Transfers is set

forth in **Exhibit "C"**.

25.      On December 5, 2019, Albert Kim appeared at the Section 341 Meeting of

Creditors in the Debtor's chapter 7 proceeding, and provided sworn testimony therein under

penalty of perjury.

26.     Albert Kim described the Defendant as "relatives" and testified that Kyle Kim,

the CEO and CFO of the Defendant, is Albert Kim's brother in law.

27.     At all times material hereto, the Defendant was an insider of the Debtor as that

term is defined under the Bankruptcy Code.  Kyle Kim, who through his marriage to Albert

Kim's sister, enjoyed a close business and personal relationship with Debtor who Albert Kim

further described as "relatives".

28.     Albert Kim testified that Transfers to Defendant were made for "marketing

brochures" that were never delivered to the Debtor.  As such, the Defendants received the

Transfers from the Debtor for nothing in return.

29.     The Transfers to Defendant started in 2017 in weekly increments between

$30,000.00 and $50,000.00.  Commencing in late 2017, those payments increased to $80,000.00.

Finally, the Transfers include $2,000,000.00 made in equal increments of $200,000.00 over a 10

week period from July 9, 2018 through September 10, 2018, at or around the time the Debtor

claimed to have ceased operating its business in September of 2018.

30.     The Transfers were made during this period notwithstanding that, per the
testimony of Albert Kim, the Debtor received no value or consideration in return.

**COUNT I**
**AVOIDANCE OF FRAUDULENT TRANSFERS**
**UNDER 11 U.S.C. § 548(A)(1)(A)**

31.     The Trustee repeats and realleges Paragraphs 1 through 30 as if fully set forth
herein.

32.     The Defendant provided no consideration to the Debtor in exchange for the
Transfers.

33.     Pursuant to 11 U.S.C. §548(a)(1)(A) and 11 U.S.C. §544, a trustee may avoid any
transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was
made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) before the
date of the filing of the petition, if the debtor voluntarily or involuntarily –

> made such transfer or incurred such obligation with actual intent to
> hinder, delay, or defraud any entity to which the debtor was or
> became, on or after the date that such transfer was made or such
> obligation was incurred, indebted; . . .

34.     The Transfers constituted transfers of an interest of the Debtor in property made
within two years of the Petition Date.

35.     The Transfers were made with actual intent to hinder or delay creditors of the
Debtor, and such Transfers were not received in good faith by the Defendant.  Among other
badges of fraud and/or lack of good faith, at or near the time of the Transfers: (i) the Debtor,
through Albert Kim, was operating an unlawful debt-relief enterprise in violation of federal and
state consumer protection laws, (ii) the Debtor was not paying its debts as they became due; (iii)
the Debtor made the Transfers commencing in April 2017 and continuing through September
2018 notwithstanding that no "marketing brochures" were ever delivered, (iv) the Debtor made

6

$2 million in Transfers to Defendant at or around the time the Debtor claimed to have ceased

operations, and (v) the Debtor did not receive reasonably equivalent value for the Transfers.

**WHEREFORE**, Plaintiff, Sonya S. Slott, as Chapter 7 for the Debtor, Consumer

Advocacy Center, Inc., demands judgment against Defendant (a) determining that the Transfers

are avoidable under 11 U.S.C. §548(a)(1)(A); (b) avoiding the Transfers; (c) disallowing any

claim that Defendant may have against the Debtor, including without limitation, pursuant to and

as provided in 11 U.S.C. §502(d); (d) for prejudgment interest; (d) for costs; and (e) for such

other and further relief as the Court deems just and proper.

**COUNT II**
**AVOIDANCE OF FRAUDULENT TRANSFERS**
**UNDER 11 U.S.C. § 548(A)(1)(A) & (B)**

36.     The Trustee repeats and realleges Paragraphs 1 through 30 as if fully set forth

herein.

37.     The Defendant provided no consideration to the Debtor in exchange for the

Transfers.

38.     Pursuant to 11 U.S.C. §548(a)(1)(B) and 11 U.S.C. §544, a trustee may avoid any

transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was

made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) before the

date of the filing of the petition, if the debtor voluntarily or involuntarily –

> (i)     received less than a reasonably equivalent value in
> exchange for such transfer or obligation; and
>
> (ii)    (I) was insolvent on the date that such transfer was made or
> such obligation was incurred, or became insolvent as a
> result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about
> to engage in business or a transaction, for which any
> property remaining with the debtor was an unreasonably

7

small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

39.     The Transfers constituted transfers of an interest of the Debtor in property made within two years of the Petition Date.

40.     The Transfers constitute constructively fraudulent transfers of interests in property of the Debtor avoidable under 11 U.S.C. §548(a)(1)(B), as the Debtor (i) did not receive reasonably equivalent value at the time such Transfers were made to the Defendant; (ii) was insolvent at the time the Transfers were made or became insolvent as a result thereof; (iii) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor was unreasonably small in relation to the business or transaction; or (iv) intended to incur, or believed or reasonably should have believed, that it would incur debts beyond its ability to pay as they came due.

**WHEREFORE**, Plaintiff, Sonya S. Slott, as Chapter 7 for the Debtor, Consumer Advocacy Center, Inc., demands judgment against Defendant (a) determining that the Transfers are avoidable under 11 U.S.C. §548(a)(1)(B); (b) avoiding the Transfers; (c) disallowing any claim that Defendant may have against the Debtor, including without limitation, pursuant to and as provided in 11 U.S.C. §502(d); (d) for prejudgment interest; (d) for costs; and (e) for such other and further relief as the Court deems just and proper.

## COUNT III
## AVOIDANCE OF PREFERENTIAL TRANSFERS
## PURSUANT TO 11 U.S.C. §§ 547(B)

41.     The Trustee repeats and realleges Paragraphs 1 through 30 as if fully set forth herein.

42.     As reflected in **Exhibit "D"**, the Debtor transferred the aggregate sum of $2,014,400.00 to the Defendant during the 1 year prior to the Petition Date (the "**Preferential Transfers**").

43.     The Preferential Transfers constituted transfers of interests of the Debtor in property.

44.     The Preferential Transfers were made between 90 days and one year before the Petition Date to an insider of the Debtor.

45.     The Preferential Transfers constituted transfers of an interest of the Debtor in property made:

     a.  to or for the benefit of Defendant, which, at all relevant times, was an insider of the Debtor;

     b.  for or on account of an antecedent debt owed by the Debtor to Defendant before such transfer was made; and

     c.  while the Debtor was insolvent.

46.     The Preferential Transfers enabled Defendant to receive more than it would receive if:

     a.  this case were a case under Chapter 7 of the Bankruptcy Code;

     b.  the transfers had not been incurred; and

     c.  Defendant received a payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

47.     By reason of the foregoing, the Preferential Transfers are avoidable by Plaintiff on behalf of the estate pursuant to 11 U.S.C. § 547(b).

**WHEREFORE**, Plaintiff, Sonya S. Slott, as Chapter 7 for the Debtor, Consumer Advocacy Center, Inc., demands judgment against Defendant (a) determining that the Preferential Transfers are avoidable under 11 U.S.C. § 547(b); (b) avoiding the Preferential Transfers; (c) disallowing any claim that Defendant may have against the Debtor, including without limitation, pursuant to and as provided in 11 U.S.C. §502(d); (d) for prejudgment interest; (d) for costs, and (e) for such other and further relief as the Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

48.     The Trustee repeats and realleges Paragraphs 1 through 30 as if fully set forth herein.

49.     Through the Transfers, the Debtor conferred a benefit upon the Defendant which had knowledge thereof.

50.     Defendant voluntarily accepted and retained the benefits of the Transfers conferred.

51.     The facts and circumstances render the Defendant's retention of the benefits of the Transfers inequitable unless the Defendant pays the Plaintiff the value of the Transfers.

**WHEREFORE**, Plaintiff, Sonya S. Slott, as Chapter 7 for the Debtor, Consumer Advocacy Center, Inc., demands judgment against Defendant (a) for the value of the Transfers; (b) for prejudgment interest; (c) for costs; and (d) for such other and further relief as the Court deems just and proper.

Dated December 30, 2019

**I hereby certify that I am admitted to the United States
District Court for the Southern District of Florida and I
am in compliance with the additional qualifications to
practice in this Court set forth in Local Rule 2090-1(A).**

GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel for the Plaintiff, Sonya S. Slott, Trustee*
100 S.E. Second Street
Suite 4400
Miami, Florida 7131
Tel: (305) 349-2300
Fax: (305) 349-2310

By:     /s/ Glenn D. Moses           
          Glenn D. Moses, Esq.
          Fla. Bar. No. 174556
          Email: gmoses@gjb-law.com
          Gregory M. Garno, Esq.
          Fla. Bar No. 087505
          ggarno@gjb-law.com
          Heather L. Harmon, Esq.
          Florida Bar No. 013192
          hharmon@gjb-law.com

# EXHBIT "A"

**8:19-cv-01998 JVS (JDEx)**

1   **BUREAU OF CONSUMER FINANCIAL PROTECTION**
    SARAH PREIS (D.C. Bar No. 997387)
2   (*Pro Hac Vice application pending*)
    Tel.: (202)-435-9318 / Email: sarah.preis@cfpb.gov
3   JESSE STEWART (N.Y. Bar No. 5145495)
    (*Pro Hac Vice application pending*)
4   Tel: (202)-435-9651 / Email: jesse.stewart@cfpb.gov
    1700 G Street, NW
5   Washington, DC 20552
    Fax: (202) 435-5471
6
    LEANNE E. HARTMANN (CA Bar No. 264787)
7   (Local Counsel for the Bureau of Consumer Financial Protection)
    301 Howard Street, Suite 1200
8   San Francisco, CA 94105
    Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788
9
    *Attorneys for Plaintiffs the Bureau of Consumer Financial Protection*
10
    **THE STATE OF MINNESOTA**
11  EVAN ROMANOFF (Attorney Reg. No. 0398223)
    (*Pro Hac Vice application pending*)
12  Assistant Attorney General
    445 Minnesota Street, Suite 1200
13  St. Paul, MN 55101-2130
    Tel.: (651) 757-1454/Email: evan.romanoff@ag.state.mn.us
14
15  *Attorneys for Plaintiff the State of Minnesota*

16  **THE STATE OF NORTH CAROLINA**
    M. LYNNE WEAVER (N.C. Bar No. 19397)
17  (*Pro Hac Vice application pending*)
    MICHAEL T. HENRY (N.C. Bar No. 35338)
18  (*Pro Hac Vice application pending*)
    North Carolina Department of Justice
19  114 W. Edenton Street
    Raleigh, NC 27602
20  Tel.: (919) 716-6000 / Fax: (919) 716-6050
    Emails: lweaver@ncdoj.gov/mhenry@ncdoj.gov
21
    *Attorneys for Plaintiff the State of North Carolina*
22
    **THE PEOPLE OF THE STATE OF CALIFORNIA**
23  MICHAEL N. FEUER, City Attorney (CA Bar No. 111529)
    MARY CLARE MOLIDOR, Chief Assistant City Attorney, (CA Bar No. 82404)
    CHRISTINA V. TUSAN, Supervising Deputy City Attorney (CA Bar No. 192203)
24  OFFICE OF THE CITY ATTORNEY
    200 N. Main Street, 500 City Hall East
25  Los Angeles, California 90012-4131
    Tel: (213) 978-8707/Fax: (213) 978-8112
26  Emails: christina.tusan@lacity.org / william.pletcher@lacity.org
27  *Attorneys for Plaintiff the People of the State of California*
28  //

---

1

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection; State of Minnesota, by its Attorney General, Keith Ellison; State of North Carolina, *ex rel.* Joshua H. Stein, Attorney General; and The People of The State of California, Michael N. Feuer, Los Angeles City Attorney, | Case No: **8:19-cv-01998 JVS (JDEx)** |

Plaintiffs,

v.

Consumer Advocacy Center Inc., d/b/a
Premier Student Loan Center; True
Count Staffing Inc., d/b/a SL Account
Management; Prime Consulting LLC,
d/b/a Financial Preparation Services;
Albert Kim, a/k/a Albert King; Kaine
Wen, a/k/a Wenting Kaine Dai, Wen
Ting Dai, and Kaine Wen Dai; and
Tuong Nguyen, a/k/a Tom Nelson,

Defendants, and

Infinite Management Corp., f/k/a
Infinite Management Solutions Inc.;
Hold The Door, Corp.; and TN
Accounting Inc.,

Relief Defendants.

**COMPLAINT**

**[FILED UNDER TEMPORARY SEAL]**

## INTRODUCTION

1. The Bureau of Consumer Financial Protection (Bureau) brings this action under §§ 1031, 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564 & 5565; and under and the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101-6108, and its implementing regulation, the Telemarketing Sales Rule

1   (TSR), 16 C.F.R. Part 310. The Bureau brings this action in connection with the offer and

2   sale of debt-relief services by Defendants Consumer Advocacy Center Inc., d/b/a Premier

3   Student Loan Center; True Count Staffing Inc., d/b/a SL Account Management; Prime

4   Consulting LLC, d/b/a Financial Preparation Services (collectively, Student Loan Debt

5   Relief Companies); and Defendants Albert Kim, Kaine Wen, and Tuong Nguyen

6   (collectively, Individual Defendants).

7       2.    The State of Minnesota, by its Attorney General, brings this enforcement

8   action to, among other things, obtain temporary, preliminary, and permanent injunctive

9   relief, restitution, and civil penalties for Defendants' acts or practices in violation of the

10   Minnesota Prevention of Consumer Fraud Act (MNCFA), Minn. Stat. §§ 325F.68-.694;

11   the Minnesota Uniform Deceptive Trade Practices Act (MNDTPA), Minn. Stat. §§

12   325D.43-.48; and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing

13   regulation, the TSR, 16 C.F.R. Part 310, in connection with Defendants' offer and sale of

14   student loan debt relief services.

15       3.    The State of North Carolina, by its Attorney General, brings this

16   enforcement action to, among other things, obtain temporary, preliminary, and permanent

17   injunctive relief, restitution, and civil penalties for Defendants' acts or practices in

18   violation of North Carolina's Debt Adjusting Act, N.C. Gen. Stat. § 14-423, *et seq.*,

19   (NCDAA); North Carolina's Unfair and Deceptive Practices Act, N.C. Gen. Stat. § 75-

20   1.1 (NCUDPA); North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat. §

21   66-260, *et seq.* (NCTSRA); and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its

22   implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with Defendants'

23   offer and sale of student loan debt relief services.

24       4.    The People of the State of California (collectively with the States of

25   Minnesota and North Carolina, "the States"), by and through Michael N. Feuer, Los

26   Angeles City Attorney, bring this enforcement action to, among other things, obtain

27   temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties

28   for Defendants' acts or practices in violation of California's Business and Professions

Code section 17200 et seq. (the "Unfair Competition Law," or "UCL") and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with Defendants' offer and sale of student loan debt relief services.

5. Defendants engage in an ongoing, unlawful student-loan debt-relief business that harms consumers nationwide by charging consumers unlawful advance fees and misrepresenting the terms and conditions of their services.

6. The Bureau and the States bring this action to stop Defendants' unlawful conduct, obtain relief for harmed consumers, and impose civil money penalties on Defendants for their unlawful actions.

7. The Bureau and the States also bring this action against Infinite Management Corporation, Hold the Door, Corp., and TN Accounting Inc., as Relief Defendants.

**OVERVIEW**

8. Since at least 2015, Defendants have operated a debt-relief enterprise that has deceived thousands of federal-student-loan borrowers and collected over $71 million in illegal advance fees, in violation of the TSR, the CFPA, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, the NCTSRA, and the UCL. Unless otherwise noted, all references to "borrowers" and "consumers" in this Complaint include California, Minnesota, and North Carolina borrowers and consumers.

9. Defendants purported to help federal-student-loan borrowers obtain loan forgiveness or lower monthly payments through programs administered by the U.S. Department of Education (DOE).

10. In fact, Defendants deceived consumers, including by misrepresenting that consumers would qualify for loan forgiveness in a matter of months, when forgiveness takes at least 10 years of on-time payments and is determined by DOE; that consumers were approved for lower monthly payments on their student loans, when consumers had not yet been approved or when the new payment amount was approved based on false information; and that consumers' lower payments would be permanent when in fact they

COMPLAINT [FILED UNDER TEMPORARY SEAL]

1  are subject to change based on changes in the consumers' family size, income, and

2  marital status.

3      11.    Defendants also falsely told consumers, or led consumers to believe, that the

4  consumers' payments to the companies would go toward paying consumers' student loan

5  balances.

6      12.    When describing the services offered to consumers, Defendants failed to

7  inform consumers that it was their practice to request that consumers' loans be placed

8  into forbearance or that interest would continue to accrue during the forbearance period,

9  thereby increasing consumers' overall loan balances.

10      13.    When describing the services offered to consumers, Defendants failed to

11  inform consumers that it was their practice to submit false information about consumers'

12  income, family size, and marital status on loan adjustment applications in order to try to

13  qualify consumers for lower monthly payments.

14      14.    Defendants charged consumers an initial fee, typically totaling about $900-

15  $1,300 for Defendants' services. This initial fee was typically levied well before

16  consumers had been accepted to and made a payment under their new loan agreement, in

17  violation of the TSR.

18      15.    Defendants conducted this operation using a network of several interrelated

19  companies and over a dozen unregistered and fictitious business names. These entities

20  operated as a common enterprise controlled by the individual defendants, rendering each

21  jointly and severally liable for the illegal acts of all Defendants.

22  **JURISDICTION AND VENUE**

23      16.    This Court has subject-matter jurisdiction over this action because it is

24  brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal

25  question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C.

