**SECOND SUPPLEMENTAL DECLARATION OF KAINE WEN**

I, Kaine Wen, declare as follows:

1. I am a defendant in *Bureau of Consumer Financial Protection, et al. v. Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al.*, Case No. 8:19-cv-01998 MWF (KSx) (the "CFPB Action"). I make this Second Supplemental Declaration in response to Venable LLP's ("Venable") *In Camera* Supplemental Brief in Support of *In Camera* Submission Re: Motion to Withdraw. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently thereto.

2. In making this Second Supplemental Declaration, I have no intent to waive the attorney-client privilege, any joint defense privilege, or any other privilege applicable to my communications with Venable and its attorneys.

3. Albert Kim ("Albert") and I entered into a retainer agreement with Venable, and namely partners Allyson Baker ("Allyson") and Gerald Sachs ("Gerry"), on approximately October 25, 2019, to represent us jointly in the CFPB Action, together with a number of companies with which we were affiliated.

4. As the timeline of relevant events below demonstrates, Venable's Motion to Withdraw was all about wanting more money from me and Albert, and not about an unwaivable (or any other) conflict of interest between us.

5. It was only after Venable demanded more money from me and Albert (after we had already paid it $535,000 to represent us in the litigation), and in response to those demands we began requesting our monthly invoices and questioning Venable's bills and

1

billing practices, that in late July 2020 Venable told us it had an unwaivable conflict of interest and needed to withdraw as counsel for both of us for that reason.

6. Moreover, it was only after I recently sent Venable a series of questions asking about its alleged conflict that, in an August 16 email, Venable claimed the conflict had arisen two months earlier, on June 20 or 21, supposedly as a result of a telephone conversation I had with Gerry.

7. Venable's claim is clearly not true. In fact, after June 21, Venable repeatedly asked me and Albert for more money to continue to represent us, without mentioning a conflict or my June 20 or 21 call with Gerry that supposedly gave rise to the conflict. In addition, Venable threatened to withdraw as our counsel on several occasions unless it received that additional money, not because of any purported conflict; told us on July 16 that it had no current conflict; did not tell us it had an unwaivable conflict until July 21; waited until July 24 to file its Motion to Withdraw; continued to say it can represent us in settlement negotiations but not in the litigation, while refusing to explain to us the distinction; and did not inform us that the origin of the conflict was a call on June 20 or 21 until Gerry's August 16 email.

8. As I believe the following timeline shows, Venable has tried to manufacture a conflict between me and Albert to justify its misconduct and Motion to Withdraw, which it filed at a critical time in the midst of the settlement negotiations and just a few days before responses to the Complaint were due. I believe the timeline also shows that Venable has not been truthful with me and Albert, or the Court, in explaining its real reasons for moving to withdraw.

**Pertinent Provisions of the Venable Engagement Letter**

9. Venable's engagement letter, dated October 29, 2019[1], includes the following provisions pertinent to the issues before the Court:

 a. "Venable will jointly represent Kaine Wen, Albert Kim, True Count Staffing, Infinite Management Corp. (f/k/a Infinite Management Solutions, Inc.), All Out Staffing, Inc., Hold The Door Corp., and Prime Consulting, Inc., in connection with defense in the matter *Consumer Fraud Protection Bureau v. Consumer Advocacy Center, et al.* filed in the U.S. District Court for the Central District of California (8:19-CV-01998). (the "Matter")"

 b. "As noted above, Venable is being engaged by Kaine Wen, Albert Kim, True Count Staffing, Infinite Management Corp. (f/k/a Infinite Management Solutions, Inc.), All Out Staffing, Inc., Hold The Door Corp., and Prime Consulting, Inc., to jointly represent them together."

 c. "In connection with this Matter, after discussion and the opportunity to obtain independent legal advice about a joint representations, Kaine Wen, Albert Kim, True Count Staffing, Infinite Management Corp. (f/k/a Infinite Management Solutions, Inc.), All Out Staffing, Inc., Hold The Door Corp., and Prime Consulting, Inc., have determined that their interests are aligned in the Matter, that they can work cooperatively together, and that there are strategic and economic reasons for Venable to represent jointly all parties in the Matter."

 d. "We have discussed whether any actual or potential conflicts exist between or among Kaine Wen, Albert Kim, True Count Staffing, Infinite Management Corp. (f/k/a Infinite Management Solutions, Inc.), All Out Staffing, Inc., Hold The Door Corp., and Prime Consulting, Inc., concerning the Matter, and none of us are aware of any such conflicts at this time. We have agreed that, based on what we currently know, it is unlikely that any actual or potential conflict will arise in the future between or among Kaine Wen, Albert Kim, True Count Staffing, Infinite Management Corp. (f/k/a Infinite Management Solutions, Inc.), All Out Staffing, Inc., Hold The Door Corp., and Prime Consulting, Inc., concerning the Matter. As a result, Kaine Wen, Albert Kim, True Count Staffing, Infinite Management Corp. (f/k/a Infinite Management Solutions, Inc.), All Out Staffing, Inc., Hold The Door Corp., and Prime Consulting, Inc., have independently determined that it is in their individual

