1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BUREAU OF CONSUMER FINANCIAL PROTECTION**
SARAH PREIS (D.C. Bar No. 997387)
(admitted *Pro Hac Vice*)
Tel.: (202)-435-9318 / Email: sarah.preis@cfpb.gov
JESSE STEWART (N.Y. Bar No. 5145495)
(admitted *Pro Hac Vice*)
Tel: (202)-435-9641 / Email: jesse.stewart@cfpb.gov
NATHAN DIMOCK (D.C. Bar No. 487743)
(Admitted *pro hac vice*)
Tel.: (202) 435-9198 / Email: nathan.dimock@cfpb.gov

1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-5471

LEANNE E. HARTMANN (CA Bar No. 264787)
(Local Counsel for the Bureau of Consumer Financial Protection)
301 Howard Street, Suite 1200
San Francisco, CA 94105
Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788

*Attorneys for Plaintiff the Bureau of Consumer Financial Protection*

**THE STATE OF MINNESOTA**
EVAN ROMANOFF (Attorney Reg. No. 0398223)
(admitted *Pro Hac Vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 757-1454/Email: evan.romanoff@ag.state.mn.us

*Attorneys for Plaintiff the State of Minnesota*

**THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (N.C. Bar No. 19397)
(admitted *Pro Hac Vice*)
MICHAEL T. HENRY (N.C. Bar No. 35338)
(admitted *Pro Hac Vice*)
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
Tel.: (919) 716-6000 / Fax: (919) 716-6050
Emails: lweaver@ncdoj,gov/mhenry@ncdoj.gov

*Attorneys for Plaintiff the State of North Carolina*

**THE PEOPLE OF THE STATE OF CALIFORNIA**
MICHAEL N. FEUER, City Attorney (CA Bar No. 111529)
MARY CLARE MOLIDOR, Chief Assistant City Attorney, (CA Bar No. 82404)
CHRISTINA V. TUSAN, Supervising Deputy City Attorney (CA Bar No. 192203)
WILLIAM PLETCHER, Deputy City Attorney (CA Bar No. 212664)

REBECCA MORSE, Deputy City Attorney (CA Bar No. 314853)
OFFICE OF THE CITY ATTORNEY
200 N. Main Street, 500 City Hall East
Los Angeles, California 90012-4131
Tel: (213) 978-8707/Fax: (213) 978-8112
Emails: christina.tusan@lacity.org / william.pletcher@lacity.org

*Attorneys for Plaintiff the People of the State of California*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., <br><br> Defendants. | CASE NO. 8:19-cv-01998 MWF <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT FIRST PRIORITY LLC** <br><br> Court: Hon. Michael W. Fitzgerald <br> Date: October 26, 2020 <br> Time: 10:00 AM <br> Place: Courtroom 5A |

## Table of Contents

I.  Introduction ........................................................................ 1 – 2

II. Procedural History ........................................................... 2 – 4

III. Discussion ......................................................................... 5 – 25

   A. The Court has the Authority to Enter a Default Judgement .................... 5

   B. The *Eitel* Factors Favor Granting Default Judgement ........................... 5

      i.     Plaintiffs Will Be Prejudiced Without a Default Judgement .......... 6

      ii.    The Amended Complaint States Proper Claims and Merits of Plaintiffs' Claims Warrant Default Judgement ............................. 6

          a.   Jurisdiction ................................................... 6 - 7

          b.   Substantial Assistance in Violation of TSR, 16 C.F.R. § 310.3(b) (Count VI), and Section 1036(a)(3) of the CFPA, 12 U.S.C. § 5536(a)(3) (Count X) ............................................ 7

             i.   TSR and CFPA Violations ..................................... 7 - 11

             ii.  First Priority's Substantial Assistance in Violations of the TSR and CFPA .......................................... 11

          c.   Violation of the CFPA Based on Violation of the TSR, 15 U.S.C § 6102 (Count XI) .............................................11 - 12

          d.   Violation of the North Carolina Unfair and Deceptive Practices Act, N.C. Gen. Stat §75-1.1 (Count XVI) ......12 - 15

          e.   Violation of the California Unfair Competition, Law Cal. Bus. & Prof. Code § 17200 et se1. (Count XVIII) ............... 15 – 16

      iii.   The Money at Stake Supports Default Judgement ............... 16 – 17

      iv.   Possibility of Dispute of Material Facts is Unlikely ................... 17

      v.    The Defaults is not Due to Excusable Neglect .................... 17 – 18

      vi.   Other Factors Outweigh Deciding the Case on the Merits............18

   C.  Default Judgement for Injunctive and Monetary Relief is Warranted ...18

      i.     Injunctive Relief to Prevent Future Violations .................... 18 – 20

i

ii.     Monetary Relief to Compensate Consumers ........................20 – 22

iii.    Civil Money Penalties .........................................................22 – 25

IV.    Conclusion ...............................................................................25

# Table of Authorities

**Cases**

*Alan Neuman Prods., Inc. v. Albright*,

862 F.2d 1388, (9th Cir. 1988). ........................................................................18

*Ariz. Cardinals Football Club, Inc. v. Bryant*,

2009 U.S. Dist. LEXIS 35524 (D. Ariz. Apr. 6, 2009) ....................................16

*Benny v. Pipes*, 799 F.2d 489, (9th Cir. 1987)..................................................18

*Bhatti v. Buckland*, 400 S.E.2d 440, (N.C. 1991) ............................................13

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,

20 Cal.4th 163, (1999). .....................................................................................15

*CFPB v. Gordon*, 819 F.3d 1179, (9th Cir. 2016).............................................20

*CFTC v. Co Petro Marketing Grp., Inc.*, 502 F. Supp. 806, (C.D.Cal.1980) ....19

Comm. v. Medicor, LLC, F. Supp. 2d 1048, (C.D. Cal. 2002). ........................20

*Davis v. Fendler*, 650 F.2d 1154, (9th Cir. 1981) ..................................5, 18, 21

*Eitel v. McCool*, 782 F.2d 1470, (9th Cir. 1986). ................................1, 5, 6, 18

*Fair Hous. of Marin v. Combs*, 285 F.3d 899, (9th Cir. 2002)...........................6

*Fed. Trade Comm. v. Inc21.com Corp.*, 745 F. Supp. 2d 975, (N.D. Cal. 2010).

