**BUREAU OF CONSUMER FINANCIAL PROTECTION**
NATHAN DIMOCK (D.C. Bar No. 487743)
(Admitted *pro hac vice*)
Tel.: (202) 435-9198 / Email: nathan.dimock@cfpb.gov
SARAH PREIS (D.C. Bar No. 997387)
(admitted *Pro Hac Vice*)
Tel.: (202)-435-9318 / Email: sarah.preis@cfpb.gov
JESSE STEWART (N.Y. Bar No. 5145495)
(admitted *Pro Hac Vice*)
Tel: (202)-435-9641 / Email: jesse.stewart@cfpb.gov
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-5471

LEANNE E. HARTMANN (CA Bar No. 264787)
(Local Counsel for the Bureau of Consumer Financial Protection) 301
Howard Street, Suite 1200
San Francisco, CA 94105
Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788

*Attorneys for Plaintiff the Bureau of Consumer Financial Protection*

**THE STATE OF MINNESOTA**
EVAN ROMANOFF (Attorney Reg. No. 0398223)
(admitted *Pro Hac Vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 757-1454/Email: evan.romanoff@ag.state.mn.us

*Attorneys for Plaintiff the State of Minnesota*

**THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (N.C. Bar No. 19397)
(admitted *Pro Hac Vice*)
MICHAEL T. HENRY (N.C. Bar No. 35338)
(admitted *Pro Hac Vice*)
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
Tel.: (919) 716-6000 / Fax: (919) 716-6050
Emails: lweaver@ncdoj,gov/mhenry@ncdoj.gov

*Attorneys for Plaintiff the State of North Carolina*

**THE PEOPLE OF THE STATE OF CALIFORNIA**
MICHAEL N. FEUER, City Attorney (CA Bar No. 111529) CHRISTINA
V. TUSAN, Supvr. Deputy City Attorney (CA Bar No. 192203)
WILLIAM PLETCHER, Deputy City Attorney (CA Bar No. 212664)
MIGUEL RUIZ, Deputy City Attorney (CA Bar No. 240387) OFFICE OF
THE CITY ATTORNEY
200 N. Main Street, 500 City Hall East
Los Angeles, California 90012-4131
Tel: (213) 473-6908/Fax: (213) 978-8112
Emails: christina.tusan@lacity.org / william.pletcher@lacity.org

*Attorneys for Plaintiff the People of the State of California*

1

**REDACTED SECOND AMENDED COMPLAINT**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

Bureau of Consumer Financial
Protection; State of Minnesota, by its
Attorney General, Keith Ellison;
State of North Carolina, *ex rel.*
Joshua H. Stein, Attorney General;
and The People of The State of
California, Michael N. Feuer, Los
Angeles City Attorney,

       Plaintiffs,

       v.

Consumer Advocacy Center Inc., d/b/a
Premier Student Loan Center; True
Count Staffing Inc., d/b/a SL Account
Management; Prime Consulting LLC,
d/b/a Financial Preparation Services;
TAS 2019 LLC d/b/a Trusted Account
Services; Horizon Consultants LLC;
First Priority LLC d/b/a Priority
Account Management; Albert Kim,
a/k/a Albert King; Kaine Wen, a/k/a
Wenting Kaine Dai, Wen Ting Dai, and
Kaine Wen Dai in his individual
capacity and as trustee of the Kaine
Wen 2017 Trust; and Tuong Nguyen,
a/k/a Tom Nelson,

       Defendants, and

Infinite Management Corp., f/k/a
Infinite Management Solutions Inc.;
Hold The Door, Corp.; TN
Accounting Inc.; Mice and Men
LLC; 1st Generation Holdings, LLC;
Sarah Kim; Anan Enterprise, Inc.;
and Judy Dai in her individual
capacity and as trustee of the Judy
Dai 2017 Trust,

       Relief Defendants.

Case No: SACV 19-1998-MWF(KSx)

**SECOND AMENDED COMPLAINT**

## INTRODUCTION

1.    The Bureau of Consumer Financial Protection (Bureau) brings this

action under §§ 1031, 1036(a), 1054, and 1055 of the Consumer Financial

Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564 & 5565; under and the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101-6108, and its implementing regulation, the Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310; under § 3304(b)(1) of the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. §§ 3001-3308; under § 3439.04(a) of the California Uniform Voidable Transactions Act (UVTA), Cal Civ. Code §§ 3439-3439.14; and under the Court's ancillary enforcement jurisdiction. The Bureau brings this action against the student-loan debt-relief operation involving Defendants Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; True Count Staffing Inc., d/b/a SL Account Management; Prime Consulting LLC, d/b/a Financial Preparation Services (collectively, Student Loan Debt Relief Companies); Defendants TAS 2019 LLC, d/b/a Trusted Account Services, Horizon Consultants LLC, and First Priority LLC (collectively, Payment Companies); and Defendants Albert Kim; Kaine Wen, in his individual capacity and as trustee of the Kaine Wen 2017 Trust; and Tuong Nguyen (collectively, Individual Defendants). (Student Loan Debt Relief Companies, Payment Companies, and Individual Defendants are referred to, collectively, as Defendants.)

2.    The State of Minnesota, by its Attorney General, brings this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of the Minnesota Prevention of Consumer Fraud Act (MNCFA), Minn. Stat. §§ 325F.68-.694; the Minnesota Uniform Deceptive Trade Practices Act (MNDTPA), Minn. Stat. §§ 325D.43-.48; and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation,

REDACTED SECOND AMENDED COMPLAINT

the TSR, 16 C.F.R. Part 310, in connection with Defendants' student-loan debt-relief operation.

3.     The State of North Carolina, by its Attorney General, brings this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of North Carolina's Debt Adjusting Act, N.C. Gen. Stat. § 14-423, *et seq.*, (NCDAA); North Carolina's Unfair and Deceptive Practices Act, N.C. Gen. Stat. § 75-1.1 (NCUDPA); North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat. § 66-260, *et seq.* (NCTSRA); and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with Defendants' student-loan debt-relief operation.

4.     The People of the State of California (collectively with the States of Minnesota and North Carolina, "the States"), by and through Michael N. Feuer, Los Angeles City Attorney, bring this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of California's Business and Professions Code section 17200 et seq. (the "Unfair Competition Law," or "UCL"), the UVTA, Cal. Civil Code sections 3439 through 3439.14, and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with student-loan debt-relief operation.

5.     Defendants engaged in an unlawful student-loan debt-relief business that harmed consumers nationwide by charging consumers unlawful advance fees and misrepresenting the terms and conditions of their services.

6.     The Bureau and the States bring this action to stop Defendants' unlawful conduct, obtain relief for harmed consumers, avoid certain fraudulent transfers to satisfy any judgment in favor of the Bureau and the People of the

**REDACTED SECOND AMENDED COMPLAINT**

1  State of California against Defendant Kaine Wen, and impose civil money

2  penalties on Defendants for their unlawful actions.

3        7.     The Bureau and the States also bring this action against Infinite

4  Management Corporation; Hold the Door, Corp.; TN Accounting Inc.; Mice

5  and Men LLC; 1st Generation Holdings, LLC; Sarah Kim; Anan Enterprise,

6  Inc.; and Judy Dai in her individual capacity and as trustee of the Judy Dai 2017

7  Trust, as Relief Defendants.

8                     **OVERVIEW**

9        8.     From at least 2015 until the filing of this action, Defendants

10  operated a debt-relief enterprise that deceived thousands of federal-student-loan

11  borrowers and collected over $95 million in illegal advance fees, in violation of

12  the TSR, the CFPA, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA,

13  the NCTSRA, and the UCL.  Unless otherwise noted, all references to

14  "borrowers" and "consumers" in this Complaint include California, Minnesota,

15  and North Carolina borrowers and consumers.

16        9.     The Student Loan Debt Relief Companies, controlled by the

17  Individual Defendants, purported to help federal-student-loan borrowers obtain

18  loan forgiveness or lower monthly payments through programs administered by

19  the U.S. Department of Education (DOE).

20        10.    In fact, the Student Loan Debt Relief Companies deceived

21  consumers, including by misrepresenting that consumers would qualify for loan

22  forgiveness in a matter of months, when forgiveness takes at least 10 years of

23  on-time payments and is determined by DOE; that consumers were approved

24  for lower monthly payments on their student loans, when consumers had not yet

25  been approved or when the new payment amount was approved based on false

26  information; and that consumers' lower payments would be permanent when in

27  fact they are subject to change based on changes in the consumers' family size,

28  income, and marital status.

**REDACTED SECOND AMENDED COMPLAINT**

11.     The Student Loan Debt Relief Companies also falsely told consumers, or led consumers to believe, that the consumers' payments to the companies would go toward paying consumers' student-loan balances.

12.     When describing the services offered to consumers, the Student Loan Debt Relief Companies failed to inform consumers that it was their practice to request that consumers' loans be placed into forbearance or that interest would continue to accrue during the forbearance period, thereby increasing consumers' overall loan balances.

13.     When describing the services offered to consumers, the Student Loan Debt Relief Companies failed to inform consumers that it was their practice to submit false information about consumers' income, family size, and marital status on loan adjustment applications in order to try to qualify consumers for lower monthly payments.

14.     The Student Loan Debt Relief Companies charged consumers an initial fee of $900-$1,750 for their services. This initial fee was typically levied well before consumers had been accepted to and made a payment under their new loan agreement, in violation of the TSR.

15.     At no time did the Student Loan Debt Relief Companies hold consumer payments in independent third-party accounts.

16.     At no time did the Student Loan Debt Relief Companies use payments from consumers to make payments toward consumers' student-loan debts.

17.     The Individual Defendants conducted this operation using a network of several interrelated companies and over a dozen unregistered and fictitious business names. The Student Loan Debt Relief Companies operated as a common enterprise controlled by the Individual Defendants, rendering each jointly and severally liable for the illegal acts of the Student Loan Debt Relief Companies.

**REDACTED SECOND AMENDED COMPLAINT**

1

## JURISDICTION AND VENUE

2       18.    This Court has subject-matter jurisdiction over this action because

3   it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1),

4   presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of

5   the United States, 28 U.S.C. § 1345.  This Court has supplemental jurisdiction

6   over the States' claims pursuant to 28 U.S.C. § 1367.

7       19.    Venue is proper in this district pursuant to 12 U.S.C. § 5564(f)

8   because Defendants are located, reside, or do business in this district.

9

## PARTIES

10      20.    The Bureau is an independent agency charged with enforcing

11  violations of Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau

12  has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the

13  authority to enforce the CFPA's prohibitions on unfair, deceptive, and abusive

14  acts or practices, 12 U.S.C. §§ 1031, 1036, the TSR as it applies to persons

15  subject to the CFPA, 15 U.S.C. §§6102(c), 6105(d), the FDCPA as to a debt

16  owed to the Bureau, and therefore the United States, 28 U.S.C. §§ 3001,

17  3002(1)(A), (3), (15)(B), and any judgment it obtains, including by invoking the

18  court's ancillary jurisdiction.

19      21.    The Bureau has authority to bring civil actions against persons

20  violating federal consumer-financial laws and to "seek all appropriate legal and

21  equitable relief including a permanent or temporary injunction as permitted by

22  law." 12 U.S.C. § 5564(a).

23      22.    Keith Ellison, Attorney General of the State of Minnesota, is

24  authorized under Minnesota Statutes chapter 8; the MNCFA, Minn. Stat. §

25  325F.69, *et seq.*; the MNDTPA, Minn. Stat. § 325D.44, *et seq.*; the

26  Telemarketing Act, 15 U.S.C. § 6103(a); and has common law authority,

27  including *parens patriae* authority, to bring this action on behalf of the State of

28  Minnesota and its citizens to enforce Minnesota law.

23.    The State of North Carolina is acting through its Attorney General Joshua H. Stein, pursuant to authority granted by Chapters 14, 66, 75, and 114 of the North Carolina General Statutes, and the Telemarketing Act, 15 U.S.C. § 6103(a).

24.    Michael N. Feuer, City Attorney for the City of Los Angeles, is authorized under the UCL, UVTA, and the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), to bring this civil law enforcement action on behalf of the People of the State of California.

25.    Defendant Consumer Advocacy Center Inc. (CAC) is a California corporation formed on August 6, 2014, and it has held itself out as doing business at the following addresses: 173 Technology Drive, Suite 202, Irvine, CA 92618; 29901 Santa Margarita Pkwy, Suite 200F, Rancho Santa Margarita, CA 92688; 8 Hughes Parkway, Irvine, CA 92618; 5350 E Suncrest Rd., Anaheim, CA 92807; and 24852 Acropolis Dr., Mission Viejo, CA 92691.

26.    CAC has held itself out as doing business as Premier Student Loan Center.

27.    CAC transacted its student-loan debt-relief business in the Central District of California since at least November 2015.

28.    On January 16, 2019, CAC filed for protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida.  *See In re Consumer Advocacy Center, Inc.*, No. 19-10655-BKC-JKO (Bankr. S.D. Fla.).

29.    Defendant True Count Staffing Inc. (True Count) registered as a California corporation on February 13, 2017, and it has held itself out as doing business at the following addresses: 173 Technology Dr., Ste 202, Irvine, CA 92618; 777 E. Sierra Madre Ave, Azusa, CA 91702; 8 Hughes Parkway, Irvine, CA 92618; and 7545 Irvine Center Drive, Suite 200, PMB #108, Irvine, CA, 92618.

