Sanjay Bhandari (SBN 181920)
sbhandari@mcnamarallp.com
Andrew M. Greene (SBN 167386)
agreene@mcnamarallp.com
Cornelia J. B. Gordon (SBN 320207)
cgordon@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Attorneys for Receiver,
Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection; et al., <br><br> Plaintiffs, <br><br> v. <br><br> Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; et al., <br><br> Defendants. | Case No. 8:19-cv-01998-MWF (KSx) <br><br> **RECEIVER'S SECOND INTERIM STATUS REPORT** <br><br> JUDGE: Hon. Michael W. Fitzgerald <br> CTRM:  5A |

Thomas W. McNamara, as Court-appointed receiver ("Receiver"), submits this report of receivership activities for the period of December 1, 2020 through April 30, 2021.

## I.

## RECEIVERSHIP ACTIVITIES

During this period, the Receiver and his team were able to recover roughly $1,000,000 in merchant account reserve funds which were secretly and improperly taken by a third-party vendor.  The Receiver's team continued to investigate financial transactions and potential receivership claims against third parties. Additional funds were received from one of the settling Defendants and via the

sale of a vehicle turned over in the settlement. The Receiver's office has also continued to answer consumer inquiries and provide periodic case updates on the receivership website.

**A.　Recovery of Reserve Funds**

Defendants' entire business model was dependent upon their ability to charge consumers' credit cards for their "services." But Defendants lacked the ability to charge consumer cards directly and had to rely on third-party payment processors to impose the charges. As part of these arrangements, Defendants were required to maintain "reserve funds" with the payment processors, generally funded by the payment processors withholding a percentage of charges to cover any consumer-initiated chargebacks. Since shortly after his appointment, the Receiver's team has been engaged with payment processors holding reserve funds to get those funds returned.

　　　　1.　<u>Recovery of Reserve Funds from Fiserv</u>

National Merchant Center ("NMC") is an independent sales organization ("ISO"); ISOs like NMC connect merchant clients with payment processing services, sometimes via another, separate ISO. Though the contract structures vary (for example, an ISO could connect a client directly to a bank which is a member of the necessary Credit Card Associations or, alternatively, it could outsource that task to another ISO), an ISO's fundamental purpose does not: they help merchants secure credit card processing.

NMC was very active as a "wholesale ISO" for Defendants' student loan debt relief business; without access to the payment processing services that NMC helped procure, Defendants would have been unable to operate. In return, NMC received fees based on the volume of transactions generated by Defendants' payment processing. As a "wholesale ISO," NMC obtained payment processing

///
///

services through another ISO, Fiserv,[1] which in turn is a registered ISO of Wells Fargo. These services were governed by a three-party agreement between NMC, Fiserv, and Wells Fargo. Fiserv had operational control of the reserve accounts that NMC placed with it. Despite the fact that the reserve accounts contained funds belonging to the Defendants, Fiserv considered these to be "NMC's" accounts, and Fiserv would only permit funds to be transferred or withdrawn from the reserve accounts with NMC's blessing.

On March 12, 2020, the Receiver's counsel sent a letter to NMC's counsel requesting that NMC comply with the terms of the Preliminary Injunction ("PI") and turn over the remaining reserves in the Receivership Defendants' accounts. *See* Gordon Decl. Ex. 1 (Mar. 12, 2020 Letter to NMC). Based on NMC's representations, those reserves were: $1,443,717.86 (True Count Staffing d/b/a Premier Student Loan Center, MID x6283), $2,120,775.87 (True Count Staffing d/b/a SL Account Mgmt, MID x6317), and $127,369.32 (Horizon Consultants, LLC). A short time later, counsel for Fiserv contacted Receiver's counsel, presumably after learning of the letter from NMC.

Fiserv's counsel confirmed the amounts held in the reserve accounts were consistent with the numbers the Receiver provided which, in turn, were based on NMC's sworn representations. In the following months, the Receiver's counsel worked with Fiserv's counsel to arrange for the return of the funds. Fiserv returned $1,466,016.48 from the True Count MID x6317 account and $1,336,034.74 from the True Count MID x6283 account to the Receivership Estate on June 19, 2020, and an additional $99,299.55 from the True Count MID x6283

///

///

---

[1] NMC actually contracted with First Data, which was acquired by Fiserv in 2019 prior to the Receiver's appointment. For ease of reference, this report refers to both entities as "Fiserv."

account on November 17, 2020.[2] After accounting for the returned funds and consumer chargebacks, both the Horizon Consultants and True Count MID x6283 reserve accounts have been depleted.

