**BUREAU OF CONSUMER FINANCIAL PROTECTION**
SARAH PREIS (DC Bar No. 997387)
(admitted *pro hac vice*)
Tel.: (202)-435-9318
Email: sarah.preis@cfpb.gov
JESSE STEWART (NY Bar No. 5145495)
(admitted *pro hac vice*)
Tel.: (202)-435-9641
Email: jesse.stewart@cfpb.gov
N. NATHAN DIMOCK (DC Bar No. 487743)
(admitted *pro hac vice*)
Tel.: (202) 435-9198
Email: nathan.dimock@cfpb.gov
1700 G Street, NW
Washington, DC 20552
Fax: (844) 826-5016
LEANNE E. HARTMANN (CA Bar No. 264787)
(Local Counsel for the Bureau of Consumer Financial Protection)
301 Howard Street, Suite 1200
San Francisco, CA 94105
Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788
*Attorneys for Plaintiff the Bureau of Consumer Financial Protection*

*Additional Counsel for Plaintiffs Listed on Next Page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al.,<br><br>    Defendants. | CASE NO. 8:19-cv-01998 MWF (KS)<br><br>**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT WEN**<br><br>Court:  Hon. Michael W. Fitzgerald<br>Date:    March 20, 2023<br>Time:   10:00 AM<br>Place:   Courtroom 5A |

*Additional Counsel for Plaintiffs Listed Below:

**THE PEOPLE OF THE STATE OF CALIFORNIA**
HYDEE FELDSTEIN SOTO, City Attorney (CA. Bar No. 106866)
CHRISTINA V. TUSAN, Supvr. Assistant City Attorney (CA. Bar No. 192203)
WILLIAM PLETCHER, Deputy City Attorney (CA. Bar No. 212664)
MIGUEL RUIZ, Deputy City Attorney (CA. Bar No. 240387)
Office Of the City Attorney
200 N. Main Street, 500 City Hall East
Los Angeles, CA 90012-4131
Tel.: (213) 473-6908/Fax: (213) 978-8112
Emails: christina.tusan@lacity.org / william.pletcher@lacity.org
*Attorneys for Plaintiff the People of the State of California*

**THE STATE OF MINNESOTA**
EVAN ROMANOFF (Attorney Reg. No. 0398223)
(admitted *pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 728-4126
Email: evan.romanoff@ag.state.mn.us
*Attorney for Plaintiff the State of Minnesota*

**THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (N.C. Bar No. 19397)
(admitted *pro hac vice*)
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
Tel.: (919) 716-6000/Fax: (919) 716-6050
Email: lweaver@ncdoj.gov
*Attorney for Plaintiff the State of North Carolina*

1

### TABLE OF CONTENTS

2  INDEX TO SUMMARY JUDGMENT EXHIBITS..............................................5

3  STATEMENT OF UNDISPUTED FACTS ...................................................14

4     I.    Background .............................................................................14

5        A. Overview of Corporate Defendants............................................14

6           1.  Consumer Advocacy Center Inc., d/b/a Premier Student Loan

7              Center......................................................................14

8           2.  True Count Staffing Inc., d/b/a SL Account Management ...........15

9           3.  Prime Consulting LLC, d/b/a Financial Preparation Services.......15

10       B. The Student-Loan Debt-Relief Enterprise.....................................16

11       C. Federal-Student-Loan-Repayment and Forgiveness Programs..........20

12    II.   The Company's Purported Student-Loan Debt-Relief Services.............23

13       A. Overview of the Sales Process ...............................................23

14       B. The Company's High-Pressure Sales Culture and Minimal Compliance

15          Measures....................................................................24

16    III.   The Company's Misrepresentations to Consumers......................................25

17       A. Representations about the Company's Fees..............................25

18       B. Representations about the Company's Services ..................................31

19       C. The Company's Practice of Submitting IDR Applications Containing

20          False Information....................................................37

21          1.  Overview of Processing...................................................37

22          2.  The Company's Misrepresentations Regarding Family Size and

23             Marital Status in IDR Applications.................................... 39

24    IV.   The Company Charged Advance Fees.................................................41

25       A. Overview of Fee Collection Practices...........................................41

26       B. The Company's Limited Dealings with Purported Dedicated Account

27          Providers....................................................................44

28

V.  The Company's High Complaint Volume, Chargebacks, and Refunds.... 45

    A. Complaint Volume......................................................................... 45

    B. Refund Policy and Chargeback Rates......................................... 50

VI.  Wen's Role in the Debt Relief Operation........................................ 51

    A. Overview of Wen's Day-to-Day Role ......................................... 51

    B. Wen's Knowledge and Control of the Company's Deceptive Practices
.................................................................................................... 54

    C. Wen's Knowledge and Control of the Company's Fee Collection
Practices .................................................................................... 57

    D. Wen's Destruction of Evidence and Conduct in Discovery................. 63

VII.  Consumers Paid over $95 Million to Companies Owned and Controlled
by Wen and Suffered Additional Harms........................................ 65

## INDEX TO SUMMARY JUDGMENT EXHIBITS

| | |
|---|---|
| Pls.' Ex. 1 | Declaration of Albert Kim and selected exhibits |
| Pls.' Ex. 1.1 | Exhibit 1 - Agreement of Joint Ownership |
| Pls.' Ex. 1.2 | Exhibit 2.1 - Company Profit and Loss Statement (January - December 2015) |
| Pls.' Ex. 1.3 | Exhibit 2.2 - Company Profit and Loss Statement (January - December 2016) |
| Pls.' Ex. 1.4 | Exhibit 2.3 - Company Profit and Loss Statement (January - December 2017) |
| Pls.' Ex. 1.5 | Exhibit 3 - January 29, 2018 email re: New Client Fee Agreement |
| Pls.' Ex. 1.6 | Exhibit 4 - Company Training Material |
| Pls.' Ex. 1.7 | Exhibit 5 - April 2018 email re: Cancellation and Refund Policy |
| Pls.' Ex. 1.8 | Exhibit 6 - September 2018 email re: Reputation management |
| Pls.' Ex. 1.9 | Exhibit 7 - February 2019 calendar appointment re: Change DBA for all Corps to avoid complaints every 6 months |
| Pls.' Ex. 1.10 | Exhibit 8 - March 2018 email re: Refunding clients |
| Pls.' Ex. 1.11 | Exhibit 10 - February 2018 email re: Client Trust Account |
| Pls.' Ex. 1.12 | Exhibit 11 - August 2018 email re: Corporate Structure Decision |
| Pls.' Ex. 1.13 | Exhibit 12 - February 2019 email re: Commitment to move forward for ACH payment processing…. |
| Pls.' Ex. 1.14 | Exhibit 14 - April 2019 email re: Online Form [] has been completed by Kenny Huang |
| Pls.' Ex. 2 | Declaration of Tuong Nguyen and selected exhibits |
| Pls.' Ex. 2.1 | Exhibit 1 - April 2019 email re: [Consumer] |
| Pls.' Ex. 2.2 | Exhibit 3 - May 2017 email re: [Consumer] |
| Pls.' Ex. 2.3 | Exhibit 4 - April 2018 email re: Cancellation and Refund Policy |
| Pls.' Ex. 2.4 | Exhibit 5 - January 2017 email re: [Consumer] |

| Pls.' Ex. 2.5 | Exhibit 6 - April 2019 email re: New Note Created On File: [Consumer] |
|---|---|
| Pls.' Ex. 2.6 | Exhibit 7 - August 2019 email re: Client [No.] |
| Pls.' Ex. 2.7 | Exhibit 8 - May 2019 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.8 | Exhibit 9 - December 2016 email re: [Consumer] |
| Pls.' Ex. 2.9 | Exhibit 10 - November 2016 email re: [Consumer] |
| Pls.' Ex. 2.10 | Exhibit 11 - October 2016 email re: [Consumer] |
| Pls.' Ex. 2.11 | Exhibit 12 - March 2017 email re: New Note Created on File [Consumer] |
| Pls.' Ex. 2.12 | Exhibit 13 - February 2017 email re: [Consumer] |
| Pls.' Ex. 2.13 | Exhibit 14 - March 2017 email re: [Consumer] |
| Pls.' Ex. 2.14 | Exhibit 15 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.15 | Exhibit 16 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.16 | Exhibit 17 - March 2017 email re: [Consumer] |
| Pls.' Ex. 2.17 | Exhibit 18 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.18 | Exhibit 19 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.19 | Exhibit 20 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.20 | Exhibit 21 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.21 | Exhibit 22 - February 2017 email re: [Consumer] |
| Pls.' Ex. 2.22 | Exhibit 23 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.23 | Exhibit 24 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.24 | Exhibit 25 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.25 | Exhibit 26 - April 2018 email re: [Consumer] Complaint with IL and CA |

| Pls.' Ex. 2.26 | Exhibit 27 - April 2017 email re: [Consumer] |
|---|---|
| Pls.' Ex. 2.27 | Exhibit 28 - March 2017 email re: [Consumer] |
| Pls.' Ex. 2.28 | Exhibit 29 - May 2017 email re: [Consumer] cancel and refund money |
| Pls.' Ex. 2.29 | Exhibit 30 - April 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.30 | Exhibit 31 - April 2017 email re: [Consumer] Account |
| Pls.' Ex. 2.31 | Exhibit 32 - May 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.32 | Exhibit 33 - May 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.33 | Exhibit 34 - June 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.34 | Exhibit 35 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.35 | Exhibit 36 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.36 | Exhibit 37 - June 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.37 | Exhibit 38 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.38 | Exhibit 39 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.39 | Exhibit 40 - July 2017 email re: Loan Summary Statement Received! |
| Pls.' Ex. 2.40 | Exhibit 41 - July 2017 email re: Loan Summary Statement Received! |
| Pls.' Ex. 2.41 | Exhibit 42 - June 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.42 | Exhibit 43 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.43 | Exhibit 44 - July 2017 email re: New Note Created On File: [Consumer] |

| Pls.' Ex. 2.44 | Exhibit 45 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.45 | Exhibit 46 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.46 | Exhibit 47 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.47 | Exhibit 48 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.48 | Exhibit 49 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.49 | Exhibit 50 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.50 | Exhibit 51 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.51 | Exhibit 52 - September 2017 email re: [Consumer] |
| Pls.' Ex. 2.52 | Exhibit 53 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.53 | Exhibit 54 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.54 | Exhibit 55 - December 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.55 | Exhibit 56 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.56 | Exhibit 57 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.57 | Exhibit 58 - November 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.58 | Exhibit 59 - December 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.59 | Exhibit 60 - March 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.60 | Exhibit 61 - April 2018 email re: New Note Created On File: [Consumer] |

| Pls.' Ex. 2.61 | Exhibit 62 - March 2018 email re: New Note Created On File: [Consumer] Plz handle this for me, or advise me how I should handle it and I will. |
|---|---|
| Pls.' Ex. 2.62 | Exhibit 63 - April 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.63 | Exhibit 64 - March 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.64 | Exhibit 65 - September 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.65 | Exhibit 66 - August 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.66 | Exhibit 67 - August 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.67 | Exhibit 68 - August 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.68 | Exhibit 69 - August 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.69 | Exhibit 70 - May 2017 email re: Letter of Explanation for Family Size |
| Pls.' Ex. 2.70 | Exhibit 71 - April 2017 email re: Premier Student Loan Center |
| Pls.' Ex. 2.71 | Exhibit 72 - October 2016 email re: [Consumer] |
| Pls.' Ex. 2.72 | Exhibit 73 - January 2018 email re: Files |
| Pls.' Ex. 2.73 | Exhibit 74 - April 2019 email re: Sales Call Audit |
| Pls.' Ex. 2.74 | Exhibit 74(a) - Attachment to 74 (with columns adjusted) |
| Pls.' Ex. 2.75 | Exhibit 75 - April 2018 email re: Cancellation and Refund Policy |
| Pls.' Ex. 2.76 | Exhibit 76 - March 2018 email re: Refunding clients |
| Pls.' Ex. 2.77 | Exhibit 78 - August 2018 email re: Mid [No.] SL ACCOUNT MGMT |
| Pls.' Ex. 3 | Excerpts from October 4, 2022 Deposition of Kenny Huang |
| Pls.' Ex. 4 | Exhibit 12 to Huang Deposition |

