# Plaintiffs' Exhibit 12

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., <br><br>      Plaintiffs, <br><br>      v. <br><br> Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., <br><br>      Defendants. | CASE NO. 8:19-cv-01998 MWF <br><br> **DECLARATION OF MANSOUR HEIDARI IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br><br> Court:   Hon. Michael W. Fitzgerald |

I, Mansour Heidari, pursuant to 28 U.S.C. § 1746, hereby state and declare that I have personal knowledge of the facts as set forth below. If called as a witness, I could and would testify as follows:

1.     I am a citizen of the United States and am over eighteen (18) years of age. I am an employee of the Bureau of Consumer Financial Protection (Bureau). I am a forensic accountant working in the Office of Enforcement within the Bureau in Washington, D.C. I am also a Certified Public Accountant and Certified Fraud Examiner. As an employee with the Bureau, my current duties include conducting financial and data analysis in support of investigations and to be used as evidence in litigation. I have been an employee of the Bureau since November 6, 2011.

2.     I am assigned to work on the Bureau's investigation and litigation involving the defendants in the above-captioned case.

3.     During the course of the investigation and litigation of this case, I received and summarized financial records related to defendants, including Consumer Advocacy Center Inc. (CAC), True Count Staffing Inc. (True Count),

Pls.' Ex. 12
P. 516

Prime Consulting LLC (Prime), TAS 2019 LLC (TAS), Horizon Consultants LLC (Horizon), First Priority LLC (First Priority), and Kaine Wen (collectively, Defendants). I summarize relevant portions of the large number of records that I reviewed, as further explained below.

**A. Debt Pay Pro Records**

4.      Specifically, I reviewed Excel files obtained from Defendants' Debt Pay Pro records (DPP Records). The Excel files contained nearly 947,000 rows and 15 columns of data. The DPP Records include information such as contact ID, Consumer Name, and Transaction Type (ACH Client Debit, Balance Transfer, Client Check Payment, Client Refund and Credit Card Payments). After eliminating a few obvious errors and correcting certain records, the DPP Records reflect that Defendants charged consumers fees through 913,018 transactions and refunded consumers through 33,884 transactions.[1]

5.      To determine the total fees and refunds that Defendants charged consumers through DPP Records, I first totaled the Excel column titled "amount." The resulting amount was $2,117,967,593.06. This amount appeared too large and not even roughly consistent with True Count's and CAC's profit and loss statements.[2] I therefore reviewed the data for obvious errors.

a.  I filtered the "amount" column and found two items with an amount of $1,000,000,000. Each of these items appeared to be input errors. They did not correspond to any of the other entries for the same consumers and were in no way consistent with True Count and CAC's profit and loss statements. One was coded as a Credit Card Payment and the other

---

[1] The declaration of Albert Kim indicates that the DPP Records reflect charges and fees involving Defendants and consumers who enrolled in Defendants' services.

[2] Based on examination of CAC and True Count P&L statements that covered a period from November 2015 to late August 2019.

1   as a Client Refund, thus netting each other out. I eliminated the two

2   entries from my review.

3   b.   The next large item was a refund for $796,368, even though that

4   consumer only paid $1,394.19 to Defendants of which $597.51 was

5   already refunded on January 17, 2019, leaving $796.68. Upon looking at

6   other entries for the same consumer, it was evident that the actual refund

7   was most likely for $796.68 and consisted of refunds for 4 earlier credit

8   card payments of $199.17 each. I corrected the entry by removing the

9   $796,368 amount and replacing it with $796.68.

10   c.   The next large item was for a refund of $39,834, even though that

11   consumer only paid $398.34 to Defendants. Upon looking at other

12   entries for the same consumer, it became evident that the correct number

13   was most likely $398.34 and was to refund two earlier payment

14   transactions of $199.17 each. I corrected the entry by removing the

15   $39,834 and replacing it with $398.34.

16   d.   The next large item was a transaction for $14,068. Other than the

17   transaction being designated as the only "Balance Transfer" in the data,

18   there were no other transactions for this consumer. Further, the amount

19   was larger than any other apparently valid consumer fee, so I decided

20   that I could not rely on the transaction and eliminated it from my review

21   as an apparent outlier.

22   e.   There were three transactions totaling only $70 that had processing dates

23   and clearing dates in the future. I determined that I could not rely on

24   these transactions to be valid so I eliminated them from my review.

25   f.   There were 155 records involving a total of $37,347.21 in transactions

26   that were marked as "Cleared," but the clearing date on each transaction

27   was December 31, 1969. These transactions had processing dates

28

between October 2016 and October 2019. Therefore, the "Cleared" date did not appear to be correct. Since most other clearing dates were usually the same as or one or two days after the processing dates and each of these transactions was marked "Cleared," I decided to consider the processing dates as the clearing dates instead of December 31, 1969, which was apparently in error as my understanding is that the Defendants did not operate in 1969.

6.      After the six changes described above, the total of the "amount" column changed from $2,117,967,593.06 to $117,118,448.08, which represents 2,858 ACH Client Debits, 11 Client Check Payments, 33,884 Client Refunds, and 910,149 Credit Card Payments. These changes are summarized in **Appendix A**. I then reviewed this adjusted dataset (Adjusted DPP Records).

7.      I next summed all fees charged to consumers and all refunds issued to consumers, as recorded in the Adjusted DPP Records. The Adjusted DPP Records show a total of $106,088,102.51 in fees charged to 114,620 different consumers[3] through 913,018 transactions from November 5, 2015, through October 30, 2019.[4] The Adjusted DPP Records further show a total of $11,030,345.59 refunds issued to 32,654 different consumers through 33,884 transactions from November 25, 2015, through October 23, 2019.[5] After subtracting total refunds issued from total fees charged, the Adjusted DPP Records show that Defendants charged consumers $95,057,756.92 in net fees from November 5, 2015, through October 30, 2019. Since of the 114,620 consumers, 32,654 consumers got refunds, the number of consumers that did not receive refunds was 81,966. **Appendix B** summarizes these transactions by year.

---

[3] Distinct consumers were identified by unique names.
[4] According to the Adjusted DPP Records, Defendants charged the first consumer a fee on November 4, 2015, and that fee cleared on November 5, 2015.
[5] I did not review which consumers received full refunds versus partial refunds.

8.      From August 1, 2019, through October 1, 2019, Defendants collected $7,584,729.99 from consumers and paid $1,077,047.72 in refunds to consumers, resulting in net fees after accounting for refunds of $6,507,682.27, as recorded in the Adjusted DPP Records.

**B. Bank and Payment Processor Records**

9.      During the course of my work in this matter, I reviewed voluminous financial records related to accounts controlled by Defendants at multiple banks, including at JPMorgan Chase & Co; Sunwest Bank; Bank of America Corp; Wells Fargo Bank, N.A.; HSBC Bank USA N.A.; and United Bank of Switzerland (UBS). The purpose of this review was to determine the source and uses of funds received by the accounts. **Appendix C** summarizes the accounts, signatories, and approximate dates the accounts were in use.

10.      During the course of my work in this matter, I also reviewed voluminous financial records related to Defendants' payment processor accounts with multiple payment processors, including Maverick BankCard, Inc.; Francis David Corp dba Electronic Merchant Systems; Electronic Payment Systems, LLC; National Merchant Center, Inc. (NMC); Quantum Electronic Payments, LLC; and RAM Payment, LLC. The purpose of this review was to determine which banks and entities these payment processor accounts made deposits to, when they were established, and who were the authorized signers on the accounts. **Appendix D** summarizes these accounts, the signatories, and approximate dates in use.

11.      Based on review of JP Morgan Chase & Co. records relating to CAC's account ending in 1522 and the Adjusted DPP Records, CAC collected fees from consumers from November 2015 through September 2018 using six merchant accounts.

12.      I reviewed True Count's QuickBooks profit and loss statements. Based on this review, from March 2018 through August 2019, True Count

collected about $55 million in fees from consumers, after accounting for refunds, using three payment processors. True Count transferred over $12 million in fee revenue to CAC from March through September 2018. True Count transferred over $16 million in fee revenue to Prime from September 2018 to February 2019.

13. Based on review of NMC records and of records for Horizon's Sunwest Bank account ending in 1069, Horizon collected fees from consumers from January 2019 through September 2019 using one merchant account provided by NMC. These fees were originally deposited to Horizon's Sunwest Bank account ending in 1069. Around July 2019, Horizon began directing fees collected from consumers to an account ending in 1126 at JP Morgan Chase, which belonged to True Count. Horizon affected the transfer of over $3 million in fee revenue to True Count from late July 2019 through September 2019. Overall, per the payment processor records, more than $13 million in consumer fees was collected by Horizon from January to September 2019.

14. First Priority collected fees from consumers from December 2018 through October 2019 using merchant accounts with RAM Payments, LLC (RAM) and Account Management Plus (AMP). First Priority collected net fees of $160,563.80 (after refunds) from consumers through AMP between February 2019 through October 2019, as apparent from First Priority's bank account statements with account number ending in 8566 with JPMorgan Chase & Co. First Priority collected net fees of about $3,734 (after refunds) from consumers through RAM between December 2018 through March 2019, as apparent from First Priority's bank account statements with account number ending in 0992 with Sunwest Bank.[6]

---

[6] The declaration of Stephen Chaya, the chief compliance officer of RAM, indicates 36 clients enrolled and 11 clients were charged through 24 drafts totaling $4,970.88. The amount deposited to First Priority's account may be less due to third-party charges, refunds to consumers, or merchant reserve withholdings.

15.     TAS collected fees from consumers from August 2019 to October 2019 using four merchant accounts provided by National Merchant Center. Based on the Adjusted DPP Records, by identifying those transactions that had "Trusted Account Services" in the column designated with "Processor," TAS collected $2,893,941.48 from 38,813 consumers. Based on review of HSBC Bank USA N.A. records relating to TAS accounts ending in 3327 and 0413, these funds were deposited to TAS bank account ending in 3327 at HSBC. TAS retained most of these funds in its HSBC bank accounts.

16.     Based on my review of bank account information for CAC and True Count, it appears that each company paid several of the same individuals as employees or contractors for the companies.

17.     I reviewed transactional data provided by two identified payment processors that both CAC and True Count used: Francis David Corporation d/b/a Electronic Merchant Systems and National Merchant Center, Inc. My review indicates that many consumers who paid CAC likely also paid True Count. Specifically, when I reviewed the recurrence of the first six and last four digits of credit card numbers in the transactional data, about 50 percent of the matching numbers were charged at least once through a CAC payment processor account and later charged at least once through a True Count payment processor account.

18.     I looked at a general ledger for CAC and similarly a general ledger for True Count and searched these documents to identify any payments from CAC or True Count to a student loan servicer. I first reviewed the account categories for any such payments and for the names of well-known student loan servicers such as Navient, Mohela, Fed Loan Servicing, My Fed Loan, or Great Lakes. Based on this review, I did not identify any information suggesting that CAC or True Count paid student loan servicers. I conducted a similar review of activity in the TAS account with HSBC Bank ending in account number 3327 (transactions dated from

DECLARATION OF MANSOUR HEIDARI IN SUPPORT OF PLAINTIFFS' MSJ

September 16, 2019, through October 28, 2019), and account ending in 0413 (transactions dated from April 29, 2019, through October 30, 2019). Based on this review, I did not identify any payments to student loan servicers. Similarly, I examined  First Priority bank account number ending in 8566 with JPMC (transactions dated May 1, 2018, through October 31, 2019), and First Priority bank account number ending in 0922 with Sunwest Bank (transactions dated December 11, 2018, through March 19, 2019). This review did not render any evidence of payments to any of the above-referenced student loan servicers.

19.   **Appendix E** identifies the files or productions that contain the information that I summarized in this declaration.

20.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

21.   Executed on January 27, 2023.

Mansour Heidari
Tustin, CA

DECLARATION OF MANSOUR HEIDARI IN SUPPORT OF PLAINTIFFS' MSJ

## Appendix A

| Adjustments and eliminations made to data to correct | Number of ACH Client Debits | Number of Balance Transfers | Number of Client Check Payments | Number of Client Refunds | Number of Credit Card Payments | Total Numbers | Total Amount as Reduced by Corrections |
|---|---|---|---|---|---|---|---|
| | 2,858 | 1 | 11 | 33,885 | 910,153 | 946,908 | $ 2,117,967,593 |
| Remove 3 items with future dates for $70 total | | | | | -3 | (3) | $ 2,117,967,523 |
| Remove 2 items each for $1B | | | | -1 | -1 | (2) | $ 117,967,523 |
| Remove 1 item for $14,068 | | -1 | | | | (1) | $ 117,953,455 |
| Remove client refund of $39,834 | | | | -1 | | (1) | $ 117,913,621 |
| Add correct refund of $398.34 | | | | 1 | | 1 | $ 117,914,019 |
| Remove client refund of $796,368 | | | | -1 | | (1) | $ 117,117,651 |
| Add correct refund of $796.68 | | | | 1 | | 1 | $ 117,118,448 |
| Totals after adjustments above | 2,858 | 0 | 11 | 33,884 | 910,149 | 946,902 | |
| | | | | | | | |
| ACH Client Debits after adjustments | 2,858 | | | | | 2,858 | $ 705,653 |
| Balance Transfers after adjustments | | 0 | | | A | 0 | $ - |
| Client Check Payments after adjustments | | | 11 | | | 11 | $ 2,836 |
| Client Refunds after adjustments | | | | 33,884 | | 33,884 | $ 11,030,346 |
| Credit Card Payments after adjustments | | | | | 910,149 | 910,149 | $ 105,379,614 |
| **Category totals reconciled with above** | **2,858** | **0** | **11** | **33,884** | **910,149** | **946,902** | **$ 117,118,448** |

## Appendix B

| Year | Number of Fee Transactions | Fees Charged to Consumers | Number of Refund Transactions | Fees Refunded to Consumers | Fees Refunded as % of Fees Charged | Net of Fees Charged Less Refunded |
|---|---|---|---|---|---|---|
| 2015 | 67 | $ 23,884.77 | 2 | $ 533.00 | 2.23% | $ 23,351.77 |
| 2016 | 12,267 | $ 2,632,227.59 | 94 | $ 27,509.16 | 1.05% | $ 2,604,718.43 |
| 2017 | 107,455 | $ 14,801,645.21 | 3,195 | $ 901,503.40 | 6.09% | $ 13,900,141.81 |
| 2018 | 355,422 | $ 44,859,615.83 | 14,821 | $ 4,530,198.53 | 10.10% | $ 40,329,417.30 |
| 2019 (Jan-Oct) | 437,807 | $ 43,770,729.11 | 15,772 | $ 5,570,601.50 | 12.73% | $ 38,200,127.61 |
| | | | | | | |
| **Totals** | **913,018** | **$ 106,088,102.51** | **33,884** | **$ 11,030,345.59** | **10.40%** | **$ 95,057,756.92** |

## Appendix C

| Account Holder's Name | Bank Name | Account Number (last four digits) | Date of First /Last Known Transaction | Name and Date of Signatory/Authorized user or Account |
|---|---|---|---|---|
| Consumer Advocacy Center Inc. | JPMorgan Chase & Co. | 0786 | 1/17/2017-9/25/18 | Kaine Wen (1/24/17) |
| Consumer Advocacy Center Inc. | JPMorgan Chase & Co. | 1522 | 1/4/16 - 10/4/18 | German S Santibanez (8/25/14), Albert Kim (8/25/14), Kaine Wen (9/4/15), Tuong T Nguyen signer (10/28/16) |
| Consumer Advocacy Center Inc. | JPMorgan Chase & Co. | 2261 | 1/17/2017 - 9/21/18 | Kim (1/17/17), Nguyen (1/17/17), Kaine Wen (1/24/17) |
| Consumer Advocacy Center Inc. | JPMorgan Chase & Co. | 1651 | 1/17/2017 - 9/21/18 | Albert Kim (1/17/17), Tuong T Nguyen (1/17/17), Kaine Wen (1/24/17) |
| Consumer Advocacy Center Inc. | Sunwest Bank | 1689 | 9/14/2018-11/13/18 | Albert Kim (9/14/18), Kaine Wen (9/14/18), Tuong Thah Nguyen (9/14/18) |
| Consumer Advocacy Center Inc. | Sunwest Bank | 0879 | 10/11/2018 | Albert Kim (10/11/18), Tuong T Nguyen (10/11/18) |
| First Priority LLC | JPMorgan Chase & Co. | 8566 | 5/1/18 - 10/31/19 | Tuong T Nguyen (5/1/18) |
| First Priority LLC | Sunwest Bank | 0992 | 12/11/18 - 3/19/19 | Tuong Thanh Nguyen (11/1/18) |
| Horizon Consultants LLC | Sunwest Bank | 1069 | 10/29/2018 | Keneth Hu (10/31/18), Tuong Thanh Nguyen (10/31/18) |
| Prime Consulting LLC | Sunwest Bank | 1026 | 9/21/2018 | Le Ho (9/21/18), Tuong Thanh Nguyen (9/21/18) |
| Prime Consulting LLC | JPMorgan Chase & Co. | 0325 | 4/27/2018 - 8/30/19 | Le Trong Hieu Ho (4/27/18) |
| TAS 2019 LLC | HSBC Bank USA, N.A. | 3327 | 9/16/19 to 10/28/19 | Kenny Huang (9/17/2019), Shi-Hao Lai, (9/18/2019) |
| TAS 2019 LLC | HSBC Bank USA, N.A. | 0413 | 4/29/2019 - 10/30/19 | Kenny Huang (9/17/2019), Shi-Hao Lai, (9/18/2019) |

| | | | | |
|---|---|---|---|---|
| TAS 2019 LLC | HSBC Bank USA, N.A. | 2079 | 9/18/2019 | Kenny Huang (9/17/2019), Shi-Hao Lai, (9/18/2019) |
| True Count Staffing Inc. | JPMorgan Chase & Co. | 1126 | 5/3/17 - 8/31/19 | Kaine Wen (4/13/17), Tuong Nguyen (4/13/17), Albert Kim (8/27/18) |
| True Count Staffing Inc. | Sunwest Bank | 1646 | 9/12/2018 | Kaine Wen (9/12/18), Albert Kim (9/12/18), Tuong Thanh Nguyen (9/12/18) |
| True Count Staffing Inc. | Sunwest Bank | 1670 | 9/12/2018 | Kaine Wen (9/12/18), Albert Kim (9/12/18), Tuong Thanh Nguyen (9/12/18) |
| True Count Staffing Inc. | Sunwest Bank | 1662 | 9/12/2018 | Kaine Wen (9/12/18), Albert Kim (9/12/18), Tuong Thanh Nguyen (9/12/18) |
| True Count Staffing Inc. | Sunwest Bank | 1654 | 9/12/2018 | Kaine Wen (9/12/18), Albert Kim (9/12/18), Tuong Thanh Nguyen (9/12/18) |
| True Count Staffing Inc. | Wells Fargo Bank, N.A. | 7276 | 8/23/2019 - 10/2/2019 | Kaine Wen (8/23/19) |
| True Count Staffing Inc. | UBS | 4251 | 8/24/2018 | Kaine Wen (8/24/18) |

## Appendix D

| Account Holder's Name | Payment Processor Name | Defendant Deposit Bank and Account Number (last four digits) | Defendant Merchant Account Number (last four digits) | Person Providing Signatures for the Merchant Contract or Account, and Date |
|---|---|---|---|---|
| CAC dba PSLC | Maverick BankCard, Inc | JP Morgan Chase & Co. X1522; Sunwest Bank X1689 (after 9/18) | 8640 | Kim (10/16/17), Wen (10/16/17) |
| CAC dba PSLC | Francis David Corp., dba Electronic Merchant Systems | JP Morgan Chase & Co. X1522 | 8157 | Wen (11/2/15) |
| CAC dba Premier Student Loan Center | Electronic Payment Systems, LLC | JP Morgan Chase & Co. X1522 | 3257 | Kim (3/25/16), (Wen (9/8/17) |
| CAC dba Premier Student Loan Center | National Merchant Center, Inc. | JP Morgan Chase & Co. X1522 | 5723 | Wen indicated as contact & General Counsel (8/4/17), signed by Albert Kim, Pres. |
| True Count dba SLAM and dba Student Loan Mgmt | Quantum Electronic Payments, LLC | JP Morgan Chase & Co. X1126; Sunwest Bank X1069 | 1149 | Wen (undated) |
| True Count dba PSLC | National Merchant Center, Inc. | JP Morgan Chase & Co. X1126 | 6283 | Wen (2/20/18) |
| True Count dba SLAM | Francis David Corp., dba Electronic Merchant Systems | JP Morgan Chase & Co. X1126 | 9144; 8055 | Wen (2/12/18) |

APPENDICES TO THE DECLARATION OF MANSOUR HEIDARI IN SUPPORT OF PLAINTIFFS' MSJ

| | | | | |
|---|---|---|---|---|
| True Count dba SLAM | Francis David Corp., dba Electronic Merchant Systems | JP Morgan Chase & Co. X1522 | 5266 | Wen (3/5/18) |
| True Count dba SLAM | National Merchant Center, Inc. | JP Morgan Chase & Co. X1126 | 6317 | Wen (2/20/18) |
| TAS 2019 LLC dba Trusted Account Services | National Merchant Center, Inc. | HSBC X0413 and X3327 | 6333 | Kenny Huang (7/1/19), Shih Hao Lai (7/30/19) |
| TAS 2019 LLC dba Trusted Account Services East | National Merchant Center, Inc. | HSBC X0413 and X3327 | 6481 | Kenny Huang (9/19/19). Shih Hao Lai (9/19/19) |
| TAS 2019 LLC dba Trusted Account Services Maintenance | National Merchant Center, Inc. | HSBC X0413 and X3327 | 6085 | Kenny Huang (9/19/19), Shih Hao Lai (9/19/19) |
| TAS 2019 LLC dba Trusted Account Services West | National Merchant Center, Inc. | HSBC X0413 and X3327 | 6549 | Kenny Huang (9/19/19), Shih Hao Lai (9/19/19) |
| Horizon Consultants LLC d/b/a STUDENTLOANMGMT | National Merchant Center, Inc. | Sunwest X1069 and JPMorgan Chase & Co. X1126 (between 7/19 to 9/19) | 5962 | Keneth Hu (12/17/2018) |
| Premier Student Loan Center; First Priority, LLC; Priority Account Management; True Count Staffing, Inc. | RAM Payment, LLC | Sunwest Bank X0992 | X553 | Tuong Thanh Nguyen (11/1/18) |

## Appendix E
### Materials or Productions Relevant to the Declaration of Mansour Heidari

1.  Debt Pay Pro records, bates numbered T-029773-00000006 and T-029773-00000007.

2.  Defendants QuickBooks records, including documents bates numbered T-016369-00000297 (True Count P&L), T-016369-00000286 (CAC P&L), T-016369-00000289 (CAC general ledger), and T-016334-00000309  (True Count general ledger).

3.  Bank of America, N.A. records relating to: the Kaine Wen 2017 Trust account ending in 9645, bates numbered WEN 0000580 through WEN 0000695.

4.  HSBC Bank records relating to:
    a.  TAS's account ending in 3327, bates numbered T-019186-00013627 through T-019186-00013644; and
    b.  TAS's account ending in 0413, bates numbered T-019186-00007368 through T-019186-00007370, and T-019186-00013645 through T-019186-00013672.

5.  JP Morgan Chase & Co. records relating to:
    a.  CAC's accounts ending in 0786, 1522, 2261, and 1651, bates numbered T-011558-00000031 through T-011558-00010361;
    b.  CAC's account ending in 1522, bates numbered T-011558-00000006;
    c.  True Count's account ending in 1126, bates numbered T-011558-00000031 through T-011558-00010361;
    d.  First Priority's account ending in 8566 and Prime Consulting's account ending in 0325, bates numbered R-015713-00000001 through R-015713-00002741; and
    e.  the Kaine Wen 2017 Trust account ending in 1984, bates numbered WEN 0000510 through WEN 0000537.

6.  Sunwest Bank records relating to:
    a.  CAC's accounts ending in 1689 and 0879, bates numbered T-016334-00002854 through T-016334-00002861;
    b.  First Priority's account ending in 0992, bates numbered T-016334-00002863 through T-016334-00002868, and T-016334-00002910 through T-016334-00002925;
    c.  Horizon's account ending in 1069, bates numbered T-016334-00002869 through T-016334-00002875, and T-016334-00002937 through T-016334-00002970;
    d.  Prime's account ending in 1026, bates numbered T-016334-00002876 through T-016334-00002881; and

     e.   True Count's accounts ending in 1646, 1670, 1662, and 1654, bates numbered T-016334-00002885 through T-016334-00002902.

7.   UBS records relating to True Count Staffing Inc. account ending in 4251, bates numbered T-018050-00000008 through T-018050-00000009.

8.   Wells Fargo, N.A. records relating to: True Count account ending in 7276, bates numbered R-016998-00000001 through R-016998-00000240.

9.   Electronic Payment Systems records relating to Premier Student Loan Center, bates numbered R-011630-00000011 through R-011630-00000294.

10.  Francis David Corporation dba Electronic Merchant Systems records relating to:
     a.   Consumer Advocacy Center dba Premier Student Loan Center and True Count Staffing Inc. dba SL Account Mgmt., bates numbered R-013763-00000011 through R-013763-00001148.

11.  Maverick BankCard, Inc. records relating to Consumer Advocacy Center dba Premier Student Loan Center, bates numbered R-011726-00000016 through R-011726-00000612.

12.  National Merchant Center, Inc. records relating to:
     a.   Horizon Consulting LLC merchant account, bates numbered T-016334-00002630 through T-016334-00002838;
     b.   Consumer Advocacy Center dba Premier Student Loan Center, bates numbered T-013145-00000001 through T-013145-00000709, T-013145-00000712 through T-013145-00000999,
     c.   T-013145-00001001 through T-013145-00001614;
     d.   True Count Staffing dba SL Account Mgmt. dba Premier Student Loan Center, bates numbered T-013145-00000001 through T-013145-00001620; and
     e.   TAS 2019 LLC, bates numbered T-016334-00002187 through T-016334-00002627.

13.  Quantum Electronic Payments, LLC records relating to True Count dba SLAM dba Student Loan Mgmt., bates numbered T-013088-00000083 through T-013088-00000089.

14. Declaration of Albert Kim, bates numbered 0-R-037924-00000001 through 0-R-037924-00000021.

15. Declaration of Stephen Chaya, Chief Compliance Officer, RAM Payment, LLC, bates numbered T-016334-00002844 through T-016334-00002846.

16. Declaration of Julie Vraja, Assistant Manager Risk/Operations, Electronic Merchant Service, bates numbered R-017457-00000001 through R-017457-00000003.

17. Supplemental Declaration of Julie Vraja, Assistant Manager Risk/Operations, Electronic Merchant Service, bates numbered R-013762-00000002 through R-013762-00000007.

18. Defendant Kaine Wen's December 17, 2020 Amended Financial Statement, bates numbered 0-R-034108-00000147 through 0-R-034108-00000440.

19. Defendant TAS Supplemental Responses and Objections to Plaintiff's First Expedited Request for Production of Documents and Interrogatory Responses, bates numbered T-024413-00000471 through T-024413-00000491.

20. Defendant TAS Response to First Set of Requests for Production of Documents, bates numbered T-024413-00000001 through T-024413-00000466.

Plaintiffs' Exhibit 13

| | |
|---|---|
| 1 | **UNITED STATES DISTRICT COURT** |
| 2 | **CENTRAL DISTRICT OF CALIFORNIA** |
| 3 | Bureau of Consumer Financial |  CASE NO. 8:19-cv-01998 MWF |
| 4 | Protection, et al., |
| 5 | | **DECLARATION OF** |
| 6 | Plaintiffs, | **DANI SCHNEIDER** |
| 7 | | **IN SUPPORT OF** |
| 8 | v. | **MOTION FOR** |
| 9 | | **SUMMARY JUDGMENT** |
| 10 | Consumer Advocacy Center Inc., | **AGAINST DEFENDANT** |
| 11 | d/b/a Premier Student Loan Center, et | **KAINE WEN** |
| 12 | al., |
| 13 | | Court:   Hon. Michael W. Fitzgerald |
| 14 | Defendants. |

**DECLARATION OF DANI SCHNEIDER**

**Pursuant to 28 U.S.C. § 1746**

I, Dani Schneider, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

1.    I am a citizen of the United States and am over the age of eighteen (18) years old. I am employed as an Investigator with the Bureau of Consumer Financial Protection Bureau ("Bureau") in the Office of Enforcement. My mailing address is 1700 G Street NW, Washington, DC 20522.

2.     I began working as an Investigator at the Bureau in August 2013. Prior to joining the Bureau, I worked as an Investigator at the Federal Trade Commission ("FTC") for five years. In that position, I investigated violations of the FTC Act. I have a Certified Fraud Examiner's License from the Association of Certified Fraud Examiners. As a Bureau Investigator, I research and investigate persons and entities that may be violating the Consumer Financial Protection Act and other statutes enforced by the Bureau.

3.     In August 2018, I was assigned to work on the Bureau's investigation of Consumer Advocacy Center Inc. ("CAC") d/b/a Premier Student Loan Center ("Premier"), True Count Staffing Inc. d/b/a SL Account Management ("True Count"), Prime Consulting LLC d/b/a Financial Preparation Services ("Prime") (collectively the "Company" or "corporate defendants"); Albert Kim (a/k/a Albert King); Kaine Wen (a/k/a Wenting Kaine Dai, Wen Ting Dai, Kaine Wen Dai);  Tuong Nguyen (a/k/a Tom Nelson); Infinite Management Corporation (f/k/a Infinite Management Solutions, Inc.); Hold the Door, Corp.; and TN Accounting Inc. (collectively, "Defendants").

4.     My work on this matter has included the following tasks, which I describe in detail below: (1) searching and reviewing public records, databases, websites, consumer complaints, and documents responsive to Civil Investigative Demands ("CIDs") regarding the Defendants; (2) reviewing select enforcement proceedings and related litigation; (3) calling Premier Student Loan Center to inquire about student loan forgiveness programs; and (4) reviewing recordings of the Company's calls with consumers.

5.     Through my investigation, which is outlined in this declaration and its attachments, I learned that CAC, True Count and Prime were interrelated companies. For example:

   a. CAC, True Count and Prime all used the same address – 173 Technology Road, Suite 202, Irvine, CA 92618.

   b. When I called the phone number on CAC's website, the person who answered the phone identified herself as a representative for Student Loan Account Management (a d/b/a for True Count) (paragraph 30 below); and

   c. CAC and Prime used substantially similar Client Agreements. *Compare,* Pls.' Ex. 42 Attach. B *with* Pls.' Ex. 36 at Attach. A.

## I. <u>Review of Documents</u>
### <u>A. Searching and Reviewing Consumer Complaints</u>

6. Over the course of this investigation, I accessed the complaint section of the FTC's Consumer Sentinel Network (Sentinel). Sentinel provides law enforcement members with access to over 18 million fraud and identity theft consumer complaints. Sentinel allows members to access consumer complaints submitted directly to the FTC and complaints shared by over 40 data contributors, including the Bureau, the Internal Revenue Service, over 20 State Attorneys General, and all North American Better Business Bureaus. Over 2,500 federal, state, local, and international law enforcement agencies have access to Sentinel; hundreds of individual members access the system each week.

7. On September 16, 2019, and October 2, 2019, I searched Sentinel for complaints filed against the Company. I identified over 1,300 fraud complaints in the Sentinel database related to these entities, as well as 34 identify theft complaints relating to entities logging into student loan websites as the consumer. These consumer complaints came from consumers in all 50 states and the District of Columbia. These consumer

<div align="center">3</div>
<div align="center">Declaration of Dani Schneider in Support of Motion for Summary Judgement</div>

complaints were filed with numerous law enforcement agencies, including the Attorneys General of Michigan, Ohio, Pennsylvania, and Washington; Department of Justice of North Carolina; Department of Justice of Oregon; Tennessee Department of Commerce and Insurance; Department of Agriculture, Trade, and Consumer Protection; the U.S. Department of Education; the FTC; and the Bureau. Some entities, including state Attorneys General and the Better Business Bureau, share complaints with the subjects of the complaints. The complaints I reviewed were filed between December 12, 2015, and October 2, 2019.

8. In January 2023, I reviewed the complaint analysis spreadsheet created by Bureau Investigator Theresa Ridder (see Pls.' Ex. 14). In her analysis, Investigator Ridder categorized complaints into several categories.

9. I reviewed select consumer complaints that were not identified as one of the categories by Investigator Ridder. Of these uncategorized complaints, I reviewed the first complaint for each month there was a complaint filed with the Bureau. Of the 48 complaints that I reviewed, one is not relevant to this investigation. Of the 47 relevant complaints, 15 consumers stated that the Company lied to them or indicated they had been promised student loan forgiveness. Of the 47 relevant complaint, 16 expressed concern that the Company was a fraud or a scam.

## B. Review of Civil Investigative Demand Issued to Defendant CAC and Related Correspondence

10. On September 10, 2018, the Bureau issued a CID to "Consumer Advocacy Center, Inc. d/b/a Premier Student Loan Center, c/o Albert Kim" seeking interrogatory responses and documents to determine whether student debt relief companies or associated persons, in connection with the marketing,

4

Declaration of Dani Schneider in Support of Motion for Summary Judgement

selling, and providing of student debt relief services, or made false or misleading representations to consumers.

11.     On September 11, 2018, CAC refused to accept service of the CID by UPS. On September 13, 2018, a process server personally served the CID on CAC.

12.     CAC did not comply with the CID instructions to meet and confer with the Bureau within ten days of receipt of the CID and failed to provide a complete response to the CID by October 8, 2018, the response date contained in the CID.

13.     On October 29, 2018, Bureau counsel sent a letter to "Consumer Advocacy Center, Inc. d/b/a Premier Student Loan Center, c/o Albert Kim", notifying CAC that it had failed to comply with the CID. The Bureau did not receive any response.

14.     On January 25, 2019, Bureau counsel sent a second letter to "Consumer Advocacy Center, Inc. d/b/a Premier Student Loan Center, c/o Albert Kim" reiterating that CAC that had failed to comply with the CID. The Bureau did not receive any response.

15.     On February 27, 2019, Brian Behar, an attorney representing CAC in its pending bankruptcy proceeding, wrote Bureau counsel regarding the CID issued to CAC, and claimed the bankruptcy proceeding filed on January 16, 2019 (19-10655-JKO) stayed the Bureau's CID. The Bureau responded on March 27, 2019, regarding CAC's continued failure to comply with the CID and explained that the automatic stay does not apply to the Bureau's CID. Mr. Behar responded to the letter on April 10, 2019, but as of the date of this declaration, CAC has not responded to the Bureau's CID. Plaintiffs' Exhibits 13.1 and 13.2 are true and correct copies of Mr. Behar's February 27, 2019, and April 10, 2019 letters, respectively.

## C. Immediate Access

16.  On October 23, 2019, pursuant to the Temporary Restraining Order entered by this Court in *Bureau of Consumer Financial Protection. v. Consumer Advocacy Center*, Case 8:19-01998-MWF (C. D. Cal.), I and other Bureau staff members accompanied Thomas McNamara, the Court appointed Receiver ("Receiver") in this matter, as well as the Receiver's associates, to the business premises of the Company, located at 173 Technology Drive, Suite 202, Irvine, CA 92618; 15261 Laguna Canyon Road, Suite 200, Irvine, CA 92618; and 8 Hughes parkway, Suite 210, Irvine, CA 92618.

17.  At the time of this immediate access, I observed: approximately 60 employees of the corporate defendants on the premises of 173 Technology Drive Suite 202; approximately 75 employees of corporate defendants on the premises of 15261 Laguna Canyon Road Suite 200; and approximately 13 employees of the corporate defendants on the premises of 8 Hughes Parkway Suite 210.

18.  Along with the Receiver, staff from the Bureau and co-Plaintiffs reviewed the Company's files as well as paperwork found in and around the desks of the Company's employees. In order to properly identify where the documents were located, each premises was labelled. When inspecting and removing original documents, Bureau staff adhered to the following protocol: (1) indicate where the original documents were located, using the office or cubicle number and, if applicable, any other identifying marks (i.e., desk drawer); and (2) return all original documents to the Receiver after copying was completed. In some cases, copies of original documents were made while on the business premises and immediately returned to the specific location where the document was found.

19. During the immediate access, I identified thousands of letters addressed to consumers at the Company's business addresses, with thousands of these letters in the shred bins, and hundreds more in and around employees' desks. Many of these letters were from student loan servicers regarding upcoming student loan payments, notifications of forbearance or consolidation, notifications that the consumer's email address isn't working, or notifications of deadlines to recertify under Income Driven Repayment (IDR). Some of these letters were in the shred bin but were still sealed.

20. Mail for the corporate defendants was intermingled and located at all three business premises. For example, in a cabinet drawer of Tuong Nguyen's office, I identified mail addressed to True Count Staffing, Consumer Advocacy Center, and Prime Consulting in the same folder. During the immediate access, I identified numerous pieces of mail addressed to one location but found onsite at another business location.

21. During the immediate access, I identified an intermingling of the corporate defendants' employees. For example, at 173 Technology Drive, I identified a paystub for one employee in his office from True Count Staffing. In the office next door, I identified a paystub for another employee in his office from Prime Consulting. In addition, Adon Janse was on site at 8 Hughes during the immediate access, but his office is located at 173 Technology.

22. Cabinets in Human Resources Manager Shirena Huizar's office at 15261 Laguna Canyon contained employee files in alphabetical order. Financial Preparation Services and Premier Student Loan Center employees were intermingled throughout the cabinets. In addition, I identified numerous Student Loan Account Management files in and near her desk. In Tuong Ngueyen's office, I identified payroll records from ADP addressed to all

7

Declaration of Dani Schneider in Support of Motion for Summary Judgement

1    three defendants: True Count, Prime Consulting, and Consumer Advocacy
2    Center, in the same manila folder.
3
4                    **D. Review of Contracts and Payment Processor Statements**
5    23.   During this investigation and subsequent litigation, I identified the
6          Company's consumer contracts. I found that contracts began using "No
7          Advance Fee" language at some point between December 2017 and
8          February 2018. According to the metadata of documents produced to the
9          Receiver, contracts created as early as December 12, 2017 have the
10         following "No Advance Fee" provision:
11               "4. **No Advance Fees**. Per the attached Client Trust Account
12               Authorization, Company does not take any advance fees from
13               Client. Company will designate an independent third-party
14               dedicated account provider ("DAP") to collect and deposit
15               payments that Client has agreed to make with Company, pursuant
16               to the Fee and Service Schedule of this Agreement, and to deposit
17               and hold Client's funds in a trust account established and serviced
18               by the DAP. The DAP will not disburse any Client fees until Client
19               has received a consolidation, adjustment, or otherwise satisfactory
20               result, and Client completes one payment towards such."
21         These same contracts that contain the "No Advance Fee" provision were last
22         modified on February 14, 2018. Plaintiffs' Ex. 36, Att. A contains the "No
23         Advance Fee" provision and is dated May 1, 2018.
24   24.   During this investigation and subsequent litigation, I identified statements
25         from payment processors pertaining to the Company. In total, I identified
26         approximately 1,300 payment processor statements that were emailed
27         directly to Kaine Wen at either kaine@premierstudentloancenter.com or
28

kwen@slaccountmgmt.com. The payment processor statements include chargeback information and credit card dispute information. The payment processor statements sent to Wen were emailed from numerous payment processors, including: Quantum Electronic Payments Gateway, Allied Wallet, Merchant Newswire, Maverick BankCard, Inc., and Authorize.Net. The payment processor statements that I identified range from April 7, 2017, through October 23, 2019.

## II. Review of Select Proceedings and Litigation

### A. <u>California Bar</u>

25.   In January 2023, I searched the California Bar website, *http://calbar.ca.gov*, for details about Kaine Wen's bar license. The results of the attorney search for Kaine Wen state that his California bar license #255420 status is "disbarred" and that his contact address is 777 E. Sierra Madre Ave., Azusa, CA 91702. The results of the attorney search for Kaine Wen also show the following three court cases:

| Case Number | File Date | Type | Status |
|---|---|---|---|
| SBC-19-Q-30612 | 11/8/2019 | Resignation with Charges Pending | Supreme Court – Closed |
| SBC-19-C-30438 | 8/29/2019 | Conviction Referral | Supreme Court – Closed |
| 15-O-15791 | 6/20/2018 | Original Discipline | Supreme Court - Closed |

Wen was admitted to the California bar in 2008. He was discipled by the California bar on July 11, 2018. Wen was disbarred on April 7, 2021,

pursuant to SBC-19-C-30438. Plaintiffs' Exhibit 13.3 is a true and correct copy of the California bar website results.

### B.   Wen's Conduct in Discovery

26.   In this litigation, the Bureau and the State of California propounded written discovery requests to Wen. The Bureau's First Set of Requests for Admissions were served on Wen on February 19, 2022. California's First Requests for Production of Documents and First Set of Interrogatories were served on Wen on February 22, 2022. The Bureau's First Requests for Production of Documents, First Set of Interrogatories, and Second Set of Requests for Admissions were served on Wen on March 30, 2022.

27.   On July 7, 2022, the Bureau and California moved to compel responses to these requests from Wen. On August 9, 2022, Magistrate Judge Stevenson found that Wen's "boilerplate objections to each and every discovery request are improper and deficient" and ordered him to provide "complete, substantive responses" to each of the Moving Parties' discovery requests within 30 days. *See* Order on Pls.' Mot. to Compel Def. Kaine Wen's Resp. To Outstanding Disc. (ECF No. 398).

28.   Although Wen did not provide any response by the Court's deadline, he later provided responses to the Bureau's requests for admission in October 2022.

29.   Wen has not provided any responses to the Bureau's interrogatories or requests for production of documents since the Court's August 9, 2022 Order, however.

### III. The Company's Calls with Consumers

### A.   Contact with the Company

30.  On October 8, 2019, I placed a call to telephone number (888) 548-0476, which was the telephone number on the Premier website. I spoke to a representative self-identified as Ysenia with Student Loan Account Management. The representative asked for my contact information, information about my student loans, my marital status, and my family size. The representative told me that somebody would return my call to discuss student loan forgiveness with me and confirmed that the person calling would be with Student Loan Account Management. The representative further explained that they are all in different departments of the same company – the representative indicated that she was in customer support at one location, while the person who would call me back to discuss enrollment qualifications would be with another department at a different location.

31.  On October 8, 2019, I received a return call from (949) 528-8263 and spoke to a representative self-identified as Manny with Student Services Plus. When asked if he was calling from Student Loan Account Management, the representative stated that the company specialized in student loan forgiveness and payment options. The representative later identified the company as studentservicesplus.com.  When asked about the prospects for having loans forgiven, the representative provided an example of a person who owed approximately $540,000 that the representative was able to reduce to approximately $40,000. Plaintiffs' Exhibit 13.4 is a true and correct copy of the transcript of this conversation.

32.  On October 11, 2019, I placed a second call to telephone number (888) 548-0476, which was the telephone number on the Premier website. I spoke to a representative who self-identified as Arthur with Customer Support. When asked if the company name was Premier Student Loan Center, the representative stated that calls are directed to customer support and that the

11
Declaration of Dani Schneider in Support of Motion for Summary Judgement

company was Premier. After asking for information about my loans, the representative indicated that I would receive a return call from Student Services Plus, which was described as a sister company. When asked what this meant, the representative stated that the companies work together.

33.  On October 11, 2019, I received a return call from a representative who self-identified as Josh Owens with Student Services Plus. After asking about my employment, the representative asked me to confirm my email address associated with Premier. When I stated that I had initially called a number that I found on the Premier website and pointed out that the representative indicated he was calling from a different company, the representative explained that they just merged with another company whose name the representative did not recall, then reiterated that he was calling from Student Services Plus. The representative then went on to explain that there were eight companies that had merged into one, but that they are all doing the same work. When I inquired as to the success rate for loan forgiveness by the company, the representative indicated that the company is usually able to reduce loans by about half. Plaintiffs' Exhibit 13.5 is a true and correct copy of the transcript of this conversation.

## B.  **Call Recording Analysis**

34.  I listened to select audio files of calls between the Company and consumers, produced by the Receiver to the Bureau. I narrowed down the thousands of audio files produced using the following parameters: selecting the first audio file for the first business day of each month for which the Receiver produced audio files and only audio files that lasted longer than 40 minutes. In total, I listened to 25 audio calls. Of the 25 calls I reviewed, the consumer provided their credit or debit card information to make a payment to the Company in

21 calls. In the majority of the calls, the Company indicated that it was going to collect the consumers payment that day. During some of those calls, the consumers asked that their credit or debit card not be charged right away.

a. Of the 25 calls that I reviewed, 24 consumers were told that they were approved for student loan forgiveness. For example:

　　i. "I do have some good news for you. The underwriting department was able to get you approved for the loan forgiveness program, so congratulations on that." (Media file RE3e1bfb120a5b14701912e2165bcbba91)

　　ii. "Department of Education, they sponsor these programs that help students or people with existing federal student loans get their loans forgiven. However, they don't promote it, so we help assist people in getting enrolled and qualified. We're pretty good at our success rate at getting people qualified because we know what to say and what to submit, to get you enrolled into the best payment plan options available for you. So we do all the heavy lifting to make sure you get approved for these programs." (Media File REc14b9913af08e8c1847f2793a12330cf).

　　iii. "So Joseph I do have some amazing news for you. It looks like I was able to get you approved today for the federal loan forgiveness program. So congratulations, Joseph, on being approved for benefits today." (Media file REac9ddbc7115101bf50144c028ff9ef32).

b. In some instances, salespeople claimed that the Company had been able to obtain loan forgiveness for other consumers. For example:

i. "The guy I just got off the phone with, I just got him cleared of like $133,000 in debt. He owed like $145 or something like that. We had to bump his family size up though." (Media file RE71ada34e0095de97e1f76c53c0bbfcda)

ii. "We're pretty good at our success rate at getting people qualified because we know what to say and what to submit, to get you enrolled into the best payment plan options available for you." (REc14b9913af08e8c1847f2793a12330cf)

iii. "We're Pacific Palm Financial Group and we're located down in Irvine, California. And we're the largest enrollment center for this program in all of California. We've been doing this for over twenty years now. We just started recently, within the last five years, we started recently applying for the federal student loan forgiveness program because as soon as Obama put that into act, we were able to assist with that program as well." (Media file REac9ddbc7115101bf50144c028ff9ef32)

c. The calls I reviewed also include examples of sales representatives misrepresenting the purpose of consumers' payments, including by implying that consumers' payments to the Company would go toward their student loan balance. Examples include:

i. "Cause what happens, let me explain to you so you really understand. Is that we're gonna have the Department of Education buy NelNet's loans okay. We're gonna have them, because you qualified today. We're gonna have them buy all these loans that you have with Nelnet which will boost your credit up in the next thirty to ninety days because all these what one two three four five six seven eight loans you have right

14
Declaration of Dani Schneider in Support of Motion for Summary Judgement

now are gonna all show up on your credit as paid in full. Right. Then what happens is you'll get, is the government, you'll get a new loan servicer. Right. I don't know what borrower it'll exactly be. But with that new servicer, the government is going to hold on to the debt. And as you continue to make payments, as you're making your $42 payment, it's gonna show as you're making a full loan payment. Does that make sense?" (Media File RE6069f4c8faf69a6ee851ce557805f438)

    ii.  "You don't have to worry about Navient. We're handling all of that, basically." (File Name RE71ada34e0095de97e1f76c53c0bbfcda)

    iii.  "Now keep in mind I'm not telling you what actions to carry out on your behalf but I will give you a piece of advice and say that if you are planning on enrolling into the program, I would set up, I would call, personally what I would do is I would call my bank and cancel the automatic payments that get withdrawn to Nelnet. Because if you enroll into this program, there's no contact required from your behalf to your servicer. Administrative Account Services will do all the documents and paperwork for you as long as you stay good on your monthly payments we will take care of everything for you and make sure everything is good with your file with the Department of Education. And that pretty much means that payments to Nelnet would not be necessary." (File Name RE311e5cfd88a12740fdc7247579bcb952)

    iv.  "I wish I could bring the payments lower but the lowest we can go because we're in compliance with the Department of

Education is the six payments of 207 [dollars]." (Media File RE4380600dd3c11eb30ea8f967954e2789)

d.  In some instances, salespeople claimed that the Company could lower consumers' monthly payments. For example:

 i.  "I got you qualified sir for what's called a zero dollar payment towards loan. And the thirty dollar monthly fee is your life lock into the program to ensure that you get the forgiveness. As long as you continue making the payments okay, towards the program, they're going to completely forgive and discharge anything. You don't have to worry about FedLoans. FedLoans is gonna get paid off within sixty days." (RE3e5dfcab604284f03d24daed7b764724)

 ii.  "With this program, you will be forgiven a total of $39,159. How does that sound to you? Let's look at the way the program is outlined so we can stop that three hundred and something dollar payment you've got coming in. For the first six months of your program, the monthly payments are, I got them down to $207.50. That's only for the first six months of the program and it covers all the costs associated with your enrollment and processing. After that, your payments will be reduced to $110 per month for the duration of your program, which is 240 months." (RE71ada34e0095de97e1f76c53c0bbfcda)

 iii.  "So for the first five months of your program, the monthly payments are $249. That's only for the first five months of your program to cover all the costs that are associated with your enrollment and processing into the government program. After that your payments will be reduced to $42 a month for the

16
Declaration of Dani Schneider in Support of Motion for Summary Judgement

duration of your program which is 240 months."
(RE4380600dd3c11eb30ea8f967954e2789)

    iv.  "The Department of Education is going to consolidate just these two loans into one loan. Your first six monthly payments would be $199. Now that is used for just the document preparation, the consolidation of your loans, the enrollment into the new program and any associated fee. Then your monthly payment will drop to just the $40 a month for a program term of 120 months. Which in total, that's an estimated payback of $5,995. So that's actually all you would pay back on your loan. The rest is completely forgiven and discharged by the federal government. So you're actually going to save $54,661 with this program." (RE88761e5b4924bdbcaf970f1df2cc24b2)

e.  In some instances, salespeople misled consumers about what counts as part of one's family size or household. For example:

    i.  "How many people actually live in your household including yourself? ...Now is there anybody else that you financially help out at all? Friend? Family member? I don't care if it's your nephew's socks." (Media File RE71ada34e0095de97e1f76c53c0bbfcda).

    ii.  "Now Laura if there's anyone you financially support, whether they live in your household or not - if they're family, if they're friends - as long as you financially support someone, whether it's medical bills, phone bills, I can add this person to your family size and anyone I can add to your family size would greatly reduce your monthly payments for your student loans. Is

that, would that being said, is there anyone you can think of,
maybe?" (Media file RE311e5cfd88a12740fdc7247579bcb952)

   iii. "I do just want to go over the family size. Since they do
consider this a hardship program, they do allow some flexibility
when it comes to your family size. It doesn't have to be only
people that live in your household. If you assist any friends or
family members, even with something as small as helping with
phone bills, or helping with groceries, they do allow you to
include them into your family size. That way you can get more
of a benefit into the program. Is there anybody else that you
would want to include in?" (Media file
RE7b6dbcec66a41c60cba951da13668702)

  f.  Of the 21 calls I reviewed for which consumers provided their credit
or debit card information to make payment to the Company, the
compliance script was read in 18 of those calls. In all 18 calls where
the compliance script was read to the consumer, it was read after the
consumer had provided their payment information and usually within
the last ten minutes of the sales call. The compliance script was read
to the consumer after the consumer had signed the company's contract
in 17 out of the 18 calls in which the consumer was read the
compliance script. In one instance, the sales representative for the
Company represents that the compliance script "is required by the
Department of Education." (Media file
RE7b6dbcec66a41c60cba951da13668702).

**Plaintiff's Exhibits**

35.   Copies of all Plaintiff's Exhibits referenced in this declaration are contained
      in Plaintiffs' Exhibits.

36.   In accordance with privacy policies of the Court and the Bureau, Plaintiffs'
      Exhibits have been redacted to protect Personally Identifiable Information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC on January 30, 2023.

Dani Schneider

# Plaintiffs' Exhibit 13.1



LAW OFFICES
# BEHAR, GUTT & GLAZER, P.A.

**1855 GRIFFIN ROAD**
**DCOTA A-350**
**FORT LAUDERDALE, FLORIDA 33004**

BRIAN S. BEHAR*
IRA GUTT
DAVID L. GLAZER**
ROBERT J. EDWARDS
DANIELLE S. FEUER

E-MAIL: bsb@bgglaw.com

www.bgglaw.com

BROWARD:          (954) 733-7030
DADE:             (305) 931-3771
DADE FAX:         (305) 931-3774

PALM BEACH:       (561) 347-7160
PALM BEACH FAX:   (561) 347-7164

CHARLES BLAKE DYE***
MARIBEL DIAZ
STACEY GLADDING

*   ALSO ADMITTED IN NY & NJ
**   RETIRED
***   ALSO ADMITTED IN IL

February 27, 2019

Attn: Sarah Preis                    *Via U.S. Mail & Email: sarah.preis@cfpb.gov*
Bureau of Consumer Financial Protection
1700 G. Street NW
Washington, DC 20552

    Re:   <u>Civil Investigation Demand served on Consumer Advocacy Center, Inc., D/B/A as</u>
          <u>Premier Student Loan Center on September 13, 2018</u>

Dear Ms. Preis:

      Please be advised that the undersigned represents Consumer Advocacy Center, Inc. ("Client").
Please be advised that Client filed a Voluntary Petition for Relief pursuant to Chapter 11 of the United
States Bankruptcy Code, in the United States Bankruptcy Court Southern District of Florida.  I enclose
for your files a copy of the Notice of Bankruptcy Case Filing issued by the Bankruptcy Court.

      Your letter dated January 25, 2019 addressed to my Client has been referred to me for response.

      Please be advised that upon the commencement of the Bankruptcy case, the Bankruptcy Automatic
Stay provisions as contained in Bankruptcy Code §362 (a) become operative.  The Bankruptcy Stay stays
all collection efforts against the Client, including but limited to the actions referenced in your letter.

      Should you have any questions, please feel free to contact me, otherwise, we will assume that you
are closing your file accordingly.

Very Truly Yours,

BEHAR, GUTT & GLAZER, P.A.

By:
      Brian S. Behar

BSB/jgn
cc: Clients

United States Bankruptcy Court
Southern District of Florida

## Notice of Bankruptcy Case Filing

A bankruptcy case concerning the debtor(s) listed
below was filed under Chapter 11 of the United
States Bankruptcy Code, entered on 01/16/2019 at
4:59 PM and filed on 01/16/2019.

**Consumer Advocacy Center Inc.**
500 East Broward Blvd., Suite 1710
Ft. Lauderdale, FL 33394
Tax ID / EIN: 47-1590303



The case was filed by the debtor's attorney:

**Brian S Behar, Esq**
1855 Griffin Road, Suite A-350
Ft. Lauderdale, FL 33004
(305) 931-3771

The case was assigned case number 19-10655-JKO to Judge John K Olson.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other
actions against the debtor and the debtor's property. Under certain circumstances, the stay may be
limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay.
If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be
penalized. Consult a lawyer to determine your rights in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are
available at our *Internet* home page www.flsb.uscourts.gov or at the Clerk's Office, , .

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting
forth important deadlines.

**Joseph Falzone**
**Clerk, U.S. Bankruptcy**
**Court**

| PACER Service Center |
| --- |

| Transaction Receipt | | | |
|---|---|---|---|
| 01/16/2019 17:36:18 | | | |
| PACER Login: | behargutt1:2512976:0 | Client Code: | 111795.01 |
| Description: | Notice of Filing | Search Criteria: | 19-10655-JKO |
| Billable Pages: | 1 | Cost: | 0.10 |

Pls.' Ex. 13.1
P. 556

Plaintiffs' Exhibit 13.2



LAW OFFICES

# BEHAR, GUTT & GLAZER, P.A.

**1855 GRIFFIN ROAD
DCOTA  A-350
FORT LAUDERDALE, FLORIDA 33004**

BRIAN S. BEHAR*
IRA GUTT
DAVID L. GLAZER**
ROBERT J. EDWARDS
DANIELLE S. FEUER

**E-MAIL: bsb@bgglaw.com**

**www.bgglaw.com**

| BROWARD: | (954) 733-7030 |
| DADE: | (305) 931-3771 |
| DADE FAX: | (305) 931-3774 |
| PALM BEACH: | (561) 347-7160 |
| PALM BEACH FAX: | (561) 347-7164 |

CHARLES BLAKE DYE***
MARIBEL DIAZ
STACEY GLADDING

\*    ALSO ADMITTED IN NY & NJ
\*\*   RETIRED
\*\*\* ALSO ADMITTED IN IL

April 10, 2019

*Via E-Mail to* **sarah.preis@cfpb.gov**
*U.S. Mail*

Attn: Sarah Preis
Senior Litigation Counsel
Consumer Financial Protection Bureau
1700 G Street NW
Washington DC 20552

     Re:   <u>Civil Investigative Demand Served on Consumer Advocacy Center, Inc., d/b/a as</u>
            <u>Premier Student Loan Center on September 13, 2018</u>

Dear Ms. Preis:

     Please be advised that the undersigned represents Consumer Advocacy Center, Inc. d/b/a Premier Student Loan Center, ("Consumer"), and Premier Student Loans, Inc.   Consumer is the Debtor-in-Possession in a Chapter 11 Bankruptcy Proceeding pending in the United States Bankruptcy Court in the Southern District of Florida under Case No.: 19-10658-JKO.

     Please allow this letter to serve as a response to your letter dated March 27, 2019 addressed to the undersigned.  Your letter was a response to mine dated February 27, 2019.

     The purpose of this letter is to provide a practical approach to the issues and concerns raised in your letter.  For purposes of this letter I do not dispute with you that Bankruptcy Code §362(b)(4) provides that a governmental unit exercising its police power is not subject to the Bankruptcy Automatic Stay.  There is of course a question as to whether the investigation your office is handling might be found not to be an exercise of police power, because the investigation would  fail the public policy test given that the action is brought primarily to advantage discrete and identifiable individuals rather than some broader segment of the public.  *In re Chintella,* 2014WL3672882 (bankr., N.D. GE, 2014).   As you know, exceptions to the automatic stay, including Bankruptcy Code §362(b)(4) are to be narrowly construed. *In re Dolen,* 265 BR 471 (bankr., M.D., FLA, 2001).  Damage claims for violation of the automatic stay can be severe, and can include punitive damages where the violation was willful and intentional.  <u>See,</u> Bankruptcy Code §362(k).

Attn: Sarah Preis
Senior Litigation Counsel
Consumer Financial Protection Bureau
April 10, 2019
page 2

_____

The Bankruptcy Stay does stay your office's efforts to enforce a money judgment, if that is part of what your office intends to seek.   Bankruptcy Code §362(a)(4) is explicit, and states the automatic stay does not apply to a governmental unit enforcing its police or regulatory power, **other than a money judgment.**  In point of fact, more recent Court opinions on the subject have concluded that a governmental unit, in enforcing its police power, cannot seek monetary  enforcement against assets of the debtor's bankruptcy estate, as this would endanger any chance of a successful reorganization.   *In re Dolen,* 265 BR at p. 483-487.

Here again looking at this from a practical point of view, rather than debate if there is a monetary claim sought by your office, and the extent of that monetary claim, it would make more sense if your office would simply file a claim in the Chapter 11 proceeding.  At the appropriate time, Consumer can review the claim, and decide what if any further action it would take on the claim.

The time and expense required to provide further documentation and information that you are requesting would be onerous, and cause the bankruptcy estate time and expenses better served in trying to explore a successful chapter 11, which would include dealing with your office's claim, should one be filed.

Please advise how you wish to proceed.

Very Truly Yours,

BEHAR, GUTT & GLAZER, P.A.

By:_____
      BRIAN S. BEHAR

cc: Client

**BEHAR, GUTT & GLAZER, P.A.**   1855 GRIFFIN ROAD,  DCOTA   #A-350,   FORT LAUDERDALE, FLORIDA 33004
BROWARD: 954-733-7030  •  MIAMI-DADE: 305-931-3771  •  PALM BEACH: 561-347-7160  •  MIAMI-DADE FAX: 305-931-3774  •  PALM BEACH FAX: 561-347-7164

Plaintiff's Exhibit 13.3

 The State Bar *of California*

**Attorney Search**

Your search for *kaine wen* returned 1 results.

Click any column heading to sort on that column. Hold shift and click multiple headings to sort on multiple columns.

| Name | Status | Number | City | Admission Date |
|------|--------|--------|------|----------------|
| Wen, Kaine | Disbarred | 255420 | Azusa | March 2008 |

Showing 1 to 1 of 1 entries

Previous | 1 | Next

Copyright © 2023 The State Bar of California

  

# Party Search Results

Name ⌄                                        Date of Birth ⌄

Wen, Kaine

Cases (3)

Cases

### SBC-19-Q-30612

Wen, Kaine

| **File Date** | **Type** | **Status** |
|---|---|---|
| 11/08/2019 | Resignation with Charges Pending | Supreme Court - Closed |

### SBC-19-C-30438

Wen, Kaine

| **File Date** | **Type** | **Status** |
|---|---|---|
| 08/29/2019 | Conviction Referral | Supreme Court - Closed |

### 15-O-15791

Wen, Kaine

| **File Date** | **Type** | **Status** |
|---|---|---|
| 06/20/2018 | Original Discipline | Supreme Court - Closed |

## Case Information

15-O-15791 | Wen, Kaine

| | | |
|---|---|---|
| Case Number | Court | Judicial Officer |
| 15-O-15791 | Los Angeles | Miles, Donald F |
| File Date | Case Type | Case Status |
| 06/20/2018 | Original Discipline | Supreme Court - Closed |

## Party

Respondent
Wen, Kaine

DOB
XX/XX/XXXX

State ID
CA 255420

Active Attorneys ▾
Attorney
Barsegyan, Artak
Retained

Lead Attorney
Pansky, Ellen Anne
Retained

Prosecutor
Office of Chief Trial Counsel

Active Attorneys ▾
Lead Attorney
Fallas, Esther

## Disposition Events

07/11/2018 Plea ▾

Judicial Officer
Miles, Donald F

Suspension Stayed/Probation

Suspension Stayed/Probation

| | |
|---|---|
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |

10/23/2018 Disposition ▾

| | |
|---|---|
| | No Review |
| | No Review |
| | No Review |
| | No Review |
| | No Review |
| | No Review |
| | No Review |
| | No Review |
| | No Review |
| | No Review |
| | No Review |

10/23/2018 Suspension Stayed/Probation ▾

| | |
|---|---|
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |
| | Suspension Stayed/Probation |

Suspension Stayed/Probation

Suspension Stayed/Probation

Suspension Stayed/Probation

Condition - Adult

1. Probation, 1Y, 11/22/2018, Active 11/22/2018

2. Stayed Suspension, 1Y, 11/22/2018, Active 11/22/2018

3. MPRE, 11/22/2018, Active 11/22/2018

# Events and Hearings

12/20/2017 Early Neutral Evaluation Conference ▼

Original Type
Early Neutral Evaluation Conference

Judicial Officer
Miles, Donald F

Hearing Time
01:30 PM

Result
Held - Not Submitted

Comment
Notes: Set: 12/05/2017 Served: Time Spent (Actual): 0.75 Time Spent (Estimated): 0.00 Assigned Staff: Ayrapetyan Louisa Type: A Activity Code:

06/18/2018 Early Neutral Evaluation Conference ▼

Judicial Officer
Miles, Donald F

Hearing Time
03:00 PM

Cancel Reason
Not Held - Continued

Comment
Notes: R available by phone, counsel in-person Set: 06/07/2018 Served: Time Spent (Actual): 0.00 Time Spent (Estimated): 0.00 Assigned Staff: Yip Mazie Type: A Activity Code:

06/18/2018 Notice of hearing served ▼

Comment
Early Neutral Evaluation - 06/19/2018

06/19/2018 Early Neutral Evaluation ▾

Original Type
Early Neutral Evaluation

Judicial Officer
Miles, Donald F

Hearing Time
01:30 PM

Result
Held - Submitted/Stip. to be Filed

Comment
Notes: R by phone; start on time Set: 06/18/2018 Served: 06/18/2018 Time Spent (Actual): 1.50 Time Spent (Estimated): 0.00 Assigned Staff: Type: A Activity Code:

06/20/2018 Activity Initiating Document ▾

Comment
Text: PRE-NOTICE STIPULATION Judge/Staff/Party: Joint

06/20/2018 Disposition Submitted for Stipulation ▾

Judicial Officer
Miles, Donald F

Comment
Plus Days: 30

06/21/2018 Activity Notice ▾

Comment
Text: NOTICE OF ASSIGNMENT Judge/Staff/Party: Yip, Mazie

07/11/2018 Matter Made Public

07/11/2018 Proof of Service

07/11/2018 Disposition Suspension Stayed/Probation ▾

Judicial Officer
Miles, Donald F

07/11/2018 Disposition Served ▾

Judicial Officer
Miles, Donald F

08/01/2018 Transmittal of Recommendation to Supreme Court ▾

Judicial Officer
Court, Supreme

Comment
Plus Days: 60

10/23/2018 Disposition Suspension Stayed/Probation ▾

Judicial Officer
Court, Supreme

## Documents

Stipulation

Supreme Court Order

## Case Information

SBC-19-C-30438 | Wen, Kaine

| | | |
|---|---|---|
| Case Number | Court | Judicial Officer |
| SBC-19-C-30438 | Los Angeles | Roland, Yvette D |
| File Date | Case Type | Case Status |
| 08/29/2019 | Conviction Referral | Supreme Court - Closed |

## Party

Respondent
Wen, Kaine

DOB
XX/XX/XXXX

State ID
CA 255420

---

Prosecutor
Office of Chief Trial Counsel

Active Attorneys ⏷

Lead Attorney
Ramirez, Sandy Anayte

---

## Disposition Events

11/03/2020 Plea ⏷

Judicial Officer
Roland, Yvette D

Disbarment Due to Default

03/08/2021 Disposition ⏷

Judicial Officer

Hearing, Department

No Review

03/08/2021 Disbarment Due to Default ▾

Disbarment Due to Default

Condition - Adult

1. Rule 9.20, 04/07/2021, Active 04/07/2021

# Events and Hearings

08/29/2019 Conviction Transmittal - Final ▾

Motion for Conviction Transmittal - Final

Judicial Officer
Review, Department

08/29/2019 Response Due ▾

Judicial Officer                          Comment
Review, Department                        No response filed.

09/19/2019 Ruling on Motion - Granted ▾

Ruling on Motion for Conviction Transmittal - Final - Granted

Judicial Officer                          Comment
Review, Department                        Order served 9/19/19.

09/19/2019 Disposition Interim Suspension and Referral ▾

Judicial Officer
Review, Department

09/19/2019 Accept Case Into Hearing

09/24/2019 Notice of Assignment and Initial Status Conference ▾

Notice of Assignment and Initial Status Conference

Judicial Officer
Roland, Yvette D

---

09/24/2019 Notice of Hearing on Conviction ▾

Judicial Officer
Roland, Yvette D

---

10/02/2019 Substitution of Counsel ▾

Substitution of Counsel

Judicial Officer
Roland, Yvette D

---

10/15/2019 Response ▾

Response

Judicial Officer          Comment
Roland, Yvette D          RESPONDENT KAINE WEN'S RESPONSE TO NOTICE OF HEARING ON CONVICTION

---

10/15/2019 Request for Settlement Conference ▾

Request for Settlement Conference

Judicial Officer          Comment
Roland, Yvette D          REQUEST FOR VOLUNTARY SETTLEMENT CONFERENCE

---

10/28/2019 Status Conference ▾

Judicial Officer
Roland, Yvette D

Hearing Time
01:30 PM

Result
Held - Ordered to VSC

Parties Present ▴
  Prosecutor: Office of Chief Trial Counsel

    Deputy Trial Counsel: Ramirez, Sandy Anayte

  Respondent: Wen, Kaine

---

10/30/2019 Status Conference Order ▾

Order of Status Conference

Judicial Officer          Comment
Roland, Yvette D          TRIAL DATE AND ORDER PURSUANT TO STATUS CONFERECE

11/07/2019 Rule 9.20 Compliance Declaration ▼

Rule 9.20 Compliance Declaration

---

12/02/2019 Status Conference ▼

Judicial Officer
Roland, Yvette D

Hearing Time
01:30 PM

Cancel Reason
Not Held - Continued

---

12/02/2019 Voluntary Settlement Conference ▼

Judicial Officer
Rosenberg, Rebecca M

Hearing Time
03:00 PM

Cancel Reason
Not Held - Continued

---

12/09/2019 Status Conference ▼

Judicial Officer
Roland, Yvette D

Hearing Time
01:30 PM

Result
Held - Abated

Parties Present ▲
  Prosecutor: Office of Chief Trial Counsel

    Deputy Trial Counsel: Ramirez, Sandy Anayte

---

12/09/2019 Motion to Abate/Stay Proceeding ▼

  Judicial Officer
  Roland, Yvette D

---

12/12/2019 Order for Abatement - Pretrial ▼

Order for Abatement - Pretrial

  Judicial Officer
  Roland, Yvette D

---

12/12/2019 Status Conference Order ▼

Order of Status Conference

Judicial Officer
Roland, Yvette D

---

01/06/2020 Pre-Trial Conference ▾

Judicial Officer
Roland, Yvette D

Hearing Time
01:30 PM

Cancel Reason
Not Held - Abated

---

01/06/2020 Voluntary Settlement Conference ▾

Judicial Officer
Rosenberg, Rebecca M

Hearing Time
03:00 PM

Cancel Reason
Not Held - Abated

---

01/14/2020 Hearing / Formal (Disciplinary/Regulatory) ▾

Judicial Officer
Roland, Yvette D

Hearing Time
10:00 AM

Cancel Reason
Not Held - Abated

---

01/15/2020 Hearing / Formal (Disciplinary/Regulatory) ▾

Judicial Officer
Roland, Yvette D

Hearing Time
10:00 AM

Cancel Reason
Not Held - Abated

---

02/14/2020 Report ▾

Report

| Judicial Officer | Comment |
| --- | --- |
| Roland, Yvette D | JOINT STATUS REPORT RE:ABATEMENT |

---

02/24/2020 Status Conference ▾

Judicial Officer
Roland, Yvette D

Hearing Time
01:30 PM

Cancel Reason
Not Held - Continued

03/23/2020 Status Conference ▾

Judicial Officer
Roland, Yvette D

Hearing Time
01:30 PM

Cancel Reason
Not Held - Abated

05/21/2020 Order Filed ▾

Court Appearance - In-Person Status Conference

| Judicial Officer | Comment |
|---|---|
| Roland, Yvette D | STATUS CONFERENCE ORDER |

06/01/2020 Status Conference ▾

Judicial Officer
Roland, Yvette D

Hearing Time
01:30 PM

Result
Held - Ordered to PTC

Parties Present ▴
Prosecutor: Office of Chief Trial Counsel

Deputy Trial Counsel: Ramirez, Sandy Anayte

Respondent: Wen, Kaine

06/01/2020 Order to Unabate - Pretrial ▾

Judicial Officer
Roland, Yvette D

06/09/2020 Status Conference Order ▾

Order of Status Conference

| Judicial Officer | Comment |
|---|---|
| Roland, Yvette D | ORDER SETTING TRIAL AND PRETRIAL DATES (Rules Proc. of State Bar, rule 5.44.1) |

06/15/2020 Voluntary Settlement Conference ▾

Judicial Officer
Chawla, Manjari

Hearing Time
11:00 AM

Cancel Reason
Not Held - Off Calendar

06/16/2020 Substitution of Counsel ▾

Substitution of Counsel

Judicial Officer
Roland, Yvette D

06/18/2020 Order re Settlement Conference ▾

Order re Settlement Conference

Judicial Officer
Chawla, Manjari

06/25/2020 Pretrial Statement ▾

Pretrial Statement

Judicial Officer
Roland, Yvette D

06/29/2020 Pre-Trial Conference ▾

Judicial Officer
Roland, Yvette D

Hearing Time
01:30 PM

Result
Held - Ordered to Trial

Parties Present ▴
Prosecutor: Office of Chief Trial Counsel

Deputy Trial Counsel: Ramirez, Sandy Anayte

07/08/2020 Hearing / Formal (Disciplinary/Regulatory) ▾

Judicial Officer
Roland, Yvette D

Hearing Time
01:00 PM

Result

**Held - Default Entered**

**Parties Present** ▲

  Prosecutor: Office of Chief Trial Counsel

  Deputy Trial Counsel: Ramirez, Sandy Anayte

---

07/08/2020 Order for Entry of Default - Failure to Appear ▼

Order for Entry of Default - Failure to Appear

  Judicial Officer
  Roland, Yvette D

---

07/08/2020 Disposition Transfer Inactive 6007(e) ▼

  Judicial Officer
  Roland, Yvette D

---

07/09/2020 Statement ▼

Statement oF Facts And Circumstances

  Judicial Officer              Comment
  Roland, Yvette D              STATEMENT OF FACTS AND CIRCUMSTANCES

---

08/28/2020 Petition for Disbarment ▼

Petition for Disbarment

  Judicial Officer              Comment
  Roland, Yvette D              PETITION FOR DISBARMENT AFTER DEFAULT; [Rules Proc. Of State Bar, Rule
                                5.85]; SUPPORTING DECLARATION OF SANDY A. RAMIREZ

---

09/29/2020 Matter Submitted for Decision - Default ▼

  Judicial Officer
  Roland, Yvette D

---

09/29/2020 Order Filed ▼

Order Issued by Hearing Department

  Judicial Officer              Comment
  Roland, Yvette D              ORDER SUBMITTING DEFAULT MATTER FOR DECISION

---

11/03/2020 Decision - Default ▼

Decision - Default

  Judicial Officer
  Roland, Yvette D

11/03/2020 Disposition Disbarment Due to Default ▾

Judicial Officer
Roland, Yvette D

11/03/2020 Disposition Transfer Inactive 6007(c) ▾

Judicial Officer
Roland, Yvette D

12/09/2020 Accept Case Into Effectuation

12/23/2020 Cost Certificate ▾

Cost Certificate

12/23/2020 Transmittal of Recommendation to Supreme Court ▾

Transmittal of Recommendation to Supreme Court

Judicial Officer
Court, Supreme

03/08/2021 Supreme Court Order - Final Discipline ▾

Supreme Court Order - Final Discipline

03/08/2021 Disposition Disbarment

03/08/2021 Costs Payment Terms Standard Payment Pursuant to 6140.7

04/07/2021 Close Case - Supreme Court

04/07/2021 Rule 9.20 Compliance Declaration ▾

Rule 9.20 Compliance Declaration

# Documents

Motion for Conviction Transmittal - Final

Ruling on Motion for Conviction Transmittal - Final - Granted

Notice of Assignment and Initial Status Conference

Substitution of Counsel

Response

Request for Settlement Conference

Order of Status Conference

Rule 9.20 Compliance Declaration

Order for Abatement - Pretrial

Order of Status Conference

Report

Court Appearance - In-Person Status Conference

Order of Status Conference

Substitution of Counsel

Order re Settlement Conference

Pretrial Statement

Email Notification-ZOOM INVITATION

Order for Entry of Default - Failure to Appear

Statement oF Facts And Circumstances

RETURNED MAIL

Return Receipt (Default)

Petition for Disbarment

Order Issued by Hearing Department

Decision - Default

Transmittal of Recommendation to Supreme Court

Cost Certificate

Supreme Court Order - Final Discipline

Rule 9.20 Compliance Declaration

## Case Information

SBC-19-Q-30612 | Wen, Kaine

| | | |
|---|---|---|
| Case Number | Court | Judicial Officer |
| SBC-19-Q-30612 | Los Angeles | Review, Department |
| File Date | Case Type | Case Status |
| 11/08/2019 | Resignation with Charges Pending | Supreme Court - Closed |

## Party

Respondent
Wen, Kaine

Active Attorneys ▾
Lead Attorney
Barsegyan, Artak
Retained

DOB
XX/XX/XXXX

State ID
CA 255420

Prosecutor
Office of Chief Trial Counsel

Active Attorneys ▾
Lead Attorney
Ramirez, Sandy Anayte

## Disposition Events

04/10/2020 Disposition ▾

Judicial Officer
Review, Department

Deny/Decline Resignation w/Charges Pending

## Events and Hearings

---

11/08/2019 Resignation with Charges Pending ▼

Resignation with Charges Pending

Judicial Officer
Review, Department

---

12/23/2019 Substitution of Counsel ▼

Substitution of Counsel

Judicial Officer
Review, Department

---

01/07/2020 Stipulation Filed ▼

Stipulation Filed

Judicial Officer
Review, Department

---

01/07/2020 Motion for Resignation Decline ▼

Motion for Resignation Decline

Judicial Officer
Review, Department

---

01/07/2020 Response Due ▼

Judicial Officer                    Comment
Review, Department                  Last day for R to file response to Report and Recommendation.

---

01/09/2020 Notice ▼

SB's Notice of Lodging of Original Signatures of Stipulation as to Facts, etc.

Judicial Officer                    Comment
Review, Department                  SB's Notice of Lodging of Original Signatures of Stipulation as to Facts and
                                    Conclusions of Law etc.

---

02/10/2020 Response ▼

Response to OCTC's Report Re Resignation with Charges Pending

Judicial Officer
Review, Department

---

02/11/2020 Miscellaneous ▼

Exhibits to the Declaration of Kaine Wen in Support of Application for Resignation Charges Pending

| Judicial Officer | Comment |
|---|---|
| Review, Department | Exhibits to the Declaration of Kaine Wen in Support of Application for Resignation with Charges Pending |

---

02/24/2020 Order Filed ▼

Order Filed

| Judicial Officer | Comment |
|---|---|
| Review, Department | Within 10 days of the date of this order, OCTC is ordered to submit a supplemental report complying with rule 5.427(C) and file the proper documents. |

---

02/24/2020 Response Due ▼

| Judicial Officer | Comment |
|---|---|
| Review, Department | Last day for SB to file a supplemental report complying with rule 5.427(C, etc. |

---

02/27/2020 Supplemental Report ▼

Supplemental Report to SB's Report and Recommendation Re Resignation with Charges Pending

| Judicial Officer | Comment |
|---|---|
| Review, Department | to State Bar's Report and Recommendation Re Resignation with Charges Pending. |

---

02/27/2020 Response Due ▼

Judicial Officer
Review, Department

---

03/03/2020 Response ▼

Response to Supplemental Report and Recommendation

| Judicial Officer | Comment |
|---|---|
| Review, Department | to Supplemental Report and Recommendation. |

---

03/11/2020 Disposition Submitted for Order ▼

Judicial Officer
Review, Department

---

04/10/2020 Ruling on Motion - Granted ▼

Judicial Officer
Review, Department

---

04/10/2020 Order Filed ▼

Order Filed

Judicial Officer
**Review, Department**

04/10/2020 Disposition Deny/Decline Resignation w/Charges Pending ▼

Judicial Officer
**Review, Department**

04/13/2020 Accept Case Into Effectuation

04/22/2020 Transmittal of Resignation to Supreme Court ▼

Transmittal of Resignation to Supreme Court

Judicial Officer
**Court, Supreme**

07/15/2020 Supreme Court Order - Resignation Declined ▼

Supreme Court Order - Resignation Declined

07/15/2020 Disposition Deny/Decline Resignation w/Charges Pending

08/14/2020 Close Case - Supreme Court

## Documents

Resignation with Charges Pending

Substitution of Counsel

Stipulation Filed

Motion for Resignation Decline

SB's Notice of Lodging of Original Signatures of Stipulation as to Facts, etc.

Response to OCTC's Report Re Resignation with Charges Pending

Exhibits to the Declaration of Kaine Wen in Support of Application for Resignation Charges Pending

Order Filed

Supplemental Report to SB's Report and Recommendation Re Resignation with Charges Pending

Response to Supplemental Report and Recommendation

Order Filed

Transmittal of Resignation to Supreme Court

Supreme Court Order - Resignation Declined

# Plaintiffs' Exhibit 13.4

CONSUMER FINANCIAL PROTECTION BUREAU


IN THE MATTER OF:            )
                            )
PREMIER STUDENT LOAN CENTER  )  Matter No. 2018-1938-02
                            )
                            )



                            Tuesday,
                            October 8, 2019


                        Live Tape

                "Second Dani Call.m4a"

            (The following transcript was transcribed from a

digital recording provided by the Consumer Financial

Protection Bureau to Heritage Reporting Corporation on

October 10, 2019.)


                PARTICIPANTS:

                DANI SCHNEIDER
                Consumer Financial Protection Bureau

                MANNY
                Student Services Plus

Page 2

```
 1                   P R O C E E D I N G S

 2                                      (2:40 p.m.)

 3              MANNY:  Hi, this is Manny and I'm with

 4    Student Services Plus.  I heard you were interested in

 5    the federal student loan forgiveness program?

 6              MS. SCHNEIDER:  I'm sorry.  What did you say

 7    your name was?

 8              MANNY:  My name is Manny.

 9              MS. SCHNEIDER:  Hi, Manny, and where are you

10    calling from?

11              MANNY:  Student Services Plus about the

12    federal student loan forgiveness program.

13              MS. SCHNEIDER:  Is that the same as Student

14    Loan Account Management?

15              MANNY:  Uh, the name of the company or

16    you're talking about like for a student loan

17    forgiveness?  That's what we do.  We're, uh,

18    in federal student loan forgiveness or reduce,

19    repayment options.

20              MS. SCHNEIDER:  Okay.  Great.

21              MANNY:  Uh, are you interested in it?

22              MS. SCHNEIDER:  Yes, please.

23              MANNY:  Okay.  All right.  Perfect.  Uh, do

24    you have a little bit of time to talk?

25              MS. SCHNEIDER:  Yeah.  Sure, let's talk.
```

1          MANNY:  Okay.  Perfect.  All right.  So, I

2     see here that you, um, you have about $48,000 in

3     student loan debt.  You are employed and you're paying

4     about 470 a month, correct?

5          MS. SCHNEIDER:  That's right.

6          MANNY:  Okay.  Perfect.  All right.  So,

7     let's go in here.  How's your day going so far?

8          MS. SCHNEIDER:  Uh, it's good.  Day's just

9     getting started.

10          MANNY:  Nice.  All right.  So, let me, uh,

11     pull up a file here for you.  And it's D███████,

12     and then D█████, correct?

13          MS. SCHNEIDER:  That's right.

14          MANNY:  All right.  I just have to ask

15     because sometimes they write down the information and

16     it's wrong or, you know, the spelling's wrong or

17     whatever.  So, I've got D██████████, correct?

18          MS. SCHNEIDER:  Yes.

19          MANNY:  All right.  So, this is the best

20     number, uh, the ████████████████.  Okay.  Uh,

21     so, what that means is you -- that you may qualify for

22     one or more of the Department of Education's programs

23     that can reduce your monthly payments and possibly

24     forgive your student loan balance.  Uh, what we can do

25     for you today is help you find the loan forgiveness

Page 4

1  program you may qualify that will have the lowest

2  monthly payments.  Please note, that while we may

3  correspond with your loan servicer on your behalf, we

4  are not the Department of Education.  This call is

5  being recorded for quality control and compliance

6  purposes.  Okay?

7          MS. SCHNEIDER:  Okay.

8          MANNY:  All right.  Perfect.  And what is

9  your date of birth?

10          MS. SCHNEIDER:  ███████████ ████.

11          MANNY:  ████?  Okay.  And what is the email

12  associated with your student loans?

13          MS. SCHNEIDER:  D██o█████, D-███-D-████████

14  █, ████████████████████ at █████.com.

15          MANNY:  At █████.com.  Okay.  So, I got D██

16  █ uh, D█████████, ████████████████████ at █████.com?

17          MS. SCHNEIDER:  Yes.

18          MANNY:  Okay.  Perfect.  Uh, do you work for

19  a nonprofit or a government organization?

20          MS. SCHNEIDER:  No.

21          MANNY:  Okay.  Uh, these federal programs

22  are income based.  Are you currently paid by the hour

23  or are you on salary?

24          MS. SCHNEIDER:  What do you mean?

25          MANNY:  Are you currently paid by the hour

Page 5

1  at your job or are you on salary, like they give you a

2  salary per year?

3          MS. SCHNEIDER:  A salary.

4          MANNY:  A salary?  Okay.  And how much do

5  you make a year?

6          MS. SCHNEIDER:  Uh, about 48,000.

7          MANNY:  Forty-eight thousand?  Okay.  Is

8  that like -- is that how much you make or is that

9  your, um, is that, um, what you owe in student loan

10 debt, 48,000?

11         MS. SCHNEIDER:  It's just about the same.

12 Yeah.

13         MANNY:  Okay.  All right.  No problem.  All

14 right.  So, the next step is to determine your, um,

15 family size.  It is very important to include everyone

16 that qualifies so you can receive the lowest monthly

17 Department of Education payment possible and potential

18 loan forgiveness.  How many children, including unborn

19 do you provide, uh, more than half their financial

20 support for?

21         MS. SCHNEIDER:  None.

22         MANNY:  Okay.  Uh, anyone else living with

23 you?  Do you provide more than half their financial

24 support for?

25         MS. SCHNEIDER:  No.

Page 6

1              MANNY:  Okay.  So, it's just you.  Okay.

2      Uh, in the Department of Education programs, your

3      marital status will determine whether your monthly

4      payments will be based only on your personal income or

5      the combined household income for both you and your

6      spouse.  How do you file taxes, single, married?  How

7      do you file taxes?

8              MS. SCHNEIDER:  Single.

9              MANNY:  Okay.  All right.  And did you file

10     taxes last year in 2018?

11             MS. SCHNEIDER:  Yes.

12             MANNY:  Okay.  All right.  The next step in

13     the process is to obtain your loan details to see

14     exactly how much you owe, uh, and determine your

15     program of what you may qualify for.  Have you ever

16     created an SSAID, a federal student aid, uh, a FAFSA?

17             MS. SCHNEIDER:  Um, probably, yeah.

18             MANNY:  Okay.  Let's see what we've got

19     here.  I'm going to send you a text message.  Go ahead

20     and, um, click on the link and follow the directions

21     on the link, okay?

22             (Silence.)

23             MANNY:  Give me one second.  I'm generating

24     it to you.

25             (Pause.)

1            MANNY:  Okay, it has been sent to you.  Uh,

2    it's to reset your password.  What you're going to do

3    is reset it, um, and then after that, it's going to

4    ask you to re-login.  It's going to ask for my badge

5    number.  That way you can send me just your loan

6    details so I can see your loans, okay?

7            MS. SCHNEIDER:  Okay.  Uh, what if I -- if I

8    don't want to do this right now?  Just the -- like the

9    resetting my password?

10           MANNY:  Um, the only other way, um, I can do

11   it is to see it through your, uh, loan servicer.  Do

12   you know who your loan servicer is?

13           MS. SCHNEIDER:  I don't have the paperwork

14   in front of me right now.

15           MANNY:  Okay.  Because I have to see your

16   loans, uh, to be able to connect it to your file, uh,

17   and that's the only way I can see what, um, you know,

18   how much, you know, you're being forgiven, what

19   programs, things like that.

20           MS. SCHNEIDER:  Okay.  Um, how -- I mean,

21   what's -- what's the success rate of my loans being

22   forgiven?  How -- how -- how good are you guys?

23           MANNY:  I mean, we're pretty good.  I mean,

24   I -- I don't know.  I haven't seen them, but like I

25   had a lady, she had about $524,000 and I got her down

Page 8

1   to about 40,000 where she had to pay.

2           MS. SCHNEIDER:  And the rest of it was

3   forgiven?

4           MANNY:  C -- correct.  Um, they are income

5   based terms, programs.  Um, so I don't know what term,

6   uh, these -- you're probably, uh, in the 300 month,

7   uh, term.  That's what the normal one is, the 300

8   month.  Um, but it can range from like, you know, 50

9   months all the way to 300 months.  So, I don't know.

10  I don't want to give you, you know, numbers like that

11  because I haven't seen your loans.  I don't know what

12  program you would qualify for or anything like that.

13          MS. SCHNEIDER:  Okay.  Um, well, before I go

14  ahead and click on this password, I want to do a

15  little bit more research before I reset my account

16  with you.  Um --

17          MANNY:  Okay.

18          MS. SCHNEIDER:  -- what's a good time for --

19  for me to call you back and how do you I call you?

20          MANNY:  Okay.  I'll give you my direct line.

21          MS. SCHNEIDER:  Yep.

22          MANNY:  Let me know when you're ready.

23          MS. SCHNEIDER:  I'm ready.

24          MANNY:  Okay.  It's (949)528-8263.

25          MS. SCHNEIDER:  And what company did you say

1   you were with?

2           MANNY:  It's going to be

3   www.studentservicesplus.com.  Okay?

4           MS. SCHNEIDER:  All right.  Thanks so much

5   for your time, Manny, I appreciate it.

6           MANNY:  You're very welcome.  You have a

7   wonderful day, okay D████?

8           MS. SCHNEIDER:  Okay.  You too.

9           MANNY:  All right.  Bye-bye.

10          (Call ended.)

11          MS. SCHNEIDER:  The current time is 2:48

12  p.m.  Today's date is October 8, 2019.  My name is

13  Dani Schneider.  I'm an investigator at the Consumer

14  Financial Protection Bureau in Washington, D.C. and

15  this has been a taping session.  I posed as a

16  consumer, D████ D████.  I spoke with a

17  representative who identified himself as Manny with

18  Student Services Plus.  He called me from (949)528-

19  8263 and during the call, he identified, uh, he said

20  -- he stated he would text me and he -- he did send me

21  a text message during the conversation from (949)528-

22  8507.  The current time is 2:49 p.m. this concludes

23  the taping session.

24          (Whereupon, the audio in the above-entitled

25  matter concluded.)

10

<u>CERTIFICATE</u>

CASE TITLE:        Premier Student Loan Center

RECORDING DATE:  October 8, 2019


      I certify that the foregoing is a true and correct transcript made to the best of our ability from a copy of the official electronic digital recording provided by the Consumer Financial Protection Bureau in the above-entitled matter.


      Date: October 10, 2019


      _Tracy Rea_

Tracy Rea
Heritage Reporting Corporation
Suite 206
1220 L Street, N.W.
Washington, D.C.  20005-4018


Heritage Reporting Corporation
(202) 628-4888

Plaintiffs' Exhibit 13.5

CONSUMER FINANCIAL PROTECTION BUREAU


IN THE MATTER OF:          )
                           )
PREMIER STUDENT LOAN CENTER  )  Matter No. 2018-1938-02
                           )
                           )




                              Friday,
                              October 11, 2019


                         Live Tape

          "4th Pretext Recording - Dani Schneider.m4a"

               (The following transcript was transcribed from a

digital recording provided by the Consumer Financial

Protection Bureau to Heritage Reporting Corporation on

October 11, 2019.)


               PARTICIPANTS:

               DANI SCHNEIDER
               Consumer Financial Protection Bureau

               JOSH OWENS
               Customer Support

Page 2

```
 1                P R O C E E D I N G S

 2                                      (2:43 p.m.)

 3            MS. SCHNEIDER:  Hello?

 4            JOSH OWENS:  Hello, is this C█████?

 5            MS. SCHNEIDER:  Yes, this is C████.

 6            JOSH OWENS: My name is Josh from Student

 7    Services Plus.

 8            MS. SCHNEIDER:  Oh, hi, Josh.

 9            JOSH OWENS:  So, I understand that you're

10    interested in the Federal Student Loan Forgiveness

11    Program?

12            MS. SCHNEIDER:  Yes.

13            JOSH OWENS:  Okay.  Do you have federal

14    loans of ten thousand dollars or more?

15            MS. SCHNEIDER:  Yes.

16            JOSH OWENS:  And then are you currently

17    employed or have a source of income?

18            MS. SCHNEIDER:  Yes.

19            JOSH OWENS:  Okay, know that while we may

20    correspond with your services on your behalf we are

21    not the Department of Education.  And this call is

22    being recorded for quality control and compliance

23    purposes, okay, C████?

24            MS. SCHNEIDER:  Okay.

25            JOSH OWENS:  All right, and the last -- the
```

Page 3

1   first thing I'm going to need -- is this the best

2   contact number in case we get disconnected?

3          MS. SCHNEIDER:  Yes.

4          JOSH OWENS:  All right, and then what's your

5   email address that is associated with your student

6   loans?

7          MS. SCHNEIDER:  Sure, it's CJ, my initials,

8   and my birthday ████████ at █████.com.

9          JOSH OWENS:  All right, now that answers my

10  next question, your birthday, so I'm guessing ███████

11  █, █████.

12         MS. SCHNEIDER:  Yes.

13         JOSH OWENS:  All right, let me go ahead and

14  get that in here.  The next thing I would need, these

15  federal programs are income based.  Are you currently

16  paid by the hour or are you on salary?

17         MS. SCHNEIDER:  Salary.

18         JOSH OWENS:  Okay, and then how much do you

19  make an hour, C████?

20         MS. SCHNEIDER:  Oh, right, I'm on a salary.

21         JOSH OWENS:  Oh, you said salary.  I'm

22  sorry, and how much do you get a year, annually?

23         MS. SCHNEIDER:  Um, around $55,000.

24         JOSH OWENS:  Okay, sounds good.  I'm going

25  to go ahead and put that in here.  Now for the next

Page 4

1    thing, can you tell me your family size?  Under the

2    Department of Education programs, it's very important

3    to include anyone that would qualify so that you can

4    receive the lowest monthly payment possible.  How many

5    children do you provide more than half the financial

6    support for?

7         MS. SCHNEIDER:  None.

8         JOSH OWENS:  Okay, so is there anyone else

9    that lives with you or that you provide more than half

10   of the financial support for?

11        MS. SCHNEIDER:  No.

12        JOSH OWENS:  Okay, so like I said, that's

13   only to determine -- that's just under the Department

14   of Education for you to receive the lowest monthly

15   payment possible.  The next thing we would need would

16   be marital status, under the Department of Education

17   programs, your marital status determines whether your

18   monthly payments are based on your personal income or

19   the combined household income of both you and a

20   spouse.  Let me know which one of these four sounds

21   the best: single, married, married but separated, or

22   married but cannot reasonably access my spouse's

23   income information?

24        MS. SCHNEIDER:  Single.

25        JOSH OWENS:  Okay.  Sounds good.  Now we're

Page 5

1   going to go into your account and try to pull up those

2   loan details.  So, what I would do next, do you

3   authorize us to perform a soft credit inquiry in order

4   to obtain your current amount of outstanding student

5   loans and determine if you qualify for student loan

6   forgiveness or income driven programs?

7            MS. SCHNEIDER:  Yeah, I guess I just have a

8   few questions first.

9            JOSH OWENS:  Okay, yeah, go for it.

10           MS. SCHNEIDER:  So, am I eligible for

11  federal student loan forgiveness?

12           JOSH OWENS:  So, it all depends on how much

13  loan balance, what your loan balance is.  I'm not

14  exactly sure yet.  I would have to pull up your loans

15  to be able to see it.

16           MS. SCHNEIDER:  Okay, and how successful are

17  you at being able to get people's student loans

18  forgiven?

19           JOSH OWENS:  Usually we're able to save you

20  about half, at least of what your current student

21  loans are.  Like I said, that all depends on your

22  income, your family size, and everything I just

23  explained a minute ago.

24           MS. SCHNEIDER:  Sure, no, I understand that

25  it varies based on my income and -- and my family

1  size.  But you think -- I mean like, on average, you

2  save people like half?  You're able to forgive half of

3  people's student loans?

4          JOSH OWENS:  Yeah, yes ma'am.

5          MS. SCHNEIDER:  Okay, and is the process

6  different if I have federal loans or not federal

7  loans?

8          JOSH OWENS:  Yes, ma'am, if your loans are

9  private, we wouldn't be able to help you.  You'd have

10  to go through the Department of Education directly.

11  But if your loans are, if you have federal loans, then

12  yes, we would be able to help you, like I said, to

13  eliminate sometimes all of it.  It basically depends.

14          MS. SCHNEIDER:  Okay.

15          JOSH OWENS:  Okay.

16          MS. SCHNEIDER:  And how quickly does it

17  work, what's the timing?

18          JOSH OWENS:  It's usually they put you in a

19  240 month program, which would be 20 years.  They put

20  you on a repayment plan depending on -- like I said,

21  your income and everything.  But most likely it's

22  either 120 months or 240 months, which is either 10

23  years or 20 years.

24          MS. SCHNEIDER:  Okay, and do you submit

25  that, or do I?

Page 7

1              JOSH OWENS:  We submit everything for you.

2      So that's why you'd pay our company a fee based on

3      same thing -- based on your income and everything.

4      And then we would submit all the documents and

5      everything for you.

6              MS. SCHNEIDER:  Oh, okay.  So what kind of

7      fee are we talking about?

8              JOSH OWENS:  Like I said, same thing, it

9      depends on what you get approved for through the

10     program.  Then, after that we'd be able to figure out,

11     exactly our fee or what you would pay us for it.

12             MS. SCHNEIDER:  Okay, and what does the

13     payment cover?

14             JOSH OWENS:  It covers all the document

15     preparation, submitting for the program and everything

16     that you would need to do to submit your application

17     and to keep you enrolled in that program.

18             MS. SCHNEIDER:  And also the loan payments?

19             JOSH OWENS:  We would put that -- yes,

20     ma'am, we would put that in to, whatever payment

21     you're making, yes, we're going to add the loan

22     payments into that so that you  make a payment to your

23     loan servicer on your payment and then you'd pay us as

24     well, a fee.

25             MS. SCHNEIDER:  Okay, and do I pay for

Page 8

1    everything up front or is it monthly?

2           JOSH OWENS:  It's going to be monthly and

3    like I said, I don't know exactly how much you would

4    be paying monthly.  All I can say right now is I would

5    have to be able to pull up your loans and everything

6    just to see exactly what that monthly fee would be.

7    But, um, yeah, you would pay monthly.

8           MS. SCHNEIDER:  Okay, so I was looking on

9    the internet and I found Premier Student Loan Center's

10   website.  And that's the phone number I called, but it

11   sounds like you're calling from a different company.

12          JOSH OWENS:  Yes, ma'am, we just had a

13   merger with another company.  I actually do not know

14   the other company's name, that (inaudible).  But

15   anyway, my company is Student Services Plus.

16          MS. SCHNEIDER:  Okay.  And are there any

17   other companies that you merged with?

18          JOSH OWENS:  Yes, ma'am, what happened -- we

19   were, there was eight different companies, I believe

20   one was Pacific Palm Financial -- there are -- they

21   are eight, I know there's eight, there were eight

22   different companies that we've combined all into one,

23   merged all into one.

24          MS. SCHNEIDER:  Okay.  Okay, and you guys

25   are just all doing the same thing, same kind of work?

Page 9

1          JOSH OWENS:  Yes, ma'am, yes, ma'am.

2          MS. SCHNEIDER:  Okay, because I read good

3     things online about Premier --

4          JOSH OWENS:  That's why we merged.

5          MS. SCHNEIDER:  Okay, because I read good

6     things online about Premier and that's why I was

7     calling their phone number.

8          JOSH OWENS:  Like I said, I can send you the

9     link to our website and our stuff and it has all of

10    our marketing information, everything on there, give

11    you information on our company if you'd like.

12         MS. SCHNEIDER:  Okay, thanks.

13         JOSH OWENS:  Okay, you still want to go

14    forward to the next step or would you like me to send

15    you that first?

16         MS. SCHNEIDER:  Yeah, if you could send me

17    the information that, that'd be great.  I'd like to

18    review it.

19         JOSH OWENS:  Okay, sounds good, I will email

20    it to you right now, give me one second.  And it's

21    going to be to that email cj█████████████.com?

22         MS. SCHNEIDER:  Right.

23         JOSH OWENS:  It's just going to say "Welcome

24    Email" in the subject line, okay?

25         MS. SCHNEIDER:  Okay.

Page 10

1            JOSH OWENS:  All right, I went ahead and

2    sent it just now. You should be receiving that

3    shortly.  Let me know when you get it.

4            MS. SCHNEIDER:  I can't do it while I'm on

5    the phone.  Let me get to a computer.  Hold on one

6    sec.

7            JOSH OWENS:  Okay, no problem.

8            MS. SCHNEIDER:  Sorry about that.  Are you

9    still there?

10            JOSH OWENS:  It's okay.  Still here.

11            MS. SCHNEIDER:  Okay.  Josh Owens, is that

12    you?

13            JOSH OWENS:  Yes, ma'am, that is me.

14            MS. SCHNEIDER:  All right, I got the email.

15            JOSH OWENS:  All right.  Like I said,

16    there's everything on there, it has all of my

17    information, our company's information on there.  So

18    you can go ahead and click on the link on the bottom

19    that says Student Services Plus or the email actually

20    down there -- or I'm sorry, the website under that as

21    well.  And then if you have any other questions you

22    can call me on my direct line there.  It's got my

23    direct phone number and my direct email.  And it also

24    has our company's phone number and everything on there

25    if you want to just call the entire company and see

Page 11

1    who you get connected with.

2            MS. SCHNEIDER:  Okay, thanks so much for

3    help, Josh.  I appreciate it.

4            JOSH OWENS:  Yeah.  No problem at all.  Have

5    a good day.

6            MS. SCHNEIDER:  You too, bye, Josh.

7            JOSH OWENS:  All right, bye, bye.

8            (Call ended.)

9            MS. SCHNEIDER:  This is Dani Schneider, I'm

10   an investigator at the Consumer Financial Protection

11   Bureau in Washington, D.C. and this is a taping

12   session.  Today's date is Friday, October 11th, 2019.

13   The current time is 2:55 p.m.  I used the name ███

14   J████   and posed as a consumer interested in student

15   loan forgiveness.  I used phone number ████████████

16   and accepted an incoming call from Josh Owens at

17   Student Services Plus.  This concludes the taping

18   session.

19            (Whereupon, at 2:55 p.m., the audio in the

20   above-entitled matter concluded.)

21   //

22   //

23   //

24   //

25   //

12

<u>CERTIFICATE</u>

DOCKET NUMBER:    2018-1938-02

CASE TITLE:       Premier Student Loan Center

RECORDING DATE:   October 11, 2019


   I certify that the foregoing is a true and correct transcript made to the best of our ability from a copy of the official electronic digital recording provided by the Consumer Financial Protection Bureau in the above-entitled matter.


    Date: October 11, 2019


Juanita Zuniga
Heritage Reporting Corporation
Suite 206
1220 L Street, N.W.
Washington, D.C.  20005-4018


Heritage Reporting Corporation
(202) 628-4888

Plaintiffs' Exhibit 14

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., | CASE NO. 8:19-cv-01998 MWF |
| Plaintiffs, | **DECLARATION OF THERESA RIDDER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT KAINE WEN** |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., | |
| Defendants. | Court:   Hon. Michael W. Fitzgerald |

## DECLARATION OF THERESA RIDDER
### Pursuant to 28 U.S.C. § 1746

I, Theresa Ridder, hereby state that I have personal knowledge of the facts as set forth below. If called as a witness, I could and would testify as follows:

1.      I am a citizen of the United States and am over eighteen (18) years of age. I am an employee of the Bureau of Consumer Financial Protection (Bureau). I am an Investigator who works in the Bureau's Office of Enforcement in Washington, D.C. As an employee with the Bureau, my current duties include, but are not limited to, conducting financial and data analysis for

Pls.' Ex. 14
P. 607

1  investigations as well as collecting and reviewing consumer complaints. I

2  have been an employee of the Bureau since December 2013.

3  2.  I am assigned to work on the Bureau's litigation in the United States District

4  Court for the Central District of California titled, *Bureau of Consumer*

5  *Financial Protection, et al., v. Consumer Advocacy Center Inc., et al.*, 8:19-

6  cv-01998 MWF.

7  3.  As part of my work on this matter, I collected and reviewed over 2,000

8  consumer complaints related to Consumer Advocacy Center, Inc. (CAC),

9  True Count Staffing Inc. (True Count), Prime Consulting LLC (Prime) and

10  their numerous d/b/a's identified during the course of this matter

11  (collectively the Company) from the Bureau's internal consumer complaint

12  database and the complaint section of the FTC's Consumer Sentinel

13  Network (Sentinel).[1]

14  4.  In October 2021, I searched Sentinel for complaints filed against the

15  Company and I subsequently reviewed these complaints. I also searched and

16  reviewed complaints from the Bureau's complaint database. The complaints

17  I identified and reviewed are Bates stamped CFPB-20211012-00015910 -

18  CFPB-20211012-00020368; CFPB-20220119-00000001 - CFPB-20220119-

19  00004521; and CFPB-20220119-00004734.

20  5.  I reviewed the complaints, including the comments or narratives and the

21  identifiable information related to each consumer, to determine the nature of

22  the complaints.

23  6.  During my review, I found that some consumers filed their complaint more

24  than once – either by filing one complaint multiple times or by filing

25  multiple complaints. To de-duplicate complaints, I organized them by the

26

27  _____

[1] See Plaintiff's Exhibit 13 for a description of Sentinel and its functionality.

28

consumers' first and last names, cities and states, zip codes, and/or email addresses, if applicable. Then, I consolidated each consumer's comments or narratives into a single representation of that consumer's complaint so that I was sure to capture the nature of their complaint only once. In other words, if a consumer filed more than one complaint or the same complaint multiple times, when calculating the number of complaints addressing the issue or issues a consumer raised, I only counted each issue once. After I de-duplicated consumer complaints, I identified over 1,700 consumer complaints.

7.   I found that approximately 300 consumers complained they believed that the fees they had paid to the Company were payments to their servicer, towards their outstanding loan debt, not fees to the Company.

8.   Over 40 consumers thought that the fees that they had paid were the adjusted amount of their periodic payments towards their outstanding loan balance, not a payment of only fees to the Company.

9.   Approximately 85 consumers complained that the Company had told them they were eligible or approved for lower monthly student loan payments.

10.  Over 20 consumers indicated they were told their student loan payments had been lowered for the life of their loan.

11.  Approximately 40 consumers indicated that the Company promised the consumer's loans would be forgiven, in whole or in part, soon after enrolling in the Defendants' services.

12.  Many consumers complained that the Company had submitted false information about their family size and marital status to their student loan servicers. Specifically, approximately 70 consumers complained about a false family size and approximately 14 consumers complained about a false marital status.

13.     Approximately 100 consumers stated that the Company told them it had ties or some sort of relationship with the federal government, including some affiliation or working relationship with the Department of Education.

14.     Approximately 100 consumers complained the Company led them to believe that the fees charged by the Company were necessary to participate and remain enrolled in a loan forgiveness or Income-Drive Repayment (IDR) plan, or the Company otherwise led them to believe that they had to pay a fee to apply for loan forgiveness or IDR plans.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, D.C. on January 30, 2023.



Theresa Ridder

Plaintiffs' Exhibit 15

## DECLARATION OF MICHELLE MARIN
## PURSUANT 28 U.S.C. § 1746

I, Michelle Marin, have personal knowledge of the following facts and matters discussed in this declaration, and if called as a witness, I would testify competently to them:

1. My name is Michelle Marin. I am the Director of Conciliation & Engagement at the Better Business Bureau Serving the Pacific Southwest ("BBB"), which is located at 1010 E. Missouri Ave, Phoenix, Arizona 85014.

2. The BBB is a non-profit organization whose purpose is to promote ethical business and marketplace conduct. The BBB gathers information and uses it to form reliability reports on businesses. BBB reliability reports are designed to assist the public in finding reliable businesses. Each business on which we report is rated using an algorithm that weighs complaints, responses to them, and several other relevant factors. The rating scale ranges from A+ to F.

3. In the ordinary course of business, the BBB received consumer complaints about Arizona and California companies, informs the company about the complaint, and received from the company and consumer any communications in an effort to resolve the complaint. Written complaint communications are received by the BBB by either mail, facsimile, email, filed online via the bbb.org website, or using the BBB's internet-based complaint handling system. Complaint communications received via the bbb.org website or complaint handling system are stored immediately in our database. Complaint communications received via mail, facsimile, and email are scanned and stored in the database as computer files.

4. My job responsibilities include managing the team that handles complaints for numerous industries, including the companies in the BBB's business categories: Legal Document Help; Student Loan Services; Financial Consultants. This includes ensuring that all complaint communications are properly stored in our database and contained within the appropriate company's file.

5. One of the businesses that we monitor and report on is Premier Student Loan Center, which also does business as Consumer Advocacy Center Inc. The primary address for Premier Student Loan Center is 173 Technology Dr Ste 202, Irvine, California 92618. Premier Student Loan Center provided this address to BBB.

6. On behalf of Premier Student Loan Center, dba Consumer Advocacy Center Inc, the following individuals have access to read and respond to consumer complaints: Mr. Albert Kim, Owner/CEO; Mr. Tom Nelson, Secretary; Mr. Christian Stark, Customer Service Manager.

7. The BBB created the business profile for Premier Student Loan Center on September 30, 2015. Since that date, the BBB has received a total of 195 consumer complaints against Premier Student Loan Center. In the past 36 months, the BBB's standard reporting period, the business has received 193 consumer complaints. Of the 193 reportable consumer complaints, 89 complaints have been closed as "Answered (Assumed)", meaning the complaint was responded to by the business, but BBB did not hear back from the consumer as to if the details in the response resolved the matter presented. 70 of the 193 complaints were closed as "Resolved", meaning that either the consumer confirmed the resolution of the complaint, or BBB determined the business made a good

faith effort to resolve the matter with the consumer. 12 of the 193 complaints were closed as "Answered", meaning the business responded to the complaint, however, the consumer remained dissatisfied with the business's efforts in addressing the matter. 12 of the 193 complaints were closed as "Invalid", meaning the complaint was not reportable based on BBB's complaint acceptance policy. 5 of the 193 complaints were closed as "Beyond Purview", meaning the complaint was determined to be outside of BBB's scope of handling. 3 of the 193 complaints were closed as "Information Only", meaning the consumer advised they were providing the details to BBB for informational purposes only. As of today's date, the business has 2  complaints that are open and currently mediating. Attached hereto as **Attachment A** are true and correct copies of the consumer complaints that were produced to the CFPB.

8. Another business we monitor and report on is SL Account Management. The primary address for SL Account Management is 8 Whatney Ste 1008, Irvine, California 92618 . This address was provided to BBB by consumers that filed complaints against the business.

9. On behalf of SL Account Management, Mr Chris Smith, Client Relations Manager, has access to read and respond to consumer complaints.

10. The BBB created the business profile for SL Account Management on June 11, 2018. Since that date, the business has received a total of 80 consumer complaints. Of the 80 consumer complaints, 41 have closed as "Answered (Assumed)", 33 have closed as "Resolved", 4 have closed as "Answered", 2 are open and currently mediating. Attached

hereto as **Attachment B** are true and correct copies of the consumer complaints that were produced to the CFPB.

11. Another business we monitor and report on is Financial Preparation Services, which also does business as Prime Consulting, LLC. The primary address for Financial Preparation Services is 7545 Irvine Center Dr Ste 200 Rm 108, Irvine, California 92618. This address was located by BBB on the business's website, https://financialpreparationservices.com.

12. On behalf of Financial Preparation Services, dba Prime Consulting, LLC, Mr. Jay Carter, Customer Support Manager, has access to read and respond to consumer complaints.

13. The BBB created the business profile for Financial Preparation Services, dba Prime Consulting, LLC, on November 8, 2018. Since that date, the business has received 55 consumer complaints. Of the 55 consumer complaints, 33 have closed as "Answered (Assumed)", 11 have closed as "Resolved", 2 has closed as "No Response", meaning the business did not respond to the complaint. 1 has closed as "Answered", 2 have closed as "Information Only", 1 has closed as "Beyond Purview", 3 have closed as "Invalid", 2 are open and currently mediating. Attached hereto as **Attachment C** are true and correct copies of the consumer complaints that were produced to the CFPB.

14. Another business we monitor and report on is Direct Account Services. The primary address for Direct Account Services is 173 Technology Dr, Irvine, California 92618. This address was provided to BBB by consumer that filed the complaint against the business.

15. BBB is unaware of Direct Account Services's owner or manager's name, but has sent complaint information to support@directaccountservices.com. This email was retrieved on the business's website, https://www.directaccountservices.com.

16. The BBB created the business profile for Direct Account Services on July 3, 2019. Since that date, the business has received 1 consumer complaint. That complaint closed as "No Response". Attached hereto as **Attachment D** are true and correct copies of the consumer complaints that were produced to the CFPB.

17. Another business we monitor and report on is Coastal Shores Financial Group. The primary address for Coastal Shores Financial Group is 7545 Irvine Center Dr, Irvine, California 92618. This address was provided to BBB by the consumers that filed complaints against the business.

18. BBB is unaware of Coastal Shores Financial Group's owner or manager's name, but has sent complaint information to support@coastalshoresfinancialgroup.com. This email was retrieved from the business's website, https://www.coastalshoresfinancialgroup.com.

19. The BBB created the business profile for Coastal Shores Financial Group on March 12, 2019. Since that date, the BBB has received 2 consumer complaints.1 complaint closed as "Beyond Purview" and 1 closed as "No Response". Attached hereto as **Attachment E** are true and correct copies of the consumer complaints that were produced to the CFPB.

20. Another business we monitor and report on is Global Direct Accounting Solutions. The primary address for Global Direct Accounting Solutions is 173 Technology Dr, Irvine, California 92618. This address was provided to BBB by consumers that filed complaints against the business.

21. BBB is unaware of Global Direct Accounting Solutions's owner or manager's name, but has sent complaint information to support@globaldirectaccountingsolutions.com. This

email was retrieved from the business's website,

https://www.globaldirectaccountingsolutions.com.

22. The BBB created the business profile for Global Direct Accounting Solutions on

September 9, 2019. Since that date, the business has received 1 consumer complaint. That

complaint closed as "No Response". Attached hereto as **Attachment F** are true and

correct copies of the consumer complaints that were produced to the CFPB.

I swear under penalty of perjury that the foregoing is true and correct.

Executed on: _September 26, 2019_

_Michelle Marin_
Michelle Marin
Better Business Bureau Serving the Pacific Southwest

Plaintiffs' Exhibit 16

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., | CASE NO. 8:19-cv-01998 MWF |
| Plaintiffs, | **DECLARATION OF SCOTT LAUSE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT KAINE WEN** |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., | |
| Defendants. | Court:   Hon. Michael W. Fitzgerald |

**DECLARATION OF SCOTT LAUSE**

**Pursuant to 28 U.S.C. § 1746**

I, Scott Lause, declare and state as follows:

    1.    I am a United States citizen and am over 18 years of age.  I have personal knowledge of the matters set forth in this declaration and, if called as a witness, could and would testify competently to them.

    2.    I am employed as the Acting General Counsel for the Higher Education Loan Authority of the State of Missouri ("MOHELA"), which is a public instrumentality and body politic and corporate of the State of Missouri, established pursuant to Sections 173.350 to 173.445 of the Missouri Revised

1

Declaration of Scott Lause in Support of Motion for Summary Judgement

1  Statutes.  MOHELA's principal place of business is located in Chesterfield,

2  Missouri.

3       3.    MOHELA is engaged in the business of servicing student loans,

4  including student loans that are made by the U.S. Department of Education

5  ("Department of Education") pursuant to the Federal Direct Loan Program.

6  Additionally, MOHELA owns and services student loans made through the Federal

7  Family Education Loan Program ("FFELP").  MOHELA provides a full range of

8  services to Direct Loan and FFELP borrowers, including billing, payment

9  processing, and advising borrowers about a number of relevant topics, including

10  repayment plan options, loan discharge and loan forgiveness, delinquency and

11  default prevention initiatives, and collections.  MOHELA works directly with

12  Direct Loan and FFELP borrowers to ensure that borrowers are in the repayment

13  plan that best meets their needs and, as necessary, to provide borrowers with

14  forbearances and deferments during times when the borrower is in school,

15  unemployed, or is suffering some form of financial hardship.

16       4.    Among my responsibilities at MOHELA's I have led a team of

17  employees who are focused on identifying and assisting borrowers who are

18  working with student loan debt relief companies ("SLDRs").

19       5.    SLDRs are third-party companies that charge borrowers fees to obtain

20  student loan debt relief benefits that are available for free through the U.S.

21  Department of Education and federal student loan servicers, such as Income-

22  Driven Repayment ("IDR") plans, forbearance and deferment, and loan

23  consolidation.  SLDRs are not federal student loan servicers and are not in any way

24  approved by or affiliated with the federal government or federal student loan

25  servicers.

26       6.    In my experience, SLDRs frequently make false or inaccurate

27  representations to borrowers in order to induce them to make payments to the

28

Declaration of Scott Lause in Support of Motion for Summary Judgement

SLDR and to provide the SLDR with their Federal Student Aid ("FSA") personal identification numbers ("PINs") and federal loan servicing account login credentials. SLDRs then may use this information to initiate various actions on borrowers' accounts, including altering the contact information on borrowers' accounts; removing the auto-debit feature on borrowers' accounts; consolidating, or attempting to consolidate, borrowers' loans; submitting requests for forbearance or deferment; and enrolling, or attempting to enroll, borrowers in various repayment programs, such as income-driven repayment plans ("IDR").

7.    A common SLDR business model involves putting a borrower in forbearance, sometimes without the borrower's knowledge, using personal information provided by the borrower. This allows the SLDRs to collect payments from the borrower without the borrower's loan going delinquent, which means the loan servicer will not contact the borrower who may be unaware that the SLDR is not providing the promised service. Additionally, during forbearance, progress towards forgiveness for a borrower in a loan forgiveness program offered by the Department of Education stalls, as does their progress on an IDR plan, and at the conclusion of the forbearance, outstanding accrued interest is added to the principal balance.

8.    During the period from November 2015 through October 2019 (the relevant period), borrowers were limited to three years of "general" forbearance over the life of the loan, for Direct Loans. During this "general" forbearance period, interest continues to accrue on borrowers' loans and is capitalized, meaning it is added into the principal balance of the loan when the forbearance period ends. Some borrowers may be eligible for another type of forbearance, a form of "administrative" forbearance, which is not limited and upon its cessation does not trigger interest capitalization.

9.     SLDRs typically apply on the borrower's behalf for loan consolidation. If a borrower only has Direct Loans, as do the majority of borrowers since the Federal Family Education Loan ("FFEL") Program ended in 2010, there is often no good reason to consolidate. For the most part, consolidation only makes sense if borrowers have FFEL loans and would like to pursue a loan forgiveness program offered by the Department of Education, or one of the more generous IDR plans that are only available in the Direct Loan program.

10.     Consolidation is not right for all borrowers, as it resets any progress borrowers have made towards forgiveness in any of the IDR plans or loan forgiveness programs offered by the Department of Education for Direct Loan borrowers. Direct Loan borrowers already have access to all of the IDR plans and PSLF, their interest rate is set, and they should only have one monthly payment with one servicer, as the Education Department has tried to eliminate split servicing (when a borrower has loans with two or more servicers). Additionally, when the Department of Education consolidates loans, a new loan term, often 240 to 300 months, is set. Borrowers who have been making payments for a number of years will find their loan terms extended, which can significantly increase the total amount the borrower will repay due to interest. Additionally, if borrowers have outstanding accrued interest at the time the consolidation is complete, that interest will be included in the principal balance of the new consolidation loan.

11.     Many borrowers enroll in an auto-debit feature in which money is automatically transferred from the borrower's checking account on a scheduled date to make their student loan debt payments. Removing the auto-debit feature has the potential to result in borrowers making untimely payments to MOHELA or missing payments altogether. This has the potential to cause borrowers'

4

Declaration of Scott Lause in Support of Motion for Summary Judgement

account balances to grow, potentially increasing borrowers' repayment periods. Removing the auto-debit feature from borrowers' accounts may cause borrowers to lose the 0.25% interest rate reduction provided to Direct Loan and FFELP borrowers who pay via auto-debit. Additionally, borrowers who consolidate their loans will need to reenroll in an auto-debit program in order to make payments automatically and to obtain the 0.25% interest rate reduction.

12.    The Department of Education offers IDR plans that may provide lower monthly payment amounts to consumers depending in part on consumers' income and family size. Under all of the IDR plans, a consumer's required monthly payment amount may increase or decrease depending on annual changes to the consumer's family size, marital status, and income.  Consumers are therefore required to "recertify" their family size, marital status, and income annually. "Recertifying" involves providing the consumer's loan servicer with updated income and family size information so that the servicer can calculate the consumer's monthly payment amount based on any changes.

13.    Only loan servicers such as MOHELA can determine borrower eligibility for, or approve borrowers for enrollment in, payment plans or programs offered by the Department of Education, including IDR plans. A borrower's student loan balance cannot be reduced solely by working with an SLDR.

14.    If an SLDR falsifies a consumer's marital status or family size on an IDR plan application, a servicer may lower the consumer's monthly payment but the consumer could face negative consequences. For instance, because borrowers may be paying less, it may result in the accrual of interest that otherwise may not have accrued, which the borrower will then have to satisfy before any payments will be applied to the principal balance. In some cases, the accrued unpaid interest may capitalize into the principal balance, such as when a borrower later leaves a

particular IDR plan or a borrower fails to timely recertify a particular IDR plan. A borrower has to leave certain IDR Plans if she or he no longer qualifies for the plan, or she or he may choose to do so if the plan is no longer affordable. Depending on the type of IDR plan, the corresponding interest capitalization may leave the borrower with a higher principal balance and daily interest accrual, and thus, a greater debt burden to repay. In other words, the borrower may wind up with a larger loan balance and corresponding interest payments than she or he had before they were put in the IDR plan. Additionally, knowingly making a false statement or misrepresentation in the IDR plan application or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097. And if the falsified information is later detected and corrected, the borrower may unexpectedly face higher monthly payments.

15.     Borrowers can easily apply for forbearance and forbearance programs both online and via mail with their loan servicer, such as MOHELA, free-of-charge. Servicers such as MOHELA can and will discuss different repayment options in depth when a borrower calls.

16.     Only the Department of Education can grant loan forgiveness. The Department of Education can also discharge loans in other limited circumstances, for example for Total and Permanent Disability (TPD) or if a borrower has a defense to repayment.

17.     The Department of Education offers two student loan debt forgiveness programs, each of which require working in certain professions for a period of years. Teacher Loan Forgiveness is available to teachers who have worked full-time for five consecutive years in a low-income elementary or secondary school or educational service agency, and forgives $5,000 or $17,500 of loans, depending on the subject area taught. Public Service Loan Forgiveness

Declaration of Scott Lause in Support of Motion for Summary Judgement

(PSLF) is available to government employees or non-profit organization employees who make timely monthly payments for a period of ten years under a qualifying repayment plan while employed in the public sector.

18.    Consumers who participate in IDR plans may also be eligible for loan forgiveness, but only after making a minimum of 20 or 25 years of qualifying payments. If any loan balance remains after making payments for 20 or 25 years, discharge of that amount may occur. However, because borrowers may realize increased income over the repayment period, monthly payment amounts under IDR plans may eventually increase to fully amortizing payments that would pay off the loans prior to reaching eligibility for loan discharge. In those cases, there is no loan forgiveness. Further, the IRS treats debt discharged under the IDR plans as income for tax purposes, requiring tax payments on the amount discharged.

19.    Although an IDR plan is a type of repayment plan that may result in forgiveness of some debt after 20 or 25 years, it is not accurate to refer to an IDR plan as a "loan forgiveness program."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at _____ *12:41 PM* on January *27*, 2023.

Scott Lause

Acting General Counsel

Declaration of Scott Lause in Support of Motion for Summary Judgement

Plaintiffs' Exhibit 17

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

Bureau of Consumer Financial
Protection, et al.,

      Plaintiffs,

      v.

Consumer Advocacy Center Inc., d/b/a
Premier Student Loan Center, et al.,

      Defendants.

CASE NO. 8:19-cv-01998 MWF

**DECLARATION OF SARAH
PREIS IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY
JUDGMENT AGAINST
DEFENDANT WEN**

Court: Hon. Michael W. Fitzgerald
Courtroom 5A

I, Sarah Preis, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a citizen of the United States and am over eighteen (18) years of age. I am a Senior Litigation Counsel with the Bureau of Consumer Financial Protection (Bureau) and lead counsel in this action. My business address is 1700 G Street NW, Washington, DC 20522. I am an attorney for the Bureau as Plaintiff in the above-captioned case, appearing *pro hac vice*.

2.     The facts set forth in this declaration are based on my personal knowledge and, if called as a witness, I could and would testify competently to the statements contained in this declaration.

3.     The Bureau is submitting the Summary Judgment Exhibits (Pls.' Ex.) referenced below in support of Plaintiffs' motion for partial summary judgment.

4.     The Bureau has not attached certain exhibits to declarations and to the Receiver's Report referenced in this declaration that are duplicative of other exhibits in the record or that the Bureau is not relying on in its Statement of

Undisputed Facts. The Bureau will submit those exhibits to the Court upon request.

5.    Pls.' Exs. 1 and 1.1 to 1.14 are true and correct copies of a Declaration executed by Albert Kim and exhibits to that declaration.

6.    Pls.' Exs. 2 and 2.1 to 2.77 are true and correct copies of a Declaration executed by Tuong Nguyen and exhibits to that declaration.

7.    Pls.' Ex. 3 is a true and correct copy of excerpts of the transcript of the October 4, 2022 Deposition of Kenny Huang provided to the Bureau in discovery.

8.    Pls.' Ex. 4 is a true and correct copy of Exhibit 12 from the October 4, 2022 Deposition of Kenny Huang provided to the Bureau in discovery.

9.    Pls.' Ex. 5 is a true and correct copy of excerpts of the certified transcript of the Investigational Hearing of Jovani Ortuno taken by the Bureau on July 12, 2019.

10.    Pls.' Exs. 6 and 7 are true and correct copies of documents that Electronic Merchant Systems produced to the Bureau in response to the Bureau's Civil Investigative Demand issued on May 10, 2019.

11.    Pls.' Ex. 8 is a true and correct copy of a February 8, 2018 email that National Merchant Center produced to the Bureau in response to the Bureau's Civil Investigative Demand issued on May 10, 2019.

12.    Pls.' Ex. 9 is a true and correct copy of Defendant Wen's Response to Plaintiff's First Request for Admissions.

13.    Pls.' Ex. 10 is a true and correct copy of Defendant Wen's Response to Plaintiff's Second Requests for Admissions.

14.    Pls.' Ex. 11 is a true and correct copy of the May 29, 2018 Civil Investigative Demand served by the Minnesota Attorney General's Office to Premier Student Loans, Inc. provided to the Bureau during the course of the investigation of this matter.

DECL. OF SARAH PREIS ISO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

15. Pls.' Ex. 12 is a true and correct copy of a Declaration executed by Matt Heidari.

16. Pls.' Exs. 13 and 13.1 to 13.5 are true and correct copies of a Declaration executed by Dani Schneider and exhibits to that declaration.

17. Pls.' Ex. 14 is a true and correct copy of a Declaration executed by Theresa Ridder.

18. Pls.' Ex. 15 is a true and correct copy of a Declaration executed by Michelle Marin.

19. Pls.' Ex. 16 is a true and correct copy of a Declaration executed by Scott Lause.

20. Pls.' Ex. 17 is a true and correct copy of a Declaration executed by Sarah Preis.

21. Pls.' Ex. 18 is a true and correct copy of a Declaration executed by Richard Anderlick. The attachments to Mr. Anderlick's declaration are available upon request from Minnesota, North Carolina, and California, respectively.

22. Pls.' Ex. 19 is a true and correct copy of a Declaration executed by David Pegg.

23. Pls.' Ex. 20 is a true and correct copy of a Declaration executed by David Evers.

24. Pls.' Ex. 21 is a true and correct copy of a Declaration executed by Jay Mason.

25. Pls.' Ex. 22 is a true and correct copy of a Declaration executed by Alyssa Pugh.

26. Pls.' Ex. 23 is a true and correct copy of a Declaration executed by Mildred Hershenson.

27. Pls.' Ex. 24 is a true and correct copy of a Declaration executed by Maxwell Sheahan.

28. Pls.' Ex. 25 is a true and correct copy of a Declaration executed by Brenda Thelen.

29. Pls.' Ex. 26 is a true and correct copy of a Declaration executed by Selam Yimer.

30. Pls.' Ex. 27 is a true and correct copy of a Declaration executed by Gregory Kirksey.

31. Pls.' Ex. 28 is a true and correct copy of a Declaration executed by Laura Jangula.

32. Pls.' Ex. 29 is a true and correct copy of a Declaration executed by Tracy Metzig.

33. Pls.' Ex. 30 is a true and correct copy of a Declaration executed by Lynne Berthiaume.

34. Pls.' Ex. 31 is a true and correct copy of a Declaration executed by Kristin Honold.

35. Pls.' Ex. 32 is a true and correct copy of a Declaration executed by Gregory Wilson.

36. Pls.' Ex. 33 is a true and correct copy of a Declaration executed by Sarah Varno.

37. Pls.' Ex. 34 is a true and correct copy of a Declaration executed by Jennifer Liming.

38. Pls.' Ex. 35 is a true and correct copy of a Declaration executed by Hildegard Hauser.

39. Pls.' Ex. 36 is a true and correct copy of a Declaration executed by Elaine Crawford.

40. Pls.' Ex. 37 is a true and correct copy of a Declaration executed by Javonna Smith.

41. Pls.' Ex. 38 is a true and correct copy of a Declaration executed by

DECL. OF SARAH PREIS ISO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  Victor Simonenko.

2      42.    Pls.' Ex. 39 is a true and correct copy of a Declaration executed by

3  Jennifer Etzel-Elaqad.

4      43.    Pls.' Ex. 40 is a true and correct copy of a Declaration executed by

5  Rochelle Breemes.

6      44.    Pls.' Ex. 41 is a true and correct copy of a Declaration executed by

7  Teresita Rosca.

8      45.    Pls.' Ex. 42 is a true and correct copy of a Declaration executed by

9  Novella Donaldson.

10     46.    Pls.' Ex. 43 is a true and correct copy of a Declaration executed by

11 Julius Fomafung.

12     47.    Pls.' Ex. 44 is a true and correct certified copy of Consumer

13 Advocacy Center Inc.'s filings with the California Secretary of State.

14     48.    Pls.' Ex. 45 is a true and correct certified copy of True Count Staffing

15 Inc.'s filings with the California Secretary of State.

16     49.    Pls.' Ex. 46 is a true and correct certified copy of Prime Consulting

17 LLC's filings with the California Secretary of State.

18     50.    Pls.' Ex. 47 is a true and correct certified copy of Premier Student

19 Loan Center's Fictitious Business Name records filed with the Orange County

20 Clerk Recorder.

21     51.    Pls.' Ex. 48 is a true and correct certified copy of SL Account Mgmt's

22 Fictitious Business Name records filed with the Orange County Clerk Recorder.

23     52.    Pls.' Ex. 49 is a true and correct certified copy of Financial

24 Preparation Services' Fictitious Business Name records filed with the Orange

25 County Clerk Recorder.

26     53.    Pls.' Ex. 50 is a true and correct copy of documents that Allied

27 Wallet, Inc. produced to the Bureau in response to the Bureau's Civil Investigative

28

1  Demand issued on May 9, 2019.

2      54.    Pls.' Ex. 51 is a true and correct copy of documents that Electronic

3  Payment Systems, LLC produced to the Bureau in response to the Bureau's Civil

4  Investigative Demand issued on March 8, 2019.

5      55.    On October 23, 2019, pursuant to the Temporary Restraining Order

6  entered by this Court in *Bureau of Consumer Financial Protection. v. Consumer*

7  *Advocacy Center Inc.*, Case 8:19-01998-MWF (KSx), I and other Bureau staff

8  members accompanied Thomas McNamara, the Court appointed Receiver

9  ("Receiver") in this matter, as well as the Receiver's associates, to the business

10  premises of Consumer Advocacy Center Inc. d/b/a Premier Student Loan Center,

11  True Count Staffing Inc. d/b/a SL Account Management, and Prime Consulting

12  LLC d/b/a Financial Preparation Services (collectively, the Company) located at

13  173 Technology Drive, Suite 202, Irvine, CA 92618, 15261 Laguna Canyon Road,

14  Suite 200, Irvine, CA 92618, and 8 Hughes parkway, Suite 210, Irvine, CA 92618

15  (the Immediate Access).

16      56.    Along with the Receiver, I and staff from the Bureau and co-Plaintiffs

17  reviewed the Company's electronic and paper files and records. During the

18  Immediate Access, we collected select Company records (1) by pulling emails

19  from the cloud; (2) by copying hard drives; and (3) by photocopying physical

20  documents found on site. True and correct copies of the paper and electronic files

21  were uploaded to the Bureau's document management system.

22      57.    Pls.' Exs. 52, 56 to 60, 65 to 84, 86, and 87 are true and correct copies

23  of records pertaining to the Company's business that were collected during the

24  Immediate Access.

25      58.    During the Bureau's investigation of the facts forming the basis of

26  Plaintiffs' claims in this action, a former employee provided the Bureau certain

27  Company records, including communications and a Compliance script. Pls.' Exs.

28

53, 54, and 61 are true and correct copies of the records provided to the Bureau by the former employee.

59.     In response to requests for documents and information, the Receiver provided to the Bureau certain records of the Company's business, including communications and other documents. Pls.' Exs. 55, 62 to 64, 85, and 88 are true and accurate copies of the records provided to the Bureau by the Receiver.

60.     Pls.' Exs. 89 and 89.1 to 89.6 are true and correct copies of the Preliminary Report of Temporary Receiver (ECF 75) and selected Exhibits to the Preliminary Report of the Receiver (ECF 75-1 to 75-3) filed by the Receiver in the above-styled action on November 1, 2019 and attached for convenience.

61.     Pls.' Ex. 90 is a true and correct copy of Consumer Advocacy Center, Inc.'s January 16, 2019 Voluntary Petition for Non-Individuals Filing for Bankruptcy filed in in the United States Bankruptcy Court for the Southern District of Florida in *In re Consumer Advocacy Center Inc.*, Case No. 19-10655-JKO (Ch.11) (the CAC Bankruptcy).

62.     Pls.' Ex. 91 is a true and correct copy of the July 31, 2019 Order Directing the Appointment of a Chapter 11 Trustee filed in the CAC Bankruptcy.

63.     Pls.' Ex. 92 is a true and correct copy of Debtor Consumer Advocacy Center Inc.'s and Albert Kim's Reply Memorandum in Support of Precautionary Joint Motion for Enlargement of Time to Comply with Turnover, filed in the CAC Bankruptcy.

64.     Defendant Kaine Wen did not serve discovery requests on the Bureau.

65.     The Bureau has produced or made available to Defendant Kaine Wen original or duplicate copies of all writings and recordings summarized in the Declarations of Matt Heidari, Dani Schneider, and Theresa Ridder.

66.     The Trustee appointed over the estate of Defendant Consumer Advocacy Center Inc. (CAC) waived attorney-client privilege over

1 | communications that are attached as exhibits to the instant motion.

2 |     67.    The Receiver appointed over True Count Staffing Inc, Prime

3 | Consulting, and other receivership defendants waived attorney-client privilege over

4 | communications that are attached as exhibits to the instant motion.

5 |     I declare under penalty of perjury that the foregoing is true and correct to the

6 | best of my knowledge and belief.

7 |

8 | Executed on January 30, 2023, at

9 |

10 |                         /s/ Sarah Preis

11 |                         Sarah Preis

12 |                         Washington, DC

Decl. of Sarah Preis ISO Plaintiffs' Motion for Partial Summary Judgment

# Plaintiffs' Exhibit 18

Defendants or paid fees to Defendants, as well as associated information for each consumer, including the total amount of fees paid.

6.     On December 12, 2019, I extracted the requested data for each Plaintiff State from Defendants' Debt Pay Pro CRM Software database, and on December 20, 2019, I provided the data to the Receiver in separate Excel spreadsheets for each Plaintiff State. I understand the Receiver forwarded the data to each Plaintiff State.

7.     A true and correct copy of the spreadsheet of California consumers I provided to the Receiver is attached hereto as **Exhibit A**. A true and correct copy of the spreadsheet of Minnesota consumers I provided to the Receiver is attached hereto as **Exhibit B**. A true and correct copy of the spreadsheet of North Carolina consumers I provided to the Receiver is attached hereto as **Exhibit C**. Each spreadsheet identifies each individual consumer (reflected in separate rows),[1] as well as total fees paid by each consumer.

8.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 18, 2023 in Schaumburg, Illinois.

Richard Anderlick

---

[1] Personally identifiable information, including consumer names and contact information, has been redacted.

3

DECLARATION OF RICHARD ANDERLICK

Pls.' Ex. 18
P. 638

# Plaintiffs' Exhibit 19

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., | CASE NO. 8:19-cv-01998 MWF |
| Plaintiffs, | **DECLARATION OF DAVID PEGG** |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., | Court: Hon. Michael W. Fitzgerald |
| Defendants. | |

**DECLARATION OF DAVID PEGG**

**Pursuant to 28 U.S.C § 1746**

I, David Pegg, hereby declare as follows:

1.      I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

2.      I am an investigator at the Minnesota Attorney General's Office (AGO).  I have worked at the AGO since August 2022.  As part of my regular work responsibilities, I have assisted with the litigation of the above-captioned matter, including communicating with Minnesota consumers about their experience with Defendants.

3.      On December 20, 2019, Edward Chang, an attorney for the court-appointed Receiver in this matter, e-mailed an Excel spreadsheet to Assistant

1

DECLARATION OF DAVID PEGG

Attorney General Evan Romanoff at the AGO. The spreadsheet contained consumer data for the State of Minnesota that had been extracted by Debt Pay, Inc. Specifically, the spreadsheet contained a list of all Minnesota consumers who signed up with Defendants or paid fees to Defendants, as well as associated information for each consumer, including contact information, date of enrollment, and the amount of fees paid by each consumer. I understand that a redacted copy of this spreadsheet is being filed as an attachment to the Declaration of Richard Anderlick.

4.    Assistant Attorney General Evan Romanoff sent me the spreadsheet and asked me to review it to calculate the total number of Minnesota consumers as well as the total amount of fees paid by Minnesota consumers.

5.    As part of my regular job duties, I reviewed the spreadsheet and de-duplicated it to remove any consumers identified more than once. Using the Excel program, I also calculated the total number of consumers and total fees paid. The spreadsheet reflects that 1,614 Minnesota consumers enrolled in Defendants' debt relief program, and that Minnesota consumers paid a total of $1,205,776.83 in fees to Defendants.

6.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 23, 2023, in Minneapolis, Minnesota.

2

DECLARATION OF DAVID PEGG



David Pegg

At Minneapolis, Minnesota

3

**DECLARATION OF DAVID PEGG**

Plaintiffs' Exhibit 20

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., | CASE NO. 8:19-cv-01998 MWF |
| Plaintiffs, | **DECLARATION OF DAVID EVERS** |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., | Court: Hon. Michael W. Fitzgerald |
| Defendants. | |

## DECLARATION OF DAVID EVERS

### Pursuant to 28 U.S.C § 1746

I, David C. Evers, hereby declare as follows:

1. I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

2. I am an investigator at the North Carolina Attorney General's Office (AGO). I have worked at the AGO since 1999. As part of my regular work responsibilities, I have assisted with the litigation of the above-captioned matter, including communicating with North Carolina consumers about their experience with Defendants.

3. On December 20, 2019, Edward Chang, an attorney for the court-appointed Receiver in this matter, e-mailed an Excel spreadsheet to Special Deputy

1

Attorney General Lynne Weaver at the AGO. The spreadsheet contained consumer data for the State of North Carolina that had been extracted by Debt Pay, Inc. ("Debt Pay"). Specifically, the spreadsheet contained a list of all North Carolina consumers who signed up with Defendants or paid fees to Defendants, as well as associated information for each consumer, including contact information, date of enrollment, and the amount of fees paid by each consumer. I understand that a redacted copy of this spreadsheet is being filed as an attachment to the Declaration of Richard Anderlick.

4.     Special Deputy Attorney General Lynne Weaver sent me the spreadsheet and asked me to review it to calculate the total number of North Carolina consumers as well as the total amount of fees paid by North Carolina consumers.

5.     As part of my regular job duties, I reviewed the spreadsheet and de-duplicated it to remove consumers who ultimately did not pay anything into the program, as well as any consumers listed more than once. Using the Excel program, I also calculated the total number of consumers and total fees paid. Based upon our office's review of the Debt Pay spreadsheet, the Debt Pay spreadsheet reflects that 4,628 North Carolina consumers enrolled in Defendants' debt relief program, and that North Carolina consumers paid a total of $4,483,915 in fees to Defendants.

6.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Pls.' Ex. 20
P. 645

Executed on January 24, 2023, in Raleigh, North Carolina.

David C. Evers

At Raleigh, North Carolina

3

Pls.' Ex. 20
P. 646

Plaintiffs' Exhibit 21

1 | THE PEOPLE OF THE STATE OF CALIFORNIA
HYDEE FELDSTEIN SOTO (CA Bar No. 106866)
2 | Los Angeles City Attorney
ANNE C. TREMBLAY (CA Bar No. 180956)
3 | Chief Assistant City Attorney
CHRISTINA V. TUSAN (CA Bar No. 192203)
4 | Supervising Assistant City Attorney
WILLIAM PLETCHER (CA Bar No. 212664)
5 | Deputy City Attorney
6 | MIGUEL RUIZ (CA Bar No. 240387)
7 | Deputy City Attorney
Office of the City Attorney
8 | 200 N. Main Street, 500 City Hall East
Los Angeles, California 90012-4131
9 | Tel: (213) 473-6908 / Fax: (213) 978-8112
10 | Emails: christina.tusan@lacity.org / william.pletcher@lacity.org

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., | CASE NO. 8:19-cv-01998 MWF |
| Plaintiffs, | **DECLARATION OF JAY MASON** |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., | Court: Hon. Michael W. Fitzgerald |
| Defendants. | |

# DECLARATION OF JAY MASON

## Pursuant to 28 U.S.C § 1746

I, Jay Mason, hereby declare as follows:

1.      I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

2.      I am a Deputy City Attorney at the Los Angeles City Attorney's Office ("LACAO").  I have worked at the LACAO since October 2022.  As part of my regular work responsibilities, I have assisted with the litigation of the above-captioned matter and am familiar with the facts of the case.

3.      On December 20, 2019, Edward Chang, an attorney for the court-appointed Receiver in this matter, e-mailed an Excel spreadsheet to Supervising Assistant City Attorney Christina Tusan at the LACAO.  The spreadsheet contained consumer data for the State of California that had been extracted by Debt Pay, Inc. Specifically, the spreadsheet contained a list of all California consumers who signed up with Defendants or paid fees to Defendants, as well as associated information for each consumer, including contact information, date of enrollment, and the amount of fees paid by each consumer.  I understand that a redacted copy of this spreadsheet is being filed as an attachment to the Declaration of Richard Anderlick.

4.      Supervising Assistant City Attorney Christina Tusan sent me the spreadsheet and asked me to review it to calculate the total number of California

consumers as well as the total amount of fees paid by California consumers.

5.      As part of my regular job duties, I reviewed the spreadsheet and de-duplicated it to remove any consumers identified more than once and match each loan to the appropriate consumer.  Using the Excel program, I also calculated the total number of consumers and total fees paid.  Based on this review of the spreadsheet, I determined that 12,184 California consumers enrolled in Defendants' debt relief program, and that California consumers paid a total of $8,112,188.83 in fees to Defendants.

6.      On February 22, 2022, the People of the State of California served on Defendant Kaine Wen ("Defendant Wen") its first requests for production of documents and other tangible things, and its first set of interrogatories ("Feb. 22 Discovery").

7.      On July 7, 2022, the Consumer Financial Protection Bureau and the People of the State of California filed a motion to compel Defendant Wen to respond to the Feb. 22 Discovery as well as the discovery propounded by the Bureau.

8.      On August 9, 2022, the Court issued an order compelling Defendant Wen to respond to the Feb. 22 Discovery and to discovery propounded by the Bureau.  Specifically, the Court found Wen's "boilerplate objections to each and every discovery request are improper and deficient[,]" and required him to provide "complete, substantive responses" to each of the moving parties' discovery requests.

3

9.      As of January 24, 2023, Defendant Wen has not provided any additional

response to the Feb. 22 Discovery since entry of the Court's August 9, 2022 order

compelling his responses.

10.     I declare under penalty of perjury under the laws of the United States

of America that the foregoing is true and correct.


Executed on January 24, 2023 in Los Angeles, California.


Jay Mason

At Los Angeles, California

DECLARATION OF JAY MASON

Plaintiffs' Exhibit 22

DECLARATION OF ALYSSA PUGH

Pursuant to 28 U.S.C. § 1746

I, Alyssa Pugh, hereby declare and state as follows:

1. I am over the age of eighteen and reside in Franklinville, North Carolina.

2. I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3. In pursuing my college education, I have incurred a large amount of student loan debt in excess of $30,000.

4. In October 2017, I was referred by a friend to a student loan debt relief company called Premier Student Loan Center ("Premier"). I searched Premier's website on the internet and found that the company was located in California and assisted federal student-loan borrowers in lowering their monthly payments through debt forgiveness programs offered by the U.S. Department of Education ("DOE"). Based on this information, I called Premier on October 15, 2017 to inquire about its student loan debt relief services.

5. I spoke with an individual at Premier who identified herself as "Maria," and I informed Maria that I was interested in lowering my monthly student loan payments. Maria told me that Premier was a student loan servicing company working with DOE and that Premier could help lower my monthly loan payments and enroll me in a loan forgiveness program administered by DOE.

6. Maria asked me about my employment status. I told Maria I was employed as a speech therapist in the public school system and that I was already aware of the Public

1

1    Service Loan Forgiveness ("PSLF") program for public service employees.  Although I

2    had been making regular monthly payments on my student loans and working towards loan

3    forgiveness, I asked Maria whether I would remain eligible for loan forgiveness if I left my

4    current job in the public sector for a private company.  Maria assured me that Premier

5    provided many student loan forgiveness programs, and if I chose to enroll with Premier,

6    my student loans would be forgiven after making 120 monthly payments, regardless of my

7    employment status.

8        7.    Maria then asked for my email address, which I gave to her.  Maria read to

9    me over the phone my personal contact information and student loan information, which

10    led me to believe that Premier was a credible company since Maria indicated Premier

11    worked directly with DOE and Premier had access to my student loan account information.

12        8.    During the phone conversation, Maria asked me for some information that

13    Maria said was for the PSLF application, including my salary, social security number,

14    marital status, number of dependents, employer, and 1040 tax returns.  I told Maria I was

15    married and have one child, and I provided the other information to Premier in order to

16    qualify for the PSLF program.

17        9.    Based on the information I provided, Maria told me that Premier would be

18    able to lower my monthly payments and interest rate by consolidating my student loans

19    and transferring the servicing of my student loan from Great Lakes to FedLoan Servicing

20    ("FedLoan").  Maria also told me that the fee for processing my application for the PSLF

21    program would be $248.75 for four months, and that after my application was approved by

22    DOE, my student loan payments would be reduced to $41.00 a month for ten years.  It was

<center>2</center>

1   my understanding that $30.00 would be paid to Premier each month as an administrative

2   fee and that $11.00 would be applied each month to my student loan balance.

3         10.    Since I could much more readily afford a monthly loan payment of $41.00

4   and I was excited about the possibility of loan forgiveness, even if left my job in the public

5   school system, I agreed to enroll with Premier.  I then gave Maria my debit card

6   information to begin the application process.

7         11.    Immediately after the phone call ended, I received an email from Maria with

8   an electronic copy of Premier's service agreement.  I signed it through Docusign and

9   emailed the agreement back to Maria, although no one from Premier ever called to review

10   the details of the agreement with me.

11         12.    My bank account was then debited once a month in the amount of $248.75

12   for the next four months on the following dates: October 17, 2017, November 22, 2017,

13   December 22, 2017, and January 23, 2018.  My bank statements showed that the company

14   debiting my account for the payments each month was "Premier Student Loan C."

15         13.    In February 2018, Premier debited $41.00 from my bank account and

16   continued to debit $41.00 from my bank account each month afterwards for the next twelve

17   months, until January 2019.

18         14.    I paid Premier a total of $1,487.00 during the fifteen months I was enrolled

19   in Premier's student loan debt relief program.

20         15.    In September 2018, I received an email from Premier regarding the annual

21   recertification process for my student loans.  Premier again asked for information regarding

22   my salary, employer, and pay stubs.  By this time, I had taken a new job as a speech

3

1   therapist for a medical provider in the private sector.  Since I was earning substantially

2   more money than I did in the public school system, Premier informed me that my increased

3   income could jeopardize my eligibility for reduced student loan payments.

4       16.    In January 2019, I received a letter from FedLoan, stating that I was no longer

5   eligible for reduced student loan payments under DOE's income driven repayment ("IDR")

6   plan.  In response to the letter, I called FedLoan and spoke with a representative who told

7   me that my federal student aid ID number ("FSA") had been changed and that Premier had

8   used my email address to create a new FSA with a different user name, security code, and

9   password.  The FedLoan representative also told me that Premier was not working with

10   DOE as a student loan servicer, but Premier had instead changed my FSA password to

11   access my student loan account information.

12       17.    With help from the FedLoan representative, I was able to reset my FSA

13   password and was allowed to discuss the status of my student loan account.  During this

14   conversation, the FedLoan representative informed me that I was no longer eligible for the

15   IDR plan due to my increased annual income.

16       18.    The FedLoan representative also shared with me the information that Premier

17   had submitted to FedLoan.  To my distress, I learned that Premier had submitted false

18   documents to FedLoan stating I was a single mother with three young children, that I had

19   three adult dependents, and that I was unemployed—all of which is untrue and was contrary

20   to what I had told Premier.

21       19.    Immediately following my phone conversation with FedLoan, I called

22   Premier and cancelled my contract with Premier.

Pls.' Ex. 22
P. 656

1          20.      Premier did not provide any beneficial services to me, and Premier has

2     worsened my student loan situation.   My total student loan debt has substantially increased

3     due to Premier's submission of false documents and information to DOE, which incorrectly

4     reduced my monthly student loan payments and caused my loan balance to increase.

5          21.      If I had known that the money I was paying to Premier was not being applied

6     to my student loan balance or that Premier was going to falsify information to my student

7     loan servicer about my family size and income, I would never have entered into Premier's

8     program.

9          22.      I declare under penalty of perjury that the foregoing is true and correct.

10         23.      Executed on October ____, 2019.

11

12

13                                                        Alyssa Pugh

14

15

16

17

5

Plaintiffs' Exhibit 23

<div align="center">Declaration of Mildred Hershenson</div>

<div align="center">Pursuant to 28 U.S.C. § 1746</div>

I, Mildred Hershenson, hereby declare and state as follows:

1.      I am over the age of eighteen and reside in Maggie Valley, North Carolina.

2.      I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.      I first became aware of Premier when I received a telemarketing phone call from a Premier representative on my home phone. The Premier representative stated that FedLoan Servicing had transferred my account to Premier. Premier was going to be my new student loan servicer.

4.      The Premier representative told me I would pay $239 per month for five months and then $40 per month until the loan was paid off.  The representative from Premier said the term was 120 payments.

5.      At the time I got the call from Premier I was paying approximately $300 per month to FedLoan. The first time I heard of Premier was when I received their phone call.

6.      My husband spoke to the Premier representative and questioned their legitimacy. The Premier representative stated that they were a student loan company authorized to lower our monthly debt and they were connected to the Department of Education ("DOE").

7.      The Premier representative stated that this was all part of a loan forgiveness program. The Premier representative stated that this was a DOE program and it would allow me to get my loans paid off quicker.  I was led to believe that I was working with the DOE.  The Premier Representative seemed to have all the right words to say to assure me that they were legitimate.

8.      I gave Premier my social security number, W2's, loan amount, marital status, family size, and income. I provided the information over the phone and through e-mail. At the time my family size was three and I was working full time on salary. I signed the agreement with an electronic signature. A true and correct copy of the electronically signed Premier contract dated February 16, 2018 is attached hereto as **Attachment A.**

<div align="center">1</div>

9.      Premier debited my account $239 per month for five months, then $40 per month from July 2018 until October 16, 2018. Overall, I paid Premier $1,355.

10.     In October 2018, I received a letter from FedLoans stating that my loan payment was due. I called FedLoans to understand why I still owed them money.

11.     During that call I discovered that FedLoans had all the wrong contact information for me. I mentioned to FedLoans that I was now making payments through Premier. FedLoans said they did not work with Premier and had not received any of these payments. To me this was evidence that Premier was not a reputable company. FedLoans suggested that I call the CFPB and file a complaint on Premier, which I did.

12.     I decided that I did not want to deal with Premier anymore and intended to cancel. However, I searched online but could not find a contact number for Premier and I didn't have access to my email, due to my e-mail being hacked. While I was looking online for a phone number I saw a number of negative comments and complaints about Premier. In order to cancel my service with Premier I called my bank and cancelled my debit card.

13.     Then I received a call from a Premier representative named Christopher. He said he was following up on a complaint I filed about their company. I called Christopher back and left a message. Christopher called back and left me a message. I left one more message and then the calls from Premier stopped. I received no more calls from Premier.

14.     If I had known that the fees paid to Premier were not payments toward my outstanding loan debt and that my loan would not be partially forgiven following the payment of the enrollment fees I never would have paid Premier for its services.

15.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

16.     Executed on 9 - 16      , 2019.

Mildred Hershenson

Mildred Hershenson

At Maggie Valley, NC

2

# Attachment A

# Document Preparation and Service Agreement ("Agreement")

This Agreement is entered into on the date shown below between PREMIER STUDENT LOAN CENTER (Hereinafter referred to as "Company") and the Client shown below (Hereinafter referred to as "Client").

Company provides document preparation services to assist consumers who are applying for federal student loan programs using Department of Education ("DOE") forms. Company is a private company, not affiliated with any government agency, and for a fee Company will assist in assembly and completion of student loan consolidation or other application documents for student loan debt assistance programs offered by the DOE, for delivery to Client for Clients review and submission to DOE. Company is not a lender, a debt consolidation company, or a law firm and does not provide legal advice.

Company and Client do hereby understand, covenant and agree to the following:

**1. Provide Complete and Truthful Information.** Company will provide Client with an overview session limited to their federal student loan debts and the available documents, and Client expressly represents and warrants that Client will provide Company with information that is complete, accurate and truthful.

**2. Performance of Services.** Upon receipt of all information from Client, Company shall promptly analyze Client's situation, review the information provided by the Client, and complete the application forms required for the DOE program(s) that have been selected by the Client. Company shall prepare for filing an application to initiate a federal student loan consolidation through the DOE on behalf of Client, or alternatively and at the Client's option, identify and apply for other DOE-sponsored programs suitable for Client. All completed applications shall be delivered by Company to Client for Client's approval, signature and direct submission to DOE.

**By initialing here, Client requests Company to complete & submit executed application to DOE.**

Initials _MH_

**3. Fees that Client Pays.** The payment for Company's services relating to the student loan assistance applications, their preparation, delivery to Client and ongoing support are described in the attached Fee Schedule (Exhibit A). Client should review the attached Fee Schedule carefully, which sets forth one or more fees that the Client will be charged depending on the services that are performed. All fees are earned, due and payable as described in the attached Fee Schedule. Payments may be collected on a periodic payment option as indicated in the attached Draft Schedule (Exhibit B). The funds shall be debited from Client's bank account or charged on Client's credit card. Client shall be responsible for any third party support or service fees, such as bank processing or third party account fees. At Client's option, an independent dedicated account provider may be used to debit/charge fees, holding them securely under Client's ownership until fees become due. Client may select such optional provider and is responsible for all costs associated with such.

**4. Limited Money Back Guarantee.** Company guarantees that its documents will be sufficiently accurate and comprehensive so that Client will receive a federal student loan consolidation or acceptance into another DOE-offered program for student loan debt, or a repayment plan using current lenders, through the DOE subject to the following conditions: (1) student loans that Client presents to Company are original debts, and have not been previously consolidated or had their terms or amounts previously adjusted, and have not been previously serviced or worked on by any other student loan assistance or adjustment company; (2) Client fully cooperates, provides accurate and timely information requested by Company and DOE; and/or (3) Client does not possess a characteristic that pursuant to DOE rules or applicable law that would disqualify Client from receiving a consolidation. Client shall not be entitled to the benefits of this section in the event that Client receives document preparation services from Company and prior to approval by DOE, Client terminates this Agreement or continues with DOE without the assistance of Company. If Company documents are rejected by DOE and Client is not approved through the DOE after reasonable efforts by the parties, then Company will reimburse the Fee paid to Company (limited to funds received by Company from Client). All refund requests must be made, in writing, to Company within 30 days of any denial by the DOE. This guarantee expires six month after the date this Agreement is signed by the Client.

**5. Process.** Once Client provides Company with all requested information and paperwork, Company will begin preparing applications. Once Client submits application package to DOE, it may take DOE or its servicers up to ninety (90) days or longer to respond. Client understands that Company may use a third party support servicer to assist in processing duties pursuant to this Agreement and Company may share Client's information to accomplish its services.

**6. Indemnification.** Client hereby agrees to defend and indemnify Company and any supporting servicer from and against any claims and liability of any nature whatsoever arising out of or in connection with Client's failure to timely provide requested information to Company, Client's lack of authority or ability to complete terms of this Agreement, and all other claims arising out of this Agreement or relating to Client's loans and

Initials _MH_

other financial obligations. This Agreement constitutes the entire agreement between the parties. Company makes no warranty, express or implied, as to the fitness of any recommendation it may make to Client arising out of this Agreement. Except for cause, Client unconditionally waives any right of action against Company and support servicer, its officers, directors, employees, agents, brokers and assignees, at law, equity or any other cause of action for any reason, directly, indirectly or proximately believed to arise out of this Agreement, for any damages of any nature whatsoever that Client may incur by reason of Client following any recommendation of Company or Client's failure to follow any recommendation of Company, whether any singular, concurrent or series of recommendations are acted upon or not acted upon in whole or in part by Client. This section shall survive any termination of this Agreement.

**7. Entire Agreement.** By virtue of Client's signature below, Client acknowledges that he/she has read, understands and agrees to every term, covenant and condition of this Agreement without change or modification and that he/she has received a true and complete copy hereof, effective on the date below. This agreement is the only agreement between the parties and there is no other collateral agreement (oral or written) between the parties in any manner relating to the subject matter of this agreement. If any portion of this agreement is held to be invalid or unenforceable, the remaining provisions will remain in effect. The parties mutually understand and agree that a facsimile copy signature or an electronic signature on this agreement shall be deemed an original for all lawfully enforceable purposes.

**8. Cancellation Policy.** The Company's cancellation policy is designed to exceed state law requirements (for the Client's protection) and be easy to understand: If you are unhappy or dissatisfied at any time prior to receiving the documents or services described herein, a consolidation or other result from the DOE that Company has assisted you with, then simply send a letter, email or facsimile to the Company requesting a refund and cancelling your program. Once Company completes its document preparation services and sends documents to Client, Client shall not be entitled to a refund unless subject to above guarantee or if Client requests such cancellation within their state statutory cancellation right. If at any time you have questions, please do not hesitate to call or write to us directly.

**9. Limitations on Damages.** Liability under this Agreement and/or relating directly or indirectly to Client's participation in any government loan or relief program, under any theory of liability regarding any claim by the Client is limited to the amount of fees paid by Client and received by Company. The parties agree to be contractually bound to such limitation on any damages, and agree not to demand or attempt to recover any amount in excess of such. This section shall survive any termination.

10. **IMPORTANT – Mandatory Binding Arbitration To Resolve All Disputes And Class Action Waiver. Please Read This Section Carefully and Do Not Sign This Agreement Unless You Understand and Agree With This Section:** This Agreement is governed by a Binding Mandatory Arbitration Requirement. You are encouraged to consult with independent legal counsel so that you understand your rights relating to this requirement. This Section limits your legal rights and ability to go to court. Please consult with legal counsel to be sure you understand this Section prior to signing.

In the event of any controversy, claim or dispute between the parties (the Company, the Client, and any support entities or persons contemplated herein) arising out of or relating to this agreement or the breach, termination, enforcement, interpretation, unconscionability or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined and resolved exclusively by arbitration in the county which the consumer resides, or the closest metropolitan county, in accordance with the Laws of the State of California for agreements to be made in and to be performed in California. The parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures and an arbitrator shall be selected by the AAA. The arbitrator shall be neutral and independent and shall comply with the AAA code of ethics. The award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the parties. If either party fails to comply with the arbitrator's award, the injured party may petition the circuit court for enforcement. The parties agree that either party may bring claims against the other only in his/her or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings of more than one person's claims, and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost (not attorney's fees) of arbitration equally. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award. Binding Arbitration means that both parties give up the right to a trial by a jury. It also means that both parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. This section and the arbitration requirement shall survive any termination.

Initials _MH_

11. **Information Authorization.** Client hereby authorizes Company to verify past and present employment earnings records, bank accounts, stock holdings, and any other asset balances that are needed to process my application request(s). Client further authorizes Company to order a consumer credit report and verify other credit information, including past and present mortgage and landlord references. Importantly, Company does not provide any form of credit repair, credit score enhancement, unsecured or secured debt relief, or legal or tax advice, so any information

Initials _MH_

obtained by Company can't be used for those purposes.

12. **Electronic and Voice Communication Consent.** Client consents to do business electronically with Company. Client understands that electronic transactions, not limited to emails, are inherently unsecure and that both Client and Company will take all reasonable steps to maintain the Privacy of the information shared between the parties. Client consents to receive information and documents relating to this Agreement and Company services via electronic mail, text message, facsimile, voicemail, and any other common electronic means. Client understands that all costs associated with the receipt, review and use of such electronic communications shall be those of Client, such as maintaining access to the Internet or paying for text messages. Client consents to receive updates and documents relating to this Agreement and the services and programs offered by Company via prerecorded voice messages, text/SMS messages, and/or through the use of an automated dialing system. Client may contact Company at any time to opt- out of receiving updates, new programs or offers through prerecorded or autodialed messages.

BY SIGNING BELOW (ELECTRONICALLY OR PHYSICALLY), I HEREBY ACKNOWLEDGE THAT I HAVE NOT BEEN ADVISED BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES TO FOREGO A STUDENT LOAN PAYMENT IN EXCHANGE FOR THE GOOD FAITH PAYMENT AND FEDERAL STUDENT LOAN CONSOLIDATION PROGRAM. DURING THIS PROCESS, CLIENT IS RESPONSIBLE FOR MAKING HIS OR HER PAYMENTS, AND FAILURE TO DO SO COULD DISQUALIFY THE CLIENT FROM OBTAINING THE SERVICE THAT WAS AGREED UPON. I FURTHER ACKNOWLEDGE THAT NO GUARANTEES CONCERNING THE SUCCESS OF THE LOAN CONSOLIDATION HAVE BEEN PROVIDED TO CLIENT BY COMPANY, AND/OR ANY OF ITS AGENTS, AND/OR AFFILIATES AND A POSITIVE OUTCOME IS NOT GUARANTEED. I UNDERSTAND AND CONSENT TO THE ARBITRATION CLAUSE AND LIMITATION OF LIABILITY CONTAINED HEREIN, AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT IN ITS TOTALITY AND ASK ANY QUESTIONS OF COMPANY.

Executed On this (Date): _02/16/2018_

Applicant Signature: _Mildred Hershenson_

Applicant Name: _Mildred Hershenson_   Applicant DOB: ▇▇▇▇▇

# Exhibit "A" to Service Agreement

# Fee and Service Schedule

The purpose of this fee and service schedule is to ensure that Client is aware and consents to the fees that Company will charge for its services in assisting Client in preparing documents for one or more of the below programs. While such programs may be available for free directly by various government agencies, our services are fee-based and focused on application and document preparation. If other programs are identified by Client or Company to be suitable for Client, then additional fees may apply and will be presented to Client in writing for approval. Fees are charged consistent with terms of Client Agreement. Fees herein are only Company fees and do not include any third party fees such as bank or dedicated account processing fees.

Client requests Company to perform, in good faith, the following services (the "Services"): (a) conduct a financial review of the Client's current situation; b) analyze and review potential Student Loan Consolidation options that may be available to Client from the DOE; (c) discuss potential options with the Client; and (d) prepare and deliver to Client selected applications.

Company's services ("Services") will be limited to the following:

1. Assisting Client in locating options and document preparation limited to government consolidation, education and/or refinance or similar programs designed for Client's specific debt(s);

2. Locating, obtaining and preparing the application(s) and supporting documents to apply for the programs and services described above;

3. Additional consultation as needed with Client to gather and obtain information and documents from client needed to prepare the above documents, and answer Client questions; and

4. Follow-up on application, provide updates to Client, as reasonable, relating to documents that the Company will complete and provide for Client approval, signature and submission.

5. For certain loans, it may be determined that Client is in default of their obligations ("Default Accounts"). Company will assist with Default Accounts limited to reviewing the Client's present status and existing loan obligations, and upon review consult with Client to locate a specific payment plan known as a "rehabilitation plan." Generally, if the Client is likely to qualify for such based on Client's financials and ability to pay, the Company will present such (with Client's approval) to the government creditors. Company will assist Client in qualifying for a rehabilitation program, and upon such acceptance Client will receive a term repayment program. Upon meeting lender-imposed repayment terms (usually for 6-12 months), Client may qualify to submit a consolidation application consistent with the above. Company shall then assist per above.

6. Some Clients may require other assistance with their loans that shall be deemed by the Company and Client to be in the Client's best interest. Those services shall be charged on a fee-for-service basis consistent with a written pricing schedule to be provided to the Client for Client's signature prior to any work commencing. Those services shall be limited to providing support with the DOE relating to other student loan assistance programs that may be available for the Client. Other than the amounts charged for these supplemental or alternative services, all of the terms of this Agreement shall continue to apply.

Fees for the Above Services and Length of Agreement: In connection with this Agreement the above services shall be provided to the Client at a rate of $1,195.00 for document preparation and delivery to Client for a consolidation consistent with the above; and $1,195.00 for services limited to default accounts and rehabilitation programs as described above. Fees shall be due in full and payable to Company once services have been completed, or in the event of a rehabilitation program fees are due in full once Client makes first payment to servicer(s). This Agreement shall automatically expire upon 120 days after the date the Agreement begins (except for surviving clauses and fees that continue to be due to company), unless Client expressly requests that Company continue. For example, following a rehabilitation program, Client may want the Company to continue program consolidation application services. Once earned through the above provision of services, all fees are non-refundable. All fees shall be debited from Client's bank account or charged on Client's credit card pursuant to the attached authorization. Client shall be responsible for any third party support or service fees, such as bank processing or third party account fees. At Client's option, an independent dedicated account provider may be used to debit/ charge fees, holding them securely under Client's ownership until fees become due. Client may select such optional provider and is responsible for all costs associated with such. A sample dedicated account provider is attached to this Agreement for Client's review. Client consents to Company receiving payment for all fees that are due under this Agreement from Client's dedicated account.

Client Signature: _Mildred Henshenson_          Date: 02/16/2018

# Exhibit "B" to Service Agreement
## Draft Schedule

| # | Date | Enrollment Fee | Recurring | Total Payment |
|---|------|----------------|-----------|---------------|
| 1 | Feb 16, 2018 | $239.00 | $0.00 | $239.00 |
| 2 | Mar 14, 2018 | $239.00 | $0.00 | $239.00 |
| 3 | Apr 14, 2018 | $239.00 | $0.00 | $239.00 |
| 4 | May 14, 2018 | $239.00 | $0.00 | $239.00 |
| 5 | Jun 14, 2018 | $239.00 | $0.00 | $239.00 |
| 6 | Jul 14, 2018 | $0.00 | $40.00 | $40.00 |
| 7 | Aug 14, 2018 | $0.00 | $40.00 | $40.00 |
| 8 | Sep 14, 2018 | $0.00 | $40.00 | $40.00 |
| 9 | Oct 14, 2018 | $0.00 | $40.00 | $40.00 |
| 10 | Nov 14, 2018 | $0.00 | $40.00 | $40.00 |
| 11 | Dec 14, 2018 | $0.00 | $40.00 | $40.00 |
| 12 | Jan 14, 2019 | $0.00 | $40.00 | $40.00 |
| 13 | Feb 14, 2019 | $0.00 | $40.00 | $40.00 |
| 14 | Mar 14, 2019 | $0.00 | $40.00 | $40.00 |
| 15 | Apr 14, 2019 | $0.00 | $40.00 | $40.00 |
| 16 | May 14, 2019 | $0.00 | $40.00 | $40.00 |
| 17 | Jun 14, 2019 | $0.00 | $40.00 | $40.00 |
| 18 | Jul 14, 2019 | $0.00 | $40.00 | $40.00 |
| 19 | Aug 14, 2019 | $0.00 | $40.00 | $40.00 |
| 20 | Sep 14, 2019 | $0.00 | $40.00 | $40.00 |
| 21 | Oct 14, 2019 | $0.00 | $40.00 | $40.00 |
| 22 | Nov 14, 2019 | $0.00 | $40.00 | $40.00 |
| 23 | Dec 14, 2019 | $0.00 | $40.00 | $40.00 |
| 24 | Jan 14, 2020 | $0.00 | $40.00 | $40.00 |
| 25 | Feb 14, 2020 | $0.00 | $40.00 | $40.00 |
| 26 | Mar 14, 2020 | $0.00 | $40.00 | $40.00 |
| 27 | Apr 14, 2020 | $0.00 | $40.00 | $40.00 |
| 28 | May 14, 2020 | $0.00 | $40.00 | $40.00 |
| 29 | Jun 14, 2020 | $0.00 | $40.00 | $40.00 |
| 30 | Jul 14, 2020 | $0.00 | $40.00 | $40.00 |
| 31 | Aug 14, 2020 | $0.00 | $40.00 | $40.00 |
| 32 | Sep 14, 2020 | $0.00 | $40.00 | $40.00 |
| 33 | Oct 14, 2020 | $0.00 | $40.00 | $40.00 |
| 34 | Nov 14, 2020 | $0.00 | $40.00 | $40.00 |
| 35 | Dec 14, 2020 | $0.00 | $40.00 | $40.00 |
| 36 | Jan 14, 2021 | $0.00 | $40.00 | $40.00 |
| 37 | Feb 14, 2021 | $0.00 | $40.00 | $40.00 |
| 38 | Mar 14, 2021 | $0.00 | $40.00 | $40.00 |
| 39 | Apr 14, 2021 | $0.00 | $40.00 | $40.00 |
| 40 | May 14, 2021 | $0.00 | $40.00 | $40.00 |
| 41 | Jun 14, 2021 | $0.00 | $40.00 | $40.00 |
| 42 | Jul 14, 2021 | $0.00 | $40.00 | $40.00 |
| 43 | Aug 14, 2021 | $0.00 | $40.00 | $40.00 |
| 44 | Sep 14, 2021 | $0.00 | $40.00 | $40.00 |
| 45 | Oct 14, 2021 | $0.00 | $40.00 | $40.00 |
| 46 | Nov 14, 2021 | $0.00 | $40.00 | $40.00 |
| 47 | Dec 14, 2021 | $0.00 | $40.00 | $40.00 |
| 48 | Jan 14, 2022 | $0.00 | $40.00 | $40.00 |
| 49 | Feb 14, 2022 | $0.00 | $40.00 | $40.00 |
| 50 | Mar 14, 2022 | $0.00 | $40.00 | $40.00 |
| 51 | Apr 14, 2022 | $0.00 | $40.00 | $40.00 |
| 52 | May 14, 2022 | $0.00 | $40.00 | $40.00 |
| 53 | Jun 14, 2022 | $0.00 | $40.00 | $40.00 |
| 54 | Jul 14, 2022 | $0.00 | $40.00 | $40.00 |
| 55 | Aug 14, 2022 | $0.00 | $40.00 | $40.00 |
| 56 | Sep 14, 2022 | $0.00 | $40.00 | $40.00 |
| 57 | Oct 14, 2022 | $0.00 | $40.00 | $40.00 |
| 58 | Nov 14, 2022 | $0.00 | $40.00 | $40.00 |

Pls.' Ex. 23
P. 665

| 59 | Dec 14, 2022 | $0.00 | $40.00 | $40.00 |
| 60 | Jan 14, 2023 | $0.00 | $40.00 | $40.00 |
| 61 | Feb 14, 2023 | $0.00 | $40.00 | $40.00 |
| 62 | Mar 14, 2023 | $0.00 | $40.00 | $40.00 |
| 63 | Apr 14, 2023 | $0.00 | $40.00 | $40.00 |
| 64 | May 14, 2023 | $0.00 | $40.00 | $40.00 |
| 65 | Jun 14, 2023 | $0.00 | $40.00 | $40.00 |
| 66 | Jul 14, 2023 | $0.00 | $40.00 | $40.00 |
| 67 | Aug 14, 2023 | $0.00 | $40.00 | $40.00 |
| 68 | Sep 14, 2023 | $0.00 | $40.00 | $40.00 |
| 69 | Oct 14, 2023 | $0.00 | $40.00 | $40.00 |
| 70 | Nov 14, 2023 | $0.00 | $40.00 | $40.00 |
| 71 | Dec 14, 2023 | $0.00 | $40.00 | $40.00 |
| 72 | Jan 14, 2024 | $0.00 | $40.00 | $40.00 |
| 73 | Feb 14, 2024 | $0.00 | $40.00 | $40.00 |
| 74 | Mar 14, 2024 | $0.00 | $40.00 | $40.00 |
| 75 | Apr 14, 2024 | $0.00 | $40.00 | $40.00 |
| 76 | May 14, 2024 | $0.00 | $40.00 | $40.00 |
| 77 | Jun 14, 2024 | $0.00 | $40.00 | $40.00 |
| 78 | Jul 14, 2024 | $0.00 | $40.00 | $40.00 |
| 79 | Aug 14, 2024 | $0.00 | $40.00 | $40.00 |
| 80 | Sep 14, 2024 | $0.00 | $40.00 | $40.00 |
| 81 | Oct 14, 2024 | $0.00 | $40.00 | $40.00 |
| 82 | Nov 14, 2024 | $0.00 | $40.00 | $40.00 |
| 83 | Dec 14, 2024 | $0.00 | $40.00 | $40.00 |
| 84 | Jan 14, 2025 | $0.00 | $40.00 | $40.00 |
| 85 | Feb 14, 2025 | $0.00 | $40.00 | $40.00 |
| 86 | Mar 14, 2025 | $0.00 | $40.00 | $40.00 |
| 87 | Apr 14, 2025 | $0.00 | $40.00 | $40.00 |
| 88 | May 14, 2025 | $0.00 | $40.00 | $40.00 |
| 89 | Jun 14, 2025 | $0.00 | $40.00 | $40.00 |
| 90 | Jul 14, 2025 | $0.00 | $40.00 | $40.00 |
| 91 | Aug 14, 2025 | $0.00 | $40.00 | $40.00 |
| 92 | Sep 14, 2025 | $0.00 | $40.00 | $40.00 |
| 93 | Oct 14, 2025 | $0.00 | $40.00 | $40.00 |
| 94 | Nov 14, 2025 | $0.00 | $40.00 | $40.00 |
| 95 | Dec 14, 2025 | $0.00 | $40.00 | $40.00 |
| 96 | Jan 14, 2026 | $0.00 | $40.00 | $40.00 |
| 97 | Feb 14, 2026 | $0.00 | $40.00 | $40.00 |
| 98 | Mar 14, 2026 | $0.00 | $40.00 | $40.00 |
| 99 | Apr 14, 2026 | $0.00 | $40.00 | $40.00 |
| 100 | May 14, 2026 | $0.00 | $40.00 | $40.00 |
| 101 | Jun 14, 2026 | $0.00 | $40.00 | $40.00 |
| 102 | Jul 14, 2026 | $0.00 | $40.00 | $40.00 |
| 103 | Aug 14, 2026 | $0.00 | $40.00 | $40.00 |
| 104 | Sep 14, 2026 | $0.00 | $40.00 | $40.00 |
| 105 | Oct 14, 2026 | $0.00 | $40.00 | $40.00 |
| 106 | Nov 14, 2026 | $0.00 | $40.00 | $40.00 |
| 107 | Dec 14, 2026 | $0.00 | $40.00 | $40.00 |
| 108 | Jan 14, 2027 | $0.00 | $40.00 | $40.00 |
| 109 | Feb 14, 2027 | $0.00 | $40.00 | $40.00 |
| 110 | Mar 14, 2027 | $0.00 | $40.00 | $40.00 |
| 111 | Apr 14, 2027 | $0.00 | $40.00 | $40.00 |
| 112 | May 14, 2027 | $0.00 | $40.00 | $40.00 |
| 113 | Jun 14, 2027 | $0.00 | $40.00 | $40.00 |
| 114 | Jul 14, 2027 | $0.00 | $40.00 | $40.00 |
| 115 | Aug 14, 2027 | $0.00 | $40.00 | $40.00 |
| 116 | Sep 14, 2027 | $0.00 | $40.00 | $40.00 |
| 117 | Oct 14, 2027 | $0.00 | $40.00 | $40.00 |
| 118 | Nov 14, 2027 | $0.00 | $40.00 | $40.00 |
| 119 | Dec 14, 2027 | $0.00 | $40.00 | $40.00 |
| 120 | Jan 14, 2028 | $0.00 | $40.00 | $40.00 |

Client Signature: _____   Date: 02/16/2018

Pls.' Ex. 23
P. 667

| Facts? | WHAT DOES PREMIER STUDENT LOAN CENTER ("Company") DO WITH YOUR PERSONAL INFORMATION? |
|--------|-------------------------------------------------------------------------------------|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>• Social Security number and income<br>• Account balances and account numbers<br>• Transaction or loss history and employment information<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business.  In the section below, we list the reasons financial companies can share their customers' personal information; the reasons PREMIER STUDENT LOAN CENTER chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Do we share? | Can you limit this sharing? |
|------------------------------------------------|--------------|-----------------------------|
| For our everyday business purposes – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes – to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes – information about your transactions and experiences | Yes | No |
| For our affiliates everyday business purposes – information about your creditworthiness | No | We don't share |
| For non-affiliates to market to you | Yes | Yes |
| ¡Questions? | www.premierstudentloancenter.com | |

Pls.' Ex. 23
P. 668

| Who we are | |
|---|---|
| **Who is providing this notice?** | PREMIER STUDENT LOAN CENTER |

| What we do | |
|---|---|
| **How do we protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safe guards and secured files and buildings<br><br>We also maintain physical, electronic and procedural safe guards such as computer virus protection software, firewalls, and a 128 bit Secure Socket Layer. Only authorized employees have access. |
| **How do we collect my personal information?** | We collect your personal information, for example when you<br>-Give us your income information<br>-Provide employment information<br>-Provide account information<br>-Give us your contact information<br>We also collect your personal information from other companies |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>-Sharing for affiliates' everyday business purposes-information about your creditworthiness<br>-Affiliates from using your information to market to you<br>-Sharing for non-affiliates o market to you<br>State laws and individual companies may give you additional rights to limit sharing. |

| Definition | |
|---|---|
| **Affiliates** | Financial and non-financial companies related by common ownership or control.<br><br>• PREMIER STUDENT LOAN CENTER does not share with our affiliates |
| **Non-affiliates** | Financial and non-financial companies not related by common ownership or control.<br><br>• PREMIER STUDENT LOAN CENTER does not share with non-affiliates so they can market to you. |
| **Joint Marketing** | A formal agreement between non-affiliated financial companies that together market financial products or services to you<br><br>• PREMIER STUDENT LOAN CENTER doesn't jointly market. |

| Other Important Information | |
|---|---|
| **For California and Vermont Residents:** We will not share information we collect about you with non-affiliated third parties, except as permitted by California or Vermont law, respectively, such as to process your transactions or to maintain your account. | |

Pls.' Ex. 23
P. 669

# Limited Power of Attorney

To: Any and all of my Student Loan Creditors:

I, hereby duly authorize, empower and appoint PREMIER STUDENT LOAN CENTER , its representatives and

1. To communicate with any and/or all of my Federal Student Loan providers and Servicers, third party account servicing companies that are working on my applications permission to perform any acts necessary or convenient, including but not limited to, the following on my behalf:

2. To communicate with banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans, including but not limited to the balance of my account, payment history verification of the account and any and all necessary communications, correspondence, and negotiations regarding my account(s). I assert that all of the information that I have provided and will provide PREMIER STUDENT LOAN CENTER is true and accurate.

3. I hereby authorize third party communication from banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans to communicate directly with PREMIER STUDENT LOAN CENTER concerning my account or the collection activities associated with it, in accordance with Section 805(b) of the Fair Debt Collection Practices Act. I further request that all of my lenders direct all further telephone calls to: and correspondence to: PREMIER STUDENT LOAN CENTER, 173 Technology Dr #202, Irvine Ca, 92618. Any and all communications directed to me will be referred to PREMIER STUDENT LOAN CENTER.

I understand that PREMIER STUDENT LOAN CENTER  is not a law firm, is not licensed to practice law or provide legal advice and that I will not request or accept, any legal advice from PREMIER STUDENT LOAN CENTER relating to my personal financial situation.

I expressly agree to waive, forgo, indemnify and defend any claim against the PREMIER STUDENT LOAN CENTER relating to the practice of law. I understand that any creditor or collection activity, demands, or lawsuits are unrelated to my enrollment in the PREMIER STUDENT LOAN CENTER program.

I agree that electronic or facsimile copy signature shall be deemed original and is an authorization by me for all lawfully enforceable purposes.

This Limited Power of Attorney shall remain in force until or unless modified or rescinded in writing, or upon resolution of the current matter.

Executed On this (Date): 02/16/2018

| Applicant Signature: | _Mildred Hershenson_ | Applicant SSN: | ██████ |
|---|---|---|---|

| Applicant Name: | Mildred Hershenson | Applicant DOB: | ████ |
|---|---|---|---|

## National Student Loan Data System Access

As part of the federal student loan assistance application process, it will be necessary for PREMIER STUDENT LOAN CENTER and its designated servicer who is assisting on my applications (hereinafter "Company") to access your student loan information within the National Student Loan Data System located online at http://www.nslds ed.gov.

The National Student Loan Data System contains a complete list of your federal education loans, along with current estimated balances and servicer details — information that is required to complete your application(s).

By enrolling in the Company assistance program, you are agreeing to allow Company and its authorized agents to access your profile and all the data contained within that profile.

Please note that all information that Company obtains from the National Student Loan Data System will be used expressly for the purposes of confirming your eligibility for the Company consolidation assistance program and assisting you in the consolidation of your federal education loans,

**Acknowledgment**

I, <u>Mildred Hershenson</u>, hereby acknowledge that I have read, understood, and agree to the

above statements regarding access to my National Student Loan Data System profile. I understand that any information received or accessed will be used solely for the purposes of verifying my eligibility for lender assistance programs and completing my applications.

By signing this acknowledgment, I agree to allow Company and its designated Servicer to access the National Student Loan Data System and my personal profile as explained above.

Client Signature: _Mildred Hershenson_                                      Date: 02/16/2018

 

# E-Signature Completion Certificate

| | |
|---|---|
| Document ID | REDACT  3175 |
| Document Title | Client Agreement |
| Sender IP | 98.173.4.2 |
| Number of Signers | 1 |
| Signer Email | REDACTED |
| Signer IP | |
| Timestamp | 2018-02-16T15:26:29-06:00 |
| Document Hash | 575837f076cecf21411eb487ca709a34 |

## Document Audit

- Send at 2018-02-16T15:25:25-06:00 from IP 98.173.4.2
- Delivered to Mildred Hershenson REDACTED at 2018-02-16T15:25:38-06:00 from
- Adopted Signature at 2018-02-16T15:26:00-06:00 from
- Completed Signing at -001-11-30T00:00:00-06:00 from
- PDF Generated at 2018-02-16T15:26:29-06:00

## User Agent

Plaintiffs' Exhibit 24

## DECLARATION OF MAXWELL SHEAHAN

Pursuant to 28 U.S.C § 1746

I, Maxwell Sheahan, hereby declare and state as follows:

1.  I am over the age of eighteen and reside in Hudson, Wisconsin.

2.  I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.  I was born in Milwaukee, Wisconsin, and raised in that same metropolitan area. In 2008, I graduated from high school in Waupun, Wisconsin. From 2008 to 2015, I studied business management and international business at Winona State University. Then, I transferred to Rasmussen University and graduated with a Bachelor of Arts degree in business management and international business in 2016. After that, I went to Colorado State University – Global Campus and graduated with a Master of Arts degree in project management and information technology in 2018. From 2015 to 2018, I worked as a project manager at WOYC Inc. in Minneapolis. Since then, I have worked as the director of operations at Certus Manufacturing in Eagan, Minnesota. My wife and I were also married in 2016 and we now have two young children. When I am not working, I enjoy sports and the outdoors. I play basketball and golf, and I like to go fishing and hiking at nearby state parks.

4.      Over the course of my studies, I accumulated more than $100,000 in student loan debt.

5.      In 2018, my wife and I were expecting our first child and I had just graduated from my master's program. It was a difficult time for us financially because my wife was not working as a teacher while she was pregnant, and I was paying extensive medical bills due to multiple knee surgeries. Since I had just completed graduate school, I also knew that I would have to start paying back my student loans soon and I was not sure if I would have enough money to make the payments.

6.      In the summer of 2018, a friend of mine told me about a company called Student Loan Account Management ("SLAM") that was able to lower the monthly payments for his student loan debt. He said that he was able to do this because his wife was a teacher. Since my wife was a teacher, he told me that this company should also be able help me enroll in a student loan forgiveness program. Then he gave me the phone number for a representative with this company named Nick Young. At first, I was skeptical, so I did some online research. The company looked credible and, since my friend had also enrolled, I assumed the company was legitimate.

7.      In July 2018, I called Nick at SLAM to see if I could get approved. When we spoke, I explained my financial situation and told him that I could not exceed $200 per month on my student loan payments. Nick evaluated my situation

2

Sheahan Decl.

and then referred me to his colleague, Tania Gonzalez, with the processing department. After Tania asked me more questions about my education, monthly income, and household size, she told me that I was approved to pay $128.70 for twenty years as a part of an income-driven student loan forgiveness program. She told me that if made all of my payments over the twenty-year period, the remainder of my debt would be forgiven. She never told me that I could have enrolled in a repayment program for free without SLAM's assistance. To the contrary, she made it seem like I was only able to enroll because of SLAM's services and its affiliation with the Department of Education.

8.      Based on SLAM's statements, particularly including that my monthly payments would remain at $128.70 for twenty years, I enrolled with SLAM.

9.      On November 1, 2018, I received an email from Tania stating that I had completed the consolidation process, and that my new loan servicer going forward would be Navient. A true and correct copy of the email is attached hereto as **Attachment A.** For the next year, I made the monthly payments of $128.70 to my new servicer, Navient. Additionally, I paid SLAM an initial installment fee of approximately $200 for several months, followed by an ongoing $40 monthly fee. During this first year, I thought everything was going according to this agreed-upon plan.

3

Sheahan Decl.

10.    On September 14, 2019, I received an email from Navient stating that my monthly payments were scheduled to increase from $128.70 to $1,192.20 a month. A true and correct copy of the email is attached hereto as **Attachment B**.

11.    I decided to call Navient because I knew I could not afford to make such high monthly payments. When I called Navient, I spoke with a representative named Mark who explained that my monthly payments were that high because I had not yet recertified my income and family size and that once I did my monthly payments should be anywhere between $500 to $800. I asked Mark to tell me what was on my previous application since my agreed-upon monthly payments were so much lower. Mark told me that my previous application listed me as single with five dependents and making only $50,000 a year, which was incorrect. I then realized that SLAM must have lied about my income and family size to get me to sign a contract with the company and to qualify me for such low monthly payments. I immediately tried to contact SLAM but was not able to reach anyone.

12.    After innumerable calls and emails to SLAM, I finally got a recording that stated that SLAM's operations had been temporarily suspended after the Consumer Financial Protection Bureau and the State of Minnesota sued SLAM. On November 4, 2019, I filed a complaint against SLAM with the Consumer Financial Protection Bureau. A true and correct copy of the complaint is attached hereto as **Attachment C**.

4

Sheahan Decl.

13.    I paid SLAM a total of $1,555 during the time I was enrolled in its student loan debt relief program.

14.    My experience with SLAM has been overwhelming and really makes me angry. When I enrolled with SLAM, my wife was not working, and we were expecting our first child. I also had just gotten a new job. I have always wanted to fulfil my financial obligations, but after my experience with SLAM I am not sure if I will ever be able to do that because I am unsure if I am paying the right people. I got scammed when I was only trying to do the right thing. Since then, I have continually made my monthly payments, even when I could have deferred them due to COVID-19, because my loan repayment was set back by this scam, and I want to finish paying off my student loan debt as soon as possible. To be honest, I am a bit embarrassed that this even happened to me. You know scammers are out there; you hear stories. However, SLAM seemed like a reputable business, and the company was even recommended by a friend. Even though I have continued to make my monthly payments, I have barely made a dent in paying off my student loan debt, and I always wonder if the same thing will happen to me again in the future.

15.    If I had known that SLAM lied to me and lied on my application about my income and family size in order to reduce my monthly payments, I never would have signed up with the company.

5

Sheahan Decl.

16.   If I had known that SLAM lied to me that my student loans would be forgiven, I never would have signed up with this company.

17.   I declare under penalty of perjury that the foregoing is true and correct.

18.   Executed on January 12, 2023.


Maxwell Sheahan

At Hudson, Wisconsin

Sheahan Decl.

| From: | Max Sheahan |
|---|---|
| To: | Tania Gonzalez |
| Subject: | Re: Final Approval - Please Read |

Hi there,

Can you please send me all the documents I need to show the colleges I attended? One of the colleges I attended sent me a letter saying I am past due on payments so I need to reconcile and make sure everything is squared away. Please send as soon as possible.

Thanks,
Max

On Thu, Nov 1, 2018 at 5:31 PM Tania Gonzalez <tgonzalez@slaccountmgmt.com> wrote:

> Hello Maxwell,
>
> Congratulations, we have completed your consolidation! Your new servicer is: Navient
>
> https://www.navient.com/
>
> Your online account has been set up. Your login information is listed below, if you have any issues logging in please contact me.
>
> **Username:**  <span style="color:red">REDACTED</span>
>
> **Password:**
>
> **Please DO NOT alter your login credentials without notifying our company!**
>
> The details following your new payment plan is as follows:
>
> **Repayment Plan:**
>
> **Approved Monthly Student Loan Payment:     $128.70**
>
> **Please setup your payments directly with your servicer before your due date.**
>
> **First Payment Due Date:        02/24/2019**
>
> **Payment End Date:             01/1/2020**
>
> **You are still responsible for any payments due to SL Account MGMT**
>
> **\*We will be reaching out to you in 10 months for updated proof of income for you annual recertification!**
>
> If you have any questions regarding the details of your new loan please contact us, thank you and congratulations again!

Sheahan Decl. - Attachment A

**Tania Gonzalez**

**Processing Department**



**SL Account  Management**

**Direct: (949) 202-4388**

**Fax:  1 (833) 815-2791**

**Email: TGonzalez@slaccountmgmt.com**

**Toll Free:  1-888-283-9631**

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

Sheahan Decl. - Attachment A

| | |
|---|---|
| **From:** | Max Sheahan |
| **To:** | markr@processingsupport.com |
| **Subject:** | Fwd: Reminder, your payment will increase soon! |
| **Date:** | Saturday, September 14, 2019 9:51:55 PM |

Mark,

Why am I getting these emails? Can you give me a call please?

<span style="color:red">REDACTED</span>

Thanks,
Max Sheahan

Begin forwarded message:

> **From:** Navient - Department of Education Loan Servicing <CustomerService@navient.com>
> **Date:** September 14, 2019 at 4:59:40 AM CDT
> **To:** <span style="color:red">REDACTED</span>
> **Subject: Reminder, your payment will increase soon!**

**It's time to renew your repayment plan**

Navient | Department of Education Loan Servicing

Sheahan Decl. - Attachment B

To view all information regarding this notification, **log in to your Navient Inbox**.

## MAXWELL, reminder - it's time to recertify your repayment plan!

We contacted you over a month ago to let you know that your current 12-month Revised Pay As You Earn (REPAYE) period is ending soon and requires you to recertify your income and family size. Unfortunately, we have not received your application yet.

**Key dates:**
There are a few important dates to keep in mind.

- **09/19/19** - Deadline to submit your application (including income and family size).

- **10/24/19** - Date the 12-month REPAYE payment you currently have will expire.

**If you don't recertify you will be placed on an Alternative Repayment Plan:**

*- Your Monthly Payment Amount will be* **$1,192.20** *on* **10/25/19.**

*- Capitalization will occur* - Unpaid Interest will be added to your principal balance when your current plan expires, increasing your total loan cost.

*- Impact to Public Service Loan Forgiveness (PSLF) -* The new Monthly Payment will not count toward PSLF but would count toward forgiveness if you re-enter the REPAYE plan or another income-driven repayment plan.

*- If you choose to re-enter the REPAYE plan at a later date -* your Monthly Payments may be more than if you had renewed by the deadline above.

**When to apply**
If you want to have your payment recertified but miss the annual deadline, please make every effort to send your application (including income and family size) as soon as possible. There is a 10-day grace period after **09/19/19**. However, please do not wait.

**How to apply now**
The easiest and fastest way to apply is online at StudentLoans.gov. You can also apply by fax or by mail (please be sure to write your account number on all documents).

**What to expect after you apply**
You'll need to continue making your payments until we let you know whether your application has been approved. We'll update you after we

review your application and income documentation.

**We're here to help**
We want to make your application process as easy as possible. If you have any questions about applying or about other repayment options, visit us online or give us a call.

---

**Manage your account online at Navient.com**



**Remember,** we can only process your application for loans you have with us. If you have loans with other servicers, make sure to apply for a repayment plan with them separately.

---

*Please do not respond to this automated message. Emails sent to this address are not monitored.*

Please note you'll need Adobe Reader 5.0 or higher to view your document. Download the latest version of Adobe Reader for free.

Privacy | Terms of Use

© 2019 Navient Solutions, LLC. All rights reserved. Navient and the Navient logo are registered service marks of Navient Solutions, LLC. Navient Corporation and its subsidiaries, including Navient Solutions, LLC, are not sponsored by or agencies of the United States of America.

WR053ED

---

Sheahan Decl. - Attachment B

**CONSUMER SENTINEL NETWORK**

Fraud Complaints

Sheahan Decl. - Attachment C

| Record 1 of 1 | |
|---|---|
| Reference Number | 114150828 |
| Created Date | 11/04/2019 |
| Created By | CFPB-USER |
| Load Date | 12/05/2019 |
| Updated By | |
| Updated Date | |
| Complaint Source | Consumer Financial Protection Bureau |
| Originator Reference Number | 191104-4521979 |
| Language | English |
| Contact Type | Complaint |
| Data Source | Organization |
| DNC? | N |
| Agency Contact | External Agency |
| Complaint Date | 11/04/2019 |
| Transaction Date | |
| Member of armed forces or dependant? | |
| Consumer First Name | Maxwell |
| Consumer Middle Name | Dominic |
| Consumer Last Name | Sheahan |
| Consumer Salutation | |
| Consumer Address, Line 1 | REDACTED |
| Consumer Address, Line 2 | |
| Consumer Address, Line 3 | |
| Consumer Address, City | SOUTH SAINT PAUL |
| Consumer Address, City Cleansed | South Saint Paul |
| Consumer Address, State Code | MN |
| Consumer Address, State Code Cleansed | MN |
| Consumer Address, State Name | Minnesota |
| Consumer Address, Country Code | USA |
| Consumer Address, Country Code Cleansed | USA |
| Consumer Address, Country Name | UNITED STATES |
| Consumer Address, ZIP Code | REDACTED |
| Consumer Address, ZIP Code Cleansed | |
| Consumer Address, ZIP Code Extension | |
| Consumer County | Dakota |
| Consumer Federal Judicial District | Minnesota |
| Consumer Home Phone, Country Code | |
| Consumer Home Phone, Area Code | REDACTED |
| Consumer Home Phone, Number | |
| Consumer Work Phone, Country Code | |
| Consumer Work Phone, Area Code | |
| Consumer Work Phone, Number | |
| Consumer Work Phone, Extension | |

Sheahan Decl. - Attachment C

| | |
|---|---|
| Consumer Fax, Country Code | |
| Consumer Fax, Area Code | |
| Consumer Fax, Number | |
| Consumer Cell Phone, Country Code | |
| Consumer Cell Phone, Area Code | |
| Consumer Cell Phone, Number | |
| Consumer Email | REDACTED |
| Consumer Age range | 20 - 29 |
| Consumer Military Status | |
| Consumer Military Station | |
| Consumer Complaining Company/Org | |
| Consumer Military Service Branch | |
| Company Type | Primary Company\|CFPB Provided Data |
| Company Name | SL Account Management & Navient\|Navient Solutions, LLC. |
| Company Normalized Name | SL Account Management & Navient\|Navient |
| Company Address, Line 1 | \| |
| Company Address, Line 2 | \| |
| Company Address, Line 3 | \| |
| Company Address, City | \| |
| Company Address, City Cleansed | \| |
| Company Address, State Code | \| |
| Company Address, State Code Cleansed | \| |
| Company Address, State Name | \| |
| Company Address, Country Code | USA\|USA |
| Company Address, Country Code Cleansed | USA\|USA |
| Company Address, Country Name | UNITED STATES\|UNITED STATES |
| Company Address, ZIP Code | \| |
| Company Address, ZIP Code Cleansed | \| |
| Company Address, ZIP Code Extension | \| |
| Company County | \| |
| Company Federal Judicial District | \| |
| Company Phone, Country Code | \| |
| Company Phone, Area Code | \| |
| Company Phone, Number | \| |
| Company Phone, Extension | \| |
| Company Email | \| |
| Company Website | \| |
| Company Subject ID Type Code | \| |
| Company Subject ID Type Name | \| |
| Company Subject ID Issuing State Code | \| |
| Company Subject ID Issuing State Name | \| |
| Company Subject ID Issuing Country Code | \| |

Sheahan Decl. – Attachment C

| | |
|---|---|
| Company Subject ID Issuing Country Name | I |
| Company Recipient Bank Account Name | I |
| Company Recipient Bank Payment Method | I |
| Company Recipient Bank Payment Date | I |
| Company Recipient Bank Amount Paid | I |
| Company Recipient Bank Amount Paid Cleansed | I |
| Company Rep First Name | |
| Company Rep Middle Name | |
| Company Rep Last Name | |
| Company Rep Salutation | |
| Company Rep Comments | |
| Complaint Info Initial Contact Method | |
| Complaint Info Initial Contact Date | |
| Complaint Info Initial Response Method | |
| Complaint Info Initial Response Date | |
| Complaint Info Amount Requested Method | |
| Complaint Info Amount Requested Value | |
| Complaint Info Amount Paid Method | |
| Complaint Info Amount Requested Value Cleansed | |
| Complaint Info Amount Paid Value | |
| Complaint Info Product Service Code | 4004 |
| Complaint Info Amount Paid Value Cleansed | |
| Complaint Info Product Service Description | Student Loans |
| Complaint Info Law Violation Code | |
| Complaint Info Law Violation Description | |
| Complaint Info Statute Code | |
| Complaint Info Statute Description | |
| Complaint Info Topic Code | |
| Complaint Info Topic Description | |

Sheahan Decl. - Attachment C

| | |
|---|---|
| **Complaint Info Comments** | CFPB Issue Type: Dealing with your lender or servicer \| Received bad information about your loan — What Happened: Back in 2018, my wife and I were expecting our first child and we moved from WI to MN back in May 2018 to prepare for the baby. 2018 was a tough year financially, I was paying extensive medical bills for 5 knee surgeries from 2015-2017, and my wife was not working because she was pregnant. She was a school teacher but decided to nanny full time, so she was not getting paid for maternity leave.I had just completed graduate school, so I knew I had to start paying back my student loans asap. A friend of mine told me about this company called SL Account Management. His wife was a teacher as well and told us that they found a company that was able to get their monthly payments down due to financial hardships. They entered a Student Loan Forgiveness Program, where if you owe $10k or more in federal student loans, the DOE and Federal Govt have income based benefit programs where a large sum of our debt would be forgiven. The number I was given to call was Nick Young @ 949-207-3790. I was skeptical of the whole thing so did some online research and also had friends using them so I thought they were legitimate. https://www.globenewswire.com/news-release/2018/10/02/1588502/0/en/SL-Account-Management-Helps-Borrowers-Pay-Down-Their-Loans.htmlI called Nick that month (roughly July of 2018) to see if my wife and I could get approved. We mentioned to them that my wife and I were dealing with minimal income, paying off medical bills and preparing for our child, and noted that we could not exceed $200 per month on student loan payments. My agent assigned to my account was Tania Gonzales, and I had to give her all of my information including monthly income, household size, etc. I was advised that I was approved to pay $128.70/mo for 240 months. As long as I make all my payments in the 240 months, the remainder of my debt would be forgiven. I received an email from SL ACCNT MNGMENT on Nov 1 2018 that I have completed my consolidation and my new servicer was Navient.The catch was we had to pay SL ACCT MNGMT a monthly fee for using their services, where they explained it was to ensure we kept the lowest monthly payments each year. I was under the impression that as long as I pay $128.70/mo to Navient for 240 months, the remainder of my debt would be forgiven. In the meantime, I had to pay several months of installment fees to SL ACCT MNGMT, as well as $40 a month until the contract was up.Fast forward a year, I was contacted by SL ACCOUNT MGMNT to renew my financials for next years monthly payments. I submitted all of my documents to them on time and noticed on Navient.com that my monthly payments went from $128.70/mo to over $1200 per month! Obviously I could not afford this, and called Navient immediately. They explained this is because I have not renewed my contract, once I did, they estimated my payments could be anywhere from $500-$800 per month. Given the fact that nothing had changed on my end financially, I was shocked to learn that my payments would go up by over $1000 per month. I asked the Naivent rep to tell me what my previous application listed, since payments were so low last year. She said that I listed I was single, lived in CA and made only $50k per year with 5 dependents. No wonder why my payments were so low SL ACCNT MNGMT must have falsified my records, in order to get me to do business with them and continue to pay them.I have been called SL ACCT MNGMENT and emailing them for months, now their phone number says the following: "The operations of this business have been temporary suspended. On Oct 21, 2019 the Consumer Financial Protection Bureau and state of MN filed a complaint and the US District Court issued a temporary restraining order." The receiver gave a website to find periodic updates on the matter, which is www.regulatoryresolutions.com.The only reason I worked with them was because they found me a wa |
| **Complaint Info Additional Comments** | |
| **Complaint Info CRA Dispute Flag** | |
| **Complaint Info CRA Dispute Responded** | |
| **Complaint Info CRA Dispute Resolved** | |
| **Complaint Info Complaint disposition provided?** | |
| **Complaint Info Complaint Disposition** | |
| **Complaint Info Cross Border Complaint?** | No |

Sheahan Decl. - Attachment C

As a Consumer Sentinel Network member, you must properly protect any information printed, downloaded, or otherwise removed from the Network as stated in OMB Memo M-06-16. Please delete or destroy this information within 90 days unless its use is still required for law enforcement purposes. When destroying the information you should burn, pulverize, or shred the information saved in paper format and destroy or erase information that has been saved electronically so that it cannot practicably be read or reconstructed. Proper erasure of electronic information must include the overwriting or "wiping" of the information from the electronic media on which it is stored.

**CONSUMER SENTINEL NETWORK**

Sheahan Decl. - Attachment C

Pls.' Ex. 24
P. 690

Plaintiffs' Exhibit 25

## DECLARATION OF BRENDA THELEN

### Pursuant to 28 U.S.C § 1746

I, Brenda Thelen, hereby declare and state as follows:

1.      I am over the age of eighteen and reside in Northome, Minnesota.

2.      I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.      I was born in Saint Paul and raised in White Bear Lake, Forest Lake, and Grand Rapids, Minnesota. I graduated from Grand Rapids High School in 1982 and I married my first husband in 1982. After the birth of our child that in 1983, I stayed home to take care of our daughter for the next year. In 1985, we moved to the Twin Cities, and I began to work as a waitress and an office support professional for the next several years. After I divorced my husband in 1987, I realized that I could not raise my child on the income I had at the time, so I decided to further my education. In 1993, I graduated as a licensed practical nurse from Hennepin Technical College. From 1994 to 2003, I worked as a licensed practical nurse with the University of Minnesota Family Practice Clinic. I also married for the second time in 1995 and had my second child in 1998; however, I divorced my second husband in 2000. In 2000, I also suffered a car accident, which resulted in me not being able to work for a number of years. In 2002, I married for the third time and subsequently moved to the state of Montana. After divorcing my third husband and

1

Thelen Decl.

moving back to Minnesota in 2009, I enrolled at Anoka Ramsey Community College and graduated as a registered nurse with an Associate in Science degree in 2017. In 2017, I also underwent the first of three back surgeries. Since then, I have been able to work as a registered nurse at several clinics and hospitals in Minnesota.

4.      After completing my education in nursing in 2017, I owed approximately $62,000 in student loans.

5.      In July 2019, I was worried about paying off my student loan debt. Although I had completed my studies, I had not yet begun to make monthly payments towards my student loans because I still had them deferred due to my medical situation. The student loans were a source of great concern for me, though, because I was told by my loan servicer that I would have to start making approximately $600 monthly payments, and I had no idea how I was going to be able to pay that much money every month. I had just gotten a new job and was still trying to catch up with my finances. I had very little extra money for even basic expenses, like food and rent, and I was also trying to help one of my daughters with her own college education by sending her about $200 a month.

6.      One day I was talking with a coworker about my student loans, and she recommended I contact Student Loan Account Management ("SLAM"). This coworker told me that SLAM might be able to reduce my student loan debt and gave me their phone number.

2

Thelen Decl.

7.     On July 15, 2019, I called SLAM and spoke with Katrina Right, who told me she was a student loan advisor. When I told her my monthly payments were going to be close to $600, and that I needed to begin making payments soon, she told me that $600 was a ridiculous amount to have to pay, and that SLAM could definitely lower my payments by enrolling me in a student loan forgiveness program. She said SLAM could do this because it was a professional enrollment center that worked directly with the Department of Education. She also made me feel that if I didn't take advantage of the opportunity right away that it might not be available later. Lastly, she said the process was quite simple and that she could get me enrolled in about ten minutes.

8.     Katrina then asked me about my family, and I explained that I lived alone, but I had a college-aged daughter who lived with her father and who I sent about $200 per month. She asked me if I helped anyone else out in any way, and I told her that I had another daughter and four grandchildren and that, when I could, I helped them out with clothes and other things. Katrina then told me that SLAM could add them to my family size to lower my monthly payments, even though I had already told her that they did not live with me, I did not claim them on my taxes, and I wasn't their caretaker. This seemed unusual to me, but I believed Katrina based on her statement that SLAM worked with the Department of Education.

9.     After a few minutes, Katrina told me that she was able to get me approved for a student loan forgiveness program and that I would only have to pay back approximately $25,000 of the $62,000 I owed in student loans and the rest would be forgiven. She explained that after making five initial payments of $207.50, which would go into a dedicated client account, my monthly payments would drop to $100. She said that these monthly payments would be split into two parts: $68 would be applied to my loans, and $32 would be applied to a recertification fee. Katrina told me that she was only able to lower my monthly payment by increasing my family size to six persons. I was surprised by this, and I told her that it didn't seem right since I only bought my grandchildren clothes and other things on occasion. Katrina told me not to worry about it as it was allowed and that in any case there was no documentation required to demonstrate family size in the student loan forgiveness program.

10.     Katrina really rushed me through the whole application process and didn't explain the contract at all. All she said was that SLAM would be taking over my student loans and all my communication would be through them going forward. She never told me that I could have enrolled in a repayment program for free without SLAM's assistance. In fact, she said I had to go through SLAM because they had unique access to Federal Student Aid and the Department of Education. She then took my payment information, including my credit card information, before even

4

Thelen Decl.

sending me enrollment documents or a contract, and told me that the first payment would be charged that same day. After that, she sent me a contract via text message and told me to e-sign everything, which I did.

11.    For the first three months, I thought everything was going fine. Then, in November 2019, I noticed the payment hadn't been withdrawn. When I called SLAM to make that payment, a recording told me the company had been shut down and that I should call the Attorney General's Office in Minnesota.

12.    When I learned that it all had been a scam, and that SLAM had lied to me, I was devastated. I couldn't eat or sleep for days because I realized that I had been literally throwing my money away. I also thought that I would have to start making $600 monthly payments, which I knew I could not afford. Lastly, I feared that I might be in trouble with my loan servicers since I had not been making any payments toward my student loan debt.

13.    I paid SLAM a total of $622.50 during the three months I was enrolled in its student loan debt relief program.

14.    My experience with SLAM affected me profoundly. It was a devastating nightmare that made me feel betrayed and taken advantage of. SLAM had access to all of my information and used it to profit. I felt violated because I had put my trust in SLAM. The company knew everything about me, and I knew nothing about it.  It also added a lot of stress in my life and didn't help with my healing

<div align="center">5</div>

<div align="center">Thelen Decl.</div>

process for the surgeries I have had to undergo. It even kept me from having a stable place to live for many months and made it a lot more difficult for me to purchase a car when my old one broke down around that same time. Since then, I have gotten a new job, and my financial situation has improved, but I still have not been able to buy my own home.

15.    If I had known that SLAM lied to me that my student loans would be forgiven, I never would have signed up with the company.

16.    If I had known that SLAM lied to me and lied on my repayment application about my family size in order to reduce my monthly payments, I never would have signed up with the company.

17.    I declare under penalty of perjury that the foregoing is true and correct.

18.    Executed on January 12, 2023.

*Brenda L Thelen*

Brenda Thelen

At Northome, Minnesota

6

Thelen Decl.

# Plaintiffs' Exhibit 26

## DECLARATION OF SELAM YIMER

## Pursuant to 28 U.S.C § 1746

I, Selam Yimer, hereby declare and state as follows:

1.      I am over the age of eighteen and reside in Brooklyn Park, Minnesota.

2.      I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.      I was born in Ethiopia and lived there until I was six years old. In 1995, my family moved to the United States, and I grew up in Brooklyn Park, Minnesota. After graduating from Osseo Senior High School in 2007, I studied at North Hennepin Community College from 2007 to 2009. After that, I studied at the Minnesota School of Business in 2010, Anoka Ramsey Community College in 2011, and Anoka Technical School in 2012. However, due to a medical condition, I was not able to complete my studies. During that same time period, I also worked as a supermarket cashier, a certified nursing assistant, and a bank teller. Since 2013, I have worked as a customer service representative at a couple of companies. In my free time, I like to go out with my husband and daughter and enjoy the outdoors. In the winter, we go sledding and tubing and, in the summer, we like to spend time at lakes and water parks.

1

4.     Over the course of my studies, I ended up accumulating about $25,000 in student loan debt.

5.     In June 2017, I was making $100 monthly payments towards my student loans through an income-driven repayment plan. At the time, I was interested in learning more on how to manage my student loan debt and had even done some online research.

6.     On June 20, 2017, I received a call from a woman named Darlyssa who told me she was a student loan advisor with Premier Student Loan Center ("PSLC"). She also told me that PSLC worked with the Department of Education. Since she had access to information relating to my student loans, I believed her.

7.     During that call, Darlyssa told me that PSLC could reduce the amount I paid on my student loans by combining the loans and reducing my monthly payments. In order to do so, Darlyssa told me that I would have to first make five monthly payments of $185, to show my good faith, but after that my monthly payments would be reduced to $30. She never told me that these payments were fees for PSLC's services or that I could apply to a program by myself free of charge. In fact, she didn't say anything about enrolling in any sort of government-run student loan forgiveness program. All she said was that PSLC would be taking care of my student loans going forward and, after the five initial payments of $185, I would only have to make $30 monthly payments for the next 20 years, after which I would no

2

longer owe anything on my student loans. I also believed the $185 and $30 payments were actually going toward my student loans.

8.      I immediately wanted to take advantage of the opportunity being presented to me because at the time I saw no end in sight to paying off my student loans. Consequently, during this same phone call I signed a client agreement and gave Darlyssa my banking information for the first monthly payment of $185, which PSLC withdrew from my bank account the same day.

9.      After I got off the phone with Darlyssa, something didn't sit right. I thought about the agreement I had signed with PSLC, and the math did not make sense. According to PSLC, I would only have to pay a quarter of my student loans and the rest would be wiped clean for some unknown reason. It seemed too good to be true.

10.     I did some more research online and I saw that PSLC was highly rated by the Better Business Bureau and people left good reviews about their experience with PSLC. I also spoke with an uncle of mine, and he told me I should be cautious and that online reviews are not always reliable. I then did some more online research and saw reviews where people said PSLC withdrew more than the agreed-to amount and did not disclose that the payments were only fees for their services.

11.     On June 27, 2017, I called one of my student loan servicers, Nelnet, and I learned that I could have applied for loan consolidation by myself for free. I asked

3

Yimer Decl.

the Nelnet representative to stop the consolidation, but they told me that they could not help me and that I had to contact PSLC.

12. I was really mad, because I now understood that PSLC was just a bunch of scam artists. All I wanted to do was contact them to cancel the agreement. When I got a hold of PSLC that same day, I told the representative that I wanted to cancel my agreement, cancel the consolidation, and return my loans to the original servicers. The PSLC representative didn't hesitate at all in accepting my request, which only reinforced my belief that it was all a scam. I was lucky that PSLC had not already submitted any consolidation paperwork, though it had already charged me $185, despite not performing any services for me.

13. Although PSLC was only able to withdraw $185 from my account before I realized it was a scam, its actions have impacted my life. I am still saddled with student loan debt. As of today, because of the interest that has accrued over time, I now owe approximately $32,000 in student loan debt, which is more than I owed when I signed up with PSLC. This has kept me from trying to go back to school, since I can't take out more loans and I would have to pay the tuition out of pocket. Because of PSLC's actions, I am apprehensive about looking into any programs that may be available. I hope PSLC is not able to do what they did to me to anyone else. I am particularly frustrated because when I signed up with PSLC, I

Yimer Decl.

was already on an income-based repayment program for my student loans, so there was really no way to lower my monthly payments at all.

14.    If I had known the money I was paying to PSLC was not being applied to my student loan balance, I never would have paid the company.

15.    If I had known the money I was paying to PSLC was only a fee for its services, I never would have signed up with this company.

16.    I declare under penalty of perjury that the foregoing is true and correct.

17.    Executed on January 18, 2023.


_____

Selam Yimer

At Brooklyn Park, Minnesota

5

Yimer Decl.

# Plaintiffs' Exhibit 27

## DECLARATION OF GEORGE KIRKSEY

### Pursuant to 28 U.S.C § 1746

I, George Kirksey, hereby declare and state as follows:

1.     I am over the age of eighteen and reside in Richfield, Minnesota.

2.     I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.     I was born and raised in Selma, Alabama. When I was 17 years old, I moved to Minneapolis, Minnesota. Since graduating from high school in Minneapolis in 1973, I have gone back to school a few times. In 1977, I studied bookkeeping and accounting at the Twin Cities Occupational Industrialization Center. In 1981, I continued to study accounting at another vocational school in Minneapolis. However, I did not take on any student loan debt at either of these schools. In 1983, I studied computer programming at Minneapolis Community and Technical College. Although I wasn't able to complete my studies, I did take on student loan debt on this occasion. Over the years, I have held many different jobs: a packer in a warehouse, an operator in a machine shop, and a food server at a university. Since October 2017, I have worked as a custodian for the Minneapolis Public School District. I have two adult children and live with my fiancé. In my free time, I like to play competitive billiards. Otherwise, I like to spend time at home in my apartment, relaxing and watching television.

1

Kirksey Decl.

4.   After studying at Minneapolis Community and Technical College, I owed approximately $10,000 in student loan debt.

5.   In November 2017, I was making $100 monthly payments towards my student loan debt. It was difficult for me to meet this obligation. I had recently been without work, and I was not sure if I would be making enough at my new job to make the monthly payments.

6.   On November 15, 2017, I received a phone call from a woman named Kim Cooke who told me she was an educational consultant with Premier Student Loan Center ("PSLC"). Kim told me that PSLC worked with the Department of Education. Because of that, Kim said that she could enroll me in a student loan forgiveness program. Kim said that, after I made five monthly payments of $200, PSLC could lower my monthly payments to $30 for ten years. I believed all these payments would go toward my loans.  Kim told me that after ten years the rest of my student loan debt would be forgiven.

7.   At first, I was apprehensive about what Kim was telling me, but she insisted that PSLC was for real and that she could even go to prison if she were lying to me. The opportunity seemed almost too good to be true, but Kim kept on assuring me that PSLC was a legitimate company. She also said that PSLC would take over my loans and I did not have to be in further communication with my student loan servicers. In fact, she said that I shouldn't let them know about me enrolling in the

2

Kirksey Decl.

program because the servicers tended to get mad at PSLC for enrolling people in student loan forgiveness programs. Once I agreed to enroll in the program, Kim referred me to her colleague, Maxwell Camp with whom I finished the enrollment process and provided my credit card information.

8.   After completing the five payments of $200, I started to make $30 monthly payments. I thought everything was going well until the fall of 2019, when I noticed that PSLC was no longer withdrawing money for my monthly payments. I tried to call PSLC, and nobody answered the phone. I visited PSLC's website, and I saw that it was no longer working. Finally, on January 23, 2020, I submitted a complaint with the Minnesota Attorney General's Office and learned that PSLC had been sued. I also submitted complaints with the Department of Education and the Better Business Bureau.

9.   I paid PSLC a total of $1645.00 during the time I was enrolled in the student loan debt relief program with them.

10.   Once I found out that I had been scammed by PSLC, I felt horrible because I realized that they had taken all of my money without applying any of it to my student loan debt, which I believed they had been doing. I contacted my loan servicer to start making my monthly payments, which I did for a few months until my payments were deferred due to COVID-19. I do not know how much I currently

3

Kirksey Decl.

owe in student loan debt, but I imagine the total has increased due to interest. The truth is I don't even want to look at it because the situation depresses me.

11.   If I had known the money I was paying to PSLC was not being applied to my student loan balance, I never would have paid the company.

12.   If I had known that PSLC lied to me that it had a relationship with the Department of Education and that my student loans would be forgiven, I never would have signed up with this company.

13.   I declare under penalty of perjury that the foregoing is true and correct.

14.   Executed on January 17, 2023.

*George Kirksey*

George Kirksey
At Richfield, Minnesota

4

Kirksey Decl.

# Plaintiffs' Exhibit 28

DECLARATION OF LAURA JANGULA

Pursuant to 28 U.S.C § 1746

I, Laura Jangula, hereby declare and state as follows:

1.     I am over the age of eighteen and reside in Burnsville, Minnesota.

2.     I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.     I was born in Minneapolis and lived there until I was in the second grade. After that, my family moved to Apple Valley, Minnesota. After graduating from high school in Apple Valley, I worked in the restaurant industry as a line cook and assistant kitchen manager from 1988 to 2002. From 2002 to 2005, I studied nursing at Saint Paul Community College and graduated as a licensed practical nurse. From 2005 to 2012, I worked as a licensed practical nurse at a couple of assisted-living facilities. Since 2012, I have worked as a machine operator for a manufacturing company based in Roseville, Minnesota. From 2016 to 2018, I returned to school and began to study at Metropolitan State University in Saint Paul. I wanted to become a licensed alcohol and drug counselor, but I had to interrupt my studies to help my mother with some medical issues. Outside of work, I love my two dogs and frequently take them to dog parks. I also spend time visiting family and friends.

1

Jangula Decl.

4.    I accumulated more than $52,000 in student loan debt over the course of my studies.

5.    In 2018, I was worried about how I would be able to pay off my student loan debt. At the time, I was only making about $40,000 a year. My mother had also just recently broken her hip and I needed to be able to help support her.

6.    In April 2018, I received a call from a woman who identified herself as a student loan advisor with Premier Student Loan Center ("PSLC"). She told me that PSLC worked with the federal government to help people lower their student loans. She also told me that if I paid their enrollment fee and started to make $40 monthly payments to PSLC, for a total of 240 payments, all of my student loan debt would be wiped free with no additional payments. Since I would be saving up to $40,000 in student loan debt, I saw it as a great opportunity. The woman stressed that PSLC had a special relationship with the federal government but that I needed to make a decision quickly as she didn't know how long the opportunity would last. At first, I was hesitant and wanted to know more about PSLC. She explained that PSLC had a contract with the U.S. Department of Education that helped people reduce their student loan debt. She was very convincing, but I wanted to think about it.

7.    One of the reasons that this woman was so convincing was because she already knew the exact amount of my student loan debt at the time. She even knew where and when I had studied and who was responsible for servicing my student

2

Jangula Decl.

loan. Because of that, I believed her when she claimed that PSLC had a special relationship with the government.

8.     This woman from PSLC called me back a few days later and that is when I signed the client agreement. During this second call, the woman explained that she was going to be my go-to person for my student loan debt. She also explained that all I needed to do was pay the enrollment fee and start making the $40 monthly payments to PSLC, which I was led to believe would go toward my loans. Finally, she explained that after 20 years the loan would be paid in full, and I wouldn't have to make any more student loan payments.

9.     After I signed the client agreement, I made the following payments to PSLC: $199.17 (in May 2018), $199.17 (in June 2018), $199.17 (in July 2018), $199.17 (in August 2018), $199.17 (in September 2018), and $199.17 (in October 2018). Then, from November 20, 2018, until September 20, 2019, I made $40 monthly payments to PSLC through my checking account.

10.     During that time, I thought everything was going as had been previously described to me. In September 2019, I saw that the payments weren't being withdrawn from my checking account any longer. I called PSLC a number of times and I could never get through to speak with someone or leave a message. I thought I should look into things, and I went to the credit bureau and saw that the amount I owed on my loan had not gone down. I also called my loan servicer and

3

Jangula Decl.

found out that PSLC claimed that I had three dependents in order to artificially lower my monthly student loan payments. This is not true; I have no dependents. I also found out that PSLC lied to me about having a special relationship with the federal government.

11.    It was at that point when I realized that PSLC had scammed me. At first, I was really angry with PSLC. Then I felt stupid and wondered what would happen next and what I could do to resolve this issue. I decided to contact my loan servicer to start making payments to them again. I made two payments, but then further payments were deferred due to COVID-19. I tried to contact PSLC, but I was not able to speak with anyone, so I filed a complaint with the Consumer Financial Protection Bureau on January 21, 2020.

12.    I paid PSLC a total of $1,635.02 during the eleven months I was enrolled in PSLC's student loan debt relief program.

13.    Although I am in good standing with student loan debt, what PSLC did has harmed me greatly. Because of PSLC's lies, I made many payments which I thought were going toward paying down my student loans. I was basically throwing away money. I still owe nearly $56,000 in student loans, which is four thousand dollars more than my original student loan debt. At one time, I dreamed of selling my house and buying a farm. I have always wanted to start an animal sanctuary for dogs and cats and any other animals if I could. I thought I would have the financial

4

Jangula Decl.

stability to do this, but now I am not so sure. This whole experience has also made me not trust people like I did before. It's made me more cynical and have less faith in humanity. I now see that we live in a world where some companies just don't care about what they do to people.

14.    If I had known the money I was paying to PSLC was not being applied to my student loan balance, I never would have paid the company.

15.    If I had known that PSLC lied to me that my student loans would be forgiven, or that it had a special relationship with the federal government, I never would have signed up with this company.

16.    I declare under penalty of perjury that the foregoing is true and correct.

17.    Executed on January 27, 2023.

Laura Jangula

At Burnsville, Minnesota

5

Jangula Decl.

Plaintiffs' Exhibit 29

## DECLARATION OF TRACY METZIG

### Pursuant to 28 U.S.C § 1746

I, Tracy Metzig, hereby declare and state as follows:

1.    I am over the age of eighteen and reside in Eagan, Minnesota.

2.    I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.    I was born in Northfield and raised in Farmington, Minnesota. After graduating from high school in Farmington in 2010, I went to Winona State University from 2010 to 2015. I graduated with a Bachelor of Social Work in 2015 and became a licensed social worker in March 2016. Since graduating from college, I have worked as a direct support professional and a case manager with two different non-profit organizations. In September 2018, my husband and I were married, and I changed my name to Tracy Metzig. Before that time, including when I first became involved with Premier Student Loan Center ("PSLC"), my legal name was Tracy Gilbertson. I am also pregnant with my first child right now, and my due date is May 11, 2022. In our free time, my husband and I like to go to all sorts of concerts and sporting events, and I also like to participate in CrossFit events on a regular basis.

4.    After completing my studies in social work, I had accumulated approximately $45,000 in student loan debt.

1

Metzig Decl.

5.     In June 2018, I was making $150 monthly payments towards my student loans through an income-driven repayment plan with FedLoan Servicing. Every year I would have to submit a financial statement and my payment was determined based on my income level.

6.     On June 19, 2018, I received a call from Ryan Ross who identified himself as a student loan advisor with Premier Student Loan Center ("PSLC"). I had received other solicitation calls relating to student loan debt, but I had always ignored them. I took the call from Ryan because I was not busy at work that morning, and I thought it would just be a short conversation. I was also curious about potentially enrolling in a loan forgiveness program and lowering my monthly payments.

7.     Ryan Ross told me that PSLC was a student loan debt relief company that worked directly with the Department of Education. Since Ryan Ross already had information about my student loans, I believed that PSLC was a legitimate company. In fact, Ryan only needed to ask me for the last four digits of my social security number. Once I gave him that, it seemed like Ryan then knew the rest of my social security number and my total student loan amount.

8.     During this initial call, Ryan Ross asked me some basic questions about my student loans, my employment, and how I was paying these loans back. I told Ryan that I was already in an income-driven repayment plan. Ryan then told me that

I qualified for a program that offered near total student loan forgiveness. Ryan explained that all I had to do was make six payments of approximately $199, as fees for PSLC's services, and after that I would make $40 monthly payments for the next ten years. Ryan led me to believe that the $40 monthly payments would go toward my student loans. Ryan said that if I completed that payment schedule the rest of my student loans would be forgiven.

9.     Ryan also said that if I entered into this agreement PSLC would take over my loans and that I should stop making payments directly toward my loans. Additionally, Ryan said that PSLC would take over all communications for me to make sure that my federal loan servicer was kept in the loop. In terms of paying back my student loans, Ryan said that I should not miss any payments to PSLC because it would make it difficult for me to stay in the student loan forgiveness program. A true and correct copy of the client agreement is attached hereto as **Attachment A**.

10.     For the next year and a half or so, I thought everything was going fine. I made the six payments of $199, and was making the monthly $40 payments, which I thought were going toward my student loans. Then, in approximately November 2019, PSLC stopped withdrawing the $40 monthly payments. I was confused because, when I first entered into the agreement with PSLC, I missed a payment and PSLC immediately sent me an email informing me that the payment had not gone through. This time, however, I did not receive any communications from PSLC.

3

Metzig Decl.

11.     Then on November 18, 2019, I received an email from a court-appointed Receiver stating that PSLC had been shut down and was being sued by the Consumer Financial Protection Bureau ("CFPB") and the States of Minnesota, North Carolina, and California. I called FedLoan Servicing, which directed me to file a complaint with the Federal Trade Commission ("FTC") and submit a new payment application. I filed a complaint with the FTC on August 31, 2020. A true and correct copy of the complaint is attached hereto as **Attachment B**.

12.     I paid PSLC a total of $1635.02 during the seventeen months I was enrolled in its student loan debt relief program.

13.     When I realized I had been scammed by PSLC, I was quite upset because I found out that my student loan debt had not been paid at all while I was in the program with PSLC. It felt horrible because I saw that I had to start over from square one, just as if I were a recent graduate all over again. To this day, I still owe nearly $48,000 in student loan debt, which is more than I owed when I enrolled with PSLC.

14.     This student loan debt has really impacted me over the years. I feel like it is this big looming problem that is completely out of my control. I try not to think about it too much because I find it self-defeating. When I do think about it, it is really depressing because I just don't know if I will even be able pay it off before I die. The program that PSLC offered me was attractive because I was led to believe that

I would be able to eventually pay off my student loan debt through this consolidation and forgiveness program. Even with an income-driven repayment plan, my finances are tight, especially now that we are preparing for our first child. I could have really used the money I paid to PSLC. The worst part is that when I signed up with PSLC I was already enrolled in an income-based repayment program, which means PSLC could never have even lowered my monthly payments. It is hard to think that my money did not go to anything meaningful. Essentially, I just threw it down the drain.

15.    If I had known the money I was paying to PSLC was not being applied to my student loan balance, I never would have paid the company.

16.    If I had known that PSLC lied to me that my student loans would be forgiven, I never would have signed up with this company.

17.    I declare under penalty of perjury that the foregoing is true and correct.

18.    Executed on January 13, 2023.


*Tracy Metzig*

Tracy Metzig

At Eagan, Minnesota

5

Metzig Decl.

# PREMIER STUDENT LOAN CENTER

## Document Preparation and Service Agreement ("Agreement")

This Agreement is entered into on the date shown below between PREMIER STUDENT LOAN CENTER (Hereinafter referred to as "Company") and the Client shown below (Hereinafter referred to as "Client").

Company provides document preparation services to assist consumers who are applying for federal student loan programs using Department of Education ("DOE") forms. Company is a private company, not affiliated with any government agency, and for a fee Company will assist in assembly and completion of student loan consolidation or other application documents for student loan debt assistance programs offered by the DOE, for delivery to Client for Clients review and submission to DOE. Company is not a lender, a debt consolidation company, or a law firm and does not provide legal advice.

Company and Client do hereby understand, covenant and agree to the following:

**1. Provide Complete and Truthful Information.** Company will provide Client with an overview session limited to their federal student loan debts and the available documents, and Client expressly represents and warrants that Client will provide Company with information that is complete, accurate and truthful.

**2. Performance of Services.** Upon receipt of all information from Client, Company shall promptly analyze Client's situation, review the information provided by the Client, and complete the application forms required for the DOE program(s) that have been selected by the Client. Company shall prepare for filing an application to initiate a federal student loan consolidation through the DOE on behalf of Client, or alternatively and at the Client's option, identify and apply for other DOE-sponsored programs suitable for Client. All completed applications shall be delivered by Company to Client for Client's approval, signature and direct submission to DOE.

**By initialing here, Client requests Company to complete & submit executed application to DOE.**

Initials _____ TB

**3. Fees that Client Pays.** The payment for Company's services relating to the student loan assistance applications, their preparation, delivery to Client, and ongoing support are described in the attached Fee and Service Schedule (Exhibit A). Client should review the attached Fee and Service Schedule carefully as it sets forth one or more fees that the Client will be charged depending on the services that are selected. All fees are earned, due, and payable pursuant to the attached Fee and Service Schedule. Payments may be collected on a periodic payment option as indicated in the attached Draft Schedule (Exhibit B). The fees shall be debited from Client's bank account or charged on Client's credit card pursuant to the attached authorization. Client shall be responsible for any third-party support or service fees, such as bank processing or third-party account fees.

**4. No Advance Fees.** Per the attached Client Trust Account Authorization, Company does not take any advance fees from Client. Company will designate an independent third-party dedicated account provider ("DAP") to collect and deposit payments that Client has agreed to make with Company, pursuant to the Fee and Service Schedule of this Agreement, and to deposit and hold Client's funds in a trust account established and serviced by the DAP. The DAP will not disburse any Client fees until Client has received a consolidation, adjustment, or otherwise satisfactory result, and Client completes one payment towards such.

**5. Limited Money Back Guarantee.** Company guarantees that the documents it prepares for consolidation or acceptance into a DOE-offered program for student loan debt, or a repayment plan using current lenders through the DOE, will be accurate and sufficient for acceptance by the DOE subject to the following conditions: (1) student loans that Client presents to Company are original debts, and have not been previously consolidated or had their terms or amounts previously adjusted, and have not been previously serviced or worked on by any other student loan assistance or adjustment company; (2) Client fully cooperates and is honest and timely in providing all information requested by Company and the DOE; and/or (3) Client does not possess a characteristic that pursuant to DOE rules or applicable law would disqualify Client from receiving a consolidation. Client shall not be entitled to the benefits of this section in the event that Client receives document preparation services from Company and prior to approval by the DOE, Client terminates this Agreement or continues with the DOE without the assistance of Company. If Client is not approved through the DOE subject to the above limitations, then Company will reimburse the Fee paid to Company (limited to funds received by Company from Client). All refund requests must be made, in writing, to Company within 30 days of any denial by the DOE. This guarantee expires six months after the date this Agreement is signed by the Client.

**6. Process and Restriction on Account Transfer.** Once Client provides Company with all requested information and paperwork, Company will begin preparing Client's application(s). Company is not an intermediary or agent of the DOE, so it does not control any review or agency approval times. Once a consolidation or other beneficial result is secured, subject to Client's election and for an additional fee, Company will continue to monitor Client's account and collect the necessary paperwork to make sure Client's account is up-to-date and ready for the yearly income validation. Prior to the anniversary of the loan, Company will provide required documents and instructions to Client for submission to the DOE. Client understands that Company may use a third-party support servicer to assist in processing duties pursuant to this Agreement and Company may share Client's information with such processor consistent with Company's Privacy Policy.

**7. Indemnification and Hold Harmless.** Client hereby agrees to defend and hold harmless Company and any supporting servicer from and against any claims and liability of any nature whatsoever arising out of or in connection with Client's failure to timely provide requested information to Company, Client's lack of authority or ability to complete terms of this Agreement, and all other claims arising out of this Agreement or relating to Client's loans and other financial

Metzig Decl. - Attachment A

obligations. This Agreement constitutes the entire agreement between the parties. Company makes no warranty, express or implied, as to the fitness of any recommendation it may make to Client arising out of this Agreement. Except for cause, Client unconditionally waives any right of action against Company and third-party support servicer, its officers, directors, employees, agents, brokers and assignees, at law, equity or any other cause of action for any reason, directly, indirectly, or proximately believed to arise out of this Agreement, for any damages of any nature whatsoever that Client may incur by reason of Client following any recommendation of Company or Client's failure to follow any recommendation of Company, whether any singular, concurrent or series of recommendations are acted upon or not acted upon in whole or in part by Client. This section shall survive any termination of this Agreement.

Initials **TB**

**8. Entire Agreement.** By virtue of Client's signature below, Client acknowledges that he or she has read, understands, and agrees to every term, covenant and condition of this Agreement without change or modification and that he or she has received a true and complete copy hereof, effective on the date below. This agreement is the only agreement between the parties and there is no other collateral agreement (oral or written) between the parties in any manner relating to the subject matter of this agreement. If any portion of this agreement is held to be invalid or unenforceable, the remaining provisions will remain in effect. The parties mutually understand and agree that a facsimile copy signature or an electronic signature on this agreement shall be deemed an original for all lawfully enforceable purposes.

**9. Cancellation Policy.** Company's cancellation policy is designed to exceed state law requirements (for the Client's protection) and be easy to understand: If you are unhappy or dissatisfied at any time prior to receiving the documents or services described herein, a consolidation or other result from the DOE that Company has assisted you with, then simply send a letter, email, or facsimile to the Company requesting a refund and cancelling your program. Once Company completes its document preparation services and sends documents to Client, Client shall not be entitled to a refund unless subject to the Satisfaction Guarantee or if Client requests such cancellation within their state statutory cancellation right. If at any time you have questions, please do not hesitate to call or write to us directly.

**10. Limitations on Damages.** Liability under this Agreement and/or relating directly or indirectly to Client's participation in any government loan or relief program, under any theory of liability regarding any claim by the Client, is limited to the amount of fees paid by Client and received by Company. The parties agree to be contractually bound to such limitation on any damages and agree not to demand or attempt to recover any amount in excess of such. It is the express intent of the parties to be bound by these limitations and this section shall survive any termination.

**11. Mandatory Binding Arbitration to Resolve All Disputes and Class Action Waiver.** This Agreement is governed by a Binding Mandatory Arbitration Requirement. You are encouraged to consult with independent legal counsel so that you understand your rights relating to this requirement. This Section limits your legal rights and ability to go to court. Please consult with legal counsel to be sure you understand this Section prior to signing.

In the event of any controversy, claim or dispute between the parties (the Company, the Client, and any support entities or persons contemplated herein) arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, unconscionability, or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined and resolved exclusively by arbitration in the county which the Client resides, or the closest metropolitan county, in accordance with the Laws of the State of California for agreements to be made in and to be performed in California. The parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures and an arbitrator shall be selected by the AAA. The arbitrator shall be neutral and independent and shall comply with the AAA code of ethics. The award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the parties. If either party fails to comply with the arbitrator's award, the injured party may petition the circuit court for enforcement. The parties agree that either party may bring claims against the other only in his, her, or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings of more than one person's claims and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost (excluding attorney's fees) of arbitration equally. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award. Binding Arbitration means that both parties give up the right to a trial by a jury. It also means that both parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. This section and the arbitration requirement shall survive any termination.

Initials **TB**

**12. Information Authorization.** Client hereby authorizes Company to verify past and present employment earnings records, bank accounts, stock holdings, and any other asset balances that are needed to process Client's application request(s). Importantly, Company does not provide any form of credit repair, credit score enhancement, unsecured or secured debt relief, or legal or tax advice, so any information obtained by Company cannot be used for those purposes.

**13. Electronic and Voice Communication Consent.** Client consents to do business electronically with Company. Client understands that electronic transactions, not limited to emails, are inherently unsecure and that both Client and Company will take all reasonable steps to maintain the Privacy of the information shared between the parties. Client consents to receive information and documents relating to this Agreement and Company services via electronic mail, text message, facsimile, voicemail, and any other common electronic means. Client understands that all costs associated with the receipt, review and use of such electronic communications shall be those of Client, such as maintaining access to the Internet or paying for text messages. Client consents to receive updates and documents relating to this Agreement and the services and programs offered by Company via prerecorded voice messages, text/SMS messages, and/or through the use of an automated dialing system. Client may contact Company at any time to opt out of receiving updates, new programs or offers through prerecorded or autodialed messages. Consent to this section does not bind Client to any future purchases of new services or offers.

Metzig Decl. - Attachment A

14. **Important Disclosure.** You may, of course, try to complete your applications and consolidate your loans yourself without paying anyone a fee – the results could be the very same or they might vary. We are required to advise you that our services are OPTIONAL and you, as the debtor, may directly apply to the DOE for benefits by yourself without fees. However, our services are private and focused on your interests. Our goal is to reduce the stress and frustration that many experience when going through this process. We wade through all your paperwork and the DOE websites and applications, find the documents that you need, and take the time to make sure your application(s) are completed accurately and timely. We back up our services by our Satisfaction Guarantee. The nominal fee for these services is similar to you paying a tax preparer to do your taxes for you – you could do them yourself, but most of us turn them over to an expert to do and to ensure that they are done right the first time. Please note that the Company does not expressly or impliedly warrant, represent or guarantee that it will be able to reduce your total student loan debt or monthly payments. Company is NOT A LENDER, and we do not consolidate debts or extend credit. We solely provide application assistance services and education, along with any optional support programs.

Initials __TG__

BY SIGNING BELOW (ELECTRONICALLY OR PHYSICALLY), I HEREBY ACKNOWLEDGE THAT I HAVE NOT BEEN ADVISED BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES TO FOREGO A STUDENT LOAN PAYMENT. DURING THIS PROCESS, I AM RESPONSIBLE FOR MAKING MY PAYMENTS, AND FAILURE TO DO SO COULD DISQUALIFY ME FROM OBTAINING THE SERVICES THAT I APPLIED FOR. I FURTHER ACKNOWLEDGE THAT NO GUARANTEES OR PROMISES RELATING TO GOVERNMENT AGENCIES OR ANY RELIEF THAT I MAY RECEIVE HAVE BEEN PROVIDED TO ME BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES, AND A POSITIVE OUTCOME IS NOT GUARANTEED. I UNDERSTAND AND CONSENT TO LIMITATIONS ON DAMAGES, BINDING ARBITRATION CLAUSE, AND CLASS ACTION WAIVER CONTAINED HEREIN, AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT IN ITS TOTALITY AND ASK ANY QUESTIONS OF COMPANY.

| | |
|---|---|
| Client Signature | *Tracy Gilbertson* |
| Client Printed Name | Tracy Gilbertson |
| Executed on this Date | 06/19/2018 |

Metzig Decl. - Attachment A

Pls. Ex. 29
P. 723

## Exhibit "A" to Service Agreement

### Fee and Service Schedule

The purpose of this Fee and Service Schedule is to ensure that Client is aware and consents to the fees that Company will charge for its services in assisting Client in preparing documents for one or more of the below programs. While such programs may be available for free directly by various government agencies, Company's services are fee-based and focused on application and document preparation. If other programs are identified by Client or Company to be suitable for Client, then additional fees may apply and will be presented to Client in writing for approval. Fees are charged consistent with the terms of Client's Agreement. Fees herein are only Company fees and do not include any third-party support or service fees, such as bank fees.

Client requests Company to perform, in good faith, the following services (the "Services"): (a) conduct a financial review of the Client's current situation; b) analyze and review potential Student Loan Consolidation options that may be available to Client from the DOE; (c) discuss potential options with the Client; and (d) prepare and deliver to Client selected applications.

Company's services ("Services") will be limited to the following:

1.   Assisting Client in locating options and document preparation limited to government consolidation, education and/or refinance or similar programs designed for Client's specific debt(s)

2.   Locating, obtaining and preparing the application(s) and supporting documents to apply for the programs and services described above;

3.   Additional consultation as needed with Client to gather and obtain information and documents from Client needed to prepare the above documents, and answer Client questions; and

4.   Follow-up on application, provide updates to Client, as reasonable, relating to documents that the Company will complete and provide for Client approval, signature, and submission.

5.   For certain loans, it may be determined that Client is in default of their obligations ("Default Accounts"). Company will assist with Default Accounts limited to reviewing the Client's present status and existing loan obligations, and upon review consult with Client to locate a specific payment plan known as a "rehabilitation plan." Generally, if the Client is likely to qualify for such based-on Client's financials and ability to pay, the Company will present such (with Client's approval) to the government creditors. Company will assist Client in qualifying for a rehabilitation program, and upon such acceptance Client will receive a term repayment program. Upon meeting lender-imposed repayment terms (usually for 6- 12 months), Client may qualify to submit a consolidation application consistent with the above. Company shall then assist per above.

6.   Some Clients may require other assistance with their loans that shall be deemed by the Company and Client to be in the Client's best interest. Those services shall be charged on a fee-for-service basis consistent with a written pricing schedule to be provided to the Client for Client's signature prior to any work commencing. Those services shall be limited to providing support with the DOE relating to other student loan assistance programs that may be available for the Client. Other than the amounts charged for these supplemental or alternative services, all of the terms of this Agreement shall continue to apply.

Fees for the Above Services and Length of Agreement: In connection with this Agreement, the above services shall be provided to the Client at a rate of $1,195 for document preparation and delivery to Client for a consolidation consistent with the above, or $1,295 for services limited to Default Accounts and rehabilitation programs as described above. Fees shall be due in full and payable to Company once services have been completed, or in the event of a rehabilitation program fees are due in full once Client makes first payment to servicer(s). Once earned through the above provision of services, all fees are non- refundable. All fees shall be debited from Client's bank account or charged on Client's credit card pursuant to the attached authorization. Client shall be responsible for any third-party support or service fees, such as bank fees.

ACKNOWLEDGEMENT

As indicated by my signature below, I acknowledge that I have read, understand, and agree to the terms and conditions of the Fee and Service Schedule.

Client Signature       _Tracy Gilbertson_

Client Printed Name    Tracy Gilbertson

Executed on this Date    06/19/2018

Metzig Decl. – Attachment A

## Exhibit "B" to Service Agreement

## Draft Schedule

| # | Date | Enrollment Fee | Recurring | Total Payment |
|---|---|---|---|---|
| 1 | Jun 22, 2018 | $199.17 | $0.00 | $199.17 |
| 2 | Aug 03, 2018 | $199.17 | $0.00 | $199.17 |
| 3 | Sep 03, 2018 | $199.17 | $0.00 | $199.17 |
| 4 | Oct 03, 2018 | $199.17 | $0.00 | $199.17 |
| 5 | Nov 03, 2018 | $199.17 | $0.00 | $199.17 |
| 6 | Dec 03, 2018 | $199.15 | $0.00 | $199.15 |
| 7 | Jan 03, 2019 | $0.00 | $40.00 | $40.00 |
| 8 | Feb 03, 2019 | $0.00 | $40.00 | $40.00 |
| 9 | Mar 03, 2019 | $0.00 | $40.00 | $40.00 |
| 10 | Apr 03, 2019 | $0.00 | $40.00 | $40.00 |
| 11 | May 03, 2019 | $0.00 | $40.00 | $40.00 |
| 12 | Jun 03, 2019 | $0.00 | $40.00 | $40.00 |
| 13 | Jul 03, 2019 | $0.00 | $40.00 | $40.00 |
| 14 | Aug 03, 2019 | $0.00 | $40.00 | $40.00 |
| 15 | Sep 03, 2019 | $0.00 | $40.00 | $40.00 |
| 16 | Oct 03, 2019 | $0.00 | $40.00 | $40.00 |
| 17 | Nov 03, 2019 | $0.00 | $40.00 | $40.00 |
| 18 | Dec 03, 2019 | $0.00 | $40.00 | $40.00 |
| 19 | Jan 03, 2020 | $0.00 | $40.00 | $40.00 |
| 20 | Feb 03, 2020 | $0.00 | $40.00 | $40.00 |
| 21 | Mar 03, 2020 | $0.00 | $40.00 | $40.00 |
| 22 | Apr 03, 2020 | $0.00 | $40.00 | $40.00 |
| 23 | May 03, 2020 | $0.00 | $40.00 | $40.00 |
| 24 | Jun 03, 2020 | $0.00 | $40.00 | $40.00 |
| 25 | Jul 03, 2020 | $0.00 | $40.00 | $40.00 |
| 26 | Aug 03, 2020 | $0.00 | $40.00 | $40.00 |
| 27 | Sep 03, 2020 | $0.00 | $40.00 | $40.00 |
| 28 | Oct 03, 2020 | $0.00 | $40.00 | $40.00 |
| 29 | Nov 03, 2020 | $0.00 | $40.00 | $40.00 |
| 30 | Dec 03, 2020 | $0.00 | $40.00 | $40.00 |
| 31 | Jan 03, 2021 | $0.00 | $40.00 | $40.00 |
| 32 | Feb 03, 2021 | $0.00 | $40.00 | $40.00 |
| 33 | Mar 03, 2021 | $0.00 | $40.00 | $40.00 |
| 34 | Apr 03, 2021 | $0.00 | $40.00 | $40.00 |
| 35 | May 03, 2021 | $0.00 | $40.00 | $40.00 |
| 36 | Jun 03, 2021 | $0.00 | $40.00 | $40.00 |
| 37 | Jul 03, 2021 | $0.00 | $40.00 | $40.00 |
| 38 | Aug 03, 2021 | $0.00 | $40.00 | $40.00 |
| 39 | Sep 03, 2021 | $0.00 | $40.00 | $40.00 |
| 40 | Oct 03, 2021 | $0.00 | $40.00 | $40.00 |
| 41 | Nov 03, 2021 | $0.00 | $40.00 | $40.00 |
| 42 | Dec 03, 2021 | $0.00 | $40.00 | $40.00 |
| 43 | Jan 03, 2022 | $0.00 | $40.00 | $40.00 |
| 44 | Feb 03, 2022 | $0.00 | $40.00 | $40.00 |
| 45 | Mar 03, 2022 | $0.00 | $40.00 | $40.00 |
| 46 | Apr 03, 2022 | $0.00 | $40.00 | $40.00 |
| 47 | May 03, 2022 | $0.00 | $40.00 | $40.00 |
| 48 | Jun 03, 2022 | $0.00 | $40.00 | $40.00 |
| 49 | Jul 03, 2022 | $0.00 | $40.00 | $40.00 |
| 50 | Aug 03, 2022 | $0.00 | $40.00 | $40.00 |
| 51 | Sep 03, 2022 | $0.00 | $40.00 | $40.00 |
| 52 | Oct 03, 2022 | $0.00 | $40.00 | $40.00 |
| 53 | Nov 03, 2022 | $0.00 | $40.00 | $40.00 |
| 54 | Dec 03, 2022 | $0.00 | $40.00 | $40.00 |
| 55 | Jan 03, 2023 | $0.00 | $40.00 | $40.00 |
| 56 | Feb 03, 2023 | $0.00 | $40.00 | $40.00 |
| 57 | Mar 03, 2023 | $0.00 | $40.00 | $40.00 |
| 58 | Apr 03, 2023 | $0.00 | $40.00 | $40.00 |

Total: 1675.02

Est Final Pay

| | | | | |
|---|---|---|---|---|
| 59 | May 03, 2023 | $0.00 | $40.00 | $40.00 |
| 60 | Jun 03, 2023 | $0.00 | $40.00 | $40.00 |
| 61 | Jul 03, 2023 | $0.00 | $40.00 | $40.00 |
| 62 | Aug 03, 2023 | $0.00 | $40.00 | $40.00 |
| 63 | Sep 03, 2023 | $0.00 | $40.00 | $40.00 |
| 64 | Oct 03, 2023 | $0.00 | $40.00 | $40.00 |
| 65 | Nov 03, 2023 | $0.00 | $40.00 | $40.00 |
| 66 | Dec 03, 2023 | $0.00 | $40.00 | $40.00 |
| 67 | Jan 03, 2024 | $0.00 | $40.00 | $40.00 |
| 68 | Feb 03, 2024 | $0.00 | $40.00 | $40.00 |
| 69 | Mar 03, 2024 | $0.00 | $40.00 | $40.00 |
| 70 | Apr 03, 2024 | $0.00 | $40.00 | $40.00 |
| 71 | May 03, 2024 | $0.00 | $40.00 | $40.00 |
| 72 | Jun 03, 2024 | $0.00 | $40.00 | $40.00 |
| 73 | Jul 03, 2024 | $0.00 | $40.00 | $40.00 |
| 74 | Aug 03, 2024 | $0.00 | $40.00 | $40.00 |
| 75 | Sep 03, 2024 | $0.00 | $40.00 | $40.00 |
| 76 | Oct 03, 2024 | $0.00 | $40.00 | $40.00 |
| 77 | Nov 03, 2024 | $0.00 | $40.00 | $40.00 |
| 78 | Dec 03, 2024 | $0.00 | $40.00 | $40.00 |
| 79 | Jan 03, 2025 | $0.00 | $40.00 | $40.00 |
| 80 | Feb 03, 2025 | $0.00 | $40.00 | $40.00 |
| 81 | Mar 03, 2025 | $0.00 | $40.00 | $40.00 |
| 82 | Apr 03, 2025 | $0.00 | $40.00 | $40.00 |
| 83 | May 03, 2025 | $0.00 | $40.00 | $40.00 |
| 84 | Jun 03, 2025 | $0.00 | $40.00 | $40.00 |
| 85 | Jul 03, 2025 | $0.00 | $40.00 | $40.00 |
| 86 | Aug 03, 2025 | $0.00 | $40.00 | $40.00 |
| 87 | Sep 03, 2025 | $0.00 | $40.00 | $40.00 |
| 88 | Oct 03, 2025 | $0.00 | $40.00 | $40.00 |
| 89 | Nov 03, 2025 | $0.00 | $40.00 | $40.00 |
| 90 | Dec 03, 2025 | $0.00 | $40.00 | $40.00 |
| 91 | Jan 03, 2026 | $0.00 | $40.00 | $40.00 |
| 92 | Feb 03, 2026 | $0.00 | $40.00 | $40.00 |
| 93 | Mar 03, 2026 | $0.00 | $40.00 | $40.00 |
| 94 | Apr 03, 2026 | $0.00 | $40.00 | $40.00 |
| 95 | May 03, 2026 | $0.00 | $40.00 | $40.00 |
| 96 | Jun 03, 2026 | $0.00 | $40.00 | $40.00 |
| 97 | Jul 03, 2026 | $0.00 | $40.00 | $40.00 |
| 98 | Aug 03, 2026 | $0.00 | $40.00 | $40.00 |
| 99 | Sep 03, 2026 | $0.00 | $40.00 | $40.00 |
| 100 | Oct 03, 2026 | $0.00 | $40.00 | $40.00 |
| 101 | Nov 03, 2026 | $0.00 | $40.00 | $40.00 |
| 102 | Dec 03, 2026 | $0.00 | $40.00 | $40.00 |
| 103 | Jan 03, 2027 | $0.00 | $40.00 | $40.00 |
| 104 | Feb 03, 2027 | $0.00 | $40.00 | $40.00 |
| 105 | Mar 03, 2027 | $0.00 | $40.00 | $40.00 |
| 106 | Apr 03, 2027 | $0.00 | $40.00 | $40.00 |
| 107 | May 03, 2027 | $0.00 | $40.00 | $40.00 |
| 108 | Jun 03, 2027 | $0.00 | $40.00 | $40.00 |
| 109 | Jul 03, 2027 | $0.00 | $40.00 | $40.00 |
| 110 | Aug 03, 2027 | $0.00 | $40.00 | $40.00 |
| 111 | Sep 03, 2027 | $0.00 | $40.00 | $40.00 |
| 112 | Oct 03, 2027 | $0.00 | $40.00 | $40.00 |
| 113 | Nov 03, 2027 | $0.00 | $40.00 | $40.00 |
| 114 | Dec 03, 2027 | $0.00 | $40.00 | $40.00 |
| 115 | Jan 03, 2028 | $0.00 | $40.00 | $40.00 |
| 116 | Feb 03, 2028 | $0.00 | $40.00 | $40.00 |
| 117 | Mar 03, 2028 | $0.00 | $40.00 | $40.00 |
| 118 | Apr 03, 2028 | $0.00 | $40.00 | $40.00 |
| 119 | May 03, 2028 | $0.00 | $40.00 | $40.00 |
| 120 | Jun 03, 2028 | $0.00 | $40.00 | $40.00 |

Metzig Decl. - Attachment A

Pls. Ex. 29
P. 727

Client Signature            Tracy Gilbertson

Client Printed Name         Tracy Gilbertson

Executed on this Date       06/19/2018

Metzig Decl. - Attachment A

## Credit Card Authorization Form

I hereby authorize PREMIER STUDENT LOAN CENTER and/or its third-party support servicers to charge my credit card below the Fees pursuant to the Fee and Service Schedule of my Agreement. The Fees will be automatically processed in accordance with the Draft Schedule of my Agreement.

I authorize Company to charge my credit card in accordance with the Draft Schedule of my Agreement for services provided pursuant to my Agreement. No additional charges are authorized. I understand that charges declined by the credit card issuer could constitute ground for cancellation of Company's document preparation services.

Please complete all of the following information.

Your account cannot be processed if incomplete.

Check the type of credit card: X MC _ VISA Discover  AMEX

Credit Card Number: REDACTED

Expiration Date: Redacted

Security (CVC) Code: REDACTED

Name of Credit Card Holder (exactly as it appears on the card): **Tracy M Gilbertson**

Billing Address: REDACTED

City: **Eagan**

State: **MN**

Zip Code: REDACTED

Signature of Credit Card Holder:
Date: 06-9/2018

Metzig Decl. - Attachment A

## Client Trust Account Authorization

## Dedicated Account Provider

## <u>No Advance Fees</u>

**Client Trust Account Services**

Company will use an independent third-party dedicated account provider ("DAP") to process payments to and from a trust account (including electronic and automatic transfers), make disbursements as directed, and provide transaction and account information related hereto (collectively "Services") on behalf of Client.

**Appointment**

Client hereby authorizes Company to designate a DAP to collect and deposit payments that Client has agreed to make with Company, pursuant to the Fee and Service Schedule of this Agreement, and to deposit and hold Client's funds in a trust account established and serviced by the DAP. Client agrees that the trust account is non-interest bearing and may be located in California or any other state of the DAP's choice. Client agrees that the DAP will disburse from Client's funds any service fees as stated below and Company's fees pursuant to the Fee and Service Schedule of this Agreement. Client may revoke this Appointment with a minimum of five banking days' notice to Company in the manner set forth below. Client acknowledges that all transactions to and from Client's trust account must comply with the provisions of local, state, and federal laws.

**Client Fee Disbursement Terms – <u>NO ADVANCE FEES</u>**

The DAP will collect, deposit, and hold payments that Client has agreed to make with Company, pursuant to the Fee and Service Schedule of this Agreement, in a trust account. The DAP will not disburse any Client fees until:

1.  Client has received a consolidation, adjustment, or otherwise satisfactory result, and

2.  Client completes one payment towards such.

If the new payment is $0 (zero dollars), then disbursement may occur upon the passing of the first due date under the new $0 payment terms.

These Client fee disbursement terms apply on an annual basis. For all Client fees rendered towards each year of Company's services under this Agreement, the DAP will only disburse Client fees when the above two requirements are met for that year.

**Transaction and Account Information, and Communications**

The DAP will provide Client with access to Client's transaction and account information, upon request. Client agrees that disclosures, transaction and account statements, disbursement verification, and any other communications may be distributed by electronic mail. Client acknowledges that Client is able to electronically receive, download, and print such information and communications. If Client is unable to communicate electronically, Client will notify Company and reasonable alternative means of communication will be established.

Metzig Decl. - Attachment A

**Service Fees** – Client authorizes the DAP to charge the following fees for services rendered:

**:** **All service fees are waived.**

**Miscellaneous**

Client agrees to indemnify and hold harmless the DAP, its officers, directors, agents, and employees, from any and all claims, demands, and damages arising out of a dispute between Client and Company.

Client understands that the DAP may share information with its depository institutions, its affiliates, Company, and any other party legally entitled to facilitate the transactions contemplated by this Agreement.

**Express Authorization**

I hereby authorize the DAP to initiate debits from my designated payment method as set forth in this Agreement. I agree that sufficient funds will be available in my designated payment account. I understand that Company and the DAP are not liable to any person for not completing a transaction as a result of any limit on my designated payment account, or if a financial institution fails to honor any debit from such account. I agree to notify Company immediately if a scheduled debit will not or does not occur. I authorize the DAP to recover funds in the event of an error or in the event that a prior debit is returned for any reason, including insufficient funds.

This Client Trust Account Authorization:

| | |
|---|---|
| Client Signature | *Tracy Gilbertson* |
| Client Printed Name | Tracy Gilbertson |
| Executed on this Date | 06/19/2018 |

Metzig Decl. - Attachment A

## Special Limited Power of Attorney

To: Any and all of my Student Loan Creditors

I hereby duly authorize, empower, and appoint PREMIER STUDENT LOAN CENTER, its representatives, designated agents, and/or employees, and third-party support servicers to perform any acts necessary or convenient, including but not limited to, the following on my behalf:

1. Communicate with any and/or all of my Federal Student Loan providers and their servicing agencies to obtain information on my student loans.

2. Communicate with banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans, including but not limited to the balance of my account, payment history verification of the account, financial adjustments, and any and all necessary communications, correspondence, and negotiations regarding my account(s). I assert that all of the information that I have provided and will provide PREMIER STUDENT LOAN CENTER is true and accurate.

I hereby duly authorize third-party communication from banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans to communicate directly with PREMIER STUDENT LOAN CENTER concerning my account or the collection activities associated with it, in accordance with Section 805(b) of the Fair Debt Collection Practices Act. I further request that all of my lenders direct all further telephone calls and correspondence to:

PREMIER STUDENT LOAN CENTER

173 Technology Dr, Ste 202

Irvine, CA 92618

Any and all communications directed to me will be referred to PREMIER STUDENT LOAN CENTER.

I understand that PREMIER STUDENT LOAN CENTER is not a law firm, is not licensed to practice law or provide legal advice, and that I will not request or accept any legal advice from PREMIER STUDENT LOAN CENTER relating to my personal financial situation.

I understand that any creditor or collection activity, demands, or lawsuits are unrelated to my enrollment in the PREMIER STUDENT LOAN CENTER program.

I agree that electronic or facsimile copy signature shall be deemed original and is an authorization by me for all lawfully enforceable purposes.

This Special Limited Power of Attorney shall remain in force until or unless modified or rescinded in writing, or upon resolution of the current matter.

This Special Limited Power of Attorney:

| | |
|---|---|
| Client Signature | *Tracy Gilbertson* |
| Client Printed Name | Tracy Gilbertson |
| Executed on this Date | 06/19/2018 |

## National Student Loan Data System Access Permission

**Purpose:** For PREMIER STUDENT LOAN CENTER to access your student loan information from government websites.

**Reason:** For PREMIER STUDENT LOAN CENTER to obtain accurate information relating to your student loans for application purposes.

**What I Need to Do:** As the Debtor who is responsible for these loans, you need to create an online User Name and Password. The U.S. Department of Education recommends that you keep your User Name and Password secure to prevent any fraudulent use. The purposes of the User Name and Password is to permit you access to various government websites and allow you to sign electronically on any applications. There are other purposes as well, so please keep your information secure.

**Why We May Request Your User Name and Password:** We need to carry out the application services that you have requested of us, which may require your User Name and Password. We will only your User Name and Password with your permission and instruction. We will keep your User Name and Password secure, and we will never share it with third parties. We may need this information to complete our contracted services, including gathering the relevant pending loan information pertaining to you, and completing the applications that you qualify for. While the government does not encourage such sharing because they want to prevent fraud and abuse, with your consent and instruction we are permitted to review and assist you with the services you have requested of us. We will never use this information to sign or submit applications for you – you must do that on your own.

**Authorization:** As part of the federal student loan assistance application process, it may be necessary for us to access your student loan information within the

Student Loan Data System located online at http://www.nslds.ed.gov.

The Data System contains a complete list of your federal education loans, along with current estimated balances and servicer details – information that is required to complete your application(s).

By enrolling in Company's program, you are agreeing to allow Company, its representatives, designated agents, and/or employees, and third-party support servicers to access your profile and all the data contained within that profile. In order to allow this access, you may need to provide Company with your User Name and Password.

Please note that all information that Company obtains from the Student Loan Data System will be used expressly for the purposes of confirming information and assisting in the preparation of your application(s).

**Acknowledgment:**   I hereby acknowledge that I have read, understood, and agree to the above statements regarding access to my National Student Loan Data System profile. I understand that any information received or accessed will be used solely for the purposes as stated above.

By signing this acknowledgment, I instruct, agree, and expressly permit Company to access the National Student Loan Data System and my personal profile as explained above.

| | |
|---|---|
| Client Signature | *Tracy Gilbertson* |
| Client Printed Name | Tracy Gilbertson |
| Executed on this Date | 06/19/2018 |

Metzig Decl. – Attachment A

| Who we are | |
|---|---|
| Who is providing this notice? | PREMIER STUDENT LOAN CENTER |
| **What we do** | |
| How do we protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safe guards and secured files and buildings<br><br>We also maintain physical, electronic and procedural safe guards such as computer virus protection software, firewalls, and a 128 bit Secure Socket Layer. Only authorized employees have access. |
| How do we collect my personal information? | We collect your personal information, for example when you<br>-Give us your income information<br>-Provide employment information<br>-Provide account information<br>-Give us your contact information<br>We also collect your personal information from other companies |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>-Sharing for affiliates' everyday business purposes-information about your creditworthiness<br>-Affiliates from using your information to market to you<br>-Sharing for non-affiliates o market to you<br>State laws and individual companies may give you additional rights to limit sharing. |
| **Definition** | |
| Affiliates | Financial and non-financial companies related by common ownership or control.<br><br>• PREMIER STUDENT LOAN CENTER does not share with our affiliates |
| Non-affiliates | Financial and non-financial companies not related by common ownership or control.<br><br>• PREMIER STUDENT LOAN CENTER does not share with non-affiliates so they can market to you. |
| Joint Marketing | A formal agreement between non-affiliated financial companies that together market financial products or services to you<br><br>• PREMIER STUDENT LOAN CENTER doesn't jointly market. |
| **Other Important Information** | |
| For California and Vermont Residents: We will not share information we collect about you with non-affiliated third parties, except as permitted by California or Vermont law, respectively, such as to process your transactions or to maintain your account. | |

Metzig Decl. - Attachment A

| Facts: | WHAT DOES PREMIER STUDENT LOAN CENTER ("Company") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>• Social Security number and income<br>• Account balances and account numbers<br>• Transaction or loss history and employment information<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons PREMIER STUDENT LOAN CENTER chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Do we share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes – to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes – information about your transactions and experiences | Yes | No |
| For our affiliates everyday business purposes – information about your creditworthiness | No | We don't share |
| For non-affiliates to market to you | Yes | Yes |
| Questions? | www.premierstudentloancenter.com | |

Metzig Decl. - Attachment A

**CONSUMER SENTINEL NETWORK**

**Fraud Complaints**

Metzig Decl. - Attachment B

**Record 1 of 1**

| | |
|---|---|
| Reference Number | 122438726 |
| Created Date | 08/31/2020 |
| Created By | ACASTANEDA |
| Load Date | 08/31/2020 |
| Updated By | |
| Updated Date | |
| Complaint Source | FTC Call Center |
| Originator Reference Number | |
| Language | English |
| Contact Type | Complaint |
| Data Source | Consumer |
| DNC? | N |
| Agency Contact | Phone |
| Complaint Date | 08/31/2020 |
| Transaction Date | 06/01/2018 |
| Member of armed forces or dependant? | N |
| Consumer First Name | Tracy |
| Consumer Middle Name | |
| Consumer Last Name | Metzig |
| Consumer Salutation | |
| Consumer Address, Line 1 | REDACTED |
| Consumer Address, Line 2 | |
| Consumer Address, Line 3 | |
| Consumer Address, City | Eagen |
| Consumer Address, City Cleansed | Saint Paul |
| Consumer Address, State Code | MN |
| Consumer Address, State Code Cleansed | MN |
| Consumer Address, State Name | Minnesota |
| Consumer Address, Country Code | USA |
| Consumer Address, Country Code Cleansed | USA |
| Consumer Address, Country Name | UNITED STATES |
| Consumer Address, ZIP Code | REDACTED |
| Consumer Address, ZIP Code Cleansed | |
| Consumer Address, ZIP Code Extension | |
| Consumer County | Dakota |
| Consumer Federal Judicial District | Minnesota |
| Consumer Home Phone, Country Code | |
| Consumer Home Phone, Area Code | |
| Consumer Home Phone, Number | |
| Consumer Work Phone, Country Code | |
| Consumer Work Phone, Area Code | |
| Consumer Work Phone, Number | |
| Consumer Work Phone, Extension | |

Metzig Decl. – Attachment B

| | |
|---|---|
| Consumer Fax, Country Code | |
| Consumer Fax, Area Code | |
| Consumer Fax, Number | |
| Consumer Cell Phone, Country Code | |
| Consumer Cell Phone, Area Code | REDACTED |
| Consumer Cell Phone, Number | |
| Consumer Email | |
| Consumer Age range | 20 - 29 |
| Consumer Military Status | |
| Consumer Military Station | |
| Consumer Complaining Company/Org | |
| Consumer Military Service Branch | |
| Company Type | Primary Company |
| Company Name | Premier Student Loan Center |
| Company Normalized Name | Premier Student Loan Center |
| Company Address, Line 1 | 173 Technology Dr Suit 202 |
| Company Address, Line 2 | |
| Company Address, Line 3 | |
| Company Address, City | Irvine |
| Company Address, City Cleansed | Irvine |
| Company Address, State Code | CA |
| Company Address, State Code Cleansed | CA |
| Company Address, State Name | California |
| Company Address, Country Code | USA |
| Company Address, Country Code Cleansed | USA |
| Company Address, Country Name | UNITED STATES |
| Company Address, ZIP Code | 92618 |
| Company Address, ZIP Code Cleansed | 92618 |
| Company Address, ZIP Code Extension | |
| Company County | Orange |
| Company Federal Judicial District | California - Central |
| Company Phone, Country Code | |
| Company Phone, Area Code | 888 |
| Company Phone, Number | 5480476 |
| Company Phone, Extension | |
| Company Email | |
| Company Website | |
| Company Subject ID Type Code | |
| Company Subject ID Type Name | |
| Company Subject ID Issuing State Code | |
| Company Subject ID Issuing State Name | |
| Company Subject ID Issuing Country Code | |

Metzig Decl. – Attachment B

| | |
|---|---|
| Company Subject ID Issuing Country Name | |
| Company Recipient Bank Account Name | |
| Company Recipient Bank Payment Method | |
| Company Recipient Bank Payment Date | |
| Company Recipient Bank Amount Paid | |
| Company Recipient Bank Amount Paid Cleansed | |
| Company Rep First Name | |
| Company Rep Middle Name | |
| Company Rep Last Name | |
| Company Rep Salutation | |
| Company Rep Comments | |
| Complaint Info Initial Contact Method | Unknown |
| Complaint Info Initial Contact Date | 06/01/2018 |
| Complaint Info Initial Response Method | Unknown |
| Complaint Info Initial Response Date | |
| Complaint Info Amount Requested Method | |
| Complaint Info Amount Requested Value | $1000.00 |
| Complaint Info Amount Paid Method | Not Reported |
| Complaint Info Amount Requested Value Cleansed | $1000.00 |
| Complaint Info Amount Paid Value | $1000.00 |
| Complaint Info Product Service Code | 3322 |
| Complaint Info Amount Paid Value Cleansed | $1000.00 |
| Complaint Info Product Service Description | Credit & Debt Counseling |
| Complaint Info Law Violation Code | DDM |
| Complaint Info Law Violation Description | Deception/Msrepresentation |
| Complaint Info Statute Code | P |
| Complaint Info Statute Description | FTC Act Sec 5 (BCP) |
| Complaint Info Topic Code | |
| Complaint Info Topic Description | |
| Complaint Info Comments | Consumer reported that she was consolidating her loans with Premier Student Loan Center and she received an email regarding the company stating that they were under investigation. The company stopped taking her payments. Consumer has already contacted Fed Loans. |
| Complaint Info Additional Comments | |
| Complaint Info CRA Dispute Flag | |
| Complaint Info CRA Dispute Responded | N |
| Complaint Info CRA Dispute Resolved | N |

Metzig Decl. - Attachment B

| | |
|---|---|
| **Complaint Info Complaint disposition provided?** | |
| **Complaint Info Complaint Disposition** | |
| **Complaint Info Cross Border Complaint?** | No |

Metzig Decl. - Attachment B

As a Consumer Sentinel Network member, you must properly protect any information printed, downloaded, or otherwise removed from the Network as stated in OMB Memo M-06-16. Please delete or destroy this information within 90 days unless its use is still required for law enforcement purposes. When destroying the information you should burn, pulverize, or shred the information saved in paper format and destroy or erase information that has been saved electronically so that it cannot practicably be read or reconstructed. Proper erasure of electronic information must include the overwriting or "wiping" of the information from the electronic media on which it is stored.

**CONSUMER SENTINEL NETWORK**

# Plaintiffs' Exhibit 30

Declaration of Lynne Berthiaume

Pursuant to 28 U.S.C. § 1746

I, Lynne Berthiaume, hereby declare and state as follows:

1.     I am over the age of eighteen and reside in Tacoma, Washington.

2.     I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.     I am a forensic nurse specialist and a single mom.

4.     Around April 2018, I received a phone call from a representative of Student Loan Account Management ("SLAM"). The representative identified herself as Hannah Schuler. Ms. Schuler told me that I could qualify for lower student loan payments because I qualify for the Public Student Loan Forgiveness Program (PSLF). Ms. Schuler gave me her direct phone number, (949) 202-2599, and SLAM's toll free phone number, (888) 283-9631.

5.     During our initial phone conversation, Ms. Schuler asked me for some information that she said was for the student loan forgiveness application, including my salary, social security number, marital status, dependents, employer, and 1040 tax returns. I told her I had two children and provided the other information to SLAM in order to qualify for PSLF.

6.     Ms. Schuler first told me that I would have to pay four monthly payments of $298.75 and then after that, I would pay a $40 additional cost per month. I asked why there was an additional $40 charge and Ms. Schuler told me that SLAM collects a $40 administrative fee for the next 10 years to maintain my account. Ms. Schuler also told me that after the four payments of $298.75, I would only pay $541 toward my student loan each month and then after 10 years the loan would be considered paid off under the PSLF program.

7.     At the time, I was making monthly student loan payments of between $580-600, depending on my income because I was in an income driven repayment plan.

8.     On April 24, 2018, I signed an agreement electronically with SLAM.

9.     On April 26, 2018, I received an email from hschuler@slaccountmgmt.com with the subject "Urgent – Proof of Income Required." Hannah Schuler asked me to verify my salary with my two most recent paystubs. I scanned the requested verification documents and emailed

1

them to SLAM. A true and correct copy of the April 26, 2018 email with the subject "Urgent – Proof of Income Required" is attached hereto as **Attachment A**.

10.     On April 26, 2018, I received a second email from hschuler@slaccountmgmt.com with the subject "Public Service Application Needed." In that email, Hannah Schuler asked me to verify my employment and included instructions for my employer. Shortly after receiving this email from Ms. Schuler, I submitted my employer verification. A true and correct copy of the April 26, 2018 email with the subject "Public Service Application Needed" is attached hereto as **Attachment B**.

11.     On April 27, 2018, my bank account was debited $298.75 by "SL Account MGMT 888-283-9631."

12.     On May 10, 2018, I received an email from hschuler@slaccountmgmt.com with the subject "Update – Application Submitted." In that email, signed by Hannah Anderson, but sent by Hannah Schuler, it states that my application has been submitted to the Department of Education. A true and correct copy of the May 10, 2018 email with the subject "Update – Application Submitted" is attached hereto as **Attachment C**.

13.     On May 30, 2018, my bank account was debited $298.75 by "SL Account MGMT 888-283-9631."

14.     On June 1, 2018, I received an email from hschuler@slaccountmgmt.com stating that my application had been approved and that my payments would be $261. A true and correct copy of the June 1, 2018 email with the subject "Repayment Plan Request Approved" is attached hereto as **Attachment D**.

15.     I assumed I had been approved for a lower initial monthly payment and that was why I had to pay $261 instead of the $541 that Hannah had quoted to me during the initial call.

16.     On June 30, 2018, my bank account was debited $298.75 by "SL Account MGMT 888-283-9631."

17.     On July 30, 2018, my bank account was debited $298.75 by "SL Account MGMT 888-283-9631."

2

18.     Between April and July 2018, I made four monthly payments of $298.75 directly to SLAM, as described in the paragraphs above.

19.     During that time, I received several email notifications from Fed Loans that my loans were past due.

20.     After each email I received from FedLoans, I called Hannah Schuler at SLAM to tell her that FedLoans was reporting me late on my payments. Ms. Schuler told me to ignore FedLoans and that payments are made through SLAM and I shouldn't worry about it. I asked Hannah several times if she was sure that I should not pay through FedLoans and she said yes, that I should pay SLAM instead of FedLoans. Hannah told me that FedLoans had not updated their website yet, but that I was fine. I had never been late on any of my payments to FedLoans, so I was worried about the emails I received from them.

21.     On August 29, 2018, my bank account was debited $40 by "SL Account MGMT 888-283-9631."

22.     On September 6, 2018, I sent an email to hschuler@slaccountmgmt.com with the subject "Payment." I told Ms. Schuler, "I did pay the 261.00 but fedloans shows me still owing the 483. They are showing me past due. Help please!!"

23.     On September 6, 2018, Ms. Schuler replied to my email and stated, "Your payments to fedloan a month are a total of $261."

24.     On September 7, 2018, I replied to Ms. Schuler's email "Re: Payment" and asked if I should call FedLoans. On the same day, hschuler@slaccountmgmt.com replied to my email and stated, "No I can see it on my end you are fine I promise." A true and correct copy of the email chain with the subject "Payment" is attached hereto as **Attachment E**.

25.     In September, I got another email from FedLoans regarding a late payment. This time, rather than call Hannah, I decided to call FedLoans directly.

26.     When I called FedLoans, I spoke to a representative who informed me that I still owed $483.81 for the month of September and that FedLoans had not received any payments from me since March 2018. The FedLoans representative also suggested to me that SLAM might be a scam and that I should change my bank card. He told me to call the company directly and

threaten to file a complaint. The FedLoans representative also told me to file a complaint with the Consumer Financial Protection Bureau.

27. The FedLoans representative told me that SLAM had reported me as having 5 dependents, for a total family size of six. I now believe that SLAM misreported my family size in an effort to lower my monthly payment. I only have three in my family size, myself and my two children. SLAM did not allow me to review the information it provided FedLoans. I never would have reported more than two dependents.

28. If I had known the money I was paying SLAM was not going to my loan balance, I never would have paid the company.

29. If I had known SLAM was going to submit false information to my student loan servicer about my family size or income, I never would have paid the company.

30. Immediately after speaking with the FedLoans representative, I called SLAM and demanded my money back or I would file a complaint. The SLAM representative I spoke to told me that I would get reimbursed.

31. Approximately one or two days after my conversation with the SLAM representative, I got a debit card refund for $1,235.00. This amount does not include the interest that had accrued on the unpaid student loan payments.

32. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

33. Executed on __30 August__, 2019.

Lynne Berthiaume

At Tacoma, Washington

4

# Attachment A

Pls.' Ex. 30
P. 747

**Schneider, Dani (CFPB)**

| | |
|---|---|
| **From:** | Lynne Berthiaume <span style="color:red">REDACTED</span> |
| **Sent:** | Monday, July 1, 2019 10:00 PM |
| **To:** | Montier, William (Contractor)(CFPB) |
| **Subject:** | Re: Urgent - Proof of Income Required |

On Thu, Apr 26, 2018 at 10:19 AM Hannah Schuler <hschuler@slaccountmgmt.com> wrote:

Hello Lynne,

I am contacting you in regards to your Student Loan Consolidation. We are requesting for you to please send in copies of at least 2 of your most recent paystubs received in the past 60 days and a copy of your most recent FEDERAL tax return 1040 pages 1 and 2. We cannot accept W-2 paperwork as acceptable forms of income.

**We DO NOT and CANNOT** accept pictures of any form via email or fax. Please remit the necessary paperwork to us as follows

    a.   **Email** – You may scan and email the documents to us at: hschuler@slaccountmgmt.com

    b.   **Fax** – You may fax the signed document to: **1-877-977-9349**

    c.   **Mail** – This is the slowest method taking up to 2-3 weeks. You may mail the documents to:

            8 Whatney Ste 100 #8 Irvine, CA 92618

**Please NOTE:** Not sending in these documents can prolong, postpone, or place your consolidation on hold. If you have any questions or concerns in regards to our request, please feel free to contact me at any time.

**Hannah Schuler**

**Processing Department**

1



# SL Account Mgmt

**SL Account Management**

**Direct: 949-202-2599**

**Fax: 1-877-977-9349**

**Email: hschuler@slaccountingmgmt.com**

**Toll Free: 1-888-283-9631**

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

Pls.' Ex. 30
P. 749

# Attachment B

Pls.' Ex. 30
P. 750

**Schneider, Dani (CFPB)**

| | |
|---|---|
| **From:** | Lynne Berthiaume <span style="color:red">REDACTED</span> |
| **Sent:** | Monday, July 1, 2019 10:03 PM |
| **To:** | Montier, William (Contractor)(CFPB) |
| **Subject:** | Re: Public Service Application Needed |

On Thu, Apr 26, 2018 at 10:25 AM Hannah Schuler <hschuler@slaccountmgmt.com> wrote:

Hello Lynne,

We are still waiting for your employment verification form to be returned in order to complete your enrollment in the program. I have attached a copy if needed. Please have your employer fill this form out and return back to me as soon as possible. If you have any questions, please do not hesitate to call us at **949-202-2599**

Once again, congratulations!

    a.  **Email –** You may scan and email the document to me at: hschuler@slaccountmgmt.com

    b.  **Fax –** You may fax the signed document to: **1-877-977-9349**

    c.  **Mail –** This is the slowest method taking up to 2-3 weeks. You may mail the documents to: 8 Whatney Ste 100 #8 Irvine, CA 92618

**Hannah Schuler**

**Processing Department**



**SL Account Management**

**Direct: 949-202-2599**

**Fax:   1-877-977-9349**

1

**Email: hschuler@slaccountingmgmt.com**

**Toll Free: 1-888-283-9631**

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

Pls.' Ex. 30
P. 752

# Attachment C

**Schneider, Dani (CFPB)**

| | |
|---|---|
| **From:** | Lynne Berthiaume <span style="color:red">REDACTED</span> |
| **Sent:** | Monday, July 1, 2019 10:04 PM |
| **To:** | Montier, William (Contractor)(CFPB) |
| **Subject:** | Re: Update - Application Submitted |

On Thu, May 10, 2018 at 10:31 AM Hannah Schuler <hschuler@slaccountmgmt.com> wrote:

Lynne,

We received all the necessary documentation in order to process your income driven program application! We have reviewed your file for accuracy and have submitted your application to the Department of Education. Please keep in mind that the process can take up to 30-50 days.

If you have any questions, please do not hesitate to call me at 949-202-2599

**Hannah Anderson**

**Processing Department**



**SL Account Management**

**Direct: 949-202-2599**

**Fax:    1-877-977-9349**

**Email:  hschuler@slaccountmgmt.com**

**Toll Free: 1-888-283-9631**

1

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

2

# Attachment D

Pls.' Ex. 30
P. 756

**Schneider, Dani (CFPB)**

| | |
|---|---|
| **From:** | Lynne Berthiaume REDACTED |
| **Sent:** | Monday, July 1, 2019 10:05 PM |
| **To:** | Montier, William (Contractor)(CFPB) |
| **Subject:** | Re: Repayment Plan Request Approved |

On Fri, Jun 1, 2018 at 2:51 PM Hannah Schuler <hschuler@slaccountmgmt.com> wrote:

Hello Lynne,

Your application has been approved by (Insert Servicer). Your new payment information for the year is listed below:

**Repayment Program: PAYE**

**Monthly Payment Amount: $261**

**First payment Due Date: 08/23/18**

I will be reaching out to you in 10 months for updated proof of income, for your annual recertification. Please call me with any questions.

**Hannah Anderson**

**Processing Department**



**SL Account Management**

**Direct:  949-202-2599**

**Fax:    1-833-817-6482**

1

**Email: hschuler@slaccountmgmt.com**

**Toll Free: 1-888-283-9631**


**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

Pls.' Ex. 30
P. 758

# Attachment E

Pls.' Ex. 30
P. 759

**Schneider, Dani (CFPB)**

| | |
|---|---|
| **From:** | Lynne Berthiaume <REDACTED |
| **Sent:** | Monday, July 1, 2019 10:06 PM |
| **To:** | Montier, William (Contractor)(CFPB) |
| **Subject:** | Re: Payment |

On Fri, Sep 7, 2018 at 7:59 AM Hannah Schuler <hschuler@slaccountmgmt.com> wrote:

No I can see it on my end you are fine I promise.

**From:** REDACTED
**Sent:** Friday, September 7, 2018 7:55 AM
**To:** Hannah Schuler <hschuler@slaccountmgmt.com>
**Subject:** RE: Payment

Okay, I will wait for them to catch up.  Should I call them?

Sent from my T-Mobile 4G LTE Device

-------- Original message --------

From: Hannah Schuler <hschuler@slaccountmgmt.com>

Date: 9/6/18 1:16 PM (GMT-08:00)

To: REDACTED

Subject: RE: Payment

Your payments to fedloan a month are a total of $261

1

**From:** REDACTED
**Sent:** Thursday, September 6, 2018 12:22 PM
**To:** Hannah Schuler <hschuler@slaccountmgmt.com>
**Subject:** Payment


Hannah, I did pay the 261.00 but fedloans shows me still owing the 483.  They are showing me past due.  Help please!!  Lynne ▮▮▮▮▮▮▮▮.




Sent from my T-Mobile 4G LTE Device

Pls.' Ex. 30
P. 761

Plaintiffs' Exhibit 31

Declaration of Kristin Honold

Pursuant to 28 U.S.C. § 1746

I, Kristin Honold, hereby declare and state as follows:

1.      I am over the age of eighteen and reside in Clinton Township, Michigan.

2.      I was called by Nicolette Bryan of South Coast Financial Center ("SCFC") stating that they could lower my student loan balance and provide forgiveness of my student loans.

3.      Nicolette assured me that SCFC's program was going to make me better off. She said that in this program I would owe less money and have my loan paid off quicker. Unfortunately, I believed her.

4.      When she explained the program, she made it sound like her plan was better than the one I was already in.  At the time I was on year 6 of 10 of the public service loan forgiveness program ("PSLF").

5.      At the time my student loans totaled $66,125.  My monthly payment amount was $0 because of my teacher salary and having a family size of four (myself, my husband, and my two children). Nicolette said if I stayed in my current program I would eventually have to pay back $114,000 which is the $66,125 plus interest, but if I got in the SCFC program I would pay just $11,925.  At the time I didn't think my entire loan balance of $66,125 was covered by the PSLF that I was enrolled in. SCFC told me that with their program my entire balance would be covered.

6.      She made it seem like SCFC was part of the U.S. Department of Education ("DOE").

7.      I did not realize and Nicolette did not tell me that she was presenting the same program that I was already in.  I also did not know and Nicolette didn't tell me that even though my monthly payment was $0, that each month that passed counted toward my 120 months qualifying for loan forgiveness. She said payments made to SCFC would help me qualify for forgiveness and all I would end up paying is $11,925.

8.      She said I would have to pay $207.50 for six months, which would go to her company for preparing all the paper work associated with signing up for the program. After six

1

Pls.' Ex. 31
P. 763

months I would then pay $89 per month for 120 months. I set up these payments with my debit card.

9.      · I signed up for the SCFC program on March 8, 2019. A true and correct copy of the agreement I signed electronically is attached hereto as **Attachment A.** At the time I did not notice that the agreement stated that I would have to make payments of $22 a month, not $89 a month as they stated on the phone.

10.     I made two payments to SCFC. Then on May 13, 2019 I attended a student loan workshop through my union and it helped me realize that SCFC was scamming me. Based on what I heard at the workshop it seemed like SCFC was not providing me with any service that I couldn't have done myself for free.

11.     While I was still trying to decide what to do, on May 17, 2019 I received an e-mail from SCFC that my loans had been consolidated with Nelnet.  A true and correct copy of the e-mail sent to me from SCFC on May 17, 2019 is attached hereto as **Attachment B.**

12.     On May 21, 2019 I contacted DOE to discuss SCFC. They said to call Nelnet and advise all parties involved of the loss of qualifying payments I sustained and that I should not have incurred such a loss and that I should be reimbursed.

13.     At the point I had completed six of the ten years required for loan forgiveness when SFCF consolidated my loans. Because my loans were transferred to Nelnet, I lost six years of qualifying payments.

14.     I cancelled my bank card and my bank refunded me the money paid to SCFC. On May 24, 2019 I received an e-mail from SCFC acknowledging that the money I paid to them had been returned to me.  I also called SCFC but they said they could not transfer my loans back to my previous servicer, FedLoans. That is the last contact I had from SCFC. A true and correct copy of the e-mail sent to me from SCFC on May 24, 2019 is attached hereto as **Attachment C.**

15.     I filed a complaint with the Consumer Financial Protection Bureau ("CFPB") on May 21, 2019 and with the Michigan Attorney General's office on May 26, 2019.

16.     If I had known consolidating my loan would result in the loss of qualifying payments I had made toward PSLF, I would never have used SCFC's services.

2

17.   If I had known that SCFC would not able to provide loan forgiveness, I would never have used their services.

18.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ~~September 29~~ 2019.

Kristin Honold

At Clinton Township, Michigan

# Attachment A

# South Coast Financial Center

## Document Preparation and Service Agreement ("Agreement")

This Agreement is entered into on the date shown below between SOUTH COAST FINANCIAL CENTER (Hereinafter referred to as "Company") and the Client shown below (Hereinafter referred to as "Client").

Company provides document preparation services to assist consumers who are applying for federal student loan programs using Department of Education ("DOE") forms. Company is a private company, not affiliated with any government agency, and for a fee Company will assist in assembly and completion of student loan consolidation or other application documents for student loan debt assistance programs offered by the DOE, for delivery to Client for Clients review and submission to DOE. Company is not a lender, a debt consolidation company, or a law firm and does not provide legal advice.

Company and Client do hereby understand, covenant and agree to the following:

**1. Provide Complete and Truthful Information.** Company will provide Client with an overview session limited to their federal student loan debts and the available documents, and Client expressly represents and warrants that Client will provide Company with information that is complete, accurate and truthful.

**2. Performance of Services.** Upon receipt of all information from Client, Company shall promptly analyze Client's situation, review the information provided by the Client, and complete the application forms required for the DOE program(s) that have been selected by the Client. Company shall prepare for filing an application to initiate a federal student loan consolidation through the DOE on behalf of Client, or alternatively and at the Client's option, identify and apply for other DOE-sponsored programs suitable for Client. All completed applications shall be delivered by Company to Client for Client's approval, signature and direct submission to DOE.

**By initialing here, Client requests Company to complete & submit executed application to DOE.**

Initials **KH**

**3. Fees that Client Pays.** The payment for Company's services relating to the student loan assistance applications, their preparation, delivery to Client, and ongoing support are described in the attached Fee and Service Schedule (Exhibit A). Client should review the attached Fee and Service Schedule carefully as it sets forth one or more fees that the Client will be charged depending on the services that are selected. All fees are earned, due, and payable pursuant to the attached Fee and Service Schedule. Payments may be collected on a periodic payment option as indicated in the attached Draft Schedule (Exhibit B). The fees shall be debited from Client's bank account or charged on Client's credit card pursuant to the attached authorization. Client shall be responsible for any third-party support or service fees, such as bank processing or third-party account fees.

**4. No Advance Fees.** Per the attached Client Trust Account Authorization, Company does not take any advance fees from Client. Company will designate an independent third-party dedicated account provider ("DAP") to collect and deposit payments that Client has agreed to make with Company, pursuant to the Fee and Service Schedule of this Agreement, and to deposit and hold Client's funds in a trust account established and serviced by the DAP. The DAP will not disburse any Client fees until Client has received a consolidation, adjustment, or otherwise satisfactory result, and Client completes one payment towards such.

**5. Limited Money Back Guarantee.** Company guarantees that the documents it prepares for consolidation or acceptance

Page 1 of 14

ID: **2960** Signed: 2019-03-08T14:48:55-06:0

into a DOE-offered program for student loan debt, or a repayment plan using current lenders through the DOE, will be accurate and sufficient for acceptance by the DOE subject to the following conditions: (1) student loans that Client presents to Company are original debts, and have not been previously consolidated or had their terms or amounts previously adjusted, and have not been previously serviced or worked on by any other student loan assistance or adjustment company; (2) Client fully cooperates and is honest and timely in providing all information requested by Company and the DOE; and/or (3) Client does not possess a characteristic that pursuant to DOE rules or applicable law would disqualify Client from receiving a consolidation. Client shall not be entitled to the benefits of this section in the event that Client receives document preparation services from Company and prior to approval by the DOE, Client terminates this Agreement or continues with the DOE without the assistance of Company. If Client is not approved through the DOE subject to the above limitations, then Company will reimburse the Fee paid to Company (limited to funds received by Company from Client). All refund requests must be made, in writing, to Company within 30 days of any denial by the DOE. This guarantee expires six months after the date this Agreement is signed by the Client.

**6. Process and Restriction on Account Transfer.** Once Client provides Company with all requested information and paperwork, Company will begin preparing Client's application(s). Company is not an intermediary or agent of the DOE, so it does not control any review or agency approval times. Once a consolidation or other beneficial result is secured, subject to Client's election and for an additional fee, Company will continue to monitor Client's account and collect the necessary paperwork to make sure Client's account is up-to-date and ready for the yearly income validation. Prior to the anniversary of the loan, Company will provide required documents and instructions to Client for submission to the DOE. Client understands that Company may use a third-party support servicer to assist in processing duties pursuant to this Agreement and Company may share Client's information with such processor consistent with Company's Privacy Policy.

**7. Indemnification and Hold Harmless.** Client hereby agrees to defend and hold harmless Company and any supporting servicer from and against any claims and liability of any nature whatsoever arising out of or in connection with Client's failure to timely provide requested information to Company, Client's lack of authority or ability to complete terms of this Agreement, and all other claims arising out of this Agreement or relating to Client's loans and other financial obligations. This Agreement constitutes the entire agreement between the parties. Company makes no warranty, express or implied, as to the fitness of any recommendation it may make to Client arising out of this Agreement. Except for cause, Client unconditionally waives any right of action against Company and third-party support servicer, its officers, directors, employees, agents, brokers and assignees, at law, equity or any other cause of action for any reason, directly, indirectly, or proximately believed to arise out of this Agreement, for any damages of any nature whatsoever that Client may incur by reason of Client following any recommendation of Company or Client's failure to follow any recommendation of Company, whether any singular, concurrent or series of recommendations are acted upon or not acted upon in whole or in part by Client. This section shall survive any termination of this Agreement.

Initials **KH**

**8. Entire Agreement.** By virtue of Client's signature below, Client acknowledges that he or she has read, understands, and agrees to every term, covenant and condition of this Agreement without change or modification and that he or she has received a true and complete copy hereof, effective on the date below. This agreement is the only agreement between the parties and there is no other collateral agreement (oral or written) between the parties in any manner relating to the subject matter of this agreement. If any portion of this agreement is held to be invalid or unenforceable, the remaining provisions will remain in effect. The parties mutually understand and agree that a facsimile copy signature or an electronic signature on this agreement shall be deemed an original for all lawfully enforceable purposes.

**9. Cancellation Policy.** Company's cancellation policy is designed to exceed state law requirements (for the Client's protection) and be easy to understand: If you are unhappy or dissatisfied at any time prior to receiving the documents or services described herein, a consolidation or other result from the DOE that Company has assisted you with, then simply send a letter, email, or facsimile to the Company requesting a refund and cancelling your program. Once Company completes its document preparation services and sends documents to Client, Client shall not be entitled to a refund unless subject to the Satisfaction Guarantee or if Client requests such cancellation within their state statutory cancellation right. If at any time you have questions, please do not hesitate to call or write to us directly.

Page 2 of 14

ID: 2960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 768

**10. Limitations on Damages.** Liability under this Agreement and/or relating directly or indirectly to Client's participation in any government loan or relief program, under any theory of liability regarding any claim by the Client, is limited to the amount of fees paid by Client and received by Company. The parties agree to be contractually bound to such limitation on any damages and agree not to demand or attempt to recover any amount in excess of such. It is the express intent of the parties to be bound by these limitations and this section shall survive any termination.

**11. Mandatory Binding Arbitration to Resolve All Disputes and Class Action Waiver.** This Agreement is governed by a Binding Mandatory Arbitration Requirement. You are encouraged to consult with independent legal counsel so that you understand your rights relating to this requirement. This Section limits your legal rights and ability to go to court. Please consult with legal counsel to be sure you understand this Section prior to signing.

In the event of any controversy, claim or dispute between the parties (the Company, the Client, and any support entities or persons contemplated herein) arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, unconscionability, or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined and resolved exclusively by arbitration in the county which the Client resides, or the closest metropolitan county, in accordance with the Laws of the State of California for agreements to be made in and to be performed in California. The parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures and an arbitrator shall be selected by the AAA. The arbitrator shall be neutral and independent and shall comply with the AAA code of ethics. The award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the parties. If either party fails to comply with the arbitrator's award, the injured party may petition the circuit court for enforcement. The parties agree that either party may bring claims against the other only in his, her, or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings of more than one person's claims and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost (excluding attorney's fees) of arbitration equally. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award. Binding Arbitration means that both parties give up the right to a trial by a jury. It also means that both parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. This section and the arbitration requirement shall survive any termination.

Initials _KH_

**12. Information Authorization.** Client hereby authorizes Company to verify past and present employment earnings records, bank accounts, stock holdings, and any other asset balances that are needed to process Client's application request(s). Importantly, Company does not provide any form of credit repair, credit score enhancement, unsecured or secured debt relief, or legal or tax advice, so any information obtained by Company cannot be used for those purposes.

**13. Electronic and Voice Communication Consent.** Client consents to do business electronically with Company. Client understands that electronic transactions, not limited to emails, are inherently unsecure and that both Client and Company will take all reasonable steps to maintain the Privacy of the information shared between the parties. Client consents to receive information and documents relating to this Agreement and Company services via electronic mail, text message, facsimile, voicemail, and any other common electronic means. Client understands that all costs associated with the receipt, review and use of such electronic communications shall be those of Client, such as maintaining access to the Internet or paying for text messages. Client consents to receive updates and documents relating to this Agreement and the services and programs offered by Company via prerecorded voice messages, text/SMS messages, and/or through the use of an automated dialing system. Client may contact Company at any time to opt out of receiving updates, new programs or offers through prerecorded or autodialed messages. Consent to this section does not bind Client to any future purchases of new services or offers.

Page 3 of 14

ID: **2960** Signed: **2019-03-08T14:48:55-06:00**

Pls.' Ex. 31
P. 769

14. **Important Disclosure.** You may, of course, try to complete your applications and consolidate your loans yourself without paying anyone a fee – the results could be the very same or they might vary. We are required to advise you that our services are OPTIONAL and you, as the debtor, may directly apply to the DOE for benefits by yourself without fees. However, our services are private and focused on your interests. Our goal is to reduce the stress and frustration that many experience when going through this process. We wade through all your paperwork and the DOE websites and applications, find the documents that you need, and take the time to make sure your application(s) are completed accurately and timely. We back up our services by our Satisfaction Guarantee. The nominal fee for these services is similar to you paying a tax preparer to do your taxes for you – you could do them yourself, but most of us turn them over to an expert to do and to ensure that they are done right the first time. Please note that the Company does not expressly or impliedly warrant, represent or guarantee that it will be able to reduce your total student loan debt or monthly payments. Company is NOT A LENDER, and we do not consolidate debts or extend credit. We solely provide application assistance services and education, along with any optional support programs.

Initials  _KH_

**BY SIGNING BELOW (ELECTRONICALLY OR PHYSICALLY), I HEREBY ACKNOWLEDGE THAT I HAVE NOT BEEN ADVISED BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES TO FOREGO A STUDENT LOAN PAYMENT. DURING THIS PROCESS, I AM RESPONSIBLE FOR MAKING MY PAYMENTS, AND FAILURE TO DO SO COULD DISQUALIFY ME FROM OBTAINING THE SERVICES THAT I APPLIED FOR. I FURTHER ACKNOWLEDGE THAT NO GUARANTEES OR PROMISES RELATING TO GOVERNMENT AGENCIES OR ANY RELIEF THAT I MAY RECEIVE HAVE BEEN PROVIDED TO ME BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES, AND A POSITIVE OUTCOME IS NOT GUARANTEED. I UNDERSTAND AND CONSENT TO LIMITATIONS ON DAMAGES, BINDING ARBITRATION CLAUSE, AND CLASS ACTION WAIVER CONTAINED HEREIN, AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT IN ITS TOTALITY AND ASK ANY QUESTIONS OF COMPANY.**

Client Signature        _KRISTIN HONOLD_

Client Printed Name     KRISTIN HONOLD

Executed on this Date   3/8/19

# Exhibit "A" to Service Agreement

## Fee and Service Schedule

The purpose of this Fee and Service Schedule is to ensure that Client is aware and consents to the fees that Company will charge for its services in assisting Client in preparing documents for one or more of the below programs. While such programs may be available for free directly by various government agencies, Company's services are fee-based and focused on application and document preparation. If other programs are identified by Client or Company to be suitable for Client, then additional fees may apply and will be presented to Client in writing for approval. Fees are charged consistent with the terms of Client's Agreement. Fees herein are only Company fees and do not include any third-party support or service fees, such as bank fees.

Client requests Company to perform, in good faith, the following services (the "Services"): (a) conduct a financial review of the Client's current situation; b) analyze and review potential Student Loan Consolidation options that may be available to Client from the DOE; (c) discuss potential options with the Client; and (d) prepare and deliver to Client selected applications.

Company's services ("Services") will be limited to the following:

1.   Assisting Client in locating options and document preparation limited to government consolidation, education and/or refinance or similar programs designed for Client's specific debt(s)

2.   Locating, obtaining and preparing the application(s) and supporting documents to apply for the programs and services described above;

3.   Additional consultation as needed with Client to gather and obtain information and documents from Client needed to prepare the above documents, and answer Client questions; and

4.   Follow-up on application, provide updates to Client, as reasonable, relating to documents that the Company will complete and provide for Client approval, signature, and submission.

5.   For certain loans, it may be determined that Client is in default of their obligations ("Default Accounts"). Company will assist with Default Accounts limited to reviewing the Client's present status and existing loan obligations, and upon review consult with Client to locate a specific payment plan known as a "rehabilitation plan." Generally, if the Client is likely to qualify for such based-on Client's financials and ability to pay, the Company will present such (with Client's approval) to the government creditors. Company will assist Client in qualifying for a rehabilitation program, and upon such acceptance Client will receive a term repayment program. Upon meeting lender-imposed repayment terms (usually for 6- 12 months), Client may qualify to submit a consolidation application consistent with the above. Company shall then assist per above.

6.   Some Clients may require other assistance with their loans that shall be deemed by the Company and Client to be in the Client's best interest. Those services shall be charged on a fee-for-service basis consistent with a written pricing schedule to be provided to the Client for Client's signature prior to any work commencing. Those services shall be limited to providing support with the DOE relating to other student loan assistance programs that may be available for the Client. Other than the amounts charged for these supplemental or alternative services, all of the terms of this Agreement shall continue to apply.

Fees for the Above Services and Length of Agreement: In connection with this Agreement, the above services shall be provided to the Client at a rate of $1,245.00 / $1,545.00 for rehab for document preparation and delivery to Client for a consolidation consistent with the above. Fees shall be due in full and payable to Company once services have been completed, or in the event of a rehabilitation program fees are due in full once Client makes first payment to servicer(s). Once earned through the above provision of services, all fees are non- refundable. All fees shall be debited from Client's bank account or charged on Client's credit card pursuant to the attached authorization. Client shall be responsible for any third-party support or service fees, such as bank fees.

Page 5 of 14

ID:    2960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 771

## ACKNOWLEDGEMENT

As indicated by my signature below, I acknowledge that I have read, understand, and agree to the terms and conditions of the Fee and Service Schedule.

| | |
|---|---|
| Client Signature | KRISTIN HONOLD |
| Client Printed Name | KRISTIN HONOLD |
| Executed on this Date | 3/8/19 |

ID: 2960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 772

# Exhibit "B" to Service Agreement

## Draft Schedule

| # | Date | Enrollment Fee | Recurring | Total Payment |
|---|------|---------------|-----------|---------------|
| 1 | Mar 15, 2019 | $207.50 | $0.00 | $207.50 |
| 2 | Apr 15, 2019 | $207.50 | $0.00 | $207.50 |
| 3 | May 15, 2019 | $207.50 | $0.00 | $207.50 |
| 4 | Jun 15, 2019 | $207.50 | $0.00 | $207.50 |
| 5 | Jul 15, 2019 | $207.50 | $0.00 | $207.50 |
| 6 | Aug 15, 2019 | $207.50 | $0.00 | $207.50 |
| 7 | Sep 15, 2019 | $0.00 | $22.00 | $22.00 |
| 8 | Oct 15, 2019 | $0.00 | $22.00 | $22.00 |
| 9 | Nov 15, 2019 | $0.00 | $22.00 | $22.00 |
| 10 | Dec 15, 2019 | $0.00 | $22.00 | $22.00 |
| 11 | Jan 15, 2020 | $0.00 | $22.00 | $22.00 |
| 12 | Feb 15, 2020 | $0.00 | $22.00 | $22.00 |
| 13 | Mar 15, 2020 | $0.00 | $22.00 | $22.00 |
| 14 | Apr 15, 2020 | $0.00 | $22.00 | $22.00 |
| 15 | May 15, 2020 | $0.00 | $22.00 | $22.00 |
| 16 | Jun 15, 2020 | $0.00 | $22.00 | $22.00 |
| 17 | Jul 15, 2020 | $0.00 | $22.00 | $22.00 |
| 18 | Aug 15, 2020 | $0.00 | $22.00 | $22.00 |
| 19 | Sep 15, 2020 | $0.00 | $22.00 | $22.00 |
| 20 | Oct 15, 2020 | $0.00 | $22.00 | $22.00 |
| 21 | Nov 15, 2020 | $0.00 | $22.00 | $22.00 |
| 22 | Dec 15, 2020 | $0.00 | $22.00 | $22.00 |
| 23 | Jan 15, 2021 | $0.00 | $22.00 | $22.00 |
| 24 | Feb 15, 2021 | $0.00 | $22.00 | $22.00 |
| 25 | Mar 15, 2021 | $0.00 | $22.00 | $22.00 |
| 26 | Apr 15, 2021 | $0.00 | $22.00 | $22.00 |
| 27 | May 15, 2021 | $0.00 | $22.00 | $22.00 |
| 28 | Jun 15, 2021 | $0.00 | $22.00 | $22.00 |
| 29 | Jul 15, 2021 | $0.00 | $22.00 | $22.00 |
| 30 | Aug 15, 2021 | $0.00 | $22.00 | $22.00 |
| 31 | Sep 15, 2021 | $0.00 | $22.00 | $22.00 |
| 32 | Oct 15, 2021 | $0.00 | $22.00 | $22.00 |
| 33 | Nov 15, 2021 | $0.00 | $22.00 | $22.00 |
| 34 | Dec 15, 2021 | $0.00 | $22.00 | $22.00 |
| 35 | Jan 15, 2022 | $0.00 | $22.00 | $22.00 |
| 36 | Feb 15, 2022 | $0.00 | $22.00 | $22.00 |
| 37 | Mar 15, 2022 | $0.00 | $22.00 | $22.00 |
| 38 | Apr 15, 2022 | $0.00 | $22.00 | $22.00 |
| 39 | May 15, 2022 | $0.00 | $22.00 | $22.00 |
| 40 | Jun 15, 2022 | $0.00 | $22.00 | $22.00 |
| 41 | Jul 15, 2022 | $0.00 | $22.00 | $22.00 |
| 42 | Aug 15, 2022 | $0.00 | $22.00 | $22.00 |
| 43 | Sep 15, 2022 | $0.00 | $22.00 | $22.00 |
| 44 | Oct 15, 2022 | $0.00 | $22.00 | $22.00 |
| 45 | Nov 15, 2022 | $0.00 | $22.00 | $22.00 |

Page 7 of 14

ID:   2960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 773

| | | | | |
|---|---|---|---|---|
| 46 | Dec 15, 2022 | $0.00 | $22.00 | $22.00 |
| 47 | Jan 15, 2023 | $0.00 | $22.00 | $22.00 |
| 48 | Feb 15, 2023 | $0.00 | $22.00 | $22.00 |
| 49 | Mar 15, 2023 | $0.00 | $22.00 | $22.00 |
| 50 | Apr 15, 2023 | $0.00 | $22.00 | $22.00 |
| 51 | May 15, 2023 | $0.00 | $22.00 | $22.00 |
| 52 | Jun 15, 2023 | $0.00 | $22.00 | $22.00 |
| 53 | Jul 15, 2023 | $0.00 | $22.00 | $22.00 |
| 54 | Aug 15, 2023 | $0.00 | $22.00 | $22.00 |
| 55 | Sep 15, 2023 | $0.00 | $22.00 | $22.00 |
| 56 | Oct 15, 2023 | $0.00 | $22.00 | $22.00 |
| 57 | Nov 15, 2023 | $0.00 | $22.00 | $22.00 |
| 58 | Dec 15, 2023 | $0.00 | $22.00 | $22.00 |
| 59 | Jan 15, 2024 | $0.00 | $22.00 | $22.00 |
| 60 | Feb 15, 2024 | $0.00 | $22.00 | $22.00 |
| 61 | Mar 15, 2024 | $0.00 | $22.00 | $22.00 |
| 62 | Apr 15, 2024 | $0.00 | $22.00 | $22.00 |
| 63 | May 15, 2024 | $0.00 | $22.00 | $22.00 |
| 64 | Jun 15, 2024 | $0.00 | $22.00 | $22.00 |
| 65 | Jul 15, 2024 | $0.00 | $22.00 | $22.00 |
| 66 | Aug 15, 2024 | $0.00 | $22.00 | $22.00 |
| 67 | Sep 15, 2024 | $0.00 | $22.00 | $22.00 |
| 68 | Oct 15, 2024 | $0.00 | $22.00 | $22.00 |
| 69 | Nov 15, 2024 | $0.00 | $22.00 | $22.00 |
| 70 | Dec 15, 2024 | $0.00 | $22.00 | $22.00 |
| 71 | Jan 15, 2025 | $0.00 | $22.00 | $22.00 |
| 72 | Feb 15, 2025 | $0.00 | $22.00 | $22.00 |
| 73 | Mar 15, 2025 | $0.00 | $22.00 | $22.00 |
| 74 | Apr 15, 2025 | $0.00 | $22.00 | $22.00 |
| 75 | May 15, 2025 | $0.00 | $22.00 | $22.00 |
| 76 | Jun 15, 2025 | $0.00 | $22.00 | $22.00 |
| 77 | Jul 15, 2025 | $0.00 | $22.00 | $22.00 |
| 78 | Aug 15, 2025 | $0.00 | $22.00 | $22.00 |
| 79 | Sep 15, 2025 | $0.00 | $22.00 | $22.00 |
| 80 | Oct 15, 2025 | $0.00 | $22.00 | $22.00 |
| 81 | Nov 15, 2025 | $0.00 | $22.00 | $22.00 |
| 82 | Dec 15, 2025 | $0.00 | $22.00 | $22.00 |
| 83 | Jan 15, 2026 | $0.00 | $22.00 | $22.00 |
| 84 | Feb 15, 2026 | $0.00 | $22.00 | $22.00 |
| 85 | Mar 15, 2026 | $0.00 | $22.00 | $22.00 |
| 86 | Apr 15, 2026 | $0.00 | $22.00 | $22.00 |
| 87 | May 15, 2026 | $0.00 | $22.00 | $22.00 |
| 88 | Jun 15, 2026 | $0.00 | $22.00 | $22.00 |
| 89 | Jul 15, 2026 | $0.00 | $22.00 | $22.00 |
| 90 | Aug 15, 2026 | $0.00 | $22.00 | $22.00 |
| 91 | Sep 15, 2026 | $0.00 | $22.00 | $22.00 |
| 92 | Oct 15, 2026 | $0.00 | $22.00 | $22.00 |
| 93 | Nov 15, 2026 | $0.00 | $22.00 | $22.00 |
| 94 | Dec 15, 2026 | $0.00 | $22.00 | $22.00 |
| 95 | Jan 15, 2027 | $0.00 | $22.00 | $22.00 |
| 96 | Feb 15, 2027 | $0.00 | $22.00 | $22.00 |

Page 8 of 14

ID:  960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 774

| 97  | Mar 15, 2027 | $0.00 | $22.00 | $22.00 |
|-----|--------------|-------|--------|--------|
| 98  | Apr 15, 2027 | $0.00 | $22.00 | $22.00 |
| 99  | May 15, 2027 | $0.00 | $22.00 | $22.00 |
| 100 | Jun 15, 2027 | $0.00 | $22.00 | $22.00 |
| 101 | Jul 15, 2027 | $0.00 | $22.00 | $22.00 |
| 102 | Aug 15, 2027 | $0.00 | $22.00 | $22.00 |
| 103 | Sep 15, 2027 | $0.00 | $22.00 | $22.00 |
| 104 | Oct 15, 2027 | $0.00 | $22.00 | $22.00 |
| 105 | Nov 15, 2027 | $0.00 | $22.00 | $22.00 |
| 106 | Dec 15, 2027 | $0.00 | $22.00 | $22.00 |
| 107 | Jan 15, 2028 | $0.00 | $22.00 | $22.00 |
| 108 | Feb 15, 2028 | $0.00 | $22.00 | $22.00 |
| 109 | Mar 15, 2028 | $0.00 | $22.00 | $22.00 |
| 110 | Apr 15, 2028 | $0.00 | $22.00 | $22.00 |
| 111 | May 15, 2028 | $0.00 | $22.00 | $22.00 |
| 112 | Jun 15, 2028 | $0.00 | $22.00 | $22.00 |
| 113 | Jul 15, 2028 | $0.00 | $22.00 | $22.00 |
| 114 | Aug 15, 2028 | $0.00 | $22.00 | $22.00 |
| 115 | Sep 15, 2028 | $0.00 | $22.00 | $22.00 |
| 116 | Oct 15, 2028 | $0.00 | $22.00 | $22.00 |
| 117 | Nov 15, 2028 | $0.00 | $22.00 | $22.00 |
| 118 | Dec 15, 2028 | $0.00 | $22.00 | $22.00 |
| 119 | Jan 15, 2029 | $0.00 | $22.00 | $22.00 |
| 120 | Feb 15, 2029 | $0.00 | $22.00 | $22.00 |

Client Signature          *KRISTIN HONOLD*

Client Printed Name       KRISTIN HONOLD

Executed on this Date     3/8/19

**Page 9 of 14**

ID:   2960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 775

# Credit Card Authorization Form

I hereby authorize SOUTH COAST FINANCIAL CENTER and/or its third-party support servicers to charge my credit card below the Fees pursuant to the Fee and Service Schedule of my Agreement. The Fees will be automatically processed in accordance with the Draft Schedule of my Agreement.

I authorize Company to charge my credit card in accordance with the Draft Schedule of my Agreement for services provided pursuant to my Agreement. No additional charges are authorized. I understand that charges declined by the credit card issuer could constitute ground for cancellation of Company's document preparation services.

Please complete all of the following information.

Your account cannot be processed if incomplete.

Check the type of credit card: MC X  VISA  Discover  AMEX

Credit Card Number: █████████

Expiration Date: █████

Security (CVC) Code: ███

Name of Credit Card Holder (exactly as it appears on the card): **KRISTIN M HONOLD**

Billing Address: █████████

City: **CLINTON TOWN SHIP**

State: **MI**

Zip Code: REDACTED

Signature of Credit Card Holder: *KRISTIN HONOLD*

Date: **3/8/19**

ID: 2960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 776

# Special Limited Power of Attorney

To: Any and all of my Student Loan Creditors

I hereby duly authorize, empower, and appoint SOUTH COAST FINANCIAL CENTER, its representatives, designated agents, and/or employees, and third-party support servicers to perform any acts necessary or convenient, including but not limited to, the following on my behalf:

1.    Communicate with any and/or all of my Federal Student Loan providers and their servicing agencies to obtain information on my student loans.

2.    Communicate with banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans, including but not limited to the balance of my account, payment history verification of the account, financial adjustments, and any and all necessary communications, correspondence, and negotiations regarding my account(s). I assert that all of the information that I have provided and will provide SOUTH COAST FINANCIAL CENTER is true and accurate.

I hereby duly authorize third-party communication from banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans to communicate directly with SOUTH COAST FINANCIAL CENTER concerning my account or the collection activities associated with it, in accordance with Section 805 (b) of the Fair Debt Collection Practices Act. I further request that all of my lenders direct all further telephone calls and correspondence to:

SOUTH COAST FINANCIAL CENTER

(855) 877-4831

Any and all communications directed to me will be referred to SOUTH COAST FINANCIAL CENTER.

I understand that SOUTH COAST FINANCIAL CENTER is not a law firm, is not licensed to practice law or provide legal advice, and that I will not request or accept any legal advice from SOUTH COAST FINANCIAL CENTER relating to my personal financial situation.

I understand that any creditor or collection activity, demands, or lawsuits are unrelated to my enrollment in the SOUTH COAST FINANCIAL CENTER program.

I agree that electronic or facsimile copy signature shall be deemed original and is an authorization by me for all lawfully enforceable purposes.

This Special Limited Power of Attorney shall remain in force until or unless modified or rescinded in writing, or upon resolution of the current matter.

This Special Limited Power of Attorney:

| | |
|---|---|
| Client Signature | *KRISTIN HONOLD* |
| Client Printed Name | KRISTIN HONOLD |
| Executed on this Date | 3/8/19 |

**Page 11 of 14**

ID: 2960 Signed: 2019-03-08T14:48:55-06:00

# National Student Loan Data System Access Permission

**Purpose:** For SOUTH COAST FINANCIAL CENTER to access your student loan information from government websites.

**Reason:** For SOUTH COAST FINANCIAL CENTER to obtain accurate information relating to your student loans for application purposes.

**What I Need to Do:** As the Debtor who is responsible for these loans, you need to create an online User Name and Password. The U.S. Department of Education recommends that you keep your User Name and Password secure to prevent any fraudulent use. The purposes of the User Name and Password is to permit you access to various government websites and allow you to sign electronically on any applications. There are other purposes as well, so please keep your information secure.

**Why We May Request Your User Name and Password:** We need to carry out the application services that you have requested of us, which may require your User Name and Password. We will only your User Name and Password with your permission and instruction. We will keep your User Name and Password secure, and we will never share it with third parties. We may need this information to complete our contracted services, including gathering the relevant pending loan information pertaining to you, and completing the applications that you qualify for. While the government does not encourage such sharing because they want to prevent fraud and abuse, with your consent and instruction we are permitted to review and assist you with the services you have requested of us. We will never use this information to sign or submit applications for you — you must do that on your own.

**Authorization:** As part of the federal student loan assistance application process, it may be necessary for us to access your student loan information within the Student Loan Data System located online at http://www.nslds.ed.gov.

The Data System contains a complete list of your federal education loans, along with current estimated balances and servicer details — information that is required to complete your application(s).

By enrolling in Company's program, you are agreeing to allow Company, its representatives, designated agents, and/or employees, and third-party support servicers to access your profile and all the data contained within that profile. In order to allow this access, you may need to provide Company with your User Name and Password.

Please note that all information that Company obtains from the Student Loan Data System will be used expressly for the purposes of confirming information and assisting in the preparation of your application(s).

**Acknowledgment:** I hereby acknowledge that I have read, understood, and agree to the above statements regarding access to my National Student Loan Data System profile. I understand that any information received or accessed will be used solely for the purposes as stated above.

By signing this acknowledgment, I instruct, agree, and expressly permit Company to access the National Student Loan Data System and my personal profile as explained above.

This National Student Loan Data System Access Permission:

| | |
|---|---|
| Client Signature | *KRISTIN HONOLD* |
| Client Printed Name | KRISTIN HONOLD |
| Executed on this Date | 3/8/19 |

ID: 2960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 778

| Facts! | WHAT DOES SOUTH COAST FINANCIAL CENTER ("Company") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>• Social Security number and income<br>• Account balances and account numbers<br>• Transaction or loss history and employment information<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business.  In the section below, we list the reasons financial companies can share their customers' personal information; the reasons SOUTH COAST FINANCIAL CENTER chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Do we share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes – to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes – information about your transactions and experiences | Yes | No |
| For our affiliates everyday business purposes – information about your creditworthiness | No | We don't share |
| For non-affiliates to market to you | Yes | Yes |
| Questions? | https://www.southcoastfinancialcenter.com/ | |

Page 13 of 14

ID:   960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 779

| Who we are | |
|---|---|
| **Who is providing this notice?** | SOUTH COAST FINANCIAL CENTER |

| What we do | |
|---|---|
| **How do we protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safe guards and secured files and buildings<br><br>We also maintain physical, electronic and procedural safe guards such as computer virus protection software, firewalls, and a 128 bit Secure Socket Layer. Only authorized employees have access. |
| **How do we collect my personal information?** | We collect your personal information, for example when you<br>-Give us your income information<br>-Provide employment information<br>-Provide account information<br>-Give us your contact information<br>We also collect your personal information from other companies |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>-Sharing for affiliates' everyday business purposes-information about your creditworthiness<br>-Affiliates from using your information to market to you<br>-Sharing for non-affiliates o market to you<br>State laws and individual companies may give you additional rights to limit sharing. |

| Definition | |
|---|---|
| **Affiliates** | Financial and non-financial companies related by common ownership or control.<br><br>• SOUTH COAST FINANCIAL CENTER does not share with our affiliates |
| **Non-affiliates** | Financial and non-financial companies not related by common ownership or control.<br><br>• SOUTH COAST FINANCIAL CENTER does not share with non-affiliates so they can market to you. |
| **Joint Marketing** | A formal agreement between non-affiliated financial companies that together market financial products or services to you<br><br>• SOUTH COAST FINANCIAL CENTER doesn't jointly market. |

| Other Important Information | |
|---|---|
| **For California and Vermont Residents:** We will not share information we collect about you with non-affiliated third parties, except as permitted by California or Vermont law, respectively, such as to process your transactions or to maintain your account. | |

**Page 14 of 14**

ID: █████2960 Signed: 2019-03-08T14:48:55-06:00

Pls.' Ex. 31
P. 780



# E-Signature Completion Certificate

| | |
|---|---|
| Document ID | REDACTED 2960 |
| Document GUID | a978a2e2f4b4601fb25e1f94a280dbf5 |
| Document Title | Client Agreement - South Coast Financial Center |
| Sender IP | 70.183.63.77 |
| Number of Signers | 1 |
| Signer Email | REDACTED |
| Signer IP | ███████ |
| Timestamp | 2019-03-08T14:48:55-06:00 |
| Document Hash | d41d8cd98f00b204e9800998ecf8427e |

## Document Audit

- Sent at 2019-03-08T14:45:26-06:00 from IP 70.183.63.77
- Delivered to REDACTED at 2019-03-08T14:45:40-06:00 from ████████
- Adopted Signature at 2019-03-08T14:45:53-06:00 from ███████
- Completed Signing at 2019-03-08T14:48:55-06:00 from ███████
- PDF Generated at 2019-03-08T14:48:55-06:00

## User Agent

Mozilla/5.0 (Macintosh; Intel Mac OS X 10_14_2) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0.2 Safari/605.1.15

# Attachment B

From: **Deborah Corzano** dcorzano@processingsupport.com
Subject: Final Approval - Please Read
Date: May 17, 2019 at 4.47 PM
To: REDACTED



Hello KRISTIN,

Congratulations, we have completed your consolidation! Your new servicer is: Nelnet

https //www nelnet.com/

Your online account has been set up. Your login information is listed below, if you have any issues logging in please contact me

Username:       ▮▮▮▮▮

Password:       ▮▮▮▮▮▮▮▮▮

**Please DO NOT alter your login credentials** without notifying our company.

The details following your new payment plan is as follows;

Repayment Plan:       **REPAYE**

Approved Monthly Student Loan Payment:       $0.00

**This payment needs to be made to Nelnet directly via online, by mail or phone.**

First Payment Due Date: ′       05/26/2019

Payment End Date:       05/26/2020


*We will be reaching out to you in 10 months for updated proof of income for you annual recertification!

If you have any questions regarding the details of your new loan please contact us, thank you and congratulations again!


# Deborah Corzano

**Processing Department**

Direct Line: (949) 347-5436

Direct Fax: +1 (833) 821-7634

Email: dcorzano@processingsupport.com

***** Email confidentiality notice *****

CONFIDENTIALITY STATEMENT The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above  Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited  If you are not the intended addressee, please notify the sender immediately and delete this message

Pls.' Ex. 31
P. 783

# Attachment C

Pls.' Ex. 31
P. 784

**Fwd: Customer Service Department - Cancellation Notice**

From:  Kristin Honold ( REDACTED

To:  ▇▇▇▇@yahoo.com

Date:  Friday, May 24, 2019, 07:39 PM EDT

Sent from my iPhone

Begin forwarded message:

**From:** Charge Back <chargebacks@processingsupport.com>
**Date:** May 24, 2019 at 7:07:26 PM EDT
**To:** REDACTED
**Subject: Customer Service Department - Cancellation Notice**

Hello KRISTIN,

After review of your file and enrollment payment(s) with us, your file was flagged due to a **CHARGEBACK** filed by your account holder. While we are sorry to hear that you were dissatisfied by our services and a chargeback was deemed necessary since we cannot assist you further the client retention department has cancelled out your file.

We are sorry to hear you won't be continuing your services with us. If you have any questions, feel free to email or give us a call at your earliest convenience. We hope that you will keep us in mind for future services.

Thank you,

**Customer Support**

South Coast Financial Center

Toll Free:  (855) 877-4831

***** Email confidentiality notice *****

**CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.**

Pls.' Ex. 31
P. 785

Plaintiffs' Exhibit 32

## DECLARATION OF GREGORY WILSON

I, GREGORY WILSON, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. My name is Gregory Wilson. I live in Los Angeles, California, and I am over the age of 18. The following facts are known to me personally, and if called as a witness, I could and would competently testify to them.

2. I first learned about Premier Student Loans ("Premier") in late 2016 from another student at my school, Walden University. At that time, I had multiple student loans. My student loan servicer at the time was a FAFSA student loan. I do not recall my servicer's name.

3. In late 2016, I called Premier for help with all of my loans. I wanted Premier to help me to refinance my student loans. I hoped that they could help me get lower monthly payments, a lower interest rate and possibly get some of my loans forgiven.

4. Around November 2016, I spoke with a Premier employee who identified himself as Frank Hernandez (Hernandez). Hernandez told me that Premier could consolidate my student loans, lower my monthly payments, and have my loans completely forgiven within five to ten years. Hernandez said Premier was in direct contact with the Department of Education, and that he could set up my account with the Department of Education.

5. During my call with Hernandez around November 2016, he told me that I had to make four payments of $299 to Premier in order to get enrolled in the Public Service Loan Forgiveness program, then $80 monthly payments for five to ten years. I understood that these payments to Premier would be the only payments I would have to make to get my loans forgiven and that I would not have to make any additional payments directly to my servicer.

6. Based on Hernandez's representations during the November 2016 call, around November 2016 I filled out and signed an enrollment contract via Premier's

---

**DECLARATION OF GREGORY WILSON**

online portal, along with a form stating that I allowed Premier to represent me with respect to all of my loans. I provided Premier with my student loan service provider's name, my social security number, mailing address, phone, school information, credit card information, and banking information.

7. On December 1, 2016, Hernandez emailed me requesting two recent paystubs and my most recent federal tax return. I sent him that information. A true and correct copy of this email is attached hereto as **Exhibit A**.

8. On January 4, 2017, Hernandez emailed me stating that Premier had all the documentation necessary to process my loan consolidation and that he had submitted my application for consolidation to the Department of Education. He also attached a Public Service Employment Verification form for me to fill out and return to him. A true and correct copy of this email, along with the form that was attached to the email, is attached hereto as **Exhibit B**.

9. Starting on or around January 2017, my account with Premier was set on autopay. This allowed Premier to debit my bank account directly each month. I made four payments of $299 and then paid $80 per month for about two to three months until I switched banks. I do not recall when I switched banks or how much I paid Premier in total.

10. After enrolling with Premier in January 2017, my interactions with Premier were more limited. Premier did not follow up with me or provide any updates or information regarding the status of my loan consolidation or interest rates.

11. In the middle of 2020, I grew concerned because I did not see any changes on the balances due for my student loans when looking at my federal loan account or my credit report. I called Hernandez and Premier repeatedly and asked for clarification, but no one responded. It was at that point that I found out there was a lawsuit against Premier Student Loans.

12. I tried to cancel my enrollment with Premier but was unable to and had to switch banks in order to stop the monthly payments.

---

**DECLARATION OF GREGORY WILSON**

13. Premier did consolidate all my loans into one, but my student loan interest rates and monthly payments were not lowered.  I learned that none of the money I had given Premier went towards my student loans, and my loans were not forgiven.

14. I would not have signed up with Premier if I had known that the money I paid was only going towards Premier's fees and not towards paying off the loans, that Premier would not help me apply for loan forgiveness, or that the only thing they would do is take a significant amount of money to merely consolidate my loans.

15. I also called Premier about four times to attempt to get a refund from them. Premier never responded to my request for a refund and never provided me with a refund.

16. On February 10, 2020, I filed a complaint with the Federal Trade Commission call center.

17. My loans are currently in deferment status due to the pandemic.


Executed on January 11, 2023 at Los Angeles, California.


_____
GREGORY WILSON

**DECLARATION OF GREGORY WILSON**

# EXHIBIT A

Pls.' Ex. 32
P. 790

Frank Capetillo <frank.capetillo@lacity.org>

## Fwd: Welcome Call
1 message

**G Wilson** REDACTED
To: Frank Capetillo <frank.capetillo@lacity.org>

Tue, May 17, 2022 at 12:29 PM

Please see email below

Sent from my iPhone

Begin forwarded message:

> **From:** frank@premierstudentloancenter.com
> **Date:** November 11, 2016 at 3:35:31 PM PST
> **To:** REDACTED
> **Subject: Welcome Call**

Hello Gregory,

My name is Frank from Premier Student Loan Center processing department and I am contacting you regarding your application. I do need to verify some important information regarding your account before I process and submit your application to the Department of Education. Once I am able to verify this information with you, Premier Student Loan Center will be able to process and submit your file immediately. Please contact us as soon as possible at 949-207-1079. Our normal business hours are from 8am-5pm PST. Thank you and have a wonderful day!

*Frank Hernandez*

# PREMIER STUDENT LOAN CENTER

Direct 949-207-1079 Ext. 7005

**Toll Free 888-548-0476**

**Fax number** 888-302-3033

frank@premierstudentloancenter.com

**www.premierstudentloancenter.com**

**http://www.whitehouse.gov/issues/education/higher-education/ensuring-that-student-loans-are-affordable**

Pls.' Ex. 32
P. 791

5/17/22, 12:44 PM
City of Los Angeles Mail - Fwd: Welcome Call
Case 8:19-cv-01998-MWF-KS   Document 423-3   Filed 01/30/23   Page 278 of 355   Page ID
http://www.bbb.org/sdoc/business-reviews/legal-document-assistance/premier-student-loan-center-in-
rancho-santa-margarita-ca-172013295/
#:12562

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

## Fwd: Pay Stub Request

1 message

**G Wilson** REDACTED
To: Frank Capetillo <frank.capetillo@lacity.org>

Tue, May 17, 2022 at 12:28 PM

Please see email below

Sent from my iPhone

Begin forwarded message:

> **From:** gregory Wilson REDACTED
> **Date:** December 2, 2016 at 7:31:16 AM PST
> **To:** frank@premierstudentloancenter.com
> **Subject: Re: Pay Stub Request**

Good afternoon,

I spoke to you yesterday about the payment being pushed back and the payment was still taken out my act.

Thanks

Sent from my iPhone

On Dec 1, 2016, at 6:35 PM, <frank@premierstudentloancenter.com> <frank@premierstudentloancenter.com> wrote:

Hello Gregory,

I am contacting you in regards to your Student Loan Consolidation. We are requesting for you to please send in copies of at least 2 of your most recent paystubs received in the past 60 days and a copy of your most recent FEDERAL tax return 1040 pages 1 and 2. **We cannot accept W-2 paperwork as acceptable forms of income.**

We DO NOT and CANNOT accept pictures of any form via email or fax. Please remit the necessary paperwork to us as follows

a. **Email** – You may scan and email the documents to us at        Frank@premierstudentloancenter.com

b. **Fax** – You may fax the signed document to **888-302-3033**

c. **Mail** – This is the slowest method taking up to 2-3 weeks. You may mail the documents to:

**173 Technology Drive**

**SUITE 202**

**IRVINE, CA 92618**

**Please NOTE: Not sending in these documents can prolong, postpone, or place your consolidation on hold. If you have any questions or concerns in regards to our request, please feel free to contact me at any time.**

*Frank Hernandez*

# PREMIER STUDENT LOAN CENTER

Direct 949-207-1079 Ext. 7005

**Toll Free 888-548-0476**

**Fax number** 888-302-3033

frank@premierstudentloancenter.com

**www.premierstudentloancenter.com**

**http://www.whitehouse.gov/issues/education/higher-education/ensuring-that-student-loans-are-affordable**

http://www.bbb.org/sdoc/business-reviews/legal-document-assistance/premier-student-loan-center-in-rancho-santa-margarita-ca-172013295/

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

Pls.' Ex. 32
P. 794

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

Pls.' Ex. 32
P. 795

# EXHIBIT B

Pls.' Ex. 32
P. 796

Frank Capetillo <frank.capetillo@lacity.org>

## Fwd: Public Service Loan Forgiveness App

1 message

**G Wilson** REDACTED                                             Tue, May 17, 2022 at 12:28 PM
To: Frank Capetillo <frank.capetillo@lacity.org>

Please see email below

Sent from my iPhone

Begin forwarded message:

> **From:** frank@premierstudentloancenter.com
> **Date:** January 4, 2017 at 2:53:23 PM PST
> **To:** REDACTED
> **Subject: Public Service Loan Forgiveness App**

Dear Gregory,

CONGRATULATIONS! We received all the necessary documentation in order to process
your consolidation! We have reviewed your file for accuracy and have submitted your
consolidation loan package to the Department of Education. Please keep in mind that the
approval process can take up to 45 days. Also, attached is your Public Service
Employment Verification form. Please have your employer fill this form out and **return
back to me** as soon as possible. If you have any questions, please do not hesitate to call
us at **949-207-1009**

Once again, congratulations!

> a.   **Email** – You may scan and email the document to me
>      at:                    Frank@premierstudentloancenter.com
>
> b.   **Fax** – You may fax the signed document to **888-761-5678**
>
> c.   **Mail** – This is the slowest method taking up to 2-3
>      weeks. You may mail the documents to:
>                          173 Technology Drive
>
>                             Suite #201
>
>                          Irvine, CA 92618

Case 8:19-cv-01998-MWF-KS Document 423-3 Filed 01/30/23 Page 284 of 355 Page ID #:12568

*Frank Hernandez*

# PREMIER STUDENT LOAN CENTER

Direct 949-207-1079

**Toll Free 888-548-0476**

**Fax number** 888-302-3033

frank@premierstudentloancenter.com

**www.premierstudentloancenter.com**

**http://www.whitehouse.gov/issues/education/higher-education/ensuring-that-student-loans-are-affordable**

http://www.bbb.org/sdoc/business-reviews/legal-document-assistance/premier-student-loan-center-in-rancho-santa-margarita-ca-172013295/

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

 **PSLF Form.pdf**
879K



# PUBLIC SERVICE LOAN FORGIVENESS (PSLF): EMPLOYMENT CERTIFICATION FORM
### William D. Ford Federal Direct Loan (Direct Loan) Program

OMB No. 1845-0110
Form Approved
Exp. Date 12/31/2017

**PSLF ECF**

**WARNING**: Any person who knowingly makes a false statement or misrepresentation on this form or on any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

## SECTION 1: BORROWER INFORMATION

Please enter or correct the following information.

☐ **Check this box if any of your information has changed.**

SSN

Date of Birth

Name

Address

City _____ State ___ Zip Code _____

Telephone - Primary

Telephone - Alternate

Email (Optional)

## SECTION 2: BORROWER AUTHORIZATIONS, UNDERSTANDINGS, AND CERTIFICATIONS

**Before signing, carefully read the entire form.** For more information on PSLF, visit **StudentAid.gov/publicservice**.

**I authorize:**

1. My employer or other entity having records about the employment that is the basis of my request to make information from those records available to the U. S. Department of Education (the Department) or its agents or contractors.

2. The entity to which I submit this request and its agents to contact me regarding my request or my loans at any cellular telephone number that I provide now or in the future using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

**I understand** that:

1. To qualify for PSLF, I must make 120 qualifying payments on my Direct Loan(s) while employed full-time by a qualifying employer or employers. Neither the 120 qualifying payments nor the employment have to be consecutive.

2. To qualify for PSLF, I must be employed full-time by a qualifying employer when I apply for and receive PSLF.

3. If I qualify for forgiveness, only the remaining balance on my Direct Loan(s) will be forgiven.

4. By submitting this form, my student loan(s) held by the Department will be transferred to FedLoan Servicing.

5. The Department may request supplemental documentation substantiating my employment.

6. The Department will notify me in writing or electronically of the number of qualifying payments I have made while employed full-time by a qualifying employer and how many more I must make before I am eligible to apply for PSLF.

7. The Department will notify me in writing or electronically if the form that I submit is incomplete, or if it determines that my employment or payments do not qualify for PSLF. The Department will explain the reason for the determination and the steps I need to take to correct the form or make qualifying payments.

8. The Department will retain this certification form until I submit my application for forgiveness.

**I certify** that all of the information I have provided on this form and in any accompanying document is true, complete, and correct to the best of my knowledge and belief.

☐ Check this box if you cannot obtain certification from your employer because the organization is closed or because the organization has refused to certify your employment. The Department will follow up to assist you in getting documentation of your employment. **Complete Section 3, but do not complete Section 4.**

**Borrower's Signature** _____   **Date** _____

Pls.' Ex. 32
P. 799

**Borrower Name** _____   **Borrower SSN** _____

## SECTION 3: EMPLOYER INFORMATION (TO BE COMPLETED BY THE BORROWER OR EMPLOYER)

**1.** Employer Name:

_____

**2.** Federal Employer Identification Number (FEIN)

_____

   Your employer's EIN may be found on your Wage
and Tax Statement (W-2).

**3.** Employer Address:

_____

**4.** Employer Website (if any):

_____

**5.** Employment Begin Date:

_____

**6.** Employment End Date:

_____   **OR**

☐ Still Employed

**7.** Employment Status:  ☐ Full-Time   ☐ Part-Time

**8.** Hours Per Week (Average)   _____

   Include vacation, leave time, or any leave taken
under the Family Medical Leave Act of 1993. If your
employer is a 501(c)(3) or a not-for-profit organization,
do not include any hours you spent on **religious
instruction, worship services, or proselytizing.**

**9.** Is your employer a **governmental** organization?

   A governmental organization is a Federal, State,
local, or Tribal government organization, agency, or
entity, a public child or family service agency, a Tribal
college or university, or the Peace Corps or
AmeriCorps.

   ☐ Yes - Skip to Section 4.

   ☐ No - Continue to Item 10.

**10.** Is your employer tax-exempt under Section **501(c)(3)**
of the Internal Revenue Code?

   ☐ Yes - Skip to Section 4.

   ☐ No - Continue to Item 11.

**11.** Is your employer a **not-for-profit** organization?

   ☐ Yes - Continue to Item 12.

   ☐ No - Your employer does not qualify.

**12.** Is your employer a partisan political organization?

   ☐ Yes - Your employer does not qualify.

   ☐ No - Continue to Item 13.

**13.** Is your employer a labor union?

   ☐ Yes - Your employer does not qualify.

   ☐ No - Continue to Item 14.

**14.** Indicate which service or services your employer
provides and then continue to Section 4, if
appropriate:

   ☐ Emergency management

   ☐ Military service (See Section 6)

   ☐ Public safety

   ☐ Law enforcement

   ☐ Public interest legal services (See Section 6)

   ☐ Early childhood education (See Section 6)

   ☐ Public service for individuals with disabilities

   ☐ Public service for the elderly

   ☐ Public health (See Section 6)

   ☐ Public education (See Section 6)

   ☐ Public library services

   ☐ School library services

   ☐ Other school-based services

   ☐ None of the above - your employer does not
qualify.

## SECTION 4: EMPLOYER CERTIFICATION (TO BE COMPLETED BY THE EMPLOYER)

By signing, **I certify** that the information in Section 3 is true, complete, and correct to the best of my knowledge and belief
and that I am an authorized official (see Section 6) of the organization named in Section 3. **Complete the rest of this Section.**
**Note:** If any of the information is crossed out or altered in Section 3, you must initial those changes.

Authorized Official's Name  _____   Authorized Official's Phone  _____

Authorized Official's Title  _____   Authorized Official's Email  _____

**Authorized Official's Signature**  _____   **Date**  _____

Pls.' Ex. 32
P. 800

## SECTION 5: INSTRUCTIONS FOR COMPLETING THE FORM

You may submit information about multiple employers by submitting one copy of Sections 1 and 2 (Page 1), and one copy of Sections 3 and 4 (Page 2) per employer. When completing this form, type or print using dark ink. Enter dates as month-day-year (mm-dd-yyyy). Use only numbers. Example: March 14, 2016 = 03-14-2016. If any information is crossed out or altered in Section 3, it must be initialed by your employer. For more information about PSLF and how to use this form, visit StudentAid.gov/publicservice. **Return the completed form to the address shown in Section 7.**

## SECTION 6: DEFINITIONS

**AmeriCorps position** means a position approved by the Corporation for National and Community Service under Section 123 of the National and Community Service Act of 1990 (42 U.S.C. 12573).

An **authorized official** is an official of a public service organization (including AmeriCorps or the Peace Corps) who has access to the borrower's employment or service records and is authorized by the public service organization to certify the employment status of the organization's employees or former employees, or the service of AmeriCorps or Peace Corps volunteers.

**Eligible loans** are loans that are not in default and made under the William D. Ford Federal Direct Loan (Direct Loan) Program.

**Early childhood education** includes licensed or regulated child care, Head Start, and State funded pre-kindergarten.

An **employee** means an individual who is hired and paid by the organization.

**Full-time** means working in qualifying employment in one or more jobs for the greater of: **(1)** An annual average of at least 30 hours per week or, for a contractual or employment period of at least 8 months, an average of 30 hours per week; or **(2)** Unless the qualifying employment is with two or more employers, the number of hours the employer considers full time.

**Government** includes a Federal, State, local or Tribal government organization, agency or entity; a public child or family service agency; or a Tribal college or university.

An **on-time payment** is a payment made no more than 15 days after the due date for the payment.

**Law enforcement** means service performed by an employee of a public service organization that is publicly funded and whose principal activities pertain to crime prevention, control or reduction of crime, or the enforcement of criminal law.

**Military service** means service on behalf of the U. S. Armed Forces or the National Guard performed by an employee of a public service organization.

**Peace Corps position** means a full-time assignment under the Peace Corps Act as provided for under 22 U.S.C. 2504.

**Public education** includes services that provide educational enrichment or support directly to students or their families in a school or a school-like setting.

**Public interest legal services** refers to legal services that are funded in whole or in part by a local, State, Federal, or Tribal government.

**Public health** includes nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health support occupations, as such terms are defined by the Bureau of Labor Statistics.

A **public service organization** is a private not-for-profit organization that is not a labor union or a partisan political organization and that provides at least one of the following public services: **(1)** emergency management, **(2)** military service, **(3)** public safety, **(4)** law enforcement, **(5)** public interest legal services, **(6)** early childhood education, **(7)** public service for individuals with disabilities and the elderly, **(8)** public health, **(9)** public education, **(10)** public library services, **(11)** school library services, or **(12)** other school-based services.

**Qualifying payments** are separate, on-time, full monthly payments made on a Direct Loan after October 1, 2007 under a qualifying repayment plan.

**Qualifying employment** includes employment by the government, employment by a not-for-profit organization that is tax-exempt under Section 501(c)(3) of the Internal Revenue Code, AmeriCorps position, a Peace Corps position, or employment at a public service organization.

**Qualifying repayment plans** include the Revised Pay As You Earn (REPAYE) plan, the Pay As You Earn (PAYE) plan, the Income-Based Repayment (IBR) plan, the Income-Contingent Repayment (ICR) plan, the 10-Year Standard Repayment plan (Standard Repayment plan with a maximum 10-year repayment period), and any other Direct Loan repayment plan, but only if payments are at least equal to the monthly payment amount that would be required under the Standard Repayment plan with a 10-year repayment period.

Pls.' Ex. 32
P. 801

## SECTION 7: WHERE TO SEND THE COMPLETED FORM

Return the completed form and any documentation to:
(If no address is shown, return to your loan holder.)

U.S. Department of Education
FedLoan Servicing       Or       Fax to: 717-720-1628
P.O. Box 69184
Harrisburg, PA 17106-9184

If you need help completing this form, call:
(If no telephone number is shown, call your loan holder.)

Domestic: 855-265-4038
International: 717-720-1985
TTY: dial 711, then enter 800-699-2908

Website: MyFedLoan.org

## SECTION 8: IMPORTANT INFORMATION ABOUT PSLF

You may obtain loan forgiveness under this program if you make 120 qualifying payments (see "Payment Eligibility") on eligible loans (see "Loan Eligibility") while working in qualifying employment (see "Employment Eligibility").

### Payment Eligibility

To receive PSLF, you must make 120 on-time, full, scheduled, separate monthly payments on your Direct Loans under a qualifying repayment plan after October 1, 2007.

On-time payments are those that are received by the Department no later than 15 days after the scheduled payment due date.

Full payments are payments on your Direct Loan in an amount that equals or exceeds the amount you are required to pay each month under your repayment schedule. If you make a payment that is less than what you are required to pay for that month, that month's payment will not count as one of the required 120 qualifying payments. If you make multiple, partial payments in a month and the total of those partial payments equals or exceeds the required full monthly payment amount, those payments will count as one qualifying payment.

Scheduled payments are those that are made while you are in repayment. They do not include payments made while your loans are in an in-school or grace status, or in a deferment or forbearance period.

You must make separate monthly payments. Lump sum payments or payments you make as advance payments for future months do not count as more than one qualifying payment. If you wish to make a payment in excess of your scheduled monthly payment, follow the instructions on your bill for providing payment instructions, and notate that your payment is not intended to cover future installments. Otherwise, your excess payment may affect your ability to make future qualifying payments.

If you were an AmeriCorps or Peace Corps volunteer, you may receive credit for making qualifying payments if you make a lump sum payment by using all or part of a Segal Education Award or Peace Corps transition payment.

The Department will consider the lump sum payment you have made as the equivalent of qualifying payments equal to the lesser of (1) the number of payments resulting after dividing the amount of the lump sum payment by the monthly payment amount you would have made under one of the qualifying repayment plans listed below; or (2) 12 payments.

Peace Corps volunteers making an eligible lump sum payment must do so within 6 months of the Employment End Date, as reported in Section 3.

Your payments must be made under a qualifying repayment plan. Qualifying repayment plans include the REPAYE plan, the PAYE plan, the IBR plan, the ICR plan, the 10-Year Standard Repayment plan, or any other Direct Loan repayment plan, but only payments that are at least equal to the monthly payment amount that would be required under the10-Year Standard Repayment plan.

Though repayment plans other than the REPAYE, PAYE, IBR, and ICR plans are qualifying repayment plans for PSLF, you must enter REPAYE, PAYE, IBR, or ICR to have a remaining balance to forgive after becoming eligible for PSLF. Otherwise, your loans will be fully repaid within 10 years. To apply for these plans, visit StudentLoans.gov.

**IMPORTANT**: The Standard Repayment Plan for Direct Consolidation Loans made on or after July 1, 2006 have repayment periods of different lengths. Monthly payments you make under the Standard Repayment Plan on such Direct Consolidation Loans are only qualifying payments if the loans have a 10-year repayment period (which would only occur if your total education indebtedness is less than $7,500).

### Loan Eligibility

Only Direct Loan Program loans that are not in default are eligible for PSLF. Loans you received under the Federal Family Education Loan (FFEL) Program, the Federal Perkins Loan (Perkins Loan) Program, or any other student loan program are not eligible for PSLF.

Pls.' Ex. 32
P. 802

### Loan Eligibility (Continued)

If you have FFEL Program or Perkins Loan Program loans, you may consolidate them into a Direct Consolidation Loan to take advantage of PSLF. However, payments made on your FFEL Program or Perkins Loan Program loans before you consolidated them, even if they were made under a qualifying repayment plan, do not count as qualifying PSLF payments. In addition, if you made qualifying payments on a Direct Loan and then consolidate it into a Direct Consolidation Loan, you must start over making qualifying payments on the new Direct Consolidation Loan.

If you consolidate your FFEL Program or Perkins Loan Program loans into a Direct Consolidation Loan to take advantage of PSLF and do not have any Direct Loans, do not submit this form until you have consolidated your loans. The online application for Direct Consolidation Loans contains a section that allows you to indicate that you are consolidating your loans for PSLF. The online application is available at StudentLoans.gov. If you don't know whether you have Direct Loans, go to StudentAid.gov/login.

### Employment Eligibility

To qualify for PSLF, you must be an employee of a qualifying organization. An employee is someone who is hired and paid by the organization. You may physically perform your work at a qualifying or non-qualifying organization, so long as your employer is a qualifying organization. If you are a contracted employee, the organization that hired and pays you must qualify, not the organization where you perform your work. The type or nature of employment with the organization does not matter for PSLF purposes.

A qualifying organization is a government organization or a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code (IRC). Service in an AmeriCorps or Peace Corps position is also qualifying employment. The type of services that these organizations provide does not matter for PSLF purposes.

A private not-for-profit organization that is not a tax-exempt organization under Section 501(c)(3) of the IRC may be a qualifying organization if it provides certain specified public services. These services include emergency management, military service, public safety, or law enforcement services; public health services; public education or public library services; school library and other school-based services; public interest law services; early childhood education; public service for individuals with disabilities and the elderly. The organization must not be a business organized for profit, a labor union, or a partisan political organization.

Employment as a member of the U.S. Congress is not qualifying employment.

### Employment Eligibility (Continued)

You must be employed full-time by your employer.

Generally, you must meet your employer's definition of full-time. However, for PSLF purposes, that definition must be at least an annual average of 30 hours per week. For purposes of the full-time requirement, your qualifying employment at a 501(c)(3) organization or a not-for-profit organization does not include time spent participating in religious instruction, worship services, or any form of proselytizing.

If you are a teacher, or other employee of a public service organization, under contract for at least eight out of 12 months, you meet the full-time standard if you work an average of at least 30 hours per week during the contractual period and receive credit by your employer for a full year's worth of employment.

If you are employed in more than one qualifying part-time job simultaneously, you may meet the full-time employment requirement if you work a combined average of at least 30 hours per week with your employers.

Vacation or leave time provided by the employer or leave taken for a condition that is a qualifying reason for leave under the Family and Medical Leave Act of 1993, 29, U.S.C. 2612(a)(1) and (3) is equivalent to hours worked in qualifying employment.

### Other Important Information

The submission of this form before you apply for PSLF is optional. However, if you wait to submit this form until you apply for PSLF, you will be required to submit one form for each employer that you want considered toward your eligibility for PSLF.

If you submit this form and your employer qualifies, all of your loans held by the Department will be transferred to FedLoan Servicing. FedLoan Servicing will then determine how many qualifying payments you made during the period of qualifying employment within the dates provided in Section 3.

You are not permitted to apply the same period of service to receive PSLF and the Teacher Loan Forgiveness, Service in Areas of National Need, and Civil Legal Assistance Attorney Student Loan Repayment programs.

No borrower will be eligible for PSLF until October 2017 at the earliest. An application for PSLF will be made available at a later time.

Pls.' Ex. 32
P. 803

## SECTION 9: IMPORTANT NOTICES

**Privacy Act Notice.** The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authorities for collecting the requested information from and about you are §421 et seq., §451 et seq., or §461 of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 et seq., 20 U.S.C. 1087a et seq., or 20 U.S.C. 1087aa et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, Federal Family Education Loan (FFEL) Program, or Federal Perkins Loan (Perkins Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan, FFEL, or Federal Perkins Loan Programs, to permit the servicing of your loans, and, if it becomes necessary, to locate you and to collect and report on your loans if your loans become delinquent or default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loans, to enforce the terms of the loans, to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions.

To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**Paperwork Reduction Notice.** According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0110. Public reporting burden for this collection of information is estimated to average 30 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain a benefit in accordance with 34 CFR 685.219. If you have comments or concerns regarding the status of your individual submission of this form, please contact your loan holder directly (see Section 7).

Pls.' Ex. 32
P. 804

Frank Capetillo <frank.capetillo@lacity.org>

## Fwd: Fed Loans Log In

1 message

**G Wilson** REDACTED
To: Frank Capetillo <frank.capetillo@lacity.org>

Tue, May 17, 2022 at 12:29 PM

Please see email below

Sent from my iPhone

Begin forwarded message:

> **From:** Frank Hernandez <frank@premierstudentloancenter.com>
> **Date:** January 4, 2017 at 2:52:38 PM PST
> **To:** REDACTED
> **Subject: Fed Loans Log In**

Hello Gregory,

You have an account set up with Fedloan Servicing. Click on the link below.

Username: REDACTED

Password:

REDACTED

Answer to all security questions:

https://accountaccess.myfedloan.org/accountAccess/index.cfm?event=common.logout

Please let me know if you have any questions

*Frank Hernandez*

PREMIER STUDENT LOAN CENTER

Direct 949-207-1079 Ext. 7005

**Toll Free 888-548-0476**

Pls.' Ex. 32
P. 805

frank@premierstudentloancenter.com

**www.premierstudentloancenter.com**

**http://www.whitehouse.gov/issues/education/higher-education/ensuring-that-student-loans-are-affordable**

http://www.bbb.org/sdoc/business-reviews/legal-document-assistance/premier-student-loan-center-in-rancho-santa-margarita-ca-172013295/

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

Pls.' Ex. 32
P. 806



Frank Capetillo <frank.capetillo@lacity.org>

---

## Fwd: Revised Payment Schedule

1 message

**G Wilson** REDACTED
To: Frank Capetillo <frank.capetillo@lacity.org>

Tue, May 17, 2022 at 12:27 PM

Please see email below

Sent from my iPhone

Begin forwarded message:

> **From:** frank@premierstudentloancenter.com
> **Date:** May 3, 2017 at 2:27:39 PM PDT
> **To:** REDACTED
> **Subject: Revised Payment Schedule**

Please re-schedule clients payments:

6/16 $149.83

7/16 $299.83

8/16 $229.83

9/10 $30

*Frank Hernandez*

# PREMIER STUDENT LOAN CENTER

Direct 949-207-1079 Ext. 7005

**Toll Free 888-548-0476**

**Fax number** 888-302-3033

frank@premierstudentloancenter.com

**www.premierstudentloancenter.com**

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

Pls.' Ex. 32
P. 807

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

Pls.' Ex. 32
P. 808

Plaintiffs' Exhibit 33

<div align="center">Declaration of Sarah Varno</div>

<div align="center">Pursuant to 28 U.S.C. § 1746</div>

I, Sarah Varno, hereby declare and state as follows:

1.  I am over the age of eighteen and reside in Worcester, Massachusetts.

2.  I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.  On June 6, 2018, I contacted Premier Student Loan Center ("Premier") and spoke with Brian Zimring regarding their student loan forgiveness program. The Premier representative stated that I could enroll in the program and receive loan forgiveness. I owed $15,096 in student loans. After I enrolled, I was contacted by Jessica Mendoza, an SL Account Management ("SLAM") representative. Jessica informed me that I would make 5 payments of $239 to cover the costs of processing my paperwork. The payments would be taken out of my account on the following dates: June 15, 2018, July 5, 2018, August 4, 2018, September 5, 2018, and October 5, 2018.

4.  Jessica told me that after making these payments I would have a loan balance of $5,000. Then I would then pay $20 per month for the next 20 years. At the time I thought the $20 payment I was making each month to Premier was going to pay my new student loan balance of $5,000.

5.  At the time that I signed up I was single with no children.

6.  It was not until I went to purchase a home that I discovered the $20 coming out of my account each month was not going toward my student loan balance.

7.  Around April 2019 when I went to apply for a mortgage, the mortgage officer told me that I had $15,000 in student loan debt. The mortgage officer showed me that my student loans had not been reduced to $5,000 like the Premier representative told me.

8.  Premier put me on an income driven repayment plan (IDR) with a zero dollar payment without my knowledge. The only time I was made aware of this change to my student loans was an e-mail from Premier that was sent to me on the day that I cancelled the program. A true and correct copy of the e-mail sent on May 30, 2019 from Premier notifying me of the new repayment plan is attached as **Attachment A**.

<div align="center">1</div>

9.      I tried calling my Premier Representative, Jessica, to inquire about what was actually going on, but whoever answered the Premier number told me that Jessica was not available. I called Premier multiple times and received the same response. I was never called back even though they said someone would call me.

10.     The program was supposed to be a loan forgiveness program but my student loan balance did not change as a result of using Premier's service.  The only thing that happened when I signed on with Premier was that I lost approximately $1,300.

11.     On May 1, 2019 I filed a complaint against Premier with the Consumer Financial Protection Bureau ("CFPB").

12.     About a month later someone from Premier, Christian, called me to try to resolve the complaint. I told Christian how disgusted I was that Premier had scammed me. He mentioned that he worked for both Premier and SLAM. During the call he agreed to refund my money and cancel the service. A true and correct copy of the e-mail Christian sent me on May 30, 2019 confirming my cancellation of their service is attached as **Attachment B.**

13.     The same day Premier refunded me $1,315. A true and correct copy of the e-mails showing the refunded payments from Premier are attached as **Attachment C.**

14.     If I had known that the fees paid to Premier were not payments toward my outstanding loan debt, I never would have signed up for their service.

15.     If I had known that my loans would not be forgiven after I made the initial payments of $239 each, I never would have signed up for their service.

16.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

17.     Executed on _9-24_____, 2019.


Sarah Varno

At Worcester, Massachusetts


2

# Attachment A

| | |
|---|---|
| **From:** | Sarah Varno |
| **To:** | Montier, William (Contractor)(CFPB) |
| **Subject:** | Fw: Fed Loan servicing Login. |
| **Date:** | Friday, June 21, 2019 2:03:39 PM |

----- Forwarded Message -----
**From:** Christian Stark <cstark@processingsupport.com>
**To:** <span style="color:red">REDACTED</span>
**Sent:** Thursday, May 30, 2019, 1:56:55 PM EDT
**Subject:** Fed Loan servicing Login.

https://myfedloan.org/

Your online account has been set up. Your login information is listed below, if you have any issues logging in please contact me.

**Username:** ▮▮▮▮▮▮

**Password:** ▮▮▮▮▮▮

**Answer to your Security Questions:** ▮

**Please DO NOT alter your login credentials** without notifying our company..

The details following your new payment plan is as follows:

**Repayment Plan:**   REVISED PAY AS YOU EARN

**Approved Monthly Student Loan Payment:**   $0

**First Payment Due Date:**   09/22/2018

**Payment End Date:**   09/1/2019

# Christian Stark

**Customer Support Department**

**Customer Support Manager**

Toll-Free: (888) 548-0476

Direct: (949) 202-1404

***** Email confidentiality notice *****
CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

Pls.' Ex. 33
P. 813

**Page 2**

# Attachment B

Pls.' Ex. 33
P. 815

| From: | Sarah Varno |
|---|---|
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: Customer Service Department - Cancellation Confirmation |
| Date: | Friday, June 21, 2019 1:35:55 PM |

----- Forwarded Message -----
**From:** Christian Stark <cstark@processingsupport.com>
**To:** REDACTED
**Sent:** Thursday, May 30, 2019, 2:02:34 PM EDT
**Subject:** Customer Service Department - Cancellation Confirmation

Hello Sarah,

**Confirmation #: PSLC-**<sup>REDACTED</sup>**7848**

This email is to confirm that we have cancelled your file effective: **May 30, 2019**

**Your cancellation has been processed and all scheduled payments will not be drafted.**

We are sorry to hear you won't be continuing your services with us. Your cancellation has been processed and all scheduled payments will not be drafted. If you have any questions or concerns, please feel free to contact us.

Thank you,

**Customer Support**

Premier Student Loan Center

Toll Free:  (888) 548-0476

***** Email confidentiality notice *****

**CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.**

Pls.' Ex. 33
P. 816

# Attachment C

Pls.' Ex. 33
P. 817

| | |
|---|---|
| **From:** | Sarah Varno |
| **To:** | Montier, William (Contractor)(CFPB) |
| **Subject:** | Fw: STUDENT LOAN MGMT Transaction Receipt |
| **Date:** | Friday, June 21, 2019 1:35:28 PM |

----- Forwarded Message -----
From: "kwen@slaccountmgmt.com" <kwen@slaccountmgmt.com>
To: REDACTED
Sent: Thursday, May 30, 2019, 1:46:02 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

----------------------------------
General Information
----------------------------------
Merchant Account: **STUDENT LOAN MGMT**
Date/Time : 05/30/2019 10:46:01 AM PDT

----------------------------------
Transaction Information
----------------------------------
Transaction Amount : $-20.00
Transaction ID : Redacted3211
Authorization Code : Redacted
Transaction Type : Card Refund
Response : APPROVED

----------------------------------
Customer Billing Information
----------------------------------
First Name : Sarah
Last Name : Mankiewicz Varno
Address : ███████████
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone : ███████████
Email REDACTED

----------------------------------
Customer Shipping Information
----------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

Pls.' Ex. 33
P. 818

| From: | Sarah Varno |
|---|---|
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: STUDENT LOAN MGMT Transaction Receipt |
| Date: | Friday, June 21, 2019 1:32:25 PM |

----- Forwarded Message -----
**From:** kwen@slaccountmgmt.com <kwen@slaccountmgmt.com>
**To:** REDACTED
**Sent:** Thursday, May 30, 2019, 1:36:22 PM EDT
**Subject:** STUDENT LOAN MGMT Transaction Receipt

------------------------------------
General Information
------------------------------------
Merchant Account: STUDENT LOAN MGMT
Date/Time : 05/30/2019 10:36:20 AM PDT

------------------------------------
Transaction Information
------------------------------------
Transaction Amount : $-239.00
Transaction ID : Redacted3609
Authorization Code : Redacted
Transaction Type : Card Refund
Response : APPROVED

------------------------------------
Customer Billing Information
------------------------------------
First Name : Sarah
Last Name : Varno
Address :
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone :
Email : REDACTED

------------------------------------
Customer Shipping Information
------------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

| | |
|---|---|
| **From:** | Sarah Varno |
| **To:** | Montier, William (Contractor)(CFPB) |
| **Subject:** | Fw: STUDENT LOAN MGMT Transaction Receipt |
| **Date:** | Friday, June 21, 2019 1:33:07 PM |

----- Forwarded Message -----
**From:** kwen@slaccountmgmt.com <kwen@slaccountmgmt.com>
**To:** REDACTED
**Sent:** Thursday, May 30, 2019, 1:38:14 PM EDT
**Subject:** STUDENT LOAN MGMT Transaction Receipt

General Information
-----------------------------------

Merchant Account: STUDENT LOAN MGMT
Date/Time : 05/30/2019 10:38:12 AM PDT

Transaction Information
-----------------------------------

Transaction Amount : $-239.00
Transaction ID : Redacted1400
Authorization Code : Redacted
Transaction Type : Card Refund
Response : APPROVED

Customer Billing Information
-----------------------------------

First Name : Sarah
Last Name : Mankiewicz Varno
Address : ████████████
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone : ████████
Email : REDACTED

Customer Shipping Information
-----------------------------------

First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

**Page 3**

From: Sarah Varno
To: Montier, William (Contractor)(CFPB)
Subject: Fw: STUDENT LOAN MGMT Transaction Receipt
Date: Friday, June 21, 2019 1:33:11 PM

---- Forwarded Message ----
From: "kwen@slaccountmgmt.com" <kwen@slaccountmgmt.com>
To: REDACTED
Sent: Thursday, May 30, 2019, 1:40:55 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

-----------------------------------
General Information
-----------------------------------
Merchant Account: STUDENT LOAN MGMT
Date/Time : 05/30/2019 10:40:53 AM PDT

-----------------------------------
Transaction Information
-----------------------------------
Transaction Amount : $-239.00
Transaction ID : Redacted 658
Authorization Code Redacted
Transaction Type : Card Refund
Response : APPROVED

-----------------------------------
Customer Billing Information
-----------------------------------
First Name : Sarah
Last Name : Mankiewicz Varno
Address :
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone :
Email : REDACTED

-----------------------------------
Customer Shipping Information
-----------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

Page 4

| From: | Sarah Varno |
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: STUDENT LOAN MGMT Transaction Receipt |
| Date: | Friday, June 21, 2019 1:33:15 PM |

----- Forwarded Message -----
From: kwen@slaccountmgmt.com <kwen@slaccountmgmt.com>
To: REDACTED
Sent: Thursday, May 30, 2019, 1:40:09 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

-------------------------------
General Information
-------------------------------
Merchant Account: STUDENT LOAN MGMT
Date/Time : 05/30/2019 10:40:07 AM PDT

-------------------------------
Transaction Information
-------------------------------
Transaction Amount : $-239.00
Transaction ID : Redacted 4282
Authorization Code : Redacted
Transaction Type : Card Refund
Response : APPROVED

-------------------------------
Customer Billing Information
-------------------------------
First Name : Sarah
Last Name : Mankiewicz Varno
Address :
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone :
Email : REDACTED

-------------------------------
Customer Shipping Information
-------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

Page 5

| From: | Sarah Varno |
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: STUDENT LOAN MGMT Transaction Receipt |
| Date: | Friday, June 21, 2019 1:33:25 PM |

----- Forwarded Message -----
From: kwen@slaccountmgmt.com <kwen@slaccountmgmt.com>
To: REDACTED
Sent: Thursday, May 30, 2019, 1:42:06 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

---------------------------------
General Information
---------------------------------
Merchant Account: STUDENT LOAN MGMT
Date/Time : 05/30/2019 10:42:04 AM PDT

---------------------------------
Transaction Information
---------------------------------
Transaction Amount : $-239.00
Transaction ID : Redacted7472
Authorization Code : Redacted
Transaction Type : Card Refund
Response : APPROVED

---------------------------------
Customer Billing Information
---------------------------------
First Name : Sarah
Last Name : Mankiewicz Varno
Address : ███████████
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone : ███████
Email : REDACTED

---------------------------------
Customer Shipping Information
---------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

Page 6

| From: | Sarah Varno |
|---|---|
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: STUDENT LOAN MGMT Transaction Receipt |
| Date: | Friday, June 21, 2019 1:34:55 PM |

----- Forwarded Message -----
From: kwen@slaccountmgmt.com <kwen@slaccountmgmt.com>
To: REDACTED
Sent: Thursday, May 30, 2019, 1:43:14 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

-------------------------------
General Information
-------------------------------
Merchant Account: STUDENT LOAN MGMT
Date/Time : 05/30/2019 10:43:12 AM PDT

-------------------------------
Transaction Information
-------------------------------
Transaction Amount : $-20.00
Transaction ID : Redacted 9162
Authorization Code : Redacted
Transaction Type : Card Refund
Response : APPROVED

-------------------------------
Customer Billing Information
-------------------------------
First Name : Sarah
Last Name : Manklewicz Varno
Address : ▇▇▇▇▇▇
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone : ▇▇▇▇▇▇
Email : REDACTED

-------------------------------
Customer Shipping Information
-------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

Page 7

| From: | Sarah Varno |
|---|---|
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: STUDENT LOAN MGMT Transaction Receipt |
| Date: | Friday, June 21, 2019 1:35:02 PM |

----- Forwarded Message -----
From: "kwen@slaccountmgmt.com" <kwen@slaccountmgmt.com>
To: REDACTED
Sent: Thursday, May 30, 2019, 1:43:51 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

------------------------------
General Information
------------------------------
Merchant Account: **STUDENT LOAN MGMT**
Date/Time : 05/30/2019 10:43:49 AM PDT

------------------------------
Transaction Information
------------------------------
Transaction Amount : $-20.00
Transaction ID : Redacted 0070
Authorization Code : Redacted
Transaction Type : Card Refund
Response : APPROVED

------------------------------
Customer Billing Information
------------------------------
First Name : Sarah
Last Name : Mankiewicz Varno
Address : █████████
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone : █████████
Email : REDACTED

------------------------------
Customer Shipping Information
------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

Page 8

Pls.' Ex. 33
P. 825

| From: | Sarah Varno |
|---|---|
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: STUDENT LOAN MGMT Transaction Receipt |
| Date: | Friday, June 21, 2019 1:35:11 PM |

----- Forwarded Message -----
From: "kwen@slaccountmgmt.com" <kwen@slaccountmgmt.com>
**To:** REDACTED
Sent: Thursday, May 30, 2019, 1:44:13 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

--------------------------------
General Information
--------------------------------
Merchant Account: **STUDENT LOAN MGMT**
Date/Time : 05/30/2019 10:44:11 AM PDT

--------------------------------
Transaction Information
--------------------------------
Transaction Amount : **$-20.00**
Transaction ID : Redacted )602
Authorization Code : Redacted
Transaction Type : Card Refund
Response : APPROVED

--------------------------------
Customer Billing Information
--------------------------------
First Name : Sarah
Last Name : Mankiewicz Varno
Address : ▇▇▇▇▇
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone : ▇▇▇▇
Email : REDACTED

--------------------------------
Customer Shipping Information
--------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

Page 9

| From: | Sarah Varno |
|---|---|
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: STUDENT LOAN MGMT Transaction Receipt |
| Date: | Friday, June 21, 2019 1:35:17 PM |

----- Forwarded Message -----
From: "kwen@slaccountmgmt.com" <kwen@slaccountmgmt.com>
To: REDACTED
Sent: Thursday, May 30, 2019, 1:44:50 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

-------------------------------------
General Information
-------------------------------------
Merchant Account: STUDENT LOAN MGMT
Date/Time : 05/30/2019 10:44:49 AM PDT

-------------------------------------
Transaction Information
-------------------------------------
Transaction Amount : S-20.00
Transaction ID : REDACTED1531
Transaction Type : Card Refund
Response : SUCCESS

-------------------------------------
Customer Billing Information
-------------------------------------
First Name : Sarah
Last Name : Mankiewicz Varno
Address : ▮▮▮▮▮▮
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone : ▮▮▮▮▮
Email REDACTED

-------------------------------------
Customer Shipping Information
-------------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

| From: | Sarah Varno |
|---|---|
| To: | Montier, William (Contractor)(CFPB) |
| Subject: | Fw: STUDENT LOAN MGMT Transaction Receipt |
| Date: | Friday, June 21, 2019 1:35:22 PM |

---- Forwarded Message ----
From: "kwen@slaccountmgmt.com" <kwen@slaccountmgmt.com>
To: REDACTED
Sent: Thursday, May 30, 2019, 1:45:21 PM EDT
Subject: STUDENT LOAN MGMT Transaction Receipt

---------------------------------
General Information
---------------------------------
Merchant Account: STUDENT LOAN MGMT
Date/Time : 05/30/2019 10:45:21 AM PDT

---------------------------------
Transaction Information
---------------------------------
Transaction Amount : $-20.00
Transaction ID : Redacted2261
Transaction Type : Card Refund
Response : SUCCESS

---------------------------------
Customer Billing Information
---------------------------------
First Name : Sarah
Last Name : Mankiewicz Varno
Address : ███████████
City : Worcester
State : MA
Zip Code : REDACTED
Country : US
Phone : ███████
Email : REDACTED

---------------------------------
Customer Shipping Information
---------------------------------
First Name :
Last Name :
Address :
City :
State :
Zip Code :
Country :
Email :

Page 11

Plaintiffs' Exhibit 34

## Declaration of Jennifer Liming

### Pursuant to 28 U.S.C. § 1746

I, Jennifer Liming, hereby declare and state as follows:

1.      I am over the age of eighteen and reside in Georgetown, Ohio.

2.      I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.      In November 2017, I saw an advertisement on Facebook for Premier Student Loan Center ("Premier") and clicked on a link and provided my name and phone number so that I could learn more information from them to help reduce my student loan debt.

4.      Shortly after I provided my contact information in response to the advertisement, Premier called me and I spoke to a representative who identified himself as Mark Szymanski. Mark explained that there was a student loan reduction program as a result of legislation that was passed under a previous president. Mark stated that if I qualified based on income, my debt would be forgiven and/or my payments would be lowered.

5.      Mark told me that I needed to send him proof of income and provide my password and login to my student loan account. Then, Premier would process my documents and send them to the Department of Education for approval.  I do not recall Premier asking, but at the time my family size was three (myself and two children).

6.      During my call with Mark, I asked for a day or two to think about whether I wanted to pay Premier. Mark got very upset, told me that he did not have time for this, and insisted the program was a good one and not a scam.

7.      I needed some time to think about it and ended the call with Mark.

8.      Although I had not signed a contract yet, I did provide Mark my password to my student loan account.

9.      I decided to sign up for Premier's service because it seemed legitimate based on what Mark told me about student loan laws and the student loan process.  On December 29, 2017 I signed the Premier agreement electronically. A true and correct copy of the agreement I signed with Premier on December 29, 2017 is attached hereto as **Attachment A**.

1

10.     Shortly after signing up with Premier, I received a letter from my student loan servicer, FedLoans, saying that I owed more money and that my loans were in default. I later learned, with help from a credit repair company, that my loans should have been listed as in deferment since I was still in school.

11.     At the time I was not aware of the error and called Mark at Premier. Mark said not to worry about it. He said it was customary to get a letter saying that your loans are in default. He stated that this was a ten year program and that I would have to make a few more payments upfront and then a low monthly payment for ten years and after ten years the balance would be forgiven.

12.     Mark sent me the forms to electronically set up the bank drafts to Premier. Mark asked me to pay $1,195 in installments of $239 from January 2018 through May 2018. Mark stated that I have to pay these amounts in order to help lower my payment. Mark stated that the $1,195 is an enrollment fee that would go towards paying down my loan. Mark also stated that once the enrollment fee is paid, then I would pay the low monthly payments of $40. Mark stated that my $40 monthly fee would go towards paying off my loans and would start on June 15, 2018 and would continue for ten years.

13.     When I later read the Premier agreement I realized that it stated that I have to make payments for twenty years, not ten.

14.     At the time I enrolled with Premier, I was trying to buy a house. Because my loans were erroneously appearing as delinquent on my credit report, the mortgage company called and asked for proof that I was paying my student loans.

15.     I tried to contact Mark at Premier and was connected to someone else named Casey Kulek. I explained to Casey that I need a copy of my loan payments to show that I am making payments and he said "no problem I will send you your agreement." I told him this was very important because it affected my ability to get a mortgage.

16.     I provided the home loan officer with the Premier agreement. The home loan officer called me back and said that after talking with people in his office about Premier, he believes this is a fraudulent company. He said that if my credit report shows no payments, and

that if I'm in deferment, then I should not be making payments. The mortgage company's home loan officer recommended that I contact my student loan servicing company directly.

17.     I called FedLoans. I spoke to a representative who was familiar with Premier and stated that this is an ongoing problem and that Premier is fraudulent. She said to call them and cancel my agreement and to get my money back. She said that none of the money I have paid to Premier is going towards the payment of my student loans and never has.

18.     I called Casey at Premier and told him that I am going to cancel because Premier is not making payments to my student loans. Casey stated that he would research what is going on with my file and call me back. I told him no, that we will deal with this now. I told Casey that FedLoans said that I could do the loan consolidation myself for free and that none of my payments to Premier are going toward my loans. Casey stated that my payments are not going toward my loans but are helping to lower my payment.  I told Casey that his story has changed from when we first talked and then he hung up on me.

19.     On or about January 31, 2019, I filed a complaint with the Better Business Bureau ("BBB"). Shortly after I filed the complaint, someone from Premier called me once and left me a voicemail. I returned that call and left a voicemail. No one from Premier returned my call. Premier then told the BBB that they tried to reach me multiple times and tried to close my complaint as resolved.  I told the BBB representative that Premier had not tried to contact me multiple times and never returned my voicemail.

20.     In February 2019, Tom Nelson from Premier called me said he was the person who handles their complaints. I told Tom that there was an ongoing BBB investigation of Premier. He cut me off and said let me refund all of your money and let's leave it at that. SL Account Management sent me a refund check for $1,355. A true and correct copy of the letter sent to me by SL Account Management with the refund check enclosed on February 8, 2019 is attached hereto as **Attachment B.**

21.     If I had known that my payments to Premier were not going to pay down my loan balance, I would not have signed up for Premier's services.

Pls.' Ex. 34
P. 832

22.   I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

23.   Executed on ___9/21___, 2019.

Jennifer Liming

At Georgetown, OH

4

# Attachment A

# Document Preparation and Service Agreement ("Agreement")

This Agreement is entered into on the date shown below between PREMIER STUDENT LOAN CENTER (Hereinafter referred to as "Company") and the Client shown below (Hereinafter referred to as "Client")

Company provides document preparation services to assist consumers who are applying for federal student loan programs using Department of Education ("DOE") forms. Company is a private company, not affiliated with any government agency, and for a fee Company will assist in assembly and completion of student loan consolidation or other application documents for student loan debt assistance programs offered by the DOE, for delivery to Client for Clients review and submission to DOE. Company is not a lender, a debt consolidation company, or a law firm and does not provide legal advice.

Company and Client do hereby understand, covenant and agree to the following:

**1 Provide Complete and Truthful Information.** Company will provide Client with an overview session limited to their federal student loan debts and the available documents, and Client expressly represents and warrants that Client will provide Company with information that is complete, accurate and truthful.

**2 Performance of Services.** Upon receipt of all information from Client, Company shall promptly analyze Client's situation, review the information provided by the Client, and complete the application forms required for the DOE program(s) that have been selected by the Client. Company shall prepare for filing an application to initiate a federal student loan consolidation through the DOE on behalf of Client, or alternatively and at the Client's option, identify and apply for other DOE-sponsored programs suitable for Client. All completed applications shall be delivered by Company to Client for Client's approval, signature and direct submission to DOE.

**By initialing here, Client requests Company to complete & submit executed application to DOE.**

Initials _JoLoL_

**3 Fees that Client Pays.** The payment for Company's services relating to the student loan assistance applications, their preparation, delivery to Client and ongoing support are described in the attached Fee Schedule (Exhibit A). Client should review the attached Fee Schedule carefully, which sets forth one or more fees that the Client will be charged depending on the services that are performed. All fees are earned, due and payable as described in the attached Fee Schedule. Payments may be collected on a periodic payment option as indicated in the attached Draft Schedule (Exhibit B). The funds shall be debited from Client's bank account or charged on Client's credit card. Client shall be responsible for any third party support or service fees, such as bank processing or third party account fees. At Client's option, an independent dedicated account provider may be used to debit/charge fees, holding them securely under Client's ownership until fees become due. Client may select such optional provider and is responsible for all costs associated with such.

**4 Limited Money Back Guarantee.** Company guarantees that its documents will be sufficiently accurate and comprehensive so that Client will receive a federal student loan consolidation or acceptance into another DOE-offered program for student loan debt, or a repayment plan using current lenders, through the DOE subject to the following conditions: (1) student loans that Client presents to Company are original debts, and have not been previously consolidated or had their terms or amounts previously adjusted, and have not been previously serviced or worked on by any other student loan assistance or adjustment company; (2) Client fully cooperates, provides accurate and timely information requested by Company and DOE; and/or (3) Client does not possess a characteristic that pursuant to DOE rules or applicable law that would disqualify Client from receiving a consolidation. Client shall not be entitled to the benefits of this section in the event that Client receives document preparation services from Company and prior to approval by DOE, Client terminates this Agreement or continues with DOE without the assistance of Company. If Company documents are rejected by DOE and Client is not approved through the DOE after reasonable efforts by the parties, then Company will reimburse the Fee paid to Company (limited to funds received by Company from Client). All refund requests must be made, in writing, to Company within 30 days of any denial by the DOE. This guarantee expires six month after the date this Agreement is signed by the Client.

**5 Process.** Once Client provides Company with all requested information and paperwork, Company will begin preparing applications. Once Client submits application package to DOE, it may take DOE or its servicers up to ninety (90) days or longer to respond. Client understands that Company may use a third party support servicer to assist in processing duties pursuant to this Agreement and Company may share Client's information to accomplish its services.

**6 Indemnification.** Client hereby agrees to defend and indemnify Company and any supporting servicer from and against any claims and liability of any nature whatsoever arising out of or in connection with Client's failure to timely provide requested information to Company, Client's lack of authority or ability to complete terms of this Agreement, and all other claims arising out of this Agreement or relating to Client's loans and

Initials _JoLoL_

other financial obligations. This Agreement constitutes the entire agreement between the parties. Company makes no warranty, express or implied, as to the fitness of any recommendation it may make to Client arising out of this Agreement. Except for cause, Client unconditionally waives any right of action against Company and support servicer, its officers, directors, employees, agents, brokers and assignees, at law, equity or any other cause of action for any reason, directly, indirectly or proximately believed to arise out of this Agreement, for any damages of any nature whatsoever that Client may incur by reason of Client following any recommendation of Company or Client's failure to follow any recommendation of Company, whether any singular, concurrent or series of recommendations are acted upon or not acted upon in whole or in part by Client. This section shall survive any termination of this Agreement.

**7 Entire Agreement.** By virtue of Client's signature below, Client acknowledges that he/she has read, understands and agrees to every term, covenant and condition of this Agreement without change or modification and that he/she has received a true and complete copy hereof, effective on the date below. This agreement is the only agreement between the parties and there is no other collateral agreement (oral or written) between the parties in any manner relating to the subject matter of this agreement. If any portion of this agreement is held to be invalid or unenforceable, the remaining provisions will remain in effect. The parties mutually understand and agree that a facsimile copy signature or an electronic signature on this agreement shall be deemed an original for all lawfully enforceable purposes.

**8 Cancellation Policy.** The Company's cancellation policy is designed to exceed state law requirements (for the Client's protection) and be easy to understand: If you are unhappy or dissatisfied at any time prior to receiving the documents or services described herein, a consolidation or other result from the DOE that Company has assisted you with, then simply send a letter, email or facsimile to the Company requesting a refund and cancelling your program. Once Company completes its document preparation services and sends documents to Client, Client shall not be entitled to a refund unless subject to above guarantee or if Client requests such cancellation within their state statutory cancellation right. If at any time you have questions, please do not hesitate to call or write to us directly.

**9 Limitations on Damages.** Liability under this Agreement and/or relating directly or indirectly to Client's participation in any government loan or relief program, under any theory of liability regarding any claim by the Client is limited to the amount of fees paid by Client and received by Company. The parties agree to be contractually bound to such limitation on any damages, and agree not to demand or attempt to recover any amount in excess of such. This section shall survive any termination.

Pls.' Ex. 34
P. 835

**10 IMPORTANT – Mandatory Binding Arbitration To Resolve All Disputes And Class Action Waiver. Please Read This Section Carefully and Do Not Sign This Agreement Unless You Understand and Agree With This Section:** This Agreement is governed by a Binding Mandatory Arbitration Requirement. You are encouraged to consult with independent legal counsel so that you understand your rights relating to this requirement. This Section limits your legal rights and ability to go to court. Please consult with legal counsel to be sure you understand this Section prior to signing.

In the event of any controversy, claim or dispute between the parties (the Company, the Client, and any support entities or persons contemplated herein) arising out of or relating to this agreement or the breach, termination, enforcement, interpretation, unconsionability or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined exclusively by arbitration in the county which the consumer resides, or the closest metropolitan county, in accordance with the Laws of the State of California for agreements to be made in and to be performed in California. The parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures and an arbitrator shall be selected by the AAA. The arbitrator shall be neutral and independent and shall comply with the AAA code of ethics. The award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the parties. If either party fails to comply with the arbitrator's award, the injured party may petition the circuit court for enforcement. The parties agree that either party may bring claims against the other only in his/her or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings of more than one person's claims, and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost (not attorney's fees) of arbitration equally. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award. Binding Arbitration means that both parties give up the right to a trial by a jury. It also means that both parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. This section and the arbitration requirement shall survive any termination.

Initials _JLL_

**11 Information Authorization.** Client hereby authorizes Company to verify past and present employment earnings records, bank accounts, stock holdings, and any other asset balances that are needed to process my application request(s). Client further authorizes Company to order a consumer credit report and verify other credit information, including past and present mortgage and landlord references. Importantly, Company does not provide any form of credit repair, credit score enhancement, unsecured or secured debt relief, or legal or tax advice, so any information

Initials _JLL_

obtained by Company can't be used for those purposes.

**12 Electronic and Voice Communication Consent.** Client consents to do business electronically with Company. Client understands that electronic transactions, not limited to emails, are inherently unsecure and that both Client and Company will take all reasonable steps to maintain the Privacy of the information shared between the parties. Client consents to receive information and documents relating to this Agreement and Company services via electronic mail, text message, facsimile, voicemail, and any other common electronic means. Client understands that all costs associated with the receipt, review and use of such electronic communications shall be those of Client, such as maintaining access to the Internet or paying for text messages. Client consents to receive updates and documents relating to this Agreement and the services and programs offered by Company via prerecorded voice messages, text/SMS messages, and/or through the use of an automated dialing system. Client may contact Company at any time to opt- out of receiving updates, new programs or offers through prerecorded or autodialed messages.

BY SIGNING BELOW (ELECTRONICALLY OR PHYSICALLY), I HEREBY ACKNOWLEDGE THAT I HAVE NOT BEEN ADVISED BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES TO FOREGO A STUDENT LOAN PAYMENT IN EXCHANGE FOR THE GOOD FAITH PAYMENT AND FEDERAL STUDENT LOAN CONSOLIDATION PROGRAM. DURING THIS PROCESS, CLIENT IS RESPONSIBLE FOR MAKING HIS OR HER PAYMENTS, AND FAILURE TO DO SO COULD DISQUALIFY THE CLIENT FROM OBTAINING THE SERVICE THAT WAS AGREED UPON I FURTHER ACKNOWLEDGE THAT NO GUARANTEES CONCERNING THE SUCCESS OF THE LOAN CONSOLIDATION HAVE BEEN PROVIDED TO CLIENT BY COMPANY, AND/OR ANY OF ITS AGENTS, AND/OR AFFILIATES AND A POSITIVE OUTCOME IS NOT GUARANTEED I UNDERSTAND AND CONSENT TO THE ARBITRATION CLAUSE AND LIMITATION OF LIABILITY CONTAINED HEREIN, AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT IN ITS TOTALITY AND ASK ANY QUESTIONS OF COMPANY

Executed On this (Date): _12/29/2017_

Applicant Signature: _Jennifer Lynne Liming_

Applicant Name: _Jennifer Liming_     Applicant DOB: ████

## Exhibit "A" to Service Agreement

## Fee and Service Schedule

The purpose of this fee and service schedule is to ensure that Client is aware and consents to the fees that Company will charge for its services in assisting Client in preparing documents for one or more of the below programs. While such programs may be available for free directly by various government agencies, our services are fee-based and focused on application and document preparation. If other programs are identified by Client or Company to be suitable for Client, then additional fees may apply and will be presented to Client in writing for approval. Fees are charged consistent with terms of Client Agreement. Fees herein are only Company fees and do not include any third party fees such as bank or dedicated account processing fees.

Client requests Company to perform, in good faith, the following services (the "Services"): (a) conduct a financial review of the Client's current situation; b) analyze and review potential Student Loan Consolidation options that may be available to Client from the DOE; (c) discuss potential options with the Client; and (d) prepare and deliver to Client selected applications.

Company's services ("Services") will be limited to the following:

1. Assisting Client in locating options and document preparation limited to government consolidation, education and/or refinance or similar programs designed for Client's specific debt(s);

2. Locating, obtaining and preparing the application(s) and supporting documents to apply for the programs and services described above;

3. Additional consultation as needed with Client to gather and obtain information and documents from client needed to prepare the above documents, and answer Client questions; and

4. Follow-up on application, provide updates to Client, as reasonable, relating to documents that the Company will complete and provide for Client approval, signature and submission.

5. For certain loans, it may be determined that Client is in default of their obligations ("Default Accounts") Company will assist with Default Accounts limited to reviewing the Client's present status and existing loan obligations, and upon review consult with Client to locate a specific payment plan known as a "rehabilitation plan." Generally, if the Client is likely to qualify for such based on Client's financials and ability to pay, the Company will present such (with Client's approval) to the government creditors. Company will assist Client in qualifying for a rehabilitation program, and upon such acceptance Client will receive a term repayment program. Upon meeting lender-imposed repayment terms (usually for 6-12 months), Client may qualify to submit a consolidation application consistent with the above. Company shall then assist per above.

6. Some Clients may require other assistance with their loans that shall be deemed by the Company and Client to be in the Client's best interest. Those services shall be charged on a fee-for-service basis consistent with a written pricing schedule to be provided to the Client for Client's signature prior to any work commencing. Those services shall be limited to providing support with the DOE relating to other student loan assistance programs that may be available for the Client. Other than the amounts charged for these supplemental or alternative services, all of the terms of this Agreement shall continue to apply.

Fees for the Above Services and Length of Agreement: In connection with this Agreement the above services shall be provided to the Client at a rate of $1,195.00 for document preparation and delivery to Client for a consolidation consistent with the above; and $1,195.00 for services limited to default accounts and rehabilitation programs as described above. Fees shall be due in full and payable to Company once services have been completed, or in the event of a rehabilitation program fees are due in full once Client makes first payment to servicer(s). This Agreement shall automatically expire upon 120 days after the date the Agreement begins (except for surviving clauses and fees that continue to be due to company), unless Client expressly requests that Company continue. For example, following a rehabilitation program, Client may want the Company to continue program consolidation application services. Once earned through the above provision of services, all fees are non-refundable. All fees shall be debited from Client's bank account or charged on Client's credit card pursuant to the attached authorization. Client shall be responsible for any third party support or service fees, such as bank processing or third party account fees. At Client's option, an independent dedicated account provider may be used to debit/ charge fees, holding them securely under Client's ownership until fees become due. Client may select such optional provider and is responsible for all costs associated with such. A sample dedicated account provider is attached to this Agreement for Client's review. Client consents to Company receiving payment for all fees that are due under this Agreement from Client's dedicated account.

Client Signature: _Jennifer Lynne Liming_     Date: 12/29/2017

## Exhibit "B" to Service Agreement
### Draft Schedule

| # | Date | Enrollment Fee | Recurring | Total Payment |
|---|------|----------------|-----------|---------------|
| 1 | Jan 12, 2018 | $239 00 | $0 00 | $239 00 |
| 2 | Feb 09, 2018 | $239 00 | $0 00 | $239 00 |
| 3 | Mar 09, 2018 | $239 00 | $0 00 | $239 00 |
| 4 | Apr 07, 2018 | $239 00 | $0 00 | $239 00 |
| 5 | May 05, 2018 | $239 00 | $0 00 | $239 00 |
| 6 | Jun 15, 2018 | $0 00 | $40 00 | $40 00 |
| 7 | Jul 15, 2018 | $0 00 | $40 00 | $40 00 |
| 8 | Aug 15, 2018 | $0 00 | $40 00 | $40 00 |
| 9 | Sep 15, 2018 | $0 00 | $40 00 | $40 00 |
| 10 | Oct 15, 2018 | $0 00 | $40 00 | $40 00 |
| 11 | Nov 15, 2018 | $0 00 | $40 00 | $40 00 |
| 12 | Dec 15, 2018 | $0 00 | $40 00 | $40 00 |
| 13 | Jan 15, 2019 | $0 00 | $40 00 | $40 00 |
| 14 | Feb 15, 2019 | $0 00 | $40 00 | $40 00 |
| 15 | Mar 15, 2019 | $0 00 | $40 00 | $40 00 |
| 16 | Apr 15, 2019 | $0 00 | $40 00 | $40 00 |
| 17 | May 15, 2019 | $0 00 | $40 00 | $40 00 |
| 18 | Jun 15, 2019 | $0 00 | $40 00 | $40 00 |
| 19 | Jul 15, 2019 | $0 00 | $40 00 | $40 00 |
| 20 | Aug 15, 2019 | $0 00 | $40 00 | $40 00 |
| 21 | Sep 15, 2019 | $0 00 | $40 00 | $40 00 |
| 22 | Oct 15, 2019 | $0 00 | $40 00 | $40 00 |
| 23 | Nov 15, 2019 | $0 00 | $40 00 | $40 00 |
| 24 | Dec 15, 2019 | $0 00 | $40 00 | $40 00 |
| 25 | Jan 15, 2020 | $0 00 | $40 00 | $40 00 |
| 26 | Feb 15, 2020 | $0 00 | $40 00 | $40 00 |
| 27 | Mar 15, 2020 | $0 00 | $40 00 | $40 00 |
| 28 | Apr 15, 2020 | $0 00 | $40 00 | $40 00 |
| 29 | May 15, 2020 | $0 00 | $40 00 | $40 00 |
| 30 | Jun 15, 2020 | $0 00 | $40 00 | $40 00 |
| 31 | Jul 15, 2020 | $0 00 | $40 00 | $40 00 |
| 32 | Aug 15, 2020 | $0 00 | $40 00 | $40 00 |
| 33 | Sep 15, 2020 | $0 00 | $40 00 | $40 00 |
| 34 | Oct 15, 2020 | $0 00 | $40 00 | $40 00 |
| 35 | Nov 15, 2020 | $0 00 | $40 00 | $40 00 |
| 36 | Dec 15, 2020 | $0 00 | $40 00 | $40 00 |
| 37 | Jan 15, 2021 | $0 00 | $40 00 | $40 00 |
| 38 | Feb 15, 2021 | $0 00 | $40 00 | $40 00 |
| 39 | Mar 15, 2021 | $0 00 | $40 00 | $40 00 |
| 40 | Apr 15, 2021 | $0 00 | $40 00 | $40 00 |
| 41 | May 15, 2021 | $0 00 | $40 00 | $40 00 |
| 42 | Jun 15, 2021 | $0 00 | $40 00 | $40 00 |
| 43 | Jul 15, 2021 | $0 00 | $40 00 | $40 00 |
| 44 | Aug 15, 2021 | $0 00 | $40 00 | $40 00 |
| 45 | Sep 15, 2021 | $0 00 | $40 00 | $40 00 |
| 46 | Oct 15, 2021 | $0 00 | $40 00 | $40 00 |
| 47 | Nov 15, 2021 | $0 00 | $40 00 | $40 00 |
| 48 | Dec 15, 2021 | $0 00 | $40 00 | $40 00 |
| 49 | Jan 15, 2022 | $0 00 | $40 00 | $40 00 |
| 50 | Feb 15, 2022 | $0 00 | $40 00 | $40 00 |
| 51 | Mar 15, 2022 | $0 00 | $40 00 | $40 00 |
| 52 | Apr 15, 2022 | $0 00 | $40 00 | $40 00 |
| 53 | May 15, 2022 | $0 00 | $40 00 | $40 00 |
| 54 | Jun 15, 2022 | $0 00 | $40 00 | $40 00 |
| 55 | Jul 15, 2022 | $0 00 | $40 00 | $40 00 |
| 56 | Aug 15, 2022 | $0 00 | $40 00 | $40 00 |
| 57 | Sep 15, 2022 | $0 00 | $40 00 | $40 00 |
| 58 | Oct 15, 2022 | $0 00 | $40 00 | $40 00 |

Pls.' Ex. 34
P. 838

| 59  | Nov 15, 2022 | $0 00 | $40 00 | $40 00 |
| 60  | Dec 15, 2022 | $0 00 | $40 00 | $40 00 |
| 61  | Jan 15, 2023 | $0 00 | $40 00 | $40 00 |
| 62  | Feb 15, 2023 | $0 00 | $40 00 | $40 00 |
| 63  | Mar 15, 2023 | $0 00 | $40 00 | $40 00 |
| 64  | Apr 15, 2023 | $0 00 | $40 00 | $40 00 |
| 65  | May 15, 2023 | $0 00 | $40 00 | $40 00 |
| 66  | Jun 15, 2023 | $0 00 | $40 00 | $40 00 |
| 67  | Jul 15, 2023 | $0 00 | $40 00 | $40 00 |
| 68  | Aug 15, 2023 | $0 00 | $40 00 | $40 00 |
| 69  | Sep 15, 2023 | $0 00 | $40 00 | $40 00 |
| 70  | Oct 15, 2023 | $0 00 | $40 00 | $40 00 |
| 71  | Nov 15, 2023 | $0 00 | $40 00 | $40 00 |
| 72  | Dec 15, 2023 | $0 00 | $40 00 | $40 00 |
| 73  | Jan 15, 2024 | $0 00 | $40 00 | $40 00 |
| 74  | Feb 15, 2024 | $0 00 | $40 00 | $40 00 |
| 75  | Mar 15, 2024 | $0 00 | $40 00 | $40 00 |
| 76  | Apr 15, 2024 | $0 00 | $40 00 | $40 00 |
| 77  | May 15, 2024 | $0 00 | $40 00 | $40 00 |
| 78  | Jun 15, 2024 | $0 00 | $40 00 | $40 00 |
| 79  | Jul 15, 2024 | $0 00 | $40 00 | $40 00 |
| 80  | Aug 15, 2024 | $0 00 | $40 00 | $40 00 |
| 81  | Sep 15, 2024 | $0 00 | $40 00 | $40 00 |
| 82  | Oct 15, 2024 | $0 00 | $40 00 | $40 00 |
| 83  | Nov 15, 2024 | $0 00 | $40 00 | $40 00 |
| 84  | Dec 15, 2024 | $0 00 | $40 00 | $40 00 |
| 85  | Jan 15, 2025 | $0 00 | $40 00 | $40 00 |
| 86  | Feb 15, 2025 | $0 00 | $40 00 | $40 00 |
| 87  | Mar 15, 2025 | $0 00 | $40 00 | $40 00 |
| 88  | Apr 15, 2025 | $0 00 | $40 00 | $40 00 |
| 89  | May 15, 2025 | $0 00 | $40 00 | $40 00 |
| 90  | Jun 15, 2025 | $0 00 | $40 00 | $40 00 |
| 91  | Jul 15, 2025 | $0 00 | $40 00 | $40 00 |
| 92  | Aug 15, 2025 | $0 00 | $40 00 | $40 00 |
| 93  | Sep 15, 2025 | $0 00 | $40 00 | $40 00 |
| 94  | Oct 15, 2025 | $0 00 | $40 00 | $40 00 |
| 95  | Nov 15, 2025 | $0 00 | $40 00 | $40 00 |
| 96  | Dec 15, 2025 | $0 00 | $40 00 | $40 00 |
| 97  | Jan 15, 2026 | $0 00 | $40 00 | $40 00 |
| 98  | Feb 15, 2026 | $0 00 | $40 00 | $40 00 |
| 99  | Mar 15, 2026 | $0 00 | $40 00 | $40 00 |
| 100 | Apr 15, 2026 | $0 00 | $40 00 | $40 00 |
| 101 | May 15, 2026 | $0 00 | $40 00 | $40 00 |
| 102 | Jun 15, 2026 | $0 00 | $40 00 | $40 00 |
| 103 | Jul 15, 2026 | $0 00 | $40 00 | $40 00 |
| 104 | Aug 15, 2026 | $0 00 | $40 00 | $40 00 |
| 105 | Sep 15, 2026 | $0 00 | $40 00 | $40 00 |
| 106 | Oct 15, 2026 | $0 00 | $40 00 | $40 00 |
| 107 | Nov 15, 2026 | $0 00 | $40 00 | $40 00 |
| 108 | Dec 15, 2026 | $0 00 | $40 00 | $40 00 |
| 109 | Jan 15, 2027 | $0 00 | $40 00 | $40 00 |
| 110 | Feb 15, 2027 | $0 00 | $40 00 | $40 00 |
| 111 | Mar 15, 2027 | $0 00 | $40 00 | $40 00 |
| 112 | Apr 15, 2027 | $0 00 | $40 00 | $40 00 |
| 113 | May 15, 2027 | $0 00 | $40 00 | $40 00 |
| 114 | Jun 15, 2027 | $0 00 | $40 00 | $40 00 |
| 115 | Jul 15, 2027 | $0 00 | $40 00 | $40 00 |
| 116 | Aug 15, 2027 | $0 00 | $40 00 | $40 00 |
| 117 | Sep 15, 2027 | $0 00 | $40 00 | $40 00 |
| 118 | Oct 15, 2027 | $0 00 | $40 00 | $40 00 |
| 119 | Nov 15, 2027 | $0 00 | $40 00 | $40 00 |
| 120 | Dec 15, 2027 | $0 00 | $40 00 | $40 00 |
| 121 | Jan 15, 2028 | $0 00 | $40 00 | $40 00 |
| 122 | Feb 15, 2028 | $0 00 | $40 00 | $40 00 |

| 123 | Mar 15, 2028 | $0 00 | $40 00 | $40 00 |
| 124 | Apr 15, 2028 | $0 00 | $40 00 | $40 00 |
| 125 | May 15, 2028 | $0 00 | $40 00 | $40 00 |
| 126 | Jun 15, 2028 | $0 00 | $40 00 | $40 00 |
| 127 | Jul 15, 2028 | $0 00 | $40 00 | $40 00 |
| 128 | Aug 15, 2028 | $0 00 | $40 00 | $40 00 |
| 129 | Sep 15, 2028 | $0 00 | $40 00 | $40 00 |
| 130 | Oct 15, 2028 | $0 00 | $40 00 | $40 00 |
| 131 | Nov 15, 2028 | $0 00 | $40 00 | $40 00 |
| 132 | Dec 15, 2028 | $0 00 | $40 00 | $40 00 |
| 133 | Jan 15, 2029 | $0 00 | $40 00 | $40 00 |
| 134 | Feb 15, 2029 | $0 00 | $40 00 | $40 00 |
| 135 | Mar 15, 2029 | $0 00 | $40 00 | $40 00 |
| 136 | Apr 15, 2029 | $0 00 | $40 00 | $40 00 |
| 137 | May 15, 2029 | $0 00 | $40 00 | $40 00 |
| 138 | Jun 15, 2029 | $0 00 | $40 00 | $40 00 |
| 139 | Jul 15, 2029 | $0 00 | $40 00 | $40 00 |
| 140 | Aug 15, 2029 | $0 00 | $40 00 | $40 00 |
| 141 | Sep 15, 2029 | $0 00 | $40 00 | $40 00 |
| 142 | Oct 15, 2029 | $0 00 | $40 00 | $40 00 |
| 143 | Nov 15, 2029 | $0 00 | $40 00 | $40 00 |
| 144 | Dec 15, 2029 | $0 00 | $40 00 | $40 00 |
| 145 | Jan 15, 2030 | $0 00 | $40 00 | $40 00 |
| 146 | Feb 15, 2030 | $0 00 | $40 00 | $40 00 |
| 147 | Mar 15, 2030 | $0 00 | $40 00 | $40 00 |
| 148 | Apr 15, 2030 | $0 00 | $40 00 | $40 00 |
| 149 | May 15, 2030 | $0 00 | $40 00 | $40 00 |
| 150 | Jun 15, 2030 | $0 00 | $40 00 | $40 00 |
| 151 | Jul 15, 2030 | $0 00 | $40 00 | $40 00 |
| 152 | Aug 15, 2030 | $0 00 | $40 00 | $40 00 |
| 153 | Sep 15, 2030 | $0 00 | $40 00 | $40 00 |
| 154 | Oct 15, 2030 | $0 00 | $40 00 | $40 00 |
| 155 | Nov 15, 2030 | $0 00 | $40 00 | $40 00 |
| 156 | Dec 15, 2030 | $0 00 | $40 00 | $40 00 |
| 157 | Jan 15, 2031 | $0 00 | $40 00 | $40 00 |
| 158 | Feb 15, 2031 | $0 00 | $40 00 | $40 00 |
| 159 | Mar 15, 2031 | $0 00 | $40 00 | $40 00 |
| 160 | Apr 15, 2031 | $0 00 | $40 00 | $40 00 |
| 161 | May 15, 2031 | $0 00 | $40 00 | $40 00 |
| 162 | Jun 15, 2031 | $0 00 | $40 00 | $40 00 |
| 163 | Jul 15, 2031 | $0 00 | $40 00 | $40 00 |
| 164 | Aug 15, 2031 | $0 00 | $40 00 | $40 00 |
| 165 | Sep 15, 2031 | $0 00 | $40 00 | $40 00 |
| 166 | Oct 15, 2031 | $0 00 | $40 00 | $40 00 |
| 167 | Nov 15, 2031 | $0 00 | $40 00 | $40 00 |
| 168 | Dec 15, 2031 | $0 00 | $40 00 | $40 00 |
| 169 | Jan 15, 2032 | $0 00 | $40 00 | $40 00 |
| 170 | Feb 15, 2032 | $0 00 | $40 00 | $40 00 |
| 171 | Mar 15, 2032 | $0 00 | $40 00 | $40 00 |
| 172 | Apr 15, 2032 | $0 00 | $40 00 | $40 00 |
| 173 | May 15, 2032 | $0 00 | $40 00 | $40 00 |
| 174 | Jun 15, 2032 | $0 00 | $40 00 | $40 00 |
| 175 | Jul 15, 2032 | $0 00 | $40 00 | $40 00 |
| 176 | Aug 15, 2032 | $0 00 | $40 00 | $40 00 |
| 177 | Sep 15, 2032 | $0 00 | $40 00 | $40 00 |
| 178 | Oct 15, 2032 | $0 00 | $40 00 | $40 00 |
| 179 | Nov 15, 2032 | $0 00 | $40 00 | $40 00 |
| 180 | Dec 15, 2032 | $0 00 | $40 00 | $40 00 |
| 181 | Jan 15, 2033 | $0 00 | $40 00 | $40 00 |
| 182 | Feb 15, 2033 | $0 00 | $40 00 | $40 00 |
| 183 | Mar 15, 2033 | $0 00 | $40 00 | $40 00 |
| 184 | Apr 15, 2033 | $0 00 | $40 00 | $40 00 |
| 185 | May 15, 2033 | $0 00 | $40 00 | $40 00 |
| 186 | Jun 15, 2033 | $0 00 | $40 00 | $40 00 |

Pls.' Ex. 34
P. 840

| | | | | |
|---|---|---|---|---|
| 187 | Jul 15, 2033 | $0 00 | $40 00 | $40 00 |
| 188 | Aug 15, 2033 | $0 00 | $40 00 | $40 00 |
| 189 | Sep 15, 2033 | $0 00 | $40 00 | $40 00 |
| 190 | Oct 15, 2033 | $0 00 | $40 00 | $40 00 |
| 191 | Nov 15, 2033 | $0 00 | $40 00 | $40 00 |
| 192 | Dec 15, 2033 | $0 00 | $40 00 | $40 00 |
| 193 | Jan 15, 2034 | $0 00 | $40 00 | $40 00 |
| 194 | Feb 15, 2034 | $0 00 | $40 00 | $40 00 |
| 195 | Mar 15, 2034 | $0 00 | $40 00 | $40 00 |
| 196 | Apr 15, 2034 | $0 00 | $40 00 | $40 00 |
| 197 | May 15, 2034 | $0 00 | $40 00 | $40 00 |
| 198 | Jun 15, 2034 | $0 00 | $40 00 | $40 00 |
| 199 | Jul 15, 2034 | $0 00 | $40 00 | $40 00 |
| 200 | Aug 15, 2034 | $0 00 | $40 00 | $40 00 |
| 201 | Sep 15, 2034 | $0 00 | $40 00 | $40 00 |
| 202 | Oct 15, 2034 | $0 00 | $40 00 | $40 00 |
| 203 | Nov 15, 2034 | $0 00 | $40 00 | $40 00 |
| 204 | Dec 15, 2034 | $0 00 | $40 00 | $40 00 |
| 205 | Jan 15, 2035 | $0 00 | $40 00 | $40 00 |
| 206 | Feb 15, 2035 | $0 00 | $40 00 | $40 00 |
| 207 | Mar 15, 2035 | $0 00 | $40 00 | $40 00 |
| 208 | Apr 15, 2035 | $0 00 | $40 00 | $40 00 |
| 209 | May 15, 2035 | $0 00 | $40 00 | $40 00 |
| 210 | Jun 15, 2035 | $0 00 | $40 00 | $40 00 |
| 211 | Jul 15, 2035 | $0 00 | $40 00 | $40 00 |
| 212 | Aug 15, 2035 | $0 00 | $40 00 | $40 00 |
| 213 | Sep 15, 2035 | $0 00 | $40 00 | $40 00 |
| 214 | Oct 15, 2035 | $0 00 | $40 00 | $40 00 |
| 215 | Nov 15, 2035 | $0 00 | $40 00 | $40 00 |
| 216 | Dec 15, 2035 | $0 00 | $40 00 | $40 00 |
| 217 | Jan 15, 2036 | $0 00 | $40 00 | $40 00 |
| 218 | Feb 15, 2036 | $0 00 | $40 00 | $40 00 |
| 219 | Mar 15, 2036 | $0 00 | $40 00 | $40 00 |
| 220 | Apr 15, 2036 | $0 00 | $40 00 | $40 00 |
| 221 | May 15, 2036 | $0 00 | $40 00 | $40 00 |
| 222 | Jun 15, 2036 | $0 00 | $40 00 | $40 00 |
| 223 | Jul 15, 2036 | $0 00 | $40 00 | $40 00 |
| 224 | Aug 15, 2036 | $0 00 | $40 00 | $40 00 |
| 225 | Sep 15, 2036 | $0 00 | $40 00 | $40 00 |
| 226 | Oct 15, 2036 | $0 00 | $40 00 | $40 00 |
| 227 | Nov 15, 2036 | $0 00 | $40 00 | $40 00 |
| 228 | Dec 15, 2036 | $0 00 | $40 00 | $40 00 |
| 229 | Jan 15, 2037 | $0 00 | $40 00 | $40 00 |
| 230 | Feb 15, 2037 | $0 00 | $40 00 | $40 00 |
| 231 | Mar 15, 2037 | $0 00 | $40 00 | $40 00 |
| 232 | Apr 15, 2037 | $0 00 | $40 00 | $40 00 |
| 233 | May 15, 2037 | $0 00 | $40 00 | $40 00 |
| 234 | Jun 15, 2037 | $0 00 | $40 00 | $40 00 |
| 235 | Jul 15, 2037 | $0 00 | $40 00 | $40 00 |
| 236 | Aug 15, 2037 | $0 00 | $40 00 | $40 00 |
| 237 | Sep 15, 2037 | $0 00 | $40 00 | $40 00 |
| 238 | Oct 15, 2037 | $0 00 | $40 00 | $40 00 |
| 239 | Nov 15, 2037 | $0 00 | $40 00 | $40 00 |
| 240 | Dec 15, 2037 | $0 00 | $40 00 | $40 00 |

Client Signature: _Jennifer Lynne Lining_          Date: 12/29/2017

| Facts: | WHAT DOES PREMIER STUDENT LOAN CENTER ("Company") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>• Social Security number and income<br>• Account balances and account numbers<br>• Transaction or loss history and employment information<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons PREMIER STUDENT LOAN CENTER chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Do we share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes — such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes — to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes — information about your transactions and experiences | Yes | No |
| For our affiliates everyday business purposes — information about your creditworthiness | No | We don't share |
| For non-affiliates to market to you | Yes | Yes |
| Questions? | www.premierstudentloancenter.com | |

Pls.' Ex. 34
P. 842

| Who we are | |
|---|---|
| **Who is providing this notice?** | PREMIER STUDENT LOAN CENTER |

| What we do | |
|---|---|
| **How do we protect my personal Information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safe guards and secured files and buildings<br><br>We also maintain physical, electronic and procedural safe guards such as computer virus protection software, firewalls, and a 128 bit Secure Socket Layer. Only authorized employees have access. |
| **How do we collect my personal Information?** | We collect your personal information, for example when you<br>-Give us your income information<br>-Provide employment information<br>-Provide account information<br>-Give us your contact information<br>We also collect your personal information from other companies |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>-Sharing for affiliates' everyday business purposes-information about your creditworthiness<br>-Affiliates from using your information to market to you<br>-Sharing for non-affiliates o market to you<br>State laws and individual companies may give you additional rights to limit sharing. |

| Definition | |
|---|---|
| **Affiliates** | Financial and non-financial companies related by common ownership or control.<br><br>• PREMIER STUDENT LOAN CENTER does not share with our affiliates |
| **Non-affiliates** | Financial and non-financial companies not related by common ownership or control.<br><br>• PREMIER STUDENT LOAN CENTER does not share with non-affiliates so they can market to you. |
| **Joint Marketing** | A formal agreement between non-affiliated financial companies that together market financial products or services to you<br><br>• PREMIER STUDENT LOAN CENTER doesn't jointly market |

| Other Important Information | |
|---|---|
| **For California and Vermont Residents:** We will not share information we collect about you with non-affiliated third parties, except as permitted by California or Vermont law, respectively, such as to process your transactions or to maintain your account. | |

Pls.' Ex. 34
P. 843

# Limited Power of Attorney

To: Any and all of my Student Loan Creditors:

I, hereby duly authorize, empower and appoint PREMIER STUDENT LOAN CENTER , its representatives and

1. To communicate with any and/or all of my Federal Student Loan providers and Servicers, third party account servicing companies that are working on my applications permission to perform any acts necessary or convenient, including but not limited to, the following on my behalf:

2. To communicate with banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans, including but not limited to the balance of my account, payment history verification of the account and any and all necessary communications, correspondence, and negotiations regarding my account(s). I assert that all of the information that I have provided and will provide PREMIER STUDENT LOAN CENTER is true and accurate.

3. I hereby authorize third party communication from banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans to communicate directly with PREMIER STUDENT LOAN CENTER concerning my account or the collection activities associated with it, in accordance with Section 805(b) of the Fair Debt Collection Practices Act. I further request that all of my lenders direct all further telephone calls to: and correspondence to: PREMIER STUDENT LOAN CENTER, 173 Technology Dr #202, Irvine Ca, 92618. Any and all communications directed to me will be referred to PREMIER STUDENT LOAN CENTER

I understand that PREMIER STUDENT LOAN CENTER _is not a law firm, is not licensed to practice law or provide legal advice and that I will not request or accept, any legal advice from PREMIER STUDENT LOAN CENTER relating to my personal financial situation.

I expressly agree to waive, forgo, indemnify and defend any claim against the PREMIER STUDENT LOAN CENTER relating to the practice of law. I understand that any creditor or collection activity, demands, or lawsuits are unrelated to my enrollment in the PREMIER STUDENT LOAN CENTER program.

I agree that electronic or facsimile copy signature shall be deemed original and is an authorization by me for all lawfully enforceable purposes.

This Limited Power of Attorney shall remain in force until or unless modified or rescinded in writing, or upon resolution of the current matter.

Executed On this (Date): 12/29/2017

Applicant Signature: _Jennifer Lynne Liming_          Applicant SSN: ▉▉▉▉▉

Applicant Name: Jennifer Liming          Applicant DOB: ▉▉▉▉

Pls.' Ex. 34
P. 844

# National Student Loan Data System Access

As part of the federal student loan assistance application process, it will be necessary for PREMIER STUDENT LOAN CENTER and its designated servicer who is assisting on my applications (hereinafter "Company") to access your student loan information within the National Student Loan Data System located online at http://www.nslds.ed.gov.

The National Student Loan Data System contains a complete list of your federal education loans, along with current estimated balances and servicer details — information that is required to complete your application(s).

By enrolling in the Company assistance program, you are agreeing to allow Company and its authorized agents to access your profile and all the data contained within that profile.

Please note that all information that Company obtains from the National Student Loan Data System will be used expressly for the purposes of confirming your eligibility for the Company consolidation assistance program and assisting you in the consolidation of your federal education loans.

**Acknowledgement**

I, <u>Jennifer Liming</u>, hereby acknowledge that I have read, understood, and agree to the

above statements regarding access to my National Student Loan Data System profile. I understand that any information received or accessed will be used solely for the purposes of verifying my eligibility for lender assistance programs and completing my applications.

By signing this acknowledgment, I agree to allow Company and its designated Servicer to access the National Student Loan Data System and my personal profile as explained above.

Client Signature: _Jennifer Lynne Liming_ _____     Date: 12/29/2017

Pls.' Ex. 34
P. 845

**SL ACCOUNT MANAGEMENT**

Dear Jennifer,

Enclosed is your refund check for $1,355.00 from SL Account Management. If you have any questions, feel free to give me a call at 949 207 1025. Thank you and have a nice day.

Sincerely,

Tom Nelson

02/08/2019

Pls.' Ex. 34
P. 846

# Plaintiffs' Exhibit 35

DECLARATION OF HILDEGARD HAUSER

Pursuant to 28 U.S.C § 1746

I, Hildegard Hauser, hereby declare and state as follows:

1.     I am over the age of eighteen and reside in Chicago, Illinois.

2.     I have personal knowledge of the following facts, which I could and would testify to if I were called to testify as a witness.

3.     I was born and raised in Minneapolis, and now live in Chicago. After graduating from high school in 2013, I moved to Chicago to study oil painting at the Art Institute of Chicago. I had to withdraw from art school because of my financial situation, which was a source of considerable stress in my life. I moved back to Minnesota in 2016. I then began to study massage therapy and in 2018 I achieved an Associate Degree in Applied Science from CenterPoint Massage and Shiatsu School & Clinic. Since then, I moved back to Chicago where I work as a massage therapist, and I also continue to create art in my free time.

4.     In pursuing my college education, I have incurred a large amount of student loan debt in excess of $17,000.

5.     After getting my degree, my financial situation, including my student loan debt, continued to cause me stress. My lender, Navient, told me that I would have to start making $200 monthly payments. I could not afford this, so I deferred the payments.

1

6.      In February 2019, I was referred by a friend to a company called South Coast Financial. My friend had heard about the company and a student loan forgiveness program the company offered on a public radio program. He was told that he would receive a $50 gift card for referring new people to the company.

7.      I was interested in learning about how to make my student loan debt more manageable, so I contacted South Coast Financial to see if it could assist me. I spoke with a woman named Tara Herrera who identified herself as a "senior account manager." I told Tara I was interested in lowering my monthly student loan payments. Tara told me that my student loans were eligible for student loan forgiveness and assured me that if I enrolled with South Coast Financial that my monthly payments would be reduced. She told me that my monthly payments would be $32 until 2039, after which my loans would be completely forgiven. She never told me that I would need to recertify my income and family size every year to determine if my monthly payment remained the same.

8.      Tara also led me to believe that, if I enrolled, I would pay thousands of dollars less on my student loans than I originally owed, and that I would not need to make any interest payments. When I asked how the forgiveness program worked, Tara told me it was a federal government loan forgiveness program that had been set up by President Obama. She also told me that South Coast Financial would take over

2

Hauser Decl.

my loans so I would owe the company instead of Navient. She told me not to worry if Navient contacted me, and that South Coast Financial would take care of it.

9.     Tara also told me that enrolling with South Coast Financial would reflect positively on my credit score as a loan that I had paid in full.

10.     I was young and naïve at the time, so I believed her.

11.     While I was on the phone with Tara on February 22, 2019, she sent me a client agreement via email, and told me to view it and sign it on my phone. She rushed me through the document and did not give me a chance to review it. When I opened the document on my phone, my signature was already automatically generated, and I was told to just click "next" and "finish." Based on what I was told about student loan forgiveness, I agreed to enroll. That day, I paid an initial enrollment fee of $1,145. A true and correct copy of the client agreement is attached hereto as **Attachment A**.

12.     In later calls, Tara asked me for my paystubs, which I provided since she told me that the amount I owed would be based partially on my income. At the time, I was working two jobs, but Tara told me to only submit a paystub for one of my jobs, saying it was better if the paystub indicated that I made less money. She also asked me to provide her with other personal information, such as my address, social security number, and credit card account information, which I did.

13.     For several months, I was charged $32 a month, in addition to the $1,145 up-front payment I made. Everything seemed fine and I even received a letter from Navient stating that my loan had been paid in full. Based on what the company told me, I believed the payments I was making were going toward my student loans.

14.     After a few months, it started to become difficult to reach South Coast Financial, and eventually I was unable to contact the company at all, but the company continued to withdraw $32 from my bank account every month. Later, I visited the company's website and noticed that it was not working any longer. I contacted my friend who had referred me to the program, and he told me that he had the same issue with the website.

15.     I did not understand what was happening, so I tried to look for answers. At some point, I went back to the website, and it indicated that the company was fraudulent and that I should contact my original lender. When I contacted Navient, they told me that a lot of people were dealing with this and that I still owed them money for my student loans even though South Coast Financial had told me it would take over my loans and that I would only need to pay South Coast Financial.

16.     I paid South Coast Financial a total of $1,369 during the eight months I was enrolled in South Coast Financial's student loan debt relief program.

17.     South Coast Financial did not provide any beneficial services to me and has worsened my student loan situation since the payments I made to the company

did not go toward my student loans, as I was led to believe, so I still owe close to

$17,000 to Navient. I would also love to go back to school, but I have not been able

to because I find it difficult to afford my expenses and save money. What South

Coast Financial did made me feel very angry, upset, overwhelmed, ashamed, and

embarrassed. I suffer from mental illness, and the stress caused by this company has

exacerbated my symptoms and has even led to panic attacks.

18.     If I had known the m.0ncy I was paying to South Coast Financial was

not being applied to my student loan balance, I never would have paid the company.

19.     If I had known that South Coast Financial lied to me that my student

loans would be forgiven, I never would have signed up with this company.

20.     I declare under penalty of perjury that the foregoing is true and correct.

21.     Executed on January 18, 2023.


_Hildegard Hauser_

Hildegard Hauser

At Chicago, Illinois

5

Pls.' Ex. 35
P. 852

# South Coast Financial Center

## Document Preparation and Service Agreement ("Agreement")

This Agreement is entered into on the date shown below between SOUTH COAST FINANCIAL CENTER (Hereinafter referred to as "Company") and the Client shown below (Hereinafter referred to as "Client").

Company provides document preparation services to assist consumers who are applying for federal student loan program Department of Education ("DOE") forms. Company is a private company, not affiliated with any government agency, and fee Company will assist in assembly and completion of student loan consolidation or other application documents for stu loan debt assistance programs offered by the DOE, for delivery to Client for Clients review and submission to DOE. Con is not a lender, a debt consolidation company, or a law firm and does not provide legal advice.

Company and Client do hereby understand, covenant and agree to the following:

1. **Provide Complete and Truthful Information**. Company will provide Client with an overview session limited to their federal student loan debts and the available documents, and Client expressly represents and warrants that Client will pro Company with information that is complete, accurate and truthful

2. **Performance of Services**. Upon receipt of all information from Client, Company shall promptly analyze Client situation, review the information provided by the Client, and complete the application forms required for the DOE program(s) that been selected by the Client. Company shall prepare for filing an application to initiate a federal student loan consolidatio through the DOE on behalf of Client, or alternatively and at the Client option, identify and apply for other DOE sponsored programs suitable for Client  All completed applications shall be delivered by Company to Client for approval, signature and direct submission to DOE.

**By initialing here, Client requests Company to complete & submit executed application to DOE.**

Initials 

3. **Fees that Client Pays**. The payment for Company services relating to the student loan assistance applications, their preparation, delivery to Client, and ongoing support are described in the attached Fee and Service Schedule (Exhibit A). should review the attached Fee and Service Schedule carefully as it sets forth one or more fees that the Client will be cha depending on the services that are selected. All fees are earned, due, and payable pursuant to the attached Fee and Servic Schedule. Payments may be collected on a periodic payment option as indicated in the attached Draft Schedule (Exhibit fees shall be debited from Client bank account or charged on Client credit card pursuant to the attached authorization. Clie shall be responsible for any third party support or service fees, such as bank processing or third party account fees.

4. **No Advance Fees**. Per the attached Client Trust Account Authorization, Company does not take any advance fees fro Client. Company will designate an independent third party dedicated account provider ("DAP") to collect and deposit payments that Client has agreed to make with Company, pursuant to the Fee and Service Schedule of this Agreement, an deposit and hold Client funds in a trust account established and serviced by the DAP. The DAP will not disburse any Cli fees until Client has received a consolidation, adjustment, or otherwise satisfactory result, and Client completes one paym towards such.

5. **Limited Money Back Guarantee**. Company guarantees that the documents it prepares for consolidation or acceptance

Pls.' Ex. 35
P. 853
ID: REDACTED 0861 Signed: 2019-02-22T11:20:01-06:00

into a DOE-offered program for student loan debt, or a repayment plan using current lenders through the DOE, will be ad and sufficient for acceptance by the DOE subject to the following conditions: (1) student loans that Client presents to Co are original debts, and have not been previously consolidated or had their terms or amounts previously adjusted, and hav been previously serviced or worked on by any other student loan assistance or adjustment company; (2) Client fully coop and is honest and timely in providing all information requested by Company and the DOE; and/or (3) Client does not po characteristic that pursuant to DOE rules or applicable law would disqualify Client from receiving a consolidation. Client not be entitled to the benefits of this section in the event that Client receives document preparation services from Compa prior to approval by the DOE, Client terminates this Agreement or continues with the DOE without the assistance of Co If Client is not approved through the DOE subject to the above limitations, then Company will reimburse the Fee paid to Company (limited to funds received by Company from Client). All refund requests must be made, in writing, to Compan 30 days of any denial by the DOE. This guarantee expires six months after the date this Agreement is signed by the Clie

**6. Process and Restriction on Account Transfer.** Once Client provides Company with all requested information and paperwork, Company will begin preparing Client's application(s). Company is not an intermediary or agent of the DOE, so does not control any review or agency approval times. Once a consolidation or other beneficial result is secured, subject Client's election and for an additional fee, Company will continue to monitor Client's account and collect the necessary paperwork to make sure Client's account is up-to-date and ready for the yearly income validation. Prior to the anniversary the loan, Company will provide required documents and instructions to Client for submission to the DOE. Client unders that Company may use a third-party support servicer to assist in processing duties pursuant to this Agreement and Compan may share Client's information with such processor consistent with Company's Privacy Policy.

**7. Indemnification and Hold Harmless.** Client hereby agrees to defend and hold harmless Company and any supporting servicer from and against any claims and liability of any nature whatsoever arising out of or in connection with Client to timely provide requested information to Company, Client's lack of authority or ability to complete terms of this Agreement, a all other claims arising out of this Agreement or relating to Client's loans and other financial obligations. This Agreement constitutes the entire agreement between the parties. Company makes no warranty, express or implied, as to the fitness o recommendation it may make to Client arising out of this Agreement. Except for cause, Client unconditionally waives any action against Company and third-party support servicer, its officers, directors, employees, agents, brokers and assignees, a law, equity or any other cause of action for any reason, directly, indirectly, or proximately believed to arise out of this Agreement, for any damages of any nature whatsoever that Client may incur by reason of Client following any recomme of Company or Client's failure to follow any recommendation of Company, whether any singular, concurrent or series of recommendations are acted upon or not acted upon in whole or in part by Client. This section shall survive any terminat this Agreement.

Initials _HH_

8. **Entire Agreement.** By virtue of Client's signature below, Client acknowledges that he or she has read, understands, and agrees to every term, covenant and condition of this Agreement without change or modification and that he or she has re a true and complete copy hereof, effective on the date below. This agreement is the only agreement between the parties a there is no other collateral agreement (oral or written) between the parties in any manner relating to the subject matter of agreement. If any portion of this agreement is held to be invalid or unenforceable, the remaining provisions will remain The parties mutually understand and agree that a facsimile copy signature or an electronic signature on this agreement sh deemed an original for all lawfully enforceable purposes.

9. **Cancellation Policy.** Company's cancellation policy is designed to exceed state law requirements (for the Client protection) and be easy to understand. If you are unhappy or dissatisfied at any time prior to receiving the documents or services described herein, a consolidation or other result from the DOE that Company has assisted you with, then simply letter, email, or facsimile to the Company requesting a refund and cancelling your program. Once Company completes it document preparation services and sends documents to Client, Client shall not be entitled to a refund unless subject to th Satisfaction Guarantee or if Client requests such cancellation within their state statutory cancellation right. If you have any questions, please do not hesitate to call or write to us directly.

Pls.' Ex. 35
P. 854
ID: REDAC 0861 Signed: 2019-02-22T11:20:01-06:00

10. **Limitations on Damages** Liability under this Agreement and/or relating directly or indirectly to Client participation in any government loan or relief program, under any theory of liability regarding any claim by the Client, is limited to the fees paid by Client and received by Company. The parties agree to be contractually bound to such limitation on any damages and agree not to demand or attempt to recover any amount in excess of such. It is the express intent of the parties to be bound by these limitations and this section shall survive any termination.

11. **Mandatory Binding Arbitration to Resolve All Disputes and Class Action Waiver** This Agreement is governed by a Binding Mandatory Arbitration Requirement. You are encouraged to consult with independent legal counsel so that you understand your rights relating to this requirement. This Section limits your legal rights and ability to go to court. Please consult with legal counsel to be sure you understand this Section prior to signing.

 In the event of any controversy, claim or dispute between the parties (the Company, the Client, and any support entities or persons contemplated herein) arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, unconscionability, or validity thereof, including any determination of the scope or applicability of this agreement, shall all be determined and resolved exclusively by arbitration in the county which the Client resides, or the closest metropolitan city, in accordance with the Laws of the State of California for agreements to be made in and to be performed in California. The parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures and an arbitrator shall be selected by the AAA. The arbitrator shall be neutral and independent and shall comply with the AAA code of ethics. The award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the parties. If either party fails to comply with the arbitrator's award, the injured party may petition the circuit court for enforcement. The parties agree that either party may bring claims against the other only in his, her, or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings of more than one person's claims and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost (excluding attorneys' fees) of arbitration equally. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award. Binding Arbitration means that both parties give up the right to a trial by a jury. It also means that both parties give up the right to appeal from the arbitrator ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. This section and the arbitration requirement shall survive any termination.

Initials  _HH_

12. **Information Authorization** Client hereby authorizes Company to verify past and present employment earnings records, bank accounts, stock holdings, and any other asset balances that are needed to process Client application request(s). Importantly, Company does not provide any form of credit repair, credit score enhancement, unsecured or secured debt relief or legal or tax advice, so any information obtained by Company cannot be used for those purposes.

13. **Electronic and Voice Communication Consent** Client consents to do business electronically with Company. Client understands that electronic transactions, not limited to emails, are inherently unsecure and that both Client and Company will take all reasonable steps to maintain the Privacy of the information shared between the parties. Client consents to receive information and documents relating to this Agreement and Company services via electronic mail, text message, facsimile, voicemail, and any other common electronic means. Client understands that all costs associated with the receipt, review of such electronic communications shall be those of Client, such as maintaining access to the Internet or paying for text messages. Client consents to receive updates and documents relating to this Agreement and the services and programs offered by Company via prerecorded voice messages, text/SMS messages, and/or through the use of an automated dialing system. Client may contact Company at any time to opt out of receiving updates, new programs or offers through prerecorded or autodialed messages  Consent to this section does not bind Client to any future purchases of new services or offers

Pls.' Ex. 35
P. 855
ID: REDAC 0861 Signed: 2019-02-22T11:20:01-06:00

**14. Important Disclosure.** You may, of course, try to complete your applications and consolidate your loans yourself without paying anyone a fee – the results could be the very same or they might vary. We are required to advise you that our services are OPTIONAL and you, the debtor, may directly apply to the DOE for benefits by yourself without fees. However, our services are private and for your own interests. Our goal is to reduce the stress and frustration that many experience when going through this process. We wade through all your paperwork and the DOE websites and applications, find the documents that you need, and take the time to make sure your application(s) are completed accurately and timely. We back up our services by our Satisfaction Guarantee. The nominal fee for these services is similar to you paying a tax preparer to do your taxes for you—you could do them yourself, but most of us turn them over to an expert to do and to ensure that they are done right the first time. Please note that the Company does not expressly or impliedly warrant, represent or guarantee that it will be able to reduce your total student loan debt or monthly payments. Company is NOT A LENDER, and does not consolidate debts or extend credit. We solely provide application assistance services and education, along with any optional support programs.

Initials  _HH_

BY SIGNING BELOW (ELECTRONICALLY OR PHYSICALLY), **I HEREBY ACKNOWLEDGE THAT I HAVE NOT BEEN ADVISED BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES TO FOREGO A STUDENT LOAN PAYMENT. DURING THIS PROCESS, I AM RESPONSIBLE FOR MAKING MY PAYMENTS, AND FAILURE TO DO SO COULD DISQUALIFY ME FROM OBTAINING THE SERVICES THAT I APPLIED FOR.** I FURTHER ACKNOWLEDGE THAT NO GUARANTEES OR PROMISES RELATING TO GOVERNMENT AGENCIES OR ANY RELIEF THAT I MAY RECEIVE HAVE BEEN PROVIDED TO ME BY COMPANY, ANY OF ITS AGENTS, AND/OR AFFILIATES, AND A POSITIVE OUTCOME IS NOT GUARANTEED. I UNDERSTAND AND CONSENT TO LIMITATIONS ON DAMAGES, BINDING ARBITRATION CLAUSE, AND CLASS ACTION WAIVER CONTAINED HEREIN, AND HAVE HAD THE OPPORTUNITY TO REVIEW THIS AGREEMENT IN ITS TOTALITY AND ASK ANY QUESTIONS OF COMPANY.

| | |
|---|---|
| Client Signature | _Hildegard Hauser_ |
| Client Printed Name | Hildegard Hauser |
| Executed on this Date | 2/22/19 |

ID: REDACTED 0861 Signed: 2019-02-22T11:20:01-06:00

# Exhibit "A" to Service Agreement

## Fee and Service Schedule

The purpose of this Fee and Service Schedule is to ensure that Client is aware and consents to the fees that Company will charge for its services in assisting Client in preparing documents for one or more of the below programs. While such programs may be available for free directly by various government agencies, Company's services are fee-based and focused on application and document preparation. If other programs are identified by Client or Company to be suitable for Client, then additional fees may apply and will be presented to Client in writing for approval. Fees are charged consistent with the terms of Client's Agreement. Fees herein are only Company fees and do not include any third-party support or service fees, such as bank fees.

Client requests Company to perform, in good faith, the following services (the "Services"): (a) conduct a financial review of the Client's current situation; b) analyze and review potential Student Loan Consolidation options that may be available to Client from the DOE; (c) discuss potential options with the Client; and (d) prepare and deliver to Client selected applications.

Company's services ("Services") will be limited to the following:

1. Assisting Client in locating options and document preparation limited to government consolidation, education and/or refinance or similar programs designed for Client's specific debt(s)

2. Locating, obtaining and preparing the application(s) and supporting documents to apply for the programs and services described above;

3. Additional consultation as needed with Client to gather and obtain information and documents from Client needed to prepare the above documents, and answer Client questions; and

4. Followup on application, provide updates to Client, as reasonable, relating to documents that the Company will complete and provide for Client approval, signature, and submission.

5. For certain loans, it may be determined that Client is in default of their obligations ("Default Accounts"). Company will assist with Default Accounts limited to reviewing the Client's present status and existing loan obligations, and upon review consult with Client to locate a specific payment plan known as a "rehabilitation plan." Generally, if the Client is likely to qualify for such based on Client's financials and ability to pay, the Company will present such (with Client's approval) to the government creditors. Company will assist Client in qualifying for a rehabilitation program, and upon such acceptance Client will receive a term repayment program. Upon meeting lender-imposed repayment terms (usually for 6- 12 months), Client may qualify to submit a consolidation application consistent with the above. Company shall then assist per above.

6. Some Clients may require other assistance with their loans that shall be deemed by the Company and Client to be in the Client's best interest. Those services shall be charged on a fee-for-service basis consistent with a written pricing schedule to be provided to the Client for Clients signature prior to any work commencing. Those services shall be limited to providing support with the DOE relating to other student loan assistance programs that may be available for the Client. Other than the amounts charged for these supplemental or alternative services, all of the terms of this Agreement shall continue to apply.

Fees for the Above Services and Length of Agreement: In connection with this Agreement, the above services shall be provided to the Client at a rate of $1,245.00 / $1,545.00 for rehab for document preparation and delivery to Client for a consolidation consistent with the above. Fees shall be due in full and payable to Company once services have been completed, or in the event of a rehabilitation program fees are due in full once Client makes first payment to servicer(s). Once earned through the above provision of services, all fees are non- refundable. All fees shall be debited from Client's bank account or charged on Client's credit card pursuant to the attached authorization. Client shall be responsible for any third-party support or service fees, such as bank fees.

<u>ACKNOWLEDGEMENT</u>

As indicated by my signature below, I acknowledge that I have read, understand, and agree to the terms and conditions o
Fee and Service Schedule.

Client Signature          *Hildegard Hauser*

Client Printed Name       Hildegard Hauser

Executed on this Date     2/22/19

## Exhibit "B" to Service Agreement

### Draft Schedule

| # | Date | Enrollment Fee | Recurring | Total Payment |
|---|---|---|---|---|
| 1 | Feb 22, 2019 | $1,145.00 | $0.00 | $1,145.00 |
| 2 | Mar 28, 2019 | $0.00 | $32.00 | $32.00 |
| 3 | Apr 28, 2019 | $0.00 | $32.00 | $32.00 |
| 4 | May 28, 2019 | $0.00 | $32.00 | $32.00 |
| 5 | Jun 28, 2019 | $0.00 | $32.00 | $32.00 |
| 6 | Jul 28, 2019 | $0.00 | $32.00 | $32.00 |
| 7 | Aug 28, 2019 | $0.00 | $32.00 | $32.00 |
| 8 | Sep 28, 2019 | $0.00 | $32.00 | $32.00 |
| 9 | Oct 28, 2019 | $0.00 | $32.00 | $32.00 |
| 10 | Nov 28, 2019 | $0.00 | $32.00 | $32.00 |
| 11 | Dec 28, 2019 | $0.00 | $32.00 | $32.00 |
| 12 | Jan 28, 2020 | $0.00 | $32.00 | $32.00 |
| 13 | Feb 28, 2020 | $0.00 | $32.00 | $32.00 |
| 14 | Mar 28, 2020 | $0.00 | $32.00 | $32.00 |
| 15 | Apr 28, 2020 | $0.00 | $32.00 | $32.00 |
| 16 | May 28, 2020 | $0.00 | $32.00 | $32.00 |
| 17 | Jun 28, 2020 | $0.00 | $32.00 | $32.00 |
| 18 | Jul 28, 2020 | $0.00 | $32.00 | $32.00 |
| 19 | Aug 28, 2020 | $0.00 | $32.00 | $32.00 |
| 20 | Sep 28, 2020 | $0.00 | $32.00 | $32.00 |
| 21 | Oct 28, 2020 | $0.00 | $32.00 | $32.00 |
| 22 | Nov 28, 2020 | $0.00 | $32.00 | $32.00 |
| 23 | Dec 28, 2020 | $0.00 | $32.00 | $32.00 |
| 24 | Jan 28, 2021 | $0.00 | $32.00 | $32.00 |
| 25 | Feb 28, 2021 | $0.00 | $32.00 | $32.00 |
| 26 | Mar 28, 2021 | $0.00 | $32.00 | $32.00 |
| 27 | Apr 28, 2021 | $0.00 | $32.00 | $32.00 |
| 28 | May 28, 2021 | $0.00 | $32.00 | $32.00 |
| 29 | Jun 28, 2021 | $0.00 | $32.00 | $32.00 |
| 30 | Jul 28, 2021 | $0.00 | $32.00 | $32.00 |
| 31 | Aug 28, 2021 | $0.00 | $32.00 | $32.00 |
| 32 | Sep 28, 2021 | $0.00 | $32.00 | $32.00 |
| 33 | Oct 28, 2021 | $0.00 | $32.00 | $32.00 |
| 34 | Nov 28, 2021 | $0.00 | $32.00 | $32.00 |
| 35 | Dec 28, 2021 | $0.00 | $32.00 | $32.00 |
| 36 | Jan 28, 2022 | $0.00 | $32.00 | $32.00 |
| 37 | Feb 28, 2022 | $0.00 | $32.00 | $32.00 |
| 38 | Mar 28, 2022 | $0.00 | $32.00 | $32.00 |
| 39 | Apr 28, 2022 | $0.00 | $32.00 | $32.00 |
| 40 | May 28, 2022 | $0.00 | $32.00 | $32.00 |
| 41 | Jun 28, 2022 | $0.00 | $32.00 | $32.00 |
| 42 | Jul 28, 2022 | $0.00 | $32.00 | $32.00 |
| 43 | Aug 28, 2022 | $0.00 | $32.00 | $32.00 |
| 44 | Sep 28, 2022 | $0.00 | $32.00 | $32.00 |
| 45 | Oct 28, 2022 | $0.00 | $32.00 | $32.00 |

Pls.' Ex. 35
P. 859
ID: REDACTED 0861 Signed: 2019-02-22T11:20:01-06:00

| 46 | Nov 28, 2022 | $0.00 | $32.00 | $32.00 |
| 47 | Dec 28, 2022 | $0.00 | $32.00 | $32.00 |
| 48 | Jan 28, 2023 | $0.00 | $32.00 | $32.00 |
| 49 | Feb 28, 2023 | $0.00 | $32.00 | $32.00 |
| 50 | Mar 28, 2023 | $0.00 | $32.00 | $32.00 |
| 51 | Apr 28, 2023 | $0.00 | $32.00 | $32.00 |
| 52 | May 28, 2023 | $0.00 | $32.00 | $32.00 |
| 53 | Jun 28, 2023 | $0.00 | $32.00 | $32.00 |
| 54 | Jul 28, 2023 | $0.00 | $32.00 | $32.00 |
| 55 | Aug 28, 2023 | $0.00 | $32.00 | $32.00 |
| 56 | Sep 28, 2023 | $0.00 | $32.00 | $32.00 |
| 57 | Oct 28, 2023 | $0 00 | $32 00 | $32 00 |
| 58 | Nov 28, 2023 | $0.00 | $32.00 | $32.00 |
| 59 | Dec 28, 2023 | $0.00 | $32.00 | $32.00 |
| 60 | Jan 28, 2024 | $0.00 | $32.00 | $32.00 |
| 61 | Feb 28, 2024 | $0.00 | $32.00 | $32.00 |
| 62 | Mar 28, 2024 | $0.00 | $32.00 | $32.00 |
| 63 | Apr 28, 2024 | $0.00 | $32.00 | $32.00 |
| 64 | May 28, 2024 | $0 00 | $32 00 | $32 00 |
| 65 | Jun 28, 2024 | $0.00 | $32.00 | $32.00 |
| 66 | Jul 28, 2024 | $0.00 | $32.00 | $32.00 |
| 67 | Aug 28, 2024 | $0.00 | $32.00 | $32.00 |
| 68 | Sep 28, 2024 | $0.00 | $32.00 | $32.00 |
| 69 | Oct 28, 2024 | $0.00 | $32.00 | $32.00 |
| 70 | Nov 28, 2024 | $0.00 | $32.00 | $32.00 |
| 71 | Dec 28, 2024 | $0 00 | $32 00 | $32.00 |
| 72 | Jan 28, 2025 | $0.00 | $32.00 | $32.00 |
| 73 | Feb 28, 2025 | $0.00 | $32.00 | $32.00 |
| 74 | Mar 28, 2025 | $0.00 | $32.00 | $32.00 |
| 75 | Apr 28, 2025 | $0.00 | $32.00 | $32.00 |
| 76 | May 28, 2025 | $0.00 | $32.00 | $32.00 |
| 77 | Jun 28, 2025 | $0.00 | $32.00 | $32.00 |
| 78 | Jul 28, 2025 | $0.00 | $32.00 | $32.00 |
| 79 | Aug 28, 2025 | $0.00 | $32.00 | $32.00 |
| 80 | Sep 28, 2025 | $0.00 | $32.00 | $32.00 |
| 81 | Oct 28, 2025 | $0.00 | $32.00 | $32.00 |
| 82 | Nov 28, 2025 | $0.00 | $32.00 | $32.00 |
| 83 | Dec 28, 2025 | $0.00 | $32.00 | $32.00 |
| 84 | Jan 28, 2026 | $0.00 | $32.00 | $32.00 |
| 85 | Feb 28, 2026 | $0.00 | $32.00 | $32.00 |
| 86 | Mar 28, 2026 | $0 00 | $32 00 | $32 00 |
| 87 | Apr 28, 2026 | $0.00 | $32.00 | $32.00 |
| 88 | May 28, 2026 | $0.00 | $32.00 | $32.00 |
| 89 | Jun 28, 2026 | $0.00 | $32.00 | $32.00 |
| 90 | Jul 28, 2026 | $0.00 | $32.00 | $32.00 |
| 91 | Aug 28, 2026 | $0.00 | $32.00 | $32.00 |
| 92 | Sep 28, 2026 | $0.00 | $32.00 | $32.00 |
| 93 | Oct 28, 2026 | $0 00 | $32 00 | $32 00 |
| 94 | Nov 28, 2026 | $0.00 | $32.00 | $32.00 |
| 95 | Dec 28, 2026 | $0.00 | $32.00 | $32.00 |
| 96 | Jan 28, 2027 | $0.00 | $32.00 | $32.00 |

Pls.' Ex. 35
P. 860
ID: REDACTED 0861 Signed: 2019-02-22T11:20:01-06:00

| 97 | Feb 28, 2027 | $0.00 | $32.00 | $32.00 |
| 98 | Mar 28, 2027 | $0.00 | $32.00 | $32.00 |
| 99 | Apr 28, 2027 | $0.00 | $32.00 | $32.00 |
| 100 | May 28, 2027 | $0.00 | $32.00 | $32.00 |
| 101 | Jun 28, 2027 | $0.00 | $32.00 | $32.00 |
| 102 | Jul 28, 2027 | $0.00 | $32.00 | $32.00 |
| 103 | Aug 28, 2027 | $0.00 | $32.00 | $32.00 |
| 104 | Sep 28, 2027 | $0.00 | $32.00 | $32.00 |
| 105 | Oct 28, 2027 | $0.00 | $32.00 | $32.00 |
| 106 | Nov 28, 2027 | $0.00 | $32.00 | $32.00 |
| 107 | Dec 28, 2027 | $0.00 | $32.00 | $32.00 |
| 108 | Jan 28, 2028 | $0.00 | $32.00 | $32.00 |
| 109 | Feb 28, 2028 | $0.00 | $32.00 | $32.00 |
| 110 | Mar 28, 2028 | $0.00 | $32 00 | $32 00 |
| 111 | Apr 28, 2028 | $0.00 | $32.00 | $32.00 |
| 112 | May 28, 2028 | $0.00 | $32.00 | $32.00 |
| 113 | Jun 28, 2028 | $0.00 | $32.00 | $32.00 |
| 114 | Jul 28, 2028 | $0.00 | $32.00 | $32.00 |
| 115 | Aug 28, 2028 | $0.00 | $32.00 | $32.00 |
| 116 | Sep 28, 2028 | $0.00 | $32.00 | $32.00 |
| 117 | Oct 28, 2028 | $0 00 | $32 00 | $32.00 |
| 118 | Nov 28, 2028 | $0.00 | $32.00 | $32.00 |
| 119 | Dec 28, 2028 | $0.00 | $32.00 | $32.00 |
| 120 | Jan 28, 2029 | $0.00 | $32.00 | $32.00 |
| 121 | Feb 28, 2029 | $0.00 | $32.00 | $32.00 |
| 122 | Mar 28, 2029 | $0.00 | $32.00 | $32.00 |
| 123 | Apr 28, 2029 | $0.00 | $32.00 | $32.00 |
| 124 | May 28, 2029 | $0 00 | $32 00 | $32 00 |
| 125 | Jun 28, 2029 | $0.00 | $32.00 | $32.00 |
| 126 | Jul 28, 2029 | $0.00 | $32.00 | $32.00 |
| 127 | Aug 28, 2029 | $0.00 | $32.00 | $32.00 |
| 128 | Sep 28, 2029 | $0.00 | $32.00 | $32.00 |
| 129 | Oct 28, 2029 | $0.00 | $32.00 | $32.00 |
| 130 | Nov 28, 2029 | $0.00 | $32.00 | $32.00 |
| 131 | Dec 28, 2029 | $0.00 | $32.00 | $32.00 |
| 132 | Jan 28, 2030 | $0.00 | $32.00 | $32.00 |
| 133 | Feb 28, 2030 | $0.00 | $32.00 | $32.00 |
| 134 | Mar 28, 2030 | $0.00 | $32.00 | $32.00 |
| 135 | Apr 28, 2030 | $0.00 | $32.00 | $32.00 |
| 136 | May 28, 2030 | $0.00 | $32.00 | $32.00 |
| 137 | Jun 28, 2030 | $0.00 | $32.00 | $32.00 |
| 138 | Jul 28, 2030 | $0.00 | $32.00 | $32.00 |
| 139 | Aug 28, 2030 | $0 00 | $32 00 | $32 00 |
| 140 | Sep 28, 2030 | $0.00 | $32.00 | $32.00 |
| 141 | Oct 28, 2030 | $0.00 | $32.00 | $32.00 |
| 142 | Nov 28, 2030 | $0.00 | $32.00 | $32.00 |
| 143 | Dec 28, 2030 | $0.00 | $32.00 | $32.00 |
| 144 | Jan 28, 2031 | $0.00 | $32.00 | $32.00 |
| 145 | Feb 28, 2031 | $0.00 | $32.00 | $32.00 |
| 146 | Mar 28, 2031 | $0 00 | $32 00 | $32 00 |
| 147 | Apr 28, 2031 | $0.00 | $32.00 | $32.00 |

ID REDACT 0861 Signed: 2019-02-22T11:20:01-06:00

| 148 | May 28, 2031 | $0.00 | $32.00 | $32.00 |
| 149 | Jun 28, 2031 | $0.00 | $32.00 | $32.00 |
| 150 | Jul 28, 2031 | $0.00 | $32.00 | $32.00 |
| 151 | Aug 28, 2031 | $0.00 | $32.00 | $32.00 |
| 152 | Sep 28, 2031 | $0.00 | $32.00 | $32.00 |
| 153 | Oct 28, 2031 | $0.00 | $32.00 | $32.00 |
| 154 | Nov 28, 2031 | $0.00 | $32.00 | $32.00 |
| 155 | Dec 28, 2031 | $0.00 | $32.00 | $32.00 |
| 156 | Jan 28, 2032 | $0.00 | $32.00 | $32.00 |
| 157 | Feb 28, 2032 | $0.00 | $32.00 | $32.00 |
| 158 | Mar 28, 2032 | $0.00 | $32.00 | $32.00 |
| 159 | Apr 28, 2032 | $0.00 | $32.00 | $32.00 |
| 160 | May 28, 2032 | $0.00 | $32.00 | $32.00 |
| 161 | Jun 28, 2032 | $0 00 | $32 00 | $32 00 |
| 162 | Jul 28, 2032 | $0.00 | $32.00 | $32.00 |
| 163 | Aug 28, 2032 | $0.00 | $32.00 | $32.00 |
| 164 | Sep 28, 2032 | $0.00 | $32.00 | $32.00 |
| 165 | Oct 28, 2032 | $0.00 | $32.00 | $32.00 |
| 166 | Nov 28, 2032 | $0.00 | $32.00 | $32.00 |
| 167 | Dec 28, 2032 | $0.00 | $32.00 | $32.00 |
| 168 | Jan 28, 2033 | $0.00 | $32 00 | $32 00 |
| 169 | Feb 28, 2033 | $0.00 | $32.00 | $32 00 |
| 170 | Mar 28, 2033 | $0.00 | $32.00 | $32.00 |
| 171 | Apr 28, 2033 | $0.00 | $32.00 | $32.00 |
| 172 | May 28, 2033 | $0.00 | $32.00 | $32.00 |
| 173 | Jun 28, 2033 | $0.00 | $32.00 | $32.00 |
| 174 | Jul 28, 2033 | $0.00 | $32.00 | $32.00 |
| 175 | Aug 28, 2033 | $0 00 | $32 00 | $32 00 |
| 176 | Sep 28, 2033 | $0.00 | $32.00 | $32.00 |
| 177 | Oct 28, 2033 | $0.00 | $32.00 | $32.00 |
| 178 | Nov 28, 2033 | $0.00 | $32.00 | $32.00 |
| 179 | Dec 28, 2033 | $0.00 | $32.00 | $32.00 |
| 180 | Jan 28, 2034 | $0.00 | $32.00 | $32.00 |
| 181 | Feb 28, 2034 | $0.00 | $32.00 | $32.00 |
| 182 | Mar 28, 2034 | $0.00 | $32.00 | $32.00 |
| 183 | Apr 28, 2034 | $0.00 | $32.00 | $32.00 |
| 184 | May 28, 2034 | $0.00 | $32.00 | $32.00 |
| 185 | Jun 28, 2034 | $0.00 | $32.00 | $32.00 |
| 186 | Jul 28, 2034 | $0.00 | $32.00 | $32.00 |
| 187 | Aug 28, 2034 | $0.00 | $32.00 | $32.00 |
| 188 | Sep 28, 2034 | $0.00 | $32.00 | $32.00 |
| 189 | Oct 28, 2034 | $0.00 | $32.00 | $32.00 |
| 190 | Nov 28, 2034 | $0 00 | $32 00 | $32 00 |
| 191 | Dec 28, 2034 | $0.00 | $32.00 | $32.00 |
| 192 | Jan 28, 2035 | $0.00 | $32.00 | $32.00 |
| 193 | Feb 28, 2035 | $0.00 | $32.00 | $32.00 |
| 194 | Mar 28, 2035 | $0.00 | $32.00 | $32.00 |
| 195 | Apr 28, 2035 | $0.00 | $32.00 | $32.00 |
| 196 | May 28, 2035 | $0.00 | $32.00 | $32.00 |
| 197 | Jun 28, 2035 | $0.00 | $32 00 | $32 00 |
| 198 | Jul 28, 2035 | $0.00 | $32.00 | $32.00 |

ID: REDAC 0861 Signed: 2019-02-22T11:20:01-06:00

| | | | | |
|---|---|---|---|---|
| 199 | Aug 28, 2035 | $0.00 | $32.00 | $32.00 |
| 200 | Sep 28, 2035 | $0.00 | $32.00 | $32.00 |
| 201 | Oct 28, 2035 | $0.00 | $32.00 | $32.00 |
| 202 | Nov 28, 2035 | $0.00 | $32.00 | $32.00 |
| 203 | Dec 28, 2035 | $0.00 | $32.00 | $32.00 |
| 204 | Jan 28, 2036 | $0.00 | $32.00 | $32.00 |
| 205 | Feb 28, 2036 | $0.00 | $32.00 | $32.00 |
| 206 | Mar 28, 2036 | $0.00 | $32.00 | $32.00 |
| 207 | Apr 28, 2036 | $0.00 | $32.00 | $32.00 |
| 208 | May 28, 2036 | $0.00 | $32.00 | $32.00 |
| 209 | Jun 28, 2036 | $0.00 | $32.00 | $32.00 |
| 210 | Jul 28, 2036 | $0.00 | $32.00 | $32.00 |
| 211 | Aug 28, 2036 | $0.00 | $32.00 | $32.00 |
| 212 | Sep 28, 2036 | $0.00 | $32.00 | $32.00 |
| 213 | Oct 28, 2036 | $0.00 | $32.00 | $32.00 |
| 214 | Nov 28, 2036 | $0.00 | $32.00 | $32.00 |
| 215 | Dec 28, 2036 | $0.00 | $32.00 | $32.00 |
| 216 | Jan 28, 2037 | $0.00 | $32.00 | $32.00 |
| 217 | Feb 28, 2037 | $0.00 | $32.00 | $32.00 |
| 218 | Mar 28, 2037 | $0.00 | $32.00 | $32.00 |
| 219 | Apr 28, 2037 | $0.00 | $32.00 | $32.00 |
| 220 | May 28, 2037 | $0.00 | $32.00 | $32.00 |
| 221 | Jun 28, 2037 | $0.00 | $32.00 | $32.00 |
| 222 | Jul 28, 2037 | $0.00 | $32.00 | $32.00 |
| 223 | Aug 28, 2037 | $0.00 | $32.00 | $32.00 |
| 224 | Sep 28, 2037 | $0.00 | $32.00 | $32.00 |
| 225 | Oct 28, 2037 | $0.00 | $32.00 | $32.00 |
| 226 | Nov 28, 2037 | $0.00 | $32.00 | $32.00 |
| 227 | Dec 28, 2037 | $0.00 | $32.00 | $32.00 |
| 228 | Jan 28, 2038 | $0.00 | $32.00 | $32.00 |
| 229 | Feb 28, 2038 | $0.00 | $32.00 | $32.00 |
| 230 | Mar 28, 2038 | $0.00 | $32.00 | $32.00 |
| 231 | Apr 28, 2038 | $0.00 | $32.00 | $32.00 |
| 232 | May 28, 2038 | $0.00 | $32.00 | $32.00 |
| 233 | Jun 28, 2038 | $0.00 | $32.00 | $32.00 |
| 234 | Jul 28, 2038 | $0.00 | $32.00 | $32.00 |
| 235 | Aug 28, 2038 | $0.00 | $32.00 | $32.00 |
| 236 | Sep 28, 2038 | $0.00 | $32.00 | $32.00 |
| 237 | Oct 28, 2038 | $0.00 | $32.00 | $32.00 |
| 238 | Nov 28, 2038 | $0.00 | $32.00 | $32.00 |
| 239 | Dec 28, 2038 | $0.00 | $32.00 | $32.00 |
| 240 | Jan 28, 2039 | $0.00 | $32.00 | $32.00 |

Client Signature          *Hildegard Hauser*

Client Printed Name       Hildegard Hauser

Executed on this Date     2/22/19

ID: REDACTED0861 Signed: 2019-02-22T11:20:01-06:00

# Credit Card Authorization Form

I hereby authorize SOUTH COAST FINANCIAL CENTER and/or its third party support servicers to charge my credit card below the Fees pursuant to the Fee and Service Schedule of my Agreement. The Fees will be automatically processed in accordance with the Draft Schedule of my Agreement.

I authorize Company to charge my credit card in accordance with the Draft Schedule of my Agreement for services prov pursuant to my Agreement. No additional charges are authorized. I understand that charges declined by the credit card is could constitute ground for cancellation of Company's document preparation services.

================================================================

Please complete all of the following information.

Your account cannot be processed if incomplete.

Check the type of credit card: MC  X  VISA Discover AMEX

Credit Card Number: REDACTED

Expiration Date: Redacted

Security (CVC) Code: REDACTE

Name of Credit Card Holder (exactly as it appears on the card): HILDEGARD HAUSER

Billing Address: REDACTED

City: MINNEAPOLIS

State: MN

Zip Code: REDACTED

Signature of Credit Card Holder: *Hildegard Hauser*

Date: 2/22/19

# Special Limited Power of Attorney

To: Any and all of my Student Loan Creditors

I hereby duly authorize, empower, and appoint SOUTH COAST FINANCIAL CENTER, its representatives, designated agents, and/or employees, and third-party support servicers to perform any acts necessary or convenient, including but not limited to, the following on my behalf:

1.      Communicate with any and/or all of my Federal Student Loan providers and their servicing agencies to obtain information on my student loans.

2.      Communicate with banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans, including but not limited to the balance of my account, payment history, verification of the account, financial adjustments, and any and all necessary communications, correspondence, and negotiations regarding my account(s). I assert that all of the information that I have provided and will provide SOUTH COAST FINANCIAL CENTER is true and accurate.

I hereby duly authorize third-party communication from banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans to communicate directly with SOUTH COAST FINANCIAL CENTER concerning my account or the collection activities associated with it, in accordance with Section 805 (b) of the Fair Debt Collection Practices Act. I further request that all of my lenders direct all further telephone calls and correspondence to:

SOUTH COAST FINANCIAL CENTER

(855) 877-4831

Any and all communications directed to me will be referred to SOUTH COAST FINANCIAL CENTER.

I understand that SOUTH COAST FINANCIAL CENTER is not a law firm, is not licensed to practice law or provide legal advice, and that I will not request or accept any legal advice from SOUTH COAST FINANCIAL CENTER relating to my personal financial situation.

I understand that any creditor or collection activity, demands, or lawsuits are unrelated to my enrollment in the SOUTH COAST FINANCIAL CENTER program

I agree that electronic or facsimile copy signature shall be deemed original and is an authorization by me for all lawfully enforceable purposes.

This Special Limited Power of Attorney shall remain in force until or unless modified or rescinded in writing, or upon resolution of the current matter.

This Special Limited Power of Attorney:

| | |
|---|---|
| Client Signature | *Hildegard Hauser* |
| Client Printed Name | Hildegard Hauser |
| Executed on this Date | 2/22/19 |

Pls.' Ex. 35
P. 865
ID: REDACTED 0861 Signed: 2019-02-22T11:20:01-06:00

## National Student Loan Data System Access Permission

**Purpose:**     For SOUTH COAST FINANCIAL CENTER to access your student loan information from government websites.

**Reason**:       For SOUTH COAST FINANCIAL CENTER to obtain accurate information relating to your student loa application purposes.

**What I Need to Do:**     As the Debtor who is responsible for these loans, you need to create an online User Name and Password  The U S  Department of Education recommends that you keep your User Name and Password secure to preve any fraudulent use. The purposes of the User Name and Password is to permit you access to various government website allow you to sign electronically on any applications. There are other purposes as well, so please keep your information s

**Why We May Request Your User Name and Password:**   We need to carry out the application services that you have requested of us, which may require your User Name and Password. We will only your User Name and Password with yc permission and instruction  We will keep your User Name and Password secure, and we will never share it with third pa We may need this information to complete our contracted services, including gathering the relevant pending loan inform pertaining to you, and completing the applications that you qualify for. While the government does not encourage such s because they want to prevent fraud and abuse, with your consent and instruction we are permitted to review and assist yo the services you have requested of us. We will never use this information to sign or submit applications for you  you must do that on your own.

**Authorization:**     As part of the federal student loan assistance application process, it may be necessary for us to access student loan information within the Student Loan Data System located online at http://www.nslds.ed.gov.

The Data System contains a complete list of your federal education loans, along with current estimated balances and serv details– information that is required to complete your application(s).

By enrolling in Company program, you are agreeing to allow Company, its representatives, designated agents, and/or employees, and third party support servicers to access your profile and all the data contained within that profile. In order t allow this access, you may need to provide Company with your User Name and Password.

Please note that all information that Company obtains from the Student Loan Data System will be used expressly for the purposes of confirming information and assisting in the preparation of your application(s).

**Acknowledgment:**    I hereby acknowledge that I have read, understood, and agree to the above statements regarding ac to my National Student Loan Data System profile. I understand that any information received or accessed will be used so the purposes as stated above.

By signing this acknowledgment, I instruct, agree, and expressly permit Company to access the National Student Loan D System and my personal profile as explained above.

This National Student Loan Data System Access Permission

| | |
|---|---|
| Client Signature | *Hildegard Hauser* |
| Client Printed Name | Hildegard Hauser |
| Executed on this Date | 2/22/19 |

Pls.' Ex. 35
P. 866
ID: ⬛0861 Signed: 2019-02-22T11:20:01-06:00

| | |
|---|---|
| **Facts:** | WHAT DOES SOUTH COAST FINANCIAL CENTER ("Company") DO WITH YOUR PERSONAL INFORMATION? |
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include: <br><br> • Social Security number and income <br> • Account balances and account numbers <br> • Transaction or loss history and employment information <br><br> When you are *no longer* our customer, we continue to share your information as described in this notice. |
| **How?** | All financial companies need to share customers' personal information to run their everyday business.  In the section below, we list the reasons financial companies can share their customers' personal information; the reasons SOUTH COAST FINANCIAL CENTER chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Do we share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes**– such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes** – to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | No | We don't share |
| **For our affiliates' everyday business purposes** information about your transactions and experiences | Yes | No |
| **For our affiliates everyday business purposes** – information about your creditworthiness | No | We don't share |
| **For non-affiliates to market to you** | Yes | Yes |
| **Questions?** | https://www.southcoastfinancialcenter.com/ | |

Pls.' Ex. 35
P. 867
ID: REDACTED 0861 Signed: 2019-02-22T11:20:01-06:00

| Who we are | |
|---|---|
| **Who is providing this notice?** | SOUTH COAST FINANCIAL CENTER |

| What we do | |
|---|---|
| **How do we protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safe guards and secured files and buildings<br><br>We also maintain physical, electronic and procedural safe guards such as computer virus protection software, firewalls, and a 128 bit Secure Socket Layer. Only authorized employees have access. |
| **How do we collect my personal information?** | We collect your personal information, for example when you<br>-Give us your income information<br>-Provide employment information<br>-Provide account information<br>-Give us your contact information<br>We also collect your personal information from other companies |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>-Sharing for affiliates' everyday business purposes-information about your creditworthiness<br>-Affiliates from using your information to market to you<br>-Sharing for non-affiliates o market to you<br>State laws and individual companies may give you additional rights to limit sharing |

| Definition | |
|---|---|
| **Affiliates** | Financial and non-financial companies related by common ownership or control.<br><br>   • SOUTH COAST FINANCIAL CENTER does not share with our affiliates |
| **Non-affiliates** | Financial and non-financial companies not related by common ownership or control.<br><br>   • SOUTH COAST FINANCIAL CENTER does not share with non-affiliates so they can market to you. |
| **Joint Marketing** | A formal agreement between non-affiliated financial companies that together market financial products or services to you<br><br>   • SOUTH COAST FINANCIAL CENTER doesn't jointly market. |

| Other Important Information |
|---|
| **For California and Vermont Residents** We will not share information we collect about you with non-affiliated third parties, except as permitted by California or Vermont law, respectively, such as to process your transactions or to maintain your account. |

# E-Signature Completion Certificate

| | |
|---|---|
| **Document ID** | REDAC0861 |
| **Document GUID** | bc2226670492c8b95695ebb0ba76632c |
| **Document Title** | Client Agreement - South Coast Financial Center |
| **Sender IP** | Redacted |
| **Number of Signers** | 1 |
| **Signer Email** | REDACTED |
| **Signer IP** | Redacted |
| **Timestamp** | 2019-02-22T11:20:01-06:00 |
| **Document Hash** | d41d8cd98f00b204e9800998ecf8427e |

## Document Audit

- Sent at 2019-02-22T11:14:56-06:00 from IP Redacted
- Delivered to REDACTED at 2019-02-22T11:15:47-06:00 from Redacted
- Adopted Signature at 2019 02 22T11 16 14 06 00 from Redacted
- Completed Signing at 2019-02-22T11:20:01-06:00 from Redacted
- PDF Generated at 2019-02-22T11:20:01-06:00

## User Agent

Mozilla/5.0 (Macintosh; Intel Mac OS X 10_14_3) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0.3 Safari/605.1.15