# Plaintiffs' Exhibit 89

Sanjay Bhandari (SBN 181920)
sbhandari@mcnamarallp.com
Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Temporary Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection; State of Minnesota, by its Attorney General, Keith Ellison; State of North Carolina, *ex rel.* Joshua H. Stein, Attorney General; and The People of The State of California, Michael N. Feuer, Los Angeles City Attorney, | Case No. 8:19-cv-01998-JVS (JDEx) **PRELIMINARY REPORT OF TEMPORARY RECEIVER** JUDGE: Hon. James V. Selna CTRM: 10C |

Plaintiffs,

v.

Consumer Advocacy Center Inc., d/b/a
Premier Student Loan Center; True Count
Staffing Inc., d/b/a SL Account
Management; Prime Consulting LLC,
d/b/a Financial Preparation Services;
Albert Kim, a/k/a Albert King; Kaine
Wen, a/k/a Wenting Kaine Dai, Wen Ting
Dai, and Kaine Wen Dai; and Tuong
Nguyen, a/k/a Tom Nelson,

Defendants, and

Infinite Management Corp., f/k/a Infinite
Management Solutions Inc.; Hold The
Door, Corp.; and TN Accounting Inc.,

Relief Defendants.

Pls.' Ex. 89
P. 1299
CFPB-20221128-00018344

# **TABLE OF CONTENTS**

## **Contents**

I. INTRODUCTION .................................................................................................... 1
II. RECEIVERSHIP ACTIVITIES ......................................................................... 2
    A.    Immediate Access ................................................................................. 2
        1.    15261 Laguna Canyon Rd, Suite 200, Irvine, CA ................ 2
        2.    173 Technology Drive, Suite 202, Irvine, CA ..................... 4
        3.    8 Hughes Parkway, Suite 210, Irvine, CA .......................... 4
    B.    Bank Accounts ..................................................................................... 5
    C.    Documents/Information/Electronic Data ............................................. 6
    D.    Accounting ........................................................................................... 7
    E.    Notice to Consumers ............................................................................ 7
III. DEFENDANTS' PIVOT TOWARD COMPLIANCE IN AUGUST 2019 ........ 7
IV. DEFENDANTS COLLECT UNLAWFUL ADVANCE FEES ....................... 11
    A.    The Law – Telemarketing Sales Rule (16 C.F.R. § 310.4(a)(5)) ...... 11
    B.    Defendants Collect Advance Fees ..................................................... 12
    C.    No Valid Escrow or Trust Procedure ................................................. 12
V. TRUSTED ACCOUNT SERVICES ................................................................. 14
    A.    Defendants Establish Trusted Account Services ............................... 15
        1.    Incorporation ........................................................................ 15
        2.    Website ................................................................................. 16
    B.    Defendants' First Attempt to Secure Payment Processing for
        Trusted Account Services ................................................................... 17
    C.    Defendants Deceive DebtPayPro to Get Trusted Account
        Services on the Platform ..................................................................... 18
    D.    Defendants Purloined Legitimate Third Party Companies'
        Methods and Documents to Establish Trusted Account Services ...... 19
    E.    Defendants Own and Control the Trusted Account Services
        Bank Accounts ................................................................................... 20
    F.    Defendants Arrange Trusted Account Services Payment
        Processing through Jimmy Lai and National Merchant Center ......... 21
    G.    Defendants' Assertion that Trusted Account Services Is a Third
        Party Dedicated Account Provider Is False ....................................... 23
VI. STUDENT LOAN DEBT RELIEF – THE SALES PITCH AND
    PROCESS ............................................................................................................ 25
    A.    Leads .................................................................................................. 26
    B.    Sales Tactics ....................................................................................... 26
    C.    Enrollment Fees ................................................................................. 28
    D.    Customer Service and Processing ...................................................... 29
    E.    Compliance ........................................................................................ 32
    F.    Complaints ......................................................................................... 32
VII. FINANCIAL INFORMATION ....................................................................... 35
VIII. CAN THE BUSINESSES BE OPERATED  LAWFULLY AND
    PROFITABLY? ................................................................................................... 36

Pls.' Ex. 89
P. 1300
CFPB-20221128-00018345

# I.

# INTRODUCTION

I was appointed Temporary Receiver for the business activities of Receivership Defendants True Count Staffing Inc., d/b/a SL Account Management ("True Count") and Prime Consulting LLC, d/b/a Financial Preparation Services ("Prime Consulting") by the Temporary Restraining Order ("TRO") entered October 21, 2019.[1]  Defendant Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center ("CAC"), which is in bankruptcy, is not a Receivership Defendant.  Albert Kim, Kaine Wen, and Tuong Nguyen are named Individual Defendants.

By this Preliminary Report, I convey to the Court my team's preliminary observations and initial actions.

Our onsite review of operations has identified the basic realities of the student loan debt relief business of Receivership Defendants:

- The overall enterprise secured more than 170,000 customers and more than $71 million in gross revenue.  But, 70% of these customers cancelled their enrollments.  *See* Exhibit 1.

- Historically, the sales process to secure consumers with student loan debt relief has included hard sell tactics and misrepresentations prohibited by the TRO which have misled and confused consumers.

- Beginning in late August 2019, Defendants pivoted to a more compliant process, but based on recent documents and consumer

---

[1]  Receivership Defendants are defined in the TRO to mean True Count and Prime Consulting "and their successors, assigns, affiliates, or subsidiaries, and each of them, by whatever names each may be known, provided that the Receiver has reason to believe they are owned or controlled in whole or in part by any of the Receivership Defendants."  *See* TRO, Definitions, pages 6-7.

On October 25, 2019, pursuant to Section XIII(T) of the TRO we gave notice to the parties that First Priority LLC, Horizon Consultants LLC, and TAS 2019 LLC d/b/a Trusted Account Services qualify as Receivership Defendants.  No party has challenged that determination.

---

1

Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

Pls.' Ex. 89
P. 1301
CFPB-20221128-00018346

complaints, this pivot was not comprehensive and, of course, it did not remedy prior unlawful practices.

- Defendants collect consumer fees in advance without complying with the Telemarketing Sales Rule, which renders the entire business unlawful. The August 2019 pivot included representations that fees would be deposited to a "dedicated customer account" at third party Trusted Account Services and only paid out when work was completed. But, this appears to be a new deception designed to create the appearance of a procedure consistent with the Telemarketing Sales Rule "escrow exception" to the advance fee prohibition. Not only is Trusted Account Services not an independent third party, I have determined that it is a Receivership Defendant.

## II.

## RECEIVERSHIP ACTIVITIES

### A. Immediate Access

As authorized by the TRO (Section XIV, page 24), we took control and exclusive custody of Defendants'[2] three business premises in Irvine, California on October 23, 2019, commencing at approximately 10:30 a.m. At each location, we received support from law enforcement officers. After securing each site, we provided access to counsel and other representatives of Plaintiffs and retained locksmiths who changed all exterior locks.

#### 1. 15261 Laguna Canyon Rd, Suite 200, Irvine, CA

This 22,000 square foot space, bearing a nondescript "Prime Consulting" sign, comprises the entire second floor of a two-story building in an upscale office

///

---

[2] "Defendants" means collectively the Corporate Defendants, Individual Defendants and Relief Defendants, individually, collectively, or in any combination. TRO, Definitions at p. 6.

Pls.' Ex. 89
P. 1302
CFPB-20221128-00018347

park.  Prime Consulting is the lessee at a monthly rent of approximately $65,000.
Exhibit 2 is a schematic of the space and an inventory of the property on site.

At our arrival, we encountered an active operation with approximately 130 personnel on site, many of whom appeared to be either brand new hires commencing training or prospects on site for job interviews.  None of the Individual Defendants were present.

Given the large number of people, many with minimal history with the business, it was a challenge to assemble them as a group and secure their cooperation.  While several supervisors were on site, they were not cooperative; they did not assist during our effort to explain the receivership situation and secure TRO-required questionnaires from employees.[3]  We ultimately imposed order, secured questionnaires from those employees who were cooperative, and met with a small number of sales personnel.

The premises are built out to support a large telephone sales operation.  The open floor space includes nearly 150 individual workstations equipped with telephones, computers, and monitors and organized in a pod-type system with each pod housing 12-15 sales workstations and one team leader.  At our arrival, 97 workstations appeared to be currently active.  The walls are adorned with multiple big screen TVs and the usual accoutrements of sales boiler rooms, including white boards tracking the daily "closings" of each sales agent, motivational sales posters, and instructions to "close" the sale.  *See* Section VI below for a summary of the sales operation.

The space also includes a large conference room, eleven interior offices,[4]

_____

[3]  Two of the supervisors who refused to cooperate and complete questionnaires – Compliance Manager Nicole Balestreri and HR Director Shirena Hulzar – did, however, file declarations in connection with Defendants' opposition to a Preliminary Injunction.

[4]  The interior offices are allocated to Human Resources (2), Training (4), the Floor Manager and his staff (2), a Compliance Manager, Information Technology, and Marketing.  The marketing office is occupied by Pub Club Leads, allegedly a third

3                    Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

and four exterior offices.[5]

## 2. 173 Technology Drive, Suite 202, Irvine, CA

This suite of approximately 15,000 square feet is subleased by Defendant CAC from a neighboring company at a monthly rent of approximately $18,000.

The site has capacity for nearly 120 staff with 4 individual exterior offices. At our arrival, approximately 60 employees were on site: 2 managers (the Customer Support Manager and the head of "Junior Processing"); 10-15 members of the Customer Service team; 10-15 members of the Junior Processing Team; and 30 temporary employees, just recently hired for the reverification campaign described below. Two other managers (Adon Janse and Isabel Banda) with offices at this site were both at the Hughes location, conducting hiring and training of temporary employees for the reverification campaign.

Nearly all employees at this site were cooperative, completed questionnaires, and responded to our questions.

Exhibit 3 is a schematic of the office and an inventory of the property on site.

## 3. 8 Hughes Parkway, Suite 210, Irvine, CA

This site is an approximately 10,000 square foot suite in a two-story building in an office park leased by True Count at a monthly rate of approximately $10,000. A small sign for "SL Account Management" is posted on the front door.

About a dozen people were present – most were temporary staff from AppleOne, a staffing agency regularly used by Receivership Defendants, on their first day of training for the reverification campaign.

The suite consists of seven rooms built out along the windows (only one in

_____

party firm to which Defendants have subcontracted advertising and lead generation.

[5] The exterior offices are allocated to operations/accounting (with 9 workstations), employee Le Ho (aka Calvin Ho) and one office each to Individual Defendants Tuong Nguyen (aka Tom Nelson) and Albert Kim.

Pls.' Ex. 89
P. 1304
CFPB-20221128-00018349

active use) and a large open area with approximately 120 cubicles (almost all of which were out of use).[6, 7]

Exhibit 4 is a schematic of the space and an inventory of the property on site.[8]

## B. Bank Accounts

Immediately after receiving the TRO, Plaintiffs and the Receiver served the asset freeze on banks and other financial institutions where Defendants were known to maintain accounts. In the brief time since the TRO was entered, we have received the following information as to frozen accounts:

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| First Priority LLC | JPMorgan Chase Bank | 8566 | $159,457.33 |
| First Priority LLC | Sunwest Bank | 0992 | $4,534.25 |
| Hold The Door Corp. (Relief Defendant) | Wells Fargo | 7284 | $53,634.41 |
| Horizon Consultants LLC | Sunwest Bank | 1069 | $707,127.02 |
| Infinite Management Corp. | JPMorgan Chase Bank | 3880 | $40,628.40 |
| Prime Consulting LLC | JPMorgan Chase Bank | 0325 | $517,412.78 |
| Prime Consulting LLC | Sunwest Bank | 1026 | $10,000.00 |
| TAS 2019 LLC | HSBC Bank USA | 3327 | $2,870,097.75 |
| TAS 2019 LLC | HSBC Bank USA | 0413 | $3,096.99 |

---

[6] One of the rooms was set up as a training room and was in use when we arrived. Another office was occupied by Ms. Banda (HR), and another appeared to be in occasional use by IT personnel. The rest seemed to be unoccupied. Nearly all the cubicles were equipped with computer monitors, but many lack an actual computer, and appear to have been out of use for some time.

[7] Both IT personnel (Keneth Hu and Mr. Vu) listed 8 Hughes as their principal office, but Mr. Hu told us that IT had offices in each location, and determined where they would spend each day based on the support requests it needed to address. Next to the IT office in the corner of 8 Hughes, we found a room containing a large rack of computer equipment apparently running bitcoin mining computations as a personal hobby of Mr. Hu. With Mr. Hu's consent, we turned that equipment off.

[8] At all three locations, we observed thousands of unopened letters from various student loan servicers and the Department of Education addressed to customers but sent to Defendants' various mail drops.

---

Pls.' Ex. 89
P. 1305
CFPB-20221128-00018350

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| TN Accounting Inc. (Relief Defendant) | JPMorgan Chase Bank | 7163 | $18,461.53 |
| True Count Staffing Inc. | BNY Mellon | 2000 | $2,824.83 |
| True Count Staffing Inc. | JPMorgan Chase Bank | 1126 | $8,887.95 |
| True Count Staffing Inc. | Sunwest Bank | 2499 | $364,355.56 |
| True Count Staffing Inc. | Wells Fargo | 7276 | $1,500.00 |
| **TOTAL** | | | **$4,762,018.80** |

## C.    Documents/Information/Electronic Data

Upon taking possession of each of the three offices, we confirmed the hard copy documents onsite were secure. We retained a computer forensic firm to supervise Plaintiffs' computer forensics experts in making images of selected desktop computers.

Receivership Defendants utilize multiple cloud computing services – Microsoft Office 365 for email; Intuit QuickBooks Online for accounting; and DebtPayPro for their customer relationship management database (CRM). Despite some initial difficulty, we ultimately secured access, via the administrative credentials, to most of the email accounts attached to the active domains[9] and to QuickBooks Online for most of the Receivership Defendants.[10] DebtPayPro immediately suspended the CRM accounts.[11]

_____

[9] slaccountmgmt.com, financialpreparationservices.com, processingsupport.com, and studentservicesplus.com.

[10] We do not yet have QuickBooks access for Receivership Defendants First Priority, Horizon Consultants, or Trusted Account Services.

