**BUREAU OF CONSUMER FINANCIAL PROTECTION**
SARAH PREIS (DC Bar No. 997387)
(admitted *Pro Hac Vice*)
Tel.: (202)-435-9318
Email: sarah.preis@cfpb.gov
JESSE STEWART (NY Bar No. 5145495)
(admitted *Pro Hac Vice*)
Tel.: (202)-435-9641
Email: jesse.stewart@cfpb.gov
N. NATHAN DIMOCK (DC Bar No. 487743)
(admitted *Pro Hac Vice*)
Tel.: (202) 435-9198
Email: nathan.dimock@cfpb.gov
1700 G Street, NW,
Washington, DC 20552
Fax: (844) 826-5016
LEANNE E. HARTMANN (CA Bar No. 264787)
(Local Counsel for the Bureau of Consumer Financial Protection)
301 Howard Street, Suite 1200,
San Francisco, CA 94105
Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788
*Attorneys for Plaintiff the Bureau of Consumer Financial Protection*

*Additional Counsel for Plaintiffs Listed on Next Page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al.,<br><br>        Defendants. | CASE NO. 8:19-cv-01998 MWF (KS)<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Court:  Hon. Michael W. Fitzgerald<br>Date:   March 20, 2023<br>Time:   10:00 AM<br>Place:  Courtroom 5A |

*Additional Counsel for Plaintiffs Listed Below:

**THE PEOPLE OF THE STATE OF CALIFORNIA**
HYDEE FELDSTEIN SOTO, City Attorney (CA Bar No. 106866)
CHRISTINA V. TUSAN, Supvr. Assistant City Attorney (CA. Bar No. 192203)
WILLIAM PLETCHER, Deputy City Attorney (CA Bar No. 212664)
MIGUEL RUIZ, Deputy City Attorney (CA Bar No. 240387)
Office Of the City Attorney
200 N. Main Street, 500 City Hall East
Los Angeles, CA 90012-4131
Tel: (213) 473-6908/Fax: (213) 978-8112
Emails: christina.tusan@lacity.org / william.pletcher@lacity.org
*Attorneys for Plaintiff the People of the State of California*

**THE STATE OF MINNESOTA**
EVAN ROMANOFF (Attorney Reg. No. 0398223)
(admitted *Pro Hac Vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 728-4126/Email: evan.romanoff@ag.state.mn.us
*Attorney for Plaintiff the State of Minnesota*

**THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (NC Bar No. 19397)
(admitted *Pro Hac Vice*)
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
Tel.: (919) 716-6000 / Fax: (919) 716-6050
Email: lweaver@ncdoj.gov
*Attorney for Plaintiff the State of North Carolina*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................. 1

BACKGROUND .............................................................................. 2

I. Statement of Facts ...................................................................... 2

   A. Overview of the Student-Loan Debt-Relief Enterprise ......................... 2

   B. Federal Student Loan Repayment and Forgiveness Programs ................ 4

   C. The Company's Purported Student-Loan Debt-Relief Services .............. 5

   D. The Company's Charging of Advance Fee ........................................... 7

   E. Wen's Role in Directing the Enterprise .............................................. 8

   F. The Company's Wrongful Collection of Over $95 Million from
      Consumers and Additional Harms Caused ........................................... 9

ARGUMENT ................................................................................ 10

I. Summary Judgment is Appropriate on the CFPA and TSR Claims ........... 10

   A. Wen and the Company are Subject to the TSR and the CFPA ............. 11

   B. The Company Violated the TSR and CFPA ..................................... 12

      1. The Company collected advance fees for debt-relief services .......... 12

      2. The Company engaged in deception ........................................... 14

         a. The Company misrepresented information about consumers
            payments ................................................................................ 15

         b. The Company misrepresented the nature and efficacy
            of its services ......................................................................... 16

   C. Wen is Directly Liable for Violating the TSR and CFPA
      (Counts I, II, III, and VII) ............................................................... 17

   D. Wen Substantially Assisted the Company's TSR and CFPA Violations
      (Counts V and IX) ........................................................................ 21

   E. Wen's Violations of the TSR are Violations of the CFPA (Count XI) .. 22

II. Summary Judgment Against Wen is Appropriate on the State
    Law Claims (Counts XVII, XVIII, XIX, XX, XII) .................................  23
    A. Wen Violated Minnesota's Consumer Protection Laws
       (Counts XVII and XVIII).................................................  23
    B. Wen Violated North Carolina's Consumer Protection Laws
       (Counts XIX and XX)...................................................  24
    C. Wen Violated California's Unfair Competition Law (UCL)
       (Count XXII)...........................................................  27
III. The Court Should Grant Injunctive Relief, a Civil Money Penalty,
     and Redress...............................................................  27
     A. Injunctive Relief .....................................................  27
     B. Civil Money Penalty..................................................  28
     C. Redress................................................................  31
     CONCLUSION ..................................................................  32

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Superior Ct.*,
  467 P.3d 184 (Cal. 2020)........................................................................31

*AMG Cap. Mgmt., LLC v. FTC*,
  141 S. Ct. 1341 (2021).........................................................................20

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  973 P.2d 527 (Cal. 1999)......................................................................27

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..............................................................................10

*CFPB v. CashCall, Inc.*,
  35 F.4th 734 (9th Cir. 2022)............................................................18, 31

*CFPB v. Chou Team Realty LLC*,
   2021 WL 4077110 (C.D. Cal. Aug. 10, 2021).......................................28

*CFPB v. D & D Mktg.*,
  2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ...................................21, 22

*CFPB v. Daniel A. Rosen, Inc.*,
  2022 WL 1514439 (C.D. Cal. Apr. 5, 2022)...........................................21

*CFPB v. Gordon*,
  819 F.3d 1179 (9th Cir. 2016) ........................................................14, 20

*CFPB v. IrvineWebWorks, Inc.*, No. SACV 14-1967 JVS (ANX), 2016 WL
  1056662 (C.D. Cal. Feb. 5, 2016) .........................................................11

*CFPB v. Nesheiwat*,
  2022 WL 17958636 (9th Cir. Dec. 27, 2022)........................................28

*Farmers Ins. Exch. v. Superior Ct.*,
  826 P.2d 730 (Cal. 1992).......................................................................27

*FTC v. All. Document Preparation*,
  296 F. Supp. 3d 1197 (C.D. Cal. 2017)......................................11, 13, 17

*FTC v. Com. Planet, Inc.*,
  815 F.3d 593 (9th Cir. 2016)....................................................................20

*FTC v. Consumer Health Benefits Ass'n*,
  2011 WL 13254502 (E.D.N.Y. Oct. 12, 2011).........................................22

*FTC v. Cyberspace.com, LLC*,
  453 F.3d 1196 (9th Cir. 2006) ...........................................................14, 15

*FTC v. Dinamica Financiera LLC*,
  2010 WL 9488821 (C.D. Cal. Aug. 19, 2010) .........................................28

*FTC v. Elegant Sols., Inc.*,
  2022 WL 2072735 (9th Cir. June 9, 2022) ..............................................32

*FTC v. Elegant Sols., Inc.*,
  2020 WL 4390381 (C.D. Cal. July 6, 2020) .............................................17

*FTC v. EMA Nationwide, Inc.*,
  767 F.3d 611 (6th Cir. 2014)....................................................................14

*FTC v. Gill*,
  265 F.3d 944 (9th Cir. 2001)....................................................................28

*FTC v. Grant Connect, LLC*,
  763 F.3d 1094 (9th Cir. 2014) ...........................................................10, 19

*FTC v. HES Merch. Servs. Co.*,
  2014 WL 6863506 (M.D. Fla. Nov. 18, 2014).........................................18

*FTC v. Lake*,
  181 F. Supp. 3d 692 (C.D. Cal. 2016)......................................................21

*FTC v. Johnson*,
  96 F. Supp. 3d 1110 (D. Nev. 2015).........................................................16

*FTC v. Lucas*,
  483 F. App'x 378 (9th Cir. 2012).............................................................15

*FTC v. MacGregor*,
  360 F. App'x. 891 (9th Cir. 2009).......................................................11, 19

*FTC v. Network Servs. Depot, Inc.*,
  617 F.3d 1127 (9th Cir. 2010) .............................................................. 10

*FTC v. Nudge, LLC*,
  2021 WL 3145700 (D. Utah July 26, 2021) ............................................ 22

*FTC v. Pantron I Corp.*,
  33 F.3d 1088 (9th Cir. 1994) ................................................................. 15

*FTC v. Publ'g Clearing House, Inc.*,
  104 F.3d 1168 (9th Cir. 1997) ............................................................... 18

*FTC v. Publishers Bus. Servs. Inc.*,
  540 F. App'x 555 (9th Cir. 2013) ........................................................... 19

