FILED

2023 MAR 27  PM 3: 47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:

Kaine Wen
146 Bishop Lndg
Irvine, CA 92620
Telephone: 626-563-7908
kainewen@gmail.com
In Pro Per

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., | CASE NO. 8:19-cv-01998 MWF (KSX |
| Plaintiffs, | **DECLARATION OF KAINE WEN IN SUPPORT OF HIS OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY** |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., | Court:  Hon. Michael W. Fitzgerald |
| Defendants. | Date:   April 24, 2023 |
| | Time:   10:00 AM |
| | Place:  Courtroom 5A |

1

**KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO**

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Kaine Wen, declare as follows:

1.      I am appearing *pro se* in *Bureau of Consumer Financial Protection, et al. v. Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al.,* Case No. 8:19-cv-01998 MWF (KSx) (the "Action").

2.      I submit this Declaration in support of my concurrently filed Opposition to Plaintiffs' Motion for Partial Summary Judgment (the "Motion") filed on January 30, 2023.

**Background On How Consumer Advocacy Center Started**

3.      In approximately July 2015, Albert Kim ("Kim"), whom I was previously acquainted with, was working for a student loan document preparation company as a sales representative.

4.      Kim told me he wanted to learn everything from the student loan document preparation company he was working for so he could start his own student loan document preparation company.

5.      Kim had done the same thing in the past, namely working at a company and learning the business in order to open his own company doing that same business.

2

6.      While Kim was working as a student loan sales representative, Kim asked me to invest in his future student loan document preparation business ("SL Business").

7.      Tuong Nguyen ("Nguyen"), who had experience in accounting, also agreed to become a part owner of the SL Business. Nguyen owned 5 percent of the SL Business, and Kim and I each owned 47.5 percent of the business. Because Nguyen wanted his ownership to be "off the books" his interest was not reflected in many corporate records.

8.      I agreed to invest $30,000 while Kim invested $10,000 towards the SL Business's start-up capital.

9.      Later, I invested more money in the SL Business by using personal and borrowed credit cards, another approximately $30,000 to $40,000.

10.     The reason I invested a disproportionately higher amount to the ownership percentage I received was because it was understood between me, Kim, and Nguyen that I was investing in the SL Business solely as a "silent" investor with no involvement or plans to be part of the operations, and my primary contribution was financial only. In contrast, Kim, who invested a disproportionately lower amount to the ownership percentage he received, would be the owner-operator of the start-up, and his primary contribution was his industry knowledge and experience and that he would be providing full-time oversight of the SL Business and its operations.

3

11. During this time, I was working full-time on a separate, unrelated business and did not have additional time to dedicate to the SL Business.

12. Prior to the SL Business, I had never been involved in any debt relief or telemarketing or call center sales type of business, nor had I worked any sales or document preparation job.

13. At Kim's request, Nguyen went to work as a processor for a student loan document preparation company in order to learn the processing side, also referred to as the back-end, of the student loan business. Nguyen later served various roles for the SL Business, including Processing Manager, Customer Service Manager, Billing Manager, Payroll Manager, Accounting Manager, and Controller.

14. In the months prior to launching the SL Business, Kim worked as a sales representative for a student loan document preparation company, a call center sales type of business that used telemarketing, to learn the sales side, also referred to as the front-end, of the student loan business.

15. Previously, Kim worked at a loan modification company where he learned the business and then started his own loan modification company, which was the same blueprint Kim used for the SL Business. Kim also worked as a salesperson at his own loan modification company, a call center sales type of business that used telemarketing.

4

16.    The loan modification company that Kim owned and operated was Consumer Advocacy Center, Inc. ("CAC"). To the best of my knowledge, CAC operated as a loan modification company from August 2014 to July 2015.

17.    I did not form CAC with Kim in 2014.

18.    To the best of my knowledge, Kim solely owned CAC while it operated as a loan modification company.

19.    I was not an owner, formally or informally, of CAC while it operated as a loan modification company.

**My Minimal Involvement and Limited Knowledge of The SL Business's**

**Practices**

**(From November 2015 To Approximately June 2017)**

20.    Kim used his company CAC for the SL Business out of convenience because it was already formed.

21.    Kim chose the name Premier Student Loan Center ("PSLC") as the Doing Business As ("DBA") for CAC.

22.    Kim recruited German Santibanez ("Santibanez"), Kim's sales employee at CAC's loan modification business, and Rumi Kim, Kim's roommate at the time, to work for CAC when it first started as the SL Business.

23.    Kim solely hired the website developer and provided the website content for the PLSC website.

5

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

24. I did not develop, draft, or approve the PSLC website and did not have responsibility or oversight with regard to the website whatsoever, which instead was entirely under Kim's oversight, consistent with his role as the operator of the business and his prior industry experience.

25. Kim solely provided the client fee agreement that CAC used, consistent with his role as the operator of the business and his prior industry experience.

26. I did not develop, draft, review, or approve CAC's client fee agreement during this time.

27. Kim solely provided the fee structure for consumers, including the amount of fees and when those fees could be collected, consistent with his role as the operator of the business and his prior industry experience.

28. I did not develop, draft, review, or approve the fee structure for CAC's consumers.

29. I was not involved in sales and did not know what CAC's fee structure was. See Def.'s Ex. 4 (April 2016 email re: consumer fee amounts) where I requested Kim to provide me with all the possible fees that CAC might charge consumers, because I did not know them.

30. Kim, at his sole discretion, adjusted CAC's fee structure and was responsible for the same and all decision making regarding the fees charged.

31. Kim solely provided and developed the sales script that CAC used, consistent with his role as the operator of the business and his prior experience.

6

32. I did not develop, draft, review, or approve the sales scripts that CAC used.

33. Kim solely provided and developed the sales training that CAC used, consistent with his role as the operator of the business and his prior experience.

34. Kim personally trained CAC sales representatives

35. I did not develop, draft, review, or approve the sales training that CAC used.

36. I did not train CAC sales representatives or any CAC personnel.

37. Kim solely provided the commission structure for the sales representatives that CAC used, including his own, consistent with his role as the operator of the business and his prior experience.

38. I did not develop, draft, review, or approve the commission structure for CAC's sales representatives during this time.

