FILED

Kaine Wen
146 Bishop Lndg
Irvine, CA 92620
Telephone: 626-563-7908
kainewen@gmail.com
In Pro Per

2023 MAR 27 PM 3:45

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Bureau of Consumer Financial
Protection, et al.,

      Plaintiffs,

      v.

Consumer Advocacy Center Inc.,
d/b/a Premier Student Loan Center, et
al.,

      Defendants.

CASE NO. 8:19-cv-01998 MWF (KS)

**MEMORANDUM OF POINTS
AND AUTHORITY IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT
AGAINST DEFENDANT WEN**

Court:  Hon. Michael W. Fitzgerald
Date:   April 24, 2023
Time:   10:00 AM
Place:  Courtroom 5A

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 4

SUMMARY JUDGMENT STANDARD ....................................................................... 8

ARGUMENT .................................................................................................................. 8

A.    The Motion Must Be Denied Because the Bureau Violates the U.S.

Constitution's Appropriations Clause and Separation of Powers ......................... 8

B.    Both State and Federal Claims are Unconstitutional Under the Eighth

Amendment's Excessive Fines Clause ................................................................ 13

C.    The Motion Should be Denied Because Numerous Genuine Issues of

Material Facts Exist Which Prevent Granting Relief ......................................... 17

D.    Even if the Court Were to Grant the Motion, the Amount of Damages

Sought Must Be Limited Under *Liu v. SEC* ...................................................... 21

E.    The Proposed Order Seeks Relief to which Plaintiffs Have Not Shown Any

Entitlement or Basis ........................................................................................... 25

CONCLUSION ............................................................................................................. 27

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Federal Cases** ................................................................................**PAGE**

4

5

*All American Check Cashing, Inc.*, 33 F.4th 218 (5th Cir. 2022) ............................12

6

*Austin v. United States*, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)...15

7

8

*Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109

9

    S.Ct. 2909, 106 L.Ed.2d 219 (1989) ......................................................................15

10

*Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).........27

11

12

*CashCall, Inc.*, (9th Cir. 2022) 35 F.4th 734.............................................................13

13

*CFPB v. Com. Fin. Services Assn.*, (U.S., Feb. 27, 2023, No. 22-448) 2023 WL

14

    2227658 ....................................................................................................................9

15

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022)...........

16

17

    ...................................................................................2, 9, 10, 11, 12, 13

18

*Collins v. Yellen*, 141 S. Ct. 1761 (2021)................................................................12

19

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522JFWRAOX, 2023

20

21

    WL 2009938 (C.D. Cal. Feb. 10, 2023).................................................................26

22

*Consumer Fin. Prot. Bureau v. Gordon*, No. CV126147RSWLMRWX, 2013 WL

23

    12116365 (C.D. Cal. June 26, 2013)......................................................................28

24

25

*Consumer Financial Protection Bureau v. Consumer First Legal Group, LLC*, No.

26

    19-3396, 2021 WL 3123735 (7th Cir. Jul. 23, 2021)..............................24, 26, 27

27

28

*Eastman Kodak Co. v. Image Technical Services, Inc.*, (1992) 504 U.S. 451, 112
S.Ct. 2072, 119 L.Ed.2d 265 ..................................................................... 3

*Exch. Comm'n v. Westport Cap. Markets, LLC*, 547 F. Supp. 3d 157 (D. Conn.
2021) ................................................................................................... 27

*Federal Trade Commission v. Electronic Payment Solutions of America
Incorporated*, 482 F.Supp.3d 921 (D. Az. 2020) .................................... 23

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477
(2010) ................................................................................................. 11

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) ............................................... 25

*G&C Auto Body Inc v. Geico General Ins. Co.*, (N.D. Cal. 2008) 552 F.Supp.2d
1015 ...................................................................................................... 8

*Liu v. Securities and Exchange Commission*, 140 S.Ct. 1936 (2020)....3, 22, 23, 24,
25, 26

*McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)....16

*SEC v. Faulkner*, No. 3:16-CV-1, 735, 2021 WL 75551 (N.D. Tex. Jan. 8, 2021) 26

*SEC v. M & A West, Inc.*, 538 F3d 1043 (9th Cir. 2008) ........................................ 9

*SEC v. Jasper*, 883 F. Supp. 2d 915 (N.D. Cal. 2010) ............................................ 17

*SEC v. San Francisco Regional Center, LLC*, No. 17-cv-00223, 2020 WL
4569844, *2 (N.D. Cal. Aug. 7, 2020) 17-cv-00223, 2020 WL 4569844 (N.D.
Cal. Aug. 7, 2020) ............................................................................................ 25

*Seila Law v. CFPB*, 140 S. Ct. 2183 (2020) ...................................................... 10, 11

iv

TABLE OF AUTHORITIES

*Timbs v. Indiana*, 203 L.Ed.2d 11, 139 S.Ct. 682 (2019) ..............................2, 15, 16

*U.S. v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) 2, 14, 15

**Federal Statutes**

12 U.S.C. 5497 ............................................................................................9, 10

12 U.S.C. § 556 ......................................................................16, 17, 24, 25

U.S. Const. Art. I,§ 9, Cl. 7 ..........................................................................9

**State Statutes**

Cal. Bus. & Prof. Code, § 17200...................................................................15

Minn. Stat. § 325D.44 ....................................................................................15

Minn. Stat. § 325F.69 ....................................................................................15

N.C. Gen. Stat. § 75-1.1(a) ...........................................................................15

N.C. Gen. Stat. §§ 14-423 .............................................................................15

**Federal Rules**

F.R.C.P. 56(a)..................................................................................................3

TABLE OF AUTHORITIES

1

## INTRODUCTION

2      Plaintiffs the Bureau of Consumer Financial Protection (the "CFPB" or the

3 "Bureau"), State of California, State of Minnesota and State of North Carolina

4 (collectively, "Plaintiffs"), have filed an ill-conceived motion for partial summary

5 judgment which asserts an astonishing 225 purported undisputed facts (many of

6 which are in fact subject to a genuine dispute) and that relies on hundreds of

7 exhibits.[1]  Plaintiffs' reliance on quantity and volume cannot hide the fact that

8 there are numerous genuine disputes as to material fact and that the movants are

9 not entitled to judgment as a matter of law, for the reasons set forth herein

10      What is clear from the Motion is that my co-Defendants, Albert Kim

11 ("Kim") and Tuong Nguyen ("Nguyen"), who have now settled with the Plaintiffs

12 and are obligated to cooperate with them pursuant to the terms of their settlements,

13 are attempting to foist undue responsibility onto me. In fact, it was Kim's idea to

14 start the business which he learned about as a salesman at another student loan

15 company. I was initially only a silent investor in the business. Kim provided and

16 formed each component of the business, including the website, client fee

17 agreement, fee structure for consumers, sales script, sales training, sales

18 commission structure, and so forth. Kim developed the policies and practices

19 which the Plaintiffs now contend are unlawful. Kim solely operated, oversaw, and

20 controlled the business for the first approximately 20 months. In fact, once I did

21 take on a more active role in the business (at Kim's request), I undertook

22 substantial efforts to bring the Companies into compliance with applicable laws

23 and regulations.

24

25 [1]  Plaintiffs have numbered their exhibits 1 to 93; however, a number of the
26 exhibits in fact contain voluminous subparts, i.e. Plaintiffs' Exhibit 2 is a
Declaration from declarant Tuong Nguyen which itself contains Exhibits 2.1 to
27 2.77.

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The instant motion fails for a number of reasons.

**First, as set forth in the recent opinion by the U.S. Court of Appeals for the Fifth Circuit in *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), the Bureau's funding scheme, by which Congress ceded its appropriations role to the Bureau and took the Bureau "off the books," violates the U.S. Constitution's appropriations clause and the separation of powers.** "The Bureau's perpetual insulation from Congress's appropriations power, including the express exemption from congressional review of its funding, renders the Bureau no longer dependent and, as a result, no longer accountable to Congress and, ultimately, to the people." *Id.* at 639. The Bureau's constitutional violation renders every Bureau action funded outside the appropriations process— such as this action and, indeed, the present motion— unlawful.

**Second, the motion should be denied because the relief sought by Plaintiffs in the motion, including civil money penalties and redress, all in excess of $240 million violates the Eighth Amendment to the U.S. Constitution's prohibition on excessive fines.** *U.S. v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). Plaintiffs seek over $148 million in fines against me, an outrageous and excessive sum in light of the fact that I only received approximately $1.55 million from the business and have already turned over (through my mother Judy Dai) $3.088 million. The Eighth Amendment's excessive fines clause applies equally to the claims brought by the states under *Timbs v. Indiana*, 203 L.Ed.2d 11, 139 S.Ct. 682 (2019). I have been incarcerated, lost all of my money that I earned before even investing in this business, and had my life and family ruined. I will never be able to pay such a sum, as I have been reduced to earning $16 per hour and cannot even afford counsel to appear on my behalf in this action.

2

**Third, even in the event the Court were to disagree with the above constitutional arguments, the motion must be denied because there are multiple genuine issues of material fact.**  Summary judgment may only be granted where there is no "genuine dispute" as to any "material fact." F.R.C.P. 56(a).  On a motion for summary judgment, "the evidence of [the opposing party] is to be believed, and all justifiable inferences are to be drawn in their favor" so that the opposing party's "version of any disputed issue of fact thus is presumed correct . . . ." *Eastman Kodak Co. v. Image Technical Services, Inc.* (1992) 504 U.S. 451, 456, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265.  Here, contrary to the misstatements by Kim and Nguyen, I joined the company as a silent investor and did not exert control over business operations and was not involved in or aware of the call center operations, sales scripts, fee structure, etc. I did not participate directly in any deceptive acts or have the authority to control them nor was I recklessly indifferent to misrepresentations or fraud, which is the standard for individual liability advanced by Plaintiffs in their motion.

**Fourth, even if the Court were to grant the motion, the amount of damages sought is improperly based on net revenues and refund of moneys to consumers, so that Plaintiffs seek a judgment against me for monies that I never received and do not take into account the Companies' legitimate business expenses.**  In *Liu v. Securities and Exchange Commission*, 140 S.Ct. 1936 (2020), the Supreme Court established significant limits on federal statutes that provide for equitable relief such as disgorgement and restitution, which the relief sought in the motion seeks to violate. As a practical matter, Plaintiffs cannot and should not be able to obtain a judgment for $95 million against me when (1) the *total profit of the business were approximately only $22.5 million and the Plaintiffs have already recovered in excess of this amount from settlements and judgments in this case*; (2) in total *the amount I received from the business was*

3

1  *approximately $1.55 million and (3) my family and I have already turned over in*

2  *excess of $3 million.*

3      **Fifth, the proposed order submitted by Plaintiffs seeks extraordinary**

4  **forms of relief for which Plaintiffs have failed to provide any basis, including**

5  **extensive and egregious reporting, recordkeeping, and cooperation**

6  **requirements.**

7  

**STATEMENT OF FACTS**

8      In approximately July 2015, Kim, with whom I was previously acquainted,

9  was working for a student loan document preparation company as a sales

10  representative. Kim told me he wanted to learn everything from the student loan

11  document preparation company he was working for so he could start his own

12  student loan document preparation company.  Material Fact in Dispute (MFID) 2;

13  Declaration of Kaine Wen ("Wen Decl."), ¶¶ 3-4.

14      Kim asked me to invest in his future student loan document preparation

15  business ("SL Business").  Nguyen, who had experience in accounting, also agreed

16  to become a part owner of the SL Business. I initially invested approximately

17  $30,000 in the business.  Later, I invested more money by using personal and

18  borrowed credit cards, another approximately $30,000 to $40,000. Wen Decl., ¶¶

19  6-9.

20      The reason I invested a disproportionately higher amount to the ownership

21  percentage I received was because I was investing in the SL Business solely as a

22  "silent" investor with no involvement or plans to be part of the operations, and my

23  primary contribution was financial only. In contrast, Kim, who invested a

24  disproportionately lower amount to the ownership percentage he received, would

25  be the owner-operator of the start-up, and his primary contribution was his industry

26  knowledge and experience and that he would be providing full-time oversight of

27  the company and its operations.  During this time, I was working full-time on a

28  4

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

separate, unrelated business and did not have additional time to dedicate to the new business. MFID ¶ 3; Wen Decl., ¶¶ 10-11.

Previously, Kim worked at a loan modification company where he learned the business and then started his own loan modification company, which was the same blueprint Kim used for the SL Business. Kim owned and worked as a salesperson at his loan modification company, a call center sales type of business that used telemarketing. MFID ¶ 4; Wen Declaration at ¶¶ 5, 14-15.

The loan modification company that Kim owned and operated was Consumer Advocacy Center, Inc. ("CAC"). MFID ¶ 5. I did not form CAC with Kim in 2014. I was not an owner, formally or informally, of CAC while it operated as a loan modification company. Kim used his company CAC for the SL Business out of convenience because it was already formed. MFID ¶ 1, 5; Wen Declaration at ¶¶15-20.

Kim solely hired the website developer and provided the website content for the company's website. Kim solely provided the client fee agreement that CAC used. Kim solely provided the fee structure for consumers, including the amount of fees and when those fees could be collected. Kim, at his sole discretion, adjusted CAC's fee structure. Kim solely provided and developed the sales script that CAC used. Kim solely provided and developed the sales training that CAC used. Kim personally trained CAC sales representatives. Kim solely provided the commission structure for the sales representatives that CAC used. Kim personally interviewed and hired, or otherwise supervised the hiring of, the sales representatives for CAC. MFID ¶ 6; Wen Declaration at ¶¶ 23-44.

All of the foregoing was consistent with Kim's role as the sole decision maker for CAC for all business operations during this time including the Sales Department and Processing Department for the business.

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    I was not involved in any of the foregoing, consistent with my role as a

2    silent investor, and I relied on Kim's expertise in the above as he was running all

3    business operations.  MFID ¶ 7; Wen Declaration at ¶¶ 49-55.

4    As a silent investor, I rarely went into the company's office, and in the rare

5    instances that I went into the office, it was during non-business hours.  Kenneth

6    Hu, the former Office Assistant and IT technician stated that he did not see me at

7    the office until June or July of 2017 and had no communications with me. *See*

8    Def.'s Ex. 52 (Declaration of Kenneth Hu).  I did not have an office, a desk, a

9    chair, or a computer at the office. MFID ¶ 8; Wen Declaration at ¶¶ 45-47.

10    From the beginning of my involvement in the company as a silent investor in

11    late 2015 to approximately June 2017, I occasionally communicated with Kim

12    about the SL Business, and only regarding budget concerns or my minor support

13    work that I provided to the business, for instance, Kim occasionally requested that

14    I help revise documents that he prepared. MFID ¶ 9; Wen Declaration at ¶ 56.

15    I deferred to and relied on Kim's experience and supposed knowledge of the

16    student loan document preparation industry. MFID ¶ 7; Wen Declaration at ¶ 57.

17    From November 2015 to June 2017, I received minimal pay from CAC

18    because my involvement with CAC and its operations was minimal.  To the best of

19    my recollection, from approximately January 2016 to June 2017, CAC paid me

20    $15-20 per hour for minor support services.  I received $5,230 from CAC in all of

21    2016.  In the 19 months from November 2015 to May 2017, CAC paid me and my

22    consulting company $9,230 in total.   In the same 19 months, CAC paid Kim and

23    his consulting company $249,321 in total. MFID ¶ 10; Wen Declaration at ¶¶ 58-

24    66.

25    During that time, Kim made, by far, more money than anyone at CAC, an

26    average of more than $13,000 per month, because he formed each component of

27    the SL Business, was the President and Sales Director, provided the sales

28                                              6

commissions structure including for his own pay, set policies and procedures, oversaw the employees and operations, and was the sole decision maker. MFID ¶ 10; Wen Declaration at ¶ 64.

During that time, I made a small amount of money at CAC, an average of less than $500 per month, because I was minimally involved and only provided minor support services at an hourly rate of $15-20 per hour.  For the year 2017, Kim earned $220,551 more than me. MFID ¶ 10; Wen Declaration at ¶¶ 65-66.

In approximately mid-2017, Kim asked me to help with CAC, besides just minor support services.  I took on time-intensive tasks and projects that were related to "general business operations" and not related to the student loan debt relief services, including but not limited to: obtaining commercial and employee health insurance policies; creating employee handbooks; hiring HR staff and consultants; drafting employment contracts, retaining outside labor and employment legal counsel; analyzing marketing data; negotiating prices with marketing vendors. Wen Declaration at ¶¶ 67-69.

Nguyen and I relied on Kim to provide insight into the student loan business and the industry, but I later came to understand that the information Kim provided was not always accurate, and that Kim hid certain information from me by directing Nguyen directly. Wen Declaration at ¶¶ 70-71.

Beginning in mid 2018, CAC began to receive Civil Investigative Demand ("CID") letters from the State of Minnesota as well as the CFPB.  Although I was involved in general business matters only, and compliance was specifically under Kim's purview, upon becoming aware of the CID letters, I felt it was important that the Company confirm it was in compliance or, barring that, that it come into compliance with all applicable laws.  Towards that end, I voiced to Kim and Nguyen that the company work with counsel that was sophisticated in these areas, and the company used the law firms Akerman LLP ("Akerman") and Greenspoon

7

1   Marder LLP ("Greenspoon"), for compliance matters. MFID ¶ 11; Wen

2   Declaration at ¶¶ 76-77.

3                    **SUMMARY JUDGMENT STANDARD**

4       Summary judgment is only "if there is no genuine issue as to any material

5   fact and the moving party is entitled to judgment as a matter of law." *G&C Auto*

6   *Body Inc v. Geico General Ins. Co*. (N.D. Cal. 2008) 552 F.Supp.2d 1015, 1018,

7   citations omitted.  When deciding a motion for summary judgment the court's role

8   is to determine if there is any material fact in dispute, rather than to weigh the

9   evidence.  Summary judgment should be denied where an issue as to a material

10   fact cannot be resolved without observation of the demeanor of witnesses in order

11   to evaluate their credibility.  "[S]ummary judgment is singularly inappropriate

12   where credibility is at issue." *SEC v. M & A West, Inc.*, 538 F3d 1043, 1054-1055

13   (9th Cir. 2008).  Here, there are substantial credibility issues as to Plaintiff's

14   primary Witnesses, Kim and Nguyen, who are presenting false information to the

15   Court in order to obtain more favorable settlements with Plaintiffs which they have

16   done. I have not been able to cross-examine or depose them, despite requesting

17   leave to do the same. [ECF No. 428]

18                         **ARGUMENT**

19   **A. The Motion Must Be Denied Because the Bureau Violates the U.S.**

20      **Constitution's Appropriations Clause and Separation of Powers**

21       On October 19, 2022, the U.S. Court of Appeals for the Fifth Circuit issued

22   a lengthy opinion holding that the Bureau's funding scheme violates the

23   Appropriations Clause of the U.S. Constitution and thus a fundamental separation

24

25

26

27

28                           8

of powers principle.[2] *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), cert. granted sub nom. *CFPB v. Com. Fin. Services Assn.*, 2023 WL 2227658 (U.S., Feb. 27, 2023, No. 22-448), and cert. denied sub nom. *Com. Fin. Services Assn. v. CFPB*, 2023 WL 2227679 (U.S., Feb. 27, 2023, No. 22-663).

The Fifth Circuit, reviewing the granting of summary judgment in favor of the Bureau, reversed and vacated the Bureau's 2017 Payday Lending Rule.  The Court ruled, "Congress's cession of its power of the purse to the Bureau violates the Appropriations Clause and the Constitution's underlying structural separation of powers.  The district court accordingly erred in granting summary judgment in favor of the Bureau and denying judgment in favor of the Plaintiffs." *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th 616 at 644.

The Court explained: "While the great majority of executive agencies rely on annual appropriations for funding, the Bureau does not.  Instead, each year, the Bureau simply requisitions from the Federal Reserve an amount 'determined by the Director to be reasonably necessary to carry out' the Bureau's functions." *Id.* at 638, citing 12 U.S.C. § 5497(a).

Thus, "Congress did not merely cede direct control over the Bureau's budget by insulating it from annual or other time limited appropriations.  It also ceded indirect control by providing that the Bureau's self-determined funding be drawn

---

[2] Alternatively, I respectfully request all proceedings in this action to be stayed until the U.S. Supreme Court rules on the question presented in the Bureau's petition for certiorari in *Cmty. Fin. Servs. Ass'n of Am., Ltd.*: "Whether the court of appeals erred in holding that the statute providing funding to the Consumer Financial Protection Bureau (CFPB), 12 U.S.C. 5497, violates the Appropriations Clause, U.S. Const. Art. I,§ 9, Cl. 7, and in vacating a regulation promulgated at a time when the CFPB was receiving such funding." Available at, https://www.supremecourt.gov/qp/22-00448qp.pdf.  The U.S. Supreme Court granted the writ of certiorari petition on February 27, 2023. CFPB v. Com. Fin. Services Assn. (U.S., Feb. 27, 2023, No. 22-448) 2023 WL 2227658, at *1.

9

---

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

from a source that is itself outside the appropriations process." *Id.* at 638-639.
Further, as explained by the Court, the Bureau is "literally off the books: Rather
than hold funds in a Treasury account, the Bureau maintains a separate fund" at a
Federal Reserve bank that is "under the control of the Director" and "permanently
available to him without any further act of Congress." *Id.* at 639, internal quotation
marks and citation omitted.

The nature of the Bureau's funding was explained by the Supreme Court in
*Seila Law v. CFPB*, 140 S. Ct. 2183 (2020):

> The CFPB's receipt of funds outside the appropriations
> process further aggravates the agency's threat to Presidential
> control. . . . [T]he Director receives over $500 million per
> year to fund the agency's chosen priorities.  And the
> Director receives that money from the Federal Reserve,
> which is itself funded outside of the annual appropriations
> process.  This financial freedom makes it even more likely
> that the agency will "slip from the Executive's control, and
> thus from that of the people."

*Seila Law v. CFPB*, 140 S. Ct. at 2204, *quoting*, *Free Enterprise Fund v. Public
Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010).

The Fifth Circuit in *Cmty. Fin. Servs. Ass'n of Am., Ltd.* concluded:
"Wherever the line between a constitutionally and unconstitutionally funded
agency may be, this unprecedented arrangement crosses it.  The Bureau's perpetual
insulation from Congress's appropriations power, including the express exemption
from congressional review of its funding, renders the Bureau no longer dependent
and, as a result, no longer accountable to Congress and, ultimately, to the people."
*Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th 616 at 639, internal quotation marks
and citation omitted.

10

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    Further: "By abandoning its 'most complete and effectual' check on 'the

2    overgrown prerogatives of the other branches of the government'—indeed, by

3    enabling them in the Bureau's case—Congress ran afoul of the separation of

4    powers embodied in the Appropriations Clause." *Id.* at 639-640, *quoting*, The

5    Federalist No. 58 (J. Madison).

6    **Critically, the Bureau's constitutional violation as determined by the**

7    **Fifth Circuit rendered every Bureau action funded outside the appropriations**

8    **process—such as this one— unlawful**.  "Because the funding employed by the

9    Bureau" to prosecute this case is "wholly drawn through the agency's

10   unconstitutional funding scheme"—just as the funding used for this enforcement

11   action is drawn—"there is a linear nexus between the infirm provision (the

12   Bureau's funding mechanism) and the challenged action." *Id.* at 643.  Thus, as in

13   the case of the plaintiffs in *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, I am "entitled to a

14   'rewinding of the Bureau's action." *Id.* at 643, *quoting*, *Collins v. Yellen*, 141 S. Ct.

15   1761, 1788 (2021).

16   The *Cmty. Fin. Servs. Ass'n of Am., Ltd.* opinion followed a concurring

17   opinion from earlier the same year by Judge Edith H. Jones (joined by four other

18   Fifth Circuit judges), in *CFPB v. All American Check Cashing, Inc.*, reaching the

19   same conclusion that the Bureau's funding "violates the separation of powers

20   principle enshrined in the Appropriations Clause." *CFPB v. All American Check*

21   *Cashing, Inc.*, 33 F.4th 218, 220-242 (5th Cir. 2022) (en banc) (Jones, J.

22   concurring).  Judge Jones explained that, as a result of the Bureau's

23   unconstitutional funding scheme, the only appropriate remedy was to dismiss the

24   Bureau's enforcement action: "Just as a government actor cannot exercise power

25   that the actor does not lawfully possess, so, too, a government actor cannot

26   exercise even its lawful authority using money the actor cannot lawfully spend."

27   *Id.* at 242.  In *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, the Fifth Circuit similarly held

28                                              11

---

1   that the proper remedy was to invalidate the Bureau's actions, i.e. vacate the

2   regulation promulgated by the Bureau.

3           There is currently a split amongst jurisdiction on the issue of the Bureau's

4   constitutionality, as explained by the Fifth Circuit:

5

6           The Bureau also contends that because every court to
            consider its funding structure has deemed it constitutionally

7           sound, we should too.  But carefully considering those
            decisions, we must respectfully disagree with their

8           conclusion.  Those courts found the constitutional scale
            tipped in the Bureau's favor based largely on one factor: a

9           handful of other agencies are also self-funded. . . .

10

11          Such a comparison, focused only on whether other agencies
            possess a degree of budgetary autonomy, mixes apples with

12          oranges.  Or, more accurately, with a grapefruit.  Even
            among self-funded agencies, the Bureau is unique.  The

13          Bureau's perpetual self-directed, double-insulated funding
            structure goes a significant step further than that enjoyed by

14          the other agencies on offer.  And none of the agencies cited
            above wields enforcement or regulatory authority remotely

15          comparable to the authority the Bureau may exercise

16          throughout the economy.

17

18  *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th 616 at 641; *see also*, *CFPB v.*

19  *CashCall, Inc*. (9th Cir. 2022) 35 F.4th 734, 743 ("Finally, offering a new theory

20  months after oral argument—and more than eight years after this litigation first

21  began—CashCall asks us to hold that the Bureau's structure violates the

22  Appropriations Clause of the Constitution.  CashCall forfeited that argument twice

23  over by failing to present it to the district court or in its briefing before us on

24  appeal.").

25          **The Fifth Circuit's decision in *Cmty. Fin. Servs. Ass'n of Am., Ltd.***

26  **establishes that the motion must be denied (and, indeed, the case should be**

27

28                                          12

─────────────────────────────────────────────

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

dismissed) because the Bureau's funding scheme—used to prepare and prosecute this case, and, indeed, to bring the instant motion for partial summary judgment which the Bureau is currently seeking to prosecute— violates the Appropriations Clause of the Constitution and its separation of powers principle.

### B. Both State and Federal Claims are Unconstitutional Under the Eighth Amendment's Excessive Fines Clause

An additional and separate ground mandating denial of Plaintiffs' motion, is that the relief sought by Plaintiffs violates the Eighth Amendment's prohibition against excessive fines. In the motion, the Bureau seeks to impose extraordinary civil penalties against me, purportedly on account of violations of the Telemarketing Sales Rule (Counts I, II, and III), and the Consumer Financial Protection Act (Count VII). The amount sought is to be imposed is "up to $34,065 (statutory penalty for reckless violations) times 1,449 (number of days violations continued), times . . . three violations, for a maximum total statutory penalty of up to $148,080,555." Motion, 29:15-18. Thus, taking various factors into account, the Bureau states in the motion that it "requests the Court impose a civil money penalty of up to $148 million" against me. Motion, 29:24-25.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amdt. 8.

The Supreme Court, in *U.S. v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), explained regarding the Eighth Amendment's excessive fines clause:

> This Court has had little occasion to interpret, and has never actually applied, the Excessive Fines Clause. We have,

13

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9

however, explained that at the time the Constitution was adopted, "the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense." *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265, 109 S.Ct. 2909, 2915, 106 L.Ed.2d 219 (1989). The Excessive Fines Clause thus "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Austin v. United States*, 509 U.S. 602, 609–610, 113 S.Ct. 2801, 2805, 125 L.Ed.2d 488 (1993) (emphasis deleted). Forfeitures—payments in kind—are thus "fines" if they constitute punishment for an offense.

10   *U.S. v. Bajakajian*, 524 U.S. 321, 327-328, 118 S.Ct. 2028, 2033, 141 L.Ed.2d 314.

11   The Eighth Amendment's excessive fines clause also applies to the states by
12   way of the Fourteenth Amendment, and thus applies to the state claims on which
13   the motion seeks summary judgment, i.e. Counts XVII, XVIII, XIX, XX, and
14   XXII.[3] *Timbs v. Indiana*, 203 L.Ed.2d 11, 139 S.Ct. 682 (2019).

15   In *Timbs v. Indiana*, the plaintiff was ordered to forfeit a Land Rover SUV
16   after pleading guilty to drug charges. Timbs contended that the seizure was an
17   excessive fine because it was more than four times the $10,000 maximum fine
18   applicable to the drug conviction charge. The Supreme Court considered whether
19   states are barred from imposing excessive fines, as set forth under the Eighth
20   Amendment to the U.S. Constitution, and held:

21   
22   The question presented: Is the Eighth Amendment's
     Excessive Fines Clause an "incorporated" protection
23   applicable to the States under the Fourteenth Amendment's
24   

25   [3] These counts are for violation of Minnesota's Consumer Fraud Act (CFA), Minn. Stat. § 325F.69, and Deceptive Trade Practices Act (DTPA), Minn. Stat. § 325D.44, North Carolina's Debt Adjustment Act (NCDAA), N.C. Gen. Stat. §§ 14-423, and Unfair and Deceptive Practices Act (NCUDPA), N.C. Gen. Stat. § 75-1.1(a), and California's Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200.
26   
27   
28   
                                         14

1
2
3
4
5
6
7
8
9

> Due Process Clause?  Like the Eighth Amendment's proscriptions of "cruel and unusual punishment" and "[e]xcessive bail," the protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority.  This safeguard, we hold, is "fundamental to our scheme of ordered liberty," with "dee[p] root[s] in [our] history and tradition." *McDonald v. Chicago*, 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (internal quotation marks omitted; emphasis deleted).  The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment.

10  *Timbs v. Indiana*, 203 L.Ed.2d 11, 139 S.Ct. 682, 686–687.

11      The fines sought against me as a "Civil Monetary Penalty" which <u>are over</u>

12  <u>$148 million</u> are patently excessive and unjustified.

13      The CFPB seeks "Second Tier" fines under 12 USC sec. 5565(c)(2)(B), yet

14  have failed to offer undisputed evidence or even offered as a material fact that I

15  violated the law (or for that matter that the companies did) on *each* of the 1,449

16  days for which they seek a $25,000 penalty,[4] or that I "recklessly" engaged in such

17  violation, as required under the statute.

18      In addition, while reciting the factors which *must* be considered under 12

19  USC sec.. 5655(c)(3) it has failed to offer any facts or evidence to carry its burden

20  that such a penalty is warranted.  The factors set forth in 5655(c)(3) state that:

21  the court shall take into account the appropriateness of the penalty with respect to:

22
23
_____

24  [4] Indeed, the CFPB "assumes only one violation per day" (Motion, FN. 8) but has

25  not proffered evidence that there were in fact even one violation on each day (including days the office was closed such as weekends or holidays) during the

26  1,449 consecutive days for which they are seeking penalties.  Without such a showing by the CFPB, the demand for daily penalties of $34,065 should be denied

27  as they have not carried their initial factual burden.

28                                    15

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    **(A)** the size of financial resources and good faith of the person
      charged;
2    **(B)** the gravity of the violation or failure to pay;
3    **(C)** the severity of the risks to or losses of the consumer, which may
      take into account the number of products or services sold or
4    provided;
5    **(D)** the history of previous violations; and
      **(E)** such other matters as justice may require.
6

7    12 U.S.C.A. § 5565.  *See SEC v. Jasper*, 883 F. Supp. 2d 915, 931-32 (N.D. Cal.

8    2010) (A court may also examine a defendant's ability to pay the civil fine in
9
10   determining the appropriate amount.)

11       The fines sought against me as a "Civil Monetary Penalty" which <u>are over

12   $148 million,</u> are patently excessive and unjustified.  It was Kim, not me, who was
13
14   the architect of the business and responsible for overseeing sales, commissions,

15   and compliance. MFID ¶ 6, 7; Wen Declaration at ¶¶ 23-44, 49-55, 57.  I was

16   ignorant of any requirements or practices that were not being followed and
17
18   incorrectly placed my trust in Kim.  Once I learned of the issues, I sought to obtain

19   experienced legal counsel for the Companies to become compliant to the extent

20   they were not already. MFID ¶  11; Wen Declaration at ¶¶ 76-77. The amount of
21
22   fines sought is nearly <u>100 times</u> the amount of money I actually received from the

23   business.  MFID ¶ 12; Wen Declaration at ¶¶ 244-245.

24       I do not have money or assets to pay any such fines and now work a job
25
26   where I make $16 per hour. MFID ¶ 13; Wen Declaration at ¶¶ 248-249.  I do not

27   have a history of previous violations. Wen Declaration at ¶ 250.  I acknowledge

28

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

that I could have and should have done more to stop the unlawful activity and I

accept responsibility for my role in the SL Business. MFID ¶ 14; Wen Declaration

at ¶¶ 251-253.

In addition, as referenced elsewhere, all of my money and assets have

already been turned over to the receiver and under these circumstances, additional

penalties and fines for which I have no means to pay would be unjust and

excessive. Wen Declaration at ¶¶ 249, 253.

## C. The Motion Should be Denied Because Numerous Genuine Issues of Material Facts Exist Which Prevent Granting Relief

As shown above, there are numerous genuine issues of material fact which

exist thereby preventing the granting of relief herein. The motion attempts to

portray me as a mastermind who orchestrated the business and had direct

knowledge of operations from the beginning, but that was simply not the case.  I

joined the business as a silent investor only and had no direct involvement in it or

operations.  Instead, it was Kim who stated to me that he had learned the business

by working at another company that performed document preparation, was forming

a company to perform those services, and asked me to invest.  My participation

was minimal.  Kim, who had prior experience in the industry, developed, on his

own, the company's fee structure, sales scripts, commission structure for sales

representatives, hired and trained sales staff and directed the sales staff in addition

to managing all operations. MFID ¶ 6; Wen Declaration at ¶¶ 23-44.

The disputed facts and additional material facts are set forth in detail in the

concurrently filed Statement of Material Facts in Dispute, incorporated by this

reference.  For instance, there is a genuine dispute as to Plaintiff's UF 5 which

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

purports that Wen and Kim owned CAC jointly and equally. In fact, it was owned by Wen, Kim, and Nguyen. I certainly did not have a controlling interest and any decision would have required two of the three of us to approve.  Critically, contrary to Plaintiff's UF 17 purporting that Wen and Kim controlled Prime is undisputed, as in fact, Kim alone had control over Prime's sales operations. Kim, who had previously worked in the industry specifically to learn the business and start his own company, solely took charge of these operations, whereas my involvement was as a silent investor only. The only period that I exercised managerial responsibility for and control over True Count's business practices from March 2018, through October 22, 2019. But the motion misrepresents my responses to the Requests for Admission in providing those responses as "evidence" in support of the UF.

The motion also understates Nyugen's role with the companies, apparently in order to inflate my involvement. UF 45 purports that Nguyen served as Controller for the debt relief operation, when in fact he served as Controller, as well as numerous other roles, such as Processing Manager, Customer Service Manager, Billing Manager, Payroll Manager, and Accounting Manager.

UF 48 purports that managers and directors of each department, as well as Ho and Nguyen, reported to me and Kim which also in untrue. Rather, managers and directors of each department reported to Kim. At all times, the Sales Directors and Sales Managers reported to Kim. Nguyen was an owner, and did not report to Kim and Wen. Ho worked with Kim on CRM-related matters, Nguyen on payroll matters, and me only with regard to discrete auditing and technology matters.

UF 49 purports that Kim and I were the final decisionmakers for CAC, True Count, and Prime during the entire course of their operation but that is also incorrect and disputed. Rather, during almost the entirety of the business, Kim was

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  the final decision maker for CAC. Kim made the final decisions for sales and

2  Nguyen made the final decisions for billing, banking, and accounting.

3     UF 70 purports that I helped develop the commission structure for

4  salespeople and, along with Kim, decided how employees were compensated

5  which is absolutely incorrect and disputed. Rather, Kim developed this on his own,

6  without my involvement whatsoever. Kim knew the business from the company he

7  previously worked at and developed the commission structure based on his

8  experience and know-how. I had zero involvement in this and trusted and relied on

9  Kim who was running company operations.

10    The following UFs are further subject to genuine dispute:

11    138. "Wen and Kim controlled CAC from its inception through the date a

12  court-appointed bankruptcy trustee took control of the Company." This is incorrect

13  and disputed. Kim solely owned and controlled CAC from 2014 through July 2015

14  when it operated as a loan modification company. Then Kim solely controlled

15  CAC from November 2015 through approximately June 2015. Kim always

16  controlled CAC's sales operations, and all sales operations of the SL business.

17  MFID ¶¶ 5, 6, 7, 8; Wen Declaration at ¶¶ 16, 23-47, 49-55, 57.

18    139. "Wen and Kim controlled True Count and Prime from their inception

19  through October 23, 2019, the date of the immediate access." This is disputed as

20  Prime was a front-end sales company, which Kim controlled. Wen Declaration at

21  ¶¶ 10, 42.

22    140. "When CAC began operating in November 2015, Wen communicated

23  daily or every other day with Kim about their student-loan debt-relief operation." I

24  did not communicated daily or every other day with Kim about the business, and

25  instead, only rarely communicated, if at all, and only regarding minor support work

26  (which I performed at a rate of $15-20 per hour) and general budgeting. MFID ¶¶

27  7, 8, 9; Wen Declaration at ¶¶ 45-57.

28                                    19

---

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

141. "By mid-2016, Wen came into the office regularly, at least several times a week." I did not come into the office regularly. I came in on rare occasions, never during business hours, and only after hours. Wen Declaration at ¶ 45.

142. "Throughout 2016, Wen communicated daily—and typically multiple times a day—with Kim and others at the Company about all aspects of running the student-loan debt-relief operation." This is incorrect and subject to a genuine dispute. I did not communicate daily, and certainly not multiple times a day, at any point in 2016. MFID ¶¶ 7, 8, 9; Wen Declaration at ¶ 56.

146. "Wen helped determine the Company's consumer fee structure, including the amount of fees and when those fees could be collected." I did not participate one iota in developing the fee structure, which was developed entirely by Kim at his sole discretion. At the time the fee structure was developed, my role was as a silent investor only and I relied entirely on Kim who was in charge of company operations and had learned the industry specifically to start the business. MFID ¶¶ 6, 7; Wen Declaration at ¶¶ 27-30.

147. "Wen drafted and approved contracts between the Company and consumers for the Company's services." This is incorrect. Kim drafted and approved contracts on his own, and only years later did Kim occasionally ask me to help revise a small number of contracts. MFID ¶¶ 6, 7; Wen Declaration at ¶¶ 25-26.

150. "Wen received and reviewed sales scripts for the Company." This is incorrect. The sales scripts were solely prepared by Kim, and the only time that I received and reviewed them was years later, in connection with compliance efforts, after I came to learn that my trust in Kim had been misplaced and when the company hired legal counsel to review the business and come into compliance. MFID ¶¶ 6, 10, 11; Wen Declaration at ¶¶ 31-32, 64-65, 186.

20

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

155. "In approximately 2016 or 2017, Wen agreed that the Company would limit employees to inflating consumers' family size up to 7." This is incorrect, I never agreed to this. Kim made this decision on his own. MFID ¶ 6; Wen Declaration at ¶ 128.

157. "Wen was informed of the Company's policy against having processors confirm the family size on file in DPP with the consumer." This is incorrect, and once I became aware of this, the Company implemented policies to confirm the consumer's family size. MFID ¶ 11; Wen Declaration at ¶¶ 125, 134.

159. "Wen was informed that it was the Company's practice to list married consumes as single in IDR applications." This is incorrect and once I became aware of this and became involved, the company implemented policies to confirm the consumer's filing status. MFID ¶ 11; Wen Declaration at ¶¶ 131, 134.

**D. Even if the Court Were to Grant the Motion, the Amount of Damages Sought Must Be Limited Under _Liu v. SEC_**

In _Liu v. Securities and Exchange Commission_, 140 S.Ct. 1936 (2020), the Supreme Court established significant limits on federal statutes that provide for equitable relief, such as "disgorgement" and "restitution." In _Liu_, the SEC brought an enforcement action that sought, among other things, "disgorgement" from multiple defendants. The trial court granted the SEC relief that included awards equal to the full amount defendants had raised from investors, less a small sum that remained in defendants' corporate accounts. The Supreme Court held that the relief granted by the district court was improper because it exceeded the equitable relief available at "common law."

First, the Court held that it was improper "to impose disgorgement liability on a wrongdoer for benefits that accrue to his affiliates . . . through joint-and-several liability, in a manner . . . seemingly at odds with the common-law rule

21

requiring individual liability for wrongful profits." *Liu*, 140 S.Ct. at 1949.  The Court explained that doing so was improper because it "could transform any equitable profits-focused remedy into a penalty . . . . [which] runs against the rule to not impose joint liability in favor of holding defendants 'liable to account for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which they have no participation.'" *Ibid*.

Second, the Court held that the district court's award exceeded the accepted bounds of equitable relief because:

> Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when both the receipts and payments are taken into account. Accordingly, courts must deduct legitimate expenses before ordering disgorgement . . . . A rule to the contrary that "make[s] no allowance for the cost and expense of conducting [a] business" would be "inconsistent with the ordinary principles and practice of courts of chancery."

*Id*. at 1949-50.

Third, the Court made clear that its holding applied equally to the remedy of "restitution." *Liu*, 140 S.Ct. at 1943 ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.'"); *see also*, *Federal Trade Commission v. Electronic Payment Solutions of America Incorporated*, 482 F.Supp.3d 921, 928 (D. Az. 2020) ("*Liu* reached its conclusion by relying on equity jurisprudence generally, as opposed to relying on SEC jurisprudence specifically. Thus, *Liu's* holding – that a disgorgement award must be limited to a defendant's net profits – is not 'cabined' to SEC proceedings.").

Following *Liu*, the Seventh Circuit reversed an order of restitution against the principals of a debt relief company who had allegedly misrepresented the company's services to consumers in a case whose facts are indistinguishable from

22

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  those of the present case. In *Consumer Financial Protection Bureau v. Consumer*

2  *First Legal Group, LLC*, No. 19-3396, 2021 WL 3123735 (7th Cir. Jul. 23, 2021),

3  the defendants were held responsible for making misrepresentations to customers

4  in connection with providing purported mortgage-assistance relief services.  In

5  reversing the trial court's $21 million restitution order, the Court of Appeals held

6  that the trial court had committed reversible error by using "net revenues" rather

7  than "net profits" in calculating the restitution award:

8

9      We first address the district court's restitution award.  The
       Act [CFPA] permits a court to grant "any appropriate legal

10      or equitable relief," including restitution. See 12 U.S.C. §
       5565(a).  At summary judgment, Judge Crabb defined the

11      appropriate level of damages in this case as "net
       revenues"—that is, gross receipts minus any refunds issued.

12      This total came out to $21,709,021.

13

14      After the court issued its restitution award, however, the
       Supreme Court handed down its decision in *Liu v. SEC*, ——

15      U.S. ——, 140 S. Ct. 1936, 207 L.Ed.2d 401 (2020).  In *Liu*,
       which dealt with the scope of equitable relief available in an

16      SEC civil enforcement action, the Court held that a
       disgorgement award may not exceed a firm's net profits. *Id.*

17      at 1946.  The question is whether *Liu* compels us to vacate
       the restitution award here and remand for re-calculation

18      based on net profits.  We are persuaded that it does.

19

20      The Bureau disagrees with this position.  It points out that
       *Liu* concerned disgorgement, whereas the district court here

21      ordered restitution. But we find this to be too narrow a
       reading of *Liu*.  *Liu's* reasoning is not limited to

22      disgorgement; instead, the opinion purports to set forth a
       rule applicable to all categories of equitable relief, including

23      restitution. *Id.* at 1945–46.

24

25

26  *Consumer First Legal Group, LLC*, at *10.

27

28                                    23

---

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    The Court of Appeals rejected the Bureau's arguments in opposition,

2    holding:

3

4        The Bureau's argument also founders because it assumes
         that equitable restitution and disgorgement are two different
5        animals. The Court, however, expressed doubts on this point
         in *Liu*. *See id.* at 1942-43 (observing that the definition of
6        the equitable remedy of disgorgement is unclear and has
         gone by several labels over time, including restitution). The
7        district court seemed unsure whether there was a difference
         between the two terms: its order interchangeably uses the
8        words restitution and disgorgement to describe its remedy.
9

10       Finally, the Bureau suggests that *Liu* is inapplicable because
         the statute at issue in *Liu* authorized only "equitable relief,"
11       whereas the Act in our case authorizes courts to award
         equitable and legal relief. Compare 15 U.S.C. § 78u(d)(5),
12       with 12 U.S.C. § 5565(a).  Accordingly, the Bureau urges us
         to uphold the court's order as an award of legal restitution.
13       We reject this argument also.  The district court understood
         itself to be awarding equitable relief, which is why it cited
14       equitable restitution cases in support of its order. *See, e.g.,*
15       *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997).
16

17

18   *Consumer First Legal Group, LLC*, at *10; *see also, Securities and Exchange*

19   *Commission v. San Francisco Regional Center, LLC*, No. 17-cv-00223, 2020 WL

20   4569844, *2 (N.D. Cal. Aug. 7, 2020) ("The ultimate holding in *Liu* precludes the

21   SEC from recovering a wrongdoer's gross profits—rather only net profits after

22   deductions for legitimate business expenses may be recovered from a defendant.");

23   *Securities and Exchange Commission v. Faulkner*, No. 3:16-CV-1735, 2021 WL

24   75551, *4 (N.D. Tex. Jan. 8, 2021) (Under *Liu v. SEC*, the monetary relief against

25   defendants is limited to "a reasonable approximation of their net profits causally

26   connected to their violations . . . ."); *CFPB v. Consumer First Legal Grp., LLC*, 6

27   F.4th 694, 710 (7th Cir. 2021) ("Liu's reasoning is not limited to disgorgement;

28                                      24

1
2
3
4

instead, the opinion purports to set forth a rule applicable to all categories of
equitable relief, including restitution.").*Consumer Fin. Prot. Bureau v. CashCall,
Inc.*, No. CV157522JFWRAOX, 2023 WL 2009938, at *6 (C.D. Cal. Feb. 10,
2023)

5
6
7
8
9
10
11
12

　　　　Here, like in *CFPB v. Consumer First Legal Group,* the CFPB seeks a
restitution order against me based on "revenues" rather than "net profits." It has
failed to put on any evidence whatsoever as to what the "net profits" were for the
Companies or for me. As such, the motion should be denied on these grounds. In
fact, the net profits of the Companies were less than $25 million and the net profits
to me were only $1.55 million (and I am informed and believed that the net profits
to Kim were substantially more than this). MFID 12; Wen Declaration at ¶¶ 244-
245.

13
14
15
16
17
18

　　　　By contrast, the Plaintiffs have already recovered *in excess* of $25 million
by way of settlements and judgments,[5] and more specifically over $3 million from
me and my mother. MFID ¶ 12; Wen Declaration at ¶¶ 244-245. As such,
restitution is not proper because the Plaintiffs have already received restitution in
excess of what is allowed under *Liu*, i.e. both the net profits to the Companies and
the net profits to me personally.

19
20

　　**E.** **The Proposed Order Seeks Relief to which Plaintiffs Have Not**
　　　　**Shown Any Entitlement or Basis**

21
22
23
24
25

　　　　The Proposed Final Judgment [ECF No. 423-7] consisting of 37 pages by
Plaintiff contains numerous additional, non-monetary requirements for which
Plaintiffs have failed to offer any basis in law or fact to justify the imposition and
as such should be stricken.

26
27
28

---

[5] Plaintiffs and the Receiver should be required to provide an accounting to the
court as it would offset any judgment against me for disgorgement or restitution.

An injunction cannot be "more burdensome to the defendant than necessary to accord complete relief to the plaintiffs" *Consumer Fin. Prot. Bureau v. Consumer First Legal Grp., LLC*, 6 F.4th 694, 712 (7th Cir. 2021) *quoting Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). For example, III (Paragraph 59) is a lifetime ban on any work that involves a "Consumer Financial Product or Service", which although I have no intention of doing this, is defined very broadly. I have not been engaged in any such line of business in the years since this case was filed and the Companies have been shut down by the receiver. *Sec. & Exch. Comm'n v. Westport Cap. Markets, LLC*, 547 F. Supp. 3d 157, 168 (D. Conn. 2021) (denying SEC request for permanent injunction in light of various factors including company being closed, lack of recurrence over intervening years).

Additionally, VII at paragraph 67(c) and (d) would require me to turn over cryptocurrency held at certain "addresses" to which I do not have access, do not control, and are not mine, as I have previously submitted to the Court.  In fact, I have previously offered to and am cooperating in turning over to the receiver all cryptocurrency which I do have access to **and continue to be willing to agree to entry of a judgment against me that is satisfied by turning over all of the assets which I control as reflected in my Amended and Corrected Financial Statement.**

Paragraph 68 requires that I turn over and notify Plaintiffs of any tax credit or deduction I receive because I have had to surrender millions of dollars of assets; if there is a tax credit or deduction that is a matter for my accountant and the IRS and there is no basis for me to be ordered to turn this over to the CFPB.

Moreover, the Proposed Judgment requires other onerous and unjustified reporting requirements, such as paragraphs 85, 88-99, lasting five years or longer. It further requires me to provide ongoing cooperating, information, and evidence in

26

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

this and related cases, such as paragraphs 104-106 and "compliance monitoring" at paragraphs 107-110  Plaintiffs have not offered any basis in law or fact for these burdensome requirements.  *See Consumer Fin. Prot. Bureau v. Gordon*, No. CV126147RSWLMRWX, 2013 WL 12116365, at *5 (C.D. Cal. June 26, 2013), *aff'd in part, vacated in part*, 819 F.3d 1179 (9th Cir. 2016) ("the injunction proposed by the CFPB is much broader and restrictive than necessary to ensure [Defendant's] future compliance with the CFPA and Regulation O. Moreover, some of the requirements, including reporting requirements that would continue for 15 years, unnecessarily burden [Defendant] without any corresponding benefit to consumers. The Court is not inclined to grant such broad injunctive relief that does little more than present a significant risk of future contempt proceedings for minor violations. Nor should the injunction unduly limit [Defendant's] ability to engage in lawful employment.")

## CONCLUSION

For the reasons set forth herein, I respectfully request that the Court deny Plaintiffs' motion in its entirety. If it is granted, I request that the Court find that my assets already turned over to the Receiver or paid by my family (in excess of $3 million) satisfy any award and there be no further monetary award or penalties imposed which I would be unable to pay.


Respectfully submitted,




_____

Kaine Wen, *In Pro Per*

27

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT