*file on Demand*

Kaine Wen
146 Bishop Lndg
Irvine, CA 92620
Telephone: 626-563-7908
kainewen@gmail.com
In Pro Per

FILED

2023 MAR 27 PM 3: 45

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., | CASE NO. 8:19-cv-01998 MWF (KS) |
| Plaintiffs, | STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2 |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., | Court: Hon. Michael W. Fitzgerald |
| | Date: April 24, 2023 |
| | Time: 10:00 AM |
| Defendants. | Place: Courtroom 5A |

Pursuant to Central District Local Rule 56-2 and this Court's procedures, I, Defendant Kaine Wen, file the following Statement of Genuine Disputes in support of my Opposition to Plaintiffs' Motion for Partial Summary Judgment.

The facts below correspond to the facts and supporting evidence presented in the moving party's Statement of Undisputed Facts. These facts are followed by additional material facts and supporting evidence showing a genuine issue of material fact in dispute.

I.**Background**
A. **Overview of Corporate Defendants**

1

1.   **Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center**

| Moving Party's Alleged Undisputed Facts and Supporting Evidence | Response |
|---|---|
| 1. Consumer Advocacy Center Inc. (CAC) was formed in 2014. *See* Pls.' Ex. 44 (certified copies of documents filed with California Secretary of State); Pls.' Ex.1 (Kim Decl.) ¶¶ 4-5 (Wen and Kim formed CAC in 2014). | Undisputed. |
| 2. CAC operated under multiple names, including Premier Student Loan Center (Premier or PSLC). *See* Pls.' Ex.1 (Kim Decl.) ¶ 77-78 (discussing decision to use multiple "doing business as" names due to growing concern about government detection); Pls.' Ex. 47 (CAC fictitious business name statement for Premier Student Loan Center). | Disputed. CAC operated under its only DBA, Premier Student Loan Center; *See* Pls.' Ex. 47 (OC FBBS Premier); Wen Declaration at ¶ 38. |
| 3. CAC filed a statement of information with the California Secretary of State listing its address as 173 Technology Drive, Suite 202, Irvine, CA 92618 and identifying Albert Kim as its sole officer and President. Pls.' Ex. 44; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 9 (explaining Wen was not listed as an owner in CAC's corporate registration documents because Kim and Wen "didn't think it was necessary to have [Wen] listed too."). | Undisputed. |
| 4. CAC operated at 173 Technology Drive, Suite 202, Irvine, CA 92618. Pls.' Ex. 44 (certified copies of documents filed with California Secretary of State); Pls.' Ex. 6 (email from Wen explaining to payment processor that CAC operated at 173 | Disputed. From approximately August 2014 to July 2015, Kim operated CAC as a separate loan modification company in Anaheim, CA. From approximately November 2015 to December 2016, CAC operated in Rancho Santa Margarita, CA. From approximately |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Technology Drive and would continue to do so after shift of certain departments to related company). | January 2017 to September 2018, CAC operated at 173 Technology Dr, Ste 202 in Irvine, CA. *See* Pls.' Ex. 44 (CA SOS CAC certified records); Pls.' Ex. 7 (EMS Merchant Application); Wen Declaration at ¶ 54. |
| 5. Kaine Wen and Albert Kim owned CAC jointly and equally. Pls.' Ex. 50 (merchant services application to Allied Wallet identifying Wen and Kim each as 50% owners of CAC signed by Wen March 29, 2016); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 7; Pls.' Ex. 1.1 (Kim Decl. Ex. 1) (list of members, capital contributions, and indicating each had 50% ownership in CAC signed by Wen and Kim Oct. 1, 2015); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 102 (admitting that he signed Pls.' Ex. 1.1 on Oct. 1, 2015); Pls.' Ex. 51 at 7 (agreement with Electronic Payment Systems regarding its online reporting module signed by Wen as CAC's owner dated Sept. 8, 2017). | Disputed. Kim and Wen each owned 47.5% of CAC. Tuong Nguyen owned 5% of CAC. *See* Def.'s Ex. 1 (EMS merchant account application package) (showing Wen's 47.5% Equity Ownership); Def.'s Ex. 2 (Kaine Wen 2017 Trust document) (Wen gifting 5% of Wen's student loan business interest to Nguyen); Wen Declaration at ¶ 7. |
| 6. Wen provided approximately $30,000 in capital to fund CAC. Pls.' Ex. 1 (Kim Decl.) at ¶ 8; Pls.' Ex. 1.1. (Kim Decl. Ex. 1). | Disputed. Wen provided $30,000 in initial starting capital. Wen later invested more money into the SL business by using personal and borrowed credit cards. *See* Wen Declaration at ¶¶ 8-9. |
| **2.   True Count Staffing Inc., d/b/a SL Account Management** | |
| 7. Wen formed True Count Staffing Inc. (True Count) in California in 2017. Pls.' Ex. 1 (Kim Decl.) at ¶ 11; *accord* Pls.' Ex. 45 (certified copies of documents filed with California Secretary of State for True Count). | Undisputed. |
| 8. Wen owned and served as an officer of True Count, and he exercised | Undisputed. |

3

| | |
|---|---|
| substantial managerial control over its operations.<br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 112, 114. | |
| 9. True Count leased the property located at 8 Hughes Parkway, Suite 210, Irvine, CA 92618.<br>Pls.' Ex 89 (Receiver's Report) at 4:17-19. | Undisputed. |
| 10. True Count operated under the names SL Account Management and SL Account Mgmt (SLAM).<br>Pls.' Ex. 10 (Wen's Resp. 2nd Req. Admiss.) at Nos. 163, 167; Pls.' Ex. 48 (fictitious business name statement for SL Account Mgmt). | Undisputed. |

### 3. Prime Consulting LLC, d/b/a Financial Preparation Services

| | |
|---|---|
| 11. Prime Consulting LLC (Prime) is a Wyoming limited-liability company that registered with the California Secretary of State on April 25, 2018.<br>Pls.' Ex. 46 (certified registration records for Prime). | Undisputed. |
| 12. Prime leased the property located at 15621 Laguna Canyon Rd., Suite 200, Irvine, CA 92618.<br>Pls.' Ex. 89 (Receiver's Report) at 2:1. | Undisputed. |
| 13. Prime operated under the name Financial Preparation Services (FPS), as well as other names.<br>*See* Pls.' Ex. 49 (fictitious business name statement for FPS); Pls.' Ex. 89 (Receiver's Report) at 10:9, n.17 (noting Defendants' practice of deploying "multiple generic-sounding business names" and including list of names used by employee teams); Pls.' | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Ex. 89.1 (example of list found during immediate access of company names). | |
| 14. Prime's Statement of Information filed on September 13, 2018, with the California Secretary of State, listed Le Ho as the President of Prime.<br>Pls.' Ex. 46 (certified registration records for Prime). | Undisputed. |
| 15. In September 2018, Le Ho (aka Calvin Ho) worked for Wen and Kim's debt-relief operation as a manager.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 16-17. | Undisputed. |
| 16. In response to a request from Wen and Kim, Ho agreed to be listed as the owner of Prime.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 18; *see* Pls.' Ex. 46 (certified registration records for Prime). | Undisputed. |
| 17. Wen and Kim controlled Prime.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 16; Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19. | Disputed. Prime was a front-end sales company. Kim, as the head of the Sales Departments, controlled Prime's sales operations. *See* Wen Declaration at ¶¶ 10, 42. |
| 18. Ho reported to Wen and Kim.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 19-20; Pls.' Ex. 1 (Kim Decl.) at ¶ 19. | Undisputed. |
| 19. Ho opened bank accounts in Prime's name at the direction of Wen and Kim.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 126 (Wen and Kim directed the opening of new bank accounts for Prime). | Undisputed. |
| **B. The Student-Loan Debt-Relief Enterprise** | |
| 20. CAC, True Count, and Prime (collectively, the Company) operated together to offer, sell, and perform purported student-loan debt-relief services to consumers nationwide.<br><br>*See* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 1, 2 (admitting | Undisputed. |

| | |
|---|---|
| Company sold services to alter the terms of payments for consumers' federal student loans by preparing and submitting applications for consolidation, income driven repayment (IDR) plans); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 3; Pls.' Ex. 18 at ¶ 3 (Anderlick Decl.) (Company used DPP customer relationship management software to conduct its business nationwide). | |
| 21. From at least November 5, 2015, through at least March 2018, CAC offered, sold and performed purported student loan debt relief services. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 3; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 21; Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 11 (Company charged consumers starting Nov. 5, 2015, and CAC collected consumer fees from Nov. 2015, through Sept. 2018). | Undisputed. |
| 22. When it first began operating, CAC had a Sales Department and a Processing Department. Pls.' Ex. 1 (Kim Decl.) at ¶ 10; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. | Undisputed. |
| 23. The Sales Department handled sales calls with consumers. Pls.' Ex. 1 (Kim Decl.) at ¶ 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. | Undisputed. |
| 24. The Processing Department primarily handled preparing and submitting paperwork to consumers' student loan servicers. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. | Undisputed. |
| 25. As the Company grew, it added Accounting/Billing, Customer Service, and later, a Human Resources Department. | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Pls.' Ex. 1 (Kim Decl.) at ¶ 10; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 9. | |
| 26. Prior to March 2018, CAC collected fees from consumers for its purported student-loan debt-relief services.<br>Pls.' Ex. 12 (Heidari Decl.) at ¶ 11. | Undisputed. |
| 27. In March 2018, Wen and Kim shifted CAC's Processing, Customer Service, and Billing Departments from CAC to True Count.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 14; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10 (CAC's processing functions transferred to True Count in March 2018); Pls.' Ex. 6 (emails between Wen and payment processor from February 2018 explaining shift from CAC to True Count). | Undisputed. |
| 28. In March 2018, True Count began collecting payments from consumers directly and remitting a portion of the income to CAC, which stopped collecting fees from consumers in September 2018.<br>Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 11-12; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 14; *see also* Pls.' Ex. 6 (email chain between Wen and EMS representative where Wen discusses rollout of True Count and relationship with CAC); Pls.' Ex. 8 (Feb. 8, 2018 email from Wen asking for the name on CAC's merchant account to be changed to True Count d/b/a SLAM); Pls.' Ex. 92 (CAC Bankruptcy proceeding ECF 131) at ¶ 5 (explaining True Count collected payments and remitted a portion back to CAC until Sept. 2018). | Undisputed. |
| 29. When CAC transferred its processing department to True Count, | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| True Count continued the same processing practices.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10. | |
| 30. In late September 2018, Wen and Kim shut down CAC and transferred its operations over to Prime.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 16; *see also* Pls.' Ex. 2 (Nguyen Decl.) at ¶ 12 (Kim and Wen formed Prime; Prime took over sales and CAC filed for bankruptcy); Pls.' Ex. 92 (CAC bankruptcy proceeding ECF 131) at ¶ 5 ("In September of 2018, the Debtor (CAC) ceased operations and transferred all of its sales staff to Prime Consulting."). | Undisputed. |
| 31. In September 2018, True Count ceased making payments to CAC.<br>*See* Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 11-12 (True Count made payments to CAC from March to September 2018). | Undisputed. |
| 32. In September 2018, CAC stopped collecting fees from consumers.<br>*See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 11. | Undisputed. |
| 33. Even after CAC stopped collecting fees from consumers, True Count continued collecting fees from legacy CAC consumers.<br>*See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 17. | Undisputed. |
| 34. In September 2018, True Count began remitting a portion of the fees it collected from consumers to Prime.<br>Pls.' Ex. 12 (Heidari Decl.) at ¶ 12. | Undisputed. |
| 35. When CAC transferred its sales department to Prime, it continued the same sales practices.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 124-27; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10. | Undisputed. |

8

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 36. CAC filed for bankruptcy on January 16, 2019, in the Southern District of Florida. Pls.' Ex. 90 (CAC's petition for bankruptcy). | Undisputed. |
| 37. During the time the student-loan debt-relief enterprise operated under CAC, True Count, and Prime, it used a customer relationship management system (CRM) called Debt Pay Pro (DPP). Pls.' Ex. 1 (Kim Decl.) at ¶ 20; Pls.' Ex. 18 (Anderlick Decl.) ¶ 3; Pls.' Ex. 92 (CAC bankruptcy proceeding ECF 131) at ¶¶ 3-5. | Undisputed. |
| 38. CAC, True Count, and Prime recorded fees paid by consumers and refunds of consumers' payments for their debt relief services in DPP. Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 4, 7; Pls.' Ex. 1 (Kim Decl.) at ¶ 20. | Undisputed. |
| 39. CAC, True Count, and Prime also used Quickbooks for the entire time they operated to generate annual profit and loss statements. Pls.' Ex. 1 (Kim Decl.) at ¶ 21; Pls.' Ex. 1.2-1.4 (Kim Decl. Exs. 2.1-2.3); *see also* Pls.' Ex. 10 (Wen's Resp. 2nd Req. Admiss.) at No. 193 (admitting that at times the Company used Quickbooks to maintain financial records, including profit and loss statements). | Undisputed. |
| 40. At times, CAC, True Count and Prime used the same address. Pls.' Ex. 13 (Schneider Decl.) at ¶ 5a. | Undisputed. |
| 41. CAC, True Count, and Prime shared employees. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 17; *see also* Pls.' Ex. 52 (email from T. Nguyen copying Wen explaining shift | Undisputed. |

9

| | |
|---|---|
| of employees from PSLC to True Count); Pls.' Ex. 12 (Heidari Decl.) at ¶ 16 (CAC and True Count paid the same individuals). | |
| 42. CAC, True Count, and Prime intermingled their business records. Pls.' Ex. 13 (Schneider Decl.) at ¶¶ 20-22. | Disputed. CAC, True Count, and Prime kept separate business records. *See* Wen Declaration at ¶ 75. |
| 43. CAC, True Count, and Prime used numerous, sometimes overlapping, DBAs. *See* Pls.' Ex. 13 (Schneider Decl.) at ¶ 3033 (discussing pretexting calls); Pls.' Ex. 89 (Receiver's Report) at 10:9, n.17 (noting Defendants' practice of deploying "multiple generic-sounding business names" and including list of names used by employee teams); Pls.' Ex. 89.1 (example of list found during immediate access of company names). | Disputed. The DBAs used by CAC, True Count, and Prime did not overlap. *See* Pls.' Ex. 47 (OC FBBS Premier); Pls.' Ex. 48 (OC FNBS SLAM); Pls.' Ex. 49 (OC FNBS Financial Preparation Services). |
| 44. Tuong Nguyen worked for the Company from approximately November 2015 through the date of the immediate access. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 5. | Disputed. Nguyen owned 5% of the Company. Nguyen and his consulting company, TN Accounting, also worked for the Company from approximately November 2015 through October 23, 2019. *See* Def.'s Ex. 1 (EMS merchant account application package) (showing Wen's 47.5% Equity Ownership); Def.'s Ex. 2 (Kaine Wen 2017 Trust document) (Wen gifting 5% of Wen's student loan business interest to Nguyen); Wen Declaration at ¶ 7. |
| 45. Nguyen served as Controller for the debt relief operation, and in that role helped oversee refunds and monitored chargebacks. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 107. | Disputed. Nguyen served as Controller, as well as numerous other roles, such as Processing Manager, Customer Service Manager, Billing Manager, Payroll Manager, and Accounting Manager. *See* Wen Declaration at ¶ 13. |

10

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 46. Nguyen also initially helped with processing and handling consumer complaints.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 22. | Undisputed. |
| 47. Nguyen also handled payroll for the debt relief operation.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 51. | Undisputed. |
| 48. The managers and directors of each department, as well as Ho and Nguyen, reported to Wen and Kim.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 20. | Disputed. From November 2015 to approximately July 2017, the managers and directors of each department reported to Kim. At all times, the Sales Directors and Sales Managers reported to Kim. Nguyen was an owner and did not report to Kim and Wen. Ho worked with Kim on CRM-related matters, Nguyen on payroll matters, and Wen only with regard to discrete auditing and technology matters. *See* Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 22 ("In the beginning, I observed Kim overseeing the Sales and Processing Departments on-site."); Wen Declaration at ¶¶ 10, 41-44, 55, 64, 70. |
| 49. Wen and Kim were the final decisionmakers for CAC, True Count, and Prime during the entire course of their operation.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 19; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 99. | Disputed. From November 2015 to approximately July 2017, Kim was the final decision maker for CAC. Kim made the final decisions for sales and Nguyen made the final decisions for billing, banking, and accounting. *See* Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 22 ("In the beginning, I observed Kim overseeing the Sales and Processing Departments on-site."); Wen Declaration at ¶¶ 41-44, 55, 64, 70. |
| **C. Federal-Student-Loan-Repayment and Forgiveness Programs** | |
| 50. The U.S. Department of Education (DOE) offers several federal-student-loan repayment and forgiveness programs to borrowers, all of which consumers can apply to for free. | Undisputed. |

11

| | |
|---|---|
| *See* Pls.' Ex. 16 (Lause Decl.) at ¶¶ 12, 1618. | |
| 51. Income-driven repayment (IDR) plans may result in lower monthly payments for consumers. Pls.' Ex. 16 (Lause Decl.) at ¶ 12. | Undisputed. |
| 52. For consumers who qualify for an IDR plan, student-loan servicers (not third-party debt-relief providers like the Company) determine a consumer's monthly loan-payment amount based on factors including the consumer's income, family size, marital status, and tax-filing status. Pls.' Ex. 16 (Lause Decl.) at ¶ 12; *see* 34 C.F.R. §§ 685.209, 685.221. | Undisputed. |
| 53. The definition of "family size" under an IDR plan means "the number that is determined by counting the borrower, the borrower's spouse, and the borrower's children, including unborn children who will be born during the year the borrower certifies family size, if the children receive more than half their support from the borrower. A borrower's family size includes other individuals if, at the time the borrower certifies family size, the other individuals—(i) Live with the borrower; and (ii) Receive more than half their support from the borrower and will continue to receive this support from the borrower for the year the borrower certifies family size. Support includes money, gifts, loans, housing, food, clothes, car, medical and dental care, and payment of college costs." *See* 34 C.F.R. §§ 685.209(a)(1)(iv), 685.221(a)(3) (definition of family size under income-based and income- | Undisputed. |

12

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| contingent repayment plans); *see also* *https://studentaid.gov/manage-loans/repayment/plans/income-driven/questions* (explaining definition of family size under all IDR plans). | |
| 54. Consumers must recertify their eligibility for IDR programs annually and their monthly payment amount may vary year to year. *See* 34 C.F.R. §§ 685.209, 685.221; Pls.' Ex. 16 (Lause Decl.) at ¶ 12. | Undisputed. |
| 55. Manipulating borrowers' family size or marital status on IDR plan applications may temporarily lower payments but can have negative consequences for borrowers. *See* Pls.' Ex. 16 (Lause Decl.) at ¶ 14. | Undisputed. |
| 56. Under each type of IDR plan, any remaining loan balance may be forgiven if a consumer's student loans are not fully repaid by the end of the repayment period. Pls.' Ex. 16 (Lause Decl.) at ¶¶ 18-19. | Undisputed. |
| 57. During the relevant time, IDR plans had repayment periods of 20-25 years, and consumers also in the Public Loan Service Loan Forgiveness Program could qualify for loan forgiveness after making 10 years of qualifying payments. Pls.' Ex. 16 (Lause Decl.) at ¶ 18; 34 C.F.R. § 685.219 (borrower eligibility for Public Loan Service Program forgiveness). | Undisputed. |
| 58. Consumers may consolidate multiple federal education loans into one loan, which could provide additional loan repayment plans and forgiveness programs. Pls.' Ex. 16 (Lause Decl.) at ¶ 9 (discussing circumstances when | Undisputed. |

13

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| consolidation can provide access to certain IDR plans). | |
| 59. Consolidating federal loans can result in losing qualifying payments for loan forgiveness in connection with IDR plans.<br>Pls.' Ex. 16 (Lause Decl.) at ¶ 10. | Undisputed. |
| 60. From November 2015, through October 23, 2019, consumers struggling to pay their loans could seek loan forbearance for a cumulative total of three years, and interest would typically continue to accrue during the forbearance, increasing the consumer's overall student loan debt over time.<br>*See* Pls.' Ex. 16 (Lause Decl.) at ¶ 8. | Undisputed. |

II. **The Company's Purported Student-Loan Debt-Relief Services**
A. **Overview of the Sales Process**

| | |
|---|---|
| 61. The entire time it operated, the Company engaged in telemarketing or arranged for others to engage in telemarketing to market its student-loan debt-relief services to consumers.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 38; Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 4-6; *see also* Pls.' Ex. 13 (Schneider Decl.) at Part III (discussing calls with Company and analysis of call recordings). | Undisputed. |
| 62. The Company used lead generators to identify potential clients; lead generators, in turn, transferred interested clients via phone to an employee in the Sales Department.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 24. | Undisputed. |
| 63. The Sales Department handled sales calls with consumers.<br>Pls.' Ex.1 (Kim Decl.) at ¶ 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 25. | Undisputed. |

14

| | |
|---|---|
| 64. Every employee in the Sales Department was paid at least in part through commissions based on the number of consumers who enrolled in the Company's services.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 40-41; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 51 (noting sales employees paid in part based on commissions and noting "it benefitted sale employees financially to sell as many consumers as possible on the Company's services."); *see also* Pls.' Ex. 89 (Receiver's Report) at 27:9-19 (describing commission structure at time of immediate access). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Wen Declaration at ¶ 172. |
| 65. Employees in the Sales Department (salespeople) pitched the Company's purported services to consumers.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 43; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 25. | Undisputed. |
| 66. Salespeople accessed consumers' loan information on the Federal Student Aid (FSA) website, either by asking the consumer for credentials or by creating an account for the consumer.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 44. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script asking the consumer to approve the Company using a soft credit inquiry to obtain student loan information). |
| 67. Salespeople, not the consumers, entered family size, income, and marital status data into the Company's customer relationship platform, DPP.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 46; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 45, 47. | Undisputed. |
| 68. When quoting consumers' monthly payments under an IDR plan, salespeople used a formula based on family size (FS), income, and marital | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| status to come up with a monthly payment amount. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 27; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 45 (employees were supposed to enter data so DPP could calculate an estimated monthly repayment amount). | |

### B. The Company's High-Pressure Sales Culture and Minimal Compliance Measures

| | |
|---|---|
| 69. Salespeople were encouraged to create a sense of urgency to induce consumers to enroll. *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 43-44; Pls.' Ex. 1.6 (explaining that training deck stating "SIGN OR DIE" and listing sales tactics that include creating urgency and "fear of loss technique" reflects sales culture they tried to promote); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 32 (stating he heard salespeople tell consumers "that they had to sign up for the Company's services right away or certain loan repayment programs would go away."); Pls.' Ex. 41 (Rosca Decl.) at ¶ 8 (PSLC told consumer that President Obama started a loan forgiveness program that "Republicans in Congress were trying to put a stop to," which caused her to feel a sense of urgency about signing up); Pls.' Ex. 25 (Thelen Decl.) at ¶ 7 ("student loan advisor" from SLAM made consumer feel that if she didn't enroll right away, the opportunity might not be available later); Pls.' Ex 89 (Receiver's Report) at 27:4-28; Pls.' Ex 89.6 ("Hard Close" and "Same Day Pitch"). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> create a sense of urgency to induce consumers to enroll). |
| 70. Wen helped develop the commission structure for salespeople | Disputed. Kim provided and developed the commission structure for salespeople based on the commission structure of the |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| and, along with Kim, decided how employees were compensated. Pls.' Ex. 1 (Kim Decl.) at ¶ 42. | student loan company he previously worked at, and Kim decided how sales employees were compensated. *See* Wen Declaration at ¶¶ 37-38. |
| 71. In an email to Wen and Kim on July 25, 2017, CAC's then counsel wrote: "IMPORTANTLY: You are on the hook (liable) for any marketing misrepresentations that your sales representatives make. So please monitor them carefully, secret shop them, and make sure they are not putting your company and you at risk." Pls.' Ex. 55 (Email re: no advance fee model). | Undisputed. |
| 72. The Company did not consistently audit sales calls. *See* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 88-91 (noting no routine audits in April 2019); *see also* Pls.' Ex. 89 (Receiver's Report) at 32:3-4 (finding that prior to August 2019, compliance concerns and procedures were "sporadic"). | Undisputed. |
| 73. Although at some point the Company started using a "Compliance Script" during sales calls with consumers, consumers continued to complain that they were misled by the Company. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 106 (noting consumer complaints continued even after the Compliance Script was implemented). | Undisputed. |

### III. The Company's Misrepresentations to Consumers
#### A. Representations about the Company's Fees

| | |
|---|---|
| 74. The Company misrepresented its fees to consumers. Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 56 (admitting that during some telemarketing calls, "the | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) (Wen admitting only "during some telemarketing calls") at |

17

| | |
|---|---|
| Company represented to consumers that fees paid by consumers to the Company would be applied towards the consumers' student loans."); *see also* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 6-26 (explaining Company led her to believe her payments were toward her loans, and directed her to ignore emails from FedLoans about past due payments); Pls.' Ex. 42 (Donaldson Decl.) at ¶¶ 7, 14 (consumer who thought payments to the Company were going to her loan debt later "dismayed" to learn they had not); Pls.' Ex. 23 (Hershenson Decl.) at ¶¶ 3-4, 9-11 (consumer led to believe she was making payments on her loan through her payments to Premier, but was later informed by FedLoans that it had not received any of her payments); Pls.' Ex. 34 (Liming Decl.) at ¶¶ 12, 17-18 (consumer told fees would go towards paying off her loans but was later informed by FedLoans that none of the money she paid Premier went to her loans); Pls.' Ex. 35 (Hauser Decl.) at ¶¶ 13-18 (Company told her it would "take over her loans" and she only needed to pay the Company, but later learned she still owed her servicer); Pls.' Ex. 27 (Kirksey Decl.) at ¶¶ 6-7, 10 (PSLC representative told consumer it would take over his loans, there was no need for consumer to communicate with the servicer, and he believed payments to the Company were going to his student loan debt, but later learned none of his payments went toward his debt); Pls.' Ex. 29 (Metzig Decl.) at ¶¶ 8, 13 (PSLC representative led her to believe $40 monthly | Nos. 29, 56; Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> misrepresent fees to consumers). |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

payments were toward her student loans and directed her to stop paying her servicer but later learned the Company had not paid her debt at all); Pls.' Ex. 37 (Smith Decl.) at ¶¶ 8-9, 12 (PSLC representative indicated Company would take over her loans, she no longer needed to contact the servicer, and consumer believed her payments to the Company were therefore going to pay down her loan balance, but she later learned the amount of her debt had ballooned); Pls.' Ex. 26 (Yimer Decl.) at ¶ 7 (PSLC representative never indicated payments to Company were fees and instead told her that PSLC would be "taking care" of her loans going forward and that, after five payments of $185, she would only have to pay $30/month for the next 20 years); Pls.' Ex. 28 Jangula Decl.) at ¶¶ 8, 10, 13 (PSLC representative claimed consumer only needed to pay the Company, which consumer understood would go toward paying her loans, but she later learned none of it did); Pls.' Exs. 62-64 (September 2016 email and attachments from Wen to Nguyen and Kim about consumer complaint); Pls.' Ex. 14 (Ridder Decl.) at ¶ 8 (discussing consumer complaints about the purpose of fees paid); Pls.' Ex. 1 (Kim Decl.) at ¶ 70 (one of top three things consumers complained about was that Company employees told them monthly payments to Company would go toward consumer's student loans); Pls.' Ex. 86-87 (scripts claiming fees were for enrollment "into the government program").

19

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 75. In some instances, salespeople stated or implied that consumers' payments to the Company were going toward student loans, when in fact the Company kept the payments from consumers. Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 29 (admitting as to some consumers that the Company did not use funds collected from consumers to make payments to their loan servicers and otherwise stating lack of knowledge or information as to other consumers); 56 (admitting that during some telemarketing calls, "the Company represented to consumers that fees paid by consumers to the Company would be applied towards the consumers' student loans."); *see also* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 6-26 (explaining Company led her to believe her payments were toward her loans, directed her to ignore emails from FedLoans about past due payments, and that she later learned her servicer had not received any payments since before she started making her payments to the Company in April 2018); Pls.' Ex. 42 (Donaldson Decl.) at ¶¶ 7, 13-14, 16 (explaining sales representative led her to believe payments were going to pay down her loans but she later learned from Navient that was not the case); Pls.' Ex. 23 (Hershenson Decl.) at ¶¶ 3-4, 9-11 (consumer led to believe she was making payments on her loan through her payments to Premier, but was later informed by FedLoans that it had not received any of her payments); Pls.' Ex. 33 (Varno Decl.) at ¶¶ 4, 6 | Undisputed. |

(Company enrolled her in an IDR plan
without her knowledge and led her to
believe $20 payments were toward her
loans, not the Company, but she later
learned that was not true); Pls.' Ex. 34
(Liming Decl.) at ¶¶ 12, 17-18
(consumer told fees would go towards
paying off her loans but was later
informed by FedLoans that none of the
money she paid Premier went to her
loans); Pls.' Ex. 35 (Hauser Decl.) at
¶¶ 13, 15 (based on what Company told
her, believed payments were going
toward her student loans, but later
learned that was not true); Ex. 27
(Kirksey Decl.) at ¶¶ 6-10 (PSLC
representative told consumer it would
take over his loans, there was no need
for consumer to communicate with the
servicer, and he believed payments to
the Company were going to his student
loan debt, but later learned none of his
payments were applied to his loan
debt); Pls.' Ex. 29 (Metzig Decl.) at
¶¶ 8-9, 13 (PSLC representative led her
to believe $40 monthly payments were
toward her student loans and directed
her to stop paying her servicer, but she
later learned it had not made any
payments on her loan debt); Pls.' Ex.
37 (Smith Decl.) at ¶¶ 8-9, 12 (PSLC
representative indicated Company
would take over her loans, she no
longer needed to contact the servicer,
and consumer believed her payments to
the Company were therefore going to
pay down her loan balance, but she
later learned the amount of her debt
had ballooned); Pls.' Ex. 26 (Yimer
Decl.) at ¶ 7 (PSLC representative
never indicated payments to company

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| were fees and instead told her that PSLC would be "taking care" of her loans going forward and that, after five payments of $185, she would only have to pay $30/month for the next 20 years, but she later learned from online research that her payments to the Company were only fees for its services); Pls.' Ex. 28 (Jangula Decl.) at ¶ 8 (PSLC representative claimed consumer only needed to pay enrollment fee and monthly fee of $40 to the Company, which consumer understood would go toward paying her loans); *see also* Pls.' Exs. 62-64 (September 2016 email from Wen to Nguyen and Kim about consumer complaint); Pls.' Ex. 1 (Kim Decl.) at ¶ 70 (one of top three things consumers complained about was that Company employees told them monthly payments to Company would go toward consumer's student loans); Pls.' Ex. 18 (Heidari Decl.) at ¶ 18 (discussing review of certain Company general ledgers and bank accounts and concluding that he did not see any payments to student loan servicers). | |
| 76. Scripts and training materials implied fees paid by consumers were their student loan payments.<br><br>*See* Pls.' Ex. 1.6 (training desk used by the Company stating, "LIST SELLING POINTS . . . No more HUGE payments ($700 month) Low manageable payments ($22, $32, $42/month)"). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> imply fees paid by consumers were their student loan payments). |
| 77. In some instances, salespeople stated or implied that consumers' fees | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| were for enrollment into a loan forgiveness program. Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a-b; *see also* Pls.' Ex. 38 (Simonenko Decl.) at ¶¶ 4, 11 (stating Company told him he qualified for its loan forgiveness program, which would cost $30 per month, and that he later learned from his servicer he was not in a loan forgiveness program, contrary to statements made by Company representatives); Pls.' Ex. 22 (Pugh Decl.) at ¶ 5 (representative told her Premier could help lower her monthly payments and enroll her in a loan forgiveness program administered by DOE); Pls.' Ex. 33 (Varno Decl.) at ¶¶ 3-4 (representative told her that her loans would drop from $15,096 to $5,000 after making the first five payments of $239 to the Company). | |

### B. Representations about the Company's Services

| | |
|---|---|
| 78. Salespeople represented that the Company could lower consumers' monthly student loan payments. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 47; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 28, 47 (explaining Company's practice of inflating family size enabled it to provide lower monthly payment quote to consumers); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34d (discussing analysis of call recordings); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 5-9; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 6 (Company representative described it as a "student loan company authorized to lower our monthly debt"); Pls.' Ex. 34 (Liming Decl.) at ¶ 12 (Company representative told consumer fees would go towards paying down her loans and would be | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did not represent that the Company could lower consumers' monthly student loan payments). |

23

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| $239 for first five months and then $40 per month for ten years); Pls.' Ex. 35 (Hauser Decl.) at ¶ 7 (consumer facing $200 monthly payments told by South Coast Financial representative if she enrolled and paid $1,145 upfront, her monthly payment would drop to $32 until 2039); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 7 (SLAM representative told consumer he was "approved" for monthly payments of $128.70 for twenty years as part of an income-driven student loan forgiveness program); Pls.' Ex. 25 (Thelen Decl.) at ¶ 7 (SLAM representative told her it could definitely lower her payments); Pls.' Ex. 26 (Yimer Decl.) at ¶ 7 (consumer who was making $100 monthly payments was told she had to make five initial payments of $185 and then her monthly payments would be reduced to $30); Pls.' Ex. 27 (Kirksey Decl.) at ¶ 6 (consumer who was making $100 monthly payments was told that after five monthly payments of $200, PSLC could lower his monthly payments to $30 for ten years); Pls.' Ex. 32 (Wilson Decl.) at ¶ 4 (Premier told him it could lower his monthly payments) *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 61 (admitting that during some Telemarketing calls, the Company told consumers that they were approved for a specific lower monthly payment on their student loans). | |
| 79. Salespeople told consumers that the Company could lower consumers' monthly payments even if the consumer was already in an IDR program. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To |

24

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| *See* Pls.' Ex. 29 (Metzig Decl.) at ¶ 14 (explaining "worst part" of her experience with PSLC is that because she was already enrolled in an income-based repayment program, PSLC never could have lowered her monthly payment); Pls.' Ex. 26 (Yimer Decl.) at ¶ 13 (consumer was already on an income-driven repayment plan when she enrolled). | Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> represent that the Company could lower consumers' monthly payments even if the consumer was already in an IDR program). |
| 80. In some instances, salespeople presented the estimated monthly payment amount to consumers as the amount that the consumer would have to pay until the loan was paid off. Pls.' Ex. 2 at (Nguyen Decl.) ¶¶ 29, 35-38; Pls.' Ex. 2.1 (email dated April 24, 2019, from Sales Director stating, "[t]he way its [sic] pitched is still the same. [Sales employees] have them write down the numbers and tell them our fees over the course of 20 years is [sic] all they're going to have to pay and it's all interest free."); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 62 (admitting that during some sales calls, the Company represented that consumers' lower monthly payments would be in place over the entire loan term). | Undisputed. |
| In some instances, salespeople told consumers they would owe a specific monthly payment amount, but that amount was based on a false family size and/or marital status. Pls.' Ex. 2 at (Nguyen Decl.) ¶¶ 28, 47, 49; 62, 84-87; Pls.' Ex. 2.73. 2.74 (exhibits to Nguyen Decl.); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 63-64 (admitting that during some Telemarketing calls, the Company | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| represented to consumers that they qualified for or were eligible for lower monthly student loan payments, where such payment amounts had been calculated based on an incorrect family size or marital status); Pls.' Ex. 1 (Kim Decl.) at ¶ 47 (salespeople provided monthly student loan payment quote based on inflated family sizes). | |
| 82. When the Company began operating, it did not have any policies prohibiting employees from inflating consumers' family size while selling or performing its services. Pls.' Ex. 1 (Kim Decl.) at ¶ 49; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 28. | Undisputed. |
| 83. Salespeople also typically listed married clients as single in the Company's customer relationship management system (DPP) because that helped them provide a lower monthly payment quote during the sales pitch. Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 48-49, 58; Pls.' Ex. 1.6 (Nguyen Decl. Ex. 4); see also Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 64 (admitting that during some Telemarketing calls, the Company represented to consumers that they qualified for or were eligible for lower monthly student loan payments, where such payment amounts had been calculated based on a consumer being single, when the consumer was actually married). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her filing status); Wen Declaration at ¶¶ 144-146, 166, 189-192. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 84. Salespeople did not tell consumers that it was the Company's practice to use a false family size to provide a low monthly payment quote to consumers. Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 31, 46-47, 63. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her family size); Wen Declaration at ¶¶ 144-146, 166, 189-192. |
| 85. In some instances, salespeople misled consumers about what counts as part of one's family size for an IDR plan application. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 73 (salespeople represented that a person could count as a family member if the consumer paid for a person's phone bill, bought the person lunch, or paid for the person's gas); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34e (discussing analysis of call recordings). | Undisputed. |
| 86. Salespeople represented that the Company obtained or could obtain loan forgiveness for consumers. *See* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 6, 9 (Premier representative assured consumer her loans would be forgiven in ten years, regardless of her employment status); Pls.' Ex. 36 (Crawford Decl.) at ¶¶ 4-5 (Premier told her it had ways of getting people approved for loan forgiveness and that if she made monthly payments of $95 for 240 months, the rest of her loan balance would be completely forgiven, saving her $18,470); Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶ 14 (Premier representative told her she had been | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> represent that the Company obtained or could obtain loan forgiveness for consumers). |

27

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

approved for partial loan forgiveness so long as she continued to make monthly payments); Pls.' Ex. 40 (Breemes Decl.) at ¶ 7 (representative said she had been approved and her loan balance would be reduced from $45,000 to approximately $10,000); Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 4-6 (during initial call, representative told consumer with an approximately $148,820 loan balance that her loans were forgiven down to $33,611); Pls.' Ex. 43 (Fomafung Decl.) at ¶¶ 9-12 (PSLC told consumer it could reduce his loan debt from $65,000 to $17,000 so long as he made monthly payments of $40 until March 2028 and paid $1,195 enrollment fee); Pls.' Ex. 27 (Kirskey Decl.) at ¶¶ 6-7 (PSLC representative told consumer she could enroll him in a student loan forgiveness program that would lower his payments to $30/month for 10 years and that servicers "got mad at PSLC for enrolling people in student loan forgiveness programs" ); Pls.' Ex. 29 (Metzig Decl.) at ¶¶ 89 (PSLC representative told her she qualified for a program that offered "near total student loan forgiveness" and that if she paid six monthly payments of $199 and $40 monthly for ten years, the rest of her loans would be forgiven); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 7 (SLAM representative told consumer he was "approved" for monthly payments of $128.70 for twenty years as part of an income-driven student loan forgiveness program and debt would be forgiven if he made all payments); Pls.' Ex. 37 (Smith Decl.) at ¶ 7 (PSLC

28

| | |
|---|---|
| representative told him the Company could reduce her student loan debt by as much as 60%); Pls.' Ex. 25 (Thelen Decl.) at ¶ 9 (SLAM representative told consumer she was approved for loan forgiveness and would only have to pay $25,000 out of the $62,000 she owed); Pls.' Ex. 28 (Jangula Decl.) at ¶¶ 6, 8 (PSLC representative led her to believe that if she paid enrollment and monthly fees to Company, $40,000 in student loan debt would be "wiped free"); Pls.' Ex. 32 (Wilson Decl.) at ¶¶ 4-5 (Premier told him he had to make payments to be enrolled into loan forgiveness program and that loans would be completely forgiven within five to ten years); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a, b (discussing analysis of call recordings); *accord* Pls.' Ex. 14 (Ridder Decl.) at ¶ 11(discussing consumer complaints about promises of loan forgiveness). | |
| 87. In some instances, salespeople stated or implied that their loans would be forgiven, in whole or in part, immediately after signing up for the Company's services.<br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 60 (admitting that during some telemarketing calls, the Company represented to consumers that, shortly after consumers enrolled in the Company's services, consumers' student loans would be forgiven in whole or in part); Pls.' Ex. 12 (Schneider Decl.) at ¶ 34a. | Undisputed. |
| 88. In some instances, salespeople stated or implied consumers had been approved for loan forgiveness when they had not. | Undisputed. |

29

| | |
|---|---|
| *Compare* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at Attach. C (email stating "Congratulations! You have been approved for your new student loan forgiveness program."); Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 5-17 (discussing representations about loan forgiveness and explaining she later learned from loan servicer and by viewing her account online they were not true); Pls.' Ex. 25 (Thelen Decl.) at ¶¶ 9, 12, 15 (SLAM representative told consumer she was approved for a student loan forgiveness program and would only have to pay back approximately $25,000 out of the $62,000 she owed but she later learned "it had all been a scam"); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a (discussing analysis of call recordings); *with* Pls.' Ex. 16 (Lause Decl.) at ¶¶ 16-19 (noting only the U.S. Department of Education can grant loan forgiveness and discussing related criteria). | |
| 89. Company scripts stated or implied consumers were approved for federal student loan forgiveness programs during the sales call.<br>Pls.' Exs. 86-87 (at CFPB-20230125-0001691-92) (Sales Director transmitting script stating, "OK, I have some great news for you; it looks like I was able to get you approved for the federal student loan forgiveness program."). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> state or imply consumers were approved for federal student loan forgiveness programs). |
| 90. In some instances, salespeople told consumers that fees paid by consumers to the Company would be the only payments consumers would owe on their student loans after being | Undisputed. |

30

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| accepted into an IDR Plan or loanforgiveness program. Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 57; Pls.' Ex. 32 (Wilson Decl.) ¶ 5 (consumer led to believe payments to Premier would be the only payments he would have to make to get his loans forgiven and that he would not have to make any additional payments directly to his servicer). | |
| 91. In some instances, salespeople claimed the Company had been able to obtain loan forgiveness for other consumers. *See* Pls.' Ex. 13 (Schneider Decl.) at 33 (discussing pretexting call where Company employee stated: "Usually we're able to save you about half, at least of what your current student loans are" and similar representations in other calls); Pls' Ex. 17 (Tr. of Return Call to Investigator Oct. 11, 2019) at 5:20-6:4. | Undisputed. |

C. **The Company's Practice of Submitting IDR Applications Containing False Information**
   1.   **Overview of Processing**

| | |
|---|---|
| 92. Following the initial sales call, an employee in the Processing Department (processor) conducted a "welcome call" with the consumer. Pls.' Ex. 1 (Kim Decl.) at ¶ 52; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 53. | Undisputed. |
| 93. It was Company policy for processors *not* to confirm the family size on file in DPP with the consumer. Pls.' Ex. 1 (Kim Decl.) at ¶ 53; *see also* Pls.' Ex. 60 (Nov. 9, 2018 email from | Disputed. After Wen got involved, the Company implemented policies to confirm the consumer's family size. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Kim looping Wen into discussion about Company policy against customer service reps disclosing family size and income to consumers); Pls.' Ex. 61 (Nov. 8, 2018 email to Wen and others noting consumer became very angry when rep "confirmed" she had a family size of 6 and noting reps should never confirm FS input by sales rep). | Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her family size); Def.'s Ex. 32 (HR email re: processing protocols) (discussing protocol for changing family size); Wen Declaration at ¶¶ 134, 144-146, 166, 189-192. |
| 94. Processors also changed the consumer's contact information on file with the consumer's student loan servicer so that all correspondence would be sent to the Company, not the consumer.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 54; *see also* Pls.' Ex. 13 (Schneider Decl.) at ¶ 19 (detailing piles of mail addressed to consumers found during the immediate access). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. In the instances that this occurred, Processors acted on a signed Special Limited Power of Attorney from the client. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit F (a sample Re-Verification Campaign enrollment package with the Special Limited Power of Attorney). |
| 95. Processors completed forbearance requests to temporarily halt the consumer's monthly student loan payments.<br>Pls.' Ex. 5 (Ortuno Investigational Hr'g Tr.) at 83:5-84:6. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that explains filing forbearance only if the student loans are in repayment status). |
| 96. Processors signed the forbearance paperwork in the consumer's name, often without the consumer's consent.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 53-56; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 68 (admitting that at times the Company did not inform consumers that it would submit | Disputed to the extent that the Plaintiffs are contending this occurred in every case. In the instances that this occurred, Processors acted on a signed Special Limited Power of Attorney from the client. *See* Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 56 ("I used to |

32

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| forbearance requests to student loan servicers on the consumers' behalf). | personally email the forbearance paperwork to clients to sign"). |
| 97. Processors prepared applications for IDR plans and the corresponding annual recertification applications and submitted them to consumers' student loan servicers.<br>Pls.' Ex. 1 at (Kim Decl.) ¶ 52; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 57. | Undisputed. |
| 98. Consumers typically did not see the application the Company prepared before the Company submitted it to their student loan servicer.<br>See Pls.' Ex. 1 (Kim Decl.) at ¶ 57. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit F (a sample Re-Verification Campaign enrollment package where the client sees the IDR application before the Company submitted it to their student loan servicer); Wen Declaration at ¶ 189-192. |

### 2. The Company's Misrepresentations Regarding Family Size and Marital Status in IDR Applications

| | |
|---|---|
| 99. The Company typically submitted IDR applications on behalf of consumers that listed more children or dependents as part of the consumers' family size than consumers actually had.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 47-51; Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (email to Wen and others noting it was "very rare" for file to be submitted without a fake FS or marital status); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 60-63; Pls.' Exs. 2.5-2.69 (Nguyen Decl. Exs. 5-69) (examples of email correspondence discussing instances where the Company listed a false family size for consumers); Pls.' Ex. 56 (email chain that includes August 19, 2019 email to | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her family size); Wen Declaration at ¶¶ 144-146, 166, 189-192. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

Kim noting that "[t]he way almost every advisor is pitching family size is pretty similar to this client. This client has no dependents, but his file has a family size of 7 on it."); *see also* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶¶ 7, 20-21, Attach. F (explaining she told the Company she had three dependents and later learned the Company had listed three dependents *and* three children in her application and attaching letter from Navient) (emphasis added); Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 5, 27 (stating she told the Company she had two children and later learned from FedLoans that the Company listed five dependents in application); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married mother of one discovered Premier listed her as a single mother of three); Pls.' Ex. 24 (Sheahan Decl.) at ¶¶ 5, 11 (married father-to-be later told by servicer that SLAM listed him as single with five dependents); Pls.' Ex. 25 (Thelen Decl.) at ¶¶ 8-9 (SLAM representative advised that consumer's adult daughter and four grandchildren who did not live with her and for whom she occasionally bought clothes and other things could count towards her family size); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 73 (admitting that at times, the Company submitted applications for IDR Plans to consumers' student loan servicers that listed family sizes greater than the family sizes provided to the Company by the corresponding consumers).

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 100. The Company generally did not tell consumers that it was inflating their family in IDR applications. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 31; Pls.' Ex. 1 (Kim Decl.) at ¶ 57; *see also* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶¶ 7, 20-21, Attachment F (explaining she learned from her servicer that Company had submitted a false family size and attaching letter from Navient); Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 5, 27 (stating she told the Company she had two children and later learned from FedLoans that the Company listed five dependents in application); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married mother of one discovered Premier listed her as a single mother of three); Pls.' Ex. 24 (Sheahan Decl.) at ¶¶ 5, 11 (married father-to-be later told by servicer that SLAM listed him as single with five dependents). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her family size); Wen Declaration at ¶¶ 144-146, 166, 189-192. |
| 101. In some instances, the Company misrepresented to consumers what could count as part of a consumer's family size in an IDR application. Pls.' Ex. 13 (Schneider Decl.) at ¶ 34e; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 60, 72-73 (sharing examples he overheard, including a salesperson telling a consumer that a person could count as member of their family if they paid for the person's phone bill, lunch, or gas bill, for example). | Undisputed. |
| 102. The Company typically listed married consumers as single in IDR applications it submitted on their behalf. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55. Pls.' Ex. 1.7 (Kim Decl. Ex. 5); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 58-59; Pls.' Ex. 2.4 (Nguyen Decl. Ex. 40); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 74 (admitting that CAC and True Count submitted applications for IDR Plans to consumers' student loan servicers that listed married consumers as single.); *see also* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married consumer later discovered Premier listed her as single in her application). | Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her filing status); Wen Declaration at ¶¶ 144-146, 166, 189-192. |
| 103. The Company did not tell married consumers that it listed them as single in IDR plan applications. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 63; Pls.' Ex. 1 (Kim Decl.) at ¶ 57. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her filing status); Wen Declaration at ¶¶ 144-146, 166, 189-192. |

**IV. The Company Charged Advance Fees**
**A. Overview of Fee Collection Practices**

| | |
|---|---|
| 104. During the entire time it operated, the Company collected fees from consumers in exchange for its purported services. *See* Pls.' Ex. 1 (Kim Decl.) ¶ 58; Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 4, 7. | Undisputed. |
| 105. The Company charged two types of fees: an enrollment fee and a monthly fee. Pls.' Ex. 1 (Kim Decl.) at ¶ 58. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. The Company charged an enrollment fee. Most of the time, the Company charged a monthly recertification fee. *See* Wen Declaration at ¶ 30. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 106. The amount of the enrollment fee varied over time and ranged from approximately $799 to at least $1,899.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 59; *see also* Pls.' Ex. 39 (Etzel-Elaqad) at Attach. B (client agreement listing three enrollment fee payments of approximately $299); Pls.' Ex. 38 (Simonenko Decl.) at ¶ 5 (Company told him to pay $1,200 split across six months and then $30 per month); Pls.' Ex. 22 (Pugh Decl.) at ¶ 12 (consumer first paid $284.75 for four months); Pls.' Ex. 36 (Crawford Decl.) at ¶¶ 68 (consumer made five payments of $239 to Premier and attaching a contract outlining additional fees); Pls.' Ex. 34 (Liming Decl.) at ¶ 12 (representative told consumer she had to pay $1,195 for an "enrollment fee that would go towards paying down my loan followed by $40 monthly payments which would also go towards paying off her loans over the course of ten years). | Disputed. At some times, Kim, at his sole discretion, adjusted the fee structure to less than $799. *See* Wen Declaration at ¶ 30. |
| 107. The Company charged the enrollment fee in exchange for preparing consumers' consolidation or IDR application.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 3, 59. | Undisputed. |
| 108. The amount of the enrollment fee could vary depending on how soon the consumer could pay.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 60. | Disputed. The amount of the enrollment fee did not vary depending on how soon the consumer could pay. Consumers who agreed to not split the enrollment fee into multiple payments received a $100 discount, but that was rare. *See* Pls.' Ex. 89 (Receiver's Report) at 28:18-19. |
| 109. The Company provided financial incentives for collecting more fees from consumers upfront; for example, | Undisputed. |

37

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| if the consumer paid in full right away, the sales representative would receive a higher commission for that enrollment. Pls.' Ex. 1 (Kim Decl.) at ¶ 60; *see also* Pls.' Ex. 89 (Receiver's Report) at 28:18-19 ("Consumers who agreed to immediately pay in full were rewarded with a $100 discount and sales advisors received bonuses."). | |
| 110. Most consumers paid at least part of the enrollment fee within two weeks of the sales call. Pls.' Ex. 1 (Kim Decl.) at ¶ 60; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 44; Pls.' Ex. 1.6 (exhibit to Kim Decl.) (training including "Same Day" pitches indicating consumers' first payment scheduled for the day of the call and that first payment must occur "today to start working on your file today and secure your rate in time."); Pls.' Ex. 89.5-89.6 (exhibits to Receiver's Report) ("Same Day Pitch" stating "[s]ince we are enrolling you into the program today, obviously the system will be setting your first payment for today"; confirming payment will be drafted that day; and "The Government is very strict with this. We must receive your first payment before they will start processing anything."); *accord* Pls.' Ex. 36 (Crawford Decl.) at ¶ 6, Attach. A at 5-6 (signed client agreement listing first payment within ten days); Pls.' Ex. 39 (Etzel-Elaqad) at ¶ 11, Attach. B at 3-4 (client agreement assessing all enrollment fees within first three months and | Undisputed. |

38

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| listing date of first payment as enrollment date). | |
| 111. By the time the Company submitted a student loan adjustment application, the Company had typically collected some or all of the enrollment fee.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 61; Pls.' Ex. 1.6 (Kim Decl. Ex. 4) (training including "Same Day" pitches indicating consumers' first payment scheduled for the day of the call and that first payment must occur "today to start working on your file today and secure your rate in time."); *see also* Pls.' Ex. 89 (Receiver's Report) at 12:7-12 ("During the initial sales call, Defendants acquire the customer's payment information and schedule the first payment, which is generally processed almost immediately after the customer executes the Services Agreement."). | Undisputed. |
| 112. The Company collected fees from consumers even if their loans were in forbearance, and the consumer therefore had not made a payment on an adjusted loan yet.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 64-65; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 9 (admitting as to some consumers). | Undisputed. |
| 113. The Company also collected monthly fees from consumers.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 62; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 14 (admitting Company collected monthly fees from some consumers in exchange for Student Loan Debt Relief Services). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Wen Declaration at ¶ 30. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 114. The amount of the monthly fees varied over time and ranged from approximately $10-50 per month. Pls.' Ex. 1 (Kim Decl.) at ¶ 62. | Undisputed. |
| 115. The Company charged monthly fees for filing recertification paperwork for IDR plans during the year leading up to the annual recertification. Pls.' Ex. 1 (Kim Decl.) at ¶ 62; Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 17 (admitting as to some consumers that the Company collected fees from consumers for preparing recertification paperwork for IDR plans before submitting recertification paperwork to student loan servicers). | Undisputed. |
| 116. The monthly recertification fee was supposed to be charged for the life of the consumer's loan. Pls.' Ex. 1 (Kim Decl.) at ¶ 62. | Undisputed. |
| 117. The Company charged fees to consumers regardless of whether consumers had made new payments on adjusted loans. Pls.' Ex. 1 (Kim Decl.) at ¶ 65; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 8-11 (admitting as to some consumers and stating lack of knowledge or information as to others that the Company: (1) collected fees from consumers before they had been approved for IDR plans, (2) while the consumers' loans were in forbearance, and (3) before the consumers had made a payment on a corresponding IDR plan or consolidated loan). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 20 (August 2018 email re: Screen Shots of Final Repayment – Proof of Work) (RAM approving screenshots to verify that consumers had made new payments on adjusted student loans); Def.'s Ex. 21 (November 2018 email re: RAM Service Agreement) (confirming First Priority will track proof of performance); Wen Declaration at ¶¶ 106-107, 122. |
| 118. The Company did not have access to records showing whether consumers made payments on an | Disputed. The Company had some access to records showing whether consumers made payments on an adjusted loan, and the Company attempted to gather this |

40

| | |
|---|---|
| adjusted loan, nor did it attempt to gather this information.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 65. | information for AMP, RAM, and TAS. *See* Def.'s Ex. 20 (August 2018 email re: Screen Shots of Final Repayment – Proof of Work) (The Company providing screenshots to verify that consumers had made new payments on adjusted student loans); Def.'s Ex. 21 (November 2018 email re: RAM Service Agreement) (confirming First Priority will track proof of performance); Wen Declaration at ¶¶ 106-107, 122. |

B. **The Company's Limited Dealings with Purported Dedicated Account Providers**

| | |
|---|---|
| 119. During the entire time it operated, the Company did not make payments to creditors on behalf of consumers.<br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 71 (Kim and Wen knew employees told consumers monthly payments to the Company would go toward paying their loans and that such statements were incorrect); Pls.' Ex. 12 (Heidari Decl.) at ¶ 18 (noting that review of certain Company account or financial records did not reveal evidence of payments to student loan servicers); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 29 (admitting as to some consumers that the Company "did not use funds collected from consumers to make payments to consumers' student loan servicers."). | Undisputed. |
| 120. The Company briefly contracted with two purported dedicated account providers (DAPs), Reliant Account Management (RAM) and Account Management Plus (AMP).<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 90-92. | Undisputed. |
| 121. The Company did not provide RAM or AMP with documentation | Disputed. The Company provided RAM and AMP with documentation of proof of |

41

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| indicating that a consumer had made an initial payment on an adjusted loan before those companies released fees paid by consumers to the Company.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 93 (stating that while they were testing RAM and AMP, "the Company did not track when consumers made payments to student loan servicers on adjusted loans. And we continued to collect fees from consumers before submitting their student loan adjustment applications."). | performance before RAM and AMP released fees paid by consumers to the Company. *See* Wen Declaration at ¶¶ 106-107. |
| 122. The Company processed most consumer payments without using RAM or AMP.<br>*See* Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 14 (of the over $95 million in consumer fees the Company collected, less than $200,000 was collected through RAM and AMP after accounting for refunds); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 117-120. | Undisputed. |

**V. The Company's High Complaint Volume, Chargebacks, and Refunds**
  **A. Complaint Volume**

| | |
|---|---|
| 123. Consumers submitted over 1,700 complaints regarding the Company to the Consumer Financial Protection Bureau's internal consumer complaint database and the Federal Trade Commission's Consumer Sentinel Network.<br>Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 3-7. | Undisputed. |
| 124. Several consumers complained that they were misled about the purpose of the fees they paid to the Company.<br>*See* Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 7-8. | Undisputed. |
| 125. Several consumers complained that the Company told them their student loan payments had been lowered for the life of their loan. | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 9-10. | |
| 126. Several consumers complained that the Company promised their loans would be forgiven, in whole or in part, shortly after enrolling in its services.<br>Pls.' Ex. 14 (Ridder Decl.) at ¶ 11. | Undisputed. |
| 127. Several consumers complained that the Company submitted false information about their family size or marital status to their student loan servicers.<br>Pls.' Ex. 14 (Ridder Decl.) at ¶ 12. | Undisputed. |
| 128. Several consumers complained they were led to believe that the fees charged by the Company were necessary to participate and remain enrolled in the loan-forgiveness or IDR program, or were otherwise led to believe they must pay a fee to apply for loan forgiveness or IDR programs.<br>Pls.' Ex. 14 (Ridder Decl.) at ¶ 14. | Undisputed. |
| 129. Other consumers expressed concern that the Company was a fraud, stated that the Company lied to them, or indicated they did not receive the services they were promised.<br>*See* Pls.' Ex. 13 (Schneider Decl.) at ¶ 9. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12; Wen Declaration at ¶¶ 189-192. |
| 130. The Company received hundreds of complaints from third parties submitted on consumers' behalf.<br>*See* Pls.' Ex. 15 (Marin Decl.) at ¶¶ 3, 522 (Better Business Bureau (BBB) received | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| complaints against PSLC, SLAM, FPS and related additional DBAs and informed the corresponding company of the complaint); *see also* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 92-97 (recalling Company received approximately 30-50 letters from state agencies, each of which he shared with Wen); Pls.' Ex. 2.26 (Nguyen Decl. Ex. 26); Pls.' Ex. 70 (complaint from California Department of Justice dated July 2019); Pls.' Ex. .71 (complaint from California Department of Justice dated April 24, 2019); Pls.' Ex. 72 (complaint from Kansas Office of the Attorney General addressed to Wen's attention); Pls.' Ex. 73 (complaint from West Virginia Office of the Attorney General); Pls.' Ex. 74 (correspondence regarding complaint sent by California Department of Justice in March 2017); Pls.' Ex. 75 (correspondence regarding complaint from North Carolina Department of Justice); Pls.' Exs. 83-84 (July 20, 2017 email from Wen attaching response for State of Kansas Consumer Protection Division regarding a complaint). | |
| 131. Consumers also contacted the Company directly to complain about its marketing practices and its falsification of information in IDR applications. *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 66-69; Pls.' Ex. 89 (Receiver's Report) at 33:5-18, n.37 (explaining Receiver identified approximately 150 "troubling contacts" from consumers via email to a single inbox since approximately Oct. 13, 2019, alone, and noting the Company may have received additional complaints to other email accounts as well). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12, and under Exhibit F (a sample Re-Verification Campaign enrollment package where the |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| | client sees the IDR application before the Company submitted it to their student loan servicer); Wen Declaration at ¶¶ 144-146, 189-192. |
| 132. The Receiver identified a TAS email box, studentloanmgmt@trustedaccountservices.com that was controlled and monitored by the Defendants. Pls.' Ex. 89 (Receiver's Report) at 33:5-7. | Undisputed. |
| 133. The Receiver identified approximately 150 complaints from consumers in the studentloanmgmt@trustedaccountservices.com inbox. Pls.' Ex. 89 (Receiver's Report) at 33:5-18. | Undisputed. |
| 134. The Receiver identified the following examples of consumer complaints received by studentloanmgmt@trustedaccountservices.com: •"The payments that are being taken each month are not the payments I agreed to and not an amount I can manage. I need to hear back from someone asap and get this resolved." •"If I'm paying $40/month, WHY has my student loan increased from $52k to $54k? . . . Instead of paying $52k to Nelnet, at the end of 240 payments, I will pay a total of $10,555 to Premier Student Loans? Will the balance be expunged from my financial obligation?" •"I have spoken to [Navient]- who holds my student loan per [Navient] they have nothing from you concerning my student loan and they are now delinquent. I need answer's and I am stoping [sic] Payment." •"This is a scam and I want all of my money returned or I am prepared to legal [sic] action. My student loans are still showing up as unpaid on my credit report." •"If I am going through this organization for my student loans, and if you are charging me $42.00 per month, I have two questions that are confusing me?" | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

1. "My loan amount has increased by $5,000 since I turned my information over to you."
2. "Fed Loan just sent me an email saying they are going to deduct $131 from my account each month starting November.
Can someone please explain all of this to me, and why did my amount increase?"
• "This is a scam. You've been reported. Stop contacting me."
• "STOP TAKING THE AUTOMATIC PAYMENT IMMEDIATELY.
I WANT A REFUND. The Department of Education called me – you are a fraud!"
• "I am just trying to figure out why I am still receiving bills from fedloan. They are saying I am behind and that I am not paying. I was told that I wouldn't have to worry about them once I sign on with you guys. Can you please explain."
• "This service was set up to help me with the payments at FEDLOAN SERVICING. I keep getting emails and phone calls saying my account is past due. Are the payments you're pulling from my account not being sent to the FEDLOAN SERVICING?"
• "Who is this payment going to? I just logged into my Fedloan Servicing Account, and none of my $40 monthly payments are showed as posting to my actual student loans. I am wondering who I am paying?"
• "Why am I paying y'all money and fed loan servicing is reporting missed payments to the credit bureaus. It's messing up my credit score and I really do not need that."
• "Is Navient aware that I am paying my student loans through this company now?"
Pls.' Ex. 89 (Receiver's Report) at 33:17-35:9.

**B. Refund Policy and Chargeback Rates**

| | |
|---|---|
| 135. At times, payment processors expressed concern about the | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Company's "excessive" chargeback rates. *See* Pls.' Ex. 2.78 (email chain from August 2018 between Wen, Nguyen, and NMC employees regarding excessive chargebacks); *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 80-81, *See* Pls.' Ex. 1.10; Pls.' Ex. 77 (email to Wen noting that SL Account MGMT had "excessive" chargebacks in September 2018); Pls.' Exs. 78-79 (email chain regarding excessive chargebacks and attaching remediation plan signed by Wen). | |
| 136. The Company enrolled in chargeback monitoring programs to help prevent chargebacks. Pls.' Ex. 2 (Nguyen Decl.) at ¶ 110; *see also* Pls.' Ex. 78-79 (Wen sends VISA remediation plan to Lai on January 24, 2019, at p. 3 of remediation plan noting that company uses Pinpoint and EIDS to monitor chargebacks). | Undisputed. |
| 137. The Company implemented a liberal refund policy as part of its effort to keep chargeback rates down and to avoid drawing attention from law enforcement. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 83 ("The Company had a liberal refund policy because Wen and I thought that would help keep chargebacks and consumer complaints down. Based on my experience, consumers who received a refund quickly were less likely to pursue a chargeback or to complain to a third-party. Wen agreed, and he and I were the final decisionmakers with respect to the refund policy."); Pls.' Ex. 2 (Nguyen | Undisputed. |

47

| | |
|---|---|
| Decl.) at ¶¶ 99-103; Pls.' Exs. 2.75-2.76 (Nguyen Decl. Exs. 75-76). | |

## VI. Wen's Role in the Debt Relief Operation
### A. Overview of Wen's Day-to-Day Role

| | |
|---|---|
| 138. Wen and Kim controlled CAC from its inception through the date a court-appointed bankruptcy trustee took control of the Company.<br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19 (stating Wen and Kim owned each Company, were the final decisionmakers, and that there was no one higher than them at the Company); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 99 (Wen and Kim made all the big decisions for the Company); *see* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 104, 112, 114 (admitting he was an owner of CAC and True Count and that he "exercised substantial managerial responsibility for and control over Prime's business practices" for "some of the time period" between September 2018-October 22, 2019); Pls.' Ex. 91 (July 31, 2019 Order Directing the Appointment of a Chapter 11 Trustee and Setting a Status Conference in CAC's bankruptcy proceeding). | Disputed. Kim owned and controlled CAC from 2014 through July 2015 when it operated as a loan modification company. Kim controlled CAC from November 2015 through approximately June 2017 when it operated as a student loan company. Kim always controlled CAC's sales operations. *See* Def.'s Ex. 3 (CAC 2014 Articles of Incorporation) (using Santibanez's Anaheim home address); Def.'s Ex. 51 (CAC 2017 Statement of Information); Wen Declaration at ¶¶ 41-44, 55, 64, 70. |
| 139. Wen and Kim controlled True Count and Prime from their inception through October 23, 2019, the date of the immediate access.<br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19 (stating Wen and Kim owned each Company, were the final decisionmakers, and that there was no one higher than them at the Company); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 99 (Wen and Kim made all the big decisions for the Company); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 104, 112, | Disputed. Prime was a front-end sales company. Kim, as the head of the Sales Departments, controlled Prime's sales operations. *See* Wen Declaration at ¶¶ 10, 42. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 114, 115 (admitting he was an owner of CAC and True Count and that he "exercised substantial managerial responsibility for and control over Prime's business practices" for "some of the time period" between September 2018 to October 22, 2019); Pls.' Ex. 89  (Receiver's Report) at Part II (discussing immediate access). | |
| 140. When CAC began operating in November 2015, Wen communicated daily or every other day with Kim about their student-loan debt-relief operation. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 22; Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 11 (Company started collecting payments from consumers in November 2015). | Disputed. When CAC began operating in November 2015, Wen occasionally communicated with Kim about Wen's minor support work and budget concerns. *See* Wen Declaration at ¶ 56. |
| 141. By mid-2016, Wen came into the office regularly, at least several times a week. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 23 (Wen began regularly coming into the office in 2016 and took a more active role in overseeing the Company). | Disputed. Wen rarely went to the office from November 2015 through June 2017. Wen did not go into the office more often until approximately July 2017. *See* Def.'s Ex. 52 (Declaration of Keneth Hu) at ¶ 4 ("I only started to see Kaine Wen at the office in 2017, around June or July."); Wen Declaration at ¶¶ 45, 68 (including footnote). |
| 142. Throughout 2016, Wen communicated daily—and typically multiple times a day—with Kim and others at the Company about all aspects of running the student-loan debt-relief operation. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23. | Disputed. Throughout 2016, Wen occasionally communicated with Kim or others at the Company, and primarily about Wen's minor support work and budget concerns. *See* Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 22 ("In the beginning, I observed Kim overseeing the Sales and Processing Departments on-site."); Def.'s Ex. 52 (Declaration of Keneth Hu) at ¶ 4 ("I only started to see Kaine Wen at the office in 2017, around June or July."); Wen Declaration at ¶ 56. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 143. Wen was an account signatory for eight merchant accounts used by the enterprise and bank accounts in CAC and True Count's name. Pls.' Ex. 12 (Heidari Decl.) at ¶ 10, App. D*; see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 106, 107, 111, 113; Pls.' Ex. 1 (Kim Decl.) at ¶ 25. | Undisputed. |
| 144. Wen helped set up and maintain the Company's merchant accounts. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 25 (Wen primarily in charge of setting up merchant accounts and was the main point of contact for merchant account providers). | Undisputed. |
| 145. Wen received and had access to information about the Company's merchant account and payment processing transactions, including refunds and chargeback information. *See* Pls.' Ex. 13 (Schneider Decl.) at ¶ 24 (discussing payment processing statements sent to Wen); Pls.' Ex. 51 (EPS module) (online merchant account portal document signed by Wen September 8, 2017, for CAC). | Undisputed. |
| 146. Wen helped determine the Company's consumer fee structure, including the amount of fees and when those fees could be collected. Pls.' Ex. 1 (Kim Decl.) at ¶ 28. | Disputed. Kim solely provided and developed the Company's consumer fee structure, including the amount of fees and when those fees could be collected. *See* Def.'s Ex. 4 (April 2016 email re: requesting consumer fee amounts) (Wen's email to Kim to find out consumer fee amounts); Wen Declaration at ¶¶ 27-30. |
| 147. Wen drafted and approved contracts between the Company and consumers for the Company's services. Pls.' Ex. 1 (Kim Decl.) at ¶¶ 29-31, Pls.' Ex. 1.5 (Kim Decl. Ex. 3) (email and attachment from Wen dated Jan. 29, | Disputed. Kim drafted and approved contracts between the Company and consumers for the Company's services. Later, after the Company had used Kim's consumer contracts for nearly two years, Kim sometimes asked Wen help |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 2019, noting on the last page that he added the "No Advance Fees" section, that Nguyen and Kim "won't bother to skim the new Agreement," and directing them to upload it into DPP). | revise the consumer contracts, which Wen did. *See* Wen Declaration at ¶¶ 25-26, 88. |
| 148. Wen was among the primary contacts for outside counsel for the Company.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 76. | Undisputed. |
| 149. Although Wen was admitted to the California bar in 2008, he was disciplined by the bar in July 2018 and disbarred in April 2021.<br>Pls.' Ex. 13 (Schneider Decl.) at ¶ 25; Pls.' Ex. 13.3. | Undisputed. |
| 150. Wen received and reviewed sales scripts for the Company.<br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 110 (admitting that he reviewed some of the Company's scripts); *see also* Pls.' Exs. 56-58 (scripts claiming consumer approved for "federal student loan forgiveness program" sent to Wen by Sales Director); Pls.' Exs. 53-54 (Sept. 21, 2018 email and attachment "compliance script" that states the Company "does not take any upfront fees" and the consumers' payments would be held "in your Dedicated Client Account"). | Disputed. Kim solely provided and developed sales scripts for the Company. Wen assisted with reviewing the sales script only during the compliance efforts with outside attorneys in approximately Aug-Sep 2019. *See* Wen Declaration at ¶¶ 31-32, 186. |
| 151. Wen used the following Company email accounts:<br>kwen@premierstudentloancenter.com<br>kaine@premierstudentloancenter.com,<br>kaine@slaccountmgmt.com,<br>kwen@slaccountmgmt.com,<br>kaine@financialpreparationservices.com, and<br>kwen@financialpreparationservices.com.<br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 90-96. | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 152. At times, Wen also used personal email accounts to send emails about the Company, including kainewen@gmail.com, kainedai@yahoo.com, 777sierramadre@gmail.com. Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 84-86, 96, 97; Pls.' Ex. 1 (Kim Decl.) ¶ 36. | Undisputed. |
| 153. Wen communicated about the debt relief operation with Kim and other Company employees in person, by phone, or via text or instant messaging applications such as Skype, Signal, and iMessage. Pls.' Ex. 1 (Kim Decl.) at ¶ 37. | Undisputed. |

B. **Wen's Knowledge and Control of the Company's Deceptive Practices**

| | |
|---|---|
| 154. Wen was informed that employees were adding children or dependents to consumers' actual family sizes when offering and performing the Company's services. Pls.' Ex. 1 (Kim Decl.) at ¶¶ 49, 51; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6065; 77-78; Pls.' Exs. 2.8 (Nguyen Decl. Ex. 8), 2.26 (Nguyen Decl. Ex. 26), 2.65 (Nguyen Dec. Ex. 65), 2.74-75 (Nguyen Decl. Exs. 74-75) (describing Company's practice of using fake family size and that he raised this issue with Wen). | Undisputed. |
| 155. In approximately 2016 or 2017, Wen agreed that the Company would limit employees to inflating consumers' family size up to 7. Pls.' Ex. 1 (Kim Decl.) at ¶ 51; *accord* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 77-82, 85-86; Pls.' Ex. 2.72 (Nguyen Decl. Ex. 72) (Oct. 2016 email chain where Kim refers to "max 7 FS"). | Disputed. Wen did not agree that the Company would limit employees to inflating consumers' family size up to 7. Kim made the sole decision to set a family size limit of 6 or 7. *See* Pls.' Ex. 2.72 (Nguyen Decl. Ex. 72) (Kim referring to "max 7 FS" in an email chain Wen was not part of); Nguyen Declaration at ¶¶ 81-82 (Kim directing |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| | using a family size of 9); Wen Declaration at ¶ 128. |
| 156. Wen received email correspondence discussing the Company's practice of inflating family size up to 7.<br>*See* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 84-85; 87-90; Pls.' Ex. 2.73 (Nguyen Decl. Ex. 73) (Nguyen copies Wen on response to January 22, 2018 email involving discussion about "whether it was real FS or not and still sticking to 6 and 7" and complaining that sales reps were "using family sizes of 8,9 and 10!"); Pls.' Exs. 2.73-2.74 (Nguyen Decl. Exs. 74-74a). | Undisputed. |
| 157. Wen was informed of the Company's policy against having processors confirm the family size on file in DPP with the consumer.<br>*See* Pls.' Ex. 61 (November 8, 2018 email from Kim looping Wen into email chain about Company policy against customer service reps disclosing family size and income to consumers). | Disputed to the extent that the Plaintiffs are contending this was always the Company's policy. After Wen got involved, the Company implemented policies to confirm the consumer's family size. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her family size); Def.'s Ex. 32 (HR email re: processing protocols) (discussing protocol for changing family size); Wen Declaration at ¶¶ 134, 138, 144-146, 151-156, 166, 189-192. |
| 158. Wen received copies of inquiries from third parties about the use of fake family sizes in applications submitted by the Company to student loan servicers.<br>*See* Pls.' Ex. 65 (letter from BBB noting, "[s]ome consumers allege that | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| their information was falsified on their application by having more members in their household than they actually had causing their monthly fee to spike once it was corrected," and Wen's response dated April 17, 2007); Pls.' Exs. 62-64 (email and attachments regarding consumer who complained Company inflated her family size, among other things). | |
| 159. Wen was informed that it was the Company's practice to list married consumes as single in IDR applications. Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 58-59, 101-102; Pls.' Ex. 2.75 (Nguyen Decl. Ex. 75) (April 13, 2018 email chain with Wen and others discussing Company's practice of submitting everyone as single whether married or not); Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (April 13, 2018, email chain informing Wen and others that it was "very rare lol" for the Company to submit an application that did not include an incorrect family size or marital status). | Disputed to the extent that the Plaintiffs are contending this was always the Company's practice. After Wen got involved, the Company implemented policies to confirm the consumer's filing status. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her filing status); Wen Declaration at ¶¶ 134, 138, 144-146, 151-156, 166, 189-192. |
| 160. Wen had been informed of the Company's practice of listing married consumers as single in IDR applications prior to April 2018. Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55 (explaining he discussed the Company's practice of listing married consumers as single in IDR applications with Wen before April 2018). | Disputed. In approximately early 2018, Wen learned through reviewing emails that Wen was copied on that CAC sales representatives sometimes listed married consumers' filing status as single. *See* Wen Declaration at ¶¶ 131-133. |
| 161. Wen agreed that the Company should use numerous fictitious names to help dilute the number of consumer complaints against the Company. | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Pls.' Ex. 1 (Kim Decl.) at ¶¶ 77-78; Pls.' Ex. 1.9 (Kim Decl. Ex. 7) (calendar appointment with subject, "[c]hange DBA for all Corps to avoid complaints every 6 months" from Kim to Wen). | |
| 162. Wen knew that CAC/PSLC had negative online reviews. Pls.' Ex. 1 (Kim Decl.) at ¶¶ 73-74; Pls.' Ex. 1.8 (Kim Decl. Ex. 6) (Sept. 21, 2018 email from Wen to reputation management company contact regarding building positive online presence for Prime/FPS and suggesting certain popular review sites "should be omitted in order to avoid negative reviews (such as what happened with PSLC)."). | Undisputed. |
| 163. Wen helped retain a reputation management company to try to "develop a positive online presence" for Prime. Pls.' Ex. 1 (Kim Decl.) at ¶ 73; Pls.' Ex. 1.8 (Kim Decl. Ex. 6). | Undisputed. |
| 164. Wen was informed that at times the Company's chargeback rates exceeded 1%. See Pls.' Ex. 2.78 (Nguyen Decl. Ex. 78) (email chain and attachment from August 2018 between Wen, Nguyen, and others regarding excessive chargebacks); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 80-81; Pls.' Ex. 1.10 (Kim Decl. Ex. 8); see also Pls.' Ex. 77 (Email from Wen to Lai on December 14, 2018, noting that SL Account MGMT had "excessive" chargebacks in September 2018 that resulted in a chargeback ratio of 1.21%); Pls.' 78. | Undisputed. |
| 165. Wen had final say over the Company's refund policy. | Disputed. Wen informally supported and deferred to Nguyen's decisions on |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 99100; Pls.' Ex. 1 (Kim Decl.) at ¶ 83; *see also* Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (email chain between Wen and others from April 2018 discussing refund policy). | refunds because Wen thought Nguyen was fair and provided good customer service. *See* Pls.' Ex. 2.75 (Nguyen Decl. Ex. 75) (Nguyen making refund decisions); Ex. 2.76 (Nguyen Decl. Ex. 76) (Nguyen making refund decisions). |
| 166. Wen responded to select consumer complaints and inquiries from law enforcement. Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 124-125 (admitting that he sometimes reviewed and responded to correspondence to the Company from state law enforcement agencies or regulators); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 92-94; Pls.' Ex. 2.26 (Nguyen Decl. Ex. 26); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 75-76 (Wen responsible for handling complaints forwarded by state law enforcement agencies). | Undisputed. |

C. **Wen's Knowledge and Control of the Company's Fee Collection Practices**

| | |
|---|---|
| 167. In a February 2, 2018 email to CAC's attorney, Wen wrote: "Is it correct that the 100% compliant way to accept fees is: 1. For an independent third-party Dedicated Account Provider ('DAP') to collect the fees from the client; 2. The DAP will hold the client's fees in a trust account until the DAP can confirm a and verify that: - The client has received a positive result (such as a consolidation), and - The client completes his first payment towards such. 3. Then the DAP will release the client's fees to the document preparation company (such as Premier)." Pls.' Ex. 66. | Undisputed. |
| 168. As early as February 2018, the Company's client agreements included the | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| following provision: "4. No Advance Fees. Per the attached Client Trust Account Authorization, Company does not take any advance fees from Client. Company will designate an independent third-party dedicated account provider ('DAP') to collect and deposit payments that Client has agreed to make with Company, pursuant to the Fee and Service Schedule of this Agreement, and to deposit and hold Client's funds in a trust account established and serviced by the DAP. The DAP will not disburse any Client fees until Client has received a consolidation, adjustment, or otherwise satisfactory result, and Client completes one payment towards such." Pls.' Ex. 13 (Schneider Decl.) at ¶ 23. | |
| 169. On August 3, 2018, Wen wrote to CAC's outside counsel about a proposed corporate restructure, acknowledging that "TC/SLAM is processing for ~37k current active clients. All clients are 'paying upfront fees'. There is no way to be retroactively compliant." Pls.' Ex. 1 (Kim Decl.) at ¶¶ 101-104; Pls.' Ex. 1.12. | Undisputed. |
| 170. In an email chain from September 2018, Wen discussed advance fees and the TSR with outside counsel, noting "we understand the legal obligations." Pls.' Ex. 88. | Undisputed. |
| 171. Wen prepared an "Attestation Letter" for a payment processor dated March 18, 2019, stating: "Regarding upfront fees, SLAM has partnered with dedicated account providers who serve as banking and escrow platforms for its clients . . . SLAM does not collect any document preparation fees until services are fully rendered, the client's first payment is complete, and proof is shown to reflect that." Pls.' Ex. 67-68 (email and attachment transmitting attestation letter). | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 172. In March 2019, the Company did not condition its collection of fees on whether consumers had made an initial payment. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 65 ("The Company charged fees to consumers regardless of what happened to the consumers' student loan adjustment applications or whether consumers made new payments on adjusted loans. The Company did not have access to records showing whether consumers made payments on an adjusted loan, nor did it attempt to gather this information."). | Disputed. Around March 2019, First Priority conditioned its collection of fees on whether the consumer had made an initial payment and provided RAM and AMP with documentation of proof of performance. *See* Wen Declaration at ¶¶ 99, 101, 160-107. |
| 173. Wen was warned by counsel and third parties about compliance with the TSR's prohibition on collecting advance fees. *See* Pls.' Ex. 55 (Email re no advance fee model) (email from former CAC attorney dated July 26, 2017, noting debt relief model "should be done no advance fee" and that operating in select states "*would be the safest approach, assuming you run a no-advance fee program with application submission on behalf of the consumer to the DOE.*")[1]; Pls.' Ex. 1 (Kim Decl.) at ¶ 114; Pls.' Ex. 1.13 (Kim Decl. Ex. 12) (email chain including ACH provider warning Wen about compliance with TSR); Pls.' Ex. 69 (email chain from Aug. 30, 2018, between Wen and others where counsel to CAC cautions against describing the business as a "document preparation company," advising "I think you just call it what it is, a student loan relief provider, which is subject to the TSR debt relief rule, and the similar state regulations in some of the states."); Pls.' Ex. 88 (Sept. 4, 2018 email chain where outside counsel asks Wen and Kim, "[a]re you on top of the advanced payment issue? You previously told me that you were handling. We previously discussed this issue, along with TSR related | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| requirements. You indicated that it was being handled. This is a major issue so please let us know if you want to go over it again."). | |
| 174. In approximately 2018, Wen and Kim decided to explore setting up their Company to process consumer payments to make it look like the Company used a third-party dedicated account provider.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 95, 99; Pls.' Ex. 1.11 (Kim Decl. Ex. 10). | Disputed. In approximately 2018, Wen explored having a neutral and independent third-party form a dedicated account provider. *See* Wen Declaration at ¶¶ 90-93. |
| 175. Wen and Kim directed one of their employees, Ho, to build a portal for the Company to process payments.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 96-97. | Disputed. Wen did not direct Ho, or any other employee, to build a portal for the Company to process payments. The Company processed payments through the DPP CRM using its various merchant accounts. *See* Wen Declaration at ¶¶ 90-93. |
| 176. Wen took the lead on forming TAS 2019 LLC, which went by the name Trusted Account Services.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 105. | Undisputed. |
| 177. Trusted Account Services registered as a Wyoming corporation and set up a virtual office in July 2019.<br>Pls.' Exs. 89 (Receiver's Report) at 15:11-21; Pls.' Ex. 89.2. | Undisputed. |
| 178. Wen also recruited his long-time family friend, Kenny Huang, to be the nominal owner of TAS.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 113; Pls.' Ex. 3 (Huang Depo. Tr.) at 15:19-16:8. | Disputed. Wen asked Huang to form and operate TAS as an independent third-party. *See* Wen Declaration at ¶¶ 109-110, 112. |
| 179. At the time Huang agreed to be TAS's nominal owner, he had absolutely no experience in the escrow industry, nor did he gain any during his tenure as a purported owner of TAS.<br>Pls.' Ex. 3 (Huang Depo. Tr.) at 17:11-21. | Disputed. Wen asked Huang to form and operate TAS as an independent third-party. *See* Wen Declaration at ¶¶ 109-110, 112-113. |
| 180. Wen directed Huang to open TAS's bank account at HSBC. | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Pls.' Ex. 3 (Huang Depo. Tr.) at 28:8-22. | |
| 181. National Merchant Center (NMC) processed consumer payments for the Company's services that were deposited to TAS bank accounts at HSBC. *See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 15. | Undisputed. |
| 182. Huang assumed Wen was actually running TAS. Pls.' Ex. 3 (Huang Depo. Tr.) at 55:24-56:2. | Undisputed. |
| 183. Wen helped secure payment processing for TAS. Pls.' Ex. 1 (Kim Decl.) at ¶¶ 117-18; Pls.' Ex. 1.14 (Kim Decl. Ex. 14); *see also* Pls.' Ex 89 (Receiver's Report) at 17:1-21 (discussing Wen's efforts to set up processing for TAS); Pls.' Ex. 89.4 (April 2019 email chain regarding TAS processing application). | Undisputed. |
| 184. Wen created the email account tas2019llc@gmail.com. Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) at No. 35. | Undisputed. |
| 185. Wen had access to the email account tas2019llc@gmail.com and reviewed and sent emails from that address. Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) Nos. 36-37. | Undisputed. |
| 186. Huang did not have access to the tas2019llc@gmail.com email account and never sent emails from it. Pls.' Ex. 3 (Huang Depo. Tr.) at 18:25-19:14. | Undisputed. |
| 187. Wen and Kim reached out to Jimmy Lai to see if Lai would be willing to be listed as an owner on paper of TAS. Pls.' Ex. 1 (Kim Decl.) at ¶ 106. | Disputed. Wen reached out to Lai to help TAS obtain a merchant account. Later, Lai asked to purchase and be the majority owner and operator of TAS. *See* Def.'s Ex. 24 (Declaration of Jimmy Lai) at ¶ 1 ("I am the Managing Member and the majority owner of TAS 2019 LLC"); Wen Declaration at ¶ 116-118. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 188. Lai had assisted the Company in setting up merchant accounts and helping to reduce their chargeback rates.<br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 121. | Undisputed. |
| 189. Lai agreed to be listed as an owner of TAS in exchange for retaining an extra fee that the Company would collect for this purpose.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 108. | Disputed. Lai purchased majority ownership in TAS and made his own decisions on TAS's business and fees. *See* Def.'s Ex. 24 (Declaration of Jimmy Lai) at ¶ 7 ("While TCS is TAS's first client, the services provided by TAS are entirely independent and distinct from the business of any Defendant or Relief Defendant. TAS's business relationship with TCS is a 'proof of concept' for TAS before TAS is able to expand its client list. Indeed, I have already discussed with an acquiring bank the possibility of offering TAS's unique services to other businesses."); Wen Declaration at ¶¶ 117-118. |
| 190. In September 2019, at Wen's request, Huang signed paperwork adding Lai as an account signatory on the TAS HSBC account.<br>Pls.' Ex. 3 (Huang Depo. Tr.) at 31:15-33:12. | Disputed. Nguyen sent documents to Huang about the TAS HSBC bank account. *See* Pls.' Ex. 3 (Huang Depo. Tr.) at 31:17-21 ("So the bottom e-mail in the chain appears to be from Tuong21@hotmail.com, which I believe is Mr. Nguyen's e-mail address. It's addressed to you. It appears to be, "Hello, Kenny. See attachments for the documents that Jimmy Lee needed to add a signer to the TAS HSBC bank account.") |
| 191. Although Huang, and later, Huang and Lai, were TAS's nominal owners, TAS was operated by the Company using the Company's employees. | Disputed. Huang and Lai were independent third-party owners of TAS. Lai operated TAS. *See* Def.'s Ex. 24 (Declaration of Jimmy Lai) at ¶ 6 ("TAS is not owned or |

61

| | |
|---|---|
| *See* Pls.' Ex 89 (Receiver's Report) 14:16-21:5. | controlled (and has never been owned or controlled) by any Defendant or Relief Defendant. Since I have been involved with TAS, the only connection that TAS has had to any Defendant or Relief Defendant is that TAS was formed as a result of discussions I had with Mr. Wen regarding TCS's need to escrow its clients' funds, and TAS worked with TCS and Mr. Wen to establish the software portal through which TAS's systems could integrate with TCS's systems."); Wen Declaration at ¶¶ 116-117, 120. |
| 192. For example, the Receiver found log-in credentials for studentloanmgmt@trustedaccountservices.com on a post-it note in a customer service manager's work station that stated "sign on to private window or incognito" on site, as well as TAS checks.<br>Pls.' Ex. 89 (Receiver's Report) 16:16-22; Pls.' Ex 89.3 (post-it with credentials stating, "sign on to private window or incognito."). | Undisputed. |
| 193. Wen and his report, Ho, took the lead on getting TAS integrated into DPP's CRM database.<br>Pls.' Ex 89 (Receiver's Report) at 18:3-17. | Disputed. Wen assisted the Company's IT team with integrating TAS into DPP's CRM database. *See* Def.'s Ex. 24 (Declaration of Jimmy Lai) at ¶ 6 ("TAS worked with TCS and Mr. Wen to establish the software portal through which TAS's systems could integrate with TCS's systems.") |
| 194. Wen reviewed and edited the TAS client agreement.<br>Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) at No. 38. | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 195. Wen reviewed and edited the TAS website.<br>Pls.' Ex. 81 (Wen circulating edits to TAS website using personal email address). | Undisputed. |

**D. Wen's Destruction of Evidence and Conduct in Discovery**

| | |
|---|---|
| 196. On May 29, 2018, the Minnesota Attorney General's Office issued a civil investigative demand (CID) to Premier Student Loans, Inc., to the 173 Technology Drive address.<br>Pls.' Ex. 11 (Minnesota CID). | Undisputed. |
| 197. In mid-September 2018, the Company received a CID issued by the Bureau to CAC.<br>Pls.' Ex. 13 (Schneider Decl.) at ¶ 10. | Undisputed. |
| 198. CAC never provided a substantive response to the Bureau's CID, and instead insisted through bankruptcy counsel that the Bureau's action was subject to the automatic stay.<br>Pls.' Ex. 13 (Schneider Decl.) at ¶ 15; *see also* Pls.' Ex. 80 (Jan. 24, 2019 email chain with Wen and Company attorneys, who note that they invoked the automatic stay as a reason for not responding to MN civil investigative demand and proclaim, "let the games begin"). | Undisputed. |
| 199. Wen authorized CAC's decision to file for bankruptcy and to shift its sales operations to Prime.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 122-123, 138-140. | Undisputed. |
| 200. Within approximately two months of receiving the Bureau's CID, Wen and Kim directed Ho to delete all of the Company's @premierstudentloancenter.com emails. | Disputed. Based on a previous call with outside attorneys who advised Kim and Wen that it was ok to delete emails if the company shut down, which was a misunderstanding, Kim and Wen directed the Network Admin to delete CAC's emails after CAC shut down. Kim and Wen |

63

| | |
|---|---|
| Pls.' Ex. (Kim Decl.) at ¶¶ 129-131; Pls.' Ex. 85 (Dec. 2018 email chain that includes email from Wen stating: "Per our previous discussion, we deleted all PSLC emails and addresses. Our Network Admin contacted Hostgator to retrieve the emails and email addresses. Since we did not have backup turned on, Hostgator informed us that the emails and emails addresses are permanently deleted and no longer retrievable."). | later tried to retrieve the emails but were unsuccessful. *See* Pls.' Ex. 85 (Dec. 2018 email chain) (Wen refers back to "Per our previous discussion" and "Our Network Admin contacted Hostgator to retrieve the emails and email addresses. Since we did not have backup turned on, Hostgator informed us that the emails and emails addresses are permanently deleted and no longer retrievable.") |
| 201. Prior to the deletion of the @premierstudentloancenter.com emails, Wen had been advised by counsel not to delete the emails. Pls.' Ex. 85 (email dated Dec. 11, 2018, from outside counsel to Wen, copying Kim and Nguyen, stating "[m]y major concern is that the emails were deleted, which we advised you not to do."). | Disputed. Based on a previous call with outside attorneys, Kim and Wen misunderstood that it was ok to delete emails if the company shut down. *See* Pls.' Ex. 85 (Dec. 2018 email chain) (Wen refers back to "Per our previous discussion"). |
| 202. The deleted emails included emails showing that Wen knew the Company was including false information about family size and marital status in student loan adjustment applications, and that he did nothing to stop these practices. Pls.' Ex. 1 (Kim Decl.) at ¶ 132. | Disputed. When Wen became aware of the incorrect family size and filing status issues, Wen took corrective actions to stop and fix those issues. *See* Wen Declaration at ¶¶ 125, 131, 134, 144-147, 151-156, 165-166, 189-192. |
| 203. The deleted emails showed that Wen knew about misrepresentations to consumers about the Company's services, but he did not try to stop those practices. Pls.' Ex. 1 (Kim Decl.) at ¶ 133. | Disputed. When Wen became aware of misrepresentations about the Company's services, Wen took corrective actions to stop and fix those issues *See* Wen Declaration at ¶¶ 144-147, 156-157, 165-166, 189-192. |
| 204. Wen and Kim also discussed their belief that emails they decided to delete likely included emails between employees | Disputed. Kim and Wen did not have those discussions. *See* Wen Declaration at ¶¶ 125, 131. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| showing that the Company was charging advance fees, including false information in student loan adjustment applications, and making misrepresentations to consumers about its services.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 130, 135. | |
| 205. On or about October 23, 2019, Wen deleted text messages that included statements showing he was aware that the Company was violating the law and had done nothing to stop those practices.<br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 148151. | Disputed. Wen took corrective actions to fix many issues at the Company. *See* Wen Declaration at ¶¶ 144-147, 156-157, 165-166, 189-192. |
| 206. The deleted texts included communications through Signal, iMessage, and Skype.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 149. | Undisputed. |
| 207. The deleted texts dated back to at least November 2015.<br>Pls.' Ex. 1 (Kim Decl.) at ¶ 150. | Undisputed. |
| 208. On February 22, 2022, the People of the State of California (California) issued document requests and interrogatories to Wen.<br>Pls.' Ex. 20 (Mason Decl.) at ¶ 6. | Undisputed. |
| 209. On March 30, 2022, the Bureau issued document requests and interrogatories to Wen.<br>Pls.' Ex. 13 (Schneider Decl.) at 26. | Undisputed. |
| 210. On August 9, 2022, the Bureau's and California's motion to compel was granted and Wen was ordered to "provide complete, substantive responses to each of the Moving Parties' discovery requests" including the document requests and interrogatories issued by the Bureau and California. | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| Order on Pls.' Motion to Compel Defendant Kaine Wen's Responses to Outstanding Discovery (ECF No. 398). | |
| 211. To date, Wen has not responded to the Bureau and California's outstanding requests for documents and responses to interrogatories. *See* Pls.' Ex. 13 (Schneider Decl.) ¶¶ 26-29; Pls.' Ex. 20 (Mason Decl.) at ¶¶ 6-9. | Undisputed. |

**VII.   Consumers Paid over $95 Million to Companies Owned and Controlled by Wen and Suffered Additional Harms**

| | |
|---|---|
| 212. Between November 5, 2015, through October 2019, the Company collected $95,057,756.92 in net fees from consumers after accounting for refunds. Pls.' Ex. 12 (Heidari Decl.) at ¶ 7. | Undisputed to the extent that this figure is an approximation. |
| 213. The Company collected fees from at least approximately 81,000 consumers who did not receive any refund. Pls.' Ex. 12 (Heidari Decl.) at ¶ 7. | Undisputed to the extent that this figure is an approximation. |
| 214. The Company collected $1,205,776.83 in fees (not including refunds) from approximately 1,614 Minnesota consumers. Pls.' Ex. 19 (Pegg Decl.) at ¶ 5. | Undisputed to the extent that this figure is an approximation. |
| 215. The Company collected $4,483,915 in fees (not including refunds) from approximately 4,628 North Carolina consumers. Pls.' Ex. 20 (Evers Decl.) at ¶ 5. | Undisputed to the extent that this figure is an approximation. |
| 216. The Company collected approximately $8,112,188.83 in fees (not including refunds) from approximately 12,184 California consumers. Pls.' Ex. 21 (Mason Decl.) at ¶¶ 3-5. | Undisputed to the extent that this figure is an approximation. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 217. At times, consumers lost qualifying payments toward student loan forgiveness because the Company procured a loan consolidation on the consumer's behalf. *See, e.g.* Pls.' Ex. 31 (Honold Decl.) at ¶¶ 4, 12-13; Pls.' Ex. 41 (Rosca Decl.) at ¶ 16 (consumer lost qualifying payments she had already made toward loan forgiveness and had to start over under a new 20-year plan). | Undisputed. |
| 218. At times the Company's practices resulted in consumers owing increased interest on their student loan debts. *See* Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 15-16, 20 (consumer discovered that not only were her loans not forgiven, her interest rate increased as a result of Premier consolidating her loans); Pls.' Ex. 37 (Smith Decl.) at ¶ 16 (noting that she owes more now than she did when she signed up with PSLC because of accrued interest); *accord* Pls.' Ex. 16 (Lause Decl.) at ¶ 14 (discussing impact of falsifying family size or marital status in an IDR application). | Undisputed. |
| 219. The Company's practices caused some consumers to fall behind on their loan payments. *See* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 18-26 (consumer made four monthly payments of $298.75 that she thought were going toward her loan debt, but later learned from her loan servicer that was not the case); Pls.' Ex. 40 (Breemes Decl.) at ¶¶ 7, 10-11 (SLAM instructed consumer just to pay the Company, not her student loan servicer, and assured her they would | Undisputed. |

67

| | |
|---|---|
| coordinate with her servicer, but she later learned she had missed payments on her loans). | |
| 220. Consumers suffered additional financial harms due to the Company's practices.<br>*See* Pls.' Ex. 43 (Fomafung Decl.) at ¶¶ 114-16 (consolidation of consumer's loans increased his interest rate); Pls.' Ex. 25 (Thelen Decl.) at ¶ 14 (explaining it was more difficult to purchase a car because of the money she paid SLAM). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12. |
| 221. Consumers suffered emotional harm due to the Company's misrepresentations and its fee collection practices.<br>*See* Pls.' Ex. 25 (Thelen Decl.) at ¶¶ 12, 14 (consumer "could not eat or sleep for days" after learning the company had been shut down because she realized she had been "throwing her money away," and her experience with SLAM made her feel violated and caused her a lot of stress); Pls.' Ex. 35 (Hauser Decl.) at ¶ 17 (experience with the Company made her feel angry, upset, overwhelmed, ashamed, embarrassed, and led to panic attacks). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12. |
| 222. Consumers would not have signed up for the Company's services if they had known it would submit student loan adjustment applications containing false information.<br>*See* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18, 21 (married mother of one discovered Premier listed her as a single mother of three, would not have | Undisputed. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| enrolled with Company had she known this); Pls.' Ex. 30 (Berthiaume Decl.) at ¶ 29 (mother with two children would not have signed up if she had known SLAM was going to report her as having five dependents); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 15. | |
| 223. Consumers would not have signed up for the Company's services if they had known their payments to the Company were not going to pay down their loan balance. *See* Pls.' Ex. 34 (Liming Decl.) at ¶ 21; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 14; Pls.' Ex. 22 (Pugh Decl.) at ¶ 21; Pls.' Ex. 30 (Berthiaume Decl.) at ¶ 28; Pls.' Ex. 42 (Donaldson Decl.) at ¶ 20; Pls.' Ex. 33 (Varno Decl.) at ¶ 14; Pls.' Ex. 43 (Fomafung Decl.) at ¶ 17; Pls.' Ex. 27 (Kirsksey Decl.) at ¶ 11; Pls.' Ex. 29 (Metzig Decl.) at ¶ 15; Pls.' Ex. 37 (Smith Decl.) at ¶ 18; Pls.' Ex. 26 (Yimer Decl.) at ¶ 14; Pls.' Ex. 28 (Jangula Decl.) at ¶ 14. | Disputed to the extent that the Plaintiffs are contending this would have occurred in every case. Many consumers were satisfied with the Company's services that helped them obtain monthly payment reductions. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12. |
| 224. Consumers would not have signed up for the Company's services if they had known that the Company could not actually lower their monthly student loan payment. *See* Pls.' Ex. 26 (Yimer Decl.) at ¶ 13 (noting particular frustration that she was already on an income-based program when she enrolled, so Company could not have lowered her monthly payments). | Disputed to the extent that the Plaintiffs are contending this would have occurred in every case. Many consumers were satisfied with the Company's services that helped them apply to their student loan servicers to obtain a lower monthly student loan payment. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| 225. Consumers would not have signed up for the Company's services if they had known that it could not provide loan forgiveness. *See* Pls.' Ex. 38 (Simonenko Decl.) at ¶ 12; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 14; Pls.' Ex. 36 (Crawford Decl.) at ¶ 13; Pls.' Ex. 31 (Honold Decl.) at ¶ 17; Pls.' Ex. 42 (Donaldson Decl.) at ¶ 21; (would not have signed up if she knew FPS could not actually guarantee her loans would be forgiven); Pls.' Ex. 40 (Breemes Decl.) at ¶ 21; Pls.' Ex. 33 (Varno Decl.) at ¶ 15; Pls.' Ex. 43 (Fomafung Decl.) at ¶ 19; Pls.' Ex. 27 (Kirksey Decl.) at ¶ 12; Pls.' Ex. 29 (Metzig Decl.) at ¶ 16; Pls.' Ex. 24 (Sheahan Decl.) at ¶ 16; Pls.' Ex. 37 (Smith Decl.) at ¶ 19; Pls.' Ex. 25 (Thelen Decl.) at ¶ 15. | Disputed to the extent that the Plaintiffs are contending this would have occurred in every case. Many consumers were satisfied with the Company's services that helped them enter IDR plans towards loan forgiveness. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12. |

I, Defendant Kaine Wen, also contend that the following other material facts are in dispute:

| Material Fact In Dispute | Source |
|---|---|
| 1. Albert Kim ("Kim"), not I, formed CAC. | *See* Wen Declaration at ¶¶ 15-19. |
| 2. Kim asked me to invest in his future business. Kim told me he wanted to learn everything from the student loan document preparation company he was working for so he could start his own student loan document preparation company. Nguyen, who had experience in accounting, also agreed to become a part owner of the SL business. | *See* Wen Declaration at ¶¶ 4-7. |
| 3. I was investing in the SL business solely as a "silent" investor with no involvement or plans to be part of the | *See* Wen Declaration at ¶¶ 8-11. |

70

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| operations, and my primary contribution was financial only. In contrast, Kim, who invested a disproportionately lower amount, would be the full-time owner-operator of the start-up. | |
| 4. Previously, Kim worked at a loan modification company where he learned the business and then started his own loan modification company, which was the same blueprint Kim used for this business. | *See* Wen Declaration at ¶¶ 5, 14-15. |
| 5. The loan modification company that Kim owned and operated was Consumer Advocacy Center, Inc. ("CAC"). | *See* Wen Declaration at ¶¶ 16. |
| 6. Kim solely hired the website developer and provided the website content, the client fee agreement that CAC used, the fee structure for consumers, the sales script that CAC used, he solely developed the sales training and personally trained CAC sales representatives, provided the commission structure for sales representatives and personally interviewed and hired, or otherwise supervised the hiring of, the sales representatives for CAC. | *See* Wen Declaration at ¶¶ 23-44. |
| 7. I was not involved in any of the foregoing, consistent with my role as a silent investor, and I relied on Kim's expertise in the above as he was running all business operations. | *See* Def.'s Ex. 52 (Declaration of Keneth Hu) at ¶ 4 ("I only started to see Kaine Wen at the office in 2017, around June or July."); Wen Declaration at ¶¶ 49-55, 57. |
| 8. As a silent investor, I rarely went into the company's office, and in the rare instances that I did, it was during non-business hours. I did not have an office, a desk, a chair, or a computer at the office. | *See* Def.'s Ex. 52 (Declaration of Keneth Hu) at ¶ 4 ("I only started to see Kaine Wen at the office in 2017, around June or July."); Wen Declaration at ¶¶ 45-47 |
| 9. From November 2015 to June 2017, I occasionally communicated with Kim | *See* Wen Declaration at ¶¶ 56. |

STATEMENT OF GENUINE DISPUTES PURSUANT TO LOCAL RULE 56-2

| | |
|---|---|
| about the business, and only regarding budget concerns or my minor support work that I provided to the business. | |
| 10. From November 2015 to June 2017, I made a small amount of money at CAC, an average of less than $500 per month, because I was minimally involved and only provided minor support services at an hourly rate of $15-20 per hour.  For the year 2017, Kim earned $220,551 more than me. | *See* Wen Declaration at ¶¶ 58-66. |
| 11. Although I was involved in general business matters only, and compliance was specifically under Kim's purview, upon becoming aware that CAC began to receive Civil Investigative Demand letters from the State of Minnesota as well as the CFPB, I voiced to Kim and Nguyen that the company work with counsel that was sophisticated in these areas in order to ensure it was in compliance/come into compliance, and the company used the law firms Akerman LLP and Greenspoon Marder LLP for compliance matters. | *See* Wen Declaration at ¶¶ 76-77. |
| 12. While I received $1,551,515 from the SL Business, I have already turned over $3,088,382 through Ms. Dai, my mother. [ECF No. 298] Notably, $3 million of the money that my mother turned over was not derived, directly or indirectly, from the SL Business and was a gift that I had given her after I sold a previous investment so that she could retire. Accordingly, Plaintiffs have already recovered from me and my mother in excess of the approximately $1.55 million in net profit I obtained from the SL Business – approximately two times that amount. | *See* Wen Declaration at ¶¶ 244-245. |

72

| | |
|---|---|
| 13. I am currently working full-time as an office admin earning $16 per hour and I do not anticipate my income will substantially increase.<br>I do not have assets or money to pay any penalties, fines, or judgments, other than what has already been turned over to the Receiver or is in the process of being turned over to the Receiver, or otherwise disclosed in my financial statements. | *See* Wen Declaration at ¶¶ 248-249. |
| 14. I made a lot of poor decisions and mistakes and I accept full responsibility for my own actions.<br>I have paid a huge price. I have been incarcerated and I have lost all the money I made prior to investing in this Business. I have already turned over through my mother around $1.5 million more than what I made from this SL Business. My life and family have been ruined. I have committed to turn over the remainder of my assets as listed on my financial statements, including substantial assets that were derived prior to and entirely independent of the SL Business, to try and put an end to this and move on with my life, but the CFPB insists that I have cryptocurrency that I am hiding or refusing to turn over which is simply not the case. If I had access to or control of any additional cryptocurrency, I would gladly turn that over as well. | *See* Wen Declaration at ¶¶ 252-253. |

73