**BUREAU OF CONSUMER FINANCIAL PROTECTION**
SARAH PREIS (DC Bar No. 997387)
(admitted *pro hac vice*)
Tel.: (202)-435-9318
Email: sarah.preis@cfpb.gov
JESSE STEWART (NY Bar No. 5145495)
(admitted *pro hac vice*)
Tel.: (202)-435-9641
Email: jesse.stewart@cfpb.gov
N. NATHAN DIMOCK (DC Bar No. 487743)
(admitted *pro hac vice*)
Tel.: (202) 435-9198
Email: nathan.dimock@cfpb.gov
1700 G Street, NW
Washington, DC 20552
Fax: (844) 826-5016
LEANNE E. HARTMANN (CA Bar No. 264787)
(Local Counsel for the Bureau of Consumer Financial Protection)
301 Howard Street, Suite 1200
San Francisco, CA 94105
Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788
*Attorneys for Plaintiff the Bureau of Consumer Financial Protection*

*Additional Counsel for Plaintiffs Listed on Next Page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al., | CASE NO. 8:19-cv-01998 MWF (KS) |
| Plaintiffs, | **CONSOLIDATED STATEMENT OF UNDISPUTED AND DISPUTED FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT WEN** |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al., | Court: Hon. Michael W. Fitzgerald |
| | Date: April 24, 2023 |
| Defendants. | Time: 10:00 AM |
| | Place: Courtroom 5A |

*Additional Counsel for Plaintiffs Listed Below:

**THE PEOPLE OF THE STATE OF CALIFORNIA**
HYDEE FELDSTEIN SOTO, City Attorney (CA. Bar No. 106866)
CHRISTINA V. TUSAN, Supvr. Assistant City Attorney (CA. Bar No. 192203)
WILLIAM PLETCHER, Deputy City Attorney (CA. Bar No. 212664)
MIGUEL RUIZ, Deputy City Attorney (CA. Bar No. 240387)
Office Of the City Attorney
200 N. Main Street, 500 City Hall East
Los Angeles, CA 90012-4131
Tel.: (213) 473-6908/Fax: (213) 978-8112
Emails: christina.tusan@lacity.org / william.pletcher@lacity.org
*Attorneys for Plaintiff the People of the State of California*

**THE STATE OF MINNESOTA**
EVAN ROMANOFF (Attorney Reg. No. 0398223)
(admitted *pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 728-4126
Email: evan.romanoff@ag.state.mn.us
*Attorney for Plaintiff the State of Minnesota*

**THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (N.C. Bar No. 19397)
(admitted *pro hac vice*)
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
Tel.: (919) 716-6000/Fax: (919) 716-6050
Email: lweaver@ncdoj.gov
*Attorney for Plaintiff the State of North Carolina*

# Table of Contents

Index to Summary Judgment Exhibits ......................................................1

Exhibits Summitted with Plaintiffs' Reply in Support of Plaintiffs' Motion for Partial Summary Judgment ...........................................................10

Consolidated Statement of Plaintiffs' Undisputed Facts and Defendant's Facts ..........11

I.     Background.........................................................................11

       A.     Overview of Corporate Defendants .................................11

              1.     Consumer Advocacy Center Inc. d/b/a Premier Student Loan Center .............................................11

              2.     True Count Staffing Inc. d/b/a SL Account Management ...............14

              3.     Prime Consulting LLC, d/b/a Financial Preparation Services .........15

       B.     The Student-Loan Debt-Relief Enterprise ........................18

       C.     Federal-Student-Loan-Repayment and Forgiveness Programs ................30

II.    The Company's Purported Student-Loan Debt-Relief Services ..........35

       A.     Overview of the Sales Process .......................................35

       B.     The Company's High-Pressure Sales Culture and Minimal Compliance Measures ..............................................38

III.   The Company's Misrepresentations to Consumers ......................41

       A.     Representations about the Company's Fees .......................41

       B.     Representations about the Company's Services ...................51

       C.     The Company's Practice of Submitting IDR Applications Containing False Information ......................................65

              1.     Overview of Processing ......................................65

              2.     The Company's Misrepresentations Regarding Family Size and Marital Status in IDR Applications ................70

IV.    The Company Charged Advance Fees ....................................75

       A.     Overview of Fee Collection Practices ..............................75

B.   The Company's Limited Dealings with Purported Dedicated Account Providers ........................................................86

V.   The Company's High Complaint Volume, Chargebacks, and Refunds .............88

A.   Complaint Volume ........................................................88

B.   Refund Policy and Chargeback Rates ........................................97

VI.   Wen's Role in the Debt Relief Operation ........................................99

A.   Overview of Wen's Day-to-Day Role ........................................99

B.   Wen's Knowledge and Control of the Company's Deceptive Practices ........................................................108

C.   Wen's Knowledge and Control of the Company's Fee Collection Practices ........................................................118

D.   Wen's Destruction of Evidence and Conduct in Discovery ...................134

VII.   Consumers Paid over $95 Million to Companies Owned and Controlled by Wen and Suffered Additional Harms ........................................141

Plaintiffs' Statement of Genuine Disputes of Material Facts ........................................149

# INDEX TO SUMMARY JUDGMENT EXHIBITS

**Exhibits filed with Plaintiffs' Motion for Partial Summary Judgment (ECF 423-2 to 423-5).**

| Pls.' Ex. 1 | Declaration of Albert Kim and selected exhibits |
|---|---|
| Pls.' Ex. 1.1 | Exhibit 1 - Agreement of Joint Ownership |
| Pls.' Ex. 1.2 | Exhibit 2.1 - Company Profit and Loss Statement (January - December 2015) |
| Pls.' Ex. 1.3 | Exhibit 2.2 - Company Profit and Loss Statement (January - December 2016) |
| Pls.' Ex. 1.4 | Exhibit 2.3 - Company Profit and Loss Statement (January - December 2017) |
| Pls.' Ex. 1.5 | Exhibit 3 - January 29, 2018 email re: New Client Fee Agreement |
| Pls.' Ex. 1.6 | Exhibit 4 - Company Training Material |
| Pls.' Ex. 1.7 | Exhibit 5 - April 2018 email re: Cancellation and Refund Policy |
| Pls.' Ex. 1.8 | Exhibit 6 - September 2018 email re: Reputation management |
| Pls.' Ex. 1.9 | Exhibit 7 - February 2019 calendar appointment re: Change DBA for all Corps to avoid complaints every 6 months |
| Pls.' Ex. 1.10 | Exhibit 8 - March 2018 email re: Refunding clients |
| Pls.' Ex. 1.11 | Exhibit 10 - February 2018 email re: Client Trust Account |
| Pls.' Ex. 1.12 | Exhibit 11 - August 2018 email re: Corporate Structure Decision |
| Pls.' Ex. 1.13 | Exhibit 12 - February 2019 email re: Commitment to move forward for ACH payment processing…. |
| Pls.' Ex. 1.14 | Exhibit 14 - April 2019 email re: Online Form [] has been completed by Kenny Huang |
| Pls.' Ex. 2 | Declaration of Tuong Nguyen and selected exhibits |
| Pls.' Ex. 2.1 | Exhibit 1 - April 2019 email re: [Consumer] |
| Pls.' Ex. 2.2 | Exhibit 3 - May 2017 email re: [Consumer] |

| Pls.' Ex. 2.3 | Exhibit 4 - April 2018 email re: Cancellation and Refund Policy |
| Pls.' Ex. 2.4 | Exhibit 5 - January 2017 email re: [Consumer] |
| Pls.' Ex. 2.5 | Exhibit 6 - April 2019 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.6 | Exhibit 7 - August 2019 email re: Client [No.] |
| Pls.' Ex. 2.7 | Exhibit 8 - May 2019 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.8 | Exhibit 9 - December 2016 email re: [Consumer] |
| Pls.' Ex. 2.9 | Exhibit 10 - November 2016 email re: [Consumer] |
| Pls.' Ex. 2.10 | Exhibit 11 - October 2016 email re: [Consumer] |
| Pls.' Ex. 2.11 | Exhibit 12 - March 2017 email re: New Note Created on File [Consumer] |
| Pls.' Ex. 2.12 | Exhibit 13 - February 2017 email re: [Consumer] |
| Pls.' Ex. 2.13 | Exhibit 14 - March 2017 email re: [Consumer] |
| Pls.' Ex. 2.14 | Exhibit 15 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.15 | Exhibit 16 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.16 | Exhibit 17 - March 2017 email re: [Consumer] |
| Pls.' Ex. 2.17 | Exhibit 18 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.18 | Exhibit 19 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.19 | Exhibit 20 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.20 | Exhibit 21 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.21 | Exhibit 22 - February 2017 email re: [Consumer] |
| Pls.' Ex. 2.22 | Exhibit 23 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.23 | Exhibit 24 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.24 | Exhibit 25 - March 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.25 | Exhibit 26 - April 2018 email re: [Consumer] Complaint with IL and CA |

| Pls.' Ex. 2.26 | Exhibit 27 - April 2017 email re: [Consumer] |
|---|---|
| Pls.' Ex. 2.27 | Exhibit 28 - March 2017 email re: [Consumer] |
| Pls.' Ex. 2.28 | Exhibit 29 - May 2017 email re: [Consumer] cancel and refund money |
| Pls.' Ex. 2.29 | Exhibit 30 - April 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.30 | Exhibit 31 - April 2017 email re: [Consumer] Account |
| Pls.' Ex. 2.31 | Exhibit 32 - May 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.32 | Exhibit 33 - May 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.33 | Exhibit 34 - June 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.34 | Exhibit 35 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.35 | Exhibit 36 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.36 | Exhibit 37 - June 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.37 | Exhibit 38 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.38 | Exhibit 39 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.39 | Exhibit 40 - July 2017 email re: Loan Summary Statement Received! |
| Pls.' Ex. 2.40 | Exhibit 41 - July 2017 email re: Loan Summary Statement Received! |
| Pls.' Ex. 2.41 | Exhibit 42 - June 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.42 | Exhibit 43 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.43 | Exhibit 44 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.44 | Exhibit 45 - September 2017 email re: New Note Created On File: [Consumer] |

| Pls.' Ex. 2.45 | Exhibit 46 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.46 | Exhibit 47 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.47 | Exhibit 48 - July 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.48 | Exhibit 49 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.49 | Exhibit 50 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.50 | Exhibit 51 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.51 | Exhibit 52 - September 2017 email re: [Consumer] |
| Pls.' Ex. 2.52 | Exhibit 53 - August 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.53 | Exhibit 54 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.54 | Exhibit 55 - December 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.55 | Exhibit 56 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.56 | Exhibit 57 - September 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.57 | Exhibit 58 - November 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.58 | Exhibit 59 - December 2017 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.59 | Exhibit 60 - March 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.60 | Exhibit 61 - April 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.61 | Exhibit 62 - March 2018 email re: New Note Created On File: [Consumer] Plz handle this for me, or advise me how I should handle it and I will. |
| Pls.' Ex. 2.62 | Exhibit 63 - April 2018 email re: New Note Created On File: [Consumer] |

| Pls.' Ex. 2.63 | Exhibit 64 - March 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.64 | Exhibit 65 - September 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.65 | Exhibit 66 - August 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.66 | Exhibit 67 - August 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.67 | Exhibit 68 - August 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.68 | Exhibit 69 - August 2018 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 2.69 | Exhibit 70 - May 2017 email re: Letter of Explanation for Family Size |
| Pls.' Ex. 2.70 | Exhibit 71 - April 2017 email re: Premier Student Loan Center |
| Pls.' Ex. 2.71 | Exhibit 72 - October 2016 email re: [Consumer] |
| Pls.' Ex. 2.72 | Exhibit 73 - January 2018 email re: Files |
| Pls.' Ex. 2.73 | Exhibit 74 - April 2019 email re: Sales Call Audit |
| Pls.' Ex. 2.74 | Exhibit 74(a) - Attachment to 74 (with columns adjusted) |
| Pls.' Ex. 2.75 | Exhibit 75 - April 2018 email re: Cancellation and Refund Policy |
| Pls.' Ex. 2.76 | Exhibit 76 - March 2018 email re: Refunding clients |
| Pls.' Ex. 2.77 | Exhibit 78 - August 2018 email re: Mid [No.] SL ACCOUNT MGMT |
| Pls.' Ex. 3 | Excerpts from October 4, 2022 Deposition of Kenny Huang |
| Pls.' Ex. 4 | Exhibit 12 to Huang Deposition |
| Pls.' Ex. 5 | Excerpts from July 12, 2019 Investigative Hearing of Jovani Ortuno |
| Pls.' Ex. 6 | Documents from Electronic Merchant Systems |
| Pls.' Ex. 7 | Documents from Electronic Merchant Systems |
| Pls.' Ex. 8 | February 2018 email re: renaming CAC account |
| Pls.' Ex. 9 | Defendant Wen's Response to Bureau's First Request for Admissions |

| Pls.' Ex. 10 | Defendant Wen's Response to Bureau's Second Request for Admissions |
|---|---|
| Pls.' Ex. 11 | May 29, 2018 Civil Investigative Demand served by Minnesota Attorney General to Premier Student Loans, Inc. |
| Pls.' Ex. 12 | Declaration of Matt Heidari |
| Pls.' Ex. 13 | Declaration of Dani Schneider |
| Pls.' Ex. 13.1 | Behar February 2019 Letter |
| Pls.' Ex. 13.2 | Behar April 2019 Letter |
| Pls.' Ex. 13.3 | Defendant Wen's California Bar Results |
| Pls.' Ex. 13.4 | October 2019 Transcript of return call to investigator |
| Pls.' Ex. 13.5 | October 2019 Transcript of return call to investigator |
| Pls.' Ex. 14 | Declaration of Theresa Ridder |
| Pls.' Ex. 15 | Declaration of Michelle Marin (BBB Declaration) |
| Pls.' Ex. 16 | Declaration of Scott Lause (MOHELA) |
| Pls.' Ex. 17 | Declaration of Sarah Preis (Bureau) |
| Pls.' Ex. 18 | Declaration of Richard Anderlick |
| Pls.' Ex. 19 | Declaration of David Pegg (MN Decl.) |
| Pls.' Ex. 20 | Declaration of David Evers (NC Decl.) |
| Pls.' Ex. 21 | Declaration of Jay Mason (LA City Decl.) |
| Pls.' Ex. 22 | Declaration of Alyssa Pugh |
| Pls.' Ex. 23 | Declaration of Mildred Hershenson |
| Pls.' Ex. 24 | Declaration of Maxwell Sheahan |
| Pls.' Ex. 25 | Declaration of Brenda Thelen |
| Pls.' Ex. 26 | Declaration of Selam Yimer |
| Pls.' Ex. 27 | Declaration of Gregory Kirksey |
| Pls.' Ex. 28 | Declaration of Laura Jangula |
| Pls.' Ex. 29 | Declaration of Tracy Metzig |
| Pls.' Ex. 30 | Declaration of Lynne Berthiaume |
| Pls.' Ex. 31 | Declaration of Kristin Honold |
| Pls.' Ex. 32 | Declaration of Gregory Wilson |
| Pls.' Ex. 33 | Declaration of Sarah Varno |
| Pls.' Ex. 34 | Declaration of Jennifer Liming |
| Pls.' Ex. 35 | Declaration of Hildegard Hauser |
| Pls.' Ex. 36 | Declaration of Elaine Crawford |
| Pls.' Ex. 37 | Declaration of Javonna Smith |

| Pls.' Ex. 38 | Declaration of Victor Simonenko |
|---|---|
| Pls.' Ex. 39 | Declaration of Jennifer Etzel-Elaqad |
| Pls.' Ex. 40 | Declaration of Rochelle Breemes |
| Pls.' Ex. 41 | Declaration of Teresita Rosca |
| Pls.' Ex. 42 | Declaration of Novella Donaldson |
| Pls.' Ex. 43 | Declaration of Julius Fomafung |
| Pls.' Ex. 44 | CA SOS CAC certified records |
| Pls.' Ex. 45 | CA SOS True Count certified records |
| Pls.' Ex. 46 | CA SOS Prime certified records |
| Pls.' Ex. 47 | OC FBBS Premier |
| Pls.' Ex. 48 | OC FNBS SLAM |
| Pls.' Ex. 49 | OC FNBS Financial Preparation Services |
| Pls.' Ex. 50 | Allied Wallet Merchant Application |
| Pls.' Ex. 51 | Electronic Payment Systems Online Reporting Module |
| Pls.' Ex. 52 | February 2018 email re: Employees at PSLC and Employees that will be transitioned over to TC Staffing Corp. |
| Pls.' Ex. 53 | September 2018 FPS Compliance Script |
| Pls.' Ex. 54 | Financial Preparation Services Compliance Script |
| Pls.' Ex. 55 | July 2017 email re: Sign On The X-Student Loan States Reminder |
| Pls.' Ex. 56 | August 2019 email re: New Note Created On File: [Consumer] |
| Pls.' Ex. 57 | September 2018 email re: 2 Versions of Scripts |
| Pls.' Ex. 58 | Coffee's 4 Closers |
| Pls.' Ex. 59 | One Call Close |
| Pls.' Ex. 60 | November 2018 email re: [No.] |
| Pls.' Ex. 61 | November 2018 email re: [No.] |
| Pls.' Ex. 62 | September 2016 email re: BBB rebuttal for [Consumer] |
| Pls.' Ex. 63 | Letter to [Consumer] re: complaint |
| Pls.' Ex. 64 | September 2016 email re: complaint |
| Pls.' Ex. 65 | April 2017 Communications with BBB |
| Pls.' Ex. 66 | February 2018 email re: No Advance Fee - Compliance |
| Pls.' Ex. 67 | March 2019 email re: SL Account Management |
| Pls.' Ex. 68 | March 2019 Letter re: Attestation Letter |

| Pls.' Ex. 69 | August 2018 email re: PSLC Compliance Script 080818 |
| Pls.' Ex. 70 | July 2019 Communications with California Office of the Attorney General |
| Pls.' Ex. 71 | April 2019 Communications with California Office of the Attorney General |
| Pls.' Ex. 72 | June 2017 Communications with Kansas Office of the Attorney General |
| Pls.' Ex. 73 | June 2019 Communications with West Virginia Office of the Attorney General |
| Pls.' Ex. 74 | April 2017 Communications with California Office of the Attorney General |
| Pls.' Ex. 75 | October 2019 Communications with the North Carolina Department of Justice |
| Pls.' Ex. 76 | Script |
| Pls.' Ex. 77 | December 2018 email re: VCMP Month 1 Notification SL ACCOUNT MGMT |
| Pls.' Ex. 78 | January 2019 email re: VCMP Month 3 Notification SL ACCOUNT MGMT |
| Pls.' Ex. 79 | Visa Acceptance Risk: VCMP/VFMP Remediation Plan |
| Pls.' Ex. 80 | January 2019 email re: Chapter 11 filing for CAC and Premier |
| Pls.' Ex. 81 | April 2019 email re: Trusted Account Services Website |
| Pls.' Ex. 82 | September 2019 email re: TAS Client Agreement |
| Pls.' Ex. 83 | July 2017 email re: [Consumer] complaint against PSLC with State of Kanasa [sic] |
| Pls.' Ex. 84 | July 2017 Letter to Investigator |
| Pls.' Ex. 85 | December 2018 email re: CFPB CID to Hostgator |
| Pls.' Ex. 86 | November 2018 email re: Sales Scripts |
| Pls.' Ex. 87 | One Call Close |
| Pls.' Ex. 88 | September 2018 email re: Advanced payments |
| Pls.' Ex. 89 | Receiver's Report, ECF 75 |
| Pls.' Ex. 89.1 | Exhibit 10 - DBA list |
| Pls.' Ex. 89.2 | Exhibit 12 - TAS corporate documents |
| Pls.' Ex. 89.3 | Exhibit 14 - TAS credentials |
| Pls.' Ex. 89.4 | Exhibit 18 - April 2019 email re: Closure of Horizon processing account…. |

| Pls.' Ex. 89.5 | Exhibit 36 - Sales Commissions Calculations |
| Pls.' Ex. 89.6 | Exhibit 38 - HARD CLOSE: EVERY SINGLE CALL WITHOUT EXCEPTION |
| Pls.' Ex. 90 | January 16, 2019 Voluntary Petition for Non-Individuals Filing for Bankruptcy |
| Pls.' Ex. 91 | July 31, 2019 Order Directing the Appointment of a Chapter 11 Trustee |
| Pls.' Ex. 92 | Debtor Consumer Advocacy Center, Inc.'s and Albert Kim's Reply Memorandum in Support of Precautionary Joint Motion for Enlargement of Time to Comply with Turnover |
| Pls.' Ex. 93 | Intentionally Omitted |

**Note:** Plaintiffs have not attached certain exhibits to declarations and to the Receiver's Report that are duplicative of other exhibits in the record or that Plaintiffs are not relying on in their Statement of Undisputed Facts. Plaintiffs will submit those exhibits to the Court upon request.

**EXHBITS SUMMITTED WITH PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

| Pls.' Ex. 94 | Declaration of Jesse Stewart |
|---|---|
| Pls.' Ex. 95 | State Bar of California Printout: In the Matter of Kaine Wen Case No. 15-O-15791 |
| Pls.' Ex. 96 | Plaintiff Bureau of Consumer Financial Protection's First Requests to Produce Documents to Defendant Kaine Wen |
| Pls.' Ex. 97 | Plaintiff Bureau of Consumer Financial Protection's First Interrogatories to Defendant Kaine Wen |
| Pls.' Ex. 98 | Wen's Amended and Corrected Individual Financial Statement |

# CONSOLIDATED STATEMENT OF PLAINTIFFS' UNDISPUTED FACTS AND DEFENDANT'S DISPUTED FACTS[1]

## I. Background
### A. Overview of Corporate Defendants
#### 1. Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center

| # | Plaintiffs' UF and Sources | Def's SUF | Plaintiffs' Response – Revised SUF |
|---|---|---|---|
| 1. | Consumer Advocacy Center Inc. (CAC) was formed in 2014.<br><br>*See* Pls.' Ex. 44 (certified copies of documents filed with California Secretary of State); Pls.' Ex.1 (Kim Decl.) ¶¶ 4-5 (Wen and Kim formed CAC in 2014). | Undisputed. | Undisputed. |
| 2. | CAC operated under multiple names, including Premier Student Loan Center (Premier or PSLC).<br><br>*See* Pls.' Ex.1 (Kim Decl.) ¶ 77-78 (discussing decision to use multiple "doing business as" names due to growing concern about government detection); Pls.' Ex. 47 (CAC fictitious business name | Disputed. CAC operated under its only DBA, Premier Student Loan Center; See Pls.' Ex. 47 (OC FBBS Premier); Wen Declaration at ¶ 38. | Undisputed as to material facts.<br><br>Wen cites to the same exhibit as Plaintiffs, Pls.' Ex. 47, to show that CAC registered with the state using the DBA Premier Student Loan Center. He does not dispute that CAC also used unofficial "doing business as" names. |

---

[1] UF, as cited in Plaintiffs' Reply.

| | | | |
|---|---|---|---|
| | statement for Premier Student Loan Center). | | |
| 3. | CAC filed a statement of information with the California Secretary of State listing its address as 173 Technology Drive, Suite 202, Irvine, CA 92618 and identifying Albert Kim as its sole officer and President.<br><br>Pls.' Ex. 44; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 9 (explaining Wen was not listed as an owner in CAC's corporate registration documents because Kim and Wen "didn't think it was necessary to have [Wen] listed too."). | Undisputed. | Undisputed |
| 4. | CAC operated at 173 Technology Drive, Suite 202, Irvine, CA 92618.<br><br>Pls.' Ex. 44 (certified copies of documents filed with California Secretary of State); Pls.' Ex. 6 (email from Wen explaining to payment processor that CAC operated at 173 Technology Drive and would continue to do so after shift of certain | Disputed. From approximately August 2014 to July 2015, Kim operated CAC as a separate loan modification company in Anaheim, CA. From approximately November 2015 to December 2016, CAC operated in Rancho Santa Margarita, CA. From approximately January 2017 to September 2018, CAC operated at 173 | Undisputed as to material facts.<br><br>Wen asserts that CAC operated at a number of different addresses but does not dispute that from December 2016 until October 2019, CAC moved to and conducted business from 173 Technology Drive. Wen Decl. at ¶ 54 "In approximately December 2016, CAC moved from its Rancho |

| | | departments to related company). | Technology Dr, Ste 202 in Irvine, CA. See Pls.' Ex. 44 (CA SOS CAC certified records); Pls.' Ex. 7 (EMS Merchant Application); Wen Declaration at ¶ 54. | Santa Margarita, CA office to its Irvine, CA office at 173 Technology Dr." |
|---|---|---|---|---|
| | 5. | Kaine Wen and Albert Kim owned CAC jointly and equally.

Pls.' Ex. 50 (merchant services application to Allied Wallet identifying Wen and Kim each as 50% owners of CAC signed by Wen March 29, 2016); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 7; Pls.' Ex. 1.1 (Kim Decl. Ex. 1) (list of members, capital contributions, and indicating each had 50% ownership in CAC signed by Wen and Kim Oct. 1, 2015); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 102 (admitting that he signed Pls.' Ex. 1.1 on Oct. 1, 2015); Pls.' Ex. 51 at 7 (agreement with Electronic Payment Systems regarding its online reporting module signed by Wen as CAC's owner dated Sept. 8, 2017). | Disputed. Kim and Wen each owned 47.5% of CAC. Tuong Nguyen owned 5% of CAC. See Def.'s Ex. 1 (EMS merchant account application package) (showing Wen's 47.5% Equity Ownership); Def.'s Ex. 2 (Kaine Wen 2017 Trust document) (Wen gifting 5% of Wen's student loan business interest to Nguyen); Wen Declaration at ¶ 7. | Undisputed as to material facts.

Wen concedes that he and Kim each owned 47.5% of CAC, which would constitute joint and equal ownership.

Wen also asserts that he gifted 5% of his student loan business to Nguyen, but the document he cites, Def.'s Ex. 2, shows only that his Trust was directed to gift 5% of several businesses to Nguyen upon Wen's death. Wen is still living. |

| 6. | Wen provided approximately $30,000 in capital to fund CAC.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 8; Pls.' Ex. 1.1. (Kim Decl. Ex. 1). | Disputed. Wen provided $30,000 in initial starting capital. Wen later invested more money into the SL business by using personal and borrowed credit cards. *See* Wen Declaration at ¶¶ 8-9. | Undisputed as to material facts.<br><br>Wen does not dispute that he provided approximately $30,000 in initial starting capital to fund CAC.  He simply asserts that he later contributed additional funds. "I agreed to invest $30,000 while Kim invested $10,000 towards the SL Business's start-up capital." Wen Decl. at ¶ 8. "Later, I [Wen] invested more money in the SL Business by using personal and borrowed credit cards, another approximately $30,000 to $40,000." *Id*. at ¶ 9. |

### 2.   True Count Staffing Inc., d/b/a SL Account Management

| 7. | Wen formed True Count Staffing Inc. (True Count) in California in 2017.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 11; accord Pls.' Ex. 45 (certified copies of documents filed with California Secretary of State for True Count). | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| 8. | Wen owned and served as an officer of True Count, and he exercised substantial managerial control over its operations.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 112, 114. | Undisputed. | Undisputed. |
| 9. | True Count leased the property located at 8 Hughes Parkway, Suite 210, Irvine, CA 92618.<br><br>Pls.' Ex 89 (Receiver's Report) at 4:17-19. | Undisputed. | Undisputed. |
| 10. | True Count operated under the names SL Account Management and SL Account Mgmt (SLAM).<br><br>Pls.' Ex. 10 (Wen's Resp. 2nd Req. Admiss.) at Nos. 163, 167; Pls.' Ex. 48 (fictitious business name statement for SL Account Mgmt). | Undisputed. | Undisputed. |

### 3. Prime Consulting LLC, d/b/a Financial Preparation Services

| | | | |
|---|---|---|---|
| 11. | Prime Consulting LLC (Prime) is a Wyoming limited-liability company that registered with the California Secretary of State on April 25, 2018. | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 46 (certified registration records for Prime). | | |
| 12. | Prime leased the property located at 15621 Laguna Canyon Rd., Suite 200, Irvine, CA 92618.<br><br>Pls.' Ex. 89 (Receiver's Report) at 2:1. | Undisputed. | Undisputed. |
| 13. | Prime operated under the name Financial Preparation Services (FPS), as well as other names.<br><br>*See* Pls.' Ex. 49 (fictitious business name statement for FPS); Pls.' Ex. 89 (Receiver's Report) at 10:9, n.17 (noting Defendants' practice of deploying "multiple generic-sounding business names" and including list of names used by employee teams); Pls.' Ex. 89.1 (example of list found during immediate access of company names). | Undisputed. | Undisputed. |
| 14. | Prime's Statement of Information filed on September 13, 2018, with the California Secretary of State, | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | listed Le Ho as the President of Prime.<br><br>Pls.' Ex. 46 (certified registration records for Prime). | | |
| 15. | In September 2018, Le Ho (aka Calvin Ho) worked for Wen and Kim's debt-relief operation as a manager.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 16-17. | Undisputed. | Undisputed. |
| 16. | In response to a request from Wen and Kim, Ho agreed to be listed as the owner of Prime.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 18; *see* Pls.' Ex. 46 (certified registration records for Prime). | Undisputed. | Undisputed. |
| 17. | Wen and Kim controlled Prime.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 16; Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19. | Disputed. Prime was a front-end sales company. Kim, as the head of the Sales Departments, controlled Prime's sales operations. See Wen Declaration at ¶¶ 10, 42. | Undisputed after June 2017; partially in dispute by Wen before June 2017.<br><br>Wen does not dispute that he and Kim owned and controlled Prime, and the cited portions of his declaration indicate that Wen concedes he owned Prime; rather, Wen contends that Kim controlled sales operations and that sales employees reported to Kim, but |

| | | | only through June 2017. *See* Wen Decl. ¶¶ 10, 42. |
|---|---|---|---|
| 18. | Ho reported to Wen and Kim.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 19-20; Pls.' Ex. 1 (Kim Decl.) at ¶ 19. | Undisputed. | Undisputed. |
| 19. | Ho opened bank accounts in Prime's name at the direction of Wen and Kim.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 126 (Wen and Kim directed the opening of new bank accounts for Prime). | Undisputed. | Undisputed. |

**B. The Student-Loan Debt-Relief Enterprise**

| | | | |
|---|---|---|---|
| 20. | CAC, True Count, and Prime (collectively, the Company) operated together to offer, sell, and perform purported student-loan debt-relief services to consumers nationwide.<br><br>*See* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 1, 2 (admitting Company sold services to alter the terms of payments for consumers' federal student loans by preparing and | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | submitting applications for consolidation, income driven repayment (IDR) plans); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 3; Pls.' Ex. 18 at ¶ 3 (Anderlick Decl.) (Company used DPP customer relationship management software to conduct its business nationwide). | | |
| 21. | From at least November 5, 2015, through at least March 2018, CAC offered, sold and performed purported student-loan debt relief services. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 3; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 21; Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 11 (Company charged consumers starting Nov. 5, 2015, and CAC collected consumer fees from Nov. 2015, through Sept. 2018). | Undisputed. | Undisputed. |
| 22. | When it first began operating, CAC had a Sales Department and a Processing Department. Pls.' Ex. 1 (Kim Decl.) at ¶ 10; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. | Undisputed. | Undisputed. |

| 23. | The Sales Department handled sales calls with consumers.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. | Undisputed. | Undisputed. |
|---|---|---|---|
| 24. | The Processing Department primarily handled preparing and submitting paperwork to consumers' student loan servicers.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 8. | Undisputed. | Undisputed. |
| 25. | As the Company grew, it added Accounting/Billing, Customer Service, and later, a Human Resources Department.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 10; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 9. | Undisputed. | Undisputed. |
| 26. | Prior to March 2018, CAC collected fees from consumers for its purported student-loan debt-relief services.<br><br>Pls.' Ex. 12 (Heidari Decl.) at ¶ 11. | Undisputed. | Undisputed. |
| 27. | In March 2018, Wen and Kim shifted CAC's Processing, Customer Service, and Billing | Undisputed. | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | | Departments from CAC to True Count.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 14; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10 (CAC's processing functions transferred to True Count in March 2018); Pls.' Ex. 6 (emails between Wen and payment processor from February 2018 explaining shift from CAC to True Count). | | |
| | 28. | In March 2018, True Count began collecting payments from consumers directly and remitting a portion of the income to CAC, which stopped collecting fees from consumers in September 2018.<br><br>Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 11-12; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 14; *see also* Pls.' Ex. 6 (email chain between Wen and EMS representative where Wen discusses rollout of True Count and relationship with CAC); Pls.' Ex. 8 (Feb. 8, 2018 email from Wen asking for the name on CAC's merchant account to be changed to True Count | Undisputed. | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | | d/b/a SLAM); Pls.' Ex. 92 (CAC Bankruptcy proceeding ECF 131) at ¶ 5 (explaining True Count collected payments and remitted a portion back to CAC until Sept. 2018). | | |
| | 29. | When CAC transferred its processing department to True Count, True Count continued the same processing practices.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10. | Undisputed. | Undisputed. |
| | 30. | In late September 2018, Wen and Kim shut down CAC and transferred its operations over to Prime.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 16; *see also* Pls.' Ex. 2 (Nguyen Decl.) at ¶ 12 (Kim and Wen formed Prime; Prime took over sales and CAC filed for bankruptcy); Pls.' Ex. 92 (CAC bankruptcy proceeding ECF 131) at ¶ 5 ("In September of 2018, the Debtor (CAC) ceased operations and transferred all of its sales staff to Prime Consulting."). | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| 31. | In September 2018, True Count ceased making payments to CAC.<br><br>*See* Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 11-12 (True Count made payments to CAC from March to September 2018). | Undisputed. | Undisputed. |
| 32. | In September 2018, CAC stopped collecting fees from consumers.<br><br>*See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 11. | Undisputed. | Undisputed. |
| 33. | Even after CAC stopped collecting fees from consumers, True Count continued collecting fees from legacy CAC consumers.<br><br>*See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 17. | Undisputed. | Undisputed. |
| 34. | In September 2018, True Count began remitting a portion of the fees it collected from consumers to Prime.<br><br>Pls.' Ex. 12 (Heidari Decl.) at ¶ 12. | Undisputed. | Undisputed. |
| 35. | When CAC transferred its sales department to Prime, it continued the | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | same sales practices.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 124-27; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 10. | | |
| 36. | CAC filed for bankruptcy on January 16, 2019, in the Southern District of Florida.<br><br>Pls.' Ex. 90 (CAC's petition for bankruptcy). | Undisputed. | Undisputed. |
| 37. | During the time the student-loan debt-relief enterprise operated under CAC, True Count, and Prime, it used a customer relationship management system (CRM) called Debt Pay Pro (DPP).<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 20; Pls.' Ex. 18 (Anderlick Decl.) ¶ 3; Pls.' Ex. 92 (CAC bankruptcy proceeding ECF 131) at ¶¶ 3-5. | Undisputed. | Undisputed. |
| 38. | CAC, True Count, and Prime recorded fees paid by consumers and refunds of consumers' payments for their debt relief services in DPP.<br><br>Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 4, 7; Pls.' | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | | Ex. 1 (Kim Decl.) at ¶ 20. | | |
| 39. | CAC, True Count, and Prime also used Quickbooks for the entire time they operated to generate annual profit and loss statements.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 21; Pls.' Ex. 1.2-1.4 (Kim Decl. Exs. 2.1-2.3); *see also* Pls.' Ex. 10 (Wen's Resp. 2nd Req. Admiss.) at No. 193 (admitting that at times the Company used Quickbooks to maintain financial records, including profit and loss statements). | Undisputed. | Undisputed. |
| 40. | At times, CAC, True Count and Prime used the same address.<br><br>Pls.' Ex. 13 (Schneider Decl.) at ¶ 5a. | Undisputed. | Undisputed. |
| 41. | CAC, True Count, and Prime shared employees.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 17; *see also* Pls.' Ex. 52 (email from T. Nguyen copying Wen explaining shift of employees from PSLC to True Count); Pls.' Ex. 12 (Heidari Decl.) | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | at ¶ 16 (CAC and True Count paid the same individuals). | | |
| 42. | CAC, True Count, and Prime intermingled their business records.<br><br>Pls.' Ex. 13 (Schneider Decl.) at ¶¶ 20-22. | Disputed. CAC, True Count, and Prime kept separate business records. See Wen Declaration at ¶ 75. | Undisputed as to material facts.<br><br>Wen asserts that CAC, True Count and Prime "kept separate business records," but does not dispute that at the time of the immediate access, documents relating to the companies were comingled in various locations, including offices and cabinets. |
| 43. | CAC, True Count, and Prime used numerous, sometimes overlapping, DBAs.<br><br>*See* Pls.' Ex. 13 (Schneider Decl.) at ¶ 30-33 (discussing pretexting calls); Pls.' Ex. 89 (Receiver's Report) at 10:9, n.17 (noting Defendants' practice of deploying "multiple generic-sounding business names" and including list of names used by employee teams); Pls.' Ex. 89.1 (example of list found during immediate access of company names). | Disputed. The DBAs used by CAC, True Count, and Prime did not overlap. See Pls.' Ex. 47 (OC FBBS Premier); Pls.' Ex. 48 (OC FNBS SLAM); Pls.' Ex. 49 (OC FNBS Financial Preparation Services). | Undisputed as to material facts.<br><br>Wen cites to Plaintiffs' exhibits showing that the DBAs used by CAC, True Count and Prime did not overlap in terms of filings with Orange County, but does not dispute that in practice the employees of CAC, True Count, and Prime used numerous, sometimes overlapping, names for the companies. |

| 44. | Tuong Nguyen worked for the Company from approximately November 2015 through the date of the immediate access.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 5. | Disputed. Nguyen owned 5% of the Company. Nguyen and his consulting company, TN Accounting, also worked for the Company from approximately November 2015 through October 23, 2019. See Def.'s Ex. 1 (EMS merchant account application package) (showing Wen's 47.5% Equity Ownership); Def.'s Ex. 2 (Kaine Wen 2017 Trust document) (Wen gifting 5% of Wen's student loan business interest to Nguyen); Wen Declaration at ¶ 7. | Undisputed as to material facts.<br><br>Wen does not dispute that Nguyen worked for the Company from approximately November 2015 through the date of the immediate access.<br><br>Plaintiffs do not dispute that Nguyen's company, relief defendant TN Accounting, performed work for the Company.<br><br>Wen's contention that Nguyen owned 5% of the Company, even if true, does not contradict that Nguyen worked there. Moreover, Wen's 2017 Trust document is not probative, as it provides only that Wen intended to gift a portion of his student loan business interest to Nguyen upon Wen's death. |
| 45. | Nguyen served as Controller for the debt relief operation, and in that role helped oversee refunds and monitored chargebacks.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 107. | Disputed. Nguyen served as Controller, as well as numerous other roles, such as Processing Manager, Customer Service Manager, Billing Manager, Payroll Manager, and | Undisputed as to material facts.<br><br>Wen does not dispute that Nguyen served as Controller and helped oversee refunds and monitored chargebacks. Wen simply further |

| | | | |
|---|---|---|---|
| | | Accounting Manager. See Wen Declaration at ¶ 13. | asserts that at various times Nguyen held other roles in addition to Controller. |
| 46. | Nguyen also initially helped with processing and handling consumer complaints.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 22. | Undisputed. | Undisputed. |
| 47. | Nguyen also handled payroll for the debt relief operation.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 51. | Undisputed. | Undisputed. |
| 48. | The managers and directors of each department, as well as Ho and Nguyen, reported to Wen and Kim.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 20. | Disputed. From November 2015 to approximately July 2017, the managers and directors of each department reported to Kim. At all times, the Sales Directors and Sales Managers reported to Kim. Nguyen was an owner and did not report to Kim and Wen. Ho worked with Kim on CRM-related matters, Nguyen on payroll matters, and Wen only with regard to discrete auditing and technology matters. See Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 22 ("In the | Undisputed after June 2017; partially in dispute by Wen before June 2017.<br><br>Wen's citations to support an alleged dispute relate only to the pre-June 2017 time period.  *See* Wen Decl. at p. 5 (identifying time frame for the cited statements contained in the Wen Decl. at ¶¶ 20-55 as approximately November 2015 to June 2017), and at p. 9 (identifying the same time frame for the cited statements contained in the Wen Decl. at ¶¶ 56-66). |

| | | | |
|---|---|---|---|
| | | beginning, I observed Kim overseeing the Sales and Processing Departments on-site."); Wen Declaration at ¶¶ 10, 41-44, 55, 64, 70. | Wen refers to paragraph 70 of his declaration, which asserts that "Kim hid information from me by directing Nguyen directly." But nothing in paragraph 70 establishes that Nguyen didn't also report to Wen.

Wen does not dispute that by July 2017, he was "help[ing] more with CAC, besides just minor services" and working in the CAC offices.  Wen Decl. at ¶¶ 67-68.

Moreover, none of the sources cited by Wen stand for the proposition that "Nguyen was an owner and did not report to Kim and Wen." |
| 49. | Wen and Kim were the final decisionmakers for CAC, True Count, and Prime during the entire course of their operation.

Pls.' Ex. 1 (Kim Decl.) at ¶ 19; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 99. | Disputed. From November 2015 to approximately July 2017, Kim was the final decision maker for CAC. Kim made the final decisions for sales and Nguyen made the final decisions for billing, banking, and accounting. See Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 22 | Undisputed after June 2017; partially in dispute by Wen before June 2017.

Wen's citations to support an alleged dispute relate only to the pre-June 2017 time period. *See* Wen Decl. at p. 5 (identifying time frame for the cited statements contained in |

| | | | | |
|---|---|---|---|---|
| | | | ("In the beginning, I observed Kim overseeing the Sales and Processing Departments on-site."); Wen Declaration at ¶¶ 41-44, 55, 64, 70. | the Wen Decl. at ¶¶ 20-55 as approximately November 2015 to June 2017), and at p. 9 (identifying the same time frame for the cited statements contained in the Wen Decl. at ¶¶ 56-66).<br><br>Wen does not dispute that by July 2017, he was "help[ing] more with CAC, besides just minor services" and working in the CAC offices. Wen Decl. at ¶¶ 67-68.<br><br>Moreover, none of the sources cited by Wen stand for the proposition that "Nguyen made the final decisions for billing, banking, and accounting." |

**C. Federal-Student-Loan-Repayment and Forgiveness Programs**

| | | | | |
|---|---|---|---|---|
| 50. | The U.S. Department of Education (DOE) offers several federal-student-loan repayment and forgiveness programs to borrowers, all of which consumers can apply to for free.<br><br>*See* Pls.' Ex. 16 (Lause Decl.) at ¶¶ 12, 16-18. | Undisputed. | | Undisputed. |

| 51. | Income-driven repayment (IDR) plans may result in lower monthly payments for consumers.<br><br>Pls.' Ex. 16 (Lause Decl.) at ¶ 12. | Undisputed. | Undisputed. |
|---|---|---|---|
| 52. | For consumers who qualify for an IDR plan, student-loan servicers (not third-party debt-relief providers like the Company) determine a consumer's monthly loan-payment amount based on factors including the consumer's income, family size, marital status, and tax-filing status.<br><br>Pls.' Ex. 16 (Lause Decl.) at ¶ 12; *see* 34 C.F.R. §§ 685.209, 685.221. | Undisputed. | Undisputed. |
| 53. | The definition of "family size" under an IDR plan means "the number that is determined by counting the borrower, the borrower's spouse, and the borrower's children, including unborn children who will be born during the year the borrower certifies family size, if the children receive more | Undisputed. | Undisputed. |

than half their support from the borrower. A borrower's family size includes other individuals if, at the time the borrower certifies family size, the other individuals—(i) Live with the borrower; and

(ii) Receive more than half their support from the borrower and will continue to receive this support from the borrower for the year the borrower certifies family size. Support includes money, gifts, loans, housing, food, clothes, car, medical and dental care, and payment of college costs."

*See* 34 C.F.R. §§ 685.209(a)(1)(iv), 685.221(a)(3) (definition of family size under income-based and income-contingent repayment plans); *see also https://studentaid.gov/manage-loans/repayment/plans/income-driven/questions* (explaining definition of family size under all IDR plans).

| 54. | Consumers must recertify their eligibility for IDR programs annually and their monthly payment amount may vary year to year.<br><br>*See* 34 C.F.R. §§ 685.209, 685.221; Pls.' Ex. 16 (Lause Decl.) at ¶ 12. | Undisputed. | Undisputed. |
| 55. | Manipulating borrowers' family size or marital status on IDR plan applications may temporarily lower payments but can have negative consequences for borrowers.<br><br>*See* Pls.' Ex. 16 (Lause Decl.) at ¶ 14. | Undisputed. | Undisputed. |
| 56. | Under each type of IDR plan, any remaining loan balance may be forgiven if a consumer's student loans are not fully repaid by the end of the repayment period.<br><br>Pls.' Ex. 16 (Lause Decl.) at ¶¶ 18-19. | Undisputed. | Undisputed. |
| 57. | During the relevant time, IDR plans had repayment periods of 20-25 years, and consumers also in the Public Loan Service | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Loan Forgiveness Program could qualify for loan forgiveness after making 10 years of qualifying payments.<br><br>Pls.' Ex. 16 (Lause Decl.) at ¶ 18; 34 C.F.R. § 685.219 (borrower eligibility for Public Loan Service Program forgiveness). | | |
| 58. | Consumers may consolidate multiple federal education loans into one loan, which could provide additional loan repayment plans and forgiveness programs.<br><br>Pls.' Ex. 16 (Lause Decl.) at ¶ 9 (discussing circumstances when consolidation can provide access to certain IDR plans). | Undisputed. | Undisputed. |
| 59. | Consolidating federal loans can result in losing qualifying payments for loan forgiveness in connection with IDR plans.<br><br>Pls.' Ex. 16 (Lause Decl.) at ¶ 10. | Undisputed. | Undisputed. |
| 60. | From November 2015, through October 23, 2019, consumers | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | struggling to pay their loans could seek loan forbearance for a cumulative total of three years, and interest would typically continue to accrue during the forbearance, increasing the consumer's overall student loan debt over time. *See* Pls.' Ex. 16 (Lause Decl.) at ¶ 8 | | |

## II. The Company's Purported Student-Loan Debt-Relief Services
### A. Overview of the Sales Process

| | | | |
|---|---|---|---|
| 61. | The entire time it operated, the Company engaged in telemarketing or arranged for others to engage in telemarketing to market its student-loan debt-relief services to consumers. Pls.' Ex. 1 (Kim Decl.) at ¶ 38; Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 4-6; *see also* Pls.' Ex. 13 (Schneider Decl.) at Part III (discussing calls with Company and analysis of call recordings). | Undisputed. | Undisputed. |
| 62. | The Company used lead generators to identify | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | potential clients; lead generators, in turn, transferred interested clients via phone to an employee in the Sales Department.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 24. | | |
| 63. | The Sales Department handled sales calls with consumers.<br><br>Pls.' Ex.1 (Kim Decl.) at ¶ 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 25. | Undisputed. | Undisputed. |
| 64. | Every employee in the Sales Department was paid at least in part through commissions based on the number of consumers who enrolled in the Company's services.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 40-41; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 51 (noting sales employees paid in part based on commissions and noting "it benefitted sale employees financially to sell as many consumers as possible on the Company's services."); see also Pls.' Ex. 89 (Receiver's Report) at 27:9-19 (describing commission | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Wen Declaration at ¶ 172. | Undisputed before August 28, 2019; partially in dispute by Wen after August 28, 2019.<br><br>Wen cites only to his declaration, which in relevant part states that "Prime paused sales on August 28, 2019" and that "[d]uring the sales pause, Prime continued to pay the Sales Department employees, but at an hourly rate and not through any commissions." Wen Decl. ¶¶ 171-72. |

| | | | | |
|---|---|---|---|---|
| | | structure at time of immediate access). | | |
| | 65. | Employees in the Sales Department (salespeople) pitched the Company's purported services to consumers.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 43; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 25. | Undisputed. | Undisputed. |
| | 66. | Salespeople accessed consumers' loan information on the Federal Student Aid (FSA) website, either by asking the consumer for credentials or by creating an account for the consumer.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 44. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script asking the consumer to approve the Company using a soft credit inquiry to obtain student loan information). | Undisputed as to material facts.<br><br>Exhibit A to the Balestreri Declaration purports to have been updated on October 21, 2019, based on markings in the top left corner of each page, and the Balestreri Declaration does not assert any other time when it was in effect, *see* Balestreri Declaration ¶ 3. Wen cites to no evidence to dispute this fact before the date on the sales script. |
| | 67. | Salespeople, not the consumers, entered family size, income, and marital status data into the Company's customer relationship platform, DPP. | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 46; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 45, 47. | | |
| 68. | When quoting consumers' monthly payments under an IDR plan, salespeople used a formula based on family size (FS), income, and marital status to come up with a monthly payment amount.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 27; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 45 (employees were supposed to enter data so DPP could calculate an estimated monthly repayment amount). | Undisputed. | Undisputed. |

**B. The Company's High-Pressure Sales Culture and Minimal Compliance Measures**

| | | | |
|---|---|---|---|
| 69. | Salespeople were encouraged to create a sense of urgency to induce consumers to enroll.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 43-44; Pls.' Ex. 1.6 (explaining that training deck stating "SIGN OR DIE" and listing sales tactics that include creating | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did not | Undisputed as to material facts.<br><br>Exhibit A to the Balestreri Declaration purports to have been updated on October 21, 2019, based on markings in the top left corner of each page, and the Balestreri Declaration does not assert any other time when it was in effect, |

| | | | |
|---|---|---|---|
| | urgency and "fear of loss technique" reflects sales culture they tried to promote); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 32 (stating he heard salespeople tell consumers "that they had to sign up for the Company's services right away or certain loan repayment programs would go away."); Pls.' Ex. 41 (Rosca Decl.) at ¶ 8 (PSLC told consumer that President Obama started a loan forgiveness program that "Republicans in Congress were trying to put a stop to," which caused her to feel a sense of urgency about signing up); Pls.' Ex. 25 (Thelen Decl.) at ¶ 7 ("student loan advisor" from SLAM made consumer feel that if she didn't enroll right away, the opportunity might not be available later); Pls.' Ex 89 (Receiver's Report) at 27:4-28; Pls.' Ex 89.6 ("Hard Close" and "Same Day Pitch"). | create a sense of urgency to induce consumers to enroll). | *see* Balestreri Declaration ¶ 3. Wen cites to no evidence to dispute this fact before the date on the sales script. |
| 70. | Wen helped develop the commission structure for salespeople and, along | Disputed. Kim provided and developed the commission structure | Undisputed after June 2017; partially in dispute by Wen before June 2017. |

| | | with Kim, decided how employees were compensated.

Pls.' Ex. 1 (Kim Decl.) at ¶ 42. | for salespeople based on the commission structure of the student loan company he previously worked at, and Kim decided how sales employees were compensated. See Wen Declaration at ¶¶ 37-38. | Wen's citations to support an alleged dispute relate only to the pre-June 2017 time period. *See* Wen Decl. at p. 5 (indicating that time frame for statements contained in ¶¶ 20-55 was approximately November 15 to June 2017). |
|---|---|---|---|---|
| | 71. | In an email to Wen and Kim on July 25, 2017, CAC's then counsel wrote: "IMPORTANTLY: You are on the hook (liable) for any marketing misrepresentations that your sales representatives make. So please monitor them carefully, secret shop them, and make sure they are not putting your company and you at risk."

Pls.' Ex. 55 (Email re: no advance fee model). | Undisputed. | Undisputed. |
| | 72. | The Company did not consistently audit sales calls.

*See* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 88-91 (noting no | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | routine audits in April 2019); *see also* Pls.' Ex. 89 (Receiver's Report) at 32:3-4 (finding that prior to August 2019, compliance concerns and procedures were "sporadic"). | | |
| 73. | Although at some point the Company started using a "Compliance Script" during sales calls with consumers, consumers continued to complain that they were misled by the Company.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 106 (noting consumer complaints continued even after the Compliance Script was implemented). | Undisputed. | Undisputed. |

**III.  The Company's Misrepresentations to Consumers**
   **A. Representations about the Company's Fees**

| | | | |
|---|---|---|---|
| 74. | The Company misrepresented its fees to consumers.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 56 (admitting that during some telemarketing calls, "the Company represented to consumers that fees paid by consumers to | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) (Wen admitting only "during some telemarketing calls") at Nos. 29, 56; Def.'s Ex. 26 (Declaration of Nicole Balestreri In | Undisputed as to material facts.<br><br>Moreover, Exhibit A to the Balestreri Declaration purports to have been updated on October 21, 2019, based on markings in the top left corner of each page, and the Balestreri Declaration does not |

| | | | |
|---|---|---|---|
| | | the Company would be applied towards the consumers' student loans."); *see also* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 6-26 (explaining Company led her to believe her payments were toward her loans, and directed her to ignore emails from FedLoans about past due payments); Pls.' Ex. 42 (Donaldson Decl.) at ¶¶ 7, 14 (consumer who thought payments to the Company were going to her loan debt later "dismayed" to learn they had not); Pls.' Ex. 23 (Hershenson Decl.) at ¶¶ 3-4, 9-11 (consumer led to believe she was making payments on her loan through her payments to Premier, but was later informed by FedLoans that it had not received any of her payments); Pls.' Ex. 34 (Liming Decl.) at ¶¶ 12, 17-18 (consumer told fees would go towards paying off her loans but was later informed by FedLoans that none of the money she paid Premier went to her loans); Pls.' Ex. 35 (Hauser Decl.) at ¶¶ 13- | Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> misrepresent fees to consumers). | assert any other time when that sales script was in effect, *see* Balestreri Declaration ¶ 3. Other than his responses to Plaintiffs' requests for admissions, which provide no detail, Wen cites to no other evidence to dispute this fact before the date on the sales script. |

18 (Company told her it would "take over her loans" and she only needed to pay the Company, but later learned she still owed her servicer); Pls.' Ex. 27 (Kirksey Decl.) at ¶¶ 6-7, 10 (PSLC representative told consumer it would take over his loans, there was no need for consumer to communicate with the servicer, and he believed payments to the Company were going to his student loan debt, but later learned none of his payments went toward his debt); Pls.' Ex. 29 (Metzig Decl.) at ¶¶ 8, 13 (PSLC representative led her to believe $40 monthly payments were toward her student loans and directed her to stop paying her servicer but later learned the Company had not paid her debt at all); Pls.' Ex. 37 (Smith Decl.) at ¶¶ 8-9, 12 (PSLC representative indicated Company would take over her loans, she no longer needed to contact the servicer, and consumer believed her

payments to the Company were therefore going to pay down her loan balance, but she later learned the amount of her debt had ballooned); Pls.' Ex. 26 (Yimer Decl.) at ¶ 7 (PSLC representative never indicated payments to Company were fees and instead told her that PSLC would be "taking care" of her loans going forward and that, after five payments of $185, she would only have to pay $30/month for the next 20 years); Pls.' Ex. 28 Jangula Decl.) at ¶¶ 8, 10, 13 (PSLC representative claimed consumer only needed to pay the Company, which consumer understood would go toward paying her loans, but she later learned none of it did); Pls.' Exs. 62-64 (September 2016 email and attachments from Wen to Nguyen and Kim about consumer complaint); Pls.' Ex. 14 (Ridder Decl.) at ¶ 8 (discussing consumer complaints about the purpose of fees paid); Pls.' Ex. 1 (Kim Decl.) at ¶ 70 (one of top three

| | | | |
|---|---|---|---|
| | things consumers complained about was that Company employees told them monthly payments to Company would go toward consumer's student loans); Pls.' Ex. 86-87 (scripts claiming fees were for enrollment "into the government program"). | | |
| 75. | In some instances, salespeople stated or implied that consumers' payments to the Company were going toward student loans, when in fact the Company kept the payments from consumers.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 29 (admitting as to some consumers that the Company did not use funds collected from consumers to make payments to their loan servicers and otherwise stating lack of knowledge or information as to other consumers); 56 (admitting that during some telemarketing calls, "the Company represented to consumers that fees | Undisputed. | Undisputed. |

paid by consumers to the Company would be applied towards the consumers' student loans."); *see also* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 6-26 (explaining Company led her to believe her payments were toward her loans, directed her to ignore emails from FedLoans about past due payments, and that she later learned her servicer had not received any payments since before she started making her payments to the Company in April 2018); Pls.' Ex. 42 (Donaldson Decl.) at ¶¶ 7, 13-14, 16 (explaining sales representative led her to believe payments were going to pay down her loans but she later learned from Navient that was not the case); Pls.' Ex. 23 (Hershenson Decl.) at ¶¶ 3-4, 9-11 (consumer led to believe she was making payments on her loan through her payments to Premier, but was later informed by FedLoans that it had not received any of her payments); Pls.' Ex. 33 (Varno Decl.) at ¶¶ 4, 6 (Company enrolled her

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | in an IDR plan without her knowledge and led her to believe $20 payments were toward her loans, not the Company, but she later learned that was not true); Pls.' Ex. 34 (Liming Decl.) at ¶¶ 12, 17-18 (consumer told fees would go towards paying off her loans but was later informed by FedLoans that none of the money she paid Premier went to her loans); Pls.' Ex. 35 (Hauser Decl.) at ¶¶ 13, 15 (based on what Company told her, believed payments were going toward her student loans, but later learned that was not true); Ex. 27 (Kirksey Decl.) at ¶¶ 6-10 (PSLC representative told consumer it would take over his loans, there was no need for consumer to communicate with the servicer, and he believed payments to the Company were going to his student loan debt, but later learned none of his payments were applied to his loan debt); Pls.' Ex. 29 (Metzig Decl.) at ¶¶ 8-9, 13 (PSLC | | |

representative led her to believe $40 monthly payments were toward her student loans and directed her to stop paying her servicer, but she later learned it had not made any payments on her loan debt); Pls.' Ex. 37 (Smith Decl.) at ¶¶ 8-9, 12 (PSLC representative indicated Company would take over her loans, she no longer needed to contact the servicer, and consumer believed her payments to the Company were therefore going to pay down her loan balance, but she later learned the amount of her debt had ballooned); Pls.' Ex. 26 (Yimer Decl.) at ¶ 7 (PSLC representative never indicated payments to company were fees and instead told her that PSLC would be "taking care" of her loans going forward and that, after five payments of $185, she would only have to pay $30/month for the next 20 years, but she later learned from online research that her payments to the Company were only fees for its services);

| | | | |
|---|---|---|---|
| | Pls.' Ex. 28 (Jangula Decl.) at ¶ 8 (PSLC representative claimed consumer only needed to pay enrollment fee and monthly fee of $40 to the Company, which consumer understood would go toward paying her loans); *see also* Pls.' Exs. 62-64 (September 2016 email from Wen to Nguyen and Kim about consumer complaint); Pls.' Ex. 1 (Kim Decl.) at ¶ 70 (one of top three things consumers complained about was that Company employees told them monthly payments to Company would go toward consumer's student loans); Pls.' Ex. 18 (Heidari Decl.) at ¶ 18 (discussing review of certain Company general ledgers and bank accounts and concluding that he did not see any payments to student loan servicers). | | |
| 76. | Scripts and training materials implied fees paid by consumers were their student loan payments.<br><br>*See* Pls.' Ex. 1.6 (training desk used by | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response | Undisputed as to material facts.<br><br>Moreover, Exhibit A to the Balestreri Declaration purports to have been updated on October 21, 2019, based |

| | | | |
|---|---|---|---|
| | the Company stating, "LIST SELLING POINTS . . . No more HUGE payments ($700 month) Low manageable payments ($22, $32, $42/month)"). | To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> imply fees paid by consumers were their student loan payments). | on markings in the top left corner of each page, and the Balestreri Declaration does not assert any other time when that sales script was in effect, *see* Balestreri Declaration ¶ 3. Wen cites to no other evidence to dispute this fact before the date on the sales script. |
| 77. | In some instances, salespeople stated or implied that consumers' fees were for enrollment into a loan forgiveness program.

Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a-b; *see also* Pls.' Ex. 38 (Simonenko Decl.) at ¶¶ 4, 11 (stating Company told him he qualified for its loan forgiveness program, which would cost $30 per month, and that he later learned from his servicer he was not in a loan forgiveness program, contrary to statements made by Company representatives); Pls.' Ex. 22 (Pugh Decl.) at ¶ 5 (representative told her Premier could help lower her monthly payments and enroll her in a loan forgiveness | Undisputed. | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | program administered by DOE); Pls.' Ex. 33 (Varno Decl.) at ¶¶ 3-4 (representative told her that her loans would drop from $15,096 to $5,000 after making the first five payments of $239 to the Company). | | | |

**B. Representations about the Company's Services**

| 78. | Salespeople represented that the Company could lower consumers' monthly student loan payments.

*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 47; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 28, 47 (explaining Company's practice of inflating family size enabled it to provide lower monthly payment quote to consumers); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34d (discussing analysis of call recordings); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 5-9; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 6 (Company representative described it as a "student loan company authorized to lower our monthly debt"); Pls.' Ex. 34 (Liming Decl.) at ¶ 12 (Company | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> represent that the Company could lower consumers' monthly student loan payments). | Undisputed.

Wen proffers no evidence to rebut this fact. In fact, the Balestreri Declaration and referenced exhibit support Plaintiffs' UF 78. *See* Def. Ex. 26 ¶ 3 (noting that True Count and Prime assist consumers with paperwork for income-drive repayment programs), Def. Ex. 26, Ex. A at 1 ("we can . . . help you find the loan forgiveness program you may qualify for that will have the lowest monthly payment."). |

| | | | |
|---|---|---|---|
| representative told consumer fees would go towards paying down her loans and would be $239 for first five months and then $40 per month for ten years); Pls.' Ex. 35 (Hauser Decl.) at ¶ 7 (consumer facing $200 monthly payments told by South Coast Financial representative if she enrolled and paid $1,145 upfront, her monthly payment would drop to $32 until 2039); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 7 (SLAM representative told consumer he was "approved" for monthly payments of $128.70 for twenty years as part of an income-driven student loan forgiveness program); Pls.' Ex. 25 (Thelen Decl.) at ¶ 7 (SLAM representative told her it could definitely lower her payments); Pls.' Ex. 26 (Yimer Decl.) at ¶ 7 (consumer who was making $100 monthly payments was told she had to make five initial payments of $185 and then her monthly payments would be reduced to $30); Pls.' Ex. 27 (Kirksey Decl.) | | | |

| | | | |
|---|---|---|---|
| | at ¶ 6 (consumer who was making $100 monthly payments was told that after five monthly payments of $200, PSLC could lower his monthly payments to $30 for ten years); Pls.' Ex. 32 (Wilson Decl.) at ¶ 4 (Premier told him it could lower his monthly payments) *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 61 (admitting that during some Telemarketing calls, the Company told consumers that they were approved for a specific lower monthly payment on their student loans). | | |
| 79. | Salespeople told consumers that the Company could lower consumers' monthly payments even if the consumer was already in an IDR program.<br><br>*See* Pls.' Ex. 29 (Metzig Decl.) at ¶ 14 (explaining "worst part" of her experience with PSLC is that because she was already enrolled in an income-based repayment program, PSLC never could have lowered her | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did <u>not</u> represent that the Company could lower consumers' monthly payments even if the | Undisputed as to material facts.<br><br>Exhibit A to the Balestreri Declaration purports to have been updated on October 21, 2019, based on markings in the top left corner of each page, and the Balestreri Declaration does not assert any other time when that sales script was in effect, *see* Balestreri Declaration ¶ 3. Wen cites to no other evidence to dispute this |

| | | | |
|---|---|---|---|
| | monthly payment); Pls.' Ex. 26 (Yimer Decl.) at ¶ 13 (consumer was already on an income-driven repayment plan when she enrolled). | consumer was already in an IDR program). | fact before the date on the sales script. |
| 80. | In some instances, salespeople presented the estimated monthly payment amount to consumers as the amount that the consumer would have to pay until the loan was paid off.<br><br>Pls.' Ex. 2 at (Nguyen Decl.) ¶¶ 29, 35-38; Pls.' Ex. 2.1 (email dated April 24, 2019, from Sales Director stating, "[t]he way its [sic] pitched is still the same. [Sales employees] have them write down the numbers and tell them our fees over the course of 20 years is [sic] all they're going to have to pay and it's all interest free."); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 62 (admitting that during some sales calls, the Company represented that consumers' lower monthly payments would be in place over the entire loan term). | Undisputed. | Undisputed. |

| 81. | In some instances, salespeople told consumers they would owe a specific monthly payment amount, but that amount was based on a false family size and/or marital status. Pls.' Ex. 2 at (Nguyen Decl.) ¶¶ 28, 47, 49; 62, 84-87; Pls.' Ex. 2.73. 2.74 (exhibits to Nguyen Decl.); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 63-64 (admitting that during some Telemarketing calls, the Company represented to consumers that they qualified for or were eligible for lower monthly student loan payments, where such payment amounts had been calculated based on an incorrect family size or marital status); Pls.' Ex. 1 (Kim Decl.) at ¶ 47 (salespeople provided monthly student loan payment quote based on inflated family sizes). | Undisputed. | Undisputed. |
|---|---|---|---|
| 82. | When the Company began operating, it did not have any policies prohibiting employees from inflating consumers' family size | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | while selling or performing its services.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 4 9; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 28. | | |
| 83. | Salespeople also typically listed married clients as single in the Company's customer relationship management system (DPP) because that helped them provide a lower monthly payment quote during the sales pitch.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 48-49, 58; Pls.' Ex. 1.6 (Nguyen Decl. Ex. 4); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 64 (admitting that during some Telemarketing calls, the Company represented to consumers that they qualified for or were eligible for lower monthly student loan payments, where such payment amounts had been calculated based on a consumer being single, when the consumer was actually married). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her filing status); Wen Declaration at ¶¶ 144-146, 166, 189-192. | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>Wen does not dispute in his declaration that married clients were listed as single to lower payments. |

| | | | |
|---|---|---|---|
| 84. | Salespeople did not tell consumers that it was the Company's practice to use a false family size to provide a low monthly payment quote to consumers.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 31, 46-47, 63. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her family size); Wen Declaration at ¶¶ 144-146, 166, 189-192. | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>Wen does not dispute that salespeople did not tell consumers of the Company's practice of using false family sizes to lower payments. |
| 85. | In some instances, salespeople misled consumers about what counts as part of one's family size for an IDR plan application.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 73 (salespeople represented that a person could count as a family member if the consumer paid for a person's phone bill, bought the person lunch, or paid for the person's gas); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34e (discussing | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | analysis of call recordings). | | |
| 86. | Salespeople represented that the Company obtained or could obtain loan forgiveness for consumers.<br><br>*See* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 6, 9 (Premier representative assured consumer her loans would be forgiven in ten years, regardless of her employment status); Pls.' Ex. 36 (Crawford Decl.) at ¶¶ 4-5 (Premier told her it had ways of getting people approved for loan forgiveness and that if she made monthly payments of $95 for 240 months, the rest of her loan balance would be completely forgiven, saving her $18,470); Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶ 14 (Premier representative told her she had been approved for partial loan forgiveness so long as she continued to make monthly payments); Pls.' Ex. 40 (Breemes Decl.) at ¶ 7 | Disputed to the extent that the Plaintiffs are contending this occurred in every case. *See* Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did not represent that the Company obtained or could obtain loan forgiveness for consumers). | Undisputed as to material facts.<br><br>Exhibit A to the Balestreri Declaration purports to have been updated on October 21, 2019, based on markings in the top left corner of each page, and the Balestreri Declaration does not assert any other time when that sales script was in effect, *see* Balestreri Declaration ¶ 3. Wen cites to no evidence to dispute this fact before the date on the sales script. And Wen does not dispute in his declaration that salespeople represented that the Company could obtain loan forgiveness for consumers. |

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | (representative said she had been approved and her loan balance would be reduced from $45,000 to approximately $10,000); Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 4-6 (during initial call, representative told consumer with an approximately $148,820 loan balance that her loans were forgiven down to $33,611); Pls.' Ex. 43 (Fomafung Decl.) at ¶¶ 9-12 (PSLC told consumer it could reduce his loan debt from $65,000 to $17,000 so long as he made monthly payments of $40 until March 2028 and paid $1,195 enrollment fee); Pls.' Ex. 27 (Kirskey Decl.) at ¶¶ 6-7 (PSLC representative told consumer she could enroll him in a student loan forgiveness program that would lower his payments to $30/month for 10 years and that servicers "got mad at PSLC for enrolling people in student loan forgiveness programs" ); Pls.' Ex. 29 (Metzig Decl.) at ¶¶ 8-9 (PSLC | | |

representative told her she qualified for a program that offered "near total student loan forgiveness" and that if she paid six monthly payments of $199 and $40 monthly for ten years, the rest of her loans would be forgiven); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 7 (SLAM representative told consumer he was "approved" for monthly payments of $128.70 for twenty years as part of an income-driven student loan forgiveness program and debt would be forgiven if he made all payments); Pls.' Ex. 37 (Smith Decl.) at ¶ 7 (PSLC representative told him the Company could reduce her student loan debt by as much as 60%); Pls.' Ex. 25 (Thelen Decl.) at ¶ 9 (SLAM representative told consumer she was approved for loan forgiveness and would only have to pay $25,000 out of the $62,000 she owed); Pls.' Ex. 28 (Jangula Decl.) at ¶¶ 6, 8 (PSLC representative led her to believe that if she paid enrollment and monthly

| | | | |
|---|---|---|---|
| | fees to Company, $40,000 in student loan debt would be "wiped free"); Pls.' Ex. 32 (Wilson Decl.) at ¶¶ 4-5 (Premier told him he had to make payments to be enrolled into loan forgiveness program and that loans would be completely forgiven within five to ten years); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a, b (discussing analysis of call recordings); *accord* Pls.' Ex. 14 (Ridder Decl.) at ¶ 11(discussing consumer complaints about promises of loan forgiveness). | | |
| 87. | In some instances, salespeople stated or implied that their loans would be forgiven, in whole or in part, immediately after signing up for the Company's services.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 60 (admitting that during some telemarketing calls, the Company represented to consumers that, shortly after consumers enrolled in the | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Company's services, consumers' student loans would be forgiven in whole or in part); Pls.' Ex. 12 (Schneider Decl.) at ¶ 34a. | | |
| 88. | In some instances, salespeople stated or implied consumers had been approved for loan forgiveness when they had not.<br><br>*Compare* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at Attach. C (email stating "Congratulations! You have been approved for your new student loan forgiveness program."); Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 5-17 (discussing representations about loan forgiveness and explaining she later learned from loan servicer and by viewing her account online they were not true); Pls.' Ex. 25 (Thelen Decl.) at ¶¶ 9, 12, 15 (SLAM representative told consumer she was approved for a student loan forgiveness program and would only have to pay back approximately $25,000 out of the $62,000 she owed but she later | Undisputed. | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | | learned "it had all been a scam"); Pls.' Ex. 13 (Schneider Decl.) at ¶ 34a (discussing analysis of call recordings); *with* Pls.' Ex. 16 (Lause Decl.) at ¶¶ 16-19 (noting only the U.S. Department of Education can grant loan forgiveness and discussing related criteria). | | |
| | 89. | Company scripts stated or implied consumers were approved for federal student loan forgiveness programs during the sales call.<br><br>Pls.' Exs. 86-87 (at CFPB-20230125-0001691-92) (Sales Director transmitting script stating, "OK, I have some great news for you; it looks like I was able to get you approved for the federal student loan forgiveness program."). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that did not state or imply consumers were approved for federal student loan forgiveness programs). | Undisputed as to material facts.<br><br>Exhibit A to the Balestreri Declaration purports to have been updated on October 21, 2019, based on markings in the top left corner of each page, and the Balestreri Declaration does not assert any other time when that sales script was in effect, *see* Balestreri Declaration ¶ 3. Wen cites to no evidence to dispute this fact before the date on the sales script.<br>Wen does not dispute that salespeople stated or implied that consumers were approved for federal student loan forgiveness programs during the sales calls. |

| 90. | In some instances, salespeople told consumers that fees paid by consumers to the Company would be the only payments consumers would owe on their student loans after being accepted into an IDR Plan or loan-forgiveness program.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 57; Pls.' Ex. 32 (Wilson Decl.) ¶ 5 (consumer led to believe payments to Premier would be the only payments he would have to make to get his loans forgiven and that he would not have to make any additional payments directly to his servicer). | Undisputed. | Undisputed. |
| 91. | In some instances, salespeople claimed the Company had been able to obtain loan forgiveness for other consumers.<br><br>*See* Pls.' Ex. 13 (Schneider Decl.) at 33 (discussing pretexting call where Company employee stated: "Usually we're able to save you about | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | half, at least of what your current student loans are" and similar representations in other calls); Pls' Ex. 17 (Tr. of Return Call to Investigator Oct. 11, 2019) at 5:20-6:4. | | |

## C. The Company's Practice of Submitting IDR Applications Containing False Information

### 1. Overview of Processing

| | | | |
|---|---|---|---|
| 92. | Following the initial sales call, an employee in the Processing Department (processor) conducted a "welcome call" with the consumer.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 52; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 53. | Undisputed. | Undisputed. |
| 93. | It was Company policy for processors *not* to confirm the family size on file in DPP with the consumer.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 53; *see also* Pls.' Ex. 60 (Nov. 9, 2018 email from Kim looping Wen into discussion about Company policy against customer service reps disclosing family size and income to consumers); Pls.' Ex. | Disputed. After Wen got involved, the Company implemented policies to confirm the consumer's family size. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the | Undisputed before April 2019; partially disputed by Wen starting in April 2019.<br><br>Wen does not dispute the Company's policy of not confirming family size. He purports instead to have implemented policies to confirm family size at some point. *See* Wen Decl. ¶ 133-34. The evidence Wen cites suggests that at the |

| | | | |
|---|---|---|---|
| | 61 (Nov. 8, 2018 email to Wen and others noting consumer became very angry when rep "confirmed" she had a family size of 6 and noting reps should never confirm FS input by sales rep). | client being able to verify his or her family size); Def.'s Ex. 32 (HR email re: processing protocols) (discussing protocol for changing family size); Wen Declaration at ¶¶ 134, 144-146, 166, 189-192. | earliest, the Company confirmed family sizes with consumers starting in April 2019. *See* Ex. 32 (email dated August 16, 2019, purporting to instruct processing employees not to change family sizes but not directing them to confirm family sizes); Wen Decl. ¶¶ 142-144 (welcome email such as the Balestreri Ex. B used starting in about April 2019). Wen also addresses a purported compliance bot called Ultron at paragraph 166 of his declaration, but he does not explain how Ultron worked or whether it actually worked to ensure that client enrollments and files were handled appropriately. And at paragraphs 188-192 of his declaration, Wen only addresses the reverification campaign from mid-September 2019, but the Receiver found serious deficiencies in this purported recertification campaign. *See* Pls.' Ex. 89 at p. 1310, 1332-35. |
| 94. | Processors also changed the consumer's contact | Disputed to the extent that the Plaintiffs are | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | | information on file with the consumer's student loan servicer so that all correspondence would be sent to the Company, not the consumer.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 54; *see also* Pls.' Ex. 13 (Schneider Decl.) at ¶ 19 (detailing piles of mail addressed to consumers found during the immediate access). | contending this occurred in every case. In the instances that this occurred, Processors acted on a signed Special Limited Power of Attorney from the client. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit F (a sample Re-Verification Campaign enrollment package with the Special Limited Power of Attorney). | Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>Wen cites no evidence that this did not occur; in fact, Exhibit F to the Balestreri Declaration supports Plaintiffs' UF 94. |
| | 95. | Processors completed forbearance requests to temporarily halt the consumer's monthly student loan payments.<br><br>Pls.' Ex. 5 (Ortuno Investigational Hr'g Tr.) at 83:5-84:6. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit A (sales script that explains filing forbearance only if the student loans are in repayment status). | Undisputed as to material facts.<br><br>Exhibit A to the Balestreri Declaration purports to have been updated on October 21, 2019, based on markings in the top left corner of each page, and the Balestreri Declaration does not assert any other time when that sales script was in effect, *see* Balestreri Decl. ¶ 3. Wen cites to no other evidence to dispute this fact before the date on the sales script. |

| | | | |
|---|---|---|---|
| | | | |
| 96. | Processors signed the forbearance paperwork in the consumer's name, often without the consumer's consent.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 53-56; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 68 (admitting that at times the Company did not inform consumers that it would submit forbearance requests to student loan servicers on the consumers' behalf). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. In the instances that this occurred, Processors acted on a signed Special Limited Power of Attorney from the client. See Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 56 ("I used to personally email the forbearance paperwork to clients to sign"). | Undisputed as to material facts.<br><br>Wen cites to no support for his contention that "Processors acted on assigned Special Limited Power of Attorney from the client." Nguyen never mentions the use of a Special Limited Power of Attorney. Instead, in paragraph 54 of his declaration, Nguyen states that "Processors also changed the consumer's contact information in the loan servicer's system so that all correspondence from the servicer would come to the Company, not the consumer." In paragraph 55, he further explains that "[p]rocessors completed forbearance paperwork for consumers. From the beginning, it was the Company's practice to have Kim or processors sign the forbearance paperwork in the consumer's name without the consumer's consent." And in |

| | | | paragraph 56 he states that he "personally used to email the forbearance paperwork to clients to sign, but Kim directed me to stop sending it to clients to sign, so I started signing for consumers too." |
|---|---|---|---|
| 97. | Processors prepared applications for IDR plans and the corresponding annual recertification applications and submitted them to consumers' student loan servicers.<br><br>Pls.' Ex. 1 at (Kim Decl.) ¶ 52; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 57. | Undisputed. | Undisputed. |
| 98. | Consumers typically did not see the application the Company prepared before the Company submitted it to their student loan servicer.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 57. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit F (a sample Re-Verification Campaign enrollment package where the client sees the IDR application before the Company | Undisputed.<br><br>Wen does not cite any evidence to dispute that consumers typically did not see the applications before they were submitted.<br><br>Exhibit F to the Balestreri Declaration relates to the purported re-verification campaign, *see* Def. Ex. 26 ¶ 12, which Wen admits did not begin until approximately |

| | | submitted it to their student loan servicer); Wen Declaration at ¶ 189-192. | September 13, 2019, Wen Decl. ¶ 188.<br><br>Similarly, at paragraphs 188-192 of his declaration, Wen addresses only the reverification campaign from mid-September 2019. |
|---|---|---|---|

### 2. The Company's Misrepresentations Regarding Family Size and Marital Status in IDR Applications

| 99. | The Company typically submitted IDR applications on behalf of consumers that listed more children or dependents as part of the consumers' family size than consumers actually had.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 47-51; Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (email to Wen and others noting it was "very rare" for file to be submitted without a fake FS or marital status); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 60-63; Pls.' Exs. 2.5-2.69 (Nguyen Decl. Exs. 5-69) (examples of email correspondence discussing instances where the Company listed a false family size for consumers); Pls.' | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her family size); Wen Declaration at ¶¶ 144-146, 166, 189-192. | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>Wen does not dispute that the Company typically submitted applications that inflated the family size. |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | Ex. 56 (email chain that includes August 19, 2019 email to Kim noting that "[t]he way almost every advisor is pitching family size is pretty similar to this client. This client has no dependents, but his file has a family size of 7 on it."); *see also* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶¶ 7, 20-21, Attach. F (explaining she told the Company she had three dependents and later learned the Company had listed three dependents *and* three children in her application and attaching letter from Navient) (emphasis added); Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 5, 27 (stating she told the Company she had two children and later learned from FedLoans that the Company listed five dependents in application); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married mother of one discovered Premier listed her as a single mother of three); Pls.' Ex. 24 (Sheahan Decl.) at ¶¶ 5, 11 (married father-to-be later told | | |

| | | | | |
|---|---|---|---|---|
| | | by servicer that SLAM listed him as single with five dependents); Pls.' Ex. 25 (Thelen Decl.) at ¶¶ 8-9 (SLAM representative advised that consumer's adult daughter and four grandchildren who did not live with her and for whom she occasionally bought clothes and other things could count towards her family size); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 73 (admitting that at times, the Company submitted applications for IDR Plans to consumers' student loan servicers that listed family sizes greater than the family sizes provided to the Company by the corresponding consumers). | | |
| | 100. | The Company generally did not tell consumers that it was inflating their family in IDR applications.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 31; Pls.' Ex. 1 (Kim Decl.) at ¶ 57; *see also* Pls.' Ex. 39 (Etzel-Elaqad Decl.) at ¶¶ 7, 20-21, Attachment F (explaining she | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>Wen does not dispute that the Company generally did not tell consumers that it was inflating family size. |

| | | | |
|---|---|---|---|
| learned from her servicer that Company had submitted a false family size and attaching letter from Navient); Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 5, 27 (stating she told the Company she had two children and later learned from FedLoans that the Company listed five dependents in application); Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married mother of one discovered Premier listed her as a single mother of three); Pls.' Ex. 24 (Sheahan Decl.) at ¶¶ 5, 11 (married father-to-be later told by servicer that SLAM listed him as single with five dependents). | sample test Welcome Email that shows the client being able to verify his or her family size); Wen Declaration at ¶¶ 144-146, 166, 189-192. | Wen addresses a purported compliance bot called Ultron at paragraph 166 of his declaration, but he does not explain how Ultron worked or whether it actually worked to ensure that client enrollments and files were handled appropriately. And at paragraphs 188-192 of his declaration, Wen only addresses the reverification campaign from mid-September 2019. |
| 101. | In some instances, the Company misrepresented to consumers what could count as part of a consumer's family size in an IDR application.<br><br>Pls.' Ex. 13 (Schneider Decl.) at ¶ 34e; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 60, 72-73 (sharing examples he overheard, including a salesperson telling a consumer that | Undisputed. | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | | a person could count as member of their family if they paid for the person's phone bill, lunch, or gas bill, for example). | | |
| | 102. | The Company typically listed married consumers as single in IDR applications it submitted on their behalf.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55. Pls.' Ex. 1.7 (Kim Decl. Ex. 5); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 58-59; Pls.' Ex. 2.4 (Nguyen Decl. Ex. 40); Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 74 (admitting that CAC and True Count submitted applications for IDR Plans to consumers' student loan servicers that listed married consumers as single.); *see also* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18 (married consumer later discovered Premier listed her as single in her application). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her filing status); Wen Declaration at ¶¶ 144-146, 166, 189-192. | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>Wen does not dispute that the Company typically listed married consumers as single.<br><br>Wen addresses a purported compliance bot called Ultron at paragraph 166 of his declaration, but he does not explain how Ultron worked or whether it actually worked to ensure that client enrollments and files were handled appropriately. And at paragraphs 188-192 of his declaration, Wen only addresses the reverification campaign from mid-September 2019. |
| | 103. | The Company did not tell married consumers that it listed them as single in IDR plan applications. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 2 (Nguyen Decl.) at ¶ 63; Pls.' Ex. 1 (Kim Decl.) at ¶ 57. | (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her filing status); Wen Declaration at ¶¶ 144-146, 166, 189-192. | do not contend it always happened.<br><br>Wen does not dispute that the Company did not tell consumers that it listed them as single.<br><br>Wen addresses a purported compliance bot called Ultron at paragraph 166 of his declaration, but he does not explain how Ultron worked or whether it actually worked to ensure that client enrollments and files were handled appropriately. And at paragraphs 188-192 of his declaration, Wen only addresses the reverification campaign from mid-September 2019. |

## IV. The Company Charged Advance Fees

### A. Overview of Fee Collection Practices

| | | | |
|---|---|---|---|
| 104. | During the entire time it operated, the Company collected fees from consumers in exchange for its purported services.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) ¶ 58; Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 4, 7. | Undisputed. | Undisputed. |

| 105. | The Company charged two types of fees: an enrollment fee and a monthly fee.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 58. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. The Company charged an enrollment fee. Most of the time, the Company charged a monthly recertification fee. See Wen Declaration at ¶ 30. | Undisputed.<br><br>Wen does not cite any evidence in support of his contention.<br><br>In paragraph 30 of his declaration, Wen states that "Kim, at his sole discretion, adjusted CAC's fee structure and was responsible for the same and all decision making regarding the fees charged." Wen's statement does not support his contention that recertification fees were only charged most of the time. |
| 106. | The amount of the enrollment fee varied over time and ranged from approximately $799 to at least $1,899.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 59; *see also* Pls.' Ex. 39 (Etzel-Elaqad) at Attach. B (client agreement listing three enrollment fee payments of approximately $299); Pls.' Ex. 38 (Simonenko Decl.) at ¶ 5 (Company told him to pay $1,200 split across six months and then $30 per month); Pls.' Ex. 22 (Pugh Decl.) at | Disputed. At some times, Kim, at his sole discretion, adjusted the fee structure to less than $799. See Wen Declaration at ¶ 30. | Undisputed.<br><br>Wen does not cite any evidence in support of his contention. In paragraph 30 of his declaration, Wen states that "Kim, at his sole discretion, adjusted CAC's fee structure and was responsible for the same and all decision making regarding the fees charged." Wen's statement does not address the amount of any fees. |

| | | | |
|---|---|---|---|
| ¶ 12 (consumer first paid $284.75 for four months); Pls.' Ex. 36 (Crawford Decl.) at ¶¶ 6-8 (consumer made five payments of $239 to Premier and attaching a contract outlining additional fees); Pls.' Ex. 34 (Liming Decl.) at ¶ 12 (representative told consumer she had to pay $1,195 for an "enrollment fee that would go towards paying down my loan followed by $40 monthly payments which would also go towards paying off her loans over the course of ten years). | | | |
| 107. | The Company charged the enrollment fee in exchange for preparing consumers' consolidation or IDR application.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 3, 59. | Undisputed. | Undisputed. |
| 108. | The amount of the enrollment fee could vary depending on how soon the consumer could pay.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 60. | Disputed. The amount of the enrollment fee did not vary depending on how soon the consumer could pay. Consumers who agreed to not split the enrollment fee into | Undisputed.<br><br>The Receiver's report cited by Wen indicates that discounts could be applied if consumers paid the entire enrollment fee up front, |

| | | multiple payments received a $100 discount, but that was rare. See Pls.' Ex. 89 (Receiver's Report) at 28:18-19. | which is consistent with the fee varying depending on how soon the consumer paid the full fees. |
|---|---|---|---|
| 109. | The Company provided financial incentives for collecting more fees from consumers upfront; for example, if the consumer paid in full right away, the sales representative would receive a higher commission for that enrollment.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 60; *see also* Pls.' Ex. 89 (Receiver's Report) at 28:18-19 ("Consumers who agreed to immediately pay in full were rewarded with a $100 discount and sales advisors received bonuses."). | Undisputed. | Undisputed. |
| 110. | Most consumers paid at least part of the enrollment fee within two weeks of the sales call.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 60; *see also* Pls.' Ex. 1 (Kim Decl.) at ¶ 44; Pls.' Ex. 1.6 (exhibit to Kim Decl.) (training including | Undisputed. | Undisputed. |

"Same Day" pitches indicating consumers' first payment scheduled for the day of the call and that first payment must occur "today to start working on your file today and secure your rate in time."); Pls.' Ex. 89.5-89.6 (exhibits to Receiver's Report) ("Same Day Pitch" stating "[s]ince we are enrolling you into the program today, obviously the system will be setting your first payment for today"; confirming payment will be drafted that day; and "The Government is very strict with this. We must receive your first payment before they will start processing anything."); *accord* Pls.' Ex. 36 (Crawford Decl.) at ¶ 6, Attach. A at 5-6 (signed client agreement listing first payment within ten days); Pls.' Ex. 39 (Etzel-Elaqad) at ¶ 11, Attach. B at 3-4 (client agreement assessing all enrollment fees within first three months and listing date of first payment as enrollment date).

| | | | |
|---|---|---|---|
| 111. | By the time the Company submitted a student loan adjustment application, the Company had typically collected some or all of the enrollment fee.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 61; Pls.' Ex. 1.6 (Kim Decl. Ex. 4) (training including "Same Day" pitches indicating consumers' first payment scheduled for the day of the call and that first payment must occur "today to start working on your file today and secure your rate in time."); *see also* Pls.' Ex. 89 (Receiver's Report) at 12:7-12 ("During the initial sales call, Defendants acquire the customer's payment information and schedule the first payment, which is generally processed almost immediately after the customer executes the Services Agreement."). | Undisputed. | Undisputed. |
| 112. | The Company collected fees from consumers even if their loans were in forbearance, and the consumer therefore had | Undisputed. | Undisputed. |

|  |  |  |  |
|---|---|---|---|
| | not made a payment on an adjusted loan yet.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 64-65; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 9 (admitting as to some consumers). | | |
| 113. | The Company also collected monthly fees from consumers.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 62; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 14 (admitting Company collected monthly fees from some consumers in exchange for Student Loan Debt Relief Services). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Wen Declaration at ¶ 30. | Undisputed.<br><br>Wen does not cite any evidence in support of his contention.<br><br>In paragraph 30 of his declaration, Wen states that "Kim, at his sole discretion, adjusted CAC's fee structure and was responsible for the same and all decision making regarding the fees charged." Wen's statement does not rebut that the Company collected monthly fees from consumers. |
| 114. | The amount of the monthly fees varied over time and ranged from approximately $10-50 per month.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 62. | Undisputed. | Undisputed. |
| 115. | The Company charged monthly fees for filing recertification | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | paperwork for IDR plans during the year leading up to the annual recertification.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 62; Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 17 (admitting as to some consumers that the Company collected fees from consumers for preparing recertification paperwork for IDR plans before submitting recertification paperwork to student loan servicers). | | |
| 116. | The monthly recertification fee was supposed to be charged for the life of the consumer's loan.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 62. | Undisputed. | Undisputed. |
| 117. | The Company charged fees to consumers regardless of whether consumers had made new payments on adjusted loans.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 65; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 8-11 (admitting as to some consumers and | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 20 (August 2018 email re: Screen Shots of Final Repayment – Proof of Work) (RAM approving screenshots to verify that consumers had made new payments on adjusted | Undisputed.<br><br>Wen does not dispute that the company charged the advance fees, just whether it did so in every case. And his supporting evidence only addresses First Priority, RAM and TAS (not any of the other student loan companies or payment processors |

| | | stating lack of knowledge or information as to others that the Company: (1) collected fees from consumers before they had been approved for IDR plans, (2) while the consumers' loans were in forbearance, and (3) before the consumers had made a payment on a corresponding IDR plan or consolidated loan). | student loans); Def.'s Ex. 21 (November 2018 email re: RAM Service Agreement) (confirming First Priority will track proof of performance); Wen Declaration at ¶¶ 106-107, 122. | employed by the Company). But none of Wen's cited evidence establishes that these entities actually required proof that consumers made a payment on an adjusted loan before releasing consumer fees to the Company.

In paragraphs 106-107 of his declaration, Wen asserts that "to the best of [his] knowledge" First Priority submitted proof that the date for the first payment had passed before releasing funds, and that First Priority complied with the advance fee rules, but provides no explanation as to what constitutes the best of his knowledge or any foundation for such knowledge, nor does he assert that First Priority submitted proof that the first payment was actually made as opposed to just scheduled.

Wen instead cites to Def.'s Ex. 20 to his declaration, which appears to be an email in which an employee at RAM states that |

| | | | | screenshots will be sufficient to show proof of completion (but not that a first payment on an adjusted loan was made). However, the email does not assert that First Priority actually submitted such proof of work to RAM in advance of RAM releasing consumer funds, nor does Wen state this in his declaration.  Moreover, Def.'s Ex. 20 constitutes only the cover email and is missing any screenshot attachments.

In Ex. 21, Wen purports to refer to how the Company will "forward proof of completion of services," but nowhere does the exhibit indicate that such proof will include proof that the consumer made a first payment on an adjusted loan.

Wen states in paragraph 122 of his declaration that TAS would require proof of work, but does not state that any such proof was ever submitted or that TAS required proof of a consumer's first |

| | | | | payment on an adjusted loan before releasing funds.<br><br>Lastly, in his declaration at paragraph 22, Wen cites to the Lai declaration for his proposition, but as noted in Plaintiffs' Evidentiary Objections, the Lai declaration was withdrawn from the docket and is thus inadmissible and cannot be relied upon. |
|---|---|---|---|---|
| 118. | The Company did not have access to records showing whether consumers made payments on an adjusted loan, nor did it attempt to gather this information.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 65. | | Disputed. The Company had some access to records showing whether consumers made payments on an adjusted loan, and the Company attempted to gather this information for AMP, RAM, and TAS. See Def.'s Ex. 20 (August 2018 email re: Screen Shots of Final Repayment – Proof of Work) (The Company providing screenshots to verify that consumers had made new payments on adjusted student loans); Def.'s Ex. 21 (November 2018 email re: RAM Service Agreement) (confirming First Priority will track proof | Undisputed.<br><br>None of the evidence cited by Wen establishes that these entities actually required proof that consumers made a payment on an adjusted loan before releasing consumer fees to the Company. As further explained in the preceding entry, the evidence Wen cites shows only that the Company was communicating with processing companies about what evidence would be sufficient to show proof of work. Wen cites no evidence to show that the Company had payment |

| | | of performance); Wen Declaration at ¶¶ 106-107, 122. | information in real time, or that such information was provided to the processors. Lastly, in his declaration, Wen cites to the Lai declaration, but as noted in Plaintiffs' Evidentiary Objections, the Lai declaration was withdrawn from the docket and is thus inadmissible and cannot be relied upon. |
|---|---|---|---|

**B. The Company's Limited Dealings with Purported Dedicated Account Providers**

| 119. | During the entire time it operated, the Company did not make payments to creditors on behalf of consumers. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 71 (Kim and Wen knew employees told consumers monthly payments to the Company would go toward paying their loans and that such statements were incorrect); Pls.' Ex. 12 (Heidari Decl.) at ¶ 18 (noting that review of certain Company account or financial records did not reveal | Undisputed. | Undisputed. |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | evidence of payments to student loan servicers); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 29 (admitting as to some consumers that the Company "did not use funds collected from consumers to make payments to consumers' student loan servicers."). | | |
| 120. | The Company briefly contracted with two purported dedicated account providers (DAPs), Reliant Account Management (RAM) and Account Management Plus (AMP). Pls.' Ex. 1 (Kim Decl.) at ¶¶ 90-92. | Undisputed. | Undisputed. |
| 121. | The Company did not provide RAM or AMP with documentation indicating that a consumer had made an initial payment on an adjusted loan before those companies released fees paid by consumers to the Company. Pls.' Ex. 1 (Kim Decl.) at ¶ 93 (stating that while they were testing | Disputed. The Company provided RAM and AMP with documentation of proof of performance before RAM and AMP released fees paid by consumers to the Company. See Wen Declaration at ¶¶ 106-107. | Undisputed as to material facts. Wen cites only to paragraphs 106-107 of his declaration, where he asserts that "to the best of [his] knowledge . . . First Priority submitted proof of performance documentation indicating that a consumer's first due |

| | | | |
|---|---|---|---|
| | RAM and AMP, "the Company did not track when consumers made payments to student loan servicers on adjusted loans. And we continued to collect fees from consumers before submitting their student loan adjustment applications."). | | date on the consumer's adjusted payment had passed" before releasing funds, and that First Priority complied with the advance fee rules. But proof that the first due date on a consumer's adjusted loan has passed is not proof that the first payment was actually made. And Wen provides no explanation as to what constitutes the best of his knowledge, or any foundation for such knowledge. |
| 122. | The Company processed most consumer payments without using RAM or AMP. <br><br> *See* Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 14 (of the over $95 million in consumer fees the Company collected, less than $200,000 was collected through RAM and AMP after accounting for refunds); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 117-120. | Undisputed. | Undisputed. |

## V. The Company's High Complaint Volume, Chargebacks, and Refunds
### A. Complaint Volume

| | | | |
|---|---|---|---|
| 123. | Consumers submitted over 1,700 complaints | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | regarding the Company to the Consumer Financial Protection Bureau's internal consumer complaint database and the Federal Trade Commission's Consumer Sentinel Network.<br><br>Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 3-7. | | |
| 124. | Several consumers complained that they were misled about the purpose of the fees they paid to the Company.<br><br>*See* Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 7-8. | Undisputed. | Undisputed. |
| 125. | Several consumers complained that the Company told them their student loan payments had been lowered for the life of their loan.<br><br>Pls.' Ex. 14 (Ridder Decl.) at ¶¶ 9-10. | Undisputed. | Undisputed. |
| 126. | Several consumers complained that the Company promised their loans would be forgiven, in whole or in part, shortly after enrolling in its services. | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 14 (Ridder Decl.) at ¶ 11. | | |
| 127. | Several consumers complained that the Company submitted false information about their family size or marital status to their student loan servicers.<br><br>Pls.' Ex. 14 (Ridder Decl.) at ¶ 12. | Undisputed. | Undisputed. |
| 128. | Several consumers complained they were led to believe that the fees charged by the Company were necessary to participate and remain enrolled in the loan-forgiveness or IDR program, or were otherwise led to believe they must pay a fee to apply for loan forgiveness or IDR programs.<br><br>Pls.' Ex. 14 (Ridder Decl.) at ¶ 14. | Undisputed. | Undisputed. |
| 129. | Other consumers expressed concern that the Company was a fraud, stated that the Company lied to them, or indicated they did not receive the services they were promised.<br><br>See Pls.' Ex. 13 (Schneider Decl.) at ¶ 9. | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>Wen's evidence refers only to the Company's purported re-verification campaign, |

| | | | | |
|---|---|---|---|---|
| | | Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12; Wen Declaration at ¶¶ 189-192. | | which allegedly took place in mid-September 2019, *see* Wen Decl. ¶ 188-91. The recertification campaign occurred during this time frame when the Company had suspended sales activities. *See* Def. Ex. 26 ¶ 14. Moreover, the Receiver found serious deficiencies in this purported recertification campaign. *See* Pls.' Ex. 89 at p. 1310, 1332-35.<br><br>Lastly, the cited paragraphs of Wen's declaration address only the mid-September 2019 recertification campaign. |
| 130. | The Company received hundreds of complaints from third parties submitted on consumers' behalf.<br><br>*See* Pls.' Ex. 15 (Marin Decl.) at ¶¶ 3, 5-22 (Better Business Bureau (BBB) received complaints against PSLC, SLAM, FPS and related additional DBAs and informed the corresponding company of the complaint); *see also* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 92-97 (recalling | Undisputed. | | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | Company received approximately 30-50 letters from state agencies, each of which he shared with Wen); Pls.' Ex. 2.26 (Nguyen Decl. Ex. 26); Pls.' Ex. 70 (complaint from California Department of Justice dated July 2019); Pls.' Ex. .71 (complaint from California Department of Justice dated April 24, 2019); Pls.' Ex. 72 (complaint from Kansas Office of the Attorney General addressed to Wen's attention); Pls.' Ex. 73 (complaint from West Virginia Office of the Attorney General); Pls.' Ex. 74 (correspondence regarding complaint sent by California Department of Justice in March 2017); Pls.' Ex. 75 (correspondence regarding complaint from North Carolina Department of Justice); Pls.' Exs. 83-84 (July 20, 2017 email from Wen attaching response for State of Kansas Consumer Protection Division regarding a complaint). | | | |
| 131. | Consumers also contacted the Company | Disputed to the extent that the Plaintiffs are | Undisputed. Wen only disputes that this |

| | | |
|---|---|---|
| directly to complain about its marketing practices and its falsification of information in IDR applications.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 66-69; Pls.' Ex. 89 (Receiver's Report) at 33:5-18, n.37 (explaining Receiver identified approximately 150 "troubling contacts" from consumers via email to a single inbox since approximately Oct. 13, 2019, alone, and noting the Company may have received additional complaints to other email accounts as well). | contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12, and under Exhibit F (a sample Re-Verification Campaign enrollment package where the client sees the IDR application before the Company submitted it to their student loan servicer); Wen Declaration at ¶¶ 144-146, 189-192. | happened in every instance, but Plaintiffs do not contend it always happened.<br><br>Plaintiffs do not contend that every customer contacted the Company directly with complaints.  Moreover, Wen's evidence refers only to the Company's purported re-verification campaign, which allegedly took place in mid-September 2019, Wen Decl. ¶¶ 188-91. The recertification campaign occurred during this time frame when the Company had suspended sales activities. *See* Def. Ex. 26 ¶ 14. Moreover, the Receiver found serious deficiencies in this purported recertification campaign.  *See* Pls.' Ex. 89 at p. 1310, 1332-35. |
| 132. | The Receiver identified a TAS email box, studentloanmgmt@trustedaccountservices.com that was controlled and monitored by the Defendants. | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 89 (Receiver's Report) at 33:5-7. | | |
| 133. | The Receiver identified approximately 150 complaints from consumers in the studentloanmgmt@trustedaccountservices.com inbox.<br><br>Pls.' Ex. 89 (Receiver's Report) at 33:5-18. | Undisputed. | Undisputed. |
| 134. | The Receiver identified the following examples of consumer complaints received by studentloanmgmt@trustedaccountservices.com:<br>•"The payments that are being taken each month are not the payments I agreed to and not an amount I can manage. I need to hear back from someone asap and get this resolved."<br>•"If I'm paying $40/month, WHY has my student loan increased from $52k to $54k? . . . Instead of paying $52k to Nelnet, at the end of 240 payments, I will pay a total of $10,555 to Premier Student Loans? Will the balance be expunged from my financial obligation?" | Undisputed. | Undisputed. |

•"I have spoken to [Navient]- who holds my student loan per [Navient] they have nothing from you concerning my student loan and they are now delinquent. I need answer's and I am stoping [sic] Payment."

•"This is a scam and I want all of my money returned or I am prepared to legal [sic] action. My student loans are still showing up as unpaid on my credit report."

•"If I am going through this organization for my student loans, and if you are charging me $42.00 per month, I have two questions that are confusing me?"

1. "My loan amount has increased by $5,000 since I turned my information over to you."

2. "Fed Loan just sent me an email saying they are going to deduct $131 from my account each month starting November.

Can someone please explain all of this to me, and why did my amount increase?"

| | | | |
|---|---|---|---|
| • "This is a scam. You've been reported. Stop contacting me." <br><br> • "STOP TAKING THE AUTOMATIC PAYMENT IMMEDIATELY. I WANT A REFUND. The Department of Education called me – you are a fraud!" <br><br> • "I am just trying to figure out why I am still receiving bills from fedloan. They are saying I am behind and that I am not paying. I was told that I wouldn't have to worry about them once I sign on with you guys. Can you please explain." <br><br> • "This service was set up to help me with the payments at FEDLOAN SERVICING. I keep getting emails and phone calls saying my account is past due. Are the payments you're pulling from my account not being sent to the FEDLOAN SERVICING?" <br><br> • "Who is this payment going to? I just logged into my Fedloan Servicing Account, and none of my $40 monthly payments are showed as posting to my actual student loans. | | | |

| | | | |
|---|---|---|---|
| I am wondering who I am paying?" •"Why am I paying y'all money and fed loan servicing is reporting missed payments to the credit bureaus. It's messing up my credit score and I really do not need that." •"Is Navient aware that I am paying my student loans through this company now?" Pls.' Ex. 89 (Receiver's Report) at 33:17-35:9. | | | |

**B. Refund Policy and Chargeback Rates**

| | | | |
|---|---|---|---|
| 135. | At times, payment processors expressed concern about the Company's "excessive" chargeback rates. *See* Pls.' Ex. 2.78 (email chain from August 2018 between Wen, Nguyen, and NMC employees regarding excessive chargebacks); *See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 80-81, *See* Pls.' Ex. 1.10; Pls.' Ex. 77 (email to Wen noting that SL Account MGMT had "excessive" chargebacks in September 2018); Pls.' Exs. 78-79 (email chain | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | regarding excessive chargebacks and attaching remediation plan signed by Wen). | | |
| 136. | The Company enrolled in chargeback monitoring programs to help prevent chargebacks.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 110; *see also* Pls.' Ex. 78-79 (Wen sends VISA remediation plan to Lai on January 24, 2019, at p. 3 of remediation plan noting that company uses Pinpoint and EIDS to monitor chargebacks). | Undisputed. | Undisputed. |
| 137. | The Company implemented a liberal refund policy as part of its effort to keep chargeback rates down and to avoid drawing attention from law enforcement.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 83 ("The Company had a liberal refund policy because Wen and I thought that would help keep chargebacks and consumer complaints down. Based on my experience, consumers | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | who received a refund quickly were less likely to pursue a chargeback or to complain to a third-party. Wen agreed, and he and I were the final decisionmakers with respect to the refund policy."); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 99-103; Pls.' Exs. 2.75-2.76 (Nguyen Decl. Exs. 75-76). | | |

## VI. Wen's Role in the Debt Relief Operation

### A. Overview of Wen's Day-to-Day Role

| | | | |
|---|---|---|---|
| 138. | Wen and Kim controlled CAC from its inception through the date a court-appointed bankruptcy trustee took control of the Company.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19 (stating Wen and Kim owned each Company, were the final decisionmakers, and that there was no one higher than them at the Company); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 99 (Wen and Kim made all the big decisions for the Company); *see* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 104, 112, 114 (admitting he | Disputed. Kim owned and controlled CAC from 2014 through July 2015 when it operated as a loan modification company. Kim controlled CAC from November 2015 through approximately June 2017 when it operated as a student loan company. Kim always controlled CAC's sales operations. See Def.'s Ex. 3 (CAC 2014 Articles of Incorporation) (using Santibanez's Anaheim home address); Def.'s Ex. 51 (CAC 2017 Statement of Information); Wen Declaration at ¶¶ 41-44, 55, 64, 70. | Undisputed after June 2017; partially in dispute by Wen before June 2017.<br><br>Wen's cited evidence only relates to the period through June 2017. *See* Wen Decl. at p. 5 (indicating the time frame for the statements contained in ¶¶ 20-55 as approximately November 2015 through June 2017), and at p. 9 (same time frame for statements contained in ¶¶ 56-66).<br><br>Wen also refers to paragraph 70 of his declaration, which asserts that "Kim hid information from me by |

| | | | |
|---|---|---|---|
| | was an owner of CAC and True Count and that he "exercised substantial managerial responsibility for and control over Prime's business practices" for "some of the time period" between September 2018-October 22, 2019); Pls.' Ex. 91 (July 31, 2019 Order Directing the Appointment of a Chapter 11 Trustee and Setting a Status Conference in CAC's bankruptcy proceeding). | | directing Nguyen directly." But nothing in paragraph 70 establishes Wen did not control CAC.<br><br>Wen does not dispute that by July 2017, he was "help[ing] more with CAC, besides just minor services" and working in the CAC offices. Wen Decl. at ¶¶ 67-68. |
| 139. | Wen and Kim controlled True Count and Prime from their inception through October 23, 2019, the date of the immediate access.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶¶ 2, 19 (stating Wen and Kim owned each Company, were the final decisionmakers, and that there was no one higher than them at the Company); Pls.' Ex. 2 (Nguyen Decl.) at ¶ 99 (Wen and Kim made all the big decisions for the Company); *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) | Disputed. Prime was a front-end sales company. Kim, as the head of the Sales Departments, controlled Prime's sales operations. See Wen Declaration at ¶¶ 10, 42. | Undisputed after June 2017; partially in dispute by Wen before June 2017.<br><br>Wen does not dispute that he and Kim controlled Prime, and in fact the cited portions of his declaration indicate that Wen concedes he owned Prime; rather, Wen contends that Kim controlled sales operations and that sales employees reported to Kim through June 2017. *See* Wen Decl. ¶¶ 10, |

| | | | | |
|---|---|---|---|---|
| | at Nos. 104, 112, 114, 115 (admitting he was an owner of CAC and True Count and that he "exercised substantial managerial responsibility for and control over Prime's business practices" for "some of the time period" between September 2018 to October 22, 2019); Pls.' Ex. 89 (Receiver's Report) at Part II (discussing immediate access). | | | |
| 140. | When CAC began operating in November 2015, Wen communicated daily or every other day with Kim about their student-loan debt-relief operation.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 22; Pls.' Ex. 12 (Heidari Decl.) at ¶¶ 7, 11 (Company started collecting payments from consumers in November 2015). | Disputed. When CAC began operating in November 2015, Wen occasionally communicated with Kim about Wen's minor support work and budget concerns. See Wen Declaration at ¶ 56. | Undisputed after June 2017; partially in dispute by Wen before June 2017, but only as to the frequency of the communications through June 2017, not as to whether Kim and Wen communicated about the debt-relief operation.<br><br>Wen doesn't dispute that he communicated with Kim about the operation. He only disputes how often he communicated with Kim, and only until approximately June 2017. *See* Wen Decl. at p. 9 (indicating the time frame for statements contained in ¶¶ 56-66 as |

| | | | | |
|---|---|---|---|---|
| | | | | approximately November 2015 through June 2017).<br><br>In paragraph 56 of his declaration, Wen asserts that he was involved in the Company: "[f]rom late 2015 to approximately June 2017, I occasionally communicated with Kim about the SL Business, and only regarding budget concerns or minor support work that I provided to the business. For instance, Kim occasionally requested that I help revise documents that he prepared."<br><br>Wen does not dispute that by July 2017, he was "help[ing] more with CAC, besides just minor services" and working in the CAC offices. Wen Decl. at ¶¶ 67-68. |
| 141. | By mid-2016, Wen came into the office regularly, at least several times a week.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 23 (Wen began | Disputed. Wen rarely went to the office from November 2015 through June 2017. Wen did not go into the office more often until approximately July 2017. See Def.'s Ex. 52 (Declaration of Keneth | Undisputed after June 2017; partially in dispute by Wen before June 2017.<br><br>Wen does not dispute that he came into the office during the entire period cited. Wen only |

| | | | |
|---|---|---|---|
| | regularly coming into the office in 2016 and took a more active role in overseeing the Company). | Hu) at ¶ 4 ("I only started to see Kaine Wen at the office in 2017, around June or July."); Wen Declaration at ¶¶ 45, 68 (including footnote). | disputes how frequently he went to the office through approximately June 2017. Wen agrees that he went in the office to some extent through June 2017, then spent more time in the office starting in July 2017.<br><br>Moreover, Hu only states that he personally did not see Wen in the office until around June or July 2017, not that Wen was not going into the office. |
| 142. | Throughout 2016, Wen communicated daily—and typically multiple times a day—with Kim and others at the Company about all aspects of running the student-loan debt-relief operation.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23. | Disputed. Throughout 2016, Wen occasionally communicated with Kim or others at the Company, and primarily about Wen's minor support work and budget concerns. See Pls.' Ex. 2 (Declaration of Tuong Nguyen) at ¶ 22 ("In the beginning, I observed Kim overseeing the Sales and Processing Departments on-site."); Def.'s Ex. 52 (Declaration of Keneth Hu) at ¶ 4 ("I only started to see Kaine Wen at the office in 2017, around June or July."); Wen Declaration at ¶ 56. | Partially in dispute by Wen, but only as to the frequency of his communications with Kim in 2016.<br><br>Wen doesn't dispute that he communicated with Kim about the operation in 2016.  He only disputes how often he communicated with Kim in 2016.  *See* Wen Decl. at p. 9 (indicating time frame for statements contained in ¶¶ 56-66 as approximately November 2015 through June 2017).<br><br>Moreover, Hu only states that he personally |

| | | | did not see Wen in the office until around June or July 2017. Hu does not address whether and to what extent Wen communicated with Kim. |
|---|---|---|---|
| 143. | Wen was an account signatory for eight merchant accounts used by the enterprise and bank accounts in CAC and True Count's name.<br><br>Pls.' Ex. 12 (Heidari Decl.) at ¶ 10, App. D; *see also* Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 106, 107, 111, 113; Pls.' Ex. 1 (Kim Decl.) at ¶ 25. | Undisputed. | Undisputed. |
| 144. | Wen helped set up and maintain the Company's merchant accounts.<br><br>*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 25 (Wen primarily in charge of setting up merchant accounts and was the main point of contact for merchant account providers). | Undisputed. | Undisputed. |
| 145. | Wen received and had access to information about the Company's merchant account and payment processing | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | transactions, including refunds and chargeback information. *See* Pls.' Ex. 13 (Schneider Decl.) at ¶ 24 (discussing payment processing statements sent to Wen); Pls.' Ex. 51 (EPS module) (online merchant account portal document signed by Wen September 8, 2017, for CAC). | | |
| 146. | Wen helped determine the Company's consumer fee structure, including the amount of fees and when those fees could be collected. Pls.' Ex. 1 (Kim Decl.) at ¶ 28. | Disputed. Kim solely provided and developed the Company's consumer fee structure, including the amount of fees and when those fees could be collected. See Def.'s Ex. 4 (April 2016 email re: requesting consumer fee amounts) (Wen's email to Kim to find out consumer fee amounts); Wen Declaration at ¶¶ 27-30. | Undisputed after June 2017; partially in dispute by Wen before June 2017. Wen states in his declaration that Kim developed the fee structure and was responsible for decisions relating to fees for the time period of "November 2015 To Approximately June 2017." Wen Decl. at p. 5 (date range for statements contained in paragraphs 20-55). Def.'s Ex. 4 shows that by April 2016, Wen knew of the fee structure and had received the client fee agreement. |

| 147. | Wen drafted and approved contracts between the Company and consumers for the Company's services.

Pls.' Ex. 1 (Kim Decl.) at ¶¶ 29-31, Pls.' Ex. 1.5 (Kim Decl. Ex. 3) (email and attachment from Wen dated Jan. 29, 2019, noting on the last page that he added the "No Advance Fees" section, that Nguyen and Kim "won't bother to skim the new Agreement," and directing them to upload it into DPP). | Disputed. Kim drafted and approved contracts between the Company and consumers for the Company's services. Later, after the Company had used Kim's consumer contracts for nearly two years, Kim sometimes asked Wen help revise the consumer contracts, which Wen did. See Wen Declaration at ¶¶ 25-26, 88. | Undisputed after June 2017; partially in dispute by Wen before June 2017.

Wen states in his declaration that Kim developed the fee structure for the time period of "November 2015 To Approximately June 2017." Wen Decl. at p. 5 (date range statements contained in paragraphs 20-55).

At paragraphs 87-88 of his declaration, Wen admits that he drafted a "Dedicated Account Provider" agreement to "make the regulator[s] more likely to go away," even though the Company was not then using such a provider. |
|------|------|------|------|
| 148. | Wen was among the primary contacts for outside counsel for the Company.

Pls.' Ex. 1 (Kim Decl.) at ¶ 76. | Undisputed. | Undisputed. |
| 149. | Although Wen was admitted to the California bar in 2008, he was disciplined by the bar in July 2018 and disbarred in April 2021. | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 13 (Schneider Decl.) at ¶ 25; Pls.' Ex. 13.3. | | |
| 150. | Wen received and reviewed sales scripts for the Company.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at No. 110 (admitting that he reviewed some of the Company's scripts); *see also* Pls.' Exs. 56-58 (scripts claiming consumer approved for "federal student loan forgiveness program" sent to Wen by Sales Director); Pls.' Exs. 53-54 (Sept. 21, 2018 email and attachment "compliance script" that states the Company "does not take any upfront fees" and the consumers' payments would be held "in your Dedicated Client Account"). | Disputed. Kim solely provided and developed sales scripts for the Company. Wen assisted with reviewing the sales script only during the compliance efforts with outside attorneys in approximately Aug-Sep 2019. *See* Wen Declaration at ¶¶ 31-32, 186. | Undisputed.<br><br>Wen does not dispute that he received and reviewed scripts. Pls.' Exs. 57 and 58 show that Wen was provided copies of scripts in August 2018, and that those scripts claimed that consumers had been "approved for the federal student loan forgiveness program." Pls.' Ex. 58 at 3. |
| 151. | Wen used the following Company email accounts:<br>kwen@premierstudentloancenter.com<br>kaine@premierstudentloancenter.com,<br>kaine@slaccountmgmt.com,<br>kwen@slaccountmgmt.com, | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | kaine@financialpreparationservices.com, and kwen@financialpreparationservices.com.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 90-96. | | |
| 152. | At times, Wen also used personal email accounts to send emails about the Company, including kainewen@gmail.com, kainedai@yahoo.com, 777sierramadre@gmail.com.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 84-86, 96, 97; Pls.' Ex. 1 (Kim Decl.) ¶ 36. | Undisputed. | Undisputed. |
| 153. | Wen communicated about the debt relief operation with Kim and other Company employees in person, by phone, or via text or instant messaging applications such as Skype, Signal, and iMessage.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 37. | Undisputed. | Undisputed. |

**B. Wen's Knowledge and Control of the Company's Deceptive Practices**

| | | | |
|---|---|---|---|
| 154. | Wen was informed that employees were adding children or dependents to consumers' actual | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | family sizes when offering and performing the Company's services.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 49, 51; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 60-65; 77-78; Pls.' Exs. 2.8 (Nguyen Decl. Ex. 8), 2.26 (Nguyen Decl. Ex. 26), 2.65 (Nguyen Dec. Ex. 65), 2.74-75 (Nguyen Decl. Exs. 74-75) (describing Company's practice of using fake family size and that he raised this issue with Wen). | | |
| 155. | In approximately 2016 or 2017, Wen agreed that the Company would limit employees to inflating consumers' family size up to 7.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 51; *accord* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 77-82, 85-86; Pls.' Ex. 2.72 (Nguyen Decl. Ex. 72) (Oct. 2016 email chain where Kim refers to "max 7 FS"). | Disputed. Wen did not agree that the Company would limit employees to inflating consumers' family size up to 7. Kim made the sole decision to set a family size limit of 6 or 7. See Pls.' Ex. 2.72 (Nguyen Decl. Ex. 72) (Kim referring to "max 7 FS" in an email chain Wen was not part of); Nguyen Declaration at ¶¶ 81-82 (Kim directing using a family size of 9); Wen Declaration at ¶ 128. | Undisputed as to material facts.<br><br>The Nguyen declaration and exhibits that Wen cites do not refer to whether Wen agreed to the family size limit. The only other evidence Wen cites in support of his contention is paragraph 128 of his declaration. Paragraph 128 states: "Kim, at his sole discretion and based on his knowledge and experience, set a family size limit of 6 or 7." Paragraph 128 does not indicate one way or the other that Wen didn't also agree to the family size limit, even |

| | | | |
|---|---|---|---|
| | | | if, as Wen purports, Kim made the decision in the first instance. Thus, the fact is not disputed in a material way.<br><br>In paragraph 125 of his declaration, Wen states that he learned about inflated family sizes in late 2017 or early 2018. "In approximately late 2017 or early 2018, I became aware that Kim had allowed CAC sales representatives to increase the consumer's family size to offer a lower monthly payment quote and help gain sales, and that they were not simply employee errors like Kim had explained to me in the past." |
| 156. | Wen received email correspondence discussing the Company's practice of inflating family size up to 7.<br><br>*See* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 84-85; 87-90; Pls.' Ex. 2.73 (Nguyen Decl. Ex. 73) (Nguyen copies Wen on response to January 22, 2018 email involving discussion about | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | "whether it was real FS or not and still sticking to 6 and 7" and complaining that sales reps were "using family sizes of 8,9 and 10!"); Pls.' Exs. 2.73-2.74 (Nguyen Decl. Exs. 74-74a). | | |
| 157. | Wen was informed of the Company's policy against having processors confirm the family size on file in DPP with the consumer.<br><br>*See* Pls.' Ex. 61 (November 8, 2018 email from Kim looping Wen into email chain about Company policy against customer service reps disclosing family size and income to consumers). | Disputed to the extent that the Plaintiffs are contending this was always the Company's policy. After Wen got involved, the Company implemented policies to confirm the consumer's family size. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her family size); Def.'s Ex. 32 (HR email re: processing protocols) (discussing protocol for changing family size); Wen Declaration at ¶¶ 134, 138, 144-146, 151-156, 166, 189-192. | Undisputed.<br><br>Wen does not dispute that he was informed of this or that it was the Company's policy. Instead, he asserts that this was not always the policy, and once he was involved, the Company implemented policies to confirm family size. However, the evidence Wen cites purports to show that the Company did not seek to implement the policies until October 2018, at the earliest. *See* Ex. 32 (email dated August 16, 2019, purporting to direct processing employees not to change family size but not directing them to confirm family size); Wen Decl. ¶ 134 (asserting that upon learning of the policy, he "began taking corrective actions," but not indicating when |

those actions were taken); Wen Decl. ¶¶ 142-146 (asserting that a welcome email such as Balestreri Ex. B was used starting in about April 2019); Wen Decl. ¶¶ 151-56 (referring to compliance memos Wen purports were circulated in October 2018, instructing employees to verify family size, but not asserting that instruction was followed).

In his declaration at paragraph 133, Wen states that "Prior to early 2018, I was not aware that CAC sales representatives could list a married consumer as single to affect the consumer's monthly student loan payment." But Wen was informed about family size inaccuracies as early as September 2016. Pls.' Exs. 62-63 (Wen BBB rebuttal dated September 27, 2016), Ex. 64 (Nguyen email to Kim and Wen copying consumer complaint alleging family size inflated).

| | | | |
|---|---|---|---|
| | | | Wen also addresses a purported compliance bot called Ultron at paragraph 166 of his declaration, but he does not explain how Ultron worked or whether it actually worked to ensure that client enrollments and files were handled appropriately. And at paragraphs 188-192 of his declaration, Wen only addresses the reverification campaign from mid-September 2019. |
| 158. | Wen received copies of inquiries from third parties about the use of fake family sizes in applications submitted by the Company to student loan servicers.<br><br>*See* Pls.' Ex. 65 (letter from BBB noting, "[s]ome consumers allege that their information was falsified on their application by having more members in their household than they actually had causing their monthly fee to spike once it was corrected," and Wen's response dated April 17, 2007); Pls.' Exs. 62- | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | 64 (email and attachments regarding consumer who complained Company inflated her family size, among other things). | | |
| 159. | Wen was informed that it was the Company's practice to list married consumes as single in IDR applications.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 58-59, 101-102; Pls.' Ex. 2.75 (Nguyen Decl. Ex. 75) (April 13, 2018 email chain with Wen and others discussing Company's practice of submitting everyone as single whether married or not); Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (April 13, 2018, email chain informing Wen and others that it was "very rare lol" for the Company to submit an application that did not include an incorrect family size or marital status). | Disputed to the extent that the Plaintiffs are contending this was always the Company's practice. After Wen got involved, the Company implemented policies to confirm the consumer's filing status. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) under Exhibit B (screenshots of a sample test Welcome Email that shows the client being able to verify his or her filing status); Wen Declaration at ¶¶ 134, 138, 144-146, 151-156, 166, 189-192. | Undisputed.<br><br>Wen does not dispute that he was informed of the Company's practice. *See, e.g.*, Wen Decl. ¶ 133 (claiming to have been informed by early 2018). Instead, he asserts that once he was more involved, the Company implemented policies to confirm consumers' filing status. However, the evidence Wen cites purports to show that the Company did not seek to implement the policies until October 2018, at the earliest. Wen Decl. ¶ 134 (asserting that upon learning of the policy, he "began taking corrective actions," but not indicating when those actions were taken); Wen Declaration ¶¶ 142-146 (asserting that a welcome email such as Balestreri Ex. B was used starting in about April 2019); Wen Decl. |

| | | | | |
|---|---|---|---|---|
| | | | | ¶¶ 151-56 (referring to compliance memos Wen purports were circulated in October 2018, instructing employees to verify filing status, but not asserting that instruction was followed).<br><br>Wen also addresses a purported compliance bot called Ultron at paragraph 166 of his declaration, but he does not explain how Ultron worked or whether it actually worked to ensure that client enrollments and files were handled appropriately. And at paragraphs 188-192 of his declaration, Wen only addresses the reverification campaign from mid-September 2019. |
| 160. | Wen had been informed of the Company's practice of listing married consumers as single in IDR applications prior to April 2018.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 54-55 (explaining he discussed the Company's practice of | Disputed. In approximately early 2018, Wen learned through reviewing emails that Wen was copied on that CAC sales representatives sometimes listed married consumers' filing status as single. See Wen Declaration at ¶¶ 131-133. | Undisputed as to material facts.<br><br>Wen concedes that in "approximately early 2018," he learned of the Company's practice of listing married consumers as single. | |

| | | | Undisputed. | Undisputed. |
|---|---|---|---|---|
| | | listing married consumers as single in IDR applications with Wen before April 2018). | | |
| | 161. | Wen agreed that the Company should use numerous fictitious names to help dilute the number of consumer complaints against the Company.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 77-78; Pls.' Ex. 1.9 (Kim Decl. Ex. 7) (calendar appointment with subject, "[c]hange DBA for all Corps to avoid complaints every 6 months" from Kim to Wen). | Undisputed. | Undisputed. |
| | 162. | Wen knew that CAC/PSLC had negative online reviews.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 73-74; Pls.' Ex. 1.8 (Kim Decl. Ex. 6) (Sept. 21, 2018 email from Wen to reputation management company contact regarding building positive online presence for Prime/FPS and suggesting certain popular review sites "should be omitted in order to avoid negative reviews (such as what | Undisputed. | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | | happened with PSLC).”). | | |
| | 163. | Wen helped retain a reputation management company to try to "develop a positive online presence" for Prime.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 73; Pls.' Ex. 1.8 (Kim Decl. Ex. 6). | Undisputed. | Undisputed. |
| | 164. | Wen was informed that at times the Company's chargeback rates exceeded 1%.<br><br>*See* Pls.' Ex. 2.78 (Nguyen Decl. Ex. 78) (email chain and attachment from August 2018 between Wen, Nguyen, and others regarding excessive chargebacks); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 80-81; Pls.' Ex. 1.10 (Kim Decl. Ex. 8); *see also* Pls.' Ex. 77 (Email from Wen to Lai on December 14, 2018, noting that SL Account MGMT had "excessive" chargebacks in September 2018 that resulted in a chargeback ratio of 1.21%); Pls.' 78. | Undisputed. | Undisputed. |
| | 165. | Wen had final say over the Company's refund policy. | Disputed. Wen informally supported and deferred to | Undisputed. |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 99-100; Pls.' Ex. 1 (Kim Decl.) at ¶ 83; *see also* Pls.' Ex. 1.7 (Kim Decl. Ex. 5) (email chain between Wen and others from April 2018 discussing refund policy). | Nguyen's decisions on refunds because Wen thought Nguyen was fair and provided good customer service. See Pls.' Ex. 2.75 (Nguyen Decl. Ex. 75) (Nguyen making refund decisions); Ex. 2.76 (Nguyen Decl. Ex. 76) (Nguyen making refund decisions). | Wen states that he "deferred" to Nguyen's decisions but does not dispute that he--Wen-- had final say over those decisions. Further, Wen cites to no evidence to show that he did not have the final say over the Company's refund policy. |
| 166. | Wen responded to select consumer complaints and inquiries from law enforcement.<br><br>Pls.' Ex. 9 (Wen's Resp. 1st Req. Admiss.) at Nos. 124-125 (admitting that he sometimes reviewed and responded to correspondence to the Company from state law enforcement agencies or regulators); Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 92-94; Pls.' Ex. 2.26 (Nguyen Decl. Ex. 26); Pls.' Ex. 1 (Kim Decl.) at ¶¶ 75-76 (Wen responsible for handling complaints forwarded by state law enforcement agencies). | Undisputed. | Undisputed. |

## C. Wen's Knowledge and Control of the Company's Fee Collection Practices

| | | | |
|---|---|---|---|
| 167. | In a February 2, 2018 email to CAC's attorney, | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Wen wrote: "Is it correct that the 100% compliant way to accept fees is: 1. For an independent third-party Dedicated Account Provider ('DAP') to collect the fees from the client; 2. The DAP will hold the client's fees in a trust account until the DAP can confirm a and verify that: - The client has received a positive result (such as a consolidation), and - The client completes his first payment towards such. 3. Then the DAP will release the client's fees to the document preparation company (such as Premier)."  Pls.' Ex. 66. | | |
| 168. | As early as February 2018, the Company's client agreements included the following provision: "4. No Advance Fees. Per the attached Client Trust Account Authorization, | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Company does not take any advance fees from Client. Company will designate an independent third-party dedicated account provider ('DAP') to collect and deposit payments that Client has agreed to make with Company, pursuant to the Fee and Service Schedule of this Agreement, and to deposit and hold Client's funds in a trust account established and serviced by the DAP. The DAP will not disburse any Client fees until Client has received a consolidation, adjustment, or otherwise satisfactory result, and Client completes one payment towards such."<br><br>Pls.' Ex. 13 (Schneider Decl.) at ¶ 23. | | |
| 169. | On August 3, 2018, Wen wrote to CAC's outside counsel about a proposed corporate restructure, acknowledging that "TC/SLAM is processing for ~37k current active clients. All clients are 'paying upfront fees'. There is | Undisputed. | Undisputed. |

| | | | | |
|---|---|---|---|---|
| | | no way to be retroactively compliant." Pls.' Ex. 1 (Kim Decl.) at ¶¶ 101-104; Pls.' Ex. 1.12. | | |
| | 170. | In an email chain from September 2018, Wen discussed advance fees and the TSR with outside counsel, noting "we understand the legal obligations." Pls.' Ex. 88. | Undisputed. | Undisputed. |
| | 171. | Wen prepared an "Attestation Letter" for a payment processor dated March 18, 2019, stating: "Regarding upfront fees, SLAM has partnered with dedicated account providers who serve as banking and escrow platforms for its clients . . . SLAM does not collect any document preparation fees until services are fully rendered, the client's first payment is complete, and proof is shown to reflect that." Pls.' Ex. 67-68 (email and attachment transmitting attestation letter). | Undisputed. | Undisputed. |

| 172. | In March 2019, the Company did not condition its collection of fees on whether consumers had made an initial payment.

*See* Pls.' Ex. 1 (Kim Decl.) at ¶ 65 ("The Company charged fees to consumers regardless of what happened to the consumers' student loan adjustment applications or whether consumers made new payments on adjusted loans. The Company did not have access to records showing whether consumers made payments on an adjusted loan, nor did it attempt to gather this information."). | Disputed. Around March 2019, First Priority conditioned its collection of fees on whether the consumer had made an initial payment and provided RAM and AMP with documentation of proof of performance. See Wen Declaration at ¶¶ 99, 101, 160-107. | Undisputed.

Wen asserts only that First Priority conditioned collection of fees on whether the consumer had made an initial payment and provided documentation of "proof of performance" to processors RAM and AMP. Wen cites to no evidence that First Priority conditioned receipt of consumer fees on consumers actually making an initial payment on an adjusted loan. Wen Decl. ¶¶ 99, 101 (referring to "proof of performance" but not proof of payment); Def. Exs. 20-21 (not referring to proof that payment was actually made); Wen Decl. ¶¶ 106-107 (referring to "proof of performance and that First Priority submitted documentation that a "consumer's first due date on the consumer's adjusted payment had passed," but not that the consumer had actually made the payment). However, at paragraphs 106-107 of Wen's declaration, he bases |

| | | | |
|---|---|---|---|
| | | | these assertions "to the best of his knowledge," but does not provide a foundation or basis for that knowledge. Moreover, the emails he cites in his declaration show only that RAM indicated screen shots would be sufficient as proof of performance, but Wen cites to no evidence to show that actual proof of performance was provided to RAM. And as to AMP, Wen states that "to the best of his knowledge" AMP required and First Priority provided proof of completion, but he provides no basis, foundation, or evidence in support of this contention as to AMP. |
| 173. | Wen was warned by counsel and third parties about compliance with the TSR's prohibition on collecting advance fees.<br><br>*See* Pls.' Ex. 55 (Email re no advance fee model) (email from former CAC attorney dated July 26, 2017, noting debt relief model "should be done no advance fee" and that operating in select | Undisputed. | Undisputed. |

states "*would be the safest approach, assuming you run a no-advance fee program with application submission on behalf of the consumer to the DOE.*")[2]; Pls.' Ex. 1 (Kim Decl.) at ¶ 114; Pls.' Ex. 1.13 (Kim Decl. Ex. 12) (email chain including ACH provider warning Wen about compliance with TSR); Pls.' Ex. 69 (email chain from Aug. 30, 2018, between Wen and others where counsel to CAC cautions against describing the business as a "document preparation company," advising "I think you just call it what it is, a student loan relief provider, which is subject to the TSR debt relief rule, and the similar state regulations in some of the states."); Pls.' Ex. 88 (Sept. 4, 2018 email chain where outside counsel asks Wen and Kim, "[a]re

---

[2]This document was obtained by the Bureau through the immediate access and contains non-relevant information pertaining to a different client of Mr. Birnbaum's. Mr. Birnbaum since informed the Bureau that the redacted portion is subject to attorney-client privilege.

| | | | |
|---|---|---|---|
| | you on top of the advanced payment issue? You previously told me that you were handling. We previously discussed this issue, along with TSR related requirements. You indicated that it was being handled. This is a major issue so please let us know if you want to go over it again."). | | |
| 174. | In approximately 2018, Wen and Kim decided to explore setting up their Company to process consumer payments to make it look like the Company used a third-party dedicated account provider.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 95, 99; Pls.' Ex. 1.11 (Kim Decl. Ex. 10). | Disputed. In approximately 2018, Wen explored having a neutral and independent third-party form a dedicated account provider. See Wen Declaration at ¶¶ 90-93. | Undisputed.<br><br>Neither Wen's declaration nor the supporting documentation dispute that Kim and Wen decided to explore setting up their Company to process payments to make it look like the Company used a third-party dedicated account provider. |
| 175. | Wen and Kim directed one of their employees, Ho, to build a portal for the Company to process payments.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 96-97. | Disputed. Wen did not direct Ho, or any other employee, to build a portal for the Company to process payments. The Company processed payments through the DPP CRM using its various merchant accounts. See | Undisputed.<br><br>Wen cites to no evidence in his declaration or accompanying exhibits to rebut the fact that he and Kim directed Ho to build a payment processing portal. |

| | | | Wen Declaration at ¶¶ 90-93. | Neither Wen's declaration nor the supporting documentation dispute that Kim and Wen tasked Ho with building a payment processing portal. |
|---|---|---|---|---|
| 176. | | Wen took the lead on forming TAS 2019 LLC, which went by the name Trusted Account Services.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 105. | Undisputed. | Undisputed. |
| 177. | | Trusted Account Services registered as a Wyoming corporation and set up a virtual office in July 2019.<br><br>Pls.' Exs. 89 (Receiver's Report) at 15:11-21; Pls.' Ex. 89.2. | Undisputed. | Undisputed. |
| 178. | | Wen also recruited his long-time family friend, Kenny Huang, to be the nominal owner of TAS.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 113; Pls.' Ex. 3 (Huang Depo. Tr.) at 15:19-16:8. | Disputed. Wen asked Huang to form and operate TAS as an independent third-party. See Wen Declaration at ¶¶ 109-110, 112. | Undisputed as to material facts.<br><br>Wen does not dispute that Huang was a long-time family friend or that he recruited Huang to be the owner of TAS. It appears that Wen may dispute whether Huang was to be a nominal owner. Wen asserts that TAS was to be independent, but |

| | | | | cites no evidence showing it was actually independent.

In his declaration, Wen asserts that he told Huang that TAS needed to be independent, but at paragraph 111 of his declaration, Wen admits that he helped Huang form TAS; at paragraph 113 he admits Huang had no experience; and at paragraph 114 he admits to helping TAS apply for business accounts. These facts support the fact that TAS was not truly independent. |
|---|---|---|---|---|
| 179. | At the time Huang agreed to be TAS's nominal owner, he had absolutely no experience in the escrow industry, nor did he gain any during his tenure as a purported owner of TAS.

Pls.' Ex. 3 (Huang Depo. Tr.) at 17:11-21. | Disputed. Wen asked Huang to form and operate TAS as an independent third-party. See Wen Declaration at ¶¶ 109-110, 112-113. | | Undisputed.

Wen does not dispute that Huang had no experience or that Huang did not gain any during his tenure as the purported owner of TAS. Wen asserts that TAS was to be independent, but cites no evidence showing it was actually independent.

In his declaration, Wen asserts that he told Huang that TAS needed to be independent, but at paragraph 111 of his |

| | | | |
|---|---|---|---|
| | | | declaration, Wen admits that he helped Huang form TAS; at paragraph 113 he admits Huang had no experience; and at paragraph 114 he admits to helping TAS apply for business accounts. These facts support the fact that TAS was not truly independent. |
| 180. | Wen directed Huang to open TAS's bank account at HSBC.<br><br>Pls.' Ex. 3 (Huang Depo. Tr.) at 28:8-22. | Undisputed. | Undisputed. |
| 181. | National Merchant Center (NMC) processed consumer payments for the Company's services that were deposited to TAS bank accounts at HSBC.<br><br>*See* Pls.' Ex. 12 (Heidari Decl.) at ¶ 15. | Undisputed. | Undisputed. |
| 182. | Huang assumed Wen was actually running TAS.<br><br>Pls.' Ex. 3 (Huang Depo. Tr.) at 55:24-56:2. | Undisputed. | Undisputed. |
| 183. | Wen helped secure payment processing for TAS. | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 117-18; Pls.' Ex. 1.14 (Kim Decl. Ex. 14); *see also* Pls.' Ex 89 (Receiver's Report) at 17:1-21 (discussing Wen's efforts to set up processing for TAS); Pls.' Ex. 89.4 (April 2019 email chain regarding TAS processing application). | | |
| 184. | Wen created the email account tas2019llc@gmail.com.  Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) at No. 35. | Undisputed. | Undisputed. |
| 185. | Wen had access to the email account tas2019llc@gmail.com and reviewed and sent emails from that address.  Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) Nos. 36-37. | Undisputed. | Undisputed. |
| 186. | Huang did not have access to the tas2019llc@gmail.com email account and never sent emails from it.  Pls.' Ex. 3 (Huang Depo. Tr.) at 18:25-19:14. | Undisputed. | Undisputed. |

| 187. | Wen and Kim reached out to Jimmy Lai to see if Lai would be willing to be listed as an owner on paper of TAS.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 106. | Disputed. Wen reached out to Lai to help TAS obtain a merchant account. Later, Lai asked to purchase and be the majority owner and operator of TAS. See Def.'s Ex. 24 (Declaration of Jimmy Lai) at ¶ 1 ("I am the Managing Member and the majority owner of TAS 2019 LLC"); Wen Declaration at ¶ 116-118. | Undisputed as to material facts.<br><br>Wen cites to no evidence disputing that he reached out to Lai in relation to TAS or that he discussed with Lai that Lai would purchase an ownership interest in TAS. Notably, it was Wen who was communicating with Lai, not Huang, which further supports the fact that TAS was not truly controlled by Huang and was not truly independent.<br><br>Additionally, Wen relies on the Lai Declaration and, as explained in Plaintiffs' Evidentiary Objections, the declaration should be deemed inadmissible and stricken because it was formally withdrawn and cannot be relied upon. *See* ECF 99. |
| 188. | Lai had assisted the Company in setting up merchant accounts and helping to reduce their chargeback rates.<br><br>Pls.' Ex. 2 (Nguyen Decl.) at ¶ 121. | Undisputed. | Undisputed. |

| 189. | Lai agreed to be listed as an owner of TAS in exchange for retaining an extra fee that the Company would collect for this purpose.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 108. | Disputed. Lai purchased majority ownership in TAS and made his own decisions on TAS's business and fees. See Def.'s Ex. 24 (Declaration of Jimmy Lai) at ¶ 7 ("While TCS is TAS's first client, the services provided by TAS are entirely independent and distinct from the business of any Defendant or Relief Defendant. TAS's business relationship with TCS is a 'proof of concept' for TAS before TAS is able to expand its client list. Indeed, I have already discussed with an acquiring bank the possibility of offering TAS's unique services to other businesses."); Wen Declaration at ¶¶ 117-118. | Undisputed.<br><br>First, Wen relies on the Lai Declaration and, as explained in Plaintiffs' Evidentiary Objections, the declaration should be deemed inadmissible and stricken because it was formally withdrawn and cannot be relied upon. *See* ECF 99.<br><br>Second, Wen cites no evidence to support his contention that Lai made decisions on TAS' business and fees, nor does he rebut Kim's statements in his declaration relating to Lai agreeing to be listed as an owner of TAS or of TAS retaining an extra fee that the Company would collect. |
| 190. | In September 2019, at Wen's request, Huang signed paperwork adding Lai as an account signatory on the TAS HSBC account.<br><br>Pls.' Ex. 3 (Huang Depo. Tr.) at 31:15-33:12. | Disputed. Nguyen sent documents to Huang about the TAS HSBC bank account. See Pls.' Ex. 3 (Huang Depo. Tr.) at 31:17-21 ("So the bottom e-mail in the chain appears to be from Tuong21@hotmail.com, which I believe is Mr. Nguyen's e-mail address. It's addressed | Undisputed.<br><br>Wen cites to no evidence to rebut this fact. The excerpt from the Huang Deposition that Wen cites does not rebut the fact that Huang testified that Wen asked Huang to sign paperwork adding Lai as a signatory on the TAS HSBC |

| | | | | |
|---|---|---|---|---|
| | | | to you. It appears to be, "Hello, Kenny. See attachments for the documents that Jimmy Lee needed to add a signer to the TAS HSBC bank account.") | account. Pls.' Ex. 3 (Huang Depo. Tr. at 32:7-33:8). |
| | 191. | Although Huang, and later, Huang and Lai, were TAS's nominal owners, TAS was operated by the Company using the Company's employees.<br><br>*See* Pls.' Ex 89 (Receiver's Report) 14:16-21:5. | Disputed. Huang and Lai were independent third-party owners of TAS. Lai operated TAS. See Def.'s Ex. 24 (Declaration of Jimmy Lai) at ¶ 6 ("TAS is not owned or controlled (and has never been owned or controlled) by any Defendant or Relief Defendant. Since I have been involved with TAS, the only connection that TAS has had to any Defendant or Relief Defendant is that TAS was formed as a result of discussions I had with Mr. Wen regarding TCS's need to escrow its clients' funds, and TAS worked with TCS and Mr. Wen to establish the software portal through which TAS's systems could integrate with TCS's systems."); Wen Declaration at ¶¶ 116-117, 120. | Undisputed.<br><br>First, Wen relies on the Lai Declaration and, as explained in Plaintiffs' Evidentiary Objections, the declaration should be deemed inadmissible and stricken because it was formally withdrawn and cannot be relied upon. *See* ECF 99.<br><br>Second, aside from the withdrawn Lai Declaration, nothing in the cited paragraphs in the Wen Declaration rebut the fact that Huang and Lai were nominal owners of TAS or that TAS was operated by the Company using the Company's employees. |
| | 192. | For example, the Receiver found log-in credentials for | Undisputed. | Undisputed. |

| | | studentloanmgmt@trust edaccountservices.com on a post-it note in a customer service manager's work station that stated "sign on to private window or incognito" on site, as well as TAS checks.

Pls.' Ex. 89 (Receiver's Report) 16:16-22; Pls.' Ex 89.3 (post-it with credentials stating, "sign on to private window or incognito."). | | |
|---|---|---|---|---|
| 193. | Wen and his report, Ho, took the lead on getting TAS integrated into DPP's CRM database.

Pls.' Ex 89 (Receiver's Report) at 18:3-17. | Disputed. Wen assisted the Company's IT team with integrating TAS into DPP's CRM database. See Def.'s Ex. 24 (Declaration of Jimmy Lai) at ¶ 6 ("TAS worked with TCS and Mr. Wen to establish the software portal through which TAS's systems could integrate with TCS's systems.") | Undisputed.

First, Wen relies solely on the Lai Declaration and, as explained in Plaintiffs' Evidentiary Objections, the Lai Declaration should be deemed inadmissible and stricken because it was formally withdrawn and cannot be relied upon. *See* ECF 99.

Second, even if the Court considered the Lai Declaration, which it should not, it actually supports the fact that Wen worked with TAS and TCS to establish the portal. And Wen cites no evidence to rebut the fact that Ho, |

| | | | |
|---|---|---|---|
| | | | an employee of the Company, was involved in creating the portal. |
| 194. | Wen reviewed and edited the TAS client agreement.<br><br>Pls.' Ex. 8 (Wen's Resp. 1st Req. Admiss.) at No. 38. | Undisputed. | Undisputed. |
| 195. | Wen reviewed and edited the TAS website.<br><br>Pls.' Ex. 81 (Wen circulating edits to TAS website using personal email address). | Undisputed. | Undisputed. |

**D. Wen's Destruction of Evidence and Conduct in Discovery**

| | | | |
|---|---|---|---|
| 196. | On May 29, 2018, the Minnesota Attorney General's Office issued a civil investigative demand (CID) to Premier Student Loans, Inc., to the 173 Technology Drive address.<br><br>Pls.' Ex. 11 (Minnesota CID). | Undisputed. | Undisputed. |
| 197. | In mid-September 2018, the Company received a CID issued by the Bureau to CAC.<br><br>Pls.' Ex. 13 (Schneider Decl.) at ¶ 10. | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| 198. | CAC never provided a substantive response to the Bureau's CID, and instead insisted through bankruptcy counsel that the Bureau's action was subject to the automatic stay.<br><br>Pls.' Ex. 13 (Schneider Decl.) at ¶ 15; *see also* Pls.' Ex. 80 (Jan. 24, 2019 email chain with Wen and Company attorneys, who note that they invoked the automatic stay as a reason for not responding to MN civil investigative demand and proclaim, "let the games begin"). | Undisputed. | Undisputed. |
| 199. | Wen authorized CAC's decision to file for bankruptcy and to shift its sales operations to Prime.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 122-123, 138-140. | Undisputed. | Undisputed. |
| 200. | Within approximately two months of receiving the Bureau's CID, Wen and Kim directed Ho to delete all of the Company's @premierstudentloancenter.com emails. | Disputed. Based on a previous call with outside attorneys who advised Kim and Wen that it was ok to delete emails if the company shut down, which was a misunderstanding, Kim and Wen directed the | Undisputed.<br><br>First, Wen cites to no evidence to rebut the fact that within approximately two months after receiving the Bureau's CID, he and Kim directed Ho to |

| | | | |
|---|---|---|---|
| | Pls.' Ex. (Kim Decl.) at ¶¶ 129-131; Pls.' Ex. 85 (Dec. 2018 email chain that includes email from Wen stating: "Per our previous discussion, we deleted all PSLC emails and addresses. Our Network Admin contacted Hostgator to retrieve the emails and email addresses. Since we did not have backup turned on, Hostgator informed us that the emails and emails addresses are permanently deleted and no longer retrievable."). | Network Admin to delete CAC's emails after CAC shut down. Kim and Wen later tried to retrieve the emails but were unsuccessful. See Pls.' Ex. 85 (Dec. 2018 email chain) (Wen refers back to "Per our previous discussion" and "Our Network Admin contacted Hostgator to retrieve the emails and email addresses. Since we did not have backup turned on, Hostgator informed us that the emails and emails addresses are permanently deleted and no longer retrievable") | delete all of the Company's email.

Second, Wen cites no evidence to support his argument that the emails were deleted at the direction of counsel. While he points to a reference to a "previous discussion" in Pls.' Ex. 85, he provides no evidence as to what was discussed, let alone that counsel purportedly informed him that it was acceptable to delete Company emails after receiving the Bureau's CID. |
| 201. | Prior to the deletion of the @premierstudentloanecenter.com emails, Wen had been advised by counsel not to delete the emails.

Pls.' Ex. 85 (email dated Dec. 11, 2018, from outside counsel to Wen, copying Kim and Nguyen, stating "[m]y major concern is that the emails were deleted, which we advised you not to do."). | Disputed. Based on a previous call with outside attorneys, Kim and Wen misunderstood that it was ok to delete emails if the company shut down. See Pls.' Ex. 85 (Dec. 2018 email chain) (Wen refers back to "Per our previous discussion"). | Undisputed.

First, Wen cites to no evidence to rebut the fact that he was advised by counsel not to delete emails after receiving the Bureau's CID.

Second, Wen cites no evidence to support his argument that the emails were deleted based on a misunderstanding. While he points to a reference to a "previous discussion" in Pls.' Ex. 85, he provides no evidence as to what was |

| | | | discussed, let alone that counsel purportedly informed him that it was acceptable to delete company emails after receiving the Bureau's CID. |
|---|---|---|---|
| 202. | The deleted emails included emails showing that Wen knew the Company was including false information about family size and marital status in student loan adjustment applications, and that he did nothing to stop these practices.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 132. | Disputed. When Wen became aware of the incorrect family size and filing status issues, Wen took corrective actions to stop and fix those issues. See Wen Declaration at ¶¶ 125, 131, 134, 144-147, 151-156, 165-166, 189-192. | Partially in dispute by Wen, but only as to what steps Wen may have taken to stop the practices, and even then, Wen cites to no evidence that purports he took any such steps before October 2018.<br><br>Wen cites to no evidence to rebut the fact that the deleted emails showed that Wen was aware of the fact that the Company was including false information or that the emails showed that he did nothing to stop the practices. Instead, Wen cites to his declaration for the contention that he took steps to try and address the issues, and that some steps were finally taken in in October 2018, though he cites to no evidence indicating the steps actually stopped the practice. |

| | | | |
|---|---|---|---|
| 203. | The deleted emails showed that Wen knew about misrepresentations to consumers about the Company's services, but he did not try to stop those practices.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 133. | Disputed. When Wen became aware of misrepresentations about the Company's services, Wen took corrective actions to stop and fix those issues See Wen Declaration at ¶¶ 144-147, 156-157, 165-166, 189-192. | Undisputed.<br><br>Wen cites to no evidence to rebut the fact that the deleted emails showed that Wen knew about misrepresentations made to consumers or that the emails showed that he did nothing to stop the practices. Instead, Wen cites to his declaration for the contention that he took steps to try and address the issues, and that some steps were finally taken in October 2018, though he cites to no evidence indicating the steps actually stopped the practice. |
| 204. | Wen and Kim also discussed their belief that emails they decided to delete likely included emails between employees showing that the Company was charging advance fees, including false information in student loan adjustment applications, and making misrepresentations to consumers about its services. | Disputed. Kim and Wen did not have those discussions. See Wen Declaration at ¶¶ 125, 131. | Undisputed.<br><br>First, Wen cites to no evidence to rebut that he and Kim discussed that the deleted emails included emails between employees showing that the Company engaged in the illegal conduct described by Kim.<br><br>Second, the cited paragraphs of his declaration simply address when Wen purportedly learned of |

| | | | |
|---|---|---|---|
| | Pls.' Ex. 1 (Kim Decl.) at ¶¶ 130, 135. | | the illegal conduct in late 2017 or early 2018, and that he reviewed relevant employee emails in early 2018. |
| 205. | On or about October 23, 2019, Wen deleted text messages that included statements showing he was aware that the Company was violating the law and had done nothing to stop those practices.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶¶ 148-151. | Disputed. Wen took corrective actions to fix many issues at the Company. See Wen Declaration at ¶¶ 144-147, 156-157, 165-166, 189-192. | Undisputed.<br><br>Wen does not dispute that he deleted the described text messages or what the messages showed. Instead, Wen cites to his declaration for the proposition that he eventually took steps to address the issues in October 2018, though he cites to no evidence indicating the steps actually stopped the practices. |
| 206. | The deleted texts included communications through Signal, iMessage, and Skype.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 149. | Undisputed. | Undisputed. |
| 207. | The deleted texts dated back to at least November 2015.<br><br>Pls.' Ex. 1 (Kim Decl.) at ¶ 150. | Undisputed. | Undisputed. |
| 208. | On February 22, 2022, the People of the State of California (California) issued | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | document requests and interrogatories to Wen.<br><br>Pls.' Ex. 20 (Mason Decl.) at ¶ 6. | | |
| 209. | On March 30, 2022, the Bureau issued document requests and interrogatories to Wen.<br><br>Pls.' Ex. 13 (Schneider Decl.) at 26. | Undisputed. | Undisputed. |
| 210. | On August 9, 2022, the Bureau's and California's motion to compel was granted and Wen was ordered to "provide complete, substantive responses to each of the Moving Parties' discovery requests" including the document requests and interrogatories issued by the Bureau and California.<br><br>Order on Pls.' Motion to Compel Defendant Kaine Wen's Responses to Outstanding Discovery (ECF 398). | Undisputed. | Undisputed. |
| 211. | To date, Wen has not responded to the Bureau and California's outstanding requests for documents and responses to interrogatories. | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | *See* Pls.' Ex. 13 (Schneider Decl.) ¶¶ 26-29; Pls.' Ex. 20 (Mason Decl.) at ¶¶ 6-9. | | |

## VII. Consumers Paid over $95 Million to Companies Owned and Controlled by Wen and Suffered Additional Harms

| | | | |
|---|---|---|---|
| 212. | Between November 5, 2015, through October 2019, the Company collected $95,057,756.92 in net fees from consumers after accounting for refunds.<br><br>Pls.' Ex. 12 (Heidari Decl.) at ¶ 7. | Undisputed to the extent that this figure is an approximation. | Undisputed.<br><br>Wen proffers no evidence to rebut the calculation. |
| 213. | The Company collected fees from at least approximately 81,000 consumers who did not receive any refund.<br><br>Pls.' Ex. 12 (Heidari Decl.) at ¶ 7. | Undisputed to the extent that this figure is an approximation. | Undisputed.<br><br>Wen proffers no evidence to rebut the calculation. |
| 214. | The Company collected $1,205,776.83 in fees (not including refunds) from approximately 1,614 Minnesota consumers.<br><br>Pls.' Ex. 19 (Pegg Decl.) at ¶ 5. | Undisputed to the extent that this figure is an approximation. | Undisputed.<br><br>Wen proffers no evidence to rebut the calculation. |
| 215. | The Company collected $4,483,915 in fees (not including refunds) from | Undisputed to the extent that this figure is an approximation. | Undisputed. |

| | | | |
|---|---|---|---|
| | approximately 4,628 North Carolina consumers.<br><br>Pls.' Ex. 20 (Evers Decl.) at ¶ 5. | | Wen proffers no evidence to rebut the calculation. |
| 216. | The Company collected approximately $8,112,188.83 in fees (not including refunds) from approximately 12,184 California consumers.<br><br>Pls.' Ex. 21 (Mason Decl.) at ¶¶ 3-5. | Undisputed to the extent that this figure is an approximation. | Undisputed.<br><br>Wen proffers no evidence to rebut the calculation. |
| 217. | At times, consumers lost qualifying payments toward student loan forgiveness because the Company procured a loan consolidation on the consumer's behalf.<br><br>*See, e.g.* Pls.' Ex. 31 (Honold Decl.) at ¶¶ 4, 12-13; Pls.' Ex. 41 (Rosca Decl.) at ¶ 16 (consumer lost qualifying payments she had already made toward loan forgiveness and had to start over under a new 20-year plan). | Undisputed. | Undisputed. |
| 218. | At times the Company's practices resulted in consumers owing | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | increased interest on their student loan debts.<br><br>*See* Pls.' Ex. 41 (Rosca Decl.) at ¶¶ 15-16, 20 (consumer discovered that not only were her loans not forgiven, her interest rate increased as a result of Premier consolidating her loans); Pls.' Ex. 37 (Smith Decl.) at ¶ 16 (noting that she owes more now than she did when she signed up with PSLC because of accrued interest); *accord* Pls.' Ex. 16 (Lause Decl.) at ¶ 14 (discussing impact of falsifying family size or marital status in an IDR application). | | |
| 219. | The Company's practices caused some consumers to fall behind on their loan payments.<br><br>*See* Pls.' Ex. 30 (Berthiaume Decl.) at ¶¶ 18-26 (consumer made four monthly payments of $298.75 that she thought were going toward her loan debt, but later learned from her loan servicer that was not the case); Pls.' Ex. 40 (Breemes | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | Decl.) at ¶¶ 7, 10-11 (SLAM instructed consumer just to pay the Company, not her student loan servicer, and assured her they would coordinate with her servicer, but she later learned she had missed payments on her loans). | | |
| 220. | Consumers suffered additional financial harms due to the Company's practices.<br><br>*See* Pls.' Ex. 43 (Fomafung Decl.) at ¶¶ 114-16 (consolidation of consumer's loans increased his interest rate); Pls.' Ex. 25 (Thelen Decl.) at ¶ 14 (explaining it was more difficult to purchase a car because of the money she paid SLAM). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12. | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>First, Plaintiffs do not contend that every consumer suffered additional financial harm.  Second, the Balestreri Declaration only addresses practices in September 2019 when the Company had suspended sales activities, and does not address, let alone dispute, that consumers suffered additional financial harms due to the Company's practices. Additionally, the Receiver uncovered serious deficiencies in the recertification campaign. *See* Pls.' Ex. 89 at p. 1310, 1332-35. |

| | | | |
|---|---|---|---|
| 221. | Consumers suffered emotional harm due to the Company's misrepresentations and its fee collection practices.<br><br>*See* Pls.' Ex. 25 (Thelen Decl.) at ¶¶ 12, 14 (consumer "could not eat or sleep for days" after learning the company had been shut down because she realized she had been "throwing her money away," and her experience with SLAM made her feel violated and caused her a lot of stress); Pls.' Ex. 35 (Hauser Decl.) at ¶ 17 (experience with the Company made her feel angry, upset, overwhelmed, ashamed, embarrassed, and led to panic attacks). | Disputed to the extent that the Plaintiffs are contending this occurred in every case. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12. | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>First, Plaintiffs do not contend that every consumer suffered emotional harm. Second, the Balestreri Declaration only addresses practices in September 2019 when the Company suspended sales practices, and does not address, let alone dispute, that consumers suffered emotional harm due to the Company's practices. Additionally, the Receiver uncovered serious deficiencies in the recertification campaign.  *See* Pls.' Ex. 89 at p. 1310, 1332-35. |
| 222. | Consumers would not have signed up for the Company's services if they had known it would submit student loan adjustment applications containing false information.<br><br>*See* Pls.' Ex. 22 (Pugh Decl.) at ¶¶ 8, 18, 21 (married mother of one discovered Premier | Undisputed. | Undisputed. |

| | | | |
|---|---|---|---|
| | listed her as a single mother of three, would not have enrolled with Company had she known this); Pls.' Ex. 30 (Berthiaume Decl.) at ¶ 29 (mother with two children would not have signed up if she had known SLAM was going to report her as having five dependents); Pls.' Ex. 24 (Sheahan Decl.) at ¶ 15. | | |
| 223. | Consumers would not have signed up for the Company's services if they had known their payments to the Company were not going to pay down their loan balance.<br><br>*See* Pls.' Ex. 34 (Liming Decl.) at ¶ 21; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 14; Pls.' Ex. 22 (Pugh Decl.) at ¶ 21; Pls.' Ex. 30 (Berthiaume Decl.) at ¶ 28; Pls.' Ex. 42 (Donaldson Decl.) at ¶ 20; Pls.' Ex. 33 (Varno Decl.) at ¶ 14; Pls.' Ex. 43 (Fomafung Decl.) at ¶ 17; Pls.' Ex. 27 (Kirsksey Decl.) at ¶ 11; Pls.' Ex. 29 (Metzig Decl.) at ¶ 15; Pls.' Ex. 37 (Smith | Disputed to the extent that the Plaintiffs are contending this would have occurred in every case. Many consumers were satisfied with the Company's services that helped them obtain monthly payment reductions. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re- | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>First, Plaintiffs do not contend that every consumer would not have signed up for the Company's services if they had known the Company were not going to pay down their loan balance. Second, the Balestreri Declaration only addresses the recertification campaign in September 2019 when the company suspended sales activities, and does not address, let alone dispute, that some |

| | | | |
|---|---|---|---|
| | Decl.) at ¶ 18; Pls.' Ex. 26 (Yimer Decl.) at ¶ 14; Pls.' Ex. 28 (Jangula Decl.) at ¶ 14. | executed compliance packages) under Paragraph 12. | consumers would not have signed up for the Company's services had they known the Company were not going to pay down their loans.  Additionally, the Receiver uncovered serious deficiencies in the recertification campaign. *See* Pls.' Ex. 89 at p. 1310, 1332-35. |
| 224. | Consumers would not have signed up for the Company's services if they had known that the Company could not actually lower their monthly student loan payment.<br><br>*See* Pls.' Ex. 26 (Yimer Decl.) at ¶ 13 (noting particular frustration that she was already on an income-based program when she enrolled, so Company could not have lowered her monthly payments). | Disputed to the extent that the Plaintiffs are contending this would have occurred in every case. Many consumers were satisfied with the Company's services that helped them apply to their student loan servicers to obtain a lower monthly student loan payment. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>First, Plaintiffs do not contend that every consumer would not have signed up for the Company's services if they had known the Company could not actually lower their monthly student loan payment.<br><br>Second, the Balestreri Declaration only addresses the recertification campaign in September 2019 when the Company suspended sales practices, and does not address, let alone dispute, that some consumers would not |

| | | packages) under Paragraph 12. | have signed up for the Company's services had they known the Company could not actually lower their student loan payment. Additionally, the Receiver uncovered serious deficiencies in the recertification campaign. *See* Pls.' Ex. 89 at p. 1310, 1332-35. |
|---|---|---|---|
| 225. | Consumers would not have signed up for the Company's services if they had known that it could not provide loan forgiveness.<br><br>*See* Pls.' Ex. 38 (Simonenko Decl.) at ¶ 12; Pls.' Ex. 23 (Hershenson Decl.) at ¶ 14; Pls.' Ex. 36 (Crawford Decl.) at ¶ 13; Pls.' Ex. 31 (Honold Decl.) at ¶ 17; Pls.' Ex. 42 (Donaldson Decl.) at ¶ 21; (would not have signed up if she knew FPS could not actually guarantee her loans would be forgiven); Pls.' Ex. 40 (Breemes Decl.) at ¶ 21; Pls.' Ex. 33 (Varno Decl.) at ¶ 15; Pls.' Ex. 43 (Fomafung Decl.) at ¶ 19; Pls.' Ex. 27 (Kirksey Decl.) at ¶ 12; Pls.' Ex. 29 (Metzig | Disputed to the extent that the Plaintiffs are contending this would have occurred in every case. Many consumers were satisfied with the Company's services that helped them enter IDR plans towards loan forgiveness. See Def.'s Ex. 26 (Declaration of Nicole Balestreri In Support Of Defendants' Response To Order To Show Cause Why Preliminary Injunction Should Not Issue) ("To date, TCS's re-certification campaign has resulted in approximately 3,252 recertifications interactions with clients, ~96% of which certified that they were satisfied and re-executed compliance packages) under Paragraph 12. | Undisputed. Wen only disputes that this happened in every instance, but Plaintiffs do not contend it always happened.<br><br>First, Plaintiffs do not contend that every consumer would not have signed up for the Company's services if they had known that it could not provide loan forgiveness.<br><br>Second, the Balestreri Declaration only addresses the recertification campaign in September 2019 when the Company suspended sales activities, and does not address, let alone dispute, that some consumers would not have signed up for the Company's services |

| | | |
|---|---|---|
| Decl.) at ¶ 16; Pls.' Ex. 24 (Sheahan Decl.) at ¶ 16; Pls.' Ex. 37 (Smith Decl.) at ¶ 19; Pls.' Ex. 25 (Thelen Decl.) at ¶ 15. | | had they known the Company could not provide loan forgiveness. Additionally, the Receiver uncovered serious deficiencies in the recertification campaign. *See* Pls.' Ex. 89 at p. 1310, 1332-35. |

**Plaintiffs' Statement of Genuine Disputes of Material Facts**

| # | Def's Additional SUF | Plaintiffs' Response – Revised SUF |
|---|---|---|
| 1. | Albert Kim ("Kim"), not I, formed CAC.<br><br>See Wen Declaration at ¶¶ 15-19. | Disputed. *See* Pls.' Ex. 1 (Kim Decl.) ¶¶ 4, 8 ("Wen and I decided to form [CAC] together in 2014. I registered CAC with the California Secretary of State in 2014" and Wen invested in CAC); Pls. Ex. 2 (Nguyen Decl.) ¶ 3 ("Sometime in 2015, Wen reached out to me and asked if I wanted to be part of a student loan document preparation company that he was forming with Kim"); *see also* Pls. Ex. 1.1 (Wen and Kim both owners CAC). |
| 2. | Kim asked me to invest in his future business. Kim told me he wanted to learn everything from the student loan document preparation company he was working for so he could start his own student loan document preparation company. Nguyen, who had experience in accounting, also agreed to become a part owner of the SL business.<br><br>See Wen Declaration at ¶¶ 4-7. | Disputed to the extent that Wen claims that CAC was Kim's business and not also Wen's. *See* Pls.' Ex. 1 (Kim Decl.) ¶¶ 4, 8 ("Wen and I decided to form [CAC] together in 2014. I registered CAC with the California Secretary of State in 2014" and Wen invested in CAC); Pls. Ex. 2 (Nguyen Decl.) ¶¶ 3, 5-6 ("Sometime in 2015, Wen reached out to me and asked if I wanted to be part of a student loan document preparation company that he was forming with Kim" and referring to CAC as "Wen and Kim's |

| | | |
|---|---|---|
| | | Company"); *see also* Pls. Ex. 1.1 (Wen and Kim both owners CAC).<br><br>Also disputed to the extent that Wen claims Nugyen was a part owner of the Company. *See* Pls.' Ex. 1 (Kim Decl.) ¶ 7 ("Wen and I owned CAC jointly and equally"); Pls. Ex. 2 (Nguyen Decl.) ¶ 16 ("CAC, True Count, and Prime were interrelated companies owned and controlled by Kim and Wen"); Pls. Ex. 1.1 (Wen and Kim listed as sole owners CAC). |
| 3. | I was investing in the SL business solely as a "silent" investor with no involvement or plans to be part of the operations, and my primary contribution was financial only. In contrast, Kim, who invested a disproportionately lower amount, would be the full-time owner-operator of the start-up.<br><br>See Wen Declaration at ¶¶ 8-11. | Disputed. Wen was significantly involved in the Company. *See* UF 138-51, 153, 154-180, 183-87, 190, 193-95, 199-207, and the record materials cited therein. |
| 4. | Previously, Kim worked at a loan modification company where he learned the business and then started his own loan modification company, which was the same blueprint Kim used for this business.<br><br>See Wen Declaration at ¶¶ 5, 14-15. | Disputed to the extent that Wen claims that CAC was Kim's business and not also Wen's. *See* Pls.' Ex. 1 (Kim Decl.) ¶¶ 4, 8 ("Wen and I decided to form [CAC] together in 2014. I registered CAC with the California Secretary of State in 2014" and Wen invested in CAC); Pls. Ex. 2 (Nguyen Decl.) ¶¶ 3, 5-6 ("Sometime in 2015, Wen reached out to me and asked if I wanted to be part of a student loan document preparation company that he was forming with Kim" and referring to CAC as "Wen and Kim's Company"); *see also* Pls. Ex. 1.1 (Wen and Kim both owners CAC). |

| | | | |
|---|---|---|---|
| | 5. | The loan modification company that Kim owned and operated was Consumer Advocacy Center, Inc. ("CAC").<br><br>See Wen Declaration at ¶¶ 16. | Disputed to the extent that Wen claims that Kim solely owned and operated CAC. Wen also owned and operated CAC. *See* Pls.' Ex. 1 (Kim Decl.) ¶¶ 4, 7, 8 ("Wen and I decided to form [CAC] together in 2014. I registered CAC with the California Secretary of State in 2014,"Wen invested in CAC, and "Wen and I owned CAC jointly and equally"); Pls. Ex. 2 (Nguyen Decl.) ¶¶ 3, 5-6, 16 ("Sometime in 2015, Wen reached out to me and asked if I wanted to be part of a student loan document preparation company that he was forming with Kim" and "CAC, True Count, and Prime were interrelated companies owned and controlled by Kim and Wen"); *see also* Pls. Ex. 1.1 (Wen and Kim both owners CAC). |
| | 6. | Kim solely hired the website developer and provided the website content, the client fee agreement that CAC used, the fee structure for consumers, the sales script that CAC used, he solely developed the sales training and personally trained CAC sales representatives, provided the commission structure for sales representatives and personally interviewed and hired, or otherwise supervised the hiring of, the sales representatives for CAC.<br><br>See Wen Declaration at ¶¶ 23-44. | Disputed.<br><br>Wen and Kim reviewed and approved web content for the Company.  Pls.' Ex. 1 (Kim Decl.) ¶ 32. Wen drafted and approved contracts between the Company and consumers for the Company's services. Pls.' Ex. 1 (Kim Decl.) ¶¶ 29-31; Pls.' Ex. 1.5 (CAC client fee agreement revised by Wen). Wen and Kim determined the Company's consumer fee structure, including the amount of fees and when those fees could be collected. Pls.' Ex. 1 (Kim Decl.) ¶ 28. Wen and Kim developed scripts and trainings when the Company first started operating and that the Company later used. Pls.' Ex. 1 (Kim Decl.) ¶¶ 33, 125-27, |

| | | |
|---|---|---|
| | | 143. Wen helped develop the commission structure for sales employees, and Wen and Kim had the final say over how sales employees were compensated. Pls.' Ex. 1 (Kim Decl.) ¶ 42. Wen and Kim fired CAC's employees and then re-hired them to work for True Count and Prime. Pls.' Ex. 1 (Kim Decl.) ¶¶ 14, 125. The heads of each Company's department, including Sales, reported to Wen and Kim. Pls.' Ex. 1 (Kim Decl.) ¶¶ 19, 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 20. Wen and Kim were the final decisionmakers for CAC, True Count, and Prime during the entire course of their operation. Pls.' Ex. 1 (Kim Decl.) at ¶ 19; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 99. |
| | | Plaintiffs do not dispute that Kim may have personally trained some CAC sales representatives based on materials Wen and Kim developed. *See* Pls. Ex. 1 (Kim Decl.) ¶¶ 33, 125-27. And Plaintiffs do not dispute that Kim may have personally interviewed, or supervised the interviewing of, some candidates for sales positions with CAC. But ultimately Company sales employees reported to Wen and Kim and they made final decisions for the Company. *See* Pls.' Ex. 1 (Kim Decl.) ¶¶ 19, 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 20, 99. |
| 7. | I was not involved in any of the foregoing, consistent with my role as a silent investor, and I relied on | Disputed.<br><br>Wen and Kim reviewed and approved web content for the |

Kim's expertise in the above as he was running all business operations.

*See* Def.'s Ex. 52 (Declaration of Keneth Hu) at ¶ 4 ("I only started to see Kaine Wen at the office in 2017, around June or July."); Wen Declaration at ¶¶ 49-55, 57.

Company. Pls.' Ex. 1 (Kim Decl.) ¶ 32. Wen drafted and approved contracts between the Company and consumers for the Company's services. Pls.' Ex. 1 (Kim Decl.) ¶¶ 29-31; Pls.' Ex. 1.5 (CAC client fee agreement revised by Wen). Wen and Kim determined the Company's consumer fee structure, including the amount of fees and when those fees could be collected. Pls.' Ex. 1 (Kim Decl.) ¶ 28. Wen and Kim developed scripts and trainings when the Company first started operating and that the Company later used. Pls.' Ex. 1 (Kim Decl.) ¶¶ 33, 125-27, 143. Wen helped develop the commission structure for sales employees, and Wen and Kim had the final say over how sales employees were compensated. Pls.' Ex. 1 (Kim Decl.) ¶ 42. Wen and Kim fired CAC's employees and then re-hired them to work for True Count and Prime. Pls.' Ex. 1 (Kim Decl.) ¶¶ 14, 125. The heads of each department, of the Company, including Sales, reported to Wen and Kim. Pls.' Ex. 1 (Kim Decl.) ¶¶ 19, 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 20. Wen and Kim were the final decisionmakers for CAC, True Count, and Prime during the entire course of their operation. Pls.' Ex. 1 (Kim Decl.) at ¶ 19, 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 99.

Plaintiffs do not dispute that Kim may have personally trained some CAC sales representatives based on materials Wen and Kim developed. *See* Pls. Ex. 1 (Kim Decl.) ¶¶ 33,

| | | |
|---|---|---|
| | | 125-27. And Plaintiffs do not dispute that Kim may have personally interviewed, or supervised the interviewing of, some candidates for sales positions with CAC. But ultimately Company sales employees reported to Wen and Kim and they made final decisions for the Company. *See* Pls.' Ex. 1 (Kim Decl.) ¶¶ 19, 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 20, 99.<br><br>Finally, Hu states only that he did not see Wen in the office until June or July 2017. Hu does not address Wen's role in the operation. |
| 8. | As a silent investor, I rarely went into the company's office, and in the rare instances that I did, it was during non-business hours. I did not have an office, a desk, a chair, or a computer at the office.<br><br>*See* Def.'s Ex. 52 (Declaration of Keneth Hu) at ¶ 4 ("I only started to see Kaine Wen at the office in 2017, around June or July."); Wen Declaration at ¶¶ 45-47 | Disputed.<br><br>Wen was not a silent investor and was actively involved in Company operations from the beginning. *See, e.g.*, Pls.' Ex. 1 (Kim Decl.) at ¶¶ 19, 22-23, 25, 28-33, 37, 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 20, 99.<br><br>By mid-2016, Wen came into the office regularly, at least several times a week. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 23 (Wen began regularly coming into the office in 2016 and took a more active role in overseeing the Company).<br><br>Moreover, the undisputed evidence shows that by June or July 2017, Wen was going into the office more regularly. Wen admits that by July 2017, he was "help[ing] more with CAC, besides just minor services" and working in the CAC offices. Wen Decl. ¶¶ 67-68. |

| 9. | From November 2015 to June 2017, I occasionally communicated with Kim about the business, and only regarding budget concerns or my minor support work that I provided to the business.<br><br>*See* Wen Declaration at ¶¶ 56. | Disputed.<br><br>First, when CAC began operating in November 2015, Wen communicated daily or every other day with Kim about "all aspects of running" their student-loan debt-relief operation. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 22.<br><br>Second, by mid-2016, Wen came into the office regularly, at least several times a week. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 23 (Wen began regularly coming into the office in 2016 and took a more active role in overseeing the Company).<br><br>Moreover, Wen admits that by July 2017, he was "help[ing] more with CAC, besides just minor services" and working in the CAC offices. Wen Decl. ¶¶ 67-68. |
| 10. | From November 2015 to June 2017, I made a small amount of money at CAC, an average of less than $500 per month, because I was minimally involved and only provided minor support services at an hourly rate of $15-20 per hour. For the year 2017, Kim earned $220,551 more than me.<br><br>*See* Wen Declaration at ¶¶ 58-66. | Disputed, except to the extent Wen claims he received a relatively small amount of direct compensation from CAC before June 2017. As a part owner, Wen also had an equity interest in CAC and was compensated through other companies, including Relief Defendant Hold the Door, Corp. Wen Decl. at ¶ 62 (admitting ownership of Hold the Door, Corp). In his declaration, Wen claims to have earned over $250,000 from CAC in 2017. *See* Wen Decl. ¶ 239. Wen also controlled other companies that received funds from the operations. *See* Pls. Ex. 98 at 1434-35 (listing Relief Defendant Mice |

| | | and Men LLC as a corporation "for the benefit of Kaine Wen.") Mice and Men stipulated to a judgment of over $5 million in unjust gains from the Company. *See* ECF 218. *See also* Def.'s Ex. 2 (Kaine Wen 2017 Trust document) (referencing Wen's business interests in the following companies: Consumer Advocacy Center Inc., Natural Nine Staffing Inc., True Count Staffing Inc., All Out Staffing Inc., and House Lannister Staffing Inc.). |
|---|---|---|
| 11. | Although I was involved in general business matters only, and compliance was specifically under Kim's purview, upon becoming aware that CAC began to receive Civil Investigative Demand letters from the State of Minnesota as well as the CFPB, I voiced to Kim and Nguyen that the company work with counsel that was sophisticated in these areas in order to ensure it was in compliance/come into compliance, and the company used the law firms Akerman LLP and Greenspoon Marder LLP for compliance matters.<br><br>*See* Wen Declaration at ¶¶ 76-77. | Disputed to the extent that Wen claims he was involved with the Company in "general business matters only, and compliance was specifically under Kim's purview." Further disputed to the extent Wen claims any compliance steps taken were effective.<br><br>First, when CAC began operating in November 2015, Wen communicated daily or every other day with Kim about their student-loan debt-relief operation. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 22. And Wen admits that by mid-2016, he came into the office regularly, at least several times a week. *See* Pls.' Ex. 1 (Kim Decl.) at ¶ 23; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 23 (Wen began regularly coming into the office in 2016 and took a more active role in overseeing the Company). Moreover, Wen admits that by July 2017, he was "help[ing] more with CAC, besides just minor services" and working in the CAC offices. Wen Decl. ¶¶ 67-68. |

Second, Wen was significantly involved in CAC's activities, including relating to compliance. Wen purported to be CAC's general counsel as early as November 2015. *See* Def. Ex. 1. Wen was responsible for responding to consumer complaints forwarded by law enforcement and working with outside counsel to respond to law enforcement subpoenas. Pls. Ex. 1 (Kim Decl.) ¶¶ 75-76; *see also* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 92-96. Wen and Kim reviewed and approved web content for the Company.  Pls.' Ex. 1 (Kim Decl.) ¶ 32. Wen drafted and approved contracts between the Company and consumers for the Company's services. Pls.' Ex. 1 (Kim Decl.) ¶¶ 29-31; Pls.' Ex. 1.5 (CAC client fee agreement revised by Wen). Wen and Kim determined the Company's consumer fee structure, including the amount of fees and when those fees could be collected. Pls.' Ex. 1 (Kim Decl.) ¶ 28. Wen and Kim developed scripts and trainings when the Company first started operating and that the Company later used. Pls.' Ex. 1 (Kim Decl.) ¶¶ 33, 125-27, 143. Wen helped develop the commission structure for sales employees, and Wen and Kim had the final say over how sales employees were compensated. Pls.' Ex. 1 (Kim Decl.) ¶ 42. Wen and Kim fired CAC's employees and then re-hired them to work for True Count and Prime. Pls.' Ex. 1 (Kim Decl.) ¶¶ 14, 125. The heads of each department, of the Company,

| | | |
|---|---|---|
| | | including Sales, reported to Wen and Kim. Pls.' Ex. 1 (Kim Decl.) ¶¶ 19, 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 20. Wen and Kim were the final decisionmakers for CAC, True Count, and Prime during the entire course of their operation. Pls.' Ex. 1 (Kim Decl.) at ¶ 19; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 99.

Third, Wen was warned in an email to Wen and Kim on July 25, 2017, by CAC's then counsel that "IMPORTANTLY: You are on the hook (liable) for any marketing misrepresentations that your sales representatives make. So please monitor them carefully, secret shop them, and make sure they are not putting your company and you at risk." Pls.' Ex. 55 (Email re: no advance fee model). And Wen admits that "CAC was still taking advance fees" in early 2018. Wen Decl. at ¶ 88. *See also* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 88-91 (noting no routine sales audits in April 2019), Pls.' Ex. 89 (Receiver's Report) at 32:3-4 (finding that prior to August 2019, compliance concerns and procedures were "sporadic"). |
| 12. | While I received $1,551,515 from the SL Business, I have already turned over $3,088,382 through Ms. Dai, my mother. [ECF 298] Notably, $3 million of the money that my mother turned over was not derived, directly or indirectly, from the SL Business and was a gift that I had given her after I sold a previous | Disputed.

First, Wen's declaration purports to provide information about funds he received from the Company, claiming that "[f]rom the information that I can gather, I received $1,551,515." Wen Decl. ¶ 243. But that amount is inconsistent with |

| | |
|---|---|
| investment so that she could retire. Accordingly, Plaintiffs have already recovered from me and my mother in excess of the approximately $1.55 million in net profit I obtained from the SL Business – approximately two times that amount.<br><br>*See* Wen Declaration at ¶¶ 244-245. | Wen's Amended and Corrected Individual Financial Statement, which lists Relief Defendant Mice and Men LLC as a corporation "for the benefit of Kaine Wen." Pls' Ex. 98 at 1434-35; Mice and Men stipulated to a judgment of over $5 million in unjust gains from the Company. ECF 218. Wen fails to explain how these funds transferred to Mice and Men were not for his benefit.<br><br>Second, Ms. Dai's settlement is only relevant to Wen to the extent that Plaintiffs are seeking joint and several redress, such that Wen's portion of the redress should be reduced by redress payments from all other defendants. Moreover, Wen was not a signatory to Ms. Dai's settlement and the Dai settlement amount consisted of substitute assets given the fact that Ms. Dai received other monetary benefits from the Company.<br><br>Further, Wen's claims about the source of the funds that Wen purports to have gifted his mother is not in any way relevant to Plaintiffs' Motion.<br><br>Finally, Wen's calculation of his net profit, which is contradicted by the record, is not in any way relevant to Plaintiffs' Motion. |
| 13. I am currently working full-time as an office admin earning $16 per hour and I do not anticipate my income will substantially increase. | Disputed to the extent Wen claims that "I do not have assets or money to pay any penalties, fines, or judgments, other than what has already been turned over to the |

| | | | |
|---|---|---|---|
| | | I do not have assets or money to pay any penalties, fines, or judgments, other than what has already been turned over to the Receiver or is in the process of being turned over to the Receiver, or otherwise disclosed in my financial statements.<br><br>See Wen Declaration at ¶¶ 248-249. | Receiver or is in the process of being turned over to the Receiver, or otherwise disclosed on my financial statements." This Court has already found by clear and convincing evidence that Wen controls significant cryptocurrency assets that are the basis for the Court holding Wen in contempt. *See* ECF 418. Wen has failed to cure his contempt. *See* ECF 418, 420. The Court's finding as to Wen's cryptocurrency assets is law of the case and Wen provides no basis to depart from that finding. |
| | 14. | I made a lot of poor decisions and mistakes and I accept full responsibility for my own actions. I have paid a huge price. I have been incarcerated and I have lost all the money I made prior to investing in this Business. I have already turned over through my mother around $1.5 million more than what I made from this SL Business. My life and family have been ruined. I have committed to turn over the remainder of my assets as listed on my financial statements, including substantial assets that were derived prior to and entirely independent of the SL Business, to try and put an end to this and move on with my life, but the CFPB insists that I have cryptocurrency that I am hiding or refusing to turn over which is simply not the case. If I had access to or control of any additional cryptocurrency, I would gladly turn that over as well.<br><br>See Wen Declaration at ¶¶ 252-253. | Disputed.<br><br>Disputed to the extent that Wen claims that his actions are the result of mistake and that he claims he has accepted full responsibility for his actions. Wen owned and controlled the Company. *See* Pls.' Ex. 1 (Kim Decl.) ¶ 2, 7 ("Wen and I owned CAC jointly and equally"); Pls. Ex. 2 (Nguyen Decl.) ¶ 16 ("CAC, True Count, and Prime were interrelated companies owned and controlled by Kim and Wen"); Pls.' Ex. 1.1 (Wen and Kim listed as sole owners CAC). The heads of each department, of the Company, including Sales, reported to Wen and Kim. Pls.' Ex. 1 (Kim Decl.) ¶¶ 19, 39; Pls.' Ex. 2 (Nguyen Decl.) at ¶ 20. Wen and Kim were the final decisionmakers for CAC, True Count, and Prime during the entire course of their operation. Pls.' Ex. 1 (Kim Decl.) at ¶ 19; Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 6-7, 99.<br><br>Wen was significantly involved in CAC's activities, including relating |

to compliance. Wen purported to be CAC's general counsel as early as November 2015. *See* Def. Ex. 1. Wen was responsible for responding to consumer complaints forwarded by law enforcement and working with outside counsel to respond to law enforcement subpoenas. Pls. Ex. 1 (Kim Decl.) ¶¶ 75-76; *see also* Pls.' Ex. 2 (Nguyen Decl.) at ¶¶ 92-96. Wen and Kim reviewed and approved web content for the Company.  Pls.' Ex. 1 (Kim Decl.) ¶ 32. Wen drafted and approved contracts between the Company and consumers for the Company's services. Pls.' Ex. 1 (Kim Decl.) ¶¶ 29-31; Pls.' Ex. 1.5 (CAC client fee agreement revised by Wen). Wen and Kim determined the Company's consumer fee structure, including the amount of fees and when those fees could be collected. Pls.' Ex. 1 (Kim Decl.) ¶ 28. Wen and Kim developed scripts and trainings when the Company first started operating and that the Company later used. Pls.' Ex. 1 (Kim Decl.) ¶¶ 33, 125-27, 143. Wen helped develop the commission structure for sales employees, and Wen and Kim had the final say over how sales employees were compensated. Pls.' Ex. 1 (Kim Decl.) ¶ 42. Wen and Kim fired CAC's employees and then re-hired them to work for True Count and Prime. Pls.' Ex. 1 (Kim Decl.) ¶¶ 14, 125.

In addition, Wen was aware of the illegal conduct. Wen knew that Company employees falsified family

sizes and listed married consumers as single. Pls.' Ex. 1 (Kim Decl.) ¶¶ 49, 54; Pls.' Ex. 2 (Nguyen Decl.) ¶ 74. Wen knew that employees made misrepresentations to consumers. Pls.' Ex. 1 (Kim Decl.) ¶ 71; Pls.' Ex. 2 (Nguyen Decl.) ¶¶ 74-75. Wen knew the Company was charging illegal advance fees. Pls.' Ex. 1 (Kim Decl.) ¶¶ 85-88. Indeed, Wen signed a "debt relief service merchant agreement addendum," where he agreed that CAC "is engaged in the business of offering debt relief services" and "understands, currently fully complies with, and during the term of the Agreement, will fully comply with all relevant provisions" of the TSR and CFPA. *See* Pls.' Ex. 7 at 453-54. Wen was informed about family size inaccuracies, including as early as September 2016. UF 154; Pls.' Exs. 62-63, Ex. 64. In April 2017, Wen was further informed by the BBB that "[m]ultiple sources" asserted CAC charged upfront fees and some consumers alleged that CAC falsified information about their household. Pls.' Ex. 65 at 1162-64. In July 2017, Wen was involved in engaging counsel experienced with the student loan industry. *See* Wen Decl. ¶¶ 82-83. Also in July 2017, Wen was warned by counsel that he and Kim were "on the hook" for misrepresentations made by sales employees. Def. Ex. 12. Wen's communications with counsel further show his actual awareness that the TSR advance fee ban applied to the Company. Def. Exs. 13-14. Wen

even admits that he knew employees were adding dependents to consumers' actual family sizes and listing married consumers as single when offering or performing the Company's services. UF 154, 156, 160; Wen Decl. ¶¶ 125, 131. Although Wen asserts that he sought to engage counsel and bring the Company into compliance, *see, e.g.*, Wen Decl. ¶¶ 175-187, Wen does not dispute that the Company continued charging illegal advance fees and engaging in deception. *See, e.g.*, UF 20, 74-91, 104, 107, 111, 115, 119, 169, 212-13.

Also disputed to the extent Wen claims that "I have already turned over through my mother around $1.5 million more than what I made from this SL Business." The amount Ms. Dai paid in connection with her settlement does not constitute amounts that Wen has turned over. ECF 298 (settlement only as to relief defendant Judy Dai, not involving Wen). Furthermore, Wen's Amended and Corrected Individual Financial Statement lists Relief Defendant Mice and Men LLC as a corporation "for the benefit of Kaine Wen." Pls. Ex. 98 at 1434-35; Mice and Men stipulated to a judgment of over $5 million in unjust gains from the Company. ECF 218. Wen fails to explain how these funds transferred to Mice and Men were not for his benefit.

Further disputed to the extent Wen claims that "If I had access to or

| | | control of any additional cryptocurrency, I would gladly turn that over as well." This Court has already found by clear and convincing evidence that Wen controls significant cryptocurrency assets that are the basis for the Court holding Wen in contempt. *See* ECF 418. Wen has failed to cure his contempt. *See* ECF 418, 420. The Court's finding as to Wen's cryptocurrency assets is law of the case and Wen provides no basis to depart from that finding. |

Dated: April 10, 2023                    Respectfully Submitted,

By: */s/ Jesse Stewart*
Jesse Stewart (NY Bar No. 5145495)
(*Admitted pro hac vice*)
N. Nathan Dimock (DC Bar No. 487743)
(*Admitted pro hac vice*)
*Attorney for Plaintiff Bureau of Consumer Financial Protection*

*/s/ M. Lynne Weaver*
M. Lynne Weaver (NC Bar No. 19397)
(Admitted *pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
*Attorney for Plaintiff State of North Carolina*

By: */s/ Evan Romanoff*
Evan Romanoff (Atty. Reg. No. 398223)
(Admitted *pro hac vice*)
Assistant Attorney General
*Attorney for Plaintiff State of Minnesota*

By: */s/ Christina Tusan*
Christina Tusan

Assistant City Attorney
Office of the City Attorney
Consumer and Workplace
Protection Unit
*Attorney for Plaintiff the People of the State of California*

I, Jesse Stewart, attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

*/s/ Jesse Stewart*
Jesse Stewart