UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** SACV 19-1998-MWF (KSx)          **Date:  July 7, 2023**
Title:     Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
          Center Inc. et al.

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

          Deputy Clerk:                      Court Reporter:
          Rita Sanchez                       Not Reported

          Attorneys Present for Plaintiff:   Attorneys Present for Defendant:
          None Present                       None Present

**Proceedings (In Chambers):**        ORDER GRANTING PLAINTIFFS' MOTION
                                     FOR PARTIAL SUMMARY JUDGMENT [423]

       Before the Court is the Motion for Partial Summary Judgment filed by Plaintiffs
Bureau of Consumer Financial Protection ("CFPB"), the State of Minnesota
("Minnesota"), the State of North Carolina ("North Carolina"), and the People of the
State of California ("California") (collectively with Minnesota and North Carolina,
"the States") on January 30, 2023.  (Docket No. 423).  Defendant Kaine Wen filed an
Opposition on March 27, 2023.  (Docket No. 440).  Plaintiffs filed a Reply on April 10,
2023.  (Docket No. 444).

       The Court has read and considered the Motion and held a hearing on **May 1**,
**2023**.

       The Motion is **GRANTED**.  The undisputed evidence demonstrates that
Defendant participated in the deceptive acts of the Company or had authority to control
them and had knowledge of the Company's various misrepresentations and related
violations of the TSR and CFPA.  With the exception of the injunctive relief sought in
Section XV of the Proposed Final Judgment, the Court determines that the requested
civil money penalties, legal restitution, and injunctive relief are all appropriate
remedies here.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** SACV 19-1998-MWF (KSx)          **Date:  July 7, 2023**

Title:    Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
          Center Inc. et al.

## I.  **BACKGROUND**

### A.  **Overview of the Student-Loan Debt-Relief Enterprise**

Between 2014 and 2019, Defendant's student-loan debt-relief enterprise
operated through three main companies:  Consumer Advocacy Center, Inc.,
d/b/a Premier Student Loan Center ("CAC"); True Count Staffing Inc. ("True
Count"), d/b/a SL Account Mgmt ("SLAM"); and Prime Consulting LLC ("Prime")
(collectively, "the Company").  (Statement of Undisputed Facts ("UF") (Docket No.
423-1) ¶¶ 1, 5, 7, 8, 11, 17, 20–35, 40–43, 48–49,138–39).  The Company marketed,
sold and performed purported student-loan debt-relief services to consumers
nationwide from November 5, 2015, until the Court entered an injunction
prohibiting further operations in October 2019.  (UF ¶¶ 20-35; *see also* Sealed
Order Granting Ex Parte Restraining Order with Asset Freeze, Appointment of
Receiver, and Other Equitable Relief, and to Show Cause Why a Preliminary
Injunction Should Not Issue (Docket No. 24); Stipulated Preliminary Injunction
with Asset Freeze, Appointment of Receiver; and Other Equitable Relief (Docket
No. 103)).

In 2014, Defendant and his business partner, Albert Kim, formed CAC to
offer, sell and perform student-loan debt-relief services.  (UF ¶¶ 1, 5, 6).  In March
2018, Defendant and Kim transferred CAC's processing department, which
prepared consumers' loan-adjustment applications and collected consumers'
payments, to True Count, also owned and controlled by Defendant and Kim.  (UF
¶¶ 27, 29, 139).  True Count then collected payments from consumers for the
student-loan debt relief services sold by CAC and remitted a portion of that money
back to CAC until September 2018.  (UF ¶ 28).

During 2018, law enforcement scrutiny of the Company intensified.  (*See* UF
¶¶ 196–197).  On May 29, 2018, the Minnesota Attorney General's Office issued a

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023**
Title:       Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
             Center Inc. et al.

civil investigative demand (CID) to a company with a name similar to CAC's to Defendant's attention. (UF ¶ 196).  And in mid-September 2018, the Company received the Bureau's CID directed to CAC.  (UF ¶ 197).  In response, Defendant and Kim developed a plan, against advice of counsel, to delete the Company's emails. (UF ¶¶ 200–04).  Defendant and Kim also formed a new company, Prime, to effectively replace CAC.  (*See* UF ¶¶ 11–18, 30–36, 139).  True Count continued to collect payments from legacy CAC customers, as well as consumers who enrolled through Prime, but Wen and Kim redirected CAC's remittances to Prime, leaving CAC insolvent.  (UF ¶¶ 30–35).  CAC petitioned for Chapter 11 bankruptcy on January 16, 2019, in the Southern District of Florida.  (UF ¶ 36).

Although Defendant and Kim publicly identified CAC, True Count, and Prime as separate companies with separate owners, they operated as one company controlled by Defendant and Kim.  (UF ¶¶ 3, 8, 14, 17–18, 20–35, 37–43, 48–49,138–39).  For example, all the companies shared a customer-relationship-management system (CRM) to store consumers' information, including payments and refunds; shared employees, including high-level managers; and intermingled their business records.  (UF ¶¶ 37–38, 41, 42).

## B.  <u>Federal Student Loan Repayment and Forgiveness Programs</u>

The U.S. Department of Education (DOE) offers several federal-student loan repayment and forgiveness programs to borrowers.  (UF ¶ 50).  As relevant to Defendant's scheme, the income-driven repayment (IDR) plan *may* result in lower monthly payments and eventual loan forgiveness for consumers.  (UF ¶ 51).  For consumers who qualify for an IDR plan, student-loan servicers (not third-party debt-relief providers like the Company) determine a consumer's monthly loan payment amount based on factors including the consumer's income, family size, marital status, and tax-filing status.  (UF ¶ 52). Consumers must recertify their eligibility

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

for IDR programs annually, and their monthly payment amount may vary year to year depending on how factors change over time.  (UF ¶ 54).

Although falsifying consumers' family size or marital status on IDR plan applications may initially lower their monthly student loan debt payments, it can also have negative consequences.  (UF ¶ 55).  For example, consumers may accrue more interest because it takes longer to pay off the loan due to the artificial lowering of the monthly payment.  (UF ¶ 55).  Also, interest on consumers' loan balances may be capitalized if they leave an IDR program voluntarily or because they did not recertify.  (*Id.*).  Consumers may also unexpectedly face higher payments when their monthly payment amount is recalculated based on accurate information.  (*Id.*).

Under each type of IDR plan, any remaining loan balance may be forgiven if a consumer's student loans are not fully repaid by the end of the repayment period.  (UF ¶ 56).  IDR plans have repayment periods of 20-25 years, and consumers also in the Public Loan Service Program could qualify for loan forgiveness after making 10 years of qualifying payments.  (UF ¶ 57).

Consumers also may consolidate multiple federal education loans into one loan, which could provide additional loan repayment plans and forgiveness programs.  (UF ¶ 58).  But consolidating federal loans can result in losing qualifying payments for loan forgiveness in connection with IDR plans.  (UF ¶ 59).

Consumers struggling to pay their loans can seek a temporary suspension of their loan payments, known as forbearance.  During the relevant period, consumers could seek a "general forbearance" for a cumulative total of three years, and interest would typically continue to accrue during the forbearance, increasing the consumer's overall student loan debt over time.  (UF ¶ 60).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| **Case No.** | SACV 19-1998-MWF (KSx) | **Date:** | **July 7, 2023** |
| Title: | Bureau of Consumer Financial Protection et al. v. Consumer Advocacy Center Inc. et al. | | |

## C.     The Company's Purported Student-Loan Debt-Relief Services

Using high-pressure sales tactics and misrepresentations, the Company lured consumers struggling with student-loan debt to pay hundreds or thousands of dollars in fees for services the consumers could perform themselves for free. (UF ¶¶ 69, 74–91, 99–103, 105–06, 113–14, 116). The Company identified potential clients through lead generators, who transferred prospective consumers by phone to the Company's sales department. (UF ¶ 62). During sales calls, salespeople accessed consumers' loan information on the Federal Student Aid (FSA) website, either by asking for the consumer's credentials or by creating an account for the consumer. (UF ¶ 66). Salespeople also entered information about consumers—including their family size and marital status—into the CRM, often entering an inflated family size and listing married consumers as single. (UF ¶¶ 67, 81–84). The Company's salespeople misled consumers about the Company's fees and services during the sales calls and pressured them to enroll, including by claiming that certain benefits could disappear if they declined. (UF ¶¶ 69, 74–91, 99–103).

Salespeople frequently misled consumers to believe that fees paid to the Company were used to pay down their student loan debt when, in fact, the Company retained consumers' payments. (UF ¶¶ 74-76). During sales calls, the Company also created the impression that consumers had to pay the Company's fees to enroll in IDR plans. (UF ¶ 77). The Company often led consumers to believe that a significant part of their loans would be forgiven simply by enrolling in the Company's services. (UF ¶¶ 86-89). Sometimes salespeople stated or implied that the loan forgiveness would be immediate. Other times they led consumers to believe that so long as they made their monthly payments to the Company, the remainder of their loans would be forgiven. (UF ¶ 90). Salespeople frequently promised consumers significantly lower monthly student loan payments and led them to believe payments would be the same for the entire loan term. (UF ¶¶ 78–81). Notably, they failed to disclose to consumers that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)                Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
             Center Inc. et al.

their quotes were based on false information about the consumer's family size
or marital status, which artificially lowered the monthly payment amount.  (UF ¶¶
84, 102–03).

Following the sales call, employees in the Processing Department
(processors) contacted the consumers and then prepared the consumer's IDR
application and, in some cases, a loan consolidation application.  (UF ¶¶ 92, 97).
Processors typically relied on the information entered in the Company's customer
relationship platform, Debt Pay Pro, by sales employees—which as discussed
above, frequently included manipulated information.  (UF ¶¶ 67, 81–84, 93).  The
Company did not show consumers the applications it submitted to servicers on their
behalf.  (UF ¶ 98).  The Company either did not inform consumers that it included
false information in IDR plan applications, or it misrepresented what could properly
be included as part of a consumer's family size.  (UF ¶¶ 99–103).

The Company received many consumer complaints about its marketing
practices.  (UF ¶¶ 130–134).  For example, during October 2019 alone, Thomas
McNamara, the court-appointed Receiver, identified approximately 150 consumer
complaints in a single inbox.  (UF ¶¶ 132–34).  And despite the Company's efforts
to "fly under the radar," numerous consumers complained about the Company's
deceptive practices to law enforcement agencies and the Better Business Bureau
who, in turn, shared some of these complaints with the Company.  (UF ¶¶ 123-130).

### D.    The Company's Charging of Advance Fee

The Company charged two types of fees: an "enrollment fee" and a "monthly
fee."  (UF ¶¶ 104–118).  The enrollment fee ranged from approximately $799 to
$1,899 and could be paid in more than one payment.  (UF ¶¶ 106, 107).  The
Company incentivized salespeople to collect as much of the enrollment fee as
possible at enrollment, and paid salespeople a higher commission when consumers

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

paid the enrollment fee in full.  (UF ¶¶ 109).  The Company also charged a monthly
fee of $10 to $50 per month for the entire life of the loan (typically 10–25 years).
(UF ¶¶ 113–16). The Company charged the monthly/recurring fees in the twelve
months leading up to the submission of the recertification paperwork, purportedly
for preparing annual recertification paperwork for IDR plans.  (UF ¶ 115).  As a
result, the Company collected monthly/recurring fees before the consumer made a
payment on a recertified IDR plan.  (UF ¶ 115).  In sum, the Company collected
enrollment and monthly fees from consumers before the consumers had made a
payment on an adjusted loan.  (UF ¶¶ 104, 107, 109–113, 115–118).  The Company
did not track whether consumers made payments on adjusted payment plans.  (UF
¶¶ 118).

## E.  **Defendant's Role in Directing the Enterprise**

Defendant held an essential role in in the student-loan debt-relief enterprise.
(UF ¶¶ 5–8, 16–19, 27, 30, 48–49, 70, 138–150, 155, 161–66, 174–180, 183–185,
187, 193–95).  He served as one of two final decisionmakers and participated in
the Company's significant decisions.  (UF ¶¶ 15–19, 27–30, 48–49, 138–39, 145–
150, 161–63, 165–66, 174, 176, 187–93.  Defendant knew about—and even
controlled—the Company's sales practices and the eventual fallout from those
practices.  (UF ¶¶ 48–49, 145–52, 154–66).  Defendant and his partner, Kim,
promoted a high-pressure "SIGN OR DIE" culture aimed at maximizing consumer
enrollment.  (UF ¶¶ 69–72, 154–166).  Despite several red flags, including
consumer complaints, Defendant and his partner did not reform the Company's
practices, and instead employed a panoply of fictitious names and engaged a
reputation management company to deal with negative online reviews.  (UF ¶¶ 71–
72, 130–31, 135–37, 145, 150, 154–166).

Defendant long understood that the Company charged illegal advance fees
and undertook efforts to conceal this practice.  (UF ¶¶ 167–176, 180, 183–85, 191–

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)                Date:  July 7, 2023
Title:    Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
          Center Inc. et al.

207).  Defendant helped establish the Company's fee structure, including when and
how those fees could be collected.  (UF ¶ 146).  He also helped set up and
maintain the Company's merchant accounts.  (UF ¶¶ 144–45).  Defendant was
personally cautioned about complying with the Telemarketing Sales Rule's advance
fee provisions, and he approved the Company's contracts, which since at least
February 2018 included a section entitled "No Advance Fees."  (UF ¶¶ 168, 173).
Later, in 2019 Defendant also helped form TAS 2019 LLC, d/b/a Trusted Account
Services ("TAS"), a supposedly independent dedicated account provider that, in
reality, Defendant and other insiders directed.  (UF ¶¶ 174–76, 178–85, 187–95).
The Company used TAS to collect fees from consumers from August to October
2019. (UF ¶¶ 174–95).

        Defendant also acknowledged the Company's illegal fee collection practices
in emails with close associates and counsel, while simultaneously perpetuating
them through approving and overseeing these practices.  (UF ¶¶ 167–176, 180,
183, 191–95).  For example, in an email dated August 3, 2018, Defendant wrote:
"TC/SLAM is processing for ~37k current active clients. All clients are 'paying
upfront fees.' There is no way to be retroactively compliant."  (UF ¶ 169).  The
Company continued to collect advance fees from consumers until the Court
entered a temporary restraining order halting its operation in October
2019.  (UF ¶¶ 104, 212).

## F.    The Company's Wrongful Collection of Over $95 Million from Consumers and Additional Harms Caused

        Between November 5, 2015, and October 23, 2019, Defendant's enterprise
collected approximately $95,057,756.92 from consumers nationwide. (UF ¶¶ 20,
212).  In addition to paying exorbitant fees for services they could perform
themselves for free, consumers suffered additional harms.  (UF ¶¶ 50, 212, 217–21).
For example, some consumers lost qualifying payments toward loan forgiveness

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** SACV 19-1998-MWF (KSx)          **Date:  July 7, 2023**
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

because the Company had pursued an unnecessary loan consolidation on their behalf.  (UF ¶ 217).  At times, the Company's practices increased consumers' loan debts through the accrual of extra interest costs.  (UF ¶ 218).  The Company's practices also caused some consumers to unknowingly fall behind on their loan payments.  (UF ¶ 219).  In addition, the Company's practices caused consumers other financial harms and significant stress.  (UF ¶¶ 220-21).

## II.   **LEGAL STANDARD**

In deciding a motion for summary judgment under Rule 56, the Court applies *Anderson*, *Celotex*, and their Ninth Circuit progeny.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The Ninth Circuit has defined the shifting burden of proof governing motions for summary judgment where the non-moving party bears the burden of proof at trial:

The moving party initially bears the burden of proving the absence of a genuine issue of material fact.  Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case.  Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial.  This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence.  The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue.  In fact, the non-moving party must come forth

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)            Date:  July 7, 2023
Title:     Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

with evidence from which a jury could reasonably render a verdict in the non-moving party's favor.

*Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 n.2 (9th Cir. 2016) (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)).

"A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249–50.  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

## III.  <u>EVIDENTIARY OBJECTIONS</u>

The parties advance various objections to the evidence submitted in connection with the Motion.  (*See* Docket Nos. 436, 438, 444-4, 448-5).  Many of the objections are garden variety evidentiary objections based on mischaracterization of evidence, speculation, lack of foundation, hearsay, and relevance.

While these objections may be cognizable at trial, on a motion for summary judgment, the Court is concerned only with the ***admissibility*** of the relevant ***facts*** at trial, and not the ***form*** of these facts as presented in the Motion.  *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) ("[A]t the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents" (citations omitted)).  Where "the contents of a document can be presented in a form that would be admissible at trial — for example, through live testimony by the author of the document — the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment."  *Id.* (citations omitted); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (holding that plaintiff's diary could be considered on summary

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)          Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

judgment because she could testify consistent with its contents at trial); *Hughes v.
United States,* 953 F.2d 531, 543 (9th Cir. 1992) (IRS litigation adviser's affidavit may
be considered on summary judgment despite hearsay and best evidence rule objections;
facts underlying affidavit were of type admissible as evidence even though affidavit
itself may not be).

    To the extent that the Court relies upon other evidence to which the parties
object, the objections are **OVERRULED**.  To the extent the Court does not, the
objections are **DENIED *as moot***.

## IV.    **DISCUSSION**

    Plaintiffs move for summary judgment on their claims asserting violations of the
Telemarketing Sales Rule (the "TSR") and the Consumer Financial Protection Act (the
"CFPA").  (Memorandum at 1.  Plaintiffs argue that the same facts that form the basis
of the TSR and the Bureau of Consumer Financial Protection's (the "Bureau") claims
under the CFPA establish Defendant's liability to Plaintiffs the State of Minnesota for
violations of the Minnesota Prevention of Consumer Fraud Act and Uniform Deceptive
Trade Practices Act; the State of North Carolina for violations of the North Carolina
Debt Adjusting Act and the Unfair and Deceptive Practices Act; and the People of the
State of California for the California Unfair Competition Law.  (*Id.* at 1–2).

    Defendant raises five arguments in Opposition: (1) the Bureau violates the
Constitution's Appropriations Clause and Separation of Powers; (2) numerous
genuine issues of material fact exist; (3) Plaintiffs' claims are unconstitutional under
the Eighth Amendment; (4) even if the Court grants the Motion, the amount of
damages sought must be limited under *Liu v. Sec*; and (5) Plaintiffs have not shown
any entitlement to the relief it seeks.  (*See* Opposition at 2–4).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

## A.      Constitutionality of the Bureau's Statutory Funding Mechanism

Defendant first argues that the Motion must be denied because the Bureau's funding scheme violates the Appropriations Clause of the Constitution and its separation of powers principle.  (Opposition at 12–13).  Defendant relies on the recent Fifth Court decision *Cmty. Fin. Servs. Assn of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *cert. granted sub nom. CFPB v. Com. Fin. Services Assn.*, 2023 WL 2227658 (U.S., Feb. 27, 2023, No. 22-448), and *cent. denied sub nom. Com. Fin. Services Assn. v. CFPB*, 2023 WL 2227679 (U.S., Feb. 27, 2023, No. 22-663).

However, as the Fifth Circuit itself recognizes, the Fifth Circuit's decision runs counter to the view of "every [other] court to consider" the validity of the CFPB's statutory funding provisions.  *Id.* at 641.  The Court is instead persuaded by the line of cases concluding that the CFPB's funding structure does not violate the separation of powers principles contained in the Appropriations Clause of the Constitution.  *See, e.g., CFPB v. L. Offs. of Crystal Moroney, P.C.*, 63 F.4th 171 (2d Cir. Mar. 23, 2023); *PHH Corp. v. CFPB*, 881 F.3d 75, 95-96 (D.C. Cir. 2018) (en banc), abrogated on other grounds by *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020)); *CFPB v. Fair Collections & Outsourcing, Inc.*, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020); *CFPB v. Think Finance LLC*, 2018 WL 3707911, at *1-2 (D. Mont. Aug. 3, 2018); *CFPB v. Navient Corp.*, 2017 WL 3380530, at *16 (M.D. Pa. Aug. 4, 2017); *CFPB v. ITT Educ. Services, Inc.*, 219 F. Supp. 3d 878, 896-97 (S.D. Ind. 2015); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014); *CFPB v. TransUnion*, 2022 WL 17082529, at *5 (N.D. Ill. Nov. 18, 2022).

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. Art. I, § 9, cl. 7.  As the Supreme Court has long emphasized, the "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'"  *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023**

Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

*Co. v. United States*, 301 U.S. 308, 321 (1937)).  "[I]n other words, the payment of
money from the Treasury must be authorized by a statute."  *Id.*

The Bureau's funding is authorized by the CFPA which permits the Bureau
Director to request a transfer "from the combined earnings of the Federal Reserve
System" of an "amount," up to an inflation-adjusted cap, that the Director
"determine[s] . . . to be reasonably necessary to carry out the authorities of the
Bureau."  12 U.S.C. § 5497(a)(1), (2).

As the Second Circuit recently concluded, "[b]ecause the CFPB's funding
structure was authorized by Congress and bound by specific statutory provisions, . . .
[it] does not offend the Appropriations Clause." *CFPB v. L. Offs. of Crystal Moroney,
P.C.*, 63 F.4th at 181.  The Second Circuit respectfully concluded that the Fifth
Circuit's contrary finding that the Appropriation's Clause required more than the
"straightforward and explicit command" that the "payment of money from the
Treasury must be authorized by a statute" to be unsupported by Supreme Court
precedent.  *See id.* at 182.

Accordingly, like every court to consider the issue other than the Fifth Circuit,
the Court determines that the Bureau's funding scheme does not violate the
Appropriations Clause.

### B.    **Issues of Material Fact**

Defendant argues that the Motion should be denied because numerous genuine
issues of material fact remain.  (Opposition at 17).  Defendant argues that Plaintiffs
overstate his role with the Company as he initially participated in the Company only as
a silent investor with no direct involvement in its operations.  (*Id.* at 17–18).  For
instance, Defendant contends he only exercised managerial responsibility for and
control over True Count's business practices from March 2018 through October 22,
2019.  (*Id.*).  Defendant disputes that he was a final decisionmaker for CAC, True

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  SACV 19-1998-MWF (KSx)           Date:  July 7, 2023**

Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

Count, and Prime during the entire course of their operation.  (*Id.* at 18–19).
Defendant argues that despite Plaintiffs' assertions, he did not help develop the
commission structure for salespeople, did not approve and draft contracts and sales
scripts until later years, and was not informed of Company policies altering consumers'
family sizes or marital statuses.  (*Id.* at 19–21).

Plaintiffs point out that Defendant does not contest the Company's liability for
(1) charging advanced fees and (2) holding consumer fees and never making payments
to creditors on behalf of consumers, both in violation of the TSR.  (Reply at 6–7 (citing
UF ¶¶ 20, 61, 104–16, 119, 169, 212–13)).  Plaintiffs also note that Defendant does not
dispute that the Company engaged in deception, in violation of the TSR and CFPA.
(*Id.* at 7 (citing UF ¶ 74–91, 98–103, 123–24)).  Instead, Defendant only disputes that
the Company made misrepresentations in every case.  (*See* Statement of Genuine
Disputes ("SGD") (Docket No. 441) at 74, 76, 78-79, 83-84, 86, 89, 98-100, 102-103,
129, 131)).

Defendant's contention that not all consumers were deceived does not rebut
Plaintiffs' evidence and does not undermine Plaintiffs' claims that the Company
violated the TSR and CFPA.  *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009)
(agency not required to show that all consumers were deceived to be granted summary
judgment on TSR and FTC Act claims).  Accordingly, the Court concludes that there
are no genuine issues of material fact with respect to the Company's violations of the
TSR and the CFPA.

The remaining core of Defendant's argument is that the Motion should be denied
because there are genuine issues of material fact over whether Defendant, individually,
is liable for the Company's violations of the TSR and CFPA.

Under the CFPA and TSR, an individual may be liable for conduct related to
corporate violations of the CFPA and the TSR where "(1) he participated directly in
the deceptive acts or had the authority to control them and (2) he had knowledge of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

the misrepresentations, was recklessly indifferent to the truth or falsity of the
misrepresentation, or was aware of a high probability of fraud along with an
intentional avoidance of the truth."  *CFPB v. CashCall, Inc.*, 35 F.4th 734, 749 (9th
Cir. 2022) (applying standard for individual liability under the CFPA and relying on
precedent noting it is the same as standard under FTC Act) (citations omitted).  A
person's role and authority within a company can demonstrate the requisite control
and level of knowledge.  *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168,
1170-71 (9th Cir. 1997).

     Additionally, under the TSR, a person may be liable for substantially assisting
any seller or telemarketer when that person knows or consciously avoids knowing
that the seller or telemarketer is engaged in any act or practice that violates the TSR.
16 C.F.R. § 310.3(b); *FTC v. Lake*, 181 F. Supp. 3d 692, 700-01 (C.D. Cal. 2016).
The CFPA similarly provides that it is unlawful for "any person to knowingly or
recklessly provide substantial assistance to a covered person" engaging in unfair,
deceptive, or abusive acts or practices. 12 U.S.C. § 5536(a)(3); *see also CFPB v. D
& D Mktg.*, No. CV 15-9692 PSG (Ex), 2016 WL 8849698, at *11 (C.D. Cal. Nov.
17, 2016) (same).

     The purported disputes over Defendant's liability take a different shape for
Defendant's conduct before and after June 2017, however the Court determines that
there is no genuine dispute of material fact in both time periods.

## 1.  Defendant's Liability before June 2017

     Defendant argues he joined the Company as a silent investor with only minimal
involvement in the Company's operation.  (*See* Opposition at 17–19).  However, the
evidence suggests Defendant was the Company's "Chief Financial Officer" (Pltf.
Exhibits 1-11 (Docket No. 423-2), Ex. 1.1) and the Company's "General Counsel"
(Def. Exhibits (Docket No. 437), Ex. 1) since at least 2015.  Because a person's
authority within a company can demonstrate the requisite control and level of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)                 Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

knowledge for direct liability, Defendant had sufficient control and involvement in the Company to be liable.  *See FTC v. P Publ'g Clearing House, Inc.*, 104 F.3d at 1170–71 (defendants assumption of the role of president and authority to sign documents demonstrated that she had requisite control over corporation to be liable for corporation's misrepresentations).

The evidence also demonstrates that Defendant had sufficient knowledge of TSR violations and at least has reckless indifference to the misrepresentations being made by the Company.  For instance, it is undisputed that Defendant regularly communicated with Kim about CAC services and budget issues beginning in 2015. (UF ¶¶ 140, 142).  Defendant was also an account signatory for eight merchant accounts and bank accounts in CAC's and True Count's names which he helped set up and maintain, at least one of which he opened in late 2015.  (*Id.* ¶ 143–145; Plaintiff's Exhibits 12-35 (Docket No. 423-3), Ex. 12, App. D).  It is also undisputed that Defendant was responsible for handling consumer complaints and inquiries from law enforcement.  (UF ¶ 166).  Defendant signed a "debt relief service merchant agreement addendum," where he agreed that CAC "is engaged in the business of offering debt relief services" and "understands, currently fully complies with, and during the term of the Agreement, will fully comply with all relevant provisions" of the TSR and CFPA.  (Pltf. Exhibits, Ex. 7 at 453–54). Further, the evidence demonstrates that Defendant was aware of CAC's advance fees since at least April 2016 when he asked Kim for CAC's fees  (*See* UF ¶ 146, Def. Exhibits, Ex. 4) and was informed about family size inaccuracies as early as September 2016 (UF ¶ 154).

In his declaration, Defendant states that he had minimal involvement in and knowledge of the Company's business practices prior to June 2017.  (Wen Decl. ¶¶ 20–66).  However, while Defendant states that he had little involvement in the day-to-day operation of the Company before June 2017, he does not meaningfully contradict the evidence of his control and knowledge of the Company's practices

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

detailed above.  *See CFPB v. Gordon*, 819 F.3d 1179, 1194 (9th Cir. 2016)
(conclusory and self-serving affidavit insufficient to raise "triable issue" where it lacks
"detailed facts and any supporting evidence") (citation omitted); *Villiarimo v. Aloha
Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("this court has refused to find a
'genuine issue' where the only evidence presented is 'uncorroborated and self-serving'
testimony") (citation omitted).

Defendant's position in the Company, his periodic communications with Kim,
and his support of the Company's business gave him sufficient control, participation,
and knowledge to be liable for the Company's TSR and CFPA violations even before
June 2017.  *See FTC v. P Publ'g Clearing House, Inc.*, 104 F.3d at 1170–71
(affirming conclusion that defendant who obtained and signed business license for
company was individually liable for company's violation of FTCA even though she
stated that she only worked at company for one week, signed the license at the
direction of someone who could not legally open a telemarketing business, and was not
in charge of conducting the violative solicitation).  Additionally, because a plaintiff
need only show "more than [casual] or incidental assistance" but "not a direct
connection between the assistance and the [underlying law] violations," there is no
genuine dispute of material fact over whether Defendant is liable for substantial
assistance of TSR and CFPA violations.  *See CFPB v. Daniel A. Rosen, Inc.*, No. 2:21-
cv-07492-VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022); *see also D
& D Mktg.*,2016 WL 8849698, at *11-12 (similar standard under CFPA).

Accordingly, the Motion is **GRANTED** with respect to Defendant's liability
starting in November 2015 through June 2017.

## 2.  Defendant's Liability after June 2017

Defendant's involvement was even more direct after June 2017.  Defendant does
not meaningfully dispute that he was directly participating in the Company's affairs
and was aware of or recklessly indifferent to the Company's illegal activity by July

---

**CIVIL MINUTES—GENERAL                                    17**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  SACV 19-1998-MWF (KSx)            Date:  July 7, 2023**

Title:     Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
           Center Inc. et al.

2017.  By this time, Defendant acknowledges that he regularly participated in the Company's activities by, among other things, preparing "numerous compliance memos" related to Company sales and processing (Wen Decl. ¶¶ 68, 147) and engaging counsel that warned that Defendant would be liable "for any marketing misrepresentations that your sales representatives make" (Def. Exhibits (Docket No. 437), Ex. 12; UF ¶ 173).  Defendant was therefore aware of the requirements of the TSR and CFPA and that the Company was violating such requirements, including the TSR advance fee ban.  *See CFPB v. CashCall, Inc.*, 35 F.4th at 749 (illegal activity contrary to advice of counsel was reckless); (Def. Exhibits, Ex. 13–14); (UF ¶¶ 104–118).  Additionally, Defendant admits that by late 2017 or early 2018 he knew that Company employees were adding dependents to consumers' actual family sizes and listing married consumers as single.  (UF ¶¶ 154, 156, 160; Wen Decl. ¶¶ 125, 131).  While Defendant states that he began taking corrective actions to stop and fix the family size and filing status issues, he does not present evidence that these practices were fixed.  (*See* Wen Decl. ¶ 131).   For instance, Defendant states that he created a compliance bot called Ultron to address these issues but does not present any evidence that Ultron did anything to ensure that client enrollments and files were handled appropriately.  (*See id.* ¶ 166).

        Defendant knew of the Company's misrepresentations or had reckless disregard for the truth.  Defendant does not dispute that he agreed that the Company use numerous fictitious names to dilute the number of the consumer complaints against it. (UF ¶ 161).  Defendant acknowledges that he responded to consumer complaints and inquiries from law enforcement, knew that CAC had negative online reviews, and helped retain a reputation management company.  (*Id.* ¶¶ 162–163, 166).  While Defendant asserts that he sought to engage counsel and bring the Company into compliance (Wen Decl. ¶¶ 168–170), as discussed above, it is undisputed that the Company continued to charge illegal advance fees and engage in deception until October 2019.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)                Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

Accordingly, the Motion is **GRANTED** with respect to Defendant's liability after June 2017.

In particular, the Court determines there is no genuine dispute of material fact with respect to Defendant's liability for violation the TSR and CFPA (Counts I, II, III, and VII) and for substantially assisting the Company's TSR and CFPA violations (Counts V and IX).  Further, because a violation of the TSR committed by a person subject to the CFPA is treated as a violation of a rule prescribed by the Bureau under Section 1031 of the CFPA, summary judgment is also warranted against Defendant on Count XI.  *See* 15 U.S.C. § 6102(c).

Additionally, on the same undisputed facts, summary judgment is also warranted against Defendant for violation of Minnesota's Consumer Protection Laws (Counts XVII and XVIII), North Carolina's Consumer Protection Laws (Counts XIX and XX), and California's Unfair Competition Law ("UCL") (Count XXII).  *See Meyer v. Dygert*, 156 F. Supp. 2d 1081, 1086-87 (D. Minn. 2001) (holding that corporate officers can be held personally liable under Minnesota's consumer protection laws "if they participate in, direct, or were negligent in learning of and preventing the fraudulent conduct"); *State ex rel. Cooper v. NCCS Loans, Inc.*, 624 S.E.2d 371, 378 (N.C. Ct. App. 2005) (holding that trial court did not err in granting State's motion for summary judgment against individual defendant for violation of N.C. Gen. Stat. section 75-1.1 where State asserted defendant "directed and controlled the illegal activities of the corporate defendants" and defendant offered no evidence contradicting the State's assertion); *Myers v. Liberty Lincoln-Mercury, Inc.*, 365 S.E.2d 663, 664 (N.C. Ct. App. 1988) (holding that to prevail in an action under North Carolina Chapter 75, a plaintiff "does not have to prove fraud, bad faith or intentional deception . . . ; it is enough that the goods [or services] bought were misrepresented."); *See Farmers Ins. Exch. v. Superior Ct.*, 826 P.2d 730, 734 (Cal. 1992) ("an unlawful business practice [prohibited by California's UCL] borrows violations of other laws and treats these

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

violations . . . as unlawful practices independently actionable under section 17200 et
seq.").

## C.      Constitutionality and Calculation of Civil Money Penalties

Plaintiffs seek civil money penalties of $148,080,555.  (Motion at 29).  Plaintiffs
calculate the civil penalties pursuant to 12 U.S.C. § 5565(c)(2)(B), as adjusted by 12
C.F.R. § 1083.1, which provides for a civil penalty up to $34,065 per day for "any
person that recklessly engages in a violation of a Federal consumer financial law."
Plaintiffs contend Defendant's violations continued between at least November 5,
2015, and October 23, 2019, for a total of 1,449 days.  (Motion at 29).  Plaintiffs
assume three violations per day:  (1) violation of TSR through collection of
enrollment fees (Count I); (2) violation of TSR through monthly recertification fees
(Count II); and (3) engaged in deceptive conduct in violation of the TSR (Count
III).  (*Id.* (excluding the two violations for substantial assistance and counting
Counts III and VII as a single violation for penalty purposes).  Plaintiffs contend the
civil penalties are appropriate because Defendant and others bilked consumers out
of over $95 million by charging thousands of dollars for services that consumers
could have undertaken themselves at little to no costs and charging consumers
hundreds of dollars per year to recertify their loans, often by submitting false
information to loan servicers.  (*Id.* at 30).  Plaintiffs also believe Defendant still
holds tens of millions of dollars' worth of cryptocurrency.  (*Id.*).

Defendant argues the civil money penalties violate the Eighth Amendment's
prohibition against excessive fines.  (Opposition at 13).  Additionally, Defendant
argues that Plaintiffs' assumption of 1,449 consecutive days is improper as Plaintiffs
have not proffered evidence that there was one violation on each day (which includes
weekends and holidays when the office was closed).  (*Id.* at 15).  Defendant also
argues that Plaintiffs' calculation ignores the mitigating factors the Bureau and the
Court is required to consider per 12 U.S.C. § 5565(c)(3).  (*Id.* at 15–16 (citing *SEC v.
Jasper*, 883 F. Supp. 2d 915, 931-32 (N.D. Cal. 2010) (A court may also examine a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

defendant's ability to pay the civil fine in determining the appropriate amount.)).
Defendant contends that fines sought is nearly 100 times the amount of money he
actually received from the Company and that all of his assets have already been
turned over to the receiver.  (*Id.* at 16–17).

## 1.  Eighth Amendment Excessive Fines Clause

The Eighth Amendment provides: "[e]xcessive bail shall not be required, nor
excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const.,
Amdt. 8.  At the time the Constitution was adopted, "the word 'fine' was understood to
mean a payment to a sovereign as punishment for some offense."  *Browning–Ferris
Industries of Vt., Inc. v. Kelco Disposal, *328 Inc.,* 492 U.S. 257, 265, 109 S.Ct. 2909,
2915, 106 L.Ed.2d 219 (1989).  The Excessive Fines Clause thus "limits the
government's power to extract payments, whether in cash or in kind, 'as punishment
for some offense.' "  *Austin v. United States,* 509 U.S. 602, 609–610, 113 S.Ct. 2801,
2805, 125 L.Ed.2d 488 (1993) (emphasis deleted).

"A civil penalty violates the Excessive Fines Clause 'if it is grossly
disproportional to the gravity of a defendant's offense.'"  *SEC v. Murphy*, 50 F.4th
832, 849 (9th Cir. 2022) (quoting *United States v. Bajakajian*, 524 U.S. 321, 334
(1998)).  But, because "judgments about the appropriate punishment for an offense
belong in the first instance to the legislature," *Bajakajian*, 524 U.S. at 336, any penalty
that "is within the bounds set by the penalty statute" is entitled to "substantial
deference," *Murphy*, 50 F.4th at 849.  Indeed, "[t]he Ninth Circuit and other federal
courts have consistently found that civil penalty awards in which the amount of the
award is less than the statutory maximum do not run afoul of the Excessive Fines
Clause." *United States v. Mackby*, 221 F. Supp. 2d 1106, 1110 (N.D. Cal. 2002), *aff'd*,
339 F.3d 1013 (9th Cir. 2003); *see also Horne v. U.S. Dep't of Agric.*, 673 F.3d 1071,
1082 (9th Cir. 2012) (explaining that statutory authorization for "steeper fine," "while
not dispositive, weighs heavily against finding the fine grossly disproportional to the . .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)            Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

. offense"), *rev'd on other grounds sub nom. Horne v. Dep't of Agric.*, 569 U.S. 513
(2013).

Here, the Bureau requests no more than what the CFPA authorizes for
reckless violations like Defendant's.  *See* 12 U.S.C. § 5565(c).  While the requested
civil penalties are steep, the fact that the penalties are statutorily authorized weighs
heavily against finding that they are grossly disproportional.  *See Murphy*, 50 F.4th
at 849–50.  Here, the nature and extent of Defendant's violations of the TSR and CFPA
support such penalties.  Defendant's recklessness in violating the law contributed to the
direct losses of over $95 million to over 80,000 consumers.  Moreover, while the
Ninth Circuit has not had the opportunity to evaluate the civil penalties authorized
by 12 U.S.C. 5565(c) under the Eighth Amendment, it has recently instructed a
district court to impose the same second-tier penalties against a similarly situated
defendant, implicitly suggesting that such civil penalties are constitutional.  *See
CashCall*, 35 F.4th at 749.  Accordingly, the Court determines that the civil
penalties are not excessive.

## 2.  Calculation of Civil Penalties

First, Defendant's argument that Plaintiffs have not shown violations "on each
of the 1,449 days" for which Plaintiffs seek a penalty is unavailing.  The CFPA
provides for a penalty to be charged "for each day during which such violation
continues." 12 U.S.C. § 5565(c)(2)(B).  The statute does not require a showing that a
violation occurred every day.  *See id.*; *see also Consumer Fin. Prot. Bureau v.
CashCall, Inc.*, No. 15-CV-7522-JFW (RAOx), 2023 WL 2009938, at *4 (C.D. Cal.
Feb. 10, 2023) (noting that Ninth Circuit did not disturb calculation of 773 day
effective date for calculating civil penalty under 12 U.S.C. § 5565, a time period which
similarly did not exclude weekends and holidays).  The Court determines that the use
of 1,449 days to calculate the civil penalties is therefore correct.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  SACV 19-1998-MWF (KSx)              **Date:  July 7, 2023**
**Title:**      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
              Center Inc. et al.

Next, Defendant seeks mitigation of the civil penalties.  In assessing penalties,
the CFPA requires courts to "take into account the appropriateness of the penalty with
respect to" the following factors: (1) the size of the financial resources and the good
faith of the person charged; (2) the gravity of the violation; (3) the severity of the risks
to or losses of the consumer; (4) the history of previous violations; and (5) such other
matters as justice may require. 12 U.S.C. § 5565(c)(3).

After consideration of Defendant's conduct, the Court concludes that the
statutory factors do not warrant a more lenient penalty.  As noted above, Defendant
acted with sufficient control and involvement in the Company to be considered to act
at least recklessly.  The gravity of the violation and severity of losses of the consumer
are large as over 80,000 consumers lost a combined $95 million because of the
Company violations.  Additionally, with respect to previous violations, Defendant
executed a stipulation in a California bar disciplinary proceeding in which he admitted
to collecting fees from a consumer in 2015 through CAC for purported loan
modification services that were never rendered.  (Pltf. Exhibits, Ex. 13.3; Plaintiffs
Exhibits 94–98 (Docket No. 444-2), Ex. 95 at 1403–08).

This conduct is similar to Defendant's TSR violations, is illustrative of
Defendant's bad faith, and suggests mitigation is unwarranted.  Defendant raises his
inability to pay such fines (Opposition at 16–17), but this does not appear to be a
mitigating factor the Court is required to consider.  *See* 12 U.S.C. § 5565(c)(3).
Regardless, the Court previously determined there was clear and convincing evidence
that Defendant has significant undisclosed cryptocurrency assets.  (*See* Order Holding
Kaine Wen in Civil Contempt (Docket No. 418)).  The Court therefore concludes there
is no basis for mitigating the civil penalties sought against Defendant.  *See Consumer
Fin. Prot. Bureau v. Morgan Drexen, Inc.*, No. 5:13-CV-1267-JLS (JEMx), 2016 WL
6601650, at *3 (C.D. Cal. Mar. 16, 2016) (declining to mitigate $40 million penalty
absent evidence of mitigating factors).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** SACV 19-1998-MWF (KSx)        **Date:** July 7, 2023
**Title:**    Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
             Center Inc. et al.

Accordingly, the Motion is **GRANTED** with respect to the civil penalties requested.

### D.    **Limitation of Damages**

Plaintiffs request redress to harmed consumers in the form of legal restitution, refunds, or damages pursuant to 12 U.S.C. 5565(a)(2).  (Motion at 31).

Under Ninth Circuit's "two-step burden-shifting framework for calculating restitution," Plaintiffs bear the burden at step one of "proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *CashCall*, 35 F.4th at 751 (internal citation and quotations omitted).  If a plaintiff meets the step one burden, "the burden shifts to the defendant to demonstrate that the net revenues figure overstates the defendant's unjust gains."  *Id.*

Plaintiffs argue that they meet the step one burden by establishing Defendant's "net revenues"—that is, "the amount consumers paid for the product or service minus refunds and chargebacks."  (Motion at 31 (quoting *CashCall*, 35 F.4th at 751)).  In particular, Plaintiffs contend they have established that the Company collected $95,057,756.92 in fees from consumers subjected to the deceptive practices of the enterprise.  (UF ¶ 212).  Plaintiffs base this figure on the calculations performed by Bureau's forensic accountant, Mansour Heidari.  (Exhibits 12-35, Ex. 12).  Mr. Heidari reviewed defendants' Debt Pay Pro records which contained 913,018 transactions and 33,884 refund transactions.  (*Id.* ¶ 4).  After removing errant entries, Mr. Heidari reached the restitution figure by summing all fees charged to defendants' consumers and subtracting all refunds issued to the consumers.  (*Id.* ¶¶ 4–7).  The calculations are summarized in the following table:

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

Appendix B

| Year | Number of Fee Transactions | Fees Charged to Consumers | Number of Refund Transactions | Fees Refunded to Consumers | Fees Refunded as % of Fees Charged | Net of Fees Charged Less Refunded |
|---|---|---|---|---|---|---|
| 2015 | 67 | $ 23,884.77 | 2 | $ 533.00 | 2.23% | $ 23,351.77 |
| 2016 | 12,267 | $ 2,632,227.59 | 94 | $ 27,509.16 | 1.05% | $ 2,604,718.43 |
| 2017 | 107,455 | $ 14,801,645.21 | 3,195 | $ 901,503.40 | 6.09% | $ 13,900,141.81 |
| 2018 | 355,422 | $ 44,859,615.83 | 14,821 | $ 4,530,198.53 | 10.10% | $ 40,329,417.30 |
| 2019 (Jan-Oct) | 437,807 | $ 43,770,729.11 | 15,772 | $ 5,570,601.50 | 12.73% | $ 38,200,127.61 |
| Totals | 913,018 | $ 106,088,102.51 | 33,884 | $ 11,030,345.59 | 10.40% | $ 95,057,756.92 |

(*Id.*, App. B).  Plaintiffs argue Defendant has not shown this amount overstates the
defendants' unjust gains and note that Defendant is jointly and severally liable for this
amount due to his CFPA and TSR violations.  (Motion at 32).

        Defendant argues that the amount of damages sought must be limited under *Liu
v. SEC*, 140 S. Ct. 1936 (2020).  (Opposition at 21).  In *Liu*, the Supreme Court
considered the bounds of "equitable relief" that a district court can grant under the
Securities Exchange Act of 1934.  *See id.* at 1940; 15 U.S.C. § 78u(d)(5) ("In any
action or proceeding brought or instituted by the Commission under any provision of
the securities laws, . . . any Federal court may grant . . . any equitable relief that may be
appropriate or necessary for the benefit of investors.").  There, the defendants had
solicited foreign investment in the construction of a cancer-treatment center and
misappropriated much of the funds.  *See id.* at 1941–42.  The district court, pursuant to
Section 78u(d)(5), ordered the disgorgement of the total amount that the defendants
had raised.  *See id.* at 1942.  The Supreme Court vacated the order, holding that the
equitable principles underlying Section 78u(d)(5) required the district court to deduct
from the disgorgement award the portion of investment monies that were put towards
legitimate business expenses.  *See id.* at 1950.  It remanded the case so that the district
court could determine whether some of the defendants' expenses, including those that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023

Title:     Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
           Center Inc. et al.

went towards lease payments and cancer-treatment equipment, constituted legitimate
business expenses that should be deducted from the final award.  *Id.*

    Relying on a Seventh Circuit case interpreting *Liu*, Defendant argues that the
Court will be in error if it orders restitution based on "net revenues" instead of "net
profits."  (*Id.* at 23–25 (citing *Consumer Fin. Prot. Bureau v. Consumer First Legal
Grp., LLC*, 6 F.4th 694, 710 (7th Cir. 2021)).  Defendant notes that Plaintiffs have
already recovered in excess of $25 million by way of settlements and judgments, and
over $3 million from Defendant and his mother.  (*Id.* at 25).

    Plaintiffs argue that Defendant is jointly and severally liable with the Company
for the full $95,057,756.92 in legal restitution, refund of moneys, or damages.  (Reply
at 17 (citing 12 U.S.C. § 5565(a)(1), (2)(B)-(C), (E) (specifically authorizing these
forms of relief); *FTC v. Com. Planet, Inc*., 815 F.3d 593, 600-01 (9th Cir. 2016) ("If an
individual may be held personally liable for corporate violations of the FTC Act under
this test, nothing more need be shown to justify imposition of joint and several liability
for the corporation's restitution obligations."), *abrogated on other grounds by AMG
Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021).  Plaintiffs contend that Defendant's
argument that restitution based on net revenues would overstate his unjust gains is
foreclosed by the Ninth Circuit's holding in *CashCall*.  (*Id.*).

    In *CashCall*, the Ninth Circuit held that that "restitution may be measured by the
full amount lost by consumers rather than limiting damages to a defendant's profits."
*CashCall*, 35 F.4th at 751.  The Ninth Circuit concluded that while "[p]erhaps net
revenues would overstate [a defendant's] unjust gains," "that was [the defendant's]
burden to prove."  *Id.*

    The Court agrees that the Ninth Circuit's recent holding in *CashCall* permits a
restitution reward measured by net revenue.  Indeed, such a measure appears
appropriate here because it is in accord with the stated objectives of the CFPA:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
              Center Inc. et al.

> "One of the [CFPA]'s express objectives is to ensure that 'consumers are
> protected from unfair, deceptive, or abusive acts and practices.'"   12
> U.S.C. § 5511(b)(2).  Another is to promote transparency in the markets
> for consumer financial products and services. *Id.* § 5511(b)(5).  The statute
> authorizes the Bureau to initiate civil litigation and seek remedies to
> achieve those objectives. *See id.* §§ 5531, 5564(a).  Restitution is one of
> those remedies, and it serves to ensure that consumers are made whole
> when they have suffered a violation of the statute. *See id.* § 5565(a)(2).

*Id.* at 750.  Here, a measure of restitution based on net revenues, as opposed to a
measure of net profits, is necessary to make consumers whole and effectively protect
consumers from unfair, deceptive, or abusive acts.  *See id.* at 751 (quoting *CFTC v.
Crombie*, 914 F.3d 1208, 1216 (9th Cir. 2019) ("there are instances in which a
defendant does not ultimately reap any profits from his wrongful conduct, and others
where even though the defendant obtained some profit, the 'loss suffered by the victim
is greater than the unjust benefit received by the defendant.' ")).  Defendant has not
provided any evidence that a different measure of restitution would adequately make
consumers whole.

Additionally, because Plaintiffs seek legal restitution, *Liu* and the Seventh
Circuit decision interpreting *Liu* as governing all forms of equitable relief are not
relevant here.  *See CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636, at *2
(9th Cir. Dec. 27, 2022) (holding *Liu* inapplicable because "[t]he district court awarded
'legal restitution'").  Also, Plaintiffs state that the Bureau is "not seeking double
recovery and will not seek to recover any amounts that the Bureau  receives or has
received through other judgments."  (Motion at 32 n. 11).

Accordingly, the Motion is **GRANTED** with respect to Plaintiffs' request for
$95,057,756.92 in legal restitution.  Any amount contributed as restitution by other
defendants will reduce Defendant's total liability by the same amount.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)                Date:  July 7, 2023
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

## E.    Injunctive Relief

A permanent injunction is justified where there is "some reasonable likelihood of future violations." *See CFPB v. Chou Team Realty LLC*, No. 8:20-cv-00043-SB (ADSx), 2021 WL 4077110, at *5 n.6 (C.D. Cal. Aug. 10, 2021), *aff'd sub nom. CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636 (9th Cir. Dec. 27, 2022).  Such relief can include "fencing in" provisions such as industry bans so long as they reasonably relate to the subject unlawful practices. *Chou Team Realty,* 2021 WL 4077110, at *5 n.6*; Nesheiwat,* 2022 WL 17958636, at *3 (affirming ban on engaging in debt relief, mortgage loans, telemarketing, and obtaining consumer data).

Plaintiffs seek injunctive relief prohibiting Defendant permanently from:  (1) advertising, marketing, promoting, offering for sale, selling, or providing any consumer financial product or service, or assisting others in the same; (2) using consumer information obtained through the subject debt relief services; (3) attempting to collect, sell, assign, or otherwise transfer any right to collect payment from any consumer who purchased or agreed to purchase a debt-relief service from any Defendant; and (4) violating the federal and state laws that form the basis for the Plaintiffs' claims set forth above.  (Motion at 28).

Defendant argues that Plaintiff is not entitled to these additional non-monetary requirements set out in the Proposed Final Judgment (Docket No. 423-7).  (Opposition at 25).  In particular, Defendant raises issues with injunctive relief that permanently restrains Defendant from work involving a "Consumer Financial Product or Service."  (Proposed Final Judgment ¶ 59).  Similarly, Defendant objects to the proposed requirements that Defendant:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:     Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
           Center Inc. et al.

- Turn over cryptocurrency assets held at certain addresses which Defendant maintains he does not have access to.  (*Id.* ¶ 67).
- Turn over and notify Plaintiffs of any tax credit or deduction Defendant receives.  (*Id.* ¶ 68).
- Provide ongoing cooperation, information, and evidence in this and related cases.  (*Id.* ¶¶ 104–106).
- Submit compliance reports, permit interviews of people affiliated with Defendant, and other submit to other compliance monitoring.  (*Id.* ¶¶ 107–110).

While injunctive relief should not be "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), a court is "not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past," *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (quotation omitted).

Here, the Court determines that most of the broad injunctive relief sought it appropriate.  Section III of the Proposed Judgment, which prohibits Defendant from, directly or indirectly, advertising, marketing, promoting, offering for sale, selling, or providing any consumer financial product or service.  Courts may grant "fencing in" relief that goes beyond the particular "product or group of products" involved in the violation, particularly where, as here, the defendant's unlawful conduct is "easily transferable" to other markets.  *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370-72 (9th Cir. 1982) (quotation omitted).  The Ninth Circuit recently affirmed similar broad fencing-in relief where a defendant engaged in  "acted in blatant and utter disregard of the law." *Nesheiwat,* 2022 WL 17958636, at *3.  Here, Defendant similarly played an essential role facilitating the Company's illegal conduct, took steps to conceal the conduct, intentionally destroyed evidence after being advised by counsel not to do so, and has obstructed litigation with his refusal to respond to or participate in discovery.  Given Defendant's willingness to ignore that law, it is appropriate for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  SACV 19-1998-MWF (KSx)              Date:  July 7, 2023
Title:       Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
             Center Inc. et al.

the Court to avoid future violations by banning Defendant from conducting any
business relating to any consumer financial product or service.  *Id.*

Additionally, the Court determines the compliance provisions in the Proposed
Final Judgment related to reporting (section XI), recordkeeping (section XIII), and
monitoring (section XVI) are appropriate.  Courts regularly impose these types of
provisions to ensure compliance with other provisions of the injunctions.  *See, e.g.,
FTC v. Mortgage Relief Advocates LLC*, 14-cv-5434-MWF, 2015 WL 11257575, at *9
(C.D. Ca. July 1, 2015) (monitoring); *see also FTC v. John Beck Amazing Profits LLC*,
888 F.Supp.2d 1006, 1016 (C.D. Cal. 2012) (reporting and recordkeeping).  Courts
have also prohibited defendants from obtaining or retaining any tax benefit because of
payments he makes to remedy harm caused to consumers.  *See e.g., CFPB
v. GST Factoring, Inc.*, 8:20-cv-01239, 2020 WL 13220063, at *5 (C.D. Cal. Dec.
3, 2020).  Similarly, courts have required these provisions for longer than five years
where, as here, the defendant has a history of prior violations.  *See, e.g.*, *John Beck
Amazing Profits*, 888 F.Supp.2d at 1016 (20 years).

However, the Court is not inclined to grant the injunctive relief with respect to
the provisions requiring Defendant's cooperation (Section XV).  The Court views these
as mandatory provisions which are insufficiently clear under Rule 65.  These
provisions could lead to endless litigation with respect to Defendant's 5th Amendment
rights and issues of contempt.

Accordingly, except for the requested relief in Section XV of the Proposed Final
Judgment, the Motion is **GRANTED**.  To the extent the Motion seeks relief that defers
or exceeds the scope of this Order, the Motion is **DENIED**.

V.    **CONCLUSION**

The Motion is **GRANTED** in all respects, except for the relief requested in
Section XV of the Proposed Final Judgment.  The Court determines that the requested

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** **SACV 19-1998-MWF (KSx)**          **Date:  July 7, 2023**
Title:      Bureau of Consumer Financial Protection et al. v. Consumer Advocacy
            Center Inc. et al.

civil money penalties, legal restitution, and remaining injunctive relief are appropriate remedies here.

A separate judgment and permanent injunction shall issue.

IT IS SO ORDERED.