

Logan D. Smith (SBN 212041)
lsmith@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Attorneys for Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; et al.,<br><br>Defendants. | Case No. 8:19-cv-01998-MWF (KSx)<br><br>**RECEIVER'S RESPONSE TO DEFENDANT KAINE WEN'S SUPPLEMENTAL MEMORANDUM**<br><br>JUDGE: Hon. Michael W. Fitzgerald<br>CTRM:  5A |

The receiver Thomas W. McNamara ("Receiver") responds to the "Supplemental Memorandum" offered by Defendant Kaine Wen (ECF No. 508) to the Receiver's August 18, 2023 OSC Contempt Motion against Wen (ECF No. 465) for his failure to turn over virtual currency assets.  Wen's latest filing is just another unsupported excuse for his non-compliance with the Court's judgment requiring he transfer millions of dollars in cryptocurrency assets.  Once again, Wen offers nothing but an improbable tale – there is no contemporaneous evidence (emails, texts, voicemails, paper records, accounting ledgers, account statements, etc.) offered to support his assertions.  But Wen's own testimony is not credible or sufficient to excuse obvious violations of the Court's order.  He has a demonstrated

1  history of falsity when it comes to his assets,[1] and there is no reason to accept his

2  latest story.  The Receiver respectfully requests that Wen be held in contempt for

3  his failure to comply with the Court's Final Judgment.

4                                    **INTRODUCTION**

5          Sections 67(c) and 67(d) of the Final Judgment are clear and unambiguous:

6  Wen was specifically ordered to turn over "all bitcoin held at the following bitcoin

7  addresses as of the date of this Order: [listing the 25 bitcoin addresses identified in

8  the Clegg Report]; and all ether held at the following ether addresses as of the date

9  of this Order [listing the two ether addresses identified in the Clegg Report].

10  ECF No. 456 at 20.[2]  Second, the proof of Wen's failure to turn over these assets is

11  clear and convincing.  This is undisputed.

12  _____

13  [1] It is worth remembering that Wen's history of failing to disclose his
    cryptocurrency assets dates back to the very beginning of this case.  Indeed, on
14  November 1, 2019, Wen completed an Individual Financial Statement **under oath**,
    which included an explanation of the "Penalty for False Information," and detailed
15  the elements and penalties of several relevant criminal statutes, 18 USC § 1001,
    18 USC § 1621, 18 USC § 1623, and 18 USC § 3571.  Despite these clear
16  warnings, when asked to "List all other assets not identified above, held by you . . .
    including cryptocurrency and other virtual currencies," Wen answered "NONE."
17  We know this answer to be false based not only on the unhosted cryptocurrency,
    which the CFPB found, but also based on the hosted cryptocurrency that Wen was
18  forced to identify and ultimately turn over to the Receiver.

19  One year later, in October of 2020, Wen amended his financial disclosures, but
    made no mention of holding any cryptocurrency.  It was only in December of
20  2020, when he was confronted by the CFPB with evidence that Wen held
    cryptocurrency, that he admitted to owning any cryptocurrency.  In his December
21  17, 2020 Amended and Corrected Individual Financial Statement, executed under
    oath, which again had explicit references to the penalties for false statements under
22  18 USC § 1001 and 18 USC § 3571, Wen indicated for the first time that he held
    $700,000 in Ethereum and $230,000 in Bitcoin.  But Wen claimed the Bitcoin
23  "does not belong to me but belongs to Sea," whom Wen identified as a
    "lender/creditor," and claimed the amount of the cryptocurrency was
24  approximately $230,000.

25  Wen's willingness to provide false sworn statements on his assets is relevant as the
    Court considers the veracity of the explanation he now asks the Court to accept.

26  [2] The Receiver has focused on the essential area of non-compliance, which is the
    failure to turn over the cryptocurrency assets.  The failure to turn over other assets
27  (such as the Escher prints) are also violations of the Final Judgment, but the
    Receiver's motion is focused on the most material of Wen's violations, his
28  continued failure to turn over the cryptocurrency assets.

The only remaining issue for contempt is whether Wen should be excused from his undisputed noncompliance.  The only way under the law for Wen to be excused from compliance is for him to satisfy **his burden** of demonstrating clearly that compliance is impossible.  *See Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983) (contemnors have burden to show categorically and in detail why they are unable to comply with court's orders); *United States v. Ayres*, 166 F.3d 991, 994 (9th Cir. 1999) (once prima facie showing is made, burden shifts to contemnor to "produce evidence explaining … noncompliance").  In short, Wen must provide evidence that he has diligently attempted to comply in a reasonable manner, but cannot do so.

"The district court has wide latitude in deciding whether there has been contemptuous defiance of one of its orders."  *Pongsai v. Am. Express Co.*, 2020 WL 6115086, at *1 (C.D. Cal. Aug. 27, 2020) (quoting *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983).  In assessing Wen's purported reasons for noncompliance, the Court may consider his history of non-compliance in this case and the extent to which he has failed to comply during the pendency of the contempt motion.  *See Stone v. City of San Francisco*, 968 F.2d 850, 856-57 (9th Cir. 1992).

Wen requests that he be excused from compliance, but has not offered any contemporaneous evidence to meet his burden.  Instead, Wen offers only an unbelievable tale.  Then, he superficially claims this "evidence" somehow shifts the burden back to the Receiver to prove that Wen can comply.  *See* ECF No. 508 at 23-24.  But, of course, that is not how it works.  The burden remains with Wen to show his compliance is not possible.  And his self-serving declaration fails to meet the burden.

///

///

///

# I.     ARGUMENT

## A.     Wen's Supplemental Memorandum Provides No Evidence

### 1.     <u>Wen Was Ordered to Turn Over Cryptocurrency in 27 Unhosted Wallets</u>

The briefing offered by Wen's latest counsel is filled with bravado and bluster, but it offers little that is new or different.  The Supplemental Memorandum fails to acknowledge Wen's conduct in this case.  Essentially, nothing has changed since the Court held Wen in contempt back in January of 2023.  (*See* ECF No. 418.)  At that time, the Court found that there was clear and convincing evidence that "it was highly probable that Wen controlled undisclosed cryptocurrency accounts."  (ECF No. 418 at 10.)  With respect to these very assets, the Court held Wen "has refused to identify and transfer assets from the 25 unhosted wallets with Bitcoin and 2 unhosted wallets with Ether attributed to him in Ms. Clegg's report," noting that "Wen's naked assertions that he does not own any bitcoin, does not control the addresses identified by Ms. Clegg, and cannot reach Sea who holds Ether for Wen does not 'categorically and in detail' document why he cannot comply."  (*Id.*)

In its January Contempt Order, the Court made clear that if Wen claimed he was unable to turn over all of the identified assets, he was to "describe, in detail, the specific steps" he took to do so.  (ECF No. 418.)  While Wen filed a "response" to the contempt order on January 17, 2023 (*see* ECF No. 420), the contempt was never purged.

Six months later, on July 7, 2023, the Court granted summary judgment against Wen, finding him liable for more than $95 million in consumer losses.  The Court ordered him to turn over all cryptocurrency identified in the Clegg expert report, and the Court specifically reaffirmed its conclusion that "there was clear and convincing evidence that Defendant [Wen] has significant undisclosed

///

cryptocurrency assets" in its order on the CFPB's motion for summary judgment (ECF No. 455 at 23) and in the Final Judgment (ECF No. 456).

Since that time, Wen has never identified or transferred any of these assets, as was ordered (which the Receiver calculates to be worth tens of millions of dollars, and perhaps more than fifty million dollars). Instead, Wen has continued to "naked[ly] assert[]" that he does not own or control the Bitcoin and Ether in the 27 unhosted wallets attributed to him in Ms. Clegg's report. To date, Wen has offered the Court several briefs and/or declarations, none of which comes close to meeting his burden (*see* ECF Nos. 420, 467, 470, 500 & 508-1). Wen's noncompliance forced the Receiver to move for contempt in August of 2023. (ECF No. 465.)

        2.   <u>Wen's Latest Brief and Supporting Declarations Has No Actual Evidence</u>

        *a.*   *Wen's Third Supplemental Declaration*

In this latest filing, Wen's new attorneys (his former criminal counsel) submitted a 20-page brief (ECF No. 508), along with three supporting declarations – Wen's own "Third Supplemental Declaration" (ECF No. 508-1), his counsel's declaration (ECF No. 508-2), and his sister's declaration (ECF NO. 508-3). Despite the volume of new materials, they offer no real proof that Wen cannot turn over some or all of the virtual currency held in the 27 unhosted wallets.

Wen's latest filing looks very much like his initial responsive brief to the Court's January 2023 contempt order (ECF No. 420) and is no more persuasive now than it was two years ago. As he did before, in his Third Supplemental Declaration, Wen once again claims that he does not own or control any of the virtual currency (mostly Bitcoin) held in the unhosted wallets. The story offered by Wen remains replete with excuses. Insofar as we can follow the meandering tale, Wen claims he lost most of his Bitcoin and Ethereum by (1) gambling, (2) investing in unidentified high risk Initial Coin Offerings, which lost money or were

frauds, (3) entering into unspecified transactions with nameless "Online Gaming Acquaintances," and (4) entering into transactions with his mysterious cryptocurrency partner known only as "Sea," who only reads and writes Chinese and speaks Mandarin. (*See generally* ECF No. 508-1.) Wen provides no contemporaneous records tracing the money or anything showing what he previously owned or how he squandered it.

According to Wen, he never had control of his cryptocurrency, apparently leaving the mysterious "Sea" in charge of some of it, and he didn't keep records. He simply trusted unnamed online people that he didn't know with millions of dollars in cryptocurrency. For instance, "I have never known [Sea's] actual name or his phone number, email address, or other contact information. I communicated exclusively using the WeChat App." (*Id.* ¶ 63.) According to Wen, Sea and he "kept our accountings in private chats so there was a mutually-shared transaction history, and we could refer to those transactions in case there were any discrepancies." (*Id.* ¶ 65.) "*Sea never gave to me, and I have never known, any password, pin, or key for any of his ether wallets. As a consequence, I have never had the ability to gain access to his ether wallets or any ether in them.*" (*Id.* ¶ 66) (emphasis added). Also according to Wen, he has not communicated online, or otherwise with Sea or other unnamed "Online Gaming Acquaintances" for several years." (*Id.* ¶ 67.)

Incredibly, Wen claims that all evidence to establish any of the above is now lost forever, and there is not even a way for him to contact Sea or any of the other unnamed "Online Gaming Acquaintances" with whom he claims to have "traded," "transferred," "loaned," and "borrowed" his cryptocurrency. (*Id.* ¶¶ 105-106.) Most significantly, according to Wen, there is now no way for him to get access to any of these 27 unhosted wallets. For instance, Wen claims that while he was in prison, "my cell phone was lost or stolen. I was never able to recover it. I tried several times to get into WeChat so I could reset the password, but I was not able

1  to do so.  I also tried but was unable to retrieve my login credentials through the

2  WeChat account recovery function.  In addition, I searched online for Sea by his

3  Chinese nickname, but found nothing related to him.  In short, I have no way to

4  contact Sea." (*Id.* ¶ 68.)

5      *It is simply incredible that Wen had millions of dollars in cryptocurrency*

6  *transactions and somehow does not have a single digital or paper record to show*

7  *for it, much less any ability to access this cryptocurrency.  It is incredible that Wen*

8  *cannot locate any of the cryptocurrency in even one of the 27 unhosted accounts*

9  *identified by Ms. Clegg.  It is incredible that Wen cannot contact even one of his*

10  *so-called unnamed "Online Gaming Acquaintances."*

11      But that is what he repeatedly asks the Court to believe.  (*See id.* ¶ 114,

12  ¶ 116 & ¶120) ("…  I did not keep records of the bitcoin addresses I used or

13  transacted business through (I cannot recall the addresses from memory…  I did

14  not keep records of the virtual currency addresses I used or transacted business

15  through…  "…I did not keep records of the bitcoin addresses I used or transacted

16  business through (and I cannot recall the addresses from memory so many years

17  later).").  And Wen often goes a step further, asking the Court to believe that even

18  if he was somehow able to gain access to the cryptocurrency, he is not sure how

19  much, if any, he actually owns of it, given all of the Wild West trading and

20  transferring he did with it.  (*See, e.g., id.* ¶¶ 108-110) ("[W]e often helped each

21  other out by sending funds to online gaming sites or to other players, paying

22  gambling losses, receiving gambling wins, loaning funds to others, and receiving

23  loans from one another…  Any bitcoin that might remain at any address that was

24  provided to me, therefore, belongs to others and cannot belong to me.").

25      As discussed below, Wen cannot be taken at his word, given his track

26  record.

27  ///

28  ///

b.    *The Declaration by the Wen's Sister*

Apart from his own word, the only other "evidence" offered by Wen is contained in the declarations of his sister and his attorney.  Neither provides any evidence supporting Wen's claims.

The declaration of Wen's sister, Diana Dai, does not address his obligations to turn over the cryptocurrency, nor does it provide evidentiary support to meet his burden to show it is impossible for him to comply with the Court's Order.  Instead, Ms. Dai provides background on her brother and their upbringing (*e.g.*, ECF No. 508-3 ¶¶ 9-17) and discusses his current circumstances.  (*Id.* ¶¶ 30-32.)  She appears to be a kind and supportive sister.  However, the information she provides has no relevance whether Wen controls the cryptocurrency in unhosted wallets.

Curiously, Wen's new counsel argues that his sister's testimony that Wen earns minimum wage and cannot afford to meet his restitution obligations or pay rent without assistance from his mother, sister, and a friend confirms that he cannot satisfy his obligations to comply with turning over his cryptocurrency.  But Wen's current financial circumstances provide no proof concerning his control of the cryptocurrency held in unhosted wallets.

c.    *The Declaration by Wen's Attorney*

The sworn testimony of Wen's attorney, Jeffrey Isaacs, fares no better. Isaacs provides a recitation of his former representation of Wen in connection with Wen's criminal case, a report of Wen serving his time honorably, and his compliance with supervised release.  (ECF No. 508-2 ¶¶ 4-14.)  This information is irrelevant and has nothing to do with whether Wen has met his obligations to turn over any of the missing cryptocurrency assets.  The second half of Isaacs's declaration includes only legal arguments and opinions critiquing the Plaintiffs' expert Pamela Clegg.  For instance, attorney Isaacs opines that the analytics tool used is unreliable, and the report is based on materially erroneous assumptions. (ECF No. 508-2 ¶¶ 15-29.)  As discussed more fully below, the legal challenges to

the Clegg Report do not assist Wen in meeting his burden to show that he does not

control the cryptocurrency.  Such opinions and legal arguments are obviously

improper in an attorney's declaration.[3]

### B.    Wen Cannot Be Trusted In Light of His History of Violating Court Orders and Contempt

Wen's egregious conduct in this case provides no basis to trust what he says

now.  It includes a history of non-compliance with Court Orders, contempt, and a

lack of candor regarding his assets generally and his cryptocurrency specifically.

The Court is especially aware of Wen's conduct, having been forced to invest so

much time and energy over many years with numerous rounds of OSC briefing and

hearings because of Wen's conduct.  The Court has specifically found clear and

convincing evidence that Wen has violated the Court's prior orders, including

violating the TRO and PI orders prohibiting Wen from transferring or dissipating

his cryptocurrency assets.  *See generally* ECF No. 418 (recounting history of

noncompliance).

The Court has previously held there was clear and convincing evidence of

Wen's significant cryptocurrency assets, despite his claims that he had limited

---

[3]Wen's counsel is transparently attempting to use his own attorney declaration to serve as an expert rebuttal opinion.  This is not permitted.  *See, e.g.*, *Pan v. State Farm Mut. Auto. Ins. Co.*, 2007 WL 1674448, at *8 (N.D. Cal. June 8, 2007) ("Because Dresser is also plaintiff's attorney, the court … strikes the portions [of his testimony] in which he opines on the standard of care…, specifically, paragraphs 25 to the extent that [attorney] Dresser opines as to adjusters' knowledge; paragraphs 27 and 31 to the extent they assert what constitutes unreasonable behavior by State Farm …"  "To the extent it has considered [attorney] Dresser's declaration, the court shall, however, consider its contents carefully, recognizing that it contains a significant amount of argument and legal conclusion."); *cf. Aguilera v. Unocal Corp.*, 2023 WL 6369701, at *5 (C.D. Cal. Aug. 14, 2023) ("[d]eclarations by attorneys are sufficient only if the facts stated are matters of which the attorney has knowledge, such as matters occurring during the course of the lawsuit ....") (quoting *Clark v. Cnty. of Tulare*, 755 F. Supp. 2d 1075, 1084 (E.D. Cal. 2010)).  As in *Aguilera,* Attorney Isaacs "does not adequately establish …, in his role as Plaintiffs' counsel, his personal knowledge of the factual matters to which he attests in his attorney declarations[,]" 755 F. Supp. 2d at 1084, such as Wen "borrow[ing]" and "trading" cryptocurrency to and from "others."  (ECF No. 508-2 ¶26.)

financial assets.  *See* ECF. No. 418 at 10.  Wen's latest filing by his new counsel conveniently disregards Wen's ignominious history of failing to disclose these assets dating back to the very beginning of this case, when Wen falsely provided the answer "NONE," under penalty of perjury, when specifically asked to identify any cryptocurrency assets in his financial disclosures.  Nor does counsel mention the fact that when Wen was ordered by this Court to detail his assets and transfers related to cryptocurrency, Wen refused to provide that information and instead invoked his Fifth Amendment privilege against self-incrimination.  *See* ECF 418 at 3-4 (citing ECF No. 365-4 & 365-6, Exhibit 9).

In light of his prior conduct in this case, his self-serving declaration unsupported by evidence should not be credited.

### C.    Wen Has No Incentive To Cooperate and Provide the Cryptocurrency

Given that Wen has repeatedly refused to come clean on his assets, the CFPB never settled the case with him but instead prosecuted the case through summary judgment against him (unlike every other defendant in the case).  This Court granted summary judgment to the Plaintiffs and entered a $95 million judgment against Wen.  But Wen's conduct intimates that he has no incentive to comply with the Final Judgment turnover order.  As of today's date, based on a review of available public sources, Bitcoin and Ether worth tens of millions of dollars is currently sitting in the unhosted accounts.  None of it has been transferred since the time of Wen's imprisonment in fall of 2021.  Wen has lived through criminal and this civil litigation for more than six years.  If he turns over the cryptocurrency, it does not help him.  The proceeds would go towards the enormous judgment entered by the Court.  *See* ECF No. 456.

On the other hand, if Wen can avoid contempt through a dog-ate-my-crypto tale, then he could bide his time in the hopes he can recover some or all of it down the road.  Wen, who is now in his 40s, can let the cryptocurrency sit for years if he

has to.  In the years and decades to come, it will be challenging to continue to monitor Wen and this cryptocurrency.  His behavior in this case to date is indicative of a fortitude and willingness to engage in a decades-long con job, if necessary, to prevent the money from being recovered by the CFPB for ultimate distribution to the victims.  The Receivership must ultimately close; the agency will move on to pursue other consumer frauds; and the Court will also need to close this case.

The Court previously observed the heightened concerns here with Wen's failure to turn over these particular cryptocurrency assets, because they are all held in ***unhosted wallets***.  The CFPB's expert witness (Pamela Clegg), described how cryptocurrency like this held in unhosted wallets would be more easily concealed, because only people with direct access to the unhosted wallets can control or confirm control of the cryptocurrency held at these addresses.  *See* Clegg Report (ECF Nos. 364-3, 365-3 ¶¶ 32-33).  As discussed below, Wen's recent challenges to the Clegg Report ignore the Court's prior reliance on the Clegg Report and provide no evidence or expert opinion to call it into question.

Coercing compliance is the Receiver's purpose in bringing an OSC Contempt Motion before the Court.  In light of the circumstances here – Wen's dubious explanations, lack of evidentiary support, and his pattern of contemptuous conduct and lack of candor in this case – the Court should find Wen in contempt for failing to comply with the Final Judgment.  Relatedly, the Receiver recommends that the Court's existing contempt dating back to January 2023 not be lifted.  Wen should remain ordered to turn over these million dollars in cryptocurrency assets, which should be used to fund consumer redress.

### D.    The Court Previously Relied on the Clegg Report

The CFPB's expert witness, Pamela Clegg, a Certified Anti-Money Laundering Specialist, determined that Wen most likely controlled digital currency at 25 unhosted Bitcoin addresses and 2 Ethereum addresses.  *See* Clegg Report,

ECF No. 364-3 ¶¶ 116-119; ECF No. 418 at 7-8.  Wen faults the Receiver for not
introducing the Clegg Report as evidence in support of his contempt motion.  This
is a contempt proceeding in an equitable receivership; thus, the Court may of
course consider this evidence in the context of its "extremely broad" authority "to
supervise an equity receivership and to determine the appropriate action to be
taken in [its] administration[.]"  *S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir.
1986).

Furthermore, Wen fatally ignores the fact that the Court has explicitly relied
on the Clegg Report previously as a reliable evidentiary source: the Court
specifically ordered that Wen turn over all of the cryptocurrency in 27 unhosted
wallets identified in the Clegg Report in the Final Judgment.  (ECF No. 456.)
Given the Court's clear and unambiguous requirement to turn over **all** Bitcoin and
Ether held in the 27 unhosted wallets specifically identified by Ms. Clegg—there is
no reason to doubt these conclusions.[4]  (ECF No. 456 at 20-21.)  And Wen has not
offered any evidentiary basis to conclude otherwise.

The Court already credited the Clegg Report as reliable evidence (*see id.*
¶ 66),[5] and Wen's belated, half-hearted challenge to the CFPB's expert testimony
is without basis.  Wen offers no actual expert declaration; instead, incredibly, he
provides his own attorney's declaration, which cannot be a source of evidence.
Beyond being facially improper, though, the Isaacs declaration is mostly filled with

---

[4] Additionally, the Court also previously found that there was clear and convincing
evidence that Wen violated previous court orders because "it was highly probable
that Wen controlled undisclosed cryptocurrency accounts." (ECF No. 418 at 10.)
In reaching that finding, the Court specifically relied on Clegg's detailed expert
declaration, showing that Mr. Wen controlled unhosted cryptocurrency assets that
he was ordered by the Court to turn over in the Final Judgment. *See id.* ¶¶ 116-
119.  As of the date of her report, Ms. Clegg identified that Mr. Wen most likely
controlled digital currency at 25 unhosted Bitcoin addresses and 2 Ethereum
addresses. *See id.* ¶¶ 116-119; ECF No. 418 at 7-8.

[5] Clegg also concluded the Wen likely used aliases to control certain accounts.
Also, Clegg found that Wen likely controlled several accounts that he had not
disclosed, from which significant withdrawals had been made in 2022.  (Clegg
Report, ECF No. 364-3, ¶¶ 67, 71–113.)

his own speculation and does nothing to rebut the substance of the Clegg Report, including its inescapable conclusion that Wen likely controls the cryptocurrency. Instead, Isaacs simply restates Wen's unsupported factual assertions.  For instance, he attests that the Clegg Report "is based upon several materially erroneous and incomplete assumptions, because the expert failed to take into account, among other things, the facts that Wen "borrowed," "traded," "transferred," and "loaned" cryptocurrency for unnamed "others."  ECF No. 508-2 ¶ 26.  Wen's fanciful story does not get any better just because it is repackaged in the guise of an "attorney declaration."

But Isaacs's acceptance and repetition of what Wen told him does not qualify as evidence.  Just like Wen did before him, Isaacs provides no concrete evidence to support any of these supposed facts.  And, of course, despite Wen and his latest attorney's most recent efforts to retell his tall tale, there is still no independent corroborative evidence provided to support his assertions that he does not control the cryptocurrency and has no way of accessing it.  That is the key point, and one that Wen and his new counsel keep conveniently ignoring.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in prior briefing, the Receiver respectfully requests that Wen be held in contempt for his failure to comply with the Court's Final Judgment.[6]

Dated:  March 5, 2025                         MCNAMARA SMITH LLP


                                                    By:    /s/ Logan D. Smith
                                                    Logan D. Smith
                                                    *Attorneys for Receiver,*
                                                    *Thomas W. McNamara*

---

[6] Relatedly, it is the Receiver's position that the Court's Contempt Order dated January 6, 2023 ECF (No. 418) finding Wen in contempt has never been purged and should remain in place.

1

## **CERTIFICATE OF SERVICE**

2

3          I hereby certify that on the 5th day of March, 2025, I caused the foregoing to

4    be electronically filed with the Clerk of the Court using the CM/ECF system, which

5    will send notification of the filing to all participants in the case who are registered

6    CM/ECF users.

7

8     /s/ Logan D. Smith
      Logan D. Smith
9     *Attorney for Receiver,*
      *Thomas W. McNamara*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28