26  § 1345. This Court has supplemental jurisdiction over the States' claims pursuant to 28

27  U.S.C. § 1367.

28      17.    Venue is proper in this district pursuant to 12 U.S.C. § 5564(f) because

Defendants are located, reside, or do business in this district.

## PARTIES

18.     The Bureau is an independent agency charged with enforcing violations of Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the CFPA's prohibitions on unfair, deceptive, and abusive acts or practices, 12 U.S.C. §§ 1031, 1036, and the TSR as it applies to persons subject to the CFPA, 15 U.S.C. §§6102(c), 6105(d).

19.     The Bureau has authority to bring civil actions against persons violating federal consumer-financial laws and to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a).

20.     Keith Ellison, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8; the MNCFA, Minn. Stat. § 325F.69, *et seq.*; the MNDTPA, Minn. Stat. § 325D.44, *et seq.*; the Telemarketing Act, 15 U.S.C. § 6103(a); and has common law authority, including *parens patriae* authority, to bring this action on behalf of the State of Minnesota and its citizens to enforce Minnesota law.

21.     The State of North Carolina is acting through its Attorney General Joshua H. Stein, pursuant to authority granted by Chapters 14, 66, 75, and 114 of the North Carolina General Statutes, and the Telemarketing Act, 15 U.S.C. § 6103(a).

22.     Michael N. Feuer, City Attorney for the City of Los Angeles, is authorized under California Business and Professions Code section 17200 et seq. (the "Unfair Competition Law," or "UCL") and the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), to bring this civil law enforcement action on behalf of the People of the State of California.

23.     Defendant Consumer Advocacy Center Inc. (CAC) is a California corporation formed on August 6, 2014, and it has held itself out as doing business at the following addresses: 173 Technology Drive, Suite 202, Irvine, CA 92618; 29901 Santa

1   Margarita Pkwy, Suite 200F, Rancho Santa Margarita, CA 92688; 8 Hughes Parkway,

2   Irvine, CA 92618; 5350 E Suncrest Rd., Anaheim, CA 92807; and 24852 Acropolis Dr.,

3   Mission Viejo, CA 92691.

4          24.    CAC has held itself out as doing business as Premier Student Loan Center.

5          25.    CAC has transacted its student-loan debt-relief business in the Central

6   District of California since at least November 2015.

7          26.    On January 16, 2019, CAC filed for protection under chapter 11 of the

8   Bankruptcy Code in the United States Bankruptcy Court for the Southern District of

9   Florida. *See In re Consumer Advocacy Center, Inc.*, No. 19-10655-BKC-JKO (Bankr.

10  S.D. Fla.).

11         27.    Defendant True Count Staffing Inc. (True Count) registered as a California

12  corporation on February 13, 2017, and it has held itself out as doing business at the

13  following addresses: 173 Technology Dr., Ste 202, Irvine, CA 92618; 777 E. Sierra

14  Madre Ave, Azusa, CA 91702; 8 Hughes Parkway, Irvine, CA 92618; and 7545 Irvine

15  Center Drive, Suite 200, PMB #108, Irvine, CA, 92618.

16         28.    True Count has held itself out as doing business as SL Account

17  Management.

18         29.    Defendant Prime Consulting LLC (Prime) is a Wyoming limited-liability

19  company that registered with the California Secretary of State on April 25, 2018, and it

20  has held itself out as doing business at 11932 Klingerman Street, Suite 3, El Monte, CA,

21  91732 and 7545 Irvine Center Drive, Suite 200, Room 108, Irvine, CA, 92618.

22         30.    Prime has held itself out as doing business as Financial Preparation Services.

23         31.    Defendant Albert Kim (a/k/a Albert King) is CAC's primary owner and

24  founder. Kim is a resident of the State of California and performed work for CAC while

25  residing in this jurisdiction.

26         32.    Kim exercised substantial control over CAC's business practices.

27         33.    Kim exercised managerial responsibility for CAC and participated in the

28  conduct of its affairs.

COMPLAINT [FILED UNDER TEMPORARY SEAL]

34. Defendant Kaine Wen (a/k/a Wenting Kaine Dai, Wen Ting Dai) is True Count's primary owner and founder and has also been an owner and manager of CAC. Wen incorporated True Count and has served as its chief executive officer, director, partner, and president.

35. Wen exercised substantial control over True Count's business practices.

36. Wen exercised managerial responsibility for True Count and participated in the conduct of its affairs.

37. Wen exercised managerial responsibility for CAC and participated in the conduct of its affairs.

38. Defendant Tuong Nguyen (a/k/a Tom Nelson) served as CAC's controller and as True Count's secretary.

39. Nguyen exercised managerial responsibility for CAC and participated in the conduct of its affairs.

40. Nguyen exercised managerial responsibility for True Count and participated in the conduct of its affairs.

41. Relief Defendant Infinite Management Corp., f/k/a Infinite Management Solutions Inc. (Infinite Management) registered as a California corporation on September 8, 2016, and it has held itself out as doing business at 9228 City Lights Drive, Aliso Viejo, CA, 92656.

42. Kim served as Infinite Management's registered agent and president, and he is the sole signatory on a bank account belonging to it.

43. Relief Defendant Hold the Door Corp. (Hold the Door) registered as a California corporation on December 30, 2016, and it listed its address as 777 E. Sierra Madre Ave, Azusa, CA 91702. It described its business type as "consulting services" in corporate filings with the California Secretary of State.

44. Hold the Door was incorporated by Wen, and he has served as its sole corporate officer.

45. Relief Defendant TN Accounting Inc. (TN Accounting) is a California

COMPLAINT [FILED UNDER TEMPORARY SEAL]

corporation that filed its Articles of Incorporation with the California Secretary of State on February 8, 2017, and it has listed its principal place of business address of 1704 S. Granada Ave, Alhambra, CA 91801 in corporate filings with the Secretary of State.

46.     Nguyen has served as TN Accounting's president and sole corporate officer.

## FACTS

### Student Loan Forgiveness and Repayment Programs

47.     DOE administers several federal student-loan repayment programs. Some potentially offer lower monthly loan payments. Others allow consumers who make the requisite qualifying payments over a period ranging from 10 to 25 years (and who meet other eligibility criteria) to obtain loan forgiveness.

48.     One such program is the income-driven repayment (IDR) program. IDR plans may lower consumers' monthly payments to more affordable amounts based on the consumers' income and family size. Consumers enrolled in IDR plans who make qualifying payments may also have their outstanding student-loan balances forgiven after 20-25 years.

49.     Under another program, the Public Service Loan Forgiveness program, consumers who work full-time for a qualifying public-service employer, make 120 qualifying payments, and meet other eligibility criteria, can apply to have their outstanding student-loan balances forgiven after 10 years.

50.     Because a borrower's income and family size can fluctuate over the life of the loan, consumers are required to recertify their eligibility for IDR programs on an annual basis. Variables such as marital status and tax-filing status (single, married filing separately, married filing jointly) may affect how DOE calculates monthly payment amounts. As a result, monthly payments under the IDR programs can vary from year to year.

### The Student Loan Debt Relief Companies

51.     CAC began offering student-loan debt-relief services purporting to lower consumers' monthly loan payments and obtain loan forgiveness through enrollment in

1    loan forgiveness or IDR plans as early as November 2015.

2        52.    Initially, CAC's internal structure included sales, processing, and customer-
3    service departments.

4        53.    The sales department fielded incoming consumer calls, made outbound
5    marketing calls, and enrolled consumers in the Student Loan Debt Relief Companies'
6    services by providing consumers with contracts for electronic signature during sales calls.

7        54.    The processing department charged consumers the initial advance fees, and
8    prepared and submitted forbearance, loan-consolidation, and IDR requests to consumers'
9    student-loan servicers. The consumer's student-loan servicer then evaluated the requests.

10       55.    In March 2018, Kim and Wen moved CAC's processing and customer-
11   service operations into a new entity, True Count.

12       56.    As part of this shift, CAC's processing and customer-service departments
13   physically moved to a new office location.

14       57.    CAC continued to handle sales, while True Count took over preparing and
15   submitting loan-consolidation and IDR-plan applications and collecting payments from
16   consumers (including from consumers who had enrolled for services with CAC).

17       58.    As early as April 2018, CAC transferred its sales functions to a new entity,
18   Prime, which ultimately assumed CAC's role as the main sales company enrolling
19   consumers for True Count's services.

20                        **Debt Relief Sales and Business Practices**

21       59.    The Student Loan Debt Relief Companies marketed their debt-relief services
22   through inbound and outbound calls, websites, social media, and direct mail.

23       60.    When consumers called the front-end sales company (CAC or Prime), the
24   consumer first spoke with a sales representative.

25       61.    Sales representatives instructed consumers on how to create an ID and
26   password for consumers' online accounts with Federal Student Aid (FSA), an office of
27   DOE, if the consumer had not previously done so. The sales representatives then
28   instructed the consumer to provide the sales representative with the consumer's FSA ID

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

1 and password.

2     62.    Sales representatives downloaded student-loan data from the consumer's

3 online FSA account into the company's customer–relationship-management system.

4     63.    Sales representatives often stated that there was an urgent need to sign up for

5 the respective Student Loan Debt Relief Company's services.

6     64.    For example, some sales representatives told consumers that they had a

7 limited time in which they could apply for an IDR program.

8     65.    At times, sales representatives represented that the respective Student Loan

9 Debt Relief Company was affiliated with DOE.

10             **Representations about Fees**

11     66.    During sales calls, sales representatives made affirmative representations or

12 material omissions about the purpose of the fees paid by consumers to the Student Loan

13 Debt Relief Companies.

14     67.    Sales representatives frequently represented that the fees would be applied to

15 the balance of consumers' student loans.

16     68.    In fact, all monies paid by the consumers to the Student Loan Debt Relief

17 Companies were fees retained by the companies and were not remitted to student-loan

18 servicers to be applied toward consumers' loan balances.

19     69.    Sales representatives frequently represented that fees paid to the Student

20 Loan Debt Relief Companies would be the only payments consumers would owe on their

21 student loans after being accepted into a DOE repayment program.

22     70.    In fact, the fees paid to the Student Loan Debt Relief Companies were in

23 addition to, and did not relieve consumers of, their obligation to pay their student loans.

24     71.    Sales representatives frequently represented to consumers that the fees

25 charged by the Student Loan Debt Relief Companies were necessary to participate and

26 remain enrolled in a loan-forgiveness or IDR program.

27     72.    In fact, consumers can apply free of charge for loan forgiveness or IDR

28 programs, either through their student-loan servicer or directly to the DOE.

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

73.   Moreover, consumers can recertify annually their eligibility to remain enrolled in their IDR plans through their student-loan servicer for free.

**Representations about Loan Forgiveness**

74.   The Student Loan Debt Relief Companies' sales representatives often told consumers that they were qualified or approved for loan forgiveness.

75.   Sales representatives frequently represented to consumers that they can get consumers' student loans forgiven in whole or in part shortly after enrolling in the respective Student Loan Debt Relief Company's services.

76.   The DOE's loan forgiveness programs require anywhere from 10-25 years of qualifying payments, as well as satisfaction of other eligibility criteria, to qualify for loan forgiveness.

77.   Only the DOE can approve consumers for loan forgiveness.

78.   Because only the DOE can approve consumers for loan forgiveness, and only after a consumer makes qualifying monthly payments over a period ranging from 10 to 25 years, the Student Loan Debt Relief Companies' representations to consumers that all or part of their loans would be forgiven upon payment of enrollment fees were false.

**Representations about Lower Monthly Payments**

79.   The Student Loan Debt Relief Companies' sales representatives often told consumers that they qualified or were approved for a specific lower monthly payment.

80.   In fact, the new, lower monthly payment amount identified by sales representatives was often calculated based on an incorrect family size, income, or marital status.

81.   Sales representatives often represented that consumers' lower monthly payment would be in place over the life of the loan.

82.   In fact, monthly payment amounts are determined by student loan servicers and can fluctuate year to year depending on changes in consumers' income, family size, or marital status, and it is therefore not possible to determine a set monthly payment for an IDR plan for the life of the loan.

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

**Preparing and Submitting Forbearance Requests and IDR Plan Applications**

83.     Following an initial sales call, consumers who purchased the Student Loan Debt Relief Companies' services were assigned to a company representative called a "processor."

84.     Processors conducted a "welcome call" during which they typically asked consumers for proof of income and, at times, verified certain information.

85.     Following the welcome call, processors submitted forbearance requests to student-loan servicers on behalf of consumers.

86.     Processors typically asked for a forbearance period of three months in the forbearance requests they submitted.

87.     If a servicer approves a forbearance request, the consumer is excused from making his or her monthly student loan payments during the period of forbearance. But interest on the consumer's student loan accrues during the period of forbearance and may be added to the principal balance.

88.     Typically, consumers were not informed during sales calls or the welcome call that processors would submit forbearance requests on their behalf.

89.     Typically, consumers were not informed during sales calls or the welcome call that interest on the consumer's student loan accrues during the period of forbearance and may be added to the principal balance.

90.     In fact, most consumers did not ask the Student Loan Debt Relief Companies for forbearance requests, and many consumers were not aware that the Student Loan Debt Relief Companies submitted forbearance requests to their student loan servicers on their behalf.

91.     Processors signed the forbearance requests in the consumer's name so that it appeared the request was submitted by the consumer.

92.     Many consumers were unaware the fees they paid to the Student Loan Debt Relief Companies were not paying down their student loans.

///

## Submitting Consolidation and IDR Requests with False Information

93.    Processors submitted IDR applications to servicers on behalf of consumers with false information about consumers' income, family size, or marital status.

94.    For consumers who did not provide proof of income to the Student Loan Debt Relief Companies, processors frequently listed those consumers as unemployed on their IDR applications, even when the consumers were employed at the time.

95.    Processors frequently submitted IDR applications to consumers' student loan servicers that listed consumers' family sizes greater than the consumers' actual family size.

96.    Processors frequently submitted IDR applications to consumers' student loan servicers that listed consumers as single, even if the consumer had informed the Student Loan Debt Relief Companies that he or she was married.

97.    When submitting IDR applications to consumers' student loan servicers, processors typically changed consumers' email address to an email address created by the Student Loan Debt Relief Company in order to temporarily divert all email correspondence from the consumer's student-loan servicer to the Student Loan Debt Relief Company.

98.    When submitting IDR applications to consumers' student-loan servicers, processors typically changed consumers' mailing address to a mailing address used by the Student Loan Debt Relief Company in order to temporarily divert all postal mail from the consumer's student-loan servicer to the Student Loan Debt Relief Company.

99.    After receiving confirmation from a consumer's student loan servicer that a consumer's loan consolidation or IDR application had been approved, processors typically logged back into the consumer's loan account and changed the consumers email and mailing address back to the consumer's actual information.

100.    The Student Loan Debt Relief Companies' practice of diverting correspondence to consumers from the consumers' student-loan servicers helped conceal the Student Loan Debt Relief Companies' practice of submitting false information to

student loan servicers.

## Representations about and Collection of Fees from Consumers

101.   The Student Loan Debt Relief Companies typically collected enrollment fees from consumers before consumers had been approved for a loan consolidation or an IDR plan.

102.   The Student Loan Debt Relief Companies collected monthly fees, typically ranging from $10-$42, before submitting the consumer's corresponding annual IDR plan recertification.

103.   At all times material to this Complaint, the Student Loan Debt Relief Companies did not track whether consumers had made an initial payment on an adjusted loan.

104.   As early as April 2018, the Student Loan Debt Relief Companies' contracts began including a section entitled "No Advance Fees."

105.   The section of the Student Loan Debt Relief Companies' contract entitled "No Advance Fees" states that the company "does not take any advance fees from Client" and further provides that consumer fees will be held in an independent third party "trust account" and not paid to the company until the consumer "has received a consolidation, adjustment, or otherwise satisfactory result" and makes one payment "towards such."

106.   At all times material to this Complaint, the Student Loan Debt Relief Companies did not use trust accounts to hold fees collected from consumers before placing consumers into loan repayment plans.

107.   Rather, fees collected from consumers by the Student Loan Debt Relief Companies were directly deposited into the companies' bank accounts and commingled with company assets.

108.   The Defendants have collected over $71 million in illegal advance fees from thousands of consumers nationwide.

## Roles of the Individual Defendants

109.   Albert Kim (a/k/a Albert King) is CAC's primary owner and manager.

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

110. Kim was in the office frequently and helped manage CAC's and True Count's day-to-day operations.

111. Kim oversaw CAC's marketing.

112. Kim signed CAC's merchant-account applications or agreements with at least three different payment processors.

113. At times, Kim personally responded to consumers' complaints.

114. Kim has controlled CAC's bank accounts, and he has been an authorized user on CAC's and True Count's bank accounts.

115. When Kim applied for a merchant account on CAC's behalf in or about July 2017, he agreed to maintain fraud and chargebacks below certain levels.

116. Monthly account statements sent to CAC's corporate address for that merchant account identify tens of thousands of dollars in chargebacks and hundreds of thousands of dollars in consumer refunds between August 2017 and March 2019.

117. After CAC filed for bankruptcy, Kim personally generated marketing leads for Prime.

118. Kaine Wen served as CAC's owner, managing partner, and general counsel.

119. CAC's 2016 tax returns and U.K. registration documents list Wen as CAC's 50% owner.

120. Wen made capital contributions to CAC in October 2015 that accounted for 75% of capital contributions by members at that time.

121. Wen participated in the decision to move CAC's processing functions to True Count.

122. Wen personally guaranteed True Count's lease agreement.

123. Wen set up payment-processing agreements for True Count.

124. Wen corresponded with payment processors regarding True Count's excessive chargeback rates.

125. Wen represented to a payment processor that True Count "understands, currently fully complies with, and during the term of the Agreement will fully comply

with" the TSR, CFPA, and "all other applicable federal, state, and local laws, rules, and
regulations."

126. Wen has been an authorized user on CAC's, Premier Student Loan Center's,
True Count's, and Hold the Door's bank accounts.

127. Wen was also a point of contact or signed for at least three merchant
accounts for CAC and at least one merchant account for True Count.

128. Tuong Nguyen served as the controller and provided accounting services for
CAC.

129. Nguyen was responsible for paying CAC's bills, reviewed its bank
statements, and was a signatory on several of CAC's bank accounts.

130. At times, Nguyen also responded to consumer complaints, and was listed as
a point of contact for CAC's d/b/a, Premier Student Loan Center, in the Bureau's
consumer-complaint portal.

131. True Count identified Nguyen as its secretary in select dealings with banks.

132. Nguyen was a point of contact for at least two of CAC's merchant accounts
and one of True Count's merchant accounts.

133. In January 2018, Nguyen signed a letter to a payment processor
acknowledging CAC had incurred "excessive chargebacks" during "December/2017."

134. Nguyen also acknowledged that the top chargeback reasons included fraud.

135. Nguyen incorporated TN Accounting and served as its president and sole
corporate officer.

136. Nguyen has been a signatory on a bank account held by TN Accounting.

137. TN Accounting's primary source of income is over $225,000 from CAC and
True Count from March 2017 through December 2018.

138. Nguyen was also an authorized user on bank accounts held by CAC, Premier
Student Loan Center, and True Count.

///

///

COMPLAINT [FILED UNDER TEMPORARY SEAL]

## The Student Loan Debt Relief Companies Operate as a Common Enterprise

139.   CAC, True Count, and Prime shared employees, customers, scripts, and training materials, and they used the same database to store consumers' information and track aspects of their business activity.

140.   CAC, True Count, and Prime shared the proceeds of the debt-relief enterprise.

141.   For example, since April 2018, True Count, acting as the purported "billing department" for CAC and Prime, has transferred at least $12 million to CAC and at least $25 million to Prime.

142.   CAC lent hundreds of thousands of dollars to True Count without interest or any written agreement.

143.   CAC stated in a lease guarantee that it had a "financial interest" in True Count.

144.   CAC guaranteed at least one lease on behalf of Prime Consulting and two leases on behalf of True Count.

145.   CAC, True Count, and Prime have used overlapping addresses to carry out the debt-relief operation.

146.   For example, addresses True Count identifies as its business addresses are also business addresses for CAC, Prime, and Hold the Door.

147.   To market their debt-relief services to consumers, CAC, True Count, and Prime shared over a dozen fictitious names, including but not limited to South Coast Financial Center, Direct Account Services, Financial Loan Advisors, Account Preparation Services, Administrative Financial, Tangible Savings Solutions, Coastal Shores Financial Group, First Choice Financial Centre (a/k/a First Choice Financial Center), Administrative Account Services, Primary Account Solutions, Prime Document Services, Financial Accounting Center, Doc Management Solutions, First Priority LLC, ALW Loans Administrative Accounting Center, Best Choice Financial Center, First Document Services, Global Direct Accounting Solutions, Keystone Document Center,

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

1 Pacific Palm Financial Group, Pacific Shores Advisory, Sequoia Account Management,
2 Signature Loan Solutions, Yellowstone Account Services, EDU Doc Support,
3 ClearStudentLoanDebt, and Clear Student Loan Debt.

4 148. The websites for Doc Management Solutions, Financial Accounting Center,
5 Prime Document Services, Primary Account Solutions, Administrative Account Services,
6 South Coast Financial Center, First Choice Financial Center, Coastal Shores Financial
7 Group, Tangible Savings Solutions, Administrative Financial, Account Preparation
8 Services, Financial Loan Advisors, and Direct Account Services are nearly identical.

9 **Transfer of Assets to Relief Defendants**

10 149. Defendants Wen, Kim, and Nguyen direct and control Relief Defendants
11 Hold the Door, Infinite Management, and TN Accounting, respectively.

12 150. Wen, Kim, and Nguyen are the signatories on bank accounts for the
13 respective companies and thus control the flow of money into and out of their corporate
14 accounts.

15 151. From 2017 to 2019, payments from CAC or True Count made up most or
16 almost all the income of Hold the Door, Infinite Management, and TN Accounting.

17 152. Monies were transferred from Hold the Door, Infinite Management, and TN
18 Accounting to the respective individuals' personal accounts or to pay their personal
19 expenses.

20 153. Hold the Door made over $200,000 in direct transfers to Wen's personal
21 bank accounts, and it made payments for purchases of art and for Wen's Tesla and
22 Mercedes Benz automobiles.

23 154. Infinite Management made more than $300,000 in payments to pay Kim's
24 personal credit cards, wedding expenses, dental expenses, and to purchase luxury cars.

25 155. TN Accounting transferred over $100,000 to Nguyen's personal bank
26 accounts and made payments on Nguyen's personal credit cards and Tesla.

27 ///
28 ///

# LEGAL BACKGROUND

## The TSR

156. The TSR defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o).

157. The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

158. The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer." 16 C.F.R. § 310.2(ff).

159. The TSR defines "telemarketing" in relevant part as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

160. The Student Loan Debt Relief Companies offer services to renegotiate, settle, or alter the terms of payments of consumers' federal student loans by submitting requests for loan forgiveness or IDR plans to consumers' student-loan servicers.

161. The Student Loan Debt Relief Companies offered and provided these services to consumers nationwide using the telephones and employed more than one interstate telephone call.

162. The Student Loan Debt Relief Companies offered and provided these services to consumers in exchange for payment of enrollment and monthly fees in connection with a telemarketing transaction.

163. The Student Loan Debt Relief Companies are each a "telemarketer" or

"seller" offering a "debt relief service" under the TSR.

164. Kim arranged for CAC to provide debt-relief services to consumers in exchange for consideration and personally generated marketing leads for Prime. Kim is a "telemarketer" or "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (ff), (o).

165. Wen arranged for CAC and True Count to provide debt-relief services to consumers in exchange for consideration. Wen is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

166. Nguyen arranged for CAC and True Count to provide debt-relief services to consumers in exchange for consideration. Nguyen is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

### The CFPA

167. Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B), prohibit "covered person[s]" from engaging in any "unfair, deceptive, or abusive act or practice."

168. The Student Loan Debt Relief Companies are each "covered persons" under the CFPA because they offer or provide consumer-financial products or services, including financial-advisory services such as assisting consumers with debt-management or debt-settlement and modifying the terms of any extension of credit. 12 U.S.C. § 5481(5), (6), (15)(A)(viii).

169. Section 1002(25) of the CFPA defines the term "related person" to mean "any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of," or "any . . . other person . . . who materially participates in the conduct of the affairs of" a non-bank provider of a consumer-financial product or service. 12 U.S.C. § 5481(25)(C). Section 1002(25) further provides that a "related person" shall be "deemed to mean a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

170. Kim is a "related person" and "covered person" under the CFPA because he

is CAC's owner and officer and has managerial responsibility for CAC. He controlled
CAC's bank accounts, oversaw CAC's sales and marketing, entered into contractual
relationships on CAC's behalf with payment processors, and responded to certain
consumer complaints.

171. Wen is a "related person" and "covered person" under the CFPA because he
is True Count's owner and officer, has been an owner and manager of CAC, and has had
managerial responsibility for both companies. He was involved in making decisions for
CAC, including the decision to shift CAC's processing function to True Count, entered
into contractual relationships on behalf of True Count with payment processors, and was
a signatory on True Count's bank accounts.

172. Nguyen is a "related person" and "covered person" under the CFPA because
he is an officer of CAC and True Count and has managerial responsibility for CAC , and
because he materially participated in the conduct of the Student Loan Debt Relief
Companies. He managed CAC's finances and responded to consumers' complaints on
CAC's behalf. He also was the point of contact for several of CAC's and True Count's
merchant accounts.

### COUNT I

**By the Bureau and the States**
**(Advance Fees in Violation of the TSR – Enrollment Fees)**
**(All Defendants)**

173. The allegations in paragraphs 1-166 are incorporated by reference.

174. Under the TSR, it is an abusive act or practice for a seller or telemarketer to
request or receive payment of any fee or consideration for any debt-relief services unless
and until (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise
altered the terms of at least one debt pursuant to a settlement agreement, debt-
management plan, or other such valid contractual agreement executed by the customer;
and (B) the customer has made at least one payment pursuant to that settlement
agreement, debt-management plan, or other valid contractual agreement between the
customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

175. In the course of providing, offering to provide, or arranging for others to provide debt-relief services, Defendants charged and collected from consumers enrollment fees before consumers had been approved for IDR plans and before consumers had made any payments toward such IDR plans, in violation of the TSR. 16 C.F.R. § 310. 4(a)(5)(i)(A)-(B).

176. Moreover, because the IDR plans in which consumers were placed often were based on false information about consumers' family size, income, and marital status that the Defendants submitted to consumers' student-loan servicers, none of the payments made by consumers in these plans were made pursuant to a "valid contractual agreement" within the meaning of the TSR and thus were collected in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B)

## COUNT II

### By the Bureau and the States
### (Advance Fees in Violation of the TSR – Monthly Fees)
### (All Defendants)

177. The allegations in paragraphs 1-166 are incorporated by reference.

178. In the course of providing, offering to provide, or arranging for others to provide debt-relief services, the Defendants charged and collected from consumers monthly fees before consumers had completed their annual recertifications of eligibility for IDR plans and before consumers had made any payments toward such recertified IDR plans, in violation of the TSR. 16 C.F.R. § 310. 4(a)(5)(i)(A)-(B).

179. Moreover, because the IDR plans in which consumers were placed often were based on false information about consumers' family size, income, and marital status that Defendants submitted to consumers' student-loan servicers, none of the payments made by consumers in these plans were made pursuant to a "valid contractual agreement" within the meaning of the TSR and thus were collected in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

///

///

## COUNT III

### By the Bureau and the States
### (Misrepresentations About Material
### Aspects of Their Services in Violation of the TSR)
### (All Defendants)

180.   The allegations in paragraphs 1-166 are incorporated by reference.

181.   It is a deceptive practice under the TSR for a seller or telemarketer to misrepresent any material aspect of the efficacy of their services and to misrepresent any material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(iii), (x).

182.   Among other things, Defendants misrepresented, directly or indirectly, expressly or by implication that:

   a.   fees paid by consumers were payments toward the consumer's outstanding loan debt;

   b.   fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

   c.   consumers' loans would be forgiven in whole or in part shortly after enrolling in Student Loan Debt Relief Companies' services;

   d.   consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status; and

   e.   consumers' monthly payment amount had been lowered for the life of the repayment plan; and

   f.   any fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services.

183.   Defendants also failed to inform consumers that:

   a.   it was Defendants' practice to submit forbearance requests on behalf of consumers; and

   b.   it was Defendants' practice to falsify consumers' family size, marital

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

status, and income to consumers' student-loan servicers.

Defendants' acts or practices, as set forth in this paragraph, are deceptive acts or practices that violate the TSR, 16 C.F.R. 310.3(a)(2)(iii), (x).

## COUNT IV

### By the Bureau and the States
### (Substantial Assistance in Violation of the TSR)
### (Individual Defendants)

184. The allegations in paragraphs 1-166 are incorporated by reference.

185. The TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act that engages in deceptive or abusive conduct" under the Rule. 16 C.F.R. § 310.3(b).

186. Kim managed both CAC's and True Count's day-to-day operations. As CAC's co-owner and president, Kim oversaw CAC's marketing and approved its sales scripts.

187. Kim knew, or recklessly avoided knowing, the material misrepresentations and omissions that CAC's and True Count's sales representatives and processors made to consumers.

188. Kim knew, or recklessly avoided knowing, that the Student Loan Debt Relief Companies charged and collected enrollment and monthly fees from consumers before the companies had obtained loan-repayment plans for consumers and before consumers had made their first payments toward such repayment plans.

189. Kim represented CAC in contractual relationships with payment processors.

190. As CAC's point of contact on a merchant account where he agreed to keep chargebacks and fraud below a certain level, Kim knew, or recklessly avoided knowing, that the merchant's monthly statements identified tens of thousands of dollars in chargebacks and hundreds of thousands of dollars in consumer refunds between August 2017 and March 2019.

191. As CAC's co-owner and officer and True Count's owner and officer, Wen

1  entered into payment-processing agreements on True Count's behalf, including at least

2  one where he represented that True Count intended to fully comply with the TSR.

3      192.  As a principal representative for CAC's and True Count's merchant

4  accounts and a signatory on the bank accounts from which refunds and chargebacks to

5  consumers were paid, Wen knew, or recklessly avoided knowing, CAC's and True

6  Count's high chargeback and refund rates, including that during at least one period, the

7  top chargeback reasons included "fraud."

8      193.  Wen knew, or recklessly avoided knowing, the material misrepresentations

9  and omissions that CAC's and True Count's sales representatives and processors made to

10  consumers.

11      194.  Wen knew, or recklessly avoided knowing, that the Student Loan Debt

12  Relief Companies charged and collected enrollment and monthly fees from consumers

13  before the companies had obtained loan-repayment plans for consumers and before

14  consumers had made their first payments toward such repayment plans.

15      195.  As an officer of CAC and True Count, Nguyen managed CAC's finances,

16  served as a point of contact for several of CAC's and True Count's merchant accounts,

17  and responded to consumer complaints on CAC's behalf.

18      196.  Because he signed a January 2018 letter from CAC to a payment processor

19  in which he acknowledged that CAC had incurred excessive chargebacks and that fraud

20  was one of the top reasons for such chargebacks, Nguyen knew, or recklessly avoided

21  knowing, the material misrepresentations and omissions that CAC's and True Count's

22  sales representatives and processors made to consumers.

23      197.  Nguyen knew, or recklessly avoided knowing, that the Student Loan Debt

24  Relief Companies charged and collected enrollment and monthly fees from consumers

25  before the companies had obtained loan-repayment plans for consumers and before

26  consumers had made their first payments toward such repayment plans.

27      198.  Kim, Wen, and Nguyen provided substantial assistance to the Student Loan

28  Debt Relief Companies in their violations of the TSR.

## COUNT V

### By the Bureau
### (CFPA – Deception)
### (All Defendants)

199.  The allegations in paragraphs 1-155 and 167-172 are incorporated by reference.

200.  Among other things, Defendants misrepresented, directly or indirectly, expressly or by implication that:

      a.    fees paid by consumers were payments toward the consumer's outstanding loan debt;

      b.    fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

      c.    consumers' loans would be forgiven in whole or in part following payment of the initial enrollment fees;

      d.    consumers were eligible or approved for lower monthly payments, including where such payment amounts have been calculated based on an incorrect family size, income, or marital status;

      e.    consumers' monthly payment amounts had been lowered for the life of the repayment plan; and

      f.    any fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services.

201.  The Student Loan Debt Relief Companies also failed to inform consumers that:

      a.    it was Defendants' practice to submit forbearance requests on behalf of consumers; and

      b.    it was Defendants' practice to falsify consumers' family size, marital status, and income to consumers' student-loan servicers and the consequences for consumers of that practice.

202.   The Student Loan Debt Relief Companies' representations were material and likely to mislead consumers acting reasonably under the circumstances.

203.   Among other things, Kim generated marketing leads for Prime, approved sales scripts for CAC, and managed day-to-day operations for CAC and True Count. He was also aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them as CAC's co-owner and president and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

204.   Among other things, Wen managed payment-processor relationships on behalf of True Count, was a signatory on True Count's bank accounts, and was aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them as CAC's co-owner and president and True Count's owner and president and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

205.   Among other things, Nguyen managed CAC's finances, responded to consumer complaints, and served as point of contact on several of CAC's and True Count's merchant accounts. He was aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

206.   Defendants have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

///

///

# COUNT VI

### By the Bureau
### (Substantial Assistance in Violation of the CFPA)
### (Individual Defendants)

207.  The allegations in paragraphs 1-155 and 167-172 are incorporated by reference.

208.  Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031" and states that "the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

209.  As CAC's co-owner and president, and as someone who managed the day-to-day operations of CAC and True Count and who generated marketing leads for Prime, Kim knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

210.  As CAC's co-owner and True Count's owner and president who was aware that high chargeback and consumer refund rates were attributable at least in part to fraud, Wen knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

211.  As an individual responsible for managing CAC's finances and responding to consumers' complaints on behalf of CAC and who was aware that the Student Loan Debt Relief Companies' high chargeback and consumer-refund rates were attributable at least in part to fraud, Nguyen knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

212.  The Individual Defendants thus provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices, in violation of § 1036(a)(3) of the CFPA. 12 U.S.C. § 5563(a)(3).

///

///

COMPLAINT [FILED UNDER TEMPORARY SEAL]

## COUNT VII

### By the Bureau
### CFPA Violation Based on Violation of TSR
### (All Defendants)

213. The allegations in paragraphs 1-172 are incorporated by reference.

214. The Bureau is authorized to enforce the Telemarketing Act with respect to the offering or provision of a consumer-financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).

215. Defendants' violations of the TSR are treated as violations of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c).

216. Because Defendants are "covered persons" who violated the TSR by charging and collecting illegal advance fees from consumers and engaging in deceptive conduct, they violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT VIII

### By the Bureau and the States
### (Relief Defendants)

217. The allegations in paragraphs 1-216 are incorporated by reference.

218. Relief Defendants Hold the Door, Infinite Management, and TN Accounting have received, directly or indirectly, funds or other assets from Defendants that are traceable to funds obtained from consumers through the deceptive and unlawful practices described herein.

219. The Relief Defendants are not bona fide purchasers with legal or equitable title to the funds or other assets received from Defendants.

220. The Relief Defendants would be unjustly enriched if not required to disgorge funds or the value of the benefits received as a result of Defendants' unlawful acts or practices.

221. The Relief Defendants therefore hold funds and assets in constructive trust for the benefit of the Student Loan Debt Relief Companies' customers.

///

30

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

## COUNT IX

### By the State of Minnesota
### Prevention of Consumer Fraud Act
### Minn. Stat. § 325F.69, et seq.
### (All Defendants)

222. The allegations in paragraphs 1-198 and 217-221 are incorporated by reference.

223. Minnesota Statutes section 325F.69, subdivision 1 reads:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

224. The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes services. *See* Minn. Stat. § 325F.68, subd. 2.

225. The term "person" includes "any natural person or legal representative, partnership, corporation (domestic and foreign), company, trust, business entity, or association, and any agent, employee, salesperson, partner, officer, director, member, stockholder, associate, trustee, or cestui que thereof." Minn. Stat. § 325F.68, subd. 3. Defendants are "persons" within the meaning of the statute.

226. Defendants have repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in the deceptive and fraudulent practices described in this Complaint, with the intent that others rely thereon in connection with the sale of their student loan debt relief services. This conduct includes, but is not limited to:

a. Misrepresenting to consumers that Defendants could forgive consumers' loans and otherwise misrepresenting their ability to reduce or eliminate student loan debt;

b. Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers

for government programs;

     c.    Misrepresenting and falsely leading consumers to believe that Defendants would apply payments made to it to consumers' loans;

     d.    Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

     e.    Misrepresenting to consumers that the amount owed on their student loans would be reduced;

     f.    Misrepresenting to consumers that their loans would be forgiven in whole or in part following payment of the enrollment fees;

     g.    Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

     h.    Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

     i.    Misleading consumers to believe that Defendants are tied to or have a relationship with the federal government or a particular federal debt relief plan;

     j.    Misrepresenting government programs and payment plan terms to consumers; and

     k.    The other practices described in this Complaint.

227.  Due to the deceptive and fraudulent conduct described in this Complaint, Minnesota consumers have made payments to Defendants for services that they otherwise would not have purchased, thereby causing harm to those consumers.

228.  Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325F.69.

///

///

///

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

Case 8:19-cv-01998-MWF-KS Document 135-1 Filed 02/24/20 Page 45 of 108 Page ID
Case 8:19-cv-10655-JKO Document 82 Filed 12/30/19 Page 45 of 103
#:5052

## COUNT X

### By the State of Minnesota
### Uniform Deceptive Trade Practices Act
### Minn. Stat. § 325F.43, et seq.
### (All Defendants)

229.    The allegations in paragraphs 1-198 and 217-221 are incorporated by reference.

230.    Minnesota Statutes section 325D.44, subdivision 1 provides, in part that:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

\* \* \*

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

\* \* \*

(5)     represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

\* \* \*

(7)     represents that goods or services are of a particular standard [or] quality . . . if they are of another;

\* \* \*

(9) advertises goods or services with intent not to sell them as advertised; [or]

\* \* \*

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

231.    Defendants are "persons" within the meaning of the statute.

COMPLAINT [FILED UNDER TEMPORARY SEAL]

232.    Defendants have repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by, in the course of business, engaging in the deceptive and fraudulent practices described in this Complaint that caused a likelihood of confusion or of misunderstanding among consumers in connection with the sale of Defendants' student loan debt relief services, including by making false, deceptive, fraudulent, and/or misleading representations to consumers regarding its advertised services. These practices include but are not limited to:

a.    Misrepresenting to consumers that Defendants could forgive consumers' loans and otherwise misrepresenting their ability to reduce or eliminate student loan debt;

b.    Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

c.    Misrepresenting and falsely leading consumers to believe that Defendants would apply payments made to it to consumers' loans;

d.    Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

e.    Misrepresenting to consumers that the amount owed on their student loans would be reduced;

f.    Misrepresenting to consumers that their loans would be forgiven in whole or in part following payment of the enrollment fees;

g.    Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

h.    Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

34

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

i.     Misleading consumers to believe that Defendants are tied to or have a relationship with the federal government or a particular federal debt relief plan;

j.     Misrepresenting government programs and payment plan terms to consumers; and

k.     The other practices described in this Complaint.

233.   Due to the deceptive and fraudulent conduct described in this Complaint, Minnesota consumers have made payments to Defendants for services that they otherwise would not have purchased, thereby causing harm to those consumers.

234.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44.

## Count XI

**By the State of North Carolina
North Carolina Debt Adjusting Act
N.C. Gen. Stat. § 14-423, et seq.
(All Defendants)**

235.   The allegations in paragraphs 1-198 and 217-221 are incorporated by reference.

236.   Defendants are engaged in illegal "debt adjusting" as that term is defined in Article 56 of Chapter 14 of the North Carolina General Statutes.  Specifically, N.C. Gen. Stat. § 14-423(2) defines "debt adjusting" as any of the following:

> "Debt adjusting" means entering into or making a contract, express or implied, with a particular debtor whereby the debtor agrees to pay a certain amount of money periodically to the person engaged in the debt adjusting business and that person, for consideration, agrees to distribute, or distributes the same among certain specified creditors in accordance with a plan agreed upon.
>
> Debt adjusting includes the business or practice of any person who holds himself out as acting or offering or attempting to act for consideration as an intermediary between a debtor and his creditors for the purpose of settling, compounding, or in any way altering the terms of payment of any debt of a debtor, and to that end receives money or other property from the debtor, or on behalf of the debtor, for the

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

payment to, or distribution among, the creditors of the debtor.

> Debt adjusting also includes the business or practice of debt settlement . . . whereby any person holds himself or herself out as acting for consideration as an intermediary between a debtor and the debtor's creditors for the purpose of reducing, settling, or altering the terms of the payment of any debt of the debtor, whether or not the person distributes the debtor's funds or property among the creditors, and receives a fee or other consideration for reducing, settling, or altering the terms of the payment of the debt in advance of the debt settlement having been completed or in advance of all the services agreed to having been rendered in full.

237. Debt adjusting is prohibited by N.C. Gen. Stat. § 14-424, which provides that "[i]f any person shall engage in, or offer to or attempt to, engage in the business or practice of debt adjusting, or if any person shall hereafter act, offer to act, or attempt to act as a debt adjuster, he shall be guilty of a Class 2 misdemeanor."

238. Defendants' offering and purported rendering of debt adjusting services to North Carolina's debt adjusting statute. Specifically:

    a. Defendants have entered into contracts with North Carolina student loan debtors whereby the debtors agree to pay certain amounts of money periodically to Defendants, and Defendants, for consideration, represent or imply that they will distribute debtors' money among debtors' student loan servicers or lenders and/or DOE in accordance with a plan agreed upon.

    b. Defendants have engaged, and are engaged in, the business or practice of holding themselves out as acting or offering or attempting to act for consideration, as an intermediary between North Carolina student loan debtors and their servicers or lenders and/or DOE for the purpose of settling, compounding, or altering the terms of payment of the student loan debts of the debtors, and to that end receive money from the debtors, or on behalf of the debtors, for the payment to, or distribution among, the student loan creditors of the debtors.

    c. Defendants have engaged, and are engaging in, a business or practice in which they hold themselves out as acting or offering or attempting to act, for consideration, as an intermediary between North Carolina student loan debtors and

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

their student loan servicers or lenders and/or DOE for the purpose of reducing, settling, or altering the terms of payment of North Carolina debtors' student loan debts, and defendants receive a fee in advance of the debt settlements having been completed or in advance of all the services agreed to having been rendered in full.

239. Pursuant to N.C. Gen. Stat. § 14-425, the Attorney General is authorized to seek (a) injunctive relief to enjoin Defendants from the continuation of any debt adjusting activities or the offering of any debt adjusting services in North Carolina; (b) the disgorgement of all monies unlawfully collected by Defendants from North Carolina consumers; (c) the appointment of a receiver to assist in the recovery of funds unlawfully collected by Defendants and to ensure their return to consumers; and (d) the assessment of civil penalties under N.C. Gen. Stat. § 75-15.2 and attorneys' fees for the State under N.C. Gen. Stat. § 75-16.1.

## Count XII

**By the State of North Carolina**
**North Carolina Unfair and Deceptive Practices Act**
**N.C. Gen. Stat. § 75-1.1**
**(All Defendants)**

240. The allegations in paragraphs 1-198, 217-221, and 235-239 are incorporated by reference.

241. In the course of soliciting and promoting their student loan debt relief services to North Carolina consumers, in entering into agreements with North Carolina consumers to provide such services, and in either performing or failing to meaningfully perform those services, defendants have engaged in unfair and deceptive acts and practices in trade or commerce in violation of N.C. Gen. Stat. § 75-1.1.

242. Defendants are engaged in trade or commerce in the State of North Carolina.

243. Defendants' unfair or deceptive acts and practices include, but are not limited to, the following:

a. Engaging in violations of the TSR, as set forth *supra*, which are specifically prohibited by 16 C.F.R. Part 310;

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

b.     Engaging in illegal debt adjusting activities, as set forth *supra*, which are specifically prohibited by N.C. Gen. Stat. 14-423, *et seq.*;

c.     Failing to register as a telephonic seller under North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat §§ 66-260 and 66-261, as set forth *infra*; and

d.     Making deceptive and misleading representations to consumers, including but not limited to:

Misrepresenting to consumers that Defendants could forgive consumers' loans and otherwise misrepresenting Defendants' ability to reduce or eliminate student loan debt;

i.      Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

ii.     Misrepresenting and falsely leading consumers to believe that Defendants would apply payments made to Defendants to the consumers' outstanding loans;

iii.    Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

iv.     Misrepresenting to consumers that the amount owed on their student loans would be reduced if students signed up for the Student Loan Debt Relief Companies' services;

v.      Misrepresenting to consumers that their loans would be forgiven in whole or in part shortly after enrolling in the Student Loan Debt Relief Companies' services;

vi.     Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

vii.    Misrepresenting that consumers were eligible or approved for lower monthly payments, including where such payment amounts

38

had been calculated based on an incorrect family size, income, or marital status;

viii. Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

ix. Misleading consumers to believe that the Student Loan Debt Relief Companies are tied to or have a relationship with the federal government or a particular federal debt relief plan;

x. Failing to inform consumers that it was their practice to submit false information about consumers' income, family size, and marital status on loan adjustment applications in order to try to qualify consumers for lower monthly payments;

xi. Misrepresenting government programs and payment plan terms to consumers; and

xii. The other practices described in this Complaint.

244. The Attorney General is authorized to seek an injunction against Defendants' practices under N.C. Gen. Stat. § 75-14, the restoration of any moneys obtained by defendants from North Carolina consumers as well as the cancellation of defendants' contracts with North Carolina consumers under N.C. Gen. Stat. § 75-15.1, civil penalties under N.C. Gen. Stat. § 75-15.2, and attorneys' fees under N.C. Gen. Stat. § 75-16.1.

### Count XIII

**By the State of North Carolina**
**North Carolina Telephonic Seller Registration Act**
**N.C. Gen. Stat. § 66-260**
**(All Defendants)**

245. The allegations in paragraphs 1-198, 217-221, and 235-244 are incorporated by reference.

COMPLAINT [FILED UNDER TEMPORARY SEAL]

246.  North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat §§ 66-260 and 66-261, requires any non-exempt person engaged in telephonic solicitations directed to North Carolina consumers to: (a) register with the North Carolina Secretary of State not less than 10 days before commencing telephone solicitations; (b) provide specified information on a form provided by the Secretary of State that contains the notarized signature of each principal of the telephonic seller; and (c) pay a $100.00 filing fee.

247.  Pursuant to N.C. Gen. Stat. § 66-261(c), a registration of a telephonic seller is valid for one year from the effective date of the provision of all required information, and may be renewed annually by making the filing required by N.C. Gen. Stat. § 66-262, and paying the filing fee of $100.00.

248.  Defendants are a "telephonic seller" as defined in N.C. Gen. Stat. § 66-260(11), as defendants have caused directly, or through employees or agents, telephone solicitations or attempted telephone solicitations to occur, and Defendants are not exempt from the Act.

249.  Defendants have engaged in violations of the Telephonic Seller Registration Act, N.C. Gen. Stat. § 66-260, *et seq.*, by failing to register with the North Carolina Secretary of State as a telephonic seller; by failing to provide the North Carolina Secretary of State with the information mandated by N.C. Gen. Stat. § 66-262; by failing to pay the filing fee of $100.00; and by failing to register in each year defendants have engaged in telephonic solicitations.

250.  N.C. Gen. Stat. § 66-266(a) provides that any violation of the Telephonic Seller Registration Act "shall constitute an unfair and deceptive trade practice in violation of N.C. Gen. Stat. §75-1.1."

251.  N.C. Gen. Stat. § 66-266(c) further provides that the remedies and penalties available under the section "shall be supplemental to others available under the law, both civil and criminal."

252.  Pursuant to N.C. Gen. Stat. §§ 66-266(b), in an action by the Attorney

1 | General against a telephonic seller for violation of the Telephonic Seller Registration Act,

2 | or for any other act or practice by a telephonic seller constituting a violation of N.C. Gen.

3 | Stat. § 75-1.1, the court may impose civil penalties of up to $25,000 for each violation

4 | involving North Carolina purchasers or prospective purchasers who are 65 years of age or

5 | older.

**Count XIV**

**By the People of the State of California
California Unfair Competition Law
Cal. Bus. & Prof. Code § 17200 et seq.
(All Defendants)**

253.  The People of the State of California re-allege and incorporate herein paragraphs 1 through 221 of this Complaint.

254.  California's UCL, Business and Professions Code section 17200, prohibits any "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200.

255.  Section 17203 of the UCL provides that "(a)ny person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction." Section 17203 also permits recovery of any "interest in money or property, real or personal" acquired by a violation of the UCL. Cal. Bus. & Prof. Code § 17203.

256.  Section 17206, subdivision (a), of the UCL provides that any person violating Section 17200 "shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the [P]eople of the State of California . . . by any city attorney of a city having a population in excess of 750,000," thereby authorizing the City Attorney of Los Angeles, which has a population in excess of 750,000, to bring such an action. Cal. Bus. & Prof. Code § 17206.

257.  Under the UCL's Section 17205, these remedies and penalties are "cumulative to each other and to the remedies or penalties available under all other laws

41

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

of this state." Cal. Bus. & Prof. Code § 17205.

258. Defendants are all "persons" within the meaning of UCL. Cal. Bus. & Prof. Code § 17201.

259. "Unlawful" acts or practices, "unfair" acts or practices, and "fraudulent" acts or practices each independently violate Section 17200. Beginning no later than 2015, and continuing to the present, Defendants, and each of them, have repeatedly violated the UCL by engaging in "unlawful, unfair, or fraudulent business act[s] or practice[s]" with the sale of their purported student loan debt settlement services. Cal. Bus & Prof Code § 17200. These violations include, but are not limited to:

    a. Violating the UCL through the following unlawful acts or practices committed against California consumers, including in the City and County of Los Angeles:

        i. As to Defendants CAC, True Count, Infinite Management, Hold the Door, TN Accounting, Albert Kim, Kaine Wen and Tuong Nguyen violating California Financial Code § 12000 et seq., the California Check Sellers, Bill Payers and Proraters Law, by acting as a check seller, bill payer, or prorater without first obtaining a license from the California Commissioner of Business Oversight. Cal. Fin. Code § 12200;

            1. As alleged in Paragraphs 8, 9, 23, 25, 27-31, 41, 43, 45 and 47-148 of this Complaint, California consumers have provided funds to Defendants based upon assurances and representations that Defendants will assist them in reducing or otherwise managing their student loan debts and/or negotiate with their creditors and distribute payments.

            2. Defendants are not licensed by the California Corporations Commissioner as required by Financial Code § 12000 et seq.

        ii. Violating California Financial Code section 28100, et seq., the California Student Loan Servicing Act, which requires Student Loan Servicers to be

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

Case 8:19-cv-01998-MWF-KS Document 135-1 Filed 02/24/20 Page 55 of 108 Page ID
Case 8:19-cv-10655-3KO Document 2 Filed 12/30/19/20 Page 55 of 108 Page ID
#:5062

licensed to lawfully operate, by engaging in the business of servicing
student loans in California without obtaining a license as required under
the Act;

    1. Defendants are "persons" under the Student Loan Servicing Act.
Cal. Fin. Code § 28104, subd. (j).

    2. As alleged in Paragraphs 8, 9, 23, 25, 27-31, 41, 43, 45 and 47-148
of this Complaint, Defendants have engaged in the business of
servicing student loans in California. Cal. Fin. Code § 28104,
subds. (f), (g), (l), (m), (n).

    3. Defendants have never obtained a license to service student loans
as required under the California Student Loan Servicing Act. Cal.
Fin. Code § 28102, subd. (a).

iii. Violating the Telemarketing Sales Rule ("TSR"), which is specifically set
forth in 16 C.F.R. Part 310, as alleged in Paragraphs 8-15, 53, 57, 59, 66,
88-89, 156-166, 173-176 (Count I - Advance Fees in Violation of the
TSR – Enrollment Fees), 177-179 (Count II - Advance Fees in Violation
of the TSR – Monthly Fees), 180-183 (Count III - Misrepresentations
About Material Aspects of Their Services in Violation of the TSR), and
184-198 (Count IV - Substantial Assistance in Violation of the TSR); and

iv. Violating the Consumer Financial Protection Act of 2010 (CFPA), 12
U.S.C. §§ 5531 et seq., as alleged in Paragraphs 8-148, 167-172, 199-206
(Count V- CFPA – Deception), 207-212 (Count VI - Substantial
Assistance in Violation of the CFPA), and 213-216 (Count VII - CFPA
Violation Based on Violation of TSR), as set forth in this Complaint.

b. Defendants also violated the UCL through the following unlawful,
fraudulent and/or unfair acts or practices committed against California
consumers, including consumers in the City of Los Angeles:

i.    Misrepresenting to consumers that Defendants could forgive consumers' loans and otherwise misrepresenting Defendants' ability to reduce or eliminate student loan debt;

ii.    Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

iii.    Misrepresenting and falsely leading consumers to believe that Defendants would apply payments made to Defendants to the consumers' outstanding loans;

iv.    Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

v.    Misrepresenting to consumers that the amount owed on their student loans would be reduced if students signed up for Student Loan Debt Relief Companies' services;

vi.    Misrepresenting to consumers that their loans would be forgiven in whole or in part shortly after enrolling in Student Loan Debt Relief Companies' services;

vii.    Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

viii.    Misrepresenting that consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status;

ix.    Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

x.    Misleading consumers to believe that the Student Loan Debt Relief Companies are tied to or have a relationship with the federal government

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

1                      or a particular federal debt relief plan;

2        xi.     Failing to inform consumers that it was their practice to submit false

3                      information about consumers' income, family size, and marital status on

4                      loan adjustment applications in order to try to qualify consumers for

5                      lower monthly payments;

6       xii.     Misrepresenting government programs and payment plan terms to

7                      consumers; and

8      xiii.     The other practices described in this Complaint.

9       260.    Due to the deceptive and fraudulent conduct described in this Complaint,

10 California consumers have made payments to Defendants for services that they otherwise

11 would not have purchased, thereby causing harm to those consumers.

12       261.    Defendants' conduct, practices, and actions described in this Complaint

13 constitute multiple, separate violations of California Business and Professions Code

14 section 17200.

15                               **DEMAND FOR RELIEF**

16       262.    WHEREFORE, the Bureau and the States request, under 12 U.S.C.

17 §§ 5538(a), 5565(a); Minn. Stat. §§ 8.31, 325D.45, and 325F.70; the State of Minnesota's

18 common law authority, including *parens partiae* authority; N.C. Gen. Stat. §§ 14-424,

19 75-14, 75-15.1, 75-16.1, and 66-266; and Cal. Bus. & Prof. Code §§ 17200 et seq. that

20 the Court:

21        a.      award the Bureau and the States such preliminary and injunctive and

22             ancillary relief as may be necessary to avert the likelihood of consumer injury

23             during the pendency of this action, including but not limited to a temporary and

24             preliminary injunction, an order freezing assets, immediate access to business

25             premises, and appointment of a Receiver against Defendants and Relief

26             Defendants;

27        b.      permanently enjoin Defendants from committing future violations of

28             the TSR, the CFPA, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, the

COMPLAINT [FILED UNDER TEMPORARY SEAL]

1      NCTSRA, and the UCL, and enter such other injunctive relief as appropriate;

2           c.     permanently enjoin Defendants from the advertisement, marketing,

3 promotion, offering for sale, or selling of any consumer-financial product or

4 service, including but not limited to any debt relief service;

5           d.     grant additional injunctive relief as the Court may deem to be just and

6 proper;

7           e.     award damages and other monetary relief against Defendants and

8 Relief Defendants as the Court finds necessary to redress injury to consumers

9 resulting from Defendants' violations of the CFPA, the TSR, the MNCFA, the

10 MNDTPA, the NCDAA, the NCUDPA, and the NCTSRA, including but not

11 limited to rescission or reformation of contracts, the refund of monies paid,

12 restitution, disgorgement or compensation for unjust enrichment;

13           f.     award restitution against Defendants and Relief Defendants as the

14 Court finds necessary to redress injury to consumers resulting from Defendants'

15 violations of the UCL;

16           g.     award the Bureau and the States civil money penalties;

17           h.     award the Bureau and the States the costs of bringing this action, as

18 well as such other and additional relief as the Court may determine to be just and

19 proper; and

20           i.     award the States the costs of investigation and attorneys' fees.

21

22 Dated: October 21, 2019

23                                 Respectfully submitted,

24

25                                 CARA PETERSEN
                                Acting Enforcement Director

26                                 DEBORAH MORRIS
                                Deputy Enforcement Director

27

28

COMPLAINT [FILED UNDER TEMPORARY SEAL]

Leanne Hartmann (local counsel)

Sarah Preis (*pro hac vice* admission pending)

Jesse Stewart (*pro hac vice* admission pending)

Enforcement Attorneys

*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

47

KEITH ELLISON
Attorney General of Minnesota

Evan S. Romanoff, Assistant Attorney General
(*pro hac vice* pending)

*Attorneys for the State of Minnesota,*
*By Its Attorney General, Keith Ellison*

JOSHUA H. STEIN
Attorney General of North Carolina

M. Lynne Weaver, Special Deputy Attorney
General, (*pro hac vice* pending)
Michael T. Henry, Assistant Attorney General (*pro*
*hac vice* pending)

*Attorneys for the State of North Carolina*

MICHAEL N. FEUER
Los Angeles City Attorney

Christina V. Tusan, Supervising Dep. City Atty.

*Attorneys for the People of the State of California*

COMPLAINT [FILED UNDER TEMPORARY SEAL]

# EXHIBIT "B"

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al. | CASE NO. 8:19-cv-01998 JVS (JDEx) |
|       Plaintiffs, | **STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF** |
|       v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al. | |
|       Defendants. | |

      Plaintiffs, the Bureau of Consumer Financial Protection (Bureau), the State of Minnesota, the State of North Carolina, and The People of the State of California (collectively, Plaintiffs) commenced this civil action on October 21, 2019, alleging violations of state and federal law against the Defendants. The Bureau has filed the complaint under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, and 5565, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c)(2), 6105(d)

1

(Telemarketing Act), based on Defendants' violations of the CFPA and the Telemarketing Sales Rule (TSR), 16 C.F.R. pt. 310. The State of Minnesota has alleged violations of the Minnesota Prevention of Consumer Fraud Act (MNCFA), Minn. Stat. §§ 325F.68-.694, the Minnesota Uniform Deceptive Trade Practices Act (MNDTPA), Minn. Stat. §§ 325D.43-.48, and the Telemarketing Act and its implementing regulation, the TSR. The State of North Carolina has alleged violations of North Carolina's Debt Adjusting Act (NCDAA), N.C. Gen. Stat. § 14-423 *et seq.*, North Carolina's Telephonic Seller Registration Act (NCTSRA), N.C. Gen. Stat. § 66-260 *et seq.*, North Carolina's Unfair and Deceptive Practices Act (NCUDPA), N.C. Gen. Stat. § 75-1.1, and the Telemarketing Act and its implementing regulation, the TSR. The People of the State of California have alleged violations of California's Business and Professions Code 17200 *et seq.* (the Unfair Competition Law or UCL), and the Telemarketing Act and its implementing regulation, the TSR.

The Complaint alleges that Defendants' acts or practices violate these laws in connection with the marketing and sale of student-loan debt-relief services. The Complaint seeks permanent injunctive relief, damages, rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement, compensation for unjust enrichment, and civil money penalties.

The Bureau also moved for a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, and an order to show cause why a preliminary injunction should not issue against Defendants and Relief Defendants. California, Minnesota, and North Carolina joined that motion. On October 21, 2019, this Court granted Plaintiffs' motion and entered the Temporary Restraining Order (TRO), which included an asset freeze as to Defendants (except Consumer Advocacy Center, Inc., whose assets are currently overseen by a Chapter 7 bankruptcy trustee) and Relief Defendants; preliminary injunctive relief as to all Defendants, and the appointment of a temporary receiver over Defendants True

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

1    Count Staffing Inc. (True Count) and Prime Consulting LLC (Prime), and other
2    equitable relief.  The Court also ordered all named Defendants to show cause as to
3    why the Court should not enter a preliminary injunction (Order) enjoining the
4    violations of law alleged in Plaintiffs' Complaint, continuing the freeze of their
5    Assets, and imposing such additional relief as may be appropriate.
6        The Plaintiffs and all Defendants, except for the Chapter 7 Trustee on behalf
7    of Defendant Consumer Advocacy Center Inc., have agreed to the entry of this
8    preliminary injunction order, and the Chapter 7 Trustee having advised the Court
9    separately  that his does not oppose entry of this order.
10       **THEREFORE, IT IS ORDERED** as follows:
11                              **FINDINGS**
12       By stipulation of the parties, the Court finds that:
13       1.    This Court has jurisdiction over the subject matter of this case, there is
14   good cause to believe that it will have jurisdiction over all the parties hereto, and
15   venue in this district is proper;
16       2.    There is good cause to believe that Defendants: (a) Consumer
17   Advocacy Center Inc., a California corporation, d/b/a Premier Student Loan
18   Center, (collectively CAC); (b) True Count Staffing Inc., a California Corporation,
19   d/b/a SL Account Management (collectively True Count); (c) Prime Consulting
20   LLC, a Wyoming limited liability corporation registered to operate in California
21   d/b/a Financial Preparation Services (collectively, Prime); (d) Albert Kim (aka
22   Albert King), an individual; (e) Kaine Wen (aka Wenting Kaine Dai, Wen Ting
23   Dai, Kaine Wen Dai), an individual; and (f) Tuong Nguyen (aka Tom Nelson), an
24   individual, have engaged and are likely to continue to engage in acts or practices
25   that violate the CFPA, the TSR, the MNCFA, the MNDTPA, the NCDAA, the
26   NCTSRA, the NCUDPA, and the UCL. And, there is good cause to believe that
27   Relief Defendants (a) Infinite Management Corp., a California corporation,
28   formerly known as Infinite Management Solutions Inc., (b) Hold The Door, Corp.,

3

Case 8:19-cv-01998-MWF-KS Document 235-1 Filed 02/24/20 Page 65 of 108 Page ID
Case 19-10655-JKO Doc 103-1 Filed 12/30/19 Page 65 of 108
#:5072

Case 8:19-cv-01998-JVS-JDE   Document 103   Filed 11/15/19   Page 4 of 43   Page ID #:4738

1  a California corporation, and (c) TN Accounting Inc., a California corporation,

2  have received funds or assets and are likely to continue to receive funds or assets

3  that can be traced directly to Defendants' unlawful acts and practices. Plaintiffs are

4  therefore likely to prevail on the merits of this action;

5       3.    There is good cause to believe that immediate and irreparable harm

6  will result from Defendants' ongoing violations of these laws unless Defendants

7  and Relief Defendants are preliminarily restrained and enjoined by Order of this

8  Court;

9       4.    There is good cause to believe that immediate and irreparable damage

10  to the Court's ability to grant effective final relief for consumers in the form of

11  monetary damages, restitution, and disgorgement or compensation for unjust

12  enrichment will occur from the transfer, dissipation, or other disposition or

13  concealment by Defendants and Relief Defendants of their assets or business

14  records unless Defendants and Relief Defendants continue to be restrained and

15  enjoined by Order of this Court;

16       5.    Good cause exists for continuing the receivership over True Count

17  and Prime and permitting Plaintiffs continued access to Defendants' business

18  premises at the discretion of the Receiver;

19       6.    Weighing the equities and considering Plaintiffs' likelihood of

20  ultimate success on the merits, this Order is in the public interest;

21       7.    The automatic stay of the Bankruptcy Code does not stay the relief

22  granted herein against CAC, which has filed for bankruptcy in United States

23  Bankruptcy Court in the Southern District of Florida, Fort Lauderdale Division,

24  Case No. 10-10655, because the relief granted herein falls within the police and

25  regulatory power exception to the automatic stay set forth in 11 U.S.C. § 362(a),

26  (b)(4);

27       8.    This Court has authority to issue this order pursuant to 12 U.S.C.

28  § 5565 and Federal Rule of Civil Procedure 65; and

4

_____
STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND
OTHER EQUITABLE RELIEF

Case 8:19-cv-01998-JVS-JDE Document 103 Filed 11/15/19 Page 5 of 43 Page ID #:4739

9.      As the Bureau is an agency of the United States, no security is required for this Order. Fed. R. Civ. P. 65(c).

10.     No security is required of the States of Minnesota, North Carolina, or California for issuance of a preliminary injunction. *See* Minn. Stat. § 574.18; *State v. Nelson*, 189 Minn. 87, 89-90, N.W. 751, 752 (1933); N.C. R. Civ. Proc. 65(c); Cal. Code Civ. Proc. § 529, subd. (b)(3).

**DEFINITIONS**

For the purposes of this Order, the following definitions shall apply:

1.      "**Assets**" means, except as provided herein, any legal or equitable interest in, right to, or claim to any real, personal, or intellectual property owned or controlled by, or held, in whole or in part for the benefit of, or subject to access by any Defendant or Relief Defendant, wherever located, whether in the United States or abroad. This includes, but is not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, contracts, mail or other deliveries, shares of stock, commodities, futures, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), funds, cash, and trusts, including, but not limited to any trust held for the benefit of any Individual Defendants' minor children, or any of the Individual Defendants' spouses. It shall include both existing Assets and Assets acquired after the date of entry of this Order, *provided, however*, all legal and equitable interests in property of the chapter 7 debtor, Consumer Advocacy Center

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

1    Inc., d/b/a Premier Student Loan Center, which interests are property of the
2    Bankruptcy Estate pursuant to 11 U.S.C. § 541, are excluded from this definition;

3       2.    "**Assisting Others**" includes, but is not limited to
4         a.   providing paralegal or administrative support services;
5         b.   performing customer service functions including, but not limited to,
6            receiving or responding to Consumer complaints;
7         c.   formulating or providing, or arranging for the formulation or
8            provision of, any advertising or marketing material, including, but not
9            limited to, any telephone sales script, direct mail solicitation, or the
10           text of any Internet website, email, or other electronic communication;
11         d.   formulating or providing, or arranging for the formulation or
12            provision of, any marketing support material or service, including but
13            not limited to, web or Internet Protocol addresses or domain name
14            registration for any Internet websites, affiliate marketing services, or
15            media placement services;
16         e.   providing names of, or assisting in the generation of, potential
17            customers;
18         f.   performing marketing, billing, or payment services of any kind;
19         g.   acting or serving as an owner, officer, director, manager, or principal
20            of any entity; and
21       3.    "**Bankruptcy Estate**" means the bankruptcy estate created within the
22    Bankruptcy Proceeding by operation of law pursuant to 11 U.S.C. § 541;

23       4.    "**Bankruptcy Proceeding**" means *In re Consumer Advocacy Center*
24    *Inc.*, Case No. 19-10655, currently pending in the United States Bankruptcy Court,
25    Southern District of Florida, Fort Lauderdale Division;

26       5.    "**Bureau**" means the Bureau of Consumer Financial Protection;

27       6.    "**Chapter 7 Trustee**" means Sonya Salkin Slott, the Trustee
28    appointed over Defendant Consumer Advocacy Center Inc. d/b/a Premier Student

_____
STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND
OTHER EQUITABLE RELIEF

1  Loan Center by the United States Bankruptcy Court, Southern District of Florida,
2  Fort Lauderdale Division in the Bankruptcy Proceeding and any successor trustee.

3        7.    "**Consumer**" means an individual or an agent, trustee, or
4  representative acting on behalf of an individual;

5        8.    "**Debt**" means any obligation or alleged obligation to pay money,
6  whether or not such obligation has been reduced to judgment;

7        9.    "**Debt-Relief Product or Service**" means any product, service, plan,
8  or program represented, directly or by implication, to renegotiate, settle, or in any
9  way alter the terms of payment or other terms of the Debt between a Consumer and
10  one or more creditors or Debt collectors, including but not limited to, a reduction
11  in the balance, interest rate, or fees owed by a Person to a creditor or Debt
12  collector;

13        10.   "**Defendants**" means the Corporate Defendants, Individual
14  Defendants, and Relief Defendants, individually, collectively, or in any
15  combination, and each of them by whatever names each might be known;

16              a.    "**Corporate Defendants**" means Consumer Advocacy Center
17                    Inc., d/b/a Premier Student Loan Center, True Count Staffing Inc.,
18                    d/b/a SL Account Management, Prime Consulting LLC, d/b/a
19                    Financial Preparation Services, and any other name by which each
20                    Corporate Defendant may be known or operate;

21              b.    "**Individual Defendants**" means Albert Kim (aka Albert King),
22                    Kaine Wen (aka Wenting Kaine Dai, Wen Ting Dai, Kaine Wen
23                    Dai), and Tuong Nguyen (aka Tom Nelson), and any other name by
24                    which each Individual Defendant may be known;

25              c.    "**Receivership Defendants**" means True Count Staffing Inc.,
26                    d/b/a SL Account Management, Prime Consulting LLC, d/b/a
27                    Financial Preparation Services, TAS 2019 LLC d/b/a Trusted
28                    Account Services, First Priority LLC, and Horizon Consultants LLC,

7

_____
STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND
OTHER EQUITABLE RELIEF

1   and their successors, assigns, affiliates, or subsidiaries, and each of
2   them, by whatever names each may be known, provided that the
3   Receiver has reason to believe they are owned or controlled in whole
4   or in part by any of the Receivership Defendants;

5   d.   "**Relief Defendants**" means Infinite Management Corp., f/k/a
6   Infinite Management Solutions Inc., Hold The Door, Corp., TN
7   Accounting Inc., and any other name by which each Relief Defendant
8   may be known or operate; and

9   11.   "**Document**" and "**Electronically Stored Information**" are
10  synonymous in meaning and equal in scope to the usage of the terms in Rule 34(a)
11  of the Federal Rules of Civil Procedure and include but are not limited to:

12  a.   the original or a true copy of any written, typed, printed,
13  electronically stored, transcribed, taped, recorded, filmed, punched,
14  or graphic matter or other data compilations of any kind, including,
15  but not limited to, letters, email or other correspondence, messages,
16  memoranda, paper, interoffice communications, notes, reports,
17  summaries, manuals, magnetic tapes or discs, tabulations, books,
18  records, checks, invoices, work papers, journals, ledgers, statements,
19  returns, reports, schedules, files, charts, logs, electronic files, stored
20  in any medium;

21  b.   any electronically created or stored information, including but
22  not limited to electronic mail, instant messaging, videoconferencing,
23  SMS, MMS, or other text messaging, and other electronic
24  correspondence (whether active, archived, unsent, or in an deleted
25  items folder), word processing files, spreadsheets, databases,
26  Document metadata, presentation files, and sound recordings,
27  whether stored on any cell phones, smartphones, flash drives,
28  personal digital assistants ("PDAs"), cards, desktop personal

8

computer and workstations, laptops, notebooks and other portable computers, or other electronic storage media, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether assigned to individuals or in pools of computers available for shared use, or personally owned but used for work-related purposes, whether stored on-site with the computer used to generate them, stored offsite in another company facility, or stored, hosted, or otherwise maintained off-site by a third party; and computers and related offsite storage used by Defendants or Defendants' participating associates, which may include Persons who are not employees of the company or who do not work on company premises; and

12. "**Electronic Data Host**" means any Person or entity that stores, hosts, or otherwise maintains electronically stored information;

13. "**Financial Institution**" means any bank, savings and loan institution, credit union, or any financial depository of any kind, including, but not limited to, any brokerage house, trustee, broker-dealer, escrow agent, title company, commodity trading company, or precious metal dealer;

14. "**Person**" means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity;

15. "**Plaintiffs**" means the Bureau of Consumer Financial Protection, the State of Minnesota, the State of North Carolina, and the People of the State of California;

16. "**Receiver**" means the receiver appointed in Section XII of this Order and any deputy receivers that shall be named by the receiver;

17. "**Telemarketer**" means any Person who, in connection with Telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(cc); and

_____
STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

1      18.   "**Telemarketing**" means a plan, program, or campaign (whether or
2 not covered by the TSR, 16 C.F.R. Part 310) that is conducted to induce the
3 purchase of goods or services or a charitable contribution by use of one or more
4 telephones.

5 **ORDER**

6 **I.  RESTRICTIONS ON ADVANCE FEES**

7      **IT IS FURTHER ORDERED** that, in connection with Telemarketing,
8 Defendants and their successors, assigns, officers, agents, servants, employees, and
9 attorneys, and those Persons in active concert or participation with any of them,
10 who receive actual notice of this Order by personal service, facsimile transmission,
11 email, or otherwise, whether acting directly or indirectly, are hereby preliminarily
12 restrained and enjoined from requesting or receiving payment or fees or
13 consideration for any Debt-Relief Product or Service before:

14          A. They have negotiated, settled, reduced, or otherwise altered the terms of
15               at least one Debt pursuant to a settlement agreement, Debt management
16               plan, or other such valid contractual agreement executed by the
17               customer; and

18          B. The customer has made at least one payment pursuant to that
19               agreement.

20 **II. PROHIBITED REPRESENTATIONS AND CONDUCT**

21      **IT IS FURTHER ORDERED** that Defendants and their successors,
22 assigns, officers, agents, servants, employees, and attorneys, and those Persons in
23 active concert or participation with any of them, who receive actual notice of this
24 Order by personal service, facsimile transmission, email, or otherwise, whether
25 acting directly or indirectly, in connection with the advertising, marketing,
26 promotion, offering for sale, sale, performance of any Debt-Relief Product or
27 Service, are hereby preliminarily restrained and enjoined from falsely representing,
28 or from Assisting Others who are falsely representing, expressly or by implication,

10

any material aspect of any service performed by the Defendant or any other person, including, but not limited to:

    A. The nature, purpose, or any other material aspect of any fee collected by any Defendant or any other person;

    B. That any Defendant or any other Person will or likely will help obtain forgiveness of any loan under a federal student loan forgiveness program; and

    C. That any Defendant or any other Person will or likely will help obtain lower payments on any loan under a federal student loan repayment program.

    **IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, agents, servants, employees, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service, facsimile transmission, email, or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, sale, performance of any Debt-Relief Product or Service, are hereby preliminarily restrained and enjoined from engaging in violations of the MNCFA, the MNDTPA, the NCDAA, the NCTSRA, the NCUDPA, and the UCL.

### III. PRESERVATION OF RECORDS AND TANGIBLE THINGS

    **IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, agents, servants, employees, independent contractors, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service, facsimile transmission, email, or otherwise, whether acting directly or indirectly are hereby preliminarily enjoined from destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any Documents or

11

1  records that relate to the business practices, or business or personal finances of any
2  Defendant, or other entity directly or indirectly under the control of any Defendant.

3                                  **IV.   WEBSITES**

4        **IT IS FURTHER ORDERED** that, immediately upon service of this Order
5  upon them and to the extent not already done so pursuant to the TRO, (1) any
6  Person hosting any Internet website for, or on behalf of, any Defendant, and (2)
7  Defendants and their successors, assigns, officers, agents, servants, employees,
8  independent contractors, and attorneys, and those Persons in active concert or
9  participation with any of them, who receive actual notice of this order by personal
10  service, facsimile transmission, email, or otherwise, whether acting directly or
11  through any corporation, subsidiary, division, or other device, shall:

12        A. Prevent the destruction or erasure of any Internet website used by
13            Defendants for the advertising, marketing, promotion, offering for sale,
14            sale, or performance of any Debt-Relief Service, by preserving such
15            website in the format in which it is maintained currently; and
16        B. Immediately notify Plaintiffs' counsel, in writing, of any other Internet
17            website operated or controlled by any Defendant.

18            **V.   INTERNET DOMAIN NAME REGISTRATIONS**

19        **IT IS FURTHER ORDERED** that upon service of this Order and to the
20  extent not already done so pursuant to the TRO, any domain name registrar shall
21  provide immediate notice to Plaintiffs' counsel of any Internet domain names
22  registered or controlled by any Defendants.

23                              **VI.   ASSET FREEZE**

24        **IT IS FURTHER ORDERED** that Receivership Defendants, Individual
25  Defendants, or Relief Defendants, and their successors, assigns, officers, agents,
26  servants, employees, independent contractors, and attorneys, and all Persons
27  directly or indirectly under the control of any of them, including any Financial
28  Institution, and all other Persons in active concert or participation with any of

12

_____
STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND
OTHER EQUITABLE RELIEF

1   them, who receive actual notice of this Order by personal service, facsimile, email,

2   or otherwise, are hereby preliminarily restrained and enjoined from directly or

3   indirectly:

4       A. Selling, liquidating, assigning, transferring, converting, loaning,

5          hypothecating, disbursing, gifting, conveying, encumbering, pledging,

6          concealing, dissipating, spending, withdrawing, or otherwise disposing of

7          any Asset that is:

8          1. owned or controlled, directly or indirectly, by any Defendant,

9             including, but not limited to those for which a Defendant is a

10             signatory on the account;

11          2. held, in part or in whole, for the benefit of any Defendant

12          3. in the actual or constructive possession of any Defendant; or

13          4. in the actual or constructive possession of, or owned or controlled

14             by, or subject to access by, or belonging to, any corporation,

15             partnership, trust or other entity directly or indirectly owned,

16             managed or controlled by any Defendant; and

17       B. Opening, or causing to be opened, any safe deposit box, commercial mail

18          box, or storage facility belonging to, for the use or benefit of, controlled

19          by, or titled in the name of any Defendant or subject to access by any

20          Defendant;

21       C. Incurring charges or cash advances on any credit card, stored value card,

22          debit card, or charge card issued in the name, singly or jointly, of any

23          Defendant or any other entity directly or indirectly owned, managed, or

24          controlled by any Defendant;

25       D. Cashing any checks or depositing or processing any payment from any

26          Consumer, client, or customer of any Defendant; and

27       E. Incurring liens or encumbrances on real property, personal property, or

28          other Assets in the name, singly or jointly, of Defendants or of any

13

1    corporation, partnership, or other entity directly or indirectly owned,

2    managed, or controlled by any Defendant.

3    F.   Notwithstanding Section VI.D, this Order does not prevent Individual

4         Defendants from opening new bank or credit card accounts so long as

5         such accounts are funded only with monies not attributable to the

6         activities alleged in the Bureau's Complaint, and so long as the

7         Individual Defendants contemporaneously notify the Receiver and the

8         Bureau in writing of such openings, the source of the funds for any such

9         accounts, and the intended source of such funds in the future.

10        **IT IS FURTHER ORDERED** that the Assets affected by this Section shall

11   include: (a) all Assets of each Receivership Defendant, Individual Defendant, or

12   Relief Defendant, as of the time this Order is entered, and (b) those Assets

13   obtained or received after entry of this Order that are derived, directly or indirectly,

14   from the actions alleged in Plaintiffs' Complaint or actions that are prohibited by

15   this Order. This Section does not prohibit transfers to the Receiver, as specifically

16   required in Section XVI (Delivery of Receivership Property), nor does it prohibit

17   the Repatriation of Foreign Assets, as specifically required in Section X of this

18   Order, nor does it prohibit the transfers of property of the Bankruptcy Estate to the

19   Chapter 7 Trustee.

20        **VII.   RETENTION OF ASSETS AND RECORDS BY**

21        **FINANCIAL INSTITUTIONS AND OTHER THIRD PARTIES**

22        **IT IS FURTHER ORDERED** that, except as otherwise ordered by this

23   Court, any Financial Institution, brokerage, business entity, Electronic Data Host,

24   payment processor, merchant bank, payment gateway, or Person served with a

25   copy of this Order, or who otherwise has actual or constructive knowledge of this

26   Order, that has held, controlled, or maintained custody of any account, Document,

27   or Asset of, on behalf of, in the name of, for the benefit of, subject to withdrawal

28   by, subject to access or use by, or under the signatory power of any Defendant, or

14

other party subject to Section VI (Asset Freeze) above, or has held, controlled, or maintained any such account, Document, or Asset shall:

    A. Hold, preserve, and retain within such person's control, and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, liquidation, or other disposal of such account, Document, or Asset held by or under such person's control, except (1) as directed by further order of the Court; (2) as directed in writing by the Receiver regarding accounts, Documents, or Assets held in the name of or benefit of any Defendant; or (3) as directed in writing by the Chapter 7 Trustee regarding accounts and Assets held in the name of or for the benefit of the Bankruptcy Estate;

    B. Provide the Receiver, the Receiver's agents, Plaintiffs, and Plaintiffs' agents immediate access to Documents, including those electronically stored, hosted, or otherwise maintained on behalf of Defendants, for forensic imaging or copying;

    C. Deny access to any safe deposit box, commercial mail box, or storage facility belonging to, for the use or benefit of, controlled by, or titled in the name of any Defendant, or subject to access by any Defendant or other party subject to Section VI (Asset Freeze) above, except that this subsection shall not limit the Receiver's access to such places, nor shall it limit the Chapter 7 Trustee's access to such places insofar as it relates to property interests of Consumer Advocacy Center Inc. d/b/a Premier Student Loan Center;

    D. Provide to Plaintiffs' counsel, the Receiver, and to the Chapter 7 Trustee as it relates to property interests of Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, within three business day of receiving a copy of this Order, a sworn statement setting forth:

15

1.  the identification of each account or Asset titled in the name, individually or jointly, or held on behalf of or for the benefit of, subject to withdrawal by, subject to access or use by, or under the signatory power of any Defendant, or other party subject to Section VI (Asset Freeze) above, whether in whole or in part;

2.  the balance of each such account, or a description of the nature and value of such Asset, as of the close of business on the day on which this Order is served;

3.  the identification of any safe deposit box, commercial mail box, or storage facility belonging to, for the use or benefit of, controlled by, or titled in the name of any Defendant, or subject to access by any Defendant, or other party subject to Section VI (Asset Freeze) above, whether in whole or in part;

4.  if the account, safe deposit box, or other Asset has been closed or removed, the date closed or removed, the balance on said date, and the name or the Person or entity to whom such account or other Asset was remitted;

5.  Subsection VII.D does not apply to the Chapter 7 Trustee; and

E. Provide to Plaintiffs' counsel, the Receiver, and to the Chapter 7 Trustee as it relates to property interests of Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, within three business days of receiving a request, copies of all Documents pertaining to such account or Asset, including but not limited to originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; provided that such institution or custodian may charge a reasonable fee;

16

F. Cooperate with all reasonable requests of the Receiver relating to this Order's implementation;

G. The accounts subject to this provision include: (a) all Assets of each Defendant deposited as of the time this Order is entered, and (b) those Assets deposited after entry of this Order that are derived from the actions alleged in Plaintiffs' Complaint or actions prohibited by this Order. This Section does not include property of the Bankruptcy Estate under the exclusive control of the Chapter 7 Trustee in the Bankruptcy Proceeding. Further, this Section does not prohibit transfers to the Receiver, as specifically required in Section XVI (Delivery of Receivership Property), nor does it prohibit the Repatriation of Foreign Assets, as specifically required in Section X of this Order, nor does it prohibit the transfer of property of the Bankruptcy Estate to the Chapter 7 Trustee; and

H. Plaintiffs are granted leave, pursuant to Rule 45 of the Federal Rules of Civil Procedure, to subpoena Documents immediately from any Financial Institution, brokerage, business entity, Electronic Data Host, or Person served with a copy of this Order that holds, controls, or maintains custody of any account, Document, or Asset of, on behalf of, in the name of, for the benefit of, subject to access or use by, or under the signatory power of any Defendant or party subject to Section VI (Asset Freeze) above, or has held, controlled, or maintained any such account, Document, or Asset and such financial or brokerage institution, business entity, Electronic Data Host or Person shall respond to such subpoena within three business days after service. This Section does not apply to the Chapter 7 Trustee.

17

## VIII. FINANCIAL STATEMENTS AND ACCOUNTING

**IT IS FURTHER ORDERED** that as set forth below, each Receivership Defendant, Individual Defendant, and Relief Defendant, to the extent that they have not each done so pursuant to the TRO, within three (3) business days of service of this Order, shall prepare and deliver to Plaintiffs' counsel and to the Receiver:

A. For each Individual Defendant, a completed financial statement accurate as of the date of service of this Order upon such Defendant on the form of Attachment A to this Order captioned "Individual Financial Statement";

B. For each Receivership Defendant and Relief Defendant, a completed financial statement accurate as of the date of service of this Order upon such Defendant (unless otherwise agreed upon with Plaintiffs' counsel) in the form of Attachment B to this Order captioned "Corporate Financial Statement";

C. A list of all officers and directors of the Receivership Defendants and Relief Defendants and all other individuals or entities with authority to direct the operations of each Receivership Defendant and Relief Defendant or withdraw money from the account of such Defendant;

D. For each Receivership Defendant, Individual Defendant, and Relief Defendant, a statement, verified under oath, of all payments, transfers, or assignments of any Assets worth $5,000 or more since January 1, 2015. Such statements shall include: (a) the amount transferred or assigned; (b) the name of each transferee or assignee; (c) the date of the assignment or transfer; and (d) the type and amount of consideration paid by or to the Defendant. Each statement shall specify the name and address of each Financial Institution at which Receivership Defendant, Individual Defendant, or Relief Defendant, has accounts or safe deposit boxes; and

18

E. For each Receivership Defendant, Individual Defendant, and Relief Defendant, a detailed accounting, verified under oath, of all gross and net profits obtained from, derived from, or related in any way to the offer for sale or sale of any Debt-Relief Product or Service since January 1, 2015.

F. For each Receivership Defendant, Individual Defendant, and Relief Defendant, other than identifying the name and address of the Financial Institution responsive to Section 8.D, compliance with Sections 8.D and 8.E shall be based on information within each Defendants' possession, custody, and control.

## IX. CONSUMER CREDIT REPORTS

**IT IS FURTHER ORDERED** that pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1), Plaintiffs may obtain credit reports concerning any Defendant or Relief Defendant, and that, upon written request, any credit reporting agency from which such reports are requested shall provide them to Plaintiffs.

## X. REPATRIATION OF FOREIGN ASSETS

**IT IS FURTHER ORDERED** that, to the extent not already done so pursuant to the TRO, within three business days following the service of this Order, each Defendant shall:

A. Provide Plaintiffs' counsel and the Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets, accounts, and Documents outside of the territory of the United States of America that are held (1) by the Defendant; (2) for any Defendant's benefit or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, or controlled by any Defendant; (3) in trust by or for any Defendant, individually or jointly; or (4) under any Defendant's direct or indirect control, individually or jointly;

19

1    B. Transfer to the territory of the United States of America all Assets,
2       accounts, and Documents in foreign countries held (1) by any Defendant;
3       (2) for any Defendant's benefit; (3) in trust by or for any Defendant,
4       individually or jointly; or (4) under any Defendant's direct or indirect
5       control, individually or jointly;
6    C. Hold and retain all repatriated Assets, accounts, funds, and Documents,
7       and prevent any transfer, disposition, or dissipation whatsoever of any
8       such Assets, accounts, or Documents;
9    D. Provide Plaintiffs access to all records of accounts, Documents, or Assets
10      of the Receivership Defendant, Individual Defendant, or Relief
11      Defendant held by Financial Institutions or other third parties located
12      outside the territorial United States of America by signing the Consent to
13      Release of Financial Records attached to this Order as Attachment C. All
14      repatriated Assets, accounts, and Documents are subject to Section VI
15      (Asset Freeze) of this Order; and
16   E. The same business day as any repatriation, (1) notify the Receiver and
17      counsel for Plaintiffs of the name and location of the Financial Institution
18      or other entity that is the recipient of such Assets, accounts, and
19      Documents; and (2) serve this Order on any such Financial Institution or
20      other entity.
21   F. This Section does not apply to the Chapter 7 Trustee.
22   G. Section X.B above may be modified or stayed by agreement of the
23      parties without further order of the Court.
24         **XI.   NONINTERFERENCE WITH REPATRIATION**
25       **IT IS FURTHER ORDERED** that Defendants and their successors,
26   assigns, officers, agents, servants, employees, and attorneys, and those Persons in
27   active concert or participation with any of them, who receive actual notice of this
28   Order by personal service or otherwise, whether acting directly or indirectly, are

20

1  hereby preliminarily restrained and enjoined from taking any action, directly or
2  indirectly, which may result in the hindrance of the repatriation required by Section
3  X of this Order, including, but not limited to:

4       A. Sending any statement, communication, letter, fax, email or wire
5         transmission, or telephoning or engaging in any other act, directly or
6         indirectly, that results in a determination by a foreign trustee or other
7         entity that a "duress" event has occurred under the terms of a foreign
8         trust agreement until such time that all Assets have been fully repatriated
9         pursuant to Section X (Repatriation of Foreign Assets) of this Order; or
10      B. Notifying any trustee, protector, or other agent of any foreign trust or
11        other related entities of either the existence of this Order, or of the fact
12        that repatriation is required pursuant to a court order, until such time that
13        all Assets have been fully repatriated pursuant to Section X (Repatriation
14        of Foreign Assets) of this Order.

15     **XII.   MONITORING OF BUSINESS ACTIVITY BY PLAINTIFFS**
16     **IT IS FURTHER ORDERED** that agents or representatives of Plaintiffs may
17 contact Defendants directly or anonymously, posing as consumers, suppliers, or
18 other individuals or entities, without the necessity of identification or prior notice,
19 for the purpose of monitoring compliance with the injunctive provisions of this
20 Order, and may tape record any oral communications that occur in the course of
21 such contacts.

22        **XIII.  REPORT OF NEW BUSINESS ACTIVITY**
23     **IT IS FURTHER ORDERED** that Defendants, their officers, agents,
24 employees, and attorneys, and all other persons in active concert or participation
25 with any of them, who receive actual notice of this Order, whether acting directly
26 or indirectly, are hereby preliminarily restrained and enjoined from creating,
27 operating, or exercising any control over any business entity, whether newly
28 formed or previously inactive, including any partnership, limited partnership, joint

1 venture, sole proprietorship, or corporation, without first providing Plaintiffs'
2 counsel and the Receiver with a written statement disclosing: (1) the name of the
3 business entity; (2) the address and telephone number of the business entity; (3) the
4 names of the business entity's officers, directors, principals, managers, and
5 employees; and (4) a detailed description of the business entity's intended
6 activities.

7 ### XIV. APPOINTMENT OF RECEIVER

8 **IT IS FURTHER ORDERED** that Thomas W. McNamara shall continue
9 to serve as Receiver for the business activities of Receivership Defendants with the
10 full power of an equity receiver. The Receiver shall solely be the agent of this
11 Court in acting as Receiver under this Order. The Receiver shall be accountable
12 directly to this Court. The Receiver shall comply with all laws and Local Rules of
13 this Court governing federal equity receivers.

14 ### XV. DUTIES AND AUTHORITIES OF RECEIVER

15 **IT IS FURTHER ORDERED** that the Receiver is directed and authorized
16 to accomplish the following:

17     A. Assume full control of the Receivership Defendants by removing, as the
18       Receiver deems necessary or advisable, any director, officer, independent
19       contractor, employee, attorney, or agent of any of the Receivership
20       Defendants, including but not limited to any named Defendant, from
21       control of, management of, or participation in, the affairs of the
22       Receivership Defendants;

23     B. Take exclusive custody, control, and possession of all Assets and
24       Documents of, or in the possession, custody, or under the control of, the
25       Receivership Defendants, wherever situated. The Receiver will assume
26       control over the income and profits therefrom and all sums of money now
27       or hereafter due or owing to the Receivership Defendants. The Receiver
28       shall have full power to divert mail and to sue for, collect, receive, take

22

1  into possession, hold, and manage all Assets and Documents of the

2  Receivership Defendants and other Persons whose interests are now held

3  by or under the direction, possession, custody, or control of the

4  Receivership Defendants. *Provided, however,* however, that the Receiver

5  will not attempt to collect or receive any amount from a Consumer if the

6  Receiver or Plaintiffs believes the Consumer was a victim of the

7  unlawful conduct alleged in the complaint in this matter;

8  C. Take all steps necessary to secure the business premises of the

9  Receivership Defendants. Such steps may include, but are not limited to,

10  the following as the Receiver deems necessary or advisable:

11      1.  serving and filing this Order;

12      2.  completing a written inventory of all Receivership Assets;

13      3.  obtaining pertinent information from all employees and other

14          agents of the Receivership Defendants, including but not limited

15          to, the name, home address, social security number, job

16          description, method of compensation, and all accrued and unpaid

17          commissions and compensation of each such employee or agent,

18          and all computer hardware and software passwords;

19      4.  videotaping or photographing all portions of such business

20          premises;

21      5.  securing the location by changing the locks and alarm codes and

22          disconnecting any internet access or other means of access to the

23          computers, servers, internal networks, or other records maintained

24          at that location;

25      6.  requiring any Persons present on the premises at the time this

26          Order is served to leave the premises, to provide the Receiver with

27          proof of identification, or to demonstrate to the satisfaction of the

28

1      Receiver that such Persons are not removing from the premises

2      Documents or Assets of the Receivership Defendants;

3         7.  requiring all employees, independent contractors, and consultants

4      of the Receivership Defendants to complete a questionnaire

5      submitted by the Receiver; and

6      D. Conserve, hold, and manage all Receivership Defendants' Assets, and

7      perform all acts necessary or advisable to preserve the value of those

8      Assets, in order to prevent any irreparable loss, damage, or injury to

9      Consumers or to creditors of the Receivership Defendants, including, but

10      not limited to, obtaining an accounting of the Assets and preventing

11      transfer, withdrawal, or misapplication of Assets;

12      E. Liquidate any and all securities or commodities owned by or for the

13      benefit of the Receivership Defendants as the Receiver deems to be

14      advisable or necessary;

15      F. Take all steps necessary to prevent the modification, destruction, or

16      erasure of any web page or website registered to and operated, in whole

17      or in part, by any Defendant, and to provide access to all such web page

18      or websites to Plaintiffs' representatives, agents, and assistants, as well as

19      Defendants and their representatives;

20      G. Enter into contracts and purchase insurance as the Receiver deems to be

21      advisable or necessary;

22      H. Prevent the inequitable distribution of Assets and determine, adjust, and

23      protect the interests of Consumers and creditors who have transacted

24      business with the Receivership Defendants;

25      I. Manage and administer the business of the Receivership Defendants until

26      further order of this Court by performing all incidental acts that the

27      Receiver deems to be advisable or necessary, which includes retaining,

28      hiring, or dismissing any employees, independent contractors, or agents;

24

J. Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

K. Make payments and disbursements from the Receivership Defendants' estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order. The Receiver shall apply to the Court for prior approval of any payment of any Debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Defendants, such as rental payments;

L. Determine and implement measures to ensure that the Receivership Defendants comply with and prevent violations of this Order and all other applicable laws, including, but not limited to, if appropriate, revising sales materials and implementing monitoring procedures;

M. Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants, or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order, including but not limited to actions challenging fraudulent or voidable transfers, *provided, however*, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer's liability to the Receivership Entities has resulted from the violations of law alleged in the Complaint in this matter, without prior Court approval;

N. Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Receiver in

25

his or her role as Receiver, or against the Receivership Defendants, that the Receiver deems necessary and advisable to preserve the Assets of the Receivership Defendants or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

O. Continue and conduct the business of the Receivership Defendants in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; *provided, however*, that the continuation and conduct of the business shall be conditioned upon the Receiver's good faith determination that the businesses can be lawfully operated at a profit using the Assets of the Receivership Defendants' estate;

P. Take depositions and issue subpoenas to obtain Documents and records pertaining to the receivership estate and compliance with this Order. Subpoenas may be served by agents or attorneys of the Receiver and by agents of any process server retained by the Receiver;

Q. Open one or more bank accounts as designated depositories for funds of the Receivership Defendants. The Receiver shall deposit all funds of the Receivership Defendants in such a designated account and shall make all payments and disbursements from the receivership estate from such account(s);

R. Maintain accurate records of all receipts and expenditures that made as Receiver;

S. Cooperate with reasonable and lawful requests for information or assistance from any state or federal law enforcement agency;

T. If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court. Provided, however, that the Receiver may delay providing such

26

1        notice until the Receiver has established control of the nonparty entity

2        and its Assets and records, if the Receiver determines that notice to the

3        entity may result in the destruction of records, dissipation of Assets, or

4        any other obstruction of the Receiver's control of the entity;

5   U. Maintain the chain of custody of all of Defendants' records in their

6        possession;

7   V. Notify all courts in which Receivership Defendants have litigation

8        pending, that this case is pending, and request temporary stays, where

9        appropriate, of those cases or any other necessary relief to preserve the

10       rights of Consumers; and

11  W. If in the Receiver's judgment the business operations cannot be continued

12       legally and profitably, take all steps necessary to ensure that any of the

13       Receivership Entities' web pages or websites relating to the activities

14       alleged in the Complaint cannot be accessed by the public, or are

15       modified solely for consumer education and/or informational purposes,

16       and take all steps necessary to ensure that any telephone numbers

17       associated with the Receivership Entities cannot be accessed by the

18       public, or are answered solely to provide consumer education or

19       information regarding the status of operations.

20 **XVI. CONTINUING ACCESS TO BUSINESS PREMISES AND RECORDS**

21      **IT IS FURTHER ORDERED** that, consistent with Section XIV of the

22 TRO, that Plaintiffs, the Receiver, and their respective representatives, agents,

23 contractors, or assistants, and the Chapter 7 Trustee as it relates to property of the

24 Bankruptcy Estate, are granted continued access to the Receivership Defendants'

25 business premises and records.

26

27

28

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

## XVII. COOPERATION WITH RECEIVER

**IT IS FURTHER ORDERED** that:

A. Receivership Defendants, Individual Defendants, and Relief Defendants and their successors, assigns, officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, and corporations, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, or any of them, shall fully cooperate with and assist the Receiver. Receivership Defendants', Individual Defendants', and Relief Defendants' cooperation and assistance shall include, but not be limited to:

    1. Providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this Order, including but not limited to allowing the Receiver to inspect Documents and Assets and to partition office space;

    2. Providing any username or password and executing any Documents required to access any computer or electronic files in any medium, including but not limited to Electronically Stored Information stored, hosted, or otherwise maintained by an Electronic Data Host;

    3. Advising all Persons who owe money to the Receivership Defendants that all Debts should be paid directly to the Receiver; and

B. Receivership Defendants, Individual Defendants, and Relief Defendants and their successors, assigns, officers, directors, agents, servants, employees, attorneys, and all other Persons or entities directly or

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

1  indirectly, in whole or in part, under their control, and all other Persons in
2  active concert or participation with them, who receive actual notice of
3  this Order by personal service or otherwise, shall not interfere in any
4  manner, directly or indirectly with the custody possession, management,
5  or control by the Receiver of Assets and Documents, and are hereby
6  preliminarily restrained and enjoined from directly or indirectly:

7     1.  Transacting any of the business of the Receivership Defendants;
8     2.  Destroying, secreting, erasing, mutilating, defacing, concealing,
9         altering, transferring or otherwise disposing of, in any manner,
10        directly or indirectly, any Documents or equipment of Defendants,
11        including but not limited to contracts, agreements, Consumer files,
12        Consumer addresses and telephone numbers, correspondence,
13        advertisements, brochures, sales material, sales presentations,
14        Documents evidencing or Defendants' services, training materials,
15        scripts, data, computer tapes, disks, or other computerized records,
16        books, written or printed records, handwritten notes, telephone
17        logs, "verification" or "compliance" tapes or other audio or video
18        tape recordings, receipt books, invoices, postal receipts, ledgers,
19        personal and business canceled checks and check registers, bank
20        statements, appointment books, copies of federal, state or local
21        business or personal income or property tax returns, photographs,
22        mobile devices, electronic storage media, accessories, and any
23        other Documents, records or equipment of any kind that relate to
24        the business practices or business or personal finances of the
25        Defendants or any other entity directly or indirectly under the
26        control of the Defendants;
27     3.  Transferring, receiving, altering, selling, encumbering, pledging,
28        assigning, liquidating, or otherwise disposing of any Assets owned,

29

controlled, or in the possession or custody of, or in which an
interest is held or claimed by, the Receivership Defendants, or the
Receiver;

4. Excusing Debts owed to the Receivership Defendants;

5. Failing to notify the Receiver of any Asset, including accounts, of
a Receivership Defendant held in any name other than the name of
the Receivership Defendant, or by any Person or entity other than
the Receivership Defendant, or failing to provide any assistance or
information requested by the Receiver in connection with
obtaining possession, custody, or control of such Assets;

6. Failing to create and maintain books, records, and accounts which,
in reasonable detail, accurately, fairly, and completely reflect the
incomes, assets, disbursements, transactions and use of monies by
the Defendants or any other entity directly or indirectly under the
control of the Defendants;

7. Doing any act or refraining from any act whatsoever to interfere
with the Receiver's taking custody, control, possession, or
managing of the Assets or Documents subject to this Receivership;
or to harass or to interfere with the Receiver in any way; or to
interfere in any manner with the exclusive jurisdiction of this Court
over the Assets or Documents of the Receivership Defendants; or
to refuse to cooperate with the Receiver or the Receiver's duly
authorized agents in the exercise of their duties or authority under
any Order of this Court; and

8. Filing, or causing to be filed, any petition on behalf of the
Receivership Defendants for relief under the United States
Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, or of any similar

30

1    insolvency proceeding on behalf of the Receivership Defendants,

2    without prior approval of the Receiver and the Court.

3    **XVIII.    DELIVERY OF RECEIVERSHIP PROPERTY**

4    **IT IS FURTHER ORDERED** that, to the extent not already done so

5    pursuant to the TRO, immediately upon service of this Order upon them or upon

6    their otherwise obtaining actual knowledge of this Order (or within a period

7    permitted by the Receiver), Defendants, and any other Person or entity, including

8    but not limited to Financial Institutions and Electronic Data Hosts, shall transfer or

9    deliver access to possession, custody, and control of the following to the Receiver:

10    A. All Assets held by or for the benefit of the Receivership Defendants;

11    B. All Documents of the Receivership Defendants, including but not limited

12         to books and records of accounts, all financial and accounting records,

13         balance sheets, income statements, bank records (including monthly

14         statements, canceled checks, records of wire transfers, records of ACH

15         transactions, and check registers), client or customer lists, title

16         Documents and other papers;

17    C. All Assets belonging to members of the public now held by the

18         Receivership Defendants;

19    D. All keys, computer and other passwords, user names, entry codes,

20         combinations to locks required to open or gain or secure access to any

21         Assets or Documents of or pertaining to the Receivership Defendants,

22         wherever located, including, but not limited to, access to their business

23         premises, means of communication, accounts, computer systems (onsite

24         and remote), Electronic Data Hosts, or other property;

25    E. All Assets and Documents belonging to other Persons or entities whose

26         interests are under the direction, possession, custody, or control of the

27         Receivership Entities; and

28

31

1       F.  Information identifying the accounts, employees, properties, or other

2           Assets or obligations of the Receivership Defendants.

3       G.  This Section does not apply to the Chapter 7 Trustee or property of the

4           Bankruptcy Estate.

5      **IT IS FURTHER ORDERED** that, in the event any Person or entity fails to

6  deliver or transfer immediately any Asset or otherwise fails to comply with any

7  provision of this Section, the Receiver may file *ex parte* with the court an Affidavit

8  of Non-Compliance regarding the failure. Upon filing of the affidavit, the Court

9  may authorize, without additional process or demand, Writs of Possession or

10  Sequestration or other equitable writs requested by the Receiver. The writs shall

11  authorize and direct the United States Marshal, any Deputy United States Marshal,

12  the Federal Bureau of Investigation, the Internal Revenue Service, or any sheriff or

13  deputy sheriff of any county to seize the Asset, Document, or other thing and to

14  deliver it to the Receiver.

15               **XIX.  NON-INTERFERENCE WITH RECEIVER**

16      **IT IS FURTHER ORDERED** that the Receivership Defendants, their officers,

17  agents, employees, attorneys, and all other persons in active concert or

18  participation with any of them, who receive actual notice of this Order, are hereby

19  preliminarily restrained and enjoined from directly or indirectly:

20       A.  Interfering with the Receiver's efforts to manage, or take custody,

21           control, or possession of, the Assets or Documents subject to the

22           receivership;

23       B.  Transacting any of the business of the Receivership Entities;

24       C.  Transferring, receiving, altering, selling, encumbering, pledging,

25           assigning, liquidating, or otherwise disposing of any Assets owned,

26           controlled, or in the possession or custody of, or in which the interest is

27           held or claimed by, the Receivership Entities; or

28

32

D. Refusing to cooperate with the Receiver or the Receiver's duly
authorized agents in the exercise of their duties or authority under any
order of this Court.

### XX.   COMPENSATION FOR RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by
the Receiver as herein authorized, including counsel to the Receiver and
accountants, are entitled to reasonable compensation for the performance of duties
pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred
by them, from the Assets now held by or in the possession or control of, or which
may be received by, the Receivership Defendants. The Receiver shall file with the
Court and serve on the parties periodic requests for the payment of such reasonable
compensation, with the first such request filed no more than sixty (60) days after
the date of this Order. The Receiver shall not increase the hourly rates used as the
bases for such fee applications without prior approval of the Court.

### XXI.  RECEIVER'S REPORTS

**IT IS FURTHER ORDERED** that to the extent not already done, the
Receiver shall report to this Court: (1) the steps taken by the Receiver to
implement the terms of this Order; (2) the value of all liquidated and unliquidated
assets of the Receivership Defendants; (3) the sum of all liabilities of the
Receivership Defendants; (4) the steps the Receiver intends to take in the future to
(a) prevent any diminution in the value of assets of the Receivership Defendants,
(b) pursue receivership assets from third parties, and (c) adjust the liabilities of the
Receivership Defendants, if appropriate; (5) the Receiver's assessment of whether
the business can be operated in compliance with this Order; and (6) any other
matters that the Receiver believes should be brought to the Court's attention.
Provided, however, that if any of the required information would hinder the
Receiver's ability to pursue receivership assets, the portions of the Receiver's

33

1  report containing such information may be filed under seal and not served on the

2  parties.

3  **XXII. TURNOVER OF PROPERTY OF THE BANKRUPTCY ESTATE**

4  **IT IS FURTHER ORDERED** that to the extent that Plaintiff or the Receiver

5  come into possession of property of the Bankruptcy Estate, such property shall be

6  turned over to the Chapter 7 Trustee as soon as it is reasonably possible to do so.

7  **XXIII.        WITHDRAWAL OF RECEIVER**

8  **IT IS FURTHER ORDERED** that the Receiver and any professional

9  retained by the Receiver, including but not limited to his or her attorneys and

10  accountants, be and are hereby authorized to reasonably withdraw from his or her

11  respective appointments or representations and apply for payment of their

12  professional fees and costs at any time after the date of this Order by sending

13  written notice seven days prior to the date of the intended withdrawal to the Court

14  and to the parties along with a written report reflecting the Receiver's work,

15  findings, and recommendations, as well as an accounting for all funds and Assets

16  in possession or control of the Receiver. The Receiver shall be exonerated and the

17  receivership deemed closed seven days from the date of the mailing of such notice

18  of withdrawal. The Court will retain jurisdiction to consider the fee applications,

19  report, and accounting submitted by the Receiver and the professionals. The

20  written notice shall include an interim report indicating the Receiver's actions and

21  reflect the knowledge gained along with the fee applications of the Receiver and

22  his or her professionals. The report shall also contain the Receiver's

23  recommendations, if any.

24  **XXIV.        RECEIVER'S BOND/LIABILITY**

25  **IT IS FURTHER ORDERED** that no bond shall be required in connection

26  with the appointment of the Receiver. Except for an act of gross negligence, the

27  Receiver and the professionals shall not be liable for any loss or damage suffered

28  by any of the Defendants, their officers, agents, servants, employees, and attorneys

1 or any other person, by reason of any act performed or omitted to be performed by
2 the Receiver and the professionals in connection with the discharge of his or her
3 duties and responsibilities, including but not limited to their withdrawal from the
4 case under Section XXIII.

## XXV. PROHIBITION ON RELEASE OF CONSUMER INFORMATION

7     **IT IS FURTHER ORDERED** that, except as required by a law
8 enforcement agency, law, regulation, or court order, Defendants, and their
9 successors, assigns, officers, agents, servants, employees, and attorneys, and all
10 other Persons in active concert or participation with any of them, who receive
11 actual notice of this Order by personal service or otherwise, are preliminarily
12 restrained and enjoined from disclosing, using, or benefitting from Consumer
13 information, including the name, address, telephone number, email address, social
14 security number, other identifying information, or any data that enables access to a
15 Consumer's account (including a credit card, bank account, or other financial
16 account), of any person, which any Defendant obtained prior to entry of this Order
17 in connection with any Debt-Relief Product or Service.

## XXVI. STAY OF ACTIONS

19     **IT IS FURTHER ORDERED** that:

20     A. Except by leave of this Court, during pendency of the Receivership
21         ordered herein, Defendants are hereby stayed from taking any action for,
22         against, on behalf of, or in the name of any of the following: the
23         Receivership Defendants, any of their subsidiaries, affiliates,
24         partnerships, Assets, Documents, or the Receiver or the Receiver's duly

35

authorized agents acting in their capacities as such. Such hereby-stayed
actions include, but are not limited to, the following:

1. Commencing, prosecuting, continuing, entering, or enforcing any
   suit or proceeding, except that such actions may be filed to toll any
   applicable statute of limitations;

2. Attempting to foreclose, forfeit, alter, or terminate any interest in
   any Asset, whether such acts are part of a judicial proceeding, are
   acts of self-help, or otherwise;

3. Executing, issuing, serving, or causing the execution, issuance, or
   service of, any legal process, including, but not limited to,
   attachments, garnishments, subpoenas, writs of replevin, writs of
   execution, or any other form of process whether specified in this
   Order or not; or

4. Doing any act or thing whatsoever to interfere with the Receiver
   taking custody, control, possession, or management of the Assets
   or Documents subject to the Receivership, or to harass or interfere
   with the Receiver in any way, or to interfere in any manner with
   the exclusive jurisdiction of this Court over the Assets or
   Documents of the Receivership Defendants; and

B. Except by leave of this Court, during pendency of the Receivership
   ordered herein, all creditors, lessors, customers, employees, and other
   persons seeking to establish or enforce any claim, right, or interest
   against Receivership Defendants, and all others acting for or on behalf of
   such persons, are enjoined from taking action that would interfere with
   the exclusive jurisdiction of this Court over the Assets or Documents of
   the Receivership Defendants, including:

   1. Commencing, prosecuting, or continuing a judicial, administrative,
      or other action or proceeding against the Receivership Defendants,

1    including the issuance of employment of process against the

2    Receivership Defendants, except that such actions may be

3    commenced if necessary to toll any applicable statute of

4    limitations; or

5        2.  Filing or enforcing any lien on any asset of the Receivership

6    Defendants, taking or attempting to take possession, custody, or

7    control of any Asset of the Receivership Defendants; or attempting

8    to foreclose, forfeit, alter, or terminate any interest in any Asset of

9    the Receivership Defendants, whether such acts are part of a

10   judicial proceedings, or acts of self-help, or otherwise.

11   C.  This Section does not stay:

12       1.  The commencement or continuation of a criminal action or

13   proceeding;

14       2.  The commencement or continuation of an action or proceeding by

15   a state bar association to enforce its police or regulatory power;

16       3.  The commencement or continuation of an action or proceeding by

17   a governmental unit to enforce such governmental unit's police or

18   regulatory power;

19       4.  The enforcement of a judgment, other than a money judgment,

20   obtained in an action or proceeding by a governmental unit to

21   enforce such governmental unit's police or regulatory power;

22       5.  The Bankruptcy Proceeding or any action of the Chapter 7 Trustee

23   with respect to property of the Bankruptcy Estate; or

24       6.  The issuance to a Receivership Defendant of a notice of tax

25   deficiency; and

26   D.  Except as otherwise provided in this Order, all Persons and entities in

27   need of Documentation from the Receiver shall in all instances first

28   attempt to secure such information by submitting a formal written request

37

1    to the Receiver, and, if such request has not been responded to within

2    thirty days of receipt by the Receiver, any such Person or entity may

3    thereafter seek an Order of this Court with regard to the relief requested.

4    **XXVII.    RESOLUTION OF BANKRUPTCY PROCEEDING**

5    **IT IS FURTHER ORDERED** that, should the Bankruptcy Proceeding be

6    dismissed during the pendency of this action, CAC will become a Receivership

7    Defendant and the property of the Bankruptcy Estate shall revert to the exclusive

8    control of the Receiver and will be deemed Assets subject to the provisions of this

9    Order.

10    **XXVIII.    LIMITED EXPEDITED DISCOVERY**

11    **IT IS FURTHER ORDERED** that Plaintiffs are granted leave to conduct

12    certain expedited discovery, and that, commencing with the time and date of this

13    Order until a Rule 16(b) scheduling order is issued, in lieu of the time periods,

14    notice provisions, and other requirements of Rules 19, 26, 30, 34, and 45 of the

15    Federal Rules of Civil Procedure, and applicable Local Rules, Plaintiffs and the

16    Receiver are granted leave to:

17    A. Take the deposition, on three days' notice, of any Person or entity,

18        whether or not a party, for the purpose of discovering: (1) the nature,

19        location, status, and extent of Assets of Defendants or their affiliates or

20        subsidiaries; (2) the nature, location, and identity of participants in

21        Defendants' business transactions and operations; 3) the nature and

22        location of Documents and business records of Defendants or their

23        affiliates or subsidiaries: and (4) compliance with this Order. The

24        limitations and conditions set forth in Rules 30(a)(2) and 31(a)(2) of the

25        Federal Rules of Civil Procedure regarding subsequent depositions shall

26        not apply to depositions taken pursuant to this Section. In addition, any

27        such depositions taken pursuant to this Section shall not be counted

28        toward the ten deposition limit set forth in Rules 30(a)(2)(A)(i) and

38

31(a)(2)(A)(i) of the Federal Rules of Civil Procedure and shall not preclude Plaintiffs from subsequently deposing the same Person or entity in accordance with the Federal Rules of Civil Procedure. Service of discovery upon a party, taken pursuant to this Section, shall be sufficient if made by facsimile, email or by overnight delivery.

B. Serve upon parties requests for production or inspection of Documents, or interrogatories that require production, inspection, or interrogatory responses within three calendar days of service, and may serve subpoenas upon non-parties that direct production, inspection, or responses to interrogatories within five calendar days of service, for the purpose of discovering: 1) the nature, location, status, and extent of Assets of Defendants or their affiliates or subsidiaries; (2) the nature, location, identify of participants, and extent of Defendants' transactions; (3) the nature and location of Documents and business records of Defendants or their affiliates or subsidiaries; and (4) enforcing compliance with this Order, *provided that* twenty-four hours' notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only as electronic data;

C. Serve deposition notices and other discovery requests upon the parties to this action by facsimile or overnight courier, and take depositions by telephone or other remote electronic means;

D. If a Defendant fails to appear for a properly noticed deposition or fails to comply with a request for production or inspection, seek to prohibit that Defendant from introducing evidence at any subsequent hearing;

E. Any expedited discovery taken pursuant to this Section is in addition to, and is not subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local Rules of this Court. The expedited

_____
STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

1    discovery permitted by this Section does not require a meeting or
2    conference of the parties, pursuant to Fed. R. Civ. P. 26(d) & (f); and
3    F.  The Parties are exempted from making initial disclosures under Fed. R.
4        Civ. P. 26(a)(1) until further order of this Court. This Section does not
5        apply to the Chapter 7 Trustee.

6    **XXIX.    DEFENDANTS' DUTY TO DISTRIBUTE ORDER**

7    **IT IS FURTHER ORDERED** that Defendants shall immediately provide a
8    copy of this Order to each affiliate, subsidiary, division, sales entity, successor,
9    assign, officer, director, employee, independent contractor, client company,
10   Electronic Data Host, agent, authorized signatory to bank accounts, attorney,
11   spouse, and representative of Defendants and shall, within three calendar days
12   from the date of entry of this Order, provide Plaintiffs' counsel with a sworn
13   statement that: (a) confirms that Defendants have provided copies of the Order as
14   required by this Section and (b) lists the names and addresses of each entity or
15   Person to whom Defendants provided a copy of the Order. Furthermore,
16   Defendants shall not take any action that would encourage officers, agents,
17   directors, employees, salespersons, independent contractors, attorneys,
18   subsidiaries, affiliates, successors, assigns, or other Persons or entities in active
19   concert or participation with Defendants to disregard this Order or believe that they
20   are not bound by its provisions.  This Section does not apply to the Chapter 7
21   Trustee.

22   **XXX. DURATION OF ORDER**

23   **IT IS FURTHER ORDERED** that this Order shall expire upon entry of a
24   final judgment in this case.

25

26   **XXXI.    CORRESPONDENCE WITH PLAINTIFFS**

27   **IT IS FURTHER ORDERED** that, for the purposes of this Order, because
28   mail addressed to the Bureau is subject to delay due to heightened security

_____

1  screening, all correspondence and service of pleadings on Plaintiff Bureau of
2  Consumer Financial Protection shall be sent either via electronic submission
3  through the court's electronic filing system or via commercial overnight express
4  delivery to:

5       Bureau of Consumer Financial Protection
6       Office of Enforcement
7       1700 G Street, NW
8       Washington, DC 20552
9       ATTN: Sarah Preis
10      Email: Sarah.Preis@cfpb.gov; Jesse.Stewart@cfpb.gov

11      **IT IS FURTHER ORDERED** that, for the purposes of this Order, all
12 correspondence and service of pleadings on Plaintiffs State of Minnesota, State of
13 North Carolina, and People of the State of California shall be sent either via
14 electronic submission through the Court's electronic filing system or email or
15 addressed to:

16      Evan S. Romanoff
17      Assistant Attorney General
18      Minnesota Attorney General's Office
19      445 Minnesota Street, Suite 1200
20      St. Paul, Minnesota 55101-2130
21      Email: Evan.Romanoff@ag.state.mn.us
22
23      M. Lynne Weaver
24      Special Deputy Attorney General
25      North Carolina Department of Justice
26      114 W. Edenton Street
27      Raleigh, NC 27603
28      Email: lweaver@ncdoj.gov

41

1

2      Christina V. Tusan

3      Supervising Deputy City Attorney

4      Office of the City Attorney

5      200 N. Main Street, 500 City Hall East

6      Los Angeles, CA 90012-4131

7      Email: christina.tusan@lacity.org

8                   **XXXII.     SERVICE OF THIS ORDER**

9           **IT IS FURTHER ORDERED** that copies of this Order may be served by

10   facsimile transmission, email, personal or overnight delivery, or US Mail, by

11   Plaintiffs' agents and employees or any local, state, or federal law enforcement

12   agency or by private process server, upon any Financial Institution or other entity

13   or Person that may have possession, custody, or control of any Documents or

14   Assets of any Defendant, or that may otherwise be subject to any provision of this

15   Order. Service upon any branch, subsidiary, affiliate, or office shall effect service

16   upon the entire entity.

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

## XXXIII. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes of construction, modification, and enforcement of this Order.

**SO ORDERED**, this 15th day of November, 2019, at 12:59 p.m.

_____
The Honorable James V. Selna
United States District Judge

43

# <u>EXHIBIT "C"</u>

| | | | In re: Consumer Advocacy Center, Inc. | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Case No. 19-10655-JKO | | | | | |
| | | | | | | | | |
| | | | Transfers to Anan Enterprise, Inc. | | | | | |
| | | | for the period January 16, 2015 through January 16, 2019 | | | | | |
| | | | | | | | | |
| | | | *(Sorted by Date)* | | | | | |
| | | | | | | | | |
| **Bank** | **Account Name** | **Account No.** | **Date** | **Transaction Type** | **Check No.** | **Payee** | **Amount** | |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 04/11/17 | Check | 1559 | Anan Enterprise, Inc | $ | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 04/18/17 | Check | 1564 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 04/25/17 | Check | 1565 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 05/02/17 | Check | 1566 | Anan Enterprise, Inc | | (50,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 05/09/17 | Check | 1567 | Anan Enterprise, Inc | | (50,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 05/16/17 | Check | 1568 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 05/23/17 | Check | 1569 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 05/31/17 | Check | 1625 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 06/06/17 | Check | 1626 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 06/13/17 | Check | 1627 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 06/20/17 | Check | 1628 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 06/27/17 | Check | 1629 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/27/17 | Check | 1692 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/08/17 | Check | 1695 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/15/17 | Check | 1694 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/22/17 | Check | 1690 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 09/06/17 | Check | 1722 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 09/13/17 | Check | 1693 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 10/03/17 | Check | 1691 | Anan Enterprise, Inc | | (30,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 10/11/17 | Check | 1787 | Anan Enterprise, Inc | | (50,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 10/16/17 | Wire | N/A | Anan Enterprise, Inc | | (50,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 10/25/17 | Wire | N/A | Anan Enterprise, Inc | | (50,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 10/30/17 | ACH | N/A | Anan Enterprise, Inc | | (80,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 11/06/17 | ACH | N/A | Anan Enterprise, Inc | | (50,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 11/13/17 | ACH | N/A | Anan Enterprise, Inc | | (50,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 11/17/17 | Wire | N/A | Anan Enterprise, Inc | | (50,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 11/22/17 | ACH | N/A | Anan Enterprise, Inc | | (80,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 11/28/17 | ACH | N/A | Anan Enterprise, Inc | | (80,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 12/04/17 | ACH | N/A | Anan Enterprise, Inc | | (80,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 12/11/17 | ACH | N/A | Anan Enterprise, Inc | | (80,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 12/18/17 | ACH | N/A | Anan Enterprise, Inc | | (78,600) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 12/28/17 | Check | 1936 | Anan Enterprise, Inc | | (80,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 12/28/17 | Check | 1939 | Anan Enterprise, Inc | | (80,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 12/28/17 | Check | 1937 | Anan Enterprise, Inc | | (80,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 01/26/18 | Wire | N/A | Anan Enterprise, Inc | | (14,400) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/09/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/16/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/23/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/30/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/06/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/13/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/20/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/27/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 09/04/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 09/10/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| | | | | | | **TOTAL** | **$ (3,643,000)** | |

# EXHIBIT "D"

| | In re: Consumer Advocacy Center, Inc. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Case No. 19-10655-JKO | | | | | | | |
| | | | | | | | | |
| | Transfers to Anan Enterprise, Inc. | | | | | | | |
| | for the period January 16, 2018 through January 16, 2019 | | | | | | | |
| | | | | | | | | |
| | *(Sorted by Date)* | | | | | | | |
| | | | | | | | | |
| **Bank** | **Account Name** | **Account No.** | **Date** | **Transaction Type** | **Check No.** | **Payee** | | **Amount** |
| | | | | | | | | |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 01/26/18 | Wire | N/A | Anan Enterprise, Inc | $ | (14,400) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/09/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/16/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/23/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 07/30/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/06/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/13/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/20/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 08/27/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 09/04/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| Chase | Consumer Advocacy Center Inc. | 628611522 | 09/10/18 | ACH | N/A | Anan Enterprise, Inc | | (200,000) |
| | | | | | | **TOTAL** | **$ (2,014,400)** | |