---

[1] Neither Albert nor I signed Venable's engagement letter, nor did we receive a copy signed by Allyson or Gerry. The engagement letter states: "If we do not receive from you a signed copy of this letter or a written response to this letter and our Terms of Engagement within twenty-one (21) days of the date of this letter, we will assume that this letter and the Terms of Engagement are acceptable to you, and they shall govern our relationship as though signed by you."

and mutual interests to have a single law firm represent them jointly in connection with the Matter."

  e. "In connection with this joint representation, Venable will send its monthly invoices to both Messrs. Wen and Kim and each of you shall be jointly and severally responsible for paying the invoices."

  f. "Venable shall have the right to withdraw from this joint representation of any one or all Clients for non-payment in full of any Venable invoice within forty-five (45) days of the date of the invoice."

  g. "In connection with a joint representation of multiple clients, information that is disclosed to Venable by one Client may be shared with the other Client(s) if it is material to the representation. Venable will not, at the request of one Client, withhold material information from the other Client."

10. Nothing in Venable's engagement letter limits its representation of me and Albert to settlement negotiations in the CFPB Action or draws a distinction between "settlement negotiations" and "litigation." Albert and I understood that we were retaining Venable, and paying its $500,000 retainer amount, to represent us in the litigation, whatever that may involve.

## Timeline of Relevant Events

11. On October 31, 2019, Allyson and Gerry submitted their *Pro Hac Vice* applications to the Court to represent me and Albert in the CFPB Action. Nothing in Venable's applications advised the Court that Venable's representation of me and Albert was limited to "settlement negotiations."

12. In return for agreeing to represent me and Albert in the litigation, Venable demanded a retainer of $500,000, which Albert and I jointly paid.

13. In March 2020, Venable demanded an additional $35,000 retainer to continue to represent me and Albert in the litigation, which Albert and I jointly paid.

14. On June 15, 2020, Gerry demanded that Albert and I pay a second additional retainer to continue to represent us in the litigation. Specifically, Gerry emailed me and Albert (copying Allyson) stating that, "we must ask for an additional retainer of $20K to continue working with you."

15. On June 20 and 21, 2020, Gerry and I had several telephone conferences to discuss Plaintiffs' recent requests that I supplement my financial disclosures for settlement purposes. In those conversations, I asked Gerry not to share my personal financial disclosure information with Albert, as I saw no need for me and Albert to share our personal information with each other. At no time during those conversations did Gerry mention that our discussions had given rise to a conflict of interest between me and Albert, or that Gerry needed to disclose any of those conversations to Albert to be in compliance with the terms of our retainer agreement.

16. On June 29, 2020, Allyson emailed me and Albert, copying Gerry, stating that, "we will need additional funds for our retainer – another $25K by the end of the week.  We are happy to coordinate with everybody, but we will need some additional money to continue on this course." No mention was made of any conflict, or my June 20-21 telephone conversations with Gerry, in that email or at that time.

17. On July 1, 2020, Allyson emailed me and Albert, copying Gerry, stating, "I am writing about the below request [referencing the June 29 email]. Please understand that we are going to have to withdraw as your counsel in this matter, as our Firm will not allow us to take this case without a fee." No mention was made of any conflict, or my June 20-21 telephone conversations with Gerry, in that email or at that time.

5

18. On July 6, 2020, during a telephone conference with only me, Allyson and Gerry again demanded a second additional retainer, and further stated that Venable would withdraw from representing Albert alone if he did not pay his share of the second additional retainer. No mention was made of any conflict, or my June 20-21 telephone conversations with Gerry, in that email or at that time.

19. As of the July 6 telephone conference, Venable had failed to send us invoices for February, March, April, and May 2020 in connection with the CFPB Action, as well as earlier invoices for related matters, in violation of the terms of the retainer agreement. As a result, I requested all of our invoices, which I reiterated in an email to Allyson and Gerry immediately following our call.

20. On July 8, 2020, I received a number of invoices from Venable, but Albert and I noticed that several invoices were still missing.

21. On July 11, 2020, I emailed Allyson's assistant (copying Allyson and Gerry) requesting the missing invoices.

22. On July 12, 2020, Allyson and Gerry emailed me alone, stating that, "we will need a retainer to continue to represent you on this case." No mention was made of any conflict, or my June 20-21 telephone conversations with Gerry, in that email or at that time.

23. On July 13, 2020, during a telephone conference with me and Albert, Allyson and Gerry again demanded that we pay a second additional retainer, but this time asked for $30,000. Allyson and Gerry further stated that Venable would withdraw if we did not pay the $30,000, as it could not "work for free." No mention was made of any conflict, or my June 20-21 telephone conversations with Gerry, in that email or at that time.

6

24. During that July 13 telephone conference, I told Allyson and Gerry that we were still missing several invoices, and that none of the invoices showed any deposits to or payments from our trust account. Gerry said his assistant would send us that information the following morning. Allyson said that, regardless of our review of the invoices, Venable still required another additional $30,000 retainer to continue to represent us.

25. On July 14, 2020, Gerry emailed me and Albert (copying Allyson) a number of the missing invoices. I sent two emails in response, one to request invoices that were still missing, and another to tell Venable that my own accounting showed a credit balance rather than an amount owed.

26. On July 15, 2020, Gerry emailed me and Albert (copying Allyson) more of the missing invoices. Albert replied to Allyson and Gerry, that his own accounting also showed a credit balance rather than an amount owed. I also replied, to request an invoice that was still missing.

27. Due to the missing invoices and no deposit and payment information for our trust account, both Albert and I were unable to reconcile Venable's accounting. In response, Gerry said that he would have Venable's finance department prepare a consolidated report.

28. On the morning of July 16, 2020, Allyson emailed us the last missing invoice.

29. On the evening of July 16, 2020, during a telephone conference with me and Albert, Allyson and Gerry told us Venable would have a conflict if the CFPB Action did not settle, and litigation resulted, but that Venable did not have a "current conflict." Allyson also remarked that Albert and I could not afford Venable for litigation.

7

30. Later on the evening of July 16, Gerry emailed me and Albert (copying Allyson) an Excel spreadsheet regarding "Invoices and Payments."

31. On July 19, 2020, because Venable's invoices were difficult to understand and inconsistent with the Excel spreadsheet Gerry had sent us, I emailed Gerry (copying Albert and Allyson), asking for Venable's finance department to send us a complete accounting of all activity in our client trust accounts, dating back to July 2019.

32. On July 20, 2020, I emailed Gerry (copying Albert and Allyson) information that he had requested identifying what was missing from the Excel spreadsheet he had sent us, and requesting again for Venable's finance department to send us a full accounting.

33. On July 21, 2020, Gerry emailed me and Albert (copying Allyson) an updated Excel spreadsheet with newly added tabs. However, both Albert and I were unable to make sense of the updated spreadsheet Gerry had sent us and found it confusing and demonstratively inaccurate.

34. On July 23, 2020 Albert and I sent multiple emails to Allyson and Gerry, requesting a complete, accurate, and organized accounting of activity in our client trust accounts. In response, Gerry agreed to schedule a call for me and Albert to speak with Venable's finance department. However, Gerry never arranged that call and we were never able to speak with anyone from Venable's finance department to obtain the clarification we had repeatedly requested.

35. At 11:15 AM on July 23, 2020, Venable received Plaintiffs' latest proposed settlement documentation. At 11:20 AM, Gerry forwarded me and Albert the settlement

8

documentation, indicating, "FYI – I am forwarding, **but have not reviewed the attachment, yet**."[2] (emphasis added).

36. At 5:23 PM on July 23, 2020, Gerry emailed me and Albert that Venable planned to file its Motion to Withdraw the following day, July 24.

37. In response, at 6:54 AM on July 24, Albert and I sent Allyson and Gerry an email stating the following:

> **Albert and I request that you <u>include the below statement verbatim in your Motion to Withdraw</u>:**
>
> **Neither Albert Kim nor Kaine Wen consent to Venable's withdrawal as their counsel in this action, and have expressly told Venable this. Venable has represented them jointly, along with Defendants True Count Staffing and Infinite Management, since the initiation of this lawsuit in October 2019, and have acted as the lead counsel for all defendants and their counsel in negotiating a settlement with Plaintiffs.**
>
> **Venable has refused to tell Mr. Kim or Mr. Wen the reasons for their withdrawal after all this time and when the parties seem close to a settlement, other than that they have an unwaivable conflict, but refuse to tell Mr. Kim or Mr. Wen what the conflict is, when it arose, and why it cannot be waived.**
>
> **Mr. Kim and Mr. Wen have also told Venable that they do not waive the attorney client privilege or any other privilege that applies to their communications with Venable.**

38. At 8:12 AM on July 24, 2020, after Venable already told me and Albert that it would be filing its Motion to Withdraw later that day, Gerry emailed me (including Allyson) offering to provide an explanation of the conflict. Prior to this, Venable never explained or

---

[2] In Venable's Reply Points and Authorities in Support of Its Motion to Withdraw, p. 2, Venable stated that, "on the afternoon of Thursday, July 23 (Eastern Time), Plaintiffs sent the parties a proposed revised settlement offer. In light of that communication, despite prior optimism about settlement prospects, it does not appear that the parties are close to settling this matter. Accordingly, the next day, on July 24, Venable filed its Motion." Given that Venable forwarded the settlement documentation to me and Albert without bothering to review it, this statement was highly misleading. I would also note that, since then, a number of parties have reached, or are in the process of finalizing, individual settlements with Plaintiffs.

9

offered to explain the conflict to me or Albert. Before I could respond, Venable filed its Motion to Withdraw.

39. At 11:49 AM on July 24, 2020, just prior to Venable filing its Motion to Withdraw, Allyson and Gerry emailed me (copying Albert), indicating that we owed Venable $8,039.99. I do not believe that, as of July 24, Albert and I owed Venable any money, and, in any event, under the terms of our retainer agreement, any such outstanding balance was not payable for another 45 days.

40. At 6:54 PM on July 24, 2020, Venable filed its Motion to Withdraw and the accompanying declaration of Gerald Sachs. Venable omitted the statement that Albert and I had asked to be included without explanation.

41. In its Motion to Withdraw, Venable breached the attorney-client privilege by gratuitously stating that, "it bears noting that Defendants have a significant outstanding balance for work performed by Venable on this matter and have not indicated any willingness or ability to pay those fees or any fees for future work." (Venable's Motion to Withdraw as Counsel of Record for Defendants True Count Staffing, Inc., Albert Kim, and Kaine Wen, and Relief Defendant Infinite Management Corp., pp. 5-6, fn. 2; Declaration of Gerald Sachs, ¶ 6).

42. At 7:18 PM on July 24, 2020, following Venable's filing of its Motion to Withdraw, I emailed Allyson and Gerry to ask for a full accounting for the fourth time, or alternatively to let me and Albert know if the invoices and the updated Excel spreadsheet Gerry had sent us were all Venable intended to provide as its accounting. After a further

exchange of emails with Allyson and Gerry, Albert and I still did not receive (and to this day have not received) a full accounting from Venable as requested.

43. On August 6, 2020, I received an email from Gerry, asking if I wanted Venable to pursue settlement discussions with Plaintiffs on my behalf.

44. On August 11, 2020, I emailed Allyson and Gerry a series of detailed questions about the alleged conflict, including when or how it arose and why Venable didn't disclose it to me earlier, that I needed answered so I could make an informed decision about whether Venable could or should continue to represent me in settlement negotiations with Plaintiffs.

45. On August 16, 2020, in response to my August 11 email, Gerry emailed me and Albert (including Allyson), purporting to disclose the basis of Venable's alleged conflict, and disclosing for the first time that the conflict supposedly arose as a result of a telephone conversation that I had with Gerry on June 20 or 21, 2020. However, Gerry's explanation was incomplete and contained false and misleading statements. First, Gerry failed to respond to a number of my specific questions, continuing to withhold from me and Albert material information about Venable's alleged conflict. Second, Gerry failed to explain why Venable waited until July 16 to disclose that it had a conflict of interest that purportedly arose on June 20 or 21. Third, Gerry falsely attributed to me statements I had not made and grossly mischaracterized statements that I had made concerning Albert.

46. On August 24, 2020, I emailed Gerry (copying Albert and Allyson), responding to his false allegations. In that email, I confirmed in writing that Albert and my positions, interests, and objectives in the litigation remained fully aligned; we both still wanted to reach a settlement with Plaintiffs; and there were no conflicts between us that we did not

11

previously understand we had waived. Albert confirmed the same in an email sent to Allyson and Gerry (copying me) on August 25, 2020.

### Conclusion

47. I continue to vigorously oppose Venable's Motion to Withdraw on the basis asserted in that Motion, that an unwaivable conflict of interest has arisen between me and Albert. As both Albert and I have repeatedly advised Venable, both orally and in writing, that our positions, interests, and objectives remain aligned and there are no conflicts between us that we did not attempt to previously waive.

48. However, based on the above timeline and my communications with Venable since June 15, 2020, it is apparent to me that Venable has taken positions and made statements adverse to my interest; that Venable has been less than truthful and forthright in its dealings with me, Albert, and the Court regarding its alleged conflict; and that Venable has breached its legal, ethical, and contractual duties to me and Albert. As a result, I no longer trust Venable to do what is in my best interest in the litigation. Therefore, I have concluded that Venable has left me no choice but to seek to retain new counsel to replace it, which I will attempt to do within the next seven to ten days.

49. I appreciate the Court's attention to this issue.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of August, 2020, in Los Angeles County, California.

_____
Kaine Wen