......................................................................................................................20

*Fed. Trade Comm. v. John Beck Amazing Profits, LLC*,

888 F. Supp. 2d 1006, (C.D. Cal. 2012). ..........................................................20

*FTC v. 1263523 Ont., Inc.*, 205 F. Supp. 2d 205, (S.D.N.Y. 2002). .......6, 18, 21

*FTC v. Affordable Media, LLC*, 179 F.3d 1228, (9th Cir. 1999).......................19

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, (1965) ......................................19

*FTC v. Gill*, 265 F.3d 944, (9th Cir. 2001). .....................................................20

*FTC v. Stefanchik*, 559 F.3d 924, (9th Cir. 2009).............................................20

*Geddes v. United Fin. Group*, 559 F.2d 557, (9th Cir. 1977). ...........................5

*Hardy v. Toler*, 218 S.E.2d 342, (N.C. 1975). .................................................13

*Marshall v. Miller*, 276 S.E.2d 397, (N.C. 1981). ..............................................13

*PepsiCo, Inc. v. Cal. Sec. Cans*,

238 F. Supp. 2d 1172, (C.D. Cal. 2002). ..........................................5, 6, 16, 18

*PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, (C.D. Cal. 1999). .............5

*Philip Morris USA, Inc. v. Castworld Prods., Inc.*,

219 F.R.D. 494, (C.D. Cal. 2003)........................................................5

*Pope v. United States*, 323 U.S. 1 (1944). .......................................................5

*South Bay Chevrolet v. General Motors Acceptance Corp.*,

72 Cal.App.4th 861, (1999)........................................................15

*State ex rel. Cooper v. NCCS Loans, Inc.*, 624 S.E.2d 371, (N.C. App. 2005)..14

*TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, (9th Cir. 1987). ...................5

*Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, (9th Cir. 1979). .................19

*US v. High Country Broad Co., Inc.*, 3 F.3d 1244, (9th Cir 1993)....................17

*Winston Realty Co. v. G.H.G., Inc.*, 331 S.E.2d at 677, (N.C. 1985) ..........13, 14

**Statutes**

12 U.S.C. § 5481...........................................................................9, 12

12 U.S.C. § 5536.................................................................11, 12, 16

12 U.S.C. § 5564....................................................................... 7

12 U.S.C. § 5565.................................................................6, 18, 20, 22

12 U.S.C. § 5655........................................................................23

15 U.S.C. § 6102........................................................................16

28 U.S.C. § 1331........................................................................ 6

28 U.S.C. § 1345........................................................................ 6

28 U.S.C. § 1367........................................................................ 7

**Other Authorities**

Cal. Bus & Prof Code § 17203...............................................22

Cal. Bus & Prof Code § 17205...............................................24

Cal. Bus. & Prof. Code § 17200 et seq............................................................15

Cal. Bus. & Prof. Code § 17204......................................................................15

Cal. Bus. & Prof. Code, § 17200.....................................................................15

N.C. Gen. Stat. § 14-423 .........................................................................13, 14

N.C. Gen. Stat. § 14-424.........................................................................12, 13

N.C. Gen. Stat. § 14-425.................................................................................14

N.C. Gen. Stat. § 75-1.1 ....................................................................13, 14, 15

*Soaring Student Debt Opens Door to Relief Scams*, WALL ST. JOURNAL,

   Aug. 26, 2019. ..........................................................................................19

**Rules**

12 C.F.R. § 1083.1..........................................................................................24

16 C.F.R. § 310.3...................................................................8, 9, 12, 16, 17

16 C.F.R. § 310.4.......................................................................................9, 16

Fed. R. Civ. P. 55........................................................................................5, 19

Memo of P&A ISO Appl. for Entry of Default Judgment Against First Priority LLC

1  **I.   Introduction**

2      The Clerk of the Court entered default against Defendant First Priority LLC

3  (First Priority) on August 31, 2020.  (Dkt. No. 213.)  Accordingly, pursuant to

4  Fed. R. Civ. P. 55(b)(2) and L.R. 55-1, and in compliance with this Court's

5  Order, Dkt. No. 177, Plaintiffs move for entry of the proposed Default

6  Judgment and Order for Permanent Injunction and Civil Money Penalties

7  ("Default Judgment") filed herewith against Defendant First Priority.

8      Default judgment is appropriate under the circumstances. The operative First

9  Amended Complaint (Amended Complaint) states valid claims that Defendant

10 First Priority (1) provided substantial assistance in violation of the

11 Telemarketing Sales Rule (TSR), 16 C.F.R. § 310.3(b) (Count VI); (2) provided

12 substantial assistance in violation of Section 1036(a)(3) of the Consumer

13 Financial Protection Act (CFPA), 12 U.S.C. § 5536(a)(3) (Count X); (3)

14 violated the CFPA based on its violations of the TSR, 15 U.S.C. § 6102 (Count

15 IX); (4) violated the North Carolina Unfair and Deceptive Practices Act, N.C.

16 Gen. Stat. § 75-1.1 (Count XVI); and (5) violated the California Unfair

17 Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. (Count XVIII), by

18 participating in a deceptive student loan debt-relief scheme that caused millions

19 of dollars in consumer injury. (Dkt. No. 134.)

20     There is no just reason to delay issuance of a default judgment order. First

21 Priority is not represented by counsel, nor has it even attempted to defend itself

22 in this action.  Moreover, the well-pled allegations in the Amended Complaint,

23 which are taken as true as a result of First Priority's default, combined with

24 evidence submitted with this Memorandum, establish Defendant First Priority's

25 knowledge of and participation in the unlawful scheme and the ensuing losses

26 attributable to it.  Finally, as explained below, the factors considered in the

27 Ninth Circuit militate in favor of entry of default judgment against Defendant

28 First Priority.  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

The requested permanent injunctive relief and default judgment amount against Defendant First Priority are necessary to protect consumers and redress injury.  Plaintiffs request that the Court enter the proposed Default Judgment filed herewith, which includes injunctive relief, restitution in the amount of $165,848.05, a civil money penalty of $6,500,000 under the CFPA, and a civil penalty of $1,200,000 to be imposed against Defendant First Priority under the California Unfair Competition Law.

## II.   Procedural History

Plaintiffs commenced this civil action on October 21, 2019, alleging violations of state and federal law against multiple defendants for their roles in an illegal student loan debt-relief scheme.  (Dkt. No. 2.)  On the same day, the Court issued a Temporary Restraining Order (TRO), finding that Plaintiffs were likely to succeed on the merits of their claims and appointing a receiver over corporate Defendants True Count Staffing Inc. and Prime Consulting LLC (Receiver).  (Dkt. No. 24.)  On November 1, 2019, the Receiver filed his first status report with the Court.  (Dkt. No. 75.)  In that report, the Receiver advised the Court that he had provided notice to the parties that, pursuant to Section XIII(T) of the TRO, First Priority qualified as a Receivership Defendant and that no party had challenged that determination.  *Id.* at 3.  The Receiver also reported that he had frozen several bank accounts that were implicated in the scheme, including two accounts in the name of First Priority.  *Id.* at 7.  The Receiver further reported that "Defendants collect consumer fees in advance without complying with the Telemarketing Sales Rule, which renders the entire business unlawful."  *Id.* at 4.  The Receiver ultimately determined that the business "cannot" be operated lawfully and at a profit.  *Id.* at 38.  On November 15, 2019, the Court entered a Stipulated Preliminary Injunction. (Dkt. No. 103.)

On February 24, 2020, Plaintiffs filed the operative Amended Complaint, naming several defendants and relief defendants including, as pertinent here,

Defendants Consumer Advocacy Center Inc., True Count Staffing Inc., and
Prime Consulting LLC (collectively, Student Loan Debt Relief Companies);
Defendants Albert Kim, Kaine Wen, and Tuong Nguyen (collectively,
Individual Defendants); and Defendant First Priority (defendants named in the
Amended Complaint, with the exception of Relief Defendants, are collectively
referred to as Defendants).[1]  (Dkt. No. 134.)  As it relates to Defendant First
Priority, Plaintiffs filed the Amended Complaint under the Consumer Financial
Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, and 5565,
and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15
U.S.C. §§ 6102(c)(2), 6105(d) (Telemarketing Act), based on defendants'
violations of the CFPA and the Telemarketing Sales Rule (TSR), 16 C.F.R. pt.
310. The State of North Carolina alleged violations of North Carolina's Unfair
and Deceptive Practices Act (NCUDPA), N.C. Gen. Stat. § 75-1.1, and the
Telemarketing Act and its implementing regulation, the TSR. The People of the
State of California alleged violations of California's Business and Professions
Code 17200 *et seq.* (the Unfair Competition Law or UCL), and the
Telemarketing Act and its implementing regulation, the TSR.  And the State of
Minnesota alleged violations of the Telemarketing Act and its implementing
regulation, the TSR.

   The Amended Complaint alleges that Defendant First Priority's acts or
practices violated these laws in connection with the marketing and sale of
student loan debt-relief services. The Amended Complaint seeks permanent
injunctive relief, damages, rescission or reformation of contracts, the refund of
monies paid, restitution, disgorgement, compensation for unjust enrichment,

---

[1] Defendant First Priority is a Wyoming limited liability corporation that has
been registered to operate in California since May 2018, and has held itself out
as doing business in Alhambra.  (Dkt. No. 134 at ¶ 36.)

and civil money penalties.

On March 6, 2020, Plaintiffs served the Amended Complaint, Notice of a Lawsuit and a Request to Waive Service of a Summons, and related documents on Defendant First Priority by delivering a copy to Defendant Tuong Nguyen in his capacity as an officer of First Priority.[2]  Plaintiffs filed an executed Waiver of the Service of Summons with the Court on March 20, 2020. (Dkt. No. 139.)

On May 5, 2020, multiple Defendants filed an *Ex Parte* Application to Extend Time to Answer.  (Dkt. No. 151.)  On May 7, 2020, the Court granted the application, extending the deadline for Defendants, including Defendant First Priority, to respond or file an answer to July 13, 2020.  (Dkt. No. 152.)

In its Order issued on July 31, 2020, the Court noted that Defendant First Priority remained unrepresented by counsel, and that "[t]he basic rule is that corporations must appear in federal court through counsel."  (Dkt. No. 177 at 4-5 (citations omitted).)  Defendant First Priority was ordered to "file notice to the Court that they have retained counsel by August 14, 2020." *Id.* at 5.  The Court further ordered that should First Priority fail to retain counsel, "Plaintiffs shall apply for entry of default by no later than August 28, 2020, and shall move for default judgment within ten (10) days of entry of default by the Clerk." *Id*.

On August 28, 2020, Plaintiffs filed an application for the Clerk to enter default against Defendant First Priority.  (Dkt. No. 212.)  The Clerk entered the default on August 31, 2020.  (Dkt. No. 213.)  As of the date of this filing, Defendant First Priority has failed to retain counsel, and has not filed a responsive pleading or answer.  Accordingly, default judgment is appropriate here against Defendant First Priority because their liability is well-pled and they have failed to participate in the litigation.

---

[2] On August 28, 2020, the Court entered a stipulated final judgment and order as to Defendant Nguyen and Relief Defendant TN Accounting Inc.  (Dkt. No. 210.)  Defendant First Priority was not a party to the stipulated judgment.

## III.   Discussion

### A. The Court has the Authority to Enter a Default Judgment

After the clerk's entry of default against a party, a court in its discretion may enter a default judgment against that party. Fed. R. Civ. P. 55(b); *see also PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002). Once default is entered, the complaint's factual allegations regarding liability are taken as true, while allegations regarding the amount of damages must be proven. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987); *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (citing *Pope v. United States*, 323 U.S. 1 (1944)). Further, where, as here, damages are liquidated, *i.e.*, based on definite figures contained in documentary evidence or in detailed affidavits, judgment by default may be entered without a hearing. *Davis v. Fendler,* 650 F.2d 1154, 1161 (9th Cir. 1981).

### B. The *Eitel* Factors Favor Granting Default Judgment

In determining whether to enter a default judgment against a party, courts in the Ninth Circuit evaluate the seven factors set forth in *Eitel*, 782 F.2d at 1471-72. Those factors are: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel,* 782 F.2d at 1471-72. "In applying this discretionary standard, default judgments are more often granted than denied." *Philip Morris USA, Inc. v. Castworld Prods., Inc.,* 219 F.R.D. 494, 498 (C.D. Cal. 2003) (quoting *PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999)).  Here, the *Eitel* factors weigh in favor of entry of a default judgment against Defendant First Priority.

### i.  Plaintiffs Will Be Prejudiced Without a Judgment

Plaintiffs will be prejudiced if default judgment is not entered against Defendant First Priority because they will be forced to commit time, resources, and personnel to prosecute a lawsuit in which Defendant First Priority will not meaningfully participate. *See FTC v. 1263523 Ontario, Inc.*, 205 F. Supp. 2d 205, 208-09 (S.D.N.Y. 2002) (denial of motion for default judgment would be "unfairly prejudicial" to the plaintiff when defendant failed to respond to complaint or default motion or appear).

Additionally, absent a judgment and final order against Defendant First Priority, Plaintiffs will be unable to reach First Priority's assets to provide compensation to the many victims of the unlawful student loan modification scheme, obtain a permanent injunction protecting consumers from future violations of law, or impose penalties to deter future wrongdoing.

### ii.  The Amended Complaint States Proper Claims and the Merits of Plaintiffs' Claims Warrant Default Judgment

The second and third *Eitel* factors – the sufficiency of the complaint and the merits of the plaintiff's claims – also weigh in favor of entry of the default judgment. Upon entry of default, the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true, except for the allegations as to the amount of damages. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). These factors, in essence, "require that a plaintiff state a claim on which [it] may recover." *Pepsico, Inc.,* 238 F. Supp. 2d at 1175.  The Amended Complaint here is sufficiently detailed to support Plaintiffs' claims.

### a.  Jurisdiction

As an initial matter, the Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345. (Dkt. No. 134 at ¶ 18.)

Moreover, this Court has supplemental jurisdiction over the States' claims pursuant to 28 U.S.C. § 1367.  *Id.*  Venue is proper in this district pursuant to 12 U.S.C. § 5564(f), because Defendants are located, reside, or do business in this district.  *Id.* at ¶¶ 19, 25-27, 29-38, 41-42, 46-47, 50, 52, 54, 56-57, 59-63.  And each of the Plaintiffs are duly authorized to bring this action.  *Id.* at ¶¶ 20-24.

### b.  Substantial Assistance in Violation of TSR, 16 C.F.R. § 310.3(b) (Count VI), and CFPA, 12 U.S.C. § 5536(a)(3) (Count X)

The Amended Complaint alleges Defendant First Priority substantially assisted the Student Loan Debt Relief companies in their violations of the TSR and the CFPA. As such, underlying violations of the TSR and CFPA are predicate violations to a corresponding substantial assistance claim.

### i.  TSR and CFPA Violations

The TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act that [constitutes deceptive or abusive conduct]" under the Rule. 16 C.F.R. § 310.3(b); Dkt. No. 134 at ¶ 267.  The Student Loan Debt Relief Companies are "sellers" or "telemarketers" of a "debt relief service" who engage in "telemarketing," as those terms are defined in the TSR. (Dkt. No. 134 at ¶¶ 211-218.)  The Student Loan Debt Relief Companies offered services to renegotiate, settle, or alter the terms of payments of consumers' federal student loans by submitting requests for loan forgiveness or income-driven repayment (IDR) plans to consumers' student-loan servicers.  *Id.* at ¶ 215.  Sales department personnel fielded incoming consumer calls, made outbound marketing calls, and enrolled consumers in the Student Loan Debt Relief Companies' services by providing consumers with contracts for electronic signature during sales calls.  *Id.* at ¶ 70.  Moreover, the Student Loan Debt Relief Companies offered

7

and provided these services to consumers nationwide using telephones and employing more than one interstate telephone call, in exchange for payment of enrollment and monthly fees.  *Id.* at ¶¶ 70, 77, 216-217.

The TSR prohibits abusive or deceptive practices, including requesting or receiving advance fees before renegotiating, settling, reducing, or otherwise altering the terms of at least one of a consumer's debts, misrepresenting any material aspect of the efficacy of their services and misrepresenting any material aspect of a debt-relief service. 16 C.F.R. § 310.4(a)(5)(i), § 310.3(a)(2)(iii), (x).

The Amended Complaint contains well-pled factual allegations supporting a finding that the Student Loan Debt Relief Companies violated the TSR.  From 2015 until the filing of the action, Defendants operated a debt-relief enterprise that deceived thousands of federal-student-loan borrowers and, as alleged at the time of the filing of the Amended Complaint, collected at least $83 million in illegal advance fees.[3]  (Dkt. No. 134 at ¶ 8.)  The scheme was carried out through the Student Loan Debt Relief Companies, controlled by the Individual Defendants, which purported to help federal-student-loan borrowers obtain loan forgiveness or lower monthly payments through programs administered by the U.S. Department of Education (DOE).  *Id.* at ¶ 9.

In furtherance of the scheme, the Student Loan Debt Relief Companies charged consumers an initial fee of $900-$1,750 for their services, which they collected well before consumers had been accepted to and made a payment under their new loan agreements, in violation of the TSR.  *Id.* at ¶ 14.  The

---

[3] As reflected in recent stipulated judgments entered in this matter, Plaintiffs have since determined that the amount of illegal advance fees exceeds the amount alleged at the time of the filing of the Amended Complaint.  Plaintiffs cite to the $83 million in the Amended Complaint only for purposes of the instant application for default judgment against Defendant First Priority.

Memo of P&A ISO Appl. for Entry of Default Judgment Against First Priority LLC

Student Loan Debt Relief Companies also collected monthly fees from consumers, typically ranging from $10 to $42, prior to submitting annual loan recertifications on behalf of consumers. *Id.* at ¶¶ 120, 217. At no time did the Student Loan Debt Relief Companies hold consumer payments in independent third-party accounts, nor did the Student Loan Debt Relief Companies use payments from consumers to make payments toward consumers' student loan debts. *Id.* at ¶¶ 15-16. As a result, these fees were illegal under the TSR.

The Student Loan Debt Relief companies also violated the TSR by "misrepresenting the terms and conditions of their services." *Id.* at ¶ 5. This included falsely asserting that the Student Loan Debt Relief Companies collected "[n]o advance fees" from consumers and that such fees would be held in independent third party "trust account[s]" and not paid to the company until the consumer "has received a consolidation, adjustment, or otherwise satisfactory result" and makes one payment "towards such." *Id.* at ¶¶ 122-123.

A "covered person" under the CFPA means any person, including any individual or business entity, that engages in "offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A) and (19). A "consumer financial product or service" includes "providing services to assist a consumer with debt management or debt settlement, [or] modifying the terms of any extension of credit." 12 U.S.C. § 5481(15)(A)(viii).

By offering or providing the debt relief services described above, the Student Loan Debt Relief Companies provide a consumer financial product or service that is covered by the CFPA. This includes providing financial-advisory services such as assisting consumers with debt-management or debt-settlement and modifying the terms of any extension of credit. 12 U.S.C. § 5481(5), (6), (15)(A)(viii); Dkt. No. 134 at ¶ 224. As a result, the Student Loan Debt Relief Companies are each a "covered person" under the CFPA and are subject to the CFPA's prohibition on deceptive acts or practices or other

9

violations of a Federal consumer financial law.  (Dkt. No. 134 at ¶ 224).

The Amended Complaint contains well-pled factual allegations supporting a finding that the Student Loan Debt Relief Companies violated the CFPA's prohibition on deceptive acts or practices.  The student-loan debt-relief scheme involved deceiving consumers in numerous ways, including:

- Misrepresenting that consumers would qualify for loan forgiveness in a matter of months, when forgiveness takes at least 10 years of on-time payments and is determined by DOE.  (Dkt. No. 134 at ¶ 10.)

- Misrepresenting that consumers were approved for lower payments on their student loans, when consumers had not yet been approved or the new payment was approved based on false information.  *Id.*

- Misrepresenting that consumers' lower payments would be permanent when in fact they were subject to change based on changes in the consumers' family size, income, and marital status.  *Id.*

- Falsely telling consumers, or leading consumers to believe, that the consumers' payments to the companies would go toward paying consumers' student loan balances.  *Id* at ¶ 11.

- Failing to inform consumers that it was their practice to request that consumers' loans be placed into forbearance, or that interest would continue to accrue during the forbearance period, thereby increasing consumers' overall loan balances.  *Id*. at ¶ 12.

- Failing to inform consumers that it was their practice to submit false information about consumers' income, family size, and marital status on loan adjustment applications in order to try to qualify consumers for lower monthly payments.  *Id.* at ¶ 13.

- Falsely telling consumers that consumer payments would be segregated in independent third-party accounts.  *Id.* at ¶¶ 15, 122-125.

These misrepresentations were material and likely to mislead consumers acting

reasonably under the circumstances. *Id.* at ¶ 274. As such, they constitute deceptive acts or practices under the CFPA.

### ii. First Priority's Substantial Assistance in Violations of the TSR and CFPA

Both the TSR and CFPA include provisions prohibiting "substantial assistance" of violations of those respective laws. The TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act that [constitutes deceptive or abusive conduct]" under the Rule. 16 C.F.R. § 310.3(b); Dkt. No. 134 at ¶ 267. Similarly, Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031" and states that "the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).  The Amended Complaint contains well-pled factual allegations supporting a finding of liability against Defendant First Priority for substantial assistance in violations of the TSR (Count VI) and substantial assistance for violations of the CFPA (Count X), as First Priority was set up in order to obtain merchant accounts and to collect and process payments from consumers. (Dkt. No. 134 at ¶¶ 76, 157, 176, 180, 229.) Moreover, Defendant First Priority knew or consciously avoided knowing that the representations made to consumers were false and that the scheme involved collecting illegal advance fees.   (Dkt. No. 134 at ¶¶ 268-269, 291.)

### c. Violation of the CFPA Based on Violation of the TSR, 15 U.S.C. § 6102 (Count XI)

Section 1036(a)(1)(A) of the CFPA provides that it is "unlawful . . . for any covered person or service provider. . . to offer or provide to a consumer any

financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

The CFPA defines "covered person" to include "(B) any affiliate of a person [that engages in offering or providing a consumer financial product or service] if such affiliate acts as a service provider to such person." 12 U.S.C. § 5481(6); Dkt. No. 134 at ¶ 226. Section 1002(26)(A) of the CFPA defines the term "service provider" to mean "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that-- … (ii) processes transactions relating to the consumer financial product or service …." 12 U.S.C. § 5481(26)(A)(ii); Dkt. No. 134 at ¶ 228.

As noted in Section III(B)(2)(b)(i), above, the Student Loan Debt Relief Companies are "covered persons" under the CFPA. Defendant First Priority is also a "covered person" because it was controlled by the Student Loan Debt Relief Companies, making it an "affiliate" of the companies. (Dkt. No. 134 at ¶ 229.) Further, First Priority acted as a "service provider" by processing consumer payments made to the Student Loan Debt Relief Companies. *Id.*

As explained above, First Priority violated the TSR. That violation also constitutes a violation of the CFPA.

### d. Violation of the North Carolina Unfair and Deceptive Practices Act, N.C. Gen. Stat. § 75-1.1 (Count XVI)

Similar to the TSR's prohibitions in connection with debt relief services, North Carolina's Debt Adjusting Act ("NCDAA") provides that it is illegal for any person to "engage in, or offer to or attempt to, engage in the business or practice of debt adjusting." N.C. Gen. Stat. § 14-424. Under the NCDAA,

"debt adjusting" includes "debt settlement" whereby the debt adjuster collects any advance fee before debt settlement services being fully performed:

> Debt adjusting also includes the business or practice of debt settlement … whereby any person holds himself or herself out as acting for consideration as an intermediary between a debtor and the debtor's creditors *for the purpose of reducing, settling, or altering the terms of the payment of any debt of the debtor*, … *and receives a fee* or other consideration for reducing, settling, or altering the terms of the payment of the debt *in advance of the debt settlement having been completed or in advance of all the services agreed to having been rendered in full.*

N.C. Gen. Stat. § 14-423(2) (emphasis added).

The North Carolina Attorney General is expressly authorized to bring an action to enjoin—as an unfair and deceptive practice in violation of North Carolina's Unfair and Deceptive Practices Act ("NCUDPA"), N.C. Gen. Stat. § 75-1.1—"the continuation of any debt adjusting business or the offering of any debt adjusting services," and to seek consumer restitution and civil penalties. N.C. Gen. Stat. § 14-425. The violation of the NCDAA is also a Class 2 criminal misdemeanor. N.C. Gen. Stat. § 14-424.

The NCUDPA, N.C. Gen. Stat. § 75-1.1, provides: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." A practice is considered "unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers…. [A] practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required." *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981). Deceptive and misleading advertisements, solicitations, and communications with customers may constitute violations of N.C. Gen. Stat. § 75-1.1. *Bhatti v. Buckland*, 400 S.E.2d 440, 442 (N.C. 1991);

*Winston Realty Co. v. G.H.G., Inc.*, 331 S.E.2d at 677, 679 (N.C. 1985); *Hardy v. Toler*, 218 S.E.2d 342, 347 (N.C. 1975).

Thus, under the NCDAA, the activity of debt adjusting is *per se* an unfair and deceptive trade practice. N.C. Gen. Stat. § 14-425.  Further, North Carolina courts have held that the violation of consumer protection statutes designed to protect the consuming public may be deemed a *per se* violation of the NCUDPA, N.C. Gen. Stat. § 75-1.1.  *Winston Realty*, 331 S.E.2d at 681; *State ex rel. Cooper v. NCCS Loans, Inc.*, 624 S.E.2d 371, 378 (N.C. App. 2005).

As explained in Section III(B)(2)(b)(i), above, and detailed in the Amended Complaint, the Student Loan Debt Relief Companies charged consumers initial and monthly advance fees before consumers' student loans were modified and before consumers made a payment under their new loan agreement.  (Dkt. No. 134 at ¶¶ 8, 15-16, 119-126, 217.)  Further, the Student Loan Debt Relief Companies misrepresented that consumer payments were held in independent third-party accounts, when they were not, and that consumers' payments would be used to make payments toward consumers' student loan debts, when they were not.  *Id.* at ¶¶ 14-16, 119-126, 217.

By collecting advance fees prior to the rendering (if rendered at all) of their student loan debt relief services, the Student Loan Debt Relief Companies and Individual Defendants engaged in violations of the NCDAA, N.C. Gen. Stat. § 14-423, and the NCUDPA, N.C. Gen. Stat. § 75-1.1.  By participating in and facilitating the illegal debt relief scheme, and in collecting illegal advance payments from North Carolina consumers, First Priority substantially assisted the Student Loan Debt Relief Companies in their violations of the NCDAA and the NCUDPA, and itself violated the NCUDPA.  Furthermore, as set forth in the preceding section, above, First Priority also engaged in violations of the TSR, 16 C.F.R. §§ 310.3(b), 310.4(a)(5)(i), by substantially assisting the Student Loan Debt Relief Companies and Individual Defendants in collecting

illegal advance fees and in making material misrepresentations to consumers. These violations of the TSR by First Priority, in turn, constitute violations of the NCUDPA, as the TSR is clearly a consumer protection statute designed to protect the consuming public.

Accordingly, given these well-pled allegations and Defendant First Priority's failure to answer or defend, the Court should enter a default judgment against First Priority for violating the NCUDPA, N.C. Gen. Stat. § 75-1.1, as alleged in Count XVI.  (Dkt. No. 134 at ¶¶ 326-334.)

### e.  Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. (Count XVIII)

The Los Angeles City Attorney is empowered, in the name of the People of the State of California, to enforce California's Unfair Competition Law. ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.  Cal. Bus. & Prof. Code § 17204.  To establish a violation of the UCL, a plaintiff must show either an (1) "unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Prof. Code, § 17200.  This section describes three distinct violations:  "Because ... section 17200 is written in the disjunctive, it establishes three varieties of unfair competition-acts or practices which are unlawful, or unfair, or fraudulent."  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999).  "[A] practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' or vice versa."  *Id.*

In proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices" that the unfair competition law makes independently actionable.  *Id.*  Section 17200 also "imposes strict liability.  It is not necessary to show that the defendant intended to injure anyone."  *South Bay Chevrolet v. General Motors Acceptance Corp.*,

72 Cal.App.4th 861, 877 (1999).  Thus, Defendant First Priority's violations, as described above, are each independent violations of the UCL, including providing substantial assistance in violation of the Telemarketing Sales Rule (TSR), 16 C.F.R. § 310.3(b) (Count VI), violating the CFPA based on violation of the TSR, 15 U.S.C. § 6102 (Count X), and providing substantial assistance in violation of Section 1036(a)(3) of the Consumer Financial Protection Act (CFPA), 12 U.S.C. § 5536(a)(3) (Count XI).  (Dkt. No. 134 at ¶¶ 343-351.)

Given these well-pleaded allegations and Defendant First Priority's failure to answer or defend, the Court should enter a default judgment against First Priority for violating the UCL as alleged in Count XVIII, based on Defendant First Priority's violations of the TSR and CFPA (Counts VI, X, and IX).  *Id.*

### iii.  The Money at Stake Supports Default Judgment

The fourth factor – the sum of money at stake in the action – also supports immediate entry of a default judgment. *PepsiCo*, 238 F. Supp. 2d at 1176; *Ariz. Cardinals Football Club, Inc. v. Bryant*, 2009 U.S. Dist. LEXIS 35524 at *3 (D. Ariz. Apr. 6, 2009). Here, the student-loan debt-relief scheme constituted serious illegal conduct that took place over a number of years, impacting thousands of consumers, and took over $83 million in unlawful advance fees from consumers.  (Dkt. No. 134 at ¶ 8, 126.)  Of that amount, Defendant First Priority received $408,438.92 from Defendant True Count, all of which was eventually transferred back to True Count, and received and retained $165,848.05 in consumer payments from payment processors and Defendant True Count.  Declaration of Mansour Heidari, filed herewith (Heidari Decl.) at ¶¶ 6, 13; *see also* Dkt. No. 75 at 22, FN 6.  Of this amount, approximately $164,054.58 has been frozen and transferred to the Receiver pursuant to the TRO and Preliminary Injunction issued by this Court. Declaration of Lisa Jones, filed herewith at ¶ 5, 8.  As a result, and as discussed

below, Plaintiffs are seeking $165,848.05 in restitution from Defendant First Priority, representing the net amount of illegal consumer fees that flowed into First Priority's accounts as a result of the scheme, minus the amounts that were returned to Defendant True Count.  While this may appear to be a relatively small amount given the size of enterprise, it represents a significant amount of money to consumers harmed by the overall scheme and Defendant First Priority's participation in it. Defendant First Priority should be held liable for this amount of consumer injury because it directly participated and substantially assisted in the scheme when it knew or consciously avoided knowing that the representations made to consumers were false and that the scheme involved collecting illegal advance fees.  (Dkt. No. 134 at ¶ 268-269, 291.)

### iv.  Possibility of Dispute of Material Facts is Unlikely

The fifth factor, the possibility of dispute concerning material facts, favors entry of the default judgment. Defendant First Priority has not made any filing disputing Plaintiffs' allegations or defending the action. First Priority has not moved to challenge the entry of default and the well-pleaded allegations in the Amended Complaint are now deemed true as to First Priority.  Moreover, this court has already entered a TRO, finding Plaintiffs are likely to prevail on the merits, and the Receiver has substantiated the nature of the student loan scheme.  In addition, Plaintiffs have submitted competent evidence as to damages.  *See* Heidari Decl., and Ex. 2 thereto.  As a result, the possibility of any real dispute concerning the material facts of the case is slim.

### v.  The Default is Not Due to Excusable Neglect

The sixth factor, whether the default was due to excusable neglect, also clearly favors entry of default judgment, as there is no valid excuse for Defendant First Priority's failure to participate in this action. To the contrary, Defendant First Priority, a corporation, did not retain counsel, file an answer, or offer any defense to this case, even though it was given the opportunity to do

17

so. *See US v. High Country Broad Co., Inc.*, 3 F.3d 1244, 1245 (9th Cir 1993). (finding entry of default judgment "perfectly appropriate" where, as here, defendant corporation failed to retain counsel after being ordered to do so); *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) ("[D]efendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and intentionally failed to answer."); *see also Benny v. Pipes*, 799 F.2d 489, 494 (9th Cir. 1987) (finding no abuse of discretion denying motion to set aside default when party had notice of filing and failed to answer the complaint). Considering these circumstances, First Priority's conduct is not excusable neglect – it is willful noncompliance.

### vi.  Other Factors Outweigh Deciding the Case on the Merits

Although the final *Eitel* factor favors deciding cases on the merits when possible, this factor is outweighed by the other factors. *Pepsico*, 238 F. Supp. 2d at 1177 ("the mere existence of Fed. R. Civ.P. 55(b) indicates that this preference, standing alone, is not dispositive.").  Here, this factor is outweighed by the other *Eitel* factors addressed above.  Thus, public policy favors entry of a default judgment against Defendant First Priority.

### C. Default Judgement for Injunctive and Monetary Relief is Warranted

In this case, the Amended Complaint seeks (1) a permanent injunction to prevent future violations of the TSR, CFPA, NCUDPA and UCL; (2) monetary relief to redress injury to consumers; and (3) civil money penalties. These forms of relief are authorized under the CFPA, 12 U.S.C. § 5565, and applicable state laws.  Moreover, it is within the Court's discretion to enter injunctive and monetary relief at this stage, without holding an evidentiary hearing. *Fendler*, 650 F.2d at 1161; *see also 1263523 Ontario, Inc.*, 205 F. Supp. 2d at 223 (calculating relief based on declaration).

### i.  Injunctive Relief to Prevent Future Violations

Memo of P&A ISO Appl. for Entry of Default Judgment Against First Priority LLC

Plaintiffs seek injunctive relief against Defendant First Priority for the violations of law pled in the Amended Complaint. The requested relief is detailed in the proposed Default Judgment filed herewith and is tailored to the allegations in the Amended Complaint.  The proposed relief includes a permanent ban on telemarketing or assisting others engaged in telemarketing any Consumer Financial Product or Service; a permanent ban on marketing, offering, or providing any Debt Relief Product or Service; and prohibitions on misrepresenting any Consumer Financial Product or Service.

A permanent injunction is justified when there is "some reasonable likelihood of future violations." *CFTC v. Co Petro Marketing Grp., Inc.*, 502 F. Supp. 806, 818 (C.D.Cal.1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982).  Cessation of activity does not moot an action for injunctive relief; otherwise defendants "would be free to return to their old ways." *See FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1237 (9th Cir. 1999).  A permanent injunction may prohibit conduct broader in scope than the illegal conduct at issue. Where, as here, the Defendants were involved in elaborate, illegal schemes to deceive consumers, broader "fencing-in" relief provisions help to "prevent similar and related violations from occurring in the future." *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 215 (9th Cir. 1979). *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (FTC "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. . . .[R]espondents must expect some reasonable fencing in.") (citation omitted).

A permanent injunction is warranted here. Defendants victimized thousands of student loan borrowers, and continued their scheme even after a Civil Investigative Demand from the Bureau was served on Defendant CAC in September 2018, and after Defendant CAC filed for bankruptcy in January 2019 in a misguided attempt to avoid regulatory enforcement.  (Dkt. No. 75 at 10.)  Further, after the Wall Street Journal published an article highly critical of

their practices on August 26, 2019, rather than stop the practices, the Defendants simply tried to retool the illegal operation.  *Id.* at 10-12.  Indeed, Defendants did not stop violating the law until the instant case was filed, the TRO was entered, and the Receiver was appointed.

Courts in the Ninth Circuit have approved categorical bans as proper injunctive relief considering a defendant's repeated violations of laws.  *See, e.g.*, *FTC v. Gill*, 265 F.3d 944, 957-58 (9th Cir. 2001) (upholding ban on participation in credit repair business); *Fed. Trade Comm. v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1014–15 (C.D. Cal. 2012) (infomercial marketing and telemarketing ban); *Fed. Trade Comm. v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1010 (N.D. Cal. 2010) (ban on telephonic billing); Fed. Trade Comm. v. Medicor, LLC, F. Supp. 2d 1048, 1050–51 (C.D. Cal. 2002) (telemarketing and work-at-home medical billing opportunities bans).  As in those cases, the requested permanent ban is necessary and appropriate to protect consumers from future harm.

### ii.  Monetary Relief to Compensate Consumers

The CFPA authorizes the Court to grant relief, including refund of moneys, restitution, and disgorgement or compensation for unjust enrichment. 12 U.S.C. § 5655(a)(2)(B), (C), and (D).  In ordinary usage, Miriam-Webster defines a "refund" as "to return (money) in restitution, repayment, or balancing of accounts."  *See* "refund" Mirriam-Webster.com 2020, https://www.merriam-webster.com/dictionary/refund (last visited Sept. 8, 2020).  Likewise, "[r]estitution may be measured by the 'full amount lost by consumers rather than limiting damages to a defendant's profits.'" *CFPB v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016). (quoting *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)).  Importantly, a defendant is liable for the entire amount spent by consumers, regardless of whether consumers were satisfied with or benefited from the goods or services provided.  *See id.* at 1195-96.

In seeking a default judgment, plaintiffs bear the burden of proving the amount of monetary relief to which it is entitled. They may do so, as here, through affidavits and other documentary evidence showing the amount consumers paid: an evidentiary hearing is unnecessary, particularly where the evidence before the Court is not controverted. *Fendler*, 650 F.2d at, 1161; *see also 1263523 Ontario, Inc*., 205 F. Supp. 2d at 223. (calculating $10 million relief based on declaration from defendants' payment processor).

As demonstrated by the attached declaration and supporting evidence, defendants collected at least approximately $165,848.05 in net from consumers in connection with their unlawful scheme that flowed to and through accounts established and owned by Defendant First Priority.  Heidari Decl. at ¶ 13. Therefore, the proposed order would impose a judgment against First Priority for refunds or restitution of $165,848.05.

As explained in the attached declaration of Mansour Heidari, this figure was derived from Defendants' bank statements. *Id*. at ¶¶ 4-5, 13. The total amount was calculated by totaling the $164,298.05 in fees charged to consumers that were transferred to Defendant First Priority by third-party payment processors, plus the total net deposits totaling $1,550 from accounts controlled by Co-Defendant True Count that were retained by Defendant First Priority. *Id*. at ¶¶ 4, 13.  Notably, this amount excludes the approximately $408,438.92 that was transferred to Defendant First Priority by co-defendant True Count, and was transferred back to True Count, as the other defendants involved in the common enterprise will be liable for this amount, including Defendant True Count.  Therefore, the total amount, $165,848.05 represents a conservative, reasonable approximation of consumer loss attributable to Defendant First Priority.

Memo of P&A ISO Appl. for Entry of Default Judgment Against First Priority LLC

Given the absence of rebuttal evidence, the well-founded allegations in the Amended Complaint, and the evidence submitted herewith, the Court should require Defendant First Priority to repay this amount as restitution.

This Court is also empowered to "make such orders or judgments, . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus & Prof Code § 17203. Accordingly, Defendant First Priority and its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, whether acting directly or indirectly, should be enjoined to restore all money received as part of this scheme, as further set forth above.

### iii.  Civil Monetary Penalties

The CFPA authorizes the Court to order civil money penalties against "[a]ny person [including individuals and entities] that violates, through any act or omission, any provision of Federal consumer financial law." 12 U.S.C. § 5565(a)(2)(H), (c)(1).   There are three tiers of penalties, based on the degree of scienter, which are adjusted for inflation.  For civil penalties assessed after January 15, 2020, whose associated violations occurred on or after November 2, 2015, those amounts are: up to $5,883 per day for any violation; up to $29,416 per day for each reckless violation; and up to $1,176,638 per day for each knowing violation.  12 U.S.C. § 5565(c)(2); 12 CFR § 1083.1.  Defendant First Priority's conduct was at least reckless, if not knowing.  (Dkt. No. 134 at ¶ 291 (First Priority "knew, or recklessly avoided knowing, the material misrepresentations" made to consumers.).)

The appropriate, conservative calculation of civil penalties for Defendant First Priority's violation of the CFPA is to multiply the number of days that Defendant First Priority participated in the scheme by the daily penalty amount for reckless violations – $29,416.  According to Defendant First Priority's bank

22

records, the company received and retained its first deposit from a payment processor on February 15, 2019.  Heidari Decl. at ¶ 10.  As noted previously, the scheme continued to operate until the filing of the instant case, entry of the TRO, and execution of the immediate access on October 23, 2019.  (Dkt. No. 75 at 4.)  As a result, Defendant First Priority should be held responsible for its participating in the scheme from February 15 through October 23, 2019, for a total of 250 days.  Therefore, a civil penalty totaling $7,354,000 for reckless violations of the CFPA over a period of 250 days would be appropriate.

The size of the civil penalty also depends on various statutory mitigating factors, including "good faith," "the size of financial resources . . . of the person charged," "the gravity of the violation," "the severity of the risks to or losses of the consumer," "the history of previous violations," and "such other matters as justice may require." 12 U.S.C. § 5655(c)(3). Most of these factors do not weigh in favor of a significant mitigation of the civil money penalty.

Defendant Nguyen was First Priority's only officer, while Defendants Kim and Wen acted as contacts on behalf of the company for a payment processor.  Heidari Decl. ¶ 3, Ex. 1; Dkt. No. 134 at ¶¶ 178-179. Moreover, The Individual Defendants, through True Count and Prime, set up First Priority and other companies to collect payments from consumers.  *Id.* at ¶¶ 76, 157, 176. After coming under scrutiny for their conduct, defendants acted in bad faith by attempting to evade the TSR's ban on upfront fees for debt relief services by making deceptive claims of using dedicated client accounts in a failed attempt to circumvent the law.  (Dkt. No. 75 at 10-12.)

The gravity of this scheme was significant.  Defendants charged consumers thousands of dollars for services that consumers could have undertaken themselves at little to no cost, and Defendants charged consumers hundreds of additional dollars per year to recertify their loans, often by submitting false information to the loan servicers.  Defendants ultimately bilked

23

these consumers out of over $83 million, of which at least $165,848.05 flowed into and was retained in accounts held by Defendant First Priority.

First Priority appears to have limited financial resources, so this factor supports some mitigation. In light of the mitigating factors, a penalty of $ 6.5 million under the CFPA is warranted. This proposed penalty is a conservative calculation based on reckless violation of the CFPA over the 250-day period during which Defendant First Priority was receiving consumer fees from payment processors.  Indeed, Defendant First Priority could be subject to civil money penalties in the hundreds of millions of dollars based upon knowing violations.  While this penalty is well in excess of Defendant First Priority's known assets, it provides necessary punishment to Defendant First Priority, accomplishes the goal of deterring others from such conduct, and considers the possibility that additional First Priority assets may be discovered in the future.

Under California Business and Professions Code section 17206, this Court is also required to impose a civil penalty for violations of that chapter of up to $2,500 per violation.  Cal. Bus & Prof Code § 17206.  This penalty is mandatory and cumulative to all other penalties under California law.  Cal. Bus & Prof Code § 17205.  In assessing this penalty, this Court must consider "relevant circumstances," including but not limited to "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth."  Cal. Bus & Prof Code § 17206, subd. (b).  Here, as outlined above, the nature and seriousness of the misconduct was severe, there are thousands of violations, even just assuming one violation of the different laws per day, and the conduct was persistent, continuing from inception until interrupted by the Plaintiff's temporary restraining order and receivership.  And as noted above, the conduct was at least reckless, if not willful.  As such, the

People of the State of California seek liability for a conservative civil penalty of $1,200,000 under section 17206.[4]  Notably, the People do not currently seek any distribution from receivership funds for this $1,200,000.  As shown in the detailed penalty calculation in footnote 4, this is a conservative mandatory penalty, necessary to punish the defendant and deter future wrongdoing.

As provided in Plaintiff's proposed Default Judgment against Defendant First Priority, Plaintiffs seek a total judgment in the amount of $7,700,000 in civil penalties and $165,848.05 in refunds or restitution.  Because the Receiver in this matter is currently holding $164,054.58 in Defendant's assets, the proposed judgment requests that this Court order the Receiver to distribute those funds, which shall constitute partial payment of the judgment in this matter, as follows:  $10,000 to each of the Plaintiff states in penalties, and all remaining funds to the Bureau to distribute on behalf of all Plaintiffs to consumer victims as redress.

## IV.   CONCLUSION

For the reasons set forth above, the Bureau respectfully requests that the Court enter the proposed Default Judgment against Defendant First Priority.

Dated: September 10, 2020                    Respectfully submitted,


                                             By: /s/ *N. Nathan Dimock*


                                             N. Nathan Dimock (D.C. Bar No. 487743)
                                             (admitted *pro hac vice*)
                                             *Enforcement Attorney*

---

[4] Taking into account the 250-day period, and assessing a Cal. Bus. & Prof. Code § 17206 per-day penalty for violations of Counts VI, IX, and X ($2,500 per violation), yields a conservative penalty of $7,500 x 250 = $1,875,000. This figure is conservative because it is a near certainty that more than one violation per day occurred.  The People here request judgment of $1,200,000 in mandatory civil penalties.

1700 G Street NW
Washington, DC 20552
Phone: (202) 435-9198
Fax: (202) 435-9346
Email: nathan.dimock@cfpb.gov

Attorney for Plaintiff
Bureau of Consumer Financial Protection

By: /s/ *M. Lynne Weaver*
M. Lynne Weaver (N.C. Bar No. 19397)
(admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Phone: (919) 716-6039
Fax: (919) 716-6050
Email: lweaver@ncdoj.gov

Attorney for Plaintiff
State of North Carolina


By: /s/ *Evan Romanoff*
Evan Romanoff (admitted *pro hac vice*)
Atty. Reg. No. 0398223
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Phone: (651) 757-1454
Fax: (651) 296-7438
Email: evan.romanoff@ag.state.mn.us


Attorney for Plaintiff
State of Minnesota

By: /s/ *Christina Tusan*
Christina Tusan,
Supervising Deputy City Attorney
Office of the City Attorney

26

Consumer and Workplace Protection Unit
200 N. Main Street, 500 City Hall East
Los Angeles, CA 90012
213-473-6908
Email: christina.tusan@lacity.org

I, Nathan Dimock, attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

/s/ *N. Nathan Dimock*

N. Nathan Dimock