**REDACTED SECOND AMENDED COMPLAINT**

30.     True Count has held itself out as doing business as SL Account Management.

31.     Defendant Prime Consulting LLC (Prime) is a Wyoming limited-liability company that registered with the California Secretary of State on April 25, 2018, and it has held itself out as doing business at 11932 Klingerman Street, Suite 3, El Monte, CA, 91732 and 7545 Irvine Center Drive, Suite 200, Room 108, Irvine, CA, 92618.

32.     Prime has held itself out as doing business as Financial Preparation Services.

33.     Defendant TAS 2019 LLC, d/b/a Trusted Account Services (TAS) is a Wyoming limited liability corporation that has held itself out as doing business at two locations affiliated with companies providing resident agent services in Wyoming, 109 E. 17th Street Suite 5656, Cheyenne, WY, 82001, and 30 N Gould Street, Suite R, Sheridan, WY 82801; a rented virtual office address at 17011 Beach Blvd., Suite 900, Huntington Beach, CA 92467; and a residential address affiliated with its purported owner, Kenny Huang, in Arcadia, CA.

34.     TAS 2019 LLC's operations and principal place of business were located in the Central District of California.

35.     Defendant Horizon Consultants LLC (Horizon) is a Wyoming limited liability corporation that has been registered to operate in California since October 2018.  It has held itself out as doing business at 2522 Chambers Rd Suite 100 Rm 209, Tustin, CA 92780.

36.     Defendant First Priority LLC d/b/a Priority Account Management (First Priority) is a Wyoming limited liability corporation that has been registered to operate in California since May 2018. It has held itself out as doing business at 1704 South Granada Ave, Alhambra, CA 91801.

REDACTED SECOND AMENDED COMPLAINT

37.   Defendant Albert Kim (a/k/a Albert King) is CAC's primary owner and founder.

38.   Kim is a resident of the State of California and performed work for CAC while residing in this jurisdiction.

39.   Kim exercised substantial control over CAC's business practices.

40.   Kim exercised managerial responsibility for CAC and participated in the conduct of its affairs.

41.   Defendant Kaine Wen (a/k/a Wenting Kaine Dai, Wen Ting Dai) is True Count's primary owner and founder and has also been an owner and manager of CAC. Wen incorporated True Count and has served as its chief executive officer, director, partner, and president.

42.   Wen is a resident of the State of California and performed work for CAC and True Count while residing in this jurisdiction.

43.   Wen exercised substantial control over True Count's business practices.

44.   Wen exercised managerial responsibility for True Count and participated in the conduct of its affairs.

45.   Wen exercised managerial responsibility for CAC and participated in the conduct of its affairs.

46.   Wen is the sole trustee, settlor, and named beneficiary (during his lifetime) of the Kaine Wen 2017 Trust, a revocable trust created on or about September 7, 2017, under the laws of the State of California.

47.   Defendant Tuong Nguyen (a/k/a Tom Nelson) served as CAC's controller and as True Count's secretary.

48.   Nguyen is a resident of the State of California and performed work for CAC and True Count while residing in this jurisdiction.

49.   Nguyen exercised managerial responsibility for CAC and participated in the conduct of its affairs.

**REDACTED SECOND AMENDED COMPLAINT**

50.     Nguyen exercised managerial responsibility for True Count and participated in the conduct of its affairs.

51.     Relief Defendant Infinite Management Corp., f/k/a Infinite Management Solutions Inc. (Infinite Management) registered as a California corporation on September 8, 2016, and it has held itself out as doing business at 9228 City Lights Drive, Aliso Viejo, CA, 92656.

52.     Kim served as Infinite Management's registered agent and president, and he is the sole signatory on a bank account belonging to it.

53.     Relief Defendant Hold the Door Corp. (Hold the Door) registered as a California corporation on December 30, 2016, and it listed its address as 777 E. Sierra Madre Ave, Azusa, CA 91702. It described its business type as "consulting services" in corporate filings with the California Secretary of State.

54.     Hold the Door was incorporated by Wen, and he has served as its sole corporate officer.

55.     Relief Defendant TN Accounting Inc. (TN Accounting) is a California corporation that filed its Articles of Incorporation with the California Secretary of State on February 8, 2017, and it has listed its principal place of business address of 1704 S. Granada Ave, Alhambra, CA 91801 in corporate filings with the Secretary of State.

56.     Nguyen has served as TN Accounting's president and sole corporate officer.

57.     Relief Defendant Mice and Men LLC (Mice and Men) is a Wyoming corporation incorporated in December 2018 that has listed its principal place of business as 30 N. Gould St, Ste R, Sheridan, WY 82801.

58.     Registered Agents Inc., is Mice and Men's registered agent in Wyoming, and is the company that filed the Wyoming articles of organization for Mice and Men. The address for Registered Agents, Inc., is 30 N. Gould St, Ste R, Sheridan, WY 82801.

**REDACTED SECOND AMENDED COMPLAINT**

59.     Mice and Men is purportedly owned by Relief Defendant Judy Dai, Defendant Wen's mother, who resides in Monterey Park, CA.

60.     Judy Dai was listed with Registered Agents Inc. as the contact person for Mice and Men, using her Monterey Park, CA residence as the mailing address.

61.     Invoices from Registered Agents Inc. for services rendered for Mice and Men were billed to Mice and Men, LLC, Judy Dai, at Judy Dai's Monterey Park, CA residence.

62.     Relief Defendant 1st Generation Holdings, LLC (1st Generation) is a Wyoming corporation with its principal place of business in Downey, California.

63.     Relief Defendant Sarah Kim is Defendant Kim's wife. She is a resident of the State of California.

64.     Relief Defendant Anan Enterprise, Inc. (Anan Enterprise), is a California corporation that has listed its principal place of business as 2080 E. 25th Street, Vernon, CA 90058. Anan Enterprise is owned by Defendant Albert Kim's brother-in-law and Relief Defendant Sarah Kim's brother, Kyle Kim.

65.     Relief Defendant Judy Dai is Defendant Wen's mother. She is a resident of the State of California and this District.

66.     Judy Dai is and has been the sole trustee, settlor, and named beneficiary (during her lifetime) of the Judy Dai 2017 Trust, a revocable trust created on or about September 7, 2017, under the laws of the State of California.

## FACTS

### Student Loan Forgiveness and Repayment Programs

67.     DOE administers several federal student-loan repayment programs. Some potentially offer lower monthly loan payments. Others allow consumers

who make the requisite qualifying payments over a period ranging from 10 to 25 years (and who meet other eligibility criteria) to obtain loan forgiveness.

68.     One such program is the income-driven repayment (IDR) program. IDR plans may lower consumers' monthly payments to more affordable amounts based on the consumers' income and family size. Consumers enrolled in IDR plans who make qualifying payments may also have their outstanding student-loan balances forgiven after 20-25 years.

69.     Under another program, the Public Service Loan Forgiveness program, consumers who work full-time for a qualifying public-service employer, make 120 qualifying payments, and meet other eligibility criteria, can apply to have their outstanding student-loan balances forgiven after 10 years.

70.     Because a borrower's income and family size can fluctuate over the life of the loan, consumers are required to recertify their eligibility for IDR programs on an annual basis. Variables such as marital status and tax-filing status (single, married filing separately, married filing jointly) may affect how DOE calculates monthly payment amounts. As a result, monthly payments under the IDR programs can vary from year to year.

### The Student Loan Debt Relief Companies

71.     CAC began offering student-loan debt-relief services purporting to lower consumers' monthly loan payments and obtain loan forgiveness through enrollment in loan forgiveness or IDR plans as early as November 2015.

72.     Initially, CAC's internal structure included sales, processing, and customer-service departments.

73.     The sales department fielded incoming consumer calls, made outbound marketing calls, and enrolled consumers in the Student Loan Debt Relief Companies' services by providing consumers with contracts for electronic signature during sales calls.

**REDACTED SECOND AMENDED COMPLAINT**

74. The processing department charged consumers the initial advance fees, and prepared and submitted forbearance, loan-consolidation, and IDR requests to consumers' student-loan servicers. The consumer's student-loan servicer then evaluated the requests.

75. In March 2018, Kim and Wen moved CAC's processing and customer-service operations into a new entity, True Count.

76. As part of this shift, CAC's processing and customer-service departments physically moved to a new office location.

77. CAC continued to handle sales, while True Count took over preparing and submitting loan-consolidation and IDR-plan applications and collecting payments from consumers (including from consumers who had enrolled for services with CAC).

78. As early as April 2018, CAC transferred its sales functions to a new entity, Prime, which ultimately assumed CAC's role as the main sales company enrolling consumers for True Count's services.

79. The Individual Defendants, through True Count and Prime, set up First Priority, Horizon, and TAS to collect payments from consumers.

**Debt Relief Sales and Business Practices**

80. The Student Loan Debt Relief Companies marketed their debt-relief services through inbound and outbound calls, websites, social media, and direct mail.

81. When consumers called the front-end sales company (CAC or Prime), the consumer first spoke with a sales representative.

82. Sales representatives instructed consumers on how to create an ID and password for consumers' online accounts with Federal Student Aid (FSA), an office of DOE, if the consumer had not previously done so. The sales representatives then instructed the consumer to provide the sales representative with the consumer's FSA ID and password.

14

**REDACTED SECOND AMENDED COMPLAINT**

83.    Sales representatives downloaded student-loan data from the consumer's online FSA account into the company's customer–relationship-management system.

84.    Sales representatives often stated that there was an urgent need to sign up for the respective Student Loan Debt Relief Company's services.

85.    For example, some sales representatives told consumers that they had a limited time in which they could apply for an IDR program.

86.    At times, sales representatives represented that the respective Student Loan Debt Relief Company was affiliated with DOE.

**Representations about Fees**

87.    During sales calls, sales representatives made affirmative representations or material omissions about the purpose of the fees paid by consumers to the Student Loan Debt Relief Companies.

88.    Sales representatives frequently represented that the fees would be applied to the balance of consumers' student loans.

89.    In fact, all monies paid by the consumers to the Student Loan Debt Relief Companies were fees retained by the companies and were not remitted to student-loan servicers to be applied toward consumers' loan balances.

90.    Sales representatives frequently represented that fees paid to the Student Loan Debt Relief Companies would be the only payments consumers would owe on their student loans after being accepted into a DOE repayment program.

91.    In fact, the fees paid to the Student Loan Debt Relief Companies were in addition to, and did not relieve consumers of, their obligation to pay their student loans.

92.    Sales representatives frequently represented to consumers that the fees charged by the Student Loan Debt Relief Companies were necessary to participate and remain enrolled in a loan-forgiveness or IDR program.

93.    In fact, consumers can apply free of charge for loan forgiveness or IDR programs, either through their student-loan servicer or directly to the DOE.

94.    Moreover, consumers can recertify annually their eligibility to remain enrolled in their IDR plans through their student-loan servicer for free.

**Representations about Loan Forgiveness**

95.    The Student Loan Debt Relief Companies' sales representatives often told consumers that they were qualified or approved for loan forgiveness.

96.    Sales representatives frequently represented to consumers that they could get consumers' student loans forgiven in whole or in part shortly after enrolling in the respective Student Loan Debt Relief Company's services.

97.    The DOE's loan forgiveness programs require anywhere from 10-25 years of qualifying payments, as well as satisfaction of other eligibility criteria, to qualify for loan forgiveness.

98.    Only the DOE can approve consumers for loan forgiveness.

99.    Because only the DOE can approve consumers for loan forgiveness, and only after a consumer makes qualifying monthly payments over a period ranging from 10 to 25 years, the Student Loan Debt Relief Companies' representations to consumers that all or part of their loans would be forgiven upon payment of enrollment fees were false.

**Representations about Lower Monthly Payments**

100.    The Student Loan Debt Relief Companies' sales representatives often told consumers that they qualified or were approved for a specific lower monthly payment.

101.    In fact, the new, lower monthly payment amount identified by sales representatives was often calculated based on an incorrect family size, income, or marital status.

102.    Sales representatives often represented that consumers' lower monthly payment would be in place over the life of the loan.

**REDACTED SECOND AMENDED COMPLAINT**

103.   In fact, monthly payment amounts are determined by student loan servicers and can fluctuate year to year depending on changes in consumers' income, family size, or marital status, and it is therefore not possible to determine a set monthly payment for an IDR plan for the life of the loan.

### Preparing and Submitting Forbearance Requests and IDR Plan Applications

104.   Following an initial sales call, consumers who purchased the Student Loan Debt Relief Companies' services were assigned to a company representative called a "processor."

105.   Processors conducted a "welcome call" during which they typically asked consumers for proof of income and, at times, verified certain information.

106.   Following the welcome call, processors submitted forbearance requests to student-loan servicers on behalf of consumers.

107.   Processors typically asked for a forbearance period of three months in the forbearance requests they submitted.

108.   If a servicer approves a forbearance request, the consumer is excused from making his or her monthly student loan payments during the period of forbearance. But interest on the consumer's student loan accrues during the period of forbearance and may be added to the principal balance.

109.   Typically, consumers were not informed during sales calls or the welcome call that processors would submit forbearance requests on their behalf.

110.   Typically, consumers were not informed during sales calls or the welcome call that interest on the consumer's student loan accrues during the period of forbearance and may be added to the principal balance.

111.   In fact, most consumers did not ask the Student Loan Debt Relief Companies for forbearance requests, and many consumers were not aware that

**REDACTED SECOND AMENDED COMPLAINT**

1  the Student Loan Debt Relief Companies submitted forbearance requests to

2  their student loan servicers on their behalf.

3      112.   Processors signed the forbearance requests in the consumer's name

4  so that it appeared the request was submitted by the consumer.

5      113.   Many consumers were unaware the fees they paid to the Student

6  Loan Debt Relief Companies were not paying down their student loans.

7      **Submitting Consolidation and IDR Requests with False Information**

8      114.   Processors submitted IDR applications to servicers on behalf of

9  consumers with false information about consumers' income, family size, or

10  marital status.

11     115.   For consumers who did not provide proof of income to the Student

12  Loan Debt Relief Companies, processors frequently listed those consumers as

13  unemployed on their IDR applications, even when the consumers were

14  employed at the time.

15     116.   Processors frequently submitted IDR applications to consumers'

16  student loan servicers that listed consumers' family sizes greater than the

17  consumers' actual family size.

18     117.   Processors frequently submitted IDR applications to consumers'

19  student loan servicers that listed consumers as single, even if the consumer had

20  informed the Student Loan Debt Relief Companies that he or she was married.

21     118.   When submitting IDR applications to consumers' student loan

22  servicers, processors typically changed consumers' email address to an email

23  address created by the Student Loan Debt Relief Company in order to

24  temporarily divert all email correspondence from the consumer's student-loan

25  servicer to the Student Loan Debt Relief Company.

26     119.   When submitting IDR applications to consumers' student-loan

27  servicers, processors typically changed consumers' mailing address to a mailing

28  address used by the Student Loan Debt Relief Company in order to temporarily

**REDACTED SECOND AMENDED COMPLAINT**

divert all postal mail from the consumer's student-loan servicer to the Student Loan Debt Relief Company.

120.   After receiving confirmation from a consumer's student loan servicer that a consumer's loan consolidation or IDR application had been approved, processors typically logged back into the consumer's loan account and changed the consumers email and mailing address back to the consumer's actual information.

121.   The Student Loan Debt Relief Companies' practice of diverting correspondence to consumers from the consumers' student-loan servicers helped conceal the Student Loan Debt Relief Companies' practice of submitting false information to student loan servicers.

**Representations about and Collection of Fees from Consumers**

122.   The Student Loan Debt Relief Companies typically collected enrollment fees from consumers before consumers had been approved for a loan consolidation or an IDR plan.

123.   The Student Loan Debt Relief Companies collected monthly fees, typically ranging from $10-$42, before submitting the consumer's corresponding annual IDR plan recertification.

124.   At all times material to this Complaint, the Student Loan Debt Relief Companies did not track whether consumers had made an initial payment on an adjusted loan.

125.   As early as April 2018, the Student Loan Debt Relief Companies' contracts began including a section entitled "No Advance Fees."

126.   The section of the Student Loan Debt Relief Companies' contract entitled "No Advance Fees" states that the company "does not take any advance fees from Client" and further provides that consumer fees will be held in an independent third party "trust account" and not paid to the company until the

**REDACTED SECOND AMENDED COMPLAINT**

consumer "has received a consolidation, adjustment, or otherwise satisfactory result" and makes one payment "towards such."

127.   At all times material to this Complaint, the Student Loan Debt Relief Companies did not use trust accounts to hold fees collected from consumers before placing consumers into loan repayment plans – at no time did the Student Loan Debt Relief Companies hold payments from consumers in accordance with Section 310.4(a)(5)(ii) of the TSR.

128.   Rather, fees collected from consumers by the Student Loan Debt Relief Companies were directly deposited into the companies' bank accounts and commingled with company assets.

129.   The Defendants have collected over $95 million in illegal advance fees from thousands of consumers nationwide.

### Roles of the Individual Defendants

130.   Albert Kim (a/k/a Albert King) is CAC's primary owner and manager.

131.   Kim was in the office frequently and helped manage CAC's and True Count's day-to-day operations.

132.   Kim oversaw CAC's marketing.

133.   Kim signed CAC's merchant-account applications or agreements with at least three different payment processors.

134.   At times, Kim personally responded to consumers' complaints.

135.   Kim controlled CAC's bank accounts, and was an authorized user on CAC's and True Count's bank accounts.

136.   When Kim applied for a merchant account on CAC's behalf in or about July 2017, he agreed to maintain fraud and chargebacks below certain levels.

137.   Monthly account statements sent to CAC's corporate address for that merchant account identify tens of thousands of dollars in chargebacks and

REDACTED SECOND AMENDED COMPLAINT

1  hundreds of thousands of dollars in consumer refunds between August 2017 and
2  March 2019.
3      138.  After CAC filed for bankruptcy, Kim personally generated
4  marketing leads for Prime.
5      139.  Kaine Wen served as CAC's owner, managing partner, and general
6  counsel.
7      140.  CAC's 2016 tax returns and U.K. registration documents list Wen
8  as CAC's 50% owner.
9      141.  Wen made capital contributions to CAC in October 2015 that
10  accounted for 75% of capital contributions by members at that time.
11     142.  Wen participated in the decision to move CAC's processing
12  functions to True Count.
13     143.  Wen personally guaranteed True Count's lease agreement.
14     144.   Wen set up payment-processing agreements for True Count.
15     145.  Wen corresponded with payment processors regarding True
16  Count's excessive chargeback rates.
17     146.  Wen represented to a payment processor that True Count
18  "understands, currently fully complies with, and during the term of the
19  Agreement will fully comply with" the TSR, CFPA, and "all other applicable
20  federal, state, and local laws, rules, and regulations."
21     147.  Wen has been an authorized user on CAC's, Premier Student Loan
22  Center's, True Count's, and Hold the Door's bank accounts.
23     148.  Wen was also a point of contact or signed for at least three
24  merchant accounts for CAC and at least one merchant account for True Count.
25     149.  Wen has been a successor trustee of the Judy Dai 2017 Trust.
26     150.  Wen has held power of attorney over the Judy Dai 2017 Trust bank
27  account at UBS Financial Services Inc. (Judy Dai 2017 Trust UBS Account)
28  since on or about August 23, 2018.

**REDACTED SECOND AMENDED COMPLAINT**

151.   Wen's power of attorney over the Judy Dai 2017 Trust UBS Account has included authorizing Wen to order the purchase and sale of securities and similar property and to transfer assets to accounts held in the name of the Judy Dai 2017 Trust.

152.   Tuong Nguyen served as the controller and provided accounting services for CAC.

153.   Nguyen was responsible for paying CAC's bills, reviewed its bank statements, and was a signatory on several of CAC's bank accounts.

154.   At times, Nguyen also responded to consumer complaints, and was listed as a point of contact for CAC's d/b/a, Premier Student Loan Center, in the Bureau's consumer-complaint portal.

155.   True Count identified Nguyen as its secretary in some communications with banks.

156.   Nguyen was a point of contact for at least two of CAC's merchant accounts and one of True Count's merchant accounts.

157.   In January 2018, Nguyen signed a letter to a payment processor acknowledging CAC had incurred "excessive chargebacks" during "December/2017."

158.   Nguyen also acknowledged that the top chargeback reasons included fraud.

159.   Nguyen incorporated TN Accounting and served as its president and sole corporate officer.

160.   Nguyen has been a signatory on a bank account held by TN Accounting.

161.   TN Accounting's primary source of income is over $225,000 from CAC and True Count from March 2017 through December 2018.

162.   Nguyen was also an authorized user on bank accounts held by CAC, Premier Student Loan Center, and True Count.

**REDACTED SECOND AMENDED COMPLAINT**

**Roles of the Payment Companies**

163.   The Individual Defendants, True Count, and Prime used TAS, Horizon, and First Priority to obtain merchant accounts and to collect fees from consumers.

164.   In September 2019, the Individual Defendants, True Count, and Prime transferred customer payment processing to TAS.

165.   TAS held itself out as an "independent third party" in its contracts with consumers.

166.   In fact, TAS was not independent of Defendants.

167.   Rather, TAS was run from within True Count and Prime by the Individual Defendants.

168.   TAS's domain credentials (username and password) were stored in an account in Albert Kim's name.

169.   The Individual Defendants and the Student Loan Debt Relief Companies controlled TAS's email system, and the Student Loan Debt Relief Companies' employees reviewed and responded to consumers' emails sent to TAS. Defendant Wen executed or acted as TAS's agent to handle the application necessary for TAS to open a merchant account to process payments from the Student Loan Debt Relief Companies' consumers. Wen and True Count's Operations Manager created a fictional employee to interact with True Count's and Prime's software provider to promote the appearance of TAS as an entity independent of Defendants.

170.   Since September 12, 2019, until the date of the temporary restraining order issued by this Court, TAS collected approximately $3 million in payments from consumers.

171.   The Individual Defendants, True Count, and Prime used Horizon to process consumers' payments to the student-loan debt-relief enterprise.

**REDACTED SECOND AMENDED COMPLAINT**

172.   Horizon's incorporation documents list Keneth Hu, an IT professional employed by the Student Loan Debt Relief Companies, as its Chief Executive Officer and President.

173.   Notwithstanding Mr. Hu's nominal ownership, Defendants Wen, Nguyen, True Count, and Prime exercised substantial control over Horizon.

174.   Defendant Nguyen was a signatory on a Horizon bank account.

175.   Defendant Wen was Horizon's designated contact on a merchant account.

176.   Defendant True Count asserts that Horizon holds over $700,000 for its benefit.

177.   Horizon's stated business address was leased by Defendant Prime Consulting.

178.   Horizon applied for at least two merchant accounts to process consumer payments (including any associated chargebacks or refunds) on behalf of the Student Loan Debt Relief Companies.

179.   Defendants Wen and Nguyen received a finalized payment processor application for a merchant account with Quantum Electronic Payments on Horizon's behalf.

180.   Defendant Wen later instructed Hu to sign the application for a merchant account with Quantum Electronic Payments.

181.   Horizon processed about $9 million in consumer payments through at least one of its payment processors accounts on behalf of the Student Loan Debt Relief Companies.

182.   The Individual Defendants, True Count, and Prime used First Priority to open merchant accounts to receive consumer payments to the student loan debt relief enterprise.

**REDACTED SECOND AMENDED COMPLAINT**

183.  The Individual Defendants, True Count, and Prime used First Priority to obtain and then copy documents, such as agreements and contracts, for use by TAS in the student-loan debt-relief operation.

184.  First Priority's corporate registration identifies Defendant Nguyen as its president and sole owner.

185.  Defendants Kim and Wen served as contacts on behalf of First Priority for a payment processor.

186.  First Priority's income in 2018 and 2019 consisted of approximately $400,000 in transfers from True Count and $150,000 in consumer fees collected through two payment processor accounts on behalf of Prime and True Count.

### The Student Loan Debt Relief Companies Operated as a Common Enterprise

187.  CAC, True Count, and Prime shared employees, customers, scripts, and training materials, and they used the same database to store consumers' information and track aspects of their business activity.

188.  CAC, True Count, and Prime shared the proceeds of the debt-relief enterprise.

189.  For example, since April 2018, True Count, acting as the purported "billing department" for CAC and Prime, has transferred at least $12 million to CAC and at least $25 million to Prime.

190.  CAC lent hundreds of thousands of dollars to True Count without interest or any written agreement.

191.  CAC stated in a lease guarantee that it had a "financial interest" in True Count.

192.  CAC guaranteed at least one lease on behalf of Prime Consulting and two leases on behalf of True Count.

**REDACTED SECOND AMENDED COMPLAINT**

193.   CAC, True Count, and Prime have used overlapping addresses to carry out the debt-relief operation.

194.   For example, addresses True Count identifies as its business addresses are also business addresses for CAC, Prime, and Hold the Door.

195.   To market their debt-relief services to consumers, CAC, True Count, and Prime shared over a dozen fictitious names, including but not limited to South Coast Financial Center, Direct Account Services, Financial Loan Advisors, Account Preparation Services, Administrative Financial, Tangible Savings Solutions, Coastal Shores Financial Group, First Choice Financial Centre (a/k/a First Choice Financial Center), Administrative Account Services, Primary Account Solutions, Prime Document Services, Financial Accounting Center, Doc Management Solutions, First Priority LLC, ALW Loans Administrative Accounting Center, Best Choice Financial Center, First Document Services, Global Direct Accounting Solutions, Keystone Document Center, Pacific Palm Financial Group, Pacific Shores Advisory, Sequoia Account Management, Signature Loan Solutions, Yellowstone Account Services, ClearStudentLoanDebt, and Clear Student Loan Debt.

196.   The websites for Doc Management Solutions, Financial Accounting Center, Prime Document Services, Primary Account Solutions, Administrative Account Services, South Coast Financial Center, First Choice Financial Center, Coastal Shores Financial Group, Tangible Savings Solutions, Administrative Financial, Account Preparation Services, Financial Loan Advisors, and Direct Account Services are nearly identical.

### Transfer of Assets to Relief Defendants

197.   Defendants Wen, Kim, and Nguyen directed and controlled Relief Defendants Hold the Door, Infinite Management, and TN Accounting, respectively.

**REDACTED SECOND AMENDED COMPLAINT**

198.   Wen, Kim, and Nguyen are the signatories on bank accounts for the respective companies and thus controlled the flow of money into and out of their corporate accounts.

199.   From 2017 to 2019, payments from CAC or True Count made up most or almost all the income of Hold the Door, Infinite Management, and TN Accounting.

200.   Monies were transferred from Hold the Door, Infinite Management, and TN Accounting to the respective individuals' personal accounts or to pay their personal expenses.

201.   Hold the Door made over $200,000 in direct transfers to Wen's personal bank accounts, and it made payments for purchases of art and for Wen's Tesla and Mercedes Benz automobiles.

202.   Infinite Management made more than $300,000 in payments to pay Kim's personal credit cards, wedding expenses, dental expenses, and to purchase luxury cars.

203.   Infinite Management purchased approximately $87,500 in jewelry, paid over $200,000 to purchase a luxury vehicle, and spent approximately $60,000 as a down payment for a second luxury vehicle for Relief Defendant Sarah Kim.

204.   Sarah Kim is not employed by Infinite Management, nor has she ever done business with Infinite Management.

205.   TN Accounting transferred over $100,000 to Nguyen's personal bank accounts and made payments on Nguyen's personal credit cards and Tesla.

206.   In December 2018, Mice and Men opened a banking account with Bank of America, listing Relief Defendant Judy L Dai as the signor, and a related debit card was issued to Mice and Men LLC Judy L Dai.

**REDACTED SECOND AMENDED COMPLAINT**

207.   In December 2018, a total of 14 deposits and credits were received in the Mice and Men account at Bank of America from Prime Consulting, totaling $5,041,039.  Thirteen of the deposits and credits were for purported marketing expenses, and one was for purported residual expenses.  During its existence, no other deposits were made into this account.

208.   In January 2019, a bank account in the name of Mice and Men was opened with UBS, listing Judy L Dai as the signor.

209.   In or around February 2019, Bank of America notified Mice and Men that Bank of America was closing the Mice and Men account.

210.   In February 2019, a bank check from Bank of America in the amount of $5,041,039 was deposited into the Mice and Men account at UBS. This represented the entire balance in the Mice and Men Bank America account.

211.   In April 2019, Defendant Wen was granted third party access to the Mice and Men account at UBS, which gave him the ability to view account information, balances, monthly statements and tax information.

212.   In the Corporate Financial Statement submitted by True Count Staffing pursuant to the October 21, 2019 Temporary Restraining Order (TRO), True Count identified the Mice and Men UBS account, which contained approximately $4 million, as being held by True Count Staffing.

213.   Defendant Wen is the 100% owner of True Count Staffing.

214.   Prime transferred approximately $4 million to 1st Generation Holdings over the last three years.

215.   True Count's Corporate Financial Statement submitted pursuant to the TRO identified funds in 1st Generation Holdings accounts as held for the benefit of True Count.

**REDACTED SECOND AMENDED COMPLAINT**

216.   Between 2017-2018, CAC paid Anan Enterprise approximately $3.6 million ostensibly for services, but Anan Enterprise never rendered those services.

217.   From 2016 through 2018, Wen transferred, or caused companies he controlled to pay, more than $REDACTED to or for the benefit of Relief Defendant Judy Dai or the Judy Dai 2017 Trust.

218.   The funds that Wen transferred or caused to be transferred to or for the benefit of Judy Dai or the Judy Dai 2017 Trust include funds he obtained from, or commingled with funds from, the Student Loan Debt Relief Companies.

219.   For example, from on or about April 16, 2018, through June 5, 2018, REDACTED in the name of the Kaine Wen 2017 Trust received a total of about $REDACTED in deposits, of which at least $REDACTED were from Hold the Door.

220.   From on or about June 1 through June 5, 2018, Wen transferred $REDACTED from the same Kaine Wen 2017 Trust REDACTED identified in the preceding paragraph to a REDACTED held by Judy Dai or the Judy Dai 2017 Trust.

221.   As another example, Hold the Door paid over $REDACTED to lease a Mercedes-Benz automobile for Judy Dai's use from at least 2017 through 2019.

222.   As another example, in or about April 2019, Hold the Door paid about $REDACTED for a Lexus automobile that has been registered to Judy Dai.

223.   As another example, in 2019, True Count made over $REDACTED in payments on a REDACTED name that has been secured by a personal residence in Arcadia, CA (Arcadia Residence).

224.   The Arcadia Residence has been owned in part by the Judy Dai 2017 Trust.

**REDACTED SECOND AMENDED COMPLAINT**

225.   Judy Dai has no legitimate claim to the funds that Hold the Door, True Count, and Wen transferred to her or for her benefit as described in paragraphs 217-225.

226.   Judy Dai and the Judy Dai 2017 Trust were never employed by Hold the Door or True Count and provided no contemporaneous consideration for the transfers and payments described at paragraphs 217-225.

**Avoidable Transfers**

**First Transfer**

227.   On or about February 5, 2018, Defendant Wen or the Kaine Wen 2017 Trust transferred about $REDACTED                owned by the Judy Dai 2017 Trust (First Transfer).

228.   Judy Dai and the Judy Dai 2017 Trust did not provide any reasonably equivalent consideration in exchange for the First Transfer.

229.   At the time of the First Transfer, the Student Loan Debt Relief Companies had unlawfully collected millions of dollars in fees from consumers in violation of the CFPA and the TSR.

230.   At the time of the First Transfer, Wen was liable for, jointly and severally with other defendants in this action, millions of dollars to the Bureau and the States based on violations of the CFPA and TSR, including for damages, restitution, or disgorgement, but not including liability for civil money penalties.

231.   Based on the civil money penalty amounts set forth in 12 U.S.C. § 5565(c)(1) & (2), Wen was subject to millions of dollars in penalties per unlawful practice alleged at Counts I-III, V, VII, IX, and XI as of February 5, 2018, before considering the statutory mitigating factors set forth in section 5565(c)(3) and upward penalty adjustments for inflation under 12 C.F.R. § 1083.1.  Wen was also subject to potential joint and several liability for millions

**REDACTED SECOND AMENDED COMPLAINT**

1   of dollars in statutory restitution orders and mandatory civil penalties per

2   unlawful act or practice under the UCL, as alleged in Count XXII.

3        232.   Wen's remaining assets immediately after the First Transfer were

4   worth less than his then-existing liabilities to the Bureau and the States as set

5   forth in paragraphs 229-232.

6        233.   Wen failed to disclose the First Transfer as a gift on REDACTED

7   REDACTED

8        234.   At the time of the first Transfer, Wen had been named in his

9   individual capacity in at least two lawsuits by consumers asserting that he and

10  other defendants violated the Telephone Consumer Protection Act, 47 U.S.C.

11  § 227, and related claims.

12       235.   At the time of the First Transfer, Defendant CAC had received

13  inquiries from at least six state law enforcement agencies, including four state

14  attorneys general, regarding consumer complaints or potential violations of

15  state consumer protection laws.

16       236.   For example, a state attorney general's office issued a letter to

17  CAC in or about March 2017, attaching a consumer complaint that asserts that

18  CAC falsified the consumer's marital status and family size to the Department

19  of Education by listing her as single with six children when in fact she was

20  married with two children.

21       237.   As purported general counsel for CAC, Wen was aware of and

22  responded to each of the six state law enforcement inquiries on behalf of CAC.

23       238.   In or about April 2017, the Better Business Bureau (BBB)

24  contacted CAC to inform it that "multiple sources" had alleged that CAC

25  charged upfront fees and that "[s]ome consumers allege that their information

26  was falsified on their [student-loan repayment] application by [listing] more

27  members in their household than they actually had."

28

**REDACTED SECOND AMENDED COMPLAINT**

239.   Wen responded to BBB within a week, presenting himself as general counsel for CAC.

240.   On or about February 12, 2018, just days after the First Transfer, Wen signed a "Credit Repair Merchant Agreement Addendum" with a payment processor, falsely warranting that True Count complied with numerous consumer protection laws, including the TSR and the CFPA, and shortly thereafter, he signed a "Debt Relief Service Merchant Agreement Addendum" with similar provisions.

241.   Before the First Transfer, Wen personally guaranteed at least two of CAC's payment processor accounts that received millions of dollars in unlawfully obtained consumer fees.

242.   As the sole corporate officer of True Count, Wen also assumed increased liability risk when True Count took over some of CAC's operations in 2018.

243.   In or about February 2018, just days after the First Transfer, Kaine Wen personally guaranteed at least three of True Count's payment processor accounts that received tens of millions of dollars in unlawfully obtained consumer fees.

244.   Wen's personal guarantee of True Count's merchant accounts made him liable for consumer refund requests and chargebacks due to True Count's unlawful acts and practices.

245.   In or about April 2018, Wen participated in an internal email chain that included an email from a True Count manager who stated that "in most cases" the Student Loan Debt Relief Companies "incorrectly" submit student-loan-adjustment applications to servicers, including by always listing consumers as single (whether married or not) and inaccurately inflating family size.

REDACTED SECOND AMENDED COMPLAINT

246.   After the First Transfer, Wen retained control over the proceeds of the First Transfer by directing REDACTED                 in wire transfers from a REDACTED held by the Judy Dai 2017 Trust, including directing an over $REDACTED      from the Judy Dai 2017 Trust that was used as a down payment on the Arcadia Residence

247.   Since in or about August 2018, the Judy Dai 2017 Trust UBS Account has held significant proceeds of the First Transfer.

**Second Transfer**

248.   In or about July 2019, the Bureau, the State of North Carolina, and the State of Minnesota filed proofs of claim seeking to recover tens of millions of dollars in CAC's bankruptcy proceeding in United States Bankruptcy Court in the Southern District of Florida.

249.   The Bureau's proof of claim was for at least $31 million in unliquidated damages and undetermined civil money penalties based on CAC's violations of the CFPA and TSR.

250.   On or about August 20, 2019, the Kaine Wen 2017 Trust transferred REDACTED                     from REDACTED REDACTED          to the Judy Dai 2017 Trust UBS Account (Second Transfer).

251.   Before the Second Transfer, the Kaine Wen 2017 Trust had held the funds traceable to the Second Transfer in REDACTED that simultaneously held at least $REDACTED that is traceable to the Student Loan Debt Relief Companies' unlawful conduct.

252.   Judy Dai and the Judy Dai 2017 Trust did not provide any reasonably equivalent consideration in exchange for the Second Transfer.

253.   At the time of the Second Transfer, the Student Loan Debt Relief Companies had unlawfully collected tens of millions of dollars in fees from consumers in violation of the CFPA and the TSR.

33

**REDACTED SECOND AMENDED COMPLAINT**

254.   At the time of the Second Transfer, Wen was liable for, jointly and severally with other defendants in this action, tens of millions of dollars to the Bureau and the States based on violations of the CFPA and TSR, including for damages, restitution, or disgorgement, but not including liability for civil money penalties.

255.   Based on the civil money penalty amounts set forth in 12 U.S.C. § 5565(c)(1) & (2), Wen was subject to millions of dollars in penalties per unlawful practice alleged at Counts I-III, V, VII, IX, and XI as of August 20, 2019, before considering the statutory mitigating factors set forth in section 5565(c)(3) and upward penalty adjustments for inflation under 12 C.F.R. § 1083.1.  Wen was also subject to potential joint and several liability for millions of dollars in statutory restitution orders and mandatory civil penalties per unlawful act or practice under the UCL, as alleged in Count XXII.

256.   Wen's remaining assets after the Second Transfer were worth less than his then-existing liability to the Bureau and the States as set forth in paragraphs 253-255.

257.   At the time of Second Transfer, Wen was aware of the Bureau's investigation of the SLDR Companies and had retained counsel for True Count related to the Bureau's investigation.

258.   Around the time of the Second Transfer, Wen was aware that the news media was inquiring about the SLDR Companies' business practices.

259.   On the eve of the Second Transfer, Wen directed a Human Resources manager for the SLDR Companies to instruct employees that the press may try to contact them and that employees were not to speak with the press.

260.   Several days after the Second Transfer, the *Wall Street Journal* published a story critical of the SLDR Companies.

261.   Since at least November 1, 2019, Wen has concealed assets.

**REDACTED SECOND AMENDED COMPLAINT**

262.   For example, for over a year after receiving service of the TRO on October 25, 2019, Wen concealed from the Bureau REDACTED estimated to be worth REDACTED                    contrary to the requirements of Section VIII, paragraph A, of the TRO.

## LEGAL BACKGROUND

### The TSR

263.   The TSR defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o).

264.   The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

265.   The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer." 16 C.F.R. § 310.2(ff).

266.   The TSR defines "telemarketing" in relevant part as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

267.   The Student Loan Debt Relief Companies offered services to renegotiate, settle, or alter the terms of payments of consumers' federal student loans by submitting requests for loan forgiveness or IDR plans to consumers' student-loan servicers.

**REDACTED SECOND AMENDED COMPLAINT**

268.   The Student Loan Debt Relief Companies offered and provided these services to consumers nationwide using the telephones and employed more than one interstate telephone call.

269.   The Student Loan Debt Relief Companies offered and provided these services to consumers in exchange for payment of enrollment and monthly fees in connection with a telemarketing transaction.

270.   The Student Loan Debt Relief Companies are each a "telemarketer" or "seller" offering a "debt relief service" under the TSR.

271.   Kim arranged for CAC to provide debt-relief services to consumers in exchange for consideration and personally generated marketing leads for Prime. Kim is a "telemarketer" or "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (ff), (o).

272.   Wen arranged for CAC and True Count to provide debt-relief services to consumers in exchange for consideration. Wen is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

273.   Nguyen arranged for CAC and True Count to provide debt-relief services to consumers in exchange for consideration. Nguyen is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

274.   TAS is a "seller" because it provided, offered to provide, or arranged for others to provide third-party dedicated account services to consumers "in connection with a telemarketing transaction." 16 C.F.R. § 310.2(dd).

### The CFPA

275.   Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B), prohibit "covered person[s]" and "service provider[s]" from engaging in any "unfair, deceptive, or abusive act or practice."

276.   The Student Loan Debt Relief Companies are each "covered persons" under the CFPA because they offer or provide consumer-financial

REDACTED SECOND AMENDED COMPLAINT

products or services, including financial-advisory services such as assisting consumers with debt-management or debt-settlement and modifying the terms of any extension of credit. 12 U.S.C. § 5481(5), (6), (15)(A)(viii).

277.   TAS is a "covered person" under the CFPA because it offered or provided consumer-financial products or services, including by "engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer." 12 U.S.C. § 5481(15)(iv).

278.   The CFPA also defines "covered person" to include "(B) any affiliate of a person [that engages in offering or providing a consumer financial product or service] if such affiliate acts as a service provider to such person." 12 U.S.C. § 5481(6).

279.   Section 1002(1) of the CFPA defines the term "affiliate" to mean "any person that controls, is controlled by, or is under common control with another person." 12 U.S.C. § 5481(1).

280.   Section 1002(26)(A) of the CFPA defines the term "service provider" to mean "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that-- … (ii) processes transactions relating to the consumer financial product or service …" 12 U.S.C. § 5481(26)(A)(ii).

281.   TAS, Horizon and First Priority are affiliates of the Student Loan Debt Relief Companies because they are controlled by the Student Loan Debt Relief Companies. Further, by processing consumer payments made to the Student Loan Debt Relief Companies, TAS, Horizon, and First Priority acted as service providers to the Student Loan Debt Relief Companies. TAS, Horizon, and First Priority are each "covered persons" under the CFPA.

**REDACTED SECOND AMENDED COMPLAINT**

282.   Section 1002(25) of the CFPA defines the term "related person" to mean "any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of," or "any . . . other person . . . who materially participates in the conduct of the affairs of" a non-bank provider of a consumer-financial product or service. 12 U.S.C. § 5481(25)(C). Section 1002(25) further provides that a "related person" shall be "deemed to mean a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

283.   Kim is a "related person" and "covered person" under the CFPA because he is CAC's owner and officer and had managerial responsibility for CAC. He controlled CAC's bank accounts, oversaw CAC's sales and marketing, entered into contractual relationships on CAC's behalf with payment processors, and responded to certain consumer complaints.

284.   Wen is a "related person" and "covered person" under the CFPA because he is True Count's owner and officer, has been an owner and manager of CAC, and has had managerial responsibility for both companies. He was involved in making decisions for CAC, including the decision to shift CAC's processing function to True Count, entered into contractual relationships on behalf of True Count with payment processors, and was a signatory on True Count's bank accounts.

285.   Nguyen is a "related person" and "covered person" under the CFPA because he is an officer of CAC and True Count and has managerial responsibility for CAC, and because he materially participated in the conduct of the Student Loan Debt Relief Companies. He managed CAC's finances and responded to consumers' complaints on CAC's behalf. He also was the point of contact for several of CAC's and True Count's merchant accounts.

REDACTED SECOND AMENDED COMPLAINT

**COUNT I**

**By the Bureau and the States**

**(Advance Fees in Violation of the TSR – Enrollment Fees)**

**(The Student Loan Debt Relief Companies and Individual Defendants)**

286.   The allegations in paragraphs 1-274 are incorporated by reference.

287.   Under the TSR, it is an abusive act or practice for a seller or telemarketer to request or receive payment of any fee or consideration for any debt-relief services unless and until (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has made at least one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

288.   In the course of providing, offering to provide, or arranging for others to provide debt-relief services, the Student Loan Debt Relief Companies and Individual Defendants charged and collected from consumers enrollment fees before consumers had been approved for IDR plans and before consumers had made any payments toward such IDR plans, in violation of the TSR. 16 C.F.R. § 310. 4(a)(5)(i)(A)-(B).

289.   Moreover, because the IDR plans in which consumers were placed often were based on false information about consumers' family size, income, and marital status that the Student Loan Debt Relief Companies submitted to consumers' student-loan servicers, none of the payments made by consumers in these plans were made pursuant to a "valid contractual agreement" within the meaning of the TSR and thus were collected in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

## COUNT II

### By the Bureau and the States

### (Advance Fees in Violation of the TSR – Monthly Fees)

### (The Student Loan Debt Relief Companies and Individual Defendants)

290.   The allegations in paragraphs 1-274 are incorporated by reference.

291.   In the course of providing, offering to provide, or arranging for others to provide debt-relief services, the Student Loan Debt Relief Companies and Individual Defendants charged and collected from consumers monthly fees before consumers had completed their annual recertifications of eligibility for IDR plans and before consumers had made any payments toward such recertified IDR plans, in violation of the TSR. 16 C.F.R. § 310. 4(a)(5)(i)(A)-(B).

292.   Moreover, because the IDR plans in which consumers were placed often were based on false information about consumers' family size, income, and marital status that the Student Loan Debt Relief Companies submitted to consumers' student-loan servicers, none of the payments made by consumers in these plans were made pursuant to a "valid contractual agreement" within the meaning of the TSR and thus were collected in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

## COUNT III

### By the Bureau and the States

### (Misrepresentations About Material

### Aspects of Their Services in Violation of the TSR)

### (The Student Loan Debt Relief Companies and Individual Defendants)

293.   The allegations in paragraphs 1-274 are incorporated by reference.

294.   It is a deceptive practice under the TSR for a seller or telemarketer to misrepresent any material aspect of the efficacy of their services and to

**REDACTED SECOND AMENDED COMPLAINT**

misrepresent any material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(iii), (x).

295.   Among other things, the Student Loan Debt Relief Companies and Individual Defendants misrepresented, directly or indirectly, expressly or by implication that:

      a.   fees paid by consumers were payments toward the consumer's outstanding loan debt;

      b.   fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

      c.   consumers' loans would be forgiven in whole or in part shortly after enrolling in the Student Loan Debt Relief Companies' services;

      d.   consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status;

      e.   consumers' monthly payment amount had been lowered for the life of the repayment plan; and

      f.   any fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services.

296.   The Student Loan Debt Relief Companies and Individual Defendants also failed to inform consumers that:

      a.   it was their practice to submit forbearance requests on behalf of consumers; and

      b.   it was their practice to falsify consumers' family size, marital status, and income to consumers' student-loan servicers.

**REDACTED SECOND AMENDED COMPLAINT**

297.   The acts or practices of the Individual Defendants and Student Loan Debt Relief Companies, as set forth in this Count, are deceptive acts or practices that violate the TSR, 16 C.F.R. 310.3(a)(2)(iii), (x).

## COUNT IV

### By the Bureau and the States

### (Misrepresentations About Material

### Aspects of Their Services in Violation of the TSR)

### (True Count, Prime, and TAS)

298.   The allegations in paragraphs 1-274 are incorporated by reference.

299.   It is a deceptive practice under the TSR for a seller or telemarketer to misrepresent any material aspect of the efficacy of their services and to misrepresent any material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(iii), (x).

300.   True Count, Prime, and TAS misrepresented, directly or indirectly, expressly or by implication, that TAS was an independent third-party provider of dedicated customer escrow accounts.

301.   The misrepresentations relate to a material aspect of a debt-relief service.

302.   The acts or practices of the Individual Defendants, Student Loan Debt Relief Companies, and TAS, as set forth in this paragraph, are deceptive acts or practices that violate the TSR, 16 C.F.R. 310.3(a)(2)(iii), (x).

## COUNT V

### By the Bureau and the States

### (Substantial Assistance in Violation of the TSR)

### (Individual Defendants)

303.   The allegations in paragraphs 1-274 are incorporated by reference.

304.   The TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or

**REDACTED SECOND AMENDED COMPLAINT**

consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that [constitutes deceptive or abusive conduct]" under the Rule. 16 C.F.R. § 310.3(b).

305.   Kim managed both CAC's and True Count's day-to-day operations. As CAC's co-owner and president, Kim oversaw CAC's marketing and approved its sales scripts.

306.   Kim knew, or recklessly avoided knowing, the material misrepresentations and omissions that CAC's and True Count's sales representatives and processors made to consumers.

307.   Kim knew, or recklessly avoided knowing, that the Student Loan Debt Relief Companies charged and collected enrollment and monthly fees from consumers before the companies had obtained loan-repayment plans for consumers and before consumers had made their first payments toward such repayment plans.

308.   Kim represented CAC in contractual relationships with payment processors.

309.   As CAC's point of contact on a merchant account where he agreed to keep chargebacks and fraud below a certain level, Kim knew, or recklessly avoided knowing, that the merchant's monthly statements identified tens of thousands of dollars in chargebacks and hundreds of thousands of dollars in consumer refunds between August 2017 and March 2019.

310.   As CAC's co-owner and officer and True Count's owner and officer, Wen entered into payment-processing agreements on CAC's and True Count's behalf, including at least one where he represented that True Count intended to fully comply with the TSR.

311.   As a principal representative for CAC's and True Count's merchant accounts and a signatory on the bank accounts from which refunds and chargebacks to consumers were paid, Wen knew, or recklessly avoided

43

1    knowing, CAC's and True Count's high chargeback and refund rates, including

2    that during at least one period, the top chargeback reasons included "fraud."

3        312.   Wen knew, or recklessly avoided knowing, the material

4    misrepresentations and omissions that CAC's and True Count's sales

5    representatives and processors made to consumers.

6        313.   Wen knew, or recklessly avoided knowing, that the Student Loan

7    Debt Relief Companies charged and collected enrollment and monthly fees

8    from consumers before the companies had obtained loan-repayment plans for

9    consumers and before consumers had made their first payments toward such

10   repayment plans.

11       314.   As an officer of CAC and True Count, Nguyen managed CAC's

12   finances, served as a point of contact for several of CAC's and True Count's

13   merchant accounts, and responded to consumer complaints on CAC's behalf.

14       315.   Because he signed a January 2018 letter from CAC to a payment

15   processor in which he acknowledged that CAC had incurred excessive

16   chargebacks and that fraud was one of the top reasons for such chargebacks,

17   Nguyen knew, or recklessly avoided knowing, the material misrepresentations

18   and omissions that CAC's and True Count's sales representatives and

19   processors made to consumers.

20       316.   Nguyen knew, or recklessly avoided knowing, that the Student

21   Loan Debt Relief Companies charged and collected enrollment and monthly

22   fees from consumers before the companies had obtained loan-repayment plans

23   for consumers and before consumers had made their first payments toward such

24   repayment plans.

25       317.   Kim, Wen, and Nguyen provided substantial assistance to the

26   Student Loan Debt Relief Companies in their violations of the TSR.

27

28

**REDACTED SECOND AMENDED COMPLAINT**

## COUNT VI

### By the Bureau and the States

### (Substantial Assistance in Violation of the TSR)

### (Payment Companies)

318.   The allegations in paragraphs 1-274 are incorporated by reference.

319.   The TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act that [constitutes deceptive or abusive conduct]" under the Rule. 16 C.F.R. § 310.3(b).

320.   The Payment Companies knew, or consciously avoided knowing, the material misrepresentations that the Student Loan Debt Relief Companies made to consumers.

321.   The Payment Companies knew, or consciously avoided knowing, that the Student Loan Debt Relief Companies charged and received fees from consumers before consumers' applications for loan consolidations, loan-repayment plans, and loan-forgiveness plans were approved, and before consumers had made the first payments under the altered terms of their student loans.

322.   The Payment Companies provided substantial assistance to the Student Loan Debt Relief Companies in their violations of the TSR.  16 C.F.R. § 310.3(b)

## COUNT VII

### By the Bureau

### (CFPA – Deception)

### (The Student Loan Debt Relief Companies and Individual Defendants)

323.   The allegations in paragraphs 1-262 and 275-285 are incorporated by reference.

324.   Among other things, the Student Loan Debt Relief Companies and Individual Defendants misrepresented, directly or indirectly, expressly or by implication that:

a.   fees paid by consumers were payments toward the consumer's outstanding loan debt;

b.   fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

c.   consumers' loans would be forgiven in whole or in part following payment of the initial enrollment fees;

d.   consumers were eligible or approved for lower monthly payments, including where such payment amounts have been calculated based on an incorrect family size, income, or marital status;

e.   consumers' monthly payment amounts had been lowered for the life of the repayment plan; and

f.   any fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services.

325.   The Student Loan Debt Relief Companies also failed to inform consumers that:

a.   it was their practice to submit forbearance requests on behalf of consumers; and

b.   it was their practice to falsify consumers' family size, marital status, and income to consumers' student-loan servicers and the consequences for consumers of that practice.

326.   The Student Loan Debt Relief Companies' representations were material and likely to mislead consumers acting reasonably under the circumstances.

**REDACTED SECOND AMENDED COMPLAINT**

327.   Among other things, Kim generated marketing leads for Prime, approved sales scripts for CAC, and managed day-to-day operations for CAC and True Count. He was also aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them as CAC's co-owner and president and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

328.   Among other things, Wen managed payment-processor relationships on behalf of True Count, was a signatory on True Count's bank accounts, and was aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them as CAC's co-owner and president and True Count's owner and president and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

329.   Among other things, Nguyen managed CAC's finances, responded to consumer complaints, and served as point of contact on several of CAC's and True Count's merchant accounts. He was aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

330.   The Student Loan Debt Relief Companies and Individual Defendants have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

47

**COUNT VIII**

**By the Bureau**

**(CFPA – Deception)**

**(True Count, Prime, and TAS)**

331.   The allegations in paragraphs 1-262 and 275-285 are incorporated by reference.

332.   True Count, Prime, and TAS misrepresented, directly or indirectly, expressly or by implication, that TAS was an independent third-party provider of dedicated customer accounts.

333.   The representations were material and likely to mislead consumers acting reasonably under the circumstances.

334.   True Count, Prime, and TAS have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

**COUNT IX**

**By the Bureau**

**(Substantial Assistance in Violation of the CFPA)**

**(Individual Defendants)**

335.   The allegations in paragraphs 1-262 and 275-285 are incorporated by reference.

336.   Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031" and states that "the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

337.   As CAC's co-owner and president, and as someone who managed the day-to-day operations of CAC and True Count and who generated marketing leads for Prime, Kim knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

338.   As CAC's co-owner and True Count's owner and president who was aware that high chargeback and consumer refund rates were attributable at least in part to fraud, Wen knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

339.   As an individual responsible for managing CAC's finances and responding to consumers' complaints on behalf of CAC and who was aware that the Student Loan Debt Relief Companies' high chargeback and consumer-refund rates were attributable at least in part to fraud, Nguyen knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

340.   The Individual Defendants thus provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices, in violation of § 1036(a)(3) of the CFPA. 12 U.S.C. § 5563(a)(3).

## COUNT X

### By the Bureau

### (Substantial Assistance in Violation of the CFPA)

### (Payment Companies)

341.   The allegations in paragraphs 1-262 and 275-285 are incorporated by reference.

342.   Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031" and states that

49

"the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

343.   The Payment Companies knew, or recklessly avoided knowing, the material misrepresentations that the Student Loan Debt Relief Companies made to consumers.

344.   The Payment Companies provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices, in violation of § 1036(a)(3) of the CFPA. 12 U.S.C. § 5563(a)(3).

**COUNT XI**

**By the Bureau**

**CFPA Violation Based on Violation of TSR**

**(All Defendants)**

345.   The allegations in paragraphs 1-285 are incorporated by reference.

346.   The Bureau is authorized to enforce the Telemarketing Act with respect to the offering or provision of a consumer-financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).

347.   A violation of the TSR "committed by a person subject to the Consumer Financial Protection Act of 2010 shall be treated as a violation of a rule under Section 1031 of [the CFPA] regarding unfair, deceptive, or abusive acts or practices." 15 U.S.C. § 6102.

348.   Section 1031 of the CFPA provides that "[t]he Bureau may prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(b).

349.   Defendants' violations of the TSR are treated as violations of a rule under    § 1031 of the CFPA. 15 U.S.C. § 6102(c).

350. Because Defendants are "covered persons" who violated the TSR by charging and collecting illegal advance fees from consumers and engaging in deceptive conduct, they violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT XII
### By the Bureau and the States
### (Relief Defendants)

351. The allegations in paragraphs 1-285 are incorporated by reference.

352. Relief Defendants Hold the Door, Infinite Management, TN Accounting, Mice and Men, 1st Generation Holdings, Sarah Kim, Anan Enterprise, and Judy Dai (in her individual capacity and as the trustee of the Judy Dai 2017 Trust) have received, directly or indirectly, funds or other assets from Defendants that are traceable to, or commingled with, funds obtained from consumers through the deceptive and unlawful practices described herein.

353. The Relief Defendants are not bona fide purchasers with legal or equitable title to the funds or other assets received from Defendants.

354. The Relief Defendants would be unjustly enriched if not required to disgorge funds or the value of the benefits received as a result of Defendants' unlawful acts or practices.

355. The Relief Defendants therefore hold funds and assets in constructive trust for the benefit of the Student Loan Debt Relief Companies' customers.

## AVOIDANCE OF FRAUDULENT TRANSFERS

356. Defendant Kaine Wen has made over $REDACTED in transfers to Relief Defendant Judy Dai that are fraudulent and can be voided under the Federal Debt Collection Procedures Act or the California Uniform Voidable Transactions Act.

357.    Defendant Kaine Wen does not have sufficient financial resources to satisfy his debts to the Bureau and the States as described in paragraphs 8, 129, 229-232 and 253-256 and Counts I-III, V, VII, IX, XI, and XXII.

## COUNT XIII

### By the Bureau

### Fraudulent Transfers under the Federal Debt Collection Procedures Act, 28 U.S.C. § 3304(b)(1)(A)

### (Defendant Kaine Wen and Relief Defendant Judy Dai)

358.    The allegations in paragraphs 1-285 are incorporated by reference.

359.    Wen is subject to, jointly and severally with other defendants in this action, a claim for a debt to the Bureau in excess of $100 million, including for damages, restitution, disgorgement, and civil money penalties for violations of the CFPA and TSR.  Counts I-III, V, VII, IX, and XI.  This debt constitutes a "debt" under 28 U.S.C. §§ 3002(3)(B) and 3304(b)(1) and Wen is a "debtor" under 28 U.S.C. §§ 3002(4) and 3304(b)(1).

360.    As set forth in paragraphs 227-262, through the First and Second Transfers, Wen transferred cash and investments directly or indirectly to Relief Defendant Judy Dai (individually and as a trustee of the Judy Dai 2017 Trust) with actual intent to hinder, delay, or defraud a creditor.

361.    Wen's actual intent to hinder, delay, or defraud a creditor is demonstrated by the allegations in this Second Amended Complaint, including the following:

a.    Judy Dai was Wen's mother and therefore an insider within the meaning of 28 U.S.C. §§ 3301(5), 3304(b)(2)(A).  Paragraph 65.

b.    Wen retained control over the assets transferred, including because Judy Dai granted him power of attorney over the Judy Dai 2017 Trust UBS Account and he directed large wires on behalf of the Judy Dai

2017 Trust.  28 U.S.C. § 3304(b)(2)(B).  Paragraphs 150-151 and 246-247.

c.      Wen failed to disclose the First Transfer on his REDACTED

REDACTED      28 U.S.C. § 3304(b)(2)(C).  Paragraph 233.

d.      At the time of the First Transfer, Wen had been sued and threatened with suit.  28 U.S.C. § 3304(b)(2)(D).  Paragraphs 234-245.

e.      At the time of the Second Transfer, Wen had been further threatened with suit. 28 U.S.C. § 3304(b)(2)(D).  Paragraphs 234-245 and 248-249, 257-260.

f.      Wen concealed significant assets from the Bureau for over a year after entry of the TRO.  28 U.S.C. § 3304(b)(2)(G).  Paragraph 261-262.

g.      Wen did not receive reasonably equivalent consideration in exchange for the First or Second Transfer.  28 U.S.C. § 3304(b)(2)(H). Paragraphs 228 and 252.

h.      At the time of the First and Second Transfers, or shortly thereafter, Wen was insolvent as he faced millions of dollars in liability to the Bureau for its claims, which significantly exceeded his assets at each of those times.  28 U.S.C. § 3304(b)(2)(I).  Paragraphs 229-232 and 253-256.

i.      The First and Second Transfers occurred shortly before Wen incurred substantial debt, including as the personal guarantor on at least three of True Count's payment processor accounts that collectively received tens of millions of dollars in unlawfully obtained consumer fees in violation of the CFPA and TSR in the months after the First Transfer. 28 U.S.C. § 3304(b)(2)(J).  Paragraphs 229-231, 241-245, and 253-255.

362.   The transfers described above should be adjudged fraudulent and avoidable to the extent necessary to satisfy any judgment for the Bureau, and therefore the United States, 28 U.S.C. § 3002(15)(B), in this proceeding.

**COUNT XIV**

**By the Bureau**

**Fraudulent Transfers under the Federal Debt Collection Procedures Act,**

**28 U.S.C. § 3304(b)(1)(B)**

**(Defendant Kaine Wen and Relief Defendant Judy Dai)**

363.   The allegations in paragraphs 1-285 are incorporated by reference.

364.   Wen is subject to, jointly and severally with other defendants in this action, a claim for a debt to the Bureau in excess of $100 million, including for damages, restitution, disgorgement, and civil money penalties for violations of the CFPA and TSR.  Counts I-III, V, VII, IX, and XI.  This debt constitutes a "debt" under 28 U.S.C. §§ 3002(3)(B) and 3304(b)(1) and Wen is a "debtor" under 28 U.S.C. §§ 3002(4) and 3304(b)(1).

365.   As set forth in paragraphs 227-262, through the First and Second Transfers, Wen transferred REDACTED        directly or indirectly to Relief Defendant Judy Dai (both individually and as a trustee of the Judy Dai 2017 Trust), who did not provide reasonably equivalent value to Wen in exchange for the transfers.

366.   At the time of the First and Second Transfers, Wen was engaged in or about to engage  in transactions for which the remainder of his assets were unreasonably small, or Wen believed or reasonably should have believed that he would incur debts beyond his ability to pay them, including because at the time of each transfer his assets were worth far less than the tens of millions of dollars in liabilities under the CFPA and TSR that he had incurred or was about to incur, including based on personally guaranteeing CAC's and True Count's

merchant accounts as set forth in paragraphs 227-262, in violation of 28 U.S.C.
§ 3304(b)(1)(B)(i), (ii).

367.   The transfers described above should be adjudged fraudulent and
avoidable to the extent necessary to satisfy any judgment for the Bureau, and
therefore the United States, 28 U.S.C. § 3002(15)(B), in this proceeding.

**COUNT XV**

**By the People of the State of California**

**Avoidable Transfers under the California Uniform Voidable Transactions
Act (UVTA), and by the Bureau (in the alternative),
Cal. Civ. Code § 3439.04(a)(1)**

**(Defendant Kaine Wen and Relief Defendant Judy Dai)**

368.   The allegations in paragraphs 1-285 are incorporated by reference.

369.   Wen's liability to the Bureau and the States, jointly and severally
with other defendants in this action, exceeds $100 million, including for
damages, restitution, disgorgement, and civil money penalties for violations of
the CFPA, TSR, and UCL.  Counts I-III, V, VII, IX, XI and XXII.  These
Counts include harm to California consumers occurring before the First
Transfer.  Thus, Wen is a "debtor" and the Bureau, and the People of the State
of California are "creditors" with a "claim" within the meaning of the UVTA.
Cal. Civ. Code § 3439.01(b), (c), (e).

370.   As set forth in paragraphs 227-262, through the First and Second
Transfers, Wen transferred REDACTED        directly or indirectly to Relief
Defendant Judy Dai (both individually and as a trustee of the Judy Dai 2017
Trust) with actual intent to hinder, delay, or defraud a creditor.

371.   Wen's actual intent to hinder, delay, or defraud a creditor is
demonstrated by the allegations in this Second Amended Complaint, including
the following:

**REDACTED SECOND AMENDED COMPLAINT**

a.     Judy Dai was Wen's mother and therefore an insider within the meaning of Cal Civ. Code § 3439.04(b)(1).  Paragraph 65.

b.     Wen retained control over the assets transferred, including because Judy Dai granted him power of attorney over the Judy Dai 2017 Trust UBS Account and he directed large wires on behalf of the Judy Dai 2017 Trust.  Cal Civ. Code § 3439.04(b)(2).  Paragraph 150-151 and 246-247.

c.     Wen failed to disclose the First Transfer on his REDACTED REDACTED    Cal Civ. Code § 3439.04(b)(3).  Paragraph 233.

d.     At the time of the First Transfer, Wen had been sued and threatened with suit.  Cal Civ. Code § 3439.04(b)(4).  Paragraphs 234-245.

e.     At the time of the Second Transfer, Wen had been further threatened with suit. Cal Civ. Code § 3439.04(b)(4).  Paragraphs 234-245 and 248-249, 257-260.

f.     Wen concealed significant assets from the Bureau for over a year after entry of the TRO.  Cal Civ. Code § 3439.04(b)(7).  Paragraph 261-262.

g.     Wen did not receive reasonably equivalent consideration in exchange for the First or Second Transfer.  Cal Civ. Code § 3439.04(b)(8).  Paragraphs 228 and 252.

h.     At the time of the First and Second Transfers, or shortly thereafter, Wen was insolvent as he faced millions of dollars in liability to the Bureau and the States for their claims, which significantly exceeded his assets at each of those times. Cal Civ. Code § 3439.04(b)(9).  Paragraphs 229-232 and 253-256.

i.     The First and Second Transfers occurred shortly before Wen incurred substantial debt, including as the personal guarantor on at least

three of True Count's payment processor accounts that collectively received tens of millions of dollars in unlawfully obtained consumer fees in violation of the CFPA, TSR, and UCL in the months after the First Transfer.  Cal Civ. Code § 3439.04(b)(10).  Paragraphs 229-231, 241-245, and 253-255.

372.   The transfers described above should be adjudged fraudulent and void to the extent necessary to satisfy any judgment for the Bureau or the People of the State of California in this proceeding.

**COUNT XVI**

**By the People of the State of California**

**Avoidable Transfers under the California Uniform Voidable Transactions Act, and by the Bureau (in the alternative),**

**Cal. Civ. Code §§ 3439.04(a)(2)**

**(Defendant Kaine Wen and Relief Defendant Judy Dai)**

373.   The allegations in paragraphs 1-285 are incorporated by reference.

374.   Wen's liability to the Bureau and the States, jointly and severally with other defendants in this action, exceeds $100 million, including for damages, restitution, disgorgement, and civil money penalties for violations of the CFPA, TSR, and UCL.  Counts I-III, V, VII, IX, XI, and XXII.  These Counts include harm to California consumers occurring before the First Transfer.  Thus, Wen is a "debtor" and the Bureau, and the People of the State of California are "creditors" with a "claim" within the meaning of the UVTA.  Cal. Civ. Code § 3439.01(b), (c), (e).

375.   As set forth in paragraphs 227-262, through the First and Second Transfers, Wen transferred cash and investments directly or indirectly to Relief Defendant Judy Dai (both individually and as a trustee of the Judy Dai 2017 Trust), who did not provide reasonably equivalent value to Wen in exchange for the transfers.

57

376.   At the time of the First and Second Transfers, Wen was engaged in or about to engage in transactions for which the remainder of his assets were unreasonably small, or Wen believed or reasonably should have believed that he would incur debts beyond his ability to pay them, including because at the time of each transfer his assets were worth far less than the tens of millions of dollars in liabilities under the CFPA, TSR, and UCL, that he had incurred or was about to incur, including based on personally guaranteeing CAC's and True Count's merchant accounts as set forth in paragraphs 227-262, in violation of Cal. Civ. Code § 3439.04(a)(2).

377.   The transfers described above should be adjudged fraudulent and void to the extent necessary to satisfy any judgment for the Bureau or the People of the State of California in this proceeding.

**COUNT XVII**

**By the State of Minnesota**

**Prevention of Consumer Fraud Act**

**Minn. Stat. § 325F.69, et seq.**

**(The Student Loan Debt Relief Companies and Individual Defendants)**

378.   The allegations in paragraphs 1-322 and 351-355 are incorporated by reference.

379.   Minnesota Statutes section 325F.69, subdivision 1 reads:

380.   The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

381.   The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes services.  See Minn. Stat. § 325F.68, subd. 2.

382.   The term "person" includes "any natural person or legal representative, partnership, corporation (domestic and foreign), company, trust, business entity, or association, and any agent, employee, salesperson, partner, officer, director, member, stockholder, associate, trustee, or cestui que thereof." Minn. Stat. § 325F.68, subd. 3.  The Student Loan Debt Relief Companies and Individual Defendants are "persons" within the meaning of the statute.

383.   The Student Loan Debt Relief Companies and Individual Defendants repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in the deceptive and fraudulent practices described in this Complaint, with the intent that others rely thereon in connection with the sale of their student loan debt relief services.  This conduct includes, but is not limited to:

a.   Misrepresenting to consumers that the Student Loan Debt Relief Companies could forgive consumers' loans and otherwise misrepresenting their ability to reduce or eliminate student loan debt;

b.   Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

c.   Misrepresenting and falsely leading consumers to believe that the Student Loan Debt Relief Companies would apply payments made to it to consumers' loans;

d.   Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

e.   Misrepresenting to consumers that the amount owed on their student loans would be reduced;

f.   Misrepresenting to consumers that their loans would be forgiven in whole or in part following payment of the enrollment fees;

g.    Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

h.    Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

i.    Misleading consumers to believe that the Student Loan Debt Relief Companies were tied to or had a relationship with the federal government or a particular federal debt relief plan;

j.    Misrepresenting government programs and payment plan terms to consumers; and

k.    The other practices described in this Complaint.

384.   Due to the deceptive and fraudulent conduct described in this Complaint, Minnesota consumers made payments to Defendants for services that they otherwise would not have purchased, thereby causing harm to those consumers.

385.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325F.69.

**COUNT XVIII**

**By the State of Minnesota**

**Uniform Deceptive Trade Practices Act**

**Minn. Stat. § 325F.43, et seq.**

**(The Student Loan Debt Relief Companies and Individual Defendants)**

386.   The allegations in paragraphs 1-322, 351-355, and 378-385 are incorporated by reference.

387.   Minnesota Statutes section 325D.44, subdivision 1 provides, in part that:

**REDACTED SECOND AMENDED COMPLAINT**

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

\*\*\*

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

\*\*\*

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

\*\*\*

(7) represents that goods or services are of a particular standard [or] quality . . . if they are of another;

\*\*\*

(9) advertises goods or services with intent not to sell them as advertised; [or]

\*\*\*

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

388.   The Student Loan Debt Relief Companies and Individual Defendants are "persons" within the meaning of the statute.

389.   The Student Loan Debt Relief Companies and Individual Defendants repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by, in the course of business, engaging in the deceptive and fraudulent practices described in this Complaint that caused a likelihood of confusion or of misunderstanding among consumers in connection with the sale of Defendants' student loan debt relief services, including by making false, deceptive, fraudulent, and/or misleading representations to consumers regarding its advertised services.  These practices include but are not limited to:

a.      Misrepresenting to consumers that the Student Loan Debt Relief Companies could forgive consumers' loans and otherwise misrepresenting their ability to reduce or eliminate student loan debt;

**REDACTED SECOND AMENDED COMPLAINT**

b.     Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

c.     Misrepresenting and falsely leading consumers to believe that the Student Loan Debt Relief Companies would apply payments made to it to consumers' loans;

d.     Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

e.     Misrepresenting to consumers that the amount owed on their student loans would be reduced;

f.     Misrepresenting to consumers that their loans would be forgiven in whole or in part following payment of the enrollment fees;

g.     Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

h.     Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

i.     Misleading consumers to believe that the Student Loan Debt Relief Companies were tied to or had a relationship with the federal government or a particular federal debt relief plan;

j.     Misrepresenting government programs and payment plan terms to consumers; and

k.     The other practices described in this Complaint.

390.   Due to the deceptive and fraudulent conduct described in this Complaint, Minnesota consumers made payments to Defendants for services

**REDACTED SECOND AMENDED COMPLAINT**

that they otherwise would not have purchased, thereby causing harm to those consumers.

391.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44.

**Count XIX**

**By the State of North Carolina**

**North Carolina Debt Adjusting Act**

**N.C. Gen. Stat. § 14-423, et seq.**

**(The Student Loan Debt Relief Companies and Individual Defendants)**

392.   The allegations in paragraphs 1-322 and 351-357 are incorporated by reference.

393.   The Student Loan Debt Relief Companies engaged in illegal "debt adjusting" as that term is defined in Article 56 of Chapter 14 of the North Carolina General Statutes.  Specifically, N.C. Gen. Stat. § 14-423(2) defines "debt adjusting" as any of the following:

> "Debt adjusting" means entering into or making a contract, express or implied, with a particular debtor whereby the debtor agrees to pay a certain amount of money periodically to the person engaged in the debt adjusting business and that person, for consideration, agrees to distribute, or distributes the same among certain specified creditors in accordance with a plan agreed upon.

> Debt adjusting includes the business or practice of any person who holds himself out as acting or offering or attempting to act for consideration as an intermediary between a debtor and his creditors for the purpose of settling, compounding, or in any way altering the terms of payment of any debt of a debtor, and to that end receives money or other property from the debtor, or on behalf of the debtor, for the payment to, or distribution among, the creditors of the debtor.

> Debt adjusting also includes the business or practice of debt settlement . . . whereby any person holds himself or herself out as acting for consideration as an intermediary between a debtor and the debtor's

creditors for the purpose of reducing, settling, or altering the terms of the payment of any debt of the debtor, whether or not the person distributes the debtor's funds or property among the creditors, and receives a fee or other consideration for reducing, settling, or altering the terms of the payment of the debt in advance of the debt settlement having been completed or in advance of all the services agreed to having been rendered in full.

394. Debt adjusting is prohibited by N.C. Gen. Stat. § 14-424, which provides that "[i]f any person shall engage in, or offer to or attempt to, engage in the business or practice of debt adjusting, or if any person shall hereafter act, offer to act, or attempt to act as a debt adjuster, he shall be guilty of a Class 2 misdemeanor."

395. The Student Loan Debt Relief Companies and Individual Defendants' offering and purported rendering of debt adjusting services was in violation of North Carolina's debt adjusting statute.

396. The Student Loan Debt Relief Companies have entered into contracts with North Carolina student loan debtors whereby the debtors agreed to pay certain amounts of money periodically to the Student Loan Debt Relief Companies, and the Student Loan Debt Relief Companies, for consideration, represented or implied that they would distribute debtors' money among debtors' student loan servicers or lenders and/or DOE in accordance with a plan agreed upon.

397. The Student Loan Debt Relief Companies and Individual Defendants have engaged in the business or practice of holding themselves out as acting or offering or attempting to act for consideration, as an intermediary between North Carolina student loan debtors and their servicers or lenders and/or DOE for the purpose of settling, compounding, or altering the terms of payment of the student loan debts of the debtors, and to that end received money from the debtors, or on behalf of the debtors, for the payment to, or distribution among, the student loan creditors of the debtors.

**REDACTED SECOND AMENDED COMPLAINT**

398.   Defendants have engaged in a business or practice in which they hold themselves out as acting or offering or attempting to act, for consideration, as an intermediary between North Carolina student loan debtors and their student loan servicers or lenders and/or DOE for the purpose of reducing, settling, or altering the terms of payment of North Carolina debtors' student loan debts, and defendants receive a fee in advance of the debt settlements having been completed or in advance of all the services agreed to having been rendered in full.

399.   Pursuant to N.C. Gen. Stat. § 14-425, the Attorney General is authorized to seek (a) injunctive relief to enjoin Defendants from the continuation of any debt adjusting activities or the offering of any debt adjusting services in North Carolina; (b) the disgorgement of all monies unlawfully collected by Defendants from North Carolina consumers; (c) the appointment of a receiver to assist in the recovery of funds unlawfully collected by Defendants and to ensure their return to consumers; and (d) the assessment of civil penalties under N.C. Gen. Stat. § 75-15.2 and attorneys' fees for the State under N.C. Gen. Stat. § 75-16.1.

## Count XX

### By the State of North Carolina

### North Carolina Unfair and Deceptive Practices Act

### N.C. Gen. Stat. § 75-1.1

### (All Defendants)

400.   The allegations in paragraphs 1-322, 351-357, and 392-399 are incorporated by reference.

401.   In the course of soliciting and promoting their student loan debt relief services to North Carolina consumers, in entering into agreements with North Carolina consumers to provide such services, and in either performing or failing to meaningfully perform those services, the Defendants have engaged in

65

unfair and deceptive acts and practices in trade or commerce in violation of N.C. Gen. Stat. § 75-1.1.

402. The Student Loan Debt Relief Companies were engaged in trade or commerce in the State of North Carolina.

403. The Student Loan Debt Relief Companies' unfair or deceptive acts and practices include, but are not limited to, the following:

404. Engaging in violations of the TSR, as set forth supra, which are specifically prohibited by 16 C.F.R. Part 310;

405. Engaging in illegal debt adjusting activities, as set forth supra, which are specifically prohibited by N.C. Gen. Stat. 14-423, et seq.;

406. Failing to register as a telephonic seller under North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat §§ 66-260 and 66-261, as set forth infra; and

407. Making deceptive and misleading representations to consumers, including but not limited to:

    a.    Misrepresenting to consumers that the Student Loan Debt Relief Companies could forgive consumers' loans and otherwise misrepresenting the Student Loan Debt Relief Companies' ability to reduce or eliminate student loan debt;

    b.    Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

    c.    Misrepresenting and falsely leading consumers to believe that the Student Loan Debt Relief Companies would apply payments made to the Student Loan Debt Relief Companies and Payment Companies to the consumers' outstanding loans;

d.      Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

e.      Misrepresenting to consumers that the amount owed on their student loans would be reduced if students signed up for the Student Loan Debt Relief Companies' services;

f.      Misrepresenting to consumers that their loans would be forgiven in whole or in part shortly after enrolling in the Student Loan Debt Relief Companies' services;

g.      Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

h.      Misrepresenting that consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status;

i.      Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

j.      Misrepresenting to consumers that TAS was an independent third-party provider of dedicated customer accounts;

k.      Misleading consumers to believe that the Student Loan Debt Relief Companies were tied to or had a relationship with the federal government or a particular federal debt relief plan;

l.      Failing to inform consumers that it was their practice to submit false information about consumers' income, family size, and marital status on loan adjustment applications in order to try to qualify consumers for lower monthly payments;

**REDACTED SECOND AMENDED COMPLAINT**

m.      Misrepresenting government programs and payment plan terms to consumers; and

n.      The other practices described in this Amended Complaint.

408.   The Attorney General is authorized to seek an injunction against Defendants' practices under N.C. Gen. Stat. § 75-14, the restoration of any moneys obtained by Defendants from North Carolina consumers as well as the cancellation of Defendants' contracts with North Carolina consumers under N.C. Gen. Stat. § 75-15.1, civil penalties under N.C. Gen. Stat. § 75-15.2, and attorneys' fees under N.C. Gen. Stat. § 75-16.1.

**Count XXI**

**By the State of North Carolina**

**North Carolina Telephonic Seller Registration Act**

**N.C. Gen. Stat. § 66-260**

**(The Student Loan Debt Relief Companies and Individual Defendants)**

409.   The allegations in paragraphs 1-322, 351-357, and 392-408 are incorporated by reference.

410.   North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat §§ 66-260 and 66-261, requires any non-exempt person engaged in telephonic solicitations directed to North Carolina consumers to: (a) register with the North Carolina Secretary of State not less than 10 days before commencing telephone solicitations; (b) provide specified information on a form provided by the Secretary of State that contains the notarized signature of each principal of the telephonic seller; and (c) pay a $100.00 filing fee.

411.   Pursuant to N.C. Gen. Stat. § 66-261(c), a registration of a telephonic seller is valid for one year from the effective date of the provision of all required information, and may be renewed annually by making the filing required by N.C. Gen. Stat. § 66-262, and paying the filing fee of $100.00.

412.   Each of the Student Loan Debt Relief Companies was a "telephonic seller" as defined in N.C. Gen. Stat. § 66-260(11), as the Student Loan Debt Relief Companies caused directly, or through employees or agents, telephone solicitations or attempted telephone solicitations to occur, and the Student Loan Debt Relief Companies are not exempt from the Act.

413.   The Student Loan Debt Relief Companies engaged in violations of the Telephonic Seller Registration Act, N.C. Gen. Stat. § 66-260, et seq., by failing to register with the North Carolina Secretary of State as a telephonic seller; by failing to provide the North Carolina Secretary of State with the information mandated by N.C. Gen. Stat. § 66-262; by failing to pay the filing fee of $100.00; and by failing to register in each year the Student Loan Debt Relief Companies engaged in telephonic solicitations.

414.   N.C. Gen. Stat. § 66-266(a) provides that any violation of the Telephonic Seller Registration Act "shall constitute an unfair and deceptive trade practice in violation of N.C. Gen. Stat. §75-1.1."

415.   N.C. Gen. Stat. § 66-266(c) further provides that the remedies and penalties available under the section "shall be supplemental to others available under the law, both civil and criminal."

416.   Pursuant to N.C. Gen. Stat. §§ 66-266(b), in an action by the Attorney General against a telephonic seller for violation of the Telephonic Seller Registration Act, or for any other act or practice by a telephonic seller constituting a violation of N.C. Gen. Stat. § 75-1.1, the court may impose civil penalties of up to $25,000 for each violation involving North Carolina purchasers or prospective purchasers who are 65 years of age or older.

## Count XXII
### By the People of the State of California
### California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200 et seq.

REDACTED SECOND AMENDED COMPLAINT

**(All Defendants and Relief Defendants)**

417.   The People of the State of California re-allege and incorporate herein paragraphs 1 through 350 of this Complaint.

418.   California's UCL, Business and Professions Code section 17200, prohibits any "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200.

419.   Section 17203 of the UCL provides that "(a)ny person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction." Section 17203 also permits recovery of any "interest in money or property, real or personal" acquired by a violation of the UCL. Cal. Bus. & Prof. Code § 17203.

420.   Section 17206, subdivision (a), of the UCL provides that any person violating Section 17200 "shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the [P]eople of the State of California . . . by any city attorney of a city having a population in excess of 750,000," thereby authorizing the City Attorney of Los Angeles, which has a population in excess of 750,000, to bring such an action. Cal. Bus. & Prof. Code § 17206.

421.   Under the UCL's Section 17205, these remedies and penalties are "cumulative to each other and to the remedies or penalties available under all other laws of this state." Cal. Bus. & Prof. Code § 17205.

422.   Defendants are all "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

423.   "Unlawful" acts or practices, "unfair" acts or practices, and "fraudulent" acts or practices each independently violate Section 17200. Beginning no later than 2015, and continuing to the filing of this action, Defendants, and each of them, have repeatedly violated the UCL by engaging in

70

"unlawful, unfair, or fraudulent business act[s] or practice[s]" with the sale of their purported student loan debt settlement services. Cal. Bus. & Prof. Code § 17200. These violations include, but are not limited to:

    a.    Violating the UCL through the following unlawful acts or practices committed against California consumers, including in the City and County of Los Angeles:

    i.    As to the Student Loan Debt Relief Companies and Individual Defendants, violating California Financial Code § 12000 et seq., the California Check Sellers, Bill Payers and Proraters Law, by acting as a check seller, bill payer, or prorater without first obtaining a license from the California Commissioner of Business Oversight. Cal. Fin. Code § 12200;

    1.    As alleged in this Complaint, including but not limited to in paragraphs 8-285, California consumers provided funds to Defendants based upon assurances and representations that Defendants would assist them in reducing or otherwise managing their student loan debts and/or negotiate with their creditors and distribute payments.

    2.    At all relevant times, the Student Loan Debt Relief Companies and Individual Defendants were not licensed by the California Corporations Commissioner as required by Financial Code § 12000 et seq.

    ii.    As to the Student Loan Debt Relief Companies and Individual Defendants, violating California Financial Code section 28100, et seq., the California Student Loan Servicing Act, which requires Student Loan Servicers to be licensed to lawfully operate, by engaging in the business of servicing student loans in California without obtaining a license as required under the Act;

**REDACTED SECOND AMENDED COMPLAINT**

1    1.  The Student Loan Debt Relief Companies and

2 Individual Defendants are "persons" under the Student Loan

3 Servicing Act. Cal. Fin. Code § 28104, subd. (j).

4    2.  As alleged in this Complaint, including but not

5 limited to in paragraphs 8-285, the Student Loan Debt Relief

6 Companies and Individual Defendants have engaged in the

7 business of servicing student loans in California. Cal. Fin.

8 Code § 28104, subds. (f), (g), (l), (m), (n).

9    3.  The Student Loan Debt Relief Companies and

10 Individual Defendants never obtained a license to service

11 student loans as required under the California Student Loan

12 Servicing Act. Cal. Fin. Code § 28102, subd. (a).

13   iii.  As to all Defendants, violating the Telemarketing

14 Sales Rule ("TSR"), which is specifically set forth in 16 C.F.R.

15 Part 310, as set forth in this Complaint, including but not limited to

16 in paragraphs 8-322 (Count I (Advance Fees in Violation of the

17 TSR – Enrollment Fees), Count II (Advance Fees in Violation of

18 the TSR – Monthly Fees), Count III (Misrepresentations About

19 Material Aspects of Their Services in Violation of the TSR) (The

20 Student Loan Debt Relief Companies and Individual Defendants),

21 Count IV (Misrepresentations About Material Aspects of Their

22 Services in Violation of the TSR) (True Count, Prime, and TAS),

23 Count V (Substantial Assistance in Violation of the TSR)

24 (Individual Defendants), and Count VI (Substantial Assistance in

25 Violation of the TSR) (Payment Companies)).

26   iv.  As to all Defendants, violating the Consumer

27 Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531 et

28 seq., as set forth in this Complaint, including but not limited to in

**REDACTED SECOND AMENDED COMPLAINT**

paragraphs 8-285 and paragraphs 323-350 (Count VII (CFPA –
Deception) (The Student Loan Debt Relief Companies and
Individual Defendants), Count VIII (CFPA – Deception) (True
Count, Prime, and TAS), Count IX (Substantial Assistance in
Violation of the CFPA) (Individual Defendants), Count X
(Substantial Assistance in Violation of the CFPA) (Payment
Companies), and Count XI (CFPA Violation Based on Violation of
TSR)).

      v.    As to the Relief Defendants, by receiving, directly or
indirectly, funds or other assets from Defendants that are traceable
to funds obtained from consumers through the deceptive and
unlawful practices as set forth in this Complaint, without having
legal or equitable title to funds or other assets received from
Defendants as bona fide purchasers, and/or in violation of the
Federal Debt Collection Procedure Act, U.S.C. Code section 3304
and the California Uniform Voidable Transactions Act, Cal. Civil
Code section 3439 et seq. and as further alleged in paragraphs 8-
285 and paragraphs 351-355 (Count XII).

    b.    The Student Loan Debt Relief Companies and Individual
Defendants also violated the UCL through the following unlawful,
fraudulent and/or unfair acts or practices committed against California
consumers, including consumers in the City and County of Los Angeles:

      i.    Misrepresenting to consumers that Defendants could
forgive consumers' loans and otherwise misrepresenting
Defendants' ability to reduce or eliminate student loan debt;

      ii.    Misrepresenting to consumers that the consumers
were "approved" for student loan relief, and otherwise

**REDACTED SECOND AMENDED COMPLAINT**

misrepresenting their ability to qualify borrowers for government programs;

iii.    Misrepresenting and falsely leading consumers to believe that Defendants would apply payments made to Defendants to the consumers' outstanding loans;

iv.    Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

v.    Misrepresenting to consumers that the amount owed on their student loans would be reduced if students signed up for Student Loan Debt Relief Companies' services;

vi.    Misrepresenting to consumers that their loans would be forgiven in whole or in part shortly after enrolling in Student Loan Debt Relief Companies' services;

vii.    Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

viii.    Misrepresenting that consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status;

ix.    Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

**REDACTED SECOND AMENDED COMPLAINT**

x.     Misleading consumers to believe that the Student Loan Debt Relief Companies are tied to or have a relationship with the federal government or a particular federal debt relief plan;

xi.     Failing to inform consumers that it was their practice to submit false information about consumers' income, family size, and marital status on loan adjustment applications in order to try to qualify consumers for lower monthly payments;

xii.     Misrepresenting government programs and payment plan terms to consumers; and

xiii.     The other practices described in this Complaint.

424.   Due to the deceptive and fraudulent conduct described in this Complaint, California consumers made payments to Defendants for services that they otherwise would not have purchased, thereby causing harm to those consumers.

425.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of California Business and Professions Code section 17200.

## DEMAND FOR RELIEF

426.   WHEREFORE, the Bureau and the States request, under 12 U.S.C. §§ 5538(a), 5565(a); 28 U.S.C. § 3306; Cal. Civ. Code § 3439.07; Minn. Stat. §§ 8.31, 325D.45, and 325F.70; the State of Minnesota's common law authority, including *parens partiae* authority; N.C. Gen. Stat. §§ 14-424, 75-14, 75-15.1, 75-16.1, and 66-266; and Cal. Bus. & Prof. Code §§ 17200 et seq., and the Court's equitable and ancillary authority to protect and enforce federal judgments, that the Court:

a.     award the Bureau and the States such preliminary and injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, including but not

limited to a temporary and preliminary injunction, an order freezing assets, immediate access to business premises, and appointment of a Receiver against Defendants and Relief Defendants;

      b.    permanently enjoin Defendants from committing future violations of the TSR, the CFPA, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, the NCTSRA, and the UCL, and enter such other injunctive relief as appropriate;

      c.    permanently enjoin Defendants from the advertisement, marketing, promotion, offering for sale, or selling of any consumer-financial product or service, including but not limited to any debt relief service;

      d.    grant additional injunctive relief as the Court may deem to be just and proper;

      e.    award damages and other monetary relief against Defendants and Relief Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, the TSR, the FDCPA, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, the NCTSRA, and the California UVTA, including but not limited to rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement or compensation for unjust enrichment;

      f.    award restitution against Defendants and Relief Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the UCL;

      g.    award the Bureau and the States civil money penalties;

      h.    award the Bureau and the States the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper;

**REDACTED SECOND AMENDED COMPLAINT**

1          i.     award the States the costs of investigation and attorneys'

2  fees; and

          j.     adjudge fraudulent and void the transfers described at

3  paragraphs 227-262 and Counts XIII-XVI to the extent necessary to

4  satisfy any judgment for the Bureau or the People of the State of

5  California in this action.

6  Dated: April 20, 2021

7                           Respectfully submitted,

8

9                           CARA PETERSEN
                           Acting Enforcement Director

10                         DEBORAH MORRIS

11                         Deputy Enforcement Director

12                         */s/ Nathan Dimock*

13                         Nathan Dimock (admitted *pro hac vice*)
                         Sarah Preis (admitted *pro hac vice*)

14                         Jesse Stewart (admitted *pro hac vice*)
                         Enforcement Attorneys

15

16                         *Attorneys for Plaintiff Bureau of*

17                         *Consumer Financial Protection*

18

19                         JOSHUA H. STEIN
                         Attorney General of North Carolina

20                         */s/ M. Lynne Weaver*

21                         M. Lynne Weaver
                         Special Deputy Attorney General

22                         (Admitted *pro hac vice*)

23                         *Attorney for the State of North Carolina*

24

25                         KEITH ELLISON
                         Attorney General of Minnesota

26                         */s/ Evan S. Romanoff*

27                         Evan S. Romanoff (admitted *pro hac vice*)

28                         Assistant Attorney General

**REDACTED SECOND AMENDED COMPLAINT**

1

2

*Attorney for the State of Minnesota,*
*By Its Attorney General, Keith Ellison*

3

*/s/ Christina V. Tusan*

4

Christina V. Tusan (CA Bar No. 192203)
Supervising Deputy City Attorney

5

Office of the Los Angeles City Attorney
Telephone (213) 473-6908

6

Fax (213) 978-8111
christina.tusan@lacity.org

7

*Attorney for the People of the State of*
*California*

8

9       I, Nathan Dimock, attest that all other signatories listed, and on whose

10   behalf the filing is submitted, concur in the filing's content and have authorized

11   the filing.

12

13                            */s/ Nathan Dimock*

14                            Nathan Dimock

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REDACTED SECOND AMENDED COMPLAINT**