### 2. Recovery of Funds Improperly Withdrawn by NMC Post-Receivership

In the course of the Receiver's investigation, his team uncovered a series of withdrawals by NMC from the Horizon Consultants, LLC ("Horizon") reserve account which occurred after the receivership was imposed and which appeared to be unrelated to NMC's fees or customer chargebacks. Just under $1,000,000 was withdrawn from these accounts by NMC in the days immediately after NMC learned of the CFPB action and the imposition of the asset freeze and receivership. Since the withdrawals were discovered in late 2020, the Receiver's counsel has worked to understand the withdrawals and ultimately coordinated with counsel for NMC to secure return of the funds. The underlying facts and the Receiver's efforts are discussed in greater detail below.

The Receiver was first appointed by entry of a Temporary Restraining Order ("TRO," ECF No. 24) on October 21, 2019; at the time, the case was under seal. On October 23, 2019, he took control and exclusive custody of Defendants' three business premises in Irvine, California. *See* ECF No. 75 (Prelim. Report) at 2. This case was unsealed soon thereafter, on October 29, 2019.

On October 30, 2019 – the day after the case was unsealed and days after NMC had notice of the receivership – NMC withdrew $499,985.00 from Horizon's reserve account[3] in five separate transfers of roughly $99,999 each. The following

---

[2] While some of these events occurred prior to the reporting period for the instant report, they provide important context and background for more recent events and are included for this reason.

[3] Horizon was not named as a Receivership Defendant in the TRO, but was determined to be one by the Receiver (and NMC was notified of such) no later than October 24, 2019.

day, on November 1, 2019, NMC made five identical withdrawals from the same account. In total, more than $999,900.00 was withdrawn from Horizon's reserve account on these two days.

As noted above, the Receiver's counsel requested that NMC return the Horizon reserve funds on March 12, 2020. *See* Gordon Decl. Ex. 1. At the time of the request the Receiver was not aware that NMC had secretly taken roughly $1,000,000 from the reserve account, though his team noted the Horizon reserve account amounts were conspicuously small ($127,369.32) when compared to the reserves for the two True Count accounts ($1,443,717.86 and $2,120,775.87). The Receiver, however, relied on the accuracy of the Horizon reserve number reported by NMC, because John F. Thompson III (NMC's Associate Director of Risk & Underwriting) attested to the reserve amounts on November 1, 2019 – the same day the second half of the roughly $999,900 was withdrawn[4]. *See* Gordon Decl. Ex. 2 (Supp. Decl. of John Thompson).

Roughly three weeks after initially demanding the return of the Horizon reserve funds, on March 31, 2020, counsel for NMC and the Receiver's counsel spoke by phone regarding the reserves. In that phone call, NMC's counsel made a number of representations about the Horizon reserves and consumer chargebacks. With respect to the Horizon reserves, NMC's counsel stated that NMC had absorbed a loss due to the fact that consumer chargebacks had exceeded the $127,369.32 that remained in the account, resulting in a roughly $50,000 loss to NMC.

It was after records were obtained from Fiserv on November 25, 2020 that the improper post-receivership withdrawals were discovered. The Receiver's counsel reached out to NMC's counsel on December 22, 2020 to obtain more

---

[4] It bears noting that this was a supplemental declaration. Thompson's first declaration, executed October 30, 2019, only provided reserve balances for the two True Count MIDs.

information about the withdrawals. In this process, it became clear there was no legitimate business explanation for the withdrawals. The Receiver's counsel demanded the return of the reserves under threat of an Order to Show Cause, after which NMC agreed to return the funds on January 4, 2021. On January 5, 2021, NMC wired $800,000 to the Receivership Estate's account, and wired the remainder ($199,980) before January 15, 2021. As a result, the improperly withdrawn funds were returned to the Receivership Estate.

### B. Potential Litigation Against Third Parties

The Receiver is actively investigating several individuals and companies that aided and abetted or profited from Defendants' fraudulent scheme at the expense of the Receivership Defendants. In connection with the Receiver's investigation, counsel for the Receiver has prepared and issued records subpoenas to multiple parties in order to facilitate tracing. Additionally, the Receiver's forensic accountant has performed cash flow analyses and reviewed bank statements collected at the receivership sites and produced by banks in response to subpoenas.[5]

The Receiver has also engaged in settlement discussions with multiple parties. Settlement talks with a third-party vendor for Defendants were serious enough that the parties attended mediation, although no settlement was reached. The Receiver also entered into a tolling agreement with a lead provider used by Defendants in order to preserve potential claims against the vendor. The Receiver anticipates the need to soon file suit against one third party and will continue to update the Court on these matters as they progress.

///

///

---

[5] The Receiver's counsel also prepared to examine Defendant Kaine Wen at his deposition, which was noticed by the BCFP. The deposition ran long, however, and the Receiver's examination was tabled for the time being.

### C. Sale of Assets

Pursuant to the terms of the Stipulated Final Judgment and Order as to Defendant Tuong Nguyen ("Nguyen") and Relief Defendant TN Accounting Inc. ("TN Accounting") entered on August 28, 2020 (ECF No. 210, Section V, paragraph 31), Defendant Nguyen and Relief Defendant TN Accounting Inc. were ordered to turn over certain assets to the Receiver for liquidation. Nguyen was to transfer a 2018 Tesla Model 3 (VIN ending in 3912) and a Chanel J12 watch to the Receiver, as well as certain cryptocurrency (8.26 Bitcoin, 10.9 Ethereum, 1.39 Bitcoin, and 1.28 Bitcoin Cash), and TN Accounting Inc. was ordered to turnover a Rolex Datejust Watch (S/N 930002E7).

Pursuant to an agreement with the Receiver, Nguyen liquidated his cryptocurrency holdings through his Coinbase account and transferred the balance ($113,606.59 after deducting transaction fees) to the Receivership Estate. After taking possession of the Tesla, the Receiver vetted a number of potential Southern California consignors before selecting a local broker. The Tesla sold relatively quickly and, after paying the broker's commission, the Receivership netted $32,750.00 from the sale of the Tesla.[6]

### D. Consumer Contact

The Receiver's office continued to respond to inquiries from both consumers and former employees during this period by email and telephone, as well as by posting information and pertinent case filings to the Receiver's website.

///

---

[6] The Receiver continues to hold the watches. Watches like the Rolex at issue generally hold their value or appreciate; the Chanel watch will hold value but probably not appreciate. The financial disclosures prepared by the Defendants indicate that they hold a number of other valuable jewelry items. Based on the Receiver's experience, the ability to sell a group of high-end jewelry at one time increases net sales proceeds, as top-level auction houses, *i.e.*, Sotheby's, Christies, Heritage, will often offer reduced commissions for multi-piece offerings. As such, the Receiver believes it makes sense to hold the watches until the remainder of the action is resolved or decided.

## II.

## RECEIVERSHIP ACCOUNTING

Attached as Exhibit A is a Receipts and Disbursements Summary for the period December 1, 2020 through April 30, 2021. During this time period, receipts were $1,040,282.86, primarily comprised of reserve funds from accounts frozen under the provisions of the TRO ($999,980.00) and the liquidation of assets ($36,875.00). Disbursements were $4,555,268.11, primarily comprised of Court-ordered payments to the Plaintiffs.[7] The current aggregate balance of the bank accounts is $3,511,975.52.

Dated: May 28, 2021                    By: /s/ Cornelia J. B. Gordon
                                            Cornelia J. B. Gordon
                                            *Attorney for Receiver,*
                                            *Thomas W. McNamara*

---

[7] *See* Default Judgment and Order Against Defendants First Priority LLC and True Count Staffing Inc. (ECF No. 248), Section IV, ¶¶ 48-49.

# CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of May, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.

 /s/ Cornelia J. B. Gordon
Cornelia J. B. Gordon
*Attorney for Receiver,
Thomas W. McNamara*