| | |
|---|---|
| Pls.' Ex. 5 | Excerpts from July 12, 2019 Investigative Hearing of Jovani Ortuno |
| Pls.' Ex. 6 | Documents from Electronic Merchant Systems |
| Pls.' Ex. 7 | Documents from Electronic Merchant Systems |
| Pls.' Ex. 8 | February 2018 email re: renaming CAC account |
| Pls.' Ex. 9 | Defendant Wen's Response to Bureau's First Request for Admissions |
| Pls.' Ex. 10 | Defendant Wen's Response to Bureau's Second Request for Admissions |
| Pls.' Ex. 11 | May 29, 2018 Civil Investigative Demand served by Minnesota Attorney General to Premier Student Loans, Inc. |
| Pls.' Ex. 12 | Declaration of Matt Heidari |
| Pls.' Ex. 13 | Declaration of Dani Schneider |
| Pls.' Ex. 13.1 | Behar February 2019 Letter |
| Pls.' Ex. 13.2 | Behar April 2019 Letter |
| Pls.' Ex. 13.3 | Defendant Wen's California Bar Results |
| Pls.' Ex. 13.4 | October 2019 Transcript of return call to investigator |
| Pls.' Ex. 13.5 | October 2019 Transcript of return call to investigator |
| Pls.' Ex. 14 | Declaration of Theresa Ridder |
| Pls.' Ex. 15 | Declaration of Michelle Marin (BBB Declaration) |
| Pls.' Ex. 16 | Declaration of Scott Lause (MOHELA) |
| Pls.' Ex. 17 | Declaration of Sarah Preis (Bureau) |
| Pls.' Ex. 18 | Declaration of Richard Anderlick |
| Pls.' Ex. 19 | Declaration of David Pegg (MN Decl.) |
| Pls.' Ex. 20 | Declaration of David Evers (NC Decl.) |
| Pls.' Ex. 21 | Declaration of Jay Mason (LA City Decl.) |
| Pls.' Ex. 22 | Declaration of Alyssa Pugh |
| Pls.' Ex. 23 | Declaration of Mildred Hershenson |
| Pls.' Ex. 24 | Declaration of Maxwell Sheahan |
| Pls.' Ex. 25 | Declaration of Brenda Thelen |
| Pls.' Ex. 26 | Declaration of Selam Yimer |
| Pls.' Ex. 27 | Declaration of Gregory Kirksey |
| Pls.' Ex. 28 | Declaration of Laura Jangula |
| Pls.' Ex. 29 | Declaration of Tracy Metzig |

| Pls.' Ex. 30 | Declaration of Lynne Berthiaume |
| Pls.' Ex. 31 | Declaration of Kristin Honold |
| Pls.' Ex. 32 | Declaration of Gregory Wilson |
| Pls.' Ex. 33 | Declaration of Sarah Varno |
| Pls.' Ex. 34 | Declaration of Jennifer Liming |
| Pls.' Ex. 35 | Declaration of Hildegard Hauser |
| Pls.' Ex. 36 | Declaration of Elaine Crawford |
| Pls.' Ex. 37 | Declaration of Javonna Smith |
| Pls.' Ex. 38 | Declaration of Victor Simonenko |
| Pls.' Ex. 39 | Declaration of Jennifer Etzel-Elaqad |
| Pls.' Ex. 40 | Declaration of Rochelle Breemes |
| Pls.' Ex. 41 | Declaration of Teresita Rosca |
| Pls.' Ex. 42 | Declaration of Novella Donaldson |
| Pls.' Ex. 43 | Declaration of Julius Fomafung |
| Pls.' Ex. 44 | CA SOS CAC certified records |
| Pls.' Ex. 45 | CA SOS True Count certified records |
| Pls.' Ex. 46 | CA SOS Prime certified records |
| Pls.' Ex. 47 | OC FBBS Premier |
| Pls.' Ex. 48 | OC FNBS SLAM |
| Pls.' Ex. 49 | OC FNBS Financial Preparation Services |
| Pls.' Ex. 50 | Allied Wallet Merchant Application |
| Pls.' Ex. 51 | Electronic Payment Systems Online Reporting Module |
| Pls.' Ex. 52 | February 2018 email re: Employees at PSLC and Employees that will be transitioned over to TC Staffing Corp. |
| Pls.' Ex. 53 | September 2018 FPS Compliance Script |
| Pls.' Ex. 54 | Financial Preparation Services Compliance Script |
| Pls.' Ex. 55 | July 2017 email re: Sign On The X-Student Loan States Reminder |
| Pls.' Ex. 56 | August 2019 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 57 | September 2018 email re: 2 Versions of Scripts |
| Pls.' Ex. 58 | Coffee's 4 Closers |
| Pls.' Ex. 59 | One Call Close |

| Pls.' Ex. 60 | November 2018 email re: [No.] |
|---|---|
| Pls.' Ex. 61 | November 2018 email re: [No.] |
| Pls.' Ex. 62 | September 2016 email re: BBB rebuttal for [Consumer] |
| Pls.' Ex. 63 | Letter to [Consumer] re: complaint |
| Pls.' Ex. 64 | September 2016 email: complaint |
| Pls.' Ex. 65 | April 2017 Communications with BBB |
| Pls.' Ex. 66 | February 2018 email re: No Advance Fee - Compliance |
| Pls.' Ex. 67 | March 2019 email re: SL Account Management |
| Pls.' Ex. 68 | March 2019 Letter re: Attestation Letter |
| Pls.' Ex. 69 | August 2018 email re: PSLC Compliance Script 080818 |
| Pls.' Ex. 70 | July 2019 Communications with California Office of the Attorney General |
| Pls.' Ex. 71 | April 2019 Communications with California Office of the Attorney General |
| Pls.' Ex. 72 | June 2017 Communications with Kansas Office of the Attorney General |
| Pls.' Ex. 73 | June 2019 Communications with West Virginia Office of the Attorney General |
| Pls.' Ex. 74 | April 2017 Communications with California Office of the Attorney General |
| Pls.' Ex. 75 | October 2019 Communications with the North Carolina Department of Justice |
| Pls.' Ex. 76 | Script |
| Pls.' Ex. 77 | December 2018 email re: VCMP Month 1 Notification SL ACCOUNT MGMT |
| Pls.' Ex. 78 | January 2019 email re: VCMP Month 3 Notification SL ACCOUNT MGMT |
| Pls.' Ex. 79 | Visa Acceptance Risk: VCMP/VFMP Remediation Plan |
| Pls.' Ex. 80 | January 2019 email re: Chapter 11 filing for CAC and Premier |
| Pls.' Ex. 81 | April 2019 email re: Trusted Account Services Website |
| Pls.' Ex. 82 | September 2019 email re: TAS Client Agreement |
| Pls.' Ex. 83 | July 2017 email re: [Consumer] complaint against PSLC with State of Kanasa [sic] |

| Pls.' Ex. 84 | July 2017 Letter to Investigator |
|---|---|
| Pls.' Ex. 85 | December 2018 email re: CFPB CID to Hostgator |
| Pls.' Ex. 86 | November 2018 email re: Sales Scripts |
| Pls.' Ex. 87 | One Call Close |
| Pls.' Ex. 88 | September 2018 email re: Advanced payments |
| Pls.' Ex. 89 | Receiver's Report, ECF No. 75 |
| Pls.' Ex. 89.1 | Exhibit 10 - DBA list |
| Pls.' Ex. 89.2 | Exhibit 12 - TAS corporate documents |
| Pls.' Ex. 89.3 | Exhibit 14 - TAS credentials |
| Pls.' Ex. 89.4 | Exhibit 18 - April 2019 email re: Closure of Horizon processing account…. |
| Pls.' Ex. 89.5 | Exhibit 36 - Sales Commissions Calculations |
| Pls.' Ex. 89.6 | Exhibit 38 - HARD CLOSE: EVERY SINGLE CALL WITHOUT EXCEPTION |
| Pls.' Ex. 90 | January 16, 2019 Voluntary Petition for Non-Individuals Filing for Bankruptcy |
| Pls.' Ex. 91 | July 31, 2019 Order Directing the Appointment of a Chapter 11 Trustee |
| Pls.' Ex. 92 | Debtor Consumer Advocacy Center, Inc.'s and Albert Kim's Reply Memorandum in Support of Precautionary Joint Motion for Enlargement of Time to Comply with Turnover |
| Pls.' Ex. 93 | Reply Brief Pls.' Ex. 3 |

**Note:** Plaintiffs have not attached certain exhibits to declarations and to the Receiver's Report that are duplicative of other exhibits in the record or that Plaintiffs are not relying on in their Statement of Undisputed Facts. Plaintiffs will submit those exhibits to the Court upon request.

# STATEMENT OF UNDISPUTED FACTS

## I. Background

### A. Overview of Corporate Defendants

#### 1. Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center

| | FACT | SOURCE |
|---|---|---|
| 1. | Consumer Advocacy Center Inc. (CAC) was formed in 2014. | *See* Pls.' Ex. 44 (certified copies of documents filed with California Secretary of State); Pls.' Ex. 1 (Kim Decl.) ¶¶ 4-5 (Wen and Kim formed CAC in 2014). |
| 2. | CAC operated under multiple names, including Premier Student Loan Center (Premier or PSLC). | *See* Pls.' Ex. 1 (Kim Decl.) ¶ 77-78 (discussing decision to use multiple "doing business as" names due to growing concern about government detection); Pls.' Ex. 47 (CAC fictitious business name statement for Premier Student Loan Center). |
| 3. | CAC filed a statement of information with the California Secretary of State listing its address as 173 Technology Drive, Suite 202, Irvine, CA 92618 and identifying Albert Kim as its sole officer and President. | Pls.' Ex. 44; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 9 (explaining Wen was not listed as an owner in CAC's corporate registration documents because Kim and Wen "didn't think it was necessary to have [Wen] listed too."). |
| 4. | CAC operated at 173 Technology Drive, Suite 202, Irvine, CA 92618. | Pls.' Ex. 44 (certified copies of documents filed with California Secretary of State); Pls.' Ex. 6 (email from Wen explaining to payment processor that CAC operated at 173 Technology Drive and would continue to do so after shift of certain departments to related company). |
| 5. | Kaine Wen and Albert Kim owned CAC jointly and equally. | Pls.' Ex. 50 (merchant services application to Allied Wallet identifying Wen and Kim each as 50% owners of CAC signed by Wen March 29, 2016); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 7; Pls.' Ex. 1.1 (Kim Decl. Ex. 1) (list of members, capital contributions, and |

| | | |
|---|---|---|
| | | indicating each had 50% ownership in CAC signed by Wen and Kim Oct. 1, 2015); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 102 (admitting that he signed Pls.' Ex. 1.1 on Oct. 1, 2015); Pls.' Ex. 51 at 7 (agreement with Electronic Payment Systems regarding its online reporting module signed by Wen as CAC's owner dated Sept. 8, 2017). |
| 6. | Wen provided approximately $30,000 in capital to fund CAC. | Pls.' Ex. 1 (Kim Decl.) at ¶ 8; Pls.' Ex. 1.1. (Kim Decl. Ex. 1). |

## 2.  True Count Staffing Inc., d/b/a SL Account Management

| | | |
|---|---|---|
| 7. | Wen formed True Count Staffing Inc. (True Count) in California in 2017. | Pls.' Ex. 1 (Kim Decl.) at ¶ 11; *accord* Pls.' Ex. 45 (certified copies of documents filed with Califonia Secretary of State for True Count). |
| 8. | Wen owned and served as an officer of True Count, and he exercised substantial managerial control over its operations. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 112, 114. |
| 9. | True Count leased the property located at 8 Hughes Parkway, Suite 210, Irvine, CA 92618. | Pls.' Ex 89 (Receiver's Report) at 4:17-19. |
| 10. | True Count operated under the names SL Account Management and SL Account Mgmt (SLAM). | Pls.' Ex. 10 (Wen's Resp. 2nd Req. Admiss.) at Nos. 163, 167; Pls.' Ex. 48 (fictitious business name statement for SL Account Mgmt). |

## 3.  Prime Consulting LLC, d/b/a Financial Preparation Services

| | | |
|---|---|---|
| 11. | Prime Consulting LLC (Prime) is a Wyoming limited-liability company that registered with the California Secretary of State on April 25, 2018. | Pls.' Ex. 46 (certified registration records for Prime). |
| 12. | Prime leased the property located at 15621 Laguna Canyon Rd., Suite 200, Irvine, CA 92618. | Pls.' Ex. 89 (Receiver's Report) at 2:1. |

| 13. | Prime operated under the name Financial Preparation Services (FPS), as well as other names. | *See* Pls.' Ex. 49 (fictitious business name statement for FPS); Pls.' Ex. 89 (Receiver's Report) at 10:9, n.17 (noting Defendants' practice of deploying "multiple generic-sounding business names" and including list of names used by employee teams); Pls.' Ex. 89.1 (example of list found during immediate access of company names). |
| 14. | Prime's Statement of Information filed on September 13, 2018, with the California Secretary of State, listed Le Ho as the President of Prime. | Pls.' Ex. 46 (certified registration records for Prime). |
| 15. | In September 2018, Le Ho (aka Calvin Ho) worked for Wen and Kim's debt-relief operation as a manager. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 16-17. |
| 16. | In response to a request from Wen and Kim, Ho agreed to be listed as the owner of Prime. | Pls.' Ex. 1 (Kim Decl.) at ¶ 18; *see* Pls.' Ex. 46 (certified registration records for Prime). |
| 17. | Wen and Kim controlled Prime. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 16; Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19. |
| 18. | Ho reported to Wen and Kim. | Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 19-20; Pls.' Ex. 1 (Kim Decl.) at ¶ 19. |
| 19. | Ho opened bank accounts in Prime's name at the direction of Wen and Kim. | Pls.' Ex. 1 (Kim Decl.) at ¶ 126 (Wen and Kim directed the opening of new bank accounts for Prime). |

**B. The Student-Loan Debt-Relief Enterprise**

| 20. | CAC, True Count, and Prime (collectively, the Company) operated together to offer, sell, and perform purported student-loan debt-relief services to consumers nationwide. | *See* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 1, 2 (admitting Company sold services to alter the terms of payments for consumers' federal student loans by preparing and submitting applications for consolidation, income driven repayment (IDR) plans); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 3; Pls.' Ex. 18 at ¶ 3 (Anderlick Decl.) (Company used |

| | | |
|---|---|---|
| | | DPP customer relationship management software to conduct its business nationwide). |
| 21. | From at least November 5, 2015, through at least March 2018, CAC offered, sold and performed purported student-loan debt relief services. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 3; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 21; Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 11 (Company charged consumers starting Nov. 5, 2015, and CAC collected consumer fees from Nov. 2015, through Sept. 2018). |
| 22. | When it first began operating, CAC had a Sales Department and a Processing Department. | Pls.' Ex. 1 (Kim Decl.) at ¶ 10; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. |
| 23. | The Sales Department handled sales calls with consumers. | Pls.' Ex. 1 (Kim Decl.) at ¶ 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. |
| 24. | The Processing Department primarily handled preparing and submitting paperwork to consumers' student loan servicers. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. |
| 25. | As the Company grew, it added Accounting/Billing, Customer Service, and later, a Human Resources Department. | Pls.' Ex. 1 (Kim Decl.) at ¶ 10; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 9. |
| 26. | Prior to March 2018, CAC collected fees from consumers for its purported student-loan debt-relief services. | Pls.' Ex. 12 (Heidari Decl.) at ¶ 11. |
| 27. | In March 2018, Wen and Kim shifted CAC's Processing, Customer Service, and Billing Departments from CAC to True Count. | Pls.' Ex. 1 (Kim Decl.) at ¶ 14; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10 (CAC's processing functions transferred to True Count in March 2018); Pls.' Ex. 6 (emails between Wen and payment processor from February 2018 explaining shift from CAC to True Count). |
| 28. | In March 2018, True Count began collecting payments from consumers directly and remitting a portion of the | Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 11-12; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 14; *see also* Pls.' Ex. 6 (email chain between Wen and EMS representative where |

| | | |
|---|---|---|
| | income to CAC, which stopped collecting fees from consumers in September 2018. | Wen discusses rollout of True Count and relationship with CAC); Pls.' Ex. 8 (Feb. 8, 2018 email from Wen asking for the name on CAC's merchant account to be changed to True Count d/b/a SLAM); Pls.' Ex. 92 (CAC Bankruptcy proceeding ECF 131) at ¶ 5 (explaining True Count collected payments and remitted a portion back to CAC until Sept. 2018). |
| 29. | When CAC transferred its processing department to True Count, True Count continued the same processing practices. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10. |
| 30. | In late September 2018, Wen and Kim shut down CAC and transferred its operations over to Prime. | Pls.' Ex. 1 (Kim Decl.) at ¶ 16; *see also* Pls.' Ex. 2 (Nguyen Decl.) at ¶ 12 (Kim and Wen formed Prime; Prime took over sales and CAC filed for bankruptcy); Pls.' Ex. 92 (CAC bankruptcy proceeding ECF 131) at ¶ 5 ("In September of 2018, the Debtor (CAC) ceased operations and transferred all of its sales staff to Prime Consulting."). |
| 31. | In September 2018, True Count ceased making payments to CAC. | *See* Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 11-12 (True Count made payments to CAC from March to September 2018). |
| 32. | In September 2018, CAC stopped collecting fees from consumers. | *See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 11. |
| 33. | Even after CAC stopped collecting fees from consumers, True Count continued collecting fees from legacy CAC consumers. | *See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 17. |
| 34. | In September 2018, True Count began remitting a portion of the fees it collected from consumers to Prime. | Pls.' Ex. 12 (Heidari Decl.) at ¶ 12. |

| 35. | When CAC transferred its sales department to Prime, it continued the same sales practices. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 124-27; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10. |
|---|---|---|
| 36. | CAC filed for bankruptcy on January 16, 2019, in the Southern District of Florida. | Pls.' Ex. 90 (CAC's petition for bankruptcy). |
| 37. | During the time the student-loan debt-relief enterprise operated under CAC, True Count, and Prime, it used a customer relationship management system (CRM) called Debt Pay Pro (DPP). | Pls.' Ex. 1 (Kim Decl.) at ¶ 20; Pls.' Ex. 18 (Anderlick Decl.) ¶ 3; Pls.' Ex. 92 (CAC bankruptcy proceeding ECF 131) at ¶¶ 3-5. |
| 38. | CAC, True Count, and Prime recorded fees paid by consumers and refunds of consumers' payments for their debt relief services in DPP. | Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 4, 7; Pls.' Ex. 1 (Kim Decl.) at ¶ 20. |
| 39. | CAC, True Count, and Prime also used Quickbooks for the entire time they operated to generate annual profit and loss statements. | Pls.' Ex. 1 (Kim Decl.) at ¶ 21; Pls.' Ex. 1.2-1.4 (Kim Decl. Exs. 2.1-2.3); *see also* Pls.' Ex. 10 (Wen's Resp. 2nd Req. Admiss.) at No. 193 (admitting that at times the Company used Quickbooks to maintain financial records, including profit and loss statements). |
| 40. | At times, CAC, True Count and Prime used the same address. | Pls.' Ex. 13 (Schneider Decl.) at ¶ 5a. |
| 41. | CAC, True Count, and Prime shared employees. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 17; *see also* Pls.' Ex. 52 (email from T. Nguyen copying Wen explaining shift of employees from PSLC to True Count); Pls.' Ex. 12 (Heidari Decl.) at ¶ 16 (CAC and True Count paid the same individuals). |
| 42. | CAC, True Count, and Prime intermingled their business records. | Pls.' Ex. 13 (Schneider Decl.) at ¶¶ 20-22. |

| | | |
|---|---|---|
| 43. | CAC, True Count, and Prime used numerous, sometimes overlapping, DBAs. | *See* Pls.' Ex. 13 (Schneider Decl.) at ¶ 30-33 (discussing pretexting calls); Pls.' Ex. 89 (Receiver's Report) at 10:9, n.17 (noting Defendants' practice of deploying "multiple generic-sounding business names" and including list of names used by employee teams); Pls.' Ex. 89.1 (example of list found during immediate access of company names). |
| 44. | Tuong Nguyen worked for the Company from approximately November 2015 through the date of the immediate access. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 5. |
| 45. | Nguyen served as Controller for the debt relief operation, and in that role helped oversee refunds and monitored chargebacks. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 107. |
| 46. | Nguyen also initially helped with processing and handling consumer complaints. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 22. |
| 47. | Nguyen also handled payroll for the debt relief operation. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 51. |
| 48. | The managers and directors of each department, as well as Ho and Nguyen, reported to Wen and Kim. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 20. |
| 49. | Wen and Kim were the final decisionmakers for CAC, True Count, and Prime during the entire course of their operation. | Pls.' Ex. 1 (Kim Decl.) at ¶ 19; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 99. |

### C. Federal-Student-Loan-Repayment and Forgiveness Programs

| | | |
|---|---|---|
| 50. | The U.S. Department of Education (DOE) offers several federal-student-loan repayment and forgiveness programs to borrowers, all of which consumers can apply to for free. | *See* Pls.' Ex. 16 (Lause Decl.) at ¶¶ 12, 16-18. |

| | | |
|---|---|---|
| 51. | Income-driven repayment (IDR) plans may result in lower monthly payments for consumers. | Pls.' Ex. 16 (Lause Decl.) at ¶ 12. |
| 52. | For consumers who qualify for an IDR plan, student-loan servicers (not third-party debt-relief providers like the Company) determine a consumer's monthly loan-payment amount based on factors including the consumer's income, family size, marital status, and tax-filing status. | Pls.' Ex. 16 (Lause Decl.) at ¶ 12; *see* 34 C.F.R. §§ 685.209, 685.221. |
| 53. | The definition of "family size" under an IDR plan means "the number that is determined by counting the borrower, the borrower's spouse, and the borrower's children, including unborn children who will be born during the year the borrower certifies family size, if the children receive more than half their support from the borrower. A borrower's family size includes other individuals if, at the time the borrower certifies family size, the other individuals—(i) Live with the borrower; and (ii) Receive more than half their support from the borrower and will continue to receive this support from the borrower for the year the borrower certifies family size. Support includes money, gifts, loans, housing, food, clothes, car, medical and | *See* 34 C.F.R. §§ 685.209(a)(1)(iv), 685.221(a)(3) (definition of family size under income-based and income-contingent repayment plans); *see also* https://studentaid.gov/manage-loans/repayment/plans/income-driven/questions (explaining definition of family size under all IDR plans). |

| | | dental care, and payment of college costs." | |
|---|---|---|---|
| | 54. | Consumers must recertify their eligibility for IDR programs annually and their monthly payment amount may vary year to year. | *See* 34 C.F.R. §§ 685.209, 685.221; Pls.' Ex. 16 (Lause Decl.) at ¶ 12. |
| | 55. | Manipulating borrowers' family size or marital status on IDR plan applications may temporarily lower payments but can have negative consequences for borrowers. | *See* Pls.' Ex. 16 (Lause Decl.) at ¶ 14. |
| | 56. | Under each type of IDR plan, any remaining loan balance may be forgiven if a consumer's student loans are not fully repaid by the end of the repayment period. | Pls.' Ex. 16 (Lause Decl.) at ¶¶ 18-19. |
| | 57. | During the relevant time, IDR plans had repayment periods of 20-25 years, and consumers also in the Public Loan Service Loan Forgiveness Program could qualify for loan forgiveness after making 10 years of qualifying payments. | Pls.' Ex. 16 (Lause Decl.) at ¶ 18; 34 C.F.R. § 685.219 (borrower eligibility for Public Loan Service Program forgiveness). |
| | 58. | Consumers may consolidate multiple federal education loans into one loan, which could provide additional loan repayment plans and forgiveness programs. | Pls.' Ex. 16 (Lause Decl.) at ¶ 9 (discussing circumstances when consolidation can provide access to certain IDR plans). |
| | 59. | Consolidating federal loans can result in losing qualifying payments for loan forgiveness in connection with IDR plans. | Pls.' Ex. 16 (Lause Decl.) at ¶ 10. |
| | 60. | From November 2015, through October 23, 2019, consumers struggling to pay their loans | *See* Pls.' Ex. 16 (Lause Decl.) at ¶ 8. |

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLS.' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEF. WEN

| | could seek loan forbearance for a cumulative total of three years, and interest would typically continue to accrue during the forbearance, increasing the consumer's overall student loan debt over time. | |
|---|---|---|

## II.  The Company's Purported Student-Loan Debt-Relief Services

### A.  Overview of the Sales Process

| | | |
|---|---|---|
| 61. | The entire time it operated, the Company engaged in telemarketing or arranged for others to engage in telemarketing to market its student-loan debt-relief services to consumers. | Pls.' Ex. 1 (Kim Decl.) at ¶ 38; Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 4-6; *see also* Pls.' Ex. 13 (Schneider Decl.) at Part III (discussing calls with Company and analysis of call recordings). |
| 62. | The Company used lead generators to identify potential clients; lead generators, in turn, transferred interested clients via phone to an employee in the Sales Department. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 24. |
| 63. | The Sales Department handled sales calls with consumers. | Pls.' Ex. 1 (Kim Decl.) at ¶ 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 25. |
| 64. | Every employee in the Sales Department was paid at least in part through commissions based on the number of consumers who enrolled in the Company's services. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 40-41; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 51 (noting sales employees paid in part based on commissions and noting "it benefitted sale employees financially to sell as many consumers as possible on the Company's services."); *see also* Pls.' Ex. 89 (Receiver's Report) at 27:9-19 (describing commission structure at time of immediate access). |
| 65. | Employees in the Sales Department (salespeople) pitched the Company's purported services to consumers. | Pls.' Ex. 1 (Kim Decl.) at ¶ 43; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 25. |

| 66. | Salespeople accessed consumers' loan information on the Federal Student Aid (FSA) website, either by asking the consumer for credentials or by creating an account for the consumer. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 44. |
|---|---|---|
| 67. | Salespeople, not the consumers, entered family size, income, and marital status data into the Company's customer relationship platform, DPP. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 46; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 45, 47. |
| 68. | When quoting consumers' monthly payments under an IDR plan, salespeople used a formula based on family size (FS), income, and marital status to come up with a monthly payment amount. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 27; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 45 (employees were supposed to enter data so DPP could calculate an estimated monthly repayment amount). |

**B. The Company's High-Pressure Sales Culture and Minimal Compliance Measures**

| 69. | Salespeople were encouraged to create a sense of urgency to induce consumers to enroll. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 43-44; Pls.' Ex. 1.6 (explaining that training deck stating "SIGN OR DIE" and listing sales tactics that include creating urgency and "fear of loss technique" reflects sales culture they tried to promote); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 32 (stating he heard salespeople tell consumers "that they had to sign up for the Company's services right away or certain loan repayment programs would go away."); Pls.' Ex. 41 (Rosca Decl.) at ¶ 8 (PSLC told consumer that President Obama started a loan forgiveness program that "Republicans in Congress were trying to put a stop to," which caused her to feel a sense of urgency about signing up); Pls.' Ex. 25 (Thelen Decl.) at ¶ 7 ("student loan |
|---|---|---|

| | | advisor" from SLAM made consumer feel that if she didn't enroll right away, the opportunity might not be available later); Pls.' Ex 89 (Receiver's Report) at 27:4-28; Pls.' Ex 89.6 ("Hard Close" and "Same Day Pitch"). |
|---|---|---|
| 70. | Wen helped develop the commission structure for salespeople and, along with Kim, decided how employees were compensated. | Pls.' Ex. 1 (Kim Decl.) at ¶ 42. |
| 71. | In an email to Wen and Kim on July 25, 2017, CAC's then counsel wrote: "IMPORTANTLY: You are on the hook (liable) for any marketing misrepresentations that your sales representatives make. So please monitor them carefully, secret shop them, and make sure they are not putting your company and you at risk." | Pls.' Ex. 55 (Email re: no advance fee model). |
| 72. | The Company did not consistently audit sales calls. | *See* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 88-91 (noting no routine audits in April 2019); *see also* Pls.' Ex. 89 (Receiver's Report) at 32:3-4 (finding that prior to August 2019, compliance concerns and procedures were "sporadic"). |
| 73. | Although at some point the Company started using a "Compliance Script" during sales calls with consumers, consumers continued to complain that they were misled by the Company. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 106 (noting consumer complaints continued even after the Compliance Script was implemented). |

### III.   The Company's Misrepresentations to Consumers
#### A. Representations about the Company's Fees

| 74. | The Company misrepresented its fees to consumers. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 56 (admitting that during some telemarketing calls, "the |
|---|---|---|

Company represented to consumers that fees paid by consumers to the Company would be applied towards the consumers' student loans."); *see also* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 6-26 (explaining Company led her to believe her payments were toward her loans, and directed her to ignore emails from FedLoans about past due payments); Pls.' Ex. 42 (Donaldson Decl.) at ¶¶ 7, 14 (consumer who thought payments to the Company were going to her loan debt later "dismayed" to learn they had not); Pls.' Ex. 23 (Hershenson Decl.) at ¶¶ 3-4, 9-11 (consumer led to believe she was making payments on her loan through her payments to Premier, but was later informed by FedLoans that it had not received any of her payments); Pls.' Ex. 34 (Liming Decl.) at ¶¶ 12, 17-18 (consumer told fees would go towards paying off her loans but was later informed by FedLoans that none of the money she paid Premier went to her loans); Pls.' Ex. 35 (Hauser Decl.) at ¶¶ 13-18 (Company told her it would "take over her loans" and she only needed to pay the Company, but later learned she still owed her servicer); Pls.' Ex. 27 (Kirksey Decl.) at ¶¶ 6-7, 10 (PSLC representative told consumer it would take over his loans, there was no need for consumer to communicate with the servicer, and he believed payments to the Company were going to his student loan debt, but later learned none of his payments went toward his debt); Pls.' Ex. 29 (Metzig Decl.) at ¶¶ 8, 13 (PSLC representative led her to believe $40 monthly

payments were toward her student loans and directed her to stop paying her servicer but later learned the Company had not paid her debt at all); Pls.' Ex. 37 (Smith Decl.) at ¶¶ 8-9, 12 (PSLC representative indicated Company would take over her loans, she no longer needed to contact the servicer, and consumer believed her payments to the Company were therefore going to pay down her loan balance, but she later learned the amount of her debt had ballooned); Pls.' Ex. 26 (Yimer Decl.) at ¶ 7 (PSLC representative never indicated payments to Company were fees and instead told her that PSLC would be "taking care" of her loans going forward and that, after five payments of $185, she would only have to pay $30/month for the next 20 years); Pls.' Ex. 28 Jangula Decl.) at ¶¶ 8, 10, 13 (PSLC representative claimed consumer only needed to pay the Company, which consumer understood would go toward paying her loans, but she later learned none of it did); Pls.' Exs. 62-64 (September 2016 email and attachments from Wen to Nguyen and Kim about consumer complaint); Pls.' Ex. 14 (Ridder Decl.) at ¶ 8 (discussing consumer complaints about the purpose of fees paid); Pls.' Ex. 1 (Kim Decl.) at ¶ 70 (one of top three things consumers complained about was that Company employees told them monthly payments to Company would go toward consumer's student loans); Pls.' Ex. 86-87 (scripts claiming fees were for enrollment "into the government program").

| 75. | In some instances, salespeople stated or implied that consumers' payments to the Company were going toward student loans, when in fact the Company kept the payments from consumers. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 29 (admitting as to some consumers that the Company did not use funds collected from consumers to make payments to their loan servicers and otherwise stating lack of knowledge or information as to other consumers); 56 (admitting that during some telemarketing calls, "the Company represented to consumers that fees paid by consumers to the Company would be applied towards the consumers' student loans."); *see also* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 6-26 (explaining Company led her to believe her payments were toward her loans, directed her to ignore emails from FedLoans about past due payments, and that she later learned her servicer had not received any payments since before she started making her payments to the Company in April 2018); Pls.' Ex. 42 (Donaldson Decl.) at ¶¶ 7, 13-14, 16 (explaining sales representative led her to believe payments were going to pay down her loans but she later learned from Navient that was not the case); Pls.' Ex. 23 (Hershenson Decl.) at ¶¶ 3-4, 9-11 (consumer led to believe she was making payments on her loan through her payments to Premier, but was later informed by FedLoans that it had not received any of her payments); Pls.' Ex. 33 (Varno Decl.) at ¶¶ 4, 6 (Company enrolled her in an IDR plan without her knowledge and led her to believe $20 payments were toward her loans, not the Company, but she later learned that was not true); Pls.' Ex. 34 (Liming Decl.) at ¶¶ 12, 17-18 |
|---|---|---|

(consumer told fees would go towards paying off her loans but was later informed by FedLoans that none of the money she paid Premier went to her loans); Pls.' Ex. 35 (Hauser Decl.) at ¶¶ 13, 15 (based on what Company told her, believed payments were going toward her student loans, but later learned that was not true); Ex. 27 (Kirksey Decl.) at ¶¶ 6-10 (PSLC representative told consumer it would take over his loans, there was no need for consumer to communicate with the servicer, and he believed payments to the Company were going to his student loan debt, but later learned none of his payments were applied to his loan debt); Pls.' Ex. 29 (Metzig Decl.) at ¶¶ 8-9, 13 (PSLC representative led her to believe $40 monthly payments were toward her student loans and directed her to stop paying her servicer, but she later learned it had not made any payments on her loan debt); Pls.' Ex. 37 (Smith Decl.) at ¶¶ 8-9, 12 (PSLC representative indicated Company would take over her loans, she no longer needed to contact the servicer, and consumer believed her payments to the Company were therefore going to pay down her loan balance, but she later learned the amount of her debt had ballooned); Pls.' Ex. 26 (Yimer Decl.) at ¶ 7 (PSLC representative never indicated payments to company were fees and instead told her that PSLC would be "taking care" of her loans going forward and that, after five payments of $185, she would only have to pay $30/month for the next 20 years, but she later learned from online

|  |  |  | research that her payments to the Company were only fees for its services); Pls.' Ex. 28 (Jangula Decl.) at ¶ 8 (PSLC representative claimed consumer only needed to pay enrollment fee and monthly fee of $40 to the Company, which consumer understood would go toward paying her loans); *see also* Pls.' Exs. 62-64 (September 2016 email from Wen to Nguyen and Kim about consumer complaint); Pls.' Ex. 1 (Kim Decl.) at ¶ 70 (one of top three things consumers complained about was that Company employees told them monthly payments to Company would go toward consumer's student loans); Pls.' Ex. 18 (Heidari Decl.) at ¶ 18 (discussing review of certain Company general ledgers and bank accounts and concluding that he did not see any payments to student loan servicers). |
|---|---|---|---|
| 76. | | Scripts and training materials implied fees paid by consumers were their student loan payments. | *See* Pls.' Ex. 1.6 (training desk used by the Company stating, "LIST SELLING POINTS . . . No more HUGE payments ($700 month) Low manageable payments ($22, $32, $42/month)"). |
| 77. | | In some instances, salespeople stated or implied that consumers' fees were for enrollment into a loan forgiveness program. | Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a-b; *see also* Pls.' Ex. 38 (Simonenko Decl.) at ¶¶ 4, 11 (stating Company told him he qualified for its loan forgiveness program, which would cost $30 per month, and that he later learned from his servicer he was not in a loan forgiveness program, contrary to statements made by Company representatives); Pls.' Ex. 22 (Pugh Decl.) at ¶ 5 (representative told her Premier could help lower her monthly payments and enroll her in a loan forgiveness program administered by |

| | | |
|---|---|---|
| | | DOE); Pls.' Ex. 33 (Varno Decl.) at ¶¶ 3-4 (representative told her that her loans would drop from $15,096 to $5,000 after making the first five payments of $239 to the Company). |

### B.   Representations about the Company's Services

| | | |
|---|---|---|
| 78. | Salespeople represented that the Company could lower consumers' monthly student loan payments. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 47; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 28, 47 (explaining Company's practice of inflating family size enabled it to provide lower monthly payment quote to consumers); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34d (discussing analysis of call recordings); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 5-9; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 6 (Company representative described it as a "student loan company authorized to lower our monthly debt"); Pls.' Ex. 34 (Liming Decl.) at ¶ 12 (Company representative told consumer fees would go towards paying down her loans and would be $239 for first five months and then $40 per month for ten years); Pls.' Ex. 35 (Hauser Decl.) at ¶ 7 (consumer facing $200 monthly payments told by South Coast Financial representative if she enrolled and paid $1,145 upfront, her monthly payment would drop to $32 until 2039); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 7 (SLAM representative told consumer he was "approved" for monthly payments of $128.70 for twenty years as part of an income-driven student loan forgiveness program); Pls.' Ex. 25 (Thelen Decl.) at ¶ 7 (SLAM representative told her it could definitely lower her payments); Pls.' Ex. 26 (Yimer Decl.) at ¶ 7 (consumer who was making $100 |

| | | |
|---|---|---|
| | | monthly payments was told she had to make five initial payments of $185 and then her monthly payments would be reduced to $30); Pls.' Ex. 27 (Kirksey Decl.) at ¶ 6 (consumer who was making $100 monthly payments was told that after five monthly payments of $200, PSLC could lower his monthly payments to $30 for ten years); Pls.' Ex. 32 (Wilson Decl.) at ¶ 4 (Premier told him it could lower his monthly payments) *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 61 (admitting that during some Telemarketing calls, the Company told consumers that they were approved for a specific lower monthly payment on their student loans). |
| 79. | Salespeople told consumers that the Company could lower consumers' monthly payments even if the consumer was already in an IDR program. | *See* Pls.' Ex. 29 (Metzig Decl.) at ¶ 14 (explaining "worst part" of her experience with PSLC is that because she was already enrolled in an income-based repayment program, PSLC never could have lowered her monthly payment); Pls.' Ex. 26 (Yimer Decl.) at ¶ 13 (consumer was already on an income-driven repayment plan when she enrolled). |
| 80. | In some instances, salespeople presented the estimated monthly payment amount to consumers as the amount that the consumer would have to pay until the loan was paid off. | Pls.' Ex. 2 at (Nguyen Decl.) ¶¶ 29, 35-38; Pls.' Ex. 2.1 (email dated April 24, 2019, from Sales Director stating, "[t]he way its [sic] pitched is still the same. [Sales employees] have them write down the numbers and tell them our fees over the course of 20 years is [sic] all they're going to have to pay and it's all interest free."); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 62 (admitting that during some sales calls, the Company represented that consumers' lower |

| | | | |
|---|---|---|---|
| | | | monthly payments would be in place over the entire loan term). |
| 1 | 81. | In some instances, salespeople told consumers they would owe a specific monthly payment amount, but that amount was based on a false family size and/or marital status. | Pls.' Ex. 2 at (Nguyen Decl.) ¶¶ 28, 47, 49; 62, 84-87; Pls.' Ex. 2.73. 2.74 (exhibits to Nguyen Decl.); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 63-64 (admitting that during some Telemarketing calls, the Company represented to consumers that they qualified for or were eligible for lower monthly student loan payments, where such payment amounts had been calculated based on an incorrect family size or marital status); Pls.' Ex. 1 (Kim Decl.) at ¶ 47 (salespeople provided monthly student loan payment quote based on inflated family sizes). |
| 82. | | When the Company began operating, it did not have any policies prohibiting employees from inflating consumers' family size while selling or performing its services. | Pls.' Ex. 1 (Kim Decl.) at ¶ 4 9; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 28. |
| 83. | | Salespeople also typically listed married clients as single in the Company's customer relationship management system (DPP) because that helped them provide a lower monthly payment quote during the sales pitch. | Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 48-49, 58; Pls.' Ex. 1.6 (Nguyen Decl. Ex. 4); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 64 (admitting that during some Telemarketing calls, the Company represented to consumers that they qualified for or were eligible for lower monthly student loan payments, where such payment amounts had been calculated based on a consumer being single, when the consumer was actually married). |

| 84. | Salespeople did not tell consumers that it was the Company's practice to use a false family size to provide a low monthly payment quote to consumers. | Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 31, 46-47, 63. |
|---|---|---|
| 85. | In some instances, salespeople misled consumers about what counts as part of one's family size for an IDR plan application. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 73 (salespeople represented that a person could count as a family member if the consumer paid for a person's phone bill, bought the person lunch, or paid for the person's gas); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34e (discussing analysis of call recordings). |
| 86. | Salespeople represented that the Company obtained or could obtain loan forgiveness for consumers. | *See* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 6, 9 (Premier representative assured consumer her loans would be forgiven in ten years, regardless of her employment status); Pls.' Ex. 36 (Crawford Decl.) at ¶¶ 4-5 (Premier told her it had ways of getting people approved for loan forgiveness and that if she made monthly payments of $95 for 240 months, the rest of her loan balance would be completely forgiven, saving her $18,470); Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶ 14 (Premier representative told her she had been approved for partial loan forgiveness so long as she continued to make monthly payments); Pls.' Ex. 40 (Breemes Decl.) at ¶ 7 (representative said she had been approved and her loan balance would be reduced from $45,000 to approximately $10,000); Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 4-6 (during initial call, representative told consumer with an approximately $148,820 loan balance that her loans were forgiven down to $33,611); Pls.' Ex. 43 |

(Fomafung Decl.) at ¶¶ 9-12 (PSLC told consumer it could reduce his loan debt from $65,000 to $17,000 so long as he made monthly payments of $40 until March 2028 and paid $1,195 enrollment fee); Pls.' Ex. 27 (Kirskey Decl.) at ¶¶ 6-7 (PSLC representative told consumer she could enroll him in a student loan forgiveness program that would lower his payments to $30/month for 10 years and that servicers "got mad at PSLC for enrolling people in student loan forgiveness programs"); Pls.' Ex. 29 (Metzig Decl.) at ¶¶ 8-9 (PSLC representative told her she qualified for a program that offered "near total student loan forgiveness" and that if she paid six monthly payments of $199 and $40 monthly for ten years, the rest of her loans would be forgiven); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 7 (SLAM representative told consumer he was "approved" for monthly payments of $128.70 for twenty years as part of an income-driven student loan forgiveness program and debt would be forgiven if he made all payments); Pls.' Ex. 37 (Smith Decl.) at ¶ 7 (PSLC representative told him the Company could reduce her student loan debt by as much as 60%); Pls.' Ex. 25 (Thelen Decl.) at ¶ 9 (SLAM representative told consumer she was approved for loan forgiveness and would only have to pay $25,000 out of the $62,000 she owed); Pls.' Ex. 28 (Jangula Decl.) at ¶¶ 6, 8 (PSLC representative led her to believe that if she paid enrollment and monthly fees to Company, $40,000 in student loan debt would be "wiped free"); Pls.'

| | | Ex. 32 (Wilson Decl.) at ¶¶ 4-5 (Premier told him he had to make payments to be enrolled into loan forgiveness program and that loans would be completely forgiven within five to ten years); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a, b (discussing analysis of call recordings); *accord* Pls.' Ex. 14 (Ridder Decl.) at ¶ 11(discussing consumer complaints about promises of loan forgiveness). |
|---|---|---|
| 87. | In some instances, salespeople stated or implied that their loans would be forgiven, in whole or in part, immediately after signing up for the Company's services. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 60 (admitting that during some telemarketing calls, the Company represented to consumers that, shortly after consumers enrolled in the Company's services, consumers' student loans would be forgiven in whole or in part); Pls.' Ex. 12 (Schneider Decl.) at ¶ 34a. |
| 88. | In some instances, salespeople stated or implied consumers had been approved for loan forgiveness when they had not. | *Compare* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at Attach. C (email stating "Congratulations! You have been approved for your new student loan forgiveness program."); Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 5-17 (discussing representations about loan forgiveness and explaining she later learned from loan servicer and by viewing her account online they were not true); Pls.' Ex. 25 (Thelen Decl.) at ¶¶ 9, 12, 15 (SLAM representative told consumer she was approved for a student loan forgiveness program and would only have to pay back approximately $25,000 out of the $62,000 she owed but she later learned "it had all been a scam"); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a (discussing analysis of call recordings); *with* Pls.' Ex. 16 (Lause |

| | | |
|---|---|---|
| | | Decl.) at ¶¶ 16-19 (noting only the U.S. Department of Education can grant loan forgiveness and discussing related criteria). |
| 89. | Company scripts stated or implied consumers were approved for federal student loan forgiveness programs during the sales call. | Pls.' Exs. 86-87 (at CFPB-20230125-0001691-92) (Sales Director transmitting script stating, "OK, I have some great news for you; it looks like I was able to get you approved for the federal student loan forgiveness program."). |
| 90. | In some instances, salespeople told consumers that fees paid by consumers to the Company would be the only payments consumers would owe on their student loans after being accepted into an IDR Plan or loan-forgiveness program. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 57; Pls.' Ex. 32 (Wilson Decl.) ¶ 5 (consumer led to believe payments to Premier would be the only payments he would have to make to get his loans forgiven and that he would not have to make any additional payments directly to his servicer). |
| 91. | In some instances, salespeople claimed the Company had been able to obtain loan forgiveness for other consumers. | *See* Pls.' Ex. 13 (Schneider Decl.) at 33 (discussing pretexting call where Company employee stated: "Usually we're able to save you about half, at least of what your current student loans are" and similar representations in other calls); Pls' Ex. 17 (Tr. of Return Call to Investigator Oct. 11, 2019) at 5:20-6:4. |

## C. The Company's Practice of Submitting IDR Applications Containing False Information

### 1. Overview of Processing

| | | |
|---|---|---|
| 92. | Following the initial sales call, an employee in the Processing Department (processor) conducted a "welcome call" with the consumer. | Pls.' Ex. 1 (Kim Decl.) at ¶ 52; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 53. |

| 93. | It was Company policy for processors *not* to confirm the family size on file in DPP with the consumer. | Pls.' Ex. 1 (Kim Decl.) at ¶ 53; *see also* Pls.' Ex. 60 (Nov. 9, 2018 email from Kim looping Wen into discussion about Company policy against customer service reps disclosing family size and income to consumers); Pls.' Ex. 61 (Nov. 8, 2018 email to Wen and others noting consumer became very angry when rep "confirmed" she had a family size of 6 and noting reps should never confirm FS input by sales rep). |
|-----|-----|-----|
| 94. | Processors also changed the consumer's contact information on file with the consumer's student loan servicer so that all correspondence would be sent to the Company, not the consumer. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 54; *see also* Pls.' Ex. 13 (Schneider Decl.) at ¶ 19 (detailing piles of mail addressed to consumers found during the immediate access). |
| 95. | Processors completed forbearance requests to temporarily halt the consumer's monthly student loan payments. | Pls.' Ex. 5 (Ortuno Investigational Hr'g Tr.) at 83:5-84:6. |
| 96. | Processors signed the forbearance paperwork in the consumer's name, often without the consumer's consent. | Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 53-56; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 68 (admitting that at times the Company did not inform consumers that it would submit forbearance requests to student loan servicers on the consumers' behalf). |
| 97. | Processors prepared applications for IDR plans and the corresponding annual recertification applications and submitted them to consumers' student loan servicers. | Pls.' Ex. 1 at (Kim Decl.) ¶ 52; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 57. |
| 98. | Consumers typically did not see the application the Company prepared before the Company | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 57. |

| | | |
|---|---|---|
| | submitted it to their student loan servicer. | |

### 2. The Company's Misrepresentations Regarding Family Size and Marital Status in IDR Applications

| 99. | The Company typically submitted IDR applications on behalf of consumers that listed more children or dependents as part of the consumers' family size than consumers actually had. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 47-51; Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (email to Wen and others noting it was "very rare" for file to be submitted without a fake FS or marital status); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 60-63; Pls.' Exs. 2.5-2.69 (Nguyen Decl. Exs. 5-69) (examples of email correspondence discussing instances where the Company listed a false family size for consumers); Pls.' Ex. 56 (email chain that includes August 19, 2019 email to Kim noting that "[t]he way almost every advisor is pitching family size is pretty similar to this client. This client has no dependents, but his file has a family size of 7 on it."); *see also* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶¶ 7, 20-21, Attach. F (explaining she told the Company she had three dependents and later learned the Company had listed three dependents *and* three children in her application and attaching letter from Navient) (emphasis added); Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 5, 27 (stating she told the Company she had two children and later learned from FedLoans that the Company listed five dependents in application); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married mother of one discovered Premier listed her as a single mother of three); Pls.' Ex. 24 (Sheahan Decl.) at ¶¶ 5, 11 (married father-to-be later told by servicer that SLAM listed him as single with five dependents); Pls.' Ex. 25 |

| | | | |
|---|---|---|---|
| | | | (Thelen Decl.) at ¶¶ 8-9 (SLAM representative advised that consumer's adult daughter and four grandchildren who did not live with her and for whom she occasionally bought clothes and other things could count towards her family size); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 73 (admitting that at times, the Company submitted applications for IDR Plans to consumers' student loan servicers that listed family sizes greater than the family sizes provided to the Company by the corresponding consumers). |
| | 100. | The Company generally did not tell consumers that it was inflating their family in IDR applications. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 31; Pls.' Ex. 1 (Kim Decl.) at ¶ 57; *see also* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶¶ 7, 20-21, Attachment F (explaining she learned from her servicer that Company had submitted a false family size and attaching letter from Navient); Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 5, 27 (stating she told the Company she had two children and later learned from FedLoans that the Company listed five dependents in application); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married mother of one discovered Premier listed her as a single mother of three); Pls.' Ex. 24 (Sheahan Decl.) at ¶¶ 5, 11 (married father-to-be later told by servicer that SLAM listed him as single with five dependents). |
| | 101. | In some instances, the Company misrepresented to consumers what could count as part of a consumer's family size in an IDR application. | Pls.' Ex. 13 (Schneider Decl.) at ¶ 34e; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 60, 72-73 (sharing examples he overheard, including a salesperson telling a consumer that a person could count as member of their family if they paid for the person's phone bill, lunch, or gas bill, for example). |

| 102. | The Company typically listed married consumers as single in IDR applications it submitted on their behalf. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55. Pls.' Ex. 1.7 (Kim Decl. Ex. 5); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 58-59; Pls.' Ex. 2.4 (Nguyen Decl. Ex. 40); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 74 (admitting that CAC and True Count submitted applications for IDR Plans to consumers' student loan servicers that listed married consumers as single.); *see also* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married consumer later discovered Premier listed her as single in her application). |
| 103. | The Company did not tell married consumers that it listed them as single in IDR plan applications. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 63; Pls.' Ex. 1 (Kim Decl.) at ¶ 57. |

## IV. The Company Charged Advance Fees

### A. Overview of Fee Collection Practices

| 104. | During the entire time it operated, the Company collected fees from consumers in exchange for its purported services. | *See* Pls.' Ex. 1 (Kim Decl.) ¶ 58; Pls.' Ex. 12  (Heidari Decl.) at ¶¶ 4, 7. |
| 105. | The Company charged two types of fees: an enrollment fee and a monthly fee. | Pls.' Ex. 1 (Kim Decl.) at ¶ 58. |
| 106. | The amount of the enrollment fee varied over time and ranged from approximately $799 to at least $1,899. | Pls.' Ex. 1 (Kim Decl.) at ¶ 59; *see also* Pls.' Ex. 39 (Etzel-Elaqad) at Attach. B (client agreement listing three enrollment fee payments of approximately $299); Pls.' Ex. 38 (Simonenko Decl.) at ¶ 5 (Company told him to pay $1,200 split across six months and then $30 per month); Pls.' Ex. 22 (Pugh Decl.) at ¶ 12 (consumer first paid $284.75 for four months); Pls.' Ex. 36 (Crawford Decl.) at ¶¶ 6-8 (consumer made five payments of $239 to Premier and attaching a contract |

| | | |
|---|---|---|
| | | outlining additional fees); Pls.' Ex. 34 (Liming Decl.) at ¶ 12 (representative told consumer she had to pay $1,195 for an "enrollment fee that would go towards paying down my loan followed by $40 monthly payments which would also go towards paying off her loans over the course of ten years). |
| 107. | The Company charged the enrollment fee in exchange for preparing consumers' consolidation or IDR application. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 3, 59. |
| 108. | The amount of the enrollment fee could vary depending on how soon the consumer could pay. | Pls.' Ex. 1 (Kim Decl.) at ¶ 60. |
| 109. | The Company provided financial incentives for collecting more fees from consumers upfront; for example, if the consumer paid in full right away, the sales representative would receive a higher commission for that enrollment. | Pls.' Ex. 1 (Kim Decl.) at ¶ 60; *see also* Pls.' Ex. 89 (Receiver's Report) at 28:18-19 ("Consumers who agreed to immediately pay in full were rewarded with a $100 discount and sales advisors received bonuses."). |
| 110. | Most consumers paid at least part of the enrollment fee within two weeks of the sales call. | Pls.' Ex. 1 (Kim Decl.) at ¶ 60; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 44; Pls.' Ex. 1.6 (exhibit to Kim Decl.) (training including "Same Day" pitches indicating consumers' first payment scheduled for the day of the call and that first payment must occur "today to start working on your file today and secure your rate in time."); Pls.' Ex. 89.5-89.6 (exhibits to Receiver's Report) ("Same Day Pitch" stating "[s]ince we are enrolling you into the program today, obviously the system will be setting your first payment for today"; confirming payment will be |

| | | |
|---|---|---|
| | | drafted that day; and "The Government is very strict with this. We must receive your first payment before they will start processing anything."); *accord* Pls.' Ex. 36 (Crawford Decl.) at ¶ 6, Attach. A at 5-6 (signed client agreement listing first payment within ten days); Pls.' Ex. 39 (Etzel-Elaqad) at ¶ 11, Attach. B at 3-4 (client agreement assessing all enrollment fees within first three months and listing date of first payment as enrollment date). |
| 111. | By the time the Company submitted a student loan adjustment application, the Company had typically collected some or all of the enrollment fee. | Pls.' Ex. 1 (Kim Decl.) at ¶ 61; Pls.' Ex. 1.6 (Kim Decl. Ex. 4) (training including "Same Day" pitches indicating consumers' first payment scheduled for the day of the call and that first payment must occur "today to start working on your file today and secure your rate in time."); *see also* Pls.' Ex. 89 (Receiver's Report) at 12:7-12 ("During the initial sales call, Defendants acquire the customer's payment information and schedule the first payment, which is generally processed almost immediately after the customer executes the Services Agreement."). |
| 112. | The Company collected fees from consumers even if their loans were in forbearance, and the consumer therefore had not made a payment on an adjusted loan yet. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 64-65; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 9 (admitting as to some consumers). |
| 113. | The Company also collected monthly fees from consumers. | Pls.' Ex. 1 (Kim Decl.) at ¶ 62; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 14 (admitting Company collected monthly fees from some consumers in exchange for Student Loan Debt Relief Services). |

| 114. | The amount of the monthly fees varied over time and ranged from approximately $10-50 per month. | Pls.' Ex. 1 (Kim Decl.) at ¶ 62. |
|---|---|---|
| 115. | The Company charged monthly fees for filing recertification paperwork for IDR plans during the year leading up to the annual recertification. | Pls.' Ex. 1 (Kim Decl.) at ¶ 62; Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 17 (admitting as to some consumers that the Company collected fees from consumers for preparing recertification paperwork for IDR plans before submitting recertification paperwork to student loan servicers). |
| 116. | The monthly recertification fee was supposed to be charged for the life of the consumer's loan. | Pls.' Ex. 1 (Kim Decl.) at ¶ 62. |
| 117. | The Company charged fees to consumers regardless of whether consumers had made new payments on adjusted loans. | Pls.' Ex. 1 (Kim Decl.) at ¶ 65; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 8-11 (admitting as to some consumers and stating lack of knowledge or information as to others that the Company: (1) collected fees from consumers before they had been approved for IDR plans, (2) while the consumers' loans were in forbearance, and (3) before the consumers had made a payment on a corresponding IDR plan or consolidated loan). |
| 118. | The Company did not have access to records showing whether consumers made payments on an adjusted loan, nor did it attempt to gather this information. | Pls.' Ex. 1 (Kim Decl.) at ¶ 65. |

**B. The Company's Limited Dealings with Purported Dedicated Account Providers**

| 119. | During the entire time it operated, the Company did not make payments to creditors on behalf of consumers. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 71 (Kim and Wen knew employees told consumers monthly payments to the Company would go toward paying their loans and that such statements were |

| | | |
|---|---|---|
| | | incorrect); Pls.' Ex. 12 (Heidari Decl.) at ¶ 18 (noting that review of certain Company account or financial records did not reveal evidence of payments to student loan servicers); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 29 (admitting as to some consumers that the Company "did not use funds collected from consumers to make payments to consumers' student loan servicers."). |
| 120. | The Company briefly contracted with two purported dedicated account providers (DAPs), Reliant Account Management (RAM) and Account Management Plus (AMP). | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 90-92. |
| 121. | The Company did not provide RAM or AMP with documentation indicating that a consumer had made an initial payment on an adjusted loan before those companies released fees paid by consumers to the Company. | Pls.' Ex. 1 (Kim Decl.) at ¶ 93 (stating that while they were testing RAM and AMP, "the Company did not track when consumers made payments to student loan servicers on adjusted loans. And we continued to collect fees from consumers before submitting their student loan adjustment applications."). |
| 122. | The Company processed most consumer payments without using RAM or AMP. | *See* Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 14 (of the over $95 million in consumer fees the Company collected, less than $200,000 was collected through RAM and AMP after accounting for refunds); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 117-120. |

## V. The Company's High Complaint Volume, Chargebacks, and Refunds

### A. Complaint Volume

| | | |
|---|---|---|
| 123. | Consumers submitted over 1,700 complaints regarding the Company to the Consumer Financial Protection Bureau's | Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 3-7. |

| | | |
|---|---|---|
| | internal consumer complaint database and the Federal Trade Commission's Consumer Sentinel Network. | |
| 124. | Several consumers complained that they were misled about the purpose of the fees they paid to the Company. | *See* Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 7-8. |
| 125. | Several consumers complained that the Company told them their student loan payments had been lowered for the life of their loan. | Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 9-10. |
| 126. | Several consumers complained that the Company promised their loans would be forgiven, in whole or in part, shortly after enrolling in its services. | Pls.' Ex. 14 (Ridder Decl.) at ¶ 11. |
| 127. | Several consumers complained that the Company submitted false information about their family size or marital status to their student loan servicers. | Pls.' Ex. 14 (Ridder Decl.) at ¶ 12. |
| 128. | Several consumers complained they were led to believe that the fees charged by the Company were necessary to participate and remain enrolled in the loan-forgiveness or IDR program, or were otherwise led to believe they must pay a fee to apply for loan forgiveness or IDR programs. | Pls.' Ex. 14 (Ridder Decl.) at ¶ 14. |
| 129. | Other consumers expressed concern that the Company was a fraud, stated that the Company lied to them, or indicated they did not receive the services they were promised. | *See* Pls.' Ex. 13 (Schneider Decl.) at ¶ 9. |

| 130. | The Company received hundreds of complaints from third parties submitted on consumers' behalf. | *See* Pls.' Ex. 15 (Marin Decl.) at ¶¶ 3, 5-22 (Better Business Bureau (BBB) received complaints against PSLC, SLAM, FPS and related additional DBAs and informed the corresponding company of the complaint); *see also* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 92-97 (recalling Company received approximately 30-50 letters from state agencies, each of which he shared with Wen); Pls.' Ex. 2.26 (Nguyen Decl. Ex. 26); Pls.' Ex. 70 (complaint from California Department of Justice dated July 2019); Pls.' Ex. .71 (complaint from California Department of Justice dated April 24, 2019); Pls.' Ex. 72 (complaint from Kansas Office of the Attorney General addressed to Wen's attention); Pls.' Ex. 73 (complaint from West Virginia Office of the Attorney General); Pls.' Ex. 74 (correspondence regarding complaint sent by California Department of Justice in March 2017); Pls.' Ex. 75 (correspondence regarding complaint from North Carolina Department of Justice); Pls.' Exs. 83-84 (July 20, 2017 email from Wen attaching response for State of Kansas Consumer Protection Division regarding a complaint). |
|---|---|---|
| 131. | Consumers also contacted the Company directly to complain about its marketing practices and its falsification of information in IDR applications. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 66-69; Pls.' Ex. 89 (Receiver's Report) at 33:5-18, n.37 (explaining Receiver identified approximately 150 "troubling contacts" from consumers via email to a single inbox since approximately Oct. 13, 2019, alone, and noting the Company may have received additional complaints to other email accounts as well). |

| | | |
|---|---|---|
| 132. | The Receiver identified a TAS email box, studentloanmgmt@trustedaccountservices.com that was controlled and monitored by the Defendants. | Pls.' Ex. 89 (Receiver's Report) at 33:5-7. |
| 133. | The Receiver identified approximately 150 complaints from consumers in the studentloanmgmt@trustedaccountservices.com inbox. | Pls.' Ex. 89 (Receiver's Report) at 33:5-18. |
| 134. | The Receiver identified the following examples of consumer complaints received by studentloanmgmt@trustedaccountservices.com:<br>•"The payments that are being taken each month are not the payments I agreed to and not an amount I can manage. I need to hear back from someone asap and get this resolved."<br>•"If I'm paying $40/month, WHY has my student loan increased from $52k to $54k? . . . Instead of paying $52k to Nelnet, at the end of 240 payments, I will pay a total of $10,555 to Premier Student Loans? Will the balance be expunged from my financial obligation?"<br>•"I have spoken to [Navient]-who holds my student loan per [Navient] they have nothing from you concerning my student loan and they are now delinquent. I need answer's and I am stoping [sic] Payment." | Pls.' Ex. 89 (Receiver's Report) at 33:17-35:9. |

• "This is a scam and I want all of my money returned or I am prepared to legal [sic] action. My student loans are still showing up as unpaid on my credit report."

• "If I am going through this organization for my student loans, and if you are charging me $42.00 per month, I have two questions that are confusing me?"

1. "My loan amount has increased by $5,000 since I turned my information over to you."

2. "Fed Loan just sent me an email saying they are going to deduct $131 from my account each month starting November. Can someone please explain all of this to me, and why did my amount increase?"

• "This is a scam. You've been reported. Stop contacting me."

• "STOP TAKING THE AUTOMATIC PAYMENT IMMEDIATELY.
I WANT A REFUND. The Department of Education called me – you are a fraud!"

• "I am just trying to figure out why I am still receiving bills from fedloan. They are saying I am behind and that I am not paying. I was told that I wouldn't have to worry about them once I sign on with you guys. Can you please explain."

• "This service was set up to help me with the payments at

| | | |
|---|---|---|
| | FEDLOAN SERVICING. I keep getting emails and phone calls saying my account is past due. Are the payments you're pulling from my account not being sent to the FEDLOAN SERVICING?"<br>•"Who is this payment going to? I just logged into my Fedloan Servicing Account, and none of my $40 monthly payments are showed as posting to my actual student loans. I am wondering who I am paying?"<br>•"Why am I paying y'all money and fed loan servicing is reporting missed payments to the credit bureaus. It's messing up my credit score and I really do not need that."<br>•"Is Navient aware that I am paying my student loans through this company now?" | |

**B. Refund Policy and Chargeback Rates**

| | | |
|---|---|---|
| 135. | At times, payment processors expressed concern about the Company's "excessive" chargeback rates. | *See* Pls.' Ex. 2.78 (email chain from August 2018 between Wen, Nguyen, and NMC employees regarding excessive chargebacks); *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 80-81, *See* Pls.' Ex. 1.10; Pls.' Ex. 77 (email to Wen noting that SL Account MGMT had "excessive" chargebacks in September 2018); Pls.' Exs. 78-79 (email chain regarding excessive chargebacks and attaching remediation plan signed by Wen). |
| 136. | The Company enrolled in chargeback monitoring | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 110; *see also* Pls.' Ex. 78-79 (Wen sends VISA remediation plan to Lai on January 24, |

| | | |
|---|---|---|
| | programs to help prevent chargebacks. | 2019, at p. 3 of remediation plan noting that company uses Pinpoint and EIDS to monitor chargebacks). |
| 137. | The Company implemented a liberal refund policy as part of its effort to keep chargeback rates down and to avoid drawing attention from law enforcement. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 83 ("The Company had a liberal refund policy because Wen and I thought that would help keep chargebacks and consumer complaints down. Based on my experience, consumers who received a refund quickly were less likely to pursue a chargeback or to complain to a third-party. Wen agreed, and he and I were the final decisionmakers with respect to the refund policy."); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 99-103; Pls.' Exs. 2.75-2.76 (Nguyen Decl. Exs. 75-76). |

## VI. Wen's Role in the Debt Relief Operation

### A. Overview of Wen's Day-to-Day Role

| | | |
|---|---|---|
| 138. | Wen and Kim controlled CAC from its inception through the date a court-appointed bankruptcy trustee took control of the Company. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19 (stating Wen and Kim owned each Company, were the final decisionmakers, and that there was no one higher than them at the Company); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 99 (Wen and Kim made all the big decisions for the Company); *see* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 104, 112, 114 (admitting he was an owner of CAC and True Count and that he "exercised substantial managerial responsibility for and control over Prime's business practices" for "some of the time period" between September 2018-October 22, 2019); Pls.' Ex. 91 (July 31, 2019 Order Directing the Appointment of a Chapter 11 Trustee and Setting a Status Conference in CAC's bankruptcy proceeding). |

| 139. | Wen and Kim controlled True Count and Prime from their inception through October 23, 2019, the date of the immediate access. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19 (stating Wen and Kim owned each Company, were the final decisionmakers, and that there was no one higher than them at the Company); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 99 (Wen and Kim made all the big decisions for the Company); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 104, 112, 114, 115 (admitting he was an owner of CAC and True Count and that he "exercised substantial managerial responsibility for and control over Prime's business practices" for "some of the time period" between September 2018 to October 22, 2019); Pls.' Ex. 89 (Receiver's Report) at Part II (discussing immediate access). |
|------|------|------|
| 140. | When CAC began operating in November 2015, Wen communicated daily or every other day with Kim about their student-loan debt-relief operation. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 22; Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 11 (Company started collecting payments from consumers in November 2015). |
| 141. | By mid-2016, Wen came into the office regularly, at least several times a week. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 23 (Wen began regularly coming into the office in 2016 and took a more active role in overseeing the Company). |
| 142. | Throughout 2016, Wen communicated daily—and typically multiple times a day—with Kim and others at the Company about all aspects of running the student-loan debt-relief operation. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23. |
| 143. | Wen was an account signatory for eight merchant accounts used by the enterprise and bank | Pls.' Ex. 12 (Heidari Decl.) at ¶ 10, App. D*; see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 106, |

| | | |
|---|---|---|
| | accounts in CAC and True Count's name. | 107, 111, 113; Pls.' Ex. 1 (Kim Decl.) at ¶ 25. |
| 144. | Wen helped set up and maintain the Company's merchant accounts. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 25 (Wen primarily in charge of setting up merchant accounts and was the main point of contact for merchant account providers). |
| 145. | Wen received and had access to information about the Company's merchant account and payment processing transactions, including refunds and chargeback information. | *See* Pls.' Ex. 13 (Schneider Decl.) at ¶ 24 (discussing payment processing statements sent to Wen); Pls.' Ex. 51 (EPS module) (online merchant account portal document signed by Wen September 8, 2017, for CAC). |
| 146. | Wen helped determine the Company's consumer fee structure, including the amount of fees and when those fees could be collected. | Pls.' Ex. 1 (Kim Decl.) at ¶ 28. |
| 147. | Wen drafted and approved contracts between the Company and consumers for the Company's services. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 29-31, Pls.' Ex. 1.5 (Kim Decl. Ex. 3) (email and attachment from Wen dated Jan. 29, 2019, noting on the last page that he added the "No Advance Fees" section, that Nguyen and Kim "won't bother to skim the new Agreement," and directing them to upload it into DPP). |
| 148. | Wen was among the primary contacts for outside counsel for the Company. | Pls.' Ex. 1 (Kim Decl.) at ¶ 76. |
| 149. | Although Wen was admitted to the California bar in 2008, he was disciplined by the bar in July 2018 and disbarred in April 2021. | Pls.' Ex. 13 (Schneider Decl.) at ¶ 25; Pls.' Ex. 13.3. |
| 150. | Wen received and reviewed sales scripts for the Company. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 110 (admitting that he reviewed some of the Company's scripts); *see also* Pls.' Exs. 56-58 (scripts claiming consumer approved for "federal student loan forgiveness |

| | | | |
|---|---|---|---|
| | | | program" sent to Wen by Sales Director); Pls.' Exs. 53-54 (Sept. 21, 2018 email and attachment "compliance script" that states the Company "does not take any upfront fees" and the consumers' payments would be held "in your Dedicated Client Account"). |
| | 151. | Wen used the following Company email accounts: kwen@premierstudentloancenter.com kaine@premierstudentloancenter.com, kaine@slaccountmgmt.com, kwen@slaccountmgmt.com, kaine@financialpreparationservices.com, and kwen@financialpreparationservices.com. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 90-96. |
| | 152. | At times, Wen also used personal email accounts to send emails about the Company, including kainewen@gmail.com, kainedai@yahoo.com, 777sierramadre@gmail.com. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 84-86, 96, 97; Pls.' Ex. 1 (Kim Decl.) ¶ 36. |
| | 153. | Wen communicated about the debt relief operation with Kim and other Company employees in person, by phone, or via text or instant messaging applications such as Skype, Signal, and iMessage. | Pls.' Ex. 1 (Kim Decl.) at ¶ 37. |

**B. Wen's Knowledge and Control of the Company's Deceptive Practices**

| | | | |
|---|---|---|---|
| | 154. | Wen was informed that employees were adding children or dependents to consumers' actual family sizes | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 49, 51; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 60-65; 77-78; Pls.' Exs. 2.8 (Nguyen Decl. Ex. 8), 2.26 (Nguyen Decl. Ex. 26), 2.65 |

| | | |
|---|---|---|
| | when offering and performing the Company's services. | (Nguyen Dec. Ex. 65), 2.74-75 (Nguyen Decl. Exs. 74-75) (describing Company's practice of using fake family size and that he raised this issue with Wen). |
| 155. | In approximately 2016 or 2017, Wen agreed that the Company would limit employees to inflating consumers' family size up to 7. | Pls.' Ex. 1 (Kim Decl.) at ¶ 51; *accord* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 77-82, 85-86; Pls.' Ex. 2.72 (Nguyen Decl. Ex. 72) (Oct. 2016 email chain where Kim refers to "max 7 FS"). |
| 156. | Wen received email correspondence discussing the Company's practice of inflating family size up to 7. | *See* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 84-85; 87-90; Pls.' Ex. 2.73 (Nguyen Decl. Ex. 73) (Nguyen copies Wen on response to January 22, 2018 email involving discussion about "whether it was real FS or not and still sticking to 6 and 7" and complaining that sales reps were "using family sizes of 8,9 and 10!"); Pls.' Exs. 2.73-2.74 (Nguyen Decl. Exs. 74-74a). |
| 157. | Wen was informed of the Company's policy against having processors confirm the family size on file in DPP with the consumer. | *See* Pls.' Ex. 61 (November 8, 2018 email from Kim looping Wen into email chain about Company policy against customer service reps disclosing family size and income to consumers). |
| 158. | Wen received copies of inquiries from third parties about the use of fake family sizes in applications submitted by the Company to student loan servicers. | *See* Pls.' Ex. 65 (letter from BBB noting, "[s]ome consumers allege that their information was falsified on their application by having more members in their household than they actually had causing their monthly fee to spike once it was corrected," and Wen's response dated April 17, 2007); Pls.' Exs. 62-64 (email and attachments regarding consumer who complained Company inflated her family size, among other things). |
| 159. | Wen was informed that it was the Company's practice to list | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 58-59, 101-102; Pls.' Ex. 2.75 (Nguyen Decl. |

| | | |
|---|---|---|
| | married consumes as single in IDR applications. | Ex. 75) (April 13, 2018 email chain with Wen and others discussing Company's practice of submitting everyone as single whether married or not); Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (April 13, 2018, email chain informing Wen and others that it was "very rare lol" for the Company to submit an application that did not include an incorrect family size or marital status). |
| 160. | Wen had been informed of the Company's practice of listing married consumers as single in IDR applications prior to April 2018. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55 (explaining he discussed the Company's practice of listing married consumers as single in IDR applications with Wen before April 2018). |
| 161. | Wen agreed that the Company should use numerous fictitious names to help dilute the number of consumer complaints against the Company. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 77-78; Pls.' Ex. 1.9 (Kim Decl. Ex. 7) (calendar appointment with subject, "[c]hange DBA for all Corps to avoid complaints every 6 months" from Kim to Wen). |
| 162. | Wen knew that CAC/PSLC had negative online reviews. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 73-74; Pls.' Ex. 1.8 (Kim Decl. Ex. 6) (Sept. 21, 2018 email from Wen to reputation management company contact regarding building positive online presence for Prime/FPS and suggesting certain popular review sites "should be omitted in order to avoid negative reviews (such as what happened with PSLC)."). |
| 163. | Wen helped retain a reputation management company to try to "develop a positive online presence" for Prime. | Pls.' Ex. 1 (Kim Decl.) at ¶ 73; Pls.' Ex. 1.8 (Kim Decl. Ex. 6). |
| 164. | Wen was informed that at times the Company's chargeback rates exceeded 1%. | *See* Pls.' Ex. 2.78 (Nguyen Decl. Ex. 78) (email chain and attachment from August 2018 between Wen, Nguyen, and others regarding excessive chargebacks); Pls.' Ex. 1 (Kim Decl.) at |

| | | |
|---|---|---|
| | | ¶¶ 80-81; Pls.' Ex. 1.10 (Kim Decl. Ex. 8); *see also* Pls.' Ex. 77 (Email from Wen to Lai on December 14, 2018, noting that SL Account MGMT had "excessive" chargebacks in September 2018 that resulted in a chargeback ratio of 1.21%); Pls.' 78. |
| 165. | Wen had final say over the Company's refund policy. | Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 99-100; Pls.' Ex. 1 (Kim Decl.) at ¶ 83; *see also* Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (email chain between Wen and others from April 2018 discussing refund policy). |
| 166. | Wen responded to select consumer complaints and inquiries from law enforcement. | Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 124-125 (admitting that he sometimes reviewed and responded to correspondence to the Company from state law enforcement agencies or regulators); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 92-94; Pls.' Ex. 2.26 (Nguyen Decl. Ex. 26); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 75-76 (Wen responsible for handling complaints forwarded by state law enforcement agencies). |

**C. Wen's Knowledge and Control of the Company's Fee Collection Practices**

| | | |
|---|---|---|
| 167. | In a February 2, 2018 email to CAC's attorney, Wen wrote: "Is it correct that the 100% compliant way to accept fees is: 1. For an independent third-party Dedicated Account Provider ('DAP') to collect the fees from the client; 2. The DAP will hold the client's fees in a trust account until the DAP can confirm a and | Pls.' Ex. 66. |

| | | verify that: - The client has received a positive result (such as a consolidation), and - The client completes his first payment towards such. 3. Then the DAP will release the client's fees to the document preparation company (such as Premier)." | |
| 168. | | As early as February 2018, the Company's client agreements included the following provision: "4. No Advance Fees. Per the attached Client Trust Account Authorization, Company does not take any advance fees from Client. Company will designate an independent third-party dedicated account provider ('DAP') to collect and deposit payments that Client has agreed to make with Company, pursuant to the Fee and Service Schedule of this Agreement, and to deposit and hold Client's funds in a trust account established and serviced by the DAP. The DAP will not disburse any Client fees until Client has received a consolidation, adjustment, or otherwise satisfactory result, and Client completes one payment towards such." | Pls.' Ex. 13 (Schneider Decl.) at ¶ 23. |
| 169. | | On August 3, 2018, Wen wrote to CAC's outside counsel about a proposed corporate restructure, acknowledging that | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 101-104; Pls.' Ex. 1.12. |

| | | |
|---|---|---|
| | "TC/SLAM is processing for ~37k current active clients. All clients are 'paying upfront fees'. There is no way to be retroactively compliant." | |
| 170. | In an email chain from September 2018, Wen discussed advance fees and the TSR with outside counsel, noting "we understand the legal obligations." | Pls.' Ex. 88. |
| 171. | Wen prepared an "Attestation Letter" for a payment processor dated March 18, 2019, stating: "Regarding upfront fees, SLAM has partnered with dedicated account providers who serve as banking and escrow platforms for its clients . . . SLAM does not collect any document preparation fees until services are fully rendered, the client's first payment is complete, and proof is shown to reflect that." | Pls.' Ex. 67-68 (email and attachment transmitting attestation letter). |
| 172. | In March 2019, the Company did not condition its collection of fees on whether consumers had made an initial payment. | *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 65 ("The Company charged fees to consumers regardless of what happened to the consumers' student loan adjustment applications or whether consumers made new payments on adjusted loans. The Company did not have access to records showing whether consumers made payments on an adjusted loan, nor did it attempt to gather this information."). |
| 173. | Wen was warned by counsel and third parties about compliance with the TSR's prohibition on collecting advance fees. | *See* Pls.' Ex. 55 (Email re no advance fee model) (email from former CAC attorney dated July 26, 2017, noting debt relief model "should be done no advance fee" and that operating in |

| | | select states "*would be the safest approach, assuming you run a no-advance fee program with application submission on behalf of the consumer to the DOE.*")[1]; Pls.' Ex. 1 (Kim Decl.) at ¶ 114; Pls.' Ex. 1.13 (Kim Decl. Ex. 12) (email chain including ACH provider warning Wen about compliance with TSR); Pls.' Ex. 69 (email chain from Aug. 30, 2018, between Wen and others where counsel to CAC cautions against describing the business as a "document preparation company," advising "I think you just call it what it is, a student loan relief provider, which is subject to the TSR debt relief rule, and the similar state regulations in some of the states."); Pls.' Ex. 88 (Sept. 4, 2018 email chain where outside counsel asks Wen and Kim, "[a]re you on top of the advanced payment issue? You previously told me that you were handling. We previously discussed this issue, along with TSR related requirements. You indicated that it was being handled. This is a major issue so please let us know if you want to go over it again."). |
| 174. | In approximately 2018, Wen and Kim decided to explore setting up their Company to process consumer payments to make it look like the Company used a third-party dedicated account provider. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 95, 99; Pls.' Ex. 1.11 (Kim Decl. Ex. 10). |

[1] This document was obtained by the Bureau through the immediate access and contains non-relevant information pertaining to a different client of Mr. Birnbaum's. Mr. Birnbaum since informed the Bureau that the redacted portion is subject to attorney-client privilege.

| 175. | Wen and Kim directed one of their employees, Ho, to build a portal for the Company to process payments. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 96-97. |
| 176. | Wen took the lead on forming TAS 2019 LLC, which went by the name Trusted Account Services. | Pls.' Ex. 1 (Kim Decl.) at ¶ 105. |
| 177. | Trusted Account Services registered as a Wyoming corporation and set up a virtual office in July 2019. | Pls.' Exs. 89 (Receiver's Report) at 15:11-21; Pls.' Ex. 89.2. |
| 178. | Wen also recruited his long-time family friend, Kenny Huang, to be the nominal owner of TAS. | Pls.' Ex. 1 (Kim Decl.) at ¶ 113; Pls.' Ex. 3 (Huang Depo. Tr.) at 15:19-16:8. |
| 179. | At the time Huang agreed to be TAS's nominal owner, he had absolutely no experience in the escrow industry, nor did he gain any during his tenure as a purported owner of TAS. | Pls.' Ex. 3 (Huang Depo. Tr.) at 17:11-21. |
| 180. | Wen directed Huang to open TAS's bank account at HSBC. | Pls.' Ex. 3 (Huang Depo. Tr.) at 28:8-22. |
| 181. | National Merchant Center (NMC) processed consumer payments for the Company's services that were deposited to TAS bank accounts at HSBC. | *See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 15. |
| 182. | Huang assumed Wen was actually running TAS. | Pls.' Ex. 3 (Huang Depo. Tr.) at 55:24-56:2. |
| 183. | Wen helped secure payment processing for TAS. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 117-18; Pls.' Ex. 1.14 (Kim Decl. Ex. 14); *see also* Pls.' Ex 89 (Receiver's Report) at 17:1-21 (discussing Wen's efforts to set up processing for TAS); Pls.' Ex. 89.4 (April 2019 email chain regarding TAS processing application). |
| 184. | Wen created the email account tas2019llc@gmail.com. | Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) at No. 35. |

| | | |
|---|---|---|
| 185. | Wen had access to the email account tas2019llc@gmail.com and reviewed and sent emails from that address. | Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) Nos. 36-37. |
| 186. | Huang did not have access to the tas2019llc@gmail.com email account and never sent emails from it. | Pls.' Ex. 3 (Huang Depo. Tr.) at 18:25-19:14. |
| 187. | Wen and Kim reached out to Jimmy Lai to see if Lai would be willing to be listed as an owner on paper of TAS. | Pls.' Ex. 1 (Kim Decl.) at ¶ 106. |
| 188. | Lai had assisted the Company in setting up merchant accounts and helping to reduce their chargeback rates. | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 121. |
| 189. | Lai agreed to be listed as an owner of TAS in exchange for retaining an extra fee that the Company would collect for this purpose. | Pls.' Ex. 1 (Kim Decl.) at ¶ 108. |
| 190. | In September 2019, at Wen's request, Huang signed paperwork adding Lai as an account signatory on the TAS HSBC account. | Pls.' Ex. 3 (Huang Depo. Tr.) at 31:15-33:12. |
| 191. | Although Huang, and later, Huang and Lai, were TAS's nominal owners, TAS was operated by the Company using the Company's employees. | *See* Pls.' Ex 89 (Receiver's Report) 14:16-21:5. |
| 192. | For example, the Receiver found log-in credentials for studentloanmgmt@trustedaccountservices.com on a post-it note in a customer service manager's work station that stated "sign on to private window or incognito" on site, as well as TAS checks. | Pls.' Ex. 89 (Receiver's Report) 16:16-22; Pls.' Ex 89.3 (post-it with credentials stating, "sign on to private window or incognito."). |

| 193. | Wen and his report, Ho, took the lead on getting TAS integrated into DPP's CRM database. | Pls.' Ex 89 (Receiver's Report) at 18:3-17. |
| 194. | Wen reviewed and edited the TAS client agreement. | Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) at No. 38. |
| 195. | Wen reviewed and edited the TAS website. | Pls.' Ex. 81 (Wen circulating edits to TAS website using personal email address). |

## D. Wen's Destruction of Evidence and Conduct in Discovery

| 196 | On May 29, 2018, the Minnesota Attorney General's Office issued a civil investigative demand (CID) to Premier Student Loans, Inc., to the 173 Technology Drive address. | Pls.' Ex. 11 (Minnesota CID). |
| 197 | In mid-September 2018, the Company received a CID issued by the Bureau to CAC. | Pls.' Ex. 13 (Schneider Decl.) at ¶ 10. |
| 198 | CAC never provided a substantive response to the Bureau's CID, and instead insisted through bankruptcy counsel that the Bureau's action was subject to the automatic stay. | Pls.' Ex. 13 (Schneider Decl.) at ¶ 15; *see also* Pls.' Ex. 80 (Jan. 24, 2019 email chain with Wen and Company attorneys, who note that they invoked the automatic stay as a reason for not responding to MN civil investigative demand and proclaim, "let the games begin"). |
| 199 | Wen authorized CAC's decision to file for bankruptcy and to shift its sales operations to Prime. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 122-123, 138-140. |
| 200 | Within approximately two months of receiving the Bureau's CID, Wen and Kim directed Ho to delete all of the Company's @premierstudentloancenter.com emails. | Pls.' Ex. (Kim Decl.) at ¶¶ 129-131; Pls.' Ex. 85 (Dec. 2018 email chain that includes email from Wen stating: "Per our previous discussion, we deleted all PSLC emails and addresses. Our Network Admin contacted Hostgator to retrieve the emails and email addresses. Since we did not have |

| | | | |
|---|---|---|---|
| | | | backup turned on, Hostgator informed us that the emails and emails addresses are permanently deleted and no longer retrievable."). |
| | 201 | Prior to the deletion of the @premierstudentloancenter.com emails, Wen had been advised by counsel not to delete the emails. | Pls.' Ex. 85 (email dated Dec. 11, 2018, from outside counsel to Wen, copying Kim and Nguyen, stating "[m]y major concern is that the emails were deleted, which we advised you not to do."). |
| | 202 | The deleted emails included emails showing that Wen knew the Company was including false information about family size and marital status in student loan adjustment applications, and that he did nothing to stop these practices. | Pls.' Ex. 1 (Kim Decl.) at ¶ 132. |
| | 203 | The deleted emails showed that Wen knew about misrepresentations to consumers about the Company's services, but he did not try to stop those practices. | Pls.' Ex. 1 (Kim Decl.) at ¶ 133. |
| | 204 | Wen and Kim also discussed their belief that emails they decided to delete likely included emails between employees showing that the Company was charging advance fees, including false information in student loan adjustment applications, and making misrepresentations to consumers about its services. | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 130, 135. |
| | 205 | On or about October 23, 2019, Wen deleted text messages that included statements showing he was aware that the Company was violating the law and had | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 148-151. |

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLS.' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEF. WEN

| | | done nothing to stop those practices. | |
|---|---|---|---|
| | 206 | The deleted texts included communications through Signal, iMessage, and Skype. | Pls.' Ex. 1 (Kim Decl.) at ¶ 149. |
| | 207 | The deleted texts dated back to at least November 2015. | Pls.' Ex. 1 (Kim Decl.) at ¶ 150. |
| | 208 | On February 22, 2022, the People of the State of California (California) issued document requests and interrogatories to Wen. | Pls.' Ex. 20 (Mason Decl.) at ¶ 6. |
| | 209 | On March 30, 2022, the Bureau issued document requests and interrogatories to Wen. | Pls.' Ex. 13 (Schneider Decl.) at 26. |
| | 210 | On August 9, 2022, the Bureau's and California's motion to compel was granted and Wen was ordered to "provide complete, substantive responses to each of the Moving Parties' discovery requests" including the document requests and interrogatories issued by the Bureau and California. | Order on Pls.' Motion to Compel Defendant Kaine Wen's Responses to Outstanding Discovery (ECF No. 398). |
| | 211 | To date, Wen has not responded to the Bureau and California's outstanding requests for documents and responses to interrogatories. | *See* Pls.' Ex. 13 (Schneider Decl.) ¶¶ 26-29; Pls.' Ex. 20 (Mason Decl.) at ¶¶ 6-9. |

## VII.   Consumers Paid over $95 Million to Companies Owned and Controlled by Wen and Suffered Additional Harms

| | | | |
|---|---|---|---|
| | 212. | Between November 5, 2015, through October 2019, the Company collected $95,057,756.92 in net fees from consumers after accounting for refunds. | Pls.' Ex. 12 (Heidari Decl.) at ¶ 7. |
| | 213. | The Company collected fees from at least approximately | Pls.' Ex. 12 (Heidari Decl.) at ¶ 7. |

| | | |
|---|---|---|
| | 81,000 consumers who did not receive any refund. | |
| 214. | The Company collected $1,205,776.83 in fees (not including refunds) from approximately 1,614 Minnesota consumers. | Pls.' Ex. 19 (Pegg Decl.) at ¶ 5. |
| 215. | The Company collected $4,483,915 in fees (not including refunds) from approximately 4,628 North Carolina consumers. | Pls.' Ex. 20 (Evers Decl.) at ¶ 5. |
| 216. | The Company collected approximately $8,112,188.83 in fees (not including refunds) from approximately 12,184 California consumers. | Pls.' Ex. 21 (Mason Decl.) at ¶¶ 3-5. |
| 217. | At times, consumers lost qualifying payments toward student loan forgiveness because the Company procured a loan consolidation on the consumer's behalf. | *See, e.g.* Pls.' Ex. 31 (Honold Decl.) at ¶¶ 4, 12-13; Pls.' Ex. 41 (Rosca Decl.) at ¶ 16 (consumer lost qualifying payments she had already made toward loan forgiveness and had to start over under a new 20-year plan). |
| 218. | At times the Company's practices resulted in consumers owing increased interest on their student loan debts. | *See* Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 15-16, 20 (consumer discovered that not only were her loans not forgiven, her interest rate increased as a result of Premier consolidating her loans); Pls.' Ex. 37 (Smith Decl.) at ¶ 16 (noting that she owes more now than she did when she signed up with PSLC because of accrued interest); *accord* Pls.' Ex. 16 (Lause Decl.) at ¶ 14 (discussing impact of falsifying family size or marital status in an IDR application). |
| 219. | The Company's practices caused some consumers to fall behind on their loan payments. | *See* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 18-26 (consumer made four monthly payments of $298.75 that she thought were going toward her loan debt, but later learned from her loan |

| | | | |
|---|---|---|---|
| | | | servicer that was not the case); Pls.' Ex. 40 (Breemes Decl.) at ¶¶ 7, 10-11 (SLAM instructed consumer just to pay the Company, not her student loan servicer, and assured her they would coordinate with her servicer, but she later learned she had missed payments on her loans). |
| | 220. | Consumers suffered additional financial harms due to the Company's practices. | *See* Pls.' Ex. 43 (Fomafung Decl.) at ¶¶ 114-16 (consolidation of consumer's loans increased his interest rate); Pls.' Ex. 25 (Thelen Decl.) at ¶ 14 (explaining it was more difficult to purchase a car because of the money she paid SLAM). |
| | 221. | Consumers suffered emotional harm due to the Company's misrepresentations and its fee collection practices. | *See* Pls.' Ex. 25 (Thelen Decl.) at ¶¶ 12, 14 (consumer "could not eat or sleep for days" after learning the company had been shut down because she realized she had been "throwing her money away," and her experience with SLAM made her feel violated and caused her a lot of stress); Pls.' Ex. 35 (Hauser Decl.) at ¶ 17 (experience with the Company made her feel angry, upset, overwhelmed, ashamed, embarrassed, and led to panic attacks). |
| | 222. | Consumers would not have signed up for the Company's services if they had known it would submit student loan adjustment applications containing false information. | *See* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18, 21 (married mother of one discovered Premier listed her as a single mother of three, would not have enrolled with Company had she known this); Pls.' Ex. 30 (Berthiaume Decl.) at ¶ 29 (mother with two children would not have signed up if she had known SLAM was going to report her as having five dependents); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 15. |
| | 223. | Consumers would not have signed up for the Company's services if they had known their | *See* Pls.' Ex. 34 (Liming Decl.) at ¶ 21; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 14; Pls.' Ex. 22 (Pugh Decl.) at |

| | | payments to the Company were not going to pay down their loan balance. | ¶ 21; Pls.' Ex. 30 (Berthiaume Decl.) at ¶ 28; Pls.' Ex. 42 (Donaldson Decl.) at ¶ 20; Pls.' Ex. 33 (Varno Decl.) at ¶ 14; Pls.' Ex. 43 (Fomafung Decl.) at ¶ 17; Pls.' Ex. 27 (Kirsksey Decl.) at ¶ 11; Pls.' Ex. 29 (Metzig Decl.) at ¶ 15; Pls.' Ex. 37 (Smith Decl.) at ¶ 18; Pls.' Ex. 26 (Yimer Decl.) at ¶ 14; Pls.' Ex. 28 (Jangula Decl.) at ¶ 14. |
|---|---|---|---|
| | 224. | Consumers would not have signed up for the Company's services if they had known that the Company could not actually lower their monthly student loan payment. | *See* Pls.' Ex. 26 (Yimer Decl.) at ¶ 13 (noting particular frustration that she was already on an income-based program when she enrolled, so Company could not have lowered her monthly payments). |
| | 225. | Consumers would not have signed up for the Company's services if they had known that it could not provide loan forgiveness. | *See* Pls.' Ex. 38  (Simonenko Decl.) at ¶ 12; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 14; Pls.' Ex. 36 (Crawford Decl.) at ¶ 13; Pls.' Ex. 31 (Honold Decl.) at ¶ 17; Pls.' Ex. 42 (Donaldson Decl.) at ¶ 21; (would not have signed up if she knew FPS could not actually guarantee her loans would be forgiven); Pls.' Ex. 40 (Breemes Decl.) at ¶ 21; Pls.' Ex. 33 (Varno Decl.) at ¶ 15; Pls.' Ex. 43 (Fomafung Decl.) at ¶ 19; Pls.' Ex. 27 (Kirksey Decl.) at ¶ 12; Pls.' Ex. 29 (Metzig Decl.) at ¶ 16; Pls.' Ex. 24 (Sheahan Decl.) at ¶ 16; Pls.' Ex. 37 (Smith Decl.) at ¶ 19; Pls.' Ex. 25 (Thelen Decl.) at ¶ 15. |

Dated: January 30, 2023

By: */s/ Sarah Preis*

Sarah Preis (DC Bar No. 997387)
(Admitted *pro hac vice*)
Email: sarah.preis@cfpb.gov
Jesse Stewart (NY Bar No. 5145495)
(Admitted *pro hac vice*)
Email: jesse.stewart@cfpb.gov

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLS.' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
DEF. WEN

N. Nathan Dimock (DC Bar No. 87743)
Email: nathan.dimock@cfpb.gov
(Admitted *pro hac vice*)
*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

By: */s/ M. Lynne Weaver*
M. Lynne Weaver (NC Bar No. 19397)
(Admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Tel.: (919) 716-6039
Fax: (919) 716-6050
Email: lweaver@ncdoj.gov
*Attorney for Plaintiff State of North Carolina*

By: */s/ Evan Romanoff*
Evan Romanoff (Atty. Reg. No. 398223)
(Admitted *pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 728-4126
Fax: (651) 296-7438
Email: evan.romanoff@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

By: */s/ Christina Tusan*
Christina Tusan
Supervising Deputy City Attorney
Office of the City Attorney
Consumer and Workplace
Protection Unit
200 N. Main Street, 500 City Hall East
Los Angeles, CA 90012
Tel.: (213) 473-6908
Email: christina.tusan@lacity.org

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLS.' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEF. WEN**

*Attorney for Plaintiff the People of the State
of California*

I, Sarah Preis, attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

/s/ *Sarah Preis*
Sarah Preis