[11] DebtPayPro also suspended the CRM database for EDU Doc Support – a related entity identified by Plaintiffs. When EDU Doc Support complained that their account should not be locked, we asked them to provide additional information to determine whether they are a related entity (i.e., owner's name, type of business, location, etc.). To date, EDU Doc Support has not provided any information. Based on a review of their website (www.edudocsupport.com), they also provide student loan debt relief services. Until EDU Doc Support demonstrates that they are not related to the common enterprise, we are not comfortable taking its DebtPayPro account off suspension.

Pls.' Ex. 89
P. 1306
CFPB-20221128-00018351

1    Receivership Defendants employed CallerReady for telephone services.

2    CallerReady's counsel has confirmed they have preserved call recordings and are

3    cooperating with the Receiver.

4    **D.    Accounting**

5    Our forensic accountant, Lisa Jones, is in the process of reviewing available

6    financial records, which include QuickBooks records, bank statements, and

7    merchant account statements for True Count and Prime Consulting.  Based on the

8    information available to date, she has prepared a Receivership Initial Account

9    Records Review report attached as Exhibit 5.  She has confirmed Defendants took

10   in more than $71 million in gross deposits from consumer payments from January

11   2016 to August 2019.  We have also identified accountants who have provided

12   bookkeeping and tax preparation services for Receivership Defendants in the past.

13   We will follow up with them to secure relevant records and tax returns.

14   **E.    Notice to Consumers**

15   We added an outgoing telephone greeting to the Receivership Defendants'

16   telephone numbers noting the suspension of operations and strongly encouraging

17   customers to contact their student loan servicers.  We have also placed a notice on

18   the Receiver's website and will use that as a vehicle to communicate with

19   consumers.

20   **III.**

21   **DEFENDANTS' PIVOT**

22   **TOWARD COMPLIANCE IN AUGUST 2019**

23   As important context for this receivership, we must note Defendants'

24   operation has attracted significant state and federal regulatory attention over the

25   last several years.  Defendants failed to comply with fundamental regulations for

26   telemarketing sales, including the prohibition of advance fees.  Only beginning in

27   August 2019 did Defendants initiate any material changes to their operations and

28   then only after the regulators were knocking at the door.

---

Pls.' Ex. 89
P. 1307
CFPB-20221128-00018352

1    As alleged in Plaintiffs' submissions to the Court and reflected in CAC's

2  bankruptcy filings, Defendants' regulatory exposure was highlighted by a

3  $31 million bankruptcy claim by the State of Minnesota and by the CFPB's

4  issuance on September 10, 2018 of a civil investigative demand ("CID") to

5  Defendant CAC.

6    Around the time of the CID, CAC shifted operations and assets to other

7  Receivership Defendants – the sales operations were transferred to Prime

8  Consulting and the customer base and revenue stream were shifted to True Count.

9  CAC then filed bankruptcy in Florida in January 2019 with the goal, according to

10 the testimony of Individual Defendant Albert Kim, to avoid the regulatory

11 enforcement agencies which were circling.  Because of concerns about false

12 statements in its filings, the bankruptcy court later appointed a trustee over CAC's

13 bankruptcy estate.

14   The CFPB's and the states' investigation of Defendants proceeded despite

15 the bankruptcy.  In July 2019, the CFPB took the investigative testimony of at least

16 two former employees.[12]  Individual Defendants Kaine Wen and Albert Kim were

17 aware of this testimony and they contacted one of the witnesses just before his

18 scheduled appearance.

19   Defendants appear to have reached a tipping point after the *Wall Street*

20 *Journal* published an article highly critical of their practices on August 26, 2019,

21 which was immediately emailed to Individual Defendants Albert Kim and Kaine

22 Wen.  *See* Exhibit 6.

23   A day after the *Wall Street Journal* article ran, management[13] convened an

24 emergency meeting which resulted in a decision to immediately suspend all sales

25

26 _____

[12]  Excerpts of the testimony of these former employees – Maxwell Camp and
27 Jovani Ortoro – are attached as Exhibits 33 and 34 to Plaintiffs' TRO Application.

[13]  This meeting of management included Kaine Wen, Albert Kim, Isabel Banda,
28 Sal Avila, Kenny Nguyen, and Eric Ortiz.

_____

8      Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

Pls.' Ex. 89
P. 1308
CFPB-20221128-00018353

efforts.  Defendants announced to employees that "effective immediately all sales and marketing will be paused until further notice."  The stated purpose of this pause, projected to last approximately three weeks, was that "[d]uring this period the company and each department will work on re-training, compliance, and policies.  In addition, each department will work together to address any and all mistakes on all client files."  *See* Exhibit 7.

The sales pause was broadcast on the Financial Preparation Services website on August 28, 2019.[14]  Human Resources emailed customer service personnel on August 28, 2018 to alert them that there was a new script to follow and instructed them to tell customers as follows:

> "[W]e are upgrading our technology and other systems to ensure that clients have received and continue to receive high-quality services from us.  While our acceptance of new clients has been temporarily put on pause, we are absolutely continuing to work with current clients who have paid at least one installment for our services."

*See* Exhibit 8.[15]

At the outset of the sales pause, management identified prohibited practices that would be subject to a new "zero tolerance" policy.[16]  We located a flyer reciting these new policies posted just outside the "Junior Processing" department

---

[14]  The "ATTENTION ALL CUSTOMERS" notice recited that as of that date Financial Preparation Services "will be integrating new operational changes" and had "decided to temporarily pause our acceptance of new clients while undertak[ing] this integration."  *See* Exhibit 8.

[15]  The email also instructed that customers needing more information be told (1) "We are working on a variety of upgrades, including the way we process payments and other operational processes"; and (2) "Improved quality control to ensure that 100% of our customers received the services that they paid for and are in the right loan modification, repayment, or forgiveness plan."  If a customer wanted to cancel, customer service should "process the cancellation without hesitation."

[16]  These prohibited practices included: Accessing NSLDS (National Student Loan Data System); accessing FSA (Federal Student Aid); changing FS (family size); signing documents on behalf of clients; misrepresentation of the company (Example: we work with the DOE/servicer); submitting clients as unemployed on annual recertifications; and final pay without ROA [release of authorization]/confirmation documents uploaded.  *See* Exhibits 7 and 9.

---

Pls.' Ex. 89
P. 1309
CFPB-20221128-00018354

1  with a character wagging his fingers, "Ah, Ah, Ah, You Didn't Say the Magic

2  Words." *See* Exhibit 9.

3  During this sales pause (August 29, 2019 to September 30, 2019),

4  Defendants took some steps toward compliance, including new sales scripts and

5  training, a reverification campaign, and new claims about not accepting advanced

6  fees. *See* Section VI.E "Compliance" below. A new dba "Student Services Plus"

7  was also launched as Defendants' public face for new customers, replacing

8  Financial Preparation Services which had been featured prominently in the *Wall*

9  *Street Journal* article. The launch of a new dba was consistent with Defendants'

10  practice of deploying multiple generic-sounding business names.[17]

11  The business changes implemented after the *Wall Street Journal* article

12  could fairly be interpreted as a mad scramble to correct illegal practices to stave off

13  potential regulatory, civil, and possibly criminal liability. Or, the changes might be

14  a sincere effort to embrace compliance. But as Receiver, I need not reach a

15  definitive conclusion on such internal motivations, which do not impact my

16  determination, as detailed below, that the Receivership Defendants operated

17  unlawfully even after the August pivot and the businesses cannot operate profitably

18  and lawfully using the assets of the Receivership Estate going forward.

19  With this history as context, we present below a summary of the operations

20  as we found them.

21

22  [17] At the time of immediate access, we found lists identifying employee teams,
each with a different, and very generic, company name including: Premier Student

23  Loan Center; Financial Preparation Services; South Coast Financial Center; Direct
Account Services; Financial Loan Advisors; Account Preparation Services;

24  Administrative Financial; Tangible Savings Solutions; Coastal Shores Financial
Group; First Choice Financial Centre; Administrative Account Services; Primary

25  Account Solutions; Prime Document Services; Financial Accounting Center; Doc
Management Solutions; Sequoia Account Management; Pacific Palm Financial

26  Group; Pacific Shores Advisory; First Document Services; Keystone Document
Center; Administrative Accounting Center; Global Direct Accounting Services;

27  Signature Loan Solutions; Best Choice Financial Center; Yellowstone Account
Services; Regional Accounting Center; and Financial Direct Services. *See*

28  Exhibit 10.

---

10      Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

Pls.' Ex. 89
P. 1310
CFPB-20221128-00018355

# IV.

## DEFENDANTS COLLECT UNLAWFUL ADVANCE FEES

The Telemarketing Sales Rule prohibition of such fees is a significant structural obstacle to this business succeeding as a lawful enterprise. The well-documented policy goal of the advance fee rule is to deter telemarketing opportunists from entering the debt relief business by removing a critical lure of such businesses – instant cash flow from susceptible consumers. Without that cash flow, the financial rationale for the business expires. Even with a TSR-compliant escrow, the impact on cash flow of deferring actual collection until the TSR pre-conditions are met is significant.

Defendants' current position, which is that their collection of advance fees is now lawful because the fees go to dedicated client accounts provided by third-party Trusted Account Services, is an ill-conceived effort to invoke the escrow exception to the TSR's advance fee prohibition.

### A. The Law – Telemarketing Sales Rule (16 C.F.R. § 310.4(a)(5))

The Telemarketing Sales Rule (16 C.F.R. § 310, "TSR") expressly prohibits the collection of advance fees for any debt relief service. *See* 16 C.F.R. § 310.4(a)(5). The full text is complex, but at its core, it prohibits requesting or receiving payment of any fee unless and until (A) the telemarketer has settled at least one debt pursuant to an agreement executed by the customer, and (B) the customer has made at least one payment pursuant to that agreement.

The TSR includes a very narrow exception (the "Escrow Exception") which permits the collection of advance fees if the funds are placed in a dedicated escrow-type account that meets five specific requirements, namely:

- The account is at an insured financial institution;
- The customer owns those funds and is paid accrued interest;
- The account holder is not owned or controlled by the debt relief servicer;

---

11     Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

Pls.' Ex. 89
P. 1311
CFPB-20221128-00018356

- The account holder does not give or accept any referral fees; and
- The customer may withdraw from the debt relief service at any time without penalty and, upon withdrawal, must receive all funds in the account, except for compliant advance fees, within seven days of the withdrawal request.

**B.    Defendants Collect Advance Fees**

Consumer payments for Defendants' services have been and continue to be collected long before any work has been completed or the customer has made a first payment on a new renegotiated plan. During the initial sales call, Defendants acquire the customer's payment information and schedule the first payment, which is generally processed almost immediately after the customer executes the Services Agreement.

The recurring monthly "recertification fee" is by definition collected in advance for 12 months before the annual recertification process even commences.

**C.    No Valid Escrow or Trust Procedure**

In four years of operation, Defendants have not had escrow or trust procedures which could lawfully invoke the TSR's Escrow Exception.[18] Consumer payments have been collected and deposited directly to Defendants' bank accounts. Nearly $71 million have flowed directly to Defendants in this manner.

Despite these immediate deposit procedures, Defendants have for years **falsely** trumpeted the absence of advance fees. A standard "No Advance Fees" provision of the form contract recites: A "third-party dedicated account provider ("DAP") [will be used] to collect and deposit payments that Client has agreed to

---

[18] There are two very minor exceptions. Defendants contracted with third party dedicated account holders Reliant Account Management and Account Management Plus for a very short time. As best we can discern this was done so Defendants could steal these companies' trade practices, methods, and documents. (Discussion below).

Pls.' Ex. 89
P. 1312
CFPB-20221128-00018357

1   make with company . . . and to deposit and hold Client's funds in a trust account

2   established and serviced by the DAP. The DAP will not disburse any Client fees

3   until Client has received a consolidation, adjustment, or otherwise satisfactory

4   result, and Client completes one payment towards such."[19]

5        Now, Defendants have introduced Trusted Account Services into this "No

6   Advance Fees" misrepresentation. The October 21, 2019 Sales Script in use at the

7   time of the TRO proclaims:

8         •  "Our fees will be placed into your own Dedicated Client Account and

9             these funds belong to you at all times. Your dedicated account

10            provider is Trusted Account Services, and they will only release our

11            fees after the Department of Education approves your Income Driven

12            Repayment Program every year." *See* Exhibit 11.

13         •  "As noted earlier on the call, all payments to us will be placed into

14            your Dedicated Client Account. Any time before completion of the

15            work, you can cancel and get your funds back. Your funds will only

16            be released to us after we prove to you and Trusted Account Services

17            that we have completed the work . . . ." *See* Exhibit 11.

18      The "Compliance Call Script" within the Sales Script further recites:

19        "Do you understand that our company does not take any upfront fees, and that your payments to us will be placed

20        into your own Dedicated Client Account for your benefit until we successfully complete our work for you?" If the

21        consumer responds No, then the script continues: "It is very important to us your money is protected. You are

22        making payments for our fees to your own Dedicated Client Account held by a non-related company (like a trust

23        company). Your payments will be released to our company only after the Department of Education accepts

24        your program/plan. That money belongs to you at all times and you can ask for it back prior to completion of

25        our work."

26

27  —————————————

[19] The consumer declarations filed by plaintiffs in connection with the TRO
28  Motion include these underlying contracts. *See, e.g.,* Pl. Exhibit 52, attachment A, p. 1466, para. 4. *See also* Pl. Exhibit 53, attachment A, para. 4.

Pls.' Ex. 89
P. 1313
CFPB-20221128-00018358

*See* Exhibit 11 (emphasis in original). Even if Defendants followed procedures as described in the scripts, they do not comply with the specific requirements of the TSR.[20]

Defendants' fundamental misrepresentation is that a Dedicated Client Account has been set up with a third party: Trusted Account Services. Our investigation has revealed that Trusted Account Services is not a third party, but an appendage of Defendants' operation which is maintained in-house by a very narrow group of insiders. Hence, Trusted Account Services does not provide Defendants cover that they are in compliance with the TSR.

Given the complex history of Defendants' deep deception as to Trusted Account Services, we present below as Section V a summary of Trusted Account Services' formation and implementation based on the materials available to us from the immediate access.

# V.

## TRUSTED ACCOUNT SERVICES

Trusted Account Services (sometimes referred to as TAS) is not an independent third-party provider of dedicated client accounts. Rather, it was created and is beneficially owned and controlled by the Defendants who have closely guarded their ownership secret. The truth was shared with only a handful of Defendants' high-level and trusted employees, who, in turn, relied on internal IT personnel and IT contractors located in Vietnam to build the Trusted Account Services facade.[21]

---

[20] TSR prohibits the release of fees from the consumer's trust account until (A) the telemarketer has settled at least one debt pursuant to an agreement executed by the customer, and (B) the customer has made at least one payment pursuant to that agreement. Defendants' script ignores the one payment requirement, stating that funds will be released "only after Department of Education accepts your program/plan," *not* after the plan has been accepted and one payment has been made as the TSR requires.

[21] Outside the C-suite executives and IT functionaries, employees within Defendants' companies were fed the party line about Trusted Account Services. Despite that, however, some employees we interviewed – who were mid-level

Pls.' Ex. 89
P. 1314
CFPB-20221128-00018359

Because Trusted Account Services is owned and controlled by the Individual Defendants and affiliated with the Receivership Defendants – and indeed is part of the Defendants' student loan debt relief common enterprise – I have determined it is a Receivership Defendant.

Once Trusted Account Services was operational, it was touted as the independent provider of dedicated client accounts for Receivership Defendants, all in an effort to create the appearance of an escrow procedure compliant with the TSR advance fee rule.

### A.    Defendants Establish Trusted Account Services

#### 1.    Incorporation

The Trusted Account Services entity, TAS 2019 LLC ("TAS 2019"), was incorporated on March 20, 2019 as a Wyoming entity through an anonymous process using a local registered agent.  The Wyoming Secretary of State does not provide information beyond the name of the registered agent – this allowed Defendants to conceal their involvement.

The address listed for Trusted Account Services on its website is 109 E. 17th Street Suite 5656, Cheyenne, WY which is simply a virtual office that accepted mail and provided the false appearance of an actual operating company.  The Wyoming virtual office was rented in the name of Trusted Account Services and Kenny Huang and was instructed to forward Trusted Account Services mail to an address in Huntington Beach, CA – 17011 Beach Blvd, Suite 900.  *See* Exhibit 12. The Beach Blvd location is yet another virtual office/mail drop arranged and paid for by Defendants' employees, including operations manager Calvin Ho, in the name of Trusted Account Services and Kenny Huang.  *See* Exhibit 13.

The TAS 2019 incorporation documents we recently secured identify Kenny Huang as the managing member of the LLC.  We believe Kenny Huang is or was

managers and line employees – noted they were suspicious about the independence of Trusted Account Services.

15

Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

Pls.' Ex. 89
P. 1315
CFPB-20221108-00018360

1  an employee of the Defendants or perhaps was simply acting as a "front" for the
2  Defendants in their effort to secure merchant payment processing.[22]  During a
3  phone call with Kenny Huang at 6:12 p.m. on October 30, 2019, I directly asked
4  him if he was the owner of TSA 2019, and he responded "yes" twice, but then
5  would not answer further questions and has not responded to our several calls since
6  then.

7          2.     Website

8          On March 20, 2019, Defendants also registered a website –
9  trustedaccountservices.com.  Although the domain is registered anonymously with
10  internet domain registrar GoDaddy, our investigation indicates that Defendants
11  control the Trusted Account Services server and website.  We discovered
12  correspondence between Defendants' employees Calvin Ho and Thein Nguyen
13  discussing, evaluating and revising the initial content for this website.  We also
14  located the GoDaddy and TAS domain credentials (username and password) in
15  Individual Defendant Albert Kim's Dropbox.

16          Defendants also controlled the Trusted Account Services email system.  In a
17  Customer Service Manager's workstation, we located the Outlook password for
18  email account studentloanmanagement@trustedaccountservices.com.  *See*
19  Exhibit 14.  That email mailbox was only recently created (October 13th), but had
20  already received several hundred emails from customers.  Although they were
21  addressed to a Trusted Account Services account, these emails were regularly
22  reviewed and responded to by Defendants' employees.

23
24  [22]  We found an IRS W-4 form completed in the name of Kenny Huang at
   Defendants' Laguna Canyon office.  Trusted Account Services merchant account
25  application documents purportedly completed by Kenny Huang reflect he is
   employed by the U.S. Department of Labor.  Regardless of where Mr. Huang is
   employed, we believe he was acting as a "front" or nominee used to establish TAS
26  2019, open bank accounts, and most importantly obtain merchant account payment
   processing.  Defendants have used other employees, for example, Keneth Hu
27  (discussed below), to act as "front" for Defendants' merchant account applications.
   In Mr. Hu's case, he opened a Horizon Consultants LLC d/b/a Premier Student
28  Loan Center merchant account.

**B.  Defendants' First Attempt to Secure Payment Processing for Trusted Account Services**

In February 2019, even before the Trusted Account Services name had been selected, Defendants sought a payment processing vendor for the new venture. They began discussions with Donald Cook, a broker who seems to cater to high-risk clients.  On February 26, Cook told the Individual Defendants Wen and Nguyen and senior employee Calvin Ho that he could secure processing services, but warned they needed a third party intermediary for client funds.  *See* Exhibit 15.[23]

Not long after the entity was incorporated, Kaine Wen (copying the other Individual Defendants and Calvin Ho) notified Donald Cook that TAS 2019 LLC would be the processing applicant with Kenny Huang as the owner.  *See* Exhibit 18.  Cook responded by email to Kenny Huang (who Mr. Cook understood was an employee of the Defendants) with more requests for information.  In response, Kaine Wen, who had been copied on the email, forwarded Cook's requests to his operations manager Calvin Ho to complete (which he did).[24]  While he was able to secure some payment processing for Defendants, Cook terminated the relationship after a falling out with Defendants.  As a result, Trusted Account Services was left without payment processing capability, but the void was later filled by Jimmy Lai – a long-time associate of the Defendants, discussed below.

///

///

---

[23]  A few days later, on March 3, Calvin Ho emailed the Individual Defendants a flow chart for a new "DAP" [dedicated account provider] intermediary, Exhibit 16, and on March 11, he emailed his technical team a list of desired functions for the DAP intermediary, **which for the first time he identifies as Trusted Account Services**.  Exhibit 17.

[24]  Kenny Huang was purported to be using the email TAS2019@gmail.com, but in fact Kaine Wen actually controlled that email account and used it frequently (posing as Kenny Huang) in communications with vendors.

Pls.' Ex. 89
P. 1317
CFPB-20221128-00018362

**C. Defendants Deceive DebtPayPro to Get Trusted Account Services on the Platform**

For Trusted Account Services to function, it had to be integrated with Defendants' customer relation management (CRM) software, provided by DebtPayPro. Kaine Wen along with Calvin Ho orchestrated a ruse to get Trusted Account Services accepted and integrated in the DebtPayPro CRM database. They went to great lengths to posture Trusted Account Services as a real and independent company, including creating fictional characters to interact with DPP via email and over the telephone.

On May 1, 2019, Kaine Wen emailed DebtPayPro's support team, writing:

> "Please provide detailed answers and explanations to the following questions from Trusted Account Services. *We are testing out their dedicated account provider services (same services as Reliant Account Management or Account Management Plus)*. Thank you in advance.
> *1. How can we integrate with DPP?*
> *2. Do you have any document that details what information we need to receive from DPP's end or pass to DPP from our end?*
> *3. Do you have any API to use for integration?*
> *4. How can we manage the transactions and clients between our systems and DPP?"*

*See* Exhibit 19 (emphasis added)

The questions posed by Kaine Wen did not, however, originate from Trusted Account Services, but were crafted by Defendants' IT employee[25] who had been tasked to integrate Trusted Account Services into the DebtPayPro platform. *See* Exhibit 20.

Kaine Wen created these questions and the lead-in to them to paint the mirage of Trusted Account Services as a separate company. When DebtPayPro support staff followed up with a request for the company's website and the name of a direct contact there, Calvin Ho responded with a link to the website

---

[25] We believe the Vietnam company, Processing Service Co., Ltd., is owned by Calvin Ho's mother. It received nearly $600,000 from Horizon Consultants.

18     Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

Pls.' Ex. 89
P. 1318
CFPB-20221128-00018363

(https://trustedaccountservices.com) and an email address (technicalsupport@tasportal.com). *See* Exhibit 19. DebtPayPro support then asked, "[i]s there a person there you've been working with that I can ask reach [*sic*] out to specifically?" *Id.* Calvin Ho responded with a name: Michael Tabin (michaelt@trustedaccountservices.com) whose signature listed him as Trusted Account Services' Chief Technology Officer. *Id.* We believe, however, that "Michael Tabin" is a fictional name invented by Kaine Wen and Calvin Ho to deal with DebtPayPro.

On May 23, Ho emailed the group – addressing both DebtPayPro and "Michael" – to ask how the integration was proceeding and when Defendants could begin using Trusted Account Services. *Id.* DebtPayPro responded that they were still reviewing the API documentation and drafting a scope of work proposal and quote. *Id.* Throughout the email chain with DebtPayPro, Wen and Ho maintained the deception that they were Trusted Account Services. Trusted Account Services was ultimately accepted by DebtPayPro – which gave Defendants the ability to process consumer payments through Trusted Account Services on the DebtPayPro platform.

**D.** **Defendants Purloined Legitimate Third Party Companies' Methods and Documents to Establish Trusted Account Services**

Our review also revealed that in establishing Trusted Account Services, Defendants just copied the methods, operations and documents of other such providers like Reliant Account Management ("RAM") and Account Management Plus ("AMP"). Defendants had their IT contractor in Vietnam copy wholesale the practices and documents (generally word-for-word) of RAM and AMP which were then only slightly modified and rebranded as Trusted Account Services materials. We located in Defendants' team management software, Monday.com (which is used to monitor IT and operations projects), a project associated with the creation of Trusted Account Services. The Defendants' Monday.com platform includes

1   tasks such as "Figure AMP's services charges to find a processing comp for TAS"

2   and "Create a new agreement based on RAM Authorization Form," as well as

3   "Build database for TAS" and "Revise TAS Contents."  *See* Exhibit 21.[26]  This

4   "creative" history demonstrates that Trusted Account Services was hatched by

5   Defendants, complete with intellectual property thievery.

6   **E.   Defendants Own and Control the Trusted Account Services Bank**

7   **Accounts**

8   Defendants opened Trusted Account Services bank accounts at HSBC Bank

9   shortly after TAS 2019 was incorporated.  While we have not yet received a

10  fullsome response from HSBC, we found the following documents at the Laguna

11  Canyon offices which show Defendants own and control these HSBC accounts:

- An HSBC account statement for Trusted Account Services for
  September/October 2019 was found in a back corner office (where
  Defendants' operations/accounting were located).

- Two large packages of Trusted Account Services HSBC business
  checks were found in a safe in the same office.  Although Kenny
  Huang is the signatory on the account, the checks were mailed to the
  home address of Defendants' accounting employee, Thu Quach.  Ms.
  Quach labeled the two accounts as an operating account and a client
  funds account.

- One sheet of checks were pre-signed via a signature stamp in the
  name of Kenny Huang.  *See* Exhibit 22.  We later found the stamp in
  the safe in Ms. Quach's office.

---

[26]  Notably, Defendants contracted with both RAM and AMP for a short period of time.  For example, Defendants entered into a contract in November 2018 with RAM, but the relationship terminated in roughly March of 2019 – Defendants having used RAM for only a couple of dozen customers (out of the Defendants' roughly 50,000 active customers).  But in doing so, Defendants learned the methods of these third party dedicated account provider companies and accessed their agreements and contracts which the Defendants promptly plagiarized.

---

Pls.' Ex. 89
P. 1320
CFPB-20221128-00018365

- We also found Costco receipts, dated September 10, 2019, for two orders of Trusted Account Services HSBC checks. The checks had been mailed to Ms. Quach's home.

- The address on the checks is the Beach Blvd. virtual office for Trusted Account Services, which was opened under Kenny Huang's name but which Defendants arranged.

**F.  Defendants Arrange Trusted Account Services Payment Processing through Jimmy Lai and National Merchant Center**

Once Defendants integrated Trusted Account Services into the DebtPayPro platform, they still needed a payment processing vendor. Defendants had been on alert for payment processing options for several months. *See* Exhibit 23. When the arrangement with Donald Cook fell apart, the Defendants went back to Jimmy Lai, who, like Cook, acts as a middle man between high-risk merchants and payment processors.[27] He has worked with Defendants on numerous occasions to secure payment processing for their various entities.

Defendants did not have to present an elaborate charade of Trusted Account Services' independence with Jimmy Lai. Lai was in on the lie. He understood that Defendants owned and controlled TAS 2019 and that Kenny Huang was a front. He had worked with Defendants for years and, in fact, had previously executed nearly this exact "front" scam with Defendants.

In late 2018, Lai worked with Individual Defendants Wen and Nguyen to use a front – this time Keneth Hu, an IT employee of Defendants – to apply for a merchant processing account in the name of Horizon Consultants LLC d/b/a Premier Student Loan Center. Hu claimed to be the 100% owner of Horizon Consultants for purposes of the application – but all involved understood that

---

[27]  In this instance it is unclear whether Lai was acting as a broker or as an employee of National Merchant Center, as we see that he uses a National Merchant email address in connection with Trusted Account Services.

Pls.' Ex. 89
P. 1321
CFPB-20221128-00018366

1    Defendants own and control the company.  When the application was finalized – in
2    Keneth Hu's name and containing all of his personal information – Lai sent it to
3    Individual Defendants Wen and Nguyen, not Hu, with a note: "Please review for
4    accuracy, sign and return."  Kaine Wen then forwarded the application on to Hu
5    with instructions, "Please sign on page 6 (twice) and page 7."  *See* Exhibit 24.
6    Horizon Consultants' merchant application was approved and it proceeded to run
7    consumer charges through the account.  *See* Exhibit 25.

8          Eight months later, Defendants approached Lai about filing another
9    application package using a "front" – this time for Trusted Account Services.  Lai
10   was happy to oblige.  On June 19, Lai submitted an application for TAS 2019 with
11   National Merchant Center with Kenny Huang as the "front" – listed as the 100%
12   owner.  *See* Exhibit 26.  Six days later, the associate director of underwriting wrote
13   to Lai and identified a number of holes in the application.  Lai simply forwarded
14   the email with a one sentence introduction: "Kaine/Kenny, There are a lot of things
15   missing that we need to obtain before we can send to First Data for review and
16   approval."  *Id.*  The application was revised and submitted on July 1.  *See*
17   Exhibit 27.  Again, Kenny Huang was the "front," listed as the owner of TAS
18   2019.  On July 9, Lai forwarded the final application for signature, listing Kenny
19   Huang as the 100% owner.  But Lai did not send the application to Kenny Huang;
20   he sent it **only** to Kaine Wen with the instruction to "[p]lease execute with Wet
21   Signature."  *See* Exhibit 28.

22         National Merchant Center accepted the application – an application that
23   Kaine Wen, Kenny Huang and Jimmy Lai knew was false.  Processing for Trusted
24   Account Services began on September 12 and by the end of the month more than
25   $800,000 in consumer funds had been processed.  Another $2,000,000 in consumer
26   charges were processed before the TRO was issued.[28]

27   _____
28   [28]  Based upon information contained in the Trusted Account Services portal that
     Defendants' employees control, more than 56,000 separate transactions were
     processed in the roughly six weeks of operation.  Indeed, it appears that all of

                            22        Case No. 8:19-cv-01998-JVS (JDEx)
                          PRELIMINARY REPORT OF TEMPORARY RECEIVER

### G. Defendants' Assertion that Trusted Account Services Is a Third Party Dedicated Account Provider Is False

In Defendants' Response to the Order to Show Cause, they assert that Trusted Account Services is a "third party" which is "a dedicated account provider that provides escrow services" and that "[n]o Defendant or Relief Defendant owns or controls (or has ever owned or controlled) [Trusted Account Services]." Response at pp. 9-10. Each of these assertions is based entirely on the declaration of Jimmy Lai attached to the Response. Mr. Lai's declaration is riddled with extraordinary falsehoods.

As discussed above, Mr. Lai was a long-time payment processing broker for the Defendants and was instrumental on at least two occasions in obtaining merchant accounts for Defendants using "fronts" or nominees, including Trusted Account Services. Nevertheless, Mr. Lai now claims that Trusted Account Services is not, and was never, owned or controlled by any Defendant or Relief Defendant (¶ 6). This claim is belied by substantial evidence as described above. Mr. Lai also claims he is the majority owner of TAS 2019 and has been since September 1, 2019 (¶ 1), and that since his involvement with Trusted Account Services, its connection to Defendants has been limited to software integration (¶ 6). These claims are inconsistent with the facts described above and any number of objective post-September 1, 2019 facts:

- On September 9, 2019, two Merchant Account Change Request Forms for Trusted Account Services were filed with National Merchant Center (a company at which Mr. Lai is or was employed). The owner of Trusted Account Services is listed as Kenny Huang and a signature in that name appears on the forms. *See* Exhibit 29. The

Defendants customers' payment processing was transferred to Trusted Account Services without notice to customers.

---

23     Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

CFPB-20221128-00018368

email listed for Mr. Huang, tas2019llc@gmail.com, is controlled by Kaine Wen.

- A Trusted Account Services voided check was attached to the September 9th Merchant Account Change Request Forms. The address listed on the check is Kenny Huang's home address. *Id.*

- Also included with the Merchant Account Change Request Forms was a letter from HSBC, dated September 9, 2019, reflecting that TAS 2019 and Kenny Huang established a business account with the bank. *Id.*

- On September 10, 2019, Defendants' employees ordered new HSBC Trusted Account Services checks and had them mailed to an employee's home.

- On September 19, 2019, National Merchant Center ran another check on the Wyoming Secretary of State site to confirm that TAS 2019 remained active at the mail drop in Wyoming. *See* Exhibit 30.

- On September 20, 2019, a Trusted Account Services mail drop invoice in the amount of $125 for October 2019 was forwarded to an employee of Defendants for payment.

- National Merchant Center sent a "card processing statement" for the period of September 1 to September 30, 2019 to Kenny Huang at the mail drop in Wyoming. *See* Exhibit 31.

- In early October, National Merchant Center mailed the Trusted Account Services September processing statement to Kenny Huang at the mail drop in Wyoming (the address listed on the Wyoming Secretary of State site). *See* Exhibit 32.

- We located the check stub for the last customer refund check written on the Trusted Account Services HSBC business account at the

---

24     Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

Pls.' Ex. 89
P. 1324
CFPB-20221128-00018369

1    Laguna Canyon office; the check was written on October 4 using a

2    signature stamp in the name of Kenny Huang.

3    • On October 7, 2019, National Merchant Center forwarded the

4    TAS 2019 September statements to Jimmy Lai at his

5    swiftpaymentsinc.com and his nationalmerchant.com addresses.

6    (Again, it is unclear if Mr. Lai continues to work at National

7    Merchant Center.)  Within eight minutes of getting the statements, Lai

8    forwarded them to Defendant Nguyen.  *See* Exhibit 33.

9    • Two days ago, Wednesday, October 30 at 6:12 p.m., in a short

10   telephone call with me, Kenny Huang claimed (twice) that **he owns**

11   TAS 2019.  Mr. Huang asked to see the TRO before having any

12   further conversation.  The TRO was provided.  Mr. Huang has not

13   responded to our emails or telephone calls since.

14   We noticed and served a deposition notice on Mr. Lai on Tuesday, October 29, for

15   a Friday, November 1 deposition.  (That deposition is now set for Tuesday,

16   November 5.)

17   **VI.**

18   **STUDENT LOAN DEBT RELIEF –**

19   **THE SALES PITCH AND PROCESS**

20   Defendants' acceptance of advance fees in violation of the TSR dooms the

21   business from the start.[29]  But, the analysis of whether this business can continue

22   lawfully and profitably does not hang entirely on advance fees.  We identified

23   fundamental flaws in the tactics deployed to secure customers which have left

24   consumers feeling confused and misled.  *See* Section VI.F "Complaints" below.

25   Defendants' student loan debt relief business is built on a challenging

26   premise:  identify and target consumers with student loan debt to sell them a

27   ─────────────────

28   [29]  Even advance fees collected through TSR-compliant escrow would pose serious
challenges to financial sustainability – see discussion below.

Pls.' Ex. 89
P. 1325
CFPB-20221128-00018370

1  utilitarian service they can do themselves (by filling out Department of Education

2  forms or with the assistance of resources available from the DOE, DOE-approved

3  loan servicers, and other consumer-friendly resources. And do this in an

4  environment that is heavily regulated to protect consumers and prohibits advance

5  fees until the work is completed and accepted by consumers. By any definition,

6  this is not a promising business model for a lawful operator, and this reality is

7  borne out by Defendants' 70% cancellation rate. *See* Exhibit 1.

8    **A.    Leads**

9        New customers are secured by the telemarketing sales team by calls to and

10  from consumer "leads." Lead generation has been managed by Pub Club Leads

11  ("Pub Club"), the marketing business which operated from an interior office at the

12  Laguna Canyon site. Pub Club was tasked to generate "Billable Leads" based on

13  parameters set forth in time-specific orders from Prime Consulting. Pub Club did

14  this by retaining and managing multiple sub-vendors who deployed various data

15  mining techniques. Pub Club was compensated by a percentage of the total

16  "advertising buy" for each of the Orders. Our review indicates that for the period

17  October 2018 to October 2019, Pub Club received approximately $9 million from

18  Prime Consulting. Pub Club also received approximately $5 million from Horizon

19  Consultants between March 2019 and September 2019.

20    **B.    Sales Tactics**

21        Defendants' new "zero tolerance compliance" protocols, announced in

22  August 2019, are themselves confirmation of bad practices that historically

23  permeated the sales process. *See* Exhibit 7. One such practice related to family

24  size where sales agents, with or without the customer's assistance, inflated family

25  size to secure lower payments. In one recorded telephone call from July 25, 2019,

26  that we reviewed, the sales advisor added the customer's two dogs to increase

27  family size. In June 2019, a customer service manager identified an issue

28  internally that customers felt "scammed" because they were paying $1,300 when

---

Pls.' Ex. 89
P. 1326
CFPB-20221128-00018371

Defendants do "very little." *See* Exhibit 34. In April, 2019, Individual Defendant Nguyen internally reported that he had done a small audit on family size and found that 6 out of 10 failed with "All fake FS." *See* Exhibit 35.

Our review of the Laguna Canyon site confirmed the obvious reality that Defendants were in the sales business with sales personnel incentivized to <u>sell</u>:

- The Sales Department was physically structured to maximize results with sales agents organized in pods headed by a Team Leader, each with a separate white board to track results and weekly goals.

- Sales advisors (who were retitled Student Loan Specialists on September 30, 2019) were paid weekly with an hourly minimum ($12-$15 per hour) and a commission based on a percentage (18%-22%) of the dollar value of closed deals after the enrollment payment cleared. The applicable percentage was determined by the advisor's rank, which was based on total revenue from sales over the previous four weeks. *See* Exhibit 36.

- Sales advisors were also paid bonuses through various "performance sprints", including special bonuses for same day closings/payments and 5 deals in a day. The big producers even got to participate in raffles for laptops, gaming consoles, headphones and movie tickets. *See* Exhibit 37.

- The overriding mission was to "Close." A big screen TV in the main room ranked the highest closers. Inspirational signs promoted "Always Be Closing" and "Assume the Close."

- Sales advisors were exhorted to complete the "Hard Close," sometimes called "Same Days," by manufacturing a need to close now. Rebuttals to customers wanting to "call back" included "the government is very strict" and the "system does not allow me to keep your application open." *See* Exhibit 38.

Pls.' Ex. 89
P. 1327
CFPB-20221128-00018372

1    Absent aggressive real time supervision, these incentives created an
2 atmosphere where sales agents are tempted to do whatever necessary to "close"
3 and get their commissions and bonuses.

4    We reviewed scripts, training materials, and sales directives found at each
5 workstation in the Sales Department.  After August 2019, the Sales Scripts were
6 revised several times, but even the most recent Sales Script – October 21, 2019
7 (Exhibit 11) – may confuse consumers about the services and the related fees, and
8 creates the impression that fees paid to Defendants would be credited to their loan.
9 This confusion is reflected in consumer complaints.  *See* Section VI.F
10 "Complaints" below.

11    **C.    Enrollment Fees**

12    "Enrollment Fees" (now called "Initial Fees") were a key component of the
13 sales process and engendered significant confusion among customers.  The most
14 recent schedule includes three tiers based on the customers student loan balance.
15 The "Initial Fee" was set at $1,545 (loan balance above $40,000), $1,395 (loan
16 balance $25,000-$40,000), and $1,245 (loan balance $9,000 – $25,000).[30]  The
17 standard payment plan was five monthly payments (six with manager approval).
18 Consumers who agreed to immediately pay in full were rewarded with a $100
19 discount and sales advisors received bonuses.  The fee structure with the
20 corresponding monthly payment amounts and related commissions were published
21 in materials and on white boards around the office.  *See* Exhibit 36.

22    All customers were also charged a recurring monthly "recertification fee"
23 ($22, $32, or $42) as required by most repayment plans.  This recertification fee
24 created residual monthly cash flow for Defendants with no immediate benefit to
25 the customer and was paid out well before the annual recertification application
26 was actually prepared or even due.

27
28 [30] Fee amounts have varied over time with $1,750 being the highest level we
identified.

28    Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

1  Fee payment schedules were entered into DebtPayPro and monthly auto

2  payments were pulled from customer accounts. The recertification fee was

3  scheduled to be charged in the month after receipt of the final payment on the

4  Initial Fee.[31]

5  **D.  Customer Service and Processing**

6  At the time of the TRO, customer service operated from the 173 Technology

7  Drive site. In early October 2019, Defendants actually laid off the entire

8  processing department as a prelude to outsourcing processing functions to an

9  offshore vendor.[32]

10  The Customer Service Team was primarily tasked to handle complaints from

11  consumers, the BBB, and regulators. Internal protocols emphasized, however, that

12  representatives were to answer the phone generically as "customer

13  service/customer support" and to give the appearance of being a "third party."[33]

14  Scripts and instructions found on site confirmed complaints were a big part

15  of the business. Written instructions found in Customer Service cubicles identified

16  two primary goals (1) retain the customer by resolving the issue and (2) mitigate

17  the fallout from customers likely to complain to outsiders. "Retention Policies"

18

19  [31] For example, the DPP file for customer L. Burdick (loan balance $40,303) shows enrollment on October 4, 2019 with the Initial Fee of $1,245 scheduled out

20  at 5 monthly payments of $249 commencing October 4, 2019, completing February 4, 2020, and the $42 monthly recertification fee scheduled to commence

21  March 4, 2020 and running through September 4, 2029.

22  [32] Historically, the primary processing functions were to pick up the customer "file" from the sales agent once the agreement was signed. From there, processing

23  finalized data collection on income and other matters, secured customer signatures on the necessary documents and commenced the processing of enrollment fees.

24

25  [33] The customer service representatives were provided scripted language: "We are a third party customer service department that takes care of customer support for many different companies. It looks like you have been working with (insert

26  appropriate name here: SL Account Management, Premier Student Loan Center, Financial Preparation Services, Financial Loan Advisors, and Tangible Saving

27  Solutions.)." They were also instructed not to acknowledge any of Defendants' name changes or that customer service was part of any of those companies. *See*

28  Exhibit 39.

1 directed that full refunds be given to consumers likely to complain to the BBB,
2 regulators, or enforcement authorities.  *See* Exhibit 40.
3      Customer Service also maintained a list of 20 "Disposition Codes" which
4 highlight the level of customer confusion.  These codes included "Fees not
5 Explained to Me," "Program not Explained Correctly," and "Payments did not go
6 toward my Student Loan Payment."  *See* Exhibit 41.
7      During September and October 2019, a primary activity at the Technology
8 Drive site was a reverification campaign supposedly designed to confirm the data
9 on more than 40,000 files and have customers sign new documentation.  This
10 campaign was implemented by personnel from Junior Processing, Customer
11 Service, and approximately 30 temporary workers who made outbound calls to
12 customers based on a script.  After verifying identity, the customer was directed to
13 a website to verify and initial a series of compliance questions and provide fresh
14 signatures on documents signed at their original enrollment.  This campaign also
15 introduced customers for the first time to Trusted Account Services and directed
16 them to sign a contract with Trusted Account Services.[34, 35]

---

[34] In this regard, the reverification script included Compliance Questions, Paragraph 10 of which provides:

- "Do you understand that your monthly recertification assistance fee to us will be placed into your own Dedicated Client Account held for your benefit until we successfully complete our work for you?"
- "You are making payments for our fees to your own Dedicated Client Account **held by a non-related company (like a trust account) until your program is finalized and complete.**"
- "To fully emphasis we do not take upfront fees.  That means that until your program is approved any payments you are making are going into a separate trust account for you until you are placed in the program initially outlined with the payment details initially discussed."

*See* Exhibit 42 (Emphasis added).

[35] Notably, Defendants unilaterally transferred all customer payment processing to Trusted Account Services in September 2019 without customer consent.

---

In their recent filings, Defendants cite a supposed 96% success rate in the reverification campaign as evidence that their customers were fully satisfied and re-executed agreements willingly. *See, e.g.*, Defendants' Response re: OSC at 8-9 (citing Balestreri Decl. ¶ 12 & Ex. F). They claim this high success rate for the 3,252 reverifications is "more statistically significant and a more accurate picture" than the customer complaints relied on by the CFPB because Defendants' "sampling of customers is random." *Id.* at 8. This success figure is astounding and suspect, particularly in a business with a 70% customer cancellation rate.

My investigation indicates, however, that the reverification campaign was not an objective scientific process confirming universally happy customers. Rather, it was a hastily organized exercise using temporary employees with little training to retroactively confirm data in old files, guided by a script that required more than 90 minutes of talk time to complete. In addition, Defendants' "sampling" does not appear random at all, but instead it appears Defendants cherry-picked the initial files to be reverified in order to achieve a higher success rate. Notes we found in the office of Mr. Ortiz, the head of Junior Processing, from a September 20, 2019 meeting with customer service managers Christian Sangalang and Adon Janse indicate that Mr. Ortiz's team was assigned 2,800 files designated "High priority." All of these had small "FS (family size)," between 1 and 5 members, thus reducing the likelihood of prior family size inflation. The notes indicate that Mr. Janse stated that approximately 2% of these files "have issues" and that "Most clients will sign." *See* Exhibit 43.

Defendants also suggest that the reverification campaign reflected a "random" sampling of calls coming *into* customer service. This is, however, belied by the reverification scripts which state: "I am calling you today on a recorded line to ensure the accuracy of all details on your account. We are contacting all our existing clients to complete a routine follow up as part of our

///

Pls.' Ex. 89
P. 1331
CFPB-20221128-00018376

newly required compliance policies and procedures."[36]  *See* Exhibit 42.

**E.     Compliance**

Compliant practices did not come naturally to Defendants.  Compliance concerns and procedures before the August pivot were sporadic.  Beginning August, 2019, however, compliance efforts were upgraded, including:

- The zero tolerance policies first announced in the August 27, 2019 Memo, were re-stated in various other formats.  *See* Exhibit 44.
- New Hires were run through a week of day-long training and education sessions.  *See* Exhibit 45.
- The basic Sales Script was updated and revised multiple times resulting in the current version of October 21, 2019.  *See* Exhibit 11.
- The 4 training rooms at the Laguna Canyon site, each outfitted with 4 workstations, were updated with new directives and information posted above each workstation, including Rebuttals, Doc. Assistance, File Accuracy, and Verbal Consent.  *See* Exhibit 46.

These are representative, but not exhaustive examples of compliance efforts after the August pivot.  These moves were in the right direction, although some elements could be described as window dressing.  Regardless of motivation or sincerity, however, compliance was on Defendants' radar, beginning in August 2019.

**F.     Complaints**

The ultimate gauge of whether consumers are confused or feel misled is to review the flow of complaints generated by those consumers.  Defendants suggest that the August pivot has resulted in a compliant operation and claim a

---

[36]  Customer service representatives were instructed that they could conduct the reverification during regular customer service calls, but when customers called with concerns about withdrawals made by a new entity (Trusted Account Services) they were told they would be receiving separate calls to reverify their information and sign contracts with Trusted Account Services.

Pls.' Ex. 89
P. 1332
CFPB-20221128-00018377

96% satisfaction rate by customers contacted in the reverification campaign. While we did not have the time or resources to statistically sample all the data, we do have the ability to get a sense of the situation by reviewing Defendants' customer contacts post-pivot.

We identified a Trusted Account Services email box studentloanmgmt@trustedaccountservices.com established around October 13, 2019. Defendants controlled and monitored this email box. Defendants' employees reviewed and responded (as necessary) to customer inquiries.[37] This has given us a discrete stream of inquiries to review – some 400 emails delivered since October 13 – which again, is obviously after the Defendants' August pivot.

We identified approximately 250 informational inquiries (*e.g.*, requests for a return call or email, requests to update payment information, inquiries about the status of consumers' application or the recertification process, etc.). One customer stated he was satisfied with Defendants' service, but then asked for clarification why FedLoan was asking him for a large payment, thinking that the monthly $40 payment handled his obligation.

We identified approximately 150 troubling customer contacts – complaints of one kind or another. Some examples follow:

- "The payments that are being taken each month are not the payments I agreed to and not an amount I can manage. I need to hear back from someone asap and get this resolved." *See* Exhibit 47.
- "If I'm paying $40/month, WHY has my student loan increased from $52k to $54k? . . . Instead of paying $52k to Nelnet, at the end of 240 payments, I will pay a total of $10,555 to Premier Student Loans? Will the balance be expunged from my financial obligation?" *See id.*

---

[37] We have not yet been able to canvas all Defendants' email accounts and therefore have not identified all mailboxes which might be receiving customer inquiries and complaints.

Pls.' Ex. 89<br>P. 1333<br>CFPB-20221128-00018378

- "I have spoken to Navinet - who hlds my student loan perNavinet they have nothing from you concerning my student loan and they are now delinquent. I need answer's and I am stoping Payment." *See id.*

- "This is a scam and I want all of my money returned or I am prepared to legal action. My student loans are still showing up as unpaid on my credit report." *See id.*

- "If I am going through this organization for my student loans, and if you are charging me $42.00 per month, I have two questions that are confusing me?

  1. My loan amount has increased by $5,000 since I turned my information over to you.

  2. Fed Loan just sent me an email saying they are going to deduct $131 from my account each month starting November.

  Can someone please explain all of this to me, and why did my amount increase?" *See id.*

- "This is a scam. You've been reported. Stop contacting me." *See id.*

- "STOP TAKING THE AUTOMATIC PAYMENT IMMEDIATELY. I WANT A REFUND. The Department of Education called me – you are a fraud!" *See id.*

- "I am just trying to figure out why I am still receiving bills from fedloan. They are saying I am behind and that i am not paying. I was told that I wouldn't have to worry about them once I sign on with you guys. Can you please explain." *See id.*

- "This service was set up to help me with the payments at FEDLOAN SERVICING. I keep getting emails and phone calls saying my account is past due. Are the payments you're pulling from my account not being sent to the FEDLOAN SERVICING?" *See id.*

Pls.' Ex. 89
P. 1334
CFPB-20221128-00018379

- "Who is this payment going to?  I just logged into my FEdloan Servicing Account, and none of my $40 monthly payments are showed as posting to my actual student loans.  I am wondering who I am paying?"  *See id.*
- "Why am I paying y'all money and fed loan servicing is reporting missed payments to the credit bureaus.  It's messing up my credit score and I really do not need that."  *See id.*
- "Is Navient aware that I am paying my student loans through this company now?"  *See id.*

The volume of complaints (roughly 150) compared to the number of customer contacts (roughly 400) is very high – 40% of the people who contacted Defendants through the email box had a complaint.  This paints a far different picture of customer satisfaction than that presented by the purported 96% satisfaction rate in the reverification campaign.  And these are customer initiated contacts, rather than outreach instituted by a reverification campaign.

Beyond the volume of complaints, the content of the complaints is troubling. The complaint themes are consistent with the consumer declarations and the allegations made by the Plaintiffs.  Pre-pivot or post-pivot, Defendants' sales materials and tactics have left consumers confused and feeling misled, particularly about Defendants' services, their fees, and whether the fees reduced their loan balances.

## VII.

## FINANCIAL INFORMATION

The Receiver's forensic accountant, Lisa Jones, has prepared a Receivership Initial Account Records Review report based on available Receivership Defendant records which is attached as Exhibit 5.

///

///

---

Pls.' Ex. 89
P. 1335
CFPB-20221128-00018380

# VIII.

## CAN THE BUSINESSES BE OPERATED

## LAWFULLY AND PROFITABLY?

Section XIII(O) (at page 23) of the TRO directs and authorizes the Temporary Receiver to continue and conduct the business of Receivership Defendants "conditioned on the Receiver's good faith determination that the business can be lawfully operated at a profit using the Assets of the Receivership Defendants' estate." I conclude that the business cannot.

These defendants chose to operate a highly-regulated and revenue-challenged business. The product is not unique or proprietary. The marketing costs to secure and retain customers are high, compounded by very high cancellation rates. Operating expenses, including commission for sales personnel, are high. And the TSR prohibits the collection of fees until the work is completed and the consumer makes the first payment.

Even if Defendants were to activate a legitimate third party provider of dedicated accounts and fully comply with the TSR escrow exception, the impact on cash flow and sustainability would be enormous, all with the added administrative costs of the escrow procedure itself. And the business would still face the compliance challenges, and related new expenses, to re-invent a sales process free of tactics and procedures that leave consumers feeling confused and misled.

Dated: November 1, 2019

By: /s/ Thomas W. McNamara
Thomas W. McNamara
*Temporary Receiver*

---

36          Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

Pls.' Ex. 89
P. 1336
CFPB-20221128-00018381

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of November 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.


  /s/ Edward Chang
Edward Chang
*Attorney for Temporary Receiver,*
*Thomas W. McNamara*

Pls.' Ex. 89
P. 1337
CFPB-20221128-00018382

Plaintiffs' Exhibit 89.1

# EXHIBIT 10

Pls.' Ex. 89.1
P. 1339

CFPB-20221128-00018451

| DBA | TOLL FREE | WEBSITE | MANAGER |
|---|---|---|---|
| Premier Student Loan Center | (855) 340-7773 | N/A; company no longer take new clients | Matt Weinberg |
| Financial Preparation Services | (877) 709-0795 | https://financialpreparationservices.com/ | Zach Kennedy |
| South Coast Financial Center | (855) 877-4831 | https://www.southcoastfinancialcenter.com/ | James Thomas |
| Direct Account Services | (855) 877-5211 | https://www.directaccountservices.com | Matt Weinberg |
| Financial Loan Advisors | (877) 382-2596 | https://www.financialloanadvisors.com/ | |
| Account Preparation Services | (855) 866-2857 | https://www.accountpreparationservices.com/ | |
| Administrative Financial | (855) 877-9458 | https://www.administrativefinancial.com/ | Nicollette Bryan |
| Tangible Savings Solutions | (877) 921-3705 | http://tangiblesavingssolutions.com/ | |
| Coastal Shores Financial Group | (855) 877-2363 | https://www.coastalshoresfinancialgroup.com/ | Zach Kennedy |
| First Choice Financial Centre | (877) 768-4620 | https://www.firstchoicefinancialcentre.com | |
| Administrative Account Services | (855) 773-0028 | https://www.administrativeaccountservices.com | James Clark |
| Primary Account Solutions | (877) 640-4918 | https://www.primaryaccountsolutions.com | |
| Prime Document Services | (877) 795-4896 | https://www.primedocumentservices.com | |
| Financial Accounting Center | (855) 659-8774 | https://www.financialaccountingcenter.com | Morgan Miller |
| Doc Management Solutions | (855) 877-5184 | https://www.docmanagementsolutions.com | |
| Sequoia Account Management | (855) 981-6062 | https://www.sequoiaaccountmanagement.com | Austen Kalevitch |
| Pacific Palm Financial Group | (855) 259-5457 | https://www.pacificpalmfinancialgroup.com/ | Zach Kennedy |
| Pacific Shores Advisory | (855) 740-7237 | https://www.pacificshoresadvisory.com | Malea Shapley |
| First Document Services | (855) 728-5743 | https://www.firstdocumentservices.com | Morgan Miller |
| Keystone Document Center | (844) 279-8002 | https://www.keystonedocumentcenter.com | James Thomas |
| Administrative Accounting Center | (844) 680-0793 | https://www.administrativeaccountingcenter.com | Nicollette Bryan |
| Global Direct Accounting Services | (833) 780-0913 | https://www.globaldirectaccountingsolutions.com | Tara Herrera |
| Signature Loan Solutions | (855) 800-5721 | https://www.signatureloansolutions.com | James Clark |
| Best Choice Financial Center | (844) 817-8003 | https://www.bestchoicefinancialcenter.com | Alyssa Levasseur |
| Yellowstone Account Services | (844) 680-0797 | https://www.yellowstoneaccountservices.com | Matt Weinberg |
| Regional Accounting Center | (855) 997-4589 | https://www.regionalaccountingcenter.com/ | Brian Barnes |
| Financial Direct Services | (855) 394-3709 | https://www.financialdirectservices.com/ | Lindsay Blalock |

CFPB-20221128-00018452

# Plaintiffs' Exhibit 89.2

Case 8:19-cv-01998-JVS-JDE   Document 83-15   Filed 10/30/23   Page 45 of 96   Page ID
#:13112

# EXHIBIT 12

Pls.' Ex. 89.2
P. 1342

CFPB-20221128-00018467



WyomingRegisteredAgent.com

WyomingRegisteredAgent.com
1621 Central Avenue
Cheyenne, WY 82001
307-637-5151

**Purchasing Information:**

**E-mail Address:**    michaelt@trustedaccountservices.com

| | |
|---|---|
| **Billing Address:** | **Shipping Address:** |
| TRUSTED ACCOUNT SERVICES | TRUSTED ACCOUNT SERVICES |
| KENNY HUANG | KENNY HUANG |
| 17011 BEACH BLVD, SUITE 900 | 17011 BEACH BLVD, SUITE 900 |
| HUNTINGTON BEACH, CA 92647 | HUNTINGTON BEACH, CA 92647 |

| | |
|---|---|
| **Billing Phone:** | **Shipping Phone:** |
| 866-363-6383 | 866-363-6383 |

**Order Grand Total:** **$29.00**

**Payment Method:**    Other

**Invoice Summary:**

**Shipping Details:**

| | |
|---|---|
| **Invoice #:** | <u>65326</u> |
| **Invoice Date:** | 2019-07-10 10:43 |
| **Shipping Method:** | Standard delivery |
| Products Subtotal: | $29.00 |
| | ------ |

**Total for this Invoice: $29.00**

**Products on invoice:**
**1 x Virtual Office (Bronze) - Month - $29.00**
   SKU: VOBRM
   • Name of the company: Trusted Account Services
   • Street Address: 109 E. 17th St.
   • Virtual Suite Number: 5656

---

# This order is *PAID IN FULL.*

CFPB-20221128-00018468

 **Wyoming Registered Agent <info@wyomingregisteredagent.com>**

## Receipt for Order Virtual Office - ch_1EuC8ZDMWj8AjnwYCL0Eec25
1 message

**no-reply@wufoo.com** <no-reply@wufoo.com>
Reply-To: info@wyomingregisteredagent.com
To: michaelt@trustedaccountservices.com

Mon, Jul 8, 2019 at 11:51 PM

**Jul 8, 2019**
11:45pm

**Transaction ID**
ch_1EuC8ZDMWj8AjnwYCL0Eec25

## Receipt for Order Virtual Office - ch_1EuC8ZDMWj8AjnwYCL0Eec25

**Billing Address**
Kenny Huang

Arcadia,CA Redacted
US

| Description | Price |
|---|---|
| **Service Level:** *Monthly Bronze $29/mo* | $29.00 |
| **Total** **$29.00** | |

**Credit Card : ****9394**

**Amount Paid :** $29.00

CFPB-20221128-00018469

# WyomingRegisteredAgent.com
## Bronze Virtual Office Instructions

## Your New Mailing Address & Phone Numbers

Trusted Account Services
109 E. 17th St.
Suite #5656
Cheyenne, WY 82001

Thank you for your purchase of the Bronze Wyoming Virtual Office. Below are a few tips and answers to commonly asked questions.

### Forwarding Your Mail

Once a week, your mail will be forwarded to you by first class mail to the address specified in your online account. As we receive mail for you throughout the week, you will be notified by email with a scanned image of the front of the envelope.

### Changing Your Address

You can change your shipping address at any time by sending an email to shipping@wyomingregisteredagent.com, sending a Fax to 307.634.7570, or by managing your online account using your Internet web browser (see below).

### Managing Your Account Online

You can change your email, phone, and mail forwarding address, and view and pay invoices by accessing your online account. To login to your account:

1. Go to http://my.wyomingregisteredagent.com/
2. In the upper right hand corner of the page, enter your username: khuang
3. Enter your password in the password field. If you do not have your password, you can have a new password emailed to you (see below).
4. Click login.

### Lost/Misplaced Password?

To request a temporary password to be emailed to you, please follow these steps:

1. Go to http://my.wyomingregisteredagent.com/user/password
2. Enter your username: khuang
3. Click Email new password

### Questions and Support

If you have any questions about your service, please contact us by email (support@wyomingregisteredagent.com), phone (307.637.5151) or Fax (307.634.7570)

CFPB-20221128-00018470



Wyoming Registered Agent <info@wyomingregisteredagent.com>

---

## Order Virtual Office [#133]
1 message

**Wufoo** <no-reply@wufoo.com>                                    Mon, Jul 8, 2019 at 11:43 PM
Reply-To: no-reply@wufoo.com
To: info@wyomingregisteredagent.com

| | |
|---|---|
| Existing Wyoming Entity: * | Trusted Account Services |
| Service Level: * | Monthly Bronze $29/mo |
| Name * | Kenny  Huang |
| Email * | michaelt@trustedaccountservices.com |
| Phone Number * | 8663636383 |
| Send My Mail Here * | 17011 Beach Blvd, Suite 900 Huntington Beach, CA 92647 United States |

CFPB-20221128-00018471

Plaintiffs' Exhibit 89.3

EXHIBIT 14

Pls.' Ex. 89.3
P. 1348

CFPB-20221128-00018479

Outlook email for TAS

Studentloan mgmt @ trustedaccount
services.com

Password ███████

Sign on to private window
or incognito.

Pls.' Ex. 89.3
P. 1349

EXHIBIT 14
Page 77

CFPB-20221128-00018480

Plaintiffs' Exhibit 89.4

# EXHIBIT 18

CFPB-20221128-00018493

CFPB-20221128-00018494

| | |
|---|---|
| **From:** | Kaine Wen |
| **To:** | Donald Cook; Calvin Ho; Calvin Ho; Tom Nguyen; Thien Nguyen |
| **Cc:** | "Rey Pasinli" |
| **Subject:** | Re: Closure of Horizon processing account.... |
| **Date:** | Friday, April 12, 2019 2:50:39 AM |
| **Attachments:** | image004.png |
| | image005.png |
| | image003.png |

Hi Donald,

The new application has been submitted under "TAS 2019 LLC".

Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

**From:** Donald Cook <donald@todaypayments.com>
**Sent:** Thursday, April 4, 2019 12:50:55 PM
**To:** Kaine Wen; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** RE: Closure of Horizon processing account....

Hi Kaine,

Sorry for the inconvenience.

We have to await the opening of the "Accommodator" account for testing....

Don
**Donald@TodayPayments.com**
**(866) 927-7180**
**(603) 947-5197 – eFax**



**From:** Kaine Wen [mailto:kwen@slaccountmgmt.com]
**Sent:** Thursday, April 04, 2019 2:14 AM
**To:** Donald Cook; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'

CFPB-20221128-00018495

**Subject:** Re: Closure of Horizon processing account....

Hi Don,

Can you keep the Horizon account open so we can continue testing? Don't worry, we are working on getting the new application in. I'm not sure if you can view it but I have it mostly completed - just waiting on the bank account information.


Best,

Kaine Wen

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

**From:** Donald Cook <donald@todaypayments.com>
**Sent:** Wednesday, April 3, 2019 1:18:24 PM
**To:** Kaine Wen; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** RE: Closure of Horizon processing account....

Good afternoon Kaine,

The account has seen $-0- processing since inception and we haven't heard from you for several weeks.

Just "cleaning up the ledgers"....

We are standing ready to receive your new application and processing account!

Respectfully,

Don
**Donald@TodayPayments.com**
**(866) 927-7180**
**(603) 947-5197 – eFax**



**From:** Kaine Wen [mailto:kwen@slaccountmgmt.com]
**Sent:** Wednesday, April 03, 2019 1:07 PM
**To:** Donald Cook; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'

**Subject:** Re: Closure of Horizon processing account....

Hi Don,

Why is the Horizon ACH account closed?

We are in the process of submitting the new application, just waiting on the business bank account to be set up.


Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

**From:** Donald Cook <donald@todaypayments.com>
**Sent:** Wednesday, April 3, 2019 9:05:32 AM
**To:** Kaine Wen; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** RE: Closure of Horizon processing account....

Good morning Gentlemen,

Your Horizon processing account has been closed.

Sincerely,

Don
**Donald@TodayPayments.com**
**(866) 927-7180**
**(603) 947-5197 – eFax**



CFPB-20221128-00018496

Plaintiffs' Exhibit 89.5

Case 8:19-cv-01998-MWF-JDE   Document 423-5   Filed 01/30/23   Page 59 of 96   Page ID #:12186

EXHIBIT 36

Pls.' Ex. 89.5
P. 1356

CFPB-20221128-00018539

Sales Commission Calculator

| Commission Percentage | Total Sales | | Total Commissions Paid |
|---|---|---|---|
| 18.0% | $1245 Enrollment Fee X 18% = $224 Per Deal / 5 Payments = $45 Per Payment | | |
| Salesperson | 7 Sales @ $45 Per Payment | Commis Per Week | Commis Per Month (4.2 Weeks) |
| Month #1 | 7 First Pays Cleared X $45 Per Payment | $315.00 | $1,323.00 |
| Month # 2 | 7 (1st) + 7 (2nd) = 14 X $45 Per Payment | $630.00 | $2,646.00 |
| Month # 3 | 7 (1st) + 7 (2nd) + 7 (3rd) = 21 X $45 Per Payment | $945.00 | $3,969.00 |
| Month # 4 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) = 28 X $45 Per Payment | $1,260.00 | $5,292.00 |
| Month # 5 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) + 7(5th) = 35 X $45 Per Payment | $1,575.00 | $6,615.00 |
| Total | | | $19,845.00 |

| Commission Percentage | Total Sales | | Total Commissions Paid |
|---|---|---|---|
| 20.0% | $1245 Enrollment Fee X 20% = $249 Per Deal / 5 Payments = $50 Per Payment | | |
| Salesperson | 7 Sales @ $50 Per Payment | Commis Per Week | Commis Per Month (4.2 Weeks) |
| Month #1 | 7 First Pays Cleared X $50 Per Payment | $350.00 | $1,470.00 |
| Month # 2 | 7 First Pays + 7 Second Pays = 14 X $50 Per Payment | $700.00 | $2,940.00 |
| Month # 3 | 7 (1st) + 7 (2nd) + 7 (3rd) = 21 X $50 Per Payment | $1,050.00 | $4,410.00 |
| Month # 4 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) = 28 X $50 Per Payment | $1,400.00 | $5,880.00 |
| Month # 5 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) + 7(5th) = 35 X $50 Per Payment | $1,750.00 | $7,350.00 |
| Total | | | $22,050.00 |

| Commission Percentage | Total Sales | | Total Commissions Paid |
|---|---|---|---|
| 22.0% | $1245 Enrollment Fee X 22% = $274 Per Deal / 5 Payments = $55 Per Payment | | |
| Salesperson | 7 Sales @ $55 Per Payment | Commis Per Week | Commis Per Month (4.2 Weeks) |
| Month #1 | 7 First Pays Cleared X $55 Per Payment | $385.00 | $1,617.00 |
| Month # 2 | 7 First Pays + 7 Second Pays = 14 X $55 Per Payment | $770.00 | $3,234.00 |
| Month # 3 | 7 (1st) + 7 (2nd) + 7 (3rd) = 21 X $55 Per Payment | $1,155.00 | $4,851.00 |
| Month # 4 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) = 28 X $55 Per Payment | $1,540.00 | $6,468.00 |
| Month # 5 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) + 7(5th) = 35 X $55 Per Payment | $1,925.00 | $8,085.00 |
| Total | | | $24,255.00 |

CFPB-20221128-00018540

# SAME DAYS & ENROLLMENTS

## A same day a day keeps the cancels away so slay those same days !!!!!

Fact if you get a same day and proof of income at the end of call, processing can start on the file right away, that way if the client does cancel and we have already begun the work there is less of a chance of the client receiving a refund. This is called "Work Rendered."

Pls.' Ex. 89.5
P. 1358

EXHIBIT 36
Page 162

CFPB-20221128-00018541

# <u>Same Day Pitch</u>



### ➡ <u>SD Pitch #1:</u>

➡ Since we are dealing with interest rates and loan amounts **your first payment will be scheduled for today so we can lock in your rate** and begin processing your file. The Government is very strict with this. We must receive your first payment before they will start processing anything.

➡ Now next month we can select any day of the month you would like Which day <u>NEXT</u> month works best for you?

➡ Ok great, just confirming one more time **your first payment of $249/$207 will be drafted today.**

### ➡ <u>SD Pitch #2:</u>

➡ Since we are enrolling you into the program today, obviously the system will be setting your first payment for today.

➡ Next month we can select any date that falls within 30 days from today, which date works best for you <u>next</u> month?

➡ Ok great, just confirming one more time **your first payment of $249/$207 will be drafted today.**

Pls.' Ex. 89.5
P. 1359

EXHIBIT 36
Page 163

CFPB-20221128-00018542

# What <u>to</u> Say:

➢ <u>Ask questions to uncover "PAIN POINTS"</u>
  ➢ "How much is Navient asking for on a monthly basis? Can you reasonably afford that payment?"
  ➢ How have these loan affected your credit? '

➢ <u>Identify Client's WHY and offer SOLUTION</u>
  ➢ Huge Payments? Target pitch on **LOW, AFFORDABLE payments**
  ➢ Huge Debt she'll never get out of? Target pitch on the **MAXIMUM amount of FORGIVENESS**
  ➢ In default and trying to restore credit?  Target pitch on **getting credit score back on track**
  ➢ **PEACE OF MIND** – "You're in the right place".  We fight to get the maximum benefit awarded under federal guidelines

**KNOW YOUR AUDIENCE – ONLY** solve the problems that matter/exist to client

Pls.' Ex. 89.5
P. 1360

EXHIBIT 36
Page 164

CFPB-20221128-00018543

# Enrollment Fees

➡ $1,245 – $9,000+ in loans required ($5,000 if defaulted)

➡ $1,395 – $25,000+ in loans required

➡ $1,545 - $50,000+ in loans required

CFPB-20221128-00018544



# $1,245 Enrollment Fee Rep's Revenue

| Fee Break-down | 1 pay | 2 pay | 3 pay | 4 pay | 5 pay | 6 pay |
|---|---|---|---|---|---|---|
| | $1145.00 | $622.50 | $415.00 | $311.25 | $249.00 | $207.50 |
| 18% | $206.10 | $112.05 | $74.70 | $56.03 | $44.82 | $37.35 |
| 20% | $229.00 | $124.50 | $83.00 | $62.25 | $49.80 | $41.50 |
| 22% | $251.90 | $136.95 | $91.30 | $68.48 | $54.78 | $45.65 |

CFPB-20221128-00018545

# $1,395 Enrollment Fee Rep's Revenue

| Fee Break-down | 1 pay | 2 pay | 3 pay | 4 pay | 5 pay | 6 pay |
|---|---|---|---|---|---|---|
| | $1,295.00 | $697.50 | $465.00 | $348.75 | $279.00 | $232.50 |
| 18% | $233.10 | $125.55 | $83.70 | $62.78 | $50.22 | $41.85 |
| 20% | $259.00 | $139.50 | $93.00 | $69.75 | $55.80 | $46.50 |
| 22% | $284.90 | $153.45 | $102.30 | $76.73 | $61.38 | $51.15 |

Pls.' Ex. 89.5
P. 1363

EXHIBIT 36
Page 167

CFPB-20221128-00018546

# $1,545 Enrollment Fee Rep's Revenue

| Fee Break-down | 1 pay | 2 pay | 3 pay | 4 pay | 5 pay | 6 pay |
|---|---|---|---|---|---|---|
|  | $1,445.00 | $722.50 | $515.00 | $386.25 | $309.00 | $257.50 |
| 18% | $206.10 | $139.05 | $92.70 | $69.53 | $55.62 | $46.35 |
| 20% | $289.00 | $154.50 | $103.00 | $77.30 | $61.80 | $51.50 |
| 22% | $317.90 | $169.95 | $113.30 | $84.98 | $67.98 | $56.65 |

Pls.' Ex. 89.5
P. 1364

EXHIBIT 36
Page 168

CFPB-20221128-00018547

**If you are at 18% and you follow this simple key each week you will always exceed your hourly wages and receive, your commission.**

| $1,245 Enrollment at 18% | | $1,395 Enrollment at 18% | | $1,545 Enrollment at 18% | |
|---|---|---|---|---|---|
| 1 Full pay 1145 = | $206.10 | 1 Full pay 1295 = | $233.10 | 1 full pay 1445 = | $206.10 |
| 1 Two pay = | $112.05 | 1 Two pay = | $125.50 | 1 two pay = | $139.05 |
| 1 Three pay = | $74.70 | 1 Three pay = | $83.70 | 1 three pay = | $92.70 |
| 1 Four pay = | $56.03 | 1 Four pay = | $62.78 | 1 Four pay = | $69.53 |
| 6 Five pay= | $268.92 | 6 Five pay = | $301.32 | 6 Five pay = | $333.72 |
| Total | $717.80 | Total | $806.45 | Total | $895.10 |

* One full pay each week will make up for two cancels and will still give you commission
* One Two pay each week will make up for one cancel and will still give you commission

Pls.' Ex. 89.5
P. 1365

EXHIBIT 36
Page 169

CFPB-20221128-00018548

**If you are at 20% and you follow this simple key each week you will always exceed your hourly wages and receive, your commission.**

| **$1,245 Enrollment at 20%** | |
|---|---|
| 1 Full pay 1145 = | $ 229.60 |
| 1 Two pay = | $ 124.50 |
| 1 Three pay = | $ 83.00 |
| 1 Four pay = | $ 62.25 |
| 6 Five pay= | $ 298.80 |
| Total | $797.55 |

| **$1,395 Enrollment at 20%** | |
|---|---|
| 1 Full pay 1245 = | $259.00 |
| 1 Two pay= | $139.50 |
| 1 Three pay = | $ 93.00 |
| 1 Four pay = | $ 69.75 |
| 6 Five pay = | $ 334.80 |
| Total : | $896.05 |

| **$1,545 Enrollment at 20%** | |
|---|---|
| 1 full pay 1445 = | $289.00 |
| 1 two pay = | $154.50 |
| 1 three pay = | $103.00 |
| 1 Four pay = | $77.30 |
| 6 Five pay = | $370.80 |
| Total | $994.60 |

* One full pay each week will make up for two cancels and will still give you commission
* One Two pay each week will make up for one cancel and will still give you commission

Pls.' Ex. 89.5
P. 1366

EXHIBIT 36
Page 170

CFPB-20221128-00018549

**If you are at 22% and you follow this simple key each week you will always exceed your hourly wages and receive, your commission.**

| **$1,245 Enrollment at 22%** | |
|---|---|
| 1 Full pay 1145 = | $ 251.90 |
| 1 Two pay = | $ 136.95 |
| 1 Three pay = | $ 91.30 |
| 1 Four pay = | $ 63.48 |
| 6 Five pay= | $ 328.68 |
| Total : | $872.31 |

| **$1.395 Enrollment at 22%** | |
|---|---|
| 1 Full pay1245 = | $284.90 |
| 1 Two pay= | $153.45 |
| 1 Three pay = | $ 102.30 |
| 1 Four pay = | $ 76.73 |
| 6 Five pay = | $ 334.80 |
| Total : | $985.66 |

| **$1,545 Enrollment at 22%** | |
|---|---|
| 1 full pay 1445 = | $317.90 |
| 1 two pay = | $169.95 |
| 1 three pay = | $113.30 |
| 1 Four pay = | $84.98 |
| 6 Five pay = | $407.88 |
| Total | $1,094.01 |

* One full pay each week will make up for two cancels and will still give you commission

* One Two pay each week will make up for one cancel and will still give you commission

CFPB-20221128-00018550

# The Goal: To make the weekly commission EXCEED your hourly



12.00 x 40hrs = $480.00

- ➡ To achieve this goal you want to make sure that you schedule payments on the same day each month
- ➡ Keep track of all payments on your commission tracker
- ➡ One Full pay a week
- ➡ Submit one same day daily
- ➡ Be top 15 on the leader board

CFPB-20221128-00018551

Case 8:19-cv-01998-MWF-JDE   Document 75-3   Filed 01/30/18   Page 32 of 96   Page ID #:14309



# LEADER BOARD



22 % commission – Ranking 1-15 (Top Reps)
20 % commission – Ranking 16-40
18 % commission – Ranking 41- and bellow

CFPB-20221128-00018552



## Financial Preparation Services

### FPS Pay Structure and Bonuses:

1. 5 Submissions = **$50.00**
   a. Files must be created AND approved the same day (5 payment plan)
2. Employee referrals = **$300.00**
   a. Received after referral's 30th day of employment
   b. No limit on number of referrals
3. 10 Deals in a Day = **$300.00**
   a. Files must be created AND approved in the same day (5 payment plan)
4. Monthly Bonus
   a. Most net doc prep payments in a calendar month (point system)

1st = **$1,000**, 2nd = **$750**, 3rd = **$750**, 4th = **$500**, 5th = **$500**, 6th = **$400**, 7th = **$400**, 8th = **$350**, 9th = **$350**

**Pay Raise:**

- Raise = $125 per deal, plus recertification fee (either $22/$32/$42, depending on loan type/size) moving forward
- To qualify: must have **80 net cleared** in a **consecutive two-month period (8 weeks)**

**Quota:**

Minimum of **10** cleared each week

Minimum of **10** scheduled for the following week

**Submissions vs. Cleared**

**Submission** – The application from the client has been completed and filled out.

   Ex: Personal information such as date of birth, address, phone number, and credit card info. In addition, the client has signed all documents and has agreed to the compliance call.

**Cleared** – First payment has been made and cleared. The submission is now considered *cleared.*

   Ex: You submitted the application on Monday the 11th, and the 1st payment is scheduled for Wednesday the 13th. The submission turns into a cleared deal on Wednesday the 13th once payment has cleared.

CFPB-20221128-00018553

Plaintiffs' Exhibit 89.6

Case 8:19-cv-01998-JVS-JDE   Document 75-3   Filed 11/01/19   Page 40 of 91   Page ID
#:4315

# EXHIBIT 38

Pls.' Ex. 89.6
1372



GO AHEAD WHEN YOU'RE READY

**DOES THAT MAKE SENSE?**

**BACK TO THE SCRIPT / CLOSE**

**OBJECTION**

**REBUTTAL**

*1-3 Sentences MAX

*Common Sense

*Stay Neutral

*Smooth Transition

"Great Question"

"We get that all the time"

"I'm Glad you asked"

**HARD CLOSE:**

**EVERY SINGLE CALL WITHOUT EXCEPTION**

CALL BACK REBUTTALS LISTED BELOW:

- **Physically cannot hold your file open**
- **I'll have to cancel your application out at this time**
- **The government is very strict, we can finish your application now or you can try again next year - <u>IF</u> it is still available**
- **Without a card/documents completed, I'll have to cancel out your application and give your seat to the next caller**
- **Unfortunately, the system does not allow me to keep your application open. I'm going to have to give your seat & benefits to the next person that qualifies as there is limited seating in these programs**

**\*STAY NEUTRAL \* ASSUME THE CLOSE \* NO CALLBACKS EVER\***

Pls.' Ex. 89.6
1373

EXHIBIT 38
Page 180

# Same Day Pitch

## SD Pitch #1:

Since we are dealing with interest rates and loan amounts **your first payment will be scheduled for today so we can lock in your rate** and begin processing your file.  The Government is very strict with this. We must receive your first payment before they will start processing anything.

Now next month we can select any day of the month you would like, or if you need a buffer between your first two payments, we can push it out 45 days for you.

Which day <u>NEXT</u> month works best for you?

Ok great, just confirming one more time **your first payment of $249/$207 will be drafted today.**

## SD Pitch #2:

Since we are enrolling you into the program today, obviously the system will be setting your first payment for today.

Next month we can select any date that falls within 45 days from today, which date works best for you <u>next</u> month?

Ok great, just confirming one more time **your first payment of $249/$207 will be drafted today.**

Pls.' Ex. 89.6
1374

EXHIBIT 38
Page 181

Plaintiffs' Exhibit 90

Fill in this information to identify your case:

United States Bankruptcy Court for the:

SOUTHERN DISTRICT OF FLORIDA

Case number *(if known)* _____ Chapter __11__

☐ Check if this an amended filing

## Official Form 201
## Voluntary Petition for Non-Individuals Filing for Bankruptcy          4/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | | |
|---|---|---|---|
| **1.** | Debtor's name | Consumer Advocacy Center Inc. | |
| **2.** | All other names debtor used in the last 8 years<br><br>Include any assumed names, trade names and *doing business as* names | | |
| **3.** | Debtor's federal Employer Identification Number (EIN) | Redacted 0303 | |
| **4.** | Debtor's address | Principal place of business | Mailing address, if different from principal place of business |
| | | 500 East Broward Boulevard, Suite 1710<br>Fort Lauderdale, FL 33394<br>Number, Street, City, State & ZIP Code | 173 Tehnology Dr. #202<br>Irvine, CA 92618<br>P.O. Box, Number, Street, City, State & ZIP Code |
| | | Broward<br>County | Location of principal assets, if different from principal place of business |
| | | | Number, Street, City, State & ZIP Code |
| **5.** | Debtor's website (URL) | | |
| **6.** | Type of debtor | ☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br>☐ Partnership (excluding LLP)<br>☐ Other. Specify: _____ | |

Pls.' Ex. 90
P. 1376
CFPB-20230125-00003125

| Debtor | **Consumer Advocacy Center Inc.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7.** Describe debtor's business

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

**8.** Under which chapter of the Bankruptcy Code is the debtor filing?

*Check one:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check all that apply:*

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** Were prior bankruptcy cases filed by or against the debtor within the last 8 years?

If more than 2 cases, attach a separate list.

☒ No.

☐ Yes.

| | District | | When | | Case number | |
|---|---|---|---|---|---|---|
| | District | | When | | Case number | |

**10.** Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?

List all cases. If more than 1, attach a separate list

☒ No

☐ Yes.

| | Debtor | | | Relationship | | |
|---|---|---|---|---|---|---|
| | District | | When | Case number, if known | | |

Pls.' Ex. 90.
P. 1377

CFPB-20230125-00003126

| Debtor | Consumer Advocacy Center Inc. | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**11. Why is the case filed in this district?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

Why does the property need immediate attention? (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

Where is the property? _____
Number, Street, City, State & ZIP Code

Is the property insured?

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

☒ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

**15. Estimated Assets**

☒ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

**16. Estimated liabilities**

☒ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

Pls.' Ex. 90
P. 1378
CFPB-20230125-00003127

Debtor     Consumer Advocacy Center Inc.         Case number (if known) _____
      Name

**Request for Relief, Declaration, and Signatures**

WARNING — Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| 17. Declaration and signature of authorized representative of debtor | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. |
|---|---|

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    1 / 15 / 19
          MM / DD / YYYY

X _____          Albert Kim
   Signature of authorized representative of debtor      Printed name

Title    President

| 18. Signature of attorney | X _____      Date   1 / 16 / 19 |
|---|---|

   Signature of attorney for debtor            MM / DD / YYYY

Brian S. Behar
Printed name

Behar, Gutt & Glazer, P.A.
Firm name

DCOTA, Suite A-350
1855 Griffin Road
Fort Lauderdale, FL 33004
Number, Street, City, State & ZIP Code

Contact phone   305-931-3771      Email address   bsb@bgglaw.com

727131 FL
Bar number and State

Official Form 201          Voluntary Petition for Non-Individuals Filing for Bankruptcy          page 4

Pls.' Ex. 90
P. 1379

CFPB-20230125-00003128

# Plaintiffs' Exhibit 91



**ORDERED in the Southern District of Florida on July 31, 2019.**

**John K. Olson, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                  Case No.: 19-10655-BKC-JKO

 CONSUMER ADVOCACY CENTER INC.,          Chapter 11

                    Debtor.
_____/

### ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE
### AND SETTING A STATUS CONFERENCE

THIS MATTER came before the Court on July 31, 2019 at 10:30 a.m. upon the *United*

*States Trustee's Motion For The Appointment Of A Chapter 11 Trustee, Or Alternatively, For*

*The Appointment Of A Chapter 11 Examiner* [D.E. #54] (the "Motion"). The Court having

reviewed the Motion and the record, heard the argument of counsel, and for the reasons stated

on the record, it is

**ORDERED** as follows:

1.      The Motion is **GRANTED** and the United States Trustee is directed to appoint

a Chapter 11 Trustee immediately.

2.      The Chapter 11 Trustee is directed to appear for a status conference hearing that

the Court will hold in this case on **August 19, 2019 at 10:30 a.m.** at the U.S. Courthouse,

Courtroom 301, 299 E. Broward Blvd., Ft. Lauderdale, Florida 33301.

###

Submitted by: Zana M. Scarlett, Esq.
U.S. Trustee's Office
51 SW 1st Ave., Rm. 1204
Miami, FL 33130

**ALL CREDITORS AND PARTIES IN INTEREST (BY CLERK'S OFFICE)**

2

Pls.' Ex. 91
P. 1382

Plaintiffs' Exhibit 92

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Ft. Lauderdale Division
www.flsb.uscourts.gov

In re:                                          CASE NO.:  19-10655-JKO

CONSUMER ADVOCACY CENTER, INC.                  CHAPTER 7

     Debtor.

_____/

### DEBTOR CONSUMER ADVOCACY CENTER, INC.'S AND ALBERT KIM'S REPLY MEMORANDUM IN SUPPORT OF PRECAUTIONARY JOINT MOTION FOR ENLARGEMENT OF TIME TO COMPLY WITH TURNOVER

     Chapter 7 Debtor, Consumer Advocacy Center, Inc. (the "Debtor"), and Albert Kim, by their undersigned counsel, file this Reply Memorandum to the Trustee's Response [ECF 130] to their Precautionary Motion for Enlargement of Time [ECF 98] and state the following:

     1.    The Trustee's Response presents a one-sided and unfair picture of the Debtor's and Mr. Kim's compliance with the Court's Turnover Order [ECF 88].

     2.    The area in which there has been a delay is the providing of the CRM data relevant to the Debtor's former operations.  The CRM data the Trustee seeks was transferred, in March 2018, to SL Account Management, Inc. d/b/a True Count Staffing ("TCS").  As discussed below, the Debtor and Mr. Kim have used their best efforts to obtain and deliver the CRM data, and they have made substantial progress.  To the best of their ability, they have complied with all other requests.

### PRODUCTION OF CRM INFORMATION

     3.    The Debtor ceased operations on or about September 21, 2018, several months before the Petition Date.  In March 2018, the Debtor transferred its processing, customer service

and billing business to TCS. At or about that time, the Debtor transferred its CRM data with DebtPay, Inc. d/b/a DebtPayPro ("DPP") to TCS. Thereafter, DPP began invoicing TCS for its services and stopped invoicing the Debtor.

4. However, because the Debtor continued to function as a sales agency for TCS, the Debtor needed access to TCS's DPP account in order to enter information and upload documents. The DPP account is an on-line CRM platform that was the primary means of recording customer transactions and communications with customers and storing documents. DPP stores uploaded documents on the cloud-storage service offered by Amazon Web Services ("AWS").

5. After March 2018, TCS billed students for services, performed all contracted services and collected payment. TCS agreed to pay the Debtor a percentage of sales for its sales services. In September 2018, this arrangement changed. In September 2018, the Debtor (CAC) ceased operations and transferred all of its sales staff to Prime Consulting. Thereafter, the Debtor no longer engaged in sales of student loan services and no longer utilized TCS' DPP platform to record any transactions or upload documents.

6. The Trustee is seeking CRM data that is not owned by the Debtor or Mr. Kim. The Trustee knows this because she has issued a Rule 2004 Examination *Duces Tecum* of True Count Staffing requesting this information [ECF 124]. The return date for the Rule 2004 production is October 11, 2019. Although neither the Debtor nor Mr. Kim owns the CRM account, the Debtor and Mr. Kim requested that TCS provide the CRM data for the period of time that the Debtor was operational (*i.e.*, through September 2018). TCS is utilizing a vendor, Setec, to retrieve the DPP files relating to the Debtor. That process has taken longer than expected, despite best efforts.

Pls.' Ex. 92
P. 1385

7.     TCS's DPP password and log-in are proprietary to TCS and are not the Debtor's
or Mr. Kim's property.  The TCS DPP account contains information concerning TCS's business
transactions, from September 2018 to the present time, to which the Debtor was not a party.
Regardless, TCS is voluntarily cooperating in retrieving and delivering the CRM data maintained
by DPP that reflects the Debtor's activities when it was operational.

8.     To date, Mr. Kim's counsel has obtained and delivered to the Trustee CSV
(comma-separated values format) files containing the data for the Debtor's transactions
(telephone information, customer names, payment information, etc.).  A CSV file is a delimited
text file that uses a comma to separate values.  A CSV file stores tabular data (numbers and text)
in plain text. Each line of the file is a data record.  Each record consists of one or more fields,
separated by commas.  The data is reviewable through Microsoft Excel, and other software may
be available to access the data.  Mr. Kim is willing to assist the Trustee in making sure that the
data is accessible.  This data was delivered to the Trustee on Monday, August 26, 2019.  A
Sharefile was made available on a site posted by the law firm Venable, LLP, counsel to TCS.

9.     The process of downloading documents and other files stored on AWS has taken
much longer.  Setec has been downloading files from AWS for several weeks.  The total number
of separate files is estimated to be over 3 million.  The total amount of storage is estimated to be
in the area of 3 terabytes.  The download rate for downloading computer files from AWS is very
slow.  The downloading took a substantial amount of time due to the number of files and the
slow download rate.

10.     Setec recently completed the downloading of the AWS pdf and other text and data
files, and the files are presently being organized by another vendor, Xact Data Discovery, to
separate the Debtor documents/data (through September 2018) from the TCS documents/data.  It

Pls.' Ex. 92
P. 1386

is expected that the Debtor will be in a position to complete its production of the Debtors' CRM data to the Trustee by Friday, September 20, 2019.[1]

11.     The Debtor does not own, hold or control the CRM data that it created and utilized when it was operating.  In response to the Trustee's request for turnover, it would have been easy to respond "none" and to direct the Trustee to seek the data from third parties.  Instead, the Debtor and Mr. Kim are cooperating to retrieve the data utilizing vendors employed by others.  The process has taken longer than anticipated.  But, the Debtor does not own the DPP account and cannot provide the Trustee with on-line access to that account.  Once the Trustee obtains all of the Debtor-related CRM data, it is expected that the Trustee will preserve the confidentiality of third party personal and financial information.  The data contains confidential student identifiers, financial information and account information.

12.     Because the Debtor ceased conducting business in September 2018, other than very minimal telephone lead brokering conducted by Mr. Kim post-petition, the customer files are likely to be of little use or relevance in the tasks of estate administration or asset recovery.  Nevertheless, the Debtor and Mr. Kim are doing everything in their power to provide the information.

## PRODUCTION OF OTHER INFORMATION

13.     The Debtor does not own any computer servers.  Mr. Kim, through counsel, offered to turnover to the Trustee the desk top computers the Debtor formerly used.  This offer was made on August 19, 2019.  Several days later, Trustee's counsel asked for a contact person and telephone number.  That information was provided on August 27, 2019.  The Trustee has not

---

[1] The exception may be MP3 files which take longer to download.

4

yet made arrangements to pick up the computers, which are located at 173 Technology Drive in

Irvine, California.[2]

14.      On August 21, 2019, Mr. Kim, through counsel, provided to the Trustee the log-

on and password for the Debtor's accounting data maintained on a cloud service provided by

QuickBooks.  It appears that the Trustee has been able to access the Debtor's QuickBooks

accounts and reports.  Neither the Trustee nor her counsel has reported any difficulty in this area.

Further, the Trustee has served a series of subpoenas to third parties (credit card processors,

banks, vendors, and others), and it appears that the Trustee utilized the accounting information

available on QuickBooks as source information for the subpoenas.

15.      On August 21, 2019, Mr. Kim, through counsel, provided to the Trustee a

spreadsheet of log-ons and passwords for two banks, five merchant accounts, two merchant

account gateways and ADP.  Mr. Kim's counsel advised the Trustee's counsel that some of the

accounts had been terminated and that the log-on and password for a third bank, Sunwest Bank,

could not be located.  Because the Debtor ceased conducting a substantial portion of its business

in March 2018 and completely ceased operations in September 2018, several on-line accounts

were closed, and the Debtor lost access.  On September 16, 2019, Mr. Kim, through counsel,

provided an updated spreadsheet designating the particular accounts that are closed and no

longer available on-line.

---

[2] The computers have not been searched or tampered with in any way.  However, the hard
drives may or may not contain any data of importance.  In some instances, when employees left
CAC, their desk top computers were re-formatted in the ordinary course of business.  The Debtor
has not made any investigation to determine what data remains on these computers.  As already
discussed, the Debtor recorded its transactions, communications with customers and documents
on the cloud services maintained by DPP and AWS, not on the Debtor's own computer network,
servers or hard drives.

Pls.' Ex. 92
P. 1388

16.     Mr. Kim understands that the Debtor's ADP on-line access is still available.
Through counsel, Mr. Kim provided the log-on and password for ADP.  The Trustee never
advised of any difficulties.  The Debtor and Mr. Kim first learned that the Trustee had been
unable to access the ADP on-line account in reading the Trustee's response memorandum, filed
on Thursday, September 12, 2019.  However, on August 26, 2019, the Debtor provided to the
Trustee, through a Sharefile, a link to pertinent ADP reports for the Debtor.  The Trustee does
not mention the provision of this Sharefile link in the Trustee's Response.

17.     The Debtor and Mr. Kim will fully cooperate with the Trustee to enable the
Trustee to obtain access to the ADP on-line account, if that is possible.  It appears that the ADP
Workforce platform requires the answer to a security question, in addition to a log-in and
password.  Mr. Kim is endeavoring to obtain that information.

18.     The Trustee is correct that the Debtor and/or Mr. Kim, through counsel, provided
its QuickBooks data, a list of its employees, a list of all merchant processing companies that did
business with the Debtor, a list of the marketing companies and the catalog processing company
that did business with the Debtor, the Debtor's bank statements and tax returns.  Mr. Kim,
through counsel, also provided the Debtor's corporate records, employee handbook, form of
client fee agreement, form of vendor services agreement and other specific documents within the
categories of documents identified by the Trustee.

19.     The Trustee requested agreements or other documents reflecting or evidencing the
sale of the business to TCS.  As counsel for Mr. Kim advised the Court at the last hearing in this
case, there are no written sale agreements.  The transfer of the business was effectuated pursuant
to an oral agreement, not a written agreement.  The Debtor and Mr. Kim have identified only a
few agreements evidencing the transfer.  The Debtor previously provided an Assignment of

6

Lease.  Mr. Kim's counsel provided to the Trustee's counsel copies of the Debtor's notices to employees relating to their change of employment.  Today, Mr. Kim's counsel provided to the Trustee's counsel copies of the DPP account transfer documents.  The Debtor and Mr. Kim have used best efforts to identify agreements and other documents relating to the transfer.

20.     Based on information supplied by Mr. Kim, the Trustee was able to obtain information concerning the status of two merchant accounts, and the Trustee learned that there are reserves held by the merchant account processors that were not disclosed in the Debtor's Schedules as assets.  Mr. Kim understood that these funds were not the Debtor's funds, but, instead, were reserves established by the credit card processors for refunds, chargebacks and other expenses.  Mr. Kim may have misunderstood the status of the funds, but his non-disclosure was unintentional.  The Trustee can assure herself that neither Mr. Kim not anyone else associated with the Debtor has withdrawn, or attempted to withdraw, any reserve funds or has made any effort to obtain the funds.  The Debtor is informed that the Trustee is making efforts now to obtain turnover of the reserves.  The Debtor will be amending its schedules to disclose all known reserves maintained by credit card processors as of the Petition Date.

## SUMMARY AND CONCLUSION

21.     Since mid-August, the Debtor and Mr. Kim have been endeavoring to comply with the Trustee's turnover request and the Turnover Order.  They have been utilizing their best efforts.  The primary source of data that has been delayed is the CRM data.  The Debtor does not own the CRM data.  Nevertheless, the Debtor and Mr. Kim have undertaken substantial efforts to provide it, and it will be provided.  The Trustee apparently seeks the current log-on and password, but neither the Debtor nor Mr. Kim owns rights in the log-on and password nor any rights in the data that is owned by third parties.

7

22.    Because of the status of the Debtor's business – essentially non-operating since September 2018 – this was not a standard turnover situation in which the Debtor could simply open its doors and deliver its computers, accounts, equipment and documents.  There were no operations or operational assets to turn over.  Still, the Debtor and Mr. Kim provided everything they could provide, the most difficult issue being the CRM data.  The Debtor and Mr. Kim expect the process of delivering the CRM data/files to be completed by September 20, 2019.

23.    The delay that has occurred has not caused any prejudice.  There is no ongoing business.  No data or documents have been altered or destroyed.  No accounts have been drawn on.  No funds or physical assets have disappeared.  The Trustee actually has all the information needed to administer the estate.  The still missing information concerns the student transactions that occurred while the Debtor was operating.  That data is expected to be supplied to the Trustee soon and not later than September 20, 2019.

**WHEREFORE**, the Debtor and Albert Kim seek the entry of an Order (i) granting the Motion; (ii) enlarging the time for the Debtor and Mr. Kim to comply with the provision of the Turnover Order relating to CRM data to September 20, 2019, and (iii) granting such other relief as the Court may deems just and proper.

**BEHAR, GUTT & GLAZER, P.A.**
Attorneys for Debtor
DCOTA, Suite A-350, 1855 Griffin Road
Fort Lauderdale, Florida 33004
Telephone: (305) 931-3771/Fax: (305) 931-3774

By: /s/ *Brian S. Behar*
Brian S. Behar
Fla. Bar. No.: 727131

Pls.' Ex. 92
P. 1391

**SHUTTS & BOWEN LLP**
Attorneys for Albert Kim
200 South Biscayne Blvd., Suite 4100
Miami, FL 33131
Telephone: (305) 358-6300/ Fax: (305) 381-9982

By: */s/ Peter H. Levitt*
Peter H. Levitt
Fla. Bar No.: 650978

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Reply Memorandum was served via the Court's Case Management/Electronic Case Filing System upon all interested creditors and parties registered to receive electronic notification on this matter and/or via U.S. Mail/E-mail as indicated on the attached Service List on this 16th day of September, 2019.

*/s/ Peter H. Levitt*
Peter H. Levitt

Pls.' Ex. 92
P. 1392

*Electronic Mail Service List*

- Brian S Behar
  bsb@bgglaw.net

- Glenn D Moses
  gmoses@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com; vlambdin@gjb-law.com;jzamora@gjb- law.com;gjbecf@ecf.courtdrive.com;ecastellanos@gjb-law.com

- Office of the US Trustee
  USTPRegion21.MM.ECF@usdoj.gov

- Sarah Preis
  sarah.preis@cfpb.gov

- Zana Michelle Scarlett
  Zana.M.Scarlett@usdoj.gov

- Sonya Salkin Slott
  sonya@msbankrupt.com, FL41@ecfcbis.com;
  sls1@trustesolutions.net;mark@msbankrupt.com;Kristen@msbankrupt.com;sls@msbankrupt.com;trusteesalkin@msbankrupt.com;Zachary@msbankrupt.com

- Jesse D Stewart
  jesse.stewart@cfpb.gov

- Larry I. Glick
  lglick@shutts.com

*U.S. Mail Service List*

Laurel Loomis Rimon
lrimon@omm.com
O'Melveny & Myers LLP
1625 Eye Street, NW Washington, DC 20006
Co-Counsel for Albert Kim

Pls.' Ex. 92
P. 1393