*FTC v. Stefanchik*,
  559 F.3d 924 (9th Cir. 2009) ................................................................. 11

*Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark
  Corp.*, 850 N.W.2d 682 (Minn. 2014) .................................................... 23

*Gray v. N.C. Ins. Underwriting Ass'n*,
  529 S.E.2d 676 (N.C. 2000) .................................................................. 26

*In re Sanctuary Belize Litig.*,
  2019 WL 1934673 (D. Md. Apr. 30, 2019) ............................................. 18

*Marshall v. Miller*,
  276 S.E.2d 397 (N.C. 1981) .................................................................. 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ............................................................................. 10

*Meyer v. Dygert*, 156 F. Supp. 2d 1081 (D. Minn. 2001) ............................ 24

*Myers v. Liberty Lincoln-Mercury, Inc.*,
  365 S.E.2d 663 (N.C. Ct. App. 1988) .................................................... 26

*Podolsky v. First Healthcare Corp.*,
  58 Cal. Rptr. 2d 89 (Ct. App. 1996) ...................................................... 27

*Saunders v. Superior Ct.*,

    33 Cal. Rptr. 2d 438 (Ct. App. 1994)........................................................27

*State ex rel. Cooper v. NCCS Loans, Inc.*,

    624 S.E.2d 371 (N.C. Ct. App. 2005).......................................................26

*State v. Alpine Air Prods., Inc.*,

    490 N.W.2d 888 (Minn. Ct. App. 1992) ................................. 23, 24, 30

*State ex rel. Easley v. Rich Food Servs., Inc.*,

    535 S.E.2d 84 (N.C. Ct. App. 2000).........................................................26

*State v. Minn. Sch. of Bus., Inc.*,

    935 N.W.2d 124 (Minn. 2019) ..................................................................31

*State v. Philip Morris, Inc.*,

    551 N.W.2d 490, 496 (Minn. 1996) ........................................................23

**Statutes & Regulations**

12 C.F.R. § 1083.1 ..............................................................................................29

12 U.S.C. § 5481(25)(C)(i), (ii).......................................................................12

12 U.S.C. § 5481(5), (15)(A)(viii)(II)............................................................12

12 U.S.C. § 5481(6)(A), (19) ...........................................................................12

12 U.S.C. § 5531(b)............................................................................................22

12 U.S.C. § 5536(a)(3)........................................................................................21

12 U.S.C. § 5565(a)(2)(B).................................................................................32

12 U.S.C. § 5565(c)(1)........................................................................................28

12 U.S.C. § 5655(c)(3)........................................................................................29

12 U.S.C. §§ 5531(a), 5536(a)(1)(B)..............................................................12

12 U.S.C. § 5565(a)(2)........................................................................................31

15 U.S.C. § 6102(c).............................................................................................22

16 C.F.R. § 310.2(dd), (ff), (gg) .....................................................................11

16 C.F.R. § 310.2(t)............................................................................................14

16 C.F.R. § 310.3(b)...........................................................................................21

16 C.F.R. § 310.4(a)(5)(i) ..................................................................... 12

16 C.F.R. § 310.4(a)(5)(ii) .................................................................... 13

16 C.F.R. § 310.4(a)(5)(ii)(C) ............................................................... 14

16 C.F.R. §§ 310.3(a)(2)(iii), (x), 310.4(a)(5)(i) ................................... 11

Cal. Bus. & Prof. Code § 17203 ........................................................... 31

Cal. Bus. & Prof. Code § 17206 ........................................................... 30

California Unfair Competition Law .........................................................2

California's Unfair Competition Law (UCL) ......................................... 27

Consumer Financial Protection Act (CFPA) ................................ *passim*

Minn Stat. § 8.31, subd. 3a .................................................................. 31

Minn. Stat. § 325D.44, subd. 2 ............................................................ 24

Minn. Stat. § 325D.44, subds. 1(2), (5), (7), (9), (13) .......................... 23

Minn. Stat. § 325D.45, subd. 1 ............................................................ 24

Minn. Stat. § 325F.68, subd. 2 ............................................................ 23

Minn. Stat. § 325F.69, subd. 1 ............................................................ 23

Minn. Stat. §§ 325F.69, subd. 1 ........................................................... 24

Minn. Stat. §§ 8.31, subd. 3, 645.24 .................................................... 30

Minnesota Prevention of Consumer Fraud Act ........................................1

N.C. Gen .Stat. § 14-425 ...................................................................... 25

N.C. Gen .Stat. §§ 14-423, -424 ........................................................... 25

N.C. Gen. Stat. § 75-1.1 ................................................................ 25, 26

N.C. Gen. Stat. § 75-1.1(a) .................................................................. 26

N.C. Gen. Stat. § 75-15.2 ..................................................................... 30

N.C. Gen. Stat. §§ 14-425, 75-15.1 ..................................................... 31

North Carolina Debt Adjusting Act ........................................................2

North Carolina Telephonic Seller Registration Act ................................2

North Carolina's Debt Adjusting Act (NCDAA) .................................. 24

North Carolina's Unfair and Deceptive Practices Act (NCUDPA) ........ 26

Telemarketing Sales Rule (TSR) ..........................................................*passim*

Unfair and Deceptive Practices Act ..........................................................2

Uniform Deceptive Trade Practices Act ....................................................2

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................... 10

## INTRODUCTION

Defendant Kaine Wen orchestrated a federal-student-loan debt-relief enterprise that illegally collected over $95 million dollars in fees from over 80,000 consumers nationwide. Wen's enterprise of student-loan debt-relief companies (the Company) coerced consumers to pay significant upfront fees by misrepresenting that consumers' payments to the Company would go toward paying down their loan debt and by making false promises that the Company could secure loan forgiveness or lower monthly payments. The Company also routinely submitted false information to federal-student-loan servicers about consumers' family size and marital status and either failed to inform consumers entirely of this practice or misled consumers about its propriety.

Wen controlled the debt-relief enterprise, forming each component to use as a vehicle to further his illicit scheme. He actively managed the Company, developing its unlawful advance fee practices and cultivating a "SIGN OR DIE" culture that encouraged misrepresentations to consumers. Throughout the Company's operation, Wen perpetuated the Company's illegal activity and undertook steps to conceal that activity, including by directing the deletion of Company records and his own text messages. Wen's actions violated the Telemarketing Sales Rule (TSR), which prohibits deceptive acts or practices and the collection of advance fees for debt-relief services; and the Consumer Financial Protection Act (CFPA), which similarly prohibits deceptive acts or practices in connection with consumer-financial products or services like debt relief. Wen's actions also provided substantial assistance to the Company in violation of both statutes.

Finally, the same facts that form the basis of Plaintiffs' claims under the TSR and the Bureau of Consumer Financial Protection's (Bureau) claims under the CFPA establish Wen's liability to Plaintiffs the State of Minnesota for violations of the Minnesota Prevention of Consumer Fraud Act and Uniform

Deceptive Trade Practices Act; the State of North Carolina for violations of the North Carolina Debt Adjusting Act and the Unfair and Deceptive Practices Act; and the People of the State of California for the California Unfair Competition Law. The Court should therefore enter summary judgment in favor of Plaintiffs and against Wen on the Bureau's claims and the aforementioned state claims.[1] Further, the Court should enter an injunction to prevent Wen from future violations, order $95,057,756.92 in legal restitution, and impose a civil money penalty.

## BACKGROUND

### I. Statement of Facts

#### A. Overview of the Student-Loan Debt-Relief Enterprise

Between 2014 and 2019, Wen's student-loan debt-relief enterprise operated through three main companies: Consumer Advocacy Center, Inc., d/b/a Premier Student Loan Center (CAC); True Count Staffing Inc. (True Count), d/b/a SL Account Mgmt (SLAM); and Prime Consulting LLC (Prime) (collectively the Company). Statement of Undisputed Facts (UF) ¶¶ 1, 5, 7, 8, 11, 17, 20-35, 40-43, 48-49, 138-39. The Company marketed, sold and performed purported student-loan debt-relief services to consumers nationwide from November 5, 2015, until this Court entered an injunction prohibiting further operations in October 2019. UF ¶¶ 20-35; Sealed Order Granting Ex Parte Restraining Order with Asset Freeze, Appointment of Receiver, and Other Equitable Relief, and to Show Cause Why a Preliminary Injunction Should Not Issue (ECF 24); Stipulated Preliminary Injunction with Asset Freeze, Appointment of Receiver; and Other Equitable Relief (ECF 103).

---

[1] North Carolina is not moving for summary judgment on its claim under the North Carolina Telephonic Seller Registration Act (Count XXI).

In 2014, Wen and his business partner, Albert Kim, formed CAC to offer, sell and perform student-loan debt-relief services. UF ¶¶ 1, 5, 6. In March 2018, Wen and Kim transferred CAC's processing department, which prepared consumers' loan-adjustment applications and collected consumers' payments, to True Count, also owned and controlled by Wen and Kim. UF ¶¶ 27, 29, 139. True Count then collected payments from consumers for the student-loan debt-relief services sold by CAC and remitted a portion of that money back to CAC until September 2018. UF ¶ 28.

During 2018, law enforcement scrutiny of the Company intensified. *See* UF ¶¶ 196-197. On May 29, 2018, the Minnesota Attorney General's Office issued a civil investigative demand (CID) to a company with a name similar to CAC's to Wen's attention.[2] UF ¶ 196. And in mid-September 2018, the Company received the Bureau's CID directed to CAC. UF ¶ 197. In response, Wen and Kim developed a plan, against advice of counsel, to delete the Company's emails.[3] UF ¶¶ 200-04. Wen and Kim also formed a new company, Prime, to effectively replace CAC.[4] *See* UF ¶¶ 11-18, 30-36, 139. True Count continued to collect payments from legacy CAC customers, as well as consumers who enrolled through Prime, but Wen and Kim redirected CAC's remittances to Prime, leaving CAC insolvent. UF ¶¶ 30-35. CAC petitioned for Chapter 11 bankruptcy on January 16, 2019, in the Southern District of Florida. UF ¶ 36.

---

[2] Minnesota's CID was directed to Premier Student Loans, Inc., c/o Kaine Wen, and was sent to the Technology Drive address. UF ¶ 196.

[3] Plaintiffs were nonetheless able to recover at least some @premierstudentloancenter.com emails through the immediate access and other sources.

[4] Although Wen and Kim owned and controlled Prime during its entire operation, they asked their employee, Calvin Ho, to be listed as Prime's owner on corporate filings. UF ¶¶ 15-16.

Although Wen and Kim publicly identified CAC, True Count, and Prime as separate companies with separate owners, they operated as one company controlled by Wen and Kim. UF ¶¶ 3, 8, 14, 17-18, 20-35, 37-43, 48-49, 138-39. For example, all the companies shared a customer-relationship-management system (CRM) to store consumers' information, including payments and refunds; shared employees, including high-level managers; and intermingled their business records. UF ¶¶ 37-38, 41, 42.

## B. Federal Student Loan Repayment and Forgiveness Programs

The U.S. Department of Education (DOE) offers several federal-student-loan repayment and forgiveness programs to borrowers. UF ¶ 50. As relevant to Wen's scheme, the income-driven repayment (IDR) plan *may* result in lower monthly payments and eventual loan forgiveness for consumers. UF ¶ 51. For consumers who qualify for an IDR plan, student-loan servicers (not third-party debt-relief providers like the Company) determine a consumer's monthly loan-payment amount based on factors including the consumer's income, family size, marital status, and tax-filing status. UF ¶ 52. Consumers must recertify their eligibility for IDR programs annually, and their monthly payment amount may vary year to year depending on how factors change over time. UF ¶ 54.

Although falsifying consumers' family size or marital status on IDR plan applications may initially lower their monthly student loan debt payments, it can also have negative consequences. UF ¶ 55. For example, consumers may accrue more interest because it takes longer to pay off the loan due to the artificial lowering of the monthly payment. UF ¶ 55. Also, interest on consumers' loan balances may be capitalized if they leave an IDR program voluntarily or because they did not recertify. *Id.* Consumers may also unexpectedly face higher payments when their monthly payment amount is recalculated based on accurate information. *Id.*

Under each type of IDR plan, any remaining loan balance may be forgiven if a consumer's student loans are not fully repaid by the end of the repayment period. UF ¶ 56. IDR plans have repayment periods of 20-25 years, and consumers also in the Public Loan Service Program could qualify for loan forgiveness after making 10 years of qualifying payments. UF ¶ 57.

Consumers also may consolidate multiple federal education loans into one loan, which could provide additional loan repayment plans and forgiveness programs. UF ¶ 58. But consolidating federal loans can result in losing qualifying payments for loan forgiveness in connection with IDR plans. UF ¶ 59.

Consumers struggling to pay their loans can seek a temporary suspension of their loan payments, known as forbearance. During the relevant period, consumers could seek a "general forbearance" for a cumulative total of three years, and interest would typically continue to accrue during the forbearance, increasing the consumer's overall student loan debt over time. UF ¶ 60.

## C. The Company's Purported Student-Loan Debt-Relief Services

Using high-pressure sales tactics and misrepresentations, the Company lured consumers struggling with student-loan debt to pay hundreds or thousands of dollars in fees for services the consumers could perform themselves for free. UF ¶¶ 69, 74-91, 99-103, 105-06, 113-14, 116. The Company identified potential clients through lead generators, who transferred prospective consumers by phone to the Company's sales department. UF ¶ 62. During sales calls, salespeople accessed consumers' loan information on the Federal Student Aid (FSA) website, either by asking for the consumer's credentials or by creating an account for the consumer. UF ¶ 66. Salespeople also entered information about consumers—including their family size and marital status—into the CRM, often entering an inflated family size and listing married consumers as single. UF ¶¶ 67, 81-84. The Company's salespeople misled

consumers about the Company's fees and services during the sales calls and pressured them to enroll, including by claiming that certain benefits could disappear if they declined. UF ¶¶ 69, 74-91, 99-103.

Salespeople frequently misled consumers to believe that fees paid to the Company were used to pay down their student loan debt when, in fact, the Company retained consumers' payments.[5] UF ¶¶ 74-76. During sales calls, the Company also created the impression that consumers had to pay the Company's fees to enroll in IDR plans. UF ¶ 77. The Company often led consumers to believe that a significant part of their loans would be forgiven simply by enrolling in the Company's services. UF ¶¶ 86-89. Sometimes salespeople stated or implied that the loan forgiveness would be immediate. Other times they led consumers to believe that so long as they made their monthly payments to the Company, the remainder of their loans would be forgiven. UF ¶ 90. Salespeople frequently promised consumers significantly lower monthly student loan payments and led them to believe payments would be the same for the entire loan term. UF ¶¶ 78-81. Notably, they failed to disclose to consumers that their quotes were based on false information about the consumer's family size or marital status, which artificially lowered the monthly payment amount. UF ¶¶ 84, 102-03.

Following the sales call, employees in the Processing Department (processors) contacted the consumers and then prepared the consumer's IDR application and, in some cases, a loan consolidation application. UF ¶¶ 92, 97. Processors typically relied on the information entered in the Company's

---

[5] The Company's practice of seeking a temporary suspension of the consumers' payments through forbearance and replacing the contact information on file with the Company's (so that communications from the servicer went to the Company instead of consumers), made it more difficult for the consumers to discover that their payments were not actually being applied to their student loan debt.  UF ¶¶ 94-96.

customer relationship platform, Debt Pay Pro, by sales employees—which as
discussed above, frequently included manipulated information. UF ¶¶ 67, 81-
84, 93. The Company did not show consumers the applications it submitted to
servicers on their behalf. UF ¶ 98. The Company either did not inform
consumers that it included false information in IDR plan applications, or it
misrepresented what could properly be included as part of a consumer's family
size. UF ¶¶ 99-103.

The Company received many consumer complaints about its marketing
practices. UF ¶¶ 130-134. For example, during October 2019 alone, Thomas
McNamara, the court-appointed Receiver, identified approximately 150
consumer complaints in a single inbox. UF ¶¶ 132-34. And despite the
Company's efforts to "fly under the radar," numerous consumers complained
about the Company's deceptive practices to law enforcement agencies and the
Better Business Bureau who, in turn, shared some of these complaints with the
Company. UF ¶¶ 123-130.

**D. The Company's Charging of Advance Fee**

The Company charged two types of fees: an "enrollment fee" and a
"monthly fee." UF ¶¶ 104-118. The enrollment fee ranged from approximately
$799 to $1,899 and could be paid in more than one payment. UF ¶¶ 106, 107.
The Company incentivized salespeople to collect as much of the enrollment fee
as possible at enrollment, and paid salespeople a higher commission when
consumers paid the enrollment fee in full. UF ¶¶ 109. The Company also
charged a monthly fee of $10 to $50 per month for the entire life of the loan
(typically 10-25 years). UF ¶¶ 113-16. The Company charged the
monthly/recurring fees in the twelve months leading up to the submission of the
recertification paperwork, purportedly for preparing annual recertification
paperwork for IDR plans. UF ¶ 115. As a result, the Company collected
monthly/recurring fees before the consumer made a payment on a recertified

IDR plan. UF ¶ 115. In sum, the Company collected enrollment and monthly fees from consumers before the consumers had made a payment on an adjusted loan. UF ¶¶ 104, 107, 109-113, 115-118. Indeed, the Company did not even track whether consumers made payments on adjusted payment plans. UF ¶¶ 118.

### E.   Wen's Role in Directing the Enterprise

Wen held an essential role in in the student-loan debt-relief enterprise. UF ¶¶ 5- 8, 16-19, 27, 30, 48-49, 70, 138-150, 155, 161-66, 174-180, 183-185, 187, 193-95. He served as one of two final decisionmakers and participated in the Company's significant decisions. UF ¶¶ 15-19, 27-30, 48-49, 138-39, 145-150, 161-63, 165-66, 174, 176, 187-83. Wen knew about—and even controlled—the Company's sales practices and the eventual fallout from those practices. UF ¶¶ 48-49, 145-52, 154-66. Wen and his partner, Kim, promoted a high-pressure "SIGN OR DIE" culture aimed at maximizing consumer enrollment. UF ¶¶ 69-72, 154-166. Despite several red flags, including consumer complaints, Wen and his partner did not reform the Company's practices, and instead employed a panoply of fictitious names and engaged a reputation management company to deal with negative online reviews. UF ¶¶ 71-72, 130-31, 135-37, 145, 150, 154-166.

Wen long understood that the Company charged illegal advance fees and undertook efforts to conceal this practice. UF ¶¶ 167-176, 180, 183-85, 191-207. Wen helped establish the Company's fee structure, including when and how those fees could be collected. UF ¶ 146. He also helped set up and maintain the Company's merchant accounts. UF ¶¶ 144-45. Wen was personally cautioned about complying with the TSR's advance fee provisions, and he approved the Company's contracts, which since at least February 2018 included a section entitled "No Advance Fees." UF ¶¶ 168, 173. Later, in 2019 Wen also helped form TAS 2019 LLC, d/b/a Trusted Account Services (TAS),

a supposedly independent dedicated account provider that, in reality, Wen and other insiders directed. UF ¶¶ 174-76, 178-85, 187-95. The Company used TAS to collect fees from consumers from August to October 2019. UF ¶¶ 174-95.

Wen also acknowledged the Company's illegal fee collection practices in emails with close associates and counsel, while simultaneously perpetuating them through approving and overseeing these practices. UF ¶¶ 167-176, 180, 183, 191-95. For example, in an email dated August 3, 2018, Wen wrote: "TC/SLAM is processing for ~37k current active clients. All clients are 'paying upfront fees.' There is no way to be retroactively compliant." UF ¶ 169. The Company continued to collect advance fees from consumers until this Court entered a temporary restraining order (TRO) halting its operation in October 2019. UF ¶¶ 104, 212.

## F.  The Company's Wrongful Collection of Over $95 Million from Consumers and Additional Harms Caused

Between November 5, 2015, and October 23, 2019, Wen's enterprise collected approximately $95,057,756.92 from consumers nationwide.[6] UF ¶¶ 20, 212. In addition to paying exorbitant fees for services they could perform themselves for free, consumers suffered additional harms. UF ¶¶ 50, 212, 217-21. For example, some consumers lost qualifying payments toward loan forgiveness because the Company had pursued an unnecessary loan consolidation on their behalf. UF ¶ 217. At times, the Company's practices increased consumers' loan debts through the accrual of extra interest costs. UF ¶ 218. The Company's practices also caused some consumers to unknowingly fall behind on their loan payments. UF ¶ 219. In addition, the Company's

---

[6] This figure represents the net amount after accounting for $11 million in refunds. UF ¶ 212.

1 practices caused consumers other financial harms and significant stress. UF ¶¶

2 220-21.

### ARGUMENT

4     Summary judgment is appropriate on Plaintiffs' claims against Wen

5 because "there is no genuine dispute as to any material fact and the [movants

6 are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once

7 plaintiffs make a *prima facie* case for summary judgment, Wen cannot rely on

8 general denials but must designate "specific facts" showing that there is a

9 genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

10 "Where the record taken as a whole could not lead a rational trier of fact to find

11 for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec.*

12 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

13 **I. Summary Judgment is Appropriate on the CFPA and TSR Claims.**

14     The Court should grant summary judgment on Plaintiffs' TSR claims and

15 the Bureau's CFPA claims against Wen. CAC, True Count, and Prime operated

16 as a common enterprise and each is subject to the TSR and CFPA. The

17 Company had the quintessential hallmarks of a common enterprise: each entity

18 was owned or controlled by Wen and his partner; shared a customer database

19 and other resources; had overlapping employees, including senior managers;

20 co-mingled business records; and participated together in the common venture.

21 *See FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010)

22 (common enterprise existed where companies pooled resources, staff, funds,

23 had common ownership, and all "participated to some extent in a common

24 venture"). Accordingly, each company may be held liable for the violations of

25 the common enterprise. *See FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105

26 (9th Cir. 2014) (where entities and individuals operate together as a common

27 enterprise, "each may be held liable for deceptive acts and practices of the

28 others"); *FTC v. All. Document Preparation*, 296 F. Supp. 3d 1197, 1203-04

1  (C.D. Cal. 2017) (defendants that operated as a common enterprise could be
2  jointly and severally liable for claims under FTC Act and TSR).

3        The Company violated the TSR and CFPA. *See infra* § I.B. Wen is
4  directly liable for engaging in violations through his role in the enterprise, *see*
5  *infra* § I.C., and is liable for substantially assisting its violations. *See infra* §
6  I.D. Finally, Wen's violations of the TSR also are violations of the CFPA. *See*
7  *infra* § I.E.

8  **A. Wen and the Company are Subject to the TSR and the CFPA.**

9        Wen and the Company are subject to the TSR. Under the TSR, "sellers"
10  and "telemarketers" are prohibited from receiving advance fees for debt-relief
11  services, misrepresenting any material aspect of the efficacy of their services, or
12  misrepresenting any material aspect of a debt-relief service. 16 C.F.R. §§
13  310.3(a)(2)(iii), (x), 310.4(a)(5)(i). The Company offered "debt relief
14  service[s]" as defined in the TSR, by offering services to renegotiate, settle, or
15  alter the payment terms of consumers' federal student loans by applying for
16  IDR plans and loan consolidation. *Id.* § 310.2(o); *see also CFPB v.*
17  *IrvineWebWorks, Inc.*, No. SACV 14-1967 JVS (ANX), 2016 WL 1056662, at
18  *6 (C.D. Cal. Feb. 5, 2016) (TSR defines "debt relief service" broadly and
19  applies to the preparation of student loan adjustment applications). The
20  Company is a "seller" and "telemarketer" under the TSR because it engaged in
21  a nationwide marketing campaign to induce consumers to purchase its services
22  and offered its services during sales calls. 16 C.F.R. § 310.2(dd), (ff), (gg). Wen
23  is also a "seller" because he arranged for the Company to provide services to
24  consumers through his extensive involvement in the Company's management
25  and operations. *Id.* § 310.2(dd); *FTC v. MacGregor*, 360 F. App'x. 891, 893-94
26  (9th Cir. 2009); *FTC v. Stefanchik*, 559 F.3d 924, 930-31 (9th Cir. 2009).

27        Wen and the Company also fall within the scope of the CFPA, which
28  prohibits "covered person[s]," from engaging in a deceptive act or practice in

connection with the offering of a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). A "consumer financial product or service" includes "providing financial advisory services" to "assist a consumer with debt management or debt settlement" or "modifying the terms of any extension of credit." *Id.* § 5481(5), (15)(A)(viii)(II). By offering services to assist consumers with modifying the terms of their student-loan debts, the Company provided a consumer financial product or service and is therefore a covered person under the CFPA.

A "covered person" includes any entity that "offer[s] or provid[es] a consumer financial product or service." *Id.* § 5481(6)(A), (19). In addition, "related person[s]" are covered persons for all purposes of any provision of Federal consumer financial law. *Id.* § 5481(25)(B). "Related person[s]" include officers, directors, and employees with managerial responsibilities. *Id.* § 5481(25)(C)(i). Wen is a "covered person" because he is a "related person" under the CFPA because he owned, controlled, and had managerial responsibility for the Company and because he "materially participate[d]" in the conduct of its affairs. *Id.* § 5481(25)(C)(i), (ii).

**B.   The Company Violated the TSR and CFPA.**

**1.     The Company collected advance fees for debt-relief services.**

The Company collected illegal advance fees for debt-relief services the entire time it operated. *See supra* Statement of Facts (SOF) § I.C, D. Under the TSR, sellers and telemarketers of debt-relief services can request or receive fees only after they have (1) renegotiated, settled, reduced, or otherwise altered the terms of a debt, *and* (2) the consumer has made at least one payment under the adjusted terms of their loan. 16 C.F.R. § 310.4(a)(5)(i). First, it is beyond dispute that the Company "renegotiated, settled, reduced, or otherwise altered the terms of a debt," between November 5, 2015, and October 23, 2019 – it was the Company's entire business. Second, although the Company did not track

whether consumers made payments on adjusted loans, the Company clearly collected fees before consumers "made at least one payment under the adjusted terms of their loan."

At enrollment, the Company financially incentivized its salespeople to collect enrollment fees as early as possible—and the evidence shows that the Company collected some, if not all, of consumers' enrollment fees before it had submitted a loan consolidation or IDR application and, as a result before consumers made an initial payment on the adjusted loan. *See supra* SOF § I.D. And the Company collected all monthly fees for recertification in the twelve months leading up to the submission of the IDR recertification paperwork, before the consumer was approved (or had made a payment) under a recertified plan. *See id.* In fact, the Company collected fees from consumers who did not even owe a payment—either because their loans were in forbearance, or their monthly payment was reduced to $0. *See id.* As a court in this District previously held, "[b]ecause the loans [were] in forbearance at the time Defendants collect[ed] their fee, consumers cannot have made any payments pursuant to the new agreement—a clear violation of the up-front payment rule." *See All. Document Preparation*, 296 F. Supp. 3d at 1210.

The Company's illegal fee collection practices continued from approximately November 2015 through October 23, 2019—even when it briefly engaged two purported dedicated account providers and when it collected fees through the defendant TAS. *See supra* (SOF) § I.C, D. The TSR allows requesting or requiring consumers to place funds in an account to be used for a debt-relief provider's fees "*and* for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt[.]" 16 C.F.R. § 310.4(a)(5)(ii) (emphasis added); *see also* Telemarketing Sales Rule, 75 Fed. Reg. 48458-01, 48490 n. 444 (Aug. 10, 2010) ("[i]f a provider is going to require a dedicated

bank account, it may not require the use of a dedicated bank account solely to set aside funds for the provider's fees."). Here, it is undisputed that the Company used the purported dedicated accounts and TAS accounts to collect its own fees, not to hold or make consumers' student loan payments. UF ¶¶ 119-122. Further, if consumers' funds are held in an account for payments to creditors *and* for debt relief provider fees, the account must be administered by an entity that "is not owned or controlled by, or in any way affiliated with, the debt relief service[,]" which was not the case for TAS. 16 C.F.R. § 310.4(a)(5)(ii)(C).

### 2. The Company engaged in deception.

The TSR prohibits certain deceptive telemarketing practices, including misrepresenting, "directly or by implication," "any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer," or any material aspect of any debt-relief service. *Id.* § 310.3(a)(2)(iii). "A representation is material if it is likely to affect a consumer's decision to buy a product or service." *FTC v. EMA Nationwide, Inc.*, 767 F.3d 611, 631, 633-34 (6th Cir. 2014) (citation omitted); *see also FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (a misrepresentation is material if it involves information that is important to consumers and likely to impact their choice or conduct); *see also* 16 C.F.R. § 310.2(t) (defining "material").

Similarly, under the CFPA, an act or practice is deceptive if "(1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (internal citation and quotations omitted). A representation or omission is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Lucas*,

483 F. App'x 378, 379 (9th Cir. 2012). Express representations are presumed material, as are implied claims designed to induce a purchase. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994). Although proof of actual deception is not necessary to establish a violation, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *Cyberspace.com*, 453 F.3d at 1201.

The Company systematically misrepresented the cost, nature, and efficacy of its services. *See supra* SOF § I.C. The Company's misrepresentations were material and likely to mislead consumers acting reasonably under the circumstances. *See supra* SOF § I.C, F. And, although not required to prove liability, the evidence shows the Company did mislead numerous consumers who reasonably relied on the Company's representations in deciding to do business with the Company. *See supra* SOF § I. F. Indeed, several consumers stated they never would have agreed to pay the Company had they known the Company's representations were untrue. UF ¶¶ 222-25.

### a. The Company misrepresented information about consumers' payments.

The Company misled consumers into believing that their payments to the Company were going toward their remaining loan balance, even telling some consumers that the Company had "taken over" the consumers' loans. UF ¶ 75. In fact, the Company had not "taken over" consumers' loans and instead kept consumers' payments as illegal fees. UF ¶ 119. Relatedly, the Company also induced consumers to enroll by telling them that their payments to the Company would satisfy their student-loan debt obligations, including because the remainder of their loan balance had been or would be forgiven. *See supra* SOF § I.C. This representation also was untrue. *See supra* § SOF I.B. The Company also created the impression that their payments were a necessary cost to participating in forgiveness program when consumers could complete the

necessary paperwork themselves for free. *See supra* SOF § I.C. Representations about the purpose and cost of services are material to consumers because they influence purchasing decisions. *See FTC v. Johnson*, 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015) (citations omitted).

### b. The Company misrepresented the nature and efficacy of its services.

The Company frequently represented that it could lower consumers' monthly payment amounts, often quoting consumers a specific new monthly payment amount on the phone. *See supra* SOF § I.C. In some instances, the Company led consumers to believe that its fees were the consumer's new monthly loan payment, when its fees were in addition to loan payments consumers were already struggling to pay. *See supra* SOF § I.C. In other instances, the Company quoted a new, lower monthly payment amount that it calculated using false information about the consumer's marital status and family size. *See id.*

For example, the Company told a married father-to-be that he was "approved" for a new monthly payment of $128.70 for the next twenty years. UF ¶¶ 78, 100. He later learned from his servicer that his application listed him as single with five dependents, leading him to conclude that the Company's quoted monthly payment amount was based on false information. UF ¶¶ 78, 100. His conclusion was consistent with testimony from Wen's partner and a high-level Company employee who confirmed the Company routinely falsified information. UF ¶¶ 99, 102. The Company also told consumers that their new payment would last the entire loan term. *See supra* SOF § I.C. But only student loan servicers can approve monthly student loan payment amounts under an IDR plan, and that amount can vary year-to-year depending on the consumer's family size or marital status, among other factors. *See supra* SOF § I.B.

Representations that a consumer's periodic payments or liabilities may be reduced if defendants' services are procured are material. *See, e.g., All. Document Preparation*, 296 F. Supp. 3d at 1205-06, 1210-11 (finding FTC's deception claim likely to prevail on the merits where defendants falsely claimed to permanently lower monthly payments); *FTC v. Elegant Sols., Inc.*, No. SACV 19-1333 JVS (KESx), 2020 WL 4390381, at *8-10 (C.D. Cal. July 6, 2020) (granting summary judgment to FTC based on defendants' false representations about lowering consumers' monthly payments).

Second, the Company led consumers to believe their student loans would be forgiven, in whole or in part, if they enrolled in the Company's services. *See supra* SOF § I.C. The Company's representations were false; only the DOE can forgive federal student loans, and it can do so only after consumers have made at least 10 years of qualifying payments, in addition to meeting other criteria. *See supra* SOF § I.B. Representations about a consumer's eligibility or approval for loan forgiveness are material, *see All. Document Preparation*, 296 F. Supp. 3d at 1205-06, 1210-11, and numerous consumers complained the Company's representations regarding loan forgiveness influenced their decision to enroll. UF ¶ 225.

Finally, the Company either omitted or misrepresented its practice of routinely falsifying information in IDR plan applications in dealings with consumers. *See supra* SOF § I.C. Consumers would not have purchased the Company's services had they known the truth about this practice. UF ¶ 222.

## C. Wen is Directly Liable for Violating the TSR and CFPA (Counts I, II, III, and VII).

Under the CFPA and TSR, an individual may be liable for conduct related to corporate violations of the CFPA and the TSR where "(1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent

to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." *CFPB v. CashCall, Inc.*, 35 F.4th 734, 749 (9th Cir. 2022) (applying standard for individual liability under the CFPA and relying on precedent noting it is the same as standard under FTC Act) (citations omitted); *see also In re Sanctuary Belize Litig.*, No. PJM 18-3309, 2019 WL 1934673, at *2 (D. Md. Apr. 30, 2019) (standard for individual liability under the TSR is the same as the standard under the FTC Act). A person's role and authority within a company can demonstrate the requisite control and level of knowledge. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997).

Here, Wen had authority to control the Company's unlawful conduct—and he exercised it. *See supra* SOF § I.E. Wen helped to create and he oversaw the entire debt relief enterprise. *See supra* SOF § I.A, E. He was one of two final decisionmakers for the Company, including regarding the Company's marketing and fee collection practices. *See supra* SOF § I.E. He established the Company's merchant accounts, controlled the Company's finances, and helped manage the Company's chargebacks and refunds. *See supra* SOF § I.E*; see also FTC v. HES Merch. Servs. Co.*, No. 6:12-cv-1618-Orl-22KRS, 2014 WL 6863506, at *6 (M.D. Fla. Nov. 18, 2014) (requisite control where defendant handled merchant accounts and had "strong influence" in hiring and business practices). Wen also participated in the illegal practices themselves, for example by approving the Company's fee collection practices and the Company's "max 7" policy on inflating family size, and he helped cultivate a sales culture that emphasized sales at all costs. *See supra* SOF § I.E.

Wen knew of, recklessly disregarded, or consciously avoided knowing that the Company engaged in deceptive marketing practices and charged illegal advance fees. *See supra* § I.E. First, Wen's role overseeing the operation is itself sufficient to show he had sufficient knowledge for individual liability. *See*

*Grant Connect*, 763 F.3d at 1102; *FTC v. Publishers Bus. Servs. Inc.*, 540 F. App'x 555, 558 (9th Cir. 2013). Further, with respect to the Company's deceptive practices, Wen participated in internal discussions regarding the Company's representations to consumers and the content of consumer complaints, in addition to responding to inquiries from law enforcement, the BBB and others about these practices. *See supra* § I.E; *see also MacGregor*, 360 F. App'x at 894-95 (volume of consumer complaints, refund and return rates, and the number of inquiries from state attorneys general and the BBB evidenced requisite level of knowledge).

Wen also approved the Company's policy to inflate consumers' family sizes and its liberal refund policy, which aimed to minimize the volume of chargebacks and complaints to third parties. *See supra* SOF § I.E. Despite knowing about consumer complaints and negative online reviews, Wen did not reform the subject practices, and instead retained a "reputation management" company. *See supra* SOF § I.E. Advised by counsel to exercise oversight of the Company's sales practices, Wen, a lawyer at the time, ignored these warnings. *See supra* SOF § I.E. For example, the Company did not consistently audit sales calls, and although at some point it implemented a so-called "compliance script," the script failed to cure preceding misrepresentations. UF ¶¶ 72, 73. Wen also approved the Company's practice of using a panoply of fictitious names to dilute the volume of complaints against any one company, and he intentionally destroyed evidence of his knowledge about the Company's marketing practices. *See supra* SOF § 1.E.

Wen also developed the Company's fee collection practices, including approving the amount and timing of fees collected. *See supra* SOF § 1.E. He managed the Company's merchant and payment processing accounts and held account signatory power on numerous business accounts. *See supra* SOF § 1.E. Wen also reviewed and approved the Company's client agreement, which since

at least February 2018 falsely stated that the Company did not charge advance fees, would use "an independent third-party dedicated account provider ("DAP")" to collect funds, and would not disburse such funds until the consumer had made one payment towards a consolidated or adjusted loan. *See supra* SOF § 1.E. In fact, the Company did charge advance fees, and it never conditioned the release of fees to the Company on consumers making a payment on an adjusted loan. *See supra* Argument I.B.1. Given Wen's role at the Company, particularly his involvement overseeing its bank and payment processing accounts, as well as guidance he received from outside counsel, Wen knew or should have known that the "Advance Fee" language in the Company's contracts did not reflect the Company's true practices. Indeed, by Wen's own admission in August 2018, "all clients are 'paying upfront fees.' There is no way to be retroactively compliant." UF ¶ 169. Later, Wen spearheaded the creation of TAS and destroyed evidence to conceal the Company's illegal practices. *See supra* SOF § 1.E; UF ¶¶ 200-07. Wen clearly had sufficient knowledge of the Company's illegal practices for individual liability.

Accordingly, summary judgment against Wen is appropriate on Counts I, II, III, V, and VII, and he is liable for the Company's restitution obligations. *See Gordon*, 819 F.3d at 1196 (affirming joint and several award of restitution against individual defendant who had control over and approved marketing materials)*; cf. FTC v. Com. Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016), *abrogated on other grounds by AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021) (explaining that where an individual is held personally liable for corporate violations of the FTC Act, nothing more needs to be shown to impose joint and several liability for the corporation's restitution obligations).

**D.  Wen Substantially Assisted the Company's TSR and CFPA violations (Counts V and IX).**

Wen also substantially assisted the Company's TSR and CFPA violations. Under the TSR, a person may be liable for substantially assisting any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates the TSR. 16 C.F.R. § 310.3(b); *FTC v. Lake*, 181 F. Supp. 3d 692, 700-01 (C.D. Cal. 2016). The CFPA similarly provides that it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person" engaging in unfair, deceptive, or abusive acts or practices. 12 U.S.C. § 5536(a)(3); *see also CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (Ex), 2016 WL 8849698, at *11 (C.D. Cal. Nov. 17, 2016) (same).

Under both the TSR and the CFPA "[t]he threshold for what constitutes substantial assistance is low," requiring only a showing of more than "mere casual or incidental assistance to the telemarketer." *CFPB v. Daniel A. Rosen, Inc.*, No. 2:21-cv-07492-VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) (internal citation and quotations omitted) (TSR); *see also D & D Mktg.*, 2016 WL 8849698, at *12 (CFPA) (assistance must "be more than mere casual or incidental dealing with a seller or telemarketer that is unrelated to the violation of the Rule") (internal citations and quotations omitted). As one of its principal architects, Wen's conduct easily meets this low bar—he designed, built, and controlled the enterprise; developed and approved Company practices; established and maintained its merchant and payment processing accounts; and took steps to both conceal and perpetuate the Company's illegal activity. *See supra* SOF § I.E; UF ¶¶ 200-07.

Finally, given Wen's participation in and authority over the enterprise, including his role in addressing chargeback rates and law enforcement and consumer complaints, it is beyond dispute that Wen had the requisite state of

mind for substantial assistance liability under the TSR and the CFPA. *See supra*
SOF § I.A, E. *See FTC v. Nudge, LLC*, No. 2:19-cv-00867-DBB-DAO, 2021
WL 3145700, at *5 (D. Utah July 26, 2021) (deliberately avoiding information
to ensure ignorance of TSR violations is ineffective for avoiding liability and
"[k]nowledge or conscious avoidance of knowledge may be inferred when the
person providing assistance receives complaints about violations."); *FTC v.
Consumer Health Benefits Ass'n*, No. 10 Civ. 3551 (ILG) (RLM), 2011 WL
13254502, at *4 (E.D.N.Y. Oct. 12, 2011) (recklessness may be found when
individuals oversee activities like reviewing consumer complaints, cancellation
and refund practices, and training); *D & D Mktg.*, 2016 WL 8849698, at *11-14
(claim for substantial assistance liability survived motion to dismiss by several
defendants based on their roles and authority). Accordingly, summary judgment
is appropriate with respect to Counts V and IX.

**E.  Wen's Violations of the TSR are Violations of the CFPA (Count XI).**

Section 1031 of the CFPA empowers the Bureau to prescribe rules
applicable to a covered person or service provider that identify unlawful unfair,
deceptive or abusive acts or practices in connection with any transaction with a
consumer for a consumer financial product or service, or the offering of a
consumer financial product or service. 12 U.S.C. § 5531(b). A violation of the
TSR committed by a person subject to the CFPA is treated as a violation of a
rule prescribed by the Bureau under § 1031 of the CFPA. Accordingly, Wen's
TSR violations constitute violations of a rule under § 1031 of the CFPA, and
summary judgment against him is warranted on Count XI. 15 U.S.C. § 6102(c).

**II. Summary Judgment Against Wen is Appropriate on the State Law Claims (Counts XVII, XVIII, XIX, XX, XXII).**

   **A.  Wen violated Minnesota's Consumer Protection Laws (Counts XVII and XVIII).**

      Minnesota's CFA broadly prohibits the use of "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice . . . in connection with the sale" of any consumer good or service. Minn. Stat. § 325F.69, subd. 1; *see also* § 325F.68, subd. 2. Minnesota's DTPA similarly prohibits: (1) "caus[ing] likelihood of confusion or of misunderstanding" as to "goods or services," (2) "represent[ing] that goods or services have . . . approval, characteristics, . . . uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have," (3) "represent[ing] that goods or services are of a particular standard [or] quality . . . if they are of another," (4) "advertis[ing] goods or services with intent not to sell them as advertised," or (5) "engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding" in the person's "course of business." Minn. Stat. § 325D.44, subds. 1(2), (5), (7), (9), (13). Minnesota's consumer protection statutes, including the CFA and DTPA, "are remedial in nature and are to be liberally construed in favor of protecting consumers." *State v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 892 (Minn. Ct. App. 1992), *aff'd*, 500 N.W.2d 788 (Minn. 1993); *see also State v. Philip Morris, Inc.*, 551 N.W.2d 490, 496 (Minn. 1996) (consumer protection statutes are "very broadly construed to enhance consumer protection"); *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 694-95 (Minn. 2014) ("conduct proscribed by the CFA is broad"). They "reflect a clear legislative policy encouraging aggressive prosecutions of statutory violations." *Philip Morris*, 551 N.W.2d at 495. Wen directed a federal-student-loan debt-relief enterprise that

1 systematically misrepresented the cost, nature and efficacy of its services, and

2 although the State is not required to show actual deception,[7] Minnesota

3 consumers *were* deceived, in violation of the CFA and DTPA. *See supra* SOF §

4 I.F. Summary judgment against Wen is therefore warranted on Counts XVII

5 and XVIII.

6 　　　　Wen directly participated in, controlled, directed, acquiesced to and/or

7 knew or should have known about and prevented the Company's unlawful

8 conduct. *See supra* SOF § I.E. Accordingly, Wen is personally liable for the

9 CFA and DTPA violations. *See Alpine Air*, 490 N.W.2d at 897-98 (holding a

10 company's founder and president was properly held personally liable, including

11 for deceptive business practices of the company because he was "intimately

12 involved in all aspects of [the] business" including the deceptive promotional

13 claims); *Meyer v. Dygert*, 156 F. Supp. 2d 1081, 1086-87 (D. Minn. 2001)

14 (holding that corporate officers can be held personally liable under Minnesota's

15 consumer protection laws "if they participate in, direct, or were negligent in

16 learning of and preventing the fraudulent conduct").

17 **B. Wen Violated North Carolina's Consumer Protection Laws (Counts**

18 **XIX and XX).**

19 　　　　North Carolina's Debt Adjusting Act (NCDAA), like the TSR, prohibits

20 the collection of advance fees for debt relief or "debt adjusting" services. The

21 statute prohibits the collection of *any* fees for debt adjusting services until *after*

22

23 [7] The CFA and DTPA do not require proof as to "whether or not any person has

24 in fact been misled, deceived, or damaged," nor do they include traditional

elements of common law fraud. Minn. Stat. §§ 325F.69, subd. 1 (eliminating

25 need to prove "whether or not any person has in fact been misled, deceived, or

damaged"); 325D.44, subd. 2 (eliminating need to prove "actual confusion or

26 misunderstanding"); 325D.45, subd. 1 ("Proof of . . . intent to deceive is not

27 required"); *Alpine Air Prods.,* 500 N.W.2d at 790 ("The legislature's intent is

evidenced by the *elimination* of elements of common law fraud, such as proof

28 of damages or reliance on misrepresentations.").

the debt relief services are fully performed. Specifically, the statute provides, in relevant part: "Debt adjusting also includes the business or practice of debt settlement or foreclosure assistance whereby any person holds himself or herself out as acting for consideration as an intermediary between a debtor and the debtor's creditors for the purpose of reducing, settling, or altering the terms of the payment of any debt of the debtor, whether or not the person distributes the debtor's funds or property among the creditors, and receives a fee or other consideration for reducing, settling, or altering the terms of the payment of the debt in advance of the debt settlement having been completed or in advance of all the services agreed to having been rendered in full." N.C. Gen .Stat. §§ 14-423, -424. Offering or engaging in debt adjusting is a *per se* unfair and deceptive practice in violation of N.C. Gen. Stat. § 75-1.1. *See* N.C. Gen .Stat. § 14-425.

It is undisputed that the Company (i) held itself out as an intermediary between student loan borrowers and their servicers or lenders to assist borrowers in altering the terms of borrowers' debts and loan payments; and (ii) the Company routinely collected its fees in advance of fully performing its debt adjusting services. *See supra* SOF § I.A, C, D. As described above, the Company incentivized salespeople to collect as much of the enrollment fee as possible at enrollment, and paid salespeople a higher commission when consumers paid the enrollment fee in full at the time of enrollment. *See supra* SOF § I.C. As a result, by the time the Company submitted a student loan adjustment application, the Company had typically collected some or all of the enrollment fee. *See supra* SOF § I.C. And all of the monthly recertification fees were charged in the twelve months leading up to the submission of the recertification paperwork. *See supra* SOF § I.C. Thus, the Company collected prohibited advance fees for debt adjusting services in violation of the NCDAA. Because Wen created and actively managed the enterprise that collected illegal

1  advance fees for debt relief or debt adjusting services, *see supra* SOF § I.E, he

2  violated the NCDAA, and summary judgment against him is appropriate on

3  Count XIX. *Cf. State ex rel. Easley v. Rich Food Servs., Inc.*, 535 S.E.2d 84, 93

4  (N.C. Ct. App. 2000) (where individual defendant was "key agent and

5  employee" who "ran the business and . . . made the decisions" he could be held

6  liable for the company's violations of N.C. Gen. Stat. § 75-1.1).

7       North Carolina's Unfair and Deceptive Practices Act (NCUDPA), N.C.

8  Gen. Stat. § 75-1.1(a), prohibits "unfair methods of competition . . . and unfair

9  or deceptive acts or practices." "[A] practice is deceptive if it has the tendency

10  to deceive" and "a practice is unfair when it offends established public

11  policy[.]" *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C.

12  2000) (*quoting Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981)); *see also*

13  *State ex rel. Cooper v. NCCS Loans, Inc.*, 624 S.E.2d 371, 378 (N.C. Ct. App.

14  2005). To prevail in an action under Chapter 75, a plaintiff "does not have to

15  prove fraud, bad faith or intentional deception . . . ; it is enough that the goods

16  [or services] bought were misrepresented." *Myers v. Liberty Lincoln-Mercury,*

17  *Inc.*, 365 S.E.2d 663, 664 (N.C. Ct. App. 1988). The same facts establishing

18  that Wen engaged in deceptive practices under the TSR and CFPA support

19  summary judgment against Wen on Counts XIX and XX. As set forth in detail

20  above, Wen created, managed, and controlled an illegal debt relief enterprise

21  that not only deceived and harmed consumers, but it also collected illegal

22  advance fees in violation of both the TSR and the NCDAA. *See supra* SOF §

23  I.E. Accordingly, summary judgment against Wen is warranted on Counts XIX

24  and XX. *See NCCS Loans*, 624 S.E.2d at 380 (holding that trial court did not err

25  in granting State's motion for summary judgment against individual defendant

26  for violation of N.C. Gen. Stat. § 75-1.1 where State asserted defendant

27  "directed and controlled the illegal activities of the corporate defendants" and

28  defendant offered no evidence contradicting the State's assertion).

**C.   Wen violated California's Unfair Competition Law (UCL) (Count XXII).**

The UCL broadly prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code, § 17200; *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999) (citation omitted). "Virtually any state, federal or local law can serve as the predicate for an action under [the UCL]." *Podolsky v. First Healthcare Corp.*, 58 Cal. Rptr. 2d 89, 98 (Ct. App. 1996). Wen's violations of the CFPA and TSR Claims (Counts I, II, III, V, VII, IX, and XI), are each independent violations of UCL's unlawful prong and, therefore, summary judgment is appropriate on Count XXII. *See Farmers Ins. Exch. v. Superior Ct.*, 826 P.2d 730, 734 (Cal. 1992) ("an unlawful business practice borrows violations of other laws and treats these violations . . . as unlawful practices independently actionable under section 17200 et seq.") (internal quotations omitted). Further, just as the TSR and CFPA prohibit "deception," the UCL also prohibits "fraudulent" business practices as an independent basis for liability. Cal. Bus. & Prof. Code § 17200. Fraud under the UCL "only requires a showing members of the public are likely to be deceived." *Saunders v. Superior Ct.*, 33 Cal. Rptr. 2d 438, 441 (Ct. App. 1994) (internal quotation omitted). Here, the same facts establishing deception claims under the TSR and CFPA (Counts III, IV, VII, VIII) support a "fraud" claim under the UCL, and summary judgment is also appropriate on Count XXII on this basis.

**III**. **The Court Should Grant Injunctive Relief, a Civil Money Penalty, and Redress.**

**A.   Injunctive Relief**

A permanent injunction is justified where there is "some reasonable likelihood of future violations." *See CFPB v. Chou Team Realty LLC*, No. 8:20-

cv-00043-SB-ADS, 2021 WL 4077110, at *5 n.6 (C.D. Cal. Aug. 10, 2021), *aff'd sub nom. CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636 (9th Cir. Dec. 27, 2022). Such relief can include "fencing in" provisions such as industry bans so long as they reasonably relate to the subject unlawful practices. *Chou Team Realty,* 2021 WL 4077110, at *5 n.6*; Nesheiwat,* 2022 WL 17958636, at *3 (affirming ban on engaging in debt relief, mortgage loans, telemarketing, and obtaining consumer data).

Here, Wen's facilitation of the Company's illegal conduct and his continued obstruction and contempt in this litigation (including failing to comply with court orders regarding his assets and discovery) indicate a disregard for the law and a likelihood of future violations. *See supra* SOF § 1.E, UF ¶¶ 196-211. The Court should therefore prohibit Wen permanently from: (1) advertising, marketing, promoting, offering for sale, selling, or providing any consumer financial product or service, or assisting others in the same; (2) using consumer information obtained through the subject debt relief services; (3) attempting to collect, sell, assign, or otherwise transfer any right to collect payment from any consumer who purchased or agreed to purchase a debt-relief service from any Defendant; and (4) violating the federal and state laws that form the basis for the Plaintiffs' claims set forth above. *See, e.g.*, *Nesheiwat,* 2022 WL 17958636,  at *3; *FTC v. Gill*, 265 F.3d 944, 957 (9th Cir. 2001) (affirming industry ban); *FTC v. Dinamica Financiera LLC*, No. CV 09-03554 MMM (PJWx), 2010 WL 9488821, at *12 (C.D. Cal. Aug. 19, 2010) (imposing ban on further deceptive acts).

## B. Civil Money Penalty

The CFPA mandates the imposition of a civil money penalty against any person who violates Federal consumer financial law. 12 U.S.C. § 5565(c)(1). Wen violated numerous laws, and his conduct contributed to direct losses of over $95 million to over 80,000 consumers.

There are three tiers of penalties, based on the degree of *scienter*. At a minimum, the evidence establishes that Wen's violations were reckless, making second-tier penalties appropriate: he knew or recklessly ignored that the Company was charging unlawful advance fees, making deceptive statements to consumers, and failing to disclose to consumers that the Company lied about material information on consumers' applications. *See supra* SOF § 1.E. The CFPA authorizes civil penalties of up to $34,065 per day for reckless violations that occurred on or after November 2, 2015, and for which penalties are assessed after January 15, 2023. 12 U.S.C. § 5565(c)(2); 12 C.F.R. § 1083.1.

Wen (1) violated the TSR through the collection of enrollment fees (Count I); (2) violated the TSR though monthly recertification fees (Count II); and (3) engaged in deceptive conduct in violation of the TSR (Count III) and the CFPA (Count VII). *See supra* Argument §1.C. Thus, at a minimum, Wen's violations continued between at least November 5, 2015, and October 23, 2019, for a total of 1,449 days. Each violation warrants a penalty of up to $34,065 (statutory penalty for reckless violations) times 1,449 (number of days violations continued), times the foregoing three violations, for a maximum total statutory penalty of up to $148,080,555.[8]

The size of the civil penalty also depends on various statutory factors, including "good faith," "the size of financial resources . . . of the person charged," "the gravity of the violation," "the severity of the risks to or losses of the consumer," "the history of previous violations," and "such other matters as justice may require." 12 U.S.C. § 5655(c)(3). Taking these factors into consideration, the Bureau requests the Court impose a civil money penalty of up to $148 million.

---

[8] This calculation assumes only one violation per day and excludes the two violations for substantial assistance, as well as the violation of the CFPA through a TSR violation. Counts III and VII are counted as a single violation for penalty purposes.

The gravity of this scheme was significant. The defendants charged consumers thousands of dollars for services that consumers could have undertaken themselves at little to no cost, and the defendants charged consumers hundreds of additional dollars per year to recertify their loans, often by submitting false information to the loan servicers. The defendants ultimately bilked these consumers out of over $95 million.

Wen's financial condition is unclear. Wen made false statements about his financial resources, delayed in correcting them (and, even then, only did so in part), and asserted the Fifth Amendment privilege against self-incrimination in response to questions about his finances. Working with a cryptocurrency expert, the Bureau nonetheless uncovered evidence indicating that Wen concealed and still holds tens of millions of dollars' worth of cryptocurrency, for which he is currently in contempt of court. *See* Order Holding Kaine Wen in Civil Contempt (Docket No. 418).

Facing increased scrutiny from law enforcement. Wen and his partner endeavored to delete Company emails against advice of counsel, and he later deleted relevant text messages as well. UF ¶¶ 197, 199-207. Wen was also part of the decision to cut off CAC's revenue stream, leaving it insolvent, and shift its operations to a new company to evade government detection. UF ¶¶ 30, 199. In sum, Wen's actions were far from acting in good faith.

Further, the States are authorized to collect civil penalties for each violation of their subject statutes. *See* Minn. Stat. §§ 8.31, subd. 3, 645.24 (Minnesota is entitled to civil penalties for each violation of the CFA and DTPA); *Alpine Air*, 490 N.W.2d at 896 (holding Minnesota is entitled to up to $25,000 in penalties for each violation); N.C. Gen. Stat. § 75-15.2 (North Carolina can collect up to $5,000 for each violation of the NCUDPA); Cal. Bus. & Prof. Code § 17206 (requiring penalties of up to $2,500 for each UCL

violation). Here, each state seeks a $5,000 civil penalty to be paid from the civil penalty awarded to the Bureau.[9]

## C. Redress

The CFPA authorizes the Court to order redress to harmed consumers, including a refund of moneys, damages, restitution, or other monetary relief. 12 U.S.C. 5565(a)(2). The undisputed evidence shows that Wen is liable (jointly and severally with the Company) for $95,057,756.92 in legal restitution (or refunds or damages) for the consumers affected by his unlawful practices.[10]

Under Ninth Circuit's well-established "two-step burden-shifting framework for calculating restitution," the Bureau bears the burden at step one of "proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *CashCall*, 35 F.4th at 751 (internal citation and quotations omitted). The Bureau meets that burden by establishing the defendant's "net revenues"—that is, "the amount consumers paid for the product or service minus refunds and chargebacks." *Id.* (quotation marks omitted). Then, "the burden shifts to the defendant to demonstrate that the net revenues figure overstates the defendant's unjust gains." *Id.*

---

[9] Alternatively, if the Bureau is not awarded a civil money penalty, then each state conservatively seeks a penalty of $1,000 per each affected consumer in their respective states (1,614 Minnesota, 4,628 North Carolina, and 12,184 California consumers). UF ¶¶ 214-16.

[10] Each State is authorized to seek a refund of monies to make consumers in their states whole. *See* Minn. Stat. § 8.31, subd. 3a*, State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 133-134 (Minn. 2019); N.C. Gen. Stat. §§ 14-425, 75-15.1; Cal. Bus. & Prof. Code § 17203; *see also Abbott Lab'ys v. Superior Ct.*, 467 P.3d 184, 192 (Cal. 2020). Here, the Company collected $1,205,776.83, $4,483,915.00, and $8,112,188.83 from Minnesota, North Carolina, and California consumers respectively, not including refunds. Redress for harmed consumers in Minnesota, North Carolina, and California is subsumed into the amount sought by the Bureau under the CFPA and the States are not seeking double recovery.

Here, the Bureau has established that the Company collected $95,057,756.92 in fees from consumers who were subjected to the deceptive practices of the enterprise, and these fees also constituted unlawful advance fees. UF ¶¶ 212. The Bureau has therefore established the Company's net revenues, Wen has not shown this amount overstates the defendants' unjust gains, and he must pay this amount as legal restitution. Alternatively, this award would be appropriate as a "refund of moneys" to consumers. *See* 12 U.S.C. § 5565(a)(2)(B); *see also FTC v. Elegant Sols., Inc.*, No. 20-55766, 2022 WL 2072735, at *3 (9th Cir. June 9, 2022) (approving "monetary relief based on a calculation of consumer loss" that was awarded under FTC's similar authority to seek the refund of money for violations of rules such as the TSR). Wen is jointly and severally liable for this amount due to his CFPA and TSR violations.[11] *See supra* Argument §§ I.C, D.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for summary judgment and enter the attached proposed judgment.

Dated: January 30, 2023

By: */s/ Sarah Preis*
Sarah Preis (D.C. Bar No. 997387)
(admitted *pro hac vice*)
Email: sarah.preis@cfpb.gov
Jesse Stewart (N.Y. Bar No. 5145495)
(admitted *pro hac vice*)
Email: jesse.stewart@cfpb.gov
N. Nathan Dimock
(D.C. Bar No. 487743)
Email: nathan.dimock@cfpb.gov
(admitted *pro hac vice*)
*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

---

[11] The Bureau is not seeking double recovery and will not seek to recover any amounts that the Bureau receives or has received through other judgments.

By: */s/ M. Lynne Weaver*
M. Lynne Weaver (N.C. Bar No. 19397)
(admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Tel.: (919) 716-6039
Fax: (919) 716-6050
Email: lweaver@ncdoj.gov
*Attorney for Plaintiff State of
North Carolina*

By: */s/ Evan Romanoff*
Evan Romanoff
(Atty. Reg. No. 0398223)
(admitted *pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 728-4126
Fax: (651) 296-7438
Email: evan.romanoff@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

By: */s/ Christina Tusan*
Christina Tusan
Supervising Deputy City Attorney
Office of the City Attorney
Consumer and Workplace Protection
Unit
200 N. Main Street, 500 City Hall East
Los Angeles, CA 90012
Tel.: (213) 473-6908
Email: christina.tusan@lacity.org
*Attorney for Plaintiff the People of the
State of California*

I, Sarah Preis, attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

/s/ *Sarah Preis*

Sarah Preis