39. Kim personally interviewed and hired, or otherwise supervised the hiring of, the sales representatives for CAC.

40. I did not interview, hire, or supervise the hiring of any sales representatives.

41. Kim oversaw and was the sole decision maker for the Sales Department during this time. See Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 22: "In the beginning, I observed Kim overseeing the Sales and Processing Departments on-site."

7

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

42.   At all times, Kim held the highest managerial, directorial, or executive position at the Sales Department of the SL Business, and all employees in the Sales Department reported to Kim.

43.   Kim oversaw and was the sole decision maker for the Processing Department during this time. See Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 22: "In the beginning, I observed Kim overseeing the Sales and Processing Departments on-site."; Id. at ¶ 56: "I personally used to email the forbearance paperwork to clients to sign, but Kim directed me to stop sending it to clients to sign."; Id. at ¶ 82: "I took this to mean that Kim was directing me to submit the client with a family size of 9." It was Kim, not me, that was doing these things.

44.   Kim was the sole decision maker for CAC for all business operations during this time. Even as late as 2017, Kim was identified in Secretary of State filings as the sole officer of CAC serving in positions as CEO, CFO and Secretary. See Def.'s 51 (Consumer Advocacy Center Inc. 2017 Statement of Information) CAC's June 8, 2017 Statement of Information filed with CA Secretary of State. See also Third Amended Complaint [ECF No. 314] para. 130-138, describing Kim's role including that he was CAC's "primary owner and manager" and "oversaw CAC's marketing."

45.   I rarely went into the company's office, and in the rare instances that I went into the office, it was during non-business hours.

46.   I did not have an office, a desk, a chair, or a computer at the office.

8

47.     I never intended to be present at CAC and thus did not require an office. Kim, as the President and Sales Director, always reserved the biggest office for himself.

48.     I did not have a phone or a DebtPayPro ("DPP") customer relationship management account.

49.     I did not hire, train, or oversee employees.

50.     I was not involved with sales, processing, customer service, or billing.

51.     I was not aware of the sales, processing, customer service, or billing policies.

52.     I did not take or receive any sales calls and I did not know what the sales pitch was.

53.     I did not review or process any student loan applications and I did not speak with any consumers.

54.     In approximately December 2016, CAC moved from its Rancho Santa Margarita, CA office to its Irvine, CA office at 173 Technology Dr.

55.     Kim continued to oversee CAC and was the sole decision maker for all business operations, and I continued in my role as a silent investor.

**My Minimal Involvement and Minimal Pay Received at CAC**

**(From November 2015 To Approximately June 2017)**

56.     From late 2015 to approximately June 2017, I occasionally communicated with Kim about the SL Business, and only regarding budget

9

concerns or minor support work that I provided to the business. For instance, Kim occasionally requested that I help revise documents that he prepared.

57.    Nguyen and I deferred to and relied on Kim's experience and supposed knowledge of the student loan document preparation industry.

58.    From November 2015 to June 2017, I received minimal pay from CAC because my involvement with CAC and its operations was minimal.

59.    In 2015, CAC did not pay me any money. See Def.'s Ex. 5 (Consumer Advocacy Center Inc. 2015 Profit and Loss) from Quickbooks, showing 1099 income for Kim, Nguyen, Santibanez, and Rumi Kim, amongst others, but no income for me.

60.    From January 2016 to June 2017, CAC paid me around $15-20 per hour for minor support services.

61.    In 2016, CAC paid me $5,230 in total. See Def.'s Ex. 6 (Consumer Advocacy Center Inc. 2016 Profit and Loss) from Quickbooks, showing 1099 income of $164,910 for Kim and $15,230 for me, of which $10,000 was moneys that were assigned, at Kim's direction, from Kim to me as a repayment for a previous failed online hat business.

62.    From January to May 2017, CAC paid my company Hold The Door Corp ("HTD") $4,000 in total. See Def.'s Ex. 7 (Consumer Advocacy Center Inc. Jan-May 2017 Profit and Loss) from Quickbooks, showing 1099 income of

10

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    $73,861 to Kim's consulting company Infinite Management Solutions

2    ("Infinite") and $4,000 to my company HTD.

3
4        63.    As discussed above, in the 19 months from November 2015 to May

5    2017, CAC paid me and my company $9,230 in total. In the same 19 months,

6    CAC paid Kim and his consulting company $249,321 in total, after correctly

7
8    crediting the $10,000 from 2016 to him.

9        64.    During that time, Kim made, by far, more money than anyone at CAC,

10   an average of more than $13,000 per month, because he formed each component

11
12   of the SL Business, was the President and Sales Director, provided the sales

13   commissions structure including for his own pay, set policies and procedures,

14   oversaw the employees and operations, and was the sole decision maker.

15
16       65.    During that time, I made a small amount of money at CAC, an average

17   of less than $500 per month, because I was minimally involved and only provided

18   minor support services at an hourly rate of around $15-20 per hour.

19
20       66.    For the year 2017, Kim earned $220,551 more than me. See Def.'s Ex.

21   8 (Consumer Advocacy Center Inc. 2017 Profit and Loss) from Quickbooks,

22   showing CAC's 2017 gross pay to Infinite and HTD.

23
24                **My Later Involvement In The SL Business**

25          **(From Approximately July 2017 To October 23, 2019)**

26       67.    In approximately mid-2017, Kim asked me to help more with CAC,

27   besides just minor support services.

28
                                     11

68.     Beginning approximately July 2017, I began to go into the CAC's

Irvine office, several times per week.[1] See Def.'s Ex. 52 (Declaration of Kenneth

Hu) at ¶ 4: "I only started to see Kaine Wen at the office in 2017, around June or

July.

69.     I took on time-intensive tasks and projects that were related to "general

business operations" and not related to the student loan debt relief services,

including but not limited to: obtaining commercial and employee health

insurance policies; creating employee handbooks; hiring HR staff and

consultants; drafting employment contracts, working with labor and employment

legal counsel; analyzing marketing data; negotiating prices with marketing

vendors. Put simply, my role and responsibility did not have to do with sales

operations, training, or compliance. The sales side of the business was managed

by Kim.

70.     Nguyen and I relied on Kim to provide insight into the student loan

business and the industry, but I later came to understand that the information Kim

---

[1] It is my belief that Kim and Nguyen both made errors stating that I began going
into CAC's office in 2016 instead of 2017, and would correct the misstatements if
asked or deposed. Kim operated CAC as a loan modification company from 2014
to 2015, and CAC did not begin operating as a student loan company until
November 2015. I believe Kim and Nguyen got confused with the year and would
correct their statements to reflect 2017 instead of 2016. See Pls.' Ex. 1
(Declaration of Albert Kim) at ¶ 23: "By mid-2016, Wen was coming into the
office several times each week."; Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶
23: "Sometime in late 2016, Wen began regularly coming into the office."

provided was not always accurate, and that Kim hid information from me by
directing Nguyen directly. See Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶
56: "I personally used to email the forbearance paperwork to clients to sign, but
Kim directed me to stop sending it to clients to sign, so I started signing for
consumers too."; Id. at ¶¶ 81-82: "Kim replied only to me, directing me to 'Just
continue with the app. This was before we started the max 7 FS.' I took this to
mean that Kim was directing me to submit the client with a family size of 9."

71.     When issues were raised by Nguyen or me regarding sales issues, Kim
would shut us down and stated it was the salespeople who made the SL Business
money. See Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 67: "The template
was created because of an occasion where I submitted a consumer's application
with a family size of nine and it was denied. I wanted to refund the consumer, but
Kim and the salesman pushed back and wanted me to re-submit the consumer's
application with a family size of nine."; Id. at ¶ 91 "Kim directed me to stop
auditing sales calls because the salespeople are the ones making the Company
money."

**True Count Staffing Inc**

**(Separating Processing, Customer Service, and Billing From Sales)**

72.     Kim explained to me that he learned from speaking with his contacts in
the student loan industry that many student loan companies only did sales or

13

1    processing, not both, and Kim recommended that we separate the sales and

2    processing sides of the SL Business.

3
4        73.    Since the SL Business needed another office space anyways, Kim,

5    Nguyen, and I agreed to move CAC's Processing, Customer Service ("CS"), and

6    Billing Departments to a separate company, True Count Staffing Inc. ("TCS"),

7
8    which we previously used to staff employees for the SL Business, to the new

9    office.

10       74.    The law firm Akerman LLP ("Akerman"), who CAC retained for labor

11   and employment issues, assisted CAC and TCS with the transition and employee

12
13   transfers.

14       75.    In March 2018, CAC's Processing, CS, and Billing Departments

15   transferred to TCS, which kept its own separate business records.

16
17                        **CAC Bankruptcy Filing**

18       76.    Beginning in mid-2018, CAC began to receive Civil Investigative

19
20   Demand ("CID") letters from the State of Minnesota as well as the CFPB.

21       77.    Although I was involved in general business matters relating to the

22
23   business, and compliance was specifically under Kim's purview, upon becoming

24   aware of the CID letters, I felt it was important that the Company confirm it was

25   in compliance or, barring that, that it come into compliance with all applicable

26
27   laws. Towards that end, I recommended to Kim and Nguyen that the company

28

                                  14

work with counsel that was sophisticated in these areas, and the company used
the law firms Akerman and Greenspoon Marder LLP ("Greenspoon").

78.   After receiving the CFPB CID, Kim told me that he knew other student
loan companies that received a CID from the CFPB, ignored the CID, and the
CFPB just went away.

79.   In approximately November 2018, Greenspoon recommended that
CAC file bankruptcy to potentially resolve the State of Minnesota and CFPB
CIDs and TCPA matters.

80.   On the advice of counsel, Kim, Nguyen, and I agreed for CAC to retain
bankruptcy counsel and file for Chapter 11 bankruptcy.

81.   Thereafter, Kim, Nguyen, and I deferred to bankruptcy counsel for any
bankruptcy related matters.

### The Advance Fee Issue

82.   Kim had explained to me and Nguyen since we became involved in the
company that the SL Business was a document preparation company and not
subject to the debt relief rules, including the "no advance fee" rule, which Kim
said was what attorneys in the industry had told him. I asked Kim to obtain
referrals for knowledgeable counsel on this subject from his contacts in the
student loan industry, as I was not familiar with the business or the rules.

83.   Kim and I reached out to Robby Birnbaum ("Birnbaum") from the law
firm Greenspoon, a previous attorney referral from one of CAC's marketing

15

vendors, and engaged Greenspoon on behalf of CAC/PSLC. See Def.'s Ex. 11 (July 2017 Greenspoon engagement letter).

84.     Thereafter, Kim began attempting to get referrals for Dedicated Account Provider ("DAP") companies, which provided client escrow accounts that held funds for the client's benefit, that serviced our SL Business type.

85.     To the best of my recollection, Kim contacted DAPs, possibly Crossroads and Global Client Solutions, amongst others, who informed him that they no longer serviced student loan document preparation companies.

86.     In approximately January 2018, Kim directed that CAC include a generic Dedicated Account Provider agreement in its Client Fee Agreement.

87.     Kim explained to me that, if a regulator obtained the Client Fee Agreement,  appearing to have a DAP would make the regulator more likely to go away.

88.     On Kim's instructions, I drafted a generic Dedicated Account Provider agreement based on a template Kim provided, to be used on a temporary basis while we worked on resolving the DAP issue, even though CAC was still taking advance fees while trying to locate a DAP.

89.     Later, but prior to July 2018, Kim asked me to revise a Compliance Script that sales representatives were mandated to review with the consumer on every call, to include a section explaining that CAC would not be taking advance fees.

16

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**Seeking Legal Advice On An Independent Third-Party DAP**

90.    Due to the lack of available DAP options, I emailed two law firms that CAC had retained to inquire about having an independent third-party create a DAP to hold consumer funds until CAC submits proof of performance.

91.    For example, see Def.'s Ex. 13 (February 2018 email re: Client Trust Account) where I explained to Akerman:

> "We haven't figured out who will own and control the DAP company. My plan is to offer it to a neutral friend who has no ties to any of our businesses. Let him run it with a minor profit, while making sure that everything is compliant.
>
> Flow of funds will be per the Client Trust Account Agreement (such as the Client Trust Account Authorization I sent you). This new DAP company will collect the client fees and hold those fees until our services are completed (usually 2-3 months later) before releasing the funds to our companies, minus any DAP company service charges."

92.    See also Def.'s Ex. 14 (February 2018 email re: No Advance Fee - Compliance), an email chain with Thurman Legal, who provided compliance counsel, to confirm the compliance requirements necessary to satisfy the no advance fee rule, as well as a similar discussion on a neutral third-party ownership and control of a DAP.

17

93.     The reason I sought legal advice into the requirements for a neutral and

independent third-party to form a DAP company was to help the SL Business

operate compliantly, and not to own or control the DAP by proxy.

**First Priority LLC: Using RAM and AMP As Dedicated Account Providers**

94.     In approximately March 2018, Kim used Nguyen's credit card to

purchase First Priority LLC ("First Priority"), a Wyoming LLC, for the SL

Business.

95.     Kim, Nguyen, and I agreed to have First Priority operate as a sales

company and use Account Management Plus ("AMP") and Reliant Account

Management ("RAM"), two DAPs servicing student loan debt relief businesses,

to comply with the no advance fee rule.

96.     On July 18, 2018, I contacted AMP and RAM about their trust account

services. See Def.'s Ex. 15 (July 2018 email re: inquiry to AMP) and Def.'s Ex.

16 (July 2018 email re: inquiry to RAM).

97.     There were delays for both AMP and RAM as they worked with

merchant account providers to obtain the required monthly transaction volume.

See Def.'s Ex. 17 (September 2018 email re: Advanced payments) where I

explained to Akerman and telemarketing compliance counsel the AMP and RAM

delays.

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

98.　First Priority submitted applications for AMP and RAM in October 2018. See Def.'s Ex. 18 (First Priority LLC RAM Application) and Def.'s Ex. 19 (October 2018 email re: AMP application and checklist).

99.　RAM required First Priority to provide proof of performance before RAM could release fees to First Priority. See Def.'s Ex. 20 (August 2018 email re: Screen Shots of Final Repayment – Proof of Work) an email dated August 10, 2018 confirming RAM accepted certain screenshots as proof of performance. See also Def.'s Ex. 21 (November 2018 email re: RAM Service Agreement) an email dated November 9. 2018 where I notified RAM that First Priority would "keep track of RAM files (in order to forward proof of completion of services)."

100.　Kim took the lead on communications with AMP and these issues.

101.　To the best of my knowledge, AMP also required First Priority to provide proof of performance before AMP could release fees to First Priority.

102.　First Priority began testing with RAM in approximately November 2018, and with AMP sometime later.

103.　Once testing began with AMP and RAM, Kim and Nguyen took the lead.

104.　To the best of my recollection, First Priority stopped using AMP because AMP was unable to secure the merchant account processing volume necessary to handle the SL Business needs.

19

105.   To the best of my recollection, First Priority stopped using RAM because of frequent technical and communication issues.

106.   To the best of my knowledge, per AMP and RAM compliance requirements, First Priority submitted proof of performance documentation indicating that a consumer's first due date on the consumer's adjusted payment had passed before AMP and RAM released fees paid by consumers to First Priority.

107.   To the best of my knowledge, all fees collected by First Priority satisfied the no advance fee rule, and First Priority submitted proof of performance to AMP and RAM prior to clients being released to First Priority.

**TAS 2019 LLC: Independent Third-Party Dedicated Account Provider**

108.   I have known Kenny Huang ("Huang") since approximately 1998.

109.   In approximately March 2019, I asked for Huang's help to form and operate a DAP company, under the same principles of a neutral, independent third-party ownership and control referenced above.

110.   I sought to have Huang, as an independent third-party, operate the DAP company and for the SL Business to use its DAP services, in order to comply with the no advance fee requirement and only release funds to the SL Business upon confirming proof of performance. See Def.'s Ex. 23 (March 2019 DAP flowchart), from Exhibit 16 of the Appendix to Preliminary Report of Receiver. [ECF No. 75-2]. I understand that this would be lawful and compliant.

20

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

111.   I helped Huang form the company TAS 2019 LLC ("TAS").

112.   I explained to Huang that the SL Business needed to use a DAP to be compliant, the DAPs we tested were unable to meet our needs, and I wanted someone trustworthy but independent to own and operate the DAP company.

113.   Huang did not have any background or experience in client trust accounts, but I felt Huang could learn easily and quickly.

114.   I helped TAS apply for merchant accounts.

115.   Huang obtained business bank accounts for TAS at HSBC Bank.

116.   I reached out to Jimmy Lai ("Lai"), a business associate who helped the SL Business obtain merchant accounts, to also obtain a merchant account for TAS.

117.   At some point, Lai asked to purchase and become the majority owner of TAS because he had experience with client trust account services and could operate and oversee TAS.

118.   Huang sold 51% ownership of TAS to Lai because Lai had the experience and bandwidth to operate TAS, and Huang agreed to the sale with the understanding that Lai would be responsible for TAS's business and operations thereafter.

119.   On September 1, 2019, TCS entered into an agreement with TAS for dedicated client account services. See Def.'s Ex. 24 (Declaration of Jimmy Lai

21

In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A the TCS and TAS agreement.

120.   TAS has never been owned or controlled by the SL Business. See Def.'s Ex. 24 (Declaration of Jimmy Lai In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) at ¶ 6.

121.   The SL Business never had access to or control over the client funds held by TAS, although the SL Business may have assisted TAS with issuing client refunds. See Def.'s Ex. 24 (Declaration of Jimmy Lai In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) at ¶ 8.

122.   TAS required the SL Business to provide proof of performance as well as verbal confirmation that the client was satisfied with the SL Business's services prior to releasing any funds to the SL Business. See Def.'s Ex. 24 (Declaration of Jimmy Lai In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) at ¶ 8.

123.   As of October 23, 2019, the date of the Temporary Restraining Order ("TRO"), TAS held approximately $2.8 million in escrow for the benefit of the SL Business's clients. See Def.'s Ex. 24 (Declaration of Jimmy Lai In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) at ¶ 9.

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

124.   As of October 23, 2019, the date of the TRO, TAS had not released any client funds to the SL Business and the SL Business did not access any of the client funds held at TAS.

**The Family Size and Filing Status Issues**

125.   In approximately late 2017 or early 2018, I became aware that Kim had allowed CAC sales representatives to increase the consumer's family size to offer a lower monthly payment quote and help gain sales, and that they were not simply employee errors like Kim had explained to me in the past.

126.   Kim learned and understood from his sales experience and his experience at CAC that allowing sales representatives, including himself, to increase the consumer's family size to offer a lower monthly payment quote would help gain sales.

127.   Kim always held the highest sales position at the SL Business and, at his sole discretion, allowed the Sales Department to increase the consumer's family size.

128.   Kim, at his sole discretion and based on his knowledge and experience, set a family size limit of 6 or 7.

129.   From November 2015 to approximately mid-2017, by allowing the Sales Department to increase the consumer's family size, Kim benefited directly from the gain in sales because he earned commissions from the entire Sales Department.

23

130.   I was not involved in the above decisions and they were made by Kim. My compensation was never based on sales commissions.

131.   In approximately early 2018, I learned through reviewing emails that I was copied on that CAC sales representatives sometimes listed married consumers' filing status as single to offer a lower monthly payment quote and help gain sales.

132.   I do not know whether Kim or anyone else allowed CAC sales representatives to list married consumers' filing status as single, or whether the CAC sales representatives made those decisions on their own.

133.   Prior to early 2018, I was not aware that CAC sales representatives could list a married consumer as single to affect the consumer's monthly student loan payment.

134.   Upon learning of this information, I began taking corrective actions to stop and fix the family size and filing status issues.

**Corrective Action - The Welcome Call and Welcome Email**

135.   To the best of my understanding, since the beginning of the SL Business, the Processing Department performed a Welcome Call within 48 hours after a consumer was enrolled by the Sales Department.

136.   During the Welcome Call, a Processor was supposed to verify the consumer's information, including family size, filing status, and income.

24

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

137.   Completing a Welcome Call earned a Processor a commission for a completed task.

138.   At some point Kim instructed the Processing Manager not to have Processors verify the consumer's information, such as family size and filing status, during the Welcome Call.

139.   By not having Processors verify the consumer's family size and filing status, Kim benefited directly from the gain in sales because he earned commissions from sales (which I did not) .

140.   In early 2019, TCS's internal proprietary software bot named "Kelly" discovered through several audits that Processors were sometimes skipping the Welcome Call task but still notating the task as completed and receiving the commissions. This was a violation of policy.

141.   TCS terminated five Processors who it was determined were in violation of this policy.

142.   In approximately April 2019, the SL Business switched from the Welcome Call to the Welcome Email, which I helped develop and was not an actual email but a web interface for the client to review his or her personal information and disclosures from the company.

143.   The sales representative was required to walk the client through the Welcome Email over the phone prior to the client's enrollment with the Company.

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

144.   The Welcome Email included the client's personal information, including family size and filing status, as well as the full Compliance Script. See Def.'s Ex. 25 (Submitted TEST Welcome Email) an April 26, 2019 sample submitted and logged test Welcome Email verification.

145.   The Welcome Email ensured that the client would personally review all his or her information for accuracy and required the client's signed acknowledgement. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B for screenshots of a sample test Welcome Email from the client's view.

146.   To the best of my knowledge, approximately 20,250 clients completed the Welcome Email which included confirming their family size and filing status.

### Corrective Action - Compliance Memos

147.   Between approximately July 2017 through October 2019, I was involved in preparing numerous compliance memos for the Sales and Processing Departments.

148.   Compliance memos were used as compliance reminders and for corrective training.

149.   The SL Business required the Managers to review the compliance memos with the employees under their supervision.

26

150.   I added all compliance memos to the HR Department's onboarding package.

151.   In October 2018, I prepared a Sales Compliance Memo to address potential sales issues, including inputting an incorrect family size and filing status.

152.   The Sales Compliance Memo required sales representatives to provide accurate enrollment information: "All Client information must be verified and completed accurately: name, address, telephone number, email address, date of birth, family size, stated income, etc." See Def.'s Ex. 27 (October 2018 Sales Compliance Memo) the October 21, 2018 Sales Compliance Memo I prepared.

153.   I emailed the Sales Compliance Memo to Kim and Nguyen and wrote: "The plan is to have every Manager sign, and have each Manager be responsible for all their Reps to sign. All signed copies will go into their employee files." See Def.'s Ex. 28 (October 2018 email re: DRAFT – FPS Sales Compliance Memo).

154.   I also emailed Joseph Boylan ("Boylan"), the Sales Director at the time, and Shirena Huizar ("Huizar"), the HR Manager at the time, copying Kim and Nguyen, and instructed Boylan and Huizar to make sure all current and future Sales Department employees had a signed copy of the Sales Compliance Memo in their file, and Managers reviewed the Sales Compliance Memo with their team members. See Def.'s Ex. 29 (October 2018 email re: IMMEDIATE ACTION REQUIRED – Sales Compliance Memo).

27

155.   To the best of my knowledge, all employees in the Sales Department as of November 2018 reviewed, understood, and signed the Sales Compliance Memo.

156.   At some point, the SL Business had a Zero Tolerance Policy, which was posted throughout the offices, that made all employees aware that there was no tolerance for making misrepresentations, including changing family size. See Def.'s Ex. 30 (Zero Tolerance Policy), from Exhibit 9 of the Appendix to Preliminary Report of Receiver. [ECF No. 75-1]

157.   I helped create numerous other compliance memos for the Prime Consulting LLC ("Prime") employees to review and sign. See Def.'s Ex. 31 (Prime Compliance Memos).

158.   The HR Department on the processing side of the SL Business also emailed periodic compliance reminders to the Processors. See Def.'s Ex. 32 (August 2019 email re: Processing Protocols) an email dated August 16, 2019 from the HR Manager at SLAM to the Processors, reminding them of proper processing protocols.

159.   I also helped create numerous telemarketing compliance memos for the SL Business employees to review and sign. See Def.'s Ex. 33 (Telemarketing Memos).

**Corrective Action - Verbal Warnings, Formal Write-Ups, Backing Out**

**Commissions**

28

160.   The HR Department, Directors, and Managers were all responsible for corrective actions, including verbal warnings, formal write-ups, and backing out commissions.

161.   In approximately mid-2018, on the advice of counsel, I asked the HR Department to document corrective actions.

162.   I helped create numerous disciplinary action charts for the SL Business employees, including Managers and Directors, to review and sign. See Def.'s Ex. 34 (Disciplinary Action Charts).

163.   Sales employees were formally written up for failing to follow compliance guidelines. See Def.'s Ex. 35 (Declaration of Shirena Huizar In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B for several example formal write-ups.

**Corrective Action - Ultron Bot**

164.   Along with TCS's internal proprietary software bot named Kelly, Prime also created its own internal proprietary software bot named "Ultron."

165.   Ultron, which I helped develop, was created to be preventative in nature by blocking the Sales Department from taking actions that were not aligned with company policy.

166.   Beginning approximately late 2018 or early 2019, Ultron ran 24/7 in real time, and was frequently upgraded and improved, to ensure that client files

29

and enrollments were being handled properly. See Def.'s Ex. 36 (Summary of Ultron's checks) for a list of items that Ultron checked for, including family size and filing status.

### Registering With The CFPB's Online Company Portal

167.   CAC, TCS, and Prime registered with the CFPB's online company portal to review and resolve consumer complaints and in an effort to be compliant with applicable laws and rules. See Def.'s Ex. 37 (July 2017 email re: registering with CFPB's online company portal) my July 14, 2017 email to the CS Manager instructing him to email CAC's CFPB Portal Form, and Def.'s Ex. 38 (August 2019 email re: CFPB Login) an August 21, 2019 email with login information to CFPB's online company portal.

### Retaining Venable LLP And O'Melveny & Myers For More Help With Compliance

### (From Approximately June 2019 To October 23, 2019)

168.   In approximately June 2019, Kim, Nguyen, and I spoke with numerous national law firms to help the SL Business with compliance.

169.   Ultimately, TCS and I engaged with Venable LLP ("Venable") while Prime, Ho, and Kim engaged with O'Melveny & Myers ("O'Melveny").

170.   Kim, Nguyen, and I chose Venable and O'Melveny due to their background and experience with the CFPB and the various compliance related issues.

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**Prime Pausing Sales**

**(From August 28, 2019 To September 30, 2019)**

171. Prime paused sales on August 28, 2019.

172. During the sales pause, Prime continued to pay the Sales Department employees, but at an hourly rate and not through any commissions.

173. During that time, "the business shut itself down to implement a rigorous campaign to raise the bar with respect to its operation compliance policies, procedures, and practices, under which it has consistently operated and from which it does not intend to deviate." See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) at ¶ 14.

174. Prime resumed sales on September 30, 2019 after implementing new compliance policies, procedures, and practices under the guidance of Venable and O'Melveny.

**The Attorneys' Recommendations**

175. Kim, Nguyen, and I, along with managers and directors at the SL Business, worked on the numerous recommendations from Venable and O'Melveny.

176. We issued company-wide legal hold and document preservation notices.

177. We retained Setec to perform data collection.

31

178.   We retained Berkeley Research Group to perform forensic accounting.

179.   We retained Quality Contact Solutions ("QCS") for telemarketing compliance consulting, building on the work QCS did for the SL Business in 2018.

180.   We retained Eva8 for compliance workflow consulting.

181.   We retained an independent third-party vendor to perform audits of every sales enrollment.

182.   We worked with Venable to create General Compliance, TSR, and UDAAP policies.

183.   We worked with QCS and Eva8 to build a Compliance Department.

184.   We developed compliance training modules for the Sales, Processing, and CS Departments, as well as third-party marketing vendors. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit G a compliance training package.

185.   We developed compliance testing materials for the Sales and CS Departments. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit D a compliance quiz.

186.   We worked with the attorneys to revise the Sales Script and trained sales employees on how to use them.

32

187.   We developed Disciplinary Actions Charts for employees to understand, and for management and the HR Department to execute.

### The Compliance Re-Verification Campaign

188.   We developed and on approximately September 13, 2019 initiated a Compliance and Re-Verification Campaign ("Re-Verification Campaign"). See Def.'s Ex. 39 (Declaration of Adon Janse In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A the Re-Verification Campaign flowchart.

189.   For the Re-Verification Campaign, CS representatives confirmed with existing clients the information they had on file, reviewed their completed IDR applications for accuracy, and asked if the clients were satisfied with the services provided by the SL Business. See Def.'s Ex. 40 (Re-Verification Campaign Training). See also Def.'s Ex. 41 (Re-Verification Campaign Script) from Exhibit 42 of the Appendix to Preliminary Report of Receiver. [ECF No. 75-3]

190.   During the Re-Verification Campaign, clients personally reviewed their enrollment package, which included their completed IDR application, amongst other forms and documents. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit F a sample Re-Verification Campaign enrollment package.

33

191.   Out of a sample of 3,252 clients during the Re-Verification Campaign, ~96% of clients confirmed that their information and IDR applications were accurate, and they were satisfied with the services provided by the SL Business. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under at ¶ 12.

192.   Out of a sample of 3,252 clients during the Re-Verification Campaign, ~4% of clients found that their information or IDR applications contained inaccuracies, the vast majority of which were because their personal information, such as family size, filing status, or income, changed. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under at ¶ 13.

### The TRO On October 23, 2019

193.   The Temporary Restraining Order ("TRO") against the SL Business occurred on October 23, 2019.

194.   At the time of the TRO, the SL Business was working closely with Venable and O'Melveny and, to the best of my knowledge, operating lawfully and compliantly.

### Damages Sought By Plaintiffs

34

195.   Plaintiffs, in their Motion, allege that I am "liable (jointly and severally with the Company) for $95,057,756.82 in legal restitution (or refunds or damages)." [ECF 423-6, Page 31:6-8]

196.   Plaintiffs make no mention of, and give no credit for, any of the assets and settlements Plaintiffs and the Receiver have received thus far in this case.

197.   Similarly, Plaintiffs to do not take into account or offer any amount as to the Companies' legitimate business expenses.

**Requests To Plaintiffs For An Accounting**

198.   On January 8, 2023, in advance of a settlement conference, I emailed Plaintiffs requesting "an accounting, including descriptions and amounts, of all assets and settlements that Plaintiffs have received thus far in this case." The purpose of this request is to determine how much money has already been recovered, as this should be credited to any judgment or settlement award against me.[2]

199.   Plaintiffs replied with a link to the CFPB website with the final judgments in this case.

---

[2] I have attempted to settle with the CFPB on similar terms as the other defendants in this case, including by turning over all assets and money in my possession, custody, or control, but they have refused to agree to the same because they believe there is cryptocurrency that I am hiding or have not turned over, which is not the case.

35

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

200.   I replied to Plaintiffs to point out that the "final judgments do not provide an accounting or even summary of the amounts that Plaintiffs received as a result of the settlements or defaults."

201.   I also noted that "[p]erhaps the Receiver may have a full accounting of the assets and amounts that Plaintiffs have received thus far in this case."

202.   Rather than provide the requested accounting, Plaintiffs replied that the request was not relevant to our settlement discussions.

203.   See Def.'s Ex. 42 (January 2023 email re: accounting request) for the email chain referenced above.

204.   Since Plaintiffs refuse to provide the accounting, I make the statements below in order to offer, to the best of my ability, an accounting of the amounts that Plaintiffs and the Receiver have received thus far in this case.

**Accounting From Receiver's Status Reports**

205.   The Receiver's Interim Status Report dated December 1, 2020 states "[d]uring this time period [of November 1, 2019 to November 30, 2020], receipts were $8,877,453.10, primarily comprised of funds from accounts frozen under the provisions of the TRO, the liquidation of assets, and the sale of Receivership Defendants' office furniture and equipment." See Def.'s Ex. 43 (Receiver's Interim Status Report).

206.   The Receiver's Second Interim Status Report dated May 28, 2021 states "[d]uring this time period [of December 1, 2020 to April 30, 2021], receipts were

36

$1,040,282.86, primarily comprised of reserve funds from accounts frozen under the provisions of the TRO ($999,980.00), and the liquidation of assets ($36,875.00)." See Def.'s Ex. 44 (Receiver's Second Interim Status Report).

207.   The Receiver's Third Interim Status Report dated November 19, 2021 states "[d]uring this time period [of May 1, 2021 to October 31, 2021], receipts were $485,067.30, comprised of True Count Staffing reserve funds being returned by National Merchant Center." See Def.'s Ex. 45 (Receiver's Third Interim Status Report).

208.   The Receiver's Fourth Interim Status Report dated June 30, 2022 states "[d]uring this time period [of November 1, 2021 to May 31, 2022], receipts were $782,797.97, comprised of settlement funds from The Brea Financial Group d/b/a Pub Club Leads ($652,500.00), True Count Staffing IOLTA funds from former counsel ($113,272.95), and the sale of remaining assets ($14,000.00)." See Def.'s Ex. 46 (Receiver's Fourth Interim Status Report).

209.   In sum, the Receiver has received $11,185,601.23 from the start of this case through May 31, 2022.

### Accounting From Final Judgments

210.   On August 26, 2020 Plaintiffs entered into a Corrected, Amended Stipulated Final Judgment and Order as to Defendants Prime Consulting LLC and Horizon Consultants LLC ("Horizon"). [ECF No. 211]

211.   As part of the Stipulated Judgment, Prime and Horizon transferred to Plaintiffs at least 4 bank accounts towards a judgment of monetary relief, but I am unable to ascertain the amounts in those accounts.

212.   On August 28, 2020 Plaintiffs entered into a Stipulated Final Judgment and Order as to Defendant Tuong Nguyen and Relief Defendant TN Accounting Inc. ("TN Accounting"). [ECF No. 210]

213.   As part of the Stipulated Judgment, Nguyen and TN Accounting transferred to Plaintiffs 5 bank accounts, a vehicle, a watch, and cryptocurrencies towards a judgment of monetary relief, but I am unable to ascertain the amounts in those accounts and the values of those assets.

214.   On September 8, 2020 Plaintiffs entered into a Stipulated Final Judgment and Order as to Relief Defendants Hold The Door Corp and Mice and Men LLC ("Mice and Men"). [ECF No. 218]

215.   As part of the Stipulated Judgment, HTD surrendered to Plaintiffs a bank account worth, to the best of my knowledge, $53,696.04 towards a judgment of monetary relief and Mice and Men surrendered to Plaintiffs a UBS bank account worth, to the best of my knowledge, $4,105,430.38 towards a judgment of monetary relief.

216.   On December 15, 2020 this Court entered a Default Judgment and Order Against Defendants First Priority LLC and True Count Staffing Inc. [ECF No. 248]

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

217.   As part of the Default Judgment, First Priority surrendered to Plaintiffs a bank account worth approximately $165,848.05 towards a judgment of monetary relief, but I am unable to ascertain the other First Priority and True Count accounts or assets that are part of the Default Judgment.

218.   On June 15, 2021 Plaintiffs entered into a Stipulated Final Judgment and Order as to Relief Defendant Judy Dai ("Ms. Dai"), my elderly mother. [ECF No. 298]

219.   As part of the Stipulated Judgment, Ms. Dai transferred to Plaintiffs, to the best of my knowledge, $3,088,381.80 towards a judgment of monetary relief. This money was money that I had gifted to her that I obtained from my investments in cryptocurrency and other businesses in order for her to retire. None of it was derived, directly or indirectly, from the SL Business. However, the CFPB contended that this was a voidable transfer and, based on those allegations, my mother ultimately settled with Plaintiffs.

220.   On July 1, 2021 Plaintiffs entered into a Stipulated Final Judgment and Order as to Relief Defendants 1st Generation Holdings, LLC ("1st Generation") and Infinite Management Corp., F/K/A Infinite Management Solutions Inc. ("Infinite") [ECF No. 304]

221.   As part of the Stipulated Judgment, 1st Generation transferred to Plaintiffs bank accounts worth, to the best of my knowledge, at least $3,984,779.28 towards a judgment of monetary relief and Infinite transferred to

39

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs a bank account towards a judgment of monetary relief, but I am unable
to ascertain the amount in that Infinite bank account.

222.   On July 14, 2021 Plaintiffs entered into a Stipulated Final Judgment
and Order as to Defendant Consumer Advocacy Center. [ECF No. 311]

223.   As part of the Stipulated Judgment, a judgment of monetary relief in
the amount of $35,105,017.93 was entered against CAC to be deemed to be an
allowed general unsecured claim in favor of the Bureau in CAC's bankruptcy
proceeding.

224.   On March 22, 2022 Plaintiffs entered a Stipulated Final Judgment and
Order as to Relief Defendant TAS 2019 LLC. [ECF No. 359]

225.   As part of the Stipulated Judgment, TAS transferred to Plaintiffs
$2,866,314.24 towards a judgment of monetary relief

226.   On May 24, 2022 Plaintiffs entered a Stipulated Final Judgment and
Order as to Relief Defendant Sarah Kim ("Ms. Kim"). [ECF No. 377]

227.   As part of the Stipulated Judgment, Ms. Kim transferred to Plaintiffs
$85,000 and two vehicles, a watch, a ring, and earrings towards a judgment of
monetary relief, but I am unable to ascertain the values of those assets.

228.   On June 10, 2022 Plaintiffs entered a Stipulated Final Judgment and
Order as to Defendant Albert Kim. [ECF No. 383]

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

229.   As part of the Stipulated Judgment, Kim transferred to Plaintiffs two bank accounts, and two watches towards a judgment of monetary relief, but I am unable to ascertain the amounts in those accounts and the values of those assets.

230.   On March 13, 2023 this Court approved Settlement Agreements with Non-Parties National Merchant Center, Inc. ("NMC") and Shih-Hao Lai and Swift Payments (collectively, "Lai").

231.   As part of the Settlement Agreements, NMC agreed to transfer $340,000 to the Receiver and Lai agreed to transfer $75,000 to the Receiver.

232.   In sum, the Bureau has received at least $14,598,601.74, as well as other bank accounts and assets unaccounted for in that total, towards a judgment of monetary relief.

233.   From the information I am able to gather, between the Receiver's receipts and the stipulated and default judgments, **Defendants and Relief Defendants have turned over at least $25,784,202.97 in this case, an incomplete total which does not include certain bank accounts and assets whose values I am unable to ascertain.**

234.   See Def.'s Ex. 47 (Case accounting summary chart) for my summary of the above information and the amounts and assets recovered.

235.   To the best of my understanding, the full amount of $25,784,202.97 has gone towards equitable restitution and disgorgement.

41

236.   From the information I am able to gather, the SL Business has at least

$72.58 million in legitimate business expenses, such as marketing, rent,

insurance, and payroll.

237.   See Def.'s Ex. 55 (SL Business Legitimate Expenses Summary Chart)

for my summary of the above information, based on my review of the financial

documents available to me, with the supporting documents attached as exhibits

as referenced therein.

238.   Thus, using the Plaintiffs $95 million figure, the total net profits of the

SL Business were approximately $22.4 million, and Plaintiffs and the Receiver

have already recovered approximately $25.8 million which is in excess of that.

### My Net Profits Received

239.   CAC paid me individually $15,230 in 2016 (although $10,000 of that

was Kim's income), $253,345 through HTD in 2017, and $275,000 through HTD

in 2018. See Def.'s Ex. 48 (2016, 2017, and 2018 1099s from CAC).

240.   TCS paid me $1,007,940 through HTD in total. See Def.'s Ex. 49 (TCS

Profit and Loss: All Dates) prepared by the Receiver's Forensic Accountant, in

Exhibit 5 of the Appendix to Preliminary Report of Receiver. [ECF No. 75-1]

241.   Prime did not pay me or HTD anything. See Def.'s Ex. 50 (Prime Profit

and Loss: All Dates) prepared by the Receiver's Forensic Accountant, in Exhibit

5 of the Appendix to Preliminary Report of Receiver. [ECF No. 75-1]

242.   First Priority did not pay me or HTD anything.

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

243.   From the information I can gather, I received $1,551,515 from the SL Business in total.

244.   While I received $1,551,515 from the SL Business, I have already turned over $3,088,382 through Ms. Dai, my mother. [ECF No. 298] Notably, $3 million of the money that my mother turned over was not derived, directly or indirectly, from the SL Business and was a gift that I had given her after I sold a previous investment so that she could retire.

245.   Accordingly, Plaintiffs have already recovered from me and my mother in excess of the approximately $1.55 million in net profit I obtained from the SL Business – approximately two times that amount.

246.   And as discussed previously, the Plaintiffs have also already recovered from the SL Business in excess of its total net profit (i.e. after accounting for legitimate business expenses).

247.   I wish to point out in the interests of fairness that Kim's settlement is for two bank accounts that, to the best of my knowledge, are worth less than $100,000 and two watches, a disproportionately lower amount than the over $3 million that Plaintiffs have already recovered from me and my mother, not to mention the remainder of my frozen assets that I have also committed to turning over to resolve this case.

248.   I am currently working full-time as an office admin earning $16 per hour and I do not anticipate my income will substantially increase.

43

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    249.  I do not have assets or money to pay any penalties, fines, or judgments,

2    other than what has already been turned over to the Receiver or is in the process

3

4    of being turned over to the Receiver, or otherwise disclosed in my financial

5    statements. Despite the CFPB's contentions to the contrary, I am not in

6    possession, custody, or control of undisclosed cryptocurrency assets and have

7

8    permitted all cryptocurrency assets which I do control to be turned over to the

9    receiver.

10   250.  I have no intention of reentering the student loan or debt relief business

11
     or any financial services business. I do not have a history of previous violations
12

13   of consumer protection laws.

14   251.  Looking back, I should not have assumed that Kim was operating the

15
     SL Business in a compliant fashion and should have insisted on more detailed
16

17   information early on. Later, when I learned there were issues with the SL

18   Business practices, such as improper advance fees, I should have acted more

19
     swiftly and decisively to stop the issues or resign from the company. I thought I
20

21   was doing the right thing by retaining experienced counsel for the SL Business

22   to address the various compliance issues, but I now realize I should have done

23

24   more.

25   252.  I made a lot of poor decisions and mistakes and I accept full

26   responsibility for my own actions.

27

28

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

253.   I have paid a huge price. I have been incarcerated and I have lost all the money I made prior to investing in this SL Business. I have already turned over through my mother around $1.5 million more than what I made from this SL Business. My life and family have been ruined. I have committed to turn over the remainder of my assets as listed on my financial statements, including substantial assets that were derived prior to and entirely independent of the SL Business, to try and put an end to this and move on with my life, but the CFPB insists that I have cryptocurrency that I am hiding or refusing to turn over which is simply not the case. If I had access to or control of any additional cryptocurrency, I would gladly turn that over as well.

Executed on March 27, 2023 at Los Angeles County, California.

Kaine Wen

45

KAINE WEN'S DECLARATION IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT